UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

**05 11579 EFH**

CIVIL ACTION NO.

MAURICE LARIVIERE, )
    Plaintiff )
     )
     ) RECEIPT # 65908
vs. ) AMOUNT $250
     ) SUMMONS ISSUED N/A
JOSEPH SOLOMON, Individually, and as ) LOCAL RULE 4.1
Chief of Police of the City of Methuen, ) WAIVER FORM
JOSEPH ALAIMO, Individually and as ) MCF ISSUED
Deputy Chief of Police of the City of Methuen, and ) BY DPTY. CLK.
THE CITY OF METHUEN ) DATE
    Defendants )
_____ ) MAGISTRATE JUDGE

## NOTICE OF REMOVAL PURSUANT TO 28 U.S.C. §1441(a)

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS:

Defendants Joseph Solomon, Joseph Alaimo and the City of Methuen give notice to this

Court of the removal of the above-entitled action to the United States District Court for the

District of Massachusetts, Civil Section, from the Essex County Superior Court and for their

Notice of Removal state:

1.    Joseph Solomon, Joseph Alaimo and the City of Methuen are named as

Defendants by Plaintiff Maurice Lariviere in a civil action entitled <u>Maurice</u>

<u>Lariviere v. Joseph Solomon, Individually and as Chief of Police of the City of</u>

<u>Methuen, Joseph Alaimo, Individually and as Deputy Chief of Police of the City</u>

<u>of Methuen, and the City of Methuen,</u> Essex County Superior Court Docket No.

SUCV2005-1155C. <u>See</u> Verified Complaint, attached as Ex. A.

2.      On July 7, 2005, Defendant City of Methuen was served with a Summons and
        copy of the Verified Complaint. The City of Methuen has not yet answered the
        Verified Complaint, nor has an appearance been filed on its behalf.

3.      On or about July 11, 2005, Defendant Joseph Solomon was served with a
        Summons and copy of the Verified Complaint. Mr. Solomon has not yet
        answered the Verified Complaint, nor has an appearance been filed on his behalf.

4.      On or about July 11, 2005, Defendant Joseph Alaimo was served with a Summons
        and copy of the Verified Complaint. Mr. Alaimo has not yet answered the
        Verified Complaint, nor has an appearance been filed on his behalf.

5.      This is a suit of a wholly civil nature filed in a Massachusetts state court. The
        action is pending in Essex County, Massachusetts and, accordingly, the United
        States District Court for the District of Massachusetts is a proper forum for
        removal. See 28 U.S.C. §§101 & 1441(a).

6.      The United States District Court has original jurisdiction over this action
        because the parties have diverse citizenship and the matter in controversy exceeds
        the sum or value of $75,000, exclusive of interest and costs. See 28 U.S.C.
        § 1332(a)(1).

7.      The plaintiff alleges that he is a resident of the State of New Hampshire. See Ex.
        A., ¶ 1.

8.      Defendant City of Methuen is a duly chartered Massachusetts municipality. See
        Ex. A, ¶4.

2

9.      Defendants Joseph Solomon and Joseph Alaimo are residents of the
        Commonwealth of Massachusetts. See Pl.'s Compl., ¶ 2-3.

10.     The plaintiff's Civil Action Cover Sheet filed with the Verified Complaint
        Plaintiff alleges damages of $788,000.00. See Civil Action Cover Sheet, attached
        as Ex. B. The matter in controversy as alleged by the Plaintiff exceeds the sum or
        value of $75,000, exclusive of interest and costs. The defendants deny that they
        are liable to pay the plaintiff any amount of damages alleged.

11.     The defendants file this Notice within thirty (30) days of service of the Summons
        and Complaint, within thirty (30) days of the date this action became removable,
        and within the time allowed to file this Notice. See 28 U.S.C. §1446.

12.     The defendants will file a Notice of Filing of this Notice of Removal and a copy
        of this Notice of Removal with the Clerk of the Superior Court of Massachusetts,
        County of Essex.

13.     Pursuant to Local Rule 81.1(a), the Defendants will ask the Clerk of the Essex
        County Superior Court to provide certified or attested copies of all records and
        proceedings in the state court and certified or attested copies of all docket entries
        therein, and will file the same with this Court within thirty days after the filing of
        this Notice of Removal.

3

WHEREFORE, defendants Joseph Solomon, Joseph Alaimo and the City of Methuen

give notice of removal of the present lawsuit from the Essex County Superior Court to this

United States District Court.

Respectfully submitted,

The Defendants,
JOSEPH SOLOMON, JOSEPH ALAIMO
and the CITY of METHUEN,
By their attorneys,

William P. Breen, Jr., Esq., BBO #558768
Rebecca L. Andrews Esq., BBO #644846
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02110
(617) 479-5000

Dated: July 27, 2005

4

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on this 27th day of July 2005, he served a copy of the foregoing document, via first class mail, upon the following:

Carmine W. DiAdamo
William H. DiAdamo
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840

William P. Breen, Jr.

5

### COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                        SUPERIOR COURT
                                                 CIVIL ACTION No. 05-1155C

| | |
|---|---|
| MAURICE LARIVIERE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| JOSEPH SOLOMON, individually, and as | ) **VERIFIED COMPLAINT** |
| Chief of Police of the City of Methuen, and | ) **(AND JURY DEMAND)** |
| JOSEPH ALAIMO, individually, and as | ) |
| Deputy Chief of Police of the City of Methuen, and | ) |
| THE CITY OF METHUEN | ) |
| | ) |
| Defendants. | ) |

### THE PARTIES

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire.

Until February 16, 2005, he was the city solicitor for the City of Methuen.

2.    Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen,

Massachusetts. At all times relevant hereto, he was the chief of police of the City of Methuen.

3.    Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen,

Massachusetts. At all times relevant hereto, he was the deputy chief of police of the City of

Methuen.

4.    The City of Methuen is a duly chartered city located in Massachusetts with a principal

place of business at 41 Pleasant Street, Methuen, Massachusetts.

## BACKGROUND

5.     The City Solicitor's position is a two-year appointment made by the City Council
pursuant to the Home Rule Charter of the City of Methuen. Lariviere had been reappointed by
the City Council ("the Council") in January of 2005.

6.     Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and
has continuously been reappointed by numerous administrations. No complaints whatsoever
have been lodged against him concerning inappropriate conduct with employees or staff.

7.     The Mayor appoints employees of the City Solicitor's office. At all times relevant
hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor").

### Relationship with the Mayor

8.     Since mid-2001, relations between the Mayor and Lariviere have been acrimonious,
upon information and belief because Lariviere was not appointed by, under the control of,
beholden to, or subservient to the Mayor.

9.     For example, the Mayor repeatedly became angry when Lariviere refused to disclose
to the Mayor confidential communications with city councilors. Lariviere's policy, as the City
Solicitor, was to keep his conversations with both councilors and the Mayor confidential.
Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or
the Mayor were kept confidential until the client went public with them. Lariviere would not
convey any information on the existence of the documents until the councilor or the Mayor
placed them on the agenda. The Mayor would often express disgust that she was not immediately
told when a councilor talked to Lariviere about any matters including resolutions or ordinances.

10.     In one instance, a council dispute erupted regarding raises being granted to
department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the
department heads of elder affairs and veterans, and not other department heads. In accordance

2

with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor. After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her. Lariviere responded that it had always been his policy to not breach attorney-client confidentiality, including not telling councilors when he did work for her. The Mayor then screamed over the phone "You scare me," and hung up.

11.    The Mayor also resented Lariviere because he wrote a report defending a political opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting her driveway and received a citation relating to the accident. After filing a complaint with the police claiming the citation was based on political retribution, the Mayor directed that Lariviere conduct a thorough investigation, which he did. Lariviere then wrote a report concluding that the Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the other driver.

12.    The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force Lariviere to change the report. Lariviere steadfastly refused, and the Mayor left the meeting angry and disgusted.

13.    On another occasion, Solomon ordered a police officer to appear at city hall on the night of a city Council meeting and issue tickets to persons parking in areas with signage limiting the time for parking. Two tickets were given out, one to a political opponent of the Mayor and the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police station and advised that the ticketing was illegal. Solomon relayed this to the Mayor and,

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The tickets were later withdrawn.

14.    In the eight years prior to the Mayor's election, insurance had been handled by the purchasing agent. Upon information and belief, the Mayor disliked the purchasing agent and forced her out of office, whereupon Lariviere took over the duties.

15.    In another matter, Lariviere sought information updates on the property insurance from various city departments and determined that there were numerous errors in the property schedule, including coverage for properties the city did not own, non-coverage for properties it did own and incorrect coverage for yet other properties. He then attempted to have the agency correct these errors. Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city. When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor.

16.    In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate.

### Metin Employment

17.    In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004.

4

18.    Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position, however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director.

19.    The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City.

20.    On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly. Metin started work as a temporary secretary on October 4, 2004.

21.    A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself.

22.    The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems.

23.    During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot.

24.    After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through

5

Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and including February 15, 2005.

25.     Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes and Noble, and D'Angelo's. Except for Starbucks, Lariviere had prior to this never been to these places. Lariviere and Metin took turns purchasing the food.

26.     In addition to going to lunch, they would go shopping at various stores including pet stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her daughter Christmas presents. All shopping expeditions, with one exception, were to purchase items Metin wanted to obtain.

27.     Metin advised Lariviere that as her marriage deteriorated and the violence got worse, she experienced psychological problems and began counseling. During this period she admitted having an adulterous affair with another man.

28.     Metin advised Lariviere that her husband didn't seem angry about the affair but thereafter they divorced.

29.     The husband had also taken their monies amounting to eighty thousand dollars and invested it in a restaurant.

30.     Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This occurred in approximately 1999.

31.     The husband after the divorce moved to Turkey where he is to this date. Since separation he has never provided her with any monies nor supported their child.

32.     At the time of the break-up of the marriage Metin was living on Long Island in New York. She had advised Lariviere she had problems keeping jobs and at her last employment she

6

was paid approximately thirty-five thousand dollars for an annual salary, which, according to
her, on Long Island constituted poverty.

33.    She admitted to Lariviere that while on Long Island things had gotten so bad that she
willfully borrowed money from people knowing she had no intent of repaying them and in fact
had already decided to flee New York.

34.    Facing no chance at being able to survive on Long Island she moved to Haverhill,
Massachusetts and began living with her mother and her mother's boyfriend Glenn.

35.    Shortly after Metin started, Lariviere contacted the Human Resources Director and
asked him to put on hold the job search for the litigation paralegal position to see if Metin would
work out. Metin had indicated that she would like the position.

36.    She indicated she very much liked working for Lariviere. She began to call him
"Archangel" saying he was helping to save her from her many problems. Their personal
relationship, formed primarily by her, was deepening. Anything that broadened the relationship
or personalized it was initiated by her.

37.    In late October, Lariviere agreed to recommend Metin for the secretary's position
upon her promising him to obtain a paralegal certificate and agreeing to his training her in a
paralegal role.

38.    Lariviere recognized that she was not qualified for the litigation paralegal position nor
for that of legal secretary, However, the pleasant relationship convinced him to offer her the
position on the hope of her being trained for it.

39.    Lariviere recommended hiring Metin full time to the Human Resources Director. The
Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to
hire her.

7

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job.

41.    Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency.

42.    The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood.

43.    Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee.

44.    Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues.

45.    During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either.

8

46.    Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations.

47.    Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter.

48.    She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff.

49.    At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner.

50.    The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere.

51.    Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate.

9

52.    Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym."

53.    In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined.

54.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site.

55.    She was and is engaged to a person named Anthony but said she was not sure if she wanted to marry him. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs.

56.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers.

10

57.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine.

58.    Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later.

59.    She went for further testing and the doctor confirmed that she had numerous ulcers.

60.    Lariviere and Metin occasionally exchanged emails on weekends. One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. On his birthday she gave him the present and they exchanged a hug and kiss.

61.    On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere.

62.    Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him.

63.    On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups.

64.    On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail.

11

65. In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time.

66. She would go to the gym two days a week and out to lunch with Lariviere two days per week.

67. In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan.

68. Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car.

69. The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi thanks for all your help" and she then proceeded to sign it "Kiss".

70. In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy."

12

71.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally.

72.    At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch.

73.    Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place."

74.    In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body.

75.    Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time.

76.    Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity.

77.    She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend.

78.    By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a

13

number of occasions Metin would in the midst of the fight take her daughter out of the home. One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them about the fighting and swearing leading to her fleeing the house that night.

79.    In early February the distraught Metin began showing signs of erratic behavior. For example, she would denounce her mother to Lariviere, but when Rana would call her on the cell phone, she would become a pleasant and loving daughter during the call and then immediately denounce her after the call terminated.

80.    On a personal level, the parties were not intimate, but mutually affectionate with much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya benefited greatly from the assistance she was getting in turning around her life problems.

February 15, 2005

81.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of Methuen*, in the Massachusetts Federal District Court, involving a claim that a Methuen police officer while on duty had taken a woman into custody and then raped her. He was later convicted of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache, was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the there had been a prior charge of rape made against Blache.

82.    As Metin knew, Lariviere worried about and lived this case day in and day out, knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a verdict against Methuen costing the taxpayers millions of dollars.

83.    This was one of the largest, most serious and most difficult cases Lariviere had ever handled. If lost, the effects on the Mayor, City Council, and police department could have been devastating.

14

84.     On January 27th, 2005 Lariviere appeared before Federal District Court Judge Stearns and argued his motion for summary judgment in favor of the City. On the afternoon of Feb. 15th, Lariviere learned that the judge had ruled in favor of the City and dismissed the case. An ecstatic Lariviere called the former Police Chief, Bruce McDougal who was in charge of the department when the rape occurred. Lariviere and McDougal knew each other for fifteen years but Lariviere's voice was so high and excited in the message left that McDougal could not even recognize Lariviere's voice. Ecstatic, Lariviere then went down and advised the Mayor's chief of staff of the victory. He then called and left cell phone messages for Solomon, and then for Metin, with whom he had discussed the subject many times. After going to the gym that night, Lariviere again called Metin to talk about the case.

85.     Unknown to Lariviere, during that time, Metin was apparently meeting with police lieutenant Michael Wnek and Solomon.

### February 16, 2005

86.     Lariviere arrived that morning and began working on a letter to send to the City Council outlining the victory in the Federal Court. He had never in his 25 years sent out a similar letter, but in his mind this extremely important victory had to be reported. He again called Solomon to talk to him about the court victory.

87.     Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go.

88.     A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office.

15

89.    Lariviere called Metin into his office and gave her a copy of the addresses of the councilors so that she could prepare mailing envelopes for them while he finalized the letter. She later asked him to email her the letter so she could reformat it. Metin asked about reformatting the letter and Lariviere said no he just wanted it on one page.

90.    She printed out one original copy and then left the solicitor's office and went to the council office to copy the letter.

91.    Metin returned and began the envelope process. Lariviere printed a copy of the Judge's decision and then went into her office to get it. Lariviere and Metin talked for a while about the case and then he picked up the decision and began to leave.

92.    As Lariviere went back to his office Metin called out, "You are a good attorney." Lariviere came back out and went around to the inside of her L-shaped desk. They talked about the case and his victory for a while.

93.    As she had done to him, he leaned over and kissed her on the cheek and then a peck type kiss on her lips. At this time she looked slightly downwards. He asked, "Are you ok?" She answered, "Yes, I am just tired." (This is something she often told him given the troubles at home and her lack of sleep.)

94.    Lariviere leaned over and with his right arm placed it on her left shoulder as a sign of support. He often told her, "I am there for you to help you, my friend." She talked to him for a bit and then stood up. They briefly kissed. She began to leave and he stood up and again asked, "Are you ok?" She again said yes and then started to walk past him a short distance. He pointed to and made contact with her stomach on the right front area and asked, "Is it (her ulcer) ok?" She said, "Yes." He said, "You are getting skinny; the gym exercises are working."

95.    After a few moments she left and went outside.

16

96.    She never at any point in time gave any indication that the contact was unwanted or inappropriate; nor was the contact any different than similar displays initiated by her in the past.

97.    Shortly after Metin left the solicitor's office, Solomon and Alaimo arrived. Lariviere assumed that the two had arrived to talk about the court triumph. However, the two were stern faced and told him they wanted to talk to him in the second floor conference room. Lariviere assumed they were going to throw him a surprise party to celebrate his victory. He followed them into the conference room and when he saw it was empty he assumed the people would arrive shortly.

98.    Alaimo then took out a piece of paper and began to read the Miranda rights to Lariviere. Only then did he realize something bad was happening. Alaimo and Solomon then told him Metin had made a complaint against him for sexual assault. These sexual assaults included fondling her breasts. Lariviere was stunned and overwhelmed to find out a person he trusted had done this to him.

99.    Solomon and Alaimo had at the beginning put on two small tape recorders. Lariviere asked to talk to them and assumed they were turned off.

100.    The officers began berating him: "Metin wants you out of here; you cannot work here anymore, you are finished." Solomon told him how much it hurt him to have to do this, and how he could not sleep the previous night because of this.

101.    Knowing that Methuen has a sexual harassment policy dealing with this type of employee-employer dispute, including a complete review process, they nevertheless demanded that he resign and waive his right to a hearing in order to avoid criminal prosecution. Solomon said, "If you resign, I know Metin will not press criminal charges based upon my talking to her just a little while ago. However, the Mayor wants you fired and prosecuted. I can talk to her; as

17

you know, we have let people have leaves and then they just go away. I will talk to her (the Mayor) about this."

102.    Lariviere told him, "I need to go home and talk to my wife about this whole issue." Solomon said, "You will not leave: resign or I arrest you right now." Solomon then left to talk to the Mayor. Alaimo remained in the room. Solomon then returned and said, "There will be no leave time - she wants you out now or you are under arrest. Metin will want you arrested if you do not resign."

103.    Lariviere was absolutely confused and devastated; he thought he was going to a victory party and was now in criminal custody, being told he had to resign immediately or be arrested.

104.    Solomon and Alaimo, the two chief law enforcement officials in Methuen and the mayor's strongest supporters, hadn't even asked him to describe what had been going on for approximately 5 months. They knew he had due process rights with respect to his job and was a council employee with 25 years of service, but his version was of no interest to them. All his rights had to be waived and he had to resign.

105.    Lariviere asked if he could talk to Metin, and was told no.

106.    They repeated again statements Metin made to them, that Lariviere had molested her and fondled her breasts and that he stalked her. Lariviere denied the charges made. Lariviere asked about the stalking, and they pointed to his call to her the night before. Lariviere told Solomon that he called her about the court case, and he admitted, "I was there for the second call and heard it." Lariviere said, "Joe if you did then you know all I talked about was the court case and then hung up."

18

107.   Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo
and the night Metin and her daughter met even though Lariviere and Depardo had planned on
being there and Metin had not.

108.   Solomon and Alaimo then said they were going back up stairs to talk to the Mayor.
They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission
to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further
indicated that he must accompany him there. They walked down the corridor and upon arrival at
the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by
myself. After he finished he stepped outside and the police captain was there waiting for him and
escorted him back to the conference room.

109.   Solomon and Alaimo returned and demanded an immediate resignation or he would
be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said
you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her
I know she will not seek criminal charges."

110.   As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign
the resignation or I will arrest you, handcuff you and drag you out of this building in front of
people you know." He then added, "When we arrest you it will be all over the papers. We will
then ask the council to terminate you. If you quit now it will be kept quiet and no one will know.
I will instruct my people not to talk about this. Your choice - make it now."

111.   Finally, Solomon looked at his watch and said "I have a meeting in twelve minutes.
This is your last chance resign or you are arrested, handcuffed and taken out of this building."

112.   After one and one-half to two hours of this vitriolic attack, Lariviere snapped. He
knew any clarification or explanation would be fruitless. The threats, intimidation and coercion

19

by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could
only see the harm that would befall him and more significantly, his family.

113.    He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the
publicity these charges would bring and the hurt to his family and name if he didn't comply with
their threats. Solomon then left and went to get the Human Resources Director, who had
prepared a short resignation and waiver of hearing letter. They returned and put the resignation
letter and a pen in front of Lariviere to sign.

114.    Ironically, the Human Resources Department was located next to the City Solicitor's
office and the Director was another unquestioning supporter of the Mayor and was fully aware of
how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of
the policy as mandated upon her employment and acquiesced as the police turned this incident
into a criminal investigation to deliberately deny Lariviere of his rights.

115.    The defendants lacked good cause for the threatened criminal proceedings.

116.    The defendants' aforementioned actions were objectively unreasonable

117.    Under duress, Lariviere involuntarily and under coercion resigned. Lariviere was not
given a reasonable time within which to choose between resignation and the termination
proceedings to which he had a right.

118.    The defendants deliberately and intentionally disregarded and circumvented
Methuen's sexual harassment policy and chose instead to utilize coercion, threats and
intimidation to seize control of the Solicitor's office and eliminate an unwanted employee. The
defendants did not investigate the relationship; rather, they brought the full force of law
enforcement down on Lariviere to force a politically desirable conclusion.

20

## COUNT I
### (Coercion)

119.    The plaintiff hereby realleges and reavers paragraphs 1 through 118 as though fully set forth herein.

120.    By threats, intimidation and coercion, the defendants unlawfully secured the plaintiff's resignation against his will, and forced him to relinquish his right to a hearing.

121.    Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.

122.    The conduct of the plaintiff did not warrant a resignation even if the allegations made against him were true. The chief law enforcement officials in Methuen, with deliberate indifference and without cause characterized his behavior as criminal when, at worst, it was a civil dispute which, at best, would warrant minor disciplinary action imposed against both participants.

123.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT II
### (Violation of Massachusetts Civil Rights Act)

124.    The plaintiff hereby realleges and reavers paragraphs 1 through 123 as though fully set forth herein.

125.    After allegedly receiving a complaint from a short-term employee concerning the conduct of a 25-year employee, the chief law enforcement officials in Methuen conducted no investigation to determine either the veracity of the complaints or the position of the proposed suspect.

126.    Instead, arrangements were made to videotape the parties. This inadequate and atypical police work insured that a complainant would know she was being taped and would act

21

consistent with her allegations even though she knew that her past conduct would lead Lariviere to believe that they had a close, warm, friendly relationship, and he would display affection for her.

127.    Moreover, since she knew the encounter was being taped, she would do nothing to discourage any interaction between them. Indeed, since the tape was intended to entrap Lariviere, her acquiescence would serve to promote any behavior now being characterized as sexual harassment or sexual assault.

128.    Even in this contrived context, approximately 1-1/2 to 2 hours of the parties' interactions were watched by 2 police officers as a videotape was running, and at no time did Lariviere's conduct cause trained police officers to intercede to protect the complainant from any unlawful conduct or crime perpetrated against her person.

129.    By threats, intimidation and coercion, the defendants interfered with the plaintiff's exercise or enjoyment of rights secured by the Constitution or the laws of the Commonwealth of Massachusetts.

130.    Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff. No other municipal employee had ever been treated in this fashion by using police misconduct to force a resignation.

131.    By unlawfully forcing him to resign, using threats, intimidation and coercion, the defendants denied the plaintiff his constitutional rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

132.    The conduct of the plaintiff did not warrant a resignation even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when it was a civil matter which, at best, would warrant minor disciplinary action imposed against both participants.

22

133. These defendants deprived Lariviere of both his right to his liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution of the Commonwealth and M.G.L. 12 §11I.

134. Acting under color of law and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing - the defendants maliciously intimidated plaintiff, abused the lawful process by unlawful purpose, violated Lariviere's constitutional rights, falsely arrested and imprisoned the plaintiff, conspired against plaintiff, and interfered with plaintiff's civil rights by means of threats, coercion and intimidation.

135. As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT III
### (Intentional Infliction of Emotional Distress)

136. The plaintiff hereby realleges and reavers paragraphs 1 through 135 as though fully set forth herein.

137. Defendants conduct was not within the course of their employment nor in furtherance of the city's interests.

138. Defendants intentionally and deliberately inflicted emotional distress on Lariviere by advancing criminal charges where none were warranted, threatening to publicize the allegations to the public and particularly his family, by maliciously intimidating plaintiff, by violating Lariviere's constitutional rights, by falsely arresting and imprisoning the plaintiff, by conspiring against plaintiff, and by interfering with plaintiff's civil rights by threats, coercion or intimidation, and knew or should have known that emotional distress was the likely result of their conduct. All of this was done willfully to strip Lariviere of his rights and assure that he would not have the forum guaranteed to him to address these allegations.

23

139.    Defendant's conduct in orchestrating the resignation and terminating the employment was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

140.    The actions of the defendants were the cause of plaintiff's distress, and the distress sustained by plaintiff was so severe and of such a nature that no reasonable man could be expected to endure it.

141.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

### COUNT IV
(Intentional Interference with Advantageous Contractual Relations)

142.    The plaintiff hereby realleges and reavers paragraphs 1 through 141 as though fully set forth herein.

143.    The plaintiff had advantageous business relationship and a contract with the city of Methuen of which the defendants were aware.

144.    The defendants intentionally and maliciously interfered with that relationship and contract with the intent of causing plaintiff harm.

145.    As a direct and proximate cause of the intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

### COUNT V
(Conspiracy)

146.    The plaintiff hereby realleges and reavers paragraphs 1 through 145 as though fully set forth herein.

24

147.    The defendants conspired to, inter alia, deprive, either directly or indirectly, Lariviere of equal privileges and immunities under the laws, and conspired to cause by force, intimidation and threat the resignation of Lariviere from his position, and cause him harm.

148.    The power of the defendants collectively to cause Lariviere harm was substantially greater than any of the participants had singly.

149.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## RELIEF REQUESTED

WHEREFORE, the plaintiff respectfully requests this Court:

    a.  A declaration that plaintiff shall be reinstated to his employment as City Solicitor with all salary and benefits reinstated and/or reimbursed;

    b.  Award monetary damages in an amount deemed to be just, fair, as appropriate;

    c.  Award loss of wages and income and benefits, including reinstatement of all seniority, retirement and other benefits plaintiff would have enjoyed but for the actions of the defendants;

    d.  Award future loss of income and value of benefits as appropriate;

    e.  Award the plaintiffs' costs and attorneys' fees;

    f.  Grant any other relief this Court deems just and proper.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

### VERIFICATION

I, Maurice Lariviere, the undersigned, hereby verify and attest under the pains and penalties of perjury that I have read the Foregoing Verified Complaint and that I know the facts stated therein to be true, except insofar as stated to be upon information and belief, as to which I believe the same to be true.

_____6/29/05_____          _____

Dated                                    Maurice Lariviere


Plaintiff,
MAURICE LARIVIERE
By his attorneys,


Carmine W. DiAdamo
BBO#122960
William H. DiAdamo
BBO#558883
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271

| CIVIL ACTION COVER SHEET | DOCKET NO.(S) | | Trial Court of Massachusetts Superior Court Department County: **Essex** |
|---|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| MAURICE LARIVIERE | JOSEPH SOLOMON, JOSEPH ALAIMO and TOWN OF METHUEN |

| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE | ATTORNEY (If known) |
|---|---|
| Carmine W. DiAdamo, Esq. - DiAdamo Law Office LLP, 40 Appleton Way, Lawrence, MA 01840 – 978-685-4271 | Peter McQuillan, Esq. City of Methuen 41 Pleasant Street, Methuen, MA 01844 |
| Board of Bar Overseers Number 122960 | |

## Origin code and track designation

Place an x in one box only:
- ☒ 1. F01 Original Complaint
- ☐ 2. F02 Removal to Sup. Ct. C. 231, s. 104 (Before trial) (F)
- ☐ 3. F03 Retransfer to Sup. Ct. C. 231, s. 102C (X)

- ☐ 4. F04 District Court Appeal c. 231, s. 97 & 104 (After trial) (X)
- ☐ 5. F05 Reactivated after rescript; relief from judgment/Order (Mass. R. Civ. P. 60) (X)
- ☐ 6. E10 Summary Process Appeal (X)

## TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| E17 | CIVIL RIGHTS ACT | ( F ) | ( X ) Yes ( ) No |

The following is a full, itemized and detailed statement of the facts on which plaintiff relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(Attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ... $ 0.00
2. Total Doctor expenses ... $ 0.00
3. Total chiropractic expenses ... $ 0.00
4. Total physical therapy expenses ... $ 0.00
5. Total other expenses ... $ 0.00

Subtotal $ 0.00

B. Documented lost wages and compensation to date ... $ 38,000.00
C. Documented property damages to date ... $ 0.00
D. Reasonably anticipated future medical and hospital expenses ... $
E. Reasonably anticipated lost wages ... over $ 750,000.00
F. Other documented items of damages (describe) ... $ 0.00

G. Brief description of plaintiff's injury, including nature and extent of injury (describe)

UNJUSTLY ACCUSED OF HARRASSMENT IN THE WORKPLACE

$ 0.00

TOTAL $ 788,000.00

### CONTRACT CLAIMS
(Attach additional sheets as necessary)

Provide a detailed description of claim(s):

TOTAL $ 0.00

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT:

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of various methods."

Signature of Attorney of Record 

DATE: 7/1/2005

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only)   Maurice Lariviere v. Joseph Solomon

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.   (See local rule 40.1(a)(1)).

   | | | |
   |---|---|---|
   | ☐ | I. | 160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT. |
   | ☒ | II. | 195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121<br>740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.    for patent, trademark or copyright cases |
   | ☐ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,<br>315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,<br>380, 385, 450, 891. |
   | ☐ | IV. | 220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,<br>690, 810, 861-865, 870, 871, 875, 900. |
   | ☐ | V. | 150, 152, 153. |

3. Title and number, if any, of related cases.  (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

   None

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

   YES ☐    NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)

   YES ☐    NO ☒

   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

   YES ☐    NO ☒

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

   YES ☐    NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

   YES ☒    NO ☐

   A.    If yes, in which division do all of the non-governmental parties reside?

   Eastern Division ☒    Central Division ☐    Western Division ☐

   B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

   Eastern Division ☐    Central Division ☐    Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)

   YES ☐    NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   William P. Breen, Jr.

ADDRESS   Murphy, Hesse, Toomey & Lehane, LLP 300 Crown Colony Drive Quincy, MA 02169

TELEPHONE NO.   617-479-5000

(CategoryForm.wpd - 5/2/05)

♨JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Maurice Lariviere

**(b)** County of Residence of First Listed Plaintiff   Rockingham, NH
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
William H. DiAdamo
DiAdamo Law Office LLP 40 Appleton Way
Lawrence, MA 01840

## DEFENDANTS

Joseph Solomon, Joseph Alaimo and
City of Methuen

County of Residence of First Listed Defendant    Essex County (MA)
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known) William P. Breen, Jr.
Rebecca L. Andrews, Esq.
Murphy, Hesse, Toomey & Lehane, LLP

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

❏ 1  U.S. Government
Plaintiff

❏ 3  Federal Question
(U.S. Government Not a Party)

❏ 2  U.S. Government
Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ❏ 4 | ❏ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated and Principal Place of Business In Another State | ❏ 5 | ❏ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 610 Agriculture | ❏ 422 Appeal 28 USC 158 | ❏ 400 State Reapportionment |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 362 Personal Injury - | ❏ 620 Other Food & Drug | ❏ 423 Withdrawal | ❏ 410 Antitrust |
| ❏ 130 Miller Act | ❏ 315 Airplane Product | Med. Malpractice | ❏ 625 Drug Related Seizure | 28 USC 157 | ❏ 430 Banks and Banking |
| ❏ 140 Negotiable Instrument | Liability | ❏ 365 Personal Injury - | of Property 21 USC 881 | | ❏ 450 Commerce |
| ❏ 150 Recovery of Overpayment | ❏ 320 Assault, Libel & | Product Liability | ❏ 630 Liquor Laws | **PROPERTY RIGHTS** | ❏ 460 Deportation |
| & Enforcement of Judgment | Slander | ❏ 368 Asbestos Personal | ❏ 640 R.R. & Truck | ❏ 820 Copyrights | ❏ 470 Racketeer Influenced and |
| ❏ 151 Medicare Act | ❏ 330 Federal Employers' | Injury Product | ❏ 650 Airline Regs. | ❏ 830 Patent | Corrupt Organizations |
| ❏ 152 Recovery of Defaulted | Liability | Liability | ❏ 660 Occupational | ❏ 840 Trademark | ❏ 480 Consumer Credit |
| Student Loans | ❏ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ❏ 490 Cable/Sat TV |
| (Excl. Veterans) | ❏ 345 Marine Product | ❏ 370 Other Fraud | ❏ 690 Other | | ❏ 810 Selective Service |
| ❏ 153 Recovery of Overpayment | Liability | ❏ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ❏ 850 Securities/Commodities/ |
| of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 380 Other Personal | ❏ 710 Fair Labor Standards | ❏ 861 HIA (1395ff) | Exchange |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle | Property Damage | Act | ❏ 862 Black Lung (923) | ❏ 875 Customer Challenge |
| ❏ 190 Other Contract | Product Liability | ❏ 385 Property Damage | ❏ 720 Labor/Mgmt. Relations | ❏ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ❏ 195 Contract Product Liability | ❏ 360 Other Personal | Product Liability | ❏ 730 Labor/Mgmt.Reporting | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | Injury | | & Disclosure Act | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ❏ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ❏ 892 Economic Stabilization Act |
| ❏ 210 Land Condemnation | ❏ 441 Voting | ❏ 510 Motions to Vacate | ❏ 790 Other Labor Litigation | ❏ 870 Taxes (U.S. Plaintiff | ❏ 893 Environmental Matters |
| ❏ 220 Foreclosure | ❏ 442 Employment | Sentence | ❏ 791 Empl. Ret. Inc. | or Defendant) | ❏ 894 Energy Allocation Act |
| ❏ 230 Rent Lease & Ejectment | ❏ 443 Housing/ | **Habeas Corpus:** | Security Act | ❏ 871 IRS—Third Party | ❏ 895 Freedom of Information |
| ❏ 240 Torts to Land | Accommodations | ❏ 530 General | | 26 USC 7609 | Act |
| ❏ 245 Tort Product Liability | ❏ 444 Welfare | ❏ 535 Death Penalty | | | ❏ 900Appeal of Fee Determination |
| ❏ 290 All Other Real Property | ❏ 445 Amer. w/Disabilities - | ❏ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ❏ 550 Civil Rights | | | to Justice |
| | ❏ 446 Amer. w/Disabilities - | ❏ 555 Prison Condition | | | ❏ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☒ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

❏ 1 Original
Proceeding

☒ 2 Removed from
State Court

❏ 3 Remanded from
Appellate Court

❏ 4 Reinstated or
Reopened

❏ 5 Transferred from
another district
(specify)

❏ 6 Multidistrict
Litigation

❏ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. section 1332 (a)(1)
Brief description of cause:
Plaintiff claims violation of Massachusetts Civil Rights Act, M.G.L. c12, 11I

## VII. REQUESTED IN
COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

**DEMAND $**
$788,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes  ❏ No

## VIII. RELATED CASE(S)
IF ANY

(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE   July 26, 2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____