COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                    SUPERIOR COURT
                                              CIVIL ACTION No. 05-1155C

_____
MAURICE LARIVIERE,                      )
                                        )
                    Plaintiff           )
v.                                      )
                                        )        **FIRST AMENDED**
JOSEPH SOLOMON, individually, and as    )        **VERIFIED COMPLAINT**
    Chief of Police of the City of Methuen, and  )   **(AND JURY DEMAND)**
JOSEPH ALAIMO, individually, and as     )
    Deputy Chief of Police of the City of Methuen, and  )
THE CITY OF METHUEN                     )
                                        )
                    Defendants.         )
_____)


THE PARTIES

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire.

Until February 16, 2005, he was the city solicitor for the City of Methuen.

2.    Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the chief of police of the City of Methuen.

3.    Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the deputy chief of police of the City of

Methuen.

4.    The City of Methuen is a duly chartered city located in Massachusetts with a principal

place of business at 41 Pleasant Street, Methuen, Massachusetts.

BACKGROUND

5.     The City Solicitor's position is a two-year appointment made by the City Council
pursuant to the Home Rule Charter of the City of Methuen.  Lariviere had been reappointed by
the City Council ("the Council") in January of 2005.

6.     Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and
has continuously been reappointed by numerous administrations. No complaints whatsoever
have been lodged against him concerning inappropriate conduct with employees or staff.

7.     The Mayor appoints employees of the City Solicitor's office. At all times relevant
hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor").

Relationship with the Mayor

8.     Since mid-2001, relations between the Mayor and Lariviere have been acrimonious,
upon information and belief because Lariviere was not appointed by, under the control of,
beholden to, or subservient to the Mayor.

9.     For example, the Mayor repeatedly became angry when Lariviere refused to disclose
to the Mayor confidential communications with city councilors. Lariviere's policy, as the City
Solicitor, was to keep his conversations with both councilors and the Mayor confidential.
Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or
the Mayor were kept confidential until the client went public with them. Lariviere would not
convey any information on the existence of the documents until the councilor or the Mayor
placed them on the agenda. The Mayor would often express disgust that she was not immediately
told when a councilor talked to Lariviere about any matters including resolutions or ordinances.

10.     In one instance, a council dispute erupted regarding raises being granted to
department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the
department heads of elder affairs and veterans, and not other department heads. In accordance

with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor. After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her. Lariviere responded that it had always been his policy to not breach attorney-client confidentiality, including not telling councilors when he did work for her. The Mayor then screamed over the phone "You scare me," and hung up.

11. The Mayor also resented Lariviere because he wrote a report defending a political opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting her driveway and received a citation relating to the accident. After filing a complaint with the police claiming the citation was based on political retribution, the Mayor directed that Lariviere conduct a thorough investigation, which he did. Lariviere then wrote a report concluding that the Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the other driver.

12. The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force Lariviere to change the report. Lariviere steadfastly refused, and the Mayor left the meeting angry and disgusted.

13. On another occasion, Solomon ordered a police officer to appear at city hall on the night of a city Council meeting and issue tickets to persons parking in areas with signage limiting the time for parking. Two tickets were given out, one to a political opponent of the Mayor and the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police station and advised that the ticketing was illegal. Solomon relayed this to the Mayor and,

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The tickets were later withdrawn.

14.    In the eight years prior to the Mayor's election, insurance had been handled by the purchasing agent.  Upon information and belief, the Mayor disliked the purchasing agent and forced her out of office, whereupon Lariviere took over the duties.

*15.*    In another matter, Lariviere sought information updates on the property insurance from various city departments and determined that there were numerous errors in the property schedule, including coverage for properties the city did not own, non-coverage for properties it did own and incorrect coverage for yet other properties. He then attempted to have the agency correct these errors.  Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city.  When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor.

*16.*    In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate.

<u>Metin Employment</u>

17.    In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004.

4

18.     Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position, however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director.

19.     The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City.

20.     On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly.  Metin started work as a temporary secretary on October 4, 2004.

21.     A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself.

22.     The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems.

23.     During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot.

24.     After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through

5

Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and including February 15, 2005.

25.     Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes and Noble, and D'Angelo's.  Except for Starbucks, Lariviere had prior to this never been to these places. Lariviere and Metin took turns purchasing the food.

26.     In addition to going to lunch, they would go shopping at various stores including pet stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her daughter Christmas presents. All shopping expeditions, with one exception, were to purchase items Metin wanted to obtain.

27.     Metin advised Lariviere that as her marriage deteriorated and the violence got worse, she experienced psychological problems and began counseling. During this period she admitted having an adulterous affair with another man.

28.     Metin advised Lariviere that her husband didn't seem angry about the affair but thereafter they divorced.

29.     The husband had also taken their monies amounting to eighty thousand dollars and invested it in a restaurant.

30.     Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This occurred in approximately 1999.

31.     The husband after the divorce moved to Turkey where he is to this date. Since separation he has never provided her with any monies nor supported their child.

32.     At the time of the break-up of the marriage Metin was living on Long Island in New York. She had advised Lariviere she had problems keeping jobs and at her last employment she

was paid approximately thirty-five thousand dollars for an annual salary, which, according to her, on Long Island constituted poverty.

33.     She admitted to Lariviere that while on Long Island things had gotten so bad that she willfully borrowed money from people knowing she had no intent of repaying them and in fact had already decided to flee New York.

34.     Facing no chance at being able to survive on Long Island she moved to Haverhill, Massachusetts and began living with her mother and her mother's boyfriend Glenn.

35.     Shortly after Metin started, Lariviere contacted the Human Resources Director and asked him to put on hold the job search for the litigation paralegal position to see if Metin would work out. Metin had indicated that she would like the position.

36.     She indicated she very much liked working for Lariviere. She began to call him "Archangel" saying he was helping to save her from her many problems. Their personal relationship, formed primarily by her,  was deepening. Anything that broadened the relationship or personalized it was initiated by her.

37.     In late October, Lariviere agreed to recommend Metin for the secretary's position upon her promising him to obtain a paralegal certificate and agreeing to his training her in a paralegal role.

38.     Lariviere recognized that she was not qualified for the litigation paralegal position nor for that of legal secretary, However, the pleasant relationship convinced him to offer her the position on the hope of her being trained for it.

39.     Lariviere recommended hiring Metin full time to the Human Resources Director.  The Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to hire her.

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job.

41.    Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency.

42.    The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood.

43.    Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee.

44.    Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues.

45.    During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either.

46.    Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations.

47.    Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter.

48.    She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff.

49.    At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner.

50.    The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere.

51.    Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate.

52.    Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym."

53.    In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined.

54.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site.

55.    She was and is engaged to a person named Anthony but said she was not sure if she wanted to marry him. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs.

56.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers.

10

57.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine.

58.    Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later.

59.    She went for further testing and the doctor confirmed that she had numerous ulcers.

60.    Lariviere and Metin occasionally exchanged emails on weekends. One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. On his birthday she gave him the present and they exchanged a hug and kiss.

61.    On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere.

62.    Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him.

63.    On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups.

64.    On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail.

65.    In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time.

66.    She would go to the gym two days a week and out to lunch with Lariviere two days per week.

67.    In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan.

68.    Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car.

69.    The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi  thanks for all your help" and she then proceeded to sign it "Kiss".

70.    In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy."

71.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally.

72.    At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch.

73.    Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place."

74.    In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body.

75.    Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time.

76.    Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity.

77.    She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend.

78.    By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a

number of occasions Metin would in the midst of the fight take her daughter out of the home. One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them about the fighting and swearing leading to her fleeing the house that night.

79.    In early February the distraught Metin began showing signs of erratic behavior.  For example, she would denounce her mother to Lariviere, but when Rana would call her on the cell phone, she would become a pleasant and loving daughter during the call and then immediately denounce her after the call terminated.

80.     On a personal level, the parties were not intimate, but mutually affectionate with much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya benefited greatly from the assistance she was getting in turning around her life problems.

<u>February 15, 2005</u>

81.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of Methuen,* in the Massachusetts Federal District Court, involving a claim that a Methuen police officer while on duty had taken a woman into custody and then raped her. He was later convicted of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache, was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the there had been a prior charge of rape made against Blache.

82.    As Metin knew, Lariviere worried about and lived this case day in and day out, knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a verdict against Methuen costing the taxpayers millions of dollars.

83.    This was one of the largest, most serious and most difficult cases Lariviere had ever handled.  If lost, the effects on the Mayor, City Council, and police department could have been devastating.

84.    On January 27th, 2005 Lariviere appeared before Federal District Court Judge Stearns and argued his motion for summary judgment in favor of the City.  On the afternoon of Feb. 15th, Lariviere learned that the judge had ruled in favor of the City and dismissed the case. An ecstatic Lariviere called the former Police Chief, Bruce McDougal who was in charge of the department when the rape occurred. Lariviere and McDougal knew each other for fifteen years but Lariviere's voice was so high and excited in the message left that McDougal could not even recognize Lariviere's voice. Ecstatic, Lariviere then went down and advised the Mayor's chief of staff of the victory. He then called and left cell phone messages for Solomon, and then for Metin, with whom he had discussed the subject many times. After going to the gym that night, Lariviere again called Metin to talk about the case.

85.    Unknown to Lariviere, during that time, Metin was apparently meeting with police lieutenant Michael Wnek and Solomon.

<u>February 16, 2005</u>

86.    Lariviere arrived that morning and began working on a letter to send to the City Council outlining the victory in the Federal Court. He had never in his 25 years sent out a similar letter, but in his mind this extremely important victory had to be reported. He again called Solomon to talk to him about the court victory.

87.    Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go.

88.    A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office.

89.    Lariviere called Metin into his office and gave her a copy of the addresses of the councilors so that she could prepare mailing envelopes for them while he finalized the letter. She later asked him to email her the letter so she could reformat it. Metin asked about reformatting the letter and Lariviere said no he just wanted it on one page.

90.    She printed out one original copy and then left the solicitor's office and went to the council office to copy the letter.

91.    Metin returned and began the envelope process. Lariviere printed a copy of the Judge's decision and then went into her office to get it. Lariviere and Metin talked for a while about the case and then he picked up the decision and began to leave.

92.    As Lariviere went back to his office Metin called out, "You are a good attorney." Lariviere came back out and went around to the inside of her L-shaped desk. They talked about the case and his victory for a while.

93.    As she had done to him, he leaned over and kissed her on the cheek and then a peck type kiss on her lips.  At this time she looked slightly downwards. He asked, "Are you ok?" She answered, "Yes, I am just tired." (This is something she often told him given the troubles at home and her lack of sleep.)

94.    Lariviere leaned over and with his right arm placed it on her left shoulder as a sign of support. He often told her, "I am there for you to help you, my friend."  She talked to him for a bit and then stood up. They briefly kissed. She began to leave and he stood up and again asked, "Are you ok?" She again said yes and then started to walk past him a short distance. He pointed to and made contact with her stomach on the right front area and asked, "Is it (her ulcer) ok?" She said, "Yes." He said, "You are getting skinny; the gym exercises are working."

95.    After a few moments she left and went outside.

96.     She never at any point in time gave any indication that the contact was unwanted or inappropriate; nor was the contact any different than similar displays initiated by her in the past.

97.     Shortly after Metin left the solicitor's office, Solomon and Alaimo arrived. Lariviere assumed that the two had arrived to talk about the court triumph. However, the two were stern faced and told him they wanted to talk to him in the second floor conference room. Lariviere assumed they were going to throw him a surprise party to celebrate his victory. He followed them into the conference room and when he saw it was empty he assumed the people would arrive shortly.

98.     Alaimo then took out a piece of paper and began to read the Miranda rights to Lariviere. Only then did he realize something bad was happening. Alaimo and Solomon then told him Metin had made a complaint against him for sexual assault. These sexual assaults included fondling her breasts. Lariviere was stunned and overwhelmed to find out a person he trusted had done this to him.

99.     Solomon and Alaimo had at the beginning put on two small tape recorders. Lariviere asked to talk to them and assumed they were turned off.

100.     The officers began berating him: "Metin wants you out of here; you cannot work here anymore, you are finished." Solomon told him how much it hurt him to have to do this, and how he could not sleep the previous night because of this.

101.     Knowing that Methuen has a sexual harassment policy dealing with this type of employee-employer dispute, including a complete review process,  they nevertheless demanded that he resign and waive his right to a hearing in order to avoid criminal prosecution. Solomon said, "If you resign, I know Metin will not press criminal charges based upon my talking to her just a little while ago. However, the Mayor wants you fired and prosecuted. I can talk to her; as

17

you know, we have let people have leaves and then they just go away. I will talk to her (the Mayor) about this."

102.    Lariviere told him, "I need to go home and talk to my wife about this whole issue." Solomon said, "You will not leave: resign or I arrest you right now." Solomon then left to talk to the Mayor. Alaimo remained in the room. Solomon then returned and said, "There will be no leave time - she wants you out now or you are under arrest. Metin will want you arrested if you do not resign."

103.    Lariviere was absolutely confused and devastated; he thought he was going to a victory party and was now in criminal custody, being told he had to resign immediately or be arrested.

104.    Solomon and Alaimo, the two chief law enforcement officials in Methuen and the mayor's strongest supporters, hadn't even asked him to describe what had been going on for approximately 5 months. They knew he had due process rights with respect to his job and was a council employee with 25 years of service, but his version was of no interest to them. All his rights had to be waived and he had to resign.

105.    Lariviere asked if he could talk to Metin, and was told no.

106.    They repeated again statements Metin made to them, that Lariviere had molested her and fondled her breasts and that he stalked her. Lariviere denied the charges made. Lariviere asked about the stalking, and they pointed to his call to her the night before. Lariviere told Solomon that he called her about the court case, and he admitted, "I was there for the second call and heard it." Lariviere said, "Joe if you did then you know all I talked about was the court case and then hung up."

107.    Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo and the night Metin and her daughter met even though Lariviere and Depardo had planned on being there and Metin had not.

108.    Solomon and Alaimo then said they were going back up stairs to talk to the Mayor. They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further indicated that he must accompany him there. They walked down the corridor and upon arrival at the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by myself. After he finished he stepped outside and the police captain was there waiting for him and escorted him back to the conference room.

109.    Solomon and Alaimo returned and demanded an immediate resignation or he would be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her I know she will not seek criminal charges."

110.    As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know." He then added, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now."

111.    Finally, Solomon looked at his watch and said "I have a meeting in twelve minutes. This is your last chance resign or you are arrested, handcuffed and taken out of this building."

112.    After one and one-half to two hours of this vitriolic attack, Lariviere snapped.  He knew any clarification or explanation would be fruitless. The threats, intimidation and coercion

by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could only see the harm that would befall him and more significantly, his family.

113.     He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the publicity these charges would bring and the hurt to his family and name if he didn't comply with their threats. Solomon then left and went to get the Human Resources Director, who had prepared a short resignation and waiver of hearing letter. They returned and put the resignation letter and a pen in front of Lariviere to sign.

114.     Ironically, the Human Resources Department was located next to the City Solicitor's office and the Director was another unquestioning supporter of the Mayor and was fully aware of how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of the policy as mandated upon her employment and acquiesced as the police turned this incident into a criminal investigation to deliberately deny Lariviere of his rights.

115.     The defendants lacked good cause for the threatened criminal proceedings.

116.     The defendants' aforementioned actions were objectively unreasonable

117.     Under duress, Lariviere involuntarily and under coercion resigned.  Lariviere was not given a reasonable time within which to choose between resignation and the termination proceedings to which he had a right.

118.     The defendants deliberately and intentionally disregarded and circumvented Methuen's sexual harassment policy and chose instead to utilize coercion, threats and intimidation to seize control of the Solicitor's office and eliminate an unwanted employee.  The defendants did not investigate the relationship; rather, they brought the full force of law enforcement down on Lariviere to force a politically desirable conclusion.

**COUNT I**
(Constructive Discharge/Unlawful Termination)

119.   The plaintiff hereby realleges and reavers paragraphs 1 through 118 as though fully set forth herein.

120.   By threats, intimidation and coercion, the defendants unlawfully secured the plaintiff's resignation against his will, and forced him to relinquish his right to a hearing.

121.   Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.  Their actions created a condition which was so difficult and unpleasant that a reasonable person in the plaintiff's position would have felt compelled to resign. By any objective assessment their actions were intolerable.

122.   Defendants' actions, in their official capacity, were to force a resignation against Lariviere's will, and therefore the resignation should be treated as an unlawful termination.

123.   The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

124.   As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT II
### (Intentional Infliction of Emotional Distress as to Solomon and Alaimo)

125.   The plaintiff hereby realleges and reavers paragraphs 1 through 124 as though fully set forth herein.

126.   Defendant's conduct is not within the course of their employment nor in furtherance of the city's interests.

127.   Defendants intended in the manner they obtained the resignation of Lariviere to inflict emotional distress or should have known that emotional stress was the likely result of their

conduct, namely advancing criminal charges where none were warranted and threatening to publicize their allegations to the public and his family.

128.    Defendants intentionally and deliberately inflicted emotional distress on Lariviere by maliciously intimidating plaintiff, by abusing the lawful process by unlawful purpose, by violating Lariviere's constitutional rights, by falsely arresting and imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, and knew or should have known that emotional distress was the likely result of their conduct.  All of this was done willfully to strip Lariviere of his rights and assure that he would not have the forum guaranteed to him to address these allegations.

129.    Defendants' conduct in causing the resignation and terminating employment was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

130.    The actions of the defendants were the cause of plaintiff' distress, and the distress sustained by plaintiff was so severe and of such a nature that no reasonable man could be expected to endure it.

131.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT III
### (Violation of Massachusetts Civil Rights Act Against Solomon and Alaimo)

132.    The plaintiff hereby realleges and reavers paragraphs 1 through 131 as though fully set forth herein.

133.    By threats, intimidation and coercion, the defendants interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and Laws and rights secured by the Constitution or laws of the Commonwealth of Massachusetts, including but not limited to the right to property and the right to a hearing.

134.    The defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.

135.    By unlawfully forcing him to resign, using threats, intimidation and coercion, the defendants denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years. These due process rights existed under the Methuen Home Rule Charter Article 9. These due process rights provide for disciplinary action for good cause only, and solely by the City Council.

136.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

137.    These defendants deprived Lariviere of both his right to his liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution or Constitution of the Commonwealth and M.G.L. 12 §11I.

138.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation.

139.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT IV
### (Violation of 42 U.S.C. §1983 v. Solomon and Alaimo Individually)

140.    The plaintiff hereby realleges and reavers paragraphs 1 through 139 as though fully set forth herein.

141.    Acting under color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

142.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

143.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

144.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

145.    Solomon and Alaimo deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution and §1983.

146.    Solomon and Alaimo acted with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by

interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

147.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT V
(Violation of 42 U.S.C. §1983 v. Solomon and Alaimo In Their Official Capacity)

148.    The plaintiff hereby realleges and reavers paragraphs 1 through 147 as though fully set forth herein.

149.    Acting under the color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

150.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

151.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

152.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

153.    Solomon and Alaimo deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

154.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

155.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT VI
(Violation of 42 U.S.C. §1983 v. Town of Methuen)

156.    The plaintiff hereby realleges and reavers paragraphs 1 through 155 as though fully set forth herein.

157.    The Chief of Police was the maker and enforcer of policy or custom on public safety and law enforcement issues.

158.    By threats, intimidation and coercion, Methuen interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property and the right to the First Amendment.

159.    Methuen's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

160.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Methuen, by its agent and employees denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

161.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

162.    Methuen deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

163.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Methuen deprived Lariviere of his rights.

164.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT VII
(Intentional Interference with Advantageous Contractual Relations)

165.    The plaintiff hereby realleges and reavers paragraphs 1 through 164 as though fully set forth herein.

166.    The plaintiff had advantageous business relationship and contract with the city of Methuen of which the defendants were aware.

167.    The defendants intentionally and maliciously interfered with that relationship with the intent of causing plaintiff harm.

168.    As a direct and proximate cause of the intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT VIII
(Conspiracy)

169.    The plaintiff hereby realleges and reavers paragraphs 1 through 168 as though fully set forth herein.

170.    The defendants unlawfully conspired to, inter alia, unlawfully deprive, either directly or indirectly, Lariviere of equal privileges and immunities under the laws, and conspired to cause by force, intimidation and threat the resignation of Lariviere from his position, and cause him harm.

171.    The power of the defendants collectively to cause Lariviere harm was substantially greater than any of the participants had singly.

As a direct and proximate cause of the negligent and intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm in connection with this deprivation of his rights.

## **RELIEF REQUESTED**

WHEREFORE, the plaintiff respectfully requests this Court:

a.  A declaration that plaintiff shall be reinstated to his employment as City Solicitor with all salary and benefits reinstated and/or reimbursed;

b.  Award monetary damages in an amount deemed to be just, fair, as appropriate;

c.  Award loss of wages and income and benefits, including reinstatement of all seniority, retirement and other benefits plaintiff would have enjoyed but for the actions of the defendants;

d.  Award future loss of income and value of benefits as appropriate;

e.  Award the plaintiffs' costs and attorneys' fees;

f.   Grant any other relief this Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**.

## VERIFICATION

I, Maurice Lariviere, the undersigned, hereby verify and attest under the pains and penalties of perjury that I have read the Foregoing Verified Complaint and that I know the facts stated therein to be true, except insofar as stated to be upon information and belief, as to which I believe the same to be true.

9/23/05                                  /s/
_____                      _____
Dated                                    Maurice Lariviere




Plaintiff,
MAURICE LARIVIERE
By his attorneys,

/s/
_____
Carmine W. DiAdamo
BBO#122960
William H. DiAdamo
 BBO#558883
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271