UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11579EFH

| | |
|---|---|
| MAURICE LARIVIERE, <br> Plaintiff, <br> v. <br><br> JOSEPH SOLOMON, Individually, and as Chief of Police of the city of Methuen, JOSEPH ALAIMO, Individually and as Deputy Chief of Police of the City of Methuen, and THE CITY OF METHUEN, <br> Defendants | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, Joseph Solomon, Joseph Alaimo and City of Methuen (hereinafter collectively referenced as "defendants"), hereby move this Honorable Court for an Order dismissing the plaintiff's Second Amended Verified Complaint with prejudice pursuant to Federal Rule of Civil Procedure 56.  In support of the instant Motion, the defendants submit a Memorandum of Law, Statement of Relevant Facts in Support of Defendants' Motion for Summary Judgment, and the following Exhibits:

A.    A copy of the original Verified Complaint is attached hereto as Exhibit "A";

B.    A copy of the Defendants' Memorandum of Law in Support of Motion for Summary Judgment is attached hereto as Exhibit "B";

C.    A copy of the Court's October 11, 2005 Order is attached hereto as Exhibit "C";

D.    A copy of the Second Amended Verified Complaint is attached hereto as Exhibit "D";

E.    A copy of Report of Methuen Police Lieutenant, Michael J. Wnek, is attached hereto as Exhibit "E";

F.    A copy of Deposition Transcript from Deposition of Plaintiff, Maurice Lariviere, Vol. I is attached hereto as Exhibit "F";

G.    A copy of February 16, 2005 resignation letter is attached hereto as Exhibit "G";

H.    A copy of three (3) page written statement of Fulya Metin is attached hereto as Exhibit "H";

I.    A copy of February 16, 2005 written statement of Fulya Metin is attached hereto as Exhibit "I";

J.    A copy of Deposition Transcript from Deposition of Plaintiff, Maurice Lariviere, Vol. II is attached hereto as Exhibit "J";

K.    A copy of Deposition Transcript from Deposition of Fulya Metin is attached hereto as Exhibit "K";

L.    A copy of City of Methuen Home Rule Charter is attached hereto as Exhibit "L"; and

M.    A copy of Deposition Transcript from Deposition of Defendant, Joseph Solomon is attached hereto as Exhibit "M".

The Defendants,
**City of Methuen, Joseph Solomon and
Joseph Alaimo**
By their Attorneys,

The Defendants,
**Joseph Solomon and Joseph Alaimo**
By their Attorneys,

_/s/ Gareth W. Notis_
Gareth W. Notis - BBO #637814
Morrison Mahoney LLP
250 Summer Street
Boston, MA 02210

_/s/ Andrew J. Gambaccini_
Andrew J. Gambaccini, BBO #: 654690
Reardon, Joyce & Akerson, P.C.
397 Grove Street
Worcester, MA

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants this 20th day of June 2007.

_/s/ Gareth W. Notis_

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.

SUPERIOR COURT
CIVIL ACTION No.

---

MAURICE LARIVIERE,                              )
                                                )
                    Plaintiff                   )
                                                )
v.                                              )
                                                )
JOSEPH SOLOMON, individually, and as            )        **VERIFIED COMPLAINT**
     Chief of Police of the City of Methuen, and )        **(AND JURY DEMAND)**
JOSEPH ALAIMO, individually, and as             )
     Deputy Chief of Police of the City of Methuen, and )
THE CITY OF METHUEN                             )
                                                )
                    Defendants.                 )
                                                )

---

## THE PARTIES

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire. Until February 16, 2005, he was the city solicitor for the City of Methuen.

2.    Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen, Massachusetts. At all times relevant hereto, he was the chief of police of the City of Methuen.

3.    Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen, Massachusetts. At all times relevant hereto, he was the deputy chief of police of the City of Methuen.

4.    The City of Methuen is a duly chartered city located in Massachusetts with a principal place of business at 41 Pleasant Street, Methuen, Massachusetts.

## BACKGROUND

5.   The City Solicitor's position is a two-year appointment made by the City Council pursuant to the Home Rule Charter of the City of Methuen. Lariviere had been reappointed by the City Council ("the Council") in January of 2005.

6.   Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and has continuously been reappointed by numerous administrations. No complaints whatsoever have been lodged against him concerning inappropriate conduct with employees or staff.

7.   The Mayor appoints employees of the City Solicitor's office. At all times relevant hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor").

### Relationship with the Mayor

8.   Since mid-2001, relations between the Mayor and Lariviere have been acrimonious, upon information and belief because Lariviere was not appointed by, under the control of, beholden to, or subservient to the Mayor.

9.   For example, the Mayor repeatedly became angry when Lariviere refused to disclose to the Mayor confidential communications with city councilors. Lariviere's policy, as the City Solicitor, was to keep his conversations with both councilors and the Mayor confidential. Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or the Mayor were kept confidential until the client went public with them. Lariviere would not convey any information on the existence of the documents until the councilor or the Mayor placed them on the agenda. The Mayor would often express disgust that she was not immediately told when a councilor talked to Lariviere about any matters including resolutions or ordinances.

10.   In one instance, a council dispute erupted regarding raises being granted to department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the department heads of elder affairs and veterans, and not other department heads. In accordance

2

with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor. After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her. Lariviere responded that it had always been his policy to not breach attorney-client confidentiality, including not telling councilors when he did work for her. The Mayor then screamed over the phone "You scare me," and hung up.

11.     The Mayor also resented Lariviere because he wrote a report defending a political opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting her driveway and received a citation relating to the accident.  After filing a complaint with the police claiming the citation was based on political retribution, the Mayor directed that Lariviere conduct a thorough investigation, which he did.  Lariviere then wrote a report concluding that the Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the other driver.

12.     The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force Lariviere to change the report.  Lariviere steadfastly refused, and the Mayor left the meeting angry and disgusted.

13.     On another occasion, Solomon ordered a police officer to appear at city hall on the night of a city Council meeting and issue tickets to persons parking in areas with signage limiting the time for parking. Two tickets were given out, one to a political opponent of the Mayor and the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police station and advised that the ticketing was illegal.  Solomon relayed this to the Mayor and,

3

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The tickets were later withdrawn.

14.     In the eight years prior to the Mayor's election, insurance had been handled by the purchasing agent. Upon information and belief, the Mayor disliked the purchasing agent and forced her out of office, whereupon Lariviere took over the duties.

15.     In another matter, Lariviere sought information updates on the property insurance from various city departments and determined that there were numerous errors in the property schedule, including coverage for properties the city did not own, non-coverage for properties it did own and incorrect coverage for yet other properties. He then attempted to have the agency correct these errors. Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city. When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor.

16.     In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate.

<u>Metin Employment</u>

17.     In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004.

4

18. Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position, however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director.

19. The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City.

20. On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly. Metin started work as a temporary secretary on October 4, 2004.

21. A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself.

22. The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems.

23. During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot.

24. After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through

Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and including February 15, 2005.

25.    Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes and Noble, and D'Angelo's. Except for Starbucks, Lariviere had prior to this never been to these places. Lariviere and Metin took turns purchasing the food.

26.    In addition to going to lunch, they would go shopping at various stores including pet stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her daughter Christmas presents. All shopping expeditions, with one exception, were to purchase items Metin wanted to obtain.

27.    Metin advised Lariviere that as her marriage deteriorated and the violence got worse, she experienced psychological problems and began counseling. During this period she admitted having an adulterous affair with another man.

28.    Metin advised Lariviere that her husband didn't seem angry about the affair but thereafter they divorced.

29.    The husband had also taken their monies amounting to eighty thousand dollars and invested it in a restaurant.

30.    Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This occurred in approximately 1999.

31.    The husband after the divorce moved to Turkey where he is to this date. Since separation he has never provided her with any monies nor supported their child.

32.    At the time of the break-up of the marriage Metin was living on Long Island in New York. She had advised Lariviere she had problems keeping jobs and at her last employment she

was paid approximately thirty-five thousand dollars for an annual salary, which, according to her, on Long Island constituted poverty.

33.    She admitted to Lariviere that while on Long Island things had gotten so bad that she willfully borrowed money from people knowing she had no intent of repaying them and in fact had already decided to flee New York.

34.    Facing no chance at being able to survive on Long Island she moved to Haverhill, Massachusetts and began living with her mother and her mother's boyfriend Glenn.

35.    Shortly after Metin started, Lariviere contacted the Human Resources Director and asked him to put on hold the job search for the litigation paralegal position to see if Metin would work out. Metin had indicated that she would like the position.

36.    She indicated she very much liked working for Lariviere. She began to call him "Archangel" saying he was helping to save her from her many problems. Their personal relationship, formed primarily by her, was deepening. Anything that broadened the relationship or personalized it was initiated by her.

37.    In late October, Lariviere agreed to recommend Metin for the secretary's position upon her promising him to obtain a paralegal certificate and agreeing to his training her in a paralegal role.

38.    Lariviere recognized that she was not qualified for the litigation paralegal position nor for that of legal secretary. However, the pleasant relationship convinced him to offer her the position on the hope of her being trained for it.

39.    Lariviere recommended hiring Metin full time to the Human Resources Director. The Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to hire her.

7

Case 1:05-cv-11579-EFH    Document 37-2    Filed 06/20/2007    Page 8 of 23

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job.

41.    Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency.

42.    The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood.

43.    Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee.

44.    Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues.

45.    During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either.

8

46.    Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations.

47.    Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter.

48.    She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff.

49.    At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner.

50.    The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere.

51.    Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate.

52.    Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym."

53.    In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined.

54.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site.

55.    She was and is engaged to a person named Anthony but said she was not sure if she wanted to marry him. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs.

56.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers.

10

FROM : CHIEF'S OFFICE                FAX NO. : 9787257804              Jul. 26 2005 03:21PM  P14

57.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine.

58.    Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later.

59.    She went for further testing and the doctor confirmed that she had numerous ulcers.

60.    Lariviere and Metin occasionally exchanged emails on weekends. One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. On his birthday she gave him the present and they exchanged a hug and kiss.

61.    On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere.

62.    Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him.

63.    On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups.

64.    On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail.

11

65.    In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time.

66.    She would go to the gym two days a week and out to lunch with Lariviere two days per week.

67.    In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan.

68.    Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car.

69.    The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi  thanks for all your help" and she then proceeded to sign it "Kiss".

70.    In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy."

71.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally.

72.    At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch.

73.    Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place."

74.    In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body.

75.    Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time.

76.    Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity.

77.    She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend.

78.    By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a

13

number of occasions Metin would in the midst of the fight take her daughter out of the home.

One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them

about the fighting and swearing leading to her fleeing the house that night.

79.    In early February the distraught Metin began showing signs of erratic behavior.  For

example, she would denounce her mother to Lariviere, but when Rana would call her on the cell

phone, she would become a pleasant and loving daughter during the call and then immediately

denounce her after the call terminated.

80.    On a personal level, the parties were not intimate, but mutually affectionate with

much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya

benefited greatly from the assistance she was getting in turning around her life problems.

February 15, 2005

81.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of*

*Methuen*, in the Massachusetts Federal District Court, involving a claim that a Methuen police

officer while on duty had taken a woman into custody and then raped her. He was later convicted

of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City

of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache,

was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the

there had been a prior charge of rape made against Blache.

82.    As Metin knew, Lariviere worried about and lived this case day in and day out,

knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a

verdict against Methuen costing the taxpayers millions of dollars.

83.    This was one of the largest, most serious and most difficult cases Lariviere had ever

handled. If lost, the effects on the Mayor, City Council, and police department could have been

devastating.

14

87.    Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go.

88.    A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office.

15

107.   Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo and the night Metin and her daughter met even though Lariviere and Depardo had planned on being there and Metin had not.

108.   Solomon and Alaimo then said they were going back up stairs to talk to the Mayor. They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further indicated that he must accompany him there. They walked down the corridor and upon arrival at the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by myself. After he finished he stepped outside and the police captain was there waiting for him and escorted him back to the conference room.

109.   Solomon and Alaimo returned and demanded an immediate resignation or he would be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her I know she will not seek criminal charges."

110.   As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know." He then added, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now."

111.   Finally, Solomon looked at his watch and said "I have a meeting in twelve minutes. This is your last chance resign or you are arrested, handcuffed and taken out of this building."

112.   After one and one-half to two hours of this vitriolic attack, Lariviere snapped. He knew any clarification or explanation would be fruitless. The threats, intimidation and coercion

by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could only see the harm that would befall him and more significantly, his family.

113.    He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the publicity these charges would bring and the hurt to his family and name if he didn't comply with their threats. Solomon then left and went to get the Human Resources Director, who had prepared a short resignation and waiver of hearing letter. They returned and put the resignation letter and a pen in front of Lariviere to sign.

114.    Ironically, the Human Resources Department was located next to the City Solicitor's office and the Director was another unquestioning supporter of the Mayor and was fully aware of how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of the policy as mandated upon her employment and acquiesced as the police turned this incident into a criminal investigation to deliberately deny Lariviere of his rights.

115.    The defendants lacked good cause for the threatened criminal proceedings.

116.    The defendants' aforementioned actions were objectively unreasonable

117.    Under duress, Lariviere involuntarily and under coercion resigned. Lariviere was not given a reasonable time within which to choose between resignation and the termination proceedings to which he had a right.

118.    The defendants deliberately and intentionally disregarded and circumvented Methuen's sexual harassment policy and chose instead to utilize coercion, threats and intimidation to seize control of the Solicitor's office and eliminate an unwanted employee. The defendants did not investigate the relationship; rather, they brought the full force of law enforcement down on Lariviere to force a politically desirable conclusion.

Case 1:05-cv-11579-EFH     Document 37-2     Filed 06/20/2007     Page 18 of 23

## COUNT I
### (Coercion)

119.     The plaintiff hereby realleges and reavers paragraphs 1 through 118 as though fully set forth herein.

120.     By threats, intimidation and coercion, the defendants unlawfully secured the plaintiff's resignation against his will, and forced him to relinquish his right to a hearing.

121.     Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.

122.     The conduct of the plaintiff did not warrant a resignation even if the allegations made against him were true. The chief law enforcement officials in Methuen, with deliberate indifference and without cause characterized his behavior as criminal when, at worst, it was a civil dispute which, at best, would warrant minor disciplinary action imposed against both participants.

123.     As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT II
### (Violation of Massachusetts Civil Rights Act)

124.     The plaintiff hereby realleges and reavers paragraphs 1 through 123 as though fully set forth herein.

125.     After allegedly receiving a complaint from a short-term employee concerning the conduct of a 25-year employee, the chief law enforcement officials in Methuen conducted no investigation to determine either the veracity of the complaints or the position of the proposed suspect.

126.     Instead, arrangements were made to videotape the parties. This inadequate and atypical police work insured that a complainant would know she was being taped and would act

consistent with her allegations even though she knew that her past conduct would lead Lariviere to believe that they had a close, warm, friendly relationship, and he would display affection for her.

127.    Moreover, since she knew the encounter was being taped, she would do nothing to discourage any interaction between them. Indeed, since the tape was intended to entrap Lariviere, her acquiescence would serve to promote any behavior now being characterized as sexual harassment or sexual assault.

128.    Even in this contrived context, approximately 1-1/2 to 2 hours of the parties' interactions were watched by 2 police officers as a videotape was running, and at no time did Lariviere's conduct cause trained police officers to intercede to protect the complainant from any unlawful conduct or crime perpetrated against her person.

129.    By threats, intimidation and coercion, the defendants interfered with the plaintiff's exercise or enjoyment of rights secured by the Constitution or the laws of the Commonwealth of Massachusetts.

130.    Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff. No other municipal employee had ever been treated in this fashion by using police misconduct to force a resignation.

131.    By unlawfully forcing him to resign, using threats, intimidation and coercion, the defendants denied the plaintiff his constitutional rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

132.    The conduct of the plaintiff did not warrant a resignation even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when it was a civil matter which, at best, would warrant minor disciplinary action imposed against both participants.

22

133.    These defendants deprived Lariviere of both his right to his liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution of the Commonwealth and M.G.L. 12 §11I.

134.    Acting under color of law and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing - the defendants maliciously intimidated plaintiff, abused the lawful process by unlawful purpose, violated Lariviere's constitutional rights, falsely arrested and imprisoned the plaintiff, conspired against plaintiff, and interfered with plaintiff's civil rights by means of threats, coercion and intimidation.

135.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT III
### (Intentional Infliction of Emotional Distress)

*Just Clear*

136.    The plaintiff hereby realleges and reavers paragraphs 1 through 135 as though fully set forth herein.

137.    Defendants conduct was not within the course of their employment nor in furtherance of the city's interests.

138.    Defendants intentionally and deliberately inflicted emotional distress on Lariviere by advancing criminal charges where none were warranted, threatening to publicize the allegations to the public and particularly his family, by maliciously intimidating plaintiff, by violating Lariviere's constitutional rights, by falsely arresting and imprisoning the plaintiff, by conspiring against plaintiff, and by interfering with plaintiff's civil rights by threats, coercion or intimidation, and knew or should have known that emotional distress was the likely result of their conduct. All of this was done willfully to strip Lariviere of his rights and assure that he would not have the forum guaranteed to him to address these allegations.

23

139.    Defendant's conduct in orchestrating the resignation and terminating the employment was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

140.    The actions of the defendants were the cause of plaintiff's distress, and the distress sustained by plaintiff was so severe and of such a nature that no reasonable man could be expected to endure it.

141.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT IV
### (Intentional Interference with Advantageous Contractual Relations)

142.    The plaintiff hereby realleges and reavers paragraphs 1 through 141 as though fully set forth herein.

143.    The plaintiff had advantageous business relationship and a contract with the city of Methuen of which the defendants were aware.

144.    The defendants intentionally and maliciously interfered with that relationship and contract with the intent of causing plaintiff harm.

145.    As a direct and proximate cause of the intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT V
### (Conspiracy)

146.    The plaintiff hereby realleges and reavers paragraphs 1 through 145 as though fully set forth herein.

147.    The defendants conspired to, inter alia, deprive, either directly or indirectly, Lariviere of equal privileges and immunities under the laws, and conspired to cause by force, intimidation and threat the resignation of Lariviere from his position, and cause him harm.

148.    The power of the defendants collectively to cause Lariviere harm was substantially greater than any of the participants had singly.

149.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## RELIEF REQUESTED

WHEREFORE, the plaintiff respectfully requests this Court:

    a.  A declaration that plaintiff shall be reinstated to his employment as City Solicitor with all salary and benefits reinstated and/or reimbursed;

    b.  Award monetary damages in an amount deemed to be just, fair, as appropriate;

    c.  Award loss of wages and income and benefits, including reinstatement of all seniority, retirement and other benefits plaintiff would have enjoyed but for the actions of the defendants;

    d.  Award future loss of income and value of benefits as appropriate;

    e.  Award the plaintiffs' costs and attorneys' fees;

    f.  Grant any other relief this Court deems just and proper.

THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.

## VERIFICATION

I, Maurice Lariviere, the undersigned, hereby verify and attest under the pains and penalties of perjury that I have read the Foregoing Verified Complaint and that I know the facts stated therein to be true, except insofar as stated to be upon information and belief, as to which I believe the same to be true.

Dated _____6/29/05_____          _____
                                                      Maurice Lariviere

Plaintiff,
MAURICE LARIVIERE
By his attorneys,

Carmine W. DiAdamo
BBO#122960
William H. DiAdamo
BBO#558883
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11579EFH

|  |  |
|---|---|
| MAURICE LARIVIERE,<br>      Plaintiff<br><br>vs.<br><br>JOSEPH SOLOMON, Individually, and as<br>Chief of Police of the City of Methuen,<br>JOSEPH ALAIMO, Individually and as<br>Deputy Chief of Police of the City of Methuen, and<br>THE CITY OF METHUEN<br>      Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION TO DISMISS

**I.    INTRODUCTION**

Defendants Joseph Solomon, Joseph Alaimo and the City of Methuen have moved the Court

to dismiss all counts of the of the Verified Complaint ("Complaint") as they pertain to the City of

Methuen and to dismiss Counts I, III and IV of the Verified Complaint against all defendants.  As

grounds for this motion, the defendants state that none of these counts of the Verified Complaint

states a claim upon which relief can be granted.  See Fed. R. Civ. P. 12(b)(6).

The plaintiff alleges, and the defendants deny that the defendants violated his rights by

forcing him to resign from his position as City Solicitor for Methuen after a female subordinate

under his direct supervision complained to the Methuen Police Department that the plaintiff had

sexually harassed and/or assaulted her.  Some of the plaintiff's conduct of which his subordinate

complained was captured on videotape. Remarkably, the plaintiff characterizes his relationship with

the complaining subordinate as "friendly" relationship, denies wrongdoing and asserts that the

defendants' investigation of the subordinate's complaint and interaction with the plaintiff after obtaining substantial proof of inappropriate conduct by the plaintiff were part of a conspiracy in furtherance of political objectives. The defendants deny wrongdoing and categorically deny liability to the plaintiff.

The plaintiff alleges in Count I of the Verified Complaint that the defendants are liable for "coercion." The Court should dismiss Count I because there is no cause of action for "coercion" under Massachusetts law.

Count II of the Verified Complaint purports to state a claim for liability under the Massachusetts Civil Rights Act against all defendants. The Court should dismiss Count II as against Methuen because municipalities are not "persons" subject to liability under the Massachusetts Civil Rights Act and cannot be held liable as a matter of law. See M.G.L. c. 12, § 11I.

Count III of the Verified Complaint purports to state a claim for intentional infliction of emotional distress against all defendants. The Court should dismiss Count III as against Methuen because it cannot be held liable for common law intentional tort as a matter of law. See M.G.L. c. 258, § 10 (c). The Court should dismiss Count III against Solomon and Alaimo because even if they presented the plaintiff with the option of resigning from his position as City Solicitor or potentially facing criminal charges as a result of his subordinate's allegations of sexual assault, which the defendants deny, their alleged actions cannot be characterized reasonably as "extreme and outrageous, beyond all decency and utterly intolerable in a civilized community." The Court should dismiss Count III in its entirety.

The Court should dismiss Count IV, which alleges intentional interference with advantageous contractual relations by Methuen because Methuen cannot be liable for the alleged common law

2

intentional torts of its employees as a matter of law. See M.G.L. c. 258, § 10 (c). The Court should dismiss Count IV against Solomon and Alaimo because the Plaintiff cannot establish a *prima facie* case for intentional interference with contractual relations against either one of them. Accordingly, the Court should dismiss Count IV.

Count V purports to assert liability against all defendants for common law conspiracy. As stated above, Methuen cannot be held liable for common law intentional torts of its employees. See M.G.L. c. 258, § 10 (c). Accordingly, the Court should dismiss Count V as against Methuen.

## II.   STATEMENT OF RELEVANT ALLEGATIONS AND FACTS

Plaintiff Maurice Lariviere was employed as the City Solicitor for Methuen before his resignation in February 2005. The plaintiff alleges that he had an acrimonious relationship with the Mayor of Methuen, Sharon Pollard. See Compl., ¶ 8. The plaintiff alleges that Mayor Pollard wanted to terminate his employment and hire a solicitor who would be primarily loyal to her, and further alleges that Mayor Pollard's alleged intent to terminate the plaintiff's employment was known to Police Chief Joseph Solomon and Deputy Chief Joseph Alaimo. See Compl., ¶ 16.

After the plaintiff's legal secretary retired on August 25, 2004, a female temporary secretary was brought in to work as the plaintiff's secretary. See Compl., ¶ 17 & 20. The plaintiff claims to have been instrumental in obtaining permanent employment for his temporary secretary as a full time legal secretary, though he admits that he recognized at that time that she was not qualified for that position. See Compl., ¶ 38 & 39. According to the Complaint, over the following five (5) months, the plaintiff and his secretary developed a close personal relationship that included sharing meals, shopping excursions, conversations regarding personal issues, loans of money, hugging, kissing and inappropriate workplace physical contact. See Compl., ¶¶ 22-46, 52-64.

3

Prior to February 15, 2005, the plaintiff's secretary complained to the Methuen Police Department that she had been subjected to sexual harassment and/or sexual assault by the plaintiff on a continuing basis. On or about February 15, 2005, the Methuen Police Department, with the secretary's knowledge and permission, videotaped the plaintiff's interaction with the secretary which recorded conduct confirmed and corroborated the secretary's complaints about the plaintiff. See Compl. ¶¶ 125-127.

The Complaint alleges that on February 15, 2005, Solomon and Alaimo arrived at the City Solicitor's Office, read the plaintiff his Miranda rights and informed him that his secretary had made a complaint against him for sexual assault. See Compl., ¶ 98. The Complaint alleges that Solomon and Alaimo demanded that the plaintiff either resign and waive his right to a hearing, or face criminal prosecution and termination of his employment. See Compl., ¶ 101. The Complaint alleges that Solomon and Alaimo lacked good cause to threaten criminal proceedings, that their actions were objectively unreasonable, and that he resigned involuntarily, under duress and coercion. See Compl., ¶¶ 115-117. The plaintiff alleges that the "full force of the law enforcement" was brought down on him "to force a politically desirable conclusion." See Compl., ¶ 118.

The Complaint alleges coercion (Count I), violation of the Massachusetts Civil Rights Act (Count II), intentional infliction of emotional distress (Count III), intentional interference with advantageous contractual relations (Count IV), and conspiracy (Count V).

## III.    ARGUMENT

### A.    THE APPLICABLE LEGAL STANDARD FOR A MOTION TO DISMISS.

Rule 12 (b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of actions which "fail to state a claim upon which relief may be granted." See Fed.R.Civ.P. 12 (b)(6). A

motion to dismiss under Rule 12 (b)(6) tests the sufficiency of the pleadings. "When confronted with a motion to dismiss the court accepts as true all well-pleaded factual averments and draws all reasonable inference in the plaintiff's favor." Dartmouth Review v. Dartmouth College, 889 F.2d 13, 16 (1st Cir.1989). However, the court need not accept a complaint's "bald assertions or legal conclusions" when assessing a motion to dismiss. See Abbott III v. United States, 144 F.3d 1, 2 (1st Cir.1996). A complaint must set forth "factual allegations, either direct or inferential, regarding each material element necessary to sustain recovery under some actionable theory." Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 28, n. 2 (1st Cir.1996). Dismissal is appropriate under Rule 12 (b)(6) of the Federal Rules of Civil Procedure if the complaint presents no set of facts justifying discovery. See Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).

B.    THE COURT SHOULD DISMISS COUNT I BECAUSE IT DOES NOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Court should dismiss Count I of the Complaint because fails to state a claim upon which relief can be granted. Count I purports to state a claim against the Defendants for coercion, yet there is no cause of action for "coercion" under Massachusetts law. Therefore, the Court should dismiss Count I.

C.    THE COURT SHOULD DISMISS COUNT II AGAINST METHUEN BECAUSE MUNICIPALITIES ARE NOT "PERSONS" SUBJECT TO LIABILITY UNDER THE MASSACHUSETTS CIVIL RIGHTS ACT.

Count II of the Complaint purports to state a claim as against all defendants under the Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I. Methuen is not a "person" subject to liability under the Massachusetts Civil rights Act and therefore the Court should dismiss Count II as against Methuen.

5

The Massachusetts Civil Rights Act provides, in relevant part

"Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages."

(Emphasis added). M.G.L. c. 12, 11I. It is well settled in Massachusetts law that municipalities are not "persons" subject to liability under the Massachusetts Civil Rights Act. Howcroft v. City of Peabody, 51 Mass.App.Ct. 573, 591-592, 747 N.E.2d 729, 744 (2001); See Allan v. Fire Chief of Sudbury, 63 Mass.App.Ct. 1108, 824 N.E.2d 487 (2005); Kelley v. Laforce, 288 F.3d 1, 11 n. 9 (1st Cir. 2002). Accordingly, the Court should dismiss Count II against Methuen.

      D.     THE COURT SHOULD DISMISS COUNT III BECAUSE IT DOES NOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

The Court should dismiss the plaintiff's claim against Methuen for intentional infliction of emotional distress because a public employer cannot be held liable for the alleged intentional torts of its employees. Methuen cannot be held liable for intentional infliction of emotional distress as a matter of law. See M.G.L. c. 258, § 10 (c).

The Massachusetts Tort Claims Act partially abrogated the doctrine of sovereign immunity which had previously governed claims against subdivisions of state government by authorizing private claims against the sovereign under limited circumstances. Notwithstanding of its limited authorization of private causes of action against governmental defendants, the Massachusetts legislature reserved immunity for the intentional torts of governmental employees and agents including:

Any claim arising out of an intentional tort, including assault, battery, false imprisonment,

6

false arrest, <u>intentional mental distress</u>, malicious prosecution, malicious abuse of process, libel, slander, misrepresentation, deceit, invasion of privacy, interference with advantageous relations or <u>interference with contractual relations</u>.

M.G. L. c. 10 (c) (emphasis added).  Because Methuen is immune to claims for damages based on alleged intentional infliction of mental distress, the Court should dismiss Count III.

The Court should dismiss the plaintiff's claim for intentional infliction of emotional distress against Solomon and Alaimo because the Complaint does not allege shocking and outrageous conduct of the type which can support liability for intentional infliction of emotional distress.  In order for the plaintiff to succeed on this claim, he must plead and prove that the defendants

(1) intended to inflict emotional distress, (2) in a manner amounting to extreme and outrageous conduct, beyond all possible bounds of decency and utterly intolerable in a civilized community (3) to cause him severe emotional distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.  <u>See</u>  <u>Tetrault v. Mahoney, Hawkes & Goldings</u>, 425 Mass. 456, 466 (1997); <u>Agis v. Howard Johnson Co.</u>, 371 Mass. 140, 144-145 (1976); Restatement (Second) of Torts, § 46.  Conduct considered extreme and outrageous must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and intolerable in a civilized community."  <u>Mello v. Stop & Shop</u>, 402 Mass. 555, 562-63 (1988); <u>Foley v. Polaroid Corp.</u>, 400 Mass. 82, 99 (1987).  Liability cannot be predicated upon:

> "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," nor is it enough "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort"; rather,

7

> [l]iability has been found only where the conduct has been found so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

Foley, 400 Mass. at 99; Restatement (Second) of Torts, § 46.

Notwithstanding the Plaintiff's rote recitation of the legal elements of such a claim in a conclusory fashion, the Complaint alleges no conduct which can support recovery on this theory of liability. In substance, the Complaint alleges that Solomon and Alaimo informed the plaintiff that his secretary had alleged that he had sexually assaulted her. See Compl., ¶ 98. The Complaint alleges that Solomon and Alaimo presented the plaintiff with two options: resign from his position; or face criminal charges and termination. See Compl.. ¶ 101. Even if the plaintiff's allegations with respect to Solomon and Alaimo could be proved, their alleged actions cannot reasonably be considered "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and intolerable in a civilized community." Mello, 402 Mass. at 562-63. There is no allegation of "profoundly shocking" conduct by Solomon or Alaimo and, accordingly, the Court should dismiss Count III as against all the Defendants.

E.    THE COURT SHOULD DISMISS COUNT IV AGAINST ALL DEFENDANTS BECAUSE IT DOES NOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

The Court should dismiss Count IV, which alleges intentional interference with advantageous contractual relations, as against Methuen because, as stated above, it cannot be held liable for the alleged common law intentional torts of its employees as a matter of law. See M.G.L. c. 258, § 10 (c). Therefore, the Court should dismiss Count IV against Methuen.

8

The Court should dismiss Count IV against Solomon and Alaimo because the plaintiff has not pled a *prima facie* case of intentional interference with contractual relations against them. In such an action, the plaintiff must prove that (1) he had a contract with a third party, (2) the defendant knowingly induced the third party to break that contract, (3) the defendant's interference was intentional and improper in motive or means and (4) the plaintiff was harmed by the defendant's actions. See Draghetti v. Chmilelski, 416 Mass. 808, 816, 66 N.E.2d 862 (1994). Neither Solomon nor Alaimo is alleged to have induced Methuen to break any contract which it may have had with the plaintiff. Rather, the Complaint alleges that the plaintiff admits that he resigned his position. See Compl., ¶ 117. Because the plaintiff has not alleged and cannot prove the second element of a *prima facie* claim for intentional interference with contractual relations the Court should dismiss Count IV.

F.    THE COURT SHOULD DISMISS COUNT V AS AGAINST METHUEN BECAUSE IT DOES NOT STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

As a matter of law, the Court should dismiss Count V alleging conspiracy, against Methuen because, as stated above, it cannot be held liable for the alleged common law intentional torts of its employees as a matter of law. See M.G.L. c. 258, § 10 (c).

## IV.    CONCLUSION

For the reasons stated above, the defendants respectfully move the Court to dismiss all Counts of the Complaint as detailed above.

Respectfully submitted,

The Defendants
JOSEPH SOLOMON, JOSEPH ALAIMO
and the CITY OF METHUEN,
By their attorneys,


/s/ William P. Breen, Jr.
William P. Breen, Jr., Esq., BBO #558768
Rebecca L. Andrews Esq., BBO #644846
MURPHY, HESSE, TOOMEY & LEHANE, LLP
300 Crown Colony Drive, Suite 410
Quincy, MA 02110
(617) 479-5000

Dated: August 19, 2005

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

MAURICE LARIVIERE,

               Plaintiff

        v.                       CIVIL ACTION NO.:
                                    05-11579-EFH

JOSEPH SOLOMON, ET AL.,

               Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## O R D E R

October 11, 2005

HARRINGTON, S.D.J.

Upon review of the documents submitted in this case, the Court rules as follows:

1.    The Court denies Motion to Dismiss as to Count I;

2.    The Court grants Motion to Dismiss as to City of Methuen as to Count II;

3.    The Court denies Motion to Dismiss as to individual defendants as to Count II;

4.    The Court grants Motion to Dismiss as to City of Methuen as to Count III;

5.    The Court denies Motion to Dismiss as to individual defendants as to Count III;

6.    The Court grants Motion to Dismiss as to Count IV;

7.    The Court grants Motion to Dismiss as to City of Methuen as to Count V; and

8.    The Court denies Motion to Dismiss as to individual defendants as to Count V.

SO ORDERED.

                             /s/ Edward F. Harrington
                             EDWARD F. HARRINGTON
                             United States Senior District Judge

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                    SUPERIOR COURT
                                              CIVIL ACTION No. 05-1155C

---

MAURICE LARIVIERE,                         )
                                           )
                  Plaintiff                )
v.                                         )
                                           )          **SECOND AMENDED**
JOSEPH SOLOMON, individually, and as       )          **VERIFIED COMPLAINT**
    Chief of Police of the City of Methuen, and )     **(AND JURY DEMAND)**
JOSEPH ALAIMO, individually, and as        )
    Deputy Chief of Police of the City of Methuen, and )
THE CITY OF METHUEN                        )
                                           )
                  Defendants.              )
                                           )

---

## THE PARTIES

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire.

Until February 16, 2005, he was the city solicitor for the City of Methuen.

2.    Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the chief of police of the City of Methuen.

3.    Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the deputy chief of police of the City of

Methuen.

4.    The City of Methuen is a duly chartered city located in Massachusetts with a principal

place of business at 41 Pleasant Street, Methuen, Massachusetts.

## BACKGROUND

5.   The City Solicitor's position is a two-year appointment made by the City Council pursuant to the Home Rule Charter of the City of Methuen. Lariviere had been reappointed by the City Council ("the Council") in January of 2005.

6.   Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and has continuously been reappointed by numerous administrations. No complaints whatsoever have been lodged against him concerning inappropriate conduct with employees or staff.

7.   The Mayor appoints employees of the City Solicitor's office. At all times relevant hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor").

<u>Relationship with the Mayor</u>

8.   Since mid-2001, relations between the Mayor and Lariviere have been acrimonious, upon information and belief because Lariviere was not appointed by, under the control of, beholden to, or subservient to the Mayor.

9.   For example, the Mayor repeatedly became angry when Lariviere refused to disclose to the Mayor confidential communications with city councilors. Lariviere's policy, as the City Solicitor, was to keep his conversations with both councilors and the Mayor confidential. Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or the Mayor were kept confidential until the client went public with them. Lariviere would not convey any information on the existence of the documents until the councilor or the Mayor placed them on the agenda. The Mayor would often express disgust that she was not immediately told when a councilor talked to Lariviere about any matters including resolutions or ordinances.

10.   In one instance, a council dispute erupted regarding raises being granted to department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the department heads of elder affairs and veterans, and not other department heads. In accordance with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor.

After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her.

Lariviere responded that it had always been his policy to not breach attorney-client

confidentiality, including not telling councilors when he did work for her. The Mayor then

screamed over the phone "You scare me," and hung up.

11.     The Mayor also resented Lariviere because he wrote a report defending a political

opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting

her driveway and received a citation relating to the accident.  After filing a complaint with the

police claiming the citation was based on political retribution, the Mayor directed that Lariviere

conduct a thorough investigation, which he did.  Lariviere then wrote a report concluding that the

Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the

other driver.

12.     The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a

city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the

report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then

ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force

Lariviere to change the report.  Lariviere steadfastly refused, and the Mayor left the meeting

angry and disgusted.

13.     On another occasion, Solomon ordered a police officer to appear at city hall on the

night of a city Council meeting and issue tickets to persons parking in areas with signage limiting

the time for parking. Two tickets were given out, one to a political opponent of the Mayor and

the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police

station and advised that the ticketing was illegal.  Solomon relayed this to the Mayor and,

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The

tickets were later withdrawn.

14.     In the eight years prior to the Mayor's election, insurance had been handled by the purchasing agent. Upon information and belief, the Mayor disliked the purchasing agent and forced her out of office, whereupon Lariviere took over the duties.

15.     In another matter, Lariviere sought information updates on the property insurance from various city departments and determined that there were numerous errors in the property schedule, including coverage for properties the city did not own, non-coverage for properties it did own and incorrect coverage for yet other properties. He then attempted to have the agency correct these errors. Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city. When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor.

16.     In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate.

<u>Metin Employment</u>

17.     In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004.

18.     Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position,

however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director.

19.     The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City.

20.     On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly. Metin started work as a temporary secretary on October 4, 2004.

21.     A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself.

22.     The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems.

23.     During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot.

24.     After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two

joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and
including February 15, 2005.

25.     Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes
and Noble, and D'Angelo's. Except for Starbucks, Lariviere had prior to this never been to these
places. Lariviere and Metin took turns purchasing the food.

26.     In addition to going to lunch, they would go shopping at various stores including pet
stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her
daughter Christmas presents. All shopping expeditions, with one exception, were to purchase
items Metin wanted to obtain.

27.     Metin advised Lariviere that as her marriage deteriorated and the violence got worse,
she experienced psychological problems and began counseling. During this period she admitted
having an adulterous affair with another man.

28.     Metin advised Lariviere that her husband didn't seem angry about the affair but
thereafter they divorced.

29.     The husband had also taken their monies amounting to eighty thousand dollars and
invested it in a restaurant.

30.     Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This
occurred in approximately 1999.

31.     The husband after the divorce moved to Turkey where he is to this date. Since
separation he has never provided her with any monies nor supported their child.

32.     At the time of the break-up of the marriage Metin was living on Long Island in New
York. She had advised Lariviere she had problems keeping jobs and at her last employment she
was paid approximately thirty-five thousand dollars for an annual salary, which, according to
her, on Long Island constituted poverty.

6

33.    She admitted to Lariviere that while on Long Island things had gotten so bad that she willfully borrowed money from people knowing she had no intent of repaying them and in fact had already decided to flee New York.

34.    Facing no chance at being able to survive on Long Island she moved to Haverhill, Massachusetts and began living with her mother and her mother's boyfriend Glenn.

35.    Shortly after Metin started, Lariviere contacted the Human Resources Director and asked him to put on hold the job search for the litigation paralegal position to see if Metin would work out. Metin had indicated that she would like the position.

36.    She indicated she very much liked working for Lariviere. She began to call him "Archangel" saying he was helping to save her from her many problems. Their personal relationship, formed primarily by her, was deepening. Anything that broadened the relationship or personalized it was initiated by her.

37.    In late October, Lariviere agreed to recommend Metin for the secretary's position upon her promising him to obtain a paralegal certificate and agreeing to his training her in a paralegal role.

38.    Lariviere recognized that she was not qualified for the litigation paralegal position nor for that of legal secretary, However, the pleasant relationship convinced him to offer her the position on the hope of her being trained for it.

39.    Lariviere recommended hiring Metin full time to the Human Resources Director. The Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to hire her.

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job.

41.     Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency.

42.     The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood.

43.     Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee.

44.     Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues.

45.     During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either.

46.     Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations.

8

47.     Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter.

48.     She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff.

49.     At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner.

50.     The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere.

51.     Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate.

52.     Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym."

53.     In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band

9

on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined.

54.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site.

55.    She was and is engaged to a person named Anthony but said she was not sure if she wanted to marry him. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs.

56.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers.

57.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine.

58.     Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later.

59.     She went for further testing and the doctor confirmed that she had numerous ulcers.

60.     Lariviere and Metin occasionally exchanged emails on weekends. One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. On his birthday she gave him the present and they exchanged a hug and kiss.

61.     On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere.

62.     Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him.

63.     On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups.

64.     On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail.

65.     In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time.

11

66.    She would go to the gym two days a week and out to lunch with Lariviere two days per week.

67.    In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan.

68.    Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car.

69.    The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi  thanks for all your help" and she then proceeded to sign it "Kiss".

70.    In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy."

71.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally.

72.    At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch.

73.    Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place."

74.    In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body.

75.    Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time.

76.    Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity.

77.    She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend.

78.    By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a number of occasions Metin would in the midst of the fight take her daughter out of the home. One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them about the fighting and swearing leading to her fleeing the house that night.

79.    In early February the distraught Metin began showing signs of erratic behavior.  For example, she would denounce her mother to Lariviere, but when Rana would call her on the cell

13

phone, she would become a pleasant and loving daughter during the call and then immediately

denounce her after the call terminated.

80.    On a personal level, the parties were not intimate, but mutually affectionate with

much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya

benefited greatly from the assistance she was getting in turning around her life problems.

February 15, 2005

81.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of*

*Methuen,* in the Massachusetts Federal District Court, involving a claim that a Methuen police

officer while on duty had taken a woman into custody and then raped her. He was later convicted

of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City

of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache,

was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the

there had been a prior charge of rape made against Blache.

82.    As Metin knew, Lariviere worried about and lived this case day in and day out,

knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a

verdict against Methuen costing the taxpayers millions of dollars.

83.    This was one of the largest, most serious and most difficult cases Lariviere had ever

handled.  If lost, the effects on the Mayor, City Council, and police department could have been

devastating.

84.    On January 27th, 2005 Lariviere appeared before Federal District Court Judge Stearns

and argued his motion for summary judgment in favor of the City.  On the afternoon of Feb. 15th,

Lariviere learned that the judge had ruled in favor of the City and dismissed the case. An ecstatic

Lariviere called the former Police Chief, Bruce McDougal who was in charge of the department

when the rape occurred. Lariviere and McDougal knew each other for fifteen years but

14

Lariviere's voice was so high and excited in the message left that McDougal could not even recognize Lariviere's voice. Ecstatic, Lariviere then went down and advised the Mayor's chief of staff of the victory. He then called and left cell phone messages for Solomon, and then for Metin, with whom he had discussed the subject many times. After going to the gym that night, Lariviere again called Metin to talk about the case.

85.     Unknown to Lariviere, during that time, Metin was apparently meeting with police lieutenant Michael Wnek and Solomon.

<u>February 16, 2005</u>

86.     Lariviere arrived that morning and began working on a letter to send to the City Council outlining the victory in the Federal Court. He had never in his 25 years sent out a similar letter, but in his mind this extremely important victory had to be reported. He again called Solomon to talk to him about the court victory.

87.     Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go.

88.     A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office.

89.     Lariviere called Metin into his office and gave her a copy of the addresses of the councilors so that she could prepare mailing envelopes for them while he finalized the letter. She later asked him to email her the letter so she could reformat it. Metin asked about reformatting the letter and Lariviere said no he just wanted it on one page.

15

90.    She printed out one original copy and then left the solicitor's office and went to the council office to copy the letter.

91.    Metin returned and began the envelope process. Lariviere printed a copy of the Judge's decision and then went into her office to get it. Lariviere and Metin talked for a while about the case and then he picked up the decision and began to leave.

92.    As Lariviere went back to his office Metin called out, "You are a good attorney." Lariviere came back out and went around to the inside of her L-shaped desk. They talked about the case and his victory for a while.

93.    As she had done to him, he leaned over and kissed her on the cheek and then a peck type kiss on her lips.  At this time she looked slightly downwards. He asked, "Are you ok?" She answered, "Yes, I am just tired." (This is something she often told him given the troubles at home and her lack of sleep.)

94.    Lariviere leaned over and with his right arm placed it on her left shoulder as a sign of support. He often told her, "I am there for you to help you, my friend."  She talked to him for a bit and then stood up. They briefly kissed. She began to leave and he stood up and again asked, "Are you ok?" She again said yes and then started to walk past him a short distance. He pointed to and made contact with her stomach on the right front area and asked, "Is it (her ulcer) ok?" She said, "Yes." He said, "You are getting skinny; the gym exercises are working."

95.    After a few moments she left and went outside.

96.    She never at any point in time gave any indication that the contact was unwanted or inappropriate; nor was the contact any different than similar displays initiated by her in the past.

97.    Shortly after Metin left the solicitor's office, Solomon and Alaimo arrived. Lariviere assumed that the two had arrived to talk about the court triumph. However, the two were stern faced and told him they wanted to talk to him in the second floor conference room. Lariviere

16

assumed they were going to throw him a surprise party to celebrate his victory. He followed

them into the conference room and when he saw it was empty he assumed the people would

arrive shortly.

98.     Alaimo then took out a piece of paper and began to read the Miranda rights to

Lariviere. Only then did he realize something bad was happening. Alaimo and Solomon then told

him Metin had made a complaint against him for sexual assault. These sexual assaults included

fondling her breasts. Lariviere was stunned and overwhelmed to find out a person he trusted had

done this to him.

99.     Solomon and Alaimo had at the beginning put on two small tape recorders. Lariviere

asked to talk to them and assumed they were turned off. After the taping stopped, Solomon and

Alaimo ceased any further investigation protocols and proceeded to use physical and emotional

threats to force Lariviere's resignation. The officers began berating him: :Metin wants you out of

here; you cannot work here anymore, you are finished." Solomon told him how much it hurt him

to have to do this, and how he could not sleep the previous night because of this.

100.     Knowing that Methuen has a sexual harassment policy dealing with this type of

employee-employer dispute, including a complete review process,  they nevertheless demanded

that he resign immediately  in order to avoid criminal prosecution. Solomon said, "If you resign,

I know Metin will not press criminal charges based upon my talking to her just a little while ago.

However, the Mayor wants you fired and prosecuted. I can talk to her; as you know, we have let

people have leaves and then they just go away. I will talk to her (the Mayor) about this."

101.     Lariviere told him, "I need to go home and talk to my wife about this whole issue."

Solomon said, "You will not leave: resign or I arrest you right now." Solomon then left to talk to

the Mayor. Alaimo remained in the room. Solomon then returned and said, "There will be no

17

leave time - she wants you out now or you are under arrest. Metin will want you arrested if you do not resign."

102. Lariviere was absolutely confused and devastated; he thought he was going to a victory party and was now in unlawful custody, being told he had to resign immediately or be arrested.

103. Solomon and Alaimo, the two chief law enforcement officials in Methuen and the mayor's strongest supporters They knew he had due process rights with respect to his job and was a council employee with 25 years of service, but his version was of no interest to them. All his rights had to be waived and he had to resign.

104. Lariviere asked if he could talk to Metin, and was told no.

105. They repeated again statements Metin made to them, that Lariviere had molested her and fondled her breasts and that he stalked her. Lariviere denied the charges made. Lariviere asked about the stalking, and they pointed to his call to her the night before. Lariviere told Solomon that he called her about the court case, and he admitted, "I was there for the second call and heard it." Lariviere said, "Joe if you did then you know all I talked about was the court case and then hung up."

106. Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo and the night Metin and her daughter met even though Lariviere and Depardo had planned on being there and Metin had not.

107. Solomon and Alaimo then said they were going back up stairs to talk to the Mayor. They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further indicated that he must accompany him there. They walked down the corridor and upon arrival at the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by

18

myself. After he finished he stepped outside and the police captain was there waiting for him and escorted him back to the conference room.

108.    Solomon and Alaimo returned and demanded an immediate resignation or he would be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her I know she will not seek criminal charges."

109.    As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know." He then added, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now."

110.    Finally, Solomon looked at his watch and said "I have a meeting in twelve minutes. This is your last chance resign or you are arrested, handcuffed and taken out of this building."

111.    After one and one-half to two hours of this vitriolic attack, Lariviere snapped. He knew any clarification or explanation would be fruitless. The threats, intimidation and coercion by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could only see the harm that would befall him and more significantly, his family.

112.    He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the publicity these charges would bring and the hurt to his family and name if he didn't comply with their threats. Solomon then left and went to the Mayor's office where he prepared the letter of resignation adding a waiver of hearing as suggested by David Bain. They returned and put the resignation letter and a pen in front of Lariviere to sign. LaRiviere in a state of fear and confusion signed the document without reading it.

113.    Ironically, the Human Resources Department was located next to the City Solictor's office and the Director was another unquestioning supporter of the Mayor and was fully aware of how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of the policy as mandated upon her employment and acquiesced as the police turned this incident into a criminal investigation to deliberately deny Lariviere of his rights.

114.    The defendants lacked good cause for the threatened criminal proceedings.

115.    The defendants' aforementioned actions were objectively unreasonable

116.    Under duress, Lariviere involuntarily and under coercion resigned. Lariviere was not given a reasonable time within which to choose between resignation and the termination proceedings to which he had a right.

117.    Shortly after the incident, Lariviere spoke to William Manzi, then a City Councilor and now Mayor of Methuen, and Manzi stated that he would "make things right." Manzi further promised that he would make sure the council did not act to accept Lariviere's resignation. Accordingly Lariviere took no formal action at that time.

118.    Under the circumstances, it was absolutely clear that either withdrawal of the resignation or pursuit of any possible administrative remedy by Lariviere was futile.

119.    The defendants deliberately and intentionally disregarded and circumvented Methuen's sexual harassment policy and chose instead to utilize coercion , threats and intimidation to seize control of the Solicitor's office and eliminate an unwanted employee. The defendants did not investigate the relationship; rather they brought the full force of law enforcement down on Lariviere to force a politically desirable conclusion.

120.    The defendants held the plaintiff against his will without lawful authority to do so given their actions were to force a resignation  and not conduct a criminal investigation.

121.    The defendant's took these actions realizing that Metin did not seek or want to pursue criminal charges.

## COUNT I
### (Constructive Discharge/Unlawful Termination)

122.    The plaintiff hereby realleges and reavers paragraphs 1 through 121 as though fully set forth herein.

123.    By threats, intimidation and coercion, the defendants unlawfully secured the plaintiff's resignation against his will, and forced him to relinquish his right to a hearing.

124.    Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff. Their actions created a condition which was so difficult and unpleasant that a reasonable person in the plaintiff's position would have felt compelled to resign. By any objective assessment their actions were intolerable.

125.    Defendants' actions, in their official capacity, were to force a resignation against Lariviere's will, and therefore the resignation should be treated as an unlawful termination.

126.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

127.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT II
### (Intentional Infliction of Emotional Distress as to Solomon and Alaimo)

128.    The plaintiff hereby realleges and reavers paragraphs 1 through 127 as though fully set forth herein.

21

129.    Defendant's conduct is not within the course of their employment nor in furtherance of the city's interests.

130.    Defendants intended in the manner they obtained the resignation of Lariviere to inflict emotional distress or should have known that emotional stress was the likely result of their conduct, namely advancing criminal charges where none were warranted and threatening to publicize their allegations to the public and his family.

131.    Defendants intentionally and deliberately inflicted emotional distress on Lariviere by maliciously intimidating plaintiff, by abusing the lawful process for an unlawful purpose, by violating Lariviere's constitutional rights, by falsely arresting and imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, and knew or should have known that emotional distress was the likely result of their conduct. All of this was done willfully to strip Lariviere of his rights and assure that he would not have the forum guaranteed to him to address these allegations.

132.    Defendants' conduct in causing the resignation and terminating employment was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

133.    The actions of the defendants were the cause of plaintiff' distress, and the distress sustained by plaintiff was so severe and of such a nature that no reasonable man could be expected to endure it.

134.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

### COUNT III
(Violation of Massachusetts Civil Rights Act Against Solomon and Alaimo)

135.    The plaintiff hereby realleges and reavers paragraphs 1 through 134 as though fully set forth herein.

22

136.    By threats, intimidation and coercion, the defendants interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and Laws and rights secured by the Constitution or laws of the Commonwealth of Massachusetts, including but not limited to the right to property and the right to a hearing.

137.    The defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.

138.    By unlawfully forcing him to resign, using threats, intimidation and coercion, the defendants denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years. These due process rights existed under the Methuen Home Rule Charter Article 9. These due process rights provide for disciplinary action for good cause only, and solely by the City Council.

139.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

140.    These defendants deprived Lariviere of both his right to his liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution or Constitution of the Commonwealth and M.G.L. 12 §11I.

141.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by

23

conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation.

142.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT IV
(Violation of 42 U.S.C. §1983 v. Solomon and Alaimo Individually)

143.    The plaintiff hereby realleges and reavers paragraphs 1 through 142 as though fully set forth herein.

144.    Acting under color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

145.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

146.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

147.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

148.    Solomon and Alaimo deprived Lariviere both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution and §1983.

149.    Solomon and Alaimo acted with the intent and motive to accomplish an ulterior goal an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

150.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT V
(Violation of 42 U.S.C. §1983 v. Solomon and Alaimo In Their Official Capacity)

151.    The plaintiff hereby realleges and reavers paragraphs 1 through 150 as though fully set forth herein.

152.    Acting under the color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

153.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

154.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

25

155.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

156.    Solomon and Alaimo deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

157.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

158.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT VI
(Violation of 42 U.S.C. §1983 v. City of Methuen)

159.    The plaintiff hereby realleges and reavers paragraphs 1 through 158 as though fully set forth herein.

160.    The Chief of Police was the maker and enforcer of policy or custom on public safety and law enforcement issues.

161.    By threats, intimidation and coercion, Methuen interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property and the right to the First Amendment.

162.    Methuen's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

163.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Methuen, by its agent and employees denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

164.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

165.    Methuen deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

166.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Methuen deprived Lariviere of his rights.

167.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT VII
(Intentional Interference with Advantageous Contractual Relations)

168.    The plaintiff hereby realleges and reavers paragraphs 1 through 167 as though fully set forth herein.

27

169.    The plaintiff had advantageous business relationship and contract with the city of
Methuen through his employer the Methuen City Council of which the defendants were aware.

170.    The defendants intentionally and maliciously interfered with that relationship with the
intent of causing plaintiff harm.

171.    As a direct and proximate cause of the intentional acts of the defendants, plaintiff
suffered severe mental anguish, loss of income, physical injury and other harm.

### COUNT VIII
(Conspiracy)

172.    The plaintiff hereby realleges and reavers paragraphs 1 through 171 as though fully
set forth herein.

173.    The defendants unlawfully conspired to, inter alia, unlawfully deprive, either directly
or indirectly, Lariviere of equal privileges and immunities under the laws, and conspired to cause
by force, intimidation and threat the resignation of Lariviere from his position, and cause him
harm.

174.    The power of the defendants collectively to cause Lariviere harm was substantially
greater than any of the participants had singly.

As a direct and proximate cause of the negligent and intentional acts of the defendants, plaintiff
suffered severe mental anguish, loss of income, physical injury and other harm in connection
with this deprivation of his rights.

### COUNT IX
(Deceit)

175.    The plaintiff hereby realleges and reavers paragraphs 1 through 174 as though fully
set forth herein.

176.    The defendants made misrepresentations to the plaintiff, as set forth in paragraphs
100 through 174.

28

177.    These misrepresentations were made with the intention to illegally and improperly compel and/or induce the plaintiff to resign.

178.    The defendants knew or should have known that these misrepresentations were untrue, and said defendants had a duty to disclose.

179.    The misrepresentations were made with the intent to improperly compel and/or induce the plaintiff to resign and to give up his rights.

180.    Plaintiff was damaged as a result of the defendants' deceit and misrepresentations.

## COUNT X
### (False Imprisonment)

181.    The plaintiff hereby realleges and reavers paragraphs 1 through 180 as though fully set forth herein.

182.    The defendants unlawfully restrained the plaintiff by force and/or threats, and would not allow plaintiff to either leave the conference room or contact his wife, counsel or anyone else during the time he was unlawfully restrained.

183.    The plaintiff was injured as a result of the defendants' unlawful restraint of his freedom.

## RELIEF REQUESTED

WHEREFORE, the plaintiff respectfully requests this Court:

    a.    A declaration that plaintiff shall be reinstated to his employment as City Solicitor with all salary and benefits reinstated and/or reimbursed;

    b.    Award monetary damages in an amount deemed to be just, fair, as appropriate;

    c.   Award loss of wages and income and benefits, including reinstatement of all

         seniority, retirement and other benefits plaintiff would have enjoyed but for the

         actions of the defendants;

    d.   Award future loss of income and value of benefits as appropriate;

    e.   Award the plaintiffs' costs and attorneys' fees;

    f.   Grant any other relief this Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE.**

**VERIFICATION**

    I, Maurice Lariviere, the undersigned, hereby verify and attest under the pains and penalties of perjury that I have read the Foregoing Verified Complaint and that I know the facts stated therein to be true, except insofar as stated to be upon information and belief, as to which I believe the same to be true.

/s/

Dated: January 11, 2007        _____

          Maurice Lariviere

          Plaintiff,
          MAURICE LARIVIERE
          By his attorneys,

          /s/

          _____

          Carmine W. DiAdamo
          BBO#122960
          William H. DiAdamo
           BBO#558883
          DiAdamo Law Office LLP
          40 Appleton Way
          Lawrence, MA 01840
          (978) 685-4271

EXHIBIT

17 Lariviere
12-29-06



# METHUEN POLICE DETECTIVE DIVISION

### Lieutenant Michael J. Wnek

On Tuesday February 15, 2004 at approximately 09:00 hours I opened up an e-mail from Fulya Metin. Fulya is employed by the City of Methuen as an assistant to the City Solicitor; Maurice J. Lariviere Jr. Fulya indicated in her e-mail message that she has a major problem in her office and requested that I meet with her to discuss her problem (See attached e-mail message).

I subsequently arranged to meet Fulya at the Loop parking lot on 90 Pleasant Valley Street Methuen at 1700 hours. At approximately 1715 Hours I met Fulya in the Loop parking lot. I entered her motor vehicle and she began to inform me her story. I immediately observed her to be very upset. She informed me that the City Solicitor, Maurice Lariviere, has repeatedly physically assaulted, sexually assaulted, and harassed her while she was at work. She told me that she has been the victim of his abuse for approximately the last four months. The sexual and verbal abuse has occurred since her fourth day of employment with the city and it has occurred almost daily up to the present time. I observed her to be visibly distressed as she detailed Maurice Lariviere's inappropriate and criminal conduct towards her. Fulya related that on about the 4th or 5th day of her employment with the city Maurice grabbed her by the file cabinets and he kissed her on the lips. She related that she was very upset and surprised by his behavior. She said that Maurice said he was sorry and that he wouldn't do that anymore. She related that this behavior had stopped for a short period of time but then he started to ask her "weird" questions like, does she like him? and will they be friends forever? She said that she would try to change the subject on him or she would walk away from him because he made her feel very uncomfortable. He also began to ask her for hugs. Fulya said that she told him no, and that she didn't enjoy him touching her, and she asked him to stop. Maurice would respond by asking her if she was mad at him, or saying, "don't be mad at me". These incidents, according to Fulya, progressively got worse. She related that it became very difficult for her to go to work under these conditions. Fulya said that Maurice would reach over her desk and kiss her on the lips. He would then stand by her desk and just stare at her. If she ever wore anything a little low cut or a skirt he would make comments and just stare at a specific part of her body. When he would hug her he would get so close to her that she could feel his private part on her private area. Fulya related that she would push him away but Maurice would still try to kiss her. Fulya related that she didn't know how to handle what he was doing. She was in fear of loosing her job and was also confused about the potential embarrassment if she came forward with a complaint. I informed Fulya that in my opinion this was clearly sexual harassment and that Maurice's

1

behavior could be considered criminal. I explained to her that these issues needed to be addressed immediately. Throughout this dialogue, Fulya remained very upset and perplexed as to why Maurice was behaving like this. Fulya claimed that Maurice would frequently hand her typed written statements such as " I love Maurice" and "Maurice is a good guy". He would ask her to sign her name to these statements. She indicated that she would sign her name to these statements in hope that he would leave her alone. She observed that he would place these papers in his desk drawer located in his office. She also saw a picture of a naked woman with her breasts exposed. Additionally, she observed her picture on his computer screen sometime in November of 2004. She asked him what he was doing with her picture on his screen? He informed her that he got it from the web site www.match .com, which was a dating site that Fulya used. Fulya said that almost everyday Maurice would ask her for a hug and a kiss. He would on a daily basis reach over her desk and kiss her on the lips and then beg her for a hug. She stressed to him that she did not want these kisses. Maurice would on a few occasions and more often lately touch Fulya's breasts when he hugged her. She said she had to pull his hands down. Maurice replied by saying " that wasn't nice you did that to me" "why are you pulling my hands away". Maurice would try to rub her back all the time and he tried to force Fulya to sit on his lap. Fulya again asserted that she was very confused as to why he was acting this way. Maurice on some occasions also touched her buttocks and tried to rub it while he was trying to get her to hug him. Recently, Maurice almost had his hand down the back of her pants as he attempted to feel her buttocks. She related that she had to pull his hand away. One day Maurice said that he loved her according to Fulya. She related that he began crying at her desk as he informed her that he had only been with his wife and he didn't know how to handle the situation with Fulya. On that same day Maurice told Fulya that he could no longer have sex with his wife because he was always thinking of Fulya. Fulya again related that she was very upset, confused and angered throughout these incidents. Fulya informed me that she told John Milori about some of these incidents. Fulya said that she made John promise her not to tell anyone. She also told Linda Gagnon and made her promise to keep the matter confidential. Fulya was subsequently taken to my office at the Methuen Police department where she was asked to give me a typed synopsis of the allegations. (Refer to Fulya's attached typed synopsis). Upon my arrival to the police station I immediately informed Chief Joseph Solomon. Fulya was present with me as I explained the details of this incident to Chief Solomon.

On Wednesday February 16, 2004 a hidden video camera was set up in Fulya's office. The camera was set up to video record Fulya's office. (Refer to attached permission statement signed by Fulya) Captain Kristopher McCarthy and I set up a covert surveillance post to observe and record the actions in Fulya's office. We began our observations at 0515 hours. At approximately 0820 hours we observed Maurice Lariviere enter the office. A few minutes later we observed Fulya enter her office. We subsequently observed three separate unwanted encounters between Maurice and the Fulya. During the first encounter we observed Maurice give Fulya a kiss. A second encounter revealed another unwanted kiss and a request for a hug. During this second encounter Maurice repeatedly kept touching Fulya's shoulder followed by another kiss. During the third and final encounter we observed Maurice kneel down beside her. Fulya subsequently rose to her feet and stood by her desk. Maurice approached her and placed his arms around her waist. He firmly held her torso and he repeatedly kissed her and aggressively attempted to kiss her as she clearly resisted. We

also observed his hands grab Fulya's buttocks area. She subsequently freed herself from his hug and left the office area. Captain McCarthy informed Chief Solomon of this. The Chief was in Mayor Pollard's and he immediately responded to the hallway to meet Fulya and he promptly took her to Mayor Pollard's office. We concluded our observations at approximately 10:30 hours. Both the office area and the video equipment were seized and secured by Sgt. Randy Haggar. (Refer to VHS tape recording)

I directly responded to the Mayor's office where I briefly spoke to Fulya. I again observed her to be visibly upset. She appeared to be anxious, flustered, and about to cry.

Chief Joseph Solomon and Deputy Chief Joseph Alaimo spoke to Maurice Lariviere. Their conversation was tape recorded on two (2) micro cassette recorders. (Refer to micro cassette recordings)

Fulya was taken to the Methuen Police station where she completed and signed a typed written synopsis of the events that occurred in her office on February 16, 2005. (Refer to signed synopsis) I briefly interviewed Fulya regarding the events that we video recorded in her office.

On February 16, 2005 Sgt. Larry Phillips was directed to write an affidavit for application for a search warrant for Maurice Lariviere's office located at 41 Pleasant Street room 311, Methuen, MA. Sgt. Michael Havey was also directed to write an affidavit for application for a search warrant for Maurice Lariviere's computer located at 41 Pleasant Street room 311. Both applications were completed and both search warrants were issued. (Refer to attached copies of affidavits and search warrants)

At approximately 1830 hours we executed the search warrant. Sgt. Havey located and seized Maurice's computer, 18 CD ROMs, 15 3.5" diskettes, and 41 3.5" diskettes, and 1 CD Rom in a plastic case. Sgt. Havey took possession of the computer to execute a forensic search. Sgt. Greg Gallant filled out an evidence inventory and collection sheet. Sgt. Phillips located assorted papers with typed written statements sign by Fulya Metin. These papers were located in the right top desk draw. Sgt. Phillips photographed these items. Sgt. Gallant filled out an evidence collection sheet.

This case is still under investigation.

---

**Lieutenant Michael J. Wnek**

**Page 1**

```
 1
 2        UNITED STATES DISTRICT COURT
          DISTRICT OF MASSACHUSETTS
 3
              C.A. NO: 05-11579EFH
 4
 5
 6   MAURICE LARIVIERE,
            Plaintiff,
 7
     v.
 8
     JOSEPH SOLOMON, Individually, and as Chief
 9   of Police of the city of Methuen, JOSEPH
     ALAMO, Individually and as Deputy Chief of
10   Police of the City of Methuen,and THE CITY
     OF METHUEN,
11          Defendants
12   ===============
13
14      DEPOSITION OF MAURICE LARIVIERE, a
     witness called on behalf of the Defendants,
15   Joseph Solomon, individually, and as Chief
     of Police of Methuen, Joseph Alaimo,
16   individually and as Deputy Chief of Police
     of the City of Methuen, and the City of
17   Methuen, pursuant to the Federal Rules of
     Civil Procedure, before Joan R. Dunne, a
18   Stenographer and Notary Public in and for
     the Commonwealth of Massachusetts, at the
19   offices of Morrison Mahoney LLP, 250 Summer
     Street, Boston, Massachusetts, on Monday,
20   November 13, 2006, commencing at 10:35 a.m.
21
22          JOAN R. DUNNE
          Court Reporting Service
23          28 Sonning Road
          Beverly, Massachusetts 01915
24          (978) 927-2678
```

**Page 2**

```
 1                        2
 2   APPEARANCES:
 3
 4      MORRISON MAHONEY LLP
        (by Gareth W. Notis, Esq.)
 5      250 Summer Street
        Boston, Massachusetts 02210
 6      Counsel for all the Defendants
 7      DiADAMO LAW OFFICE LLP
        (by William H. DiAdamo, Esq.)
 8      40 Appleton Way
        Lawrence, Massachusetts 01840
 9      Counsel for the Plaintiff
10
11      REARDON, JOYCE & AKERSON, P.C.
        (by Andrew J. Gambaccini, Esq.)
12      397 Grove Street
        Worcester, Massachusetts 01605
        Counsel for the Defendants
13        Joseph Solomon and Joseph Alaimo
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1                        3
 2              I N D E X
 3   WITNESS:  MAURICE LARIVIERE
 4      Direct   Cross   Redirect   Recross
 5        8
 6
 7
 8
 9            E X H I B I T S
10   Number       Description         Page
11
12
13      1    Verified Amended Complaint    6
14      2    Sexual Harassment Policies    6
15
16      3       Notice of Resignation      6
17      4       Agreement                  6
18
19      5       Resume of Fulya Metin      6
20      6       Synopsis                   6
21
22      7          Synopsis               7
23      8       Copy of Photograph         7
24
```

**Page 4**

```
 1                        4
 2   (Exhibits Continued)
 3      9       Statement               7
 4
 5     10          Statement            7
 6     11       Note and Poem           7
 7
 8     12    Police Department Report   7
 9     13       Letter of Resignation   7
10
11     14       Investigation Report    7
12     15       Answers to Interrogatories   8
13
14
15
16
17
18
19
20
21
22
23
24
```

MAURICE LARIVIERE          CondenseIt!™          LARIVIERE V. SOLOMON ET AL.

| | Page 5 |
|---|---|

```
                    5
1
2         STIPULATIONS
3
4       It is hereby stipulated and agreed by
5    and between counsel for the respective
6    parties that the reading and signing of the
7    deposition is not waived.
8       It is agreed that the deposition may
9    be signed under the pains and penalties of
10   perjury within thirty days of receipt or it
11   will be deemed accepted.
12      It is further stipulated and agreed
13   that all objections, except objections to
14   the form of the questions and all motions
15   to strike, will be reserved until the time
16   of trial.
17
18       MAURICE LARIVIERE,
19
20      Having been satisfactorily identified
21   and duly sworn by the Notary Public was
22   examined and testified as follows:
23
24
```

| | Page 7 |
|---|---|

```
                    7
1
2    (Exhibit No. 7 marked for identification)
3         Synopsis
4
5    (Exhibit No. 8 marked for identification)
6         Photocopy of Photograph
7
8    (Exhibit No. 9 marked for identification)
9         Photocopy of Note
10
11   (Exhibit No. 10 marked for identification)
12        Photocopy of Note
13
14   (Exhibit No. 11 marked for identification)
15        Photocopy of Poem and Note
16
17   (Exhibit No. 12 marked for identification)
18        Methuen Police Detective Division Memo
19
20   (Exhibit No. 13 marked for identification)
21        Letter of Resignation.
22
23   (Exhibit No. 14 marked for identification,
24        Investigation Report
```

| | Page 6 |
|---|---|

```
                    6
1
2    (Exhibits Premarked)
3
4    (Exhibit No. 1 marked for identification)
5         Verified Amended Complaint
6
7    (Exhibit No. 2 marked for identification)
8         Sexual Harassment Policy of the
9         City of Methuen.
10
11   (Exhibit No. 3 marked for identification)
12        Request for Leave of Absence and
13        Notice of Resignation.
14
15   (Exhibit No. 4 marked for identification)
16        Agreement between the Methuen Police
17        Department and Local 396
18
19   (Exhibit No. 5 marked for identification)
20        Resume of Fulya Metin
21
22   (Exhibit No. 6 marked for identification)
23        Synopsis by Lieutenant Wnek.
24
```

| | Page 8 |
|---|---|

```
                     8
1
2    (Exhibit No. 15 marked for identification)
3         Answers to Interrogatories
4
5         DIRECT EXAMINATION
6
7  Q (By Mr. Notis) Sir, Could you state full
8    name for the record.
9  A Maurice Joseph Lariviere Jr.
10 Q Mr. Lariviere, my name is Gareth Notis.  I
11   represent defendants Solomon, Alaimo and
12   City of Methuen in this case.
13       Have you had your deposition taken
14   before?
15 A I had a deposition a week or so ago.
16 Q Besides that deposition, any others in your
17   past?
18 A No.
19 Q A few ground rules for today.  I'm sure
20   you've attended many depositions taken, and
21   you've had your deposition taken, but try
22   to wait for me to complete my question
23   before you give an answer.  That will make
24   the court reporter's job a lot easier.
```

Page 9

9

1
2  You're doing a good job giving verbal
3  responses.  Nods of the head don't pick up
4  on a transcript.
5      If you want to take a break at any
6  time to talk to Attorney DiAdamo, to use
7  the men's room or take a cigarette break,
8  whatever, I'm happy to accommodate you.
9      Do you have any questions for us
10  before we start?
11  A  No.
12  Q  I'm going to proceed with the deposition,
13  and Attorney Gambaccini may have some
14  questions for you as we go along.  We might
15  pass the buck back and forth as it goes.
16      Did you review any documents in
17  preparation for your testimony today?
18  A  Today, no.  I've read a lot of documents in
19  the past but not for today.
20  Q  Did you have any conversations with anyone
21  besides your attorneys and your wife in
22  preparation for today's testimony?
23  A  No.
24  Q  Did you speak with any employees at the

Page 10

10

1
2  city of Methuen in the past thirty days
3  about this case?
4  A  Yes.
5  Q  Who did you speak with?
6  A  Linda Gagnon.
7  Q  Anyone else besides Linda Gagnon?
8  A  Shirley Terry.
9  Q  Anybody else besides Shirley Terry and
10  Linda Gagnon?
11  A  William Manzi III.
12  Q  Anyone else?
13  A  Within thirty days, not that I recall, no.
14  Q  What was the nature of your conversation
15  with Ms. Gagnon?
16  A  Can I have one moment with my counsel,
17  please?
18  Q  Yes, you may.
19
20  (Stenographer reads back last question)
21
22  A  I appeared at a deposition that was
23  conducted under the MCAD proceedings by
24  Marcia "Kasarosian", and Marcia presented

Page 11

11

1
2  the Wnek report to me.  In the Wnek report
3  there were some statements that allegedly
4  Linda had made to Wnek about sexual contact
5  and there were comments, that sort of thing
6  that bothered her.  You'll see it's in the
7  exhibits here.  I called her -- at that
8  deposition, quite frankly, I said I don't
9  recall any of that, but she's a friend of
10  mine, if she said it it's true.  I called
11  her, quite frankly, to apologize because
12  we've known each other a long time and I
13  was figuring after so many years if it
14  still bothered her it was wrong on my
15  part.  She categorically denied that she
16  ever told Lieutenant Wnek any of the
17  statements that he has put in his report.
18  Q  When you called her, where did you call
19  her?
20  A  Her house.
21  Q  How about Ms. Terry, what did you discuss
22  with Ms. Terry?
23  A  Shirley and I are good friends.  It would
24  be generic conversations about how things

Page 12

12

1
2  are.  She will call me periodically just to
3  talk to me and see how things are going.
4  We've known each other a quarter of a
5  century, and we'll talk.  That sort of
6  thing.
7  Q  When you called her, did you call her at
8  the office?
9  A  She calls me, typically.
10  Q  What is her role with the city?
11  A  She's the head custodian over in the
12  building.
13  Q  Mayor Manzi, what did you discuss with
14  Mayor Manzi in the past thirty days?
15  A  I had told a friend of mine about the
16  deposition that my wife was going to be
17  there, and he had suggested that I contact
18  Manzi in an effort to see why she's being
19  deposed.  I had told the person at the time
20  it's a waste of time, I'm sure he doesn't
21  know about it and I'm sure it's an attorney
22  that decided it had to be done.  He told me
23  go ahead and give him a call, so I did.
24  Q  Who is the friend?

Page 13

```
13
1
2  A  I don't want to piss off the DiAdamos, so
3       if I do, because I'm under oath, I prefer
4       you not to be pissed off at him.  Tony
5       Copani.  Please don't take it----.
6  Q  Was it just one conversation with Mayor
7       Manzi in the past thirty days?
8  A  I couldn't say for sure.  It might be two.
9       I'm not positive.
10 Q  Have you exchanged any e-mail
11      correspondence with Mayor Manzi in the past
12      thirty days?
13 A  Yes.
14 Q  Do you recall what was discussed in those
15      e-mails?
16 A  Yes.  I had been trying to get him to have
17      Solomon tell the truth.
18 Q  What else about this case did you discuss
19      with the mayor via e-mail?
20 A  Some of the e-mails that I've sent have
21      been a little caustic because I'm not very
22      happy with the fact that he hasn't come
23      forward and done the right thing under the
24      circumstances.
```

Page 14

```
14
1
2  Q  Have you kept copies of your e-mails?
3  A  Probably.
4  Q  Are they still on your computer hard drive?
5  A  I save them on the internet site.
6  Q  What internet site is that?
7  A  AOL.
8  Q  You customarily save the e-mails you send
9       and receive?
10 A  I can't say in every instance I do, but AOL
11      now has an unlimited saving of e-mails so
12      anything that's free, I'll do.
13 Q  You have the ability to print up those
14      e-mails, correct?
15 A  Yes.
16 Q  Could you do that and pass them onto your
17      attorneys?
18 A  Sure.  Those are the e-mails to Manzi.
19 Q  Any e-mails with any other city employees
20      in the past thirty days?
21 A  He would be the only one.
22 Q  If there are any could you please print
23      those up and give them to Bill?
24 A  Sure.
```

Page 15

```
15
1
2  Q  Thank you.
3  A  I can't say that I saved every one.  I will
4       give you the ones I saved.
5  Q  Were they all sent from the same computer?
6  A  No.
7  Q  Which computers were they sent from?
8  A  I have a laptop at the house, and I'm in
9       Tony Copani's office, I have computer
10      access there.
11 Q  You know that the city of Methuen is
12      represented by me in this case, correct?
13 A  Yes.
14 Q  You're an attorney?
15 A  Not in this case.
16 Q  But you're an attorney licensed by the
17      Commonwealth, right?
18 A  Yes.
19 Q  You know that you're not supposed to
20      contact parties represented by other
21      counsel?
22      MR. DiADAMO:  Objection.  Answer
23      the question.
24 A  To my knowledge, I am not counsel in this
```

Page 16

```
16
1
2       case, I'm a plaintiff.
3  Q  You're a party, aren't you?
4  A  I'm a party.
5  Q  You know under the rules of professional
6       responsibility that you are not to contact
7       other parties in the case?
8       MR. DiADAMO:  Objection.
9  A  No, I don't, where I'm sitting as a
10      plaintiff and not as an attorney.
11 Q  Your position is that you can freely
12      contact any employees of the city of
13      Methuen and discuss this case with them?
14 A  I haven't really thought about it.
15 Q  What is your date of birth?
16 A  December 7, 1949.
17 Q  Where were you born?
18 A  Lawrence, Massachusetts.
19 Q  Where do you live presently?
20 A  Windham, New Hampshire.
21 Q  What is the street address?
22 A  16 Sun Ridge Road.
23 Q  Do you have a P. O. Box?
24 A  No.
```

MAURICE LARIVIERE          Condenselt!™          LARIVIERE V. SOLOMON ET AL.

---

Page 17

17

2 Q  Who lives with you at that address?
3 A  Currently my wife.
4 Q  What is your wife's name?
5 A  Christine.
6 Q  Does anyone else reside with you at the
7     home residence?
8 A  I have two other children who are in
9     college, but during the time when they're
10    off they're living back in our house.
11 Q  You have three children total?
12 A  Yes.
13 Q  What are their names and ages?
14 A  The oldest one is Maura.  She was born in
15    1982.  My middle child is Cathryn with a C,
16    she was born in 1987.  My youngest is Tom,
17    he was born in 1988.
18 Q  It would be Cathryn and Tom that
19    periodically reside with you at the home
20    address?
21 A  Yes.
22 Q  Are any of the three children dependent
23    upon you for income?
24 A  Yes.

---

Page 18

18

2 Q  Which of the three?
3 A  The last two.
4 Q  You list them as dependents on your income
5     tax?
6 A  Yes.
7 Q  Have you filed income tax returns for the
8     past ten years?
9 A  Yes.
10 Q  Do you keep copies of your income tax
11    returns?
12 A  Yes.
13 Q  Have you filed jointly with your wife
14    during all of those ten years?
15 A  Ever since we've been married, yes.
16 Q  Where do you keep the income tax returns?
17 A  At my house.
18 Q  Did someone prepare them for you?
19 A  No.
20 Q  You've always prepared them yourself in the
21    past ten years?
22 A  Yes.
23 Q  Do you own or rent at the Windham address?
24 A  Own.

---

Page 19

19

2 Q  Who is on the title?
3 A  Myself and my wife.
4 Q  What manner is the title held?
5 A  Joint.
6 Q  Do you own any other properties besides the
7     Windham residence?
8 A  Yes.
9 Q  Where are the other properties?
10 A  Meredith, New Hampshire.
11 Q  What is the street address of the Meredith
12    residence?
13 A  11 Brookhurst Lane West.
14 Q  What type of property is that?
15 A  It's in an association.
16 Q  Is it a condominium?
17 A  No.
18 Q  Is it a summer cottage?  What type of
19    structure is it?
20 A  Summer cottage.
21 Q  Is it on a lake?
22 A  The association is.  I'm three hundred feet
23    away from the lake.
24 Q  What is the lake?

---

Page 20

20

2 A  Winnipesaukee.
3 Q  How long have you owned that property?
4 A  1998.
5 Q  Since January 1, 2005, have you taken out
6     any home equity loans or second mortgages
7     on either of those two properties?
8 A  January 1st, 2005?
9 Q  Yes.
10 A  No.  I'm sorry, let me apologize, it would
11    have been late January, early February.
12    Most likely late January I did take out a
13    loan.
14 Q  On which property?
15 A  The Windham.
16 Q  Was that recorded at the Registry of Deeds?
17 A  Yes.
18 Q  Any plans to move in the near future?
19 A  No.
20 Q  Do you have a business address?
21 A  265 Broadway, Methuen.
22 Q  What type of office is that?
23 A  Tony Copani has a law office, Kiley &
24    Copani.

---

JOAN R. DUNNE

MAURICE LARIVIERE                 CondenseIt!™                 LARIVIERE V. SOLOMON ET AL.

| | Page 21 |
|---|---|

21

2 Q  You maintain an office at that address?
3 A  Yes.
4 Q  You have a desk?
5 A  Yes.
6 Q  A computer?
7 A  Yes.
8 Q  You can conduct a law practice from that
9     address?
10 A  Yes.
11 Q  Are you licensed in any other states to
12     practice law besides Massachusetts?
13 A  No.
14 Q  Do you keep a resume presently?
15 A  Yes.
16 Q  How often do you update it?
17 A  Last time I updated it was for the current
18     situation.
19 Q  How many days a week do you customarily
20     spend at Attorney Copani's office?
21 A  Four.
22 Q  How many hours per week, customarily?
23 A  Probably about five.
24 Q  Do you work from home?

| | Page 22 |
|---|---|

22

2 A  No.
3 Q  Are you currently receiving income from
4     other sources besides the work that you
5     perform at Tony Copani's office?
6 A  I don't really get paid for being there.
7 Q  What are your sources of income presently?
8 A  None.  The only one I have is I have a
9     contract with Andover Housing Authority,
10     but that's limited to two thousand dollars
11     a year.
12 Q  Does your wife work?
13 A  Yes, she does.
14 Q  Where does she work?
15 A  Deerfield school system.
16 Q  What is her title?
17 A  She's a teacher -- she does language
18     teaching.  I forget the exact name of the
19     title, but it's to assist students in
20     reading and writing.
21 Q  Do you receive any pension or retirement
22     benefits presently?
23 A  No.
24 Q  How about health insurance?

| | Page 23 |
|---|---|

23

2 A  My wife has the health insurance.
3 Q  Prior to your resignation in February of
4     2005 as the city solicitor for the city of
5     Methuen, who did you have your health
6     insurance through?
7 A  Methuen.
8 Q  Who did your wife have her insurance
9     through?
10 A  Me.
11 Q  Then you switched to the state of New
12     Hampshire plan?
13 A  Cigna.  And it's by the school system.
14 Q  In what way does the current health
15     insurance plan differ, if at all, from the
16     plan you had with the city of Methuen?
17 A  Roughly the same.  The only issue I have is
18     my son's got to undergo surgery next year
19     and we're not sure if that will be covered.
20 Q  Your primary care stayed the same?
21 A  Yes.
22 Q  Did your copay stay the same?
23 A  Yes.
24 Q  Have you been denied any medical coverage

| | Page 24 |
|---|---|

24

2     since you resigned from the city
3     solicitor's office?
4 A  No.
5 Q  Have you taken any prescription medications
6     in the past 24 hours?
7 A  Yes.
8 Q  Which medications are those?
9 A  I keep them in my pocket.  Allopurinol, 100
10     milligrams; Vytorin, 10/20 milligrams;
11     Lisinopril, 10 milligrams; Sertraline, 50
12     milligrams.
13 Q  In the past year, have you been prescribed
14     any other medications besides those four?
15 A  Yes.
16 Q  What other medications?
17 A  I had an ear infection, and I forget the
18     name of it.  I just stopped using it
19     recently.  It's medication to cure the
20     irritation in the ear.
21 Q  Could you tell me who prescribes each of
22     those four medications?
23 A  My prior physician, Dr. Sandler.
24 Q  You say prior, do you have a new physician?

MAURICE LARIVIERE                CondenseIt! ™            LARIVIERE V. SOLOMON ET AL.

Page 25

```
                    25
1
2  A  Yes.
3  Q  Who is that?
4  A  She retired October 31st, so I've gone with
5       a fellow named Dr. Hafner.
6  Q  First name?
7  A  Don't know.  I haven't really been with
8       him.
9  Q  Could you tell us the reason for each of
10      those four medications.
11 A  Allopurinol is in relation to gout, there's
12      a proclivity, I guess, based upon tests for
13      gout that I have.  Vytorin is cholesterol
14      medicine.  Lisinopril is for blood
15      pressure, and Sertraline is the generic
16      name for Zoloft, which is a depression
17      medicine.
18 Q  Where do you have your prescriptions
19      filled?
20 A  Through the mail.
21 Q  Since January 1st, 2005, have you had your
22      prescriptions filled at any pharmacies?
23 A  Yes.  When I started first with Zoloft, I
24      had them done at Brooks, and that would be
```

Page 26

```
                    26
1
2       September of 2005.
3  Q  Which Brooks?
4  A  Londonderry.
5  Q  Is there more than one in Londonderry?
6  A  I don't know.
7  Q  For each of the four medications, did you
8       take any of them prior to February 15th,
9       2005?
10 A  Allopurinol and Vytorin, yes.  The other
11      two are subsequent.
12 Q  Zoloft is an antidepressant?
13 A  Yes.
14 Q  You said September 2005 you were prescribed
15      the Zoloft?
16 A  My doctor told me based upon my depression
17      I better start using something.
18 Q  Time frame is about September 2005?
19 A  I know as a fact it's the middle of
20      September 2005.
21 Q  Prior to that date had you ever been
22      prescribed an antidepressant?
23 A  No.
24 Q  Had you ever been diagnosed with an anxiety
```

Page 27

```
                    27
1
2       disorder?
3  A  No.
4  Q  Depressive disorder?
5  A  No.
6  Q  Bipolar disorder?
7  A  No.
8  Q  Any psychiatric disorder of any kind?
9  A  No, I never even seen a psychiatrist or a
10      psychologist before this.
11 Q  Had you ever seen a counselor for family
12      purposes such as marital problems or
13      problems with your children?
14 A  No.
15 Q  Do any of these medications impact your
16      ability to understand questions today or
17      offer testimony?
18 A  I'm not sure what impact Zoloft has on me
19      or Sertraline, what they call it.  I don't
20      really know.  I don't think so.  I think I
21      clearly understand the questions you're
22      posing to me.
23 Q  For a time were you given a prescription
24      for Viagara?
```

Page 28

```
                    28
1
2  A  Yes.
3  Q  Who gave you that prescription?
4  A  Dr. Sandler.
5  Q  What was the reason for that prescription?
6       What was your understanding of the reason
7       for that prescription?
8  A  Starting in September 2004 I had some off
9       and on ED issues.
10 Q  Have the ED issues revolved since that
11      time?
12 A  Yes, it was very temporary.  Unfortunately
13      with Sertraline, one of the things it's
14      knocked off is that, so I don't have ED but
15      I don't have the ability to have a
16      relationship.
17 Q  Who gave you that information, any medical
18      professional?
19 A  It's in the booklet they give you, and it's
20      been a result.
21 Q  To the best of your memory, when did the ED
22      resolve?
23 A  I took, I believe, two pills and that was
24      it.
```

JOAN R. DUNNE

MAURICE LARIVIERE     CondenseIt!™     LARIVIERE V. SOLOMON ET AL.

Page 29

29

2 Q When did you take the pills?
3 A The first one would have been September,
4    and then the second one somewhere in
5    October, early November.
6 Q So after November 2004 you didn't notice
7    any symptoms related to your ED?
8 A To the best of my memory without having a
9    calendar, so to speak, on that sort of
10    thing. I remember it being just a few
11    times and that was it.
12 Q Any other medications for ED besides
13    Viagara?
14 A There's another one that was given. It's
15    the one they advertise on TV. I forget the
16    name of it.
17 Q Cialis?
18 A Yeah.
19 Q Who prescribed Cialis?
20 A It really wasn't a prescription. The
21    doctor had those.
22 Q Samples?
23 A Yeah.
24 Q Do you recall when you took the samples?

Page 30

30

2 A I never wound up taking those. I've got
3    them still at the house.
4 Q Are there any current prescription
5    medications that you're not taking for any
6    reason?
7 A No.
8 Q When did you marry your wife?
9 A February 14th, 1976.
10 Q Was she your first wife?
11 A Yes.
12 Q Have you ever been divorced for any reason?
13 A No.
14 Q Have you ever been separated from your
15    wife?
16 A No.
17 Q Has there ever been a period when either
18    you or your wife has moved out of your
19    residence?
20 A No.
21 Q When does your wife obtain the age of
22    retirement within the New Hampshire school
23    system?
24 A I believe she would be somewhat eligible at

Page 31

31

2    age 60. Her only issue was she didn't work
3    for a number of years. She actually just
4    started this job, the full-time job in
5    September of 2004. Before that she'd been
6    part time which was not included towards
7    the retirement system, so there's not much
8    time there for her.
9 Q When are you entitled to retirement
10    benefits?
11 A I was technically entitled after ten years,
12    you're vested, and at age 55 or older, and
13    they do a point system. At age 55 or older
14    you can technically have that.
15 Q What is your current age?
16 A 56.
17 Q How about health insurance, once you're
18    vested you're entitled to health insurance,
19    correct?
20 A I'm not sure.
21 Q You could tap into your state retirement
22    presently, correct?
23 A It would be municipal, yes.
24 Q If you did have access to your health

Page 32

32

2    insurance benefits through the retirement
3    system, would you switch from your wife's
4    plan back?
5 A Frankly, it would be based upon economics.
6    I would have to look at what the numbers
7    were.
8 Q Do you know of any child support liens for
9    any reason?
10 A No.
11 Q All three of your children are with your
12    wife Christine?
13 A Oh, you mean biologically?
14 Q Yes, sir.
15 A Yes.
16 Q Have you spoken to your children about this
17    litigation?
18 A Yes.
19 Q What did you discuss with your children
20    about it?
21 A Give me a second, please.
22 Q Sure.
23 A The paper started haunting my house. They
24    haunted my kids. My kids were in Salem --

MAURICE LARIVIERE                    CondenseIt!™                    LARIVIERE V. SOLOMON ET AL.

Page 33

```
 1                    33
 2   can I have a minute, please.
 3 Q Absolutely, take as much time as you want.
 4
 5        BRIEF RECESS
 6
 7 Q Would you like to complete your answer?
 8 A I believe you asked what discussions I had
 9   with my kids?
10 Q About the litigation.
11 A About the litigation in and of itself,
12   nothing.  The situation, yes.  Litigation,
13   you don't talk to your kids about something
14   like that.
15 Q Could you tell us what you discussed about
16   the situation?
17 A My two youngest were in high school at the
18   time.  Quite obviously at the high school
19   there's a newspaper bin, and newspapers --
20   I can't use the term in front of you --
21   newspapers like to stick it to people, and
22   they had quite a fest.  Your clients had
23   quite a fest.
24 Q Any other conversation, sir?
```

Page 34

```
 1                    34
 2 A Just trying to calm them down, trying to
 3   get them to move on with their lives.
 4 Q Did you talk about the reason for your
 5   resignation?
 6 A Yes.
 7 Q What did you discuss in that regard?
 8 A What is in the Complaint.
 9 Q You don't recall anything specifically
10   besides the 27 page complaint?
11 A Yeah.
12 Q What did you discuss?
13 A That I should have got out when Pollard had
14   come in.  That I knew her for what she was,
15   that I knew Solomon for what he was, that I
16   was stupid enough to trust the son of a
17   bitch that he'd keep his word to me.  Dirty
18   bastard.
19 Q What was the word that he didn't keep to
20   you?
21 A He wanted to slam down on me with that
22   stupid setup, and I believed when they said
23   sign and leave and that's it.  For some
24   reason I stupidly trusted that that man had
```

Page 35

```
 1                    35
 2   some level of integrity.  Big mistake on my
 3   part.
 4 Q You trusted----
 5 A He promised.  They arranged a setup.  I
 6   wanted out.  They'd made my life miserable.
 7 Q When you say he promised, who are you
 8   referring to?
 9 A Solomon.
10 Q What exactly did he promise you, sir?
11 A I put the exact words right in that
12   Complaint.
13 Q Could you look at Exhibit l and tell us
14   what you're referring to.
15 A It's right in here.
16 Q Could you read from which paragraph and the
17   text of the paragraph that you're referring
18   to, please.
19 A It starts with 99 and goes forward.  A lot
20   of them are in quotes.
21 Q I'm asking not necessarily what the nature
22   of your conversations were with Chief
23   Solomon, but what the promise was that was
24   made to you.
```

Page 36

```
 1                    36
 2 A The threat that was made to me at that
 3   point in time is that I would be arrested,
 4   handcuffed, and dragged out of the
 5   building.  The exact words, dragged out of
 6   the building, unless I signed the
 7   resignation.  If I did, nothing would
 8   happen, I would go on and that would be
 9   that.
10 Q So the promise was that if you signed the
11   resignation letter nothing would happen?
12 A That's what he was saying.  It's right in
13   here.
14 Q Where is that in the Complaint?
15 A It starts at like 105 forward.
16 Q Could you refer to specific paragraphs and
17   sentences, please.
18 A 109 refers to the threat about the
19   handcuffs.  110 is the threat again.  111
20   is the threat again.  Then the rest of it.
21   I do know that at that point in time that
22   is what he was saying.  I can sit here and
23   read it but it's in here.
24 Q I understand that you're talking about what
```

JOAN R. DUNNE

Page 37

```
1                   37
2    you've characterized as threats.  Do you
3    distinguish between threats and promises?
4  A  Yes.
5  Q  Because I certainly do, and I would like
6    you to point out to us where there's been a
7    promise here that you articulated in the
8    Complaint that has been breached.
9  A  Would you give me some time.
10 Q  Absolutely.
11 A  I'm not sure if it's in here or the MCAD.
12    101 is one of the references. 110. In a
13    quick read, that's what I remember here.
14 Q  Essentially the promise was that it would
15    be kept out of the papers, then?
16 A  The promise was that I could leave, which I
17    then did.  As soon as I signed I was out
18    the door.  They escorted me upstairs and I
19    was out the door.  When I was upstairs, he
20    made the promise again and told me, as a
21    matter of fact, my stuff would be taken
22    out, but they would do it and do it at
23    night so nobody would know.
24 Q  So the promises were you could leave the
```

Page 38

```
1                   38
2    building.
3  A  That I would not be arrested.
4  Q  That didn't happen, right?
5  A  Correct.
6  Q  The other promise was that it would be kept
7    out of the papers?
8  A  Correct.
9  Q  Is that the extent of the promises that
10    Solomon made to you on February 16, 2005?
11 A  Promises versus threats?
12 Q  I asked you about promises.
13 A  Yeah.  If I signed I could leave.  I would
14    not be arrested or prosecuted, and it would
15    be kept out of the papers and kept quiet.
16 Q  You allege that that promise was breached?
17 A  Yeah.
18 Q  Have you had any conversations with any
19    media about this case?
20 A  Most of it I put over to counsel.
21 Q  So you have, in fact, had conversations?
22 A  Frankly, one day they called my house and I
23    was drunk, and I answered the phone as if I
24    was at work and said solicitor's office.
```

Page 39

```
1                   39
2    Then I kind of declined and passed it over
3    to my counsel.
4  Q  Have you ever initiated any conversations
5    with media about this case yourself?
6  A  You're talking this federal litigation?
7  Q  I'm talking about the situation.
8  A  Initiated, no.
9  Q  Could you summarize your education for us.
10 A  Tenney High School for a high school
11    degree; Northeastern University, a
12    bachelor's degree in political science;
13    Suffolk University Law School, a JD.
14 Q  When did you get the high school diploma?
15 A  1967.
16 Q  And the Northeastern degree?
17 A  1972.
18 Q  And the JD?
19 A  1977.
20 Q  What was your first legal job after you
21    graduated from law school?
22 A  I worked in an office with an attorney,
23    Smith Williams.
24 Q  For how long?
```

Page 40

```
1                   40
2  A  December 1977 until May 1980.
3  Q  Any part-time employment during that
4    period?
5  A  No.
6  Q  What was the nature of the work that you
7    did at Smith Williams?
8  A  General practice.
9  Q  What was your next job?
10 A  City solicitor.
11 Q  When officially did you begin your job as
12    the city solicitor?
13 A  May 1980.
14 Q  Was there any part-time employment between
15    May 1980 and February 16, 2005?
16 A  One time for a community, I handled it was
17    -- I was the arbitrator in a dispute.
18 Q  That's the only instance of part-time
19    employment?
20 A  I taught a law school course.
21 Q  What was the subject of the course?
22 A  Zoning.
23 Q  Have you exhausted your memory of part-time
24    employment?
```

MAURICE LARIVIERE           CondenseIt!™         LARIVIERE V. SOLOMON ET AL.

| Page 41 | Page 43 |
|---|---|
| 41 | 43 |

**Page 41**

2 A From 1980 to 2005?
3 Q Yes, sir.
4 A I believe that was it. Part of the deal
5    when I took over as solicitor it was
6    understood no outside work.
7 Q Have you attended any continuing education
8    courses since you began as the city
9    solicitor?
10 A Yes, CLEs.
11 Q Could you tell us what they are and when
12    you took them.
13 A It would be municipal law issues and
14    anything related to municipal law.
15 Q Civil rights?
16 A Yes.
17 Q Employment law?
18 A Yes.
19 Q Issues relating to contract negotiations?
20 A Yes. Zoning, labor relations.
21 Q Do you have a business card presently?
22 A Not on me, but I have one, yes.
23 Q What does it say?
24 A Law Office of Maurice Lariviere.

**Page 42**

2 Q Do you advertise at all or have a website?
3 A No.
4 Q Word of mouth is how you get business?
5 A Yes.
6 Q Besides your law license, do you hold any
7    other professional licenses?
8 A No.
9 Q Have you obtained any professional
10    certificates since your graduation from
11    Suffolk Law School?
12 A No.
13 Q Have you been a member of any professional
14    or trade organizations since you graduated
15    from law school?
16 A Yes.
17 Q Could you tell us what they are.
18 A MBA, MATA, there's the International
19    Municipal Lawyers Association, City
20    Solicitors and Town Counsel Association.
21 Q Do you know if there have been any Board of
22    Bar Overseer proceedings arising out of Ms.
23    Metin's complaints?
24 A No, there have not.

**Page 43**

2 Q Has your license ever been suspended for
3    any reason?
4 A No.
5 Q Has there ever been an investigation into
6    your conduct in the practice of law at the
7    BBO?
8 A No.
9 Q How would you characterize the nature of
10    your association with Attorney Copani?
11 A Friends.
12 Q But on a professional level, what's----
13 A On a couple of occasions he's had me handle
14    a case for him.
15 Q Do you pay rent at his office?
16 A No.
17 Q In exchange for your use of the office, do
18    you provide anything to Attorney Copani?
19 A Once in awhile he'll ask me if I'm familiar
20    with a particular issue of law or seek
21    advice on it.
22 Q Are you a member of any unions?
23 A No.
24 Q Have you ever been?

**Page 44**

2 A No.
3 Q Since February 16, 2005, have you sought
4    employment other than at Attorney Copani's
5    office?
6 A Yes.
7 Q Could you describe the nature of your job
8    search.
9 A Obviously looking for an attorney's
10    position. I've put in about, through hard
11    mail filing and e-filing, four hundred
12    applications.
13 Q Have you been offered any positions?
14 A No.
15 Q Have you gone on any interviews?
16 A Yes.
17 Q How many?
18 A Two, I believe.
19 Q Where were they?
20 A The last one was for the Greater Lowell
21    Techical High School, they were looking for
22    a labor relations attorney.
23 Q Were you given a reason why you weren't
24    offered the position?

JOAN R. DUNNE

MAURICE LARIVIERE                 CondenseIt!™           LARIVIERE V. SOLOMON ET AL.

| Page 45 | Page 47 |
|---|---|

**Page 45**

```
1              45
2  A  No.
3  Q  What was the other interview?
4  A  Newton.  City solicitor's office in Newton.
5  Q  Were you given a reason why you were not
6     offered the Newton city solicitor position?
7  A  No.
8  Q  Did the MCAD litigation or the instant
9     litigation----
10 A  I'm sorry, there was a third one.  I do
11    recall now.  I went to the Attorney
12    General's office.
13 Q  Which department at the AG's office?
14 A  Government.
15 Q  With respect to all three interviews, did
16    the topic of this litigation or the MCAD
17    litigation arise?
18 A  Yes.
19 Q  Were you given either the MCAD or the
20    instant case as a reason why you were not
21    offered any of those three positions?
22 A  Openly, no.
23 Q  Have you sought any employment outside of
24    the legal field?
```

**Page 47**

```
1              47
2  A  Yes.
3  Q  Which branch?
4  A  The United States Army.
5  Q  What years?
6  A  It was in the reserves, '73 to '79.
7  Q  What was your highest rank?
8  A  I was an officer, so when I went out they
9     give you the one last promotion, and I was
10    promoted to captain.  I served as first
11    lieutenant and second lieutenant.
12 Q  Were you honorably discharged?
13 A  Yes.
14 Q  Because it's close to Veterans Day I'll
15    thank you for your service, and I truly
16    mean that.  Veterans day was one of these
17    past few days, wasn't it?
18 A  Yes, it was.
19 Q  Any criminal convictions at any point?
20 A  Traffic tickets.
21 Q  Besides motor vehicle infractions?
22 A  No.
23 Q  Prior to February of 2005, had you ever
24    been questioned by a police officer or a
```

| Page 46 | Page 48 |
|---|---|

**Page 46**

```
1              46
2  A  Yes.
3  Q  In what fields?
4  A  Like insurance sales.  That would have been
5     May '05, somewhere around there.
6  Q  Are you still actively looking for
7     employment?
8  A  Yeah.
9  Q  Yes?
10 A  Yes.
11 Q  Do you typically put your salary
12    requirements in your cover letters?
13 A  No.
14 Q  Did you proof read your letters before you
15    sent them out?
16 A  Yes.
17 Q  Have you ever collected unemployment
18    benefits?
19 A  No.
20 Q  Workers' compensation?
21 A  No.
22 Q  Have you ever filed a workers' comp claim?
23 A  No.
24 Q  Have you ever served in the military?
```

**Page 48**

```
1              48
2     police department for any reason?
3  A  Yes.
4  Q  On how many occasions?
5  A  When I was either 17 or 18, a friend and
6     myself were driving around in a car and we
7     had a couple of beers and the police pulled
8     us over.
9  Q  Other than that instance, any other
10    occasions when you were questioned by
11    police?
12 A  No.
13 Q  Besides the instant litigation, have you
14    ever filed another lawsuit?
15 A  No.
16 Q  Have you ever filed a lawsuit on behalf of
17    your children?
18 A  No.
19 Q  Has your wife ever filed a lawsuit?
20 A  No.
21 Q  Have you ever been a defendant before
22    outside of your capacity as city solicitor?
23 A  Outside of my capacity as solicitor, no.
24 Q  How about inside your capacity?
```

JOAN R. DUNNE                                    Page 45 - Page 48

Page 49

49

1
2  A  Yes.
3  Q  On how many occasions?
4  A  Not counting any of this situation,
5     correct?
6  Q  We know about the MCAD case.  Aside from
7     that case.
8  A  There's a fellow named Matthew Chiara who
9     was looking to have some property rezoned,
10    then at another time to get a wetlands
11    permit, and he filed a suit in Federal
12    Court.
13 Q  Any other lawsuits that you can recall?
14 A  No.
15 Q  When did you move to Windham?
16 A  1986.
17 Q  Have you lived there since?
18 A  Yes.
19 Q  Where did you live prior to that?
20 A  Wakefield.
21 Q  How long did you live in Wakefield?
22 A  1977 to 1986.
23 Q  Was there ever a period of time when you
24    lived in Methuen?

Page 50

50

1
2  A  Yes, I lived there until I was 25.
3  Q  So you were essentially born and raised in
4     Methuen?
5  A  Yes.
6  Q  Were you born in Methuen?
7  A  No, they didn't have a hospital when I was
8     born.
9  Q  Your father was a police officer, correct?
10 A  Yes, he was.
11 Q  Any other relatives that were police
12    officers with any police department?
13 A  I have a cousin who is a police officer.
14 Q  In Methuen?
15 A  Yes.
16 Q  What is his or her name?
17 A  William Raino.
18 Q  Is he presently a----
19 A  Retired.
20 Q  In the Complaint you've alleged that the
21    city solicitor's position that you held was
22    a two year position, is that right?
23 A  That's correct.
24 Q  Was there a document that memorialized that

Page 51

51

1
2     agreement between the city solicitor and
3     the city of Methuen?
4  A  The charter.
5  Q  Other than the charter, was there a
6     document that you know of that memorialized
7     the dates of your appointment and the terms
8     of your employment?
9  A  The only other documents would be the
10    minutes when I was reappointed.  Or then
11    the city clerk would give you a certificate
12    when you were appointed or reappointed.
13 Q  When was your last two year appointment
14    prior to your resignation?
15 A  January 2005.
16 Q  Officially did the appointment take place
17    as a city councilors meeting?
18 A  Yes.
19 Q  Or at a city council meeting, I should say?
20 A  A city council meeting, yes.
21 Q  Did the mayor at that time have any role in
22    your appointment?
23 A  My understanding is she was trying to knock
24    it out, but it was unsuccessful.

Page 52

52

1
2  Q  Anything in the minutes that might suggest
3     that?
4  A  No.
5  Q  On what do you base your understanding that
6     she was trying to knock your appointment
7     out?
8  A  The current mayor.
9  Q  What specifically have you learned from the
10    current mayor?
11 A  He apprised me whenever Pollard was talking
12    about me what she was saying.
13 Q  Do you have a specific memory what you were
14    told with regard to your January 2005
15    appointment?
16 A  Specific words, no.
17 Q  What was the general tenor?
18 A  The general tenor is that it had been since
19    2001 that she wanted to get me.
20 Q  Did you have an employment contract with
21    the city of Methuen for your appointment
22    post January 2005?
23 A  My benefits are set by ordinance and
24    statute.

MAURICE LARIVIERE ————— CondenseIt!™ ————— LARIVIERE V. SOLOMON ET AL.

Page 53

```
 1                      53
 2 Q  So that there wasn't an official contract
 3     that discussed the terms and conditions of
 4     your employment, is that right?
 5 A  For the purposes of law, the ordinance -- I
 6     hate to sound like an attorney on this one.
 7 Q  That's okay, you are one.
 8 A  A written contract document, no.
 9 Q  So correct me if I'm wrong, the terms and
10     conditions of your employment as city
11     solicitor after January 2005, up until your
12     resignation, were governed by the city
13     charter and the minutes of the city council
14     meeting, is that your understanding?
15 A  Are you talking about the employment and
16     the benefits -- I'm sorry, I missed the
17     question.
18 Q  Let's start with the employment.
19 A  The appointment would be set in the charter
20     and confirmed in the minutes.
21 Q  How about your benefits, was there a
22     different set of documents or organizations
23     that set the terms and conditions of your
24     benefits?
```

Page 54

```
 1                      54
 2 A  Yes, Chapter 6 of the Methuen Municipal
 3     Code establishes the benefits and salaries,
 4     and then the statute deals with retirement
 5     and health insurance.
 6 Q  Could you look at Exhibit 2, please.
 7 A  Yes.
 8 Q  Could you identify that document for the
 9     record.
10 A  That's the sexual harassment policy of the
11     city of Methuen.
12 Q  Was Exhibit 2 the sexual harassment policy
13     that was in place in February of 2005?
14 A  Yes, however some pages are missing.
15 Q  What pages are missing, to your memory?
16 A  The last page, I believe
17
18        (OFF THE RECORD DISCUSSION)
19
20 Q  We'll try to get the complete copy of
21     Exhibit 2.  Did you have any role in
22     preparing Exhibit 2?
23 A  Yes.
24 Q  What was your role?
```

Page 55

```
 1                      55
 2 A  I brought it to the mayor's attention, the
 3     then current mayor, Pollard, that we needed
 4     to have online a sexual harassment policy.
 5     I advised her that there's a model policy
 6     done by MCAD.  Frankly, if you look at
 7     this, what it is is a model policy MCAD
 8     with just inputting reference to Methuen.
 9 Q  When was that conversation with Mayor
10     Pollard?
11 A  She signed the policy in 2002, so it would
12     have been right around then.
13 Q  When the mayor signed the policy, what
14     legal effect did it have?
15 A  We were mandated to be having that, and
16     then to be distributing it.  So the legal
17     effect is compliance with the statute.
18     Again, I hate to sound like an attorney.
19 Q  That's okay.  You are an attorney and also
20     a witness.  The Sexual Harassment Policy
21     that we've marked as Exhibit 2, was that
22     incorporated into the city charter?
23 A  No.
24 Q  Does the city charter discuss the sexual
```

Page 56

```
 1                      56
 2     harassment policy in any regard?
 3 A  No.
 4 Q  Do you agree that your employment as city
 5     solicitor was conditioned upon compliance
 6     with Exhibit 2?
 7 A  No.
 8 Q  In other words, if you've violated sexual
 9     harassment policy, how would that impact
10     your employment as city solicitor?
11 A  That would be a decision placed in the
12     hands of the city council after a hearing.
13 Q  In your experience as a city solicitor, and
14     an employee of Methuen, when the sexual
15     harassment policy was violated, what
16     happened to that employee?
17 A  It would be handled with the interest of
18     meeting the statute, the issue, and how to
19     deal with it the best way.  Never
20     criminally, always civilly, and in all the
21     cases I handled, quietly.
22 Q  During your term as city solicitor, were
23     there any sexual harassment investigations
24     that arose?
```

MAURICE LARIVIERE      CondenseIt!™      LARIVIERE V. SOLOMON ET AL.

Page 57

```
                    57
1
2  A  Yes.
3  Q  Were any of those investigations post-
4     adoption of Exhibit 2?
5  A  I don't believe so.  Give me one second,
6     please.  There was one that could have been
7     right around that timeline, and I'm not
8     sure if it was before or after but it was
9     in that time area.
10 Q  Did you ever perform any investigations of
11    sexual harassment claims as city solicitor?
12 A  Yes.
13 Q  How many?
14 A  Three or four.
15 Q  Do you recall the names of any of those
16    investigations, names of the employees?
17 A  This is where we enter into that field,
18    you're the city of Methuen, are you
19    indicating that I am supposed to respond to
20    that even if it's attorney-client?
21 Q  You make that decision, sir.  I'm
22    representing the city in its capacity in
23    this case.  I'm asking you a question about
24    your knowledge of sexual harassment
```

Page 58

```
                    58
1
2     investigations.  I can't tell you how
3     you're supposed to respond.
4          MR. DiADAMO:  Let's go off the
5     record for a second.
6
7          (OFF THE RECORD DISCUSSION)
8
9  Q  Without reference to names, identities of
10    alleged victims or employees or harassers,
11    could you tell us when, approximately, the
12    three or four investigations that you
13    conducted took place.
14 A  The most serious would have been '96 or
15    '97.  That would have been the most
16    serious.  There was one in the late '90s.
17    Then there was one, it could have been
18    2002, 2003.  It could have been as far back
19    as 2001, I'm not positive, but it's right
20    in that time frame.
21 Q  If the sexual harassment policy was
22    violated, did the city council have
23    authority to terminate an employee?
24 A  They had only three appointments, the mayor
```

Page 59

```
                    59
1
2     was in charge of making all the other
3     appointments.  The three appointments they
4     had control of was city auditor, city
5     solicitor and the council clerk.  They
6     could override a termination of a
7     department head or assistant department
8     head.
9  Q  Essentially, aside from those three
10    positions, all other city positions were
11    subject to the mayor's appointment?
12 A  Yes, discounting schools, also.
13 Q  The mayor would have the authority under
14    the city charter to terminate an employee
15    if they violated the sexual harassment
16    policy, is that a fair statement?
17 A  Yes, subject to a potential appeal.
18    There's an appeal right to the council for
19    some of the employees.
20 Q  Which employees are those?
21 A  Non civil service.  If you're civil
22    service, you would have the right to go to
23    the Civil Service Commission.  Non civil
24    service would be to the council.
```

Page 60

```
                    60
1
2  Q  The mayor in February of 2005 had no
3     authority under the city charter to
4     terminate you as city solicitor; is that
5     correct?
6  A  That's correct.
7  Q  The termination had to come from the city
8     council?
9  A  That's correct.
10 Q  Who would conduct a sexual harassment
11    investigation into the city solicitor in
12    February of 2005, civilly?
13 A  Under the policy, it would be the human
14    resources director.
15 Q  That was David Bain at the time?
16 A  That is correct.
17 Q  Then procedurally after Attorney Bain had
18    completed his investigation, what would
19    happen next?
20 A  Things are different between the civil
21    service position and non civil service
22    position.
23 Q  I'm talking only about city solicitor at
24    this point.
```

JOAN R. DUNNE                  Page 57 - Page 60

Page 61

```
                        61
1
2  A  The methodology is specified under the
3     charter as to how the process works.
4  Q  Could you tell us what it is.
5  A  Basically I would have to be alerted there
6     was something in gear for a disciplinary
7     action.  I would then have the right to be
8     present at any of the hearings, offer
9     testimony.  It would be an informal
10    judicial type of scenario, quasi judicial,
11    I guess you could call it.
12 Q  When you say the hearings, what are you
13    referring to, hearings before the council?
14 A  That's correct.
15 Q  You're not referring to interviews of
16    witnesses or anything in that regard?
17 A  Council has full authority to call in
18    witnesses.
19 Q  I understand that, but you as the person
20    against who the sexual harassment is
21    alleged, you didn't have any right to sit
22    in on interviews that Bain conducted,
23    right?
24 A  The initial interviews?
```

Page 62

```
                        62
1
2  Q  Any of them.
3  A  If there was going to be evidence offered,
4     yeah.  If there was going to be a
5     background interview, no.
6  Q  That's what I'm asking, if there was a
7     hearing before the city council, what was
8     your right as city solicitor if there was a
9     sexual harassment investigation into your
10    conduct?
11 A  It would be equivalent to any disciplinary
12    proceeding, it wouldn't be different.  It
13    would be equivalent to any other
14    disciplinary proceeding.  There would be
15    due process.
16 Q  What typically would occur at the city
17    council hearing into a sexual harassment
18    investigation?
19 A  Understand at this point in time that has
20    never occurred, so it would have to be an
21    analysis, not a reality.  It's never
22    occurred.
23 Q  Is there any document such as the city
24    charter or any policies or procedures that
```

Page 63

```
                        63
1
2     tell us how it would proceed?
3  A  Yes.
4  Q  What would that be?
5  A  Charter, and obviously there's federal
6     decisions.
7  Q  Do you know if the city council ever
8     terminated an employee for sexual
9     harassment?
10 A  To my knowledge and memory, they've never
11    terminated an employee.  By terminated, you
12    mean get rid of them during their term, not
13    reappoint.  No, it's never occurred, to my
14    knowledge.
15 Q  How about the mayor, any mayor, has any
16    mayor ever terminated an employee for
17    sexual harassment?
18 A  No.
19 Q  In relation to any allegations of sexual
20    harassment, as city solicitor did you ever
21    negotiate a departure of an employee that
22    wasn't considered a termination?
23 A  Yes.
24 Q  Some of those were for sexual harassment,
```

Page 64

```
                        64
1
2     correct?
3  A  I'm sorry, now that I recall it, part of my
4     testimony is incorrect on the termination
5     for sexual.  It wasn't sexual harassment,
6     but there was a cop that was convicted of
7     rape.  He was terminated not under the
8     sexual harassment policy but just in and of
9     itself the conviction.
10 Q  But as to allegations of sexual harassment,
11    has the city council ever terminated an
12    employee for a violation of that?
13 A  No.
14 Q  Your testimony is there's never even been a
15    hearing before the city council in that
16    regard?
17 A  On a termination?
18 Q  No, on a sexual harassment investigation.
19 A  No.
20 Q  There hasn't?
21 A  No.
22 Q  How about the mayor, has the mayor ever
23    terminated an employee for violation of the
24    sexual harassment policy?
```

Page 65

```
                      65
 1
 2  A  We've had agreements -- you're talking an
 3     absolute termination?
 4  Q  Yes.  We'll get to the agreements later.
 5  A  No.
 6  Q  You have negotiated as the city solicitor
 7     departures of employees for violation of
 8     the sexual harassment policy, correct?
 9  A  For sexually related matters, yes.
10  Q  On how many occasions?
11  A  There's one I remember very clearly.
12  Q  Again, we don't want to get into
13     specifics.
14  A  How many were there is the question.  One,
15     to my memory.
16  Q  Was part of the terms and conditions of
17     that departure a resignation by the
18     employee?
19  A  It was a retirement.  A person took a
20     retirement.
21  Q  A voluntary retirement?
22  A  Yes.
23  Q  You, as city solicitor, have negotiated
24     voluntary resignations of city employees,
```

Page 66

```
                      66
 1
 2     correct?
 3  A  Yes.
 4  Q  On how many occasions?
 5  A  I was there twenty-five years so it would
 6     be -- honest to God it would be a pure
 7     guess -- I'm saying it's between 6 and 10,
 8     maybe.  But I would be truthfully guessing
 9     at that point.
10  Q  Could you look at Exhibit 3, please.
11  A  Yes.
12  Q  Could you identify Exhibit 3.
13  A  May I have a moment to read it?
14  Q  Yes, sir.
15  A  May I apprise you of one thing before we
16     get into specific questions.  Sean Cronin
17     has now filed a court action, I don't know
18     if you're aware, against Methuen.
19  Q  That's fine.  I'm asking about this
20     document.
21  A  It is in relation to the documents and what
22     occurred later.
23  Q  It's a public record.
24  A  This?  I don't know if we made it public.
```

Page 67

```
                      67
 1
 2  Q  Where does it say it's not in the document?
 3  A  On matters relating to personnel, we always
 4     would attempt to have that as an exemption
 5     from public records.
 6  Q  You negotiated this contract, yes or no?
 7  A  Yes.
 8  Q  Did you draft the document?
 9  A  Yes.
10  Q  Have you drafted similar documents for
11     resignations of employees?
12  A  Oh, yes.
13  Q  As the city solicitor, did you offer advice
14     regarding the sexual harassment policy to
15     different city departments and their
16     division heads?
17  A  Yes.
18  Q  That was part of your role, correct?
19  A  Basically after we formed the human
20     resources department, it fell onto the
21     shoulders of the human resources officer,
22     but before that, yes.
23  Q  Would you advise different city officials
24     as to disciplinary actions that should be
```

Page 68

```
                      68
 1
 2     taken in response to a sexual harassment
 3     claim?
 4  A  I'm trying to think.  I want to make sure
 5     I'm not wandering over the line on
 6     attorney/client.  I can speak generically.
 7     The two areas I pushed them on were the
 8     retaliatory clause, number one, and number
 9     two was the conducting of an investigation.
10  Q  You also from time to time advised on
11     appropriate discipline.
12  A  Not really.  From a lawyer's perspective, I
13     never looked on whether it was just or
14     unjust, I was looking on would it would be
15     upheld, to be honest with you.  For
16     example, it's civil service, so it would be
17     a matter of what action do you want to
18     take, tell me, I'll see if I can find
19     references that will justify that action.
20  Q  You would advise that employee as to
21     whether it was legally appropriate?
22  A  I would be advising the mayor, town manager
23     or department head.
24  Q  Do you agree that you had an intricate
```

Page 69

```
1                      69
2      knowledge during your tenure as city
3      solicitor of employment laws that related
4      to sexual harassment?
5           MR. DiADAMO:  Objection.
6  A   I was aware of them.
7  Q   Did you ever defend a sexual harassment
8      case on behalf of the city that went into
9      litigation?
10 A   I handled sexual discrimination cases.  I
11     don't recall a sexual harassment case going
12     into litigation.  Sexual discrimination,
13     yes.
14 Q   You managed the outside counsel that the
15     city had retained to defend itself against
16     employment cases in general, correct?
17 A   The only time we would have outside counsel
18     is if there was an insurance policy that
19     covered it.
20 Q   That happened from time to time during your
21     tenure, yes?
22 A   Yes.
23 Q   More than ten occasions?
24 A   You're talking sexual harassment?
```

Page 70

```
1                      70
2  Q   I'm talking employment.
3  A   On the ten we're talking about, we were
4      talking about resignations, so it never got
5      anywhere.  It stayed in the room, so to
6      speak.  Is that what we're referring to?
7  Q   No.  We're referring to your role as city
8      solicitor in managing litigation.  That was
9      one of your job responsibilities, yes?
10 A   Principally I was the litigation.
11 Q   And sometimes outside counsel, right?
12 A   Yes.
13 Q   You said that you never defended any sexual
14     harassment cases that went into litigation
15     against the city, yes?
16 A   To my memory the only one that was ever in
17     litigation was that rape case, but it
18     wasn't so much sexual harassment.  It was a
19     suit against the city under a 1983.
20 Q   Any others besides that case?
21 A   Not to to my memory, no.
22 Q   Did you manage outside counsel that handled
23     the defense of sexual harassment cases
24     against the city?
```

Page 71

```
1                      71
2  A   I'm dividing between discrimination and
3      harassment with harassment being a quid pro
4      quo of a hostile work environment.  That's
5      the category I'm in.  There's only one that
6      I'm aware of that's currently handled by an
7      insurance company.  I handled the
8      retirement piece of it, but it's handled by
9      an insurance company that's still in the
10     works.
11 Q   You played a role in defending that case,
12     in fact, right?
13 A   They would communicate with me
14     periodically, mainly insurance counsel tend
15     to disappear into the wind.
16 Q   Did you ever attend any CLEs on sexual
17     harassment?
18 A   I know they gave CLEs, it would be
19     municipal law, and a piece of that would be
20     sexual harassment.
21 Q   But you can't tell us whether or not you
22     had an intricate knowledge of sexual
23     harassment law in the field of a
24     municipality?
```

Page 72

```
1                      72
2           MR. DiADAMO:  Objection.
3  A   You use the word intricate.
4  Q   How would you characterize your knowledge,
5      sir?
6  A   I'm familiar with it.
7  Q   How about labor relations, you agree that
8      you were familiar with that field of law as
9      well, right?
10 A   Oh, yes.
11 Q   You told us already that you negotiated
12     many departures of employees on behalf of
13     the city, yes?
14 A   I would say six to 10 over the time, yes.
15 Q   Some of those were resignations?
16 A   Yes.
17 Q   You've also advised the city on termination
18     of employees, right?
19 A   Yes.
20 Q   Would you say that you had an intricate
21     knowledge of labor relations as it applied
22     to the city of Methuen?
23          MR. DiADAMO:  Object to that.
24 A   Yes.
```

MAURICE LARIVIERE          CondenseIt!™          LARIVIERE V. SOLOMON ET AL.

Page 73

```
 1                          73
 2        MR. NOTIS: What is the
 3   objection?
 4        MR. DiADAMO: I don't know what
 5   intricate means.
 6        MR. NOTIS: You're objecting to
 7   the form.
 8        MR. DiADAMO: Yes, I'm objecting
 9   to the form because I think the word
10   intricate could be misleading.
11 Q What does intricate mean to you, sir?
12 A To me I'm taking it as 98 percent knowledge
13   of the field. That's why I can't say I
14   have 98 percent knowledge of a particular
15   law. I do have in-depth knowledge, and I
16   hate to dance words. If you're asking me
17   did I have an in-depth knowledge of labor
18   law, yes.
19 Q In-depth knowledge of sexual harassment
20   law?
21 A I was familiar with it, yes.
22 Q In-depth knowledge of employment law as it
23   pertained to the city of Methuen?
24 A Public employment law, yes.
```

Page 74

```
 1                          74
 2 Q How about the retirement system, did you
 3   have an in-depth knowledge of the
 4   retirement system as it applied to the city
 5   of Methuen's employees?
 6 A Yes, I was counsel for the retirement
 7   system.
 8 Q What did that entail as counsel for the
 9   city?
10 A Advising them on retirement law, and
11   representing them in appeals proceedings.
12 Q Would you from time to time counsel
13   individual employees of the impact of their
14   decisions on their retirement benefits?
15 A Yes, if I was told to by the
16   representatives of the retirement board.
17 Q How many times did that occur?
18 A I was there twenty-five years, again. A
19   lot.
20 Q Do you agree that for the employment
21   departures that you negotiated on behalf of
22   the city, all of those involved
23   implications on the employees' retirement?
24 A I believe it would be reviewed in one
```

Page 75

```
 1                          75
 2   fashion or another if it was brought up by
 3   the employee or the union or the attorney
 4   representing the employee.
 5 Q Not just the retirement, but the benefits
 6   that they were entitled to as a result of
 7   that departure?
 8 A I believe so.
 9 Q Could you look at Exhibit 4.
10 A (witness complies) I've gone through it,
11   yes.
12 Q Do you recognize the document?
13 A I believe so, yes.
14 Q Have you seen it before today?
15 A If memory serves me correctly, I probably
16   drafted it.
17 Q That's all for the exhibit. Do you agree
18   that you've convinced an employee who left
19   the employment of Methuen to forego an
20   administrative hearing in exchange for
21   their departure?
22 A Can we go off the record for a second?
23
24       (OFF THE RECORD DISCUSSION)
```

Page 76

```
 1                          76
 2 Q The question stands. I'm asking you, sir,
 3   not to identify individual parties.
 4   Talking in general as city solicitor, did
 5   you ever convince an employee to leave the
 6   employ of the city of Methuen in exchange
 7   for foregoing an administrative hearing?
 8 A That function would be bifurcated. It
 9   would be the determination of any
10   department head whether or not the person
11   was suspended, terminated or whatever. It
12   would be my function that if the question
13   was asked by counsel, or by themselves, or
14   by the union representative, to structure
15   any settlement in that fashion.
16 Q You've seen that happen on occasion?
17 A Where the department head or the mayor and
18   the employee and the union mutually agreed,
19   yes.
20 Q You've defended the city against civil
21   rights claims?
22 A Yes.
23 Q On how many occasions?
24 A I would say two or three.
```

JOAN R. DUNNE

Page 77

77

2 Q  One was the Beal case?
3 A  Yes.
4 Q  Do you know the names of the other cases?
5 A  That's where I was having problems. It's
6    some years back.
7 Q  Did you advance the qualified immunity
8    argument in any of the civil rights cases
9    that you defended for the city of Methuen?
10 A  Not to my memory, no.
11 Q  How about immunity on behalf of the city
12    itself as a party?
13 A  Yes.
14 Q  In the Beal case you did that, right?
15 A  The standard was deliberate indifference.
16 Q  You were successful?
17 A  Yes, as a matter of fact it was on the
18    basis of an agreement.
19 Q  Could you look at the Verified Complaint
20    again, specifically paragraph 104.
21 A  (witness complies)  Okay.
22 Q  When you refer to due process rights in
23    paragraph 104 of the Verified Complaint,
24    what did you mean by that?

Page 78

78

2 A  You're asking for a legal----
3 Q  Legal and factual. You've told us you're a
4    lawyer, right?
5 A  Yes.
6 Q  You drafted the complaint?
7       MR. DiADAMO: Objection.
8 A  I'm not going to discuss matters involving
9    my counsel.
10 Q  You already told us you did earlier.
11 A  I was talking in the total.
12 Q  I'm not asking you, then, if you feel it's
13    attorney-client privilege, and your
14    attorney does, whether you drafted the
15    Complaint, I will withdraw that aspect of
16    the question. This is a Verified Complaint
17    and you signed it, right?
18 A  Yes.
19 Q  You wouldn't have signed it under oath if
20    you didn't believe that the statements were
21    true, correct?
22 A  Yes.
23 Q  What did you mean by due process rights?
24 A  As far as my understanding?

Page 79

79

2 Q  Yes.
3 A  If you have a position with a municipal or
4    a state entity, then there are due process
5    rights. It's considered a property right.
6 Q  What were the due process rights that you
7    allege you were denied in relation to this
8    lawsuit?
9       MR. DiADAMO: Objection. You can
10    answer.
11 A  What had happened, there is case law out
12    there which says that there is a property
13    right if there is a process that must be
14    followed, then before there can be a
15    deprivation of that property right, it must
16    be complied with, and we've discussed about
17    the process with the city council.
18 Q  We talked about it with regard to a sexual
19    harassment allegation, correct?
20 A  No, the council authority is right across
21    the board. It's not established simply on
22    sexual harassment, it's any form of
23    disciplinary action as it relates to their
24    employees.

Page 80

80

2 Q  Procedurally, what due process were you
3    entitled to, sir, as a result of the events
4    of February 16, 2005?
5       MR. DiADAMO: Objection. You can
6    answer.
7 A  First of all, it would have to be the
8    appropriate party that would be in control
9    of the entire disciplinary process, which
10    would be the council. Second of all, I
11    would have a right to be notified about it
12    and to be able to respond including
13    bringing counsel and the conducting of a
14    hearing.
15 Q  That would be if there was a sexual
16    harassment complaint against you?
17 A  Any form of disciplinary proceeding, and if
18    there was going to be a disciplinary
19    process then it would include that, yes.
20 Q  And that you would have some right of
21    appeal, I imagine?
22 A  Yes.
23 Q  Who would the appeal be to?
24 A  After the council?

MAURICE LARIVIERE                CondenseIt!™            LARIVIERE V. SOLOMON ET AL.

|  | Page 81 |
|---|---|

Page 81

1                      81
2  Q  Yes.
3  A  It would go into the court system.
4  Q  Is it your testimony that there was some
5     discipline taken against you as a result of
6     what happened on February 16, 2005?
7  A  It was a hit.  We can call it what we want,
8     it was a setup and a hit.
9  Q  Procedurally under the city charter, was
10    there any discipline that was initiated
11    against you?
12 A  It depends upon what you're using the term
13    discipline.  If you use the cops to whack
14    somebody, yes, I guess you would call it
15    discipline.
16 Q  Let's talk about Fulya Metin.  When did you
17    first meet Fulya Metin?
18 A  I believe it was September 29th.
19 Q  Of 2004?
20 A  Yes.
21 Q  Where did you meet her?
22 A  David Bain brought her over to the office.
23 Q  Did you conduct an interview?
24 A  It was about a ten-minute discussion.

Page 82

1                      82
2  Q  Was Mr. Bain in the room?
3  A  I don't believe so.
4  Q  As a result of that conversation with Ms.
5     Metin, did you make a decision as to
6     whether or not you wanted her to be your
7     assistant?
8  A  Temporary.  To be brought in temporary
9     pending a job search for a permanent.
10 Q  Did you review her resume on that first
11    occasion when you met her?
12 A  No.
13 Q  When did you first review her resume?
14 A  I'm not sure, to be honest with you.
15 Q  Would you look at Exhibit 5.
16 A  Yes.
17 Q  Do you recognize Exhibit 5 to be Ms.
18    Metin's resume that you reviewed in
19    September of 2004?
20 A  It wouldn't have been September of 2004,
21    probably more I saw it somewhere in October
22    2004.
23 Q  Before her full-time hire?
24 A  Yes.

Page 83

1                      83
2  Q  Incidentally, do you call her a secretary
3     or assistant, the position that she filled?
4  A  My intention was to convert her from a
5     secretary to a paralegal, but the status is
6     secretary.
7  Q  Your previous secretary, what was her name?
8  A  Diane Maciariello.
9  Q  She retired?
10 A  Yes.
11 Q  When was her last day of work?
12 A  August 2004.
13 Q  Did you know that she was leaving at some
14    point prior to the actual day she left?
15 A  Yes, she was kind enough to let me know
16    several months ahead so that I would have
17    the timeline to initiate the process and
18    make a hire.
19 Q  What did you do to initiate the process?
20 A  I went over and informed David Bain that
21    she was retiring.  I gave David Bain a job
22    description.  I told him I wanted to change
23    it from a secretary to a paralegal
24    specifically focused on litigation, and he

Page 84

1                      84
2     then posted it through Boston Works and I
3     think a local paper.
4  Q  What was Ms. Metin's official title when
5     she was hired on a full-time basis?
6  A  Temporary.  I don't know if she had a
7     title.  She was a temporary contract
8     employee.
9  Q  Eventually when she obtained a full-time
10    position, what was her title?
11 A  Secretary.
12 Q  Did you experience any problems in getting
13    the position switched from a secretarial to
14    a paralegal position?
15 A  Yeah.
16 Q  Could you tell us what they were.
17 A  Well, I had given months in advance by my
18    secretary retiring, I had plenty of time to
19    fill the position, and I said I wanted to
20    shift it to a paralegal, but when I chose
21    people that would fill the job, the mayor
22    refused to hire them.
23 Q  Do you know the names of any of the people
24    that you wanted to hire that she refused to

JOAN R. DUNNE                                    Page 81 - Page 84

MAURICE LARIVIERE                 CondenseIt!™         LARIVIERE V. SOLOMON ET AL.

| Page 85 | Page 87 |
|---|---|
| 85 | 87 |

**Page 85**

1
2 hire?
3 A The top one, Gail Piccolomini.
4 Q Any others?
5 A No, Dave Bain would have those.
6 Q What was the reason for Gail's non-hire
7   that you were given by the mayor?
8 A I can only tell you what Dave Bain told me
9   because by that point in time if you'd go
10   in there to ask her for something, she
11   wouldn't do it for me, so I tried to have
12   Dave Bain do it.
13 Q What did Bain tell you the reason was?
14 A She said no. Dictators aren't much for
15   explanation.
16 Q Did the mayor interview Gail?
17 A No.
18 Q Just you?
19 A Dave Bain and myself interviewed the
20   potential candidates.
21 Q What was the criteria that you were looking
22   for to replace your old secretary?
23 A Initially I wanted somebody with a
24   paralegal certificate.

**Page 87**

1
2 A Yes.
3 Q Did you have any discussions with the mayor
4   about your hire of Metin?
5 A No.
6 Q Do you know if Bain did?
7 A No, I do not.
8 Q Did he ever discuss with you what the mayor
9   said about Metin's hire?
10 A No.
11 Q So basically the decision was yours whether
12   or not to hire Fulya as your secretary on a
13   temporary basis?
14 A The decision was to bring somebody in
15   during that transition, and I said fine.
16   Dave brought her in, and I said fine, let
17   her start.
18 Q You didn't review her resume at that time,
19   that was your testimony, right?
20 A Correct.
21 Q You then ultimately made the decision to
22   hire her on a full-time basis or at least
23   make that request, right?
24 A Yes.

**Page 86**

1
2 Q Anything else?
3 A Gail Piccolomini, as it turned out, was a
4   recent admitted to the bar, so that's what
5   led my choice, quite frankly.
6 Q So aside from a paralegal certificate, what
7   other duties and responsibilities and
8   qualifications were you looking for in a
9   candidate?
10 A Highest level would be litigation
11   experience. Below that would be municipal
12   experience.
13 Q Anything else?
14 A Those would be the "primal" ones.
15 Q You did, in fact, decide that you wanted to
16   have Metin hired as a temporary employee,
17   right?
18 A Yes.
19 Q Then you made that request to Bain?
20 A I made the agreement. He had brought her
21   over as the temporary, and I said okay,
22   that's fine.
23 Q Did the mayor have to approve of that
24   temporary hire?

**Page 88**

1
2 Q You made that request to the mayor or to
3   Bain?
4 A Bain.
5 Q Then Bain in turn made it to the mayor?
6 A To my knowledge, yes.
7 Q Any problems with the approval of her as
8   your full-time secretary?
9 A The only problem that I'm aware of is
10   because she was a temp there was a twelve
11   week period that we would have to
12   compensate the employment agency for, and
13   the mayor, from what I'm told by Bain, had
14   said no to that, so she had to remain in a
15   temporary status until December 27th.
16 Q You told us about some resistance on the
17   mayor's part to Gail, right?
18 A Gail and several others, yes.
19 Q Did you meet any resistance except for with
20   respect to her temporary status with regard
21   to Ms. Metin?
22 A To my memory, no.
23 Q Before you hired her as full time employee,
24   you reviewed her resume, Exhibit 5?

JOAN R. DUNNE                                    Page 85 - Page 88

Page 89

**89**

1
2  A  I believe so, yes.
3  Q  What was it about her experience that
4     qualified her to fill the position?
5  A  Truthfully, we got along really well.
6  Q  Anything else?
7  A  She had some experience in a law office.
8  Q  Did any of that involve litigation?
9  A  She had some knowledge of litigation, but
10    it was criminal.
11 Q  How about municipal experience?
12 A  No.  To my knowledge, no.
13 Q  So the only reason that you saw fit to hire
14    her as a full-time employee was you got
15    along really well with her.
16 A  Truthfully, yes.
17 Q  Do you agree that she really wasn't
18    qualified to fill that position?
19 A  She needed training, yes.
20 Q  At the time of full-time hire she needed
21    training, correct?
22 A  Yes.
23 Q  What training did you think she needed?
24 A  I wanted her ultimately to get a paralegal

Page 90

**90**

1
2     certificate, and that's one of the things I
3     asked her to do as a condition.
4  Q  Did you ever discuss with the mayor at any
5     time, Mayor Pollard, former Mayor Pollard,
6     Metin's qualifications?
7  A  No.
8  Q  Did you ever discuss with former Mayor
9     Pollard anything about Metin's job
10    performance?
11 A  No.
12 Q  Did you have any direct conversations with
13    former Mayor Pollard about the hire of Ms.
14    Metin?
15 A  I'm sorry, let me correct my earlier
16    answer.  Around late January, early
17    February, I had asked the mayor to count
18    her temporary time towards all calculations
19    for her position, and she had agreed to
20    that.
21 Q  That was a direct conversation, it didn't
22    go through Bain, right?
23 A  It was just before a council meeting, I
24    walked in her office and asked her and she

Page 91

**91**

1
2     said okay.
3  Q  Did the former mayor interview Metin?
4  A  My understanding is yes.
5  Q  Did you ever learn how the interview went
6     or what was discussed in the interview?
7  A  Yeah.  Fulya came back very happy, and it's
8     in the Complaint what occurred.
9  Q  What is the synopsis of what occurred?
10 A  She came back in the office gleeful as
11    anything and came running over and threw
12    herself into my arms.
13 Q  Did she tell you anything about her
14    conversations with Mayor Pollard?
15 A  Just that the thing went very well, and she
16    was going to get the job, and she thought
17    at that point in time it was going to be
18    immediate.
19 Q  Did you ever learn from any source that
20    former Mayor Pollard really didn't want to
21    hire Fulya Metin?
22 A  No, I've never heard that.
23 Q  Have you ever heard that she relied on your
24    recommendation to hire her as a full-time

Page 92

**92**

1
2     employee when she approved of Metin's
3     employment?
4  A  No.
5  Q  You disagree with that?
6  A  Yes.
7  Q  Why?
8  A  Understand that what we're doing is hiring
9     a secretary, and mayors typically don't
10    interview -- a mayor wouldn't be
11    interviewing a secretary.  A department
12    head position, an assistant head, but she
13    took direct control of the hiring process.
14    I was never asked to get involved.  I
15    wasn't even invited to the interview.
16 Q  We're going to talk about your relationship
17    with Metin.  Keeping in mind that the
18    statute of limitations period may not have
19    run and any criminal proceedings, are you
20    willing to answer questions knowingly and
21    voluntarily today?
22 A  Yes, subject to advice of counsel.
23
24            LUNCH RECESS

**Page 93**

93

2 Q  Do you deny touching Fulya Metin at work at
3     any time?
4 A  No.
5 Q  So you agree that from time to time you did
6     make physical contact with her?
7 A  Yes.
8 Q  At any point was any of that contact
9     unwanted by her?
10 A  No, to my knowledge.
11 Q  She never told you to cease touching her
12     physically in any regard?
13 A  No.
14 Q  Did she ever imply that to you?  Maybe she
15     didn't say it in words, but that you felt
16     that she implied that the physical
17     touchings were unwanted?
18 A  No.
19 Q  At some point did you ask Ms. Metin to go
20     on a vacation to the Mediterranean?
21 A  She told me a lot about Turkey, and quite
22     frankly I never paid attention to that
23     country, but as she described it to its
24     history it was very interesting.  As a

**Page 94**

94

2     matter of fact, we went to Barnes & Noble,
3     she said let's go there and she wanted to
4     show me some books on Turkey, and I
5     jokingly said to her, yeah, we ought to go
6     there some day.
7 Q  So it was in jest, from your perspective?
8 A  Yes.
9 Q  But you did make the remark?
10 A  Oh, yes.
11 Q  Could you look at Exhibit 7, please.
12 A  Yes.
13 Q  Have you seen this document before?
14 A  Yes.  Do I remember every word, no.
15 Q  Neither do I.  What do you recognize the
16     document as?
17 A  My understanding is after the incident, so
18     to speak, she prepared this, or before,
19     it's one way or the other, I forget
20     exactly, but it was right around that point
21     in time.
22 Q  I'm going to ask you to read -- why don't I
23     read it into the record and then I'm going
24     to ask a question, okay?

**Page 95**

95

2 A  Sure.
3 Q  Then we'll go through some of the aspects
4     of the statement.  About five or six
5     sentences in, Ms. Metin wrote about the
6     fourth or fifth day into the assignment,
7     Maurice was acting a little too nice to me,
8     and I thought he was a little strange, but
9     I brushed the thoughts aside.  On that day,
10     by the file room near the doorway near the
11     entrance to the office, he came up to me
12     out of nowhere and grabbed me and kissed me
13     on the lips.  Do you recall that incident?
14 A  No.
15 Q  Do you deny that it occurred?
16 A  Yes.
17 Q  Later on in the statement, about halfway
18     through the first page she wrote, the days
19     at the office would be getting my work done
20     but often almost on a daily basis he would
21     come over to my desk and make stupid
22     comments about me being in a bathing suit
23     or stare at my chest or just stare at me
24     all the time and make me feel

**Page 96**

96

2     uncomfortable.  Do you recall making
3     comments about Ms. Metin in a bathing suit?
4 A  I remember our discussing where her
5     mother's place was they have a pool, and we
6     talked about that once.  She was talking
7     about being at the pool, and I asked her
8     what kind of bathing suit did she wear.
9 Q  What was her response?
10 A  A bikini.
11 Q  Why did you ask her about her bathing suit?
12 A  Didn't have any particular reason, just
13     asked the question since we were talking
14     about the pool.
15 Q  Did you feel that that was an appropriate
16     topic of discussion in the workplace?
17 A  It's all based upon the person you're
18     dealing with.  Some are hypersensitive,
19     some you don't know.  If you know somebody,
20     you're friendly with somebody, you talk
21     differently.
22 Q  So in some cases that was appropriate and
23     in some cases it wasn't, is that your
24     testimony?

Page 97

## 97

2  A  I didn't notice it being improper or her
3     taking offense at it.
4  Q  Later on she wrote, will I run away with
5     him somewhere to the Mediterranean, do I
6     like it if he touches me or hugs me and I
7     would say to him and just try to get away
8     from him, avoid him by changing the subject
9     and try to get away from him. With regard
10    to that statement, do you recall asking her
11    whether she liked it if you touched her or
12    hugged her?
13 A  I'm not sure. I don't recall one way or
14    the other.
15 Q  She later wrote, he would reach over my
16    desk and kiss me on the lips, a quick kiss
17    and stand by my desk and hover and just
18    stare at me. Do you recall that conduct?
19 A  The first part, yes, the hovering, no.
20 Q  She later wrote, he would tell me to hug
21    him all the time and he would get so close
22    to me that I could feel his private part on
23    my private area and he would sort of try to
24    adjust himself so he got really close to my

Page 98

## 98

2     private area. Do you deny that conduct?
3  A  Yes.
4  Q  She characterized kisses between you as
5     "almost to the point of trying to make out
6     with me." Do you agree with that
7     characterization?
8  A  Where is that, Gareth?
9  Q  It's a couple of sentences after the
10    private part statement.
11 A  I'm sorry, I don't see it.
12 Q  Let me read it. It starts with I would
13    push him away----
14 A  Okay, I see it.
15 Q  The question is with respect to her
16    characterization of the kisses as almost to
17    the point of trying to make out with me, do
18    you agree with that characterization?
19 A  No.
20 Q  She later wrote towards the end of that
21    first page, if I refused to hug him he
22    would grab me anyway when I was at my desk
23    from behind and push me next to him. Did
24    you make those gestures towards her?

Page 99

## 99

2  A  No.
3  Q  She wrote that he would sometimes when I
4     walked by force me to sit on his lap and
5     try to kiss me, I would try to get away
6     from him and just avoid being next to him.
7     Did that ever occur?
8  A  No.
9  Q  On the second page towards the top she
10    wrote, he would often ask me to sign pieces
11    of paper that said something like "Maurice
12    is a nice guy." Then on the bottom of the
13    paper would be a signature line and he'd be
14    like sign that... Or he would bring me a
15    piece of paper that said I like Maurice, he
16    is a good guy" and make me try to sign it..
17    It got so annoying that sometimes I would
18    just sign it so he would go away from my
19    desk.
20        Did you ever present such pieces of
21    paper to Ms. Metin?
22 A  There was a couple, yes. Not that language,
23    but yes.
24 Q  What was the reason for that presentation

Page 100

## 100

2     to her?
3  A  There was one, and as a matter of fact I
4     think you have it in evidence as I was
5     looking through there. There was one that
6     we were going out to D'Angelos one day, and
7     she was talking about her stepmother who is
8     her biological father's next wife, second
9     or third wife, and eighteen months after
10    they married down in Florida, he died, so
11    she was getting a good portion of their
12    money, and she was trying to get some, and
13    she kind of hated her. I remember we were
14    going down the street and she was calling
15    her on the phone. As a matter of fact, the
16    woman was in California, and she got off
17    the phone and was hooting and hollering,
18    and then she talked about her and her
19    former husband hooting and hollering, and I
20    finally said I hope I'm not on your bad
21    list and just jokingly said write me a note
22    saying I'm not on your bad list or words to
23    that effect.
24 Q  We'll talk about the pieces of paper when

MAURICE LARIVIERE | CondenseIt!™ | LARIVIERE V. SOLOMON ET AL.

Page 101

```
         101
1
2   we get to them.
3       Continuing, she wrote in the
4   statement, almost every day he would ask me
5   for a hug and a kiss and would grab at me.
6   He would do this disgusting thing with his
7   tongue sometimes when I went by him when he
8   was in the office like I enjoyed looking at
9   his tongue or something.
10      With regard to that statement, when
11  you tried to hug and kiss her would you use
12  your tongue?
13 A  No.
14 Q  Did you ever make those gestures with your
15  tongue to her?
16 A  I can't deny, I'm not sure.  You jokingly
17  might not as a kiss but just as a gesture.
18  I can't say for a fact I didn't.  I don't
19  recall one way or the other.
20 Q  She wrote, he would on a few occasions and
21  more often lately touch my breasts when he
22  tried to hug me, and I would pull his hands
23  down and he's be like "ouch, you hurt my
24  hand, say you're sorry."  Did you ever try
```

Page 102

```
         102
1
2   to touch Ms. Metin's breasts?
3 A  No.
4 Q  Do you deny making the statement "ouch, you
5   hurt my hand, say you're sorry."
6 A  In that context, no, I did not.  But
7   sometimes I would say ouch if I bumped my
8   hand or something, I'd go ouch.  Not in
9   that context, but have I used the term?
10  Yeah.
11 Q  Later she wrote the question in the
12  statement, on some occasions he would try
13  to rub my shoulders and I would tell him to
14  stop and he would be don't you like that?
15  Do you recall trying to rub her shoulders?
16 A  And having that response?
17 Q  Let's start with rubbing of the shoulders?
18 A  Did I ever rub her shoulders?  Yes.
19 Q  Were you told to stop rubbing her shoulders
20  when you did so?
21 A  No.
22 Q  Did you feel her move away from you when
23  you tried to rub her shoulders?
24 A  No.
```

Page 103

```
         103
1
2 Q  Do you recall her asking you to stop?
3 A  No.  As a matter of fact, she asked.
4 Q  She asked you to rub her shoulders?
5 A  Yeah, when she started the Gold's Gym she
6   was doing weight lifting and her muscles
7   were hurting, so I said want me to give you
8   a back rub? and she said, yeah, and I gave
9   her a rub around here.  I remember that
10  because that led to one of the e-mails I
11  sent her.
12 Q  Did that occur on more than one occasion
13  when she would ask you for a back rub?
14 A  No, I think that was just one time.
15 Q  Do you recall when that occurred?
16 A  I'm going to say towards the end of
17  January.
18 Q  Later on she wrote, he on some occasions
19  also touched my buttocks and tried to rub
20  it while he was trying to get me to hug
21  him.
22 A  I'm sorry, where are you?
23 Q  About midway through page 2.
24 A  Where are you, Gareth?
```

Page 104

```
         104
1
2 Q  Right here.
3 A  Got it.  Yeah, okay.
4 Q  Do you agree with the statement that on
5   some occasions you tried to touch her
6   buttocks and rub it?
7 A  Touch, yes.  Rub, no.
8 Q  You would try to touch her buttocks when
9   you gave her a hug, is that right?
10 A  Yes.
11 Q  It wasn't a situation where you weren't
12  giving her a hug and you approached her
13  from behind?
14 A  No.
15 Q  Was there ever an occasion when you pinched
16  her buttocks at work?
17 A  No.
18 Q  She wrote the other day he almost had his
19  hand down the back of pants, pants is
20  misspelled, and I pulled his hand back up.
21  Do you recall that incident?
22 A  No.
23 Q  Did she ever pull your hand away when you
24  had your hand on her buttocks?
```

Page 105

105

1
2  A  No.
3  Q  A little further down she wrote, he at one
4     time told me that he loved me, and that he
5     never went through anything like this, and
6     that he was only with his wife, and he
7     didn't know how to handle this and cried
8     for a long time at my desk. Do you recall
9     that incident?
10 A  No.
11 Q  Did you ever tell Ms. Metin that you loved
12    her?
13 A  I said I loved her being there, yes.
14 Q  You never told her that you loved her?
15 A  No.
16 Q  I'm sorry, this is an embarrassing
17    statement but it's what Ms. Metin wrote so
18    I'm going to have to ask you questions
19    about it.
20       That same day he told me that he
21    can't have sex with his wife anymore
22    because he thinks of me. Did you ever make
23    that remark to Ms. Metin?
24 A  No, that's ridiculous.

Page 106

106

1
2  Q  Did you ever have any conversations with
3     John Milori about Ms. Metin?
4  A  The best I can remember, something to the
5     effect he might ask is Fulya in. It would
6     be that sort of conversation.
7  Q  You're aware that Ms. Metin claims she told
8     Mr. Milori that she felt some of your
9     gestures were unwanted?
10 A  It's my understanding.
11 Q  Do you have any reason to dispute that she
12    made that claim to Mr. Milori?
13 A  I have absolutely no idea what two other
14    people are discussing outside of my ear.
15 Q  But you have no evidence to refute that
16    that happened?
17 A  Objection, hearsay. No, I do not.
18 Q  Since February 16, 2005, have you had any
19    conversations with Ms. Metin?
20 A  No. The closest would be at the MCAD where
21    she was offering testimony, and I was, but
22    that would be it, and it wasn't direct, it
23    was into the hearing officer.
24 Q  That was at the investigative conference.

Page 107

107

1
2  Q  Correct?
3  A  Not.
4  Q  Not transcribed?
5  A  I don't know.
6  Q  On page 3 near the top she wrote, on some
7     occasions he would use the phone by my desk
8     and keep touching my hair all the time and
9     stroking my hair and I would push his hand
10    away.
11       Do you agree with that statement?
12 A  That I used the phone by her? Yes. I used
13    it quite often.
14 Q  Did you stroke her hair when you used the
15    phone?
16 A  There was one time where I found out -- she
17    has straight hair, I don't know, you were
18    at her depo, does she have straight hair
19    again?
20 Q  I don't recall.
21 A  Her natural thing is to be very curly,
22    super curly, and she used to have straight
23    hair that was very dry. I asked her once,
24    I said wow, that's kind of dry, isn't it?

Page 108

108

1
2     Then a couple of weeks later she walked in
3     and it was like curly as hell. She said
4     that's the natural way I am. I
5     straightened it out with a curling iron or
6     something. Then I went I like that better.
7  Q  You touched her hair on that occasion,
8     right?
9  A  Yes.
10 Q  She characterized it as stroking her hair,
11    would you agree with that characterization?
12 A  No, because stroking means a long run with
13    the hand, no. Touch, yes.
14 Q  Did you ever push your hand away when you
15    touched or stroked her hair?
16 A  No.
17 Q  Right after that she wrote that almost
18    every day there was a close hug or a kiss.
19    Is that your memory?
20 A  No.
21 Q  She wrote, on two occasions I can remember
22    that he was upset with me for not saying
23    goodbye one time or when he saw me talking
24    to John Milori, the next day he admitted to

| Page 109 | Page 111 |
|---|---|

**Page 109**

1    109
2    me he was very jealous.
3        Did you make that remark about the
4    jealousy with Ms. Metin?
5 A  No, and I talked to her about it that same
6    day as far as John Milori.
7 Q  What did you talk about?
8 A  At that point in time is when I was getting
9    prepped for the Beal case, and she had
10   started the gym in late January. I
11   remember where I was there's windows and
12   you look right out onto the parking lot,
13   and I looked out and I saw her pull her car
14   back in, which I wondered as to its
15   condition, and John was in the car.
16   Subsequent to that she came upstairs. I
17   was heading out the door for the restroom,
18   when you're in your 50s you go real quick,
19   and she said something like it's snowy
20   out. I said, yeah, you should have used
21   his car, he got an SUV, and I went across.
22   When I came back she was hooting at me and
23   calling me names et cetera for having said
24   that. I said, okay, listen, I'm sorry for

**Page 110**

1    110
2    offending you, I'm sorry. I remember that
3    one because she was mad as hell and it kind
4    of went on for a while.
5 Q  Were you jealous of Ms. Metin's
6    relationship with Mr. Milori?
7 A  No. My understanding was it wasn't
8    intimate in any instance.
9 Q  She later wrote Maurice occasionally asks
10   me to go out for a drink one night after
11   work to talk, and I would tell him that I
12   couldn't because I couldn't find a
13   baby-sitter or someone to watch my
14   daughter. He brought that up when I said
15   often to him that I couldn't go out for a
16   drink with him.
17       With reference to that statement, did
18   you periodically ask Ms. Metin to go out
19   for a drink after work?
20 A  No. I remember one time asking her. She
21   wasn't very good at handling money, and I
22   was trying to explain to her budgeting
23   because she would just spend every dime. I
24   said let's sit down and kind of talk about

**Page 111**

1    111
2    what you do with money and how you keep
3    it. You want to put some to the side,
4    because she had a lot of debt issue. I
5    remember that one.
6 Q  At least on one occasion you did ask her
7    out for a drink?
8 A  Yes.
9 Q  But that was to talk about the credit
10   issues, correct?
11 A  Yes.
12 Q  No other invitations to have a drink
13   besides that one occasion?
14 A  Not a drink. At one point in time she
15   talked a lot about her daughter Melissa,
16   and this is early November, and I said I
17   would like to meet her sometime, we ought
18   to go to Wendy's.
19 Q  Did you, in fact, meet her at the time?
20 A  About a week or so later, Melissa stayed at
21   the office for a week in the afternoons
22   when her baby-sitter was unavailable, so
23   she was there.
24 Q  You said she started at the gym during

**Page 112**

1    112
2    January 2005?
3 A  I'm going to say mid-January, yes.
4 Q  Did you also join Gold's Gym at some point
5    during 2005?
6 A  Late January, yes.
7 Q  Had you ever belonged to a gym before that
8    time?
9 A  No.
10 Q  Why did you join?
11 A  She had asked a couple of times about my
12   joining with her. Then when she did join,
13   her words to me was a friend of a friend is
14   getting me a pass there. She joined, and
15   at that point in time she asked me again
16   about joining and she said I can get you a
17   seven day pass. I had declined initially,
18   and then myself and a couple of other
19   people started going to the gym together, I
20   joined and we all went.
21 Q  How long did you keep your membership?
22 A  I gave it up immediately after the
23   situation.
24 Q  Have you since joined another gym?

MAURICE LARIVIERE                    CondenseIt!™              LARIVIERE V. SOLOMON ET AL.

| Page 113 | Page 115 |
|---|---|

Page 113

1
2 A  I don't have any money.
3 Q  So the answer is no?
4 A  The answer is no.
5 Q  What was your reason for joining the gym at
6      the end of January 2005?
7 A  I enjoyed her company, and we had started
8      an exercise program together.
9 Q  Anything regarding your health?  Was there
10     a health benefit to the gym membership for
11     you?
12 A  Oh, yes, definitely.
13 Q  What were the benefits that you were
14     seeking to enjoy from the membership?
15 A  As you get older in life, your muscle turns
16     to fat.  If you exercise, then it converts
17     in your body more effectively and burns
18     that.
19 Q  When you went to the gym what kinds of
20     exercises did you engage in?
21 A  It would be all kinds of different things
22     between riding a bike or doing situps,
23     lifting weights.  There's a variety of
24     items.

Page 114

1
2 Q  Were there ever occasions when you and Ms.
3      Metin would go to the gym together?
4 A  Yes.
5 Q  How many occasions did that occur?
6 A  I joined in late January, and the last time
7      we went to the gym together would have been
8      February 14th.
9 Q  Did you have a blood pressure problem prior
10     to February 2005?
11 A  Not that I know of.  I think I might have
12     had an elevated blood pressure, but my
13     understanding is the doctor told me to
14     start doing the medicine after this whole
15     thing cooked.  Is there a correlation?  I
16     don't know.
17 Q  Were you ever told you had hypertension
18     prior to February 2005?
19 A  Not that I recall.
20 Q  Looking back at Exhibit 2, the sexual
21     harassment policy.
22 A  Yes.
23 Q  You told us that you touched Ms. Metin's
24     hair on occasion, correct?

Page 115

1
2 A  Yes.
3 Q  Do you consider that a violation of any of
4      the provisions of the sexual harassment
5      policy?
6 A  The entire sexual harassment policy is
7      based on either quid pro quo or a hostile
8      work environment, and if you look at
9      hostile work environment, it's
10     unwelcomeness in conduct.  There was never
11     an indication of unwelcomeness.
12 Q  Touching of the buttocks, would you
13     consider that a violation of the sexual
14     harassment policy?
15 A  If it's unwelcomed, yes.
16 Q  Gestures with the tongue, would you
17     consider that a violation of the sexual
18     harassment policy?
19 A  That I'm not sure.
20 Q  Kisses on the lips?
21 A  If it's unwelcome.
22 Q  Hugs?
23 A  If it's unwelcome.
24 Q  Discussing a sexual experience or ones

Page 116

1
2      sexual activities, would you agree that is
3      a violation of the sexual harassment
4      policy?
5 A  Again, it would be unwelcome.  If that was
6      the case then she would have committed
7      unwelcome conduct to me.
8 Q  You're the supervisor, though?
9 A  Oh, yes.
10 Q  Do you differentiate between a supervisor's
11     conduct at work and an employees?
12 A  Yes.
13 Q  How about with regard to the sexual
14     harassment policy?
15 A  There's direct liability to the employer
16     because the law recognizes the position of
17     a supervisor.
18 Q  I'm going to quickly ask you about some of
19     the exhibits.  Exhibit 8.  Do you recognize
20     Exhibit 8?
21 A  Yes.
22 Q  Could you identify it, please.
23 A  As to what it is?
24 Q  Yes, what is it?

JOAN R. DUNNE

MAURICE LARIVIERE                CondenseIt!™                LARIVIERE V. SOLOMON ET AL.

Page 117

117

2 A  It appears to be a picture of a woman from
3     the shoulders down to her belly button
4     exposing her breasts, and there's a card on
5     it saying I love Maurice.
6 Q  Did you prepare this document, sir?
7 A  No, I did not.
8 Q  Do you know where it came from?
9 A  Yes.
10 Q  Where did it come from?
11 A  Bill Depardo.
12 Q  Who is Bill Depardo?
13 A  Bill Depardo was a good friend of mine.  In
14     fact, he is one of the ones I used to go to
15     the gym with a lot.  He worked over in the
16     health department as an inspector, we
17     had worked on cases together when we did
18     code prosecutions, and one day he brought
19     that in and told me he was giving it out to
20     a bunch of people, and told me he was
21     showing me that one with my name on the
22     card and showing it to other people.
23 Q  Do you know when that was that Mr. Depardo
24     gave you this document?

Page 118

118

2 A  Somewhere, I'm going to say, and this is
3     not an absolute, it's a guess, I think it
4     was in late January, but I'm not absolutely
5     positive.
6 Q  2005?
7 A  Oh, yes.
8 Q  Did you ever display that document, Exhibit
9     8, to Ms. Metin?
10 A  That I'm not positive one way or the
11     other.  I do remember Billy used to come in
12     and chat with her forever, and I used to
13     say, Billy is crazy.  He's really crazy, so
14     I would give her examples of when he did
15     crazy stuff.  They used to talk forever
16     when he walked in about their dogs.  I
17     remember he brought it in that day, and I
18     remember telling her, remember I told you
19     Billy was crazy.  I brought in a picture.
20     I can't say whether or not to my memory I
21     showed her that or not, I'm not positive.
22 Q  When you told her about the picture you
23     were referring to Exhibit 8?
24 A  Yes.

Page 119

119

2 Q  Exhibit 9, do you recognize Exhibit 9?
3 A  Yes.  Do you see that one I remember I told
4     you earlier, I'm not putting Maurice down
5     on the mad list.
6 Q  Did you prepare the typed written remarks
7     at the top of Exhibit 9?
8 A  I think I said to her give me a supervisory
9     survey, and I believe, yes, I did.
10 Q  Then you asked her to sign, and she did?
11 A  Yes.  I remember we talked about her
12     concerns from a prior employment about
13     something.
14 Q  Did you keep Exhibit 9 in your office after
15     she signed it?
16 A  I might have thrown it in the top drawer, I
17     don't know.
18 Q  Exhibit 10, did you also prepare Exhibit
19     10?
20 A  No.
21 Q  Do you know who prepared Exhibit 10?
22 A  Fulya, to my knowledge.
23 Q  Have you ever seen this document prior to
24     today?

Page 120

120

2 A  Yes.  I think these were two separate
3     documents, if I remember correctly.
4 Q  You're referring to the typewritten
5     statement at the top and the handwritten
6     that's midway down; correct?
7 A  Yes.
8 Q  Did you keep this document in your office?
9 A  I'm assuming, yes, it was the upper right-
10     hand drawer I used to throw things in and
11     never pay attention to.  It could have been
12     up in there.
13 Q  Exhibit 11, do you recognize Exhibit 11?
14 A  No.  I've actually seen this and looked at
15     it a million times and could not correlate
16     it.
17 Q  You're referring to the poem?
18 A  Yeah.
19 Q  You never prepared this poem, typed it out,
20     and gave it to Ms. Metin?
21 A  No.
22 Q  How about the handwritten words on the
23     right side of the document that appear to
24     say Fulya Metin, yes.  I like MJL.  Have

JOAN R. DUNNE                                        Page 117 - Page 120

Page 121

121

2  you seen that before?
3 A  I think so, yes.
4 Q  Was it also next to the poem when you saw
5    it or was that a separate document as well?
6 A  That's where I'm confused.  I remember
7    seeing notes like that but I don't remember
8    this poem thing.
9 Q  Did you direct Ms. Metin to write the yes.
10    I like MJL.
11 A  No.
12 Q  Did you ever visit pornographic websites at
13    work?
14 A  I'm going to say in the mid 1990s when I
15    first got AOL I think I did.
16 Q  When you did that, was that in your office
17    that you visited the sites?
18 A  Yes, this was in the days when Methuen
19    didn't have an internet system and you had
20    to use your own through a telephone, and I
21    started using the internet in 1996, late
22    '96, and I think somebody told me that
23    that stuff was on there and I went and
24    looked.

Page 122

122

2 Q  During February 2005, did you access any
3    pornographic websites from your office
4    computer?
5 A  There was one guy that sent me some e-mails
6    with photos, and when I opened his e-mail
7    it was there.
8 Q  Did you have a computer at home that was
9    issued by Methuen?
10 A  I had a laptop that I brought home
11    periodically, but I didn't have a computer
12    at home that was theirs.
13 Q  From the laptop did you have an internet
14    access at home or from anywhere other than
15    your own office?
16 A  I have dial-up so you can do dial-up
17    anywhere.
18 Q  Do you recall if you ever accessed
19    pornographic websites from the laptop?
20 A  Absolutely not.
21 Q  Do you know when those e-mails were sent
22    from your friend that contained the
23    pornographic material?
24 A  It would have been early February.  There

Page 123

123

2    was a bunch of people he started sending
3    these out to, and actually I had gone down
4    to him and told him, I said please don't do
5    that.  I'm sure that they're monitoring
6    everybody.
7 Q  Did you ever display pornographic material
8    to Ms. Metin at work?
9 A  No.
10 Q  Did you ever have it up on your computer
11    screen when she walked into the office?
12 A  Pornography?
13 Q  Yes.
14 A  Absolutely not.
15 Q  Did you visit Fulya's myspace.com website?
16 A  I think you mean match.com.
17 Q  Let's talk about the myspace website, do
18    you have any knowledge that she had such a
19    site.
20 Q  How about match.com?
21 A  Yes.
22 Q  Tell us the circumstances around visiting
23    that website?
24 A  The first time she told me that she was

Page 124

124

2    doing internet dating, and I don't believe
3    I even knew about match.com at that point
4    in time.  She explained it to me, and then
5    she signed on and showed me her site with
6    some pictures she had on there.  Then she
7    would tell me how you post yourself and
8    then somebody will try to connect with you
9    and set up a date.  She told me she had set
10    up dates that way.  That was the first
11    time.
12 Q  Tell us about all the times that you
13    visited the site.
14 A  The second time she came into my office and
15    had talked about that again, and she
16    explained to me, this one I can't remember
17    perfectly, either the person that sends the
18    message or the person that posts to be able
19    to receive the message has to pay for it, I
20    guess, and she was explaining that to me,
21    and she went on the site and showed me her
22    site again and her posting.
23 Q  Did you ever visit the site outside of the
24    presence of Ms. Metin?

MAURICE LARIVIERE                    CondenseIt!™                    LARIVIERE V. SOLOMON ET AL.

Page 125

125

1
2 A  Yes.
3 Q  Why did you do that?
4 A  I told her, and maybe it's because I'm in
5     my 50s, I don't know, I think that internet
6     dating is strange at best and puts you in
7     harm's way. I told her she should stop
8     doing that sort of thing because you don't
9     know who the hell you're going to be
10    meeting. Then at one point in time I went
11    on the site, and I saw her picture that
12    she'd done and copied it and put it on the
13    desktop, and I called her in. I said see
14    how easy it is to access your information
15    and all the rest? She seemed stunned. She
16    didn't realize that you could copy a
17    picture off the internet and actually keep
18    it as a desktop.
19 Q  At that time did you have a separate
20    printer in your office as opposed to the
21    one at Ms. Metin's desk?
22 A  Yes, and whenever it was broken the mayor
23    would refuse to allow me money to pay for
24    it, so yes.

Page 126

126

1
2 Q  Was it working when you printed the
3     picture?
4 A  I didn't print the picture.
5 Q  I thought you said you printed out her
6     picture and placed it on the table?
7 A  No, I should have said copy it from the
8     internet and posted it. I posted it on the
9     desktop.
10 Q  I see. Do you recall what time Ms. Metin
11    left the office on February 15th, 2005?
12 A  Five o'clock.
13 Q  Was that her typical time to leave the
14    office?
15 A  What we had was you would work three days
16    until 5:30, one day until five, and one
17    day, which is Friday, you would get out at
18    noon, so they had extended hours. Instead
19    of 4:30 they went to 5:30, and then they
20    gave you that half day to balance out your
21    hours. Five o'clock was her time to leave.
22 Q  The 15th, do you recall what day of the
23    week that was?
24 A  Tuesday.

Page 127

127

1
2 Q  Anything unusual about her conduct on the
3     15th?
4 A  No, quite frankly it was probably -- from
5     all the friendly times we had it was the
6     friendliest.
7 Q  The 14th was Valentine's Day?
8 A  Yes.
9 Q  Did you get a present for Ms. Metin on
10    Valentine's Day that year?
11 A  Not that I recall.
12 Q  Do you recall if she presented one to you?
13 A  Not that I recall.
14 Q  Did you get a card for her?
15 A  I don't believe so.
16 Q  Did she get a card for you?
17 A  I don't believe so.
18 Q  On the 15th you received the favorable
19    decision on the Beal case, right?
20 A  On the 15th I went to the Pacer site and
21    found out, yes.
22 Q  Around what time was that?
23 A  Shortly after she left.
24 Q  At some point did you call any other

Page 128

128

1
2     employees of Methuen to discuss the outcome
3     of the case?
4 A  I called the former police chief and left a
5     message. I called and left a message with
6     the then current police chief. I called
7     Fulya. I went down and talked to the chief
8     of staff, and I believe Dave Bain and Tina
9     Touma-Conway were there that day.
10 Q  Was the mayor in her office on the 15th?
11 A  I believe so though I'm not positive. Her
12    door was closed.
13 Q  In any event did you discuss the Beal case
14    with her on the 15th?
15 A  No.
16 Q  What time was the call to the former police
17    chief?
18 A  He was the first call I made.
19 Q  Do you recall what time you made that call?
20 A  As I recall the time sequence, Fulya left
21    at five, then I had started checking the
22    Pacer site, and I missed it on the 14th, so
23    I checked it on the 15th, I picked it up
24    and I would say it was five or 10 past

JOAN R. DUNNE                                    Page 125 - Page 128

Page 129

129

1
2   five.
3 Q So the call would be sometime after that, I
4    assume.  You digested----
5 A It was almost immediately.  I unfortunately
6    have a tendency, I don't need the body of
7    the decision.  I go to the end and see how
8    I did.
9 Q When was the call to the current chief?
10 A I believe he was the second call.
11 Q Were all these calls made from your office
12    and City Hall?
13 A Yes.
14 Q When did you call Ms. Metin on the evening
15    of the 15th?
16 A I called her that -- in that time period
17    between five and 5:30.  Then later I went
18    to the gym, and I was coming back out, and
19    I called her then to see if she got my
20    message about the case.
21 Q The first call you left a voicemail
22    message.
23 A Yes.
24 Q On her cellphone or her home phone?

Page 130

130

1
2 A Cellphone.  She didn't use her home phone.
3 Q Did she provide her cell number to you?
4 A Yes.
5 Q Do you recall what the reason for that was?
6 A We used to exchange phone calls.
7 Q Personal or work related?
8 A Both.
9 Q What time did you leave the gym that
10    evening?
11 A To the best of my memory, somewhere around
12    9:30, quarter of ten, I believe.
13 Q On that occasion when you called her after
14    leaving the gym, you got her directly, it
15    wasn't voicemail, right?
16 A Correct.
17 Q Did she mention where she was at that time?
18 A No, she did not.
19 Q What did you discuss?
20 A I said the Beal decision is in, did you get
21    my message, I won.
22 Q What did she say?
23 A Very few words.  It was a very, very short
24    conversation.

Page 131

131

1
2 Q You don't recall anything specific about
3    what she said?
4 A No, not exactly.
5 Q In the Amended Complaint you allege that
6    during one of the calls Ms. Metin was with
7    Chief Solomon?
8 A Yes.
9 Q How did you learn that information?
10 A Solomon told me that.
11 Q Do you know which phone call it was?
12 A It was the only one that I had with her in
13    direct contact which would be around,
14    guessing, 9:30, quarter of ten, somewhere
15    around there.
16 Q Who was your cellphone provider at that
17    time?
18 A Verizon.
19 Q Was the call made from your cellphone?
20 A Yes.
21 Q The second, not the first, right?
22 A Yes.
23 Q After you made the phone call, where did
24    you go next?

Page 132

132

1
2 A I went home.
3 Q The next morning between the time when you
4    left your house and you arrived at City
5    Hall, did you go any place?
6 A No.
7 Q Did you speak to anybody on your cellphone?
8 A No, not to my memory.
9 Q What did you do when you arrived at City
10    Hall that morning?
11 A Went in, took off my coat and went into my
12    office, started the computer, and quite
13    frankly I was so proud of that decision, I
14    started to prepare a letter to send to the
15    city council fluffing my feathers.
16 Q Do you recall what time you got to the
17    office that morning?
18 A I would typically arrive ten to fifteen to
19    twenty minutes before start time, depending
20    on traffic, so it would be somewhere
21    between 8:15, 8:20, somewhere around there.
22 Q That was your typical time to arriving at
23    the office?
24 A There was some days I would drop my

MAURICE LARIVIERE                    Condenselt!™         LARIVIERE V. SOLOMON ET AL.

Page 133

133
1
2   daughter off who was on student council at
3   the high school, so I would be in there a
4   little after seven.
5 Q When did you become aware that Ms. Metin
6   arrived at work that morning?
7 A When she came in and said hi to me.
8 Q Do you know what time that was?
9 A Typically she'd be about 8:40.
10 Q That morning your memory is that it was
11   around 8:40?
12 A Yes.
13 Q Besides exchanging hellos and pleasantries,
14   what else did you discuss upon her arrival?
15 A I went over the case again.  My ego was
16   about 800 percent, quite frankly, and I was
17   telling her I was writing a letter to the
18   city council and I would e-mail it over to
19   her.  I did e-mail it over to her, and she
20   looked at it and she talked about
21   restructuring the spacing and that sort of
22   thing.  Then I provided her with some
23   addresses to send to the city councilors.
24 Q When was the next city council meeting

Page 134

134
1
2   after the time you received the decision?
3 A They meet on the first and third Mondays of
4   the month.
5 Q So typically----
6 A I believe they met on the 7th, so the next
7   time they would have met would be on the
8   21st.
9 Q Typically you would communicate with them
10   by letter if there was something that came
11   up between meetings?
12 A No.
13 Q How would you communicate with the city
14   councilors?
15 A My communication would be, if I was going
16   to send out any messages it would be
17   directly to the chairman or through the
18   city council office to the members.  But it
19   was rare that you'd communicate to all the
20   councilors directly on an issue.
21 Q You would communicate by mail or e-mail or
22   by phone?  How would you communicate in
23   between meetings?
24 A Say if a councilor called me up and wanted

Page 135

135
1
2   me to prepare a resolution for him or an
3   ordinance, my policy was I would tell
4   nobody else but the councilor I was doing
5   it for.  I would try at that level to
6   always get e-mails.  Frankly, the laziness
7   principle because it was so easy to do the
8   e-mails.  So I'd send the councilors
9   typically an e-mail.  There was some that
10   didn't have e-mails and I would call them.
11   There was one councilor that ultimately
12   became the chairman during this time period
13   that had a fax machine, so I used to fax
14   him things.
15 Q On the 16th, prior to your resignation, did
16   you discuss the Beal decision with any of
17   the city councilors either by e-mail or by
18   phone?
19 A No, I was preparing the letter at that
20   point in time.
21 Q When you were at the office, which restroom
22   would you use if you had to go?
23 A Directly across the corridor.
24 Q You would use the men's room where the

Page 136

136
1
2   video apparatus was employed?
3 A Yes.
4 Q Did you visit the men's room that morning
5   prior to your contact with Chief Solomon
6   and Deputy Alaimo?
7 A No, there was a sign on it that day that
8   said something to the effect of out of
9   order or needs repair, something like that,
10   so it was closed off.
11 Q Did you find that unusual?
12 A No.  I can't say one way or the other.  It
13   didn't even occur to me, I was thinking of
14   other things, not toilets.
15 Q Incidentally, outside of your office and
16   Ms. Metin's office, was the sexual
17   harassment policy listed anywhere on any
18   bulletin boards or on the walls?
19 A I believe it was.
20 Q Where would it be located?
21 A I believe there's a bulletin board right
22   outside the mayor's office.  I remember
23   clearly telling them that they had to do
24   yearly distribution of the policy and they

JOAN R. DUNNE                                        Page 133 - Page 136

Page 137

137

1
2  should have a posting.
3  Q  In proximity to your office and the
4     entrance to your office, were the sexual
5     harassment rules listed and posted in any
6     form anywhere?
7  A  The mayor's office would be down the
8     corridor on the same floor.
9
10        BRIEF RECESS
11
12  Q  On the morning of February 16, 2005 before
13     you were approached by Chief Solomon and
14     Deputy Chief Alaimo, did you have any
15     knowledge that there was a videotape
16     running?
17  A  No.
18  Q  When did you first learn that there was a
19     videotape running?
20  A  They brought me down to the second floor
21     conference room and apprised me of it then.
22  Q  Why don't we look at Exhibit 6.
23  A  Yes.
24  Q  Have you seen Exhibit 6 before today?

Page 138

138

1
2  A  Yes.
3  Q  I'll do similar to what I did with Exhibit
4     7.  I'll read a passage and ask you a
5     question about it.
6  A  Sure.
7  Q  The passage is, on Wednesday, February
8     16th, I was at work when Maurice J.
9     Lariviere, Jr. approached me and leaned
10    over my desk and kissed me.
11        Do you have a memory of leaning over
12    Ms. Metin's desk and kissing her on the
13    morning of the 16th?
14  A  Yes.
15  Q  Did she tell you that that kiss was
16    unwanted at the time?
17  A  Absolutely not.
18  Q  Was it a kiss on the lips or a kiss on the
19    cheek?
20  A  I believe lips.
21  Q  Later on she wrote, about thirty minutes or
22    so later he came over to use the telephone
23    by my desk and he started stroking my arm
24    while he was on the phone and kept asking

Page 139

139

1
2  me if I was mad at him or if I liked the
3  fact that he was touching me or kissing
4  me.  Did I read that correctly?
5  A  It appears that you read it correctly from
6     that sheet, yes.
7  Q  Do you agree that you walked over to her
8     desk and started stroking her arm at some
9     point on the morning of the 16th?
10  A  Have you seen the video?
11  Q  Yes, I have.
12  A  If you can picture where her desk is, it's
13     a reverse L, and where she sits there's the
14     phone and then the photycopying machine, so
15     I had gone over to the photycopying machine
16     and the phone rang, and I had been using
17     the phone.  Yes, I was over in that area.
18  Q  Incidentally, have you seen the video?
19  A  Yes, June of '05.
20  Q  Where did you view it?
21  A  The police station.
22  Q  Who was there when you viewed it?
23  A  Captain -- I forget his name now.  I should
24     remember it.  Haggar, Randy Haggar, who was

Page 140

140

1
2  lieutenant at that point in time, Carmine
3  and Bill DiAdamo, and myself.
4  Q  When you reviewed it was it a disk or was
5     it an actual VHS tape that you saw?
6  A  VHS tape if I remember correctly.
7  Q  On just one occasion you saw it?
8  A  Yes.  I think he only saw part of it.  He
9     came in later, if I remember correctly.
10    (Indicating to Attorney Bill DiAdamo).
11  Q  As to the stroking of the arm, aside from
12    what you saw on the videotape, do you have
13    a memory of using Ms. Metin's phone and
14    stroking her arm that morning?
15  A  I remember very clearly using the phone.
16    Stroking the arm, I'm not really sure but
17    the tape speaks for itself.
18  Q  Did she ever tell you that stroking of the
19    arm was unwanted or unwelcome?
20  A  No.
21  Q  Did you ask her that morning if she was mad
22    at you?
23  A  No, not to my memory.
24  Q  Did you ask her that morning if she liked

MAURICE LARIVIERE        CondenseIt!™        LARIVIERE V. SOLOMON ET AL.

Page 141

141

2 the fact that you were touching her or
3 kissing her?
4 A No.
5 Q Later she wrote, he then went back into his
6 office and got some work done, I went next
7 door made copies came back and then he came
8 back to my work area and kneeled in front
9 of me trying to kiss me, touch me and
10 asking me if I liked that. Then he kept
11 asking me for a hug and a kiss and I told
12 him he needs to sign something and then he
13 kept insisting he hug or kiss me. Did I
14 read that correctly?
15 A I believe so. I wasn't watching it word
16 for word, to be honest.
17 Q Does that passage of the statement comport
18 with your memory of the morning of the
19 16th?
20 A What did occur was she had gone next door
21 to make copies of that letter I was going
22 to send out to the council, so that is
23 absolutely correct that she left the room
24 for that purpose. She did return. There

Page 142

142

2 was not a kneel, there was a squat when I
3 was talking to her, yes.
4 Q Do you recall what you said to her when you
5 squatted next to her that morning?
6 A She'd had a lot of problems at home with
7 her mother and the mother's boyfriend who
8 was living there, and she would come in and
9 be very depressed over what occurred. At
10 that point in time I would be talking to
11 her, asking how things went, did you get to
12 sleep last night because she would be
13 reporting that sleeping in the room with
14 the cat, the dog, her daughter and herself
15 she was missing a lot of sleep, especially
16 when the mother and her significant other
17 were fighting. So I'd go over and ask her
18 how things were.
19 Q Did you ask her for a hug and a kiss when
20 you were squatting next to her?
21 A I don't recall. It might have been but I
22 don't recall.
23 Q Did she give you a response to a request
24 for a hug or a kiss?

Page 143

143

2 A At one point in time I leaned over and gave
3 her a kiss, yes.
4 Q During that second occasion when you were
5 squatting next to her?
6 A Yes. I think I was sitting on the desk at
7 that point in time.
8 Q Was that a kiss on the lips or on some
9 other part of the body?
10 A I think it was the lips.
11 Q Was that kiss unwanted, from your
12 perspective?
13 A No.
14 Q Did she ever convey to you orally that it
15 was unwanted?
16 A No.
17 Q Did she pull back from you?
18 A No.
19 Q You felt that it was a mutually
20 affectionate gesture?
21 A Yeah. The tape speaks for itself.
22 Q It sure does.
23 A It's awfully obvious to me.
24 Q She wrote, he then kept trying to touch my

Page 144

144

2 face with his finger.
3    Do you recall trying to touch Ms.
4 Metin's face that morning with your finger?
5 A I'm not positive, but again the tape will
6 speak for itself.
7 Q Did you ask for any kisses or hugs outside
8 of view of the tape in your office?
9 A No.
10 Q Did you give any hugs or kisses to Ms.
11 Metin in your office that morning outside
12 of view of the videotape?
13 A No.
14 Q She later wrote, he was at my desk for a
15 while talking and when I tried to get up he
16 grabbed me to him really close and started
17 to kiss me and if I tried to get away he
18 kept pulling me closer to him and kept
19 kissing me and kept moving me closer to
20 him. The more I tried to get away the more
21 agressive he seemed to become.
22    Does your memory of the morning of
23 the 16th comport with that passage of
24 Exhibit 6?

JOAN R. DUNNE           Page 141 - Page 144

Page 145

145

1
2  A  No, and the tape shows that's not true.
3  Q  Did you ever grab Ms. Metin and pull her
4     close to your body?
5  A  I would give her a hug periodically. I
6     don't know if you would classify it as a
7     grab.
8  Q  That morning did you grab her and pull her
9     close to your body?
10 A  I remember giving her a hug and talking to
11    her. At that point in time it's more a
12    discussion about the mother and the
13    boyfriend and how things were going.
14 Q  Was this hug before or after the squatting
15    incident?
16 A  After.
17 Q  How long did the embrace last?
18 A  The tape speaks for itself. I assume----
19 Q  I know it does, and it's fair, but we're
20    here today for your memory. So the best of
21    your memory.
22 A  To the best of my memory a minute.
23 Q  During that hug did you grab her buttocks
24    region?

Page 146

146

1
2  A  Did I touch it, yes.
3  Q  Did she say that that was unwanted?
4  A  No.
5  Q  Did she pull away from you in any respect?
6  A  No.
7  Q  At that point you felt that it was not an
8     unwelcome hug, correct?
9  A  Correct.
10 Q  You felt that the touching of her buttocks
11    was welcome?
12 A  Not unwelcome.
13 Q  But not welcome?
14 A  I didn't really judge it one way or the
15    other.
16 Q  Looking back on it now, do you think it was
17    welcome?
18 A  There was no opposition to it whatsoever.
19 Q  When you grabbed her buttocks that morning,
20    was it with one hand or two?
21 A  Touched.
22 Q  Okay, you used touched. When you touched
23    her buttocks that morning, was it one hand
24    or two?

Page 147

147

1
2  A  Two, to my memory.
3  Q  One on each cheek?
4  A  Yes.
5  Q  When you touched the buttocks cheeks, did
6     you pull her towards you or was it just----
7  A  There was no pulling.
8  Q  She wrote next, while he was kissing and
9     hugging me and pulling me closer, I felt
10    that he was hard because he was holding me
11    so tightly and his hand was wandering down
12    to the buttocks area.
13       Did I read that passage correctly?
14 A  Yes, you did. I didn't realize that word
15    was in there before.
16 Q  When you were kissing and hugging her, were
17    you pulling her closer to you?
18 A  No.
19 Q  Were you erect when you were hugging her or
20    at any time that morning in Ms. Metin's
21    presence?
22 A  No.
23 Q  But you don't disagree with the statement
24    that his hand was wandering down to the

Page 148

148

1
2     buttocks area?
3  A  No.
4  Q  Then she lastly wrote, I finally got free
5     and ran out of the office. Do you have a
6     memory of that?
7  A  That she ran out of the office, no.
8  Q  What is your memory of what happened after
9     the minute long embrace?
10 A  What we used to do is have tea next door at
11    the council office, and she was going over
12    to the council office to get some tea, if I
13    remember correctly.
14 Q  She said that to you?
15 A  I believe so, yes.
16 Q  Then what did you do?
17 A  What did I do?
18 Q  What did you do next?
19 A  I went back into my office and started
20    doing some work.
21 Q  Did you see Ms. Metin at any point after
22    she left the office to go get tea?
23 A  No. The next time I would see her would be
24    at MCAD.

Page 149

149

1
2 Q  Who was the next person you saw after she
3    left the office that morning?
4 A  Solomon and Alaimo.
5 Q  How soon was that after Ms. Metin left the
6    office?
7 A  Fairly immediate, if I remember correctly.
8 Q  Do you deny that Ms. Metin objected to any
9    of the kisses on the morning of the 16th?
10 A  Yes.
11 Q  Do you deny that she objected to any of the
12    hugs on the morning of the 16th?
13 A  Yes.
14 Q  Do you deny that she objected to the
15    touching of the buttocks region on the
16    morning of the 16th?
17 A  Yes.
18 Q  Do you deny that she felt you erect next to
19    her on the morning of the 16th?
20 A  That she said that?  She said that in the
21    statement.  I think you're asking me if I
22    had an erection.
23 Q  I'll rephrase the question.  Do you deny
24    that you had an erection that morning in

Page 150

150

1
2    the presence of Ms. Metin?
3 A  No, I did not.
4 Q  You said in your Complaint that the parties
5    were mutually affectionate and that Ms.
6    Metin initiated contact.
7 A  Yes.
8 Q  Do you agree with that statement?
9 A  Yes.
10 Q  Did Ms. Metin initiate kisses on the lips
11    with you?
12 A  Yes.
13 Q  How often?
14 A  I remember several instances.
15 Q  Specifically?
16 A  There was one time where we were out for
17    lunch and she wanted to go over to the Ski
18    House, so we went in there and she had
19    bought some ski outfit.  When we got back
20    in the car she thanked me for going in
21    there and leaned over and gave me a kiss.
22    When she met with the mayor and offered
23    the position, she did it then.  When I had
24    the welcome aboard cake party for her, she

Page 151

151

1
2    did it then and some other times like that.
3 Q  You only remember three specifically today,
4    right?
5 A  I remember those instances because of the
6    uniqueness of the circumstance, yes.
7 Q  But you can't recall any other specific
8    instances when she kissed you on the lips
9    on her initiation, fair?
10 A  Correct.
11 Q  Do you agree that you initiated all the
12    physical contact on the morning of the
13    16th?
14 A  Yes.
15 Q  None was initiated by her on the morning of
16    the 16th?
17 A  Where she made the physical contact?
18 Q  Yes, sir.
19 A  No.
20 Q  You told us that you didn't know at any
21    time that you were being videotaped; right?
22 A  That's correct.
23 Q  If you knew you were being videotaped that
24    morning, would you have acted differently?

Page 152

152

1
2 A  If I knew I was being set up, yeah,
3    probably.
4 Q  How would you have acted differently?
5 A  Stayed in my office.
6 Q  Would you have initiated physical contact
7    with Ms. Metin if you knew you were being
8    videotaped?
9 A  No.
10 Q  Why not?
11 A  Because it was obvious I was being set up.
12 Q  Did you ever have the level of personal
13    relationship that you had with Ms. Metin
14    with any of your other secretaries or
15    assistants?
16 A  No.
17 Q  How would you compare your personal
18    relationship with her to your other
19    secretaries and assistants?
20 A  The others would be purely professional.
21 Q  Are you familiar with the crime of indecent
22    assault and battery?
23 A  I'm aware there is one but I'm not a
24    criminal attorney.

Page 153

153

1
2  Q  The Appeals Court has defined----
3  A  Touching of the buttocks.
4  Q  The Appeals Court has defined indecent
5      assault and battery as the Commonwealth
6      proving beyond a reasonable doubt that a
7      defendant committed an intentional
8      unprivileged and indecent touching of the
9      victim. Do you have any reason to dispute
10     that definition?
11         MR. DiADAMO: Objection.
12  A  Do you want me to answer from a legal
13     perspective?
14  Q  I want you to answer as a witness.
15  A  I'm not a criminal attorney. That would
16     seemingly be the definition.
17  Q  Do you disagree that your conduct on the
18     morning of the 16th on the videotape rose
19     to the level of that definition?
20         MR. DiADAMO: Objection.
21  A  Absolutely not even close.
22  Q  How about at any other time prior to
23     February 16, 2005?
24  A  No.

Page 154

154

1
2  Q  What was said between you, Chief Solomon
3      and Deputy Chief Alaimo in your office on
4      the morning of the 16th?
5  A  They came walking in looking stern-faced,
6      told me they wanted to have me go down to
7      the second floor conference room. At that
8      point I got up and went down with them.
9  Q  Did you ask them why you were going to the
10     second floor conference room?
11  A  No. To be honest with you, I thought I was
12     going to be celebrated for the Beal case.
13  Q  So at that point the only thing that was
14     discussed in the office was them asking you
15     to come down to the second floor conference
16     room?
17  A  Yes.
18  Q  Did they escort you down to the room?
19  A  Yes. Solomon was in the front, I was in
20     the middle, Alaimo was behind me.
21  Q  At any point while you were in your office
22     and the time you entered the conference
23     room, did you feel like you didn't have to
24     go or that you could object to going to the

Page 155

155

1
2      second floor conference room?
3  A  I thought I was going to a party. I was
4      looking forward to it when they come in.
5  Q  The answer is you didn't. You didn't feel
6      like this was an unwilling escort down to
7      the conference room, correct?
8  A  I had absolutely no idea what was going on.
9  Q  Was anything discussed between the time you
10     left your office and when you entered the
11     second floor conference room?
12  A  No.
13  Q  You didn't hear Chief Solomon say anything,
14     correct?
15  A  No.
16  Q  You didn't hear Deputy Chief Alaimo say
17     anything during that time period, correct?
18  A  No.
19  Q  Did you encounter anyone else in the
20     hallways of City Hall or the elevator as
21     you went down to the second floor
22     conference room?
23  A  No, to the best of my memory.
24  Q  Did you take the elevator or did you take

Page 156

156

1
2      the stairs?
3  A  Walked down.
4  Q  Is there more than one conference room on
5      the second floor?
6  A  No.
7  Q  What happened when you entered the
8      conference room?
9  A  I walked in, there was nobody there and I
10     was surprised but I figured everybody would
11     be coming afterwards. I sat down. Alaimo
12     pulled out a piece of paper and read
13     Miranda.
14  Q  Were either Chief Solomon or Deputy Chief
15     Alaimo in uniform that morning?
16  A  To the best of my memory, yes.
17  Q  Physically can you describe the uniforms
18     that they were wearing?
19  A  Not really, no.
20  Q  Was anything said between the time you
21     entered the room and when Alaimo read you
22     your Miranda rights?
23  A  Was there anything said?
24  Q  Yes, sir.

MAURICE LARIVIERE          CondenseIt!™          LARIVIERE V. SOLOMON ET AL.

| Page 157 | Page 159 |
|---|---|

**Page 157**

1                          157
2  A  No.
3  Q  You said earlier you're not a criminal
4     attorney, right?
5  A  Correct.
6  Q  Is there anything that was omitted from the
7     Miranda reading to you, to your knowledge?
8  A  I don't believe so.
9  Q  You were told that you could not say
10    anything, correct?
11 A  I believe so.
12 Q  You were told that you had the right to an
13    attorney?
14 A  As it was read to me, I believe so, yes.
15 Q  Before you said anything that morning in
16    the second floor conference room, you knew
17    that you could contact an attorney?
18 A  At that point in time, I freaked out
19    totally.  I was stunned and shocked what
20    was going on.  The only person I asked to
21    see, quite frankly, was my wife.
22 Q  But you knew that you could call an
23    attorney at all points that morning, right?
24 A  There was no thought process at that point

**Page 159**

1                          159
2     was an attorney.
3  Q  How about for the motor vehicle
4     infractions, did you ever use an attorney
5     for those proceedings?
6  A  No, just sent the town the money.
7  Q  You said in the Amended Complaint that
8     there were tape recorders in the conference
9     room that morning, correct?
10 A  Yes.
11 Q  Could you tell us how you first learned
12    there were tape recorders and where they
13    came from.
14 A  Solomon put them on the table in front of
15    me and pressed the start button or the
16    record button.
17 Q  Solomon had both of them on his person?
18 A  I believe so, yes.
19 Q  He took them out and put them on the
20    conference table?
21 A  That's correct.
22 Q  Physically can you describe the tape
23    recorders?
24 A  Microcassette type tape recorders.  They

**Page 158**

1                          158
2     in time.
3  Q  The thought never crossed your mind?
4  A  No.  Imagine the worst you've ever done in
5     your life is getting a speeding ticket, and
6     all of sudden you've got two of the top
7     trumps going after you.
8  Q  You're an attorney though, correct?
9  A  Yes.
10 Q  Were you aware that you could have not said
11    anything to these officers that morning?
12 A  Were I sitting there as an attorney and not
13    there myself, yes, but I wasn't there as an
14    attorney.
15 Q  At that time did you have a personal
16    attorney outside of the city government?
17 A  I never had a need for one.
18 Q  You never used an attorney for estate
19    planning?
20 A  No, I wrote my own will.
21 Q  Never used an attorney for tax reasons?
22 A  No.  The only time I ever used an attorney
23    would be when I bought real estate, like I
24    bought my house and had a mortgage so there

**Page 160**

1                          160
2     looked exactly the same.
3  Q  Were they silver, black, what color were
4     they?
5  A  I'm not positive on that one.
6  Q  Did you observe Chief Solomon turn on the
7     tape recorders that morning?
8  A  Yes.
9  Q  Both of them?
10 A  Yes.
11 Q  Did you see them both running?
12 A  I saw him push the record.  I can't say
13    that I sat there and watched if it was
14    running, but I saw him push both the
15    records and then later push both the stops.
16 Q  Have you ever heard an audio tape of what
17    transpired that morning in the conference
18    room?
19 A  My understanding is you folks are claiming
20    one is totally messed up and one is very
21    highly messed up.  I tried to listen to it
22    and all I heard was whishhhhhh.  I have not
23    heard an audible portion from one of those,
24    and I am not aware, even though we asked

JOAN R. DUNNE

MAURICE LARIVIERE                    CondenseIt!™                    LARIVIERE V. SOLOMON ET AL.

Page 161

161

1  for discovery on it, there is an audible
2  portion.
3
4 Q  One second and I'll go get it and we'll
5  listen to it.
6
7  (OFF THE RECORD DISCUSSION)
8
9 Q  I think the question before we went off the
10  record was have you heard the tape?
11 A  I attempted to listen to it, yes.
12 Q  The version you attempted to listen to was
13  the copy that we provided to you during
14  discovery?
15 A  That is my understanding.
16 Q  But you've never heard the original tape?
17 A  No.
18 Q  Do you have a recollection of how long the
19  tape recorders were going or running on
20  that morning in the second floor conference
21  room?
22 A  The tape started, they asked a series of
23  questions, and then I said can we talk,
24  something to that effect.  And Solomon

Page 162

162

1  leaned over and he turned them off.  To my
2  knowledge that was the end of it, and I'm
3  going to judge it at five to ten minutes.
4
5 Q  Was the Miranda reading on the tape
6  recorder, to your knowledge?
7 A  I'm not positive.
8 Q  Was anything of substance said between the
9  time you entered the room and when the
10  recorders went on?
11 A  Not to my knowledge, no.
12 Q  The tapes were turned off when you asked
13  them to be turned off, correct?
14 A  I said can we talk.  At that point in time
15  he reached over and I think he said
16  something to the effect at the request of
17  Lariviere these were turned off.  Words to
18  that effect.
19 Q  From that point forward after they were
20  turned off, how much longer were you in
21  that conference room?
22 A  About an hour and a half, hour and
23  forty-five minutes.
24 Q  Of that hour and a half to hour and

Page 163

163

1  forty-five minutes, how much of that time
2  were Solomon and Alaimo in there?
3
4 A  With the exception of the times that
5  Solomon went upstairs to Pollard's office,
6  and the one time that Alaimo went in, they
7  were always there.
8 Q  Alaimo left on one occasion?
9 A  Yes.
10 Q  All other times while you were in the room
11  he was there?
12 A  Yes.
13 Q  When he left on that one occasion, was it
14  during the tape recording or was it after?
15 A  After.
16 Q  Did you have an understanding of where he
17  went when he left the room, and I'm
18  referring to Alaimo?
19 A  To Pollard's office, the two of them went.
20 Q  They both went together?
21 A  Yes.
22 Q  Do you have a memory of whether Alaimo left
23  at some point and said I'm going to look at
24  the tape, I'll be right back.

Page 164

164

1
2 A  To my memory, no.
3 Q  Do you have a memory of Solomon going to
4  review the tape and then come back into the
5  conference room?
6 A  The only thing he said during those times
7  was I'm going to go talk to Pollard.
8 Q  Pollard is his supervisor?
9 A  The mayor, yes.
10 Q  She is?
11 A  Was at that point in time, yes.
12 Q  Did he have an obligation under the sexual
13  harassment policy to notify her of what he
14  had observed that morning?
15 A  The human resource director would be the
16  first source.
17 Q  Do you know if he did that?
18 A  I do know that at the very end Bain came
19  down with the resignation letter.
20 Q  If an employee became aware of an incident
21  of sexual harassment, they were to go to
22  their supervisor, correct?
23 A  I believe you're referring to Article 4.
24 Q  I'm not referring to any Article.  I'm just

Page 165

165

1 
2  asking what the policy in general obligated
3  an employee to do?  If you want to refer to
4  a specific provision, that's fine, but the
5  question is in a general sense.
6  A  The obligation, I believe, flows to a
7  supervisor who would have that obligation.
8  I'm not sure that a non-supervisory
9  employee would have that obligation, but I
10  would have to read that policy again.  I
11  don't have it memorized word for word.
12  Q  Is there anything inappropriate about a
13  city of Methuen employee going to their
14  direct supervisor when they became aware of
15  a possible instance of sexual harassment?
16  A  Absolutely nothing wrong.
17  Q  Anything wrong about an employee going to
18  their supervisor before they go to Mr.
19  Bain?
20  A  I don't think there's a prohibition, if
21  that's your question.
22  Q  You drafted the policy.  Is it
23  inappropriate?
24  A  Quite honestly, it's an MCAD model policy.

Page 166

166

1 
2  I didn't sit there and create this.
3  Certainly there would be nothing that I
4  know of inappropriate in that method.
5  Q  So it was appropriate for Solomon to report
6  possible sexual harassment to his
7  supervisor, Mayor Pollard?
8  A  If we're talking about a civil
9  investigation, yes.
10  Q  Can you describe the substance of your
11  conversations, first with Solomon, that
12  took place in the second floor conference
13  room when the recorders were off.
14  A  Most of it is listed in here, this section,
15  where I've been discussing what was said.
16  I wish the recorders had stayed on because
17  at that point in time my proof goes down
18  the toilet that's on the record, because as
19  soon as it went off, the threats started.
20  Q  That's my question, really.  If you need to
21  take some time, that's okay, but could you
22  please go through the Verified Complaint
23  and tell us which of the statements took
24  place in the second floor conference room

Page 167

167

1 
2  after the recorders were turned off.
3  A  All of them.  I don't believe any of them
4  occurred while the recorders were on.
5  Q  So everything Solomon said that you
6  referenced or quoted in the Verified
7  Complaint took place after the recorders
8  were off?
9  A  To the best of my knowledge.
10  Q  How about Alaimo?
11  A  In terms of?
12  Q  Conversations you had with him in the
13  second floor conference room after the
14  recorders were off.
15  A  He was being a second kick to Solomon, so
16  they would be bouncing back and forth with
17  their threats.
18  Q  You can't tell us anything specific about
19  what Alaimo said after the recorders went
20  off in the second floor conference room?
21  A  He chimed in with whatever Solomon said.
22  Q  Can you show us in the Complaint where you
23  reference Alaimo's comments specifically as
24  opposed to Solomon.

Page 168

168

1 
2  A  I don't know that I put any of Alaimo's
3  comments in here.  I think it was Solomon
4  because he's the chief and I was relying on
5  him, what he stated.
6  Q  Did Alaimo make any specific threats to
7  you?
8  A  The handcuffs, yeah.
9  Q  What did he say with regard to handcuffs?
10  A  Once Solomon started that routine, he would
11  pick up on it too.
12  Q  What routine?
13  A  Resign or I throw the cuffs on you.
14  Q  Is that a statement that Alaimo made or
15  that Solomon made?
16  A  That's the one that Solomon made that then
17  Alaimo would chime in on.
18  Q  Would he repeat that statement?  What do
19  you mean by chime in on?
20  A  Alaimo is not an original creator of
21  ideas.  He kind of follows up on somebody
22  else, for example, Solomon.  If Solomon
23  would say it, he would repeat it.
24  Q  Regardless of what you think of him, he is

Page 169

```
                      169
 1
 2   a defendant in this case.  I would like you
 3   to tell us specifically what he said based
 4   on your memory, and if you've documented it
 5   in the Verified Complaint, fine.  If you
 6   didn't, please tell us.
 7 A I think I told you that I believe all the
 8   comments that I put in this Complaint are
 9   Solomons.
10 Q So none of the statements in here in the
11   Verified Complaint do you attribute to Joe
12   Alaimo, is that right?
13       MR. DiADAMO:  Objection.
14 A I am referencing Solomon in here.
15 Q Yes or no.  None of the threats or alleged
16   intimidation that you put in the Verified
17   Complaint were actually made by Joe Alaimo;
18   is that correct?
19       MR. DiADAMO:  Objection.
20 A The Verified Complaint does not contain the
21   threats that Alaimo made, just the threats
22   that Solomon made.
23 Q As you sit here today, you cannot tell us,
24   based on your memory, any specific threats
```

Page 170

```
                      170
 1
 2   or intimidation that Joe Alaimo made to
 3   you?
 4 A The cuffs.
 5 Q Just the cuffs?
 6 A Yes.
 7 Q What specifically do you recall him saying?
 8 A Solomon started with the resign now or I'm
 9   going to throw cuffs on you and take you
10   out of here.  Then Alaimo chimed in that
11   way.
12 Q That's what I'm asking you.  What do you
13   specifically recall him saying other than
14   he chimed in?
15 A He would repeat the same line.  It wasn't
16   new words or a new phrase or a new thought
17   that was being done.  It was a repeat.
18 Q What exactly did he repeat?
19 A The handcuffs.
20 Q Tell us exactly what he said, based on your
21   memory, because it's not in the Verified
22   Complaint, you told us.
23 A Solomon started in, Alaimo started chiming
24   in, you better resign, words to that
```

Page 171

```
                      171
 1
 2   effect, you better resign or we're going to
 3   cuff you and take you out of here.
 4 Q That's what Solomon said, right?
 5 A No, Solomon said it, then Alaimo said it.
 6 Q The exact same words, is that what you're
 7   telling us?
 8 A No, it would be the same concept, but it's
 9   not every single word the exact same.
10       MR. DiADAMO:  Could we go off the
11   record for a second.
12
13   (OFF THE RECORD DISCUSSION)
14
15 Q Sir, tell us exactly what your memory is of
16   what Joseph Alaimo said in the second floor
17   conference room after the recorders were
18   off specifically, please.
19 A I can't give you a word for word exact one
20   hundred percent.  All I can tell you is
21   that he referenced the handcuffs, and that
22   I would be cuffed and taken out.  There's
23   frankly only one sentence that I
24   specifically remember the wording on
```

Page 172

```
                      172
 1
 2   exactly.
 3 Q You told us that?
 4 A No.
 5 Q What is it?
 6 A At that point in time, quite frankly,
 7   having lost it, I said I can't believe my
 8   friend did this to me, referencing Fulya,
 9   and Alaimo's last words to me in this
10   entire world was he looked at me and said,
11   Moe, trust me on this one, she ain't no
12   friend of yours.  I remember that one
13   hundred percent.
14 Q How many times was it that Solomon left the
15   room while you were there?
16 A To my memory, three times.
17 Q None of those times were before the
18   recorders were turned off, correct?
19 A Correct.
20 Q When he came back on each of the three
21   times, tell us what your memory is of what
22   he said to you.
23 A It's listed in the Complaint.
24 Q Could you refer us to where.
```

Page 173

173

1
2  A  Yes.
3
4        BRIEF RECESS
5
6  Q  Before we took the break, I asked you, sir,
7      to identify the specific statements that
8      Chief Solomon made when he arrived back on
9      the three trips from leaving the room.
10     Have you done that?
11 A  I did.  101, which is the other leave
12     return, 108 and 113.  Those are the times
13     that he was exiting and returning.
14 Q  Based on the Verified Complaint, you claim
15     that Chief Solomon said, "If you resign, I
16     know Metin will not press criminal charges
17     based upon my talking to her a little while
18     ago.  However, the mayor wants you fired
19     and prosecuted.  I can talk to her, as you
20     know, we have let people have leaves and
21     then they just go away.  I will talk to her
22     (the mayor) about this."  I read that
23     correctly?
24 A  Yes.

Page 174

174

1
2  Q  At that time you knew that the mayor
3      couldn't fire you.
4  A  Yes.
5  Q  You knew that?
6  A  Could not fire me, yes.
7  Q  The only authority to have you fired was
8      the city council?
9  A  The only final legal authority, yes.
10 Q  So that was a veiled threat?
11 A  No.  The mayor wants you fired and
12     prosecuted.
13 Q  You just told us that she had no authority
14     to fire you, right?
15 A  It doesn't say the mayor is going to fire
16     you, it says wants you fired.
17 Q  How is that a threat to you if the city
18     council was the only authority to terminate
19     you?
20        MR. DiADAMO:  Objection.
21 A  You want my interpretation of what he was
22     saying?
23 Q  Do you not understand the question?
24 A  I understood what he was saying, yes.

Page 175

175

1
2  Q  My question is, how is it a threat that the
3      mayor wants you fired when she has no
4      authority to do it?
5  A  She wanted me fired.  I would have been
6      gone a long time ago if she had the legal
7      authority to do it.
8  Q  What legal authority did she have that
9      morning as you sat in the conference room
10     on the second floor?
11 A  The threats were they were going to bring
12     that to the city council and have them fire
13     me.
14 Q  How was that a threat to you?
15        MR. DiADAMO:  Objection.
16 A  To have my entire life blown up?
17 Q  You deny Metin's allegations, correct?
18 A  Yes.
19 Q  You deny her version of what happened in
20     large part in her statements, correct?
21 A  Yes.
22 Q  So how was it a threat to you for them to
23     go to the city council?
24 A  The mayor largely controlled the city

Page 176

176

1
2      council, to begin with, number one.  Number
3      two, I've got a female making allegations
4      against me, and I have not had an arm's
5      length relationship, so I couldn't sit back
6      and say totally innocent, there had been
7      some feelings, there had been some
8      contact.  They just took it to this
9      ultimate stage.
10 Q  What feelings were there?
11 A  We really liked each other, we were
12     friendly.
13 Q  What feelings were there on your part?
14 A  I felt like after many years of hating the
15     job with Pollard in office that here comes
16     somebody really nice.  We got along really
17     well, the office just became very pleasant.
18 Q  Did you have any feelings of sexual
19     intimacy towards Metin?
20 A  No.
21 Q  Did you ever desire to have sexual contact
22     with Ms. Metin?
23 A  She's very attractive, but I hadn't gone to
24     that level, no.

Page 177

177

2 Q In your own mind, did you desire to have
3    sexual relations with her at any time
4    during her employment?
5 A No.
6 Q Prosecute. The mayor couldn't prosecute
7    you, right?
8 A Right.
9 Q Only the district attorney's office could
10    prosecute you, right?
11 A The chief could bring the charges, yes.
12 Q He can bring them, but with respect to
13    prosecution you knew as you sat in the
14    second floor conference room that the only
15    party that could prosecute you was the
16    district attorney, correct?
17 A At that point in time with the threats, I
18    was not sitting there as a lawyer doing an
19    analysis. I knew that if she wanted to
20    push something, if he wanted to push
21    something, I would be stuck with it.
22 Q Even though you denied the allegations?
23 A Yes.
24 Q The mayor controlled the city council,

Page 178

178

2    according to your testimony?
3 A Yes.
4 Q Who was the chairman?
5 A As of January, Mike Hennessey.
6 Q Who else did she control on the board?
7    MR. DiADAMO: Objection.
8 A She had influence over approximately seven
9    of the nine.
10 Q Who were the seven of the nine she had
11    influence over?
12 A I would have to go down and remember every
13    one. There's only two that I knew that
14    were opposing her.
15 Q Who were they?
16 A Kenneth Hendrick, and there had been a guy
17    named Woekel when he was on there.
18 Q It's your testimony that current Mayor
19    Manzi was on the council at the time,
20    correct?
21 A Yes.
22 Q He was under the control of Mayor Pollard?
23 A He followed her lead. There's only a few
24    instances that he blocked her. Her trying

Page 179

179

2    to get rid of me he blocked.
3 Q It's your belief that the city councilors
4    would not be objective in their review of
5    the allegations brought by Ms. Metin and
6    your employment status?
7    MR. DiADAMO: Objection. What
8    time period? That time? Now?
9 Q How about that time period.
10 A At that point in time, the threat was the
11    hammer hitting me in the head. Again, I'm
12    all of a sudden having two cops going after
13    me. I wasn't sitting there like a legal
14    analysis.
15 Q I understand that, but you were an attorney
16    at that time, right?
17 A Yes. Was I licensed, yes.
18 Q You didn't practice criminal law, but you
19    knew that you had the right to an attorney?
20 A Yes.
21 Q You knew that you could end the interview
22    at any time and call an attorney, correct?
23 A I was not allowed to leave the room. I
24    couldn't even call my wife.

Page 180

180

2 Q Did you ever ask to leave the room?
3 A Yes.
4 Q What was the response?
5 A No, and they blocked me.
6 Q Who blocked you?
7 A Solomon and then Alaimo.
8 Q How many times did you ask them to leave
9    the room?
10 A Twice.
11 Q For what reason?
12 A I wanted to go home.
13 Q They told you you couldn't leave the room?
14 A Correct.
15 Q Did you ever ask to call anyone outside of
16    the room?
17 A Yes, my wife.
18 Q What was the response?
19 A They wouldn't let me.
20 Q You said earlier that Alaimo left the room
21    on one occasion, correct?
22 A Yes, to my memory.
23 Q That must be paragraph 108.
24 A Yes.

Page 181

181

2 Q  The occasion was that Solomon and Alaimo
3    then said they were going back upstairs to
4    talk to the mayor.  That's the one
5    occasion, sir, that Alaimo left the room,
6    according to you?
7 A  To my memory.
8 Q  Did either Alaimo or Solomon ever tell you
9    that you were under arrest?
10 A  To my memory, no.  They threatened but I
11   don't believe they said you are under
12   arrest at this time.
13 Q  In what way did they threaten it?
14 A  It's listed in there that they would arrest
15   me, handcuff me, drag me out of the
16   building.
17 Q  Were you ever told that you cannot leave
18   the building or the second floor conference
19   room?
20 A  Yes, when I attempted to leave they blocked
21   me.
22 Q  Was that on tape or was that off tape?
23 A  To my memory, only the first five or ten
24   minutes was on tape.

Page 182

182

2 Q  So your attempts to leave the office were
3    after the tape recorders were turned off,
4    correct?
5 A  Yes.
6 Q  Was anyone else present on either of the
7    two occasions when you attempted to leave
8    the room besides Alaimo and Solomon?
9 A  To my memory, no.
10 Q  Besides asking to call your wife, did you
11   ask to call an attorney?
12 A  No.
13 Q  Did you ask them to stop the interview?
14 A  When I tried to leave, yeah.  I was turning
15   and saying I wanted to leave, and I was
16   blocked.
17 Q  Did you say you weren't going to return
18   after you left?
19 A  There was no conversation about that.  I
20   was just plain blocked.
21 Q  Was there any physical contact between you
22   and Chief Solomon in the conference room?
23 A  To my memory, no.
24 Q  Was there any physical contact between you

Page 183

183

2    and Deputy Chief Alaimo in the conference
3    room?
4 A  One time when he pushed the chair back in
5    when I wanted to get up.
6 Q  Could you elaborate on that incident,
7    please.
8 A  I was sitting where the stenographer would
9    be, basically in that type of table, and I
10   started to push back and was blocked.
11 Q  Is that incident referenced in the
12   Complaint?
13 A  I don't believe so, no.
14 Q  Did you talk about asking to leave anywhere
15   in the Complaint?
16 A  I don't remember.  I'm not sure.  I don't
17   know.
18 Q  You talked about going to the men's room on
19   one occasion in the Complaint, correct?
20 A  Yes.
21 Q  You did, in fact, go to the men's room with
22   Captain McCarthy, correct?
23 A  Yes, he would only let me go to the
24   bathroom if he was there.

Page 184

184

2 Q  Was that one of the occasions when you
3    asked to leave the room or was that another
4    one?
5 A  That was a different one.  The two were out
6    of the conference room at that point in
7    time.  It was just McCarthy.
8 Q  Was there anything unlawful about Chief
9    Solomon and Deputy Chief Alaimo putting
10   handcuffs on you?
11       MR. DiADAMO:  Objection.
12 A  I'm not a criminal attorney.  Quite
13   obviously there weren't any criminal
14   charges they were pressing.  Now I find out
15   Fulya never wanted criminal charges.  So,
16   yes, if they were going to arrest me when
17   the person who is claiming according to
18   them for a crime, and she isn't, yeah, that
19   would be illegal.
20 Q  They never did put handcuffs on you,
21   correct?
22 A  No.
23 Q  Physically removing you from the conference
24   room and taking you to the police

MAURICE LARIVIERE    CondenseIt!™    LARIVIERE V. SOLOMON ET AL.

Page 185

185

1
2  department for additional questioning, is
3  there anything unlawful about that?
4  A  I never went to the police department.
5  Q  You said you were threatened and
6  intimidated about leaving the conference
7  room and being dragged out of the building,
8  correct?
9  A  Correct.
10  Q  Was there anything unlawful about them
11  removing you from the conference room and
12  taking you down to the police station?
13          MR. DiADAMO: Objection.
14  A  Under the then circumstances, yes.
15  Q  What was unlawful about that?
16  A  They had ceased any investigation as soon
17  as that tape went off and pursued their
18  political agenda.  There was no more
19  investigation, there was no more
20  questioning about what occurred and how it
21  occurred and what my side of the story
22  was.  That stopped as soon as the tape
23  stopped.
24  Q  Did you deny any of the allegations in the

Page 186

186

1
2  conference room that morning?
3  A  Yes.
4  Q  What specifically did you deny?
5  A  He brought up a comment that she said I was
6  following her, and I referenced that the
7  only one I knew was Depardo and I were at
8  Gold's Gym and going from the first floor
9  to the second floor when we saw Fulya and
10  the daughter coming down from the second
11  floor to the first.  I said I was not
12  pursuing her or following her.  We just
13  bumped into each other at that point in
14  time.  There was the conversation about the
15  phone call, you know you called Fulya.  He
16  had already told me he was there.  I said
17  Joe, you were there, you know that I wasn't
18  doing anything inappropriate, just
19  reporting a case.  Those were the sort of
20  things.
21  Q  Were you ever told that you could leave the
22  building in exchange for your resignation?
23  A  I was told if I resigned, sign the
24  resignation, I could leave.

Page 187

187

1
2  Q  You knew that you could leave without
3  signing the resignation at that time,
4  right?
5  A  No, they wouldn't let me out.  They were
6  physically blocking me from leaving.
7  Q  Administratively you knew you didn't have
8  to resign, though, correct?
9          MR. DiADAMO: Objection.
10  A  Administratively?
11  Q  You knew that in order to be discharged,
12  that you had to go through an
13  administrative process before the city
14  council, correct?
15  A  That thought process wasn't crossing my
16  mind at that point in time.
17  Q  You knew that going into the room, though,
18  right?
19  A  No, I knew that I was going to be
20  celebrated for a great victory, that's what
21  I was thinking about.
22  Q  Before you went into that room, before you
23  encountered Solomon and Alaimo that
24  morning, you knew that before you could be

Page 188

188

1
2  discharged you were entitled to a hearing
3  before the city council.
4  A  Was I aware, yes.
5  Q  You knew that when you were in the
6  conference room as well, correct?
7  A  No.
8  Q  It escaped your memory?
9          MR. DiADAMO: Objection.
10  A  Some day, Gareth, if you have bad luck and
11  have two corrupt clowns doing that to you,
12  see if you sit there as an attorney.
13  Q  Did it escape your memory or not?
14          MR. DiADAMO: Objection.
15  A  I went totally fuzzy when I found out what
16  they were doing and how they were doing it
17  to me.  I didn't sit there and think, nor
18  did they intend for me to be to able think
19  through some of the issues.
20  Q  After you left the room, in hindsight, you
21  knew that you were entitled to an
22  administrative hearing before your
23  discharge, correct?
24  A  Not for a long time.

JOAN R. DUNNE    Page 185 - Page 188

Page 189

189

2 Q  When did it occur to you?
3 A  That was brought up, and that's
4    attorney/client and I'm not going to be
5    discussing that, thank you.
6 Q  Did you deny having a dating relationship
7    with Ms. Metin?
8 A  I don't recall the term dating being used.
9 Q  Were you asked whether the relationship was
10   consensual?
11 A  I'm not sure if that wording was used or
12   not.
13 Q  In so many words, were you asked if it was
14   a consensual relationship by Solomon or
15   Alaimo?
16 A  I can't remember the exact words. I would
17   say something to that effect.
18 Q  What was your response?
19 A  I don't recall specific wording.
20 Q  Your testimony today is that it was a
21   mutually affectionate relationship, right?
22 A  I never had the feeling it was an unwelcome
23   predatory relationship. I was never shown
24   that.

Page 190

190

2 Q  You didn't have that thought as you sat in
3    the conference room, correct?
4 A  Which thought, sir?
5 Q  That it was not an unwanted unwelcomed
6    predatory relationship?
7 A  Correct.
8 Q  Why did you not tell that to the officers
9    when you were asked about this issue?
10 A  I believe I did, but I don't remember the
11   words. I think that section was on the
12   tape.
13 Q  Your answer was on the tape?
14 A  I believe that question to that effect, and
15   a response to that effect, was on the tape.
16 Q  You had not had sexual relations with Ms.
17   Metin up to that point, correct?
18 A  No.
19 Q  You had had mutually affectionate welcomed
20   contact with her, right?
21 A  Yes.
22 Q  What was there to be embarrassed about if
23   it was welcomed and mutually affectionate?
24 A  You have to put it where I was at that

Page 191

191

2    point in time and how much it hit me. I
3    had gone through three and a half years of
4    hell with Pollard, and all of a sudden
5    somebody comes that's in nice and friendly
6    to me, and I'm saying thank God, at least
7    when I get out of the car in the morning my
8    gut isn't turning because I have to walk
9    into that freaking building, that somebody
10   is friendly to me and we're getting along
11   real great, and all of a sudden I find out
12   she participated in a setup and I got two
13   corrupt cops going after me. It was like
14   being hit by an atomic bomb.
15 Q  Did either Solomon or Alaimo ever come back
16   into the conference room that morning
17   before you left and tell you that they saw
18   the tape themselves?
19 A  The only thing I recall about the
20   conversation, they said there was a tape.
21   I think they said they saw it, I'm not
22   positive. But the timeline, unless they
23   were sitting there watching the events as
24   they occurred, the timeline wouldn't work.

Page 192

192

2 Q  In paragraph 113 of the Complaint you
3    wrote, B, he simply wanted to avoid the
4    publicity these charges would bring and the
5    hurt to his family and name if he didn't
6    comply with their threats. Did I read that
7    correctly?
8 A  Yes.
9 Q  My question is, if you challenged the
10   allegations and didn't resign, how would
11   the embarrassment be any less to you and
12   your family?
13 A  You're guilty no matter what once the
14   charge is made.
15 Q  You had no confidence in the city council
16   they would objectively review the
17   situation?
18 A  I have no confidence in politics. I know
19   the way it works.
20 Q  You had no choice, no alternative to
21   resigning that morning, is that your
22   testimony?
23 A  Yeah. I knew how ruthless they were. I
24   just stupidly decided to trust them for one

Page 193

193

1
2    moment and I'm paying for that a thousand
3    times over.
4  Q  But you were the city solicitor for
5    twenty-five years, correct?
6  A  Yes.
7  Q  A dedicated employee, right?
8  A  The last mayor gave me the employee of the
9    year award because of my qualifications and
10   my work.
11 Q  Never any complaints about you regarding
12   sexual harassment?
13 A  No.  Quite frankly, they used to joke at
14   town hall that it was a city solicitor form
15   of government because so many people
16   listened to what I advised them and they
17   took the steps in that fashion.  I went
18   from being a very important employee to
19   some political person coming in and
20   Stalinizing the area.
21 Q  You denied that you sexually harassed Ms.
22   Metin?
23 A  Yes.
24 Q  In the face of denying Ms. Metin's charges,

Page 195

195

1
2    then I'm guilty.
3  Q  If you wanted your name and you wanted to
4    support your family, wouldn't the better
5    alternative have been to stop the
6    proceedings and ask for an attorney?
7  A  No.
8  Q  Would a better alternative have been to
9    continue with the investigation and the
10   interrogation and then go through the
11   administrative process?
12 A  No.
13 Q  How about proceed with the criminal
14   investigation and defend yourself in a
15   court?
16 A  No.
17 Q  The only alternative was resignation.
18 A  Once the charges are made you're guilty.
19   The reality is all I ever did was work in
20   the public sector of law.  I can't get a
21   job in that sector now because of this
22   goddamned BS.
23 Q  You waived the right to a hearing, correct?
24 A  It's in that statement that Bain prepared.

Page 194

194

1
2    your dedicated professional service to the
3    community, the lack of any complaints, and
4    your administrative right to a hearing
5    before the city council, you felt there was
6    no alternative but for you to resign that
7    morning, is that your testimony?
8        MR. DiADAMO: Objection.
9  A  My father said one thing to me that I run
10   through my mind every day.  He said the
11   Larivieres will never have much money, but
12   I gave you a good name and you'll pass it
13   to your kids.  Now this.  Do you think I
14   wanted this?  Those scum, if they kept
15   their mouth shut I would have honored mine,
16   gone out the door and never said another
17   word, because we can play all the games we
18   want, but when I signed that resignation
19   they let me go.  So stop playing the
20   criminal game, it didn't happen.
21 Q  Your answer is no, you felt you didn't have
22   an alternative?
23 A  No, I wanted my name.  I wanted the ability
24   to support my family.  If that's a crime,

Page 196

196

1
2  Q  Let's look at it.  Exhibit 13.  Do you
3    recognize Exhibit 13?
4  A  Yes, I do.
5  Q  Can you till us what it is?
6  A  It's the resignation.
7  Q  Your signature appears on the document,
8    correct?
9  A  That is correct.
10 Q  You signed it on August 16th, 2005?
11       MR. DiADAMO: Objection.
12 A  That is correct.
13 Q  I'm sorry, February 16th, 2005.
14 A  February, I'm sorry.
15 Q  David Bain was there when you signed this
16   document?
17 A  Bain brought this back in and threw it and
18   handed me a pen and said sign.
19 Q  When you signed it, had Bain already
20   signed?
21 A  To my knowledge, no.
22 Q  Did he sign it in your presence?
23 A  I don't recall.
24 Q  You knew that by signing this document you

MAURICE LARIVIERE        CondenseIt!™        LARIVIERE V. SOLOMON ET AL.

Page 197

197
1
2   were voluntarily resigning your position as
3   city solicitor?
4  A  No, I was not voluntarily resigning.
5  Q  You knew that you were resigning your
6      position, correct?
7  A  Yes.
8  Q  You also acknowledged the statement, I also
9      hereby waive my rights for an impartial
10     panel for an Article 9, Section 9-10
11     hearing under the Methuen Home Rule
12     Charter, correct?
13 A  Yes.
14 Q  By waiving that right with your signature,
15     you were giving up the right to a hearing
16     before the city council to challenge the
17     charges against you?
18 A  Under coercion, yes.
19 Q  You had inserted provisions waiving an
20     employee's right to an impartial panel and
21     Article 9 hearing in other instances,
22     correct?
23 A  No.  That is the very first time that that
24     language has ever appeared in any document,

Page 198

198
1
2      to my knowledge.
3  Q  But you have negotiated departures for
4      employees where they agreed not to go
5      before the city council for a hearing,
6      correct?
7  A  No.
8  Q  What type of hearing is an employee
9      entitled to?  A non-city council controlled
10     employee.
11 A  Those would be the civil service employees
12     are the one who have the hearing rights.
13 Q  Have you ever negotiated a waiver of a
14     civil service hearing for an employee of
15     the city of Methuen during your term as
16     city solicitor?
17 A  Only upon agreement of the union and
18     counsel.  I think you've seen the exhibits
19     in there that were countersigned by a
20     number of people.
21 Q  But you didn't ask for an attorney when you
22     signed this, right, because you were an
23     attorney?
24         MR. DiADAMO:  Objection.

Page 199

199
1
2  A  Not in that proceeding, no.
3  Q  You weren't an attorney in that proceeding?
4  A  No.  Lincoln was one hundred percent
5      correct.
6  Q  What did he say?
7  A  You can't be your own attorney.  You don't
8      have the ability to stand back and make a
9      decision.
10 Q  You drafted your wills, right?
11 A  Yeah.
12 Q  You were your own attorney in that
13     proceeding?
14 A  Everything to the wife and kids.
15 Q  You negotiated your appointment to the city
16     solicitor's position.  You were your own
17     attorney in that proceeding.
18         MR. DiADAMO:  Objection.
19 A  There isn't a proceeding that I'm involved
20     in.
21 Q  Did you hire an attorney to handle your
22     reappointment to the city solicitor's
23     position?
24 A  No, they put it on the agenda in accordance

Page 200

200
1
2      with the time standards of the charter, and
3      they vote it in.
4  Q  What if anything did David Bain say to you
5      that morning in the conference room?
6  A  Something like a greeting.  I don't
7      remember the exact words.  But there was no
8      discussion.
9  Q  Did he say whether he had prepared Exhibit
10     13?
11 A  I don't remember him using those words,
12     no.  He just walked in with the paper.
13 Q  Was anyone else in the room when you signed
14     Exhibit 13?
15 A  Solomon and Alaimo, to my memory.
16 Q  After you signed the document, what
17     happened next?
18 A  Solomon took me by the shoulder, took me
19     upstairs to the office, I went past a
20     couple of the cops, went into the office,
21     Solomon told me I would never be allowed to
22     come back into town hall.  At that point he
23     said I want the keys to the town hall, and
24     there's a security device, he said he

JOAN R. DUNNE                                    Page 197 - Page 200

MAURICE LARIVIERE                    CondenseIt!™                    LARIVIERE V. SOLOMON ET AL.

Page 201

201
1
2   wanted both of those.  I started looking
3   for it.  As a matter of fact, that
4   photograph that Bill Depardo gave me, it
5   was in that top-right hand drawer, and I
6   reached in not knowing whether the keys
7   were there.  At that point in time Solomon
8   grabbed my hand and took that away from
9   me.  He then saw my cellphone and handed me
10   the cellphone.  I told him I thought the
11   keys would be down in the car.  He sent
12   Chris McCarthy, the captain, down with me
13   to my car to get the keys.  One of the last
14   statements he was making while I was in the
15   office fulfilling on the promise that
16   nothing would be said or talked about, he
17   had said I'll make sure that your stuff is
18   taken out of the office and given to you.
19   We'll have it done at night so nobody will
20   know.
21 Q  Then you left the office?
22 A  Escorted, yes.
23 Q  Where did you go next?
24 A  I went down to the car, looked in my glove

Page 202

202
1
2   compartment, found the keys, handed them to
3   McCarthy, and then drove home.
4 Q  When you first left the building, what time
5   was it the first time?
6 A  It would be some time after noon.
7 Q  Did you drive home after leaving City Hall?
8 A  Yes.
9 Q  Did you stop anywhere on the way home?
10 A  No.
11 Q  Did you drive your customary route on your
12   way home?
13 A  Yes.
14 Q  What time did you arrive home?
15 A  It's about a half hour, twenty minutes to a
16   half hour, so it would be whatever that
17   timeline is.
18 Q  Did you make any phone calls on your
19   cellular phone between the time you left
20   the building and you arrived home?
21 A  Before I arrived home?
22 Q  Yes.
23 A  No.
24 Q  Did you call anyone else after you arrived

Page 203

203
1
2   home that evening?
3 A  Yes.
4 Q  Who did you call?
5 A  I called Solomon to confirm that he
6   wouldn't be doing anything and that I could
7   go on.
8 Q  What was the response?
9 A  Yes.
10 Q  When you say doing anything, you mean
11   criminally?
12 A  Yes, and that and publicity-wise.
13 Q  Do you distinguish between a criminal
14   investigation into what occurred on the
15   morning of the 16th and the civil sexual
16   harassment investigation?
17 A  They're totally different ballgames.
18 Q  But you agree that there are two different
19   components, correct?
20      MR. DiADAMO:  Objection.
21 A  In the employee situation it's very rare
22   that there would be a criminal.  It's
23   always civil.
24 Q  If Chief Solomon and Deputy Chief Alaimo

Page 204

204
1
2   had probable cause to believe that an
3   indecent assault and battery had occurred
4   on the morning of the 16th in Fulya Metin's
5   office and your office, do you agree that
6   they had a right to ask you questions?
7 A  If there was a criminal allegation being
8   lodged, yes.
9 Q  Do you agree that they had a right to
10   detain you?
11 A  If it was purely related to the criminal,
12   yes.
13 Q  If Chief Solomon and Deputy Chief Alaimo
14   had probable cause to believe that an
15   indecent assault and battery had occurred
16   on the morning of February 16th, do you
17   agree that they had a right to arrest you?
18 A  Yes.
19 Q  Could you explain in what way you believe
20   your resignation was involuntary.
21 A  I've outlined it in there.  It was a
22   coercion and threats of applying the
23   criminal process, lies that Fulya wanted
24   the criminal process, so I was going to be

JOAN R. DUNNE                                        Page 201 - Page 204

Page 205

205

2 handcuffed and dragged out of the building,
3 was his exact words to me, and prosecuted.
4 My career, everything would be in the
5 toilet.
6 Q Do you agree that if an investigating
7 officer investigating the sexual complaint
8 is questioning a possible defendant, that
9 they have the right to use coercive
10 methods?
11     MR. DiADAMO: Objection.
12 A I believe there's due process in this
13 country. One has a right to know what's
14 going on, be apprised of it. If you look
15 at the policy, it's not a sneaky peeky,
16 it's an outlined process.
17 Q But you had your due process rights,
18 correct, because you were given your
19 Miranda warning?
20 A If it was purely criminal, if they stayed
21 purely criminal, yes.
22 Q You waived that right to the criminal due
23 process, correct?
24     MR. DiADAMO: Objection.

Page 206

206

2 A No, I was deprived of the right to leave.
3 I was deprived of the right to communicate.
4 Q You said that you didn't ask for an
5 attorney.
6 A No.
7 Q You didn't ask to call an attorney.
8 A No.
9 Q But you were given that right?
10 A It was read under Miranda, yes.
11 Q You knew going into the room that you were
12 entitled to an administrative hearing on
13 the civil side of the investigation, right?
14 A If you're asking me as I walked to the door
15 if somebody stopped me and asked me that
16 question, I would say yeah.
17 Q But when you got into the room, you no
18 longer felt you had that right to a civil
19 hearing before the city council, correct?
20 A What happened is outlined in the Complaint
21 when the threats and the coercion started.
22 I did not, and I've repeatedly said, their
23 intent was to knock me off balance. They
24 did. I've never denied that. I'm not

Page 207

207

2 going to deny it now. I've never denied
3 that they read Miranda and started out with
4 a criminal process and wound up using it
5 for a political purpose.
6 Q In paragraph 102 you said that, and I'm
7 referring to Exhibit 1, the Verified
8 Amended Complaint, you said that I need to
9 go home and talk to my wife about this
10 whole issue. I read that right, correct?
11 A Yeah.
12 Q Why did you need to go home to talk to your
13 wife about the whole issue?
14 A I've been with her since 1973. I don't
15 think I've made any solid decision ever
16 without communicating with her.
17 Q Why did you decide not to communicate with
18 her about the resignation?
19 A I wasn't allowed to.
20 Q But you knew that you didn't have to sign
21 that paper that morning, correct?
22     MR. DiADAMO: Objection.
23 A I knew, through their coercion, that I had
24 no choice, and I even uttered those words

Page 208

208

2 to them, what choice do I have.
3 Q Is there a provision in the city charter
4 for criminal activities of an employee?
5 A To my knowledge, no.
6 Q If an employee commits a crime, does
7 anything in city policy, whether it's in
8 the charter or otherwise, speak to whether
9 that employee can continue their
10 employment?
11 A Under Chapter 258, if somebody is indicted
12 you can be suspended without pay pending
13 the outcome of the trial. If you're found
14 not guilty, they have to repay you. If
15 you're found guilty, then you can be
16 terminated and never recover the monies.
17 Q Do you agree that former Mayor Pollard had
18 no authority to revoke leave time, your
19 leave time?
20 A Direct authority?
21 Q Yes.
22 A No, direct legal authority, no.
23 Q She had no authority to deny you leave time
24 as well, correct?

MAURICE LARIVIERE                CondenseIt!™                LARIVIERE V. SOLOMON ET AL.

Page 209

209

1
2 A  Legal authority, no.  Political authority,
3     yes.
4 Q  Wasn't one of your options that morning to
5     take a paid administrative leave?
6 A  Solomon said he broached that issue with
7     Pollard.  I do remember one other thing
8     that was in there that I had a conversation
9     with him that he said Pollard was going to
10    fire me, and I said she doesn't have the
11    authority.  I know she can bring it to
12    council, but she doesn't directly have the
13    authority.  The leave, there was no
14    question in my mind if she said no the
15    political establishment would go with it.
16 Q  One of the allegations that you've made in
17    the Complaint is that you signed the
18    resignation letter under duress, correct?
19 A  Yes.
20 Q  Do you deny that you did not have a
21    reasonable alternative to the resignation?
22        MR. DiADAMO:  Objection.
23 A  I'm not following you.
24 Q  Was there a reasonable alternative to your

Page 210

210

1
2     resignation?
3 A  No.
4 Q  Was there any alternative to your
5     resignation?
6 A  I was not allowed any alternative, no.
7 Q  If you had been afforded a paid
8     administrative leave and you were
9     ultimately terminated by the city council,
10    what impact would that have on your pension
11    and retirement?
12 A  There's no criminal action, so it shouldn't
13    affect it unless they proceeded against me
14    at the retirement level.
15 Q  If you're terminated by the city council,
16    there's no implications for your pension or
17    retirement?
18 A  There's a moral turpitude statute, it's not
19    applied that often to my knowledge, but it
20    could be applied, yes.  So if the
21    termination is made for moral turpitude,
22    yes.
23 Q  If you were convicted of a criminal offense
24    arising out of Ms. Metin's allegations,

Page 211

211

1
2     what would be the impact on your pension
3     and retirement benefits?
4 A  If it's related to the office, it would be
5     forfeited.
6 Q  Did that enter your mind as you sat in the
7     conference room on February 16th, 2006?
8 A  No.
9 Q  The consequences to your pension and
10    retirement never entered your mind when you
11    decided to resign?
12 A  From the moment they started at me,
13    everything was surrealistic.
14 Q  As you sit here today, do you wish you
15    didn't sign the resignation letter?
16 A  Of course.
17 Q  What would you have done differently?
18 A  If I knew that they were telling me lies
19    about Metin, if I knew that Metin in fact
20    wanted to come back to work with me, I
21    would have said the hell with this, you're
22    lying to me.  No, now I want my rights
23    because I know what the truth is.
24 Q  Based on your experience as city solicitor

Page 212

212

1
2     and an employee of the city of Methuen, if
3     the allegations of sexual harassment were
4     deemed true, would you have been fired?
5 A  I have no idea what the council would have
6     done.  I'm assuming and hoping that no
7     matter what, a twenty-five year employee
8     would be given some credit.
9
10    (OFF THE RECORD DISCUSSION)
11
12        MR. NOTIS:  The parties have
13    agreed to suspend the deposition for the
14    day and reconvene the deposition hopefully
15    before the end of November 2006.  We've
16    also agreed to conduct it either in
17    Lawrence or Methuen on a date mutually
18    convenient for all parties.
19
20
21
22    (WHEREUPON THE DEPOSITION WAS SUSPENDED)
23
24

MAURICE LARIVIERE                    CondenseIt!™          LARIVIERE V. SOLOMON ET AL.

Page 213

```
1                          213
2              C E R T I F I C A T E
3    COMMONWEALTH OF MASSACHUSETTS
4    ESSEX, SS.
5
6         I, Joan R. Dunne, a Notary Public in
7    and for the Commonwealth of Massachusetts,
8    do hereby certify:
9         That MAURICE LARIVIERE, the witness
10   whose testimony is hereinbefore set forth,
11   was duly sworn by me and that such
12   testimony is a true and accurate record of
13   my stenotype notes taken in the foregoing
14   matter, to the best of my knowledge, skill
15   and ability.
16        IN WITNESS WHEREOF, I have hereunto
17   set my hand and Notarial Seal this 20th day
18   of November, 2006.
19
20        Joan R. Dunne, Notary Public
          My Commission expires December 27, 2007
21
          THE FOREGOING CERTIFICATION OF
22   THIS TRANSCRIPT DOES NOT APPLY TO ANY
     REPRODUCTION OF THE SAME BY ANY MEANS
23   UNLESS UNDER THE DIRECT CONTROL AND/OR
24        DIRECTION OF THE CERTIFYING REPORTER.
```

Page 214

```
1                          214
2
3         I have read the foregoing
     transcript of testimony and the same
4    contains a true and accurate record of my
     answers given to the questions therein set
5    forth.
6
7         _____
8              MAURICE LARIVIERRE
9
10
11
12
13
14
15
16        SIGNED UNDER THE PAINS AND PENALTIES
               OF PERJURY
17
18
19
20
21
22
23
24
```

JOAN R. DUNNE                                              Page 213 - Page 214

I, Maurice Lariviere, do hereby tender my resignation to the City of Methuen, effective immediately, this 16th Day of February 2005.

I also hereby waive my rights for an impartial panel or an ARTICLE 9 Section 9-10 hearing under the Methuen Home Rule Charter.

_____
Maurice J. Lariviere

_____
Date

Witnessed:

_____
David J. Bain JR.

_____
Date

EXHIBIT _m.L_
13
11/13/06



EXHIBIT
7
11/13/06

FM

I started working at the City of Methuen Searles Building around the middle of October for a temp assignment through a company called _____. I got an assignment working for the City of Methuen Solicitor named Maurice J. Lariviere as a Legal Assistant. When I started Maurice was very nice to me and I was enthusiastic about choosing that assignment and not taking the other full time positions that I had been offered, thinking that maybe a full time permanent position would result after I started working for the City of Methuen. About the 4th or 5th day into the assignment Maurice was acting a little too nice to me and I thought he was a little strange but I brushed the thoughts aside. On that day by the file room near the doorway near the entrance to the office he came up to me out of nowhere and just grabbed me and kissed me on the lips. I was very upset and horrified by it and I pulled away and he said he was sorry and that he wouldn't do that anymore but that he couldn't help himself and I was very horrified and was not going to come back to that office but I was afraid of not having any money coming in to support myself and my nine year old daughter. At the end of the day I called my best friend Linnea Aspesi who lives in Leceister MA and who works for Brigham and Woman's Hospital in Human Resources and she told me what he had done was wrong and that I should go right away to the temp agency and tell them. I didn't follow her advice because I was afraid of not having any money come in and if I lost the temp assignment. I went back the next day and he was always very pleasant and nice to me saying that he wants me to work for him full time right away and I was so happy that I was getting a full time job and going to make at least 41,000 a year and very grateful, so I didn't think of what happened with the kiss anymore. Thinking that Maurice was my friend and a good boss I would go to lunch with him because he would tell me that he really enjoyed spending time with me and that since I started working there he was for once really happy to come into work and that he really had a great secretary. I also thought he was very thoughtful if I ever had a problem with something, he seemed very eager to help me. The days at the office would be getting my work done but often almost on a daily basis he would come over to my desk and make stupid comments about me being in a bathing suit or stare at my chest or just stare at me all the time and make me feel uncomfortable. Then he kept asking me questions like, do I like him, will we be friends for ever. Will I run away to him somewhere to the Mediterranean, do I like it if he touches me or hugs me and I would say to him, and just try to get away from him, avoid him by changing the subject or getting away from him. I would tell him no I don't enjoy you touching me and to stop. However, he wouldn't stop. He would reach over my desk and kiss me on the lips, a quick kiss and then would stand by my desk and hover and just stare at me. If I ever wore anything a little low cut or a skirt he would make comments, or just stare at a specific part of my body and make faces that he liked what he saw sort of thing. He would tell me to hug him all the time and he would get so close to me that I could feel his private part right on my private area and he would sort of try to adjust himself so he got really close to my private area. I would push him away and get all upset and then he would still try to kiss me and the more I tried to push him away the more he would try to kiss me almost to the point of trying to make out with me. I wouldn't even open my mouth, I would leave my lips closed shut so he wouldn't stick his tongue or anything in my mouth. If I refused to hug him he would grab me anyway when I was at my desk from behind and push me next to him. He would sometimes when I walked by force me to sit on his lap and try to kiss me, I would try to

get away from him and just avoid being next to him. He would make comments like you don't like when I hug you, you don't like me anymore. I didn't know how to handle what he was doing, I was afraid of loosing my job and having no money come in to support myself and my daughter. I would always change the subject when he asked me questions. He would often ask me to sign pieces of paper that said something like "Maruice is a nice guy" then on the bottom of the paper would be a signature line and he'd be like sign that... or he would bring me a piece of paper that said "I like Maruice, he is a good guy" and make me try to sign it.. it got so annoying that sometimes I would just sign it so he would go away from my desk area. I didn't know whether to laugh about all of this or cry or think I was in this strange twilight zone office. Almost everyday he would ask me for a hug and a kiss and would grab at me. He would do this disquisting thing with his tongue to sometimes when I went by him when he was in the office like I enjoyed looking at his tongue or something. He would daily reach over my desk and kiss me on the lips and then beg me for a hug. He would on a few occasions and more often lately touch my breasts when he tried to hug me and I would pull his hands down and he's be like "ouch you hurt my hand, say your sorry". " that wasn't nice you did that to me" "why are you pulling my hands away". ON some occasions he would try to rub my shoulders and I would tell him to stop and he'd be like don't you like that? I would say no or I would try to get up from my desk and say I had to use the restroom. He would try to rub my back all the time when he was hugging me or trying to force me to sit on his lap. I felt so confused why this was happening and I didn't know what to do. He on some occasions also touched my buttocks and tried to rub it while he was trying to get me to hug him. The other day he almost had his hand down the back of panths, and I pulled his hand back up. I also have a tattoo and he would always beg me to kiss it and its in a location where it is close to my left thigh and on some occasions he would force himself near that area and pull me to him and try to kiss my tattoo and he did manage if I had on something a little loose to pull it down and kiss my tattoo before I could get away from him. He at one time told me that he loved me and that he never went through anything like this and that he was only with his wife and that he didn't know how to handle t his and cried for along time at my desk. When he told me that I said to him that he was married and that I was engaged and that I liked him as a friend/ boss and I started crying and he said he was sorry and that he would never do anything to hurt me and would we be friends for life. That same day he told me that he can't have sex with is wife anymore because he thinks of me. While I went through all of this, I went through much confusion of thinking that I was going to loose my job and didn't know what to do if I had walked out or never came back to work the next day. On many occasions I wanted to punch him in the face and walk away but I was afraid of loosing my job. I told two other people in the building. I told John Molori who works at the mayors office, but I begged him not to say anything because I didn't want to cause any problems and that I didn't know if I could take all the questions and comments from people and if people knew in the building what had happened I would be very horrified if anyone else new what was happening. John kept his word to me and didn't say anything unless I told him to and he did suggest that we go right away to Toody or the Mayor and say something but I was again afraid of loosing my job and also making Maurice loose his job because he has worked there for the past 20 something years and that he had a wife and three kids and two kids to put through college and I felt bad for him because I didn't think he was

normal or he has some major sexual, perverted issues. I also told Linda Gagnon a few weeks ago and I asked her not to say anything and she was very helpful but she was concerned about what I should do and couldn't understand why he was doing this to me because they had been working together for a long time. On some occasions he would use the phone by my desk and keep touching my hair all the time and stroking my hair and I would push his hand away. I can say that this almost happened everyday working there, either a close hug feeling him really close to me, kissind me or trying to get close to me or touch me somewhere on my body either being my breast or butt or stomach sometimes. On two occasions I can remember he was upset at me for not saying goodbye one time or when he saw me talking to John Molori, the next day he admitted to me that he was very jelous. Also, one time a few weeks ago, John Molori and I went to the gym together in his car as friends and when I came back to the office I said to Maruice the roads are a little icy and he walked past me and said something to the effect that "why don't you ask John to drive in a nasty tone and I told him that he had no right saying anything like that to or having that attitude and why was he watching me all the time. On another occasion he was mad at me for talking too much to Connie and trying to make plans to go out with her one night for a drink. Maruice occasionally asked me to go out for a drink one night after work to talk and I would tell him that I couldn't because I couldn't find a babysitter or someone to watch my daughter and he brought that up when I said often to him that I couldn't go out for a drink with him. I wasn't able to go to lunch alone all the time, he would often find ways to come with me by saying that he really enjoyed my company and that he needed to talk to me about something and that he just enjoyed being with me. He seemed to do whatever I did, if I drank allot of water during the day, he started drinking more water and not drinking coffee anymore. If I started working out at a gym that I just joined in Methuen, he would all of a sudden want to join and did join the exact gym that I belong to. When I first started we did have a conversation about the gym and how much I wanted to join and he had told me that he wanted to join with me and work out together that would be fun but at the time I didn't really think he would join the gym just because I joined the gym. I feel like I can't get away from him at work or at lunch. One occasion also he for about one week asked daily if I wanted more kids and I told him he needed help and that he was crazy and he was like if we don't have kids what are we going to do if we didn't have kids. Everyday he would say he liked me..





February 16, 2005

On Wednesday, February 16th I was at work when Maurice J. Lariviere, Jr. approached me and leaned over my desk and kissed me. He then proceeded to go back into his office and I was trying to get some work done but then he came back into the office and kissed me again. About 30 minutes or so later he came over to use the telephone by my desk and he started stroking my arm while he was on the phone and kept asking me if I was mad at him or if I like the fact that he was touching me or kissing me. He then went back into his office and got some work done, I went next door made copies came back and then he came back to my work area and kneeled in front of me trying to kiss me, touch me and asking if I liked that and then he kept asking me for a hug and a kiss and I told him he needs to sign something and then he kept insisting he hug or kiss me. He then kept trying to touch my face with his finger. He was at my desk for awhile talking and when I tried to get up he grabbed me to him really close and started to kiss me and if I tried to get away he kept trying to pull me closer to him and kept kissing me and kept moving me closer to him, the more I tried to get away the more aggressive he seemed to become. While he was kissing and hugging me and pulling me closer, I felt that he was hard because he was holding me so tightly and his hand was wandering down to the buttocks area. I finally got free and I ran out of the office.

_____ 2/16/05
Fulya Metin

_____ 2/16/05
Lieutenant Michael J. Wnek

**MAURICE J. LARIVIERE**                    **CondenseIt!™**

```
1              VOLUME II
            PAGES: 1-134
2           EXHIBITS: 16-18

3    COMMONWEALTH OF MASSACHUSETTS

4  ESSEX, ss        SUPERIOR COURT DEPARTMENT
                    C.A. NO. 05-1155C
5  _____

6  MAURICE LARIVIERE,
        Plaintiff,
7
    vs.
8
    JOSEPH SOLOMON, Individually, and as
9  Chief of Police of the City of Methuen,
    and JOSEPH ALAIMO, Individually, and as
10 Deputy Chief of Police of the City of Methuen,
    and the CITY OF METHUEN,
11      Defendants,
        _____
12       CONTINUED DEPOSITION of MAURICE LARIVIERE, a

13 witness called on behalf of the Defendants, a

14 above-captioned matter, said deposition being taken

15 pursuant to Massachusetts Rules of Civil Procedure, by

16 and before Jean Wiseman, a Certified Shorthand Reporter,

17 and Notary Public in and for the Commonwealth of

18 Massachusetts, at the DiADAMO LAW OFFICE, LLP, 40

19 Appleton Way, Lawrence, Massachusetts, on Friday,

20 December 29, 2006, commencing at 10:00 o'clock in the

21 a.m.

22            JOAN R. DUNNE
          COURT REPORTING SERVICES
23          28 Sonning Road
          Beverly, Massachusetts 01915
24          978-927-2678
```

```
1 A P P E A R A N C E S:

2  DiADAMO LAW OFFICE, LLP
    40 Appleton Way
3  Lawrence, MA 01840
    BY: WILLIAM DiADAMO, ESQ.
4  Counsel for Plaintiff

5  MORRISON MAHONEY, LLP
    250 Summer Street
6  Boston, MA 02210
    BY: GARETH W. NOTIS, ESQ.
7  Counsel for Defendant

8  REARDON, JOYCE & AKERSON, P.C.
    397 Grove Street
9  Worcester, MA 01605
    BY: ANDREW J. GAMBACCINI, ESQ.
10 Counsel for Defendants, Joseph Solomon and Joseph Alaimo
```

```
1              I N D E X

2  WITNESS NAME              Page No. _____

3

4  MAURICE LARIVIERE

5

6  CONTINUED DIRECT EXAMINATION BY MR. NOTIS         4

7  CROSS EXAMINATION BY MR. GAMBACCINI              61

8  REDIRECT EXAMINATION BY MR. NOTIS               111

9  RECROSS EXAMINATION BY MR. GAMBACCINI           130

10

11

12

13              E X H I B I T S

14

15 No.              Description           Page No.

16

17 No. 16   City of Methuen Home Rule Charter 6

18

19 No. 17   Lt. Wnek's 3-pg. report         41

20

21 No. 18   E-mail communication between Manzi

22            and Lariviere              64

23

24
```

```
1          P R O C E E D I N G S

2

3

4  M A U R I C E   L A R I V I E R E,

5

6      a witness having been duly identified and sworn

7      under oath, testified as follows:

8

9          CONTINUED DIRECT EXAMINATION

10 BY MR. NOTIS:

11  Q  Good morning, Mr. Lariviere.  Today is day 2 of

12 your deposition.  Day 1 took place on November 13th,

13 2006.  Is that your memory?

14  A  It was somewhere around there, around Veteran's

15 Day.

16  Q  Did you have an opportunity to review day 1 of

17 your transcript?

18  A  Did I read it?  Yes.

19  Q  Have you made any changes to your testimony from

20 November 13, 2006?

21  A  I ran through it briefly.  I don't recall

22 anything that jumped out at me.

23  Q  You didn't prepare an errata sheet with any

24 changes to the transcript?
```

**JOAN R. DUNNE**

Page 5

1    A  No.
2    Q  I'm going to show you a bound document from the
3  City of Methuen Home Rule Charter and ask you to review
4  that document, please.
5          (Witness examines document.)
6    A  Do you want me to read the whole thing or --
7    Q  Why don't you review it and my question concerns
8  whether or not that was the charter that was in effect in
9  January of 2005 at the time of your resignation?
10   A  Are we at the end of the day going to be on
11  9-10?
12   Q  We might, but for now I would like you to just
13  take a look at the document and let me know whether it
14  was the document in effect in February of 2005 at the
15  time of your resignation?
16   A  Without sitting here for an hour and a half
17  reviewing this, it appears to be, yes.
18   Q  And are there dates on the document that would
19  let you know whether or not it was not the charter in
20  effect in February of 2005?
21   A  There are charter amendment chronologies.
22   Q  Could you review that and let me know whether or
23  not it looks like the version that was in effect in
24  February of 2005?

Page 6

1    A  Again, without spending an hour and a half it
2  appears to be.
3    Q  Why don't we have that marked as the next
4  exhibit, which will be Exhibit 16.
5          (Lariviere Exhibit 16 was marked
6           for identification.)
7    Q  It looks like on page 34 of the charter that the
8  last amendment was in 1999; is that correct?
9    A  To my memory it seems to be accurate.
10   Q  And based on your tenure as city solicitor do
11  you have a memory of whether or not the Methuen City
12  Charter was amended at any time between 1999 and February
13  of 2005?
14   A  To the best of my memory, no.
15   Q  Do you know whether it's been amended since your
16  resignation in February of 2005?
17   A  I don't know.
18   Q  Okay.  Thanks.  Do you agree that you waived
19  your right to the remedies articulated in section 9-10 of
20  the Methuen City Charter?
21   A  Not without coercion and being forced, no, I did
22  not.
23   Q  The resignation letter that you signed on
24  February 16th, 2005 stated that you were waiving your

Page 7

1  right to the remedies in section 9-10, correct?
2    A  The document that I was forced to sign said
3  that, yes.
4    Q  Okay.  And you knowingly signed that document,
5  correct?
6          MR. DiADAMO:  Objection.
7    A  By that point in time, no.  They had obtained
8  their mission to physically and emotionally intimidate
9  me.
10   Q  But at that point in time when you signed the
11  document in the presence of David Bain you were aware of
12  the remedies that you were waiving, weren't you?
13   A  No.
14   Q  Why were you not aware?
15   A  Because by that point in time they had been on
16  me for an hour and a half coercing and intimidating me.
17  I'm dealing with two known punks with a history of
18  violence that I knew that these sons of bitches had, in
19  fact, beaten up people and I thought that I was their
20  next candidate, especially after what they had been doing
21  to me.
22   Q  During the period of time in which you were in
23  the second floor conference room at the city hall tell us
24  all of the physical contact that was made between you and

Page 8

1  Chief Solomon.
2    A  You know, Gareth, I would more than happy to
3  show you what was going on.  Would you like to be me as
4  an actor today?  I'll do it for you.
5    Q  The record can't reflect that, so what I would
6  like you do is please describe --
7    A  They were standing within inches of my face and
8  then --
9    Q  Let me finish my question.  I would like you to
10  the best of your memory describe the physical contact
11  between Chief Solomon and you that occurred in the second
12  floor conference room.
13   A  He's demonstrating how he's going to cuff me and
14  drag me out.  He's standing inches away from my face.
15  He's screaming at me demanding my resignation, demanding
16  that he's going to have me arrested.  At that point in
17  time, me not realizing it, lying that Fulya wanted
18  something done.
19   Q  Could you now describe all of the physical
20  contact between you and Deputy Chief Alaimo that took
21  place in the second floor conference room?
22   A  His distance from me was exactly the same as
23  Solomon's, right up to my face.  His physical contact
24  with me was when I tried to get up and there was that

MAURICE J. LARIVIERE                              CondenseIt!™

Page 9

1 time when I tried to push the chair back and he went
2 behind it and threw me back into the desk.
3    Q  Now, you've testified that you believe Fulya
4 Metin did not want to pursue criminal charges against
5 you; is that fair?
6    A  Based upon having read her deposition and based
7 upon having now read Wnek's deposition, yes.
8    Q  At the time that you were in the second floor
9 conference room did you know that Ms. Metin did or did
10 want to pursue criminal charges against you?
11    A  I was being told by Solomon and Alaimo also
12 saying it that she wanted me out and that she was going
13 to have me criminally prosecuted if I didn't resign.
14    Q  Do you have any personal knowledge that Fulya
15 Metin had made a decision at any time on February 16th,
16 2005 not to press criminal charges against you?
17        MR. DiADAMO: Objection.
18    A  Based upon her deposition -- I don't know
19 personally because I tried to go talk to her and they
20 would not allow me to go talk to her.
21    Q  Now, a portion of your conversations with Chief
22 Solomon and Deputy Chief Alaimo were recorded; correct?
23    A  Yes.
24    Q  Do you agree that you asked Chief Solomon and

Page 10

1 Deputy Chief Alaimo to turn off those recording devices
2 while you were in the conference room on February 16th?
3    A  I said to him: "Can we talk?" And he at that
4 point in time said something to the effect of: "Upon
5 request of Lariviere I'm turning off these tapes."
6        Did I ask for them to be turned off? No, I do
7 not recall that at all.
8    Q  Did you ever from that point forward ask Chief
9 Solomon or Deputy Chief Alaimo to turn the recording
10 devices back on?
11    A  No. I don't even know if they were there any
12 more.
13    Q  Do you agree one alternative to resigning on
14 February 16th, 2005 was to take a leave of absence from
15 your position as the city solicitor?
16    A  Solomon said that and he said he was going to
17 look into that and he told me -- he turned around and
18 walked out the door and said: "I'm going to go talk to
19 Pollard and then he was gone for several minutes and came
20 back and said: "No, she doesn't want that. She wants
21 you out of here. She wants you arrested and prosecuted."
22    Q  Aside from what Chief Solomon told you Mayor
23 Pollard was saying about a leave of absence, as you sat
24 in that second floor conference room you knew that one of

Page 11

1 the alternatives to a resignation was to take a leave of
2 absence, correct?
3    A  No.
4    Q  Why was that not an alternative to a
5 resignation?
6    A  That subject was brought up by Solomon and
7 immediately it was no, 'cause they were closing down
8 every other road.
9    Q  But you knew that ultimately the city council
10 was the authority that would make the decision as to
11 whether or not you would be granted administrative leave
12 or not, correct?
13    A  I was not given that mental thought. We were
14 not sitting a room where there's peace. I'm sitting in
15 the room with a guy that had been charged on numerous
16 occasions with beating the shit out of people that I
17 personally know beat the hell out of people and he's two
18 inches away from my face about to cream into me and I'm
19 going to sit there and think through the thought process?
20 Gareth, there was no God damn intent on their part ever
21 to allow me to think. It was to intimidate me and push
22 me to the edge and that's exactly what they did.
23        And I would like to have you sit there two
24 inches away from the sons of bitches going at you and

Page 12

1 say: Oh, yeah, I got a thought process going on. No.
2 And you want to know something? The pattern of conduct
3 is well established and it's being repeated even to this
4 moment until these bastards are indicted by that federal
5 grand jury.
6    Q  So your testimony is that --
7    A  My testimony is they were out to screw me and
8 they were in my face. They were after me. They were
9 pushing me around and they were threatening me and they
10 broke me because I was a coward.
11    Q  Let me finish my question and we'll get out of
12 here a lot quicker. Your testimony is that as you sat
13 there on the second floor conference room the thought
14 never occurred to you that you could go to the city
15 council and ask for a leave absence? Is that your
16 testimony?
17    A  I was not allowed to talk to anybody, Gareth. I
18 asked for permission to talk to two people and I was
19 denied that. I was denied the ability to leave the area.
20 I was denied the ability to make any communication
21 whatsoever and yet I'm going to be talking to someone.
22    Q  You asked to talk to Fulya Metin, correct?
23    A  Yes
24    Q  And you also asked to talk to your wife,

MAURICE J. LARIVIERE                      CondenseIt!™

Page 13

1  correct?
2     A  Yes.
3     Q  But you never asked to talk to an attorney,
4  right?
5     A  No, I did not.
6     Q  You never asked to talk to anyone on the city
7  council, correct?
8     A  No, I did not.
9     Q  You never asked to speak with William Manzi, did
10  you?
11     A  No, I did not.
12     Q  Those thoughts never occurred to you.
13     A  No, sir.
14     Q  Even though you were given your Miranda rights
15  and you knew that you had those rights to talk to a
16  attorney, right?
17     A  Those Miranda rights disappeared the minute they
18  turned that tape off because any level of criminal
19  investigation ceased and that was my big screw up when
20  they turned that off because at that point that's when
21  the shit started and they went after me and that's when
22  they knew they could physically intimidate me because I
23  knew what the bastards were like and they knew it.  Don't
24  be telling me any God damn thing about I had some kind of

Page 14

1  thought process 'cause they wanted to deprive me of it
2  and if someone is two inches away from your face
3  repeatedly screaming at you do you think that you would
4  just sit there?  No.
5     Q  You knew that there were consequences to your
6  pension as you sat there --
7     A  I told you that was BS the last time and I'm
8  telling you it's BS again.
9     Q  Why don't you tell me as you sit here today what
10  the consequences were to your pension for a resignation
11  versus a termination.
12     A  On what basis?
13     Q  On the basis of a termination of your position
14  as city solicitor versus a resignation of your position
15  as city solicitor.
16     A  On what basis is the termination?
17       MR. DiADAMO:  Well, objection.
18     Q  Well, you tell me what the different bases would
19  be for a termination.
20     A  Damned if I know given Fulya's testimony that
21  she had no intent whatsoever to hurt me, that she had no
22  intent for me to lose my job or for my family to be hurt
23  and she said we were good friends and she wanted to go
24  back to work for me.  Not my words.  You were there and

Page 15

1  you know what she's testified to and Wnek's testified to
2  that.
3     Q  Sir, I'm asking you --
4     A  So there would be no termination.
5     Q  I'm asking you a hypothetical.  If the city
6  solicitor in February of 2005 was terminated from that
7  position what would be the consequences to the city
8  solicitor's pension benefits?
9       MR. DiADAMO:  Just so I understand, you're
10  asking him a question with a legal conclusion?  You're
11  asking him as a legal expert what his opinion would be.
12     Q  No, I'm asking based upon his personal knowledge
13  and his experience as the city solicitor what the
14  consequences of his pension benefits would be.
15     A  Sure.
16       MR. DiADAMO:  Hold on for a second.  I
17  understand that to be a legal question.
18     Q  You can characterize it any way you want and I
19  guess the judge will be the arbitrator of that, so, sir,
20  do you understand the question?
21     A  I understand what happens under the normal
22  course of termination.
23       MR. DiADAMO:  Let me object to the question.  Go
24  ahead and answer it.

Page 16

1     A  It accelerates your pension benefits.
2     Q  If you're terminated.
3     A  If you have more than 20 years of service and
4  resulting in a termination of service, then there are
5  provisions in the retirement statute that give you an
6  acceleration of benefits.
7     Q  How would that differ from a voluntary
8  resignation?
9     A  Less money for a voluntary under those
10  circumstances.
11     Q  In what way would you receive less money for a
12  resignation versus a termination?
13     A  The calculation is different.
14     Q  Be more specific, please.
15       MR. DiADAMO:  Just note my objection to this
16  line of questioning.
17       MR. NOTIS:  Your objection is noted.
18     A  I have not looked at that statute in a couple of
19  years or probably five years.
20     Q  You knew as you sat in the room that if you were
21  terminated by the city council that your pension benefits
22  and your retirement benefits would be in jeopardy, didn't
23  you?
24     A  Absolutely did not.

JOAN R. DUNNE

Page 17

1   Q  That never occurred to you?
2   A  I was not given that kind of opportunity.  At
3  this point in time I had to ask permission from someone
4  to go pee and they guarded while I went for a pee for
5  God's sake.
6   Q  The letter that you signed did not include a
7  waiver or a release from the City of Methuen, did it?
8   A  Not to my knowledge.
9   Q  You had negotiated resignations of employees
10  before that --
11   A  With full due process.
12   Q  I'm not finished with my question.
13   A  Good.  Have a good time.
14   Q  The letter that you signed on February 16th,
15  2005 did not include a waiver or release from the City of
16  Methuen, right?
17   A  No.
18   Q  And you had negotiated waivers and releases in
19  other resignations of Methuen employees in the past
20  before that date, right?
21   A  Yes.
22   Q  And you knew that that wasn't included in the
23  resignation letter that you signed?
24   A  No, I did not know that.  By that point in time

Page 18

1  they had made me so fuzzy that there was no thought
2  process.  Take a look at my signature and tell me that
3  that is the signature of an absolutely normal person
4  executing a document.  It's a freaking zigzag that they
5  turned me mentally into and I just wanted to get the hell
6  out of there.  I couldn't take it anymore.
7   Q  The fact that there was no release or waiver in
8  the resignation letter you knew that because there was no
9  release or waiver that you would have an opportunity to
10  file a lawsuit against the city of Methuen, right?
11   A  No, I did not.  If you're asking me was that
12  incompetently drawn?  Yes.  I guess Solomon doesn't know
13  how to do a resignation letter very well.
14      MR. DiADAMO:  Wait for a question.
15   Q  As you sat in the second floor conference room
16  on February 16, 2005 did you know that your resignation
17  would be in the newspapers?
18   A  No.
19   Q  You were working under the belief that it
20  wouldn't be in the newspapers?
21   A  I was working under the promise.
22   Q  But you knew that because the city solicitor is
23  a very public position that regardless of whether or not
24  you resigned this was going to have media scrutiny,

Page 19

1  correct?
2   A  No.  I did not.
3   Q  So you believed that whether or not you resigned
4  this was not going to get any attention to the papers?
5  Is that what you are telling us?
6   A  I believed that those bastards were either going
7  to beat me up or make me sign that and leave.
8   Q  So you have no opinion, sir, as to whether or
9  not a resignation versus you walking out of that room
10  without resigning would have received media attention?
11  Is that what you are telling us?
12   A  At this point I was told that there would be
13  none and all I really gave a shit about was getting the
14  hell out of there.  I didn't want to go through this.  Do
15  you think that I want this?  Do you think I want my
16  family put through this shit because of those clowns?
17  They are going to jail you know.  Those sons of bitches
18  will get indicted and they're going to jail.
19      MR. DiADAMO:  Why don't we take a break and go
20  off the record.
21       (A brief recess was taken.)
22  BY MR. NOTIS:
23   Q  Okay.  Back on the record.  After you left city
24  hall on February 16th, 2005 you went home, right?

Page 20

1   A  Yes.
2   Q  You didn't return to Methuen for the remainder
3  of that day, correct?
4   A  That's correct.
5   Q  You returned the next day though, didn't you?
6   A  To Methuen?
7   Q  Uh-huh, yes.
8   A  No.
9   Q  When was the next time that you returned to
10  Massachusetts after February 16th?
11   A  The next day.
12   Q  For what reason was that?
13   A  Bill Manzi had called me and he said that he
14  wanted to meet with me.  He specifically said not in
15  Methuen though.  He told me let's meet at the One Mill
16  Street Restaurant area in the parking lot.
17   Q  And that's what you did, right?
18   A  Yes.
19   Q  What time did you get to the Mill Street parking
20  lot?
21   A  It was early morning.  I would say without
22  complete accuracy 9 o'clock or 9:30.
23   Q  What time did you talk to William Manzi prior to
24  coming to Lawrence that day?

MAURICE J. LARIVIERE                    CondenseIt!™

**Page 21**

1  A  What time?

2  Q  Yes, sir.

3  A  It would have been very early in the morning.

4  Q  Do you have a memory of what else was discussed

5  during that first telephone conversation besides let's

6  meet at the Mill Street parking lot in Lawrence?

7  A  To my memory there was no in-depth discussion on

8  the telephone.

9  Q  Can you tell us anything else about what was

10  said during that telephone conversation?

11  A  It was to the effect of, you know: "I know what

12  happened with you with the resignation. I need to talk

13  with you. I want to meet with you. I can't meet with

14  you in Methuen." And then he suggested One Mill Street.

15  Q  And have you now exhausted your memory

16  concerning this telephone conversation?

17  A  Yes.

18  Q  When you arrived at the Mill Street parking lot

19  was Mayor Manzi already there?

20  A  He was a councilor at the time, but no, I

21  arrived first and he arrived subsequent.

22  Q  What happened next?

23  A  I got out of my car and I went over and sat in

24  his passenger seat.

**Page 22**

1  Q  How long were you in the car at the parking lot

2  that day?

3  A  I would say approximately 20 to 25 minutes.

4  Q  And once you left the parking lot where did you

5  go?

6  A  I came here.

7  Q  To the DiAdamo law office?

8  A  Yes.

9  Q  Did you have any further conversations with

10  William Manzi on that day after you left the parking lot?

11  A  That day, no.

12  Q  When was the next time you spoke with him?

13  A  We spoke daily thereafter for I would say about

14  ten days.

15  Q  What was the discussion in Mayor or Councilor

16  Manzi's vehicle on the 17th of February?

17  A  I told him about what occurred.

18  Q  And what did you tell him exactly?

19  A  I told him that I was down in the second floor

20  conference room and apparently they had done the sting

21  trap or whatever you want to call it and Pollard was the

22  commander of the ship of this incident and Solomon and

23  Alaimo did their thing and manipulated me to the point of

24  signing.

**Page 23**

1  Q  What did Councilor Manzi say to you in the

2  vehicle that day?

3  A  About Solomon he said words to the effect of:

4  "You know that's what he's like."

5  Q  What else did Councilor Manzi say?

6  A  He told me that the resignation would not be

7  accepted by the city council and his plan at that point

8  in time was to have a transition and have me come back.

9  Q  And was the resignation ultimately received by

10  the city council?

11  A  To my knowledge they never accepted it. He told

12  me in a subsequent telephone conversation that he kind of

13  diverted the issue to make sure they would not accept it.

14  Q  Have you exhausted your memory about the

15  conversation between you and Councilor Manzi in the

16  vehicle on February 16th, 2005?

17  A  We discussed the incident and what occurred and

18  then he was discussing with me my return and he said

19  quite frankly I was his right hand.

20  Q  Would you consider Councilor Manzi to have been

21  a political ally of yours?

22  A  No, a friend, not a political ally.

23  Q  Did you consider him to be a political ally of

24  Sharon Pollard?

**Page 24**

1  A  Yes, for the purposes of getting elected mayor.

2  Q  Did you ever ask the city council to reinstate

3  you as city solicitor?

4  A  Yes.

5  Q  When did you do that?

6  A  I talked to Mike Hennessey who is the chairman a

7  few days after that and we had a very brief conversation

8  in that area and he drifted immediately away from it and

9  I talked to Bill Manzi several times thereafter about

10  that.

11  Q  Did you ask anyone else on the city council to

12  reinstate you as city solicitor?

13  A  To my memory, no.

14  Q  Did you ever formally ask the city council as a

15  body to reinstate you as city solicitor?

16  A  As a body? No.

17  Q  Did you ever submit anything in writing to the

18  city council asking them to reinstate you as city

19  solicitor?

20  A  I believe you have letters from Carmine DiAdamo

21  addressing that issue.

22  Q  And that letter was sent in June of 2005, right?

23  A  I'm not sure when it was sent. At that point in

24  time I was in my alcoholic phase and everything was

JOAN R. DUNNE                                          Page 21 - Page 24

**MAURICE J. LARIVIERE**                        CondenseIt!™

Page 25

1  pretty fuzzy.
2      Q  In any event between the date of your
3  resignation and when Attorney DiAdamo sent that letter to
4  the city council regarding your reinstatement did you or
5  anyone else on your behalf ask the city council formally
6  to reinstate you as city solicitor?
7      A  The full body?
8      Q  Yes.
9      A  No, I was dealing with the chairman and then
10  Manzi who was the real power behind the system.
11     Q  And all of that was done informally during
12  conversations that you had with those individuals, right?
13     A  Yes.
14     Q  And no one else was present during those
15  conversations?
16     A  I don't believe anyone else was present, no,
17  with the exception of one person one time.
18     Q  Was that an attorney or was it -- who was
19  present during that one occasion when someone else was
20  present?
21     A  Emma Donnelly.
22     Q  Who is Emma Donnelly?
23     A  She was an activist in Methuen years ago and --
24  a political activist and she got to know me in one of the

Page 26

1  disputes she had with Methuen, so she contacted me and
2  tried to help me.
3      Q  Who else was present during that conversation?
4      A  It was just her and I.
5      Q  And was a member of the city council present?
6      A  No.  There was a message passed by her to
7  another person who was a friend of Manzi.
8      Q  So Councilor Manzi told you the day after your
9  resignation that the resignation would not be received by
10  the city council?
11     A  Yes.
12     Q  Did you have any reason to dispute that
13  information?
14     A  No, I did not and he confirmed it to me at the
15  next meeting when he said that he deliberately diverted
16  the subject so it wasn't received.
17     Q  And Mayor Manzi also told you that he would
18  accept a reinstatement on your behalf if you petitioned
19  the city council, didn't he?
20     A  He told me depending on the political
21  circumstance because initially he told in a conversation
22  me two or three articles and this will be all over and it
23  wasn't.  It got hotter and hotter and he walked away from
24  the issue and would not return calls to me and would not

Page 27

1  provide any aide or assistance.
2      Q  Peter McQuillan was appointed as the interim
3  city solicitor from February 17th, 2005 up until around
4  June 15th, 2005.  Is that your memory?
5      A  To my memory he was appointed the following
6  Monday.
7      Q  So, in any event, it was sometime in February of
8  2005 until June 15th, 2005 that Peter McQuillan served as
9  interim city solicitor.
10     A  I'm not sure when he got the permanent
11  appointment, but your date line seems correct.
12     Q  Do you agree that at no time during Peter
13  McQuillan's tenure as interim city solicitor did you ask
14  to be reinstated?
15        MR. DiADAMO:  Objection.
16     A  No, I said I talked to Bill Manzi about that and
17  I kept calling and leaving massages quite frankly.
18     Q  Bill Manzi invited you to ask the city council
19  to ask to be reinstated, right?
20     A  He told me to stand down until he felt
21  politically able to handle the situation and it steamed
22  up and he walked away and he would not return my phone
23  calls and he would not provide me assistance at that
24  point.  At that point that's when I asked for a 2-11.

Page 28

1      Q  Fair to say that up until the time that Peter
2  McQuillan was appointed permanent city solicitor that one
3  of your alternatives was to ask for a reinstatement by
4  the city council?
5      A  Not when Manzi opposed it, no.  Manzi was the
6  leader of that council and when the leader will not take
7  on the shoulder of responsibility to get the mission
8  accomplished it ain't going to happen.
9      Q  Mike Hennessey was the chairman of the council?
10     A  Yes.  So that Bill could run for mayor he put
11  Hennessey in.
12     Q  Hennessey was an ally of yours, right?
13     A  An ally?  We knew each other.
14     Q  He was an opponent of Sharon Pollard?
15     A  Yes.
16     Q  Didn't like Sharon Pollard?
17     A  That's the assumption that I had.
18     Q  He also invited you to petition the council for
19  reinstatement.
20     A  No, he did not.  I asked him about that.
21     Q  Aside from what Councilor Manzi was telling you
22  about reinstatement you knew that one of the alternatives
23  to your resignation was to ask for it to be revoked and
24  for you to be reinstated, correct?

**JOAN R. DUNNE**                                    Page 25 - Page 28

MAURICE J. LARIVIERE                                    CondenseIt!™

Page 29

1    A  At that point in time it was very clear to me,
2  especially since Fulya had been used to being out on a
3  free ride paycheck and then filing with the MCAD, that
4  that was not going to happen, and I was told very clearly
5  by the political allies of Manzi that that was not going
6  to happen.  The message had been passed to me that way.
7    Q  But you never asked, did you?
8    A  It was a waste of time.  I knew it was a waste
9  of time when Manzi walked away and refused to answer and
10  refused to commit and refused to even return a phone call
11  that it was over.  And certainly Dave never initiated
12  anything though Dave had the responsibility as the
13  supervisor.  They refused to do an investigation that I
14  asked them to do.
15    Q  When did you ask them to do an investigation?
16    A  Manzi was asked twice.
17    Q  In writing?
18    A  No.
19    Q  Who asked him?
20    A  Well, first time was me directly to him.  Second
21  time it was Emma Donnelly through another source.
22    Q  Do you know when she asked him?
23    A  I would say within a week of the initial
24  incident.

Page 30

1    Q  And what was his response?
2    A  Let me think about it.
3    Q  And after that time you never followed up to see
4  if an investigation would take place?
5    A  After that point in time he wouldn't return my
6  calls.
7    Q  And at that point you had resigned your
8  position.
9    A  I did not resign the position.  I was forced out
10  against my will.
11    Q  If an employee resigned their position from
12  their employ with the city of Methuen are you aware of
13  any obligation under the sexual harassment policy for the
14  city to conduct an investigation?
15      MR. DiADAMO:  Objection.
16    A  Under that policy I'm not positive, but in the
17  real word the MCAD absolutely.
18    Q  Well, if you were you were no longer employed by
19  the city what would be the remedy of an investigation?
20      MR. DiADAMO:  Objection.
21    A  The principal purpose for the entire MCAD policy
22  is to protect the individual claiming to have been
23  harassed and to find an adequate remedy to address the
24  situation and to return him or her to a normal work

Page 31

1  environment.
2    Q  And you were no longer in your position as the
3  supervisor for Fulya Metin after you signed that
4  resignation letter, right?
5    A  That's correct.
6    Q  So what would be the remedy that the
7  investigation would implement?
8      MR. DiADAMO:  Objection.
9    A  As you are well aware that's what accelerated
10  Fulya's issue, no. 1, and then, no. 2, then she got
11  concerned about -- allegedly about the phone being there.
12    Q  If you did not resign and did got sign the
13  letter would what have prevented you from returning to
14  work?
15      MR. DiADAMO:  Objection.
16    A  If I did not resign and I did not what?  I'm
17  sorry.
18    Q  If you didn't sign the resignation letter in the
19  second floor conference room on the 16th what would have
20  prevented you returning to work as the city solicitor for
21  Methuen?
22      MR. DiADAMO:  Objection.
23    A  Nothing.
24    Q  Was there an intolerable work condition that you

Page 32

1  experienced as city solicitor from Methuen?
2      MR. DiADAMO:  Objection.
3    A  Yes.
4    Q  What was that intolerable work condition, sir?
5    A  Sharon Pollard was a miserable bitch.  She went
6  out of her way to make my life miserable every day of the
7  week literally.
8    Q  At any point after you signed the resignation
9  letter on February 16th, 2005 was there an intolerable
10  work condition that prevented you from returning to work?
11    A  Yes.
12    Q  When was that?
13    A  In accordance with their lie they immediately
14  went public with this whole thing to beat the shit of me
15  and to discourage any attempt whatsoever to allow my
16  reinstatement and they went running to the district
17  attorney with these bullshit statements.  That was their
18  way of making sure that the door was locked.
19    Q  Do you have any personal knowledge that your
20  employer deliberately acted to create an intolerable work
21  condition for you?
22    A  By my employer who do you mean?
23    Q  The city of Methuen.
24    A  Any officer of the city or --

JOAN R. DUNNE                                          Page 29 - Page 32

Page 33

1    Q    Just the city of Methuen.
2        MR. DiADAMO: Objection.
3    A    The city of Methuen is 44,000 people.
4    Q    You have sued the city of Methuen in this case,
5    right?
6    A    Being left no choice, yes.
7    Q    And what do you allege that the city of Methuen
8    did to deliberately create an intolerable work condition
9    for you?
10   A    The reasons for the lawsuit is outlined in this.
11   Q    Can you show me where?
12   A    Page 1 to the end.
13   Q    So it's only contained in your complaint, right?
14   A    No, there's more information.
15   Q    I want you to tell me what information you have
16   that the city of Methuen acted deliberately to create an
17   intolerable work condition for you in your employment as
18   city solicitor.
19       MR. DiADAMO: Objection.
20   A    I think it's an obtuse question and at best I
21   don't understand it.
22   Q    You allege that an intolerable work condition
23   was created, right?
24   A    Yes.

Page 34

1    Q    And you allege that that was deliberately done,
2    right?
3    A    Yes.
4    Q    What facts do you have that there was a
5    deliberate intent to create an intolerable work
6    environment for you?
7    A    Pollard regularly calling me and yelling at me,
8    threatening me. Manzi coming down to the office and
9    telling me that she's berating the hell out of me to
10   everybody and that she wants me out. Her denying me the
11   most basic things such as membership in lawyer
12   associations as far as being picked up by the town, which
13   it had been for twenty years. Her refusing to hire
14   people that I asked be hired, her refusing to allow me to
15   buy or fix equipment such as my photocopy machine, fax,
16   any office materials. It goes on and on.
17   Q    Did any of the things that you just stated play
18   a role in your decision to sign that resignation letter
19   on the 16th of February?
20   A    No. Regrettably, it didn't.
21   Q    Did any of those things that you just stated
22   prevent you from asking the city council to reinstate you
23   to your position as city solicitor?
24   A    Yes.

Page 35

1    Q    Which ones?
2    A    It was very clear with her attitude towards me
3    and how she had screwed other department heads and put
4    them in a psychological condition and forced them out of
5    their employment, that she controlled and owned that
6    entity and that she had a cop that she owned and was
7    corrupt and was doing this stuff with the district
8    attorney as a blocking maneuver. There was no intent
9    whatsoever to allow me to ever have any rights.
10   Q    Are you aware of a specific policy of the city
11   of Methuen that coerced you into signing that resignation
12   letter?
13       MR. DiADAMO: Objection.
14   A    No.
15       MR. DiADAMO: You are talking about a written
16   policy, correct?
17   Q    Well, let's ask about a written policy first.
18   Are you aware of a written policy that the city of
19   Methuen had in place to coerce you to resign?
20       MR. DiADAMO: Objection.
21   A    No.
22   Q    Are you aware of anything unwritten concerning a
23   policy that the city had to coerce you to resign?
24   A    Yes.

Page 36

1    Q    What was that?
2    A    Pollard and Solomon and Alaimo detailed
3    repeatedly that she wanted me out, detailed that she
4    wanted me either arrested or resigning and they were
5    telling me repeatedly they were marching on her orders in
6    addition to these allegations about Fulya's statements.
7    Q    Are you aware of a custom that the city of
8    Methuen had to intimidate you to resign your position?
9        MR. DiADAMO: Objection.
10   A    I'm aware that it had been done in the past,
11   yes.
12   Q    And what do you base that testimony on?
13   A    The way they got rid of Bruce McDougall.
14   Q    What was intimidating about the way that Mr.
15   McDougall's employment ended with the city of Methuen?
16   A    He could detail it. They made his life an
17   absolute misery. Anything he wanted, no. She constantly
18   went behind his back to Solomon and had Solomon
19   effectively -- made him de facto running the police
20   department. Insulting and demeaning him and she
21   supported Solomon in the midst of all of this.
22   Q    Are you aware of any regulation that was
23   implemented by your employer that contributed to your
24   resignation?

**MAURICE J. LARIVIERE**                    CondenseIt!™

| Page 37 | Page 39 |
|---|---|

**Page 37**

1    MR. DiADAMO:  Objection.
2    A  Are we talking written?
3    Q  Written or otherwise, sir.
4         MR. DiADAMO:  Objection.
5    A  To the extent that you consider their actions to
6    be a regulation, yes.
7    Q  Was there any ordinance that was implemented
8    that contributed to your resignation?
9         MR. DiADAMO:  Objection.
10   A  No.
11   Q  Was there any ordinance that prevented you from
12   asking the city council to reinstate your position as
13   city solicitor?
14   A  A written ordinance?  No.
15   Q  Was there any unwritten ordinance that prevented
16   you from asking the city council to reinstate you as city
17   solicitor?
18        MR. DiADAMO:  Objection.
19   A  By definition it wouldn't be an ordinance, so
20   no.
21   Q  Any regulation?
22   A  No.
23   Q  Any custom?
24   A  Yes.

**Page 38**

1    Q  What custom?
2    A  It was very clear that the city council would
3    not do anything to help an employee.  They did not do
4    anything for a number of people that got screwed by her
5    and forced out the door.
6    Q  Any specific policy that you are aware of that
7    the city of Methuen had that prevented you from
8    petitioning the city council to reinstate your position?
9         MR. DiADAMO:  Objection.
10   A  Again, as I told you, I went to the right
11   sources in the political regime and how it works and I
12   was denied that ability.
13   Q  But you don't know of any policy that was in
14   place that prevented you from doing that, correct?
15        MR. DiADAMO:  Objection.
16   A  I don't understand what that means.
17   Q  Do you know what a policy is?
18   A  I know what a policy is.
19   Q  What's your definition of a policy?
20        MR. DiADAMO:  Objection.
21   A  A procedure that's enacted in a rule that does
22   not carry the force of a law, but it's established as a
23   protocol or a carry-on.
24   Q  Using that definition of a policy, tell me what

**Page 39**

1    policy was in place that prevented you from petitioning
2    the city council to reinstate you to your position as
3    city solicitor?
4         MR. DiADAMO:  Objection.
5    A  If we are going to go in with the context of
6    that with some kind of legal definition -- is that what
7    you're looking for?
8    Q  Do you understand the question?
9    A  I very well understand the question and I very
10   well understand the custom and routine that was being
11   carried on in Methuen at that point in time.
12   Q  That's what I'm asking you to describe.
13   A  Sure.  When Pollard decided she wanted to knock
14   you out she made your life an absolute misery.  She did
15   one after another in a Stalinist fashion.  She just made
16   your life miserable.  She denied you rights.  She
17   insulted you.  She demeaned you to your face.  She
18   demeaned you behind your back so people would come to
19   you.  She deprived you of any ability to effectively
20   operate your office.
21   Q  But you knew that in signing the resignation
22   letter you waived any contract rights you had to your
23   employment with the city of Methuen?
24        MR. DiADAMO:  Objection.

**Page 40**

1    A  Absolutely not.
2    Q  Do you have any knowledge of any documentary
3    evidence to show that there was a conspiracy between
4    Pollard and anyone else to coerce you into resigning your
5    position as city solicitor?
6    A  Only the names that are in the depositions.
7    Q  No documents to support that conclusion?
8    A  One other would be the Wnek report and the
9    newspaper articles.
10   Q  Which Wnek report are you referring to?
11   A  I believe it was done in April.
12   Q  Exhibit 12?
13   A  I would have to look.  I'm not positive.
14        (Witness examines document.)
15   A  No, this is not the one.  It would be related to
16   the incident.  This was a subsequent review of other
17   employees.
18   Q  I'm showing you a three-page document.  Is this
19   the report that you are referring to?
20   A  Give me one second.
21   Q  Sure.
22        (Pause)
23   A  The third page, first paragraph.
24   Q  You're referring to the paragraph that reads:

**JOAN R. DUNNE**                                    Page 37 - Page 40

Page 41

1  "I directly responded" --
2      A  No, not that part of the paragraph.
3      Q  Could you show me which sentence you are
4  referring to?
5      A  It would be those references that demonstrate
6  that Chief Solomon had been in Pollard's office, that he
7  came out to meet Fulya and to bring her back into
8  Pollard's office and that's where the staging area had
9  been.
10     Q  Just so the record is clear, why don't we mark
11  this as the next exhibit.
12             (Lariviere Exhibit 17 was marked
13               for identification.)
14     Q  Exhibit 17 is Lieutenant Wnek's three page
15  report, correct, sir?
16     A  That is what has been represented to me.
17     Q  And this is the report that you say supports --
18     A  You asked me if there was anything in writing, I
19  believe your phraseology was.
20     Q  I asked you whether or not there was any
21  documentary evidence to support a conspiracy between
22  Mayor Pollard and anyone else to coerce you to resign
23  your employment and you said --
24     A  Written documents, yes.

Page 42

1      Q  Let me finish my question.  I asked you whether
2  or not there was any documentary evidence to support your
3  theory that there was a conspiracy between Sharon Pollard
4  and anyone else to coerce you into resigning your
5  employment.  Do you understand that question?
6      A  Written documents, yes.
7      Q  And your testimony was that there was a
8  newspaper article; there was deposition testimony given
9  in this case and there was a report prepared by
10  Lieutenant Wnek, correct?
11     A  That's correct.
12     Q  And you have in front of you the report that you
13  claim was prepared by Lieutenant Wnek.
14     A  I believe it's what I've been told.
15     Q  And you have referred to page 3 of the report to
16  support the conspiracy theory?
17     A  Yes.
18     Q  Where specifically -- please read into the
19  record where in the report is the evidence to support the
20  conspiracy theory?
21     A  The Chief was in Mayor Pollard's -- which would
22  be the office -- and he immediately responded to the
23  hallway to meet Fulya and he promptly took her to Mayor
24  Pollard's office.  He then indicates -- and this is

Page 43

1  allegedly Wnek -- that he responded to the Mayor's office
2  where he spoke to Fulya.
3      Q  Is that it, sir?
4      A  Yes.
5      Q  Thanks.  Do you have any knowledge that Chief
6  Solomon knew about Fulya Metin's allegation against you
7  before she made her complaints to Lieutenant Wnek?
8      A  No.
9      Q  Do you have any knowledge that Deputy Chief
10  Alaimo knew anything about Fulya Metin's allegation
11  against you before she went to Lieutenant Wnek?
12     A  No.
13     Q  Do you have any knowledge that Sharon Pollard
14  had any awareness of Fulya Metin's allegations against
15  you before she went to Lieutenant Wnek?
16     A  No.
17     Q  Have you ever overheard any statement made by
18  Sharon Pollard that she directed Chief Solomon or Deputy
19  Chief Alaimo to coerce you into resigning your position
20  as city solicitor?
21     A  No.
22     Q  Is there anything besides your personal opinion
23  to support the conclusion that Sharon Pollard directed
24  Deputy Chief Alaimo and Chief Solomon to coerce you into

Page 44

1  resigning your position?
2         MR. DiADAMO:  Objection.
3      A  There's the statements of Solomon and Alaimo and
4  the fact that she was definitely involved in this because
5  the staging area was right there in her office and
6  there's the obvious inconsistency that not one piece of
7  this was done in accordance with standard police
8  procedure or the sexual harassment policy, not one ounce.
9      Q  Anything else, sir?
10     A  No.
11     Q  Have you completed your answer?
12     A  Yes.
13     Q  Up.  Up until the morning of February 16th, 2005
14  you had a good working relationship with Chief Solomon.
15  Fair statement?
16     A  I dealt with him when I had to and I stayed away
17  from him otherwise.
18     Q  You held him in high regard up until that date,
19  right?
20         MR. DiADAMO:  Objection.
21     A  I don't understand your question.  What do you
22  mean?
23     Q  You thought up until the morning of February
24  16th, 2005 that Chief Solomon was an excellent police

MAURICE J. LARIVIERE                    CondenseIt!™

Page 45

1 chief, correct?
2    A I don't believe I ever said that.
3    Q You felt that he was very professional in the
4 way that he conducted himself up until that date?
5    A No.
6    Q Did you ever write anything concerning your
7 opinions about Chief Solomon's performance and his role
8 as chief of police?
9    A To my memory, no.
10        MR. DiADAMO: Off the record for a second.
11        (A brief recess was taken.)
12 BY MR. NOTIS:
13    Q Have you ever seen any surveillance videotapes
14 of any individuals with personal knowledge of the
15 allegations in this case?
16    A I'm sorry. You're talking about the video that
17 they did?
18    Q No, I'm just talking in general. Have you seen
19 any surveillance tapes of any witnesses that have
20 personal knowledge of the allegations in your complaint?
21    A No.
22    Q Did you retain any investigator to perform any
23 investigation into the allegations in your complaint?
24        MR. DiADAMO: Objection.

Page 46

1    A I decline to answer.
2    Q On what grounds?
3        MR. DiADAMO: Well, are you asking him if he
4 retained anyone or if I retained anyone?
5    Q I'm not asking you whether you did. I'm asking
6 whether he retained anyone to conduct an investigation.
7        MR. DiADAMO: Let's just be clear.
8    Q If he knows, he knows.
9        MR. DiADAMO: Just, again, I'm entitled to do my
10 investigation and attorney-client and blah, blah, blah.
11 So anything that you have learned from me or anything
12 that you knew from me -- I guess the question is whether
13 or not you ever went out and hired a PI independently to
14 go out and do something.
15    A No.
16    Q Have you ever met with an investigator outside
17 of the presence of your attorneys in this case concerning
18 the allegations in your complaint?
19    A No.
20    Q Have you ever read any transcribed statements
21 taken from witnesses in this case other than the
22 deposition testimony?
23        MR. DiADAMO: Objection.
24    A Yes.

Page 47

1    Q What statements have you read?
2    A MCAD.
3    Q Outside of the MCAD proceedings and depositions
4 taken in this case have you read any transcribed
5 statements from any witnesses with personal knowledge of
6 the allegations in your complaint?
7    A No.
8    Q Since February 16th, 2005 have you had any
9 conversations with Sharon Pollard about anything
10 contained in the allegations in your verified complaint?
11    A No.
12    Q Have you spoken to her at all since February
13 16th, 2005?
14    A No. Nor did I speak to her on that day.
15    Q You had a conversation with Chief Solomon after
16 you left city hall on February 16, 2005, correct?
17    A Yes.
18    Q And that was on your cell phone?
19    A Yes.
20    Q Can you tell us what you discussed during that
21 telephone conversation?
22    A When I got home my thought was just to move on,
23 that I would find another job. I wanted to confirm that
24 they had given me their word and they would live with it

Page 48

1 and so I called them. He told me that he was on the road
2 driving at that point in time and he confirmed yes.
3    Q What did he confirm?
4    A He had during the course of that incident down
5 on the second floor said if I didn't resign he was going
6 public and destroy me. If I did, he would keep it quiet.
7 After the resignation when he took me upstairs he was
8 instructing his men not to say anything and that, in
9 fact, he would clear out my office without anyone knowing
10 about it and do it at night.
11    Q And do you have any information to suggest that
12 Chief Solomon discussed this incident with any members of
13 the media?
14    A Yes, he was in the paper a number of times.
15    Q Do you have any information to suggest that
16 Chief Solomon was the first person to go to the media to
17 discuss your resignation?
18    A No.
19    Q Have you had any conversations since that
20 February 16th, 2005 conversation with Chief Solomon?
21 Have you talked to Solomon since then?
22    A No.
23    Q Have you spoken to Alaimo since you left city
24 hall on February 16, 2005?

JOAN R. DUNNE                                    Page 45 - Page 48

**MAURICE J. LARIVIERE**    CondenseIt!™

Page 49

1  A  No.
2  Q  Have you spoken to Peter McQuillan about the
3  allegations in your complaint since February 16, 2005?
4  A  The day after in the afternoon. I believe the
5  day after or the following day he called.
6  Q  And since that time have you had discussions
7  with him about the allegations in your complaint?
8  A  Maybe one or two times around that time frame,
9  but not since then.
10  Q  So those conversations would have been during
11  February 2005. Is that a fair statement?
12  A  Yes.
13  Q  And your testimony is that there were anywhere
14  between two and three conversations with Mr. McQuillan?
15  A  About that issue, yes.
16  Q  Tell me what you discussed with Mr. McQuillan
17  the day after February 16th, 2005?
18  A  He called up. He was livid. He was screaming.
19  Do I say the exact words or --
20  Q  Yeah.
21  A  He said that fat fucking bitch screwed you and
22  that stinking fucking Leb did, too -- words to that
23  effect.
24  Q  What was the last word?

Page 50

1  A  Leb. Which surprised me because his wife is
2  Lebanese also.
3  Q  What else was discussed during that conversation
4  with Mr. McQuillan?
5  A  During the course of the conversation we
6  discussed what occurred and I gave him a detail. He
7  asked what had occurred between Fulya and I, and I told
8  him and he said there was nothing wrong there.
9  Q  Did he say whether he had seen the videotape
10  yet?
11  A  No. As a matter of fact, in that conversation
12  he had asked the question about: "Is there anything that
13  shows that you didn't do anything serious?" And I said:
14  "They videotaped it and that will show it."
15  Q  Have you had any conversation with Mr. McQuillan
16  about his viewing of the videotape?
17  A  To the best of my memory the last time I talked
18  to him regarding this incident would have been the day of
19  the videotape and there was nothing substantive. He
20  happened to be in the parking lot with Carmine when I
21  arrived and he went wherever he went and Carmine and I
22  went in.
23  Q  And at that point do you know whether Mr.
24  McQuillan had seen the videotape yet?

Page 51

1  A  I believe at that point he indicated that he
2  had.
3  Q  And did he tell you what his thoughts were about
4  the videotape?
5  A  Not to my memory.
6  Q  Has he ever expressed to you what his thoughts
7  were after seeing the videotape?
8  A  No, because we've had conversations since then
9  unrelated.
10  Q  Okay. So the answer is no, he's never expressed
11  any thoughts to you about his viewing of the videotape
12  and what was contained on the videotape?
13  A  To the best of my memory, no.
14  Q  Did you have any conversations with Mr.
15  McQuillan about your reinstatement to the position as
16  city solicitor?
17  A  Yes.
18  Q  What did you discuss in that regard?
19  A  When he was getting appointed interim he said
20  that he was only there until I got back and that's all he
21  wanted at that point in time.
22  Q  Did he ever counsel you on how to petition the
23  city council to reinstate you to the city solicitor's
24  position?

Page 52

1  A  No.
2  Q  Did you ever make any statements to him about
3  your intent to petition the city council for
4  reinstatement?
5  A  I advised him that Billy had been talking to me,
6  that there would not be an acceptance of the resignation.
7  Billy wanted things to calm down and then he would patch
8  it up.
9  Q  And what was Mr. McQuillan's response, if any?
10  A  I don't recall any response.
11  Q  Let me show you your Answers to Interrogatories
12  which we have marked as Exhibit 15, correct?
13  A  Yes. Yes, it appears to be.
14  Q  Okay. I'll turn your attention to Interrogatory
15  No. 3 and your answer to No. 3.
16  A  Yes.
17  Q  And you were asked to provide the name,
18  residential address, business address, telephone number
19  of any persons that possess information concerning your
20  complaint, the factual assertions and allegations
21  advanced in that complaint or any damages that you allege
22  have been suffered as a result of the matters advanced in
23  that complaint, correct?
24  A  Yes.

**MAURICE J. LARIVIERE**                    Condenselt!™

---

Page 53

1   Q  And you have listed eleven individuals, correct?
2   A  Yes.
3   Q  And you signed the Answers on the 19th of July
4   2006?
5   A  Yes.
6   Q  Is there anyone else that you would like to add
7   to Answer No. 3?
8   A  I have not made a final decision on that.
9   Q  When do you anticipate a final decision?
10  A  When the discovery period is closed as is
11  standard.
12  Q  Well, it is closed, so --
13  A  It is?  See you later.  I thought this was
14  discovery.
15  Q  I will represent to you, sir, that discovery is
16  closed in this case.  Do you have any intent to further
17  supplement Answer No. 3 to your Interrogatories?
18  A  That would be something that I would be
19  discussing with my attorney and not discussing at this
20  time.
21  Q  But you know of no one else based on your
22  personal knowledge that would be responsive to
23  Interrogatory No. 3.
24      MR. DiADAMO: Let's take a break for a minute.

---

Page 54

1          (A brief recess was taken.)
2   BY MR. NOTIS:
3   Q  Would you read the last question back?
4          (The last question referred to
5              was read back.)
6   A  There might, in fact, be a number of more
7   people.
8   Q  Who are those people?
9   A  I don't know.  At this time I'm going through
10  the discovery that's existing.  We're also examining the
11  pattern of conduct that Solomon and Alaimo have
12  demonstrated of intimidation to people.  And we're
13  examining what information we can develop on the federal
14  criminal investigation against them.  And we're examining
15  two more cases that have been filed as well as the union
16  grievances filed about him intimidating cops.
17  Q  But as you sit here today you can't provide any
18  additional witnesses that are responsive to No. 3?
19  A  At this time I have not made a final decision
20  and I don't know.
21  Q  Okay.  One of the individuals you listed was
22  Christopher McCarthy, correct?
23  A  Yes.
24  Q  What information does Mr. McCarthy have

---

Page 55

1   pertaining to the allegations in your complaint?
2   A  He was present that day.
3   Q  And is there anything aside from what's
4   contained in the verified complaint and discovery that's
5   been exchanged in this case that would indicate what
6   information Mr. McCarthy has?
7   A  We have not finalized, no.
8   Q  Same question as to Michael Hennessey.
9   A  In terms of --
10  Q  What information does Mr. Hennessey have that's
11  responsive to Interrogatory No. 3?
12  A  He was aware of Pollard and her methodology.  He
13  was aware of Solomon and Alaimo and their method of
14  conduct and their pattern of conduct.
15  Q  Same question as to Randy Haggar.  What
16  information does Mr. Haggar have that's responsive to No.
17  3?
18  A  He was there and participated in this operation.
19  Q  He was there on the 16th?
20  A  Yes, he was.
21  Q  What role did he have in the events of that day?
22  A  The first time that I became aware that he was
23  there and had been called in was when I arrived back at
24  the office and he was there in front of the office door.

---

Page 56

1   Q  Did you have any conversations with him on
2   February 16th, 2005?
3   A  No, I did not.
4   Q  Have you had any conversation with him since
5   that date?
6   A  No, I have not.
7   Q  Thomas Kelly, what knowledge does he have that's
8   responsive to Interrogatory No. 3?
9   A  Kelly on a number of occasions told me how much
10  Pollard disliked me and had disdain for me and was pissed
11  off at a lot of the opinions I made when I had indicated
12  to him she was wondering out of the financial boundaries
13  out of the town and what the state law allowed.  And he
14  also was aware that she was the one that gave me the
15  marching orders to send the buy-back checks to me and he
16  was aware that that was done and it drained out the
17  financial budget.
18      One other thing since you asked about Kelly.
19  He's the chairman of the Methuen Retirement Board or was
20  the last time I knew, so he would know the figures and
21  calculations.
22  Q  Since February 16th, 2005 have you had
23  conversations with Linda Gagnon?
24  A  Yes, I have.

---

**JOAN R. DUNNE**                              Page 53 - Page 56

MAURICE J. LARIVIERE                                CondenseIt!™

Page 57

1    Q  How many?
2    A  Quite a few.  She used to call me when this
3   incident occurred.  She wanted me back as solicitor and
4   we had a very good relationship.  We talked on numerous
5   occasions up until the marching order was issued to her
6   not to talk to me.
7    Q  Has Linda Gagnon discussed with you the content
8   of Lieutenant Wnek's April 2005 report?
9    A  Yes.
10    Q  What has she discussed with you in that regard?
11    A  Do you want the context it was in or --
12    Q  Well, do you understand the question?
13    A  Yes.
14    Q  Can you answer it?
15    A  I saw the report early on and, quite frankly, at
16   that point in time I did not know that it had been
17   falsified.  I assumed that she had said that, so I just
18   kept silent on it.  I was called in for an MCAD
19   deposition and it was brought out that I had sexually
20   assaulted her and in the deposition, quite frankly, I
21   took the bullet.  I said: "I do not recall that.  But
22   she's a friend.  If she said it happened, it happened."
23       Thereafter, I called her and quite frankly I
24   called to apologize to her that if this had been this way

Page 58

1   for this many years that it bothered her that it bothered
2   me.
3       She immediately said: "Maurice, that never ever
4   happened.  You never did that."  And then she went on to
5   indicate that she had talked to Fulya.  She had worked at
6   another business or company years before and someone had
7   done that and, apparently, it had been transposed by
8   Fulya to Wnek, which she denied in her depo, and she
9   transposed that information and Wnek then put it in the
10   report as if she had said it.
11       She has categorically denied repeatedly that
12   those statements were true.  She categorically denied
13   that I ever said anything that insulted her or touched
14   her or made her feel uncomfortable.  But I have not
15   talked to her since she was issued the marching orders.
16    Q  One of the statements in Lieutenant Wnek's
17   report at the end of the third paragraph is that she
18   indicated that she observed Maurice's behavior changed
19   when Fulya became employed with the city.  Did Ms. Gagnon
20   discuss that sentence with you?
21    A  I sent her that portion of the report, so that
22   she could look at what was being said about her.
23   She read the report.  She called in an emotional state
24   and actually used a couple of swear words and said:

Page 59

1   "Maurice, not one word of that is true."
2    Q  And you understood her to mean the Wnek report?
3    A  Yes.  She went piece by piece on that.
4    Q  My question is concerning the last sentence.
5   What specifically did she tell you about the last
6   sentence, if anything?
7    A  She said she never said that.
8    Q  And was it just on one occasion that you
9   discussed Lieutenant Wnek's April 2005 report with Linda
10   Gagnon?
11    A  I would say approximately three times.
12    Q  And did you discuss the content on all three
13   occasions?
14    A  The first time was a summary because I didn't
15   have the document in my hand.  I told her that I
16   would send it to her for her to look at and she then --
17   we then talked.  She then told me there were two
18   occasions on which she spoke to Wnek.  One was that day
19   and one was a couple of days later they talked.  She told
20   me that at that stage Wnek had not made any notes or
21   brought any recorder or anything and apparently
22   thereafter no report existed until one was done in April
23   which was a couple of months later.
24       The last conversation we had substantively about

Page 60

1   that was just before the deposition with you.  And she
2   said to me at that point in time that -- no, I'm sorry,
3   this was Wnek because she said to me at that point in
4   time: "I told Wnek when I met him in the corridor I said
5   words to the effect that nothing had ever occurred
6   between him and I."
7    Q  Have you talked to Connie Souci?
8    A  No, I have not.
9    Q  Have you talked to Diane Machiarello?
10    A  No, I have not.
11    Q  Have you spoken to her since the incident?
12    A  No, I have not.
13    Q  Have you spoken to Michelle Dragett since that
14   time?
15    A  I haven't spoken to her since about 2001.
16    Q  Have you spoken to John Mallory since February
17   16, 2005?
18    A  Yes.  Very briefly.
19    Q  What did you discuss with Mr. Mallory?
20    A  I saw him on two occasions.  He's the president
21   of the MCTV and the former president, Dave Scully, had
22   died, so I went to Dave's wake and funeral and I saw him
23   there.  And then I saw him -- they had a presentation
24   award at MCTV for Dave Scully.  They named a room after

JOAN R. DUNNE                                      Page 57 - Page 60

MAURICE J. LARIVIERE                    CondenseIt!™

Page 61

1 him and I went to the presenting ceremony and saw him
2 there.
3    Q  Did you have any conversations with Mr. Mallory
4 about what's contained in your verified complaint?
5    A  No.
6    Q  Did Mr. Mallory convey to you any information
7 that he discussed with Fulya Metin about the allegations
8 in the verified complaint?
9    A  No.
10    Q  Or the MCAD complaint?
11    A  No.
12       MR. NOTIS: At this point I'm going to pass the
13 questioning on to Attorney Gambaccini. I might have some
14 additional questions later. Thanks.
15
16          CROSS EXAMINATION
17 BY MR. GAMBACCINI:
18    Q  During the first day your deposition testimony
19 do you recall giving some information about conversations
20 you had in the then previous 30 days with city employees;
21 namely, Gagnon, Kelly and Manzi?
22    A  I'd have to look at the deposition.
23    Q  You don't recall that testimony as you sit here
24 today?

Page 62

1    A  Not offhand. I'm sure it was brought up.
2 I do know that he asked some questions about the last 30
3 days.
4    Q  Turning to your earlier testimony regarding
5 Mayor Manzi do you recall giving some testimony about
6 e-mails that you had exchanged with him?
7    A  Yes.
8    Q  Were you able to locate those e-mails since the
9 first day of your deposition?
10    A  Yes, you called and were looking for them.
11    Q  I called you?
12       MR. DiADAMO: No, me.
13    Q  So then you have been able to locate them?
14    A  I forwarded them to my attorney and my
15 understanding is he forwarded them to you.
16       MR. DiADAMO: Let's go off the record for a
17 second. Give me two minutes. I might be able to get my
18 hands on them.
19       (A brief recess was taken and Atty.
20       DiAdamo has brought back into the room the
21       e-mails that he found.)
22 BY MR. GAMBACCINI:
23    Q  Earlier in your testimony you had indicated that
24 some of your communications with Mayor Manzi were

Page 63

1 directed towards the end of having Chief Solomon tell the
2 truth; is that right?
3    A  Right.
4    Q  What did you feel that Chief Solomon was saying
5 that was untruthful at the time that you had these
6 conversations with the mayor?
7    A  Every time he opened his lips.
8    Q  What had he said to that point?
9    A  He's lying about what went on in totality.
10    Q  What statements are you referring to by Chief
11 Solomon?
12    A  The easiest ones are just look at his
13 deposition. He's denying that there was ever any
14 coercion or any intimidation or any threats. He's
15 denying that he participated in anything having to do
16 with the civil side of the resignation.
17    Q  Okay. So his deposition testimony is the
18 statement or the statements by Chief Solomon that you're
19 referring to, correct?
20    A  Yeah, by and large and there's newspapers
21 articles, too, about what he was saying.
22    Q  And I'm going to place in front of you a
23 document that I just received which purports to be an
24 e-mail communication between you and Mayor Manzi.

Page 64

1    A  Yes.
2    Q  Is part of the subject matter of that e-mail
3 your communication with Mayor Manzi that you wished that
4 Chief Solomon would tell the truth?
5    A  Yes.
6    Q  Could we just mark that as the next exhibit,
7 please.
8       (Lariviere Exhibit 18 was marked
9           for identification.)
10    Q  Taking a look at what has been marked as Exhibit
11 18, based on the text of the e-mail, do you have an
12 understanding as to when you sent that e-mail to Mayor
13 Manzi?
14    A  It indicates October 31st.
15    Q  In the body of the e-mail itself is there a
16 reference to where this e-mail was sent with relation to
17 the deposition of Chief Solomon?
18    A  Yes.
19    Q  And when was that?
20    A  It says October 31st. I think -- I'm trying to
21 think if where it's a forwarding if the date would
22 change.
23    Q  The first sentence of the e-mail reads, does it
24 not, "Today is Solomon's depo."?

JOAN R. DUNNE                                   Page 61 - Page 64

MAURICE J. LARIVIERE                 condenseIt!™

Page 65

1  A  Yes. That would be the tag line. I'm not sure
2  if October 31st would be something else, but the tag line
3  would definitely be the depo date.
4  Q  As of the time that you were writing that e-mail
5  communication to the mayor, Chief Solomon's deposition
6  had not yet been taken, correct?
7  A  To my understanding, yes.
8  Q  What statements are you referring to in that
9  e-mail communication to Mayor Manzi that you believe
10 Chief Solomon had made at that point that were
11 untruthful?
12 A  He has repeated them in the newspaper again and
13 again and again. He has denied repeatedly that there was
14 any action that was political. He said that it has been
15 a by-the-book investigation. He repeatedly has said I
16 was guilty. He repeatedly said no participation in the
17 resignation.
18 Q  He repeatedly has said that he had no
19 participation in the resignation?
20 A  Yes. He said that he was purely on the criminal
21 investigation side.
22 Q  While we were on that subject can you articulate
23 for us what you contend to be Chief Solomon's
24 participating in your resignation -- in the actual

Page 66

1  paperwork?
2     MR. DiADAMO: Objection.
3  A  In the complaint it's covered in detail and I
4  have offered you now a day and a half of testimony on
5  what has been said by him.
6  Q  Other than that which is in the complaint and
7  that which has been testified to by you previously, any
8  other information that you have about Chief Solomon's
9  involvement in the events leading up to your resignation?
10    MR. DiADAMO: Objection.
11 A  Short of we are now in the final stages of
12 assembling the evidence in the case.
13 Q  Shifting gears you recall that earlier in your
14 deposition you gave some testimony about a summer cottage
15 that you owned in Meredith, New Hampshire. Do you recall
16 that testimony?
17 A  Yes.
18 Q  Have you ever derived any income from that
19 property?
20 A  No.
21 Q  Now, you also testified earlier in your
22 deposition about a mortgaging of your Windham, New
23 Hampshire property in January or February of 2005. Do
24 you recall that?

Page 67

1  A  Yes. It would have been late January, early
2  February.
3  Q  Do you recall the amount of that mortgage?
4  A  $34,000, I believe.
5  Q  At the time that you took out that mortgage was
6  the Windham, New Hampshire property otherwise encumbered?
7  A  Yes.
8  Q  And what was the encumbrance on the property
9  prior to taking out the $34,000 mortgage, if you recall?
10 A  $60,000.
11 Q  What was your purpose in taking out a mortgage
12 in January or February of 2005?
13 A  My wife had finally gotten back to a full-time
14 job in Deerfield and she wanted to buy into the Deerfield
15 teacher retirement system and they told her that to
16 include her Massachusetts teachers service she would have
17 to pay them the current rate at which she was making
18 which came out to $34,000. So our plan was that we'd
19 take out the loan. She'd pay out over the teacher
20 retirement system the 34,000, so that she would be able
21 to buy her time and when she retired be able to have a
22 retirement income.
23 Q  Do you know from what entity that mortgage was
24 taken?

Page 68

1  A  Methuen Municipal Employees Credit Union.
2  Q  Was this sequence of events taking place all
3  prior to your resignation on February 16, 2005?
4  A  Yes.
5  Q  Do you have any understanding as to what your
6  status with the city of Methuen has to be in order to
7  have a mortgage with the Methuen Credit Union?
8  A  I'm still a member of the credit union.
9  Q  Is membership in the union initially limited to
10 those who are employees of the city?
11 A  No. I think it's if it's a family member I
12 think you qualify.
13 Q  There has to be some connection to the city of
14 Methuen?
15 A  To the best of my knowledge, but that is purely
16 speculation.
17 Q  In connection with the paperwork that you had to
18 fill out for that mortgage in February of 2005 do you
19 recall who notarized the document for you?
20 A  I know who the closing attorney was.
21 Q  Who was the closing attorney?
22 A  Peter McQuillan. He was the attorney for the
23 credit union.
24 Q  Now, currently you have an arrangement of sorts

JOAN R. DUNNE                                Page 65 - Page 68

**MAURICE J. LARIVIERE**                Condenselt!™

---

Page 69

1  with Attorney Anthony Copani.  You have space in his
2  offices, correct?
3     A  Yes.
4     Q  Can you describe to us how you came to that
5  arrangement with Attorney Copani?
6     A  He called me.  He obviously knew that I was
7  undergoing a severe psychological condition.  He came to
8  realize that I had been offsetting this with alcohol
9  usage and he felt that I had better get the hell out of
10  the house and get somewhere and he said: "Come on down
11  here and I'll give you a space and we'll see what we can
12  do if we can help you."
13     Q  Do you recall when you began sharing space with
14  Attorney Copani?
15     A  The first time would have been March or April of
16  '05.
17     Q  And what was the frequency with which you went
18  to Attorney Copani's offices during that time period in
19  March or April of 2005?
20     A  Two, maybe three days a week.
21     Q  Do you have any written agreement with Attorney
22  Copani about sharing space with his firm?
23     A  No.  He refuses to take any money.
24     Q  Have you shared in any profits or fees with

---

Page 70

1  attorney Copani?
2     A  Yes.
3     Q  And what have those profits or fee sharing
4  events been?
5     A  Maybe $1800.
6     Q  And what was the nature of that money?
7     A  There was a woman that got a variance and her
8  neighborhood challenged her and Tony took the case over
9  and handed it to me to represent her.
10     Q  So did you receive all of the fees from that
11  particular matter?
12     A  No.
13     Q  So there's been some splitting of fees with
14  Attorney Copani?
15     A  Yes, the check was written out to Tony.  There
16  was a retainer of, I believe, $5000.  The check was
17  written out to him and he ultimately -- the case was
18  closed before the 5000 was used and I believe he gave me
19  one-third of whatever the balance was.
20     Q  Any other fee or profit splitting that you can
21  recall other than that $1800 matter?
22     A  There was been a couple of cases that we've
23  talked to people about, but no, not to my knowledge.
24     Q  Now, I understand your testimony earlier was

---

Page 71

1  that you don't advertise or have a website for your law
2  office located in Attorney Copani's building.
3     A  Well, quite frankly, afterwards when I became
4  aware of MySpace I posted myself there now.
5     Q  And that's on MySpace.com?
6     A  Yes.  And I have had business cards made and
7  handed those out.
8     Q  Where have you handed out business cards?
9     A  Anybody that came within a few feet of me,
10  if they ever asked me questions about law and potential
11  representation.
12     Q  Now, a few seconds ago you indicated that when
13  you became aware of MySpace.com you posted your law
14  office on there; is that correct?
15     A  Yes.
16     Q  When did you become aware of the website
17  MySpace.com?
18     A  Quite frankly, I was unaware that Fulya had been
19  on MySpace and I used the term MySpace and I had said no,
20  it was Match.com and then I looked up MySpace and posted
21  myself up there.
22     Q  Is the site that you have on MySpace.com a
23  professional site or a personal site that references your
24  professional endeavors?

---

Page 72

1     A  It lists my professional endeavors.
2     Q  Is it limited to your professional endeavors?
3     A  Mine?
4     Q  Yes.
5     A  I have put on there an outline.  I had put on --
6  they asked you questions and I put on there what my
7  interests are and what my practice of law is and, quite
8  frankly, some pictures.
9     Q  Did you make any attempts to visit Fulya Metin's
10  MySpace.com page?
11     A  Yes.  I went there to verify whether or not she
12  had a MySpace.
13     Q  How many times have you visited her page?
14     A  Twice probably.  First time to look at it and
15  the second time to collect some evidence.
16     Q  What evidence did you collect from her MySpace
17  page?
18     A  Her friends' statements and comments to her.
19     Q  Do you have any understanding as to whether
20  you're listed on any advertisements for Mr. Copani's
21  firm?
22     A  I don't believe so.
23     Q  Do you know whether you are listed in the Yellow
24  Pages?

---

**JOAN R. DUNNE**                                Page 69 - Page 72

## Page 73

1  A  No.
2  Q  Any other similar business directory?
3  A  Well, I'm in the Mass Journal, obviously.  Other
4  than that I don't think so.
5  Q  Earlier you also gave some testimony about a
6  contract that you have with the Andover Housing Authority
7  that you provide legal services for.  How did you come
8  into that contract with the Andover Housing Authority?
9  A  Peter McQuillan when he got the job with the
10 city of Methuen had left working there and they had
11 sought proposals -- RFPs -- and I filed with them and
12 went for an interview and got it.
13 Q  Do you have any understanding as to whether
14 anyone recommended you for that position?
15 A  I believe the executive director and I believe
16 one of the members were strong advocates.
17 Q  How about anyone outside the Andover Housing
18 Authority?  Do you have an understanding whether someone
19 outside the Andover Housing Authority recommended you for
20 the position?
21 A  Oh, yes.
22 Q  And who were these persons?
23 A  Lee Palmimer, Dennis DeSaglio and then the
24 former Police Chief, Bruce McDougall.

## Page 74

1  Q  Anyone else that you were aware of?
2  A  I have used other folks as references on other
3  applications.  I think it was those two on the Andover
4  application.
5  Q  For what reason did your wife move to full-time
6  employment in September of 2004 to the Deerfield School
7  System.
8  A  In '82 we had our first child and she left
9  employment as a full-time teacher in Wakefield, Mass and
10 we ultimately had three children and she wanted them to
11 get to a proper age and then she started looking for a
12 job and got a part-time job in Derry in 1995 with the
13 intent of trying to finding a full-time job and
14 ultimately she had a shot at Deerfield and got the job in
15 September of 2004 I believe is when she started.
16 Q  Do you recall what her salary was for the year
17 2005 approximately?
18 A  I would have to take a guess.  Are we including
19 all the pre-tax numbers?
20 Q  If I represent to you that on your tax returns
21 for the year 2005 the W-2 total was $100,000 how much of
22 that was your wife's salary?
23 A  I would say 46,000 -- somewhere around there.
24 Though obviously at the house I would have the exact

## Page 75

1  numbers.
2  Q  Is there any reason why you have elected not to
3  begin drawing from your municipal pension?
4  A  Yes.  I have this court case and I have an
5  equitable provisions clause as well as a damages clause.
6  Frankly, I would like to go back to work.
7  Q  Is it your understanding that once you begin
8  drawing from your municipal pension that that would
9  prevent your return at some point in the future with
10 Methuen?
11 A  Yes.
12 Q  Now, during the first day of your deposition
13 testimony you also indicated that prior to the events of
14 February 2005 you had not consulted with a psychiatrist
15 or a psychologist.  Do you recall that testimony?
16 A  I believe so.
17 Q  I'll represent to you that in some of the
18 medical records that have been provided in discovery
19 there was a reference about 20 years or so ago to a
20 referral to a mental health professional.  Do you recall
21 anything about that referral?
22 A  It might be in '81 when I went on a cruise with
23 my wife and we went through a storm.  I didn't have a
24 problem whatsoever, but she got sick.  A lot of people on

## Page 76

1  the ship were sick and when we got back all of a sudden I
2  got on the shore and I was dizzy as hell and she's goes
3  back to her normal condition and the doctor that was
4  treating me I believe said let's see if there's any
5  psychological component and I think I went once to see
6  somebody about my balance.  I think it was the balancing
7  system of the ears that got fouled up.  That would be the
8  only one that I'm aware of.
9  Q  Some documents produced by your attorney earlier
10 in discovery also reference your job search since
11 February of 2005 and included among those documents was a
12 spreadsheet of sorts with a listing of contacts.  Do you
13 recall that document?
14 A  Yes.
15 Q  Do you recall when you prepared that
16 spreadsheet?
17 A  Upon starting looking.
18 Q  And this is a spreadsheet that you've inputted
19 data into over time?
20 A  Yes.
21 Q  Are you still inputting contacts that you have
22 made for employment into a spreadsheet?
23 A  Yes.
24 Q  Do you know whether the document that was

Page 77

1 produced through discovery in about July of 2006 was the
2 spreadsheet as existing at that time?
3    A  It should be, I believe.
4    Q  And your attorney also provided some
5 documents -- correspondence for the most part -- either
6 from you or to you related to employment prospects.  Have
7 you had seen those documents?
8    A  I would have provided them to him, I believe.
9    Q  In the documents that were provided there is one
10 correspondence from March of 2005 involving the town of
11 Brookine.  Do you recall that inquiry to Brookline?
12    A  The application seems familiar; the details I'm
13 not sure.  Towns for the most part would be in writing
14 rather than electronically like a lot of firms do now.
15    Q  Do you recall what attempts you made to secure
16 employment in February of 2005?
17    A  I'm not sure.
18    Q  And let me be clear you have given some
19 testimony earlier today about conversations that you had
20 with then Councilor Manzi about returning to work.  I'm
21 looking for inquiries that you made outside of the city
22 of Methuen.
23    A  The inquiries I believe would be logged in that
24 document that you have.

Page 78

1    Q  If I were to represent to you that other than
2 that one document reflecting an inquiry made to the town
3 of Brookline in March of 2005 all of the other materials
4 reference inquiries made between August 2005 and February
5 of 2006 or thereafter.  Does that refresh your
6 recollection for employment outside of Methuen?
7    A  I believe that would be accurate because at that
8 point I was the daily article in the newspaper and there
9 was no way in hell that I could even be considered.  I
10 was hoping that time would be the great curer and
11 unfortunately it did not produce that.
12    Q  Other than the inquiry made to Brookline,
13 conversations that you had with then Councilor Manzi and
14 other individuals about returning to work and
15 conversations with Attorney Copani about sharing space
16 there, it's fair to say that you ever conducted no other
17 job search from February 2005 through August of 2005?
18    A  At that point I'm a total freaking train wreck.
19 I'm being promised that something would be worked out and
20 I was quite frankly drunk a lot.
21    Q  Now, you referenced earlier e-mailed
22 applications to potential employers.  When you e-mailed
23 applications to potential employers were those e-mails
24 requested by the employer, meaning the advertisement that

Page 79

1 the employer had posted said please send e-mail
2 inquiries?
3    A  A lot of them had just that.  Some of them
4 were -- quite frankly, you could e-mail or hard mail and
5 the e-mailing is no charge, so in most circumstances when
6 it was e-mail I would choose that because of the cost.
7    Q  In the one year prior to February 16, 2005 -- so
8 from February '04 to February '05 -- did you make any
9 inquiries -- and by inquiries I'm talking about formal
10 letters, seeking employment, looking at job postings,
11 anything of the sort -- looking for a job outside of
12 Methuen?
13    A  I monitored it a couple of times because I was
14 getting tired of the shit I was going through, but I was
15 looking for municipal and looking for equivalent or
16 better salary and looking for a public system to continue
17 my retirement.
18    Q  So prior to the events of February of 2005 you
19 were looking for employment elsewhere?
20    A  I was monitoring.
21    Q  What do you mean by monitoring, just looking at
22 job postings?  Did you take any actions beyond that?
23    A  I don't believe so to my memory.
24    Q  For how long had that process of monitoring been

Page 80

1 occurring moving back from February 16, 2005?
2    A  Shortly after Pollard started making my life an
3 absolute misery I started thinking about it.
4    Q  When was that approximately?
5    A  When she first started or when it went hard?
6    Q  When in your words your life became hell and you
7 began looking for employment elsewhere, when was that?
8    A  Late 2003 probably I would start monitoring,
9 where I had not looked before that.
10    Q  So it's fair to say that by February 2005 you
11 had been monitoring other employment for about a year and
12 a half?
13    A  On and off, yes.
14    Q  Referring to your employment as solicitor, they
15 were two-year appointments, correct?
16    A  That's correct.
17    Q  Did you have any right to contest a decision by
18 the council not to reappoint you?
19    A  No.  It would have to be some sort of situation,
20 but in the normal course of events, no.  If it was
21 something that might tag line a 1983 type of thing
22 potentially, yes.
23    Q  Excluding instances of discrimination based on
24 race or gender or religion or something like that, there

MAURICE J. LARIVIERE                    CondenseIt!™

Page 81

1  would be no recourse to a decision by the council not to
2  reappoint?
3      A  To the best of my knowledge, yes.
4      Q  If a decision was made by the city council not
5  to reappoint a solicitor, did that individual have any
6  right to a reason for the decision?
7      A  No.
8      Q  Within the window of a two-year appointment
9  we've talked about some of the procedural safeguards that
10 were in place -- the right to a hearing before the
11 council should the individual decide to have one, to have
12 an attorney present to cross examine witnesses -- things
13 like that.  Putting aside the procedural were there any
14 substantive job protections for the solicitor in or about
15 2005?
16     MR. DiADAMO:  Objection.
17     A  I'm not understanding your question.
18     Q  Let me be transparent with my question.  You're
19 aware of civil service law, correct?
20     A  Yes.
21     Q  And a just cause standard before you can be
22 disciplined or terminated, correct?
23     A  Yes.
24     Q  Was there any similar sort of substantive

Page 82

1  protection for the position of city solicitor in Methuen
2  in 2005?
3      A  No.
4      Q  There would be a 9-10 procedure.  The sole
5  source of any substantive rights enjoyed by the solicitor
6  would be the charter that has been entered into evidence
7  earlier this morning?
8      A  The main frame, yes.
9      Q  Now, you were reappointed as solicitor in
10 January of 2005, correct?
11     A  Yes, that's correct.
12     Q  Was there a city council meeting to formally
13 appoint you or reappoint you as solicitor?
14     A  Yes, first meeting in January in odd number
15 years they would reappoint the city council employees.
16     Q  Was there a vote to reappoint you in January of
17 2005?
18     A  Yes, there was.
19     Q  Do you recall what the vote was -- what the
20 breakdown was?
21     A  Unanimous.
22     Q  Between the time period of the unanimous vote to
23 reappoint you as solicitor in 2005 and February 16, 2005
24 and the week thereafter was there a change in the

Page 83

1  membership of the city council?
2      A  No.
3      Q  Do you believe that you would have received a
4  fair hearing before the city council in February 2005 or
5  soon thereafter?
6      MR. DiADAMO:  Objection.
7      A  Based upon what I know today, yes.
8      Q  And what do you know today that would lead you
9  to believe that you would have had a fair hearing before
10 the city council?
11     A  That Solomon and Alaimo were complete liars to
12 me that day.
13     Q  What information did you have in February of
14 2005 about the type of hearing that you would receive
15 before the city counsel?
16     A  I documented what they were saying in the
17 complaint.  I was being told that Fulya Metin was making
18 criminal charges against me, that she wanted me out, that
19 she was going to criminally prosecute me and it's
20 detailed in there what was being said to me.
21 Subsequently, I have obviously read Wnek's statement and
22 I have Fulya Metin's statement and I was just plain lied
23 to.
24     Q  Putting aside what might be termed the merits of

Page 84

1  your testifying at a hearing before the city council,
2  what information did you have about the city council
3  itself in February of 2005 with respect to the type of
4  hearing that you believe that you would have received?
5      MR. DiADAMO:  Objection.
6      A  I had a discussion with Bill Manzi at that
7  point.
8      Q  Is that one of the conversations that you
9  referred to earlier with Mayor Manzi?
10     A  Yes.
11     Q  And what did he tell you about the type of
12 hearing that you would receive?
13     A  He told me that I should not have been forced to
14 resign.  He told me that my relationship with Fulya was a
15 little too close based upon what he had seen in the
16 video, and at that point he was telling me he's seen the
17 full video, so he got a new version of life.
18     Q  Did he indicate to you that if you petitioned
19 the city council at that time that they would take an
20 objective view of the evidence and that you might be
21 returned to work in Methuen?
22     A  He told me at that point -- and, again, I think
23 I said it before, knowing he had the political parameters
24 of the entire system, he told me that he wanted it to

JOAN R. DUNNE                                    Page 81 - Page 84

MAURICE J. LARIVIERE                                    ConfenseIt!™

---

Page 85

1  calm down and when things calmed down he would take care
2  of it.  He was making sure that there was an absorption
3  of my resignation and he told me that I should rely on
4  him.
5    Q  Now, during the first day of your deposition
6  testimony you described what you characterized as a
7  mutual affectionate relationship with Fulya Metin over
8  the course of time and you also testified about some of
9  the physical contact between the two of you in connection
10  with that relationship.  Was there any physical contact
11  between the two of you that you can recall today that you
12  haven't testified to previously?
13    A  Not to my knowledge.
14    Q  Any sexual conduct or banter that you can recall
15  sitting here today that you haven't testified to
16  previously in this deposition?
17    A  Quite frankly, yes.
18    Q  What are those?
19    A  When I appeared for the 56 in the federal case I
20  came back elated and I thought that I had done a really
21  good job before the judge and --
22    Q  You are talking about the summary judgment?
23    A  Yes.  And I said to Fulya: "Quite frankly, if I
24  had a choice between going away for a weekend with you or

---

Page 86

1  going to court, I would choose court."  I said that in a
2  joking fashion.
3    Q  What was her response?
4    A  She laughed.
5    Q  Do you recall when the summary judgment argument
6  was?
7    A  End of January.
8    Q  Anything else other than that comment?
9    A  In a sexual connotation?
10    Q  Correct.
11    A  No.
12    Q  When were you married?
13    A  February 14, 1976.
14    Q  Understanding that we've seen the videotape, are
15  there any persons other than Fulya Metin that you have
16  engaged in the conduct that's on that tape as well as
17  what you have testified to previously since your marriage
18  in February of 1976?
19      MR. DiADAMO:  Objection.
20    A  No.
21    Q  How often did you hug Fulya Metin?
22    A  Periodically we exchanged a hug when something
23  went on that was happy or gleeful.
24    Q  When you say periodically, looking at the time

---

Page 87

1  frame from September of 2004 to February of 2005 --
2    A  It would be October 2004.
3    Q  Did you hug her more than once a week generally?
4    A  No.
5    Q  Every two weeks?
6    A  I would have to speculate.  If she was happy
7  about something or I was happy about something -- she had
8  a very disturbed home life, so I might give her a hug as
9  a source of support.
10    Q  On February 14th, 2005 do you recall what time
11  you left work?
12    A  It should have been about 5:30.
13    Q  Do you recall what you did after you left work
14  at about 5:30 on February 14th?
15    A  I believe at that point I was going to the gym.
16  I would have gone home, had supper and then gone out to
17  the gym until about 8 o'clock or so.  I think that I had
18  gone that Monday night.
19    Q  Did you go to the gym that night with Fulya
20  Metin?
21    A  No.
22    Q  Was she there at the gym that night?
23    A  There was one night and this might be that or
24  maybe not when we were heading up the stairs and she was

---

Page 88

1  coming down with her daughter.  It might have been the
2  14th.  I'm not positive.  I believe that's the only time
3  I ever saw her there at night.
4    Q  Did you have any understanding during the day of
5  February 14th, 2005 whether she would be there that
6  night?
7    A  If that is the event, no.  And if that is the
8  event to my understanding she had not planned on that
9  until the mother and the boyfriend had such a violent
10  argument that she left the house with the daughter.
11    Q  Why did you frequent the Methuen Gold's Gym as
12  compared to any other gym closer to home?
13    A  The initial part was Fulya had talked about
14  going to the gym there and, thereafter, Bill DePardo and
15  I were friends and we started going nights over there on
16  and off.
17    Q  Earlier in your testimony you also referenced
18  e-mail correspondence that contained pornographic images
19  that you received in or about February of 2005 and that
20  you opened on your work computer.  Do you recall that
21  testimony?
22    A  I received these e-mails and I saw that they had
23  come from a Brian Leif -- I'm not positive how it's
24  spelled, but he was working in CD at that point in time.

---

JOAN R. DUNNE                                          Page 85 - Page 88

**MAURICE J. LARIVIERE**                                  CondenseIt!™

---

Page 89

1   Q  What's CD?
2   A  Community Development.
3   Q  And do you recall how many e-mails there were?
4   A  Maybe four or five -- maybe. I'm not positive.
5   I just recall them and going downstairs and asking --
6   he'd been sending them to multiple people and I had asked
7   him to take me off the list.
8   Q  What was his response?
9   A  He did.
10  Q  Do you recall any of the other recipients of the
11  e-mails?
12  A  I believe Bill DePardo got some. I think Gerry
13  DuShane (phonetic) and there as another fellow who works
14  in engineering. He's an Italian gentleman and I forget
15  his name, but I believe he was getting them also.
16  Q  In connection with the MCAD proceedings do you
17  recall at some point in time participating in the
18  submission of a position statement?
19  A  Yes.
20  Q  In connection with that position statement do
21  you recall having any e-mail communications between you
22  and Fulya Metin appended to that position statement?
23  A  Yes.
24  Q  In one of those e-mail communications between

---

Page 90

1   you and Fulya Metin that took place there was at the end
2   of an e-mail from you to her your initials, MJL, and then
3   FFL. What does that mean?
4   A  Friends for life. Short life.
5   Q  What was your purpose in adding that to the end
6   of that communication with Fulya Metin?
7   A  Any time she ever described a situation that was
8   going on in her life I always told her: "I'm there for
9   you. I'll help you. I'll do whatever I can." And I
10  started saying: "You are my friend for life."
11  Q  Earlier in your testimony you also described Ms.
12  Metin's behavior on February 15th, 2005 as among the
13  friendliest times that you ever spent with her. Is that
14  accurate?
15  A  Yes.
16  Q  Can you elaborate as to what led you to that
17  opinion of her behavior on February 15th, 2005?
18  A  Yes. Quite frankly, at that point in time for
19  some time she had been talking about a friend of hers --
20  I don't know who it was -- her lover -- who was in
21  federal prison, but quite frankly I'm not interested in
22  criminal law, and she would put me on and on into a
23  diatribe about how this guy got fouled up with the system
24  and the jury came back guilty and she talked about an

---

Page 91

1   appeals court and, quite frankly, if you want to talk
2   about municipal law I'm with you, but criminal law didn't
3   interest me that much and that day I was going to Essex
4   County over to Salem Superior Court and her car had
5   broken down and I go and head over and frankly for the
6   first time I didn't mind her talking about that federal
7   thing, I guess, because she was receptive about talking
8   about other things as well and she really got ultra
9   friendly.
10  Q  How would you compare that behavior to her
11  behavior on February 15th?
12  A  Well, we were in the -- we were at Wendy's at
13  the Methuen Loop and that was on the 15th that her car
14  broke down and then I got her a coffee in the afternoon
15  when I got back from court and we had that discussion and
16  she left and it was as friendly as it gets.
17  Q  How would you compare that behavior on the 15th
18  to her actions and behavior on February 16th, 2005?
19  A  I would say on the 15th it was ultra friendly
20  and the 16th it was okay.
21  Q  Do you know whether you still have your personal
22  cell phone records from February 2005?
23  A  Yes, I do. Let me put it this way. I'm a
24  Verizon customer and back in that time line they did not

---

Page 92

1   give you those. They do now, but I asked Verizon to send
2   me those.
3   Q  Have you received them from Verizon yet?
4   A  Yes, I have.
5   Q  Moving ahead to February 16th, 2000 during the
6   period of time in which you were in the second floor
7   conference room with Chief Solomon and Deputy Chief
8   Alaimo during your conversation with them that morning
9   was there a period of time that the chief and deputy
10  chief were seated?
11  A  No.
12  Q  They were standing the entire time?
13  A  Yes.
14  Q  And you were seated the entire time?
15  A  Yes. With the exception of when I went to the
16  restroom.
17  Q  Okay. Do you recall anyone telling you that
18  morning what actions of yours were visible on the
19  videotape?
20  A  I believe Solomon said words to the effect of
21  that he saw me touch her butt.
22  Q  What was your response to that by Chief Solomon?
23  A  I said yes. I believed him.
24  Q  Now, once David Bain entered the conference room

---

**JOAN R. DUNNE**                                  Page 89 - Page 92

**Page 93**

1 how long was he present for?
2   A  I would say less than 30 seconds.
3   Q  Did you have any conversation with him?
4   A  No.  He said: "Here's this.  Sign it."
5   Q  Did you read the document before you signed it?
6   A  No.
7   Q  Who was in the room when you signed the
8 resignation document?
9   A  I know Solomon was there and I'm not positive,
10 but I think Alaimo was and then Dave Bain.
11   Q  Do you recall where the individuals were
12 situated at that time that you signed the document?
13   A  Bain was next to me and they were at the door,
14 which would be the exit.
15   Q  Was David Bain seated next to you?
16   A  No.  Like I said the entire thing was less than
17 30 seconds.  That's all it took to sign the thing.
18   Q  How far was Chief Colomon from you when you
19 signed the document?
20   A  Rough estimation, ten or twelve feet.
21   Q  And Deputy Chief Alaimo?
22   A  I believe he was right next to him.
23   Q  Now, earlier in your testimony you indicated
24 that it was your recollection that Chief Solomon left the

**Page 94**

1 conference room three times; is that correct?
2   A  That's correct.
3   Q  How long was he gone each time?
4   A  I would say that the first time about four or
5 five minutes as best I can guesstimate.  The second time
6 when he went with Alaimo would have been ten minutes and
7 then the last time was just go up, grab it and come back.
8   Q  What's the --
9   A  The resignation letter.  He came back down with
10 Bain.
11   Q  And on the occasion that you just referred to
12 where Chief Solomon left the room with Deputy Chief
13 Alaimo that's the only time that you recall Deputy Chief
14 Alaimo leaving the room?
15   A  To my memory, yes.
16   Q  Do you recall either Chief Solomon or Deputy
17 Chief Alaimo indicating to you during your conversation
18 in the conference room: "We don't want to arrest you,
19 Moe", or words to that effect?
20   A  No.
21   Q  Do you recall Chief Solomon saying that he had
22 lost sleep and that this incident was causing him pain?
23   A  That was his original statement and that was
24 part of the good cop/bad cop stuff.  I think that I put

**Page 95**

1 that in the complaint, in fact.
2   Q  Do you recall either the chief or the deputy
3 chief indicating that if you need any help we can help
4 you get it or words to that effect?
5   A  No.
6   Q  Subsequently, you testified that you had a
7 telephone conversation with Chief Solomon on the 15th of
8 February, correct?
9   A  Yes.
10   Q  How long was that telephone conversation?
11   A  Not overly long, but the records I obtained from
12 Verizon I believe detail it.
13   Q  Do you have any present recollection based on
14 reviewing those records about how long the phone
15 conversation was?
16   A  It was short in nature.  I'm going to say three
17 to five minutes, but the record is very clear.
18   Q  Did you make any attempt to tape that telephone
19 conversation?
20   A  No, it's illegal.
21   Q  Earlier you gave some testimony about an Emma
22 Donnelly.
23   A  Yes.
24   Q  And you indicated that she had passed a note

**Page 96**

1 from another person to Mayor Manzi?
2   A  A phone call.
3   Q  Who was the middle person in that scenario?
4   A  Dorothy Kalil, K-a-l-i-l.
5   Q  You also gave some testimony earlier with
6 respect to a request for an investigation also with a
7 third person being involved.  Who was that third person?
8   A  Emma Donnelly.
9   Q  On that issue of a request for an administrative
10 or internal investigation, based on your experience as
11 the city solicitor in Methuen, was there any practice in
12 the city about putting an administrative investigation on
13 hold while a criminal matter was pending?
14   A  It would depend upon the nature of it.
15   Q  Was there any practice in the city of Methuen
16 regarding internal investigations once the subject matter
17 of the investigation had proceeded into litigation,
18 whether at the MCAD, the Superior Court or federal court?
19   A  If it was MCAD we would make an investigation.
20 It was initiated right up front.  There's two steps.  The
21 city wants you to first look at the thing and then they
22 want you to do an investigation into it.  If you look at
23 their model you can see --
24   Q  On the issue of the conspiracy that you believe

Page 97

1  existed in Methuen do you think that Fulya Metin was
2  involved in the conspiracy?
3      A  To the best of my knowledge at this point she
4  was rendered a sucker by Solomon and Pollard.
5      Q  Do you contend that either Chief Solomon, Deputy
6  Chief Alaimo or anyone else associated with the city of
7  Methuen coerced or tricked you or did anything that led
8  to your actions on the morning of February 16th, 2005?
9         MR. DiADAMO:  Objection.
10     A  I don't know.
11     Q  When do you contend that the conspiracy was
12 formed?
13     A  That's something we are in the process of
14 finalizing now once we go through all of the records.
15     Q  You currently have two children in college,
16 correct?
17     A  Three.
18     Q  How many of those children are dependent upon
19 you and your wife for tuition, food or otherwise living
20 expenses?
21     A  My middle child Catherine has a Presidential
22 Scholarship with a college and we had put away college
23 money for years and she's using that for the room and
24 board and books and other items.

Page 98

1         My son Tom, again, is using the college funds
2  and my daughter, who is the oldest one is in Yale, and
3  she's on a part scholarship and she's going -- she's also
4  using the funds that we gave her.
5      Q  The Presidential Scholarship for your daughter
6  Catherine what percentage is that scholarship of her
7  total tuition expenses?
8      A  100 percent of the tuition.
9      Q  And the part scholarship for your child at Yale
10 what percentage of that scholarship --
11     A  Part of that is work study, part is money that
12 we give her and part of that is scholarship and I'm not
13 sure what the numbers are.
14     Q  Are your children's college expenses paid for
15 totally by a combination of scholarship or the college
16 funds that you had set up for them?
17     A  I'm sorry, I missed the question.
18     Q  Your children's college expenses, are those
19 totally taken care of by a combination of their
20 scholarships and work study and the college funds that
21 you had set up for them?
22     A  Yes.  For the last two and the first one -- the
23 work study would be purely for the oldest one.
24     Q  Now, during the first day of your deposition

Page 99

1  testimony you indicated that this incident has come up in
2  three interviews that you had for subsequent employment.
3  When that issue had arisen during the course of those
4  interviews what has your response been?
5      A  The one that I remember most vividly is I
6  applied to the AG's office for a position and Tom Reilly
7  had already formed -- he was running for governor at that
8  point and Reilly had a form that you had to fill out and
9  one of the questions was about any litigation in your
10 life as either a plaintiff or defendant and the question
11 that was nuclear with respect to me was:  Is there
12 anything in your past that might show up as an
13 embarassment to the Attorney General?  And I didn't have
14 any choice but to truthfully answer and I had the
15 interview with the team that was heading up that
16 particular division and they asked the question and I
17 told them truthfully.
18     Q  Do you recall what you indicated on that
19 application form?
20     A  The MCAD action and the federal complaint.
21     Q  And can you describe what was said during the
22 interview on that subject?
23     A  They asked me to explain what the MCAD action
24 was and I did.

Page 100

1      Q  Do you recall what you said?
2      A  I said it's a sexual harassment case brought
3  against me in Methuen because I was the supervisor.
4      Q  And was there any response from the team once
5  you explained what the MCAD action was?
6      A  I could tell in their faces that I was dead.
7  Reilly was going through a lot of garbage.  The last
8  thing he wanted to do was add another problem to his
9  cart.
10     Q  What about the other two interviews?  How did
11 you respond to this issue during those interviews?
12     A  Frankly in Newton I lied, but he found out
13 later.
14     Q  How did you lie in the Newton interview?
15     A  I did not go into the MCAD action.  The thing is
16 that among the cities there's frequent networking, so
17 everyone ends up knowing everything about everyone
18 anyway.  Everyone also fantasizes as I'm sure you know
19 and I had talked to a couple of people by that point in
20 time and the paperwork had gone to the head of the city
21 solicitor's association and word got back and so on and
22 so on.
23     Q  And was there a subsequent conversation with
24 that individual about his learning about the MCAD matter

MAURICE J. LARIVIERE                CondenseIt!™

Page 101

1 despite the fact that you had not disclosed it
2 previously?
3    A  No.  I tried to recontact him.  I sent him an
4 e-mail and I tried to contact him, but I was not getting
5 any calls back at that point in time.  No letters or
6 anything else.
7    Q  What about the third interview?
8    A  On that one it was just a very quick in and out
9 sort of scenario.  I discussed it, but in wasn't intense.
10    Q  Do you remember what you said about the MCAD
11 matter during that third interview?
12    A  Very basically there was an allegation in which
13 I will have to go to a hearing and I'll be all set once
14 the hearing is finished.
15    Q  Now, at one point earlier this morning you
16 referred to a certain period of time as your alcohol
17 phase after the incident of February of 2005; is that
18 correct?
19    A  Yes.
20    Q  Can you describe what you meant by that phrase?
21    A  I was drunk all of the time.
22    Q  Prior to February of 2005 did you have any
23 problems with alcohol abuse?
24    A  At New Year's parties and Christmas parties I

Page 102

1 might have had an excess on occasion.
2    Q  Had any individuals prior to February 2005 ever
3 suggested or recommended to you that you seek treatment
4 for alcohol abuse?
5    A  No.
6    Q  Have you ever sought treatment for alcohol
7 abuse?
8    A  No.  Once I went on Zoloft you're not allowed to
9 have that because that's an anti-depressant and if you
10 were to drink while on anti-depressants you would be
11 offsetting one to the other and I had to stop and
12 fortunately I was just able to do that and it was gone.
13    Q  Has any individual suggested or recommended to
14 you at any time that you seek treatment for a narcotic or
15 prescription medication abuse?
16    A  No.
17    Q  Are there any physical ailments that you now
18 suffer or have suffered from that you attribute to the
19 incident of February 2005 and your resignation from
20 Methuen?
21    A  The only physical ailment that I know of -- and
22 I'm not sure if it's related or just something that
23 occurs due to my age -- is blood pressure and I was put
24 on blood pressure medication, but I have never asked for

Page 103

1 a specific diagnosis.
2    Q  Did you have any issues with your blood pressure
3 prior to February of 2005?
4    A  I remember my doctor saying at one point in time
5 that a couple of times when they took the blood pressure
6 it was higher than it had been and I remember asking her
7 that question at that point in time.
8       Are headaches considered -- would you consider
9 that a physical ailment, too?
10    Q  Anything of that sort, yes.
11    A  I had more recently -- it's been more rare, but
12 I did have a lot of headaches.  And I have them if I
13 don't take my sertraline, which is the generic of Zoloft,
14 and if I miss that frankly I'm screwed.  I got a quick
15 education from doing that and I went into a depression,
16 so I learned pretty quickly not to do that again.
17       MR. DIADAMO:  Let me just grab some water.
18       (Pause)
19       MR. DIADAMO:  Sorry, about that.  Go ahead.
20 BY MR. GAMBACCINI:
21    Q  Prior to February 2005 had you experienced any
22 problems with headaches.
23    A  Once in a while I would have a headache if I had
24 like the flu or something I would get a wicked headache

Page 104

1 in the area above the eyes.
2    Q  Prior to 2005 any problems with headaches that
3 were similar in severity or frequency to what you claim
4 after February 2005?
5    A  Yes.
6    Q  Any other physical ailments that you attribute
7 to your resignation from Methuen in February of 2005?
8    A  No.
9    Q  Has your marriage changed at all since February
10 of 2005?
11    A  Give me a minute, please.
12    Q  Sure.  Take your time.
13       MR. DIADAMO:  Let's go outside for a minute.
14       (A brief recess was taken.)
15 BY MR. GAMBACCINI:
16    Q  Do you recall the question before we took a
17 break?
18    A  Yes.
19    Q  Can you describe how your marriage has changed
20 since February of 2005, please?
21    A  My wife is the most loving mother that ever
22 walked this planet and it's hurt her what all of those
23 newspapers articles with Solomon enjoying shitting all
24 over me did to my kids and it hurt them a lot and we were

JOAN R. DUNNE                                    Page 101 - Page 104

**MAURICE J. LARIVIERE**                CondenseIt!™

Page 105

1 a strong family and they hold it in, but sometimes it
2 just blows over.
3         And she was at the point -- we're at the point
4 now where I'm down to the last few years. I wish the
5 fuck they hadn't been there. I would have just gone
6 through and left.
7         All of a sudden we were going to have -- you
8 know, the last few years before I retired we'd enjoy it.
9 We had two incomes and we would have a little extra
10 rather than where we put the money for the kids and all
11 of a sudden it's gone and we were sitting there losing
12 all of the money and selling property and we have to sit
13 and see all the newspaper articles of those bastards
14 repeating themselves over and over again. It's just
15 added like ten years to her life. She looks physically
16 like she gained ten years in two. It's just destroyed
17 her totally as far as this.
18     Q  To your understanding has any of that that had
19 an adverse impact on your wife been related to your
20 relationship with Fulya Metin?
21     A  The main stay of it is the newspaper articles
22 and the continuous beating that Pollard and Solomon made
23 again and again and again and it was just the impact it
24 had.  Obviously, I can't talk about direct conversations.

Page 106

1     Q  Since February 16th, 2005 have you received any
2 funds from the city of Methuen?
3     A  Pollard drained out that buy-back account in
4 order to prevent the appointment of somebody and she sent
5 it to me a few days after she claimed there was no money
6 left in the budget and that was it.
7     Q  Was that one payment?
8     A  I believe there were two checks if I remember
9 correctly.
10    Q  Do you recall the total amount of those two
11 checks?
12    A  No.
13    Q  Do you have an approximation as to how much?
14    A  It would be the balance basically of what my
15 wife earned to what my earnings were for that year.
16 Since then nothing.
17    Q  The numbers that I referenced before for 2005 of
18 $100,000 of W-2 income and I believe your approximation
19 of your wife's salary in 2005 was 40,000, so does that
20 refresh your recollection as to how much money you
21 received after February 16th, 2005?
22    A  On the salary end you would have three
23 components. It would be salary that I earned as city
24 solicitor between January and February and they had

Page 107

1 ranked it as a cost of living adjustment, so because it
2 was from a prior year I got that amount, so it would be
3 the regular earnings until I left, the COLA amounts that
4 were paid, my wife's amount and then the buy-back amount.
5     Q  Have you had any out-of-pocket expenses that you
6 attribute to your separation from employment with Methuen
7 in February of 2005?
8     A  There's a tally running right now for the cost
9 of the litigation. The municipality used to pay for my
10 BBO and for my MBA and now I'm paying that. And we pay
11 the medical costs and the psychological counseling.
12    Q  Do you have a current understanding as to even
13 by way of approximation how much the out-of-pocket
14 expenses are at this time?
15    A  I would have to sit down and add it up. It
16 would be two years of MBA and two years of BBO. It would
17 be the medical expenses and I haven't added it all
18 together.
19    Q  You have no approximation as to how much it
20 would be?
21    A  It would be under $10,000 to my knowledge.
22    Q  How has the separation from employment with
23 Methuen in February of 2005 affected you emotionally?
24    A  I'm gone. I'm destroyed.

Page 108

1     Q  Can you elaborate how it's affected you since
2 February of 2005?
3     A  No family name no longer exists. My ability to
4 have a career no longer exists. I have to look my
5 children in the face and know that, in part, I'm
6 responsible. The harm that's been done to my wife.
7 Friendships that I had for years; people that I trusted,
8 people that I counted on betrayed me out of convenience.
9         Outside of a few people like these guys and Tony
10 Copani everybody just said tough shit, bye, bye. People
11 I did a lot of favors for and helped. But honest to God
12 as bad as Pollard, Solomon and Alaimo were, your real
13 harm and your hurt is when your friends don't step
14 forward.
15        There's nothing left. I went from everything --
16 being very happy, everything going along to Pollard
17 busting my balls at every turn to them doing this shit.
18        There isn't a day that goes by that this isn't
19 on my mind. There isn't a minute that goes by that this
20 isn't occupying my thoughts. I walked in today and you
21 said something as simple as: "How's things?"  That's
22 like a baseball bat hit me on the side of the head. I
23 can't even watch TV without somehow drawing a connection
24 between statements from people that are suffering or

**JOAN R. DUNNE**                              Page 105 - Page 108

Page 109

1  whatever. Every facet of my life has been destroyed.
2     Q  I don't want to interrupt you, so just let me
3  know when you have completed your answer.
4     A  It won't be complete until this shit is over.
5  I don't know what else to say. I went from everything to
6  nothing.
7     Q  Has the severity or the nature of that distress
8  changed over time since February of 2005?
9     A  Yes.
10    Q  Have things gotten better or worse?
11    A  It's worse because I was listening to Manzi and
12 him saying: "Don't worry about it. This will all take
13 care of itself over time. Things will be okay." Where
14 am I today? I loved municipal law. I lived municipal
15 law. What is the last thing that I can get? Municipal.
16    Q  Has the emotional distress that you have
17 described had any impact on your usual daily activities?
18    A  Well, given the medicine and all of the rest my
19 ability to have a physical relationship with my wife is
20 gone. My ability just to sit and watch TV or to go out
21 for a walk or to talk to my kids or to see somebody, it's
22 gone, everything is gone.
23       Like I said the simplest thing such as "How's
24 things going?", that which you never paid attention to,

Page 110

1  now it's like a slam to me. I don't know what to say to
2  people. What am I going to say? Don't ask me such a
3  freaking stupid question?
4     Q  Has the mental health counseling and the
5  associated medication assisted you at all in the distress
6  that you have suffered?
7     A  I gave up on psychology. It wasn't helping me
8  and I just gave up. It was -- I was spending money for
9  that and I just don't have the financial wherewithal and
10 it wasn't doing any good. To me psychology is maybe if
11 there's something that isn't real that you perceive it,
12 then maybe somebody can talk you out of the problem, but
13 if the problem is everything there's nothing that they
14 can do.
15       And I went to two groups and they tried their
16 best. They were good, but it just didn't work, the
17 medicine, yeah, I went from thinking about suicide a lot
18 to not thinking about it.
19    MR. DiADAMO: Let's take a break.
20       (A brief recess was taken.)
21 BY MR. GAMBACCINI:
22    Q  Excluding matters relating to your separation
23 from employment with Methuen, have there been any other
24 stressors in you life since February of 2005?

Page 111

1     A  Unrelated?
2     Q  Unrelated.
3     A  No.
4     Q  Are there any other damages or any other harms
5  that you attribute to your separation from employment
6  with Methuen that we haven't talked about today?
7     A  Not that I can think of.
8     MR. GAMBACCINI: Okay. I have no further
9  questions.
10    MR. DiADAMO: I have no questions.
11
12       REDIRECT EXAMINATION
13 BY MR. NOTIS:
14    Q  I have a couple of follow-up questions, Mr.
15 Lariviere, and I'll stay on the more emotional topics and
16 try to get rid of those right now.
17       You discussed your marital problems that you
18 experienced since February 16, 2005. Do you attribute
19 any of those marital problems to your own actions?
20    A  Yes.
21    Q  In what way?
22    A  Very simply stated, I'm not going to claim that
23 I'm a 100 percent decent guy. You and your clients can
24 claim perfection on their jobs and duties and functions.

Page 112

1  I made a mistake. Someone swung their fanny at me and I
2  sniffed and then these corrupt clowns used that as a
3  hammer to destroy me. There's no freaking magic here. I
4  exposed my leg and two snakes came out of the ground and
5  bit me and put poison into me.
6     Q  Specifically, what mistakes did you make that
7  contributed to your predicament?
8     A  After the way I have been treated by Pollard,
9  life was a freaking misery coming into work. My gut
10 turned as I stepped out of the car every day. I went
11 from loving a job to loving the idea she was finally
12 going to be freaking gone and all of a sudden out of the
13 darkness comes this very bright light that blinded me in
14 Fulya. And she was so nice to me, always treating me
15 nice. You saw the e-mails. That's what I saw on a daily
16 basis from her. And I latched on to that bright light
17 and was rendered blind.
18    Q  With respect to the physical contact that you
19 had with Ms. Metin what portion of the physical contact
20 that you had with her contributed to your current
21 predicament?
22    MR. DiADAMO: Objection.
23    A  I'm not following you. The reality is you guys
24 have seen the deposition. She was played as a sucker,

Page 113

1  too. She never was told that there was criminal charges.
2  She never said that she wanted to do criminal. She said
3  she was my friend. She wanted to go back to work for me
4  and yet these clowns lied and said she was going to
5  prosecute me and I'm scared shitless that my name is
6  going to be destroyed and my career is going to be
7  destroyed unless I did exactly what those bastards
8  ordered me to when they trapped me the room.
9    Q  Are you done?
10   A  Yes. I'm not done until those bastards are
11  brought to justice.
12   Q  What portion of the physical contact that you
13  described in your testimony today and during day one
14  contributed to your marital problems?
15     MR. DiADAMO: Objection.
16   A  Day 1? Which is day 1?
17   Q  Day 1 of your deposition in November? Do you
18  understand that you gave testimony that day concerning
19  the physical contact that you had with Ms. Metin?
20   A  Help me out here. Everything is starting to go.
21   Q  Let's take our time here.
22   A  I'm not a freaking computer.
23   Q  Do you understand that you gave testimony in
24  this case -- the federal case in November, correct?

Page 114

1    A  Yes.
2    Q  That was at my office. Attorney Gambaccini and
3  Attorney DiAdamo were there. Do you recall that?
4    A  Yes.
5    Q  And you gave some testimony about the physical
6  contact that you had with Ms. Metin?
7    A  Yes.
8    Q  Did that physical contact that you had with Ms.
9  Metin contribute to the marital problems that you
10  described earlier today?
11     MR. DIADAMO: Objection.
12   A  This became the catalyst that those clowns could
13  use to kill me.
14   Q  You said earlier today that, in part, you were
15  responsible for the marital problems that you're having.
16  What do you mean by, in part, you were responsible?
17   A  Had I not taken on Fulya's friendship and tried
18  to help her. Had I done a pure analysis of work I would
19  have hired Gail Picclameni, which I was not allowed to
20  do, but I started putting her friendship at a very high
21  ranking and I shouldn't have. I started enjoying her
22  companionship and that's when I stepped out of the
23  professional realm into more of an associate. I
24  shouldn't have. I'm not going to sit here -- let your

Page 115

1  people tell you they're 100 percent innocent. I'm not
2  going to. When I screwed up, I screwed up. I exposed my
3  leg to the snakes.
4    Q  You said during day 1 of your deposition that
5  you had not had an arm's-length relationship with Ms.
6  Metin. What did you mean by that?
7    A  A hug is the elimination of arm's length and we
8  exchanged hugs.
9    Q  Anything else that you would consider to take it
10  out of the realm of an arm's-length relationship?
11   A  The touching of the butt.
12   Q  Anything else?
13   A  Well, the hug and the kiss, never like a long
14  one. It would be like a peck, but yeah.
15   Q  Anything else?
16   A  On reflection we shouldn't have been so social
17  that we went out to lunch every day. On reflection I
18  should not have been doing the things to help her that I
19  was. It should have been just a plain cold office
20  relationship -- hello, goodbye. I should not have let
21  friendship get that many points.
22   Q  You mentioned during your examination from
23  Attorney Gambaccini that when you returned from the
24  appeal summary judgment argument you made the remark that

Page 116

1  if you had the choice between going away for a weekend
2  with Ms. Metin or arguing the summary judgment motion,
3  that you would choose the summary judgment motion,
4  correct?
5    A  Yes. I remember jokingly saying that. I loved
6  being in the courtroom.
7    Q  Did you desire to go away for a weekend with Ms.
8  Metin?
9    A  No, it was just a joke.
10   Q  When was the last time that you received any
11  sort of mental health or psychiatric counseling?
12   A  July or August of --
13   Q  Of 2006?
14   A  Yes. I went to a fellow named Brian McCarthy
15  over in Derry and I went there three times and, quite
16  frankly, he recognized that there was that which you
17  perceive as a problem, which they can cure, and there's
18  that which is a fatal problem and there's nothing they
19  can do for that and he asked me: "Is there anything I
20  can do to help you? What do you think?" And I said
21  until this is resolved -- this scat is resolved,
22  everything is destroyed.
23   Q  Do you have any plans to go back for additional
24  psychiatric counseling or mental health counseling?

**MAURICE J. LARIVIERE**                                CondenseIt!™

---

Page 117

1   A  It doesn't do any good. I tried. I went to the
2  psychologist. I went back to another one and it just
3  doesn't do any good.
4   Q  So the answer is no?
5   A  No. People are better for me psychologically
6  than anything else on the planet.
7   Q  One of the reasons that you told Attorney
8  Gambaccini that you have not returned for counseling is
9  that you couldn't afford it. Is that true?
10   A  One of the reasons was I was spending money and
11  it wasn't -- I was spending money that I don't have and
12  it wasn't doing any good.
13   Q  Did you ever submit any of the bills for your
14  mental health counseling or psychiatric counseling or
15  psychological counseling to your health insurer?
16   A  Yes.
17   Q  What was the response that you received when you
18  submitted those bills?
19   A  They covered most of it outside of the -- what's
20  the phrase? -- the co-pay.
21   Q  So some were covered and some weren't?
22   A  They cover up to I think it's 20 sessions in any
23  given fiscal year from July 1st to June 30th and then
24  you'd have to pay the full boat. So I went to that guy

---

Page 118

1  until I reached 20 and I said I can't be paying full
2  boat, so I'll wait until July and then I made a decision
3  that although he was doing the best damn job he could
4  that maybe I should try somebody else and I wanted to go
5  see a psychiatrist to see if that could be helpful.
6   Q  And who was the first gentleman that you
7  received therapy from?
8   A  It's in the notes. I gave the medical notes to
9  you. I'm starting to get scrambled here.
10   Q  So to the best of your memory there were just
11  two mental health therapists: Mr. McCarthy and then the
12  first individual who you can't recall.
13   A  Dr. -- I can look it up right now -- Swinburne,
14  S-w-i-n-b-u-r-n-e.
15   Q  Who is your current health insurer?
16   A  My wife has insurance through CIGNA.
17   Q  Have you had any conversations with William
18  Manzi about him viewing the videotape of the events of
19  the morning of February 16th, 2005?
20   A  Yes.
21   Q  On how many occasions have you discussed this
22  with him?
23   A  The first time was a few days afterwards he
24  called me and advised me that he had seen the tape.

---

Page 119

1   Q  And then how many conversations after that first
2  occasion?
3   A  I'm not sure. It would be two or three.
4   Q  And tell us what Mr. Manzi told you about his
5  observations of the videotape?
6   A  I read the MCAD complaint and then by that point
7  in time the brain was really in mush and there were
8  statements in there about me touching her breasts and a
9  statement in there about me grabbing and pulling her and
10  committing other activities and I called him and I said:
11  "Look, Billy, you saw that tape. I don't recall every
12  doing that. Did you see that?" And he said: "No, I did
13  not see that on the tape." And he told me he had seen
14  the entire tape.
15   Q  Did he say whether he was able to actually see
16  the events that were taking place on the tape?
17   A  Yes, he did.
18   Q  Did he say whether the imagine was distorted in
19  any respect?
20   A  No, he did not. He said he could clearly see
21  it.
22   Q  Have you told us everything that William Manzi
23  told you about his viewing of the videotape?
24   A  He said some of your actions were inappropriate

---

Page 120

1  and would merit some level of discipline.
2   Q  Which -- did he specify which type of conduct
3  was inappropriate?
4   A  I'm not positive at this time. I just remember
5  him saying that there would be a like a suspension, but
6  no, this would never merit me for termination.
7   Q  Did any of your conduct merit discipline that's
8  present on the videotape?
9   A  Yes.
10   Q  Which aspects of it?
11   A  Not being arm's length.
12   Q  Anything specific about the interaction between
13  you and Ms. Metin?
14   A  Well, there was never an unwellcomeness shown.
15  There was never unwellcomeness conveyed to me. It would
16  be not appropriate to touch a butt.
17   Q  One of the aspects of the relief you are seeking
18  in this case is a reinstatement, correct?
19   A  Yes.
20   Q  And you filed two complaints in this case: The
21  original verified complaint and then the amended verified
22  complaint, correct?
23   A  Yes, which cataloged to one, yes.
24   Q  And when did you first file the first complaint?

---

**JOAN R. DUNNE**                                    Page 117 - Page 120

Page 121

1 What month and what year?
2    A  My attorney would know that.  I think it was
3 June, but I'm not positive.
4    Q  In any event in that first complaint you sought
5 equitable relief to return to your employment, correct?
6    A  Yes.
7    Q  So it's a fair statement that at that point in
8 time you desired to be reinstated to your position as
9 city solicitor?
10    A  Yes.
11    Q  Even though Mayor Pollard was still in office.
12    A  I believed at that point in time the political
13 system had failed totally and only the judicial system
14 would work, yes.
15    Q  But at that time when you filed the complaint
16 you desired to be reinstated to your position with Mayor
17 Pollard in the mayor's office, right?
18    A  At this point all I wanted to do was work a job.
19 That's all.
20    Q  Well, we are not talking about at this point.
21 We're talking about when you filed that complaint in
22 2005.
23    A  Yeah.  I knew that the system had walked on me.
24 I knew that the politics of the dynamic was what it was

Page 122

1 and only a judge would make things right.
2    Q  When you filed the complaint were the conditions
3 of the position of city solicitor acceptable for you to
4 return?
5    A  I'm sorry, could you explain that, please?
6    Q  Were the work conditions -- the environment at
7 the city solicitor's office at city hall acceptable for
8 you to return to the position when you filed the
9 complaint in this action?
10    MR. DiADAMO:  Objection.
11    A  Yes.  Go walk in city hall and see how many
12 people miss me and think I did a hell of a nice job.  Go
13 ask them.
14    Q  When did you reach the decision that you wanted
15 to return to the city solicitor's office?
16    A  The very same day.
17    Q  That you resigned?
18    A  That's when I came in to see the DiAdamos.
19    Q  You accepted the reappointment in January of
20 2005 to the city solicitor's position?
21    A  Yes.
22    Q  If the conditions created by Mayor Pollard were
23 so intolerable why did you accept that appointment?
24    A  She was in her last year and I was ready to hang

Page 123

1 up on the wall:  "ISSP" - "I survived Sharon Pollard."
2 And I was going to sit there at that door as she dragged
3 that fat ass out of city hall for the last time and have
4 the biggest smirk in history.
5    Q  So you were willing to stay in the city
6 solicitor's office for half of your term with Sharon
7 Pollard as mayor, correct?
8    A  I had no choice.
9    Q  Did you ever request a 9-10 hearing following
10 the events of February 16th, 2005?
11    A  I requested an investigation of the matter for
12 purposes of reinstatement, yes.
13    Q  Not in writing?
14    A  No.
15    Q  And all those were behind closed doors with city
16 council members.
17    A  They're not behind closed doors.  They were
18 phone conversations.
19    Q  Were you ever denied specifically a 9-10 hearing
20 by the city council?
21    A  By Manzi, yes.
22    Q  How were you denied a 9-10 hearing by Manzi?
23    A  The first one he blew me off on.  The second one
24 him and Emma Donnelly came up with the most ridiculous

Page 124

1 condition I ever heard of in my life.
2    Q  What was that?
3    A  I had to indemnify the city to not be able to
4 have my rights at hearing and Emma Donnelly can tell you
5 that story if you like.
6    Q  Are you still consuming alcohol?
7    A  No.  You can't drink when you're on sertraline.
8    Q  When's the last time that you had a drink?
9    A  In the communion line.
10    Q  Aside from the communion line?
11    A  December 15th, 2005.
12    Q  When did you first learn that Fulya Metin would
13 not be pursuing criminal charges against you?
14    A  She never intended to pursue anything against
15 me.
16    Q  When did you reach that conclusion?
17    A  When was it in the paper.
18    Q  What date?
19    A  I don't remember.
20    Q  You can't remember --
21    A  Sometime in 2005, I think, but I'm not positive.
22    Q  Was it before or after you filed the complaint?
23    A  I'm not positive.  I'm not establishing a time
24 line one to the other.

MAURICE J. LARIVIERE                                    Condenselt!™

Page 125

1   Q  So you can't tell us what month in relation to
2   the February 16th, 2005 events you first learned that Ms.
3   Metin was not pursuing criminal charges against you?
4   A  She never intended to, so the question is not
5   properly phrased.
6   Q  Well, sir, you told us earlier that you were
7   working under the impression that she was pursuing
8   charges against you.
9   A  I was told that by Solomon and Alaimo.
10  Q  Whether it was true or not you were working
11  under that assumption, correct?
12  A  Yes.
13  Q  My question is --
14  A  Pardon me, if I may answer the question.  I was
15  told that if I did not resign she was going to go out for
16  criminal charges against me.  That's what I was told.
17  Q  Again, from that day after you signed the
18  resignation forward to some point in time you were
19  working under the assumption that she was pursuing
20  criminal charges against you?
21  A  No.  I was made aware very quickly afterwards
22  that Solomon in order to cover his activity had brought
23  this crap down to the district attorney's office and I
24  didn't know what was going on then because there was all

Page 126

1   of these articles flying around about the district
2   attorney and criminal charges and all of the rest.  And
3   at a later date I found out through sources that that was
4   just all crap.
5   Q  That's my question.  When was that time that you
6   learned that there was no criminal charges?
7       MR. DiADAMO:  Objection.
8   A  I'm not positive.
9   Q  What was your source of the information?
10  A  I can't disclose that.
11  Q  Why not?
12  A  Attorney-client.
13  Q  Did you ever inquire into the status of the
14  criminal charges through the district attorney's office?
15  A  Did I go directly to the DA?  No.
16  Q  Did you make any phone calls or send any e-mails
17  to the district attorney's office?
18  A  No, because that's not the way I think it should
19  be handled.
20  Q  Do you have an understanding of who at the
21  district attorney's office was in charge of criminal
22  investigations?
23  A  Yes.  And she was appointed as a judge a few
24  months ago.

Page 127

1   Q  Does the name Kathleen Tutman refresh your
2   memory?
3   A  Yes.
4   Q  Did you have any conversations with then
5   District Attorney Tutman about the status of the criminal
6   charges against you?
7   A  No.
8   Q  Once you learned that there were no criminal
9   charges that were going to be brought against you, why
10  did you not petition the city to be reinstated?
11      MR. DiADAMO:  Objection.
12  A  I'm not sure about all of the time lines that we
13  were talking about, so I can't tell you.  All I know is I
14  had asked for an investigation and for reinstatement.  I
15  had been told when the water has calmed down that would
16  happen and then all of a sudden the political system
17  walked away on me and left me and my family dead in the
18  road.
19  Q  Do you agree that you could practice municipal
20  law in the private sector?
21  A  Yes, I have attempted to do that as late as --
22  with Brackett & Lucas I contacted them and I got a call
23  from Gary and he said:  "Give me a call.  I know you are
24  a good attorney.  I'll take you on."  And it must have

Page 128

1   been thereafter that he found out about this because no
2   matter how many calls I made I got no return calls.  And
3   Kopelman & Paige I went to and sent applications and
4   resumes and a cover letter to every law firm that handles
5   municipal law short of those involved in this litigation.
6   Q  In your private practice that you are operating
7   out of Attorney Copani's office have you made any efforts
8   to practice municipal law?
9   A  Yes.
10  Q  What were those efforts?
11  A  In dealing with some of the local lawyers there
12  have been discussions about either through a direct
13  source or secondary source that they would funnel over
14  some municipal stuff to me.  The problems is right now if
15  it involves the city of Methuen nobody wants to go near
16  it.
17  Q  Well, you could represent clients in matters
18  involving other municipalities, couldn't you?
19  A  Yes.
20  Q  You could represent not just municipalities, but
21  individuals who had legal matters with municipalities.
22  A  Yes.  Obviously, I can't disclose the nature of
23  that, but yes, I have dealt with some people and
24  sometimes you tell them the reality of the politics and

JOAN R. DUNNE                                           Page 125 - Page 128

Page 129

1 sometimes you tell them it's the law that controls and
2 most of the time you tell them you have to maneuver this
3 for a political solution.
4    Q  So there's nothing that's precluding you
5 cultivating a successful law practice in the field of
6 municipal law, is there?
7       MR. DIADAMO:  Objection.
8    A  Outside of the fact that my career is destroyed,
9 no.
10    Q  Well, you can represent clients against various
11 municipalities or towns other than Methuen, right?
12    A  If they were to take me on, yes.
13    Q  And it's just your reputation that's holding you
14 back from that, right?
15    A  Yes.
16    Q  Nothing else?
17    A  Walk into city hall and talk to any freaking
18 lawyer that I dealt with and find someone that said I
19 sucked as an attorney.  Talk to any mayor short of that
20 fatso and they will all come back and tell you that I did
21 a good job.
22    Q  Well, sir, if you're such a successful attorney
23 what's preventing you from cultivating a successful law
24 practice?

Page 130

1       MR. DIADAMO:  Objection.
2    A  This situation.  For god's sake, don't pretend
3 you don't know that.
4    Q  Do you have a copy of the application that you
5 filed with any of the three entities in which you had an
6 interview?
7    A  I should, yes.
8    Q  Could you provide them to your attorney, please?
9    A  Yes.
10    Q  Would you mind?
11    A  Uh-huh.
12       MR. NOTIS:  Okay.  That's all I have.  Thanks
13 again.
14
15       RECROSS EXAMINATION
16 BY MR. GAMBACCINI:
17    Q  I have just one brief question.  Brian McCarthy
18 is in Derry, New Hampshire; is that correct?
19    A  Yes.  Center for Health Management, I think
20 it's called.  It's right across from the Parkland
21 Hospital.
22    Q  And he's a psychiatrist?
23    A  No.  They gave me a lower level referral.  I
24 think it's licensed social worker.

Page 131

1       MR. GAMBACCINI:  That's it for me.  No further
2 questions.
3       MR. DIADAMO:  All right.  We'll read.
4 (Whereupon, the deposition was concluded at 1:50 p.m.)

Page 132

2       ERRATA SHEET DISTRIBUTION INFORMATION
3    DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS
5       ERRATA SHEET DISTRIBUTION INFORMATION
8       When the errata sheet has been completed by the
9 deponent and signed, a copy thereof should be delivered
10 to each party of record and the ORIGINAL forwarded to
11 Gareth W. Notis, Esq. to whom the original deposition
12 transcript was delivered.
14       INSTRUCTIONS TO DEPONENT
16       After reading this volume of your deposition,
17 please indicate any corrections or changes to your
18 testimony and the reasons therefore on the Errata Sheet
19 supplied to you and sign it.  DO NOT make marks or
20 notations on the transcript volume itself.  Add
21 additional sheets if necessary.  Please refer to the
22 above instructions for errata sheet distribution
23 information.

**MAURICE J. LARIVIERE**                    **CondenseIt!™**

---

### Page 133

1  PLEASE ATTACH TO THE DEPOSITION OF MAURICE LARIVIERE

2  CASE: LARIVIERE VS. CITY OF METHUEN, ET AL

3  DATE TAKEN: 12-29-06

4              ERRATA SHEET

5  Please refer to page 132 for errata sheet

6  instructions and distribution instructions.

7  Page  Line   Change              Reason

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17          I have read the foregoing transcript

18 of my deposition and except for any corrections or

19 changes noted above, I hereby subscribe to the

20 transcript as an accurate record of the statements

21 made by me.

22     Executed this _____ day of _____, 2007

23        _____
          (Witness Name)

24

---

### Page 134

1  COMMONWEALTH OF MASSACHUSETTS

2  COUNTY OF SUFFOLK

3         I, JEAN WISEMAN, Shorthand Reporter and

4  Notary Public duly commissioned and qualified in

5  and for the Commonwealth of Massachusetts, do

6  hereby certify that the foregoing deposition of MAURICE

7  LARIVIERE was taken before me at the time and place

8  therein designated; that the proceedings of said

9  deposition were stenographically reported by me, and that

10 the foregoing pages, numbered 1 through 131, constitutes

11 a true and correct transcription of said proceedings as

12 had.

13         I FURTHER CERTIFY that I am not a relative

14 or employee or attorney or counsel of any of the parties,

15 nor a relative or employee of such attorney or

16 counsel, or financially interested in the foregoing

17 action.

18         WITNESS MY HAND AND SEAL THIS, THE ____ DAY

19 OF JANUARY, 2007, BOSTON, SUFFOLK COUNTY, COMMONWEALTH OF

20 MASSACHUSETTS.

21     _____
       JEAN WISEMAN
       Court Reporter, Notary Public,

22     My commission expires:

23         May 19, 2009

24

---

**JOAN R. DUNNE**                    Page 133 - Page 134

1                                    Volume: I

2                                    Pages:  1-39

3                                    Exhibits: 1-9

4              COMMONWEALTH OF MASSACHUSETTS

5                         C.A. No. 05-11579EFH

6

7    ----------------------------------------

8    MAURICE LARIVIERE,

9                     Plaintiff,

10       v.

11   JOSEPH SOLOMON, Individually, and as Chief

12   of Police of the City of Methuen, and JOSEPH

13   ALAIMO, Individually, and as Deputy Chief of

14   Police of the City of Methuen, and the

15   CITY OF METHUEN,

16                     Defendants.

17   ----------------------------------------

18

19              DEPOSITION of FULYA METIN

20   Thursday, October 12, 2006, 10:30 a.m. to 4:48 p.m.

21              DAVIS, MALM & D'AGOSTINE

22                 One Boston Place

23               Boston, Massachusetts

24       Court Reporter:  Paulette Cook, RPR/RMR

Fulya Metin

Page 2

```
1   A P P E A R A N C E S:
2       DAVIS, MALM & D'AGOSTINE
3       By David Rapaport, Esq.
4       One Boston Place
5       Boston, Massachusetts 02108
6       617-367-2500
7       drapaport@davismalm.com
8       Counsel for the Plaintiff
9
10      KAZAROSIAN LAW OFFICES
11      By Marsha V. Kazarosian, Esq.
12      546 Main Street
13      Haverhill, Massachusetts 01830
14      978-372-7758
15      marsha@kazarosian.com
16      Counsel for the Fulya Metin
17
18      DiADAMO LAW OFFICE, LLP
19      By Carmine W. DiAdamo, Esq.
20      40 Appleton Way
21      Lawrence, Massachusetts 01840
22      978-685-4271
23      carmine@diadamo.com
24      Counsel for Maurice Lariviere
```

Page 3

```
1   A P P E A R A N C E S (cont.):
2
3       MORRISON MAHONEY, LLP
4       Gareth W. Notis, Esq.
5       250 Summer Street
6       Boston, Massachusetts 02210-1181
7       617-737-8857
8       gnotis@morrisonmahoney.com
9       Counsel for the City of Methuen,
10      Joseph Solomon and Joseph Alaimo
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                I N D E X
2   Examination of:                  Page
3
4   FULYA METIN
5    By Mr. Notis                      6
6
7
8
9             E X H I B I T S
10  No.                              Page
11
12  1       E-Mail 2/14/05            8
13  2       Synopsis 2/15/05          8
14  3       Permission Note 2/16/05    8
15  4       Synopsis                  8
16  5       Synopsis 2/16/05          8
17  6       Poem                      8
18  7       Document                  8
19  8       Document                  8
20  9       Document                  8
21
22
23
24  ** Exhibits retained by Mr. Notis **
```

Page 5

```
1           P R O C E E D I N G S
2       MR. DiADAMO:  For the record I have
3   completed my examination of Fulya Metin during the
4   first deposition which we have just concluded.
5       MR. NOTIS:  Okay.   The parties will
6   agree to the usual stipulations.  Reserve all
7   objections, except as to the form of the question,
8   including motions to strike until the time of trial.
9       We've also stipulated prior to beginning
10  this deposition that any questions and answers
11  provided in the MCAD deposition will have equal
12  effect to those questions asked and answered during
13  this deposition.  Is that correct, Attorney DiAdamo?
14      MR. DiADAMO:  Yes.  And would you -- may
15  I offer an amendment that the exhibits entered in
16  the first one will also be part of the second
17  deposition?
18      MR. NOTIS:  Great.  I agree.  Attorney
19  DiAdamo noticed the deposition.  However, I will
20  begin my questioning.  He's certainly not foreclosed
21  from asking questions when I'm completed.
22      Could you swear the witness, please?
23          FULYA  METIN,
24
```

2 (Pages 2 to 5)

Fulya Metin

|  | Page 6 |
| --- | --- |

1  a witness called for examination by counsel for the
2  Plaintiff, being first duly sworn, was examined and
3  testified as follows:
4
5         DIRECT EXAMINATION
6  BY MR. NOTIS:
7      Q.  Good afternoon.  Could you state your name
8  for the record?
9      A.  It's Fulya.  Last name is Metin, M-E-T-I-N.
10     Q.  My name is Gareth Notis.  I represent the
11 City of Methuen, Joseph Alaimo and Joseph Solomon in
12 this case.
13        The same instructions that you got this
14 morning will apply to this deposition.  You'll have
15 a right to read and sign and your transcript from
16 the federal case.  Would you like that opportunity?
17     A.  Yes.
18     Q.  We'll send it to you, and you'll have thirty
19 days from your attorney's receipt of the transcript
20 to make any corrections and return it to us.
21     A.  (Nods head.)
22     Q.  You married your husband on September 15th;
23 is that correct?
24     A.  September 5th.

|  | Page 7 |
| --- | --- |

1      Q.  September 5th.  His last name is what?
2      A.  Capanelli.
3      Q.  Do you intend to change your name from Metin
4  to Capanelli?
5      A.  Yes.  I haven't been able to do it yet.
6      Q.  When he is released from the halfway house,
7  do you intend to move in with him?
8      A.  Yes.
9      Q.  Have you made any arrangements as to where
10 you're going to live?
11     A.  Not at the moment.
12     Q.  Do you plan to stay on Long Island down in
13 New York?
14     A.  I'm not a hundred percent sure yet, but I --
15 I'm not sure.  Maybe.  Maybe not.  I'm not sure
16 right at this time.
17     Q.  Okay.  Do you have any plans to leave the
18 United States?
19     A.  No.
20     Q.  And your daughter's enrolled in elementary
21 school down on Long Island?
22     A.  She's in sixth grade, middle school.
23     Q.  What school is she enrolled in?
24     A.  She's in the Cormack Middle School.

|  | Page 8 |
| --- | --- |

1      Q.  Was your social security number?
2      A.  ████████████
3      Q.  What is your mother's name?
4      A.  Rana, R-A-N-A.
5      Q.  Last name is Metin?
6      A.  No.  It's K-U-R-A-N.
7      Q.  And if we need to get in touch with you to
8  testify at the trial in the federal case, how would
9  we do that?
10     A.  The address that I gave -- you want me to
11 give the address again?
12     Q.  Yes, please.
13     A.  It's 26 Arista -- A-R-I-S-T-A -- Drive.
14 It's Huntington -- H-U-N-T-I-N-G-T-O-N -- New York
15 11746.
16     Q.  Do you have a phone number where we can
17 reach you?
18     A.  Yes.  It's 631-332-0554.
19     Q.  And that is your cell phone number?
20     A.  Yes.
21        MR. NOTIS:  Can we have these marked as
22 the exhibits?
23        (Exhibit Nos. 1 through 9 marked
24        for identification.)

|  | Page 9 |
| --- | --- |

1      Q.  Miss Metin, when did you first meet
2  Mr. Molori?
3      A.  When did I first meet him?  I can't remember
4  the day.  When I started working at the City of
5  Methuen.
6      Q.  Sometime after you began your assignment
7  through Moore Temp Agency --
8      A.  Yes.
9      Q.  -- is that correct?
10     A.  Yes.
11     Q.  You hadn't met him prior to beginning work
12 at the City of Methuen, correct?
13     A.  No.
14     Q.  And you periodically went to lunch with him?
15     A.  Sometimes, yes.
16     Q.  And he also partially paid for your
17 membership to the Gold's Gym, correct?
18     A.  Yes.
19     Q.  Would you describe --
20     A.  Sorry, go ahead.
21     Q.  Would you describe your relationship with
22 him as friendly?
23     A.  Yeah, we were really good friends.
24     Q.  It never reached the level of a sexual or

3 (Pages 6 to 9)

Fulya Metin

Page 10

1  intimate relationship?
2      A.  No, it never did.
3      Q.  And you told us this morning that you
4  eventually at some point during 2005 had a
5  discussion with Mr. Molori about Mr. Lariviere's
6  conduct; is that right?
7      A.  Yes.
8      Q.  And to the best of your memory, could you
9  tell us during that first conversation what you told
10 Mr. Molori?
11     A.  To my best of my knowledge, I told him that
12 he was acting a little strange and he was trying to
13 touch me all the time, things like that.  And there
14 was a letter that he had written to me talking about
15 going to Turkey; that I was some kind of goddess --
16 some strange letter that I was showing John.
17         I was like, you know, I can't believe he
18 wrote this weird letter, and I just threw the letter
19 away.  That's one conversation I had with John
20 Molori.
21     Q.  Mr. Molori encouraged you to report
22 Mr. Lariviere's conduct; is that correct?
23     A.  Yes.  He said I should tell the mayor or
24 Tootie.

Page 11

1      Q.  In response, you made Mr. Molori promise
2  that he would not report your conversation; is that
3  right?
4      A.  Yes.
5      Q.  Why did you do that?
6      A.  I just -- at that time I didn't know -- I
7  thought I could handle it.  I didn't want to say
8  anything.  You know, I was afraid to lose my job.
9  There was a lot of mixed feelings about that.  I
10 just didn't want John to get involved either.
11     Q.  And to your knowledge at any time between
12 that first conversation with Mr. Molori and the time
13 of the videotape on February 16, 2005 did Mr. Molori
14 report your conversation with him to anyone else?
15     A.  Not that I know of.  I -- I told him not to.
16 I was pretty sure he kept his word, but I don't know
17 if he behind my back or anything ever said anything.
18 I do not know.
19     Q.  Do you have any personal knowledge of
20 Mr. Molori reporting the conversation that you had
21 with him about Mr. Lariviere's conduct to the
22 mayor?
23     A.  Not that I know of.
24     Q.  Do you have any personal knowledge about

Page 12

1  Mr. Molori having discussions with Joseph Solomon?
2      A.  Not that I know of, no.  I don't think he
3  ever did.  I don't think he ever did 'cause he
4  promised me he would never say anything.
5      Q.  How about Joseph Alaimo?
6      A.  Not that I know of.
7      Q.  Okay.  You first notified lieutenant win I
8  can by e-mail; is that right?
9      A.  Yes.
10     Q.  Could you look at Exhibit 1 and tell us if
11 you recognize that document?
12     A.  Yes.  That was an e-mail that I wrote on
13 February 14th right before I left work.
14     Q.  And you sent that from your --
15     A.  -- computer.
16     Q.  -- work e-mail or your home address?
17     A.  My work e-mail.
18     Q.  What is the time of that e-mail?
19     A.  5:18.
20     Q.  You asked Lieutenant Wnek to either respond
21 to the e-mail or call you on your cell phone; is
22 that right?
23     A.  Yes.  Yes.
24     Q.  And do you recall how Mr. Wnek responded to

Page 13

1  you?
2      A.  The next day -- I can't remember if he sent
3  me -- I can't remember if he sent me an e-mail or
4  called me and told him that I could meet him at --
5  at the -- after work by the -- at the parking lot
6  near Starbucks to meet with him and talk to him
7  about what had happened -- about what was going on,
8  to tell him what was happening.
9          He met me in the parking lot.  He came
10 into the car.  I told him everything that was going
11 on in the office.
12     Q.  And your memory is that that was on February
13 15th?
14     A.  Fifteenth, yes.
15     Q.  Incidentally, the 14th was Valentine's day?
16     A.  It was the next day.  It was the 15th.
17     Q.  The day you sent your e-mail was Valentine's
18 Day, right?
19     A.  Yes.
20     Q.  Was Mr. Lariviere's harassment of you any
21 greater or less on Valentine's Day than any other
22 day?
23     A.  I just remember towards a couple weeks
24 before I said something it was getting worse, it was

Fulya Metin

Page 14

1  more grabbing, more touching, more hand trying to go
2  down your pants kind of thing. It was getting
3  harder for me to push him away. It was much harder
4  for me to get away from him.
5      Q. The conversation with Lieutenant Wnek behind
6  city hall, was that after work?
7      A. It was after work. It was in the parking
8  lot of Starbucks. It wasn't near city hall.
9      Q. Do you recall how long the conversation was
10 approximately?
11     A. For like fifteen minutes or so.
12     Q. What happened next after the conversation
13 ended in the vehicle?
14     A. He told me to go down to the police station
15 with him, if I'd be willing to do that. I said
16 sure, so we went down to the police station. Yeah.
17     Q. Did Mr. Wnek express to you any concerns of
18 his that the contact from Mr. Lariviere might have
19 been of a criminal nature?
20     A. I cannot recall, but he seemed to be upset
21 by what was happening when I told him everything
22 that was happening, he seemed to be upset that that
23 was happening; that I should go to the police
24 station and file a report and tell them what was

Page 15

1  going on.
2      Q. So that's what you did, right?
3      A. Yes.
4      Q. You went down to the police station with
5  Lieutenant Wnek?
6      A. Yes.
7      Q. And when you got there, did you speak with
8  anyone else besides Lieutenant Wnek?
9      A. I went to -- he had me meet with the chief,
10 too. I had to meet with the chief and him -- after
11 I was in there for like an hour or so filing my
12 report of what happened, I met with the chief and
13 him.
14     Q. Could you look at --
15     A. Yeah, this is my report that I filed at
16 Michael Wnek's office.
17     Q.  -- Exhibit 2?
18     A. Yep.
19     Q. And that's a copy of your report, correct?
20     A. Yes.
21     Q. Is that your initial on the bottom
22 right-hand corner of Exhibit 2?
23     A. Yes.
24         MR. NOTIS: Should I distribute these to

Page 16

1  everyone?
2          (Pause.)
3      Q. Could you look at Exhibit 4 as well? Do you
4  recognize Exhibit 4?
5      A. Yes.
6      Q. That's just a second copy of Exhibit 2 but
7  without the date on the first page, right?
8      A. Let me see. Yes. It's the same thing.
9      Q. And your memory is that you -- this was a
10 recording of the statement that you gave to
11 Lieutenant Wnek at the police station on the evening
12 of February 15, 2005?
13     A. Yes, it is.
14     Q. Have you seen either Exhibit 2 or Exhibit 4,
15 your statement, at any time since you gave it to
16 Lieutenant Wnek?
17     A. I -- let me think. I saw that date -- I saw
18 it that day after I typed it.
19     Q. You reviewed the statement in lieutenant --
20 in Lieutenant Wnek's office?
21     A. Yes.
22     Q. And everything in the statement is accurate,
23 correct?
24     A. Yes.

Page 17

1      Q. You wouldn't have put your initials on it if
2  it wasn't accurate, would you?
3      A. Of course.
4      Q. After you gave the statement to Lieutenant
5  Wnek, you went down to the chief's office?
6      A. Yes.
7      Q. And at the chief's office what was
8  discussed?
9      A. They were asking questions like what's going
10 on, what happens -- all kinds of questions.
11     Q. And was there a discussion about videotaping
12 what was going on in the city solicitor's office on
13 the evening of the 15th?
14     A. Yeah. Not until the end of all the
15 questioning and everything they said would you mind
16 if we put a videotape -- would it be okay with you
17 to see if he's doing all this stuff. I was like
18 sure. They made me -- I signed something. I said,
19 okay, I wouldn't mind.
20     Q. Was Joseph Alaimo present at any time on the
21 evening of the 15th when you were at the police
22 station?
23     A. I'm sorry?
24     Q. Was Joseph Alaimo present --

5 (Pages 14 to 17)

Fulya Metin

Page 18

1    A.  Yes, he was.  He was actually in the office
2  when they were asking me questions.  So it was -- it
3  was a three -- it was Wnek, Solomon and Alaimo.
4    Q.  Could I see the exhibits?
5    A.  Sure.
6    Q.  Exhibit 3, is that your signature?
7    A.  Yes, it is.
8    Q.  And that's on the 16th of February 2005,
9  correct?
10    A.  Yes.
11    Q.  And that would be the morning of the
12  videotaping, correct?
13    A.  Yes.
14    Q.  And you -- you authorized the police
15  department to video --
16    A.  Yes.
17    Q.  -- the conduct in the city solicitor's
18  office, correct?
19    A.  Yes.
20    Q.  Had you ever met Joseph Solomon before the
21  evening of the 15th?
22    A.  I'm trying to think.  He had come to the
23  office a couple times to meet with Maurice.  That's
24  the only interaction I ever had.

Page 19

1    Q.  Had you ever complained to Joseph Solomon
2  about Mr. Lariviere's harassment or conduct prior to
3  the evening of February 15?
4    A.  No.
5    Q.  When did you first meet Mayor Pollard?
6    A.  I first met Mayor Pollard -- I'm trying to
7  think -- when I first started like in the elevator,
8  I met her.  Like I saw her in the elevator.
9         Just hello, that was it.  Then when I
10  had the interview is when I really formally met her.
11  During the interview that I had for the full-time
12  job.
13    Q.  Your memory of the interview was that
14  someone else was present, correct?
15    A.  Yes.
16    Q.  You just don't remember exactly who it was?
17    A.  I can't remember exactly who it was.  I
18  can't remember.
19    Q.  Did you make any complaints to the mayor
20  during that interview or at any time before the
21  interview about Mr. Lariviere's conduct?
22    A.  No, I did not.
23    Q.  How about subsequent to that interview
24  leading up to the date of the videotape on the

Page 20

1  morning of February 16th, did you complain to Mayor
2  Pollard about Mr. Lariviere's conduct?
3    A.  I did not, no.
4    Q.  Did you ever have any discussions with Mayor
5  Pollard about any of the harassment that was going
6  on from Mr. Lariviere of you?
7    A.  No, I did not.
8    Q.  Do you have any personal knowledge of
9  whether Mayor Pollard had any knowledge of
10  Mr. Lariviere's conduct any time prior to February
11  15, 2005?
12    A.  I do not -- No, I don't think she knew
13  anything.  I never told her anything.
14    Q.  You told us earlier that you had no
15  knowledge that Mr. Molori even told Mayor Pollard --
16    A.  I have no idea -- sorry.
17    Q.  You told us earlier you have no knowledge of
18  Mr. Molori conveying that information to Mayor
19  Pollard?
20    A.  Yes, I have no knowledge of that.
21    Q.  Did you see Mayor Pollard on the morning of
22  the videotaping at any time?
23    A.  No, I did not.
24    Q.  It wasn't until afterwards that you saw her?

Page 21

1    A.  Afterwards I saw her, yes.
2    Q.  How about Joseph Solomon; did you see him on
3  the morning of the videotaping?
4    A.  I did not see him on the morning of the
5  videotaping.
6    Q.  Did you see Joseph Alaimo on the morning of
7  the videotaping?
8    A.  I did not see Joseph Alaimo on the morning
9  of the taping.
10    Q.  Was any promise ever made to you that if you
11  didn't press charges Mr. Lariviere would resign?
12    A.  Nobody ever told me that, no.
13    Q.  And what was the reason you decided not to
14  press charges against Mr. Lariviere?
15    A.  I guess I felt bad for his family more than
16  anything 'cause I know criminal charges -- after
17  what Anthony went through and everything, I just
18  didn't feel that was needed.  Even though what I
19  felt he had done to me was wrong and everything, I
20  just felt to put his family through that -- I just
21  felt bad.  I just didn't want to do that.
22    Q.  Did the media attention that the case was
23  gathering have any role in your decision not to
24  press charges?

6 (Pages 18 to 21)

Fulya Metin

Page 22

1    A.  It could have.  I was maybe afraid of the
2  videotape getting out maybe.  That was another fear
3  of mine -- that was another reason, too.  'Cause the
4  videotape was kind of scaring of me, if that came
5  out and --
6    Q.  What is your memory of the first time that
7  you discussed Mr. Lariviere's conduct with someone
8  from the district attorney's office?
9    A.  Like how it went?  Like how they were
10  towards me or --
11    Q.  Just the timing of it.  Do you have a memory
12  of when that first meeting took place?
13    A.  I think it was like a week after.
14    Q.  Who was present at the meeting?
15    A.  Officer Wnek and -- I forgot her name, but
16  the -- I can't remember her name.  I had her card.
17    Q.  Kathy Tuttman?
18    A.  Tuttman, I believe so, yes.
19    Q.  Was anyone else present besides Lieutenant
20  Wnek and Kathy Tuttman?
21    A.  I think there was another woman there from
22  -- there was another woman there as well.  I can't
23  remember her name though.  She had something to do
24  with -- I can't remember her.  I think there was

Page 23

1  another woman there.
2    Q.  Can you describe the substance of the
3  conversation with the meeting with District Attorney
4  Tuttman?
5    A.  She was like very pleasant.  She was very
6  pleasant.  She asked me what I wanted to do -- to
7  think about it and to give an answer whenever I'm
8  ready.  She gave me her card.  And that's about it
9  -- is all I can recall.
10    Q.  Did you give her an answer that day at the
11  first meeting?
12    A.  No.  I don't think so.  I think I told them
13  later on I think.
14    Q.  Did she tell you what type of criminal
15  charges she was considering filing against
16  Mr. Lariviere?
17    A.  I can't recall.  I don't remember.
18    Q.  And subsequent to that meeting, how long was
19  it after that meeting that you decided not to press
20  charges?
21    A.  I think it was like a couple days later, I
22  believe.
23    Q.  If you could look at your statement, Exhibit
24  4, I'm going to ask you some questions about the

Page 24

1  document.
2    A.  Sure.
3    Q.  About halfway down the statement reads:
4  "The days at the office would be getting my work
5  done, but often almost on a daily basis he would
6  come over to my desk and make stupid comments about
7  me being in a bathing suit."  Is that correct?
8    A.  Yes, he would.  Yes.
9    Q.  How frequently were there remarks about you
10  being in a bathing suit?
11    A.  There was a couple times maybe.
12    Q.  And did you object to those remarks from
13  Mr. Lariviere?
14    A.  I just tried to change the subject.  I just
15  tried to change the subject.  I didn't say anything.
16  I just changed the subject from what I remember.
17    Q.  Later in the statement almost at the bottom
18  it reads:  "He would tell me to hug him all the
19  time, and he would get so close to me that I could
20  feel his private part on my private area, and he
21  would sort of try to adjust himself so he got really
22  close to my private area."  Did I read that
23  correctly?
24    A.  Yes.

Page 25

1    Q.  Could you describe when approximately that
2  instant occurred?
3    A.  It happened a lot when he was trying to hug
4  me really close and kiss me.  He was so -- he was
5  thrusting a little bit and adjusting himself a
6  little bit sort of, and I could feel that.
7    Q.  During those occasions when Mr. Lariviere
8  would rub against you, did you direct him to stop?
9    A.  I would try to get away from him.  I was
10  like stop it.  I would just try to push him away.
11  He kept pushing me closer; I kept pushing away.
12  It was like a struggle all the time push
13  away, get closer -- I would just get away from him
14  and would just leave.
15    Q.  Did you ever invite Mr. Lariviere to gyrate
16  against you?
17    A.  No.
18    Q.  Those were unwanted advances, right?
19    A.  Yes.
20    Q.  You directed him to stop?
21    A.  Yes.
22    Q.  On the second page about halfway through it
23  talks about Mr. Lariviere touching your breast when
24  he tried to hug you.  Do you have a memory of

7 (Pages 22 to 25)

Fulya Metin

Page 26

1  Mr. Lariviere trying to touch your breasts?
2      A.  Yes.
3      Q.  Could you describe to us how many times that
4  occurred?
5      A.  A lot -- it happened a lot.
6      Q.  When it happened, could you give us a
7  description of what occurred?
8      A.  I'd be sitting at my desk, and he would try
9  to grab me from behind.  He would grab right here
10 and would come move his hands up higher so he was
11 trying to grab that area.
12     Q.  Did he ever try to stick his hands down your
13 shirt?
14     A.  Not down my shirt, no.  But everywhere -- if
15 I wore some loose pants, he'd try to stick his hand
16 down the back of my pants sometimes.
17     Q.  Did you object to those advances?
18     A.  Yes.
19     Q.  Did Mr. Lariviere ever describe to you the
20 status of his sex life with his wife?
21     A.  Yes, he did.
22     Q.  Could you tell us what he described in that
23 regard?
24     A.  Sure.  One day he said he was crying -- came

Page 27

1  to my desk.  He was crying.  He said to me he's
2  really upset.  I was like what's wrong.  We went
3  into his office to sit down at his desk, this little
4  conference table that he has, and he said to me he's
5  having a really hard time, he's only been with one
6  woman in his life, never been with anybody else but
7  his wife and that he can't have sex with his wife
8  anymore; that he thinks of me and that -- that he
9  loves me, and he's crying like hysterically crying.
10 And I didn't know what to do.  I didn't know what to
11 say.
12         I just said to him I don't think of you
13 that way.  I work for you.  I'm a friend like --
14 you're like a father to me.  I said -- I said I love
15 somebody else, that kind of stuff.  But he kept
16 crying and crying and crying.
17     Q.  Could you like at Exhibit 5.  It's a
18 document dated February 16, 2005?
19     A.  Exhibit 5?
20     Q.  Is it Exhibit 6?
21     A.  This (indicating)?
22     Q.  Yeah, Exhibit 5.
23     A.  Okay.
24     Q.  Do you recognize Exhibit 5?

Page 28

1      A.  Yes.
2      Q.  Is that your signature on the bottom?
3      A.  Yes, it is.
4      Q.  And you signed it on the 16th of February,
5  2005, right?
6      A.  Yes.
7      Q.  That was the day of the videotape?
8      A.  Yes.
9      Q.  And could you read the statement to
10 yourself, and let me know when you're done?
11     A.  Okay.
12         (Pause.)
13     A.  I read it.
14     Q.  Does this statement that you signed
15 accurately reflect your memory of what occurred on
16 the morning of February 16, 2005 in the city
17 solicitor's office?
18     A.  Yes, it does.
19     Q.  And does it reflect your memory of what was
20 recorded on the videotape that you viewed on two
21 occasions?
22     A.  Yes, it does.
23     Q.  You wouldn't have signed it if it didn't,
24 right?

Page 29

1      A.  Yes.
2      Q.  It's fair to say your memory on the day of
3  was better than it is today?
4      A.  I still remember that pretty clearly.  I
5  remember what happened that day pretty clearly.
6      Q.  Did Lieutenant Wnek type up Exhibit -- is it
7  5 for you?
8      A.  I typed it up myself.
9      Q.  Did Mr. Lariviere ever ask you to go on any
10 vacations with him?
11     A.  He would talk about -- I would ask me
12 questions about Turkey a lot, where I'm from.  And
13 on some occasions he went to the library and was
14 looking at books on Turkey, and there was one time
15 he kept asking me maybe we should go to Turkey one
16 day, how many children are we going to have, that
17 kind of stuff.
18         But that was only one time I remember.
19 But I don't know if he was serious.  I think he was
20 just saying -- I don't know.
21     Q.  You told us this morning about occasions
22 when you would hug Mr. Lariviere voluntarily,
23 correct?
24     A.  Yes.

Fulya Metin

| Page 30 |
|---|
| 1  Q. And from time to time you would give him a |
| 2  kiss on the cheek, correct? |
| 3    A. Yes. When -- sorry. |
| 4    Q. None of the kisses to your lips though were |
| 5  voluntary, were they? |
| 6    A. No. |
| 7    Q. You never initiated them, did you? |
| 8    A. No, I did not. |
| 9    Q. They were initiated by Mr. Lariviere? |
| 10   A. Yes. |
| 11   Q. Were they wanted by you? |
| 12   A. No. |
| 13   Q. Did you object to them? |
| 14   A. Yes. |
| 15   Q. Did you object to them orally to |
| 16  Mr. Lariviere? |
| 17   A. Yes. |
| 18   Q. What did you say on those occasions? |
| 19   A. I said don't do that, it's uncomfortable, I |
| 20  don't like when you do that. |
| 21   Q. Were his touchings of your buttocks area |
| 22  welcomed or wanted? |
| 23   A. No. |
| 24   Q. Were his touchings of your breasts welcome |

| Page 31 |
|---|
| 1  or wanted? |
| 2    A. No. |
| 3    Q. Incidentally, did he ever feel your breasts |
| 4  underneath your shirt, or was it always on top of |
| 5  your shirt? |
| 6    A. On top of my shirt. |
| 7    Q. Did Mr. Lariviere ever make statements to |
| 8  you asking you do you like me? |
| 9    A. All the time. |
| 10   Q. How frequently would that occur? |
| 11   A. A lot. I can't remember but many, many |
| 12  times he would ask me that. |
| 13   Q. Did he ever present to you documents where |
| 14  he made statements like that and asked you to sign |
| 15  them? |
| 16   A. Yes. He would come by with a little |
| 17  post-it, and it would be like I like Maurice; |
| 18  Maurice is a good guy, things like that. He'd sit |
| 19  there and say sign it. |
| 20   Q. Could you look through the exhibits before |
| 21  you and tell me if you recognize any of those to be |
| 22  Mr. Lariviere's post-it notes or statements that he |
| 23  asked you to sign? |
| 24   A. Yes, these are some of them. |

| Page 32 |
|---|
| 1    Q. Why don't you tell us which exhibit you're |
| 2  looking at and describe what it says? |
| 3    A. Sure. That's my -- that looks like my |
| 4  signature on Exhibit 7. Yeah. That's one thing he |
| 5  made me sign. |
| 6    Q. Could you read what it says on the top of |
| 7  Exhibit 7? |
| 8    A. Sure. It says Maurice has always treated me |
| 9  good and been very supportive of me. |
| 10   Q. Where did he ask you to sign that document? |
| 11  Physically where were you located? |
| 12   A. At my desk. I was trying to do my work, and |
| 13  he'd just come by with something, sign this. I'm |
| 14  like -- |
| 15   Q. Why did you sign it? |
| 16   A. 'Cause he wouldn't go away if I didn't sign |
| 17  it. He sat there, and he's like sign it, sign it. |
| 18  I just wanted him to go away so I would be just like |
| 19  whatever (indicating). |
| 20   Q. Why don't you look at the next exhibit and |
| 21  tell us if you recognize that? |
| 22   A. Exhibit 8, yes, I do. |
| 23   Q. What is that document? |
| 24   A. Another one that he made me sign Maurice |

| Page 33 |
|---|
| 1  means a lot to me. He typed it, and he made me sign |
| 2  it. |
| 3    Q. What does that document say? |
| 4    A. Exhibit 8? |
| 5    Q. Yes. Could you read it into the record? |
| 6    A. Yep. Maurice means a lot to me. And he |
| 7  would come by and say like sign it. To get rid of |
| 8  him, I'd just sign it so he'd go away and leave me |
| 9  alone. |
| 10   Q. Could you look at Exhibit 9 and tell me if |
| 11  you've have seen that before? |
| 12   A. I've never seen that before. All I know |
| 13  about this is that that day they came and everything |
| 14  happened with the videotape I heard something about |
| 15  this, but I never -- I didn't see this. I don't |
| 16  know about this one. |
| 17   Q. Were there ever occasions when you would go |
| 18  into Mr. Lariviere's office, and there would be |
| 19  pornographic material on his computer screen? |
| 20   A. I never noticed anything like that. |
| 21   Q. Was there an occasion when you went into -- |
| 22  when you went into Mr. Lariviere's office when he |
| 23  had your photograph up on his video -- on his |
| 24  computer screen? |

9 (Pages 30 to 33)

Fulya Metin

Page 34

1    A. Yes, I saw my -- my photograph on his
2  computer screen.
3    Q. Was that the photograph from your
4  match.com --
5    A. Yes.
6    Q. -- entry?
7    A. Yes, it was.
8    Q. Did he ever present pornographic material to
9  you?
10   A. No, he did not.
11   Q. I'm going to show you the first amended
12  verified complaint and jury demand which
13  Mr. Lariviere has filed in this litigation.
14         Could you review paragraph 80 to
15  yourself?
16         (Pause.)
17   Q. Mr. Lariviere's claiming in the present
18  litigation that on a personal level the parties were
19  not intimate but mutually affectionate with much of
20  the affection initiated by Metin.
21         Is it true that on a personal level you
22  were not intimate with Mr. Lariviere?
23   A. Yes.
24   Q. Was the contact of a sexual nature mutually

Page 35

1  affectionate?
2    A. No.
3    Q. Was any of the sexual or physical contact
4  with Mr. Lariviere initiated by you?
5    A. No, it was not.
6    Q. Have you ever heard an audiotape of the
7  interrogation of Mr. Lariviere by the chief of
8  police and the deputy chief?
9    A. No, I have not.
10   Q. Were you aware on the morning of February
11  16, 2005 that Mr. Lariviere was being interrogated
12  in the building?
13   A. No, I had no idea where he was in the
14  building. I had no idea they audiotaped him or
15  anything.
16   Q. Approximately what time did you leave the
17  building that morning?
18   A. I was -- after everything that had happened
19  and like around 10:30, 11, I went to the mayor's
20  office. I was there for a good hour or so, hour and
21  a half I believe.
22         Then from there I left, but I didn't see
23  anybody else. I didn't see Maurice. I didn't see
24  the police or anything. I left and I followed

Page 36

1  Michael Wnek to the police station. I went to the
2  police station after that to file some more -- to do
3  some more paperwork.
4    Q. During that hour that you were in the
5  mayor's office did you see Joseph Solomon enter the
6  office at any time?
7    A. I can't remember if he did or not. I don't
8  recall.
9    Q. Did you see Joseph Alaimo come into the
10  mayor's office at any time?
11   A. I can't remember. I just remember Michael
12  Wnek being there and the mayor and that other woman
13  -- the lawyer. And David Bain. I can't remember if
14  they came in or not.
15   Q. After you left the mayor's office where did
16  you go next?
17   A. To my car and then to the police station.
18   Q. When you got to the police station, what did
19  you do?
20   A. I think I signed some more things, looked
21  over some -- I sat there -- I can't remember. I
22  think I signed something here on the 16th.
23   Q. Why don't you review the documents and let
24  me know if you signed any of those when you went to

Page 37

1  the police station after leaving city hall?
2    A. Oh, I watched a video when I went to the
3  police station. Now I remember. I watched the
4  video and then I signed this.
5    Q. Is that the statement?
6    A. Yeah, of what happened.
7    Q. What exhibit is that?
8    A. Exhibit 5.
9         MR. NOTIS: Nothing further. Thanks.
10        MR. DiADAMO: Are you all set? I want
11  to know what we're doing for time? I don't think
12  she's got a chance of making it --
13        MR. RAPAPORT: Sounds like everyone's
14  done.
15        MS. KAZAROSIAN: Are you done?
16        MR. DiADAMO: I think I'm done.
17        MS. KAZAROSIAN: I'm not a party to this
18  anyway.
19        MR. RAPAPORT: I'm not.
20        MS. KAZAROSIAN: So we're done.
21        MR. NOTIS:   The deposition has ended.
22        MS. KAZAROSIAN: Concluded. Great.
23  (Whereupon the proceedings
24  adjourned at 4:48 p.m.)

10 (Pages 34 to 37)

Fulya Metin

Page 38

```
 1              C E R T I F I C A T E
 2      I, FULYA METIN, do hereby certify
 3   that I have read the foregoing transcript of my
 4   testimony, and further certify that it is a true and
 5   accurate record of my testimony (with the exception
 6   of the following corrections listed below):
 7
 8   Page  Line        Correction
 9   ____  ____   _____
10   ____  ____   _____
11   ____  ____   _____
12   ____  ____   _____
13   ____  ____   _____
14   ____  ____   _____
15   ____  ____   _____
16   ____  ____   _____
17
18
19      Signed under the pains and penalties of
20   perjury this _____ day of _____, 2006.
21
22           _____
23           FULYA METIN
24
```

Page 39

```
 1              CERTIFICATE
 2   COMMONWEALTH OF MASSACHUSETTS)
 3   SUFFOLK, SS.                )
 4
 5      I, Paulette M. Cook, Registered Merit Reporter
 6   and Notary Public in and for the Commonwealth of
 7   Massachusetts, do hereby certify that FULYA METIN,
 8   the witness whose deposition is hereinbefore set
 9   forth, was duly sworn by me and that such deposition
10   is a true record of the testimony given by the
11   witness.
12      I further certify that I am neither related to
13   or employed by any of the parties in or counsel to
14   this action, nor am I financially interested in the
15   outcome of this action.
16      In witness whereof, I have hereunto set my hand
17   and seal this 28th day of October, 2006.
18
19
20
21           Notary Public
22
23   My commission expires:
24   March 8, 2007
```

11 (Pages 38 to 39)

*Peter J. McQuillan*
*Attorney at Law*
*59 Jackson Street*
*Lawrence, Ma 01840*

**HOME RULE CHARTER**

**OF THE CITY OF METHUEN**

## SUMMARY OF CHARTERS
## IN THE CITY OF METHUEN

The City of Methuen was originally organized as a Town by Chapter 12 of the Acts and Resolves of 1725, "Being an act for dividing the City of Haverhill and erecting a new Town there and in parts adjacent by the name of Methuen"; the name of the Town being given by Governor Dummer after Lord Methuen.

- The City functioned under a Selectmen/Open Town Meeting form of government from 1726 until 1917.

- The General Court, by Chapter 116 of the Acts and Resolves of 1916, established a Selectmen/Representative Town Meeting form of government.

- The General Court, thereafter, by Chapter 289 of 1917, allowed the Town to organize as a City.

- On January 7th, 1921, the Supreme Judicial Court, in the case of Attorney General ex rel. Mann vs. City of Methuen, 236 Mass. 564, found that the City Charter had not been appropriately adopted under the Constitution of the Commonwealth. Though the Court did not strike down the Charter, it left open the legality of all City action thereafter.

- The General Court subsequently enacted Chapter 241 of 1921, providing for the establishment of a Selectmen/Representative Town Meeting form of government. This Charter existed from 1921 to 1973.

- On January 1st, 1973, Methuen's first Home Rule Charter became effective. Said Charter established a strong Town Administrator with a twenty-one member Town Council. Said Charter was written by the first Home Rule Charter Commission. This "Town Form" was declared to be, in law, a City by the Appeals Court on December 12th, 1978 in the case of Chadwick vs. Scarth, 6 Mass. App. 725.

- On January 1st, 1978, Methuen's second Home Rule Charter became effective. Said Charter, while keeping the Town Manager/Town Council form of government, reduced the Town Manager's power by requiring Council approval of such matters as contracts and appointments.

- On May 4th, 1993, at a Special Town Election, the citizens accepted Chapter 332 of the Acts and Resolves of 1992 providing for a Mayor and lifetime term limitations for the Mayor and City Council.

For a complete listing of all Charter amendments, see Chronology of Charter Amendments, (Appendix I).

i

# SUMMARY OF CONTENTS

**Page**

Summary of Charters in Methuen . . . . . . . . . . . . . . . . .   i

Article 1.     Incorporation; Short Title; Power . . . . . . . . . .   1

Article 2.     Legislative Branch . . . . . . . . . . . . . . . .   2

Article 3.     Executive Branch . . . . . . . . . . . . . . . .   6

Article 4.     School Committee . . . . . . . . . . . . . . . .   10

Article 5.     Financial Procedures . . . . . . . . . . . . . . .   12

Article 6.     Administrative Departments . . . . . . . . . . . .   14

Article 7.     Nominations and Elections . . . . . . . . . . . . .   15

Article 8.     Free Petition; Initiative; Referendum; Recall . . . . . . .   17

Article 9.     General Provisions . . . . . . . . . . . . . . .   21

Article 10.    Transitional Provisions . . . . . . . . . . . . .   27

Chronology of Charter Amendments . . . . . . . . . . . . . . .   31

## ARTICLE 1
### Incorporation; Short Title; Power

Section 1-1    **Incorporation**.

The Inhabitants of the municipality of Methuen, within the corporate limits established by law, shall continue to be a body corporate and politic under the name "City of Methuen".

Section 1-2    **Short Title**.

This instrument shall be known, and may be cited as the Methuen Home Rule Charter.

Section 1-3    **Form of Government**.

The administration of the fiscal, prudential, and municipal affairs of the City, with the government thereof, shall be vested in an executive branch, to consist of the Mayor, and a legislative branch, to consist of the City Council. The executive branch shall never exercise any legislative power, and the legislative branch shall never exercise any executive powers. Except as may otherwise be specifically authorized by the Charter, no member of the City Council, nor any committee thereof, shall take any part in the conduct of the administrative business of the City.

Section 1-4    **Powers of the Municipality**.

Subject only to express limitations on the exercise of any power or function by a municipality in the Constitution or the statutes of the Commonwealth, it is the intent and the purpose of the voters in Methuen, through the adoption of the Charter, to secure for the City all powers it is possible to secure under the Constitution and statutes of the Commonwealth, as fully and as completely as though each such power was specifically and individually enumerated herein.

Methuen will constitutionally have a city form of government and the General Laws that apply only to cities, or treat cities differently than towns, will automatically apply to Methuen. For example, Methuen will conform to the debt limit, bond and notes issuances, etc. of Chapter 44, the Municipal Finance Act, as it applies to cities.

Section 1-5    **Construction**.

The powers of the municipality under the Charter are to be construed liberally in favor of the City, and the specific mention of particular powers is not intended to limit, in any way, the general powers of the municipality as stated in Section 1-4.

Section 1-6    **Intergovernmental Relations.**

Subject only to express limitations in the construction of statutes of the Commonwealth, the City may exercise any of its powers or perform any of its functions, and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with the Commonwealth, or any political subdivision or agency thereof, or the United States government or any agency thereof.

## ARTICLE 2
### Legislative Branch

Section 2-1    **Composition; Eligibility; Election and Term.**

(a)  Composition – There shall be a City Council consisting of nine members which shall exercise the legislative powers of the City.  Six Councillors shall be nominated and elected from the voters by districts, two Councillors to be elected from each of the three districts of the City.  Three Councillors shall be nominated and elected at large.  Precincts 1, 2, 6 and 10, to be known as the Central District; Precincts 3, 7, 9 and 12, to be known as the East District; and Precincts 4, 5, 8 and 11, to be known as the West District.  (Increase in number of precincts from 9 to 12 approved by Legislature, June 10th, 1986, Chapter 88 of the Acts and Resolves of 1986).  The City Council shall be the judge of the election and qualification of its members.

(b)  Eligibility – Only voters who at all times during their term of office shall be and remain residents of the City shall be eligible to hold the office of Councillor.  A member of the City Council shall, notwithstanding his removal from one district to another, continue to serve and to perform his official duties during his term of office.

(c)  Election and Term – The term of office of all members of the City Council shall be for two years, beginning on the first secular day in January after their election and until their successors are qualified.\ No person shall hold office of City Councillor for more than three consecutive terms.  (Consecutive term limits approved by the Legislature, September 24th, 1999, Chapter 82 of the Acts and Resolves of 1999 and adopted by the Voters November 2nd, 1999.  This Act eliminated lifetime term limits.)

Section 2-2    **Organization.**

After the Councillors elect have been sworn, the City Council shall be called together by the oldest member elected who shall preside.  The City Council shall then elect, from among its members, a Chairman and Vice Chairman to serve at the pleasure of the City Council.  The Chairman shall preside at all meetings of the City Council and perform such other functions as may be assigned by the Charter, by ordinance, or by vote of the City Council.  The Vice Chairman shall act as Chairman of the Council during the absence or disability of the Chairman.  (Elimination of appointed Councillor on School Committee approved by voters November 3rd, 1981; see Resolution #758).

Section 2-3      **Compensation; Expenses**.

The City Council shall, by ordinance, establish an annual salary and expense allowance for its members.

No ordinance increasing such salary or expense allowance shall be effective, however, unless it shall have been adopted by a two-thirds vote of the full Council during the first eighteen months of the term for which Councillors are elected and the new salary and expense schedule is to be effective upon the commencement of the terms of office of the next City Council to be elected.

Section 2-4      **General Powers and Duties**.

Except as otherwise provided by law or by the Charter, all powers of the City shall be vested in the City Council which shall provide for their exercise and for the performance of all duties and obligations imposed on the City by law.

Section 2-5      **Prohibitions**.

No Councillor shall, while a member of the City Council, hold any other office or position the salary or compensation for which is payable out of the City treasury. No former Councillor shall hold any compensated appointive City office or City employment until one year after the expiration of his service on the City Council. This provision shall not prevent a City officer or employee who has taken a leave of absence from such duties in order to serve as a member of the City Council from returning to such office or employment following service as a member of the City Council.

Section 2-6      **Filling of Vacancies**.

If a vacancy occurs in the office of Councillor-at-Large or in the office of District Councillor, whether by failure to elect or otherwise, the remaining Councillors shall, within twenty-one days following the date such vacancy is declared to exist, act to fill the said vacancy. The Council shall elect, as acting Councillor whichever of the defeated candidates for the seat in which the vacancy is declared to exist, that person who received the highest number of votes at the last regular City election immediately preceding the date the vacancy is declared to exist, and who received at least twenty (20) percent of the total votes cast for the office at such election, and who remains eligible and willing to serve.

There being no such person, the Council shall choose from among the voters entitled to vote for such Councillor, an acting Councillor to serve for the balance of the unexpired term. If such choice is not made as hereinbefore provided within the said twenty-one days, the choice shall be made by the Councillor senior in length of service, or if there be more than one such, by the Councillor senior both in age and in terms of service. Any person so chosen shall be sworn and commence to serve forthwith. No vacancy shall be filled, in the

-3-

manner hereinbefore provided, if a regular City election is to be held within one hundred twenty days following the date the vacancy is declared to exist.

**Section 2-7    Exercise of Powers; Quorum; Rules of Procedure.**

(a)    <u>Exercise of Powers</u> - Except as otherwise prohibited by law or the Charter, the legislative powers of the City Council may be exercised in a manner determined by it.

(b)    <u>Quorum</u> - A majority of the full City Council shall constitute a quorum. The affirmative vote of a majority of the full City Council shall be necessary to adopt any appropriation order. Except as otherwise provided by law or the Charter, any other motion or measure may be adopted by a majority vote of those present.

(c)    <u>Rules of Procedure</u> - The City Council shall, from time to time, establish rules for its proceedings. Regular meetings of the City Council shall be held at a time and place fixed by ordinance but which shall be not less frequent than once monthly. Special meetings of the City Council may be held on the call of the Chairman of the City Council, or on the call of any three or more members, by written notice delivered to the place of residence or business of each member at least forty-eight hours in advance of the time set. Except as otherwise authorized by General Laws, all sessions of the City Council shall be open to the public and press. Every matter coming before the City Council for action shall be put to a vote, the result of which shall be duly recorded. A full, accurate, and up-to-date record of the proceedings of the City Council shall be kept and shall be open to inspection by the public.

**Section 2-8    Council Staff.**

(a)    <u>City Accountant</u> - The City Council shall, on or before January fifteenth in odd numbered years, elect, by ballot or otherwise, a City Accountant to hold office for a term of two years and until his/her successor is qualified. (Odd numbered year appointment by amendment approved by the Legislature June 28th, 1996 as Chapter 145 of the Acts and Resolves of 1996. Amendment submitted by City Council Order #3738, approved February 5th, 1996.)

The City Accountant shall keep and have charge of the accounts of the City. He shall regularly audit the books and accounts of all City agencies, and he shall have such powers and perform such other duties as the City Council may prescribe in addition to such duties as may be prescribed by law.

13.    <u>Clerk of the Council</u> - The City Council shall, on or before January fifteenth in odd numbered years, elect, by ballot or otherwise, a Clerk of the Council to hold office for a term of two years or until his/her successor is qualified. The Clerk of the Council shall give notice of all meetings of the City Council to its members and to the public, keep a record of its proceedings and perform such duties as may be assigned by the Charter, by ordinance, or by other vote of the City Council. (Odd numbered year appointment by amendment approved by the Legislature June 28th, 1996 as Chapter 145 of the Acts and Resolves of 1996. Amendment submitted by City Council Order #3738, approved February 5th, 1996.)

(c)    City Solicitor - The City Council shall, on or before January fifteenth in odd numbered years, elect, by ballot or otherwise, a City Solicitor to hold office for a term of two years and until his/her successor is qualified. (Odd numbered year appointment by amendment approved by the Legislature June 28th, 1996 as Chapter 145 of the Acts and Resolves of 1996. Amendment submitted by City Council Order #3738, approved February 5th, 1996.)

The City Solicitor shall represent the municipality in all court matters, advise the City Council and municipal boards and officers upon all legal questions and perform such other duties as the City Council may prescribe in addition to such duties as may be prescribed by law. (Appointment by the City Council approved by voters November 5th, 1985; see Resolution #1380 and Chapter 182 of the Acts and Resolves of 1985).

(d)    Salaries - The City Council shall set the salaries of the City Accountant, Clerk of the Council, Mayor and City Solicitor. (Approved by voters November 5th, 1985; see Resolution #1380 and Chapter 182 of the Acts and Resolves of 1985).

Section 2-9    **Measures; Emergency Measures; Charter Objection.**

(a)    In General - No measure shall be passed finally on the date on which it is introduced, except in cases of special emergency involving the health or safety of the people or their property. Except as otherwise provided by the Charter, every adopted measure shall become effective at the expiration of thirty days after adoption or at any later date specified therein. Measures not subject to referendum shall become effective upon adoption. No ordinance shall be amended or repealed except by another ordinance adopted in accordance with the Charter, or as provided in the initiative and referendum procedures.

(b)    Emergency Measures - An emergency measure shall be introduced in the form and manner prescribed for measures generally except that it shall be plainly designated as an emergency measure and shall contain statements after the enacting clause declaring that an emergency exists and describing its scope and nature in clear and specific terms. A preamble which declares and defines the emergency shall be separately voted on and shall require the affirmative vote of two-thirds of the City Council.

An emergency measure may be passed with or without amendment or rejected at the meeting at which it is introduced. No measure making a grant, renewal or extension, whatever its kind or nature, of any franchise or special privilege shall be passed as an emergency measure, and except as provided in General Laws, Chapter 166, Sections 70 and 71 (relating to utility lines), no such grant, renewal or extension shall be made otherwise than by ordinance. After its adoption, an emergency measure shall be published as prescribed for other adopted measures. It shall become effective upon adoption or at such later time as it may specify.

14.    Charter Objection – On the first occasion that the question on adoption of a measure is put to the City Council, if a single member objects to the taking of the vote, the vote shall be postponed until the next meeting of the City Council, whether regular or special. If two or more

other members shall join the member in objection, such postponement shall be until the next regular meeting; but for an emergency measure, at least four members in all must object. This procedure shall not be used more than once for any matter bearing a single docket number notwithstanding any amendment to the original matter.

**Section 2-10    Delegation of Powers.**

The City Council may delegate to one or more City agencies, the powers vested in the City Council by the laws of the Commonwealth to grant and issue licenses and permits, and may regulate the granting and issuing of licenses and permits by any such City agency, and may, in its discretion, rescind any such delegation without prejudice to any prior action which has been taken.

**Section 2-11    Inquiries and Investigations.**

The City Council may require any City officer or member of a board or commission to appear before it, and give such information as it may require in relation to his office, its function, and performance. The City Council shall give at least forty-eight hours written notice of the general scope of the inquiry which is to be made to any person it shall require to appear before it under this section.

The City Council may make investigations into the affairs of the City and into the conduct of any City agency, and for this purpose may subpoena witnesses, administer oaths and require the production of evidence.

## ARTICLE 3
## EXECUTIVE BRANCH

**Section 3-1    Mayor – Qualifications; Term of Office; Compensation.**

13.    Mayor; Qualifications – The Chief Executive Officer of the City shall be a Mayor, elected by and from the qualified voters of the City. Any voter domiciled in the City shall be eligible to hold the office of Mayor. He shall devote his full time to the office and shall not hold any other public office, elective or appointive, nor engage in any other business activity whether or not such business activity is pursued for gain, profit or other pecuniary advantage, during his term.

(b)    Term of Office – The term of office of Mayor shall be two years, beginning on the first Monday of January following his election and until his successor is qualified. No person shall hold the office of Mayor for more than three consecutive terms. (Consecutive term limits approved by the Legislature September 24th, 1999, Chapter 82 of the Acts and Resolves of 1999 and adopted by the Voters November 2nd, 1999).

(c)    Compensation – The City Council shall, by ordinance, establish an annual salary for the Mayor.

-6-

Section 3-2    **Executive Authority and Duties.**

The executive powers of the City shall be vested solely in the Mayor, and may be exercised by him either personally or through the several City agencies under his general supervision and control. The Mayor shall see that all of the provisions of the General Laws, of this Charter, of votes of the City Council which require enforcement by him or officers subject to his direction and supervision are faithfully carried out and shall cause a record of all his official duties to be kept. He shall have the following authority and duties:

13. He shall supervise and direct the administration of all departments, commissions, boards and offices, except the City Council, the School Committee, the City Accountant, the City Solicitor and Clerk of the Council.

14. He shall fix the compensation of all City officers and employees appointed by him within the limits established by City ordinances and existing appropriations.

15. He shall attend all regular meetings of the City Council, unless excused at his own request, and shall have a voice but no vote in all of its deliberations.

(d) He shall keep full and complete records of his office, and shall render as often as may be required by the City Council, but not less than once a year, a full report of all operations during the period reported on, which report shall be made available to the public.

(e) He shall keep the City Council fully advised as to the needs of the City and shall recommend to the City Council for adoption such measures requiring action by them as he may deem necessary or expedient.

(f) He shall have full jurisdiction over the rental and use of all City facilities under his control. He shall be responsible for the maintenance and repair of all City property under his control.

(g) He shall be responsible for the appointment, subject to the approval of the City Council, of any necessary building and facilities committees having to do with the preparation of plans and supervision of work on all construction, reconstruction, alterations, improvements and other undertakings authorized by the City Council, provided, however, that the approval of the School Committee shall be obtained for school construction or improvement plans.

(h) He shall keep a full and complete inventory of all property of the City, both real and personal.

(i) He shall negotiate and may execute contracts involving any subject within his jurisdiction. All contracts shall be awarded by the Mayor, however, all contracts, prior to said award, shall meet with approval, by vote, of the majority of the City Council.

(j)   He shall be responsible for the purchasing of all supplies, materials and equipment for all departments and activities of the City, but not including food for schools, school books and other instructional materials, supplies and equipment; library books and related printed and audio-visual subject material, unless otherwise requested by the School Committee or the Library Trustees.

(k)   The City of Methuen shall have a board of no less than three (3) Assessors appointed by the Mayor and he shall designate one of his appointees as Chairman thereof.

(l)   He shall perform any other duties required by the ordinances or other votes of the City Council.

(m)   He shall exercise general supervision and direction over all City agencies unless otherwise provided by law.  Each City agency shall furnish to him, forthwith upon his request, any information, materials or otherwise as he may request and as needs of his office and the interests of the City require.

Section 3-3.   **Appointments by the Mayor**.

Except as otherwise provided by this Charter, the Mayor shall appoint, upon merit and fitness alone, and may remove subject to the provisions of the civil service laws, the provisions of this Charter, or other pertinent statutes where applicable, all officers and employees of the City, except employees of the School Department.  All appointments of Department Heads, Assistant Department Heads, Division Heads, Police Superior Officers of the rank of Sergeant and above, Fire Department Superior Officers of the rank of Lieutenant and above, the Conservation Commission Agent, and all Boards and Commissions shall be subject to confirmation by a majority vote of the full City Council.  The Mayor shall submit, in writing, to the City council, at least ten days prior to the next regular meeting when the appointment is to be made, the name of any person he desires to appoint to a City position.  (Approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996).

Section 3-4.   **Temporary Appointments to City Offices**.

Whenever a vacancy, either temporary or permanent, occurs in a City office and the needs of the City require that such office be filled, the Mayor may designate the head of another City agency or a City officer or employee, or some other person, especially fitted by merit and fitness, to perform the duties of the office on a temporary basis until such time as the position can be filled as otherwise provided by law, Charter or ordinance.  The Mayor shall file a certificate, in substantially the following form, with the City Clerk whenever he makes a designation under this section:

I designate (name of person) to perform the duties of the office of (designate office in which vacancy exists) on a temporary basis until the office can be filled by (here set out the regular procedure for filling the vacancy, or when the regular officer shall return).  I certify

-8-

that said person is qualified to perform the duties which will be required and that I make this designation solely in the interests of the City of Methuen.

Section 3-5.    **Communications; Special Meetings**.

13.    <u>Communications to the City Council</u> - Within six weeks following the start of each fiscal year, the Mayor shall submit to City Council, and make available for public distribution, a complete report on the financial and administrative activities and status of the City for the preceding fiscal year. He shall from time to time, and, whenever requested by the City Council, by written communication, keep the City Council fully informed of the financial condition and administrative issues of the City and shall recommend to them such measures for their consideration as, in his judgment, the needs of the City require.

(b)    <u>Special Meetings of the City Council</u> - The Mayor may at any time call a special meeting of the City Council for any purpose by causing a notice thereof to be delivered in hand or residence of each member of the City Council. Such notice shall, except in an emergency as determined by the Mayor, be delivered at least forty-eight (48) hours in advance of the time set and shall specify the purpose or purposes for which the meeting is to be held.

Section 3-6.    **Approval of Mayor; Exception (Veto)**.

Every order, ordinance, resolution or vote adopted or passed by the City Council relative to the affairs of the City shall be presented to the Mayor for his approval. If approved, he must sign it. If not, he shall return it, with his written objections, to the City Council who shall, again, consider it. To override the Mayor's objections, a two-thirds vote is required. Further, the failure of the Mayor to submit his disapproval of the measure with written objections within ten (10) days after it is presented to him shall be deemed valid and in full force and effect. This section shall not apply to emergency measures as provided in Sections 2-9(a) and 2-9(b) of this Charter.

Section 3-7.    **Temporary Absence of Mayor**.

(a)    <u>Acting Mayor</u> - Whenever, by reason of sickness, absence from City or other unexpected cause, the Mayor shall be unable to perform the duties of his office for a period of three (3) successive working days or more, the City Council shall appoint from among its members an Acting Mayor to serve in the Mayor's absence.

(b)    <u>Powers of an Acting Mayor</u> - The Acting Mayor shall have all the powers of the Mayor except that he shall not make any permanent appointment or removal to or from any office unless the disability of the Mayor shall have continued for sixty (60) days or more without having resigned, nor shall he approve or disapprove of any measure passed by the City Council unless the time within the Mayor must act would expire before the return of the Mayor.

Section 3-8.     **Vacancy in Office of Mayor**.

(a)     Special Election - If a vacancy in the office of Mayor occurs in the first year of the term for which the Mayor is elected, whether by reason of death, resignation, removal from office, incapacity, or otherwise, the City Council shall forthwith order a special election to be held within sixty (60) days following the date the vacancy is created to fill such vacancy for the balance of the then unexpired term.

(b)     Council Election – If a vacancy in the office occurs in the second year of the term for which the Mayor was elected, whether by reason of death, resignation, removal from office, or otherwise, a meeting of the City council shall be called forthwith and they shall elect, by a majority vote, one of its members as Mayor for the unexpired term.  Failing to so elect at said meeting, or, thirty (30) days thereafter, the Chairman of the City Council shall become Acting Mayor for the unexpired term.  Upon the qualification of the City Council member or Chairman of the City Council as the Mayor under this section, a vacancy shall exist in his seat on the City Council which shall be filled in the manner provided in Section 2-6.

(c)     Powers; Term of Office – The Mayor elected under Section 3-8(a) or 3-8(b) shall have all the powers of the Mayor.  He shall serve for the balance of the term unexpired at the time of his election to the office.

Section 3-9.     **Terms of Office – Department Heads**.

The terms of office of Department Heads of the City of Methuen shall be three years.  The term "Department Heads", as used herein, shall mean the Fire Chief, Director of Public Works, Veterans' Service Agent, City Clerk, Treasurer/Tax Collector, and the Executive Director of the Council on Aging and such other officers who may be designated as Department Heads under City ordinances.  (Approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996).

## ARTICLE 4
## School Committee

Section 4-1.     **Composition; Eligibility; Election; Term.**

(a)     Composition – There shall be a School Committee consisting of seven members, six of whom shall be nominated and elected at large, and the Mayor who shall serve as the seventh member of the School Committee.  The Mayor shall also serve as the Chairman thereof with full power to vote.  The School Committee shall exercise control and management of the public schools of the City.  (Mayor as ex-officio Chairman approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996).

(b)     Eligibility – Only voters shall be eligible to hold office of School Committeeman.

13.    Election and Term – The terms of School Committeemen shall be two years, beginning the first secular day in January after election and until their successors are qualified. No person shall hold the office of school committee member for more than three consecutive years. (Establishment of term limits approved by the Legislature, September 24th, 1999, Chapter 82 of the Acts and resolves of 1999 and adopted by the Voters November 2nd, 1999).

Section 4-2    **Organization.**

The School Committee shall annually organize by the election from among its members a Chairman, a Vice Chairman and a Secretary. The Vice Chairman shall preside at all meetings of the committee in the event of the absence or the disability of the Chairman.

Section 4-3    **General Powers and Duties.**

The School Committee shall have the powers and duties which School Committees have under the General Laws and may have such additional powers and duties as the City Council may, by ordinance, from time to time assign. The powers of the School Committee shall include, but not be limited to, the power to: (1) appoint a Superintendent; (2) appoint all other officers and employees connected with the schools, except as otherwise provided by this Charter, fix their compensation and define their duties, make rules concerning their tenure of office and discharge them; (3) furnish all school buildings with proper fixtures, furnishings and equipment; and (4) make all reasonable rules and regulations consistent with law, for the management of the public schools of the City and for conducting the business of the Committee.

Section 4-4    **Location and Erection of Schools; Approvals Required.**

No site for a school building shall be acquired by the City unless the approval of the site by the School Committee is first obtained. No plans for the construction of or alterations in a school building shall be accepted, and no work shall be begun on the construction or alteration of a school building unless with the approval of the School Committee and the Mayor. The Mayor shall notify the School Committee in writing prior to or at the time of each change in plans after work is begun. This section shall not require such approval for the making of ordinary repairs.

Section 4-5    **Prohibitions.**

No member of the School Committee shall, during the term for which he was elected, hold any other compensated City office or City employment under the jurisdiction of the School Committee, nor shall he be eligible for appointment to any compensated City office or City employment under the jurisdiction of the School Committee until one year after the term for which he was elected has expired. This provision shall not prevent a City officer or employee, under the jurisdiction of the School Committee, who has taken a leave of absence from such duties in order to serve as a member of the School Committee from returning to such office or employment following such services as a member of the School Committee.

Section 4-6    **Filling of Vacancies**.

If a vacancy occurs in the office of School Committeeman, whether by failure to elect or otherwise, the remaining School Committeemen shall, within twenty-one days following the date such vacancy is declared to exist, act to fill the said vacancy. The School Committee shall elect as acting School Committeeman whichever of the defeated candidates for election to the School Committee who received the highest number of votes at the last regular City election immediately preceding the date the vacancy is declared to exist and who received at least twenty (20) percent of the total votes cast for the office at such election, and who remains eligible and willing to serve. There being no such person, the School Committee shall choose from among the voters an acting School Committeeman to serve the balance of the unexpired term. If such choice is not made as hereinbefore provided within the said twenty-one days, the choice shall be made by the School Committeeman senior in length of service, or if there be more than one such, by the School Committeeman senior both in age and in terms of service. Any person so chosen shall be sworn and commence to serve forthwith. No vacancy shall be filled, in the manner hereinbefore provided, if a regular City election is to be held within one hundred twenty days following the date the vacancy is declared to exist.

Section 4-7    **Budget Hearing**.

(a)    At least thirty (30) days before the meeting at which the School Committee is to vote on the budget request which it will submit to the Mayor for inclusion in the budget he is required to submit to the City Council, the School Committee shall cause to be published in a local newspaper a general summary of their proposed budget. The summary shall indicate specifically areas of increase from the present budget, if any, and the reasons for such changes and a notice stating (1) the times and places where complete copies of their proposed budget will be available for public examination, and (2) the date, not less than seven nor more than fourteen days following such publication, and the place at which a public hearing will be held by the School Committee on their proposed budget.

(b)    The School Committee shall submit its annual budget to the City Council for approval in the following format: Expenditures for each individual school building in the City, including administration, if any, shall be broken down categorically by line item. Example: Teacher salaries, custodial salaries, teacher aide salaries, teacher supplies, maintenance supplies, etc.

### ARTICLE 5
### Financial Procedures

Section 5-1    **Submission of Budget; Budget Message**.

Within the period prescribed by state statute, the Mayor shall submit to the City Council a proposed budget for the ensuing fiscal year which shall provide a complete financial plan of all City funds and activities for the ensuing fiscal year, and accompanying budget message, and supporting documents, including the estimated effect of the proposed budget on

the tax rate. The proposed budget, including departmental requests, shall be in the same format as prescribed by the Mayor.

The message of the Mayor shall explain the budget for all City agencies both in fiscal terms and in terms of work programs. It shall outline the proposed financial policies of the City for the ensuing fiscal year, describe the important features of the budget, indicate any major changes from the current fiscal year in financial policies, expenditures and revenues, together with the reasons for such changes; summarize the City's debt position and include such other material as the Mayor deems desirable or the City Council may reasonably require.

Section 5-2    **Action on the Budget**.

(a)    <u>Public Hearing</u> - The City Council shall publish in one or more newspapers of general circulation in the City the general summary of the proposed budget as submitted by the Mayor by a notice stating: (1) the times and places where copies of the proposed budget are available for inspection by the public, and (2) the date, time and place, not less than two weeks after such publication, when a public hearing on said proposed budget will be held by the City Council.

(b)    <u>Adoption of the Budget</u> - The City Council shall adopt the budget, with or without amendments, within forty-five days following the date the budget is filed with the Clerk of the Council. In amending the budget, it may delete or decrease any programs or amounts except expenditures required by law or for debt service, but except on the recommendation of the Mayor, it shall not increase any item in or the total of the proposed budget.

If the City Council fails to take action with respect to any item in the budget within forty-five days after receipt of the budget, such amount shall, without any action by the City Council, become a part of the appropriations for the year, and be available for the purposes specified.

Section 5-3    **Capital Improvement Program**.

(a)    <u>Submission</u> - The Mayor shall prepare and submit annually to the City Council a five-year capital improvement program at least thirty days prior to the final date for submission of the operating budget.

(b)    <u>Contents</u> - The capital improvement program shall include: (1) a clear summary of its contents; (2) a list of all capital improvements proposed to be undertaken during the next five fiscal years with supporting data; (3) cost estimates, method of financing, and recommended time schedules; and (4) the estimated annual cost of operating and maintaining the facilities included. The above information shall be revised and extended each year.

14.    <u>Public Hearing</u> - The City Council shall publish in one or more newspapers of general circulation in the City the general summary of the capital improvement program and a notice stating: (1) the times and places where copies of the capital improvement program are

-13-

available for inspection by the public; and, (2) the date, time and place not less than two weeks after such publication, when a public hearing on said program will be held by the City Council.

(d)    Adoption - After the public hearing and on or before the twentieth day of the last month of the current fiscal year, the City Council shall, by resolution, adopt the capital improvement program, with or without amendment, provided that each amendment must be voted separately and that any increase in the capital improvement program as submitted must clearly identify the method of financing proposed to accomplish this increase.

Section 5-4    **Provision for Outside Audit.**

At least once in every three years an outside audit of the books and accounts shall be made. In the event that the Commonwealth shall fail in any such period to provide for an audit to be conducted, within ninety days following the date a written request for them to do so is made by the City Council, the City Council shall provide for such an audit to be made by a certified public accountant, or firm of such accountants, who have no personal interests, direct or indirect, in the fiscal affairs of the City government or of any of its affairs or employees.

Section 5-5    **Annual Audit of Department Heads.**

There will be a financial audit done by a private public accountant or firm of all department heads who are responsible for any negotiating or any individual who awards any contracts or investments in the interest of the City.

This audit shall be done annually and if this audit finds that there is no wrongdoing as far as the residents of the City are concerned, a report stating such shall be placed on file with the City Clerk. If any wrongdoing is found, then the private accountant shall forward to the District Attorney's office of Essex County, any such evidence of wrongdoing for his necessary action.

Section 5-6    **Chief Financial Officer Obtaining Five (5) Quotes from Banks.**

The Treasurer shall obtain not less than five (5) quotes on interest rates from separate corporate financial institutions when borrowing or investing City funds and shall file such records of transaction with the City Council. This section does not pertain to bond issues.

### ARTICLE 6
### Administrative Departments

Section 6-1    **Reorganization Plans by City Council.**

Except as otherwise prohibited by law or the Charter, the City Council may, by ordinance, reorganize, consolidate or abolish any existing City agency, in whole or in part; establish new City agencies and prescribe the functions of any City agencies. All City agencies

-14-

under the direction and supervision of the Mayor shall be headed and administered by officers appointed by him.

Section 6-2      **Reorganization Plans by Mayor.**

(a)      The Mayor may, from time to time, prepare and submit to the City Council, reorganization plans which may, subject to applicable law and the Charter, reorganize, consolidate or abolish any City agency, in whole or in part, or establish new City agencies, as he deems necessary or expedient. Such reorganization plan shall be accompanied by an explanatory message when submitted.

(b)      Every such reorganization plan shall, upon receipt by the Clerk of the Council, be referred to an appropriate committee of the City Council which shall, not more than thirty days later, hold a public hearing on the matter and shall, within ten days following such hearing, report either that it approves or that it disapproves of the plan. A reorganization plan shall become effective ninety days after the date it is received by the City Council, unless the City Council has, prior to that date, voted to disapprove the reorganization plan, or, unless a later effective date is specified in the plan. A reorganization plan presented by the Mayor to the City Council under this section may not be amended by it, but shall either be approved or rejected as submitted and shall not be subject to the objection as provided in Section 2-9(c).

Section 6-3      **Publication of Reorganization Plan.**

An up-to-date record of any reorganization plan under this article shall be kept on file in the office of the City Clerk and copies of all such plans shall be included as an appendix in any publication of the ordinances of the City.

### ARTICLE 7
### Nominations and Elections

Section 7-1      **City Elections; General and Preliminary.**

The regular City election shall be held on the first Tuesday following the first Monday in November of each odd- numbered year.

On the fourth Tuesday preceding every regular City election, there shall be held a preliminary election for the purpose of nominating candidates.

Section 7-2      **Preliminary Elections.**

(a)      <u>Signature Requirements</u> - The number of signatures of voters required to place the name of a candidate on the official ballot to be used at a preliminary election shall be as follows: For an office which is to be filled by vote of the whole City, not less than one hundred and fifty

signatures, not less than fifty from each of the three districts. For an office which is elected by the voters in a district, not less than fifty signatures from said district.

(b)     <u>Ballot Position</u> - The order in which names of candidates appear on the ballot for each office shall be determined by a drawing by lot conducted by the City Clerk in the presence of such candidates or their representatives as may choose to attend such drawings.

(c)     <u>Determination of Candidates for Election</u> – The two persons receiving at a preliminary election the highest number of votes for nomination for an office shall be the sole candidates for that office whose names may be printed on the official ballot to be used at the regular election at which such office is to be filled, and no acceptance of a nomination at a preliminary election shall be necessary to its validity.

If two or more persons are to be elected to the same office at such regular election, the several persons in number equal to twice the number so to be elected receiving at such preliminary election the highest number of votes for nomination for that office shall be the sole candidates for that office whose names may be printed on the official ballot.

If the preliminary election results in a tie vote among candidates for nomination receiving the lowest number of votes, which but for said tie vote would entitle a person receiving the same to have his name printed upon the official ballot for the election, all candidates participating in said tie vote shall have their names printed upon the official ballot, although in consequence, there be printed thereon candidates to a number exceeding twice the number to be elected.

(d)     <u>Nominations of Candidates; Conditions Making Preliminary Election Unnecessary</u> - If, at the expiration of the time for filing petitions of candidates to be voted for at any preliminary election, not more than twice as many such petitions have been filed with the City Clerk for an office as are to be elected to such office, the candidates whose petitions have thus been filed shall be deemed to have been nominated to said office and their names shall be voted on for such office at the succeeding regular election, and the City Clerk shall not print said names upon the ballot to be used at said preliminary election and no other nomination to said office shall be made. If, in consequence, it shall appear that no names are to be printed upon the official ballot to be used at any preliminary election in any district or districts of the City, no preliminary election shall be held in any such district or districts.

Section 7-3     **Regular Election.**

(a)     <u>Information to Voters</u> - If the candidate in a regular City election is an incumbent of the office to which he seeks election, against his name shall appear the phrase "candidate for re-election".

(b)     <u>Ballot Position</u> - The order in which names of candidates appear on the ballot for each office in a regular City election shall be determined by a drawing by lot conducted by the City Clerk in the presence of such candidates or their representatives as may choose to attend.

-16-

Section 7-4    **Precincts and Districts.**

The territory of Methuen shall be divided into twelve precincts, so established as to consist of as nearly equal a number of inhabitants as it is possible in compact and contiguous territory; bounded insofar as possible by the center line of known streets or ways or by other well defined limits. The twelve precincts shall be separated into three districts. The Central District shall include Precincts 1, 2, 6 and 10; the East District shall include Precincts 3, 7, 9 and 12; and the West District shall include Precincts 4, 5, 8 and 11. (Increase in precincts from 9 to 12 approved by the Legislature June 10th, 1986 - Chapter 88 of the Acts and Resolves of 1986; see Resolution #1473).

Section 7-5    **Application of State Laws.**

Except as expressly provided in the Charter and authorized by statute, all City elections shall be governed by the laws of the Commonwealth relating to the right to vote, the registration of voters, the nomination of candidates, the conduct of preliminary and regular elections, the submission of Charter amendments and other propositions, the counting of votes and the declaration of results.

## ARTICLE 8
### Free petition; Initiative; Referendum; Recall

Section 8-1    **Free Petition.**

a)    <u>Individual Petitions, Action Discretionary</u> - The City Council and the School Committee shall receive all petitions which are addressed to them and signed by a voter and may, in their discretion, take such action in regard to such petitions as they deem necessary and appropriate.

b)    <u>Group Petitions; Action Required</u> - The City Council (or the School Committee), as the case may be, shall hold a public hearing and act by taking a vote on the merits of every petition which is addressed to it and which is signed by at least one hundred fifty voters. The hearing shall be held by the City Council or the School Committee, or, in either case, by a committee or sub-committee thereof and the action by the City Council or School Committee shall be taken not later than three months after the petition is filed with the City Clerk. Hearings on two or more petitions filed under this section may be held at the same time and place. The City Clerk shall mail notice of the hearing to the ten petitioners whose names first appear on each petition at least seven days before the hearing. Notice by publication at least seven days prior to all such hearings shall also be made, and shall be at public expense. No hearing shall be heard upon any one subject matter more than once in any given twelve month period.

Section 8-2    **Citizen Initiative Measures.**

a)    <u>Commencement of Proceedings</u> – Initiative procedures shall be started by the filing of an initiative petition with the City Clerk. The petition shall be addressed to the City

Council or the School Committee, shall contain a request for passage of a particular measure set forth in the petition and shall be signed by not less than ten per cent of the total number of voters.

Signatures to initiative petitions need not be all on one paper. All such papers pertaining to any one measure shall be fastened together and shall be filed in the office of the City Clerk as one instrument, with the endorsement thereon of the names and addresses of the persons designated as filing the same. With each signature to the petitions, shall be stated the place of residence of the signer, giving the street and number, if any.

Within five days after the filing of said petition the registrars of voters shall ascertain by what number of voters the petition is signed, and what percentage that number is of the total number of voters and shall attach thereto their certificate showing the result of such examination.

The City Clerk shall forthwith transmit the said certificate with the said petition to the City Council or to the School Committee, according as the petition is addressed and at the same time shall send a copy of said certificate to the persons designated on the petition as filing the same.

When such certificate has been so transmitted, said petition shall be deemed to be valid unless written objections are made with regard to the signatures thereon by a voter within forty-eight hours after such certification by filing such objections with the City Council or the School Committee, and a copy thereof with the registrars of voters. Any such objection shall be determined forthwith.

b)      Referral to City Solicitor - If the City Clerk determines that a sufficient number of signers are voters, he shall transmit a copy of the petition to the City Solicitor.

Within fifteen days after his receipt of the petition the City Solicitor shall advise the City Clerk in writing whether the measure may be proposed by initiative procedures and whether it may lawfully be passed by the City Council or the School Committee. If the opinion of the Solicitor is that the measure may not lawfully be passed, he shall state his reason or reasons therefor in his reply. The City Clerk shall forthwith furnish a copy of the City Solicitor's opinion to the person designated on the petition as filing the same.

c)      Initiative Petition; Requirements for Passage and Submission to Electorate - If any initiative petition is signed by voters equal in number to at least ten per cent of the total number of voters, and, in the opinion of the City Solicitor, such measure may lawfully be passed by the City Council or the School Committee, the City Council or the School Committee, within twenty days after the date of the certificate of the registrars to that effect: (1) shall pass said measure without alteration, subject to the referendum vote provided by this Charter; or (2) the City Council shall call a special election to be held on a date fixed by it not less than thirty nor more than forty-five days after the date of the certificate hereinbefore mentioned, and shall submit the proposed measure without alteration to a vote of the voters at that election; provided, that if any

City election is otherwise to occur within one hundred and twenty days after the date of said certificate, the City Council may, at its discretion, omit the calling of a special election and submit the proposed measure to the voters at such approaching election.

The ballots used when voting upon a proposed measure under this section shall state the nature of the measure in terms sufficient to show the substance thereof.

Section 8-3    **Citizen Referendum Procedures**.

Referendum Petition; Effect on Final Passage – If within twenty days after the final passage of any measure, except a revenue loan order, by the City Council or by the School Committee, a petition signed by voters equal in number to at least ten per cent of the total number of voters, and addressed to the City Council or to the School Committee, as the case may be, protesting against such measure or any part thereof taking effect, is filed with the City Clerk, the same shall thereupon and thereby be suspended from taking effect; and the City Council or the School Committee, as the case may be, shall immediately reconsider such measure or part thereof; and if such measure or part thereof is not entirely rescinded, the City Council shall submit the same, by the method herein provided, to a vote of the voters either at the next regular City election, or at a special election which may, in its discretion, be called for the purpose and such measure or part thereof shall forthwith become null and void unless a majority of the voters voting on the same at such election vote in favor thereof.

The petition described in this section shall be termed a referendum petition and section 8-2 (a) shall apply to the procedure in respect thereto, except that the words "measure or part thereof protested against" shall for this purpose be understood to replace "measure" in said section whenever it may occur, and "referendum" shall be understood to replace the word "initiative" in said section.

In addition to the requirements for filing as mentioned above, the following shall apply:  referendum petitions shall be on a form as prepared by the City Clerk and such petition forms may not be issued on any referendum matter until the same has been finally passed in accordance with Article 2, Section 2-9(a) of the Methuen Home Rule Charter.  Failure to comply with the above procedure shall invalidate any petition otherwise proper in form and substance. (Approved by voters November 5, 1985; see resolution #1359).

Section 8-4    **Submission of Proposed Measure to Voters**.

The City Council may, of its own motion, and shall upon request of the School Committee if a measure originates with that committee and pertains to the affairs under its administration, submit to a vote of the voters for adoption or rejection at a general or special City election any proposed measure, or a proposition for the repeal or amendment of any measure, in the same manner and with the same force and effect as are hereby provided for submission on petition.

-19-

Section 8-5    **Measures with Conflicting Provisions.**

If two or more proposed measures passed at the same election contain conflicting provisions, only the one receiving the greater number of affirmative votes shall take effect.

Section 8-6    **Recall Petitions.**

(a)    <u>Who Can Be Recalled</u> - The holder of any elective City office may be recalled therefrom by the voters as herein provided.

(b)    <u>Recall Petition</u> - Any one hundred fifty voters may file with the City Clerk an affidavit containing the name of the officer sought to be recalled and a statement of the grounds for the recall. The City Clerk shall thereupon deliver to said voters making the affidavit copies of petition blanks demanding such recall printed forms of which he shall keep available. The blanks shall be issued by the City Clerk with his signature and the official seal attached hereto. They shall be dated, shall be addressed to the City Council and shall contain the names of all persons to whom they are issued, the name of the person whose recall is sought, the grounds of recall as stated in the affidavit and shall demand the election of a successor in the said office. A copy of the petition shall be entered in a record book to be kept in the office of the City Clerk. The recall petition shall be returned and filed with the City Clerk within sixty days after the filing of the affidavit, and shall have been signed by at least fifty per cent of the number of voters of the City who have voted in the last preceding local election, or in the case of a district councilman, of the district, who shall add to their signatures the street and number, if any, of their residences.

The City Clerk shall within twenty-four hours of receipt submit the petition to the registrars of voters and the registrars shall forthwith certify thereon the number of signatures which are names of voters.

(c)    <u>City Council's Action on Receiving Petition</u> - If the petition shall be found and certified by the City Clerk to be sufficient, he shall submit the same with his certificate to the City Council without delay, and the City Council shall forthwith give written notice of the receipt of the certificate to the officer sought to be recalled and shall, if the officer does not resign within five days thereafter, order an election to be held on a date fixed by them not less than forty-five nor more than sixty days after the date of the City Clerk's certificate that a sufficient petition is filed; provided, however, that if any other City election is to occur within sixty days after the date of the certificate, the city council shall postpone the holding of the recall election to the date of such other election. If a vacancy occurs in said office after a recall election has been ordered, the election shall nevertheless proceed as provided in this section.

(d)    <u>Nomination of Candidates</u> - Any officer sought to be removed may be a candidate to succeed himself, and unless he requests otherwise in writing, the City Clerk shall place his name on the ballot without nomination. The nomination of other candidates, the publication of the warrant for the removal election, and the conduct of the same, shall all be in accordance with the provisions of law relating to elections, unless otherwise provided in this section.

(e)     <u>Incumbent Holds Office Until Election</u> – The incumbent shall continue to perform the duties of his office until the recall election. If then re-elected, he shall continue in office for the remainder of his unexpired term, subject to recall as before, except as provided in this section. If not re-elected in the recall election, he shall be deemed removed upon the qualification of his successor, who shall hold office during the unexpired term. If the successor fails to qualify within five days after receiving notification of his election, the incumbent shall thereupon be deemed removed and the office vacant.

(f)     <u>Propositions on Ballot</u> - Ballots used in a recall election shall submit the following propositions in the order indicated:

> For the recall of (name of officer)
> Against the recall of (name of officer)

Immediately at the right of each proposition there shall be a square in which the voter, by making a cross mark (X), may vote for either of the said propositions. Under the proposition shall appear the word "Candidates", the directions to voters required by Section 42 of Chapter 54 of the General Laws, and beneath this, names of candidates nominated as hereinbefore provided. If a majority of the votes cast upon the question of recall is in the affirmative, the candidate receiving the highest number of votes shall be declared elected. If a majority of votes on the question is in the negative, the ballots for candidates need not be counted.

(g)     <u>Re-appointment of Person Recalled</u> - No person who has been recalled from an office, or who has resigned from office while recall proceedings were pending against him, shall be appointed to any city office within two years after such recall or such resignation.

## ARTICLE 9
### General Provisons

**Section 9-1     Certificate of Election and Appointment.**

Every person who is elected or appointed shall receive a certificate of such election or appointment from the City Clerk which shall bear the date of its expiration. Except as otherwise provided by law, before performing any act under his election or appointment, he shall take and subscribe to an oath to qualify him to enter upon the duties of office. A record of the taking of such oath shall be made by the City Clerk. Any oath required by this section may be administered by any officer authorized by law to administer oaths. Records of transaction of all officers and boards shall be open to the inspection of the public.

**Section 9-2     Rules and Regulations.**

A copy of all rules and regulations adopted by any City agency shall be filed in the office of the City Clerk and made available for review by any person who requests such information.

-21-

Section 9-3      **Re-enactment and Publication of Ordinances.**

The City Council shall, at five year intervals, cause to be prepared by a special committee of the City Council appointed for that purpose proposed revisions or recodifications of all ordinances of the City which shall be presented to the City Council for re-enactment. Such revision or recodification shall be prepared under the supervision of the City Solicitor, or, if the City Council so directs, by special counsel retained for that purpose. Copies of the revised ordinances shall be made available for distribution, provided, however, that a charge not to exceed the actual cost per copy of reproduction may be charged.

Section 9-4      **Liability of City Offices and Agencies.**

All City officers and members of City agencies shall be deemed to be public or municipal officers or officials. Subject to appropriation, the City may indemnify any such officer or member for expenses or damages incurred in the defense or settlement of a claim against him which arose while acting within the scope of his official duties or employment, but only to the extent and subject to the limitations imposed by the General Laws.

Section 9-5      **Prohibition.**

No member of the executive or legislative branch or of the School Committee shall appear as counsel before any City office or agency.

Section 9-6      **Meetings of Qualified Voters.**

General meetings of the voters may be held from time to time, according to the right secured to the people by the Constitution of the Commonwealth; and all such meetings may, and upon the request in writing of one hundred voters setting forth the purpose thereof, shall be duly called by the City Council.

Section 9-7      **Severability.**

If any provision of the Charter is held invalid, the other provisions of the Charter shall not be affected thereby. If the application of the Charter or any of its provisions to any person or circumstance is held invalid, the application of the Charter and its provisions to other persons and circumstances shall not be affected thereby.

Section 9-8      **Specific Provisions Shall Prevail.**

To the extent that any specific provision of the Charter will conflict with any provisions expressed in the Charter in general terms, the specific provisions shall prevail.

Section 9-9    **References to General Laws**.

All references to the General Laws contained in the Charter refer to the General Laws of the Commonwealth of Massachusetts and are intended to include any amendments or revisions to such chapters and sections or to the corresponding chapters and sections of any re-arrangement of the General Laws enacted subsequent to the adoption of the Charter.

Section 9-10    **Removals and Suspensions**.

(a)    <u>In General</u> - Any appointed officer or full-time salaried employee of the City, not subject to the provisions of the state civil service law, whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause. The term cause shall include, but not be limited to, the following: incapacity other than temporary illness, inefficiency, insubordination and conduct unbecoming the office.

(b)    <u>Suspension</u> - Any appointed officer or full-time salaried employee of the City may be suspended from the office by the appointing authority if such action is deemed by them to be necessary to protect the interest of the City. However, no suspension shall be for more than fifteen days.

Suspension may be coterminous with removal and shall not interfere with the rights of the officer or employee under the removal procedure given below.

(c)    <u>Removal</u> - The appointing authority, when removing any such officer or employee, shall act in accordance with the following procedure:

1. A written notice of intent to remove and a statement of the cause or causes therefor shall be delivered by registered mail to the last known address of the person sought to be removed.

2. Within five days of delivery of such notice, the officer or employee may request a public or closed hearing to be held by the City Council at which he may be represented by counsel, who shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing. Such hearing shall be conducted under the rules of evidence.

3. Between one and ten days after the public or closed hearing is adjourned, the City Council shall direct the appointing authority to take final action by either removing the officer or employee or notifying him that the notice has been rescinded.

4. After delivery of this notice of intent to remove, if the officer or employee fails to request a hearing, the appointing authority shall take final action either by removing the officer or employee or notifying him that the notice has been rescinded.

Nothing in this section shall be construed as granting a right to such a hearing to:

(i)     A person who holds a position for a fixed term, when his term expires; and

(ii)    A person who is a member of Local 3699, American Federation of State, County and Municipal Employees, AFL-CIO, Methuen Support Staff Employees Unit.  Said member shall be governed by the disciplinary Procedure of said Unit's collective bargaining agreement with the City Of Methuen.  (Chapter 76 of the Acts and Resolves of 1996)

Section 9-11    **Procedures**.

(a)    <u>Meetings</u> - All multiple member bodies of the City, whether elected or appointed or otherwise constituted, shall meet regularly at such times and places within the City as they may prescribe.  Except in emergencies, special meetings of any multiple member body shall be held on the call of the respective chairman or by one-third of the members thereof by written notice delivered to the residence or place of business of each member at least forty-eight hours in advance of the time set.  A copy of the said notice shall also be posted on the City bulletin board(s).  Special meetings of any multiple member body shall also be called within one week after the date of the filing with the City Clerk of a petition signed by at least one hundred voters and which states the purpose or purposes for which the meeting is to be called.  Except in cases of special emergency as otherwise authorized by the General Laws, all meetings of all multiple member bodies shall be open and public; however, the multiple member body may recess for the purpose of discussing in a closed or executive session limited to its own membership, any matter which would tend to defame or prejudice the character or reputation of any person, which would affect the public security, or which might have a direct fiscal effect on the city, provided that the general subject matter for consideration is expressed in the motion calling for such session.

(b)    <u>Agendas</u> - Except in cases of special emergency, at least forty-eight hours before any meeting of a multiple member body is to be held, an agenda containing all items which are scheduled to come before it at the meeting shall be posted.  No action taken on a matter not included in the posted agenda shall be effective unless the body first adopts by special vote a resolution declaring that an emergency exists and that the particular matter must be acted upon at that meeting for the immediate preservation of the peace, health, safety or convenience of the City.

(c)    <u>Rules and Journal</u> - Each multiple member body shall determine its own rules and order of business unless otherwise provided by the Charter or by law and shall provide for keeping a journal of its proceedings.  These rules and journals shall be a public record kept available in a place convenient to the public at all times and certified copies shall be kept available in the City Clerk's office.

(d)    <u>Voting</u> - Except on procedural matters, all votes of all multiple member bodies shall be taken by a call of the roll and the ayes and nays shall be recorded in the journal, provided, however, that if the vote is unanimous only that fact need be recorded.

(e)    <u>Quorum</u> - A majority of the members of a multiple member body shall constitute a quorum, but a smaller number may adjourn from time to time and compel the attendance of absent members in the manner and subject to the penalties prescribed by the rules of the body. No other action shall be valid or binding unless ratified by the affirmative vote of the majority of the full body.

Section 9-12    **Definitions**.

Unless another meaning is clearly apparent from the manner in which the word is used, the following words as used in the Charter shall have the following meanings:

(a)    <u>Charter</u> - The word "Charter" shall mean this Charter and any amendments to it made through any of the methods provided under Article LXXXIX of the amendments to the State Constitution.

(b)    <u>Days</u> - The word "days" shall refer to business days, not including Saturdays, Sundays, and Legal Holidays, when the time set is seven days or less; when more than seven days, every day shall be included when counting days.

(c)    <u>Emergency</u> - The word "emergency" shall mean a sudden, unexpected, unforeseen happening, occurrence or condition which necessitates immediate action.

(d)    <u>Full Council</u> - The words "full Council" shall mean the entire authorized complement of the City Council notwithstanding any vacancies which might exist.

(e)    <u>Initiative Measure</u> - The words "initiative measure" shall mean a measure proposed by initiative procedures under the Charter, including a specific item in a City budget or School Committee budget but excluding:

1.  Proceedings relating to the organization or operation of the City Council or School Committee;

2.  An emergency measure passed in conformity with the Charter;

3.  The City budget as a whole or the School Committee budget as a whole;

4.  A revenue loan order;

5.  An appropriation for the payment of the City debts or obligations;

6.  Any appropriation of funds necessary to implement a written agreement executed under General Laws, Chapter 149, Section 178I (relating to collective bargaining);

7.  Any proceeding or part thereof, relating to the election, employment, appointment, suspension, transfer, demotion, removal or discharge of any City officer or employee;

8.  Any proceeding repealing or rescinding a measure, or a part thereof, which is protested by referendum procedures.

(f)    Majority Vote - The shall mean "majority vote" shall mean a majority of those present and voting, provided, that a quorum of the body is present.

(g)    Measure - The word "measure" shall mean an ordinance passed or which could be passed by the City Council or an order, resolution, vote or other proceeding passed or which could be passed by the City Council or School Committee.

(h)    Multiple Member Body - The words "multiple member body" shall mean any body consisting of two or more persons, whether elected, appointed or otherwise constituted.

(i)    Municipality - Methuen shall have a municipal form of government.

(j)    Number and Gender - The singular number may be extended and applied to several persons or things; words imparting the plural number may include the singular; and words imparting the masculine gender shall include the feminine gender.

(k)    Referendum Measure - The words "referendum measure" shall mean a measure protested by referendum procedures under the Charter, including a specific item in the City budget or School Committee budget, but excluding items #1 through 7 mentioned under the definition of (e) Initiative Measures, and:

(8)    any proceeding providing for the submission or referral of a matter to the voters at an election.

(l)    City - The word "City" shall mean the name "City of Methuen".

(m)    City Agency - The words "City agency" shall mean any board, commission, committee, department, or office of the City government.

(n)    Voters - The word "voters" shall mean registered voters of the City of Methuen.

-26-

# ARTICLE 10
## Transitional Provision

Section 10-1    **Continuation.**

All by-laws, ordinances, resolutions, of the previous City Council votes, and rules and regulations of the City which are in force at the time the Charter is adopted, not inconsistent with the provisions of the Charter, shall continue in force until amended or repealed.

Section 10-2    **Continuation of Government.**

All City agencies shall continue to perform their duties until re-appointed, re-elected, or until successors to their respective positions are duly appointed or elected or their duties have been transferred.

Section 10-3    **Continuation of Administrative Personnel.**

Any person holding an office or position in the administrative service of the City, or any person serving in the employment of the City shall retain such office or position and shall continue to perform his duties until provisions shall have been made in accordance with the Charter for the performance of the said duties by another person or agency; provided, however, that no person in the permanent full time service of employment of the City shall forfeit his pay grade or time in service. All such persons shall be retained in a capacity as similar to their former capacity as it is practical so to do.

Section 10-4    **Transfer of Records and Property.**

All records, property, and equipment whatsoever of any City agency or part thereof, the powers and duties of which are assigned in whole or part to another City agency shall be transferred forthwith to the City agency to which such powers and duties are assigned.

Section 10-5    **Effect on Obligations, Taxes and other Legal Acts.**

All official bonds, recognizances, obligations, contracts and other instruments entered into or executed by or to the City before its adoption of the Charter, and all taxes, special assessments, fines, penalties, forfeitures incurred or imposed, due or owing to the City, shall be enforced and collected, and all writs, prosecutions, actions and causes of action, except as herein otherwise provided, shall continue without abatement and remain unaffected by the Charter; and no legal act done by or in favor of the City shall be rendered invalid by its adoption of the Charter.

Section 10-6    **Council Salary.**

   The salary to be paid to each member of the City Council elected at the first election shall be determined by the City Council but under no circumstances shall exceed $1,000.00 per annum. This salary if any shall continue until changed by ordinance under the provisions of Section 2-3 of the Charter.

Section 10-7    **Time of Taking Effect.**

   This Charter shall become fully effective on January 1, 1978 but it shall take partial effect in accordance with the following schedule:

  (a) The first regular election shall be held in accordance with Article 7-1 of this proposed Charter on the first Tuesday following the first Monday in November, 1977. All of the provisions of the Charter which relate to the conduct of regular City elections including a preliminary election with regard to the City Council shall take effect as stated in the Charter.

  (b) The School Committee shall only elect three members at large in November of 1977 for a term of two years. The three School Committeemen elected at the regular City election of April, 1977 shall continue to serve until the election of November, 1979. At that time, six School Committeemen will be elected every two years in accordance with the Charter proposed.

  (c) The powers and duties of the City Council shall not become fully effective until the first secular day of January, 1978, but in the meantime, the City Council shall prepare for the transition to the new form of government as follows:

    1. They shall establish qualifications and procedures to follow in the selection of a City Manager to serve under the Charter. The appointment of a City Manager shall be effective on the second Monday of January following their election.

    2. They shall cause to be prepared rules and regulations governing the conduct of Council business. They shall study the requirements of the new Council and may prepare all necessary ordinances to be effective, for the orderly and convenient exercise of the administrative affairs of the City. They shall consider and prepare such agency reorganizations as they deem advisable, such as a Community Development Authority and a Human Service Board, for their consideration at the first session of the Council after January 1, 1978 but shall take no such action until they have taken the oath of office on the first secular day of 1978.

(d)     Representatives to Greater Lawrence Regional Vocational Technical High School.

The committee members elected by the City of Methuen to the Greater Lawrence Regional Vocational Technical High School district shall be elected in the following manner.

1.     The committee member to be elected at the April, 1977 election shall serve until the end of 1979 and his replacement shall be elected at the November, 1979 election.

2.     The committee member whose term would have expired after the April, 1979 election shall serve until the end of 1979 and his replacement shall also be elected in the November, 1979 election.

Thereafter, both representatives that Methuen is entitled to will be elected at the regular election held every two years in accordance with this Charter.

(e)     Representatives to Nevins Library.

The representatives elected by the City of Methuen to the Nevins Memorial Library will be elected in the following manner:

1.     The delegate who will be elected in April, 1977 will serve until the end of 1979 and his replacement will be elected in the November, 1979 election.

2.     The delegate who would have been elected in the April, 1978 election will continue serving as a holdover and he will serve until the end of 1979 and his replacement will be elected at the November, 1979 election.

Thereafter, both representatives will be elected in the regular manner.

(f)     Any officials elected under the previous Charter shall remain in office until January 1, 1978 unless specific provisions for their continuance is provided for in this Charter.

(g)     Community Development Department.

The City Council, within sixty (60) days after taking office, shall file a special act with the Great and General Court of the Commonwealth of Massachusetts to create a Community Development Department which will combine the Methuen Housing Authority, Methuen Redevelopment Authority, Methuen Planning Board and any other boards and commissions that the City Council feels is necessary to coordinate the present responsibilities of these boards and commissions.

(h)     <u>Elimination of Fiscal Autonomy for the Methuen School Department.</u>

The City Council shall, within thirty (30) days after taking office in January 1978, submit home rule legislation which shall eliminate fiscal autonomy for the Methuen School Department. Such legislation shall allow the City Council, by a 4/5 vote, to reduce the budget as submitted by the Methuen School Department.

(i)     The City Manager appointed in January following the election at which the Charter is adopted shall assist the City Council in the establishment of the new Charter as they may request him to do.

(j)     The Councillors in office at the time of the first November election shall continue to serve in that office until December 31st of that year. They shall be responsible for general operation of the government and shall continue to perform all of the powers, duties and functions of their office as though, this, the Charter, had not been adopted except that they shall coordinate all of their long-range plans with the new members of the new City Council.

Section 10-8     **Disposition of Special Acts.**

(a)     <u>Partial Repeal of Certain Special Acts</u> – The following special acts, insofar as they confer power upon the City of Methuen which the City would not otherwise hold under the Charter, General Laws or the Constitution, are retained; otherwise, they are hereby repealed, it being the explicit intention of this paragraph that portions of any special acts retained which limit or restrict a power conferred or the manner in which it is to be exercised be repealed and that powers so conferred are to be exercised in accordance with the Charter.

Chapter 310 of the acts of 1892; Chapter 176 of the acts of 1909; Chapter 57 of the acts of 1968.

(b)     <u>Special Act Specifically Retained</u> – The following act is hereby recognized, confirmed and retained: Chapter 12 of the acts of 1725.

Section 10-9     **City Solicitor Appointment/Time of Taking Effect.**

The provisions of Section 2-8(c) relative to the appointment of the City Solicitor shall take effect on July 1st, 1986, provided, however, that the City Council shall, upon the effective date of the act, assume supervision and direction of the City Solicitor and he/she shall become directly responsible and accountable to the City Council. (Approved by voters November 5, 1985, see Resolution #1380 Chapter 182 of the Acts and Resolves 1985.)

# CHRONOLOGY OF CHARTER AMENDMENTS

1. Home Rule Charter adopted April 23rd, 1977, effective January 1st, 1978.

2. Article 2, City Council, Section 2-2, Organization. Amendment approved by the voters November 3rd, 1981. Amendment submitted to voters by the City Council, Resolution #758, approved March 16th, 1981.

This section originally read as follows:

Section 2-2   Organization.

After the Councillors Elect have been sworn, the City Council shall be called together by the oldest member elected who shall preside. The City Council shall then elect, from among its members, a chairman and vice chairman to serve at the pleasure of the City Council. The chairman shall preside at all meetings of the City Council, and perform such other functions as may be assigned by the Charter, by ordinance or by vote of the City Council. The vice chairman shall act as chairman of the Council during the absence or disability of the chairman. The City Council shall elect from among its members one Councillor to sit as a voting member of the School Committee. This member shall serve at the pleasure of the City Council.

3. Article 4, School Committee, Section 4-1, sub-section (a), Composition. Amendment approved by the voters November 3rd, 1981. Amendment submitted to voters by the City Council, Resolution #758, approved March 16th, 1981.

This section originally read as follows:

(a)   Composition - There shall be a School Committee of seven members. Six of these members to be nominated and elected at-large. The seventh member shall be a member of the City Council elected by the City Council. The School Committee shall exercise control and management of the public schools of the City. All school committeemen shall be nominated and elected by the voters at large.

4. Article 8, Referendum Petitions, Section 8-3. Amendment approved by the voters November 5th, 1985. Amendment submitted to voters by the City Council, Resolution #1359, approved February 25th, 1985. Said amendment added the last two sentences at the end of the second paragraph.

5. Appointment of City Solicitor. Amendment approved by the voters November 5th, 1985. Amendment submitted to the voters by the City Council, Resolution #1380, approved August 5th, 1985 and enacted by the General Court as Chapter 182 of the Acts and Resolves of 1985.

Said Act:

(a)  Struck sub-section (c) of Article 2, Section 2-8, and replaced the same with the present section;

(b)  Moved former sub-section (c) to new sub-section (d);

(c)  Added new Article 10, Section 10-9.

6.   Number of Precincts Increased.  Amendment approved by the legislature June 10th, 1986 as Chapter 88 of the Acts and Resolves of 1986.  Amendment submitted by the City Council, Resolution #1473, approved April 16th, 1986.

Amendment changed:

(a)  Article 2, Section 2-1, sub-section (a), which originally read:

"Precincts 1, 2 and 6 to be known as the central district; precincts 3, 7 and 9 to be known as the east district; and precincts 4, 5 and 8 to be known as the west district".

(b)  Article 7, Section 7-4, which originally read:

"Section 7-4   Precincts and Districts.

The territory of the City shall be divided into nine precincts so established as to consist of as nearly equal a number of inhabitants as it is possible in compact and contiguous territory; bounded insofar as possible by the center line of known streets or ways or by other well defined limits.

The nine precincts shall be separated into three districts.  The central district shall include precincts 1, 2 and 6; the east district shall include precincts 3, 7 and 9; and the west district shall include precincts 4, 5 and 8.".

7.   Election of a Mayor and Establishment of Limitation of Terms of City Councillors. Chapter 332 of the Acts and Resolves of 1992 accepted by the voters on May 4th, 1993 replaced the City Manager with a Mayor and placed term limits on the Mayor and City Councillors.

8.   Section 9-10 of Article 9, Removals and Suspensions.  The following was added: "Nothing in this section shall be construed as granting a right to such a hearing to a person who is a member of Local 3699, American Federation of State, County and Municipal Employees, AFL-CIO, Methuen Support Staff Employees Unit.  Said member shall be governed by the disciplinary procedure of said Unit's collective bargaining agreement with the City of Methuen."  Chapter 76 of the Acts and Resolves of 1996.

9.  Article 2, Sections 2-8(a), (b) and (c), Appointment of City Accountant, Clerk of the Council and City Solicitor.  Amendment approved by the legislature approved June 28th, 1996 as Chapter 145 of the Acts and Resolves of 1996.  Amendment submitted by the City Council, Order #3738, approved February 5th, 1996.

Amendment changed:

(a)  Article 2, Section 2-8, sub-section (a), which originally read:

"(a)  City Accountant - As soon as practicable after the Council has been organized, the City Council shall elect, by ballot or otherwise, a City Accountant to hold office for a term of two years and until his successor is qualified."

(b)  Article 2, Section 2-8, sub-section (b), which originally read:

"(b)  Clerk of the Council - The City Council shall elect, by ballot or otherwise, a Clerk of the Council, who may be the City Clerk, to hold office at the pleasure of the Council."

(c)  Article 2, Section 2-8, sub-section (c), which originally read:

"(c)  City Solicitor - The City Council shall, on or before July 1st in the year it organizes under Article 2, Section 2-2, elect, by ballot or otherwise, a City Solicitor to hold office for a term of two years and until his/her successor is qualified."

10.  Article 3, Section 3-3, Appointments by the Mayor.  Amendment approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.

This section originally read as follows:

"Section 3-3.  Appointments by the Mayor.

Except as otherwise provided by this Charter, the Mayor shall appoint, upon merit and fitness alone, and may remove subject to the provisions of the civil service laws, the provisions of this Charter, or other pertinent statutes where applicable, all officers and employees of the Town, except employees of the School Department.  All appointments made by the Mayor shall be subject to confirmation by a majority vote of the full Council.  The Mayor shall submit, in writing, to the Town council, at least ten days prior to the next regular meeting when the appointment is to be made, the name of any person he desires to appoint to a Town position."

11.  Article 3, a new section 3-9, Terms of Office - Department Heads was added. Amendment approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.

12. Article 4, School Committee, Section 4-1, sub-section (a), Composition. Amendment approved by the voters November 5th, 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.

This sub-section originally read as follows:

"(a) Composition - There shall be a School Committee of seven members who shall be nominated and elected at large. The School Committee shall exercise control and management of the public schools of the City." (Approved by the voters November 3rd, 1981; see Resolution #758).

13. Article 2, Legislative Branch, Section 2-1, Sub-section (c), Election and Term

Amendment approved by the Legislature September 24th, 1999, Chapter 82 of the Acts and Resolves of 1999, and adopted by the Voters November 2nd, 1999.

The second sentence thereof originally read as follows:

"No person shall hold the office of City Councillor for more than three consecutive or non-consecutive terms".

14. Article 3, Executive Branch, Section 3-1, Sub-section (b), Term of Office

Amendment approved by the Legislature September 24th, 1999, Chapter 82 of the Acts and Resolves of 1999, and adopted by the Voters November 2nd, 1999.

The following sentence was added to Sub-section (b):

"No person shall hold the office of Mayor for more than three consecutive terms".

15. Article 4, School Committee, Section 4-1, Sub-section (c), Election and Term

Amendment approved by the Legislature September 24th, 1999, Chapter 82 of the Acts and Resolves of 1999, and adopted by the Voters November 2nd, 1999.

The following sentence was added to Sub-section (c):

"No person shall hold the office of School Committee ember for more than three consecutive terms".

**JOSEPH SOLOMON**
**October 31, 2006**

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                 C.A. NO.: 05-11579EFH

4 *******************************************

5 MAURICE LARIVIERE,

6              PLAINTIFF

7 VS.

8 JOSEPH SOLOMON, individually and

9 as Chief of Police for the

10 City of Methuen, JOSEPH ALAIMO,

11 individually and as Deputy Chief

12 of Police for the City of Methuen

13 and THE CITY OF METHURN,

14             DEFENDANTS

15 *******************************************

16

17        DEPOSITION OF JOSEPH SOLOMON

18        DiADAMO LAW OFFICE, LLP.

19          40 Appleton Way

20       Lawrence, Massachusetts

21         October 31, 2006

22

23         Annmarie Pereira

24          Court Reporter

**JOSEPH SOLOMON**
**October 31, 2006**

2 (Pages 2 to 5)

| Page 2 |
|---|
| 1  APPEARANCES: |
| 2 |
| 3  Representing the Plaintiff: |
| 4   DiADAMO LAW OFFICE, LLP |
| 5   40 Appleton Way |
| 6   Lawrence, MA 01840 |
| 7   BY: CARMEN DiADAMO, ESQUIRE |
| 8   (978) 685-4271   Fax (978) 794-4743 |
| 9 |
| 10  Representing the Defendant, Joseph Solomon: |
| 11   REARDON, JOYCE & AKERSON |
| 12   397 Grove Street |
| 13   Worcester, MA 01605 |
| 14   BY: ANDREW J. GAMBACCINI, ESQUIRE |
| 15   (508) 754-7285   Fax (508) 754-7220 |
| 16 |
| 17  Representing the Defendant, Joseph Alaimo |
| 18   MORRISON MAHONEY, LLP |
| 19   250 Boston Street |
| 20   Boston, MA 02110-1181 |
| 21   BY: GARETH W. NOTIS, ESQUIRE |
| 22   (617) 737-8857   Fax (617) 342-4281 |
| 23 |
| 24 |

| Page 3 |
|---|
| 1        I N D E X |
| 2  WITNESS:  JOSEPH SOLOMON |
| 3 |
| 4  EXAMINATION        PAGE |
| 5  BY MR. DiADAMO:    4 |
| 6 |
| 7       E X H I B I T S |
| 8 |
| 9       (none offered) |
| 10 |
| 11 |
| 12 |
| 13 |
| 14 |
| 15 |
| 16 |
| 17 |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 4 |
|---|
| 1        PROCEEDINGS |
| 2 |
| 3     MR. NOTIS:  Usual stipulations alright? |
| 4     MR. DiADAMO:  Perfect. |
| 5     MR. GAMBACCINI:  Okay. |
| 6 |
| 7     JOSEPH SOLOMON, DEPONENT, having first been |
| 8  duly sworn by me testified as follows: |
| 9 |
| 10  EXAMINATION BY MR. DiADAMO: |
| 11 |
| 12   Q.  Tell us your full name. |
| 13   A.  Joseph E. Solomon, S-O-L-O-M-O-N. |
| 14   Q.  Excuse me.  Off the record. |
| 15 |
| 16     (Off the record.) |
| 17 |
| 18     MR. DiADAMO:  Let's put on the record, A: |
| 19  He's going to read and sign it; thirty days before |
| 20  any notary.  And, what, do you want to volunteer? |
| 21  I'm not going to ask him his home address.  If |
| 22  something needs to be sent of or served, I'll send it |
| 23  to? |
| 24     MR. GAMBACCINI:  I'll volunteer to accept |

| Page 5 |
|---|
| 1  service. |
| 2     MR. DiADAMO:  Okay. |
| 3 |
| 4   Q.  Now, you are personally the Chief of Police |
| 5  in the Town of Methuen? |
| 6   A.  Yes. |
| 7   Q.  And how long have you enjoyed that |
| 8  position? |
| 9   A.  Just over four years. |
| 10   Q.  And when did you begin it, if you know? |
| 11   A.  September 1st of 2002. |
| 12   Q.  And prior to that time, what was your |
| 13  position in the Methuen Police Department? |
| 14   A.  I was a Captain. |
| 15   Q.  And how long had you been a Captain? |
| 16   A.  August 2002 -- no.  August 2000 to |
| 17  September of 2002. |
| 18   Q.  And prior to 2000, what was your position |
| 19  in the Methuen Police? |
| 20   A.  Lieutenant, 1995, I was a Lieutenant. |
| 21   Q.  '95? |
| 22   A.  Yes, sometime in '95. |
| 23   Q.  Okay.  When did you start with the Methuen |
| 24  Police Department? |

**JOSEPH SOLOMON**
**October 31, 2006**

3 (Pages 6 to 9)

---

Page 6

1   A.  April, April 1986 as a patrolman.
2   Q.  As a patrolman, okay.  Then you progressed
3 to Sargent?
4   A.  Yes.
5   Q.  Then Lieutenant?
6   A.  Correct.
7   Q.  Now, who is the Deputy Chief of Methuen?
8   A.  Joseph Alaimo.
9   Q.  And when was he appointed Deputy Chief?
10   A.  Sometime in 2002.  I don't know the date.
11   Q.  Was it approximately at the same time as
12 you was?
13   A.  It was after me.  It was a few months or so
14 afterwards.
15   Q.  Okay.  And by whom were you appointed and
16 by whom was he appointed?
17   A.  I was appointed by Sharon Pollard who was
18 the Mayor, and he was appointed by Sharon Pollard who
19 was the Mayor.
20   Q.  How did the job become open?  Your job; not
21 his.
22   A.  The former Chief took an early retirement,
23 five-year program and retired.
24   Q.  Was there a reason for him taking an early

---

Page 7

1 retirement other than his desire to do so?
2   A.  Not that I'm aware of.
3   Q.  Now, the Chief of Detectives presently is
4 Michael Wnek?
5   A.  Yes.
6   Q.  And how long has he been Chief of
7 Detectives?
8   A.  July or August of 2002, within a few months
9 before I became Chief.
10   Q.  And there is Christopher McCarthy.  Is he
11 Captain?
12   A.  Captain, yes.
13   Q.  How long has Christopher been Captain?
14   A.  I do not know that.
15   Q.  Before your time?
16   A.  No, it was after I became Chief, but I
17 don't know at what point.
18   Q.  Okay.  And I take it that he took a
19 Captain's exam and it was part of a list?
20   A.  Yes.
21   Q.  Okay.  Now, in the time you became a
22 patrolman in Methuen, who was the Town Solicitor?
23   A.  I have no idea.
24   Q.  That was what year?

---

Page 8

1   A.  1986.
2   Q.  Okay.  Well, when did you become aware that
3 Maurice Lariviere was the Town Solicitor?
4   A.  I don't remember when.  Sometime during my
5 career.
6   Q.  I'm sorry.  Would you repeat the answer?
7   A.  Sometime during my career.  I don't know
8 exactly when.
9   Q.  Do you recall any other City Solicitor in
10 Methuen other than Maurice Lariviere?
11   A.  Not that I dealt with until Peter McQuillan
12 came in.
13   Q.  Okay.  So, he is the first one you've ever
14 dealt with in any capacity before Peter McQuillan?
15   A.  Me personally?
16   Q.  Yes.
17   A.  Yes.
18   Q.  Now, from the time you became Chief of
19 Police, had you ever been made aware of any formal
20 complaints made against Maurice Lariviere in the
21 Town?
22   A.  I'm sorry?
23   Q.  Had you become aware while you were Chief
24 of Police of any formal complaints that are beared

---

Page 9

1 against Maurice Lariviere?
2   A.  There is just the current one.
3   Q.  Besides the current one?
4   A.  No.
5   Q.  Okay.  Had anyone filed any protests or
6 complaints for any conduct that he had performed
7 during your time as Chief?
8   A.  Not to me, no.
9   Q.  Were you aware of anything that he had done
10 prior to the time you were Chief that was the subject
11 of any investigation?
12   A.  Not prior to this incident.
13   Q.  Okay.  Now, had you become aware during
14 your tenure in the Methuen Police Department of any
15 informal complaints that were made against Maurice
16 Lariviere?
17   A.  No.
18   Q.  And in your capacity as Chief of Police, I
19 take it that you would have had fairly frequent
20 interactions with Maurice Lariviere?
21   A.  Yes.
22   Q.  And interactions with his staff?  You would
23 have gone to his office?
24   A.  Yes.

---

**JOSEPH SOLOMON**
**October 31, 2006**

4  (Pages 10 to 13)

| Page 10 | Page 12 |
|---|---|
| 1   Q.  Now, when did you become aware that Fulya<br>2  Metan was working for the Town?<br>3   A.  Sometime during her term that she was<br>4  there. I don't know exactly when.<br>5   Q.  So, you would not know her beginning date<br>6  for instance?<br>7   A.  No, I do not.<br>8   Q.  Or her approximate time?<br>9   A.  I know approximately because of this<br>10  investigation, but I don't know exactly when she<br>11  started.<br>12   Q.  As a result of the investigation that's<br>13  gone on, do you know now when she started working at<br>14  the Town of Methuen?<br>15   A.  Sometime in November of 2004.<br>16   Q.  Okay. And do you know if she had been<br>17  working as a temporary prior to that?<br>18   A.  Yes.<br>19   Q.  Now, as a result of this case, I take it<br>20  you've seen the Verified Complaint that's filed in<br>21  the Federal Court?<br>22   A.  By who?<br>23   Q.  By Maurice Lariviere?<br>24   A.  Yes, absolutely. | 1   Q.  Okay. And so that we know what we're<br>2  talking about, is this the Verified Complaint to<br>3  which I've been referring?<br>4<br>5   MR. NOTIS:  Is this the amended complaint<br>6  or this is the original?<br>7   MR. DiADAMO:  Let's make sure it's the<br>8  amended. Hang on. This is the Verified Complaint<br>9  that you're in jury demand.<br>10   MR. NOTIS:  Okay.<br>11   MR. DiADAMO:  Okay. And I'd the amendment<br>12  right under it, and I lost it. I don't want to put<br>13  this before you until I have the amended complaint.<br>14   MR. GAMBACCINI:  I have my copy.<br>15   MR. DiADAMO:  Okay, good.<br>16   MR. GAMBACCINI:  Are you going to mark it<br>17  as an exhibit?<br>18   MR. DiADAMO:  Yes, and I'll copy it and<br>19  make sure everybody gets them.<br>20<br>21   Q.  Two documents have been put in front of you<br>22  to your left, and to my right is the Verified<br>23  Complaint and to my left and your right is the<br>24  Amended Verified Complaint. On which document did |
| Page 11 | Page 13 |
| 1   Q.  Okay. And I take it you've also seen his<br>2  response, the Mayor's Commission Against<br>3  Discrimination?<br>4   A.  I have not read that, no.<br>5   Q.  No one has given that to you?<br>6   A.  I haven't read it. I have it.<br>7   Q.  You just didn't read it?<br>8   A.  No, I did not.<br>9   Q.  Who gave it to you?<br>10   A.  It came in the mail. I'm not sure.<br>11   Q.  Let's stick with the Verified Complaint.<br>12  When you were reviewing the assertions, and that's<br>13  all they were in the Verified Complaint, did you note<br>14  anything that in your judgement was untrue?<br>15   A.  Yes.<br>16   Q.  What?<br>17   A.  I don't know that off the top of my head.<br>18  I made a list of some information and forwarded it to<br>19  my attorney.<br>20   Q.  Okay. So, you made a list of things that<br>21  you considered to be untrue --<br>22   A.  Yes.<br>23   Q.  -- in the Verified Complaint?<br>24   A.  Yes. | 1  you use to make comments?<br>2   A.  That, I have no idea.<br>3   Q.  If you looked at them, would it refresh<br>4  your memory?<br>5   A.  I would have to read them all and look at<br>6  the answers that I gave.<br>7   Q.  Go ahead, look at them. Do you have the<br>8  answer you gave with you?<br>9   A.  No, I don't have those.<br>10   Q.  So, since there's a chance that's going to<br>11  be time consuming and I'm going to want you to<br>12  explain all of the answers that I'm asking you that<br>13  full question and I'm going to ask you some other<br>14  questions.<br>15   But be sure you've not been given the<br>16  opportunity to go through that.<br>17   A.  Okay.<br>18   Q.  Now, instead, let us go directly to<br>19  February of 2005.<br>20   A.  Yes.<br>21   Q.  And in February of 2005 at some point<br>22  during the day did you become aware of a complaint by<br>23  a woman by the name of Fulya Metan?<br>24   A.  Yes. |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

5 (Pages 14 to 17)

---

### Page 14

1   Q.  And who made you aware of that complaint?
2   A.  Lieutenant Mike Wnek.
3   Q.  And can you tell me what time of day he
4  made you aware of that complaint?
5   A.  It was somewhere around six o'clock, six
6  p.m., in that area.
7   Q.  Okay.  So, that's prior to six p.m. or
8  approximately, you had not heard anything about this
9  incident?
10   A.  Correct.
11   Q.  Okay.  And at that time is this the time
12  you were regularly scheduled to come in the police
13  department or were you in the police department?
14   A.  I was already at work.
15   Q.  Okay.  So, he came back from something to
16  discuss something with you?
17   A.  Correct.
18   Q.  Came to your office?
19   A.  Yes.
20   Q.  Was anybody else in your office?
21   A.  Yes.
22   Q.  Who?
23   A.  Lieutenant Mike Wnek came to my office with
24  Fulya Metan.

---

### Page 15

1   Q.  Anyone else?
2   A.  No.
3   Q.  Okay.  And did you have a discussion at
4  that time?
5   A.  Not exactly at that time, but I had a
6  discussion with him.
7   Q.  Okay.  When they walked in the office, what
8  did they say to you?
9   A.  Lieutenant Wnek wanted to inform me of an
10  incident that had occurred and that, that Fulya had
11  contacted him, too.
12       I told him that I would like to speak with
13  him alone and asked him to remove Fulya from my
14  office.
15   Q.  So, Fulya said nothing; at that time you
16  spoke with Wnek?
17   A.  Correct.
18   Q.  Okay.  And when you spoke with Wnek, what
19  did Wnek say to you and what --
20   A.  Well, he left with her and then came back
21  and then he gave me --
22   Q.  How much time elapsed?
23   A.  A minute, just walked down to his office.
24   Q.  Okay.  So, she's still around?

---

### Page 16

1   A.  She's still there.  Just went to his office
2  to wait.
3   Q.  Okay.  Go ahead, and?
4   A.  Then he told me that he had been contacted
5  by Fulya Metan today.  She said that there was
6  something major going on in her office and she needed
7  to talk to someone.
8       He then talked to her, and then he repeated
9  what she had said to him in a synopsis version.
10   Q.  Did he show you an e-mail at that time?
11   A.  No.
12   Q.  So, he just told you what she had related
13  to him?
14   A.  Correct.
15   Q.  Correct.  And after he told you what she
16  related to him, what did you do?
17   A.  I told him that he should have her write a
18  statement out, and that we'd be more than happy to
19  use one of our computers or give a notepad like we
20  would normally take a statement; and he then left my
21  office.
22   Q.  And at some point did he come back?
23   A.  Yes.
24   Q.  And did he ever have a statement by Fulya

---

### Page 17

1  Metan with him at that time?
2   A.  Yes, he did.
3   Q.  And when he came back with the statement,
4  did you read the statement?
5   A.  Yes, I did.
6   Q.  Was Fulya there when you read the
7  statement?
8   A.  No.
9   Q.  You read it alone?
10   A.  No.
11   Q.  Michael was there?
12   A.  Mike was there and Deputy Alaimo was there.
13   Q.  Deputy Alaimo was there too.  When you
14  completed the statement, what did you do?
15   A.  I told him I would like to speak with her
16  personally.
17   Q.  And did she come back into your office?
18   A.  Yes, she did.
19   Q.  And what was the conversation between you
20  at that time?
21   A.  I told her I had read her statement, and I
22  asked her if she could tell me what had happened.
23  Eventhough I had read it, I'd like to hear it
24  directly from her.

---

**JOSEPH SOLOMON**
**October 31, 2006**

6 (Pages 18 to 21)

Page 18

1    Q.  And did she relate to you orally what she
2    had put down in the statement?
3    A.  Yes, she did.
4    Q.  Did she miss anything or did she relate the
5    entire statement to you?
6    A.  She related the entire statement to me.
7    Q.  And while she was relating the entire
8    statement to you, were you in the office alone or was
9    Lieutenant Alaimo there?
10   A.  Deputy Alaimo was there.
11   Q.  I beg your pardon?  Deputy Alaimo?
12   A.  Yes.
13   Q.  And what about Mr. Wnek?
14   A.  I believe Lieutenant Wnek was there.
15   Q.  Okay.
16   A.  So, she related again to all three of us.
17   Yes.
18   Q.  Now, it's after six o'clock; correct?
19   A.  Yes.
20   Q.  I assume after six o'clock there's nobody
21   at Town Hall?
22   A.  That's correct.
23   Q.  Okay.  Now, after she related it to you,
24   did you give any direct orders to the people who were

Page 19

1    in the room with you?
2    A.  You'd -- you'll have to -- I don't
3    understand exactly what you mean.
4    Q.  Well, you had a complaint in writing.  What
5    did you do about it?
6    A.  At that time Lieutenant Wnek and Fulya left
7    to go to his office so I could speak with the Deputy,
8    and I then talked with the Deputy for a short period
9    of time to decide exactly what I should do.
10   Q.  So, what did he say; what did you say?
11   A.  Well, yes, we just -- I don't remember
12   exact words.  We discussed the situation and at that
13   point I thought that it was important that I got into
14   City Hall.
15   Q.  It was important that you brought it to
16   City Hall?
17   A.  That I got into City Hall.  Had access to
18   City Hall.
19   Q.  Had access to City Hall and for what
20   purpose did you want that access?
21   A.  Well, I had discussed the situation and
22   felt that I wanted to put a camera into -- based on
23   the conversation that I had with Fulya, I wanted to
24   put a camera, a video camera, in Fulya's office.

Page 20

1    Q.  And who did you call to get the access?
2    A.  Mayor Sharon Pollard.
3    Q.  Did you call her at home?
4    A.  Either at home or on her cell.  I don't
5    remember.
6    Q.  And what did you say and what did she say?
7    A.  I told her that I needed access to City
8    Hall.  That I was working on a criminal
9    investigation.  I didn't want to discuss anything on
10   the phone, so could she meet me at City Hall to let
11   me in.
12   Q.  Okay.  Now, did she meet you at City Hall?
13   A.  Yes, she did.
14   Q.  Alone?
15   A.  I believe so, yes.
16   Q.  Nobody else with her?
17   A.  Well, the Deputy and me.
18   Q.  Deputy.  So, it's just you Pollard and the
19   Deputy?
20   A.  Correct.  To the best of my recollection.
21   Q.  And David Bain isn't there?
22   A.  No.
23   Q.  No other member of the Mayor's staff is
24   there?

Page 21

1    A.  No.
2    Q.  No other police officers are there?
3    A.  At that time, no.
4    Q.  Okay.  And when you got to the City Hall,
5    can you tell us what you discussed?
6    A.  I told the Mayor that there had been an
7    accusation by the Solicitor's secretary that's of a
8    criminal nature and I didn't want to discuss the
9    criminal nature stuff with her but I needed access to
10   the secretary's office.  And I also told her that
11   this criminal allegation may also have a civil aspect
12   to it.
13   Q.  And then I take it that you told her that
14   you wanted to record the goings on in the office the
15   next day?
16   A.  I did not tell her I was putting a camera
17   in the office.
18   Q.  You didn't tell her you were going to put a
19   camera in.  You just wanted access to the office?
20   A.  Yes, I needed access to the office.
21   Q.  Okay.  Now, at the point that you wanted
22   access to the office, I take it you wanted access to
23   the office so that you could install the camera?
24   A.  That's correct.

**JOSEPH SOLOMON**
**October 31, 2006**

7 (Pages 22 to 25)

| Page 22 |
| --- |

1    Q.  Now, up until that point, you had seen her
2  allegations in writing.  Okay.  You had heard the
3  allegations orally.  Which one, which one of the
4  allegations had you corroborated?
5    A.  I don't understand that.
6    Q.  Well, she told you something happened?
7    A.  Correct.
8    Q.  You're a police officer in charge of
9  investigations.  You do seek out corroboration of
10  allegations?
11    A.  Well, it would depend on the type of a
12  case.  Under sexual assault investigations, which I
13  am a Sexual Assault Investigator, the victims who are
14  named have inherit liability.
15    And in my cases, it's impossible to go get
16  some physical evidence on a sexual assault.  You have
17  to relay basically what she says to you, and it's
18  based on whether or not you believe.
19    Q.  So, you started off with a thought that
20  based on your experience there's inherit credibility
21  in anyone making an accusation of sexual assault?
22    A.  That's the way sexual assault
23  investigations work.  The named victims have inherit
24  reliability.  You also have to look at what they're

| Page 23 |
| --- |

1  saying and their mannerisms and how they react, what
2  they're telling you their version, I guess, of the
3  stories.
4    Q.  And you're also listening carefully to what
5  their wishes and desires are at that time; correct?
6    A.  Correct.
7    Q.  And one of the things that you noted when
8  you looked at the report was for Fulya Metan's desire
9  was to quote: "Please, keep it confident."  Did you
10  notice that?
11    A.  Not to the police.  She didn't tell me to
12  keep it confident.
13    Q.  So, that at that time when you were noting
14  her inherit credibility, you were not mindful of the
15  fact that she had said: "Please, keep it
16  confidential."?
17    A.  You have to look at what you're taking out
18  of her statement.  When you look at the manner of the
19  way she spoke, and I believe it was Linda Gagnon,
20  that she asked them to, "Please, keep it
21  confidential."
22    Q.  What about the Chief of Detectives?
23    A.  I'm sorry.
24    Q.  What about the Chief of Detectives, Michael

| Page 24 |
| --- |

1  Wnek?
2    A.  I don't remember her telling him saying
3  that he had to keep anything confident.
4    Q.  Do you recall in her written e-mail to him?
5    A.  I just said to you I didn't seen those
6  e-mails.
7    Q.  Please, keep it confidential.
8    A.  I didn't see those e-mails at that point.
9  But if you go back and read that e-mails, she was
10  asking to, please, keep it confidential that they
11  were meeting.
12    Other than that, it was a major problem.
13  So, I guess you have to be careful to read things in
14  context; otherwise, you can misconstrue what they
15  actually say.
16    Q.  In the conversation with Fulya, reading the
17  reports and speaking with Wnek, did you determine
18  that there was something that changed this from
19  sexual harassment to a sexual assault?
20    A.  I was never investigating sexual
21  harassment.  The whole case I was investigating was a
22  criminal charge of sexual assault.
23    So, I'm not the one who placed that title
24  on changing something from one thing to another.

| Page 25 |
| --- |

1    Q.  I'm not talking about changing.  Your job
2  as Chief of Police, do you understand any distinction
3  between those terms?
4    A.  Yes, I do.
5    Q.  What is the distinguishment?
6    A.  Well, sexual harassment would be unwanted
7  comments, statements that are generally feeling of
8  making someone uncomfortable by walking close by
9  them.
10    Under the law when you touch someone
11  against there will in a sexual nature then or in an
12  inappropriate place, that's a criminal offense.  So,
13  it's not sexual harassment.  It's sexual assault.
14    Q.  So, that if somebody were engaged in a
15  friendship one-on-one conversation and the other
16  reached over and kissed him or her, you would always
17  see that as an assault?
18    A.  No.  You'd have to know the factors as to
19  whether it was warranted or unwarranted, and you
20  would have to ask that person.
21    Q.  You would have to know pretty much the
22  conduct and the dealings between the parties up to
23  that time; wouldn't you?
24    A.  Well, I guess you would have to know some

**JOSEPH SOLOMON**
**October 31, 2006**

8  (Pages 26 to 29)

| Page 26 | Page 28 |
|---|---|
| 1  background information.<br>2  Q.  Right.  Now, when I look at the report and<br>3  the statement, I didn't see much background<br>4  information.  Did you see some?<br>5  A.  Of course we're not talking about someone<br>6  kissing someone.  We're talking about someone<br>7  touching someone's breast and buttocks which is a<br>8  sexual assault.<br>9  If someone walked in here now and grabbed<br>10  one of your secretary's breasts, if it's unwarranted,<br>11  it's unwarranted.  The kissing is different than a<br>12  touching of the private parts.<br>13  Q.  Most basic kind of police work, if somebody<br>14  said that it would be desirable to try to corroborate<br>15  that in some way?<br>16  A.  You have to explain what you mean by<br>17  corroborate.<br>18  Q.  Well, you're in the business where you're<br>19  trying to prove things beyond the reasonable doubt?<br>20  A.  Probably cause.  Excuse me.  Don't put<br>21  words in my mouth.<br>22<br>23  MR. NOTIS:  Carmen, he's not finished his<br>24  answer. | 1  enough; correct?<br>2  A.  Under the law, it would.  We would<br>3  obviously want to speak with her and then go speak<br>4  with the Mayor and get his version.<br>5  Q.  The Mayor denies it and she says he reached<br>6  down the back of my pants and touched my buttocks.<br>7  Criminal?<br>8  A.  It's criminal.<br>9  Q.  So, with respect to employment in the Town<br>10  of Methuen, all allegations of unwanted touching are<br>11  subject of criminal investigation?<br>12  A.  Nothing to do with employment in the Town<br>13  of Methuen.  It has to do with a victim coming to you<br>14  and saying they were inappropriately touched.  And if<br>15  it fits within the statute, than it's a criminal<br>16  offense.<br>17  And then a lot of times we make calls to<br>18  the District Attorney's Office and we seek warrants<br>19  or he makes arrests.  We have many different ways of<br>20  doing those.<br>21  Q.  Having in mind now when we're dealing with<br>22  an uncorroborated version, are you attempting to go<br>23  out and find some more evidence to corroborate what's<br>24  happening? |

| Page 27 | Page 29 |
|---|---|
| 1  A.  Police officers are required before they<br>2  charge someone to raise the level of probable cause.<br>3  When it gets to the trial, that's where<br>4  beyond a reasonable doubt.  The law for charging<br>5  someone is probable cause not reasonable doubt.  Is<br>6  it more probable than not that this occurred?<br>7  Q.  And if somebody said that, just said that<br>8  that happened and in your mind that would be probable<br>9  cause?<br>10  A.  Well, many times people walk in the station<br>11  and say: I was at a date with such and such, he<br>12  grabbed my breast, stuck his hands down my pants. We<br>13  interview her.  We then ask to speak with the<br>14  gentleman and occasionally arrests are made right<br>15  there as we speak to the people regardless of what's<br>16  said.  So, that's part of the nature of the sexual<br>17  assault investigation.<br>18  Q.  So, I get this straight and I'm not saying<br>19  that this happened or is going to happen or anything<br>20  else.<br>21  If you received a call from a female<br>22  employee in the Mayor's office today telling you that<br>23  the Mayor reached down the back of her pants and<br>24  touch her buttocks, that in and of itself would be | 1  A.  That's correct.  That's exactly what was<br>2  done in this case.  Wasn't it?<br>3  Q.  We'll get to that.<br>4  A.  You brought it up.  You asked the question.<br>5  Q.  You're going to be there.  Believe me.<br>6  Relax, you've got plenty of time.<br>7  A.  I'm perfectly relaxed.<br>8<br>9  MR. NOTIS:  Wait for his question.<br>10<br>11  Q.  The question before you was, is that you go<br>12  out and you seek some corroboration?<br>13  A.  In some instances you do and some instances<br>14  you don't.  It all depends on the facts of the<br>15  individual case.<br>16  Q.  If there's a chance of corroboration.  You<br>17  never just go to trial with somebody saying to the<br>18  Mayor, I'm suing.  That individual put his hand down<br>19  the pants of an employee; would you try to find<br>20  something that either supported it or disproved it?<br>21  A.  There's a lot of differences between<br>22  charging somebody and being prepared for trial<br>23  because they're ongoing investigations.<br>24  Q.  But you're telling me that he would be |

# JOSEPH SOLOMON
# October 31, 2006

9  (Pages 30 to 33)

## Page 30

1  charged and then --
2      A.  Very likely he could be.  It would all
3  depend specifically on how the person related,
4  whether they appear to be credible, did they display
5  the proper demeanor, are they what we would expect a
6  sexual assault victim to display?  We would review it
7  with the District Attorney's Office and then we would
8  make a decision.
9      Q.  One of the first things you would do as a
10 matter of common sense would be to attempt to explore
11 the relationship between the parties; correct?
12     A.  Well, I mean, you say that as part of
13 common sense.  I don't know if I refer to it as part
14 of common sense, but that is part of a question that
15 we would ask somebody.
16     Q.  Yes.  That's not common sense?
17     A.  Common sense, police sense.  I don't know
18 what you call it.
19     Q.  Police sense is try as best you can to get
20 as much information as possible as to the
21 relationship between the parties?
22     A.  Yes, easy enough to do.
23     Q.  Now, did anybody ask Fulya Metan about the
24 relationship between the parties in the months before

## Page 31

1  that?
2      A.  She related that it was a work/boss
3  relationship and that there was no outside dating
4  relationship.
5      Q.  There was not even an attempt for an
6  outside dating relationship; correct?
7      A.  I don't know what you mean, an attempt.
8      Q.  Well, I noted no statement that Maurice
9  Lariviere wanted to meet her on a back road or a
10 diner or nightclub or any other place?
11     A.  I don't understand what that is.
12     Q.  Yes.
13     A.  I don't under understand the question.  I'm
14 sorry.
15     Q.  Okay.  Let's try it a different way.  I
16 asked you whether or not you attempted to solicit how
17 these two related to each other prior to November
18 14.
19     A.  Um-hmm.
20     Q.  Did you?
21     A.  Yes.
22     Q.  And what was the response?
23     A.  We asked the question of Maurice Lariviere,
24 and he said we -- I specifically asked him if there

## Page 32

1  was any mitigating factors that maybe there was a
2  dating relationship or was there any other
3  information that could mediate the allegations that
4  he inappropriately touched someone, and he said, No.
5      He had a perfect opportunity to say, yes,
6  there was a prior relationship.
7      Q.  At that time haven't you already told me
8  that if someone has told you about an unwanted
9  touching that's probable cause and there is a crime
10 that is going to be pursued?
11     A.  Well, the investigation is pursued,
12 absolutely.  I never said to you that just that
13 there's an arrest we do.  And I also said to you we
14 interview both parties.
15     We at least give them the opportunity, and
16 Maurice had the opportunity to tell us that.  And
17 that question was asked more than once to him.
18     Q.  After these initial interviews up until
19 this time, you found out considerably more about the
20 relationship between the parties; have you not?
21     A.  I don't understand.  Could you rephrase
22 that?
23     Q.  Well, during the first interview with Fulya
24 Metan, you were not told about e-mails sent to

## Page 33

1  Maurice Lariviere's house on the weekends; were you?
2      A.  No.
3      Q.  You were not told that her daughter was
4  brought to the office to work and both of them used
5  to walk in and out of the office while the other
6  worked there?
7      A.  I was aware that the daughter came to work.
8      Q.  That Fulya Metan brought her daughter to
9  work in that office?
10     A.  She said that on some occasions when she
11 couldn't get a baby-sitter, Maurice said have her
12 come in.  Let her sit in my office while you work.
13 Yes, I knew that.
14     Q.  Was that in the first meeting when the
15 things were reduced to reports?
16     A.  I don't remember when I knew that.
17     Q.  Okay.  Well, how about the lunch
18 engagements?  Most every day in the week in the
19 proceeding months, had you been told about that
20 before those statements were written?
21
22     MR. NOTIS:  Objection.  You can answer.
23     THE WITNESS:  I'm sorry?
24     MR. NOTIS:  I'm just objecting for the

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH SOLOMON**
**October 31, 2006**

10 (Pages 34 to 37)

## Page 34

1  record.
2
3  A. I don't remember when I found out about
4  that but at some point during this. I do not know
5  that.
6  Q. As a police officer investigating the
7  relationship between the party if's somebody out to
8  lunch with them eighty percent of the work days,
9  that's something you would have noted as Chief of
10  Police; correct?
11  A. Well, there is statements in there about
12  them, about him joining the gym and drinking water
13  and things like and the same things. I don't
14  remember how many times, but it is in her statement.
15  Q. Were you mindful of that before you turn,
16  before somebody turned the videotape on the 15th?
17  A. Mindful of that. What do you mean mindful
18  of that?
19  Q. Were you mindful of the fact that both of
20  them had been going to lunch and shopping, etcetera,
21  etcetera?
22  A. Well, the information in the statement I
23  was mindful of, yes.
24  Q. Were you mindful of that? Let's forget the

## Page 35

1  statement.
2  A. I was mindful of the things of the
3  statement that she said that he joined the gym after
4  she joined the gym and they had lunch. I did not
5  know that he -- that -- I don't know how many times
6  they did, but I did know that.
7  Q. You knew nothing about the e-mails?
8  A. No, I didn't know about the e-mails.
9  Q. If you had known about the e-mails, would
10  you have taken the same action?
11  A. Yes.
12  Q. Same thing if you saw an e-mail signed,
13  kiss; you would have? It wouldn't made any
14  difference to you?
15  A. The videotape had a dual purpose on both
16  sides. It could corroborate what exactly Miss Metan
17  was saying or it, it could vindicate Mr. Lariviere
18  saying nothing did occur.
19  He had just as much of an opportunity to
20  behave in an appropriate manner and not sexually
21  assault her on video which would then be mitigating
22  factors.
23  Q. Are those the only two alternatives that
24  you're aware of?

## Page 36

1  A. I don't know. Alternative to what?
2  Q. You said it could have vindicated him or it
3  could have been showing somebody was harmed?
4  A. It gave us both purposes one she said
5  occurs on a routine day or that none of it did occur
6  and Maurice Lariviere wasn't doing anything.
7  Q. She knows that she's being videotaped;
8  correct?
9  A. Yes.
10  Q. He doesn't know he's being videotaped?
11  A. Correct.
12  Q. What does that videotape tell you about the
13  last time they're in the office alone without people
14  videotaping them?
15  A. Nothing.
16  Q. And it doesn't tell you about the time
17  before that when they were in the office alone?
18  A. No. We're talking about at that time.
19  Q. So, if there were willing kisses or willing
20  hugs in the times before that video that you took, it
21  would have been valueless?
22  A. Say that again.
23  Q. I said: If they were willing kisses and
24  hugs in the office prior to November 14th, prior to

## Page 37

1  her making a complaint, your videotape would be
2  valueless?
3
4  MR. NOTIS: Objection. You can answer.
5
6  A. I don't -- valueless or not valuable?
7  Q. It means that on November 14th, if you
8  assume that as true and I'm not telling you if you
9  would have seen the same thing on the 14th as would
10  have occurred the last time they were in the office
11  together?
12
13  MR. NOTIS: Objection.
14
15  A. I don't know if that's true or not.
16  Q. You didn't know at the time you saw the
17  videotape?
18  A. Didn't know.
19  Q. You didn't know if it had happened twelve
20  times before?
21  A. Just based on what she told us.
22  Q. Yes. And the corroboration for what she
23  told you was your experience that people who
24  complained are generally truthful; that's the only

**JOSEPH SOLOMON**
**October 31, 2006**

11 (Pages 38 to 41)

Page 38

1  one?
2      A.  No.  I said they were, they have inherit
3  liability, and you have to evaluate them as a person,
4  the way they act and what they tell you.
5          Just as the husband of twenty-five years.
6  The wife says: No, I don't want to have sex
7  tonight.  Don't touch my breasts.  If he does, it's
8  wrong.  Arrests are made all of the time for sexual
9  assault.
10     Q.  The woman has inherit credibility and
11  reliability?
12     A.  A victim has inherit reliability in sexual
13  assaults, yes.
14     Q.  Now, you're talking about where you're
15  trained in investigating.  Let's just say sexual
16  matters, potential sexual crimes, who else in the
17  department is trained to do that?
18     A.  Lieutenant Wnek.  Seven, eight people.  I
19  don't know the number of them.  Several different
20  people.
21     Q.  And all of them were trained by whom?
22     A.  Either the Mass State Police or the -- I'm
23  trying to think of the name of the training
24  committee.  The Massachusetts Police Training Council

Page 39

1  but I don't know.  We send them to a forty-hour
2  school.
3      Q.  And they all have inherited credibility?
4      A.  The officers?
5
6          MR. NOTIS:  Objection.
7
8      Q.  Strike that question.  They were all taught
9  that there was a victim's inherit credibility that
10  they should be mindful of?
11     A.  Reliability.
12     Q.  Reliability.
13     A.  That's what they should have been taught
14  that.
15     Q.  And this should be taken as a form of
16  corroboration?
17     A.  I never said it's a form of corroboration.
18  It's -- you have to take the whole persona, again,
19  together as to what the person is telling you, how
20  they were acting, do they fit in the typical profile
21  that you would expected of a victim of a sexual
22  assault.
23     Q.  Okay.  Now, if I'm right and correct me if
24  I'm wrong, the video was setup somewhere around five

Page 40

1  a.m. in the morning?
2      A.  The camera was set up at night.  The video
3  was turned on around five in the morning.
4      Q.  Oh, okay.  So, it was setup at night by
5  Captain McCarthy?
6      A.  Captain McCarthy.
7      Q.  He was there at five a.m.?
8      A.  Him and Lieutenant Wnek.
9      Q.  Okay.  And then the video was just turned
10  on at that time?
11     A.  The recorder was turned on at that time,
12  yes.
13     Q.  And I take it that nothing happened until
14  after eight o'clock?
15     A.  Yes.
16     Q.  And eight-twenty, Maurice Lariviere enters
17  the office?
18     A.  Somewhere around that time frame.
19     Q.  Okay.  And sometime after that, Fulya Metar
20  entered the office?
21     A.  Yes.
22     Q.  And at that time where are you?
23     A.  I am at City Hall.
24     Q.  And in the Mayor's office?

Page 41

1      A.  Correct.
2      Q.  She knows it's going on?
3      A.  She does not know what's going on.  I did
4  not tell the Mayor I had a camera setup.
5      Q.  It was separate business that you were
6  doing in the Mayor's office?
7      A.  No.  I was waiting outside her office,
8  three offices.  I was waiting there because it's a
9  close place that I could be without being visible
10  during the day.
11     Q.  I don't understand that.  Let's try it
12  again.  Was the closest place that you could be
13  visible all day?
14     A.  I wouldn't be sitting out in the corridor
15  at City Hall and someone would say --
16     Q.  But your purpose of being there was the
17  investigation that was going on?
18     A.  Correct.
19     Q.  Okay.  And by prior arrangement with the
20  Mayor, were you there to inform her if something cam
21  about?
22     A.  No, I hadn't told the Mayor that I was
23  physically going to be there.  I appeared there in
24  the morning.  I didn't say to the Mayor; oh, I'll

**JOSEPH SOLOMON**
**October 31, 2006**

12 (Pages 42 to 45)

Page 42

1  meet you in the office in the morning.
2      Q.  So, you're in the office, she has no idea
3  why you're there?
4      A.  I said hi to her, and I don't know what she
5  thought.  I'm assuming she figures it has something
6  to do with the investigation, but I'm not talking to
7  her about it.
8      Q.  The video ran for about two hours; right?
9      A.  Right.
10     Q.  And you're there in the Mayor's office for
11  two hours?
12     A.  I'm sorry?
13     Q.  You didn't leave?
14     A.  I don't know.  Maybe go to the bathroom,
15  get a drink.  I'm not really sure.
16     Q.  Or are you in communication with Captain
17  McCarthy and Lieutenant Wnek?
18     A.  Yes.
19     Q.  And they're telling you what's going on in
20  the video?
21     A.  Yes.
22     Q.  And when I say approximately two hours,
23  that's the length of the video; is that right?
24     A.  Yes.  It runs until somewhere around

Page 43

1  ten-thirty.
2      Q.  Okay.  So, that, is it fair to state that
3  from the time one of the participants in the video
4  arrived in the office until ten-thirty, two superior
5  officers in the Methuen Police Department saw no
6  behavior that they wanted to go in and stop --
7      A.  No.
8      Q.  -- they wanted to go in and stop it?
9      A.  Well, they saw behavior that was wrong, but
10  they didn't go in.  They were in contact with Fulya,
11  and she felt that, that she was willing to stick it
12  out a little bit longer.
13     Q.  They were watching her being, in your
14  words, sexually assaulted?
15     A.  Correct.
16     Q.  Okay.  And it was the kind of an assault
17  that the police officers didn't unilaterally enter
18  the room about?
19     A.  Correct.  The beginning stuff that they all
20  saw was the kissing and the rubbing of the shoulder
21  and the touching of her hands.  When it got to the
22  point where he --
23
24     MR. NOTIS:  Hold on.  He's not done with

Page 44

1  his answer.
2
3      Q.  I want you to finish your answer.
4      A.  When they got to the point where he
5  sexually assaulted her by touching her
6  inappropriately and pulling her into himself, at that
7  point they called me and said that there's, this has
8  got to be stopped right now.
9      Q.  If the they walked in during the first
10  incident, would they have arrested him?
11     A.  They, wouldn't have been anyone.  I was
12  running the investigation.
13     Q.  If they called you and said:  He kissed
14  her.  Would you tell them to arrest him?
15     A.  For his kissing her, no.
16     Q.  Touching her shoulder?
17     A.  No.
18     Q.  Okay.  And once again, you had absolutely
19  no evidence that the first part of the conduct hadn't
20  happened several times in the office before that
21  without any objection?
22     A.  Yes.  She said that it happened, and that
23  it was unwanted.  She told him to stop it.
24     Q.  That's what you had.  You had her

Page 45

1  statement; period?
2      A.  Correct.
3      Q.  Okay.  Now, even at the end of this video
4  that I saw, no police officer came into the room or
5  made a move into the room; correct?
6      A.  Correct.
7      Q.  And nobody, nobody prevented Fulya Metan,
8  according to what I saw, from leaving the room?
9      A.  That's not correct.
10     Q.  You saw somebody preventing her from
11  leaving the room in the video I saw?
12     A.  Yes.
13     Q.  How were they preventing her?
14     A.  Maurice was holding her and pulling her
15  tighter and tighter to him, and she was trying to get
16  away from him.  She eventually was able to get away
17  from him and ran out of the room.
18     Q.  That's what you saw in the video?
19     A.  That's what I saw in the video.
20     Q.  Now, the two police officers according to
21  them hadn't budged, so did they see that, too?
22     A.  They saw in the video, and they called me
23  and said what was occurring and should they go in or
24  not.

**JOSEPH SOLOMON**
**October 31, 2006**

13 (Pages 46 to 49)

Page 46

1      And, yes, they when he opened the door to
2  come out, she was running out of the office. So, she
3  had managed to get out of, out by herself.
4      Q.  Is it true that Captain McCarthy and Wnek
5  had not left the room they were in when Fulya was
6  totally out of the office?
7      A.  No.  My understanding is they were leaving
8  that office.  They were going to go in there as she
9  came running out.
10      Q.  Who told you that?
11      A.  One of them.  I don't know which one.
12      Q.  No recollection which one?
13      A.  No.  I had a communication with them by
14  phone.  I don't know with which one of them.
15      Q.  A communication?
16      A.  We were talking on the telephone.  No.  I'm
17  sorry?
18      Q.  Now that she's out, I take it, you're
19  coming back from the Town Hall?
20      A.  I was walking down the corridor.
21      Q.  Okay.  Did you stop in to see the Mayor?
22      A.  Who, me?
23      Q.  Yes.
24      A.  No.  I was coming down the corridor towards

Page 47

1  Maurice's office and I passed Fulya.
2      Q.  Now, when they had called you, okay, they
3  called you; are they watching or are they seeing her
4  leave the office?
5      A.  When they first called me, they were
6  watching the videotape.
7      Q.  Okay.  Who told you to come down?
8      A.  They told me what was going on, and I said
9  it was okay to go in there and stop it.  By the time
10  they were coming out to go in there, she came running
11  out of the office and went down the corridor and
12  passed me in the great hall.
13      Q.  Past who?
14      A.  She went by me in the great hall.
15      Q.  Okay.  So, you were in the Mayor's office
16  and she passed you going where?
17      A.  Going across to great hall.
18      Q.  To the Mayor's office?
19      A.  Very likely.  I don't know.  I didn't send
20  her there.
21      Q.  She would have gone out of the City
22  Solicitor's Office.  She would have past the great
23  hall?
24      A.  There's where the woman's bathroom is.  I

Page 48

1  don't know.  You have to ask her where she was going.
2      Q.  She was going by David Bain's office?
3      A.  No, his office is to the right.
4      Q.  Okay.  There was nowhere else to go by?
5  The counselor's office?
6      A.  There's a counselor office, the great hall,
7  the Solicitor, the Mayor's office, the accounting's
8  office, the bathroom.
9      Q.  Okay.  So, she was going to the general
10  area of the bathroom and the Mayor's office.  You
11  don't know which one she got into?
12      A.  No, because I continued by her.
13      Q.  Okay.  And up to this time, she's had no
14  conversations whatsoever with the Mayor Sharon
15  Pollard?
16      A.  Correct.
17      Q.  Nor have you that day?
18      A.  I had a conversation with her, but not
19  about this conversation.
20      Q.  Okay.  So, she still has had no
21  conversation about the videotape?  She doesn't know
22  about it?
23      A.  Correct.
24      Q.  Now, she's out of the office and where does

Page 49

1  Lieutenant Wnek go?
2      A.  That, I don't know.
3      Q.  Well, you and your Deputy got together;
4  correct?
5      A.  Correct.
6      Q.  And where did you get together?
7      A.  What do you mean:  Where did we get
8  together?
9      Q.  Where are you?
10      A.  We were both going down the corridor to
11  talk to Maurice.
12      Q.  You were going to go down to talk to or
13  confront Maurice?
14      A.  Correct.
15      Q.  And did you go into his office?
16      A.  Yes.
17      Q.  Was anything said as you, as you got into
18  the office?
19      A.  Yes.
20      Q.  What?
21      A.  I said:  Hi, Maurice, I need to talk to you
22  about something.
23      Q.  And did you ask him to come with you?
24      A.  Yes, I did.

**JOSEPH SOLOMON**
**October 31, 2006**

14 (Pages 50 to 53)

Page 50

1    Q.  Okay.  Where did you go?
2    A.  Downstairs to the second floor conference
3  room.
4    Q.  Now, before this time, had you discussed
5  that Civil Rights case that he had just received a
6  decision on?
7    A.  No.  He had left a message for me on my
8  cell phone.
9    Q.  Okay.  And as a matter of fact at some
10  point was there some discussion about the message
11  that he left with you and a telephone call?  Another
12  cell phone call with Fulya Metan?
13    A.  Discuss, discussion with you?
14    Q.  Discussion with Maurice.  Yes?
15    A.  Yes.
16    Q.  By you?
17    A.  Correct, I brought it up.
18    Q.  You brought up that he had talked to Fulya
19  Metan?
20    A.  During our interview that was on tape, yes.
21    Q.  And he said he talked to you about the same
22  thing?
23    A.  I would remember if he said that, but I
24  hadn't spoken to him.  I hadn't spoken to him.  He

Page 51

1  left me the message.
2    Q.  Well, in any event, you and the Deputy are
3  going to now meet with Maurice somewhere?
4    A.  Um-hmm.
5    Q.  In the room in City Hall?
6    A.  Correct.
7    Q.  Okay.  Is there reason why both of you are
8  meeting as opposed to just you?
9    A.  Yes, so that there was a witness to the
10  interview.
11    Q.  Let's see.  You need a witness to the
12  interview, you got two tapes.  Who's in charge of the
13  tapes?
14    A.  What do you mean who's in charge of the
15  tapes?
16    Q.  In charge of using the tapes?
17    A.  Me.  I had the machines.
18    Q.  You used them before?
19    A.  Have I used them before, I've never done an
20  interview recorded but I've used the machines before.
21    Q.  You've never done an interview before this?
22    A.  I have never interviewed before and
23  recorded them on two tapes myself.  That was a
24  procedure that was set by the District Attorney's

Page 52

1  Office shortly before this whole incident.
2    Q.  Where did the two tapes come from?
3  Belonged to somebody?
4    A.  I got one tape recorder from the
5  detective.  One tape recorder from my office and two
6  tapes from his draw.
7    Q.  Okay.  And I take it that there was
8  something that made you confident that these tapes
9  were going to work?
10    A.  Well, I tape recorded that.  The one in my
11  office I know works because I've used, and the ones
12  from the detectives are the ones that they use when
13  he interview people.
14    Q.  The one that you used that was used which
15  one is that the one I can't hear or the one with
16  nothing on it?
17    A.  I don't know what you're talking about.
18    Q.  Well, there are two tapes in this case.
19  One I can't hear and one there is nothing on it.
20
21    MR. NOTIS:  Objection.  Go ahead.
22
23    A.  So, what's the question?
24    Q.  I'm saying:  Which one of them is yours?

Page 53

1    A.  The black one is mine which is the one that
2  recorded; silver was the one from the detective that
3  didn't record.
4    Q.  The one that we can hear words on?
5    A.  Not me personally but mines as the Police
6  Chief.  It was my in my office.
7    Q.  It was purchased?  That was police issued?
8    A.  Right.  It was there when I took over.
9    Q.  Okay.  And the other one?
10    A.  Came from the Detective division.
11    Q.  Came from Lieutenant Wnek?
12    A.  Yes, it did.
13    Q.  Okay.  And knowing you were going to tape,
14  somebody turned them on to find out if they were
15  recording anything before you taped?
16    A.  I turned them on to make sure that the
17  wheel spun and they had batteries.
18    Q.  Did you check to see if there was going to
19  be anything on them?
20    A.  No.  I didn't test record, no.
21    Q.  Now, the interview with Maurice Lariviere
22  was approximately two hours long?
23    A.  No.
24    Q.  How long?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

15 (Pages 54 to 57)

Page 54

1      A.   I don't know the amount of time.  You would
2  have to play the tape and count how many minutes it
3  takes.
4      Q.   Okay.  Well over an hour?
5      A.   I don't know.
6      Q.   So, there's no recording or you've never
7  recorded anywhere that we interviewed a suspect for
8  ten minutes, thirty minutes, eighty minutes; you
9  never did that?
10     A.   No.  No.
11     Q.   And you have no memory of any approximation
12 of time both of you spent in the room with Maurice
13 Lariviere?
14     A.   I don't know how long.  That's not what you
15 said.  You asked how long the interview was.
16     Q.   How long did you spend in the room with
17 him?
18     A.   Probably about an hour but the interview
19 wasn't an hour long.
20     Q.   Okay.  Now, before you were in the room
21 with him, had you seen the tape or had listened?  Had
22 you seen the video or you had just heard a
23 description of it?
24     A.   I just heard a description of it.

Page 55

1      Q.   Okay.  And have you heard the tape as it
2  exists?  You now, the one that has words on it?
3      A.   Yes.
4      Q.   Can you understand it all?
5      A.   Not all of it but the majority of it.
6      Q.   Okay.  Now, on that tape though, correct me
7  if I'm wrong because I don't know how much I have
8  absorbed from it, okay.
9           Did you tell them that you clearly had
10 evidence to the assault of somebody?
11     A.   Yes.
12     Q.   Now, having in mind you had a so-called
13 victim and you had a videotape, okay.  Did you know
14 at that time were you going to arrest him?
15     A.   No, it was not my plan.
16     Q.   Your plan was?
17     A.   To interview him, see what information I
18 could obtain from him and make a phone call to the
19 District Attorney's Office.
20     Q.   You were going to make a call to the
21 District Attorney's Office?
22     A.   Yes.
23     Q.   And you told him about that?
24     A.   They had already been aware of it.  I had

Page 56

1  spoken with somebody that morning.
2      Q.   Okay.  On the tape, was there a discussion
3  about a resignation?
4      A.   No.
5      Q.   I do.  It did get prepared by David Bain
6  later on?
7      A.   I'm sorry?
8      Q.   How did one get prepared by David Bain
9  later on?
10     A.   Because Maurice asked to go off the record,
11 and then Maurice said I just want to resign.  I told
12 him that that had nothing to do with me.  If that's
13 what he wanted, I would go relay the message.
14     Q.   So, at no time did you tell him that he was
15 under arrest?
16     A.   No, I did not tell him that he was under
17 arrest.
18     Q.   Do you recall at some point going back to
19 the Mayor's office during that interview?
20     A.   Yes.
21     Q.   Do you recall assigning somebody to be with
22 Maurice while you left?
23     A.   Yes.
24     Q.   Who was that?

Page 57

1      A.   Captain McCarthy.
2      Q.   Captain McCarthy's instructions were to
3  stay with him?
4      A.   Correct.
5      Q.   If he stood up and said:  I'm going home.
6  What was Captain McCarthy supposed to do?
7      A.   He was to keep him there.
8      Q.   To keep him there?
9      A.   Absolutely.
10     Q.   What authority do have you to keep anybody
11 there?
12     A.   We have authority to detain somebody
13 without placing them under arrest.  I mean, you're an
14 attorney; you should know that.
15     Q.   I'm asking you what authority you used to
16 keep him there, you?
17     A.   We have the authority to retain somebody
18 during an investigation.
19
20          MR. NOTIS:  Hold on.
21
22     Q.   Under the facts of this case, let me get my
23 question out.  He stopped me before I stopped him.
24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

16 (Pages 58 to 61)

Page 58

1      MR. NOTIS: Let's just so we have a clear
2  record.
3      MR. DiADAMO: Strike it. We'll start
4  again.
5      MR. NOTIS: Okay. But I'd run into the
6  problem again. Chief, I'll just remind you to let
7  him finish his question. And I'd ask counsel to let
8  the witness complete his answer before you start the
9  next question. Thank you.
10      THE WITNESS: Yes.
11
12      Q. The question to you was: In the facts of
13  this case where you were with respect to the
14  interview at the time you left, you still felt that
15  you had authority to detain him in the police
16  station?
17      A. We weren't in the police station.
18      Q. In that room?
19      A. Yes.
20      Q. Okay. And had he said: I'm going home;
21  Captain McCarthy would have detained him?
22      A. Correct.
23      Q. By arresting him?
24      A. No.

Page 59

1      Q. By physically holding him there?
2      A. If required to be.
3      Q. So, he would have used physical force to
4  keep him there?
5      A. If, it was required.
6      Q. Okay. Now, how many times did Maurice ask
7  to speak to somebody outside that room?
8      A. Once.
9      Q. Who did he want to speak to?
10      A. Fulya Metan.
11      Q. Did he also want to speak to his wife?
12      A. No.
13      Q. Okay. Had he asked you to speak to his
14  wife, would you have let him gone out to call his
15  wife?
16      A. No.
17      Q. Had he asked to talk to a lawyer, would you
18  have let him call a lawyer?
19      A. Absolutely.
20      Q. Now, you on that day were in the Mayor's
21  office. We talked about the resignation. You said
22  David Baine prepared it; correct?
23      A. I never said David Baine prepared it.
24  Either he prepared it or someone else prepared it.

Page 60

1      Q. He came in with it?
2      A. He's the one that came in with the piece of
3  paper.
4      Q. He's the Human Resource Officer?
5      A. Director.
6      Q. He's the sexual harassment officer, if you
7  will, in the Town of Methuen?
8      A. Correct.
9      Q. As a matter of fact, after you walked
10  outside his office at the place before you and Fulya
11  Metan was walking down the corridor, you'll see the
12  sexual harassment policy in the Town of Methuen?
13      A. I have no knowledge of that.
14      Q. You don't know that that's posted right
15  there?
16      A. No, I don't.
17      Q. Okay. Did you and Baine have any
18  discussions with respect to sexual harassment?
19      A. No, I did not.
20      Q. Did you and Alaimo and Baine have those
21  discussions?
22      A. Not to my knowledge.
23      Q. Did Wnek and Baine have those discussions?
24      A. Not to my knowledge.

Page 61

1      Q. Okay. When the resignation was secured,
2  who was it given to?
3      A. That, I would have no knowledge of. I -- I
4  didn't secure it.
5      Q. Who secured it?
6      A. Maurice and Dave Baine.
7      Q. And that room that you were discussing that
8  you are in --
9      A. Correct.
10      Q. -- you weren't in there anymore?
11      A. No. Myself and the deputy did. I left the
12  room and Dave Baine and Maurice Lariviere were in
13  there talking.
14      Q. Now, you had gone back to the Mayor's
15  office?
16      A. I'm sorry. Who had?
17      Q. You had during that period?
18      A. Yes.
19      Q. And you went back to her to discuss the
20  status of the case with her; correct?
21      A. I went back. You're confusing me as to
22  what you're talking about. I went back to the
23  Mayor's office. When I went to the Mayor's office
24  when Maurice said he wanted to resign to relay that

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH SOLOMON**
**October 31, 2006**

17 (Pages 62 to 65)

## Page 62

1 message, and then I had a conversation with Fulya to
2 ask if she had decided what she wanted to do with
3 charges.
4    Q. And what did Fulya say to you?
5    A. She said she still wasn't sure. She wanted
6 time to think about it.
7    Q. She wasn't sure?
8    A. She wanted to think about what she wanted
9 to do.
10   Q. She didn't tell you directly that she did
11 not want to press charges?
12   A. Not at that point, no.
13   Q. Who was Maurice Lariviere's employer?
14   A. The City of Methuen.
15   Q. Who hired him and fired him?
16   A. I don't know who hired him, but.
17   Q. It's a counsel position; correct?
18   A. But I don't know who hired him, and to my
19 knowledge he wasn't fired, so.
20   Q. Well, I just said who could hire him and
21 fire him?
22   A. Who could, the City Counselor.
23   Q. City Counselor, period; Mayor's got nothing
24 to do with it?

## Page 63

1    A. Correct.
2    Q. You knew that the relations between the
3 Mayor and Maurice Lariviere were not good?
4    A. I knew that there was some estrangement
5 between the two of them, yes.
6    Q. And it was an estrangement that had lasted
7 for some time?
8    A. I don't know how long it lasted.
9    Q. I mean, you knew that when you were sitting
10 in the office, as in the Mayor's office, and the
11 videotape was running?
12   A. I knew there had been issues between the
13 two. It was mutual.
14   Q. In your entire police career, have you ever
15 heard of another videotaped alleged sexual crime?
16   A. Of it actually occurring?
17   Q. Yes, like --
18   A. Videotaped by the police?
19   Q. Yes.
20   A. Not in the Methuen Police, no.
21   Q. By anybody?
22   A. I don't know by anybody.
23   Q. You've never heard of one; have you?
24   A. I can't say that I never heard of any one.

## Page 64

1    Q. Well, let's begin at the beginning. You
2 know in your common knowledge as the Chief of Police
3 that law enforcement officials have taped bribery
4 confrontations?
5    A. Um-hmm.
6    Q. You know that they have videotaped drug
7 arrests?
8    A. Um-hmm.
9    Q. You know that they have taped extortion
10 attempts?
11   A. Correct.
12   Q. I want to know if you've ever even heard of
13 anybody taping a sexual event with police officers
14 watching?
15   A. Not to my knowledge at this point that I
16 remember.
17   Q. Are you a member of the Police Chief
18 Association of Massachusetts?
19   A. Yes.
20   Q. Never ever heard of it; have you?
21   A. I don't know at this point I have ever
22 heard of it.
23   Q. Okay. In your judgement, having in mind
24 you're trained to investigate sex crimes, in your

## Page 65

1 judgement do you have a judgement about whether or
2 not it's ever happened in Massachusetts?
3    A. I don't know.
4    Q. Certainly not one of the vices you were
5 taught about; is it?
6    A. Well, wireless cameras were not around when
7 I was trained. I was trained in the 1980s.
8    Q. Well, you've had officers trained since
9 that time; correct?
10   A. Correct.
11   Q. You haven't heard one of them talk about
12 videotapes; have you?
13   A. We talk about videotapes in law instances.
14 We've used them in many cases, and I think the
15 Methuen Police is a very ahead of the game police
16 department. So, I thought it was a very good
17 investigative technique.
18   Q. By ahead of the game on videotaping a
19 sexual event, you're not ahead of the game; are you?
20 You're first in the game; aren't you?
21   A. I can't answer that. I have no knowledge
22 if someone, anyone else has videotaped.
23   Q. And as your officers come back from
24 training in the investigation of sexual events, not

**JOSEPH SOLOMON**
**October 31, 2006**

18 (Pages 66 to 69)

| Page 66 |
|---|
| 1 one of them has given you an example of videotaping |
| 2 possible confrontations that involve a sexual |
| 3 component? |
| 4   A. No. No one has come to me with that. |
| 5   Q. Okay. And no one has told you that they've |
| 6 been given any manual telling them that that is a |
| 7 strategy or a good idea; correct? |
| 8   A. No, no one has told me that. No one has |
| 9 told me that at any time it isn't either. |
| 10   Q. And this one is done to an employee who has |
| 11 bad relations with the Mayor; correct? |
| 12   A. Correct. |
| 13   Q. The Mayor you have good relations with? |
| 14   A. Correct. And the man who I had good |
| 15 relations with. Me and Maurice had an excellent |
| 16 working relationship. |
| 17   Q. It was no secret in the Town Hall among |
| 18 everyone who was working there that Sharon Pollard |
| 19 wanted Maurice Lariviere removed and David Baine made |
| 20 City Solicitor? |
| 21 |
| 22   MR. NOTIS: Objection. |
| 23 |
| 24   A. That was never said to me. Oh, I'm sorry. |

| Page 67 |
|---|
| 1   MR. NOTIS: You can answer. I just |
| 2 objected. |
| 3 |
| 4   A. That was never said to me, and I had no |
| 5 actual knowledge of that. |
| 6   Q. You never heard that? |
| 7   A. No, I never heard that. |
| 8   Q. This is the first time? |
| 9   A. That Maurice Lariviere was going to be |
| 10 removed and Dave Baine was going to be replacing him, |
| 11 absolutely never heard that. |
| 12   Q. I never ask questions twice, but I'm just |
| 13 going to ask you to think for a moment about somebody |
| 14 who may have been present when you would have heard |
| 15 that directly. I'm just giving you a chance to |
| 16 think, and you can restate your answer after you -- |
| 17   A. I never heard that directly said to me or |
| 18 indirectly said to me. |
| 19   Q. Okay. So, now, after you spent time with |
| 20 Maurice Lariviere that day? |
| 21   A. Um-hmm. |
| 22   Q. You know there was a resignation executed? |
| 23   A. Correct. |
| 24   Q. And that a resignation meant to you that |

| Page 68 |
|---|
| 1 all the rights that he had under the Charter a |
| 2 Solicitor who had been receiving approximately |
| 3 twenty-five years were over, he didn't have those |
| 4 rights anymore? |
| 5   A. Correct. |
| 6   Q. You also know that after that resignation |
| 7 was signed, that any rights he had under the Methuen |
| 8 Sexual Harassment Policy would never be exercised by |
| 9 him again? |
| 10   A. I didn't even give that a thought. I don't |
| 11 know what rights he had under the policy. |
| 12   Q. When you first heard of the Fulya Metan |
| 13 incident, it must have at least occurred to you that |
| 14 she had some rights under the Methuen Sexual |
| 15 Harassment Policy? |
| 16   A. Oh, I thought of it, but that wasn't what I |
| 17 was there to investigate. |
| 18   Q. What rights that she has of the policy |
| 19 applies to you too; right? |
| 20   A. The other. If I become aware of it, I'm |
| 21 required to report it up the chain of command to my |
| 22 bosses. So, if somebody tells me about something, |
| 23 I'm supposed to report it. |
| 24   Q. And you know there's a procedure to resolve |

| Page 69 |
|---|
| 1 those things? |
| 2   A. I'm sure there is. |
| 3   Q. How long have you known Maurice Lariviere? |
| 4   A. Probably twenty years or eighteen. From |
| 5 whatever time I became aware that he was the |
| 6 Solicitor I mean, the majority of my career. |
| 7   Q. Fulya Metan went to Mike Wnek to stop some |
| 8 behavior according to the police; correct? |
| 9   A. Correct. |
| 10   Q. Having in mind how long you've known |
| 11 Maurice Lariviere, if you, Joseph Solomon, had simply |
| 12 said: We heard something. True or false. Stop it. |
| 13 Would you expect it to occur again the next day? |
| 14   A. That's not what a police officer does. I |
| 15 have an oath to investigate crimes, and this is a |
| 16 report of a crime. |
| 17 |
| 18   MR. NOTIS: Let him answer the question. |
| 19 |
| 20   A. That is my answer. That is a crime. I'm |
| 21 not going to go to somebody tomorrow that says my |
| 22 husband smacked me and say: Don't smack your wife. |
| 23 My oath is to abide the law and to uphold it, and |
| 24 that's what I was doing. |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

19 (Pages 70 to 73)

---

Page 70

1    Q.  Now, with respect to upholding the law in
2  sexual encounters, would you agree with me that the
3  wise police officer looks at the aggradation of
4  sexual conduct?
5    A.  I don't know what aggradation means.
6    Q.  Well, let's deal with the fact that:  If I
7  walked up to the Methuen Town Hall and saw somebody
8  who I had known in the old days and held their hand
9  and she said:  I'm very offended by you holding my
10  hand.  I shouldn't expect to be a criminal defendant?
11    A.  No.  Because that's not a sexual assault.
12    Q.  You have in your mind an idea of what a
13  sexual assault is, and that isn't sexual assault?
14    A.  Correct.
15    Q.  Correct.  Touching of the shoulder, you
16  didn't think of as sexual assault?
17    A.  No.
18    Q.  The kissing was not a sexual assault?
19    A.  Kissing on the lips, no.
20    Q.  Touching the buttocks was a sexual assault?
21    A.  Yes.
22    Q.  What other sexual assaults have you seen?
23    A.  What do you mean, have you seen?
24    Q.  When you saw the video, you heard about

---

Page 71

1  touching buttocks, touched.  That's the crime.  What
2  else?
3    A.  The thrusting of his hips into her crotch
4  area allowing his erect penis to touch her vagina.
5    Q.  Okay.  Are you telling me what she's
6  related to you?
7    A.  I see that on the video of him, pumping his
8  hips into her, and then her relation was that while
9  that was occurring he was erect and was touching her
10  private with his private.
11    Q.  That's what you saw in the video?
12    A.  I saw him thrusting the hips, and then I
13  listened to her explanation as to what occurred.
14    Q.  Now, the incident is over and Lariviere is
15  gone and Peter Biginley (phonetic) is at some point
16  in the City Solicitor's Office appointed or not.  I
17  don't know.  And what happens to Fulya Metan?
18    A.  I had nothing to do with Fulya Metan.  I
19  don't know.
20    Q.  Well, you work in the Town, and you know
21  that she is not an employee of the Town?
22    A.  Just as recent; correct.
23    Q.  Pardon me?
24    A.  Recently she's not an employee of the Town.

---

Page 72

1    Q.  Recently?
2    A.  Correct.  That's my understanding.
3    Q.  How about one day after the incident?
4    A.  That's not my understanding.
5    Q.  Two days after the incident?
6    A.  My understanding was she was a City
7  employee up until very recently when I heard from an
8  attorney that she was no longer an employee of the
9  City.
10    Q.  Excuse me.  Let me phrase that a lot better
11  than I phrased it.  You knew as an employee of the
12  City of Methuen that at some point she stopped
13  appearing in the Town of Methuen?
14    A.  Yes, I'm aware of that.
15    Q.  Okay.  Now, do you know approximately when
16  she stopped appearing?
17    A.  No, I do not.
18    Q.  Is it fair to state that you knew within a
19  week that she had stopped appearing as an employee?
20    A.  No, it's not because I don't know when she
21  stopped appearing as an employee.
22    Q.  When did you know that she had stopped
23  appearing as an employee?
24    A.  At some point I was told by Peter McQuillan

---

Page 73

1  that an attorney was hired to represent the City, and
2  in some worker comp case against Fulya; and that's
3  when I was aware that she wasn't reporting to work.
4    Q.  From the time of this February 14, 15th,
5  until the time you folks spoke to McQuillan, you were
6  in the presence of Sharon Pollard many, many times?
7    A.  Yes.
8    Q.  And are you telling me in those many, many
9  times, you weren't told that Fulya Metan was a no
10  show?
11    A.  No.  I never discussed Fulya Metan with
12  her.
13    Q.  And nobody in the presence of both of you
14  discussed that she was a no show?
15    A.  Not to my knowledge.
16    Q.  Okay?
17    A.  Or my remembrances.
18    Q.  As Chief of Police, you go to the City
19  Solicitor's Office?
20    A.  Correct.
21    Q.  Correct.  Did you see her there?
22    A.  I hadn't been to the City Solicitor's
23  office during all of this.  That's the first few
24  months for quite some time.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

20 (Pages 74 to 77)

---

Page 74

1    Q.  So, you had no idea that she's not
2   appearing for work?
3    A.  No.  It wasn't something that was of my
4   concern.
5    Q.  Oh, I take it at some point you read about
6   it in the newspaper?
7    A.  Oh, yes.
8    Q.  And then when you read about it in the
9   newspaper, you --
10    A.  I would have read it in the paper.
11    Q.  You've read that he was afraid of Peter
12   McQuillan; correct?
13    A.  Correct.
14    Q.  When the person you relied on when you felt
15   that had inherit credibility said she wasn't coming
16   back to work because she was afraid of Peter
17   McQuillan, did you do any further investigation?
18
19        MR. NOTIS:  Objection.  You can answer.
20
21    A.  There was further investigation going on as
22   of the one or two days right after this incident
23   occurred.
24    Q.  Who was doing the further investigation?

---

Page 75

1    A.  We arranged for the District Attorney's
2   Office to interview Fulya Metan and Assistant
3   District Attorney, Kathy Tutman, came into my office
4   and had a conversation with me.
5        She then had an interview of Fulya Metan.
6   She then came back and had another conversation with
7   me.  And during that second conversation after she
8   had interviewed Fulya and reviewed our reports, she
9   said to me that was a textbook investigation and we
10   did a very good job.  And from that point forward,
11   the District Attorney's Office was involved.
12        The District Attorney handles all of that.
13   And my understanding the District Attorney or
14   Assistant District Attorney, whose Kathy Tutman,
15   whose the Chief of the Sex Crime Unit at the time was
16   working directly with Fulya Metan and Lieutenant Wnek
17   in reviewing cases and making decisions.
18        At that point I wasn't directly involved
19   but the investigation was ongoing.
20    Q.  And at the time that Kathy Tutman, now
21   Judge Tutman, came to your office?
22    A.  Yes.
23    Q.  Both neither you nor she knew about the
24   e-mails that were going to Maurice Lariviere's house;

---

Page 76

1   correct?
2    A.  I didn't.  I don't know if she did.
3    Q.  If you didn't know it, there would be no
4   way of her knowing it; correct?
5    A.  I can't say what she knew.  I'm not one to
6   speak to her.
7    Q.  She knew nothing about the personal
8   relationship about the parties other than what Fulya
9   told her and Fulya told her what she told you;
10   correct?
11    A.  I don't know, so you'd have to ask her.
12    Q.  So, when you're talking about textbook
13   investigation, you don't know whether or not she knew
14   about the e-mails?
15    A.  No.
16    Q.  You didn't know about the shopping
17   excursions that were happening on a weekly basis?
18    A.  No.
19    Q.  You didn't know about the daily luncheons
20   that were going on?
21    A.  I didn't know what she knew.  I can't speak
22   for her.
23    Q.  So, if she did know about it, all of that
24   would be missing from the textbook investigation?

---

Page 77

1    A.  Well, you've got to understand as I said
2   before as a husband or the wife.  So, you're
3   independent actual contact before or after has no, no
4   major bearing on whether somebody is assaulted
5   against their will.
6    Q.  You're also very interested in credibility;
7   correct?
8    A.  Sure, absolutely.
9    Q.  And when you hear in Iraq, okay?
10    A.  Um-hmm.
11    Q.  And somebody talked about letters and you
12   find out the guy is doing time for a Federal thing
13   which is a major thing, that's something that tells
14   you something about the person whose credibility
15   you're relying on; doesn't it?
16
17        MR. NOTIS:  Objection.
18
19    A.  That may or may not.
20    Q.  It would be something of interest to you;
21   would it not?
22    A.  Well, if I see you have information you
23   would like to provide, I would be more than happy to
24   take a look at it.

---

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH SOLOMON**
**October 31, 2006**

21 (Pages 78 to 81)

---

**Page 78**

1  Q.  You've never seen it?
2  A.  No, I haven't.
3  Q.  You hadn't been told about it?
4  A.  I heard just recently about that, but I
5  haven't seen anything that says that's accurate.
6  Q.  At the time had you seen letters going out
7  to Federal judges about boyfriends who are supposed
8  to be in Iraq and are really being held in Federal
9  penitentiaries, would it have made a difference with
10  respect to your idea of her inherit credibility?
11  A.  It would probably have warranted a little
12  bit more investigation.
13  Q.  And if you saw that in your other hand you
14  had a group of e-mails, one of which was signed kiss
15  and a second one was a description of the birthday
16  presents being bought for the so-called assailant;
17  would that have required a little more investigation?
18
19       MR. NOTIS:  Objection.
20
21  A.  No, e-mails back and forth.  The dating
22  relationship back and forth still don't erase whether
23  somebody was assaulted against their will.
24       As I've said before, husband and wives;

---

**Page 79**

1  girlfriends and boyfriends.  It occurs.  And again
2  that question was asked of Mr. Lariviere, and he
3  didn't say that there was any dating relationship.
4  Q.  Fulya Metan was the first one interviewed.
5  Did she tell you anything about the relationship
6  period, like, gifts going back and forth?
7  A.  No, she didn't mention there was gifts
8  going back and forth.
9  Q.  She didn't mention there were e-mails going
10  back and forth?
11  A.  No, she didn't.
12  Q.  She didn't mention shopping excursions with
13  both of them going?
14  A.  No.
15  Q.  Or lunches?
16  A.  No.
17  Q.  Okay.  Now, had you had that information,
18  would you at least have questioned her about the
19  relationship?
20  A.  We may have asked her more questions.
21  Q.  Yes.  And would you have asked her more
22  questions about the relationship between the two
23  parties in the office with the door closed without
24  other people looking at them?  Having in mind --

---

**Page 80**

1  A.  Yes, we could have.
2  Q.  -- having in mind, you know, that there's a
3  person with them at that time; correct?
4  A.  Correct.
5  Q.  And in your investigating of a so-called
6  sex, sex crimes, it would be of interest to you to
7  know that cordial and friendly e-mails were being
8  sent from the so-called victim to the so-called
9  assailant in his house where his wife and children
10  live.  That would have been of interest to you;
11  correct?
12  A.  That's kind of a weird question.  So, you
13  don't really send e-mails to a house.  You send them
14  to an address.  I could send to ABC.com, and you
15  could be in Hensing to get that e-mail.
16       So, it doesn't necessarily go to your
17  house.  It goes to your address.  That's kind of a
18  question that can't answer.  So, but.
19  Q.  Let's get a way that it can be answered.
20  A.  Electric.
21  Q.  If it's sent on a Saturday evening, pretty
22  good inference it ain't going to work; correct?  I'm
23  talking about whether that day going to the person at
24  work.

---

**Page 81**

1  A.  If I could answer this to you, it doesn't
2  go to a person or place.  My e-mail goes here.  So,
3  if I'm in Florida, my e-mail is in Florida.  It's not
4  in a house.  An e-mail you can retrieve that mail
5  from your house, from you cell phone, from the
6  library if you chose to, from you car if you had a
7  labtop in it.  So, it's kind of a hard question to
8  answer.
9  Q.  When you're looking at an e-mail that's
10  describing the weather on a Saturday and you look at
11  the time of e-mail and it's 7:15 p.m.?
12  A.  Um-hmm.
13  Q.  And you know that Maurice Lariviere is the
14  City Solicitor in the Town of Methuen?
15  A.  Correct.
16  Q.  It's a pretty good bet that that e-mail is
17  going to him someplace other than his work?
18  A.  It's definitely not going to -- wherever
19  the server is located, so you're asking a question
20  that's impossible to answer because e-mail doesn't go
21  to the person.  It goes to the location of that
22  server, and the server for his e-mail could be
23  outside the country.
24  Q.  So, we know how e-mails go.

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

22 (Pages 82 to 85)

Page 82

1    A.  I'm, I'm, I'm trying to answer the
2  question.
3    Q.  If you saw at 7:15 saying the weather is
4  snowy outside and what are you doing tonight?  You
5  know that that e-mail was not intended to reach
6  somebody at City Hall on a Saturday night?
7    A.  Correct.  Not at their office, correct.
8    Q.  You would make a probable inference that it
9  was going to him personally at his home?
10    A.  Well, I can't say where it was going to
11  him.
12    Q.  Well, having in mind that if you knew that
13  they existed before you took any action, would you've
14  wanted to investigate those other facts?
15    A.  I don't understand what you're saying.
16    Q.  If you know that you have tangible evidence
17  of a warm ongoing relationship between the parties
18  and you've been told by somebody that there's a
19  constant series of assaults going on, based on your
20  experience as a police officer particularly as the
21  Chief of Police, you would not know that that wasn't
22  atypical to be buying presents and communicating with
23  people on the weekend who were assaulting you;
24  correct?

Page 83

1    MR. NOTIS:  Objection.
2
3    A.  No.  Actually, in a lot of instances when a
4  person, depends on the type of person, they befriend
5  another person, they would buy them stuff.  They may
6  take them on trips.
7    They may do one on, one guilted to be a
8  servant; and it's uncomfortable for accepting things
9  and allows them to have a little bit more of, you
10  know, their ability to trust them and go a little bit
11  further thinking that they're using some type of a
12  control technique.
13    And it always depends on the individual
14  situation.  There's some situations where people buy
15  things for people and buy them presents and try to
16  use that psychologically to gain an advantage over
17  the person and eventually assault them.
18    Q.  What about buying him a Bombay clock for
19  his birthday?
20    A.  I don't know.  Maybe she's saying thank you
21  for him giving her a $41,000.00 a year job.  I don't
22  know.  You'd have to ask her what her advantage was.
23    Q.  Did you think about the fact that the
24  complaints were lodged by her after her job became

Page 84

1  full time?
2    A.  What do you mean by that?
3    Q.  I want you to assume it's true that Fulya
4  is a temporary employee by Moore Services up until
5  December 26, 27 or 28.
6    A.  Okay.
7    Q.  The preceding year.  Did you know that
8  before I just said it?
9    A.  I knew she was a temp, but I didn't know
10  for how long.
11
12    MR. NOTIS:  I'm not sure if that date is
13  correct.
14    MR. DiADAMO:  I'm just telling him to
15  assume if it's not true.  The question is going out
16  the window.
17    THE WITNESS:  Just so we're all on the same
18  page.  That's all.
19    MR. DiADAMO:  Okay.
20
21    Q.  When you're dealing with the human
22  experience people you're interviewing, you're trying
23  to find out whether or not there's some secondary
24  gain of telling a story or doing something like that

Page 85

1  so you can judge or ask the story; correct?
2    A.  Um-hmm.
3    Q.  Now, when the complaint was made a month
4  after full-time employment was granted and not before
5  full-time employment was granted, would that have
6  made any difference to you?
7    A.  No.
8    Q.  If you had known that at the time, would
9  you at least have asked whether or not she was
10  requesting full-time employment before any physical
11  contact, before she was a full-time employee?
12    A.  If I know she was still temporary?
13    Q.  Yes, and claiming that she was being
14  touched later on?
15    A.  No, that doesn't have any bearing on my
16  investigation.  Whether she's a woman delivering a
17  UPS package or an employee, what does that have to do
18  with my investigation?
19    Q.  I'm asking you.  At some point do you
20  investigate the alleged assailant's status as well as
21  the victim's status?
22    A.  I don't know.  What do you mean by status?
23  Whether they're full-time or not?
24    Q.  Okay.  No, the mere fact is that Fulya

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

23 (Pages 86 to 89)

---

Page 86

1  Metan could have been telling a story about Maurice
2  Lariviere that wasn't entirely true; correct?
3      A.  She could have been.  But in my opinion
4  from years and years of experience of interviewing
5  sexual assault victims, she was telling the truth.
6      Q.  But you know she didn't tell you the whole
7  truth; correct?
8
9          MR. NOTIS:  Objection.
10
11      A.  We never asked those questions about any of
12  those inside facts.  At the time the questions and
13  the conversation was about what is occurring to her
14  that is of a sexual assault nature.
15      Q.  But how about Fulya, is there any personal
16  relationship between you two.  Did you ask that?  Did
17  you ask that?
18      A.  No, I did not.
19      Q.  As a sexual investigator, wouldn't that be
20  the first thing you would ask?
21      A.  It would all depend on the type of
22  situation.  She was asked if there was a dating
23  relationship, and she said: "No." There's a
24  difference than a personal relationship.

---

Page 87

1          Everyone who works has personal
2  relationships.  But, no, I didn't specifically ask if
3  she had those words personal relationship.
4      Q.  So, in this context, you would not have
5  probed what the actual relationship between the two
6  parties was?
7      A.  You know what, I didn't ask that question.
8  And, again as I've said I don't know how many times
9  today even, if they had a dating relationship today
10  and she said stop touching my ass and he kept doing
11  it; it's breaking the law.
12      Q.  And if she said stop touching my ass and I
13  stopped, I stopped breaking the law?
14      A.  If they weren't unwarranted before and she
15  didn't mind it, no, it wouldn't be breaking the law.
16      Q.  As a matter of fact, we can carve into
17  stone with respect to the law if the person doesn't
18  know the touching is unwanted, the touching is not
19  criminal?
20      A.  No.  No.  That's not true.  If you walk
21  down the street and grabbed some girl's ass right
22  here, you would be locked up for an assault and
23  battery.  I don't have to.
24      Q.  I'm eighteen years old and in the back of a

---

Page 88

1  car and me and a girl are kissing her; and she says,
2  I don't want to be kissed in the first place.  Why
3  are you kissing me?  Did I commit a crime?
4      A.  Well, you have to -- kissing is not --
5  kissing someone on the lips is not a sexual assault.
6      Q.  Let me just get this perfectly clear.  The
7  person who is being charged of committing a crime,
8  that you've described it, has to know the conduct is
9  unwanted or nobody would make an approach to anybody
10  correct?
11      A.  There's a difference between conduct of
12  touching somebody in an inappropriate place.  You as
13  an attorney know you can't walk out and touch your
14  secretary's ass unless you know it's warranted.
15          It's different than an eighteen-year-old
16  girl or boy and they pick each other up and going out
17  on dates, and then the guy reaches over and touches
18  her.  Well, no, knock it off.  Knock it off.
19          We have had dating relationships with
20  teenagers.  One child has been charged, charged with
21  sexual assault.  I didn't want him to do it, and he
22  did it and I'm offended by it.  It's a case by case
23  scenario.
24      Q.  As adults males we know that sexual

---

Page 89

1  interactions is a progression; correct?
2      A.  Um-hmm.
3      Q.  And at some point the progression, somebody
4  has a right to say no or indicate no?
5      A.  Correct.
6      Q.  We agree.  No question about it.  What
7  about if they don't say no and they don't indicate
8  no.  Just afterwards they say:  I didn't want that.
9  The guy shouldn't have touched me.
10      A.  Well, if it was an one-time situation, then
11  we would have to evaluate.  At that point there was
12  an one-time situation, there was the only time it
13  occurred and what do you think.  And we would get
14  advice as to which way to go.
15      Q.  So, when you videotaped that day in
16  February if there were touchings that had gone on at
17  other times where there was no indication they were
18  unwanted, would that have changed in your mind with
19  respect to what you saw in the videotape?
20          Let me, so that we make no mistake.  I'm
21  not saying that occurred.  I just asked you a
22  question.
23      A.  So, you're saying if --
24      Q.  If there were --

---

**JOSEPH SOLOMON**
**October 31, 2006**

24 (Pages 90 to 93)

Page 90

1    A. If she wanted to be touched all of those
2 other times?
3    Q. If there was no way, you know, to
4 understand the question. And so that you don't get a
5 -- strike that. Okay, and put on the record that
6 you're not answering that question because I stopped
7 you. Okay?
8    A. Okay.
9    Q. So, I want to get this perfectly clear.
10 Fulya Metan had been approached in that office on
11 occasions with a kiss or a touch in the buttocks and
12 she made no indication whatsoever it was unwanted,
13 would that have changed your mind with respect to
14 February 14th and 15th?
15    A. Changed my mind as to what?
16    Q. Whether or not there was any unwanted
17 sexual activities? If she had never, ever indicated
18 it was unwanted?
19    A. If she had never ever indicated? I have to
20 make sure I have it clear in my mind.
21       Indicating that him touching her in those
22 places was unwarranted, and then it was just that one
23 day that they saw it on video and now she's saying
24 it's unwarranted but never told him to stop that day

Page 91

1 or before then, I would say that that would not be --
2 it would be a question for a District Attorney, but I
3 don't believe this to be a qualifier for sexual
4 assault.
5    Q. If you had that, the undisputed facts, if
6 you have those undisputed facts, you wouldn't even
7 think about calling a District Attorney; would you?
8    A. Absolutely we would.
9    Q. You would call in the District Attorney?
10    A. We call the District Attorney all of the
11 time and run situations similar to this by him.
12    Q. So, if somebody came in and said: I've
13 been horsing around the office kissing me, hugging
14 me, reaching down my dress, etcetera, etcetera and I
15 sort of like it. And then one day he just reached
16 down my dress, and I didn't want that.
17       And you said: Well, did he know before he
18 did it, and you said, No, but he did. He had no
19 idea. That would be to the District Attorney?
20    A. Absolutely.
21    Q. Okay. While you were interviewing her,
22 there was never even a hint that she was threatened
23 with job loss or her occupation being compromised if
24 she didn't deliver so-called sexual favors; correct?

Page 92

1    A. No. She said she was afraid if she had
2 come forward that she would lose her job, but she
3 never said somebody told her that.
4    Q. Okay. There was no indication that Maurice
5 ever did anything or said anything to come across
6 that you're out of here?
7    A. Not that I'm aware of.
8    Q. As a matter of fact based on everything
9 that you've looked at in further investigation of the
10 interaction was just kindness, paying her medication
11 and doing her tax returns and etcetera. They're just
12 kind acts; correct?
13    A. I don't know if they were kind acts. You
14 would have to ask him if that's what he was doing.
15    Q. Did she tell you she didn't appreciate it,
16 having her meds paid for?
17    A. No. But I look at it as a well calculated
18 act to actions based on the whole totality of the
19 situation.
20    Q. So, that would've been in your mind too
21 when you made final judgements in the case that that
22 would be, would have been calculating?
23    A. Yes.
24    Q. Let me see if I've got this without

Page 93

1 spending a lot of time on it. When he started this
2 all and asked you a question about the complaint, a
3 verified complaint?
4    A. Um-hmm.
5    Q. And you've answered questions about your
6 interviews with Lariviere and the videotape. When I
7 asked you about the assertions in the complaint, can
8 I now direct your attention specifically to
9 Lariviere's assertions about his interactions with
10 Fulya Metan. Not with you. And ask you if there's
11 anything that you found untrue?
12    A. If you have a specific one, I will look at
13 it. But I don't remember them off the top of my
14 head.
15    Q. Okay.
16
17       MR. DiADAMO: Off the record.
18
19       (Off the record.)
20
21       MR. DiADAMO: Back on the record. So we
22 don't have to do it. Chief, I'm putting the amended
23 complaint in front of you.
24       It was provided kindly by your counselor,

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH SOLOMON**
**October 31, 2006**

25 (Pages 94 to 97)

| Page 94 |
|---|
| 1   and I ask you to review page two beginning with |
| 2   background to the middle of page fourteen bearing the |
| 3   date February 15th, '05 which is up to paragraph |
| 4   eighty; and I'll be asking you questions about that |
| 5   after the break. |
| 6        THE WITNESS: Okay. |
| 7        MR. DiADAMO: Eight to eighty; okay. |
| 8   |
| 9        (Off the record.) |
| 10  |
| 11       MR. DiADAMO: Back on the record. |
| 12  |
| 13   Q. Prior to the break, Chief Solomon, I asked |
| 14  you to review paragraphs eight through eighty of the |
| 15  verified complaints and that eliminates the |
| 16  assertions that relate to February 14th and the 15th |
| 17  and thereafter. And now that you have now reviewed |
| 18  them; correct? |
| 19   A. Yes. |
| 20   Q. Okay. Now, in your review of them, did you |
| 21  see any assertion that you have evidence or that is |
| 22  incorrect? |
| 23   A. I have to look at them. Incorrect or that |
| 24  I have no knowledge of? Because a lot of them I have |

| Page 95 |
|---|
| 1   no knowledge of. It's true. |
| 2        Q. I'm not asking you is it's the truth of |
| 3   false of any of them. All I am asking if you are |
| 4   seeing something that is untrue; and if you are not, |
| 5   your view even for the truth of anything. Do you |
| 6   understand that? |
| 7        A. I think so. |
| 8        Q. Alright. So, your lawyers can advise you |
| 9   if they want you, but I'm not asking you to vouch for |
| 10  the truth of any of them. I'm asking you if you have |
| 11  personal knowledge that any of them are false? |
| 12       A. Number eleven, the last sentence is not |
| 13  true, and I have actual knowledge of. |
| 14       Q. Okay. For the record, the witness has |
| 15  testified to the sentence that is, and look at it too |
| 16  quote Lariviere, a then wrote "report concluding that |
| 17  the Mayor's opponent was not properly ticketed, and |
| 18  that, in fact, the accident was the fault of the |
| 19  other driver. Are you saying that is untrue, true? |
| 20       A. Partially untrue, yes. |
| 21       Q. What part is untrue? |
| 22       A. He did not say in the, in the report that |
| 23  the opponent was not properly ticketed. What he said |
| 24  was: The other driver should have received a ticket |

| Page 96 |
|---|
| 1   also so they both were ticketed. |
| 2        Q. Okay. Go on. And number, it's towards the |
| 3   middle. |
| 4        A. Do you want me to read it? |
| 5        Q. Where are you starting? The next night? |
| 6        A. Yes. |
| 7        Q. You can read it. First of all, are you |
| 8   saying it's untrue? |
| 9        A. Yes. |
| 10       Q. Okay. It's false? |
| 11       A. It's false. |
| 12       Q. Okay. Please, read. |
| 13       A. This is untrue: "The next day Lariviere |
| 14  went to the police station and advised that the |
| 15  ticketing was illegal." Solomon relayed this to the |
| 16  Mayor, and according to Solomon was outraged that |
| 17  Lariviere had interfered with the ticket issuance. |
| 18  The tickets were later withdrawn. |
| 19       Q. That's all untrue? |
| 20       A. Except for the tickets were later |
| 21  withdrawn. |
| 22       Q. Okay. Go on. |
| 23  |
| 24       (Witness complies.) |

| Page 97 |
|---|
| 1        A. And number sixteen, second sentence: I say |
| 2   this is untrue. This was well known to Solomon, |
| 3   Alaimo, who also had known that the Mayor wanted the |
| 4   solicitor's position vacated because she had |
| 5   sufficient votes in the Town Counselor to select her |
| 6   own date. |
| 7        Q. Are you saying that's false or you don't |
| 8   know? |
| 9        A. I'm saying that's false as it relates to |
| 10  me. |
| 11       Q. Okay. The part -- without putting words in |
| 12  your mouth. The part that says: This was well known |
| 13  to Solomon is false? |
| 14       A. Correct. |
| 15       Q. Okay. And Alaimo, too? |
| 16       A. I can't answer for him. |
| 17       Q. Just for you for now. |
| 18       A. I would prefer to answer that. |
| 19       Q. Okay. It's well known to Solomon, okay. |
| 20       A. And number twenty-four: I would, I'm |
| 21  saying this is untrue because this is not what was |
| 22  told to me. Fulya Metan it states in January, the |
| 23  two joined Golds Gym in Methuen and thereafter they |
| 24  went to the gym and out to lunch up to and including |

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

26 (Pages 98 to 101)

## Page 98

1  February 15th, 2005.
2      Q.  You say that was not told to you by Fulya
3  Metan?
4      A.  That's not what Fulya Metan told me.
5      Q.  What did she tell you?
6      A.  That she joined the gym and then shortly
7  after, thereafter, Maurice joined the gym and then
8  would appear there while she was working out.
9          Number forty-nine.  At no time, however,
10  did she ever tell the counsel staff about Lariviere
11  causing any illness or distress nor did she reference
12  Lariviere as approaching her, approaching her
13  sexually or in an unwanted manner.  I'm saying that
14  that's untrue.
15      Q.  And what is the truth?
16      A.  She had said that she had spoken to Linda
17  Gagnon, who was the City Counselor Clerk, and told
18  her that this, what was going on.  And Linda Gagnon
19  in an interview, and I believe there's a statement
20  somewhere from her said that, something similar to
21  that where Maurice was touching her in an appropriate
22  way that happened twenty years ago.
23          Number fifty-one the last sentence:  Metan
24  never reported to that person that Lariviere had done

## Page 99

1  anything inappropriate.
2          It is to the best of my recollection that
3  Metan had said she had told this woman, whose name is
4  Connie I can't think of her last name, about what was
5  going on.
6          I also believed there's a statement from
7  Connie, and I don't believe Connie -- I can't
8  remember if Connie confirmed that or not.
9
10      THE WITNESS:  Could we have a minute?
11  Could I have a minute with just my lawyers?
12      MR. DiADAMO:  Sure.  Go ahead off.
13
14      (Off the record.)
15
16      MR. DiADAMO:  Back on.
17
18      A.  Number seventy-two.  I would say this is
19  untrue.  I'm saying this is untrue:  At the request
20  of Metan, Lariviere in late-January joined the gym
21  when they had a special rate of joining.  After this,
22  Lariviere and Metan went together to the gym during
23  lunch.
24          And number eighty.  I'm saying that this

## Page 100

1  part is untrue:  But mutual affectionate, which is on
2  much of the. . . . .  by Metan, light hugs and kisses
3  were commonplace and Fulya benefited.
4          Fulya has informed me that nothing was
5  initiated by her and it was all unwanted.  I think
6  that was where I'm supposed to end.
7      Q.  You were supposed to end on eighty.
8      A.  Correct.
9      Q.  And so that we're perfectly clear, I want
10  the record to show that you have not been asked to
11  attest to the truth of any allegation?
12      A.  Okay.
13      Q.  You're comments of whether or not you had
14  evidence of the contrary?  Okay?
15      A.  Yes, sir.
16      Q.  Now respect to that verified complaint, I
17  did not ask you about February 14 or 15th.  I want to
18  just ask you in general terms now that you
19  categorically did not ask for Mr. Maurice Lariviere
20  resignation?
21      A.  Absolutely not.
22      Q.  And your Deputy Alaimo did not ask for his
23  resignation?
24      A.  Absolutely not.

## Page 101

1      Q.  And you know that had you, had you asked
2  for a resignation, that would be inappropriate?
3      A.  Correct.
4      Q.  Would have been unconstitutional?
5
6      MR. NOTIS:  Objection.
7
8      A.  I don't know if it was unconstitutional.  I
9  just know it was not my place.
10      Q.  It was not your place.  Certainly not the
11  place of the two chief law enforcement officers for
12  the police; no one at the Town of Methuen?
13      A.  Correct.
14      Q.  Okay.  Now, when did you talk to any of
15  Maurice Lariviere's employers?  The people who
16  actually employed him?
17      A.  It would probably be on the 16th.  Because
18  you're saying 14th and 15th was -- actually the 15th
19  was the incident, so I believe it was the 16th.
20      Q.  Okay.  And who did you speak with?
21      A.  Counselor Chairman Michael Henneson.
22      Q.  And what did you say and what did he say?
23      A.  I don't remember all the specifics.  I told
24  him that there had been allegations of a sexual

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

27 (Pages 102 to 105)

Page 102

1  assault nature made, that we had conducted an
2  investigation, but that I didn't believe I should be
3  releasing the specifics of it.
4      And that if he needed those, he can get
5  them from the District Attorney's office and that
6  Maurice had tendered a resignation to the city.
7      Q.  And that made it unnecessary for you to
8  talk to the employer; correct?
9      A.  No.  It was because of the sexual nature of
10 it.  I wouldn't tell the employer the details of what
11 occurred.
12     Q.  Well, had he not resigned, his rights under
13 the charter to a hearing would have had to speak to
14 his employer?
15     A.  I don't know how that works.  That would be
16 up to the District Attorney to decide what's said and
17 what isn't said.
18     Q.  We've already -- we're not going to go over
19 the same territory about what his rights were from
20 the Town.  You already testified to that.
21     What I do want to know is that at some
22 point you showed the videotape to some other people;
23 correct?
24     A.  Yes.

Page 103

1      Q.  To whom did you show it?
2      A.  To the District Attorney's representative
3  which was Kathy Tutman.
4      Q.  Yes?
5      A.  We have signed things by the people that
6  saw it.  You saw it, I believe.  I wasn't there.
7  Billy DiAdamo.
8      Q.  Let me make it more specific so that you
9  don't have to stretch your memory.
10     A.  I'm just trying to remember who saw it.
11     Q.  Other than counselor and first of all let's
12 start with elected officials in the Town of Methuen,
13 of the February incident, who saw it?
14     A.  As elected officials?
15     Q.  Yes.
16     A.  My understanding that nobody saw that and
17 the elected official, I would have to go back and
18 look at the sign-in logs at everybody that viewed it.
19     As of right now, my recollection is that no
20 elected officials have seen that videotape.
21     Q.  Let's me see if I can refresh your memory.
22 How about councilman now Mayor William Mansey?
23     A.  No, not to my recollection did the
24 councilman saw that videotape.

Page 104

1      Q.  So, to your recollection, in February and
2  March of that year, Mansey did not see the tape?
3      A.  Not to my recollection, no.  I would have
4  to go look at the log of everybody that saw the tape.
5      Q.  And you did not discuss the contents of the
6  tape with him?
7      A.  No, I did not.
8      Q.  Are you telling me you don't recall it or
9  you didn't do it?
10     A.  I'm saying I don't recall having any
11 conversation with Counselor Mansey or any elected
12 officials about specifics of the tape.
13     Q.  Let me ask that question again.
14     A.  To my belief, it didn't happen.
15     Q.  Okay.  Because if it didn't happened or you
16 didn't recall it; so, it wouldn't have happened with
17 any other elected official other then Counselor to
18 Mayor Mansey?
19     A.  Correct.  Correct.
20     Q.  Okay.  Did you have any direct discussions
21 with Counselor Mansey?
22     A.  No.
23     Q.  You never spoke to him then?
24     A.  I've spoken to him hundreds of times.

Page 105

1      Q.  Well, specifically on this issue, and I'm
2  dealing with February, March, let's say April, too.
3      A.  I don't remember any specific conversations
4  that I had with Counselor Mansey as to any specifics
5  of this case overall.
6      Q.  Or his resignation?
7      A.  I had nothing to do with his resignation.
8      Q.  Or the criminal complaint?
9      A.  No.
10     Q.  Or the contents of what was on the
11 videotape?
12     A.  Not to my recollection.
13     Q.  Or the contents of what was on the
14 audiotapes?
15     A.  No, not to my recollection.
16     Q.  Okay.  The Town of Methuen has an evidence
17 room; correct?
18     A.  Yes.  We have several different locations,
19 but we have an evidence place.
20     Q.  Is there a general custodian of the
21 evidence room?
22     A.  Yes.
23     Q.  Somebody whose responsible for it?
24     A.  Yes.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

# JOSEPH SOLOMON
# October 31, 2006

28 (Pages 106 to 109)

## Page 106

1  Q. Okay. Did the audiotapes ever get into the
2  evidence room?
3  A. No.
4  Q. What happened to them?
5  A. They were locked into a safe.
6  Q. And they weren't evidence of anything?
7  A. They were evidence, absolutely.
8  Q. But they're not in the evidence room?
9  A. Correct.
10  Q. The videotape, did that ever get into an
11  evidence room?
12  A. Into the actual evidence room, no.
13  Q. Okay. But the harddrive from Lariviere's
14  computer did get in there?
15  A. The harddrive from the computer was turned
16  over, too. Actually seized as a search warrant
17  by our computer forensics people who have their own
18  separate handle of evidence.
19       As to when they finished that did it go to
20  evidence, I don't know.
21  Q. Do you recall taking it out of the evidence
22  room? You?
23  A. Me, the harddrive?
24  Q. Yes.

## Page 107

1  A. No.
2  Q. You don't recall you and Alaimo taking out
3  the harddrive out of the evidence room?
4  A. No.
5  Q. Alright. Did you ever see a letter from
6  Peter McQuillan demanding a computer be returned by
7  Maurice Lariviere?
8  A. I don't remember seeing a letter demanding
9  it. I believe there was an e-mail asking for his
10  computer to be returned.
11  Q. Did you request that that letter be sent?
12  A. I don't remember.
13  Q. But you do recall that there was a request
14  for a computer?
15  A. Yes. And I had a conversation with Peter
16  about it.
17  Q. And you do know that after the video was
18  taken, Maurice Lariviere was in the constant custody
19  or at least the presence of the police; correct?
20  A. I'm sorry. The video and Maurice in the
21  presence of us, correct.
22  Q. The entire time after?
23  A. Until he left City Hall.
24  Q. He was escorted out of City Hall?

## Page 108

1  A. Yes.
2  Q. And to your knowledge, never to return?
3  A. I don't know if he ever returned.
4  Q. Not withstanding that you're aware of the
5  demand that he returned a computer that's the
6  property of the Town of Methuen?
7  A. I'm sorry. That who?
8  Q. I'm sorry. You recall that there has been
9  a demand made on him to return a computer?
10  A. I thought you -- I thought you asked me
11  too. Peter McQuillan ask us to give Peter a
12  computer. I'm sorry. I misunderstood your
13  question.
14       Peter McQuillan I believe he had an e-mail
15  conversation that he wanted us to give him back
16  Maurice's hard stationary computer.
17  Q. And did you give it to him?
18  A. To my knowledge, it was never returned; and
19  the D.A. still has it keeping it secured at the
20  police department. I don't believe that was ever
21  returned.
22  Q. Did you recall a letter going directly to
23  Lariviere demanding that he return it?
24  A. There's two different kinds. It's

## Page 109

1  confusing, but it's two separate computers.
2  Q. Well, let's deal with the two separate
3  ones.
4  A. Okay.
5  Q. Peter McQuillan was demanding a computer be
6  returned?
7  A. From whom?
8  Q. From Maurice Lariviere?
9  A. I never seen it. I understand from Peter
10  that he was demanding Maurice Lariviere return a
11  laptop computer that was City property. That, I have
12  never seen or no knowledge of it other than Peter
13  telling me about it.
14  Q. Okay. But you do know that when he left,
15  he left empty handed?
16  A. He left with some small personal
17  belongings.
18  Q. Okay. But not a computer?
19  A. He didn't leave there with a computer in my
20  presence, no.
21  Q. You're aware that Fulya Metan was
22  processing a worker's compensation claim; correct?
23  A. That she had one, yes.
24  Q. She was processing. Did anybody discuss

## CATUOGNO COURT REPORTING SERVICES
### Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**JOSEPH SOLOMON**
**October 31, 2006**

29 (Pages 110 to 113)

| Page 110 |
|---|
| 1  with you being a witness in this case? |
| 2      A.  Not me being a witness, no. |
| 3      Q.  Did anybody discuss with you any facts that |
| 4  related to the case?  Again, just yes or no. |
| 5      A.  No. |
| 6      Q.  And I'm not interested in what any lawyer |
| 7  told you. |
| 8      A.  That's who I'm talking about, no. |
| 9      Q.  Did a lawyer speak with you? |
| 10     A.  Yes. |
| 11     Q.  About the case? |
| 12     A.  Yes. |
| 13     Q.  Who? |
| 14     A.  Attorney Ted Fayburn (phonetic). |
| 15     Q.  Okay.  He represented the Town of Methuen? |
| 16     A.  Yes. |
| 17     Q.  Okay.  And engaged by? |
| 18     A.  Peter McQuillan. |
| 19     Q.  And? |
| 20     A.  To my understanding, engaged by Peter |
| 21  McQuillan. |
| 22     Q.  Well, prior to this thing? |
| 23     A.  He was my personal attorney years ago. |
| 24     Q.  So, your personal attorney was the one who |

| Page 112 |
|---|
| 1  from Malden Mills, he's a security guard.  I've known |
| 2  him for twenty years. |
| 3      Q.  You've known Fosset for twenty years? |
| 4      A.  Yes.  He was a con and he was ECE. |
| 5      Q.  Do you know he was engaged by the Town to |
| 6  do security checks on Fulya Metan? |
| 7      A.  No, I did not know that. |
| 8      Q.  Did you know that he was engaged by Murray |
| 9  Miller a month before by the Town? |
| 10     A.  No, I did not no that. |
| 11 |
| 12     MR. DiADAMO:  I have nothing further. |
| 13     MR. GAMBACCINI:  I have no questions. |
| 14     MR. NOTIS:  No questions. |
| 15     MR. DiADAMO:  Okay. |
| 16 |
| 17     (Deposition concluded at 12:30 p.m.) |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 111 |
|---|
| 1  was defending the Fulya Metan worker's compensation |
| 2  case? |
| 3      A.  Yes. |
| 4      Q.  Now, have you seen any investigative |
| 5  reports? |
| 6      A.  You've been my personal attorney, too. |
| 7      Q.  I have been? |
| 8 |
| 9      MR. DiADAMO:  Off the record. |
| 10 |
| 11     (Off the record.) |
| 12 |
| 13     Q.  Are you aware of any investigative reports, |
| 14  activity checks on Fulya Metan? |
| 15     A.  I don't know what you mean. |
| 16     Q.  Are you aware of any generated reports by |
| 17  private investigators with respect to Fulya Metan? |
| 18     A.  I was told that there's one that exists. |
| 19     Q.  Had you spoken to the investigators? |
| 20     A.  No. |
| 21     Q.  Do you know Robert Fosset? |
| 22     A.  Oh, yes. |
| 23     Q.  And his son? |
| 24     A.  I don't know his son.  If it's Bob Fosset |

| Page 113 |
|---|
| 1      I, ANNMARIE PEREIRA, a Notary Public in and |
| 2  for the Commonwealth of Massachusetts, do hereby |
| 3  certify that JOSEPH SOLOMON appeared before me and |
| 4  satisfactorily identified themself, on the 31st day |
| 5  of October, 2006 at Lawrence, Massachusetts, and was |
| 6  by me duly sworn to testify to the truth and nothing |
| 7  but the truth as to his knowledge touching and |
| 8  concerning the matters in controversy in this cause; |
| 9  that he was thereupon examined upon his oath and said |
| 10  examination reduced to writing by me; and that the |
| 11  statement is a true record of the testimony given by |
| 12  the witness, to the best of my knowledge and ability. |
| 13      I further certify that I am not a relative |
| 14  or employee of counsel/attorney for any of the |
| 15  parties, nor a relative or employee of such parties, |
| 16  nor am I financially interested in the outcome of the |
| 17  action. |
| 18      WITNESS MY HAND this _____ day of |
| 19  _____, 2006. |
| 20 |
| 21  Annmarie Pereira   My Commission expires: |
| 22  Notary Public      August 7, 2009 |
| 23 |
| 24 |

**JOSEPH SOLOMON**
**October 31, 2006**

30 (Pages 114 to 116)

Page 114

1  Today's date:  November 13, 2006
2  To:       Carmen DiAdamo, Esquire
3  Copied to:   Andrew Gambaccini, Esquire
4            Gareth Notis, Esquire
5  From:      Annmarie Pereira
6  Deposition of:  JOSEPH SOLOMON
7  Taken:      October 31, 2006
8  Action:     U.S. DIST. CT., DIST. OF MA.
9            C.A. NO.: 05-11579EFH
10       Enclosed is a copy of the deposition of
11  JOSEPH SOLOMON.  Pursuant to the Rules of Civil
12  Procedure, MR. SOLOMON has thirty days to sign the
13  deposition from today's date.
14       Please have him sign the enclosed signature
15  page.  If there are any errors, please have him mark
16  the page, line and error on the enclosed correction
17  sheet.  He should not mark the transcript itself.
18  This addendum should be forwarded to all interested
19  parties.
20       Thank you for your cooperation in this
21  matter.
22
23
24

Page 115

1          UNITED STATES DISTRICT COURT
2          DISTRICT OF MASSACHUSETTS
3             C.A. NO.: 05-11579EFH
4  *****************************************
5  MAURICE LARIVIERE,
6          PLAINTIFF
7  VS.
8  JOSEPH SOLOMON, individually and
9  as Chief of Police for the City of
10  Methuen, JOSEPH ALAIMO, individually
11  and as Deputy Chief of Police
12  for the City of Methuen and
13  THE CITY OF METHUEN,
14          DEFENDANTS
15  *****************************************
16       I, JOSEPH SOLOMON, do hereby certify, under
17  the pains and penalties of perjury, that the
18  foregoing testimony is true and accurate, to the best
19  of my knowledge and belief.
20       WITNESS MY HAND, this _____ day of
21  _____, 2006.
22
23          JOSEPH SOLOMON
24  AP

Page 116

1          CORRECTION SHEET
2  DEPONENT:    JOSEPH SOLOMON
3  CASE:      U.S. DIST. CT. DIST. OF MA.
4          C.A. NO.: 05-11579EFH
5  DATE TAKEN:  October 31, 2006
6  ***********************************************
7  PAGE / LINE / CHANGE OR CORRECTION AND REASON
8  ***********************************************
9  _____/_____/_____
10  _____/_____/_____
11  _____/_____/_____
12  _____/_____/_____
13  _____/_____/_____
14  _____/_____/_____
15  _____/_____/_____
16  _____/_____/_____
17  _____/_____/_____
18  _____/_____/_____
19  _____/_____/_____
20  _____/_____/_____
21  _____/_____/_____
22  _____/_____/_____
23  _____/_____/_____
24  _____/_____/_____

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**