UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11579EFH

---

MAURICE LARIVIERE, )
)
Plaintiff )
v. )
)
JOSEPH SOLOMON, individually, and as )
   Chief of Police of the City of Methuen, and )
JOSEPH ALAIMO, individually, and as )
   Deputy of Police of the City of Methuen, and )
THE CITY OF METHUEN )
)
Defendants. )

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (AND REQUEST FOR ORAL ARGUMENT)

Now comes the plaintiff Maurice Lariviere ("Lariviere") in the above-entitled action and hereby submits his Opposition to the Motion For Summary Judgment of the Defendants Joseph Solomon ("Solomon"), Joseph Alaimo ("Alaimo") and The City of Methuen ("Methuen")(collectively referred to hereinafter as "defendants").

## INTRODUCTION

A very troubled, new arrival to the Methuen area, Fuyla Metin ("Metin") took a temporary assignment from a placement agency in the Methuen Town Solicitor's office. The solicitor, Lariviere, the plaintiff in this case, was immediately taken with her, and she was equally taken with the job, which provided an excellent salary and benefits.

1

As set forth in the accompanying materials, Metin was financially adrift and had suffered setbacks to her personal well-being, her relationships, and the stability of her daughter. With no better choices, and her fiancé in prison, she had been forced into a living arrangement unsatisfactory to her and dangerous to her daughter (Ex A, 27-34, 43-46, Ex. G, pp. 91, 111-112, 183). To permanently secure this desirable job, she was singularly equipped with artifice, her need for self-preservation, and the experience that constant adversity brings. No one, then, who could help her, would feel rebuffed or unwanted. The contrary was true. To ensure she secured the position, she immediately interjected a personal component into the workplace – she was appealing, friendly, welcoming, and shared explicit personal details about herself and her life (some true, some false), calculated to attract a sponsor who could help her and, was indispensable to her reaching her goal. As manifest in the record, she brought more of this behavior to the employer-subordinate table than anyone would expect or, in this case, would know about until the damage was done.

Similarly, Lariviere was primed for a change. Left out of important Methuen decisions, and clearly targeted for elimination by Methuen's Mayor, Sharon Pollard, he welcomed, and was attracted to, someone who initiated personal interactions with him. Although he did not even hint that acquiescence to sexual advances were going to be requested or required to attain employment, he was attracted to the attention, affection and personal warmth he received.

Unfortunately, shortly after Metin obtained her full-time job, she realized that the charade could not continue. New to the area and with limited alliances, she contacted a police detective she met in the Solicitor's office, and felt comfortable with. When she met with him, she was looking for nothing but help in extricating herself from a relationship she had initiated and encouraged so it would go no farther. Instead, her complaint instantly accelerated into Methuen's

political arena and morphed into something she never contemplated, because it served the purposes of people she did not even know.

## ARGUMENT

Defendants' Statement of Relevant Facts primarily recites facts most favorable to them, omits the context of the incident, and concludes there are no genuine issues for trial. Inexplicably, as hereinafter provided, Methuen has taken opposite positions in other proceedings and has filed pleadings to the effect that Metin was not the subject of any unwelcome advances, and, more significantly, *that Methuen forced Lariviere's resignation* (Ex. L2, B. pp. 3, 9). Sadly, even after the announcement of these mutually exclusive positions, Methuen, through its elected officials, has done nothing to remedy the wrong.   Accordingly, despite serving Methuen for 25 years and working with for 13 Town Councils, 7 City Managers, and, after a charter change, 2 Mayors, a loyal, well regarded city solicitor, his wife of 31 years, and three children, currently enrolled at Yale, Emanuel and Massachusetts Maritime Academy, have suffered greatly and unnecessarily. Despite filing over 450 job applications, Lariviere has been unable to secure any real employment.  His financial situation is dire, and he is danger of losing his home.  He requires medication to combat the depression he now suffers (Ex. N, ¶¶8-17).

This case turned into a debacle because of a willfully inadequate investigation by Methuen's chief law enforcement officials, Chief of Police Solomon and Deputy Chief Alaimo (Ex. E, p. 74-87). Immediate aggressive and coercive action was taken against Lariviere, a highly respected employee, because, apparently, it was inconvenient to develop a comprehensive case. Rather, the police accepted a fragmented version of the events and focused on attempting to

obtain corroboration by videotape that, in the context of this case, could not have possibly provided accurate or compelling evidence.[1]

Without knowing any details about the prior interactions between the parties (described in detail in the Second Amended Complaint), Solomon and Alaimo, with no commensurate training or experience, decided to arrange a videotape of Lariviere's office the following day with one party, the complainant, knowing everything was being filmed, while the other party was totally ignorant of the plan (Ex. E, pp. 64-6). Not one law enforcement officer involved considered the obvious flaw in the plan – that if the parties related affectionately or sexually in the past on a frequent basis it would have been entirely probable that the videotape would have captured a repetition of the prior conduct. Certainly, personal advances by one person to another are not a crime if there is no evidence that the other party recoiled, and Metin, knowing of the tape, could, and a jury would be warranted in finding, knowingly did act in a manner to support her allegations.

Since highly relevant facts had not been disclosed, those responsible for the hastily planned and executed scheme had no idea if they were looking at conduct which had been seemingly consensual in the past and now was being elevated to something else by one of the parties.

Not one law enforcement official involved reflected on the fact that the last thought in Metin's mind was criminal prosecution (Ex. G, p. 174). Rather, she had simply communicated with a police officer she knew to seek advice as to how to stop a relationship or, more

---

[1] As part of this Opposition, Lariviere is requesting that the video, which defendants' have consistently fought to keep secret, be shown to this Court so that the tape itself, rather than the defendants' self serving characterizations of it, is considered by this Court as part of the record.

specifically, end any misconceptions she may have initiated or contributed to concerning the relationship between the parties. (Ex. G, p. 174-5).

Why was this complaint, elevated into a criminal investigation and why did Maurice Lariviere ultimately resign?  A jury would certainly be warranted in finding that if these same complaints had been made about anyone other than an enemy of the Mayor, they would have been referred to the Human Resources department, as would have been appropriate.  Sadly, a problem that could have been solved in a brief, informal meeting conducted under Methuen's sexual harassment policy brought down a valued employee and his family. The law enforcement officials who brought him down knew, or at least should have known, that their hasty, ill-conceived act which we now know was calculated to force his separation from employment, not his criminal prosecution, would effect and devastate his life. In their hurry to take Lariviere down, the law enforcement officials who seized on this incident took absolutely no steps to investigate the complainant, her credibility, or her past life because of their eagerness to vanquish their target.

Why they did it is clear. Both of them owed their job to the then Mayor who elevated political loyalty over qualifications and competent performance (Ex. E, pp. 5-6, Ex. F, pp.  5-6).[2] Along with placing her allies at the top of Methuen's Law Enforcement Department, she appointed two lawyers to non-legal supervisory positions and embarked upon a campaign to eliminate Lariviere (Ex. J, pp. 10-3, 21-4).  Fortunately for him, but an impediment to her, was the fact that the Town Solicitor's position is a prerogative of the Methuen Town Council and not the Mayor's office (Ex. J, p. 38).

What twist of fate enveloped Lariviere in this atypical and singular morass? There are times arguments must yield to common sense and common experience. As Lariviere was looking for a new secretary there is no doubt he was taken with Metin. As manifest in the facts set forth in the Second Verified Complaint and confirmed in her deposition, Metin was desperately in need of stability and financial security (Ex. A, ¶¶ 30, 44-48, Ex. G, p. 114-6).  A review of their interactions from October 2004 to February 2005 clearly shows she did nothing to discourage their relationship (Ex. A, ¶¶ 36, 53–74). Moreover, their day-to-day interaction over several months discloses no intense sexuality, demands for sexual favors, hints that any quid pro quo was required, or, indeed, indicated that any real, intense physical relationship was being pursued. Charitably, without overstating her motives, Metin did nothing to discourage Lariviere's thoughts that she harbored genuine affection for him (Ex. A, ¶ 82).

In contrast to her past disappointment and abuse, Lariviere offered her kindness, support, assistance and warmth (Ex. A, ¶¶ 38-74). Unfortunately, based upon her responses, he was deluded into thinking her feelings were reciprocal. The curtain fell on this fabricated fantasy immediately after she was notified that the full-time job was hers. Reality set in. How could she continue on? She had done nothing to discourage it. Indeed, she willfully acquiesced.

However, they would be in the same office every day. How could she have the job, stop deluding Maurice, and prepare for the release of her boyfriend who she had told co-workers was serving in Iraq, but who, in reality, was serving a 51 month Federal sentence for conspiracy to commit robbery (Ex. O), if she was sending out signals that any advances were welcome? (Ex. G, pp. 91-92).

---

[2] The Mayor appointed both Solomon as Chief and Alaimo as Deputy Chief, despite the fact that he is the only

It was in this state of mind that she went to Detective Wnek. Wnek knew nothing of the documented interaction between she and Lariviere; he was listening simply to a story that, after a proper and reasonable investigation, warranted further conversation and no action (Ex. H, pp. 68-9). Simply put, she chose to speak with Wnek because she needed help in changing the rules of a game where she had principally established the rules and manipulated the conduct between the parties. She knew that she had done nothing to indicate to Lariviere that his feelings, or behavior, were unwanted. She knew that he had made no attempt to establish a sexual relationship, or establish a quid pro quo. She knew that the relationship had progressed only to the degree she permitted and no farther. But now she knew that the setting as well as the job was permanent and the charade had to stop. *As clearly set forth in plaintiff's 56.1 statement, Metin did not want to pursue a criminal prosecution. Rather, she simply wanted someone to do what she should have done, make it clear that the relationship was terminated* (Ex. H, P. 16-7, Ex. G, pp. 173- 4, 60-1). Methuen now knows she was in the driver's seat, and Lariviere a naïve but willing passenger.

What Metin did not know was how Chief Solomon and Deputy Chief Solomon would react to her assertions.   Both immediately recognized the opportunity to utterly destroy a perceived foe of the Mayor (Ex. E, p. 63). They were not only personally indebted to her for their jobs, but would take any action that would please her even if it meant causing an individual incalculable harm, totally diminish the credibility of the police department, and provide a dispiriting example of using the blunt club of law enforcement to support an agenda unlawfully advancing the interests of their political master at the expense of an individual.

---

sworn officer not appointed to civil service (Ex F, p. 5). Alaimo's wife was the Mayor's secretary (Ex. F, p. 6).

*Ironically, even Methuen now acknowledges that Lariviere's resignation was coerced and Metin gave every indication that the alleged advances were not unwelcome* (Ex. L, pp. 4-8).[3] Moreover, Solomon admits that if the touching was not unwanted, which it Methuen's MCAD position, then Lariviere was not breaking the law (Ex. E, p. 87).

This, of course, is noticeably absent from defendants' Rule 56.1 submission. These admissions by Methuen acknowledge that its two chief law enforcement officials, knowing no history of the interaction between the parties (Ex. E, pp. 74-79, 86), knew that if they could cobble something together, there was a significant political prize to be won by separating the plaintiff from his job.

If this were the case, why did Lariviere resign? And why is Methuen in this case asserting that the police proceedings were routine (although admittedly they were not (Ex. E, pp. 64-66)) when they have already acknowledged that Lariviere's resignation was coerced (Ex. L2, B. 3, 9)?

When Lariviere was brought into the room with Solomon and Alaimo he thought he was going to a congratulatory party because he had just won the most significant case he had handled for Methuen in 25 years, ironically pending in this Federal District Court (Ex. A, ¶¶ 81-84). Instead, in a matter of seconds or minutes he was threatened with literal and figurative destruction (Ex. A, ¶ 98). Worse, he was less than proud of his behavior and he was threatened with the impact of the allegations on his family. Someone who had prided himself in the work he had done and his status in the Town was threatened with being dragged off in handcuffs before

_____

[3] Shortly after the events described above, Metin filed two claims of her own. First, she filed a Workers' Compensation claim alleging, inter alia, that she was unable to work due to stress. Despite Methuen's repeated declarations that they would defend the matter to the end, Metin was paid weekly benefits from the date of the alleged incident to June, 2006, when Methuen settled for an additional lump sum in the amount of $33,900.00. (Ex. L.) Metin also filed a Complaint with the Massachusetts Commission Against Discrimination against Lariviere and Methuen.

his colleagues (Ex. A, ¶ 110). The defendants take comfort in the argument that he was a skilled 25-year lawyer. Apparently that background, according to them, should have braced him, made him dispassionate, and allowed him to intellectually and calmly process the devastation he was presented with. They ignore the fact that two years after the event he is still in treatment and taking anti-depressants (Ex. N, ¶ 17).

   The most significant fact for consideration by the Court in deciding this Motion is that at best two chief law enforcement officials of Methuen had a complaint and videotape, yet, the plaintiff was detained in a room for approximately an hour and a half for a reason that had absolutely nothing to do with law enforcement (Ex. A, ¶¶ 98-114). Solomon and Alaimo's sole mission was to force a resignation, not conduct an investigation, even though this was admittedly inappropriate action by them (Ex. E, 100-101). Lariviere's employer was the Methuen Town Council and the hour and a half was spent insuring that his job status would not be considered by them. Indeed, a typed resignation put in front of him when he finally gave up hope wasn't even prepared by the Human Resources officer (a Massachusetts attorney and Methuen's sexual harassment officer), it was prepared by Chief Joseph Solomon, and he would not even admit it in his deposition (Ex. E, 59-60; Ex. I, pp. 24, 26-7).

<u>Summary Judgment Standard</u>

   Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco*

*Co.,* 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).   In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." *Galloza v. Foy,* 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).   Resolving all doubts in favor of the nonmoving party, the court must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"In case where, as here, the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than the usual difficulty." "Under such circumstances, jury judgments about credibility are typically thought to be of special importance. This courts are particularly cautious about granting summary judgment in such cases." *Stepanischen vs. Merchants Despatch Trans. Corp.* 722 F. 2d 922 (1st Cir. 1983), See. e.g. *Morales v. Hernandez*, 579 F.2d 677,680-81 (1st Cir. 1978).

## PROCEDURAL BACKGROUND

For clarification, the plaintiff has filed three complaints, an original one the in the Massachusetts State Court, which was subsequently removed to this Court based on diversity, a First Amended Complaint, filed shortly after the removal to reflect, among other things, federal causes of action, and a Second Amended Complaint. The defendants did file a Motion to Dismiss

on the original Complaint, and plaintiff agrees that this Court did dismiss plaintiff's claims for

Intentional Interference with Contractual Relations against all defendants, and for Conspiracy

against Methuen.    Accordingly, the following claims remain:  I. Constructive Discharge;  II.

Intentional infliction of Emotional Distress; III. Violation of Massachusetts Civil Rights Act; IV.

Violation of 42 U.S.C. § 1983, Individually; V. Violation of 42 U.S.C. § 1983, in Their Official

Capacity; VI. Violation of 42 U.S.C. § 1983, against Methuen; VIII. Conspiracy; IX. Deceit,

and; X. False Imprisonment.

**I.    Whether Plaintiff Was Constructively Discharged Is A Question Of Fact For A Jury, And Summary Judgment Should Be Denied.**

The defendants rely upon *GTE Products Corp. v. Stewart,* 421 Mass. 22 (1995) regarding

constructive discharge. However, a complete reading of the case and its precedents contradicts

their assertions.   "A "[c]onstructive discharge occurs when the employer's conduct effectively

forces an employee to resign. Although the employee may say, 'I quit,' the employment

relationship is actually severed involuntarily by the employer's acts, against the employee's will.

As a result, a constructive discharge is legally regarded as a firing rather than a resignation." *Id.*

At 33-4, citing *Turner v. Anheuser-Busch, Inc.,* 7 Cal.4th 1238, 1244-1245, 32 Cal.Rptr.2d 223,

876 P.2d 1022 (1994). In *Turner*, the court found, "In order to amount to a constructive

discharge, adverse working conditions must be unusually 'aggravated' *or* amount to a

'continuous pattern' before the situation will be deemed intolerable. In general, '[s]ingle, trivial,

or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim.

(Silver, Public Employee Discharge and Discipline (1989) § 1.5, p. 1-13.)"(Emphasis added.)

However, "In some circumstances, *a single intolerable incident*, such as a crime of violence

against an employee by an employer, or an employer's ultimatum that an employee commit a

crime, may constitute a constructive discharge. Such misconduct potentially could be found 'aggravated.'" *Turner, at n.3* (emphasis added).

This of course is common sense; while constructive discharge is usually founded on a pattern of activity, it is possible to imagine any number of single events that would make someone resign unwillingly, and certainly a reasonable person could find the actions of the defendants constituted "a single intolerable incident": Lariviere went to that second floor conference room expecting to be congratulated; instead he was read his rights (Ex. A, ¶ 98). He was not allowed to leave the room, and would have been physically detained if he had tried to leave (Ex. E, pp. 56-9). He was kept there for around an hour and a half, and the audiotape was turned off 13 minutes (Ex. A, ¶ 99).[4] Solomon and Alaimo were armed, and berating him (Ex. A, ¶ 100). They lied to him, *inter alia*, insisting that Metin wanted him out, and that he was going to be fired and prosecuted if he did not resign (Ex. A, ¶ 101, Ex. G2, p. 21). He was not allowed to talk to his wife or Metin, and was told that if he did not resign, he would be arrested and taken out, in front of his co-workers, in handcuffs, to jail (Ex. A, ¶102 -9). Alaimo stood over Lariviere while Solomon continued to harangue him, telling him, "'Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know.' He then added, 'When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now.'" (Ex. A, ¶ 110).[5] Finally, Solomon looked at his watch and said, "I have a meeting in twelve minutes. This is your last chance resign or you are arrested,

---

[4] Significantly, of the two tapes, one is essentially inaudible and the other is blank, which certainly speaks volumes about the competency of the investigation Ex. N ¶ 6).

handcuffed and taken out of this building." Ex. A, ¶ 111.  In determining whether a resignation is voluntary, the court considers all the circumstances surrounding the plaintiff's resignation. *O'Connell v. County of Northampton*, 79 F.Supp.2d 529, 533 (E.D.Pa.1999).

Moreover, there is in fact evidence of a "continuous pattern" of conduct by Methuen prior to and including the coercion by Solomon and Alaimo.  It was well known that Pollard despised Lariviere, and not only has Lariviere identified specific incidents and problems he had with Pollard (Ex. A, ¶ 8-16 et seq.), but this has been independently confirmed by both Manzi (Ex. J, p. 10-38) and Solomon himself (Ex. E, p. 63).

With respect to the M.G.L. c. 258 defense asserted by the defendants, employees are only protected, "if the employee was acting within the *scope* of the employment and the employee was under the direction and control of the public employer." *Canney v. City of Chelsea*, 925 F. Supp. 58, 69 (D.Mass. 1996). In Massachusetts, "The common law test considers whether the act was in furtherance of the employer's work ... Factors to be considered include whether the conduct in question is of the kind the employee is hired to perform, whether it occurs within the authorized time and space limits, and whether it is motivated, at least in part, by a purpose to serve the employer." *Clickner v. City of Lowell; Waltham*, 422 Mass. 539, 542 (1996).  Solomon is a Chief of Police, not the Human Resources Director.  By his own admission, Solomon's duties as Chief or a police officer did not include his ability to use his police authority to demand a resignation (Ex. E, pp. 100-101). Alaimo agrees (Ex. F, pp. 30-1).  Nevertheless, Solomon even prepared the resignation, which is certainly not within the usual purview of the Chief of Police.

---

[5] Alaimo admitted to Michael Hatem, a former Methuen Police Officer, that he said, "Maurice, you've known me for 25 years. If you do not resign right now, I am going to put handcuffs on you and march you out of the office right now in front of everybody."

(Ex. I, pp. 26-7). Alaimo, meanwhile, was continuing to intimidate Lariviere and prevent him from leaving or talking to anyone, such as his wife, or Metin, despite the fact that criminal investigation was over. Neither Solomon nor Alaimo, therefore, were even arguably acting within the scope of their employment.

Significantly, neither Solomon or Alaimo even saw the videotape or the actions of Metin or Lariviere before they entered the second floor conference room; this is powerful evidence that their intent was not to investigate a crime, but to force a resignation (Ex. E, p. 46-52, 54). If they had seen the video, or had bothered to do a real and proper investigation, or better yet refer the matter, as was appropriate, to the sexual harassment officer, Methuen and they would not be stuck making utterly contradictory defenses to this case on one hand and Metin's discrimination case on the other. Astoundingly, and revealingly, Methuen is defending Metin's discrimination case on the grounds, *inter alia*, *that Lariviere's conduct was not unwelcome by Ms. Metin* (Ex. L2, B. p. 4.) In its Certification Memorandum, filed with the MCAD and executed by Methuen's counsel, Methuen admits "the City *forced* Mr. Lariviere's resignation…." (Emphasis added.) Methuen further argues that, "There is clear evidence that Ms. Metin welcomed and even encouraged Mr. Lariviere's alleged conduct toward her, or at the very least, Ms. Metin did nothing to discourage it and did not find it offensive or unwelcome." (Ex. L, pp. 4-8).

As for the conjunctive second prong, defendants do not offer any evidence that they were acting under the control of the public employer, Mayor Pollard. According to Solomon, he did not talk to Pollard before the time he went in to interrogate Lariviere, despite the fact that he was in her office while Lariviere and Metin were being videotaped. (Ex. E, pp. 48-9). (Alaimo, unsurprisingly, does not recall any portion of any conversation in the Mayor's office (Ex. F, p. 36), he does not recall almost anything (Ex. F, pp. 24-40).)

14

As for Chapter 258 immunity from personal liability, it applies only to "a negligent or wrongful act or omission"; intentional torts are expressly exempted from the Act. See G.L. c. 258, § 10 (c). (See Joseph W. Glannon, "Governmental Tort Liability Under The Massachusetts Tort Claims Act Of 1978", 66 Massachusetts Law Review 7, 11 (1981). It clearly does not apply to negligent or wrongful acts or omissions committed while he was acting outside of the scope of his employment. M.G.L. c. 258 § 2. See also, *Sperry v. Florida*, 373 U.S. 379, 383--385 (1963).)

Perhaps the most telling, and damning, statement that the defendants make in their entire argument is that, "The only plausible explanation for Mr. Lariviere's resignation was not duress or coercion, but was his own acknowledgement that the allegation had validity…." This is precisely the type of "fact-finding" that is forbidden in summary judgment motions. Not only is the interpretation unwarranted, but also it takes the facts in the light most favorable to the defendants, which is exactly wrong. Especially here, where credibility and state of mind are everything, trials are a necessity. "In case where, as here, the state of mind of one of the parties is crucial to the outcome of the case, resort to summary judgment is vested with more than the usual difficulty. Under such circumstances, jury judgments about credibility are typically thought to be of special importance. Thus courts are particularly cautious about granting summary judgment in such cases." *Stepanischen vs. Merchants Despatch Trans. Corp.*, 722 F. 2d 922, 931 (1st Cir. 1983).

II.    **Whether Defendants Violated The Massachusetts Civil Rights Act Is A Question Of Fact For A Jury To Determine.**

To establish a claim under the Massachusetts Civil Rights Act, M.G.L.A. c. 12, § 11I (MCRA), the plaintiff must prove that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) has been

15

interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion'." *Bally v. Northeastern University*, 403 Mass. 713 (1989). "Under the MCRA a " '[threat' … involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct … ] Coercion … [is] 'the application to another of such force, either physical or moral, as to constrain him to do against his will something he would not otherwise have done.' " *Planned Parenthood League of Mass., Inc. v. Blake*, 417 Mass. 467, 474 (1994).

With respect to the first part of the test, Lariviere had several secured rights. First, Lariviere had a property right in his employment as City Solicitor, a two year position to which he was reappointed for the 13th time a mere month before he was forced to resign involuntarily. See *Costello v. School Committee of Chelsea*, 27 Mass. App. Ct. 822, 827 (1989). See also, *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 547-58, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)(a public employee has a protected property interest in his or her continued employment by the government). Further, he had, as do all citizens, even 25-year lawyer, a right to due process. Lariviere's due process rights were even codified in the Methuen Charter, under which he was entitled to notice of the charges, a right to request a good cause hearing, and a good cause hearing before the City Council (Ex. R, Sec. 9).

Defendants make the patently flawed argument that Lariviere was not an employee because he had resigned and that he waived his rights with his resignation; *this utterly and completely ignores plaintiff's basic argument that the resignation was involuntary and therefore invalid.* "An employee's resignation will be considered involuntary only if: (1) the employer forces the resignation by using coercion or duress, or (2) the employee resigned

16

because the employer deceived or misrepresented a material fact to the employee." *Leheny v. City of Pittsburgh*, 183 F.3d 220, 227 (3d Cir.1999). "Both obviously involve situations in which the employer's conduct has prevented the employee from making a free and informed choice, hence, in our terms, has effectively deprived the employee of his protected property interest." *Young, supra*, at 926. The defendants used both coercion and duress and materials misrepresentations to force Lariviere's involuntary resignation.

### A.     Coercion and Duress

First, with respect to duress and coercion, *Young* sets forth a four-part test:

> Under the "duress/coercion" theory, a resignation may be found involuntary if on the totality of the circumstances it appears that the employer's conduct in requesting resignation effectively deprived the employee of free choice in the matter. Factors to be considered are (1) whether the employee was given some alternative to resignation (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; and (4) whether he was permitted to select the effective date of resignation ... [T]he assessment whether real alternatives were offered must be gauged by an objective standard rather than by the employee's purely subjective evaluation....

*Young*, Supra at 927. The facts and arguments forth by plaintiff in Section I, *inter alia*, squarely address and meet these conditions.  A jury would be warranted in finding that Lariviere was not given an alternative, because Solomon and Alaimo were not going to let him leave until he resigned; that was what they wanted. Further, Lariviere has already testified that he "snapped" (Ex. A, ¶ 112); at one point he was given only twelve minutes to decide (Ex. A, ¶ 111), and was told to resign immediately or be dragged out in handcuffs (Ex. A, ¶ 109-12).  The facts set forth by Lariviere clearly establish at least a question of fact that the coercive conduct of the defendants, "caused him to enter into [his resignation] 'under the influence of such fear as precludes him from exercising free will and judgment." *Coveny v. President & Trustees of the*

*College of the Holy Cross*, 388 Mass. 16, 22. (1983), quoting *Avallone v. Elizabeth Arden Sales Corp.,* 344 Mass. 556, 561 (1962).

**B.     Material Misrepresentations**

Solomon and Alaimo also lied to Lariviere. "Under the 'misrepresentation' theory, a resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. A misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation...." *Young,* Supra at 927.   First, Solomon and Alaimo, misrepresented Metin's intentions: *inter alia*, they insisted that Metin wanted him out, and that he was going to be fired and prosecuted if he did not resign (Ex. A, ¶ 101, Ex. G2, p. 21). In reality, Metin just "wanted the whole thing to stop." Her "goal was not criminal prosecution or lawsuits or anything," but "just to go back to work and have him stop and to be normal like have a normal office where nobody was touching you or harassing you be able to go to work and not be sick to your stomach and be upset all the time." (Ex. G, p. 174). In fact, Metin has testified that her "goal was to go back to work for Maurice Lariviere in that office in the foreseeable future," and that was all (Ex. G. p. 174).  Metin did not go to Wnek because he was a police officer or because she wanted to bring charges; she went to Wnek because "he came into our office all the time" and he and Lariviere "would discuss sometimes about harassment issues and things like that." She thought of him particularly because she got an email that day from the police department about a fundraising and she saw his name (Ex G, p. 60). Wnek corroborates that Metin never mentioned any criminal behavior, and that she did not want Lariviere to lose his job (Ex. H, p. 17). She admitted that she liked her job, like Lariviere and they were on a friendly basis. (Ex. H. 19, 31).

18

Second, Solomon and Alaimo also lied to Lariviere about the consequences by telling him that if he resigned, the matter would be kept quiet and out of the newspapers (Ex. A, ¶¶ 127-8). They further claims, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now." Ex. A, ¶ 110. Ex. C, p. 36. [6]

These material misrepresentations alone, and certainly in conjunction with the coercion and duress, are enough to defeat summary judgment. See, *Spreen v. Brey*, 961 F.2d 109, 11-2 (1992)(Whether defendants made misrepresentations that plaintiff would lose her retirement benefits is she did not resign, and plaintiff testified that she relied on these statements causing her to reign, was a genuine issue of material fact for determination at trial, not summary judgment.) See also, *Stone v. University of Maryland Medical Sys. Corp.*, 855 F. 2d 167, 173 (4th Cir.1988)(A resignation may be found involuntary if induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation. A misrepresentation is material if it concerns either the consequences of the resignation or the alternative to resignation); *Sharf v. Dept. of the air Force*, 710 F.2d 1572 (C.A. Fed. 1983)(Optional Retirement was involuntary when petitioner was misled about its effect on his disability retirement); *Covington v. Dept. of Health and Human Resources*, 750 F. 2d. 937 (C.A. Fed 1984). A jury, after due consideration of the facts and assessment of the witnesses, would certainly be warranted in finding that Lariviere was not going to be allowed to leave that room until he had resigned, and that actions of Solomon and Alaimo constituted threats and

---

[6] Lariviere estimates that since the incident there have been over 90 articles in both the Lawrence Eagle Tribune and

coercion under the MCRA.  These are issues for trial, not to be decided on summary judgment based on defendants' interpretation of facts.

Finally, Defendants ignore the law that the use of police authority incorrectly is a violation of the MCRA. "The arrest and detention of the plaintiffs by police were intrinsically coercive, and thus, sufficient to meet the plaintiffs' burden of that prong." *Sarvis v. Boston Safe Deposit and Trust*, 47 Mass. App. Ct. 86, n. 19 at 92–93 (1999) . See *Batchelder v. Allied Stores Corp.*, 393 Mass. 819 (1985) (private security guard's order to a candidate for public office to stop distributing his political handbills at the common area of a private shopping center, which he was doing in a reasonable and unobtrusive manner, was intimidation or coercion within the meaning of the MCRA): *Reproductive Rights Network v. President of University of Massachusetts*, 45 Mass.App.Ct. 495, (1998) (university's use of campus police officers to prohibit, under threat of arrest for trespass, student access to a campus building for the purpose of engaging in protected political activity was "threats, intimidation, or coercion" under the MCRA).

### III.  Whether Defendants Violated 42 U.S.C. § 1983 Is A Question Of Fact For A Jury

To establish a claim under 42 U.S.C. § 1983 against the defendants, plaintiff must establish that (1) the conduct complained of was committed by Solomon and Alaimo acting under the color of state law, and (2) that the conduct deprived him of a constitutional right.[7]

---

Boston Globe (Ex. N, ¶ 9.)

[7]Municipalities and their officers are "persons" amenable to suit under § 1983. *Figueroa-Garay v. Municipality of Rio Grande*, 364 F. Supp. 2d 117 (D.P.R. 2005). In this regard single isolated acts by a government official can constitute a violation of 1983.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

Taking the second part first, that Lariviere was deprived of his constitutional property and due process rights has already been addressed in Section II, above. The first part of the test is equally clear: Solomon and Alaimo are Methuen police officers claiming that they are investigating a crime (Ex. E, p. 69); as such, they were clearly acting under the color of state law.

Further, constructively discharging an employee from a position in which he has a protectable property interest may be actionable under § 1983. *Yearous v. Niobrana County Mem. Hosp.,* 128 F.3d 1351, 1355 (10th Cir.1997). This was addressed in Sections I and II, above.

Rather than press the argument that § 1983 does not apply, defendants rather suggest that Lariviere cannot proceed because he had an adequate post-deprivation remedy, "in the form of petitioning the Methuen City Council for reinstatement…." Defendants' Memorandum, p. 14. Ironically, a few lines above on that same page, defendants assert that Lariviere, "was not entitled to any hearing before the City Council" which again clearly demonstrates the duplicity of their arguments. "A public employer obviously cannot avoid its constitutional obligation to provide due process by the simple expedient of forcing involuntary 'resignations.'" *Young v. Annarino*, 123 F. Supp. 2d 915 (2000), citing *Stone, supra, at* 173 n. 5.

What is known is that Lariviere was forced to waive his right to a hearing and no longer had any rights under the Methuen Charter (Ex. S, Ex. E, 67-8), This post deprivation remedy applies in cases like *Cronin v. Amesbury*, 81 F. 3d 257 (1st Cir. 1996), in which the plaintiff had the benefit of Civil Service Law. (See *Keim v. County of Bucks*, 311 F.Supp.2d. 587 (E.D. Pa. 2004), where an employee was required to complete the appeals steps as outlined in the collective bargaining agreement's grievance/arbitration procedure.) Lariviere has no such protections; there was no adequate post deprivation remedy. See, *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984).  Moreover, the courts have long recognized that "a

21

litigant is generally not required to exhaust state judicial or administrative remedies prior to commencing an action under § 1983." *Edwards vs Balisok* 520 U.S. 641, 117 S.Ct. 1584, 137 L. Ed 2d 906 (1997).

**IV.    Defendants Solomon And Alaimo Are Not Entitled To Qualified Immunity**

Qualified immunity is designed to shield government officials, in the course of performing discretionary tasks, from liability for civil damages. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "On a motion for summary judgment, 'the relevant question is whether a reasonable official could have believed his actions were lawful in light of clearly established law and the information the official possessed at the time of his allegedly unlawful conduct.' " *Febus-Rodriguez v. Betancourt-Lebron*, 14 F.3d at 91, quoting from *McBride v. Taylor*, 924 F.2d 386, 389 (1st Cir.1991). When making this determination, "it important to bear in mind the policy that informs the qualified immunity doctrine, namely 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.'" *Clancy v. McCabe*, 441 Mass. 311, 317 (2004), citing *Harlow*, at 807 (1982), quoting *Butz v. Economou*, 438 U.S. 478, 506 (1978).

First and foremost, from a public policy standpoint, there is no need to protect (in fact, there is actually a need to deter), police officers like Solomon and Alaimo not engaged in police work, but in demanding and drafting a resignation for an ulterior, political purpose.  Notably, Solomon and Alaimo never claim, because they cannot, that their actions were furthering the interests of Methuen; they were furthering their own.  Certainly, this is not protected behavior.

Further, Solomon and Alaimo are not entitled to qualified immunity because their conduct clearly violated established statutory and constitutional rights that they reasonably

should have known in forcing Lariviere to involuntarily resign. *Clancy v. McCabe*, 441 Mass. 311, 317 (2004). Defendants were not following established procedure in coercing and obtaining Lariviere's resignation, but acting in a random, unauthorized manner. *Walsh v. Cuyahoga County*, 424 F.3d 510 (2005). Defendants admit that they had no right or authority to obtain a resignation, *and yet Solomon himself drafted it*, and in such a way to deprive Lariviere of his post deprivation remedy (Ex. I, pp. 26-7). Accordingly, "there exists a genuine dispute of material fact that would prevent a finding that the defendants' conduct, in following the requirements of due process, was objectively reasonable." *Lebeau v. Town of Spencer*, 167 F.Supp.2d 449 (2001).

## V.   There Is Sufficient Evidence That Methuen Has A Policy Or Custom That Caused Lariviere's Deprivation

Methuen, although a municipality, can be held liable for a violation of § 1983 when municipal "policy" or "custom" caused the plaintiff's injury. *Silva v. Worden*, 130 F. 3d 26, 31 (1997). A municipality may be held liable for the acts pursuant to a "policy" when, *inter alia*, the deprivation resulted, "from the decisions of those officials whose acts may fairly be said to be those of the municipality" and "attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 31. (Citations omitted.) In this case, it is undisputed that the Methuen decisionmaker, the Mayor, was present for (Ex. I, p. 19-29), and can fairly said to be at least complicit with, if not a motivator for, Solomon and Alaimo using unwarranted force to obtain Lariviere's resignation (See Ex. A, ¶¶ 8-12, Ex. J, p. 10-38). She was in the room as Solomon wrote the resignation. To suggest that she was not involved in the decision on how to proceed strains reason, and is at least a question for a jury.

23

## VI.    Whether There Is A Civil Conspiracy Is Again A Question Of Fact For A Jury

There is sufficient evidence to support a plaintiff's claims of a civil conspiracy; the evidence warrants a finding that Solomon and Alaimo (1) conspired (2) for the purpose of depriving, either directly or indirectly, Lariviere of the equal protection of the laws, or of equal privileges and immunities under the laws (3) causing to be done an act in furtherance of the object of the conspiracy (4) resulting either in injury to Lariviere and his property or in depriving him or her of having or exercising any right or privilege of a United States citizen. *Butner v. Department of State Police*, 60 Mass. App. Ct. 461, 469 (2004).  These tests are closely related to those of the preceding claims.  Clearly, Solomon and Alaimo acted together and pursuant to an agreement to injure Lariviere.  Defendants claim that Plaintiff cannot rely on the Second Amended Complaint is erroneous, because it is verified and not a "mere allegation"; for the purposes of opposing defendants' motion, it is established fact.  Moreover, A jury would certainly be warranted in finding that Solomon and Alaimo worked together with the intent of forcing Lariviere to resign and waive his rights in order to please their joint master and patron.  Admittedly, both were in the conference room with Lariviere, and it was Alaimo who "stood over" and intimidated Lariviere while Solomon yelled at him to resign (Ex. A, ¶¶ 98-111).

## VII.   The Actions Of The Defendants Constituted The False Imprisonment Of The Plaintiff

False imprisonment, simply, is the intentional, unjustified confinement of a person, directly or indirectly, by force or threat, of which that person is conscious or by which he is harmed.  *Cremalti-Vikery v. Otis Elevator, Inc.*, 57 Mass. App. Ct. 1105 (2003) The defendants bear the burden of proof on establishing that their confinement of Lariviere was justified by law. *Gutierrez v. Massachusetts Bay Transportation Authority*, 437 Mass. 396, 409 (2002). They

cannot; Solomon and Alaimo had no right to detain Lariviere for the purpose of compelling his resignation, which they both admit is not police work (Ex. E, p. 100-101, Ex. F, p. 30). Certainly, a jury could find that the "investigation" such as it was lasted at most 13 minutes, and the other hour and a quarter was a politically motivated diatribe against Lariviere. (Once the "investigation" was over, the Methuen Sexual Harassment Policy should have been implemented, but never was (Ex. T)). It is hard to imagine a clearer example of false imprisonment than a situation than where police officers use their inherent power to hold a person even after their investigation is over while one of the officers drafts a resignation (Ex. I, p. 26-7) and the other prevents him from leaving or indeed talking to anyone. (Ex. A, ¶¶ 102-8).

**VIII.   Whether The Defendants Were Deceitful Is A Question Or Fact For A Jury**

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from action in reliance thereon in a business transaction is liable to the other for the harm caused to him by his justifiable reliance upon the misrepresentation." *Graphics Arts Finishers Inc. v. Boston Redevelopment Authority*, 357 Mass. 40, 44 (1970). As in *Graphics Arts*, " The plaintiff has alleged the misrepresentation, its falsity, the defendant's knowledge of its falsity, and the defendant's intention to induce the plaintiff to act upon it, the plaintiff's reliance on the misrepresentation, and the harm suffered as a result." *Id.* Solomon and Alaimo specifically, maliciously, and willfully lied to Lariviere that Metin wished him prosecuted unless he resigned (Ex. A, ¶ 109), did not want to work for him anymore (Ex. A, ¶ 100), and that if he resigned, it would be kept quiet (Ex. A, ¶ 110).  The falsity of the representations, and the intent with which they are made, material questions of fact to be determined at trial. *Id.* at 44.

**IX.    Whether The Defendants Intentionally Inflicted Emotional Distress Is A Question Of Fact For A Jury**

Certainly, there is more than sufficient evidence on which a jury could find that the defendants' actions caused emotional distress to the plaintiff. Defendants correctly set forth the test:

> To prevail on [a] claim [based on this tort], [a] plaintiff [] must establish '(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, ... (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community, (3) [that] the actions of the defendant were the cause of the plaintiff's distress, and (4) [that] the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

*Quinn v. Walsh*, 49 Mass. App. Ct. 696, 732 (2000).  Defendants, however, do leave out an important part of the analysis by the Court: cases that survive, "are based, not on conduct engaged in for the purpose of causing distress, but on conduct that the actor should have known would result in distress." *Id.* Certainly there is evidence that it was the express intent of Solomon and Alaimo to cause distress in Lariviere.  These are not ordinary citizens, but the two chief law officers in Methuen, acting not to investigate a crime, but to coerce a resignation of an enemy; a jury could certainly find that their conduct was extreme and outrageous, and utterly intolerable. It is indisputable that the actions of the defendants were the cause of Lariviere's distress, and that the distress is so severe that no person should be expected to endure it.

**CONCLUSION**

When Methuen will settle on a lucid and comprehensible opinion as to what really transpired is problematic. There seems to be no appetite for Metin's version. Methuen seemingly acted immediately on her behalf as soon as it received notice of her complaint. Unimpressed and

26

unfazed by this instant show of support and protection, she disappeared in hours and never returned to her job. Instead, she pursued workers compensation and sexual harassment claims, while returning to New York to reconnect with her recently released Federal parolee companion.

The Town, with more information, which it could have had after a perfunctory investigation, now takes the legal position (totally missing from its instant submission) that Lariviere's advances were not unwanted and he was coerced into separating from his job. While the extraordinary hardship he has been caused is well known, no elected official has interceded on his behalf. Conversely, despite its public pronouncements that Methuen would defend all of Metin's claims aggressively, she was paid workers compensation without resistance. The conclusion is inescapable that the now revealed facts have reflected poorly on Methuen's Chief and Deputy Chief of Police and, any testimony will cause obvious political turmoil and awaken Methuen residents to the fact that they are wasting money because of a flagrant abuse of power.

The facts to be aired are ample. Methuen admits as much in other proceedings but chooses to parse them in this one.

WHEREFORE, Plaintiff respectfully request that Plaintiff's Motion be DENIED.

**REQUEST FOR A HEARING AND REVIEW OF THE VIDEO AND AUDIO TAPES**

The Plaintiff respectfully requests a hearing on defendants' Motion and his Opposition, and further requests that adequate time (estimated at about one and a half hours) be added to the hearing so that the video and audio tapes referenced above may be viewed by this Court and the parties.

<div style="margin-left:45%">

Plaintiff,
Maurice Lariviere
By his attorneys,

/s/
_____
Carmine W. DiAdamo
 BBO#122960
William H. DiAdamo
 BBO#558883
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271

</div>

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by electronic filing and/or first class mail on July 20, 2007.

<div style="margin-left:45%">

/s/
_____
William H. DiAdamo

</div>

COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS.                                  SUPERIOR COURT
                                           CIVIL ACTION No. 05-1155C

_____
MAURICE LARIVIERE,                     )
                                       )
                    Plaintiff          )
v.                                     )
                                       )        **SECOND AMENDED**
JOSEPH SOLOMON, individually, and as   )        **VERIFIED COMPLAINT**
    Chief of Police of the City of Methuen, and  )   **(AND JURY DEMAND)**
JOSEPH ALAIMO, individually, and as    )
    Deputy Chief of Police of the City of Methuen, and  )
THE CITY OF METHUEN                    )
                                       )
                    Defendants.        )
_____)

THE PARTIES

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire.

Until February 16, 2005, he was the city solicitor for the City of Methuen.

2.    Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the chief of police of the City of Methuen.

3.    Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen,

Massachusetts.  At all times relevant hereto, he was the deputy chief of police of the City of

Methuen.

4.    The City of Methuen is a duly chartered city located in Massachusetts with a principal

place of business at 41 Pleasant Street, Methuen, Massachusetts.

BACKGROUND

5.    The City Solicitor's position is a two-year appointment made by the City Council pursuant to the Home Rule Charter of the City of Methuen.  Lariviere had been reappointed by the City Council ("the Council") in January of 2005.

6.    Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and has continuously been reappointed by numerous administrations. No complaints whatsoever have been lodged against him concerning inappropriate conduct with employees or staff.

7.    The Mayor appoints employees of the City Solicitor's office. At all times relevant hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor").

Relationship with the Mayor

8.    Since mid-2001, relations between the Mayor and Lariviere have been acrimonious, upon information and belief because Lariviere was not appointed by, under the control of, beholden to, or subservient to the Mayor.

9.    For example, the Mayor repeatedly became angry when Lariviere refused to disclose to the Mayor confidential communications with city councilors. Lariviere's policy, as the City Solicitor, was to keep his conversations with both councilors and the Mayor confidential. Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or the Mayor were kept confidential until the client went public with them. Lariviere would not convey any information on the existence of the documents until the councilor or the Mayor placed them on the agenda. The Mayor would often express disgust that she was not immediately told when a councilor talked to Lariviere about any matters including resolutions or ordinances.

10.    In one instance, a council dispute erupted regarding raises being granted to department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the department heads of elder affairs and veterans, and not other department heads. In accordance

with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor.
After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her.
Lariviere responded that it had always been his policy to not breach attorney-client
confidentiality, including not telling councilors when he did work for her. The Mayor then
screamed over the phone "You scare me," and hung up.

11.     The Mayor also resented Lariviere because he wrote a report defending a political
opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting
her driveway and received a citation relating to the accident.  After filing a complaint with the
police claiming the citation was based on political retribution, the Mayor directed that Lariviere
conduct a thorough investigation, which he did.  Lariviere then wrote a report concluding that the
Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the
other driver.

12.     The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a
city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the
report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then
ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force
Lariviere to change the report.  Lariviere steadfastly refused, and the Mayor left the meeting
angry and disgusted.

13.     On another occasion, Solomon ordered a police officer to appear at city hall on the
night of a city Council meeting and issue tickets to persons parking in areas with signage limiting
the time for parking. Two tickets were given out, one to a political opponent of the Mayor and
the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police
station and advised that the ticketing was illegal.  Solomon relayed this to the Mayor and,

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The tickets were later withdrawn.

14.    In the eight years prior to the Mayor's election, insurance had been handled by the purchasing agent.  Upon information and belief, the Mayor disliked the purchasing agent and forced her out of office, whereupon Lariviere took over the duties.

15.    In another matter, Lariviere sought information updates on the property insurance from various city departments and determined that there were numerous errors in the property schedule, including coverage for properties the city did not own, non-coverage for properties it did own and incorrect coverage for yet other properties. He then attempted to have the agency correct these errors.  Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city.  When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor.

16.    In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate.

<u>Metin Employment</u>

17.    In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004.

4

18. Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position, however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director.

19. The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City.

20. On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly. Metin started work as a temporary secretary on October 4, 2004.

21. A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself.

22. The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems.

23. During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot.

24. After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through

Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and including February 15, 2005.

25.    Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes and Noble, and D'Angelo's.  Except for Starbucks, Lariviere had prior to this never been to these places. Lariviere and Metin took turns purchasing the food.

26.    In addition to going to lunch, they would go shopping at various stores including pet stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her daughter Christmas presents. All shopping expeditions, with one exception, were to purchase items Metin wanted to obtain.

27.    Metin advised Lariviere that as her marriage deteriorated and the violence got worse, she experienced psychological problems and began counseling. During this period she admitted having an adulterous affair with another man.

28.    Metin advised Lariviere that her husband didn't seem angry about the affair but thereafter they divorced.

29.    The husband had also taken their monies amounting to eighty thousand dollars and invested it in a restaurant.

30.    Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This occurred in approximately 1999.

31.    The husband after the divorce moved to Turkey where he is to this date. Since separation he has never provided her with any monies nor supported their child.

32.    At the time of the break-up of the marriage Metin was living on Long Island in New York. She had advised Lariviere she had problems keeping jobs and at her last employment she

was paid approximately thirty-five thousand dollars for an annual salary, which, according to her, on Long Island constituted poverty.

33.    She admitted to Lariviere that while on Long Island things had gotten so bad that she willfully borrowed money from people knowing she had no intent of repaying them and in fact had already decided to flee New York.

34.    Facing no chance at being able to survive on Long Island she moved to Haverhill, Massachusetts and began living with her mother and her mother's boyfriend Glenn.

35.    Shortly after Metin started, Lariviere contacted the Human Resources Director and asked him to put on hold the job search for the litigation paralegal position to see if Metin would work out. Metin had indicated that she would like the position.

36.    She indicated she very much liked working for Lariviere. She began to call him "Archangel" saying he was helping to save her from her many problems. Their personal relationship, formed primarily by her, was deepening. Anything that broadened the relationship or personalized it was initiated by her.

37.    In late October, Lariviere agreed to recommend Metin for the secretary's position upon her promising him to obtain a paralegal certificate and agreeing to his training her in a paralegal role.

38.    Lariviere recognized that she was not qualified for the litigation paralegal position nor for that of legal secretary, However, the pleasant relationship convinced him to offer her the position on the hope of her being trained for it.

39.    Lariviere recommended hiring Metin full time to the Human Resources Director.  The Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to hire her.

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job.

41.    Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency.

42.    The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood.

43.    Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee.

44.    Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues.

45.    During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either.

46.    Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations.

47.    Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter.

48.    She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff.

49.    At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner.

50.    The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere.

51.    Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate.

52.    Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym."

53.    In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined.

54.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site.

55.    She was and is engaged to a person named Anthony but said she was not sure if she wanted to marry him. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs.

56.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers.

57.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine.

58.    Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later.

59.    She went for further testing and the doctor confirmed that she had numerous ulcers.

60.    Lariviere and Metin occasionally exchanged emails on weekends. One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. On his birthday she gave him the present and they exchanged a hug and kiss.

61.    On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere.

62.    Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him.

63.    On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups.

64.    On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail.

11

65.    In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time.

66.    She would go to the gym two days a week and out to lunch with Lariviere two days per week.

67.    In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan.

68.    Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car.

69.    The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi  thanks for all your help" and she then proceeded to sign it "Kiss".

70.    In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy."

71.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally.

72.    At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch.

73.    Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place."

74.    In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body.

75.    Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time.

76.    Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity.

77.    She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend.

78.    By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a

number of occasions Metin would in the midst of the fight take her daughter out of the home.

One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them

about the fighting and swearing leading to her fleeing the house that night.

79.    In early February the distraught Metin began showing signs of erratic behavior.  For

example, she would denounce her mother to Lariviere, but when Rana would call her on the cell

phone, she would become a pleasant and loving daughter during the call and then immediately

denounce her after the call terminated.

80.    On a personal level, the parties were not intimate, but mutually affectionate with

much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya

benefited greatly from the assistance she was getting in turning around her life problems.

<u>February 15, 2005</u>

81.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of*

*Methuen,* in the Massachusetts Federal District Court, involving a claim that a Methuen police

officer while on duty had taken a woman into custody and then raped her. He was later convicted

of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City

of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache,

was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the

there had been a prior charge of rape made against Blache.

82.    As Metin knew, Lariviere worried about and lived this case day in and day out,

knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a

verdict against Methuen costing the taxpayers millions of dollars.

83.    This was one of the largest, most serious and most difficult cases Lariviere had ever

handled.  If lost, the effects on the Mayor, City Council, and police department could have been

devastating.

84.    On January 27th, 2005 Lariviere appeared before Federal District Court Judge Stearns and argued his motion for summary judgment in favor of the City.  On the afternoon of Feb. 15th, Lariviere learned that the judge had ruled in favor of the City and dismissed the case. An ecstatic Lariviere called the former Police Chief, Bruce McDougal who was in charge of the department when the rape occurred. Lariviere and McDougal knew each other for fifteen years but Lariviere's voice was so high and excited in the message left that McDougal could not even recognize Lariviere's voice. Ecstatic, Lariviere then went down and advised the Mayor's chief of staff of the victory. He then called and left cell phone messages for Solomon, and then for Metin, with whom he had discussed the subject many times. After going to the gym that night, Lariviere again called Metin to talk about the case.

85.    Unknown to Lariviere, during that time, Metin was apparently meeting with police lieutenant Michael Wnek and Solomon.

<u>February 16, 2005</u>

86.    Lariviere arrived that morning and began working on a letter to send to the City Council outlining the victory in the Federal Court. He had never in his 25 years sent out a similar letter, but in his mind this extremely important victory had to be reported. He again called Solomon to talk to him about the court victory.

87.    Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go.

88.    A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office.

89.     Lariviere called Metin into his office and gave her a copy of the addresses of the councilors so that she could prepare mailing envelopes for them while he finalized the letter. She later asked him to email her the letter so she could reformat it. Metin asked about reformatting the letter and Lariviere said no he just wanted it on one page.

90.     She printed out one original copy and then left the solicitor's office and went to the council office to copy the letter.

91.     Metin returned and began the envelope process. Lariviere printed a copy of the Judge's decision and then went into her office to get it. Lariviere and Metin talked for a while about the case and then he picked up the decision and began to leave.

92.     As Lariviere went back to his office Metin called out, "You are a good attorney." Lariviere came back out and went around to the inside of her L-shaped desk. They talked about the case and his victory for a while.

93.     As she had done to him, he leaned over and kissed her on the cheek and then a peck type kiss on her lips.  At this time she looked slightly downwards. He asked, "Are you ok?" She answered, "Yes, I am just tired." (This is something she often told him given the troubles at home and her lack of sleep.)

94.     Lariviere leaned over and with his right arm placed it on her left shoulder as a sign of support. He often told her, "I am there for you to help you, my friend."  She talked to him for a bit and then stood up. They briefly kissed. She began to leave and he stood up and again asked, "Are you ok?" She again said yes and then started to walk past him a short distance. He pointed to and made contact with her stomach on the right front area and asked, "Is it (her ulcer) ok?" She said, "Yes." He said, "You are getting skinny; the gym exercises are working."

95.     After a few moments she left and went outside.

96.     She never at any point in time gave any indication that the contact was unwanted or inappropriate; nor was the contact any different than similar displays initiated by her in the past.

97.     Shortly after Metin left the solicitor's office, Solomon and Alaimo arrived. Lariviere assumed that the two had arrived to talk about the court triumph. However, the two were stern faced and told him they wanted to talk to him in the second floor conference room. Lariviere assumed they were going to throw him a surprise party to celebrate his victory. He followed them into the conference room and when he saw it was empty he assumed the people would arrive shortly.

98.     Alaimo then took out a piece of paper and began to read the Miranda rights to Lariviere. Only then did he realize something bad was happening. Alaimo and Solomon then told him Metin had made a complaint against him for sexual assault. These sexual assaults included fondling her breasts. Lariviere was stunned and overwhelmed to find out a person he trusted had done this to him.

99.     Solomon and Alaimo had at the beginning put on two small tape recorders. Lariviere asked to talk to them and assumed they were turned off.

100.     The officers began berating him: "Metin wants you out of here; you cannot work here anymore, you are finished." Solomon told him how much it hurt him to have to do this, and how he could not sleep the previous night because of this.

101.     Knowing that Methuen has a sexual harassment policy dealing with this type of employee-employer dispute, including a complete review process,  they nevertheless demanded that he resign and waive his right to a hearing in order to avoid criminal prosecution. Solomon said, "If you resign, I know Metin will not press criminal charges based upon my talking to her just a little while ago. However, the Mayor wants you fired and prosecuted. I can talk to her; as

you know, we have let people have leaves and then they just go away. I will talk to her (the Mayor) about this."

102.     Lariviere told him, "I need to go home and talk to my wife about this whole issue." Solomon said, "You will not leave: resign or I arrest you right now." Solomon then left to talk to the Mayor. Alaimo remained in the room. Solomon then returned and said, "There will be no leave time - she wants you out now or you are under arrest. Metin will want you arrested if you do not resign."

103.     Lariviere was absolutely confused and devastated; he thought he was going to a victory party and was now in criminal custody, being told he had to resign immediately or be arrested.

104.     Solomon and Alaimo, the two chief law enforcement officials in Methuen and the mayor's strongest supporters, hadn't even asked him to describe what had been going on for approximately 5 months. They knew he had due process rights with respect to his job and was a council employee with 25 years of service, but his version was of no interest to them. All his rights had to be waived and he had to resign.

105.     Lariviere asked if he could talk to Metin, and was told no.

106.     They repeated again statements Metin made to them, that Lariviere had molested her and fondled her breasts and that he stalked her. Lariviere denied the charges made. Lariviere asked about the stalking, and they pointed to his call to her the night before.  Lariviere told Solomon that he called her about the court case, and he admitted, "I was there for the second call and heard it." Lariviere said, "Joe if you did then you know all I talked about was the court case and then hung up."

107.    Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo and the night Metin and her daughter met even though Lariviere and Depardo had planned on being there and Metin had not.

108.    Solomon and Alaimo then said they were going back up stairs to talk to the Mayor. They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further indicated that he must accompany him there. They walked down the corridor and upon arrival at the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by myself. After he finished he stepped outside and the police captain was there waiting for him and escorted him back to the conference room.

109.    Solomon and Alaimo returned and demanded an immediate resignation or he would be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her I know she will not seek criminal charges."

110.    As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know." He then added, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now."

111.    Finally, Solomon looked at his watch and said "I have a meeting in twelve minutes. This is your last chance resign or you are arrested, handcuffed and taken out of this building."

112.    After one and one-half to two hours of this vitriolic attack, Lariviere snapped. He knew any clarification or explanation would be fruitless. The threats, intimidation and coercion

by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could only see the harm that would befall him and more significantly, his family.

113.    He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the publicity these charges would bring and the hurt to his family and name if he didn't comply with their threats. Solomon then left and went to get the Human Resources Director, who had prepared a short resignation and waiver of hearing letter. They returned and put the resignation letter and a pen in front of Lariviere to sign.

114.    Ironically, the Human Resources Department was located next to the City Solicitor's office and the Director was another unquestioning supporter of the Mayor and was fully aware of how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of the policy as mandated upon her employment and acquiesced as the police turned this incident into a criminal investigation to deliberately deny Lariviere of his rights.

115.    The defendants lacked good cause for the threatened criminal proceedings.

116.    The defendants' aforementioned actions were objectively unreasonable

117.    Under duress, Lariviere involuntarily and under coercion resigned.  Lariviere was not given a reasonable time within which to choose between resignation and the termination proceedings to which he had a right.

118.    Shortly after the incident, Lariviere spoke to William Manzi, then a City Counselor and now Mayor of Methuen, and Manzi stated that he would "make things right." Manzi also stated that he had put Peter McQuillan in as interim city solicitor and would reinstate Lariviere "when things calmed down but he needed time."

119.    Manzi further stated numerous times that Lariviere coming forward early would result in nothing occurring especially since Solomon and Pollard had sent this case to the DA to block his return.

120.    Manzi further promised that he would make sure the council did not act to accept Lariviere's resignation and in fact proudly told Lariviere that he diverted the council's attention from such action at the meeting where McQuillan was made interim solicitor. (Upon information and belief, the Council has never accepted Lariviere's resignation.)

121.    McQuillan also called Lariviere several times during the early period and told Lariviere that he (McQuillan) was there only until Lariviere could return.

122.    Lariviere relied on their statements based on his belief that Manzi was the de facto leader of the political system in Methuen.  Although another was the chairman of the City Council, Manzi was clearly the leader, and at the time was running for Mayor (Pollard was prevented from running by term limits) and was expected to win handily, which he did.  Manzi's power grew even further after Pollard was alleged and later found to have diverted public funds to a non-profit with which she was involved.

123.    Lariviere was justified in taking no formal action with respect to his resignation based on the representations of Manzi, who asked for Lariviere's patience and stated he needed time to correct the situation and did not want to have his chances of becoming Mayor hurt in this controversy.

124.    On several occasions, Lariviere began asking Manzi for a Methuen Home Rule Charter 2-11 council investigation of the event and was told to wait until things calmed down a bit more.

125.    In early to mid June, 2005, Emma Donnelly, a politically active former resident, contacted Lariviere and asked if she could help.  At Lariviere's request, Donnelly asked Dorothy Kalil, one of Manzi's primary political supporters, to ask Manzi for the 2-11 investigation. Manzi never acted.

126.    Nevertheless, after this Manzi kept promising to make things right and that he would get Lariviere a different job. Again, nothing happened.

127.    Under the circumstances, it was absolutely clear that either withdrawal of the resignation or pursuit of any possible administrative remedy by Lariviere was futile.

128.    The defendants deliberately and intentionally disregarded and circumvented Methuen's sexual harassment policy and chose instead to utilize coercion, threats and intimidation to seize control of the Solicitor's office and eliminate an unwanted employee. The defendants did not investigate the relationship; rather, they brought the full force of law enforcement down on Lariviere to force a politically desirable conclusion.

## COUNT I
### (Constructive Discharge/Unlawful Termination)

129.    The plaintiff hereby realleges and reavers paragraphs 1 through 118 as though fully set forth herein.

130.    By threats, intimidation and coercion, the defendants unlawfully secured the plaintiff's resignation against his will, and forced him to relinquish his right to a hearing.

131.    Defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff. Their actions created a condition which was so difficult and unpleasant that a reasonable person in the plaintiff's position would have felt compelled to resign. By any objective assessment their actions were intolerable.

132.    Defendants' actions, in their official capacity, were to force a resignation against Lariviere's will, and therefore the resignation should be treated as an unlawful termination.

133.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

134.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT II
(Intentional Infliction of Emotional Distress as to Solomon and Alaimo)

135.    The plaintiff hereby realleges and reavers paragraphs 1 through 124 as though fully set forth herein.

136.    Defendant's conduct is not within the course of their employment nor in furtherance of the city's interests.

137.    Defendants intended in the manner they obtained the resignation of Lariviere to inflict emotional distress or should have known that emotional stress was the likely result of their conduct, namely advancing criminal charges where none were warranted and threatening to publicize their allegations to the public and his family.

138.    Defendants intentionally and deliberately inflicted emotional distress on Lariviere by maliciously intimidating plaintiff, by abusing the lawful process by unlawful purpose, by violating Lariviere's constitutional rights, by falsely arresting and imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, and knew or should have known that emotional distress was the likely result of their conduct.  All of this was done willfully to strip Lariviere of his rights and assure that he would not have the forum guaranteed to him to address these allegations.

139.    Defendants' conduct in causing the resignation and terminating employment was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.

140.    The actions of the defendants were the cause of plaintiff' distress, and the distress sustained by plaintiff was so severe and of such a nature that no reasonable man could be expected to endure it.

141.    As a direct and proximate cause of the acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

**COUNT III**
(Violation of Massachusetts Civil Rights Act Against Solomon and Alaimo)

142.    The plaintiff hereby realleges and reavers paragraphs 1 through 131 as though fully set forth herein.

143.    By threats, intimidation and coercion, the defendants interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and Laws and rights secured by the Constitution or laws of the Commonwealth of Massachusetts, including but not limited to the right to property and the right to a hearing.

144.    The defendants' actions were motivated by bad faith and a malicious intent to injure the plaintiff.

145.    By unlawfully forcing him to resign, using threats, intimidation and coercion, the defendants denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years. These due process rights existed under the Methuen Home Rule Charter Article 9. These due process rights provide for disciplinary action for good cause only, and solely by the City Council.

146.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

24

147.    These defendants deprived Lariviere of both his right to his liberty without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution or Constitution of the Commonwealth and M.G.L. 12 §11I.

148.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation.

149.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

**COUNT IV**
(Violation of 42 U.S.C. §1983 v. Solomon and Alaimo Individually)

150.    The plaintiff hereby realleges and reavers paragraphs 1 through 139 as though fully set forth herein.

151.    Acting under color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

152.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

153.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly

25

established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

154.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

155.    Solomon and Alaimo deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the United States Constitution and §1983.

156.    Solomon and Alaimo acted with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

157.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

### COUNT V
(Violation of 42 U.S.C. §1983 v. Solomon and Alaimo In Their Official Capacity)

158.    The plaintiff hereby realleges and reavers paragraphs 1 through 147 as though fully set forth herein.

159.    Acting under the color of law and by threats, intimidation and coercion, Solomon and Alaimo interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property, due process and the right to the First Amendment.

160.    Solomon and Alaimo's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

161.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Solomon and Alaimo denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

162.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

163.    Solomon and Alaimo deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

164.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Solomon and Alaimo deprived Lariviere of his rights.

165.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

**COUNT VI**
(Violation of 42 U.S.C. §1983 v. Town of Methuen)

166.    The plaintiff hereby realleges and reavers paragraphs 1 through 155 as though fully set forth herein.

167.    The Chief of Police was the maker and enforcer of policy or custom on public safety and law enforcement issues.

168.    By threats, intimidation and coercion, Methuen interfered with the plaintiff's exercise or enjoyment of rights secured by the United States Constitution and 42 U.S.C. §1983, including the right to property and the right to the First Amendment.

169.    Methuen's actions were motivated by bad faith and a malicious intent to injure the plaintiff.

170.    By unlawfully forcing him to resign, using threats, intimidation and coercion, Methuen, by its agent and employees denied the plaintiff his constitutional due process rights to a clearly established protected property interest, namely his employment as city solicitor, a job he had held for over 25 years.

171.    The plaintiff was not lawfully required to resign even if the allegations made against him were true. The chief law enforcement officials in Methuen deliberately and without cause characterized his behavior as criminal when, at worst, it was a civil dispute.

172.    Methuen deprived Lariviere of both his right to his liberty and property without due process of law, his right to equal protection of the laws, and the due course of justice was impeded, in violation of the Constitution and §1983.

173.    Acting under color of law and pursuant to policy or custom, and with the intent and motive to accomplish an ulterior goal – an unwarranted resignation and waiver of a hearing, by maliciously intimidating plaintiff, or by abusing the lawful process by unlawful purpose, or by violating Lariviere's constitutional rights, or by falsely arresting in imprisoning the plaintiff, by conspiring against plaintiff, or by interfering with plaintiff's civil rights by threats, coercion or intimidation, Methuen deprived Lariviere of his rights.

28

174.    As a direct and proximate cause of the actions of the defendants, plaintiff was severed from his job and suffered severe mental anguish, loss of income, physical injury and other harm in connection with his deprivations constitutional and statutory rights.

## COUNT VII
(Intentional Interference with Advantageous Contractual Relations)

175.    The plaintiff hereby realleges and reavers paragraphs 1 through 164 as though fully set forth herein.

176.    The plaintiff had advantageous business relationship and contract with the city of Methuen of which the defendants were aware.

177.    The defendants intentionally and maliciously interfered with that relationship with the intent of causing plaintiff harm.

178.    As a direct and proximate cause of the intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm.

## COUNT VIII
(Conspiracy)

179.    The plaintiff hereby realleges and reavers paragraphs 1 through 168 as though fully set forth herein.

180.    The defendants unlawfully conspired to, inter alia, unlawfully deprive, either directly or indirectly, Lariviere of equal privileges and immunities under the laws, and conspired to cause by force, intimidation and threat the resignation of Lariviere from his position, and cause him harm.

181.    The power of the defendants collectively to cause Lariviere harm was substantially greater than any of the participants had singly.

As a direct and proximate cause of the negligent and intentional acts of the defendants, plaintiff suffered severe mental anguish, loss of income, physical injury and other harm in connection with this deprivation of his rights.

## COUNT IX
### (Deceit)

182.    The plaintiff hereby realleges and reavers paragraphs 1 through 171 as though fully set forth herein.

183.    The defendants made misrepresentations to the plaintiff, as set forth in paragraphs 100 through 111.

184.    These misrepresentations were made with the intention to illegally and improperly compel and/or induce the plaintiff to resign.

185.    The defendants knew or should have known that these misrepresentations were untrue, and said defendants had a duty to disclose.

186.    The misrepresentations were made with the intent to improperly compel and/or induce the plaintiff to resign and to give up his rights.

187.    Plaintiff was damaged as a result of the defendants' deceit and misrepresentations.

## COUNT X
### (False Imprisonment)

188.    The plaintiff hereby realleges and reavers paragraphs 1 through 177 as though fully set forth herein.

189.    The defendants unlawfully restrained the plaintiff by force and/or threats, and would not allow plaintiff to either leave the conference room or contact his wife, counsel or anyone else during the time he was unlawfully restrained.

190.    The plaintiff was injured as a result of the defendants' unlawful restraint of his freedom.

## <u>RELIEF REQUESTED</u>

WHEREFORE, the plaintiff respectfully requests this Court:

a.  A declaration that plaintiff shall be reinstated to his employment as City Solicitor with all salary and benefits reinstated and/or reimbursed;

b.  Award monetary damages in an amount deemed to be just, fair, as appropriate;

c.  Award loss of wages and income and benefits, including reinstatement of all seniority, retirement and other benefits plaintiff would have enjoyed but for the actions of the defendants;

d.  Award future loss of income and value of benefits as appropriate;

e.  Award the plaintiffs' costs and attorneys' fees;

f.  Grant any other relief this Court deems just and proper.

**THE PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**.

### VERIFICATION

I, Maurice Lariviere, the undersigned, hereby verify and attest under the pains and penalties of perjury that I have read the Foregoing Verified Complaint and that I know the facts stated therein to be true, except insofar as stated to be upon information and belief, as to which I believe the same to be true.

9/23/05                                   /s/
_____      _____
Dated                                     Maurice Lariviere

Plaintiff,
MAURICE LARIVIERE
By his attorneys,

/s/

_____

Carmine W. DiAdamo
BBO#122960
William H. DiAdamo
 BBO#558883
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271

0001

1                    COMMONWEALTH OF MASSACHUSETTS

2              COMMISSION AGAINST DISCRIMINATION

3                                   No. 05BEM00777

4

5     * * * * * * * * * * * *

6     FULYA METIN

7
              vs.
8
      MAURICE LARIVIERE and
9     CITY OF METHUEN

10

11    * * * * * * * * * * * *

12

13

14

15        DEPOSITION OF MAURICE J. LARIVIERE, JR., taken

16

17    pursuant to agreement of counsel at Kazarosian Law

18

19    Offices, 546 Main Street, Haverhill, Massachusetts

20

21    on Wednesday, the 1st of November 2006, commencing

22

23    at 10:03 a.m.

0002

```
 1   APPEARANCES:

 2         Representing the Plaintiff:

 3

             KAZAROSIAN LAW OFFICES
 4           BY: Marsha V. Kazarosian, Esq.
             546 Main Street
 5           Haverhill, Massachusetts 01830

 6         Representing Maurice Lariviere:

 7               DiADAMO LAW OFFICE, LLP

 8           BY: Carmine W. DiAdamo, Esq.
             40 Appleton Way
 9           Lawrence, Massachusetts 01840

10         Representing City of Methuen:

11               DAVIS, MALM & D'AGOSTINE, P.C.

12           BY: David Rapaport, Esq.
             One Boston Place
13           Boston, Massachusetts 02108

14          Court Reporter:  Nancy J. Theroux, CSR, RPR

15

16

17

18                   * * * *

19

20

21

22

23
```

0003

1                      I N D E X

2    WITNESS:                                PAGE

3    MAURICE J. LARIVIERE, JR.

4    EXAMINATIONS:

5        Examination by Ms. Kazarosian          4

6    ERRATA                                    122
     CERTIFICATE OF REPORTER                   123
7

8                       *   *   *

9                  E X H I B I T S
     EX. NO.                                   PAGE
10

11    25    Document entitled, "Sexual          10
            Harassment Policy for the
12          City of Methuen"

13    26    Document re: Interview of           77
            City employees, 4/5/05

14    27    Police Report, February 2004        77

15

16

17

18

19

20

21

22

23

0004

1                    P R O C E E D I N G S

2            MS. KAZAROSIAN:  We have agreed to reserve

3    all objections until trial except as to form.  And do

4    you want him to read and sign?

5            MR. DiADAMO:  Read and sign, any notary.

6            MS. KAZAROSIAN:  Okay.

7            MAURICE J.LARIVIERE, JR., first being duly

8    sworn, deposes and states as follows:

9                         EXAMINATION

10   BY MS. KAZAROSIAN:

11   Q.    I'm Marsha Kazarosian.  I represent Fulya

12   Metin in a complaint against you and the City of

13   Methuen with the MCAD.  You're familiar with

14   depositions, you're an attorney, but just to remind

15   you again, if you need to take a break, please tell

16   me, and I will be happy to stop and you can take a

17   break.

18           If you don't understand a question or you

19   want me to repeat it, just let me know, and I will be

20   happy to repeat it.  I don't want you to guess at any

21   answers, just answer to the best of your knowledge.

22   A.    Yes.

23   Q.    Mr. Lariviere, can you state your name and

0005

1    address, please.

2        A.    Maurice J. Lariviere, Jr., 16 Sunridge Road,

3    Windham, New Hampshire.

4        Q.    And, Mr. Lariviere, how old are you?

5        A.    56.

6        Q.    And what is your occupation?

7        A.    Attorney.

8        Q.    And how long have you been an attorney?

9        A.    December 1977.

10       Q.    And have you been practicing since you were

11   admitted to the bar consistently?

12       A.    Until the last twenty months.   There's been

13   very little work.

14       Q.    Where did you go to school, starting from

15   high school?

16       A.    Tenney High School in Methuen.   Bachelor

17   degree at Northeastern, and a law degree at Suffolk.

18       Q.    Are you married?

19       A.    Yes.

20       Q.    And your wife's name?

21       A.    Christine with a C.

22       Q.    How long have you been married?

23       A.    February 14th, 1976.   Just shy of 31 years.

0006

1     Q.   Do you have children?

2     A.   Yes.

3     Q.   How many children?

4     A.   Three.

5     Q.   And what are their names and dates of birth?

6     A.   The oldest one is Maura.  She was born in

7     1982.  My middle child is Catherine with a C.  She was

8     born in 1987.  My last child is Tom.  He was born in

9     1988.

10    Q.   At some point in time, did you become

11    employed by the City of Methuen?

12    A.   Several times.

13    Q.   When was the first time?

14    A.   I was elected a town meeting member,

15    representative town meeting member, in 1971.  In '72,

16    I was elected home rule charter commissioner.  And

17    then I believe 1973, I was elected a town councilor.

18    Next time, I was a city solicitor in 1980.

19    Q.   And have you been city solicitor since 1980

20    without interruption until just the past twenty

21    months?

22    A.   Yes.

23    Q.   Did you work as an attorney for any other

0007

1    employer or on your own prior to becoming city

2    solicitor of the Town of Methuen?

3        A.   From 1977 until May 1980, I was in with Smith

4    Williams.

5        Q.   And what is Smith Williams?

6        A.   Smith Williams.

7        Q.   What is that?  Is it a firm?

8        A.   It was an individual attorney.

9        Q.   Oh, that's his name?  Smith is his first name

10   and Williams is his last name?

11       A.   Yes.

12       Q.   It's confusing when you have two last names.

13   Where was he practicing?

14       A.   Methuen.

15       Q.   And as an attorney in his firm, what were

16   your duties and what did you practice?

17       A.   Just general practice of law.

18       Q.   Did you do criminal defense?

19       A.   Yes.  Got beaten by him.

20       Q.   And that's why you hired him?  Personal

21   injury?

22       A.   No.

23       Q.   Real estate?

0008

1    A.    No, landlord/tenant.

2    Q.    Primarily what did you do then?  Was it

3   mostly criminal defense?

4    A.    At that age, anything for a buck.

5    Q.    When you started with Methuen, describe what

6   your job duties were early on.

7    A.    Same as it was at the end.  Handle labor

8   relations, drafting of all legal documents,

9   representing municipality in court and in the

10   administrative forums principally would be the work.

11    Q.    You said you got your bachelor's from

12   Northeastern.  What was your concentration at

13   Northeastern, was it pre-law or --

14    A.    It was in government, political science.

15    Q.    Since you have been employed by Methuen as

16   the city solicitor, have you attended during the

17   course of your employment any CLEs?

18    A.    Yes, basically anything related to municipal.

19   As a matter of fact, I was in a couple of programs.

20    Q.    Which programs were you -- when you say you

21   "were in," you were faculty?

22    A.    I was one of the people -- faculty I guess

23   you would call it.  I was speaker at one of the CLEs.

0009

1      Q.    And what was that?

2      A.    Mass Tort Claims Act.

3      Q.    And when was that?

4      A.    1990.

5      Q.    How many CLEs would you attend each year,

6  say, in the last five years?

7      A.    The last five years, probably two a year

8  maybe.  Principally, I would order the courses, you

9  know, have the books delivered.

10     Q.    Are you admitted in any other jurisdiction

11  other than Massachusetts?

12     A.    District Court of Massachusetts and the First

13  Circuit.

14     Q.    To the best of your knowledge, does the Town

15  of Methuen provide any kind of education regarding

16  harassment policies or protocols?

17     A.    It had a sexual harassment policy.

18     Q.    And when did that policy go into effect?

19     A.    I forget exact dates, ten years.

20     Q.    Ten years ago?

21     A.    Something like that.  I can't give you an

22  exact date.  It wouldn't be correct.

23     Q.    And do you know who drafted that policy?

0010

1       A.    The last one I did, quite frankly, using the

2   model that MCAD presents.

3       Q.    And when is the last one?  Is that the one

4   ten years ago?

5       A.    No, that would be the one that Pollard

6   signed.

7       Q.    And do you remember what year that was?

8       A.    I would -- I'm taking a guess now, 2002,

9   2003, somewhere around there.

10          MS. KAZAROSIAN:  I lied.  I might have a

11  couple of documents to mark.

12      Q.    I'm going show you a document here that's

13  already marked as Exhibit A, but it's entitled,

14  "Sexual Harassment Policy of the City of Methuen," and

15  it's signed by Sharon Pollard on October 29th, 2002";

16  do you recognize that?

17      A.    It appears to be the policy I drafted using

18  the policy from MCAD.

19          MS. KAZAROSIAN:  Can I have this marked?

20              (Document marked Lariviere

21              No. 25 for identification)

22      A.    Basically, if you go through that one, it's

23  basically adding in City of Methuen and references to

0011

1    the particular parties, otherwise, it's word-for-word,

2    the policy from MCAD.

3        Q.    Prior to this 2002 policy, were there other

4    policies that sort of evolved since the first one you

5    recall ten years ago?

6        A.    I'm guessing at ten years.  I can't give you

7    a specific figure, but I believe the latest update was

8    that one.

9        Q.    Were there any other updates in between this

10   2002 update and the first one that you recall?

11       A.    To the best of my memory, no.

12       Q.    Did you receive any training with regard to

13   sexual harassment in the workplace prior to your

14   updating this sexual harassment policy in 2002?

15       A.    I'm not positive.

16       Q.    Did you ever have an occasion to discuss

17   sexual harassment with any other employees of the City

18   of Methuen prior to this instance with Ms. Metin?

19       A.    It would be in relation to my duties as a

20   solicitor.

21       Q.    Is that a yes, that you did?

22       A.    Yes.

23       Q.    How many times have you had occasion to have

0012

1    those discussions?

2        A.    On a particular subject or with particular

3    persons?  There would be numerous people on one

4    particular subject.

5        Q.    Let's start off on the subject of sexual

6    harassment in the workplace.

7        A.    I would say approximately three, to the best

8    of my memory, three issues.

9        Q.    Three different times in the course of your

10   entire employment as city solicitor?

11       A.    Yes.

12       Q.    And could you describe the circumstances of

13   each of those times.

14             MS. KAZAROSIAN:  I don't have to have names

15   right now.

16             MR. DiADAMO:  Keep the names out, and use

17   general terms.

18             If you think you have an attorney-client

19   problem, let us know.

20       A.    I think I can speak generally as long as I do

21   nothing which connects names.  Okay.  I don't want to

22   cross --

23       Q.    That's okay.  Fine.

0013

1        A.    One instance was a male who was claiming that

2    he was sexually harassed by another male and another

3    female by use of words, verbiage.

4        Q.    Excuse me just for a moment.  When you say

5    you may have an attorney-client privilege, you were

6    representing which party in these cases?

7        A.    The City.

8        Q.    The City?

9        A.    Yes.  I couldn't represent anybody else but

10   the City?

11       Q.    Okay.  All right.  Go ahead.  I'm sorry.

12       A.    One was a forced retirement issue, and in

13   relation to it being done because it was a female, the

14   claim.

15       Q.    Could you explain that a little further?

16       A.    The party was claiming that she had been

17   pushed out the door, so to speak, on retirement --

18   involuntary retirement based upon her being a female

19   and not -- her inability to perform the duty.

20       Q.    So that was more of a gender discrimination

21   rather than sexual harassment?

22       A.    Yes.

23       Q.    The first one you described, however, was

0014

1   sexual harassment?

2      A.    Yes.

3      Q.    And then there was a third time?

4      A.    Yes.

5      Q.    Could you describe that.

6      A.    Give me one second.  I have forgotten.  There

7   was an employee of the City of Methuen who alleged had

8   physically assaulted females, numerous females.

9      Q.    And in your capacity as city solicitor, we'll

10  start with the first one, did you have discussions

11  with this employee who was alleged to have been the

12  recipient of sexual harassment?

13          THE WITNESS:  Should I answer that?

14          MR. DiADAMO:  You can answer yes or no for

15  now.

16     A.    Yes.

17     Q.    It's my understanding you have no

18  attorney-client privilege with the man who was

19  claiming he was sexually harassed?

20     A.    No.

21     Q.    Nor do you have any attorney-client privilege

22  between yourself and the male and female who were --

23  who allegedly sexually harassed this male, correct?

0015

1      A.    Yes.

2      Q.    So any discussions you may have had involving

3   these three are not going to be subject to

4   attorney-client privilege.

5          MR. DiADAMO:  He's going to be so advised of

6   that.

7          MS. KAZAROSIAN:  Okay.

8      A.    Frankly, I want to protect my license, so --

9      Q.    Well, I have no problem.  I don't want to

10  jeopardize your license.

11     A.    Right.

12     Q.    And until such time as I would inquire -- and

13  I don't anticipate -- into what your discussions were

14  with the City of Methuen as to how to handle this or

15  how to resolve it, let's just limit it to what your

16  discussions were with those three people in that first

17  instance.

18     A.    There's not even a question of law that the

19  employer has the obligation to conduct, in accordance

20  with the policy, an investigation.  As a result of

21  that, yes, I talked to the person who made the claim.

22  There was a number of people, and I talked to --

23     Q.    Let me go back for a moment.  You said you

0016

1    talked to the person who made the claim, and then you

2    said there were a number of people --

3         A.    There were two other females.

4         Q.    Who were making the same claim as that male?

5         A.    The other two were not the actual touching.

6    It was the inferences and words used suggesting.  It

7    would be more of a quid pro quo.

8         Q.    Let me understand that.  You have a male and

9    two females that claim they were sexually harassed?

10        A.    We're talking about -- this one was three

11   females.  The first instance was the discussion about

12   swears and sexual words being used in front of a male.

13   That's an earlier one.  I'm on the last one right now.

14        Q.    Let's stay with the first one.

15        A.    Sure.

16        Q.    Let's stay with the first one.

17        A.    Yeah.  That one went to MCAD.

18        Q.    A man alleged he was being sexually harassed

19   by -- this man who was an employee of the City --

20        A.    Yes.

21        Q.    -- was being sexually harassed by a male and

22   female who were also employees of City; is that

23   correct?

0017

1     A.    Yes.

2     Q.    Did you counsel or discuss this issue with

3     any of those three people involved in those

4     allegations?

5     A.    Yes.

6     Q.    And when you -- first of all, when you spoke

7     to the male, what discussion did you have with the

8     male about his allegations?

9     A.    That was relatively brief.  I wanted to get

10    the wording as being used or professed in front of

11    him.  Subsequent to that, he decided to file an MCAD.

12    Q.    When you say you wanted to get the wording,

13    you spoke to him because you wanted to find out what

14    language was being used specifically in his presence?

15    A.    My duty, as I understood it, and it would be

16    ordered by the Mayor -- my duty as I understand it was

17    to affirmatively investigate and find the remedy for

18    anything of that nature, including and already being,

19    referring it to the Mayor for disciplinary action.

20    Q.    Let me go back to the question.  You said you

21    had a brief discussion with him primarily to determine

22    exactly what language was used in front of him that

23    was offensive to him; is it safe for me to say that?

0018

1       A.    Yes.

2       Q.    And after you had that discussion with him

3    about the language, what did you do?

4       A.    I then talked to the parties involved.

5       Q.    When you say, "the parties," are you talking

6    about the two other people who were being accused of

7    sexually harassing him with this language?

8       A.    Yes.

9       Q.    What were your discussions with the two

10   parties involved?

11      A.    Asking them the words that we used, if any,

12   and the nature they were delivered.

13      Q.    And what did they tell you?

14      A.    They admitted using language that would be

15   considered inappropriate but understanding it just to

16   be in the joke format and not as an intent to harm.

17      Q.    And did you have any other discussions with

18   them at that point?

19      A.    At that point in time, we received notice

20   that an MCAD action had been filed.

21      Q.    Were you responsible for responding to that

22   action on behalf of the City?

23      A.    Yes.

0019

1      Q.    What did you do in response to that action?

2      A.    We filed a position statement.   There was an

3   investigatory conference.   There was a finding in

4   Methuen's favor.

5      Q.    In Methuen's favor?

6      A.    Yes.

7      Q.    How long ago did this occur?

8      A.    As best as I can remember, ten or twelve year

9   years ago.

10      Q.    Do you recall why the finding was in

11   Methuen's favor?

12      A.    To the best of my knowledge, no.

13      Q.    Do you recall whether or not the decision by

14   the MCAD had anything to do with whether or not there

15   was notice to a supervisor or superiors to this

16   activity going on?

17      A.    One of them was a supervisor.

18      Q.    Do you know whether or not the decision had

19   anything to do with a reasonable person's standard

20   with regard to the language being used?

21      A.    I believe that was ultimately the reason.   It

22   was in the investigatory stage.   It never went beyond

23   that.

0020

1      Q.    After this complaint was filed and was

2    resolved, did any of those three people continue to

3    work for the City?

4      A.    Yes, all three.

5      Q.    And after that happened, did you have any

6    further discussions or conversations with them about

7    future -- the propriety of any future action or

8    language?

9      A.    When I discussed with them at the beginning,

10    the entire situation, I told them very clearly not to

11    do that.

12      Q.    And when you said not to do that, what do you

13    mean exactly?

14      A.    Joking using the F-word, that sort of thing.

15    I told them not to do that.

16      Q.    Did you have any discussion with them about

17    the different sensibilities of different employees who

18    would be working there and how they might be affected

19    by that language?

20      A.    Yes.

21      Q.    And who did you have those discussions with?

22      A.    The supervisor at the time was the supervisor

23    handling the dispatches, and this was a dispatcher.

0021

1      Q.    Dispatcher for what?

2      A.    The police have a dispatcher unit.  You know,

3  they handle the phone calls.

4      Q.    Uh-huh.  So one of the people who was being

5  accused of making inappropriate statements or language

6  was the police dispatcher?

7      A.    Yes.

8      Q.    And so you spoke to him or her -- was it a

9  male or female?

10     A.    The dispatcher that made the complaint was a

11  male.

12     Q.    So you spoke with him and discussed with him

13  the inappropriate nature of his language?

14     A.    No, he was the one who made the complaint,

15  the dispatcher.

16     Q.    Who did you speak with about the

17  inappropriate nature of the language being used?

18     A.    The supervisor.

19     Q.    Okay.  And there was one other person who

20  also was alleged to have used inappropriate language?

21     A.    Also a dispatcher.

22     Q.    Did you speak to that dispatcher as well

23  about the inappropriate use of the language?

0022

1      A.    Yes.

2      Q.    Do you recall what it was that you said to

3  them?

4      A.    I put it in the sense -- in terms if you're

5  good friends with somebody, you might be joking, but

6  if you don't have a good relationship, if you don't

7  understand the person or have a connection, don't be

8  stepping out of the line.

9      Q.    And did you advise them that inappropriate

10  language may be stepping out of the line?

11      A.    Yes.  I explained to them, without going into

12  all the legalese, hostile work environment.

13      Q.    Did you ever have occasion to speak to either

14  of these people again or any of these people again

15  after the last time you had this discussion with them

16  about the language and the environment?

17      A.    No.

18      Q.    Did you at that point in time ever have an

19  en masse discussion with the employees of the police

20  department or City Hall about the use of inappropriate

21  language or sexual harassment in the workplace at or

22  about this time?

23      A.    If there was new case law that came down or

0023

1    regulations, or when they changed model, I would

2    apprise the Mayor.  In instances, the Mayor would

3    direct that the human resources director, who -- he

4    was the officer in charge of this -- he would be

5    responsible for the overall control of that.

6              I believe, in fact, that after that model

7    policy occurred, that the human resources director

8    talked to the department heads and the assistant

9    department heads about the policy and how this would

10   have to be followed step by step.

11        Q.   When you say, "the new policy," are you

12   talking about the 2002 policy that's just been marked

13   as Exhibit 25?

14        A.   Yes.

15        Q.   Prior to that, are you aware of whether or

16   not the human resources director had any other

17   discussions with the department heads or the employees

18   regarding a sexual harassment policy?

19        A.   I can't say affirmatively one way or the

20   other.  I assume human resources did its job, but I

21   wasn't directly involved in each and every instance.

22        Q.   Who was responsible for educating the human

23   resources director about the sexual harassment

0024

1    policies?

2        A.    I don't know that anybody was directly told,

3    "As the human resources director, I've got to teach

4    you."  I assume that as human resources director,

5    especially the most current one being an attorney, he

6    would know.

7        Q.    Given that you drafted this 2002 policy,

8    whether it was by the MCAD model or not, did you have

9    occasion, at or around the time you drafted this 2002

10   policy, to discuss it at any length with the human

11   resources director at that time?

12       A.    Yes.  As a matter of fact, it was done at one

13   of the Mayor's -- what they used to call the cabinet

14   meetings.  All the department heads were there.  When

15   the Mayor agreed to sign the policy, I instructed them

16   in the basic functions and reasons for the MCAD

17   policy, how it must be complied with, that there is

18   not only the complaint process but the failure to

19   follow up on a complaint is even worse.

20            As a result of that, the Mayor told the human

21   resources director at a meeting where they have the

22   assistant department heads to give them an instruction

23   lesson.  I was going to go that day, but I was in a

0025

1   court proceeding, and my understanding is he, in fact,

2   did instruct them on the new policy.

3        Q.    Okay.  When you say, "he," you're talking the

4   human resources director?

5        A.    Yes.

6        Q.    And who was that?

7        A.    David Bain.

8        Q.    And when you say, "he was going to instruct

9   them on the new policy," are you referring to the

10  department heads?

11       A.    That was the assistant department heads and

12  the department heads.  There would be a cabinet

13  meeting which was just the department heads, and then

14  there would be a broader meeting monthly which would

15  involve the department heads and the assistants.

16       Q.    And so you were present at that cabinet

17  meeting?

18       A.    Yes.

19       Q.    And then it's your understanding that there

20  was to be a second meeting with David Bain, Human

21  Resources Director, to educate the assistant

22  department heads about the sexual harassment policy?

23       A.    Yes.  I gave the department heads a general

0026

1    overview of the complaint process, the need to

2    affirmatively respond with the process as developed in

3    that policy, and I also advised them that

4    retaliation -- that, in fact, in the law in

5    Massachusetts, one could have a totally bogus claim,

6    but a retaliation still is a violation of law.  And I

7    told them this many times, after the complaint is

8    filed, the failure to do anything causes more problem

9    than the original complaint.

10       Q.   When you discussed this policy with them at

11   that cabinet meeting, did you go through each section

12   of your policy section by section and explain each

13   portion of your policy?

14       A.   No, the Mayor at that point in time

15   instructed the human resources director to have that

16   next meeting and give the education course, so to

17   speak.

18       Q.   Now, other than you handing the sexual

19   harassment policy over to David Bain and just

20   generally giving an overview of how to legally handle

21   a potential claim, are you aware of anybody providing

22   David Bain with any specific education about the

23   particulars of this policy?

0027

1     A.    I'm not aware, no.

2     Q.    Did you have any discussions with David Bain

3  about the particulars of this policy, exclusive of

4  your general overview of the legal proceeding that

5  could ensue as a result of a complaint?

6     A.    Yes.

7     Q.    When was that?

8     A.    Just prior to the cabinet meeting you're

9  referring to.

10     Q.    And what did you discuss with Mr. Bain about

11  this policy?

12     A.    In so many words, I was telling him I don't

13  want to offend you, because I know you're an attorney,

14  you can read, but these are the steps we should go

15  through, and I'm sure you know that we have an

16  affirmative responsibility.  We should be careful not

17  to conduct -- if we don't conduct a good

18  investigation, we got a problem, number one.  And

19  number two, retaliation.  People have to be instructed

20  that that will be protected by us in the process.

21  Number one, and number two, if the other party takes a

22  retaliatory conduct, then it holds us more liable and

23  there would be a necessity to act disciplinarily on

0028

1    that basis alone.

2        Q.    In addition to reviewing the legal process of

3    what would happen or what should happen as a result of

4    a potential complaint, did you also discuss with him

5    in detail each of the paragraphs or sections of the

6    policy that you drafted?

7        A.    No.

8        Q.    Is it safe to say that you believe that

9    because he was an attorney, he understood all of this

10   information from some prior experience or education?

11       A.    David Bain had been assistant solicitor in

12   Lawrence.

13       Q.    So that would that mean the answer to my

14   question is yes?

15       A.    Yes.

16       Q.    Could you describe what happened in the

17   second -- well, actually, the third instance.   The

18   second instance you described for me really pertained

19   to gender discrimination, correct?

20       A.    Uh-huh.

21       Q.    So the third instance you had recorded was

22   that a city employee was allegedly physically

23   assaulted by a number of females; is that correct?

0029

1      A.    No, she was physically assaulted by a male.

2      Q.    And a number of females had complained?

3      A.    Non-employee females, yes.

4      Q.    About the same male?

5      A.    Yes.

6      Q.    And about how long ago was this?

7      A.    I would pick a time window of 1997 to 1999.

8      Q.    And can you describe that situation in a

9    little more detail.

10      A.    This is where we're getting into a closed

11    area.  I'm not sure.

12      Q.    Is there a confidentiality agreement?

13            MR. DiADAMO:  First of all, let me just talk

14    to him.

15            MS. KAZAROSIAN:  Okay.  We're going to take a

16    break for a second.

17            (Recess taken)

18            (Discussion off the record)

19            MR. RAPPAPORT:  We have had an off-the-record

20    discussion, and the City is going to go ahead and let

21    Mr. Lariviere answer Ms. Kazarosian's questions about

22    this so-called third incident or the second incident

23    involving sexual harassment allegations, but because

0030

1    it was resolved internally within the City, it was a

2    matter of a very sensitive nature, and it was

3    understood by the people resolving it that it would be

4    held confidential.

5          We have agreed off the record and now on the

6    record, subject to Ms. Kazarosian telling me if I have

7    this right or wrong, until further agreement of

8    parties or order of the Court, the questions and

9    answers about this particular incident will be held

10   confidential, will be used only for purposes of this

11   case and not disclosed outside by Ms. Kazarosian to

12   the press or to any other attorneys, but simply used

13   for purposes of this case.

14         In other words, the usual confidentiality

15   order which I, in my appointment practice, are into

16   all the time, and I'm sure Marsha does, too, is that

17   we can subsequently assign a couple of pages, setting

18   this forth more formally, but in order to go ahead

19   with the deposition, we need to have some kind of

20   basic confidentiality understanding only about this

21   particular incident.  Is that accurate?

22         MS. KAZAROSIAN:  Yeah, that says it.  I just

23   want to make sure it's understood that, yes, it still

0031

1    is potentially going to be used as part of this case.

2              MR. RAPPAPORT:  Yes.  Oh, absolutely.

3              MS. KAZAROSIAN:  But just confidential as to

4    everybody on the outside.

5              MR. RAPPAPORT:  Yes.

6              MR. DiADAMO:  Just one more thing on the

7    record as Maurice Lariviere's attorney.  Since

8    Mr. Rapaport is representing the City, you're not

9    going to get cumulative objections.  He's the client.

10   He'll do the objections.  I won't say much.

11             MR. RAPPAPORT:  Any attorney-client privilege

12   is the City's privilege, so it would be incumbent on

13   me to object.  If, for example, you ask Mr. Lariviere

14   what he and the Mayor discussed about how to handle

15   the situation, I will have to object.

16             MS. KAZAROSIAN:  Right.

17             MR. DiADAMO:  Okay?

18             MS. KAZAROSIAN:  Okay.

19             THE WITNESS:  I want it very clear, I'm not

20   throwing my license out the window today.  If David

21   objects, I'm not going anywhere.

22             MR. RAPPAPORT:  I'll instruct --

23             MR. DiADAMO:  He's going to instruct you.

0032

1          MS. KAZAROSIAN:  Don't worry, if he objects

2    on the basis of attorney-client privilege, and it's

3    legitimately a conversation or communication, I don't

4    have any interest in it, and I'm not going to -- I

5    can't force you to answer anyway, nor would I try to.

6          MR. RAPPAPORT:  We all understand.

7          MR. DiADAMO:  Okay.

8    BY MS. KAZAROSIAN:

9    Q.   You started to describe an incident in '98 or

10   '99 of when you had to deal with an issue of sexual

11   harassment in your capacity as city solicitor.  Could

12   you describe that in a little more detail?

13   A.   A complaint had been made to the Mayor's

14   office.  The Mayor's reaction was immediate to --

15   Q.   What was -- going back for a minute, what was

16   the nature of the complaint, speaking generally?

17   A.   Sexual contact of private areas of a female.

18   Q.   And what was the circumstance, meaning when

19   did it happen, how did it happen, was it on the job,

20   et cetera?  Go into some detail about that first.

21   A.   It was definitely on the job, not a question

22   about it.  The female involved did not work directly

23   for that person, but he was -- he was at department

0033

1    head level.

2        Q.    So something happened that disturbed this

3    woman, what was it?

4        A.    Her complaint allegation was that she had

5    been grabbed on her breasts while she was operating a

6    photocopy machine.

7        Q.    And so she registered a complaint?

8        A.    Yes, to the Mayor's office.

9        Q.    Were there any other allegations from that

10    female with regard to that person who was accused?

11        A.    As memory serves, I believe she referenced

12    about certain talk, certain use of words or

13    implications regarding sexual desire, but I -- quite

14    frankly, the direct physical contact kind of directed

15    my attention.

16        Q.    And is it safe to say that, in your capacity

17    as city solicitor, you had to react to that complaint?

18        A.    The Mayor wanted to --

19            MR. RAPPAPORT:  Before you discuss what the

20    Mayor told you, we better check in case that's

21    privileged.

22            MS. KAZAROSIAN:  I don't want to know what

23    the Mayor --

0034

1    Q.    My question was -- and I was trying to be

2    careful for you -- as a result of this complaint, in

3    your capacity as city solicitor, did you have to

4    respond to that and react to that?

5    A.    Yes.

6    Q.    How did you respond and react to that

7    complaint?

8          THE WITNESS:  I think I need to talk to

9    David.

10          (Pause in proceeding)

11    A.    The mayor was the one that ran the ship.  He

12    wanted an immediate response and the matter taken care

13    of.  I cannot talk to you about meetings between the

14    Mayor and myself on the issue.  I can talk to you that

15    he did have the female involved in the office talking

16    to us, reassuring her that that was not acceptable

17    conduct, that the City would react immediately to

18    resolve it to take the pressure off her.

19          She was the type of female that really didn't

20    want to get into an adverse proceeding.  She wanted to

21    be left alone.  And what was arranged is he took a

22    retirement and went out the door.

23    Q.    Did you have any discussions with this female

0035

1    prior to having the meeting in the Mayor's presence

2    about her complaint?

3       A.   No.

4       Q.   Did you have any discussions with her after

5    meeting with the Mayor about her complaint?

6       A.   No.  The way we had the conversation that

7    day -- she is a friend of mine, and I -- I didn't

8    really want to get into it.  It was obvious to me that

9    it was bothering her, and she just wanted this by the

10   end -- and she seemed very pleased.  The only

11   conversation I had with her was, "He's retiring.  He's

12   gone.  He'll never bother you again."  She was happy,

13   but I didn't want to get into details again.

14      Q.   Did she stay on as an employee of the City?

15      A.   Until Pollard killed her.

16      Q.   Until who?

17      A.   Pollard.

18      Q.   Pollard killed her, you said?

19      A.   I can't go any further.

20           MR. RAPAPORT:  You mean terminated her?

21      Q.   She's still alive, correct?

22      A.   Yes, very much so.

23      Q.   But she's no longer working there, I take it?

0036

1      A.    Correct.

2      Q.    Since Mayor Pollard came into her tenure as

3   mayor?

4      A.    That's correct.

5      Q.    You had mentioned that there were other

6   complaints about this person that you described in the

7   second incident where he touched this woman at the

8   copy machine, correct?  There were other people who

9   complained about him?

10     A.    Not employees.

11     Q.    Okay.  Were there touchings or was it similar

12  types of complaints?

13     A.    It was an inference of a quid pro quo.

14     Q.    Now, did you then -- prior to him taking an

15  early retirement, did you have any discussions with

16  him about his behavior?

17     A.    There was a discussion with him, the Mayor

18  and myself.

19     Q.    And what did you -- what happened in that

20  discussion?

21     A.    Let's say the Mayor expressed himself, but

22  not in a legal format.

23          MS. KAZAROSIAN:  Okay.  I don't want to get

0037

1   into any attorney-client privilege, but anything that

2   the Mayor may have said to this man in your presence

3   or that you may have said to this man in the presence

4   of the Mayor wouldn't necessarily be covered by

5   privilege; am I correct?

6          MR. RAPPAPORT:  I agree.  I agree.

7      Q.   Okay.  So could you explain and describe that

8   conversation when the three of you were together.

9      A.   The Mayor was very angry about what happened

10  to the secretary, but he really went over the edge

11  when it was -- it was regarding widows of veterans,

12  where there was an inference of a quid pro quo for

13  benefits, and that -- let's say, he started swearing,

14  and then calmed down and said, "Look, I'm not out to

15  hurt anybody, but you've got to go now, and for the

16  best interest of her, for those females from Methuen,

17  and for you, just take your retirement."

18     Q.   Did he or you explain to this man what it was

19  specifically about his behavior that was

20  inappropriate?

21     A.   Yes, the Mayor did.

22     Q.   How did you do that?

23     A.   I didn't do it.  The Mayor did.  And that was

0038

1   at the early stages when we weren't having a legal

2   discussion.  He was very angry and screaming at him

3   about the incident.

4       Q.   And is it safe to say he made it very clear

5   to him that that kind of behavior was inappropriate

6   and illegal and intolerable?

7       A.   Yes, I think for the next two blocks away

8   from the building, you would know.

9       Q.   And you were present for that conversation?

10      A.   Yes.

11      Q.   After that incident happened, did you have

12  any kind of general discussions with any of the City

13  department heads or employees or assistant department

14  heads about sexual harassment in the workplace?

15      A.   We took a slight break, so to speak.  We

16  didn't want to make a direct connection.  There was an

17  agreement by all parties this was going to be

18  resolved.  It was going to be handled politely,

19  quietly.  So it was several months later, and then the

20  department heads -- there was a discussion in a

21  department head meeting about that.

22      Q.   And what was that discussion?

23      A.   Basically, about sexual harassment and

0039

1   translating quid pro quo and hostile work environment.

2       Q.    And what did you discuss about translating

3   quid pro quo?

4       A.    That you can't offer a job, an increase in

5   pay, an easier job, whatever, in exchange for physical

6   contact.

7       Q.    And what did you discuss about inappropriate

8   conduct in the workplace?

9       A.    Basically what's in the policy, went through

10  what would now be known as unwelcomeness and that sort

11  of thing.

12      Q.    Okay.  When you say what's basically in the

13  policy, you're referring to the 2002 policy that's

14  marked as Exhibit 25?

15      A.    Yes.

16      Q.    But this discussion that you had with the

17  department head was prior to 2002?

18      A.    Yes, but that is a formation of that which

19  already existed.

20      Q.    So what you're saying is the policy that was

21  in effect at the time this incident happened on or

22  about '98 or '99 was primarily the same policy

23  prohibiting the same kind of behavior as the behavior

0040

1    described in the 2002 policy that is Exhibit 25?

2        A.    To the best of my memory, yes.

3        Q.    Now, when you say you described the

4    conduct -- strike that.  When you say that you

5    discussed the conduct that is prohibited in the sexual

6    harassment policy, for example, unwelcomeness, do you

7    remember specifically what you discussed and how you

8    described unwelcomeness?

9        A.    Advances that aren't welcome in so many

10   words.

11       Q.    Did you discuss whether or not they had to be

12   physical or nonphysical?

13       A.    I can't tell you.  That's -- you're talking

14   seven, eight years ago.  It's hard to tell.

15       Q.    Let's go back to this policy for a moment

16   that you drafted.  You describe in this policy -- and

17   I will show you again a copy of it.

18           MS. KAZAROSIAN:  And I apologize, I don't

19   have copies.  Do you want me to get them?

20           MR. RAPPAPORT:  No problem.

21       Q.    You talk about unwelcome sexual advances,

22   whether they are physical or not.  Do you recall that

23   sentence in this policy which is under 2?

0041

1       A.    That's the MCAD model policy, yes.

2       Q.    And what is your understanding of what that

3    means, that sentence, "unwelcome sexual advances,

4    whether they involve physical touching or not"?

5       A.    It could be as little as gestures or words.

6       Q.    And why would that necessarily translate into

7    an unwelcome sexual advance, in your opinion or point

8    of view, as having been the one who drafted this

9    policy?

10      A.    Well, in many instances, that's a subjective

11   standard.

12      Q.    And what does that mean to you?

13      A.    It's that one person could not have any

14   occasion to have any reaction to it.  Another person

15   it could overwhelm them.  It's all individually done,

16   and, as you know, there have been a number of cases

17   about that.

18      Q.    And you're aware of all those cases?

19      A.    I'm aware of situations where there have been

20   a translation between two parties where they have used

21   sexual language between each other or in an entire

22   environment, yes.

23      Q.    You're talking about banter between two

0042

1    people or --

2         A.    Two people or the office, in general, yes.

3         Q.    And when you talk about that, are you saying

4    there may be situations when that banter occurs when

5    one person may feel uncomfortable about it but the

6    other person does not?

7         A.    There are situations, yes.  That's everyday

8    life.

9         Q.    I'd like you to look at -- this is the second

10   page which says, "Definition of sexual harassment,"

11   and it has different descriptions of what apparently

12   possible sexual harassment could be, starting with, A,

13   and I'm going to ask you if you could just read each

14   one and tell me what you believe that means.  So start

15   with A.  If you could read A.  And we're talking about

16   Exhibit 25.  You can read it out loud.

17        A.    "Submission to or rejection of such advances,

18   requests or conduct is made, either explicitly or

19   implicitly a term or condition of employment or as the

20   basis for employment decisions."

21        Q.    What does that mean to you?

22        A.    Quid pro quo.

23        Q.    Explain it in a little more detail in sort of

0043

1     a layman's term.

2          A.     "You want that promotion, you better be ready

3     to go away with me this weekend," could be interpreted

4     as a quid pro quo.

5          Q.     And is it your understanding that those have

6     to be specifically clear, or could that be

7     communicated in another fashion?

8          A.     It uses the term "implicit."

9          Q.     What does that mean to you?  Are you saying

10    yes in answer to my question?

11         A.     It could be a series of signals.

12         Q.     So you understand or you believe that that

13    that communication doesn't necessarily have to be

14    verbalized as articulately as you just verbalized it

15    in your prior answer, correct?

16         A.     Correct.

17         Q.     Could you read the second one.

18         A.     "Such advances, requests or conduct having

19    the purpose or effect of unreasonably interfering with

20    an individual's work performance by creating an

21    intimidating, hostile, humiliated or sexually

22    offensive work environment."  That's the alternative,

23    sexual harassment, and that's hostile work

0044

1    environment.

2        Q.    And could you explain what that means to you

3    in that context?

4        A.    Where because of sexual issues a person

5    simply can't work there.  It disturbs them.  It

6    deprives them of ability to perform or enjoy their

7    job.

8        Q.    And when you say, "sexual issues," what do

9    you mean?

10       A.    It could be conduct.  It could be talk.  It

11   could be signals.

12       Q.    Could you read the third one if there's next

13   one.

14       A.    No, there's A or B.

15       Q.    Could I take a look at that for a moment?

16   Now, in this policy it has some examples of what could

17   be considered inappropriate behavior, advances,

18   comments, et cetera.  Do you see those examples in

19   this definitions on the second page?

20       A.    Yes.

21       Q.    And do you believe and is it your

22   understanding that what those examples describe or try

23   to describe are things such as inappropriate joking,

0045

1    innuendo, inappropriate pictures, et cetera?

2        A.    If it's unwelcome and if it has the impact of

3    a hostile work environment, yes.

4        Q.    Okay.  Had there been any other times where

5    you have had to approach someone or admonish someone

6    or address an issue of potential sexual harassment or

7    a sexual complaint in your capacity as city solicitor

8    of Methuen?

9        A.    Are we including sexual discrimination?

10       Q.    No, sexual harassment right now.

11       A.    To the best of my memory, I think that --

12   there was -- as far as I know, that was it.

13       Q.    You asked about sexual discrimination?

14       A.    Yes.

15       Q.    Were there instances of sexual discrimination

16   that you have had to address?

17       A.    Yes.

18       Q.    And how many of those have you had to

19   address?

20       A.    One that went to MCAD, and one that just

21   stayed at the local level.

22       Q.    And do you recall when the one occurred that

23   went to the MCAD?

0046

1       A.      Yes.

2       Q.      When was that?

3       A.      That would be in the late '90s.

4       Q.      And can you give a general description of

5    what that complaint consisted of?

6       A.      Yes.  Lisa Alaimo filed a sexual

7    discrimination case for not being appointed a reserve

8    fire officer.

9       Q.      Now, you don't have any concerns about

10   discussing this complaint with the names of the

11   people?

12      A.      All of this one is open.

13      Q.      Did you have to consult or advise or address

14   these issues with Lisa Alaimo or any other people

15   involved, without discussing any communications you

16   may have had with the Mayor at that time?

17      A.      The first time I was aware and I believe the

18   first time the parties, the department heads, were

19   aware, was when the complaint was filed.

20      Q.      And what did you do as a result of the

21   complaint being filed?

22      A.      I conducted a review, prepared a response,

23   and appeared in an investigatory hearing.

0047

1     Q.    What happened at the hearing -- strike that.

2    What happened as a result of the hearing?

3     A.    They ruled in favor of Methuen.

4     Q.    And you said there was a second one that was

5    also resolved without going to the MCAD; am I correct?

6     A.    Yes.

7     Q.    And what's the general issue that was

8    involved in that complaint?

9     A.    It was a female that was not treated properly

10   or she asserted not treated properly because she was a

11   female in doing her functions.

12    Q.    How did that get resolved?

13    A.    I conducted an investigation, interviewed all

14   the parties, was subsequently advised by her that she

15   was withdrawing the complaint.

16    Q.    How long ago was that?

17    A.    I'd say ten or eleven years ago.

18    Q.    You had said earlier that you had not

19   attended any specific sexual harassment education

20   seminars or any other kind of education program; is

21   that correct?

22    A.    To the best of my memory.  I have read,

23   obviously, a lot of material on it.

0048

1       Q.    What material have you read on it, for

2    example?

3       A.    CLEs and court cases, the MCAD regs.

4       Q.    Anything else?

5       A.    Probably the Mass. Prac.

6       Q.    When you say CLEs, is that through MCLE or

7    other entities?

8       A.    Yes.

9       Q.    And in these many treatises or cases, did you

10   come across descriptions of what, in each instance,

11   may have been considered sexual harassment or

12   inappropriate behavior?

13      A.    It falls down to the two categories every

14   time.

15      Q.    And in those materials, were you able to

16   determine different fact patterns, based on what you

17   read, as to what would be considered unwanted

18   advances?

19      A.    Yes.

20      Q.    And in those --

21      A.    Unwelcome.  We use the term "unwelcome."

22      Q.    Unwelcome or unwanted?

23      A.    Uh-huh.

0049

1      Q.    And does it describe or did it describe in

2  any of these different ways of the alleged victim

3  communicating the fact that those advances were

4  unwelcome or unwanted?

5      A.    Yes.

6      Q.    And can you describe some of the different

7  ways in these many treatises or cases that you have

8  read where potential victims have communicated or

9  attempted to communicate to the alleged perpetrator

10  that his or her advances were unwelcome or unwanted?

11     A.    Direct response, a secondary channel.

12     Q.    Let's go one by one.  Direct response, what

13  do you mean by that?

14     A.    Talking directly to the person.

15     Q.    And saying what?

16     A.    It could be as simple as, "Please don't do

17  that."

18     Q.    Anything else that would be considered a

19  direct response?

20     A.    It could be a number of words which

21  translates the same way.

22     Q.    So, for example, if someone were to say, "I'm

23  uncomfortable about that," would that, in your mind,

0050

1    constitute indication of an unwelcome advance?

2        A.    Yes.

3        Q.    Or if they said, "That bothers me," would

4    that also be an indicator of communication of an

5    unwelcome advance?

6        A.    Yes.

7        Q.    And then you started to give other examples

8    after direct response.   What other ways would that be

9    communicated?

10       A.    The complaint made to human resources or if

11   it's a subordinate to their department head.

12       Q.    Without complaining to someone else, I'm

13   really talking about more about the discourse between

14   the alleged victim and the alleged perpetrator.   What

15   are the other ways that you have come across in these

16   cases and treatises that people are communicating

17   these feelings that they have that they're unwanted?

18       A.    It could be as simple as the female

19   communicates with another co-employee.

20       Q.    No, go back between the victim and the

21   alleged perpetrator, just between the two of them.

22   What are the other ways of communicating that the

23   advances are unwelcome?

0051

1          A.     Pushing somebody away.

2          Q.     Anything else?

3          A.     That would be a physical gesture.

4          Q.     Okay.  So other physical gestures?

5          A.     Uh-huh.

6          Q.     Diverting their faces or bodies from being in

7      close contact with the alleged perpetrator?

8          A.     It could be, but that's very subjective at

9      that point.

10         Q.     What other ways then physically would you

11     think are an indicator, based on your experience in

12     reviewing these treatises and cases or from your own

13     personal experience, would be an indication of an

14     unwanted advance?

15         A.     Based on the cases I reviewed, it could be

16     running away.  It could be not reporting to work,

17     would be another one.  It could be arm gestures,

18     blocking the person, for example, crossing their arms

19     and stopping the conduct or the contact.

20         Q.     Have you ever come across in any of these

21     cases or treatises a fact pattern where a person who

22     is being subjected to these advances is uncomfortable

23     about communicating the fact that they are unwanted

0052

1    out of fear of retaliation or some other kind of

2    unfortunate response from the alleged perpetrator?

3        A.   I don't recall one offhand.

4        Q.   So are you saying in all these things that

5    you've read each and every time the alleged victim is

6    very, very clear and feels very comfortable about

7    communicating the fact that the advances are

8    unwelcome?

9             MR. RAPPAPORT:  Objection.  You can answer.

10       A.   I'm trying now to remember every case that I

11   have ever read, and the ones that I have had, there

12   has been, of course, a return signal of "no," in one

13   form of another.

14       Q.   When you say a clear return signal of no in

15   one form or another, are you referring to return

16   signal such as pushing away, turning away or direct

17   verbal response?

18       A.   Yes.

19       Q.   In direct verbal responses, would you also be

20   referring to things such as, "I'm uncomfortable with

21   that," that kind of response?

22       A.   Subjectively, I believe, yes.

23       Q.   What do you mean by that?

0053

1      A.   I believe that if the average person heard

2  that, they would take into accordance what that meant.

3      Q.   And if the average person heard that, what do

4  you believe they would think that meant?

5           MR. RAPPAPORT:  Objection.

6      Q.   Let me rephrase that.  If the average person

7  heard from another person that something they were

8  doing made them feel uncomfortable, from your

9  perspective, what would the average person interpret

10  by that response?

11           MR. RAPPAPORT:  Objection.

12           MR. DiADAMO:  Objection as to form.  You can

13  answer.

14           THE WITNESS:  I thought you don't object?

15           MR. DiADAMO:  Just as to form.  You can

16  answer.

17      A.   I believe it's largely subjective.

18      Q.   Subjective meaning each person who was --

19      A.   Each person that was --

20      Q.   Let me finish.  Each person hearing it may

21  have a different interpretation, correct?

22      A.   Based on the relationship, yes.

23      Q.   Now, I'm asking you, if you were to take an

0054

1    action or engage in an action with someone who said to

2    you, "I am uncomfortable with that," how would you

3    interpret that response to you?

4             MR. RAPPAPORT:  Objection.

5             MR. DiADAMO:  Objection.  You may answer.

6    A.    Again, if I may, it's all subjective.  At the

7    end of the day, it's largely subjective.

8    Q.    How would you respond to someone who would

9    say to you, as a result of an action that you made, "I

10   am uncomfortable with that"?

11   A.    If there was --

12            MR. RAPPAPORT:  Objection.

13   A.    If there was a raised voice like you just

14   made, I would take it as a "no," an absolute stand

15   back.

16   Q.    And if there was no raised voice and the same

17   words were spoken, how would that change your

18   interpretation of the meaning of those words?

19   A.    We drop back subjective.  Again, when you

20   said that and raised your voice, that, to any person,

21   would send a very clear signal.  If it's undertoned,

22   quiet -- I don't know.  I mean, again, it's

23   subjective.

0055

1    Q.   If someone were to say to you in a monotone,

2    "I'm uncomfortable with that," after you had some

3    action toward that person, what would you think that

4    person meant to you?

5         MR. RAPPAPORT:   Objection.

6    A.   Using your example, just then I saw your face

7    flux, I would say definitely stand back.

8    Q.   Are there any circumstances at all where you

9    think that a person saying, "I'm uncomfortable with

10   that," wants you to continue those actions?

11   A.   No.

12   Q.   When did you first -- you've met Fulya Metin

13   obviously, she worked with you for a while; is that

14   correct?

15   A.   Yes.

16   Q.   When did you first meet Ms. Metin?

17   A.   Wednesday, September 29th.

18   Q.   Of what year?

19   A.   2004.

20   Q.   And under what circumstances did you meet her

21   that day?

22   A.   The Mayor had left me without a secretary for

23   six weeks, and, at that point in time, I was told by

0056

1    David Bain that they were going to reactivate the

2    search for a new secretary or paralegal.  In the

3    intervening period, they would send Moore Staffing

4    over, somebody.

5         Q.    Moore meaning -- this is the name, M-o-o-r-e?

6         A.    Yes.

7         Q.    Okay.

8         A.    And she reported in on the 29th to the human

9    resources office, and Dave brought her over and

10   introduced her to me.

11        Q.    When you say, "Dave," you're talking about

12   David Bain?

13        A.    Yes.

14        Q.    And where were you when you met Ms. Metin?

15        A.    In my office.

16        Q.    And who else was with you at that time?

17        A.    Nobody.

18        Q.    You said David Bain brought her over to you.

19   Was he there as well?

20        A.    He brought her over, introduced her and then

21   left.

22        Q.    So when you met her, David Bain was present?

23        A.    Yes.

0057

1     Q.    And then you had a continued meeting with her

2   on that day; is that correct?

3     A.    I would say, at best, it was ten minutes.

4     Q.    Is that the day she started working for you?

5     A.    No.

6     Q.    What happened in that ten-minute meeting?

7     A.    I said to her -- I said, "Can you start

8   tomorrow," and at this point in time, she told me the

9   story that she couldn't because her baby-sitter -- she

10  needed to get a baby-sitter.  And I said, "Can you

11  start Friday?"  She said no because of the

12  baby-sitter, is the story she used.  And then she

13  wound up starting Monday, October the 4th.

14    Q.    Now, you say, "the story she used."  Did you

15  believe she wasn't telling you the truth?

16    A.    At the time, no.  She later confessed to me

17  she had not told the truth.

18    Q.    She later confessed to you at this first

19  meeting that when she said she couldn't work for two

20  days because of the baby-sitter, she was not telling

21  you the truth?

22    A.    Yes.

23    Q.    When did she confess that to you?

0058

1      A.    Sometime in November I believe.

2      Q.    And under what circumstances did she confess

3   that to you?

4      A.    She told me -- I obviously accepted it.  I

5   don't have a problem.  She said, in fact, she had a

6   baby-sitter lined up but she was looking at other

7   jobs, and she had been offered a job Thursday and then

8   Friday.  I believe it was two jobs she was offered.

9   And she made the decision to stay with me.

10     Q.    Do you remember when that was again?  You

11  said November?

12     A.    I'm going to say, best memory, sometime in

13  November.

14     Q.    Do you know whether or not that was after she

15  had begun working as a -- full time with the City and

16  not through Moore, or if she was still being placed

17  with you through Moore?

18     A.    You've read the position statement.  As you

19  know, there was a twelve-week lapse.  She was

20  appointed but couldn't officially begin until December

21  27th as a full-time employee.  She was -- at that

22  point in time, she was still with Moore.

23     Q.    So your answer is when she said this to you,

0059

1    she was still an employee of Moore?

2       A.    Yes.

3       Q.    Okay.  But she was still reporting to you?

4       A.    Yes.

5       Q.    Now, can you describe where your office is in

6    relation to where Ms. Metin would be working?

7       A.    Well, it was all my office.  As you walked

8    in, there's where the file system is, metal file

9    cabinets, which is a corridor nature.  You would take

10   a left.  There's a small office area where she worked.

11   Then there was a door, and then there is where I was.

12      Q.    Now, you're aware of the allegations that

13   Ms. Metin has made as to your advances toward her; is

14   that true?

15      A.    Yes.

16      Q.    And you have read them in detail and

17   responded to them; is that correct?

18      A.    I read the complaint and responded by way of

19   the position statement, yes.

20      Q.    Now, Ms. Metin has described that you would

21   say things to her that made her uncomfortable; do you

22   recall that, that she had described that?

23      A.    Could you show me the complaint, please?

0060

1      Q.    Well, no, if you don't recall it, that's

2    fine.  Do you recall whether or not she has complained

3    about things you have said that have made her

4    uncomfortable?

5      A.    Not offhand, no.

6      Q.    Do you recall that she has described things

7    that you have done that have made her uncomfortable?

8      A.    Yes.

9      Q.    Now, have you ever heard Ms. Metin say to

10   you, in response to something that you've said or

11   done, that what you've just done made her

12   uncomfortable prior to her making this formal

13   complaint to the MCAD?

14     A.    No.

15     Q.    So it's your testimony that in all the time

16   Ms. Metin has worked for you, she has never once said

17   to you that something you did or said made her

18   uncomfortable?

19     A.    Do you mean in a sexual context or nonsexual

20   context?  If it's nonsexual, I would have to say yes.

21     Q.    So if it's sexual, your answer is no?

22     A.    Uh-huh.

23           COURT REPORTER:  No?

0061

1        A.    Correct.

2        Q.    So how do you know whether or not if what

3    she's talking about is in a sexual or non-sexual

4    context?

5        A.    The particular incident.

6        Q.    Well, describe one of the incidents where she

7    has, if she has, said that something you have done has

8    made her uncomfortable?

9        A.    She had gone to the gym, and this would be in

10   late January, and she had -- was coming back.  She had

11   gone with John Molori in her car, and it was snowing

12   that day, and she had, at that point in time, had a

13   really small car that was in not good condition,

14   brake-wise.

15           And I saw her entering the parking lot.  And

16   she came upstairs as I was heading out the door.  I

17   had to go to the bathroom in a rather quick fashion.

18   And as she walked in, she said to me, "Boy, it's

19   terrible out there," or words to that effect.  And I

20   said, "You really should have used Molori's car,"

21   because he had a big SUV.  And I went across to the

22   bathroom and I came back.  She took that in a bad

23   context and began yelling.  I apologized to the extent

0062

1   that I had said something that offended her, and she

2   yelled again.

3       Q.   What was she yelling?

4       A.   Unkind words about me.

5       Q.   Such as?

6       A.   Jerk.

7       Q.   And why was she calling you a jerk?  Did she

8   explain to you why she was calling you these names?

9       A.   She took it in the context of my not liking

10  her being at the gym with Molori.

11      Q.   My question was did she explain to you why

12  she was calling you a jerk?

13      A.   Yes.

14      Q.   What did she specifically explain to you?

15      A.   I can give you the best my memory can give.

16  I can't give you direct words.  Basically, it was,

17  "Listen, you jerk, if I want to go to the gym with

18  John Molori, I'm going."

19      Q.   Okay.  Any other time that she said to you

20  that something you had done has made her

21  uncomfortable?

22      A.   Give me a second.  I'm trying to run through.

23  I don't recall.

0063

1     Q.    Going back to that time you just described,

2  you said she had come in -- you saw her come in from

3  the snow, and she said, "It's really bad out there"?

4     A.    Yes.

5     Q.    Now, tell me again how that happened.  You

6  saw her coming in out of the snow?

7     A.    Yes, I worked -- where I work is all windows

8  laying out to the parking lot, so it's a matter if I

9  just look left, I can see the parking lot obviously.

10    Q.    So what did you see in the parking lot?

11    A.    I saw her pull in driving her vehicle, which

12 I had warned her about several times.

13    Q.    Which you wondered about?

14    A.    Warned her about.  When we used to go out for

15 lunch together, she would be driving that car, and the

16 brakes would squeal, which means they need to be

17 changed big time.  So I saw her pull in.  I saw her

18 get out.  I saw John get out of the passenger side and

19 then head back in.  I started back to work, working on

20 the computer, and then had the need to go out and go

21 to the bathroom, went across and came back.

22    Q.    And what made you think that there was an

23 option to use John Molori's car just by seeing him get

0064

1    out of her car?

2        A.    His car was there.  He brought it to work.

3        Q.    And that was the first conversation you had

4    with her where you said you really should use his car,

5    and she began immediately yelling at you?

6        A.    Yes.  Quite frankly, when you're in your

7    fifties, and you have an emergency, you need to go.

8    And I did that.  I had to go bad.

9        Q.    But you said she said, "If I want to go to

10   the gym with John Molori, I can," correct?

11       A.    Words to that effect.  I don't have the exact

12   words, but translated.

13       Q.    Did you say to her you knew she had gone to

14   the gym with John Molori?

15       A.    No.

16       Q.    So it's your testimony that she said that out

17   of blue and just assumed you knew she had gone to the

18   gym?

19       A.    No, as I said, "You should use have used John

20   Molori's car or SUV."

21       Q.    Okay.  Were there any other times or any

22   times you can remember where Ms. Metin would have

23   indicated to you, without using words, that something

0065

1    you had done made her feel uncomfortable?

2        A.    Not that I can recall.

3        Q.    There was a videotape taken of you with

4    Ms. Metin sometime in February by the Methuen Police

5    Department; is that correct?

6        A.    February 16th.

7        Q.    So you recall that?

8        A.    Yes.

9        Q.    Have you seen that video?

10       A.    Yes.

11       Q.    How many times did you see that video?

12       A.    Once.

13       Q.    How long a period of time did that videotape

14   cover?

15       A.    I believe somewhere from 8:40 to 10:30.

16       Q.    So it's almost two hours long?

17       A.    Somewhere about that.  I wasn't watching my

18   watch, but I think that would be approximate.

19       Q.    Now, do you recall in that videotape,

20   watching yourself approach Ms. Metin and watching her

21   turn around and walk away?

22       A.    No.

23       Q.    Do you recall watching yourself touch

0066

1    Ms. Metin and seeing her pull away from you?

2        A.    No.

3        Q.    Do you recall going around Ms. Metin's desk

4    and kneeling in front of her at her lap?

5        A.    That was a squat, yes.

6        Q.    Do you recall her then pulling away and

7    walking out?

8        A.    No.

9        Q.    Do you recall using Ms. Metin's telephone

10   very close to her physically?

11       A.    I used that phone quite often.

12       Q.    Do you recall that that phone is on her desk?

13       A.    If I remember correctly, there's her desk and

14   then a sub-desk, or whatever it was called, it would

15   be there.  That's where the printer is also.

16       Q.    Is it at her work station?

17       A.    Yes.

18       Q.    And in order to get to the phone, do you have

19   to go behind where she's sitting to answer that phone

20   or use that phone?

21       A.    Yes.

22       Q.    So do you recall in the videotape using that

23   phone?

0067

1        A.    Yes.

2        Q.    And do you recall being very physically close

3   to her as you were using that phone while she was

4   sitting at the work station?

5        A.    In proximity, yes.

6        Q.    Do you have a phone in your office?

7        A.    Yes.

8        Q.    Do you remember how many times you approached

9   Ms. Metin physically in that videotape over the

10  two-hour period?

11       A.    Three times.

12       Q.    That's all you recall was three times?

13       A.    Yes.

14       Q.    And do you recall whether or not each and

15  every time Ms. Metin either pulled away from you,

16  turned her head or left the room?

17       A.    At the end, she walked out.  She was going

18  next door.

19       Q.    Prior to at the end, do you recall whether or

20  not she turned her head away from you as you

21  approached her physically?

22       A.    No.

23       Q.    Do you recall whether or not she turned her

0068

1    body or pulled her body away from you as you

2    approached her physically?

3        A.    No.

4        Q.    Do you recall whether or not, when you were

5    on your knees in front of her, she pushed her chair

6    back away from you?

7        A.    I did not go on my knees.  I did a squat.

8        Q.    Okay.  When you were squatting in front of

9    her at her lap, do you recall whether or not she

10   pushed her chair away from you?

11       A.    No.  I'm sure she moved her chair at some

12   point in time, but I don't recall your reference.

13       Q.    During that two-hour period or approximately

14   two-hour period that you were videotaped, did you

15   perceive any signals from Ms. Metin that she was not

16   comfortable with either your proximity to her or

17   anything that you may have been doing near her?

18       A.    No.

19       Q.    Do you recall attempting to kiss Ms. Metin on

20   that videotape?

21       A.    Yes.

22       Q.    Do you recall her turning her head away from

23   you as you attempted to kiss her?

0069

1      A.    No.

2      Q.    Do you know John Molori?

3      A.    Yes.  I know of him, I should say.

4      Q.    Have you ever met him?

5      A.    Yes.

6      Q.    How many times have you met him?

7      A.    He worked in Pollard's office.

8      Q.    You're talking about Mayor Pollard?

9      A.    Yes.

10     Q.    What was his position in Mayor Pollard's

11  office?

12     A.    I forget the exact title.  It was basically

13  communications.

14     Q.    Did he work for the City prior to Mayor

15  Pollard becoming mayor?

16     A.    No.

17     Q.    So as of 2004, how long had he been working

18  for the City?

19     A.    I couldn't tell you.  I know he came in under

20  Pollard.  How many years he was there, I don't know.

21     Q.    Have you had any conversations with

22  Mr. Molori about Ms. Metin?

23     A.    Before or after the incident?

0070

1     Q.    Before.

2     A.    It could have been words in passing.  I don't

3  recall anything of substance or any discussion.

4     Q.    So it's possible you have had some words with

5  Mr. Molori about Ms. Metin?

6     A.    It would be in the context of he might say,

7  "Is Fulya in the office?"  Those sort of

8  conversations.  It would be yes and no, and then

9  moving on.

10    Q.    Where was Mr. Molori's office in relation to

11 yours?

12    A.    He was in the Mayor's office.

13    Q.    And how close was that to your office?

14    A.    Opposite end of the building.

15    Q.    Did you see him over the course of a day or a

16 week near your office physically?

17    A.    Yes, he was wanting a friendship with her.

18    Q.    He was -- I'm sorry -- wanting a friendship

19 with her?

20    A.    Yes.

21    Q.    Let's go back -- first of all, Mr. Molori

22 being physically near or in your office.  How often

23 would you say he was physically near or in your office

0071

1    during the course of a week?

2        A.    This is just purely a guess.

3        Q.    Well, don't guess.  If you can approximate

4    based on your experience, but if it's purely a guess,

5    please don't give me a pure guess.

6        A.    It would be a pure guess.

7        Q.    Can you state with any kind of certainty that

8    he would be near or in your office once a week?

9        A.    Oh, yes.

10       Q.    Can you say with any certainty that he would

11   be in or near your office twice a week?

12       A.    Yes.

13       Q.    Can you say with any certainty that he would

14   be in or near your office more than five times a week?

15       A.    No, I could not.

16       Q.    So would it be safe to say it would be

17   between two and four times a week with certainty?

18       A.    Yes.

19       Q.    And you would observe Ms. Molori speaking

20   with Ms. Metin?

21       A.    Yes.

22       Q.    And you were in the office all of those times

23   you observed him, I would assume?

0072

1      A.   Sometimes I would be coming back in the

2  office.  If I went out, he might go and see her.

3      Q.   So is it safe to say he was there quite

4  often?

5      A.   I would say yes.

6      Q.   You said Mr. Molori wanted a relationship

7  with Ms. Metin?  Is that what you said?

8      A.   It was well known.

9      Q.   Did you say that, yes or no?

10      A.   I don't know if I said it, but I do believe I

11  used the term friendship, but, yes, I believe he

12  wanted a relationship.

13      Q.   What do you mean by a "relationship"?

14      A.   Dating.

15      Q.   And how do you know that?

16      A.   From what people told me and from what I

17  observed.

18      Q.   And do you think that coming to such a

19  conclusion, based on what you observed and what other

20  people tell you, is reliable?

21      A.   If the two match each other, yes.

22      Q.   So do you mean by that that if what you

23  observe and what other people tell you appear to be

0073

1    consistent, then it must be true?

2         A.    From what I observed, yes.

3         Q.    Yes?

4         A.    Yeah.

5         Q.    Now, have you ever heard anyone discussing

6    the fact that perhaps you wanted a relationship with

7    Ms. Metin?

8         A.    Yes.

9         Q.    Who have you heard discussing that?

10        A.    There's a friend of mine who was kind of

11   joking about it.

12        Q.    And who was that?

13        A.    It's a janitress.

14        Q.    Pardon me?

15        A.    It's a janitress.

16        Q.    What is her name?

17        A.    Shirley Terry.

18        Q.    Shirley Terry?

19        A.    Yes.

20        Q.    And you said she was saying it in a joking

21   manner?

22        A.    Yes.

23        Q.    And what did she say?

0074

1      A.    The exact words, I don't recall, but --

2      Q.    Do you recall -- I'm sorry.

3      A.    The exact words, I don't recall, but that's

4   the translation.

5      Q.    When you say, "the translation," can you

6   describe the gists of her words if you recall?

7      A.    The gist would be my attitude changed after

8   she arrived, something to that effect.

9      Q.    Did you take that to mean that she was

10  suggesting that you had an infatuation with Ms. Metin?

11     A.    Did I like her a lot, yes.

12     Q.    That's not what I asked you.  When she made

13  that comment, that you had changed, did you take that

14  to mean that what she observed was that you had an

15  infatuation with Ms. Metin?

16     A.    I can't say what her attitude was.  I can

17  only say what she said.

18     Q.    Well, when I first asked you if you had ever

19  heard anyone discussing the fact that you appeared to

20  want to have a relationship with Ms. Metin, you

21  immediately answered that this Shirley Terry did.

22     A.    Yes.

23     Q.    So at some point, you must have made or come

0075

1    to a conclusion that the comment that she had made was

2    that you wanted to have a relationship with Ms. Metin,

3    correct?

4        A.   It honestly is hard to tell, because we were

5    good friends for twenty years, and we joke about a lot

6    of things.

7        Q.   Well, then why did you answer with her name

8    in the first instance when I asked you if you ever

9    heard anyone discussing whether or not you wanted to

10   have a relationship with Ms. Metin?

11       A.   Because it was within that framework of a

12   joke, yes.

13       Q.   So that's what you understood her comment to

14   be, correct?

15       A.   Yes.

16       Q.   Did she only make that comment once?

17       A.   To my memory, yes.

18       Q.   You said you've known her for how many years?

19       A.   She's been there forever, and I was there

20   forever.  I would say twenty years or more.

21       Q.   So is it safe to say that she knows you

22   fairly well in your capacity as city solicitor?

23            MR. RAPPAPORT:  Objection.

0076

1       Q.    I'm going to strike that question.   Is it

2   fair to say that she's an acquaintance of yours?

3       A.    She's a friend, yes.  Friendly enough that we

4   could, quite frankly, exchange jokes and words that --

5   I mean, we were good friends.

6       Q.    You said that she had observed that your

7   attitude seems to have changed; do you recall saying

8   that?

9       A.    Yes.

10      Q.    Do you believe that she has the personal

11  experience with you to be able to determine whether or

12  not your attitude had changed?

13      A.    Probably, yes.

14      Q.    Did she describe to you how she thought your

15  attitude had changed?

16      A.    No.

17      Q.    Did you hear anyone else discussing their

18  thoughts or belief that you wanted to have a

19  relationship with Ms. Metin?

20      A.    Not to my memory, no.

21      Q.    So the only one you've ever heard make any

22  comments about your wanting to have a relationship

23  with Ms. Metin was Ms. Terry?

0077

1       A.   Yes, to my memory.  The jokes, quite frankly,

2    were more about John Molori.

3            MS. KAZAROSIAN:  I'm going to have this

4    introduced.  It's the April 5th, 2005 statement of

5    Michael Wnek.

6            And then I'm going to also mark Lieutenant

7    Wnek's second statement, which starts, "On Tuesday,

8    February 15th, 2004, at approximately 0900 hours."

9                    (Documents marked Lariviere

10                   Nos. 26 and 27 for identification)

11           MS. KAZAROSIAN:  I want to make sure that --

12   Attorney DiAdamo, you've given Mr. Lariviere copies of

13   what I have marked.

14           MR. DiADAMO:  Yes, and for the record, he has

15   them in front of him.  You don't have to compare them.

16   I was looking upside-down.

17           It's dated April 5, 2005.  "Interview of City

18   Employees," and the second one you eluded to starts

19   off, "Lieutenant Michael Wnek," and it starts, "On

20   Tuesday, February 4th, at approximately 9:00 o'clock."

21   BY MS. KAZAROSIAN:

22       Q.   Mr. Lariviere, do you know Linda Gagnon?

23       A.   Yes.

0078

1      Q.    And how do you know Linda Gagnon?

2      A.    She works in the city council office, and we

3   are friends, quite frankly.

4      Q.    And how long have you known her?

5      A.    Ten or 15 years, a long time.

6      Q.    Now, is it safe to say that this complaint

7   that Ms. Metin has filed saying that you had sexually

8   harassed her is not the first time that you've been

9   told that some of your actions or comments were

10  unwanted or inappropriate?

11     A.    Are you referring to that April 5th thing,

12  because that's the first time I knew about it.

13     Q.    I'm asking you whether or not this is the

14  first time that you've been told that your actions or

15  words are inappropriate or unwanted?

16     A.    Sexually, yes.

17     Q.    Now, you've read Exhibit 26.  Have you looked

18  that over?

19     A.    Is this 26?

20     Q.    Yes, the April 5th, 2005.

21     A.    Yes.

22     Q.    And that's a statement that was typed up by

23  Michael Wnek it appears; is that correct?

0079

1       A.    I believe so.

2       Q.    In the third paragraph, Lieutenant Wnek

3   relates a conversation that he had with Linda Gagnon;

4   did you read that paragraph?

5       A.    Yes.

6       Q.    Now, in that paragraph, Mr. Wnek describes an

7   incident that was described to him by Linda Gagnon

8   where, as a new employee to the City, you walked up

9   behind her as she was seated in a chair, started to

10  rub her shoulders, thrust your hips into the back of

11  the chair; do you recall doing that?

12      A.    No.

13      Q.    Ms. Gagnon then says she sternally warned you

14  to stop and said she was not going to tolerate that

15  behavior.  Do you recall ever hearing that come out of

16  Linda Gagnon's mouth?

17      A.    No.

18      Q.    She also, apparently, as related to

19  Lieutenant Wnek, has heard you make sexual comments.

20  Are you aware of making any sexual comments in Ms.

21  Gagnon's presence?

22      A.    In the form of a joke, probably.

23      Q.    What kind of comments would you have made in

0080

1    the form of a joke?

2        A.    I don't know.  I don't question the fact

3    that, periodically, we might joke around.

4        Q.    Well, I specifically was asking you about

5    sexual comments, and you responded in the form of a

6    joke.  So are you saying that you periodically joke

7    around and make sexual comments in the form of a joke?

8        A.    You know, if it was something like a joke

9    about President Clinton or something like that, yes.

10       Q.    So it's okay to joke about President Clinton

11   in a sexual way; is that what you're saying?

12       A.    Yes.

13       Q.    What would make joking about President

14   Clinton in a sexual way be any different than making

15   any other kind of jokes in a sexual way?

16       A.    Don't know.

17       Q.    Are these the only kinds of sexual jokes that

18   you would make, that they would be pertaining to

19   President Clinton?

20       A.    I guess so.  I don't know.  I don't know.  I

21   will tell you this, Linda Gagnon and I are good

22   friends, and if she said that occurred, it occurred.

23   I don't --

0081

1      Q.    You don't recall it?

2      A.    No.  You're talking 15 years ago, and like I

3   said, we're very good friends.

4      Q.    And you're saying you know Linda Gagnon.  Do

5   you believe that Linda Gagnon is a hypersensitive

6   woman?

7            MR. RAPPAPORT:  Objection.

8      Q.    Strike that.  Do you believe Linda Gagnon is

9   hypersensitive when it comes to sexual comments or

10  innuendo?

11     A.    No.

12     Q.    So you said if she were to say it happened,

13  it probably did.  Would you agree then that that

14  behavior as described in Exhibit 26 would be sexual

15  harassment?

16           MR. RAPPAPORT:  Objection.

17     A.    If it offended her, yes.  I don't recall it.

18  Like I said, I'm not going to question her word.  I'm

19  not going to question her word.  If she said it

20  happened, it happened.  I just don't recall it.

21     Q.    And it does say in here that she clearly

22  indicated that it was unwanted and had offended her;

23  is that correct?

0082

1      A.    Where?  I believe she said, "warned him that

2   she was not going to tolerate that behavior"; is that

3   what you're referring to?  Yes.

4      Q.    "Linda told me she sternally warned Maurice

5   to stop and warned him that she was not going to

6   tolerate that behavior."  Did I read that correctly?

7      A.    Yes.

8      Q.    Does that describe a woman who may have been

9   made uncomfortable by your behavior?

10      A.    Yes.

11      Q.    And so having read that, do you believe that

12   what you engaged in at that time was sexual

13   harassment?

14      A.    No, not on a one-incident basis.

15      Q.    Now, do you believe that sexual harassment

16   has to -- is defined by only occurring more than once?

17      A.    The problem is that I'm trying to disengage

18   myself from being an attorney.  That's the real

19   problem I'm trying to deal with here.

20      Q.    I'm asking you --

21      A.    I can tell you this --

22      Q.    Well, let me finish my question.  Let me just

23   frame it a little for you.

0083

1      A.    Yes.

2      Q.    You commented that you did not believe that

3    the behavior described in Exhibit 26 was sexual

4    harassment because it only happened once; is that

5    correct?

6      A.    What I have said, and I'll say it again, if

7    she said it occurred, it occurred.  I trust her.  If

8    she said she was offended by it, then she was.

9      Q.    That wasn't my question.  I asked you if you

10   felt, after reading this description, that the

11   behavior described therein was sexual harassment.  You

12   answered that, no, you did not believe so because it

13   only occurred once.  Am I misstating what you

14   answered?

15     A.    No.  That's correct.

16     Q.    Now, my next question is:  Do you believe

17   that sexual harassment is defined only if it occurs

18   more than once?

19     A.    Everything is taken subjectively.  I can tell

20   you she's a friend of mine, and I don't believe that

21   she ever intended to claim that I was a sexual

22   harasser.

23     Q.    I didn't ask you that.  I asked you whether

0084

1    or not --

2        A.    The easiest thing is to call her as a

3    witness.

4        Q.    Let me finish my question.  I need you to

5    answer my question.  My question is:  Do you believe

6    that sexual harassment doesn't occur unless the

7    behavior has occurred more than once, yes or no?

8        A.    With this story, no, I do not believe it is.

9        Q.    So your answer is that you do not believe

10   that sexual harassment requires more than one instance

11   of inappropriate behavior?

12       A.    It depends on the incident.

13       Q.    In general.

14       A.    You're making me parse when I have told you

15   up front, if she said it, it's true.

16       Q.    I'm not asking about this, and I think that I

17   have made myself very clear in my question.  Do you

18   believe that in order to be responsible for sexual

19   harassment, one has to engage in the behavior more

20   than once?

21       A.    We are parsing again.  Are we taking about

22   this incident or in general?

23       Q.    I said in the beginning in general.  I will

0085

1    say it again.  I am asking you again, do you believe

2    that in order to be responsible for sexual harassment,

3    one has to engage in the behavior more than once?

4        A.   If it is a situation where I grabbed her,

5    forced her to the ground, no, once is enough.  It's

6    the severity of the situation.  But, again, we're

7    parsing.

8        Q.   Mr. Lariviere, I asked you a simple question.

9    I don't honestly even know what you mean by "parsing."

10   The question is very simple.  I'm not asking about you

11   or anyone in particular.  You wrote the sexual

12   harassment policy.  You're fully aware of what sexual

13   harassment is and is not, and my question is, based on

14   your experience as an attorney, do you believe that in

15   order to be found responsible for sexual harassment,

16   behavior has to occur more than once, yes or no?

17           MR. RAPPAPORT:  Objection.

18       A.   Depending on the circumstance, yes.

19   Depending on the circumstance, no.

20       Q.   Now, you indicated that Ms. Terry said that

21   she noticed that your attitude or behavior had changed

22   once Ms. Metin started working with you; do you

23   remember that?

0086

1       A.   Yes.

2       Q.   Now, you read this paragraph here in 26 where

3  you see that Linda Gagnon said she's observed that

4  your behavior changed once Ms. Metin became employed

5  by the City as well?

6       A.   Where is that, please?

7       Q.   It's in the same paragraph, the last

8  paragraph on the first page at the very end?

9       A.   Yes, that would be true.

10      Q.   Now, do you believe that Ms. Gagnon did not

11  say this?

12      A.   No, I said I believe that would be true.

13      Q.   So you believe that your behavior did change

14  once Ms. Metin started to work for the City?

15      A.   Yes.

16      Q.   In what way?

17      A.   I spent three and a half years under Pollard,

18  who hated me and was doing everything to get me, and

19  all of a sudden, Fulya came along, and the entire

20  atmosphere changed.  I went from stepping out of my

21  car in the parking lot with my gut turning to looking

22  forward to going to work.

23      Q.   So you're blaming -- or you're -- strike

0087

1   that.  You're saying that your attitude change had

2   everything to do with your hating your job under Mayor

3   Pollard, and then once Ms. Metin became employed, you

4   started liking your job?

5       A.   I liked my job.  I didn't like going there

6   when she was mayor.

7       Q.   How many terms did Mayor Pollard serve?

8       A.   Three.

9       Q.   Was there any other mayors in your tenure

10  that you were not enamored with?

11      A.   No.  Every single one I got along with well.

12      Q.   And when did Mayor Pollard come in?

13      A.   January of 2000.

14      Q.   Do you know Connie Sousa?

15      A.   Yes.

16      Q.   She says, apparently, that she's known you

17  for 30 years; is that correct?

18      A.   25.  I would say, yes, correct.

19      Q.   So you and Connie Sousa have known each other

20  for 25 years?

21      A.   Yes.

22      Q.   And does she work in the City of Methuen?

23      A.   Yes, she had been in the Mayor's office and

0088

1   moved down to human resources.

2       Q.   So she has seen you when you were working for

3   a mayor that you were happy with and also a mayor that

4   you were unhappy with; is that correct?

5       A.   Yes.

6       Q.   And the same would go for Linda Gagnon, she

7   has observed you working for mayors that you were

8   happy with and mayors that you were not happy with,

9   correct?

10      A.   Yes.

11      Q.   Now, did you ever say to either of these two

12  people how unhappy you were with Mayor Pollard?

13      A.   It was well known.

14      Q.   Did you ever say to them that you were

15  unhappy with Mayor Pollard?

16      A.   Yes.

17      Q.   Did you ever say to them that you were happy

18  with your job now that Ms. Metin was working there?

19      A.   Yes.

20      Q.   Do you believe that Ms. Gagnon may have

21  forgotten that information when she gave this

22  statement to Mr. Wnek, Lieutenant Wnek?

23      A.   That's pure speculation.  I have no idea.

0089

1    Q.   Ms. Gagnon talks about your behavior change

2  as it relates to Fulya in the same paragraph she talks

3  about the alleged sexual harassment that you inflicted

4  on her; is that correct?

5    A.   Not true the way the question is posed.

6    Q.   I'm not here to throw you, Mr. Lariviere.

7    A.   I had that feeling.

8    Q.   Is that correct?

9    A.   Could you rephrase, please.  I'm sorry.  I

10  didn't listen.

11    Q.   Sure.  Ms. Gagnon talks about her

12  observations of your behavior change once Ms. Metin

13  became employed in the same paragraph where she

14  describes the alleged sexual harassment that you

15  inflicted upon her; isn't that correct?

16        MR. DiADAMO:  Objection as to form, and I

17  want to really express a real objection.  This is

18  Wnek writing the paragraph, not her writing the

19  paragraph, so get it squared away, and he'll be able

20  to answer the question.

21        MS. KAZAROSIAN:  Sure.  I will rephrase that.

22    Q.   In Mr. Wnek's report that we have here as

23  Exhibit 26, he relates a conversation with Ms. Gagnon,

0090

1    correct?

2        A.    Yes.

3        Q.    And in that conversation, within the same

4    conversation, Ms. Gagnon talks about a couple of

5    things, one an incident where she feels you acted

6    sexually inappropriately to her, correct?

7        A.    I don't believe she meant that, but that's

8    your interpretation.

9        Q.    Okay.  And, secondly, she noted that your

10   behavior changed when Fulya became employed by the

11   City, correct?

12       A.    Wnek says that, yes.

13       Q.    And do you believe that Ms. Gagnon was aware

14   when Lieutenant Wnek was talking with her that he was

15   investigating incidents of alleged sexual harassment

16   between you and Ms. Metin?

17       A.    I assume, but it's all speculation.

18       Q.    So does it strike you as odd that she didn't

19   say or that Mr. Wnek didn't include in here that your

20   behavior changed due to your inability -- or dislike

21   of Mayor Pollard?

22            MR. DiADAMO:  Objection as to form.

23            MR. RAPPAPORT:   Objection.

0091

1              THE WITNESS:  Want it rephrased or --

2              MR. DiADAMO:  If it strikes you as odd.

3         A.   Yeah, you're asking me to speculate about a

4    speculation about a non-comment.

5         Q.   But you were very clear.  You said that you

6    told Linda Gagnon that you were unhappy, and that she

7    was aware you were unhappy working when Ms. Pollard

8    was mayor, but you were a lot more happy when

9    Ms. Metin became employed by the City, correct?

10        A.   Yes.

11        Q.   Now, when Lieutenant Wnek speaks with Connie

12   Sousa, in the first paragraph of the second page, he

13   relates that Connie indicated, quote, you could see

14   this coming, end quote.  Do you see that statement?

15        A.   Yes.

16        Q.   Now, is it safe to say that she was referring

17   to this issue between you and Ms. Metin when reading

18   the context of this paragraph?

19        A.   I don't know.

20        Q.   The next sentence is, "She said that Maurice

21   would follow Fulya around everywhere"; did you read

22   that sentence?

23        A.   Yes.

0092

1    Q.    Do you believe Connie Sousa is making that up

2    if she said that to Lieutenant Wnek?

3    A.    I do know that the meeting area, so to speak,

4    to have coffee was the council office, and Fulya used

5    to be over there all the time, and when I wanted to

6    get work done, I would have to go over and get her and

7    send her back.

8    Q.    So you think that's what made Connie Sousa

9    think that you were following Fulya around everywhere?

10    A.    I don't know.

11    Q.    This is a woman who's known you for 25 years,

12    correct?

13    A.    Correct.

14    Q.    And then she goes on to tell Lieutenant Wnek,

15    as he reports here, "Several people in city hall were

16    talking about him and Fulya"; do you see that?

17    A.    Yes.

18    Q.    Did you have any idea that several people in

19    city hall were talking about you and Fulya?

20    A.    Yes.

21    Q.    Did you know what they were saying about you

22    and Fulya?

23    A.    I heard comments because we were going out to

0093

1    lunch all the time, hanging around.

2        Q.    Who did you hear comments from?

3        A.    I believe Connie might have mentioned it.

4        Q.    Do you recall me asking you this question

5    earlier on in the deposition?

6        A.    The question?

7        Q.    About whether or not you had heard that

8    anyone had any discussions about you and Fulya.

9        A.    Not offhand, no.

10       Q.    Do you recall in response to my question that

11   the only one you had ever heard make a comment was the

12   janitress, Ms. Terry?

13       A.    Yes.

14       Q.    Are you changing your testimony right now?

15       A.    That was a specific statement that, you know,

16   she had joked with me about.  The other was just a

17   general commentary I'm hearing, like the rumor mill.

18       Q.    Any other people that you have heard engaging

19   in this rumor mill about you and Ms. Metin?

20       A.    I remember Linda Gagnon telling me that Fulya

21   would come back and talk about where we went to eat

22   and what we ate, that sort of thing.

23       Q.    What I'm referring to is the rumor mill that

0094

1     there's some relationship going on between you and

2     Ms. Metin.  Do you recall anyone else engaging in that

3     rumor mill?

4          A.    No.

5          Q.    So now it's just Connie Sousa?

6          A.    Well, as I already identified, Shirley was

7     making a joke, and Connie.

8          Q.    So other than that, nobody else?

9          A.    Yes.

10         Q.    When did you join Gold's Gym; do you remember

11    that date?

12         A.    The very end of January.

13         Q.    Did you go in there by yourself to join?

14         A.    I believe so, yes.

15         Q.    Now, were you aware that Ms. Metin was a

16    member of Gold's Gym as well?

17         A.    Yes.

18         Q.    So she was a member prior to you joining,

19    correct?

20         A.    Yes.

21         Q.    Now, why did you join Gold's Gym?

22         A.    At this point in time, the two of us started

23    on an exercise program.  Particular type eating,

0095

1    exercising, and drinking particular teas and that.

2        Q.    And so you chose to join the same gym that

3    she was a member of?

4        A.    Yes, from the beginning, she asked me to join

5    the gym with her.

6        Q.    She asked you to join the gym with her?

7        A.    Yes.

8        Q.    When was that?

9        A.    First time would be October, and then when

10    she joined, she advised me she could get me a

11    seven-day trial pass and asked me to use it.

12        Q.    Did you use the seven-day trial pass?

13        A.    No.

14        Q.    So if she asked you to join back in October,

15    why didn't you join back in October?

16        A.    Neither one of us joined then.  She joined in

17    mid-January 2005 when somebody got her a slot there,

18    whatever you want to call it.

19        Q.    If she asked you to join with her, why didn't

20    you join with her?

21        A.    Initially?

22        Q.    No.  Why didn't you join with her in

23    mid-January 2005?

0096

1      A.    At that point in time, I was working on a

2   case, and I was spending most of my time trying to get

3   that.

4      Q.    So you didn't join the gym because you were

5   working on a case?

6      A.    Uh-huh.

7      Q.    When you're not working on a case, how many

8   hours do you work as a city solicitor, when you're not

9   working on a court case?

10     A.    They slate it as 35, but in the reality, it's

11   about 50.

12     Q.    And when you are working on a court case, how

13   many hours do you work as city solicitor?

14     A.    Each case carries its own load.

15     Q.    This last case, how many hours a week did you

16   generally work until it was resolved?

17     A.    An enormous amount.  I was doing it at home,

18   too.  I didn't sit there -- unfortunately, I didn't

19   sit and tally up the hours.

20     Q.    But you were still able to go to lunch every

21   day?

22     A.    There was that point in time when she first

23   went to the gym that I wasn't going.

0097

1      Q.    But you had testified or stated before, in

2    your response to Ms. Metin's complaint, that you and

3    she would go to lunch virtually every single day at

4    her request; do you recall that?

5      A.    Yes, October through January, the middle of

6    January, yes.

7      Q.    So from October to the middle of January, you

8    went to lunch with Ms. Metin almost every day?

9      A.    Not Fridays, but Monday through Thursday,

10   yes.

11     Q.    And yet you didn't have time to join the gym

12   because of this case you were working on until the end

13   of January?

14     A.    No, she did not join the gym until

15   mid-January, so I couldn't join her when she wasn't

16   there obviously.

17     Q.    And you did not have time until the end of

18   January because you were working very hard on a case;

19   isn't that what you just testified to?

20     A.    I don't believe so, no.

21     Q.    So why is it that you didn't join until the

22   end of January?

23     A.    Are you referring to October, November?  Be

0098

1    kind with me, if you would, so I understand the

2    question.

3        Q.    Why did you not join until the end of

4    January?

5        A.    I rethought her request and went along with

6    it.

7        Q.    So she asked you to join with her.  You

8    didn't.  She joined in mid-January, correct?

9        A.    Yes.

10       Q.    And then you decided to join at the end of

11   January because you reconsidered her request to join

12   with her?

13       A.    Yes, I actually asked her.

14       Q.    You asked her what?

15       A.    Did she want me to still join.

16       Q.    Now, in any of these conversations, were

17   there ever any witnesses?  Was anyone else ever around

18   when you had these conversations with her about

19   joining the gym?

20       A.    No.

21       Q.    Now, I'm going to direct your attention to

22   Exhibit 27, which is Lieutenant Wnek's statement that

23   starts, "On Tuesday, February 15."  Have you had a

0099

1    chance to read it?

2        A.    Briefly.

3        Q.    Well, you've had it since before the lunch

4    break, correct?

5        A.    Yes, quite frankly I went out for a walk and

6    didn't look at it.

7        Q.    You want a minute to look at it?

8        A.    No, we can go on.

9        Q.    Now, I'm going to direct you to Page 2, the

10   second paragraph, last paragraph, starting, "On

11   Wednesday, February 16th"; do you see that?

12       A.    Uh-huh.

13       Q.    Now, this paragraph describes what Lieutenant

14   Wnek observed while they were videoing you in Fulya's

15   office, is that correct, on February 16th?

16       A.    Yes.

17       Q.    Now, it says in here that he observed three

18   separate unwanted encounters between you and Fulya; is

19   that correct?

20       A.    Yes.

21       Q.    It says here, "During the first encounter, we

22   observed Maurice give Fulya a kiss"; do you see that?

23       A.    Yes.

0100

1    Q.    Now, it says, "The second encounter revealed

2    another unwanted kiss and a requested for a hug"; do

3    you see that?

4    A.    Yes.

5    Q.    Then it goes on to say, "During the second

6    encounter, Maurice kept touching Fulya's shoulder

7    followed by another kiss"; do you see that?

8    A.    Yes.

9    Q.    Now, up to that point, do you deny that these

10   things happened?

11   A.    That it was unwanted, yes, absolutely.  That

12   it occurred, no, it didn't.

13   Q.    Do you recall me asking you if you attempted

14   to kiss Ms. Metin, and you said no?

15   A.    Now, you asked me, and I said three times.

16   If that record shows otherwise, I would be glad to

17   recant, because that's not the truth.

18   Q.    "During the third and final encounter, we

19   observed Maurice kneel down beside her"; did you read

20   that?

21   A.    Yes.

22   Q.    "Fulya subsequently rose to her feet and

23   stood by her desk;" is that correct?

0101

1        A.    Correct.

2        Q.    Maurice approached her and placed his arms

3    around her waist.  He firmly held her torso and

4    repeatedly kissed her and aggressively attempted to

5    kiss her as she clearly resisted"; did you read that?

6        A.    As it's written there, yes.

7        Q.    Do you deny that that happened?

8        A.    That we exchanged a kiss, no.

9        Q.    Do you deny that she resisted?

10       A.    Yes.

11       Q.    Do you deny that you placed your arms around

12   her waist?

13       A.    No.

14       Q.    Do you deny that she, after you knelt down in

15   front of her, rose and stood by her desk?

16       A.    I believe that's what occurred, yes.

17       Q.    Do you believe that that may have been an

18   indication to you that she did not want you kneeling

19   down in front of her in that fashion?

20       A.    No.

21       Q.    "We also observed his hands grab Fulya's

22   buttock area.  She subsequently freed herself from his

23   hug and left the office area"; do you recall that?

0102

1       A.    Do I recall this being in here?  Yes, it's

2    right there.

3       Q.    Do you recall that's what happened?

4       A.    No, he's characterizing what's occurring.

5       Q.    How would you characterize what occurred?

6       A.    I believe it's in the position statement.  I

7    said it very clearly.

8       Q.    How would you characterize what occurred?

9       A.    I was giving her a hug and talking to her.

10      Q.    Do you remember your hands going to her

11   buttocks area?

12      A.    Yes.

13      Q.    Is that what you call a hug?

14      A.    Yes, it was a hug, but -- yeah.

15      Q.    Did she free herself from you?

16      A.    No.  I put -- I said, "okay," and put my

17   hands down, and she was going out to go to the council

18   office she told me.

19      Q.    You're aware now that when this video was

20   being taken, there was more than one person watching

21   this occur while the video was being taken, correct?

22      A.    I'm led to understand, yes.

23      Q.    Do you believe that all the people who saw

0103

1   that may have seen it in different way than it

2   actually happened?

3       A.   Yes.

4       Q.   Do you believe that the video portrays the

5   circumstances in a different way than they actually

6   occurred from what you remember?

7            MR. RAPPAPORT:  Objection.

8            MR. DiADAMO:  I don't even understand that.

9   I assume the video displays the video.

10      Q.   Do you believe that what is seen on the video

11  could be interpreted as something differently than how

12  you recall the actions occurred?

13           MR. DiADAMO:  Objection as to form.  If you

14  can answer that.

15      A.   I believe I would like that video released,

16  and you know that I want it released.

17      Q.   Okay.  That wasn't the question, and just for

18  the record --

19      A.   I'm not trying to hide this from people.

20      Q.   Excuse me.

21           MS. KAZAROSIAN:  Just for the record,

22  Attorney DiAdamo, I'm sure he knows if he can't answer

23  the question, he won't answer it.  So he doesn't need

0104

1   to be prompted by you to think that he may not be able

2   to answer the question, so I would appreciate it if we

3   not have those interjections, okay?

4       Q.    So let me ask my question again.

5            MR. DiADAMO:  There's no suggestion.  I'm

6   looking at a fine picture from the Museum of Fine

7   Arts.  If you turn around and look at it, we're both

8   going to be looking at a picture.  There's a video

9   that I think is a picture.

10           MS. KAZAROSIAN:  Would you like to answer the

11   question?  No?  All right.

12      Q.    Mr. Lariviere, do you believe that the

13   actions depicted on that video can be interpreted

14   differently by different people watching it?

15      A.    I believe twelve people should interpret it.

16      Q.    I didn't ask that you, and I'm going to ask

17   you again, do you believe that people looking at that

18   video could interpret what was going on in the video

19   differently?

20      A.    I don't know anything on the planet people

21   can't interpret differently.

22      Q.    Is that a yes?

23      A.    Yes, I don't know anything that people can't

0105

1    interpret differently.

2        Q.    So if one person sees it and believes they

3    are observing Ms. Metin trying to resist you, that may

4    be different from what you actually experienced when

5    the video was being taken; is that what you're saying?

6            MR. DiADAMO:  Objection as to form.  Read

7    that back even for me.

8            (Record read as requested)

9            MR. DiADAMO:  I will just object as to form,

10   and good luck.  Do what you want to do with it.

11           MS. KAZAROSIAN:  Mr. DiAdamo, you know what,

12   you're verging on interfering with my ability to ask

13   the questions and coaching your witness, and you know

14   that.  Please don't do it.

15           MR. DiADAMO:  Sometimes I don't like

16   questions, and sometimes I have no idea what the

17   question means, and that could spill over to the

18   client.  If he knows what it means, he's being

19   instructed by me to answer as best he can.

20           MS. KAZAROSIAN:  But not after every

21   question, and you know what, thank God you're not the

22   deponent, because I'm asking him.  Let him decide

23   whether or not he understands it without you telling

0106

1     him.  If he doesn't understand it, he can tell me.

2     I'll be very happy to rephrase it.

3          Q.    Did you understand that question?

4          A.    I don't understand it.

5          Q.    I'm not surprised after you heard from

6     Mr. DiAdamo.  Let's try this.  You are reading here in

7     Lieutenant Wnek's statement that what he believes he

8     saw was Fulya Metin attempting to resist you; is that

9     safe to say?

10         A.    That's what he's saying.

11         Q.    Do you think he's lying?

12              MR. RAPPAPORT:  Objection.

13              MR. DiADAMO:  Objection as to form.

14         A.    No.

15         Q.    Why would you think he would say this when

16    you believe it did not occur?

17              MR. DiADAMO:  Objection as to form.

18              MR. RAPPAPORT:  Objection.  Form.

19         A.    She poisoned him with lies.

20         Q.    What was that?  She poisoned him with lies;

21    is that what you said?

22         A.    Uh-huh.

23         Q.    She poisoned Lieutenant Wnek with lies?

0107

1      A.    Yes.

2      Q.    Do you think there's anyone else that

3  Ms. Metin may have poisoned with lies?

4      A.    My God, I don't know.  There's 300 million of

5  us.

6      Q.    Well, how did you come to the conclusion she

7  poisoned Lieutenant Wnek with lies?

8      A.    Because in the report she says what's going

9  on.

10     Q.    What report?

11     A.    Right here.  He's reporting what she's been

12 saying.

13     Q.    So you believe that that led him to see

14 something going on in a video that did not occur?

15           MR. RAPPAPORT:  Objection.

16     A.    There isn't a lawyer who's practiced five

17 minutes in a trial court that doesn't know you can do

18 that.

19     Q.    We all know you're a lawyer, Mr. Lariviere,

20 but I would like you to answer the question.

21     A.    Not in this case.

22     Q.    But I would like you to answer the question.

23 Do you believe that that recitation of what happened

0108

1    led Lieutenant Wnek to see something on that video

2    that actually did not occur?

3        A.    To interpret it, yes, absolutely.

4        Q.    Now, you had stated that you went out to

5    lunch with Ms. Metin almost every day, correct?

6        A.    Yes.

7        Q.    And who invited who?

8        A.    She made the first invitation, and it just

9    became mutual thereafter.

10       Q.    So it was a mutual invitation every time

11   after the first?

12       A.    Every time after the first.  I made the first

13   invitation.

14       Q.    Okay.  You made the first invitation, and

15   every time after that, it was a mutual invitation; is

16   that your testimony?

17       A.    Yes.

18       Q.    When you say "mutual," how did it occur?

19       A.    Typically, I would be working in the office,

20   and she'd say, "Want to go out to lunch now," and I'd

21   say, "Okay," and we'd go out.

22       Q.    And that would be the way it happened?

23       A.    Pretty much, yes.

0109

1       Q.    Anybody ever hear that happen in all the days

2   you were working together?

3       A.    The invitation?

4       Q.    Yes.

5       A.    No.

6       Q.    No one heard the invitation, but it would

7   happen every day?

8       A.    Yeah.  "It's time" -- in so many words, "It's

9   time to go."

10      Q.    Mr. Molori never heard it happen to the best

11  of your knowledge?

12      A.    I'm not aware if he never heard that.

13      Q.    Was he ever in the office when Ms. Metin

14  would ask you to go to lunch?

15      A.    Not to my memory, no.

16      Q.    So basically what your testimony is is that

17  whenever she would ask you to lunch, no one else would

18  be around?

19      A.    There was only two of us in that office,

20  so --

21      Q.    My question was -- is that a yes to my

22  question?

23      A.    There was only two of us in the office.  To

0110

1   my knowledge, no, nobody else heard us.

2       Q.   So my question is, whenever she would ask you

3   to go to lunch, no one else would be in the office,

4   correct?

5       A.   Yes.  But like I told, you she had reported

6   back when we went out to lunch.

7       Q.   She reported back what?

8       A.   Linda Gagnon told me several times that she

9   had mentioned that we went out to lunch and where we

10  went and what we had.

11      Q.   And so you're saying she told other people

12  you had gone to lunch?

13      A.   Yes.

14      Q.   And is it your testimony then that you have

15  personal knowledge that she told Linda Gagnon that she

16  was the one that continued to ask you to go to lunch?

17      A.   No.

18      Q.   So you don't know that, do you?

19      A.   No.  All I know is her reports about when we

20  went on a particular event.

21      Q.   And you know that because Linda Gagnon told

22  you?

23      A.   Yes.

0111

1      Q.    Do you ever recall having discussions with

2   Ms. Metin about your personal life?

3      A.    Yes.

4      Q.    What kinds of discussions did you have?

5      A.    Told her about how proud I was of my three

6   kids, how good they were doing in life.  I told her

7   about my wife.

8      Q.    What did you tell her about your wife?

9      A.    Well, that February, we were married 30

10  years -- excuse me -- 29 years.  I'm sorry.

11     Q.    Is that all you told her about your wife?

12     A.    General things.  You know, when we were

13  dating and got married and where we lived.

14     Q.    Is that all you told her about your wife and

15  your relationship with your wife?

16     A.    The only other thing I ever mentioned, we

17  used to exchange medical information.

18     Q.    Who used to exchange medical information?

19     A.    She would tell me things about her medical

20  condition, and I told her about my medical condition.

21     Q.    What does that have to do with your wife?

22     A.    One incident did.

23     Q.    What was it?

0112

1      A.    I was telling her once when I was going to

2    the doctor, and she asked me, "Where are you going and

3    why?"  And I told her at that time I was going to see

4    a doctor because of an issue.

5      Q.    What was the issue?

6      A.    Temporary ED.

7      Q.    Erectile dysfunction, is that what you're

8    saying?

9      A.    Yes.

10     Q.    That you experienced with your wife; is that

11   what you're saying?

12     A.    Yes.

13     Q.    You related that to Ms. Metin?

14     A.    Yes, we talked very open.  Now, it doesn't

15   seem like it, but we had a good, close relationship,

16   very friendly, very mutual in the exchange of

17   information.  I felt I had a friend I could talk to

18   about every issue, so when she asked, I answered.

19     Q.    Did you ever give her any reason why you

20   thought you were experiencing this erectile

21   dysfunction?

22     A.    No, thankfully it was temporary, and it

23   occurred -- I did go for several different types of

0113

1    testing, just of my general health condition at that

2    point.

3         Q.   Did you ever say to her that you no longer

4    could have sex with your wife because you were

5    constantly thinking about her?

6         A.   What?  No.

7         Q.   Is this the first time that you've heard

8    this?

9         A.   I think I might have saw something like this,

10   but, no.

11        Q.   Because you seem very surprised, and it was

12   in a lot of documents.

13        A.   I'm surprised you bring it up, but --

14        Q.   Excuse me.  Excuse me.  It was in a lot of

15   documents, and you appeared very surprised.  Is this

16   the first time that you've heard this statement that

17   you may have made to Ms. Metin?

18        A.   Something strikes me it's in one document.

19   I'm not positive.  I don't know that it's in a lot.  I

20   can't say I've read everything.

21        Q.   Well, have you read the complaint, the MCAD

22   complaint?

23        A.   Initially, yes.  I don't think I have looked

0114

1    at it since April of 2005.

2        Q.    Have you read the rebuttal to your response?

3        A.    I don't recall a rebuttal.  I'm not sure.  I

4    don't recall a rebuttal having been filed.

5              MR. DiADAMO:  Off the record.

6              (Discussion off the record)

7        Q.    Have you read Ms. Metin's deposition?

8        A.    No.  Are you talking the one that occurred a

9    couple of weeks ago?  It's not out, is it?

10       Q.    Have you -- you've not read her deposition?

11             THE WITNESS:  Is it out?

12       Q.    Excuse me.  You haven't read it?

13       A.    Yeah.

14       Q.    That's all I need to know, you haven't read

15   it.

16       A.    Okay.

17       Q.    When you represent someone going to court or

18   appearing at a deposition, how do you generally

19   prepare those people for the deposition?

20       A.    I ask the -- principally, I asked them if

21   they have ever participated in a proceeding in court

22   before and if they have done a deposition.  I explain

23   to them very carefully that my job isn't really to say

0115

1    much.  It's just to be there in case the other side

2    crosses the line.  And, you know, I try to tell them,

3    just answer the questions as best as possible.  It's

4    my job to run interference if it's necessary because

5    the questions are inappropriate.

6        Q.    Do you prepare them in any fashion other than

7    this general conversation you just related to me?

8        A.    When I was first practicing, I made that

9    faux pas, and then they look like they're a prepared

10   computer program.

11       Q.    Do you think that I'm talking about coaching

12   answers?

13       A.    It sounded like you were saying that.

14       Q.    No.  Do you prepare them in any fashion such

15   as reviewing answers to interrogatories, reviewing the

16   pleadings they're going to be discussing?

17       A.    Yes.

18       Q.    You do?

19       A.    Oh, yes.  Definitely have them review any

20   documents that are relevant.

21       Q.    Do you have an e-mail address?

22       A.    Yes.

23       Q.    How many e-mail addresses do you have?

0116

1       A.    At one point, I had like five or six.   I

2    think I have got like three.

3       Q.    When did you have five or six?

4       A.    When they really were first starting the

5    Internet, with all of them coming out, I was reserving

6    space.

7       Q.    Are you talking domain name or an e-mail

8    address?

9       A.    E-mail address.

10      Q.    So what period of time -- what years did you

11   have five or six e-mail addresses?

12      A.    '98, '99, 2000, somewhere around there.

13      Q.    In 2004, how many e-mail addresses did you

14   have?

15      A.    Probably the same amount.

16      Q.    Can you tell me what they were?

17      A.    There was Yahoo.

18      Q.    What was the address?

19      A.    Brookhurst98.

20      Q.    B-R-O-O-K-H-U-R-S-T-98?

21      A.    Yes.

22      Q.    At Yahoo.com?

23      A.    Yes.

0117

1      Q.    Was there another one?

2      A.    There was the AOL address which is MCTCM.

3      Q.    Is that one that you access at work?

4      A.    I could access it, yes.

5      Q.    What does MCTCM stand for?

6      A.    Maurice, Christine, Tom, Catherine and Maura.

7      Q.    And did you have another address at that

8 time?

9      A.    Brookhurt98@hotmail.com.

10     Q.    And what does Brookhurst98 mean?

11     A.    I had a property up in Meredith, and the

12 association called Brookhurst, which I bought in '98.

13     Q.    Do you have any other e-mail addresses?

14     A.    No.

15     Q.    So those are the only three you have?

16     A.    I have one now.

17     Q.    In 2004, are those the only three that you

18 had?

19     A.    There was one other site, and I can't

20 remember what it was, but it would have been

21 Brookhurst98 again, whatever the address was.

22     Q.    Did you ever have an e-mail address through

23 the City of Methuen?

0118

1       A.    I had one Brookhurst98@myway.com.

2       Q.    Did you ever have an address through the city

3   of Methuen or anything to that effect?

4       A.    Yes, accessible only inside town hall.

5       Q.    What does that mean?

6       A.    I could only get it inside work.  If I wanted

7   to stay at home, I could not access that program.

8       Q.    But you could exchange e-mails with others

9   people within town hall; is that correct

10      A.    Yes, when I was inside town hall.

11      Q.    So five or six e-mails in 2004.  Do you still

12  have five or six?

13      A.    No.

14      Q.    In 2002 to 2004, you had about five or six

15  e-mail addresses, correct?

16      A.    I'd say approximately.

17      Q.    Who were some people you would e-mail

18  routinely?

19      A.    On those --

20      Q.    On all of your e-mail addresses, who were

21  some of the people that you would routinely e-mail

22  back and forth with?

23      A.    I have been an officer of the Brookhurst

0119

1    Association, so I set up their web site and used to

2    exchange e-mails all the time on association business.

3    And there's an abutting association.  I was exchanging

4    information with them.  I exchanged e-mails with Bill

5    Dipardeau and with relatives.

6        Q.    Meaning children, wife, et cetera?

7        A.    Uncles -- excuse me, not uncle, nephew,

8    nieces, brother-in-law, sister-in-law, that sort of

9    thing.

10       Q.    Did you exchange with friends?

11       A.    Yes, Bill Dipardeau would be an example.

12       Q.    How often in a day would you have e-mail

13   conversations with people in general?  And this is

14   between 2002 and 2004.

15       A.    It would be a pure guess on my part.

16       Q.    Is it safe to say it was voluminous?

17       A.    I would say ten or more.

18       Q.    Ten or more a day?

19       A.    Yeah.  You're talking just personal stuff,

20   correct?

21       Q.    Any kind of e-mails, personal or otherwise.

22       A.    Tremendous amount through the office,

23   contacting lawyers, that sort of thing.  That became

0120

1    very much the standard for translation of information.

2         Q.    Are you a good typist?

3         A.    I'm a two-finger typist.

4         Q.    Pretty slow typist?

5         A.    I type at a pretty good rate, but not what

6    you call secretary quality.  I wouldn't be able to do

7    this deposition.

8         Q.    So is it safe to say that you would, at

9    times, use acronyms or abbreviations for fully typed

10   out words?

11        A.    Yes.

12        Q.    And were you familiar with some of the

13   generally used acronyms or abbreviations for fully

14   typed out words or phrases?

15        A.    I use shortcut keys regularly.

16        Q.    Are you familiar with the acronyms or

17   abbreviations that are generally used for phrases or

18   words in e-mail communications?

19        A.    Somewhat, but not the level a teenager would

20   know.

21        Q.    Are you familiar what GG is?

22        A.    No.

23        Q.    Are you familiar with what BTW is?

0121

1      A.    By the way.

2      Q.    Are you familiar with LOL?

3      A.    Laugh out loud.

4      Q.    Any others that you know or are familiar

5    with?

6      A.    LU would be love you.  I think that's pretty

7    much it, my memory.  There could be others, but I just

8    don't recall.

9           MS. KAZAROSIAN:  One second.  I don't have

10   any other questions.

11          MR. DiADAMO:  I have nothing.

12          MR. RAPPAPORT:  I don't have anything.

13          (Whereupon, the deposition

14          was concluded at 1:46 p.m.)

15

16

17

18

19

20

21

22

23

0122

1                    C E R T I F I C A T E

     I, MAURICE J. LARIVIERE JR., do hereby certify

2  that I have read the foregoing transcript of my

   testimony, and further certify that said transcript

3  (with/without) suggested corrections is a true and

   accurate record of said testimony (with the exception

4  of the following corrections):

5  Page    Line    Correction

6  _____   _____   _____

7  _____   _____   _____

8  _____   _____   _____

9  _____   _____   _____

10 _____   _____   _____

11 _____   _____   _____

12 _____   _____   _____

13 _____   _____   _____

14 _____   _____   _____

15


                        _____

16                      MAURICE J. LARIVIERE, JR.

17 Subscribed and sworn to before me this _____ day

   of_____, 2006.

18

```
                              _____

19                            Notary Public

                             My commission expires:

20                           _____

21

                              - - - -

22

23

0123

1              C E R T I F I C A T E

2        I, Nancy J. Theroux, Certified Shorthand Reporter

3     and Notary Public in and for the Commonwealth of

4     Massachusetts, do hereby certify that there came

5     before me on the 1st day of November 2006, the person

6     hereinbefore named, who was by me duly sworn to

7     testify to the truth and nothing but the truth of his

8     knowledge touching and concerning the matters in

9     controversy in this cause; that he was thereupon

10    examined upon his oath, and his examination reduced to

11    typewriting under my direction; and that the

12    deposition is a true record of the testimony given by

13    the witness.

14        I further certify that I am neither attorney or

15    counsel for, nor related to or employed by, any
```

16    attorney or counsel employed by the parties hereto

17    or financially interested in the action.

18        In witness whereof, I have hereunto set my hand

19    and affixed my notarial seal this 7th day of

20    November, 2006.

21

      _____

22                    Nancy J. Theroux, CSR, RPR

                      Notary Public

23                    My commission expires: 9/21/12

1

2                    UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS
3
                              C.A. NO: 05-11579EFH
4

5
           MAURICE LARIVIERE,
6                    Plaintiff,

7          v.

8          JOSEPH SOLOMON, Individually, and as Chief
           of Police of the city of Methuen, JOSEPH
9          ALAIMO, Individually and as Deputy Chief of
           Police of the City of Methuen,and THE CITY
10         OF METHUEN,
                     Defendants
11
           = = = = = = = = = = = = = = =
12

13

14              DEPOSITION OF MAURICE LARIVIERE, a
           witness called on behalf of the Defendants,
15         Joseph Solomon, individually, and as Chief
           of Police of Methuen, Joseph Alaimo,
16         individually and as Deputy Chief of Police
           of the City of Methuen, and the City of
17         Methuen, pursuant to the Federal Rules of
           Civil Procedure, before Joan R. Dunne, a
18         Stenographer and Notary Public in and for
           the Commonwealth of Massachusetts, at the
19         offices of Morrison Mahoney LLP, 250 Summer
           Street, Boston, Massachusetts, on Monday,
20         November 13, 2006, commencing at 10:35 a.m.

21
                          JOAN R. DUNNE
22                   Court Reporting Service
                        28 Sonning Road
23             Beverly, Massachusetts  01915
                       (978) 927-2678
24

```
1                                                    2

2          APPEARANCES:

3
                   MORRISON MAHONEY LLP
4                  (by Gareth W. Notis, Esq.)
                   250 Summer Street
5                  Boston, Massachusetts  02210
                   Counsel for all the Defendants
6

7                  DiADAMO LAW OFFICE LLP
                   (by William H. DiAdamo, Esq.)
8                  40 Appleton Way
                   Lawrence, Massachusetts  01840
9                  Counsel for the Plaintiff

10
                   REARDON, JOYCE & AKERSON, P.C.
11                 (by Andrew J. Gambaccini, Esq.)
                   397 Grove Street
12                 Worcester, Massachusetts  01605
                   Counsel for the Defendants
13                   Joseph Solomon and Joseph Alaimo

14

15

16

17

18

19

20

21

22

23

24
```

```
1                                                        3
2                          I N D E X
3            WITNESS:  MAURICE LARIVIERE
4                   Direct   Cross   Redirect   Recross
5                     8
6
7
8
9                       E X H I B I T S
10           Number          Description          Page
11
12
13           1        Verified Amended Complaint     6
14
             2        Sexual Harassment Policies     6
15
16           3           Notice of Resignation       6
17
             4               Agreement               6
18
19           5         Resume of Fulya Metin         6
20
             6               Synopsis                6
21
22           7               Synopsis                7
23
             8           Copy of Photograph          7
24
```

1                                                                              4

2              (Exhibits Continued)

3
       9                  Statement              7
4

5      10                 Statement              7

6
       11              Note and Poem             7
7

8      12          Police Department Report      7

9
       13          Letter of Resignation         7
10

11     14           Investigation Report         7

12
       15      Answers to Interrogatories        8
13

14

15

16

17

18

19

20

21

22

23

24

```
1                                                    5

2                        STIPULATIONS

3

4              It is hereby stipulated and agreed by

5         and between counsel for the respective

6         parties that the reading and signing of the

7         deposition is not waived.

8              It is agreed that the deposition may

9         be signed under the pains and penalties of

10        perjury within thirty days of receipt or it

11        will be deemed accepted.

12             It is further stipulated and agreed

13        that all objections, except objections to

14        the form of the questions and all motions

15        to strike, will be reserved until the time

16        of trial.

17

18                   MAURICE LARIVIERE,

19

20             Having been satisfactorily identified

21        and duly sworn by the Notary Public was

22        examined and testified as follows:

23

24
```

```
1                                                          6

2                        (Exhibits Premarked)

3

4            (Exhibit No. 1 marked for identification)

5                   Verified Amended Complaint

6

7            (Exhibit No. 2 marked for identification)

8               Sexual Harassment Policy of the

9                     City of Methuen.

10

11           (Exhibit No. 3 marked for identification)

12              Request for Leave of Absence and

13                  Notice of Resignation.

14

15           (Exhibit No. 4 marked for identification)

16             Agreement between the Methuen Police

17                  Department and Local 396

18

19           (Exhibit No. 5 marked for identification)

20                   Resume of Fulya Metin

21

22           (Exhibit No. 6 marked for identification)

23              Synopsis by Lieutenant Wnek.

24
```

```
 1                                                    7

 2                  (Exhibit No. 7 marked for identification)

 3                            Synopsis

 4

 5                  (Exhibit No. 8 marked for identification)

 6                      Photocopy of Photograph

 7

 8                  (Exhibit No. 9 marked for identification)

 9                        Photocopy of Note

10

11                  (Exhibit No. 10 marked for identification)

12                        Photocopy of Note

13

14                  (Exhibit No. 11 marked for identification)

15                    Photocopy of Poem and Note

16

17                  (Exhibit No. 12 marked for identification)

18                 Methuen Police Detective Division Memo

19

20                  (Exhibit No. 13 marked for identification)

21                      Letter of Resignation.

22

23                  (Exhibit No. 14 marked for identification,

24                      Investigation Report
```

```
 1                                                    8
 2              (Exhibit No. 15 marked for identification)
 3                   Answers to Interrogatories
 4
 5                   DIRECT EXAMINATION
 6
 7        Q    (By Mr. Notis) Sir, Could you state full
 8             name for the record.
 9        A    Maurice Joseph Lariviere Jr.
10        Q    Mr. Lariviere, my name is Gareth Notis.  I
11             represent defendants Solomon, Alaimo and
12             City of Methuen in this case.
13                  Have you had your deposition taken
14             before?
15        A    I had a deposition a week or so ago.
16        Q    Besides that deposition, any others in your
17             past?
18        A    No.
19        Q    A few ground rules for today.  I'm sure
20             you've attended many depositions taken, and
21             you've had your deposition taken, but try
22             to wait for me to complete my question
23             before you give an answer.  That will make
24             the court reporter's job a lot easier.
```

```
 1                                                  9

 2              You're doing a good job giving verbal

 3              responses.  Nods of the head don't pick up

 4              on a transcript.

 5                  If you want to take a break at any

 6              time to talk to Attorney DiAdamo, to use

 7              the men's room or take a cigarette break,

 8              whatever, I'm happy to accommodate you.

 9                  Do you have any questions for us

10              before we start?

11       A      No.

12       Q      I'm going to proceed with the deposition,

13              and Attorney Gambaccini may have some

14              questions for you as we go along.  We might

15              pass the buck back and forth as it goes.

16                  Did you review any documents in

17              preparation for your testimony today?

18       A      Today, no.  I've read a lot of documents in

19              the past but not for today.

20       Q      Did you have any conversations with anyone

21              besides your attorneys and your wife in

22              preparation for today's testimony?

23       A      No.

24       Q      Did you speak with any employees at the
```

```
1                                                      10
2              city of Methuen in the past thirty days
3              about this case?
4      A   Yes.
5      Q   Who did you speak with?
6      A   Linda Gagnon.
7      Q   Anyone else besides Linda Gagnon?
8      A   Shirley Terry.
9      Q   Anybody else besides Shirley Terry and
10             Linda Gagnon?
11     A   William Manzi III.
12     Q   Anyone else?
13     A   Within thirty days, not that I recall, no.
14     Q   What was the nature of your conversation
15             with Ms. Gagnon?
16     A   Can I have one moment with my counsel,
17             please?
18     Q   Yes, you may.
19
20             (Stenographer reads back last question)
21
22     A   I appeared at a deposition that was
23             conducted under the MCAD proceedings by
24             Marcia "Kasarosian", and Marcia presented
```

```
1                                                    11

2              the Wnek report to me.  In the Wnek report

3              there were some statements that allegedly

4              Linda had made to Wnek about sexual contact

5              and there were comments, that sort of thing

6              that bothered her.  You'll see it's in the

7              exhibits here.  I called her -- at that

8              deposition, quite frankly, I said I don't

9              recall any of that, but she's a friend of

10             mine, if she said it it's true.  I called

11             her, quite frankly, to apologize because

12             we've known each other a long time and I

13             was figuring after so many years if it

14             still bothered her it was wrong on my

15             part.  She categorically denied that she

16             ever told Lieutenant Wnek any of the

17             statements that he has put in his report.

18      Q      When you called her, where did you call

19             her?

20      A      Her house.

21      Q      How about Ms. Terry, what did you discuss

22             with Ms. Terry?

23      A      Shirley and I are good friends.  It would

24             be generic conversations about how things
```

```
 1                                                      12
 2                 are.  She will call me periodically just to
 3                 talk to me and see how things are going.
 4                 We've known each other a quarter of a
 5                 century, and we'll talk.  That sort of
 6                 thing.
 7        Q        When you called her, did you call her at
 8                 the office?
 9        A        She calls me, typically.
10        Q        What is her role with the city?
11        A        She's the head custodian over in the
12                 building.
13        Q        Mayor Manzi, what did you discuss with
14                 Mayor Manzi in the past thirty days?
15        A        I had told a friend of mine about the
16                 deposition that my wife was going to be
17                 there, and he had suggested that I contact
18                 Manzi in an effort to see why she's being
19                 deposed.  I had told the person at the time
20                 it's a waste of time, I'm sure he doesn't
21                 know about it and I'm sure it's an attorney
22                 that decided it had to be done.  He told me
23                 go ahead and give him a call, so I did.
24        Q        Who is the friend?
```

```
 1                                               13
 2       A    I don't want to piss off the DiAdamos, so
 3            if I do, because I'm under oath, I prefer
 4            you not to be pissed off at him.  Tony
 5            Copani.  Please don't take it----.
 6       Q    Was it just one conversation with Mayor
 7            Manzi in the past thirty days?
 8       A    I couldn't say for sure.  It might be two.
 9            I'm not positive.
10       Q    Have you exchanged any e-mail
11            correspondence with Mayor Manzi in the past
12            thirty days?
13       A    Yes.
14       Q    Do you recall what was discussed in those
15            e-mails?
16       A    Yes.  I had been trying to get him to have
17            Solomon tell the truth.
18       Q    What else about this case did you discuss
19            with the mayor via e-mail?
20       A    Some of the e-mails that I've sent have
21            been a little caustic because I'm not very
22            happy with the fact that he hasn't come
23            forward and done the right thing under the
24            circumstances.
```

```
 1                                                  14

 2        Q    Have you kept copies of your e-mails?

 3        A    Probably.

 4        Q    Are they still on your computer hard drive?

 5        A    I save them on the internet site.

 6        Q    What internet site is that?

 7        A    AOL.

 8        Q    You customarily save the e-mails you send

 9             and receive?

10        A    I can't say in every instance I do, but AOL

11             now has an unlimited saving of e-mails so

12             anything that's free, I'll do.

13        Q    You have the ability to print up those

14             e-mails, correct?

15        A    Yes.

16        Q    Could you do that and pass them onto your

17             attorneys?

18        A    Sure.  Those are the e-mails to Manzi.

19        Q    Any e-mails with any other city employees

20             in the past thirty days?

21        A    He would be the only one.

22        Q    If there are any could you please print

23             those up and give them to Bill?

24        A    Sure.
```

```
1                                                  15

2        Q    Thank you.

3        A    I can't say that I saved every one.  I will

4             give you the ones I saved.

5        Q    Were they all sent from the same computer?

6        A    No.

7        Q    Which computers were they sent from?

8        A    I have a laptop at the house, and I'm in

9             Tony Copani's office, I have computer

10            access there.

11       Q    You know that the city of Methuen is

12            represented by me in this case, correct?

13       A    Yes.

14       Q    You're an attorney?

15       A    Not in this case.

16       Q    But you're an attorney licensed by the

17            Commonwealth, right?

18       A    Yes.

19       Q    You know that you're not supposed to

20            contact parties represented by other

21            counsel?

22                  MR. DiADAMO:  Objection.  Answer

23            the question.

24       A    To my knowledge, I am not counsel in this
```

```
 1                                                    16

 2              case, I'm a plaintiff.

 3        Q    You're a party, aren't you?

 4        A    I'm a party.

 5        Q    You know under the rules of professional

 6              responsibility that you are not to contact

 7              other parties in the case?

 8                    MR. DiADAMO:  Objection.

 9        A    No, I don't, where I'm sitting as a

10              plaintiff and not as an attorney.

11        Q    Your position is that you can freely

12              contact any employees of the city of

13              Methuen and discuss this case with them?

14        A    I haven't really thought about it.

15        Q    What is your date of birth?

16        A    December 7, 1949.

17        Q    Where were you born?

18        A    Lawrence, Massachusetts.

19        Q    Where do you live presently?

20        A    Windham, New Hampshire.

21        Q    What is the street address?

22        A    16 Sun Ridge Road.

23        Q    Do you have a P. O. Box?

24        A    No.
```

```
 1                                                        17
 2          Q    Who lives with you at that address?
 3          A    Currently my wife.
 4          Q    What is your wife's name?
 5          A    Christine.
 6          Q    Does anyone else reside with you at the
 7               home residence?
 8          A    I have two other children who are in
 9               college, but during the time when they're
10               off they're living back in our house.
11          Q    You have three children total?
12          A    Yes.
13          Q    What are their names and ages?
14          A    The oldest one is Maura.  She was born in
15               1982.  My middle child is Cathryn with a C,
16               she was born in 1987.  My youngest is Tom,
17               he was born in 1988.
18          Q    It would be Cathryn and Tom that
19               periodically reside with you at the home
20               address?
21          A    Yes.
22          Q    Are any of the three children dependent
23               upon you for income?
24          A    Yes.
```

1                                                              18

2          Q     Which of the three?

3          A     The last two.

4          Q     You list them as dependents on your income

5                tax?

6          A     Yes.

7          Q     Have you filed income tax returns for the

8                past ten years?

9          A     Yes.

10         Q     Do you keep copies of your income tax

11               returns?

12         A     Yes.

13         Q     Have you filed jointly with your wife

14               during all of those ten years?

15         A     Ever since we've been married, yes.

16         Q     Where do you keep the income tax returns?

17         A     At my house.

18         Q     Did someone prepare them for you?

19         A     No.

20         Q     You've always prepared them yourself in the

21               past ten years?

22         A     Yes.

23         Q     Do you own or rent at the Windham address?

24         A     Own.

```
 1                                                          19
 2        Q    Who is on the title?
 3        A    Myself and my wife.
 4        Q    What manner is the title held?
 5        A    Joint.
 6        Q    Do you own any other properties besides the
 7             Windham residence?
 8        A    Yes.
 9        Q    Where are the other properties?
10        A    Meredith, New Hampshire.
11        Q    What is the street address of the Meredith
12             residence?
13        A    11 Brookhurst Lane West.
14        Q    What type of property is that?
15        A    It's in an association.
16        Q    Is it a condominium?
17        A    No.
18        Q    Is it a summer cottage?  What type of
19             structure is it?
20        A    Summer cottage.
21        Q    Is it on a lake?
22        A    The association is.  I'm three hundred feet
23             away from the lake.
24        Q    What is the lake?
```

```
 1                                                      20

 2        A    Winnipesaukee.

 3        Q    How long have you owned that property?

 4        A    1998.

 5        Q    Since January 1, 2005, have you taken out

 6             any home equity loans or second mortgages

 7             on either of those two properties?

 8        A    January 1st, 2005?

 9        Q    Yes.

10        A    No.  I'm sorry, let me apologize, it would

11             have been late January, early February.

12             Most likely late January I did take out a

13             loan.

14        Q    On which property?

15        A    The Windham.

16        Q    Was that recorded at the Registry of Deeds?

17        A    Yes.

18        Q    Any plans to move in the near future?

19        A    No.

20        Q    Do you have a business address?

21        A    265 Broadway, Methuen.

22        Q    What type of office is that?

23        A    Tony Copani has a law office, Kiley &

24             Copani.
```

```
 1                                                          21
 2          Q    You maintain an office at that address?
 3          A    Yes.
 4          Q    You have a desk?
 5          A    Yes.
 6          Q    A computer?
 7          A    Yes.
 8          Q    You can conduct a law practice from that
 9               address?
10          A    Yes.
11          Q    Are you licensed in any other states to
12               practice law besides Massachusetts?
13          A    No.
14          Q    Do you keep a resume presently?
15          A    Yes.
16          Q    How often do you update it?
17          A    Last time I updated it was for the current
18               situation.
19          Q    How many days a week do you customarily
20               spend at Attorney Copani's office?
21          A    Four.
22          Q    How many hours per week, customarily?
23          A    Probably about five.
24          Q    Do you work from home?
```

```
 1                                               22
 2       A    No.
 3       Q    Are you currently receiving income from
 4            other sources besides the work that you
 5            perform at Tony Copani's office?
 6       A    I don't really get paid for being there.
 7       Q    What are your sources of income presently?
 8       A    None.  The only one I have is I have a
 9            contract with Andover Housing Authority,
10            but that's limited to two thousand dollars
11            a year.
12       Q    Does your wife work?
13       A    Yes, she does.
14       Q    Where does she work?
15       A    Deerfield school system.
16       Q    What is her title?
17       A    She's a teacher -- she does language
18            teaching.  I forget the exact name of the
19            title, but it's to assist students in
20            reading and writing.
21       Q    Do you receive any pension or retirement
22            benefits presently?
23       A    No.
24       Q    How about health insurance?
```

```
1                                              23
2            A    My wife has the health insurance.
3            Q    Prior to your resignation in February of
4                 2005 as the city solicitor for the city of
5                 Methuen, who did you have your health
6                 insurance through?
7            A    Methuen.
8            Q    Who did your wife have her insurance
9                 through?
10           A    Me.
11           Q    Then you switched to the state of New
12                Hampshire plan?
13           A    Cigna.  And it's by the school system.
14           Q    In what way does the current health
15                insurance plan differ, if at all, from the
16                plan you had with the city of Methuen?
17           A    Roughly the same.  The only issue I have is
18                my son's got to undergo surgery next year
19                and we're not sure if that will be covered.
20           Q    Your primary care stayed the same?
21           A    Yes.
22           Q    Did your copay stay the same?
23           A    Yes.
24           Q    Have you been denied any medical coverage
```

1                                                    24

2                  since you resigned from the city

3                  solicitor's office?

4        A        No.

5        Q        Have you taken any prescription medications

6                  in the past 24 hours?

7        A        Yes.

8        Q        Which medications are those?

9        A        I keep them in my pocket.  Allopurinol, 100

10                 milligrams; Vytorin, 10/20 milligrams;

11                 Lisinopril, 10 milligrams; Sertraline, 50

12                 milligrams.

13       Q        In the past year, have you been prescribed

14                 any other medications besides those four?

15       A        Yes.

16       Q        What other medications?

17       A        I had an ear infection, and I forget the

18                 name of it.  I just stopped using it

19                 recently.  It's medication to cure the

20                 irritation in the ear.

21       Q        Could you tell me who prescribes each of

22                 those four medications?

23       A        My prior physician, Dr. Sandler.

24       Q        You say prior, do you have a new physician?

```
1                                                      25

2         A    Yes.

3         Q    Who is that?

4         A    She retired October 31st, so I've gone with

5              a fellow named Dr. Hafner.

6         Q    First name?

7         A    Don't know.  I haven't really been with

8              him.

9         Q    Could you tell us the reason for each of

10             those four medications.

11        A    Allopurinol is in relation to gout, there's

12             a proclivity, I guess, based upon tests for

13             gout that I have.  Vytorin is cholesterol

14             medicine.  Lisinopril is for blood

15             pressure, and Sertraline is the generic

16             name for Zoloft, which is a depression

17             medicine.

18        Q    Where do you have your prescriptions

19             filled?

20        A    Through the mail.

21        Q    Since January 1st, 2005, have you had your

22             prescriptions filled at any pharmacies?

23        A    Yes.  When I started first with Zoloft, I

24             had them done at Brooks, and that would be
```

```
 1                                                      26

 2              September of 2005.

 3       Q      Which Brooks?

 4       A      Londonderry.

 5       Q      Is there more than one in Londonderry?

 6       A      I don't know.

 7       Q      For each of the four medications, did you

 8              take any of them prior to February 15th,

 9              2005?

10       A      Allopurinol and Vytorin, yes.  The other

11              two are subsequent.

12       Q      Zoloft is an antidepressant?

13       A      Yes.

14       Q      You said September 2005 you were prescribed

15              the Zoloft?

16       A      My doctor told me based upon my depression

17              I better start using something.

18       Q      Time frame is about September 2005?

19       A      I know as a fact it's the middle of

20              September 2005.

21       Q      Prior to that date had you ever been

22              prescribed an antidepressant?

23       A      No.

24       Q      Had you ever been diagnosed with an anxiety
```

```
 1                                                          27
 2              disorder?
 3      A       No.
 4      Q       Depressive disorder?
 5      A       No.
 6      Q       Bipolar disorder?
 7      A       No.
 8      Q       Any psychiatric disorder of any kind?
 9      A       No, I never even seen a psychiatrist or a
10              psychologist before this.
11      Q       Had you ever seen a counselor for family
12              purposes such as marital problems or
13              problems with your children?
14      A       No.
15      Q       Do any of these medications impact your
16              ability to understand questions today or
17              offer testimony?
18      A       I'm not sure what impact Zoloft has on me
19              or Sertraline, what they call it.  I don't
20              really know.  I don't think so.  I think I
21              clearly understand the questions you're
22              posing to me.
23      Q       For a time were you given a prescription
24              for Viagara?
```

```
 1                                              28
 2        A    Yes.
 3        Q    Who gave you that prescription?
 4        A    Dr. Sandler.
 5        Q    What was the reason for that prescription?
 6             What was your understanding of the reason
 7             for that prescription?
 8        A    Starting in September 2004 I had some off
 9             and on ED issues.
10        Q    Have the ED issues revolved since that
11             time?
12        A    Yes, it was very temporary.  Unfortunately
13             with Sertraline, one of the things it's
14             knocked off is that, so I don't have ED but
15             I don't have the ability to have a
16             relationship.
17        Q    Who gave you that information, any medical
18             professional?
19        A    It's in the booklet they give you, and it's
20             been a result.
21        Q    To the best of your memory, when did the ED
22             resolve?
23        A    I took, I believe, two pills and that was
24             it.
```

```
1                                                      29
2          Q    When did you take the pills?
3          A    The first one would have been September,
4               and then the second one somewhere in
5               October, early November.
6          Q    So after November 2004 you didn't notice
7               any symptoms related to your ED?
8          A    To the best of my memory without having a
9               calendar, so to speak, on that sort of
10              thing.  I remember it being just a few
11              times and that was it.
12         Q    Any other medications for ED besides
13              Viagara?
14         A    There's another one that was given.  It's
15              the one they advertise on TV.  I forget the
16              name of it.
17         Q    Cialis?
18         A    Yeah.
19         Q    Who prescribed Cialis?
20         A    It really wasn't a prescription.  The
21              doctor had those.
22         Q    Samples?
23         A    Yeah.
24         Q    Do you recall when you took the samples?
```

```
1                                                        30
2        A    I never wound up taking those.  I've got
3             them still at the house.
4        Q    Are there any current prescription
5             medications that you're not taking for any
6             reason?
7        A    No.
8        Q    When did you marry your wife?
9        A    February 14th, 1976.
10       Q    Was she your first wife?
11       A    Yes.
12       Q    Have you ever been divorced for any reason?
13       A    No.
14       Q    Have you ever been separated from your
15            wife?
16       A    No.
17       Q    Has there ever been a period when either
18            you or your wife has moved out of your
19            residence?
20       A    No.
21       Q    When does your wife obtain the age of
22            retirement within the New Hampshire school
23            system?
24       A    I believe she would be somewhat eligible at
```

```
 1                                                   31
 2              age 60.  Her only issue was she didn't work
 3              for a number of years.  She actually just
 4              started this job, the full-time job in
 5              September of 2004.  Before that she'd been
 6              part time which was not included towards
 7              the retirement system, so there's not much
 8              time there for her.
 9       Q      When are you entitled to retirement
10              benefits?
11       A      I was technically entitled after ten years,
12              you're vested, and at age 55 or older, and
13              they do a point system.  At age 55 or older
14              you can technically have that.
15       Q      What is your current age?
16       A      56.
17       Q      How about health insurance, once you're
18              vested you're entitled to health insurance,
19              correct?
20       A      I'm not sure.
21       Q      You could tap into your state retirement
22              presently, correct?
23       A      It would be municipal, yes.
24       Q      If you did have access to your health
```

```
1                                                      32

2                 insurance benefits through the retirement

3                 system, would you switch from your wife's

4                 plan back?

5          A      Frankly, it would be based upon economics.

6                 I would have to look at what the numbers

7                 were.

8          Q      Do you know of any child support liens for

9                 any reason?

10         A      No.

11         Q      All three of your children are with your

12                wife Christine?

13         A      Oh, you mean biologically?

14         Q      Yes, sir.

15         A      Yes.

16         Q      Have you spoken to your children about this

17                litigation?

18         A      Yes.

19         Q      What did you discuss with your children

20                about it?

21         A      Give me a second, please.

22         Q      Sure.

23         A      The paper started haunting my house.  They

24                haunted my kids.  My kids were in Salem --
```

```
1                                                          33
2              can I have a minute, please.
3       Q      Absolutely, take as much time as you want.
4
5                           BRIEF RECESS
6
7       Q      Would you like to complete your answer?
8       A      I believe you asked what discussions I had
9              with my kids?
10      Q      About the litigation.
11      A      About the litigation in and of itself,
12             nothing.  The situation, yes.  Litigation,
13             you don't talk to your kids about something
14             like that.
15      Q      Could you tell us what you discussed about
16             the situation?
17      A      My two youngest were in high school at the
18             time.  Quite obviously at the high school
19             there's a newspaper bin, and newspapers --
20             I can't use the term in front of you --
21             newspapers like to stick it to people, and
22             they had quite a fest.  Your clients had
23             quite a fest.
24      Q      Any other conversation, sir?
```

1                                                        34

2      A    Just trying to calm them down, trying to

3           get them to move on with their lives.

4      Q    Did you talk about the reason for your

5           resignation?

6      A    Yes.

7      Q    What did you discuss in that regard?

8      A    What is in the Complaint.

9      Q    You don't recall anything specifically

10          besides the 27 page complaint?

11     A    Yeah.

12     Q    What did you discuss?

13     A    That I should have got out when Pollard had

14          come in.  That I knew her for what she was,

15          that I knew Solomon for what he was, that I

16          was stupid enough to trust the son of a

17          bitch that he'd keep his word to me.  Dirty

18          bastard.

19     Q    What was the word that he didn't keep to

20          you?

21     A    He wanted to slam down on me with that

22          stupid setup, and I believed when they said

23          sign and leave and that's it.  For some

24          reason I stupidly trusted that that man had

```
1                                                        35
2                   some level of integrity.  Big mistake on my
3                   part.
4         Q    You trusted----
5         A    He promised.  They arranged a setup.  I
6                   wanted out.  They'd made my life miserable.
7         Q    When you say he promised, who are you
8                   referring to?
9         A    Solomon.
10        Q    What exactly did he promise you, sir?
11        A    I put the exact words right in that
12                  Complaint.
13        Q    Could you look at Exhibit 1 and tell us
14                  what you're referring to.
15        A    It's right in here.
16        Q    Could you read from which paragraph and the
17                  text of the paragraph that you're referring
18                  to, please.
19        A    It starts with 99 and goes forward.  A lot
20                  of them are in quotes.
21        Q    I'm asking not necessarily what the nature
22                  of your conversations were with Chief
23                  Solomon, but what the promise was that was
24                  made to you.
```

```
 1                                                        36
 2        A    The threat that was made to me at that
 3             point in time is that I would be arrested,
 4             handcuffed, and dragged out of the
 5             building.  The exact words, dragged out of
 6             the building, unless I signed the
 7             resignation.  If I did, nothing would
 8             happen, I would go on and that would be
 9             that.
10        Q    So the promise was that if you signed the
11             resignation letter nothing would happen?
12        A    That's what he was saying.  It's right in
13             here.
14        Q    Where is that in the Complaint?
15        A    It starts at like 105 forward.
16        Q    Could you refer to specific paragraphs and
17             sentences, please.
18        A    109 refers to the threat about the
19             handcuffs.  110 is the threat again.  111
20             is the threat again.  Then the rest of it.
21             I do know that at that point in time that
22             is what he was saying.  I can sit here and
23             read it but it's in here.
24        Q    I understand that you're talking about what
```

1                                                                37

2              you've characterized as threats.  Do you

3              distinguish between threats and promises?

4      A      Yes.

5      Q      Because I certainly do, and I would like

6              you to point out to us where there's been a

7              promise here that you articulated in the

8              Complaint that has been breached.

9      A      Would you give me some time.

10     Q      Absolutely.

11     A      I'm not sure if it's in here or the MCAD.

12             101 is one of the references. 110.  In a

13             quick read, that's what I remember here.

14     Q      Essentially the promise was that it would

15             be kept out of the papers, then?

16     A      The promise was that I could leave, which I

17             then did.  As soon as I signed I was out

18             the door.  They escorted me upstairs and I

19             was out the door.  When I was upstairs, he

20             made the promise again and told me, as a

21             matter of fact, my stuff would be taken

22             out, but they would do it and do it at

23             night so nobody would know.

24     Q      So the promises were you could leave the

```
1                                                          38
2                 building.
3         A       That I would not be arrested.
4         Q       That didn't happen, right?
5         A       Correct.
6         Q       The other promise was that it would be kept
7                 out of the papers?
8         A       Correct.
9         Q       Is that the extent of the promises that
10                Solomon made to you on February 16, 2005?
11        A       Promises versus threats?
12        Q       I asked you about promises.
13        A       Yeah.  If I signed I could leave.  I would
14                not be arrested or prosecuted, and it would
15                be kept out of the papers and kept quiet.
16        Q       You allege that that promise was breached?
17        A       Yeah.
18        Q       Have you had any conversations with any
19                media about this case?
20        A       Most of it I put over to counsel.
21        Q       So you have, in fact, had conversations?
22        A       Frankly, one day they called my house and I
23                was drunk, and I answered the phone as if I
24                was at work and said solicitor's office.
```

```
1                                                39
2                  Then I kind of declined and passed it over
3                  to my counsel.
4        Q   Have you ever initiated any conversations
5                  with media about this case yourself?
6        A   You're talking this federal litigation?
7        Q   I'm talking about the situation.
8        A   Initiated, no.
9        Q   Could you summarize your education for us.
10       A   Tenney High School for a high school
11                 degree; Northeastern University, a
12                 bachelor's degree in political science;
13                 Suffolk University Law School, a JD.
14       Q   When did you get the high school diploma?
15       A   1967.
16       Q   And the Northeastern degree?
17       A   1972.
18       Q   And the JD?
19       A   1977.
20       Q   What was your first legal job after you
21                 graduated from law school?
22       A   I worked in an office with an attorney,
23                 Smith Williams.
24       Q   For how long?
```

```
 1                                                        40
 2          A    December 1977 until May 1980.
 3          Q    Any part-time employment during that
 4               period?
 5          A    No.
 6          Q    What was the nature of the work that you
 7               did at Smith Williams?
 8          A    General practice.
 9          Q    What was your next job?
10          A    City solicitor.
11          Q    When officially did you begin your job as
12               the city solicitor?
13          A    May 1980.
14          Q    Was there any part-time employment between
15               May 1980 and February 16, 2005?
16          A    One time for a community, I handled it was
17               -- I was the arbitrator in a dispute.
18          Q    That's the only instance of part-time
19               employment?
20          A    I taught a law school course.
21          Q    What was the subject of the course?
22          A    Zoning.
23          Q    Have you exhausted your memory of part-time
24               employment?
```

```
 1                                                        41
 2          A    From 1980 to 2005?
 3          Q    Yes, sir.
 4          A    I believe that was it.  Part of the deal
 5               when I took over as solicitor it was
 6               understood no outside work.
 7          Q    Have you attended any continuing education
 8               courses since you began as the city
 9               solicitor?
10          A    Yes, CLEs.
11          Q    Could you tell us what they are and when
12               you took them.
13          A    It would be municipal law issues and
14               anything related to municipal law.
15          Q    Civil rights?
16          A    Yes.
17          Q    Employment law?
18          A    Yes.
19          Q    Issues relating to contract negotiations?
20          A    Yes.  Zoning, labor relations.
21          Q    Do you have a business card presently?
22          A    Not on me, but I have one, yes.
23          Q    What does it say?
24          A    Law Office of Maurice Lariviere.
```

```
 1                                              42
 2        Q    Do you advertise at all or have a website?
 3        A    No.
 4        Q    Word of mouth is how you get business?
 5        A    Yes.
 6        Q    Besides your law license, do you hold any
 7             other professional licenses?
 8        A    No.
 9        Q    Have you obtained any professional
10             certificates since your graduation from
11             Suffolk Law School?
12        A    No.
13        Q    Have you been a member of any professional
14             or trade organizations since you graduated
15             from law school?
16        A    Yes.
17        Q    Could you tell us what they are.
18        A    MBA, MATA, there's the International
19             Municipal Lawyers Association, City
20             Solicitors and Town Counsel Association.
21        Q    Do you know if there have been any Board of
22             Bar Overseer proceedings arising out of Ms.
23             Metin's complaints?
24        A    No, there have not.
```

```
1                                                      43

2          Q    Has your license ever been suspended for

3               any reason?

4          A    No.

5          Q    Has there ever been an investigation into

6               your conduct in the practice of law at the

7               BBO?

8          A    No.

9          Q    How would you characterize the nature of

10              your association with Attorney Copani?

11         A    Friends.

12         Q    But on a professional level, what's----

13         A    On a couple of occasions he's had me handle

14              a case for him.

15         Q    Do you pay rent at his office?

16         A    No.

17         Q    In exchange for your use of the office, do

18              you provide anything to Attorney Copani?

19         A    Once in awhile he'll ask me if I'm familiar

20              with a particular issue of law or seek

21              advice on it.

22         Q    Are you a member of any unions?

23         A    No.

24         Q    Have you ever been?
```

```
 1                                                    44
 2        A    No.
 3        Q    Since February 16, 2005, have you sought
 4             employment other than at Attorney Copani's
 5             office?
 6        A    Yes.
 7        Q    Could you describe the nature of your job
 8             search.
 9        A    Obviously looking for an attorney's
10             position.  I've put in about, through hard
11             mail filing and e-filing, four hundred
12             applications.
13        Q    Have you been offered any positions?
14        A    No.
15        Q    Have you gone on any interviews?
16        A    Yes.
17        Q    How many?
18        A    Two, I believe.
19        Q    Where were they?
20        A    The last one was for the Greater Lowell
21             Techical High School, they were looking for
22             a labor relations attorney.
23        Q    Were you given a reason why you weren't
24             offered the position?
```

```
 1                                                  45

 2      A    No.

 3      Q    What was the other interview?

 4      A    Newton.  City solicitor's office in Newton.

 5      Q    Were you given a reason why you were not

 6           offered the Newton city solicitor position?

 7      A    No.

 8      Q    Did the MCAD litigation or the instant

 9           litigation----

10      A    I'm sorry, there was a third one.  I do

11           recall now.  I went to the Attorney

12           General's office.

13      Q    Which department at the AG's office?

14      A    Government.

15      Q    With respect to all three interviews, did

16           the topic of this litigation or the MCAD

17           litigation arise?

18      A    Yes.

19      Q    Were you given either the MCAD or the

20           instant case as a reason why you were not

21           offered any of those three positions?

22      A    Openly, no.

23      Q    Have you sought any employment outside of

24           the legal field?
```

```
 1                                                    46

 2        A    Yes.

 3        Q    In what fields?

 4        A    Like insurance sales.  That would have been

 5             May '05, somewhere around there.

 6        Q    Are you still actively looking for

 7             employment?

 8        A    Yeah.

 9        Q    Yes?

10        A    Yes.

11        Q    Do you typically put your salary

12             requirements in your cover letters?

13        A    No.

14        Q    Did you proof read your letters before you

15             sent them out?

16        A    Yes.

17        Q    Have you ever collected unemployment

18             benefits?

19        A    No.

20        Q    Workers' compensation?

21        A    No.

22        Q    Have you ever filed a workers' comp claim?

23        A    No.

24        Q    Have you ever served in the military?
```

```
1                                                          47

2        A    Yes.

3        Q    Which branch?

4        A    The United States Army.

5        Q    What years?

6        A    It was in the reserves, '73 to '79.

7        Q    What was your highest rank?

8        A    I was an officer, so when I went out they

9             give you the one last promotion, and I was

10            promoted to captain.  I served as first

11            lieutenant and second lieutenant.

12       Q    Were you honorably discharged?

13       A    Yes.

14       Q    Because it's close to Veterans Day I'll

15            thank you for your service, and I truly

16            mean that.  Veterans day was one of these

17            past few days, wasn't it?

18       A    Yes, it was.

19       Q    Any criminal convictions at any point?

20       A    Traffic tickets.

21       Q    Besides motor vehicle infractions?

22       A    No.

23       Q    Prior to February of 2005, had you ever

24            been questioned by a police officer or a
```

```
 1                                                    48

 2             police department for any reason?

 3      A      Yes.

 4      Q      On how many occasions?

 5      A      When I was either 17 or 18, a friend and

 6             myself were driving around in a car and we

 7             had a couple of beers and the police pulled

 8             us over.

 9      Q      Other than that instance, any other

10             occasions when you were questioned by

11             police?

12      A      No.

13      Q      Besides the instant litigation, have you

14             ever filed another lawsuit?

15      A      No.

16      Q      Have you ever filed a lawsuit on behalf of

17             your children?

18      A      No.

19      Q      Has your wife ever filed a lawsuit?

20      A      No.

21      Q      Have you ever been a defendant before

22             outside of your capacity as city solicitor?

23      A      Outside of my capacity as solicitor, no.

24      Q      How about inside your capacity?
```

1                                                                49

2          A     Yes.

3          Q     On how many occasions?

4          A     Not counting any of this situation,

5                correct?

6          Q     We know about the MCAD case.  Aside from

7                that case.

8          A     There's a fellow named Matthew Chiara who

9                was looking to have some property rezoned,

10               then at another time to get a wetlands

11               permit, and he filed a suit in Federal

12               Court.

13         Q     Any other lawsuits that you can recall?

14         A     No.

15         Q     When did you move to Windham?

16         A     1986.

17         Q     Have you lived there since?

18         A     Yes.

19         Q     Where did you live prior to that?

20         A     Wakefield.

21         Q     How long did you live in Wakefield?

22         A     1977 to 1986.

23         Q     Was there ever a period of time when you

24               lived in Methuen?

```
1                                                          50

2        A    Yes, I lived there until I was 25.

3        Q    So you were essentially born and raised in

4             Methuen?

5        A    Yes.

6        Q    Were you born in Methuen?

7        A    No, they didn't have a hospital when I was

8             born.

9        Q    Your father was a police officer, correct?

10       A    Yes, he was.

11       Q    Any other relatives that were police

12            officers with any police department?

13       A    I have a cousin who is a police officer.

14       Q    In Methuen?

15       A    Yes.

16       Q    What is his or her name?

17       A    William Raino.

18       Q    Is he presently a----

19       A    Retired.

20       Q    In the Complaint you've alleged that the

21            city solicitor's position that you held was

22            a two year position, is that right?

23       A    That's correct.

24       Q    Was there a document that memorialized that
```

```
1                                                    51
2                   agreement between the city solicitor and
3                   the city of Methuen?
4          A        The charter.
5          Q        Other than the charter, was there a
6                   document that you know of that memorialized
7                   the dates of your appointment and the terms
8                   of your employment?
9          A        The only other documents would be the
10                  minutes when I was reappointed.  Or then
11                  the city clerk would give you a certificate
12                  when you were appointed or reappointed.
13         Q        When was your last two year appointment
14                  prior to your resignation?
15         A        January 2005.
16         Q        Officially did the appointment take place
17                  as a city councilors meeting?
18         A        Yes.
19         Q        Or at a city council meeting, I should say?
20         A        A city council meeting, yes.
21         Q        Did the mayor at that time have any role in
22                  your appointment?
23         A        My understanding is she was trying to knock
24                  it out, but it was unsuccessful.
```

```
 1                                              52
 2        Q    Anything in the minutes that might suggest
 3             that?
 4        A    No.
 5        Q    On what do you base your understanding that
 6             she was trying to knock your appointment
 7             out?
 8        A    The current mayor.
 9        Q    What specifically have you learned from the
10             current mayor?
11        A    He apprised me whenever Pollard was talking
12             about me what she was saying.
13        Q    Do you have a specific memory what you were
14             told with regard to your January 2005
15             appointment?
16        A    Specific words, no.
17        Q    What was the general tenor?
18        A    The general tenor is that it had been since
19             2001 that she wanted to get me.
20        Q    Did you have an employment contract with
21             the city of Methuen for your appointment
22             post January 2005?
23        A    My benefits are set by ordinance and
24             statute.
```

```
1                                                    53
2         Q     So that there wasn't an official contract
3               that discussed the terms and conditions of
4               your employment, is that right?
5         A     For the purposes of law, the ordinance -- I
6               hate to sound like an attorney on this one.
7         Q     That's okay, you are one.
8         A     A written contract document, no.
9         Q     So correct me if I'm wrong, the terms and
10              conditions of your employment as city
11              solicitor after January 2005, up until your
12              resignation, were governed by the city
13              charter and the minutes of the city council
14              meeting, is that your understanding?
15        A     Are you talking about the employment and
16              the benefits -- I'm sorry, I missed the
17              question.
18        Q     Let's start with the employment.
19        A     The appointment would be set in the charter
20              and confirmed in the minutes.
21        Q     How about your benefits, was there a
22              different set of documents or organizations
23              that set the terms and conditions of your
24              benefits?
```

```
 1                                                    54
 2      A    Yes, Chapter 6 of the Methuen Municipal
 3           Code establishes the benefits and salaries,
 4           and then the statute deals with retirement
 5           and health insurance.
 6      Q    Could you look at Exhibit 2, please.
 7      A    Yes.
 8      Q    Could you identify that document for the
 9           record.
10      A    That's the sexual harassment policy of the
11           city of Methuen.
12      Q    Was Exhibit 2 the sexual harassment policy
13           that was in place in February of 2005?
14      A    Yes, however some pages are missing.
15      Q    What pages are missing, to your memory?
16      A    The last page, I believe
17
18                (OFF THE RECORD DISCUSSION)
19
20      Q    We'll try to get the complete copy of
21           Exhibit 2.  Did you have any role in
22           preparing Exhibit 2?
23      A    Yes.
24      Q    What was your role?
```

```
 1                                                    55

 2        A     I brought it to the mayor's attention, the

 3              then current mayor, Pollard, that we needed

 4              to have online a sexual harassment policy.

 5              I advised her that there's a model policy

 6              done by MCAD.  Frankly, if you look at

 7              this, what it is is a model policy MCAD

 8              with just inputting reference to Methuen.

 9        Q     When was that conversation with Mayor

10              Pollard?

11        A     She signed the policy in 2002, so it would

12              have been right around then.

13        Q     When the mayor signed the policy, what

14              legal effect did it have?

15        A     We were mandated to be having that, and

16              then to be distributing it.  So the legal

17              effect is compliance with the statute.

18              Again, I hate to sound like an attorney.

19        Q     That's okay.  You are an attorney and also

20              a witness.  The Sexual Harassment Policy

21              that we've marked as Exhibit 2, was that

22              incorporated into the city charter?

23        A     No.

24        Q     Does the city charter discuss the sexual
```

1                                                          56

2              harassment policy in any regard?

3        A    No.

4        Q    Do you agree that your employment as city

5              solicitor was conditioned upon compliance

6              with Exhibit 2?

7        A    No.

8        Q    In other words, if you've violated sexual

9              harassment policy, how would that impact

10             your employment as city solicitor?

11       A    That would be a decision placed in the

12             hands of the city council after a hearing.

13       Q    In your experience as a city solicitor, and

14             an employee of Methuen, when the sexual

15             harassment policy was violated, what

16             happened to that employee?

17       A    It would be handled with the interest of

18             meeting the statute, the issue, and how to

19             deal with it the best way.  Never

20             criminally, always civilly, and in all the

21             cases I handled, quietly.

22       Q    During your term as city solicitor, were

23             there any sexual harassment investigations

24             that arose?

```
 1                                                    57

 2        A    Yes.

 3        Q    Were any of those investigations post-

 4             adoption of Exhibit 2?

 5        A    I don't believe so.  Give me one second,

 6             please.  There was one that could have been

 7             right around that timeline, and I'm not

 8             sure if it was before or after but it was

 9             in that time area.

10        Q    Did you ever perform any investigations of

11             sexual harassment claims as city solicitor?

12        A    Yes.

13        Q    How many?

14        A    Three or four.

15        Q    Do you recall the names of any of those

16             investigations, names of the employees?

17        A    This is where we enter into that field,

18             you're the city of Methuen, are you

19             indicating that I am supposed to respond to

20             that even if it's attorney-client?

21        Q    You make that decision, sir.  I'm

22             representing the city in its capacity in

23             this case.  I'm asking you a question about

24             your knowledge of sexual harassment
```

```
1                                                    58

2              investigations.  I can't tell you how

3              you're supposed to respond.

4                    MR. DiADAMO:  Let's go off the

5              record for a second.

6

7              (OFF THE RECORD DISCUSSION)

8

9         Q    Without reference to names, identities of

10             alleged victims or employees or harassers,

11             could you tell us when, approximately, the

12             three or four investigations that you

13             conducted took place.

14        A    The most serious would have been '96 or

15             '97.  That would have been the most

16             serious.  There was one in the late '90s.

17             Then there was one, it could have been

18             2002, 2003.  It could have been as far back

19             as 2001, I'm not positive, but it's right

20             in that time frame.

21        Q    If the sexual harassment policy was

22             violated, did the city council have

23             authority to terminate an employee?

24        A    They had only three appointments, the mayor
```

```
 1                                              59
 2              was in charge of making all the other
 3              appointments.  The three appointments they
 4              had control of was city auditor, city
 5              solicitor and the council clerk.  They
 6              could override a termination of a
 7              department head or assistant department
 8              head.
 9       Q      Essentially, aside from those three
10              positions, all other city positions were
11              subject to the mayor's appointment?
12       A      Yes, discounting schools, also.
13       Q      The mayor would have the authority under
14              the city charter to terminate an employee
15              if they violated the sexual harassment
16              policy, is that a fair statement?
17       A      Yes, subject to a potential appeal.
18              There's an appeal right to the council for
19              some of the employees.
20       Q      Which employees are those?
21       A      Non civil service.  If you're civil
22              service, you would have the right to go to
23              the Civil Service Commission.  Non civil
24              service would be to the council.
```

1                                                              60

2     Q     The mayor in February of 2005 had no

3           authority under the city charter to

4           terminate you as city solicitor; is that

5           correct?

6     A     That's correct.

7     Q     The termination had to come from the city

8           council?

9     A     That's correct.

10    Q     Who would conduct a sexual harassment

11          investigation into the city solicitor in

12          February of 2005, civilly?

13    A     Under the policy, it would be the human

14          resources director.

15    Q     That was David Bain at the time?

16    A     That is correct.

17    Q     Then procedurally after Attorney Bain had

18          completed his investigation, what would

19          happen next?

20    A     Things are different between the civil

21          service position and non civil service

22          position.

23    Q     I'm talking only about city solicitor at

24          this point.

1                                                               61

2       A     The methodology is specified under the

3             charter as to how the process works.

4       Q     Could you tell us what it is.

5       A     Basically I would have to be alerted there

6             was something in gear for a disciplinary

7             action.  I would then have the right to be

8             present at any of the hearings, offer

9             testimony.  It would be an informal

10            judicial type of scenario, quasi judicial,

11            I guess you could call it.

12      Q     When you say the hearings, what are you

13            referring to, hearings before the council?

14      A     That's correct.

15      Q     You're not referring to interviews of

16            witnesses or anything in that regard?

17      A     Council has full authority to call in

18            witnesses.

19      Q     I understand that, but you as the person

20            against who the sexual harassment is

21            alleged, you didn't have any right to sit

22            in on interviews that Bain conducted,

23            right?

24      A     The initial interviews?

```
1                                                    62

2        Q    Any of them.

3        A    If there was going to be evidence offered,

4             yeah.  If there was going to be a

5             background interview, no.

6        Q    That's what I'm asking, if there was a

7             hearing before the city council, what was

8             your right as city solicitor if there was a

9             sexual harassment investigation into your

10            conduct?

11       A    It would be equivalent to any disciplinary

12            proceeding, it wouldn't be different.  It

13            would be equivalent to any other

14            disciplinary proceeding.  There would be

15            due process.

16       Q    What typically would occur at the city

17            council hearing into a sexual harassment

18            investigation?

19       A    Understand at this point in time that has

20            never occurred, so it would have to be an

21            analysis, not a reality.  It's never

22            occurred.

23       Q    Is there any document such as the city

24            charter or any policies or procedures that
```

1                                                          63

2              tell us how it would proceed?

3     A    Yes.

4     Q    What would that be?

5     A    Charter, and obviously there's federal

6          decisions.

7     Q    Do you know if the city council ever

8          terminated an employee for sexual

9          harassment?

10    A    To my knowledge and memory, they've never

11         terminated an employee.  By terminated, you

12         mean get rid of them during their term, not

13         reappoint.  No, it's never occurred, to my

14         knowledge.

15    Q    How about the mayor, any mayor, has any

16         mayor ever terminated an employee for

17         sexual harassment?

18    A    No.

19    Q    In relation to any allegations of sexual

20         harassment, as city solicitor did you ever

21         negotiate a departure of an employee that

22         wasn't considered a termination?

23    A    Yes.

24    Q    Some of those were for sexual harassment,

```
 1                                                    64

 2            correct?

 3       A    I'm sorry, now that I recall it, part of my

 4            testimony is incorrect on the termination

 5            for sexual.  It wasn't sexual harassment,

 6            but there was a cop that was convicted of

 7            rape.  He was terminated not under the

 8            sexual harassment policy but just in and of

 9            itself the conviction.

10       Q    But as to allegations of sexual harassment,

11            has the city council ever terminated an

12            employee for a violation of that?

13       A    No.

14       Q    Your testimony is there's never even been a

15            hearing before the city council in that

16            regard?

17       A    On a termination?

18       Q    No, on a sexual harassment investigation.

19       A    No.

20       Q    There hasn't?

21       A    No.

22       Q    How about the mayor, has the mayor ever

23            terminated an employee for violation of the

24            sexual harassment policy?
```

```
1                                                      65
2      A    We've had agreements -- you're talking an
3           absolute termination?
4      Q    Yes.  We'll get to the agreements later.
5      A    No.
6      Q    You have negotiated as the city solicitor
7           departures of employees for violation of
8           the sexual harassment policy, correct?
9      A    For sexually related matters, yes.
10     Q    On how many occasions?
11     A    There's one I remember very clearly.
12     Q    Again, we don't want to get into
13          specifics.
14     A    How many were there is the question.  One,
15          to my memory.
16     Q    Was part of the terms and conditions of
17          that departure a resignation by the
18          employee?
19     A    It was a retirement.  A person took a
20          retirement.
21     Q    A voluntary retirement?
22     A    Yes.
23     Q    You, as city solicitor, have negotiated
24          voluntary resignations of city employees,
```

```
 1                                                    66

 2              correct?

 3       A      Yes.

 4       Q      On how many occasions?

 5       A      I was there twenty-five years so it would

 6              be -- honest to God it would be a pure

 7              guess -- I'm saying it's between 6 and 10,

 8              maybe.  But I would be truthfully guessing

 9              at that point.

10       Q      Could you look at Exhibit 3, please.

11       A      Yes.

12       Q      Could you identify Exhibit 3.

13       A      May I have a moment to read it?

14       Q      Yes, sir.

15       A      May I apprise you of one thing before we

16              get into specific questions.  Sean Cronin

17              has now filed a court action, I don't know

18              if you're aware, against Methuen.

19       Q      That's fine.  I'm asking about this

20              document.

21       A      It is in relation to the documents and what

22              occurred later.

23       Q      It's a public record.

24       A      This?  I don't know if we made it public.
```

```
 1                                                      67
 2        Q    Where does it say it's not in the document?
 3        A    On matters relating to personnel, we always
 4             would attempt to have that as an exemption
 5             from public records.
 6        Q    You negotiated this contract, yes or no?
 7        A    Yes.
 8        Q    Did you draft the document?
 9        A    Yes.
10        Q    Have you drafted similar documents for
11             resignations of employees?
12        A    Oh, yes.
13        Q    As the city solicitor, did you offer advice
14             regarding the sexual harassment policy to
15             different city departments and their
16             division heads?
17        A    Yes.
18        Q    That was part of your role, correct?
19        A    Basically after we formed the human
20             resources department, it fell onto the
21             shoulders of the human resources officer,
22             but before that, yes.
23        Q    Would you advise different city officials
24             as to disciplinary actions that should be
```

```
1                                                    68
2              taken in response to a sexual harassment
3              claim?
4      A       I'm trying to think.  I want to make sure
5              I'm not wandering over the line on
6              attorney/client. I can speak generically.
7              The two areas I pushed them on were the
8              retaliatory clause, number one, and number
9              two was the conducting of an investigation.
10     Q       You also from time to time advised on
11             appropriate discipline.
12     A       Not really.  From a lawyer's perspective, I
13             never looked on whether it was just or
14             unjust, I was looking on would it would be
15             upheld, to be honest with you.  For
16             example, it's civil service, so it would be
17             a matter of what action do you want to
18             take, tell me, I'll see if I can find
19             references that will justify that action.
20     Q       You would advise that employee as to
21             whether it was legally appropriate?
22     A       I would be advising the mayor, town manager
23             or department head.
24     Q       Do you agree that you had an intricate
```

1                                                            69

2              knowledge during your tenure as city

3              solicitor of employment laws that related

4              to sexual harassment?

5                       MR. DiADAMO:  Objection.

6       A    I was aware of them.

7       Q    Did you ever defend a sexual harassment

8              case on behalf of the city that went into

9              litigation?

10      A    I handled sexual discrimination cases.  I

11             don't recall a sexual harassment case going

12             into litigation.  Sexual discrimination,

13             yes.

14      Q    You managed the outside counsel that the

15             city had retained to defend itself against

16             employment cases in general, correct?

17      A    The only time we would have outside counsel

18             is if there was an insurance policy that

19             covered it.

20      Q    That happened from time to time during your

21             tenure, yes?

22      A    Yes.

23      Q    More than ten occasions?

24      A    You're talking sexual harassment?

```
1                                                    70
2        Q    I'm talking employment.
3        A    On the ten we're talking about, we were
4             talking about resignations, so it never got
5             anywhere.  It stayed in the room, so to
6             speak.  Is that what we're referring to?
7        Q    No.  We're referring to your role as city
8             solicitor in managing litigation.  That was
9             one of your job responsibilities, yes?
10       A    Principally I was the litigation.
11       Q    And sometimes outside counsel, right?
12       A    Yes.
13       Q    You said that you never defended any sexual
14            harassment cases that went into litigation
15            against the city, yes?
16       A    To my memory the only one that was ever in
17            litigation was that rape case, but it
18            wasn't so much sexual harassment.  It was a
19            suit against the city under a 1983.
20       Q    Any others besides that case?
21       A    Not to to my memory, no.
22       Q    Did you manage outside counsel that handled
23            the defense of sexual harassment cases
24            against the city?
```

```
1                                              71
2        A    I'm dividing between discrimination and
3             harassment with harassment being a quid pro
4             quo of a hostile work environment.  That's
5             the category I'm in.  There's only one that
6             I'm aware of that's currently handled by an
7             insurance company.  I handled the
8             retirement piece of it, but it's handled by
9             an insurance company that's still in the
10            works.
11       Q    You played a role in defending that case,
12            in fact, right?
13       A    They would communicate with me
14            periodically, mainly insurance counsel tend
15            to disappear into the wind.
16       Q    Did you ever attend any CLEs on sexual
17            harassment?
18       A    I know they gave CLEs, it would be
19            municipal law, and a piece of that would be
20            sexual harassment.
21       Q    But you can't tell us whether or not you
22            had an intricate knowledge of sexual
23            harassment law in the field of a
24            municipality?
```

```
1                                               72
2                     MR. DiADAMO:  Objection.
3         A    You use the word intricate.
4         Q    How would you characterize your knowledge,
5              sir?
6         A    I'm familiar with it.
7         Q    How about labor relations, you agree that
8              you were familiar with that field of law as
9              well, right?
10        A    Oh, yes.
11        Q    You told us already that you negotiated
12             many departures of employees on behalf of
13             the city, yes?
14        A    I would say six to 10 over the time, yes.
15        Q    Some of those were resignations?
16        A    Yes.
17        Q    You've also advised the city on termination
18             of employees, right?
19        A    Yes.
20        Q    Would you say that you had an intricate
21             knowledge of labor relations as it applied
22             to the city of Methuen?
23                     MR. DiADAMO:  Object to that.
24        A    Yes.
```

```
1                                              73
2                    MR. NOTIS:  What is the
3            objection?
4                    MR. DiADAMO:  I don't know what
5            intricate means.
6                    MR. NOTIS:  You're objecting to
7            the form.
8                    MR. DiADAMO:  Yes, I'm objecting
9            to the form because I think the word
10           intricate could be misleading.
11      Q    What does intricate mean to you, sir?
12      A    To me I'm taking it as 98 percent knowledge
13           of the field.  That's why I can't say I
14           have 98 percent knowledge of a particular
15           law.  I do have in-depth knowledge, and I
16           hate to dance words.  If you're asking me
17           did I have an in-depth knowledge of labor
18           law, yes.
19      Q    In-depth knowledge of sexual harassment
20           law?
21      A    I was familiar with it, yes.
22      Q    In-depth knowledge of employment law as it
23           pertained to the city of Methuen?
24      A    Public employment law, yes.
```

```
 1                                              74
 2      Q    How about the retirement system, did you
 3           have an in-depth knowledge of the
 4           retirement system as it applied to the city
 5           of Methuen's employees?
 6      A    Yes, I was counsel for the retirement
 7           system.
 8      Q    What did that entail as counsel for the
 9           city?
10      A    Advising them on retirement law, and
11           representing them in appeals proceedings.
12      Q    Would you from time to time counsel
13           individual employees of the impact of their
14           decisions on their retirement benefits?
15      A    Yes, if I was told to by the
16           representatives of the retirement board.
17      Q    How many times did that occur?
18      A    I was there twenty-five years, again.  A
19           lot.
20      Q    Do you agree that for the employment
21           departures that you negotiated on behalf of
22           the city, all of those involved
23           implications on the employees' retirement?
24      A    I believe it would be reviewed in one
```

```
1                                                    75

2              fashion or another if it was brought up by

3              the employee or the union or the attorney

4              representing the employee.

5      Q      Not just the retirement, but the benefits

6              that they were entitled to as a result of

7              that departure?

8      A      I believe so.

9      Q      Could you look at Exhibit 4.

10     A      (witness complies)  I've gone through it,

11             yes.

12     Q      Do you recognize the document?

13     A      I believe so, yes.

14     Q      Have you seen it before today?

15     A      If memory serves me correctly, I probably

16             drafted it.

17     Q      That's all for the exhibit.  Do you agree

18             that you've convinced an employee who left

19             the employment of Methuen to forego an

20             administrative hearing in exchange for

21             their departure?

22     A      Can we go off the record for a second?

23

24                 (OFF THE RECORD DISCUSSION)
```

```
 1                                                      76

 2          Q    The question stands.  I'm asking you, sir,

 3               not to identify individual parties.

 4               Talking in general as city solicitor, did

 5               you ever convince an employee to leave the

 6               employ of the city of Methuen in exchange

 7               for foregoing an administrative hearing?

 8          A    That function would be bifurcated.  It

 9               would be the determination of the

10               department head whether or not the person

11               was suspended, terminated or whatever.  It

12               would be my function that if the question

13               was asked by counsel, or by themselves, or

14               by the union representative, to structure

15               any settlement in that fashion.

16          Q    You've seen that happen on occasion?

17          A    Where the department head or the mayor and

18               the employee and the union mutually agreed,

19               yes.

20          Q    You've defended the city against civil

21               rights claims?

22          A    Yes.

23          Q    On how many occasions?

24          A    I would say two or three.
```

1                                                                    77

2        Q     One was the Beal case?

3        A     Yes.

4        Q     Do you know the names of the other cases?

5        A     That's where I was having problems.  It's

6              some years back.

7        Q     Did you advance the qualified immunity

8              argument in any of the civil rights cases

9              that you defended for the city of Methuen?

10       A     Not to my memory, no.

11       Q     How about immunity on behalf of the city

12             itself as a party?

13       A     Yes.

14       Q     In the Beal case you did that, right?

15       A     The standard was deliberate indifference.

16       Q     You were successful?

17       A     Yes, as a matter of fact it was on the

18             basis of an agreement.

19       Q     Could you look at the Verified Complaint

20             again, specifically paragraph 104.

21       A     (witness complies)  Okay.

22       Q     When you refer to due process rights in

23             paragraph 104 of the Verified Complaint,

24             what did you mean by that?

```
1                                                      78
2        A    You're asking for a legal----
3        Q    Legal and factual.  You've told us you're a
4             lawyer, right?
5        A    Yes.
6        Q    You drafted the complaint?
7                      MR. DiADAMO:  Objection.
8        A    I'm not going to discuss matters involving
9             my counsel.
10       Q    You already told us you did earlier.
11       A    I was talking in the total.
12       Q    I'm not asking you, then, if you feel it's
13            attorney-client privilege, and your
14            attorney does, whether you drafted the
15            Complaint, I will withdraw that aspect of
16            the question.  This is a Verified Complaint
17            and you signed it, right?
18       A    Yes.
19       Q    You wouldn't have signed it under oath if
20            you didn't believe that the statements were
21            true, correct?
22       A    Yes.
23       Q    What did you mean by due process rights?
24       A    As far as my understanding?
```

```
1                                                    79

2        Q    Yes.

3        A    If you have a position with a municipal or

4             a state entity, then there are due process

5             rights.  It's considered a property right.

6        Q    What were the due process rights that you

7             allege you were denied in relation to this

8             lawsuit?

9                  MR. DiADAMO:  Objection.  You can

10            answer.

11       A    What had happened, there is case law out

12            there which says that there is a property

13            right if there is a process that must be

14            followed, then before there can be a

15            deprivation of that property right, it must

16            be complied with, and we've discussed about

17            the process with the city council.

18       Q    We talked about it with regard to a sexual

19            harassment allegation, correct?

20       A    No, the council authority is right across

21            the board.  It's not established simply on

22            sexual harassment, it's any form of

23            disciplinary action as it relates to their

24            employees.
```

```
1                                                    80

2         Q    Procedurally, what due process were you

3              entitled to, sir, as a result of the events

4              of February 16, 2005?

5                   MR. DiADAMO:  Objection.  You can

6              answer.

7         A    First of all, it would have to be the

8              appropriate party that would be in control

9              of the entire disciplinary process, which

10             would be the council.  Second of all, I

11             would have a right to be notified about it

12             and to be able to respond including

13             bringing counsel and the conducting of a

14             hearing.

15        Q    That would be if there was a sexual

16             harassment complaint against you?

17        A    Any form of disciplinary proceeding, and if

18             there was going to be a disciplinary

19             process then it would include that, yes.

20        Q    And that you would have some right of

21             appeal, I imagine?

22        A    Yes.

23        Q    Who would the appeal be to?

24        A    After the council?
```

```
 1                                                     81

 2        Q    Yes.

 3        A    It would go into the court system.

 4        Q    Is it your testimony that there was some

 5             discipline taken against you as a result of

 6             what happened on February 16, 2005?

 7        A    It was a hit.  We can call it what we want,

 8             it was a setup and a hit.

 9        Q    Procedurally under the city charter, was

10             there any discipline that was initiated

11             against you?

12        A    It depends upon what you're using the term

13             discipline.  If you use the cops to whack

14             somebody, yes, I guess you would call it

15             discipline.

16        Q    Let's talk about Fulya Metin.  When did you

17             first meet Fulya Metin?

18        A    I believe it was September 29th.

19        Q    Of 2004?

20        A    Yes.

21        Q    Where did you meet her?

22        A    David Bain brought her over to the office.

23        Q    Did you conduct an interview?

24        A    It was about a ten-minute discussion.
```

1                                                                    82

2      Q    Was Mr. Bain in the room?

3      A    I don't believe so.

4      Q    As a result of that conversation with Ms.

5           Metin, did you make a decision as to

6           whether or not you wanted her to be your

7           assistant?

8      A    Temporary.  To be brought in temporary

9           pending a job search for a permanent.

10     Q    Did you review her resume on that first

11          occasion when you met her?

12     A    No.

13     Q    When did you first review her resume?

14     A    I'm not sure, to be honest with you.

15     Q    Would you look at Exhibit 5.

16     A    Yes.

17     Q    Do you recognize Exhibit 5 to be Ms.

18          Metin's resume that you reviewed in

19          September of 2004?

20     A    It wouldn't have been September of 2004,

21          probably more I saw it somewhere in October

22          2004.

23     Q    Before her full-time hire?

24     A    Yes.

1                                                    83

2     Q    Incidentally, do you call her a secretary

3          or assistant, the position that she filled?

4     A    My intention was to convert her from a

5          secretary to a paralegal, but the status is

6          secretary.

7     Q    Your previous secretary, what was her name?

8     A    Diane Maciariello.

9     Q    She retired?

10    A    Yes.

11    Q    When was her last day of work?

12    A    August 2004.

13    Q    Did you know that she was leaving at some

14         point prior to the actual day she left?

15    A    Yes, she was kind enough to let me know

16         several months ahead so that I would have

17         the timeline to initiate the process and

18         make a hire.

19    Q    What did you do to initiate the process?

20    A    I went over and informed David Bain that

21         she was retiring.  I gave David Bain a job

22         description.  I told him I wanted to change

23         it from a secretary to a paralegal

24         specifically focused on litigation, and he

```
1                                                    84
2              then posted it through Boston Works and I
3              think a local paper.
4      Q       What was Ms. Metin's official title when
5              she was hired on a full-time basis?
6      A       Temporary.  I don't know if she had a
7              title.  She was a temporary contract
8              employee.
9      Q       Eventually when she obtained a full-time
10             position, what was her title?
11     A       Secretary.
12     Q       Did you experience any problems in getting
13             the position switched from a secretarial to
14             a paralegal position?
15     A       Yeah.
16     Q       Could you tell us what they were.
17     A       Well, I had given months in advance by my
18             secretary retiring, I had plenty of time to
19             fill the position, and I said I wanted to
20             shift it to a paralegal, but when I chose
21             people that would fill the job, the mayor
22             refused to hire them.
23     Q       Do you know the names of any of the people
24             that you wanted to hire that she refused to
```

```
1                                                    85

2              hire?

3        A     The top one, Gail Piccolomini.

4        Q     Any others?

5        A     No, Dave Bain would have those.

6        Q     What was the reason for Gail's non-hire

7              that you were given by the mayor?

8        A     I can only tell you what Dave Bain told me

9              because by that point in time if you'd go

10             in there to ask her for something, she

11             wouldn't do it for me, so I tried to have

12             Dave Bain do it.

13       Q     What did Bain tell you the reason was?

14       A     She said no.  Dictators aren't much for

15             explanation.

16       Q     Did the mayor interview Gail?

17       A     No.

18       Q     Just you?

19       A     Dave Bain and myself interviewed the

20             potential candidates.

21       Q     What was the criteria that you were looking

22             for to replace your old secretary?

23       A     Initially I wanted somebody with a

24             paralegal certificate.
```

```
1                                              86

2        Q    Anything else?

3        A    Gail Piccolomini, as it turned out, was a

4             recent admitted to the bar, so that's what

5             led my choice, quite frankly.

6        Q    So aside from a paralegal certificate, what

7             other duties and responsibilities and

8             qualifications were you looking for in a

9             candidate?

10       A    Highest level would be litigation

11            experience.  Below that would be municipal

12            experience.

13       Q    Anything else?

14       A    Those would be the "primal" ones.

15       Q    You did, in fact, decide that you wanted to

16            have Metin hired as a temporary employee,

17            right?

18       A    Yes.

19       Q    Then you made that request to Bain?

20       A    I made the agreement.  He had brought her

21            over as the temporary, and I said okay,

22            that's fine.

23       Q    Did the mayor have to approve of that

24            temporary hire?
```

```
 1                                                    87
 2        A    Yes.
 3        Q    Did you have any discussions with the mayor
 4             about your hire of Metin?
 5        A    No.
 6        Q    Do you know if Bain did?
 7        A    No, I do not.
 8        Q    Did he ever discuss with you what the mayor
 9             said about Metin's hire?
10        A    No.
11        Q    So basically the decision was yours whether
12             or not to hire Fulya as your secretary on a
13             temporary basis?
14        A    The decision was to bring somebody in
15             during that transition, and I said fine.
16             Dave brought her in, and I said fine, let
17             her start.
18        Q    You didn't review her resume at that time,
19             that was your testimony, right?
20        A    Correct.
21        Q    You then ultimately made the decision to
22             hire her on a full-time basis or at least
23             make that request, right?
24        A    Yes.
```

1                                                              88

2        Q    You made that request to the mayor or to

3             Bain?

4        A    Bain.

5        Q    Then Bain in turn made it to the mayor?

6        A    To my knowledge, yes.

7        Q    Any problems with the approval of her as

8             your full-time secretary?

9        A    The only problem that I'm aware of is

10            because she was a temp there was a twelve

11            week period that we would have to

12            compensate the employment agency for, and

13            the mayor, from what I'm told by Bain, had

14            said no to that, so she had to remain in a

15            temporary status until December 27th.

16       Q    You told us about some resistance on the

17            mayor's part to Gail, right?

18       A    Gail and several others, yes.

19       Q    Did you meet any resistance except for with

20            respect to her temporary status with regard

21            to Ms. Metin?

22       A    To my memory, no.

23       Q    Before you hired her as full time employee,

24            you reviewed her resume, Exhibit 5?

```
 1                                              89
 2          A    I believe so, yes.
 3          Q    What was it about her experience that
 4               qualified her to fill the position?
 5          A    Truthfully, we got along really well.
 6          Q    Anything else?
 7          A    She had some experience in a law office.
 8          Q    Did any of that involve litigation?
 9          A    She had some knowledge of litigation, but
10               it was criminal.
11          Q    How about municipal experience?
12          A    No.  To my knowledge, no.
13          Q    So the only reason that you saw fit to hire
14               her as a full-time employee was you got
15               along really well with her.
16          A    Truthfully, yes.
17          Q    Do you agree that she really wasn't
18               qualified to fill that position?
19          A    She needed training, yes.
20          Q    At the time of full-time hire she needed
21               training, correct?
22          A    Yes.
23          Q    What training did you think she needed?
24          A    I wanted her ultimately to get a paralegal
```

```
 1                                                      90

 2                 certificate, and that's one of the things I

 3                 asked her to do as a condition.

 4        Q    Did you ever discuss with the mayor at any

 5                 time, Mayor Pollard, former Mayor Pollard,

 6                 Metin's qualifications?

 7        A    No.

 8        Q    Did you ever discuss with former Mayor

 9                 Pollard anything about Metin's job

10                 performance?

11        A    No.

12        Q    Did you have any direct conversations with

13                 former Mayor Pollard about the hire of Ms.

14                 Metin?

15        A    I'm sorry, let me correct my earlier

16                 answer.  Around late January, early

17                 February, I had asked the mayor to count

18                 her temporary time towards all calculations

19                 for her position, and she had agreed to

20                 that.

21        Q    That was a direct conversation, it didn't

22                 go through Bain, right?

23        A    It was just before a council meeting, I

24                 walked in her office and asked her and she
```

```
 1                                                     91
 2              said okay.
 3         Q    Did the former mayor interview Metin?
 4         A    My understanding is yes.
 5         Q    Did you ever learn how the interview went
 6              or what was discussed in the interview?
 7         A    Yeah.  Fulya came back very happy, and it's
 8              in the Complaint what occurred.
 9         Q    What is the synopsis of what occurred?
10         A    She came back in the office gleeful as
11              anything and came running over and threw
12              herself into my arms.
13         Q    Did she tell you anything about her
14              conversations with Mayor Pollard?
15         A    Just that the thing went very well, and she
16              was going to get the job, and she thought
17              at that point in time it was going to be
18              immediate.
19         Q    Did you ever learn from any source that
20              former Mayor Pollard really didn't want to
21              hire Fulya Metin?
22         A    No, I've never heard that.
23         Q    Have you ever heard that she relied on your
24              recommendation to hire her as a full-time
```

```
1                                                    92
2              employee when she approved of Metin's
3              employment?
4     A        No.
5     Q        You disagree with that?
6     A        Yes.
7     Q        Why?
8     A        Understand that what we're doing is hiring
9              a secretary, and mayors typically don't
10             interview -- a mayor wouldn't be
11             interviewing a secretary.  A department
12             head position, an assistant head, but she
13             took direct control of the hiring process.
14             I was never asked to get involved.  I
15             wasn't even invited to the interview.
16    Q        We're going to talk about your relationship
17             with Metin.  Keeping in mind that the
18             statute of limitations period may not have
19             run and any criminal proceedings, are you
20             willing to answer questions knowingly and
21             voluntarily today?
22    A        Yes, subject to advice of counsel.
23
24                          LUNCH RECESS
```

```
1                                                    93
2        Q    Do you deny touching Fulya Metin at work at
3             any time?
4        A    No.
5        Q    So you agree that from time to time you did
6             make physical contact with her?
7        A    Yes.
8        Q    At any point was any of that contact
9             unwanted by her?
10       A    No, to my knowledge.
11       Q    She never told you to cease touching her
12            physically in any regard?
13       A    No.
14       Q    Did she ever imply that to you?  Maybe she
15            didn't say it in words, but that you felt
16            that she implied that the physical
17            touchings were unwanted?
18       A    No.
19       Q    At some point did you ask Ms. Metin to go
20            on a vacation to the Mediterranean?
21       A    She told me a lot about Turkey, and quite
22            frankly I never paid attention to that
23            country, but as she described it to its
24            history it was very interesting.  As a
```

```
 1                                                        94

 2              matter of fact, we went to Barnes & Noble,

 3              she said let's go there and she wanted to

 4              show me some books on Turkey, and I

 5              jokingly said to her, yeah, we ought to go

 6              there some day.

 7      Q       So it was in jest, from your perspective?

 8      A       Yes.

 9      Q       But you did make the remark?

10      A       Oh, yes.

11      Q       Could you look at Exhibit 7, please.

12      A       Yes.

13      Q       Have you seen this document before?

14      A       Yes.  Do I remember every word, no.

15      Q       Neither do I.  What do you recognize the

16              document as?

17      A       My understanding is after the incident, so

18              to speak, she prepared this, or before,

19              it's one way or the other, I forget

20              exactly, but it was right around that point

21              in time.

22      Q       I'm going to ask you to read -- why don't I

23              read it into the record and then I'm going

24              to ask a question, okay?
```

```
 1                                              95
 2        A    Sure.
 3        Q    Then we'll go through some of the aspects
 4             of the statement.  About five or six
 5             sentences in, Ms. Metin wrote about the
 6             fourth or fifth day into the assignment,
 7             Maurice was acting a little too nice to me,
 8             and I thought he was a little strange, but
 9             I brushed the thoughts aside.  On that day,
10             by the file room near the doorway near the
11             entrance to the office, he came up to me
12             out of nowhere and grabbed me and kissed me
13             on the lips.  Do you recall that incident?
14        A    No.
15        Q    Do you deny that it occurred?
16        A    Yes.
17        Q    Later on in the statement, about halfway
18             through the first page she wrote, the days
19             at the office would be getting my work done
20             but often almost on a daily basis he would
21             come over to my desk and make stupid
22             comments about me being in a bathing suit
23             or stare at my chest or just stare at me
24             all the time and make me feel
```

```
1                                                              96

2                    uncomfortable.  Do you recall making

3                    comments about Ms. Metin in a bathing suit?

4         A          I remember our discussing where her

5                    mother's place was they have a pool, and we

6                    talked about that once.  She was talking

7                    about being at the pool, and I asked her

8                    what kind of bathing suit did she wear.

9         Q          What was her response?

10        A          A bikini.

11        Q          Why did you ask her about her bathing suit?

12        A          Didn't have any particular reason, just

13                   asked the question since we were talking

14                   about the pool.

15        Q          Did you feel that that was an appropriate

16                   topic of discussion in the workplace?

17        A          It's all based upon the person you're

18                   dealing with.  Some are hypersensitive,

19                   some you don't know.  If you know somebody,

20                   you're friendly with somebody, you talk

21                   differently.

22        Q          So in some cases that was appropriate and

23                   in some cases it wasn't, is that your

24                   testimony?
```

```
 1                                                     97
 2        A    I didn't notice it being improper or her
 3             taking offense at it.
 4        Q    Later on she wrote, will I run away with
 5             him somewhere to the Mediterranean, do I
 6             like it if he touches me or hugs me and I
 7             would say to him and just try to get away
 8             from him, avoid him by changing the subject
 9             and try to get away from him.  With regard
10             to that statement, do you recall asking her
11             whether she liked it if you touched her or
12             hugged her?
13        A    I'm not sure.  I don't recall one way or
14             the other.
15        Q    She later wrote, he would reach over my
16             desk and kiss me on the lips, a quick kiss
17             and stand by my desk and hover and just
18             stare at me.  Do you recall that conduct?
19        A    The first part, yes, the hovering, no.
20        Q    She later wrote, he would tell me to hug
21             him all the time and he would get so close
22             to me that I could feel his private part on
23             my private area and he would sort of try to
24             adjust himself so he got really close to my
```

```
1                                                    98
2            private area.  Do you deny that conduct?
3       A    Yes.
4       Q    She characterized kisses between you as
5            "almost to the point of trying to make out
6            with me."  Do you agree with that
7            characterization?
8       A    Where is that, Gareth?
9       Q    It's a couple of sentences after the
10           private part statement.
11      A    I'm sorry, I don't see it.
12      Q    Let me read it.  It starts with I would
13           push him away----
14      A    Okay, I see it.
15      Q    The question is with respect to her
16           characterization of the kisses as almost to
17           the point of trying to make out with me, do
18           you agree with that characterization?
19      A    No.
20      Q    She later wrote towards the end of that
21           first page, if I refused to hug him he
22           would grab me anyway when I was at my desk
23           from behind and push me next to him.  Did
24           you make those gestures towards her?
```

```
 1                                               99

 2        A    No.

 3        Q    She wrote that he would sometimes when I

 4             walked by force me to sit on his lap and

 5             try to kiss me, I would try to get away

 6             from him and just avoid being next to him.

 7             Did that ever occur?

 8        A    No.

 9        Q    On the second page towards the top she

10             wrote, he would often ask me to sign pieces

11             of paper that said something like "Maurice

12             is a nice guy." Then on the bottom of the

13             paper would be a signature line and he'd be

14             like sign that... Or he would bring me a

15             piece of paper that said I like Maurice, he

16             is a good guy" and make me try to sign it..

17             It got so annoying that sometimes I would

18             just sign it so he would go away from my

19             desk.

20                  Did you ever present such pieces of

21             paper to Ms. Metin?

22        A    There was a couple, yes. Not that language,

23             but yes.

24        Q    What was the reason for that presentation
```

1                                                         100

2              to her?

3       A     There was one, and as a matter of fact I

4              think you have it in evidence as I was

5              looking through there.  There was one that

6              we were going out to D'Angelos one day, and

7              she was talking about her stepmother who is

8              her biological father's next wife, second

9              or third wife, and eighteen months after

10             they married down in Florida, he died, so

11             she was getting a good portion of their

12             money, and she was trying to get some, and

13             she kind of hated her.  I remember we were

14             going down the street and she was calling

15             her on the phone.  As a matter of fact, the

16             woman was in California, and she got off

17             the phone and was hooting and hollering,

18             and then she talked about her and her

19             former husband hooting and hollering, and I

20             finally said I hope I'm not on your bad

21             list and just jokingly said write me a note

22             saying I'm not on your bad list or words to

23             that effect.

24      Q     We'll talk about the pieces of paper when

1                                                      101

2              we get to them.

3                     Continuing, she wrote in the

4              statement, almost every day he would ask me

5              for a hug and a kiss and would grab at me.

6              He would do this disgusting thing with his

7              tongue sometimes when I went by him when he

8              was in the office like I enjoyed looking at

9              his tongue or something.

10                    With regard to that statement, when

11             you tried to hug and kiss her would you use

12             your tongue?

13       A     No.

14       Q     Did you ever make those gestures with your

15             tongue to her?

16       A     I can't deny, I'm not sure.  You jokingly

17             might not as a kiss but just as a gesture.

18             I can't say for a fact I didn't.  I don't

19             recall one way or the other.

20       Q     She wrote, he would on a few occasions and

21             more often lately touch my breasts when he

22             tried to hug me, and I would pull his hands

23             down and he's be like "ouch, you hurt my

24             hand, say you're sorry."  Did you ever try

```
 1                                              102

 2              to touch Ms. Metin's breasts?

 3        A     No.

 4        Q     Do you deny making the statement "ouch, you

 5              hurt my hand, say you're sorry."

 6        A     In that context, no, I did not.  But

 7              sometimes I would say ouch if I bumped my

 8              hand or something, I'd go ouch.  Not in

 9              that context, but have I used the term?

10              Yeah.

11        Q     Later she wrote the question in the

12              statement, on some occasions he would try

13              to rub my shoulders and I would tell him to

14              stop and he would be don't you like that?

15              Do you recall trying to rub her shoulders?

16        A     And having that response?

17        Q     Let's start with rubbing of the shoulders?

18        A     Did I ever rub her shoulders?  Yes.

19        Q     Were you told to stop rubbing her shoulders

20              when you did so?

21        A     No.

22        Q     Did you feel her move away from you when

23              you tried to rub her shoulders?

24        A     No.
```

1                                                              103

2        Q    Do you recall her asking you to stop?

3        A    No.  As a matter of fact, she asked.

4        Q    She asked you to rub her shoulders?

5        A    Yeah, when she started the Gold's Gym she

6             was doing weight lifting and her muscles

7             were hurting, so I said want me to give you

8             a back rub? and she said, yeah, and I gave

9             her a rub around here.  I remember that

10            because that led to one of the e-mails I

11            sent her.

12       Q    Did that occur on more than one occasion

13            when she would ask you for a back rub?

14       A    No, I think that was just one time.

15       Q    Do you recall when that occurred?

16       A    I'm going to say towards the end of

17            January.

18       Q    Later on she wrote, he on some occasions

19            also touched my buttocks and tried to rub

20            it while he was trying to get me to hug

21            him.

22       A    I'm sorry, where are you?

23       Q    About midway through page 2.

24       A    Where are you, Gareth?

1                                                                104

2      Q    Right here.

3      A    Got it.  Yeah, okay.

4      Q    Do you agree with the statement that on

5           some occasions you tried to touch her

6           buttocks and rub it?

7      A    Touch, yes.  Rub, no.

8      Q    You would try to touch her buttocks when

9           you gave her a hug, is that right?

10     A    Yes.

11     Q    It wasn't a situation where you weren't

12          giving her a hug and you approached her

13          from behind?

14     A    No.

15     Q    Was there ever an occasion when you pinched

16          her buttocks at work?

17     A    No.

18     Q    She wrote the other day he almost had his

19          hand down the back of pants, pants is

20          misspelled, and I pulled his hand back up.

21          Do you recall that incident?

22     A    No.

23     Q    Did she ever pull your hand away when you

24          had your hand on her buttocks?

```
 1                                                           105

 2        A    No.

 3        Q    A little further down she wrote, he at one

 4             time told me that he loved me, and that he

 5             never went through anything like this, and

 6             that he was only with his wife, and he

 7             didn't know how to handle this and cried

 8             for a long time at my desk.  Do you recall

 9             that incident?

10        A    No.

11        Q    Did you ever tell Ms. Metin that you loved

12             her?

13        A    I said I loved her being there, yes.

14        Q    You never told her that you loved her?

15        A    No.

16        Q    I'm sorry, this is an embarrassing

17             statement but it's what Ms. Metin wrote so

18             I'm going to have to ask you questions

19             about it.

20                  That same day he told me that he

21             can't have sex with his wife anymore

22             because he thinks of me.  Did you ever make

23             that remark to Ms. Metin?

24        A    No, that's ridiculous.
```

```
1                                                        106

2        Q    Did you ever have any conversations with

3             John Milori about Ms. Metin?

4        A    The best I can remember, something to the

5             effect he might ask is Fulya in.  It would

6             be that sort of conversation.

7        Q    You're aware that Ms. Metin claims she told

8             Mr. Milori that she felt some of your

9             gestures were unwanted?

10       A    It's my understanding.

11       Q    Do you have any reason to dispute that she

12            made that claim to Mr. Milori?

13       A    I have absolutely no idea what two other

14            people are discussing outside of my ear.

15       Q    But you have no evidence to refute that

16            that happened?

17       A    Objection, hearsay.  No, I do not.

18       Q    Since February 16, 2005, have you had any

19            conversations with Ms. Metin?

20       A    No.  The closest would be at the MCAD where

21            she was offering testimony, and I was, but

22            that would be it, and it wasn't direct, it

23            was into the hearing officer.

24       Q    That was at the investigative conference.
```

1                                                                107

2          Q    Correct?

3          A    Not.

4          Q    Not transcribed?

5          A    I don't know.

6          Q    On page 3 near the top she wrote, on some

7               occasions he would use the phone by my desk

8               and keep touching my hair all the time and

9               stroking my hair and I would push his hand

10              away.

11                   Do you agree with that statement?

12         A    That I used the phone by her?  Yes.  I used

13              it quite often.

14         Q    Did you stroke her hair when you used the

15              phone?

16         A    There was one time where I found out -- she

17              has straight hair, I don't know, you were

18              at her depo, does she have straight hair

19              again?

20         Q    I don't recall.

21         A    Her natural thing is to be very curly,

22              super curly, and she used to have straight

23              hair that was very dry.  I asked her once,

24              I said wow, that's kind of dry, isn't it?

```
 1                                                        108

 2              Then a couple of weeks later she walked in

 3              and it was like curly as hell.  She said

 4              that's the natural way I am.  I

 5              straightened it out with a curling iron or

 6              something.  Then I went I like that better.

 7      Q    You touched her hair on that occasion,

 8           right?

 9      A    Yes.

10      Q    She characterized it as stroking her hair,

11           would you agree with that characterization?

12      A    No, because stroking means a long run with

13           the hand, no.  Touch, yes.

14      Q    Did she ever push your hand away when you

15           touched or stroked her hair?

16      A    No.

17      Q    Right after that she wrote that almost

18           every day there was a close hug or a kiss.

19           Is that your memory?

20      A    No.

21      Q    She wrote, on two occasions I can remember

22           that he was upset with me for not saying

23           goodbye one time or when he saw me talking

24           to John Milori, the next day he admitted to
```

1                                                              109

2              me he was very jealous.

3                   Did you make that remark about the

4              jealousy with Ms. Metin?

5       A      No, and I talked to her about it that same

6              day as far as John Milori.

7       Q      What did you talk about?

8       A      At that point in time is when I was getting

9              prepped for the Beal case, and she had

10             started the gym in late January.  I

11             remember where I was there's windows and

12             you look right out onto the parking lot,

13             and I looked out and I saw her pull her car

14             back in, which I wondered as to its

15             condition, and John was in the car.

16             Subsequent to that she came upstairs.  I

17             was heading out the door for the restroom,

18             when you're in your 50s you go real quick,

19             and she said something like it's snowy

20             out.  I said, yeah, you should have used

21             his car, he got an SUV, and I went across.

22             When I came back she was hooting at me and

23             calling me names et cetera for having said

24             that.  I said, okay, listen, I'm sorry for

```
1                                          110
2              offending you, I'm sorry.  I remember that
3              one because she was mad as hell and it kind
4              of went on for a while.
5         Q    Were you jealous of Ms. Metin's
6              relationship with Mr. Milori?
7         A    No.  My understanding was it wasn't
8              intimate in any instance.
9         Q    She later wrote Maurice occasionally asks
10             me to go out for a drink one night after
11             work to talk, and I would tell him that I
12             couldn't because I couldn't find a
13             baby-sitter or someone to watch my
14             daughter.  He brought that up when I said
15             often to him that I couldn't go out for a
16             drink with him.
17                  With reference to that statement, did
18             you periodically ask Ms. Metin to go out
19             for a drink after work?
20        A    No.  I remember one time asking her.  She
21             wasn't very good at handling money, and I
22             was trying to explain to her budgeting
23             because she would just spend every dime.  I
24             said let's sit down and kind of talk about
```

```
1                                                      111
2              what you do with money and how you keep
3              it.  You want to put some to the side,
4              because she had a lot of debt issue.  I
5              remember that one.
6       Q      At least on one occasion you did ask her
7              out for a drink?
8       A      Yes.
9       Q      But that was to talk about the credit
10             issues, correct?
11      A      Yes.
12      Q      No other invitations to have a drink
13             besides that one occasion?
14      A      Not a drink.  At one point in time she
15             talked a lot about her daughter Melissa,
16             and this is early November, and I said I
17             would like to meet her sometime, we ought
18             to go to Wendy's.
19      Q      Did you, in fact, meet her at the time?
20      A      About a week or so later, Melissa stayed at
21             the office for a week in the afternoons
22             when her baby-sitter was unavailable, so
23             she was there.
24      Q      You said she started at the gym during
```

```
1                                                    112

2              January 2005?

3      A      I'm going to say mid-January, yes.

4      Q      Did you also join Gold's Gym at some point

5              during 2005?

6      A      Late January, yes.

7      Q      Had you ever belonged to a gym before that

8              time?

9      A      No.

10     Q      Why did you join?

11     A      She had asked a couple of times about my

12             joining with her.  Then when she did join,

13             her words to me was a friend of a friend is

14             getting me a pass there.  She joined, and

15             at that point in time she asked me again

16             about joining and she said I can get you a

17             seven day pass.  I had declined initially,

18             and then myself and a couple of other

19             people started going to the gym together, I

20             joined and we all went.

21     Q      How long did you keep your membership?

22     A      I gave it up immediately after the

23             situation.

24     Q      Have you since joined another gym?
```

```
1                                          113

2         A    I don't have any money.

3         Q    So the answer is no?

4         A    The answer is no.

5         Q    What was your reason for joining the gym at

6              the end of January 2005?

7         A    I enjoyed her company, and we had started

8              an exercise program together.

9         Q    Anything regarding your health?  Was there

10             a health benefit to the gym membership for

11             you?

12        A    Oh, yes, definitely.

13        Q    What were the benefits that you were

14             seeking to enjoy from the membership?

15        A    As you get older in life, your muscle turns

16             to fat.  If you exercise, then it converts

17             in your body more effectively and burns

18             that.

19        Q    When you went to the gym what kinds of

20             exercises did you engage in?

21        A    It would be all kinds of different things

22             between riding a bike or doing situps,

23             lifting weights.  There's a variety of

24             items.
```

1                                                              114

2      Q      Were there ever occasions when you and Ms.

3             Metin would go to the gym together?

4      A      Yes.

5      Q      How many occasions did that occur?

6      A      I joined in late January, and the last time

7             we went to the gym together would have been

8             February 14th.

9      Q      Did you have a blood pressure problem prior

10            to February 2005?

11     A      Not that I know of.  I think I might have

12            had an elevated blood pressure, but my

13            understanding is the doctor told me to

14            start doing the medicine after this whole

15            thing cooked.  Is there a correlation?  I

16            don't know.

17     Q      Were you ever told you had hypertension

18            prior to February 2005?

19     A      Not that I recall.

20     Q      Looking back at Exhibit 2, the sexual

21            harassment policy.

22     A      Yes.

23     Q      You told us that you touched Ms. Metin's

24            hair on occasion, correct?

```
1                                                      115
2        A    Yes.
3        Q    Do you consider that a violation of any of
4             the provisions of the sexual harassment
5             policy?
6        A    The entire sexual harassment policy is
7             based on either quid pro quo or a hostile
8             work environment, and if you look at
9             hostile work environment, it's
10            unwelcomeness in conduct.  There was never
11            an indication of unwelcomeness.
12       Q    Touching of the buttocks, would you
13            consider that a violation of the sexual
14            harassment policy?
15       A    If it's unwelcomed, yes.
16       Q    Gestures with the tongue, would you
17            consider that a violation of the sexual
18            harassment policy?
19       A    That I'm not sure.
20       Q    Kisses on the lips?
21       A    If it's unwelcome.
22       Q    Hugs?
23       A    If it's unwelcome.
24       Q    Discussing a sexual experience or ones
```

```
 1                                                116

 2              sexual activities, would you agree that is

 3              a violation of the sexual harassment

 4              policy?

 5        A     Again, it would be unwelcome.  If that was

 6              the case then she would have committed

 7              unwelcome conduct to me.

 8        Q     You're the supervisor, though?

 9        A     Oh, yes.

10        Q     Do you differentiate between a supervisor's

11              conduct at work and an employees?

12        A     Yes.

13        Q     How about with regard to the sexual

14              harassment policy?

15        A     There's direct liability to the employer

16              because the law recognizes the position of

17              a supervisor.

18        Q     I'm going to quickly ask you about some of

19              the exhibits.  Exhibit 8.  Do you recognize

20              Exhibit 8?

21        A     Yes.

22        Q     Could you identify it, please.

23        A     As to what it is?

24        Q     Yes, what is it?
```

```
 1                                              117
 2        A    It appears to be a picture of a woman from
 3             the shoulders down to her belly button
 4             exposing her breasts, and there's a card on
 5             it saying I love Maurice.
 6        Q    Did you prepare this document, sir?
 7        A    No, I did not.
 8        Q    Do you know where it came from?
 9        A    Yes.
10        Q    Where did it come from?
11        A    Bill Depardo.
12        Q    Who is Bill Depardo?
13        A    Bill Depardo was a good friend of mine.  In
14             fact, he is one of the ones I used to go to
15             the gym with a lot.  He worked over in the
16             health department as an inspector, so we
17             had worked on cases together when we did
18             code prosecutions, and one day he brought
19             that in and told me he was giving it out to
20             a bunch of people, and told me he was
21             showing me that one with my name on the
22             card and showing it to other people.
23        Q    Do you know when that was that Mr. Depardo
24             gave you this document?
```

```
1                                                118
2        A    Somewhere, I'm going to say, and this is
3             not an absolute, it's a guess, I think it
4             was in late January, but I'm not absolutely
5             positive.
6        Q    2005?
7        A    Oh, yes.
8        Q    Did you ever display that document, Exhibit
9             8, to Ms. Metin?
10       A    That I'm not positive one way or the
11            other.  I do remember Billy used to come in
12            and chat with her forever, and I used to
13            say, Billy is crazy.  He's really crazy, so
14            I would give her examples of when he did
15            crazy stuff.  They used to talk forever
16            when he walked in about their dogs.  I
17            remember he brought it in that day, and I
18            remember telling her, remember I told you
19            Billy was crazy.  I brought in a picture.
20            I can't say whether or not to my memory I
21            showed her that or not, I'm not positive.
22       Q    When you told her about the picture you
23            were referring to Exhibit 8?
24       A    Yes.
```

```
 1                                                   119
 2          Q    Exhibit 9, do you recognize Exhibit 9?
 3          A    Yes.  Do you see that one I remember I told
 4               you earlier, I'm not putting Maurice down
 5               on the mad list.
 6          Q    Did you prepare the typed written remarks
 7               at the top of Exhibit 9?
 8          A    I think I said to her give me a supervisory
 9               survey, and I believe, yes, I did.
10          Q    Then you asked her to sign, and she did?
11          A    Yes.  I remember we talked about her
12               concerns from a prior employment about
13               something.
14          Q    Did you keep Exhibit 9 in your office after
15               she signed it?
16          A    I might have thrown it in the top drawer, I
17               don't know.
18          Q    Exhibit 10, did you also prepare Exhibit
19               10?
20          A    No.
21          Q    Do you know who prepared Exhibit 10?
22          A    Fulya, to my knowledge.
23          Q    Have you ever seen this document prior to
24               today?
```

1                                                          120

2        A     Yes.  I think these were two separate

3              documents, if I remember correctly.

4        Q     You're referring to the typewritten

5              statement at the top and the handwritten

6              that's midway down; correct?

7        A     Yes.

8        Q     Did you keep this document in your office?

9        A     I'm assuming, yes, it was the upper right-

10             hand drawer I used to throw things in and

11             never pay attention to.  It could have been

12             up in there.

13       Q     Exhibit 11, do you recognize Exhibit 11?

14       A     No.  I've actually seen this and looked at

15             it a million times and could not correlate

16             it.

17       Q     You're referring to the poem?

18       A     Yeah.

19       Q     You never prepared this poem, typed it out,

20             and gave it to Ms. Metin?

21       A     No.

22       Q     How about the handwritten words on the

23             right side of the document that appear to

24             say Fulya Metin, yes.  I like MJL.  Have

1                                                      121

2              you seen that before?

3    A    I think so, yes.

4    Q    Was it also next to the poem when you saw

5         it or was that a separate document as well?

6    A    That's where I'm confused.  I remember

7         seeing notes like that but I don't remember

8         this poem thing.

9    Q    Did you direct Ms. Metin to write the yes.

10        I like MJL.

11   A    No.

12   Q    Did you ever visit pornographic websites at

13        work?

14   A    I'm going to say in the mid 1990s when I

15        first got AOL I think I did.

16   Q    When you did that, was that in your office

17        that you visited the sites?

18   A    Yes, this was in the days when Methuen

19        didn't have an internet system and you had

20        to use your own through a telephone, and I

21        started using the internet in 1996, late

22        '96, and I think somebody told me that

23        that stuff was on there and I went and

24        looked.

```
1                                                      122
2        Q    During February 2005, did you access any
3             pornographic websites from your office
4             computer?
5        A    There was one guy that sent me some e-mails
6             with photos, and when I opened his e-mail
7             it was there.
8        Q    Did you have a computer at home that was
9             issued by Methuen?
10       A    I had a laptop that I brought home
11            periodically, but I didn't have a computer
12            at home that was theirs.
13       Q    From the laptop did you have an internet
14            access at home or from anywhere other than
15            your own office?
16       A    I have dial-up so you can do dial-up
17            anywhere.
18       Q    Do you recall if you ever accessed
19            pornographic websites from the laptop?
20       A    Absolutely not.
21       Q    Do you know when those e-mails were sent
22            from your friend that contained the
23            pornographic material?
24       A    It would have been early February.  There
```

```
 1                                                      123

 2              was a bunch of people he started sending

 3              these out to, and actually I had gone down

 4              to him and told him, I said please don't do

 5              that.  I'm sure that they're monitoring

 6              everybody.

 7         Q    Did you ever display pornographic material

 8              to Ms. Metin at work?

 9         A    No.

10         Q    Did you ever have it up on your computer

11              screen when she walked into the office?

12         A    Pornography?

13         Q    Yes.

14         A    Absolutely not.

15         Q    Did you visit Fulya's myspace.com website?

16         A    I think you mean match.com.

17         Q    Let's talk about the myspace website, do

18              you have any knowledge that she had such a

19              site.

20         Q    How about match.com?

21         A    Yes.

22         Q    Tell us the circumstances around visiting

23              that website?

24         A    The first time she told me that she was
```

```
1                                                    124
2              doing internet dating, and I don't believe
3              I even knew about match.com at that point
4              in time.  She explained it to me, and then
5              she signed on and showed me her site with
6              some pictures she had on there.  Then she
7              would tell me how you post yourself and
8              then somebody will try to connect with you
9              and set up a date.  She told me she had set
10             up dates that way.  That was the first
11             time.
12        Q    Tell us about all the times that you
13             visited the site.
14        A    The second time she came into my office and
15             had talked about that again, and she
16             explained to me, this one I can't remember
17             perfectly, either the person that sends the
18             message or the person that posts to be able
19             to receive the message has to pay for it, I
20             guess, and she was explaining that to me,
21             and she went on the site and showed me her
22             site again and her posting.
23        Q    Did you ever visit the site outside of the
24             presence of Ms. Metin?
```

```
1                                                   125

2         A    Yes.

3         Q    Why did you do that?

4         A    I told her, and maybe it's because I'm in

5              my 50s, I don't know, I think that internet

6              dating is strange at best and puts you in

7              harm's way.  I told her she should stop

8              doing that sort of thing because you don't

9              know who the hell you're going to be

10             meeting.  Then at one point in time I went

11             on the site, and I saw her picture that

12             she'd done and copied it and put it on the

13             desktop, and I called her in.  I said see

14             how easy it is to access your information

15             and all the rest? She seemed stunned.  She

16             didn't realize that you could copy a

17             picture off the internet and actually keep

18             it as a desktop.

19        Q    At that time did you have a separate

20             printer in your office as opposed to the

21             one at Ms. Metin's desk?

22        A    Yes, and whenever it was broken the mayor

23             would refuse to allow me money to pay for

24             it, so yes.
```

1                                                              126

2      Q    Was it working when you printed the

3           picture?

4      A    I didn't print the picture.

5      Q    I thought you said you printed out her

6           picture and placed it on the table?

7      A    No, I should have said copy it from the

8           internet and posted it.  I posted it on the

9           desktop.

10     Q    I see.  Do you recall what time Ms. Metin

11          left the office on February 15th, 2005?

12     A    Five o'clock.

13     Q    Was that her typical time to leave the

14          office?

15     A    What we had was you would work three days

16          until 5:30, one day until five, and one

17          day, which is Friday, you would get out at

18          noon, so they had extended hours.  Instead

19          of 4:30 they went to 5:30, and then they

20          gave you that half day to balance out your

21          hours.  Five o'clock was her time to leave.

22     Q    The 15th, do you recall what day of the

23          week that was?

24     A    Tuesday.

1                                                          127

2        Q    Anything unusual about her conduct on the

3             15th?

4        A    No, quite frankly it was probably -- from

5             all the friendly times we had it was the

6             friendliest.

7        Q    The 14th was Valentine's Day?

8        A    Yes.

9        Q    Did you get a present for Ms. Metin on

10            Valentine's Day that year?

11       A    Not that I recall.

12       Q    Do you recall if she presented one to you?

13       A    Not that I recall.

14       Q    Did you get a card for her?

15       A    I don't believe so.

16       Q    Did she get a card for you?

17       A    I don't believe so.

18       Q    On the 15th you received the favorable

19            decision on the Beal case, right?

20       A    On the 15th I went to the Pacer site and

21            found out, yes.

22       Q    Around what time was that?

23       A    Shortly after she left.

24       Q    At some point did you call any other

```
 1                                              128
 2              employees of Methuen to discuss the outcome
 3              of the case?
 4        A     I called the former police chief and left a
 5              message.  I called and left a message with
 6              the then current police chief.  I called
 7              Fulya.  I went down and talked to the chief
 8              of staff, and I believe Dave Bain and Tina
 9              Touma-Conway were there that day.
10        Q     Was the mayor in her office on the 15th?
11        A     I believe so though I'm not positive.  Her
12              door was closed.
13        Q     In any event did you discuss the Beal case
14              with her on the 15th?
15        A     No.
16        Q     What time was the call to the former police
17              chief?
18        A     He was the first call I made.
19        Q     Do you recall what time you made that call?
20        A     As I recall the time sequence, Fulya left
21              at five, then I had started checking the
22              Pacer site, and I missed it on the 14th, so
23              I checked it on the 15th, I picked it up
24              and I would say it was five or 10 past
```

```
 1                                              129
 2           five.
 3      Q    So the call would be sometime after that, I
 4           assume.  You digested----
 5      A    It was almost immediately.  I unfortunately
 6           have a tendency, I don't need the body of
 7           the decision.  I go to the end and see how
 8           I did.
 9      Q    When was the call to the current chief?
10      A    I believe he was the second call.
11      Q    Were all these calls made from your office
12           and City Hall?
13      A    Yes.
14      Q    When did you call Ms. Metin on the evening
15           of the 15th?
16      A    I called her that -- in that time period
17           between five and 5:30.  Then later I went
18           to the gym, and I was coming back out, and
19           I called her then to see if she got my
20           message about the case.
21      Q    The first call you left a voicemail
22           message.
23      A    Yes.
24      Q    On her cellphone or her home phone?
```

```
 1                                               130

 2        A     Cellphone.  She didn't use her home phone.

 3        Q     Did she provide her cell number to you?

 4        A     Yes.

 5        Q     Do you recall what the reason for that was?

 6        A     We used to exchange phone calls.

 7        Q     Personal or work related?

 8        A     Both.

 9        Q     What time did you leave the gym that

10              evening?

11        A     To the best of my memory, somewhere around

12              9:30, quarter of ten, I believe.

13        Q     On that occasion when you called her after

14              leaving the gym, you got her directly, it

15              wasn't voicemail, right?

16        A     Correct.

17        Q     Did she mention where she was at that time?

18        A     No, she did not.

19        Q     What did you discuss?

20        A     I said the Beal decision is in, did you get

21              my message, I won.

22        Q     What did she say?

23        A     Very few words.  It was a very, very short

24              conversation.
```

1                                                      131

2        Q    You don't recall anything specific about

3             what she said?

4        A    No, not exactly.

5        Q    In the Amended Complaint you allege that

6             during one of the calls Ms. Metin was with

7             Chief Solomon?

8        A    Yes.

9        Q    How did you learn that information?

10       A    Solomon told me that.

11       Q    Do you know which phone call it was?

12       A    It was the only one that I had with her in

13            direct contact which would be around,

14            guessing, 9:30, quarter of ten, somewhere

15            around there.

16       Q    Who was your cellphone provider at that

17            time?

18       A    Verizon.

19       Q    Was the call made from your cellphone?

20       A    Yes.

21       Q    The second, not the first, right?

22       A    Yes.

23       Q    After you made the phone call, where did

24            you go next?

```
 1                                                        132

 2        A    I went home.

 3        Q    The next morning between the time when you

 4             left your house and you arrived at City

 5             Hall, did you go any place?

 6        A    No.

 7        Q    Did you speak to anybody on your cellphone?

 8        A    No, not to my memory.

 9        Q    What did you do when you arrived at City

10             Hall that morning?

11        A    Went in, took off my coat and went into my

12             office, started the computer, and quite

13             frankly I was so proud of that decision, I

14             started to prepare a letter to send to the

15             city council fluffing my feathers.

16        Q    Do you recall what time you got to the

17             office that morning?

18        A    I would typically arrive ten to fifteen to

19             twenty minutes before start time, depending

20             on traffic, so it would be somewhere

21             between 8:15, 8:20, somewhere around there.

22        Q    That was your typical time to arriving at

23             the office?

24        A    There was some days I would drop my
```

```
1                                                       133

2              daughter off who was on student council at

3              the high school, so I would be in there a

4              little after seven.

5     Q    When did you become aware that Ms. Metin

6              arrived at work that morning?

7     A    When she came in and said hi to me.

8     Q    Do you know what time that was?

9     A    Typically she'd be about 8:40.

10    Q    That morning your memory is that it was

11             around 8:40?

12    A    Yes.

13    Q    Besides exchanging hellos and pleasantries,

14             what else did you discuss upon her arrival?

15    A    I went over the case again.  My ego was

16             about 800 percent, quite frankly, and I was

17             telling her I was writing a letter to the

18             city council and I would e-mail it over to

19             her.  I did e-mail it over to her, and she

20             looked at it and she talked about

21             restructuring the spacing and that sort of

22             thing.  Then I provided her with some

23             addresses to send to the city councilors.

24    Q    When was the next city council meeting
```

1                                                                      134

2              after the time you received the decision?

3      A       They meet on the first and third Mondays of

4              the month.

5      Q       So typically----

6      A       I believe they met on the 7th, so the next

7              time they would have met would be on the

8              21st.

9      Q       Typically you would communicate with them

10             by letter if there was something that came

11             up between meetings?

12     A       No.

13     Q       How would you communicate with the city

14             councilors?

15     A       My communication would be, if I was going

16             to send out any messages it would be

17             directly to the chairman or through the

18             city council office to the members.  But it

19             was rare that you'd communicate to all the

20             councilors directly on an issue.

21     Q       You would communicate by mail or e-mail or

22             by phone?  How would you communicate in

23             between meetings?

24     A       Say if a councilor called me up and wanted

```
1                                                       135
2              me to prepare a resolution for him or an
3              ordinance, my policy was I would tell
4              nobody else but the councilor I was doing
5              it for.  I would try at that level to
6              always get e-mails.  Frankly, the laziness
7              principle because it was so easy to do the
8              e-mails.  So I'd send the councilors
9              typically an e-mail.  There was some that
10             didn't have e-mails and I would call them.
11             There was one councilor that ultimately
12             became the chairman during this time period
13             that had a fax machine, so I used to fax
14             him things.
15        Q    On the 16th, prior to your resignation, did
16             you discuss the Beal decision with any of
17             the city councilors either by e-mail or by
18             phone?
19        A    No, I was preparing the letter at that
20             point in time.
21        Q    When you were at the office, which restroom
22             would you use if you had to go?
23        A    Directly across the corridor.
24        Q    You would use the men's room where the
```

1                                                          136

2              video apparatus was employed?

3         A    Yes.

4         Q    Did you visit the men's room that morning

5              prior to your contact with Chief Solomon

6              and Deputy Alaimo?

7         A    No, there was a sign on it that day that

8              said something to the effect of out of

9              order or needs repair, something like that,

10             so it was closed off.

11        Q    Did you find that unusual?

12        A    No.  I can't say one way or the other.  It

13             didn't even occur to me, I was thinking of

14             other things, not toilets.

15        Q    Incidentally, outside of your office and

16             Ms. Metin's office, was the sexual

17             harassment policy listed anywhere on any

18             bulletin boards or on the walls?

19        A    I believe it was.

20        Q    Where would it be located?

21        A    I believe there's a bulletin board right

22             outside the mayor's office.  I remember

23             clearly telling them that they had to do

24             yearly distribution of the policy and they

```
1                                                   137

2              should have a posting.

3        Q    In proximity to your office and the

4              entrance to your office, were the sexual

5              harassment rules listed and posted in any

6              form anywhere?

7        A    The mayor's office would be down the

8              corridor on the same floor.

9

10                        BRIEF RECESS

11

12       Q    On the morning of February 16, 2005 before

13             you were approached by Chief Solomon and

14             Deputy Chief Alaimo, did you have any

15             knowledge that there was a videotape

16             running?

17       A    No.

18       Q    When did you first learn that there was a

19             videotape running?

20       A    They brought me down to the second floor

21             conference room and apprised me of it then.

22       Q    Why don't we look at Exhibit 6.

23       A    Yes.

24       Q    Have you seen Exhibit 6 before today?
```

```
1                                          138

2        A    Yes.

3        Q    I'll do similar to what I did with Exhibit

4             7.  I'll read a passage and ask you a

5             question about it.

6        A    Sure.

7        Q    The passage is, on Wednesday, February

8             16th, I was at work when Maurice J.

9             Lariviere, Jr. approached me and leaned

10            over my desk and kissed me.

11                 Do you have a memory of leaning over

12            Ms. Metin's desk and kissing her on the

13            morning of the 16th?

14       A    Yes.

15       Q    Did she tell you that that kiss was

16            unwanted at the time?

17       A    Absolutely not.

18       Q    Was it a kiss on the lips or a kiss on the

19            cheek?

20       A    I believe lips.

21       Q    Later on she wrote, about thirty minutes or

22            so later he came over to use the telephone

23            by my desk and he started stroking my arm

24            while he was on the phone and kept asking
```

```
1                                                    139

2                  me if I was mad at him or if I liked the

3                  fact that he was touching me or kissing

4                  me.  Did I read that correctly?

5        A         It appears that you read it correctly from

6                  that sheet, yes.

7        Q         Do you agree that you walked over to her

8                  desk and started stroking her arm at some

9                  point on the morning of the 16th?

10       A         Have you seen the video?

11       Q         Yes, I have.

12       A         If you can picture where her desk is, it's

13                 a reverse L, and where she sits there's the

14                 phone and then the photycopying machine, so

15                 I had gone over to the photycopying machine

16                 and the phone rang, and I had been using

17                 the phone.  Yes, I was over in that area.

18       Q         Incidentally, have you seen the video?

19       A         Yes, June of '05.

20       Q         Where did you view it?

21       A         The police station.

22       Q         Who was there when you viewed it?

23       A         Captain -- I forget his name now.  I should

24                 remember it.  Haggar, Randy Haggar, who was
```

```
1                                                      140

2               lieutenant at that point in time, Carmine

3               and Bill DiAdamo, and myself.

4          Q    When you reviewed it was it a disk or was

5               it an actual VHS tape that you saw?

6          A    VHS tape if I remember correctly.

7          Q    On just one occasion you saw it?

8          A    Yes.  I think he only saw part of it.  He

9               came in later, if I remember correctly.

10              (Indicating to Attorney Bill DiAdamo).

11         Q    As to the stroking of the arm, aside from

12              what you saw on the videotape, do you have

13              a memory of using Ms. Metin's phone and

14              stroking her arm that morning?

15         A    I remember very clearly using the phone.

16              Stroking the arm, I'm not really sure but

17              the tape speaks for itself.

18         Q    Did she ever tell you that stroking of the

19              arm was unwanted or unwelcome?

20         A    No.

21         Q    Did you ask her that morning if she was mad

22              at you?

23         A    No, not to my memory.

24         Q    Did you ask her that morning if she liked
```

```
 1                                                    141

 2              the fact that you were touching her or

 3              kissing her?

 4        A     No.

 5        Q     Later she wrote, he then went back into his

 6              office and got some work done, I went next

 7              door made copies came back and then he came

 8              back to my work area and kneeled in front

 9              of me trying to kiss me, touch me and

10              asking me if I liked that.  Then he kept

11              asking me for a hug and a kiss and I told

12              him he needs to sign something and then he

13              kept insisting he hug or kiss me.  Did I

14              read that correctly?

15        A     I believe so.  I wasn't watching it word

16              for word, to be honest.

17        Q     Does that passage of the statement comport

18              with your memory of the morning of the

19              16th?

20        A     What did occur was she had gone next door

21              to make copies of that letter I was going

22              to send out to the council, so that is

23              absolutely correct that she left the room

24              for that purpose.  She did return.  There
```

```
 1                                                    142
 2                  was not a kneel, there was a squat when I
 3                  was talking to her, yes.
 4          Q       Do you recall what you said to her when you
 5                  squatted next to her that morning?
 6          A       She'd had a lot of problems at home with
 7                  her mother and the mother's boyfriend who
 8                  was living there, and she would come in and
 9                  be very depressed over what occurred.  At
10                  that point in time I would be talking to
11                  her, asking how things went, did you get to
12                  sleep last night because she would be
13                  reporting that sleeping in the room with
14                  the cat, the dog, her daughter and herself
15                  she was missing a lot of sleep, especially
16                  when the mother and her significant other
17                  were fighting.  So I'd go over and ask her
18                  how things were.
19          Q       Did you ask her for a hug and a kiss when
20                  you were squatting next to her?
21          A       I don't recall.  It might have been but I
22                  don't recall.
23          Q       Did she give you a response to a request
24                  for a hug or a kiss?
```

```
1                                                    143
2       A    At one point in time I leaned over and gave
3            her a kiss, yes.
4       Q    During that second occasion when you were
5            squatting next to her?
6       A    Yes.  I think I was sitting on the desk at
7            that point in time.
8       Q    Was that a kiss on the lips or on some
9            other part of the body?
10      A    I think it was the lips.
11      Q    Was that kiss unwanted, from your
12           perspective?
13      A    No.
14      Q    Did she ever convey to you orally that it
15           was unwanted?
16      A    No.
17      Q    Did she pull back from you?
18      A    No.
19      Q    You felt that it was a mutually
20           affectionate gesture?
21      A    Yeah.  The tape speaks for itself.
22      Q    It sure does.
23      A    It's awfully obvious to me.
24      Q    She wrote, he then kept trying to touch my
```

1                                                    144

2              face with his finger.

3                    Do you recall trying to touch Ms.

4              Metin's face that morning with your finger?

5    A    I'm not positive, but again the tape will

6              speak for itself.

7    Q    Did you ask for any kisses or hugs outside

8              of view of the tape in your office?

9    A    No.

10   Q    Did you give any hugs or kisses to Ms.

11             Metin in your office that morning outside

12             of view of the videotape?

13   A    No.

14   Q    She later wrote, he was at my desk for a

15             while talking and when I tried to get up he

16             grabbed me to him really close and started

17             to kiss me and if I tried to get away he

18             kept pulling me closer to him and kept

19             kissing me and kept moving me closer to

20             him.  The more I tried to get away the more

21             agressive he seemed to become.

22                   Does your memory of the morning of

23             the 16th comport with that passage of

24             Exhibit 6?

```
1                                                   145
2        A    No, and the tape shows that's not true.
3        Q    Did you ever grab Ms. Metin and pull her
4             close to your body?
5        A    I would give her a hug periodically.  I
6             don't know if you would classify it as a
7             grab.
8        Q    That morning did you grab her and pull her
9             close to your body?
10       A    I remember giving her a hug and talking to
11            her.  At that point in time it's more a
12            discussion about the mother and the
13            boyfriend and how things were going.
14       Q    Was this hug before or after the squatting
15            incident?
16       A    After.
17       Q    How long did the embrace last?
18       A    The tape speaks for itself.  I assume----
19       Q    I know it does, and it's fair, but we're
20            here today for your memory.  So the best of
21            your memory.
22       A    To the best of my memory a minute.
23       Q    During that hug did you grab her buttocks
24            region?
```

```
1                                                        146
2          A    Did I touch it, yes.
3          Q    Did she say that that was unwanted?
4          A    No.
5          Q    Did she pull away from you in any respect?
6          A    No.
7          Q    At that point you felt that it was not an
8               unwelcome hug, correct?
9          A    Correct.
10         Q    You felt that the touching of her buttocks
11              was welcome?
12         A    Not unwelcome.
13         Q    But not welcome?
14         A    I didn't really judge it one way or the
15              other.
16         Q    Looking back on it now, do you think it was
17              welcome?
18         A    There was no opposition to it whatsoever.
19         Q    When you grabbed her buttocks that morning,
20              was it with one hand or two?
21         A    Touched.
22         Q    Okay, you used touched.  When you touched
23              her buttocks that morning, was it one hand
24              or two?
```

```
1                                              147
2        A    Two, to my memory.
3        Q    One on each cheek?
4        A    Yes.
5        Q    When you touched the buttocks cheeks, did
6             you pull her towards you or was it just----
7        A    There was no pulling.
8        Q    She wrote next, while he was kissing and
9             hugging me and pulling me closer, I felt
10            that he was hard because he was holding me
11            so tightly and his hand was wandering down
12            to the buttocks area.
13                 Did I read that passage correctly?
14       A    Yes, you did.  I didn't realize that word
15            was in there before.
16       Q    When you were kissing and hugging her, were
17            you pulling her closer to you?
18       A    No.
19       Q    Were you erect when you were hugging her or
20            at any time that morning in Ms. Metin's
21            presence?
22       A    No.
23       Q    But you don't disagree with the statement
24            that his hand was wandering down to the
```

```
1                                                        148

2              buttocks area?

3        A     No.

4        Q     Then she lastly wrote, I finally got free

5              and ran out of the office.  Do you have a

6              memory of that?

7        A     That she ran out of the office, no.

8        Q     What is your memory of what happened after

9              the minute long embrace?

10       A     What we used to do is have tea next door at

11             the council office, and she was going over

12             to the council office to get some tea, if I

13             remember correctly.

14       Q     She said that to you?

15       A     I believe so, yes.

16       Q     Then what did you do?

17       A     What did I do?

18       Q     What did you do next?

19       A     I went back into my office and started

20             doing some work.

21       Q     Did you see Ms. Metin at any point after

22             she left the office to go get tea?

23       A     No.  The next time I would see her would be

24             at MCAD.
```

```
 1                                               149
 2    Q   Who was the next person you saw after she
 3        left the office that morning?
 4    A   Solomon and Alaimo.
 5    Q   How soon was that after Ms. Metin left the
 6        office?
 7    A   Fairly immediate, if I remember correctly.
 8    Q   Do you deny that Ms. Metin objected to any
 9        of the kisses on the morning of the 16th?
10    A   Yes.
11    Q   Do you deny that she objected to any of the
12        hugs on the morning of the 16th?
13    A   Yes.
14    Q   Do you deny that she objected to the
15        touching of the buttocks region on the
16        morning of the 16th?
17    A   Yes.
18    Q   Do you deny that she felt you erect next to
19        her on the morning of the 16th?
20    A   That she said that?  She said that in the
21        statement.  I think you're asking me if I
22        had an erection.
23    Q   I'll rephrase the question.  Do you deny
24        that you had an erection that morning in
```

```
1                                                    150
2                the presence of Ms. Metin?
3        A       No, I did not.
4        Q       You said in your Complaint that the parties
5                were mutually affectionate and that Ms.
6                Metin initiated contact.
7        A       Yes.
8        Q       Do you agree with that statement?
9        A       Yes.
10       Q       Did Ms. Metin initiate kisses on the lips
11               with you?
12       A       Yes.
13       Q       How often?
14       A       I remember several instances.
15       Q       Specifically?
16       A       There was one time where we were out for
17               lunch and she wanted to go over to the Ski
18               House, so we went in there and she had
19               bought some ski outfit.  When we got back
20               in the car she thanked me for going in
21               there and leaned over and gave me a kiss.
22               When she met with the mayor and was offered
23               the position, she did it then.  When I had
24               the welcome aboard cake party for her, she
```

```
 1                                                    151
 2              did it then and some other times like that.
 3         Q    You only remember three specifically today,
 4              right?
 5         A    I remember those instances because of the
 6              uniqueness of the circumstance, yes.
 7         Q    But you can't recall any other specific
 8              instances when she kissed you on the lips
 9              on her initiation, fair?
10         A    Correct.
11         Q    Do you agree that you initiated all the
12              physical contact on the morning of the
13              16th?
14         A    Yes.
15         Q    None was initiated by her on the morning of
16              the 16th?
17         A    Where she made the physical contact?
18         Q    Yes, sir.
19         A    No.
20         Q    You told us that you didn't know at any
21              time that you were being videotaped; right?
22         A    That's correct.
23         Q    If you knew you were being videotaped that
24              morning, would you have acted differently?
```

```
1                                                    152
2          A    If I knew I was being set up, yeah,
3               probably.
4          Q    How would you have acted differently?
5          A    Stayed in my office.
6          Q    Would you have initiated physical contact
7               with Ms. Metin if you knew you were being
8               videotaped?
9          A    No.
10         Q    Why not?
11         A    Because it was obvious I was being set up.
12         Q    Did you ever have the level of personal
13              relationship that you had with Ms. Metin
14              with any of your other secretaries or
15              assistants?
16         A    No.
17         Q    How would you compare your personal
18              relationship with her to your other
19              secretaries and assistants?
20         A    The others would be purely professional.
21         Q    Are you familiar with the crime of indecent
22              assault and battery?
23         A    I'm aware there is one but I'm not a
24              criminal attorney.
```

```
1                                                      153

2        Q    The Appeals Court has defined----

3        A    Touching of the buttocks.

4        Q    The Appeals Court has defined indecent

5             assault and battery as the Commonwealth

6             proving beyond a reasonable doubt that a

7             defendant committed an intentional

8             unprivileged and indecent touching of the

9             victim.  Do you have any reason to dispute

10            that definition?

11                      MR. DiADAMO:  Objection.

12       A    Do you want me to answer from a legal

13            perspective?

14       Q    I want you to answer as a witness.

15       A    I'm not a criminal attorney.  That would

16            seemingly be the definition.

17       Q    Do you disagree that your conduct on the

18            morning of the 16th on the videotape rose

19            to the level of that definition?

20                      MR. DiADAMO:  Objection.

21       A    Absolutely not even close.

22       Q    How about at any other time prior to

23            February 16, 2005?

24       A    No.
```

```
1                                                    154

2        Q    What was said between you, Chief Solomon

3             and Deputy Chief Alaimo in your office on

4             the morning of the 16th?

5        A    They came walking in looking stern-faced,

6             told me they wanted to have me go down to

7             the second floor conference room.  At that

8             point I got up and went down with them.

9        Q    Did you ask them why you were going to the

10            second floor conference room?

11       A    No.  To be honest with you, I thought I was

12            going to be celebrated for the Beal case.

13       Q    So at that point the only thing that was

14            discussed in the office was them asking you

15            to come down to the second floor conference

16            room?

17       A    Yes.

18       Q    Did they escort you down to the room?

19       A    Yes.  Solomon was in the front, I was in

20            the middle, Alaimo was behind me.

21       Q    At any point while you were in your office

22            and the time you entered the conference

23            room, did you feel like you didn't have to

24            go or that you could object to going to the
```

```
1                                                    155
2               second floor conference room?
3       A       I thought I was going to a party.  I was
4               looking forward to it when they come in.
5       Q       The answer is you didn't.  You didn't feel
6               like this was an unwilling escort down to
7               the conference room, correct?
8       A       I had absolutely no idea what was going on.
9       Q       Was anything discussed between the time you
10              left your office and when you entered the
11              second floor conference room?
12      A       No.
13      Q       You didn't hear Chief Solomon say anything,
14              correct?
15      A       No.
16      Q       You didn't hear Deputy Chief Alaimo say
17              anything during that time period, correct?
18      A       No.
19      Q       Did you encounter anyone else in the
20              hallways of City Hall or the elevator as
21              you went down to the second floor
22              conference room?
23      A       No, to the best of my memory.
24      Q       Did you take the elevator or did you take
```

```
 1                                                      156

 2              the stairs?

 3      A      Walked down.

 4      Q      Is there more than one conference room on

 5              the second floor?

 6      A      No.

 7      Q      What happened when you entered the

 8              conference room?

 9      A      I walked in, there was nobody there and I

10              was surprised but I figured everybody would

11              be coming afterwards.  I sat down.  Alaimo

12              pulled out a piece of paper and read

13              Miranda.

14      Q      Were either Chief Solomon or Deputy Chief

15              Alaimo in uniform that morning?

16      A      To the best of my memory, yes.

17      Q      Physically can you describe the uniforms

18              that they were wearing.

19      A      Not really, no.

20      Q      Was anything said between the time you

21              entered the room and when Alaimo read you

22              your Miranda rights?

23      A      Was there anything said?

24      Q      Yes, sir.
```

```
1                                                    157

2         A    No.

3         Q    You said earlier you're not a criminal

4              attorney, right?

5         A    Correct.

6         Q    Is there anything that was omitted from the

7              Miranda reading to you, to your knowledge?

8         A    I don't believe so.

9         Q    You were told that you could not say

10             anything, correct?

11        A    I believe so.

12        Q    You were told that you had the right to an

13             attorney?

14        A    As it was read to me, I believe so, yes.

15        Q    Before you said anything that morning in

16             the second floor conference room, you knew

17             that you could contact an attorney?

18        A    At that point in time, I freaked out

19             totally.  I was stunned and shocked what

20             was going on.  The only person I asked to

21             see, quite frankly, was my wife.

22        Q    But you knew that you could call an

23             attorney at all points that morning, right?

24        A    There was no thought process at that point
```

1                                                          158

2              in time.

3        Q     The thought never crossed your mind?

4        A     No.  Imagine the worst you've ever done in

5              your life is getting a speeding ticket, and

6              all of sudden you've got two of the top

7              trumps going after you.

8        Q     You're an attorney though, correct?

9        A     Yes.

10       Q     Were you aware that you could have not said

11             anything to these officers that morning?

12       A     Were I sitting there as an attorney and not

13             there myself, yes, but I wasn't there as an

14             attorney.

15       Q     At that time did you have a personal

16             attorney outside of the city government?

17       A     I never had a need for one.

18       Q     You never used an attorney for estate

19             planning?

20       A     No, I wrote my own will.

21       Q     Never used an attorney for tax reasons?

22       A     No.  The only time I ever used an attorney

23             would be when I bought real estate, like I

24             bought my house and had a mortgage so there

```
1                                              159
2              was an attorney.
3         Q    How about for the motor vehicle
4              infractions, did you ever use an attorney
5              for those proceedings?
6         A    No, just sent the town the money.
7         Q    You said in the Amended Complaint that
8              there were tape recorders in the conference
9              room that morning, correct?
10        A    Yes.
11        Q    Could you tell us how you first learned
12             there were tape recorders and where they
13             came from.
14        A    Solomon put them on the table in front of
15             me and pressed the start button or the
16             record button.
17        Q    Solomon had both of them on his person?
18        A    I believe so, yes.
19        Q    He took them out and put them on the
20             conference table?
21        A    That's correct.
22        Q    Physically can you describe the tape
23             recorders?
24        A    Microcassette type tape recorders.  They
```

```
1                                            160
2            looked exactly the same.
3       Q    Were they silver, black, what color were
4            they?
5       A    I'm not positive on that one.
6       Q    Did you observe Chief Solomon turn on the
7            tape recorders that morning?
8       A    Yes.
9       Q    Both of them?
10      A    Yes.
11      Q    Did you see them both running?
12      A    I saw him push the record.  I can't say
13           that I sat there and watched if it was
14           running, but I saw him push both the
15           records and then later push both the stops.
16      Q    Have you ever heard an audio tape of what
17           transpired that morning in the conference
18           room?
19      A    My understanding is you folks are claiming
20           one is totally messed up and one is very
21           highly messed up.  I tried to listen to it
22           and all I heard was whishhhhhh.  I have not
23           heard an audible portion from one of those,
24           and I am not aware, even though we asked
```

```
 1                                                161

 2              for discovery on it, there is an audible

 3              portion.

 4         Q    One second and I'll go get it and we'll

 5              listen to it.

 6

 7                   (OFF THE RECORD DISCUSSION)

 8

 9         Q    I think the question before we went off the

10              record was have you heard the tape?

11         A    I attempted to listen to it, yes.

12         Q    The version you attempted to listen to was

13              the copy that we provided to you during

14              discovery?

15         A    That is my understanding.

16         Q    But you've never heard the original tape?

17         A    No.

18         Q    Do you have a recollection of how long the

19              tape recorders were going or running on

20              that morning in the second floor conference

21              room?

22         A    The tape started, they asked a series of

23              questions, and then I said can we talk,

24              something to that effect.  And Solomon
```

```
1                                              162

2            leaned over and he turned them off.  To my

3            knowledge that was the end of it, and I'm

4            going to judge it at five to ten minutes.

5       Q    Was the Miranda reading on the tape

6            recorder, to your knowledge?

7       A    I'm not positive.

8       Q    Was anything of substance said between the

9            time you entered the room and when the

10           recorders went on?

11      A    Not to my knowledge, no.

12      Q    The tapes were turned off when you asked

13           them to be turned off, correct?

14      A    I said can we talk.  At that point in time

15           he reached over and I think he said

16           something to the effect at the request of

17           Lariviere these were turned off.  Words to

18           that effect.

19      Q    From that point forward after they were

20           turned off, how much longer were you in

21           that conference room?

22      A    About an hour and a half, hour and

23           forty-five minutes.

24      Q    Of that hour and a half to hour and
```

```
 1                                                      163
 2                forty-five minutes, how much of that time
 3                were Solomon and Alaimo in there?
 4      A        With the exception of the times that
 5                Solomon went upstairs to Pollard's office,
 6                and the one time that Alaimo went in, they
 7                were always there.
 8      Q        Alaimo left on one occasion?
 9      A        Yes.
10      Q        All other times while you were in the room
11                he was there?
12      A        Yes.
13      Q        When he left on that one occasion, was it
14                during the tape recording or was it after?
15      A        After.
16      Q        Did you have an understanding of where he
17                went when he left the room, and I'm
18                referring to Alaimo?
19      A        To Pollard's office, the two of them went.
20      Q        They both went together?
21      A        Yes.
22      Q        Do you have a memory of whether Alaimo left
23                at some point and said I'm going to look at
24                the tape, I'll be right back.
```

```
1                                                    164

2        A    To my memory, no.

3        Q    Do you have a memory of Solomon going to

4             review the tape and then come back into the

5             conference room?

6        A    The only thing he said during those times

7             was I'm going to go talk to Pollard.

8        Q    Pollard is his supervisor?

9        A    The mayor, yes.

10       Q    She is?

11       A    Was at that point in time, yes.

12       Q    Did he have an obligation under the sexual

13            harassment policy to notify her of what he

14            had observed that morning?

15       A    The human resource director would be the

16            first source.

17       Q    Do you know if he did that?

18       A    I do know that at the very end Bain came

19            down with the resignation letter.

20       Q    If an employee became aware of an incident

21            of sexual harassment, they were to go to

22            their supervisor, correct?

23       A    I believe you're referring to Article 4.

24       Q    I'm not referring to any Article.  I'm just
```

```
1                                          165

2              asking what the policy in general obligated

3              an employee to do?  If you want to refer to

4              a specific provision, that's fine, but the

5              question is in a general sense.

6        A     The obligation, I believe, flows to a

7              supervisor who would have that obligation.

8              I'm not sure that a non-supervisory

9              employee would have that obligation, but I

10             would have to read that policy again.  I

11             don't have it memorized word for word.

12       Q     Is there anything inappropriate about a

13             city of Methuen employee going to their

14             direct supervisor when they became aware of

15             a possible instance of sexual harassment?

16       A     Absolutely nothing wrong.

17       Q     Anything wrong about an employee going to

18             their supervisor before they go to Mr.

19             Bain?

20       A     I don't think there's a prohibition, if

21             that's your question.

22       Q     You drafted the policy.  Is it

23             inappropriate?

24       A     Quite honestly, it's an MCAD model policy.
```

```
1                                              166
2              I didn't sit there and create this.
3              Certainly there would be nothing that I
4              know of inappropriate in that method.
5      Q    So it was appropriate for Solomon to report
6              possible sexual harassment to his
7              supervisor, Mayor Pollard?
8      A    If we're talking about a civil
9              investigation, yes.
10     Q    Can you describe the substance of your
11             conversations, first with Solomon, that
12             took place in the second floor conference
13             room when the recorders were off.
14     A    Most of it is listed in here, this section,
15             where I've been discussing what was said.
16             I wish the recorders had stayed on because
17             at that point in time my proof goes down
18             the toilet that's on the record, because as
19             soon as it went off, the threats started.
20     Q    That's my question, really.  If you need to
21             take some time, that's okay, but could you
22             please go through the Verified Complaint
23             and tell us which of the statements took
24             place in the second floor conference room
```

1                                                              167

2              after the recorders were turned off.

3      A      All of them.  I don't believe any of them

4              occurred while the recorders were on.

5      Q      So everything Solomon said that you

6              referenced or quoted in the Verified

7              Complaint took place after the recorders

8              were off?

9      A      To the best of my knowledge.

10     Q      How about Alaimo?

11     A      In terms of?

12     Q      Conversations you had with him in the

13             second floor conference room after the

14             recorders were off.

15     A      He was being a second kick to Solomon, so

16             they would be bouncing back and forth with

17             their threats.

18     Q      You can't tell us anything specific about

19             what Alaimo said after the recorders went

20             off in the second floor conference room?

21     A      He chimed in with whatever Solomon said.

22     Q      Can you show us in the Complaint where you

23             reference Alaimo's comments specifically as

24             opposed to Solomon.

```
 1                                              168
 2        A    I don't know that I put any of Alaimo's
 3               comments in here.  I think it was Solomon
 4               because he's the chief and I was relying on
 5               him, what he stated.
 6        Q    Did Alaimo make any specific threats to
 7               you?
 8        A    The handcuffs, yeah.
 9        Q    What did he say with regard to handcuffs?
10        A    Once Solomon started that routine, he would
11               pick up on it too.
12        Q    What routine?
13        A    Resign or I throw the cuffs on you.
14        Q    Is that a statement that Alaimo made or
15               that Solomon made?
16        A    That's the one that Solomon made that then
17               Alaimo would chime in on.
18        Q    Would he repeat that statement?  What do
19               you mean by chime in on?
20        A    Alaimo is not an original creator of
21               ideas.  He kind of follows up on somebody
22               else, for example, Solomon.  If Solomon
23               would say it, he would repeat it.
24        Q    Regardless of what you think of him, he is
```

```
1                                              169

2              a defendant in this case.  I would like you

3              to tell us specifically what he said based

4              on your memory, and if you've documented it

5              in the Verified Complaint, fine.  If you

6              didn't, please tell us.

7         A    I think I told you that I believe all the

8              comments that I put in this Complaint are

9              Solomons.

10        Q    So none of the statements in here in the

11             Verified Complaint do you attribute to Joe

12             Alaimo, is that right?

13                  MR. DiADAMO:  Objection.

14        A    I am referencing Solomon in here.

15        Q    Yes or no.  None of the threats or alleged

16             intimidation that you put in the Verified

17             Complaint were actually made by Joe Alaimo;

18             is that correct?

19                  MR. DiADAMO:  Objection.

20        A    The Verified Complaint does not contain the

21             threats that Alaimo made, just the threats

22             that Solomon made.

23        Q    As you sit here today, you cannot tell us,

24             based on your memory, any specific threats
```

```
 1                                                    170
 2              or intimidation that Joe Alaimo made to
 3              you?
 4        A     The cuffs.
 5        Q     Just the cuffs?
 6        A     Yes.
 7        Q     What specifically do you recall him saying?
 8        A     Solomon started with the resign now or I'm
 9              going to throw cuffs on you and take you
10              out of here.  Then Alaimo chimed in that
11              way.
12        Q     That's what I'm asking you.  What do you
13              specifically recall him saying other than
14              he chimed in?
15        A     He would repeat the same line.  It wasn't
16              new words or a new phrase or a new thought
17              that was being done.  It was a repeat.
18        Q     What exactly did he repeat?
19        A     The handcuffs.
20        Q     Tell us exactly what he said, based on your
21              memory, because it's not in the Verified
22              Complaint, you told us.
23        A     Solomon started in, Alaimo started chiming
24              in, you better resign, words to that
```

```
 1                                           171

 2              effect, you better resign or we're going to

 3              cuff you and take you out of here.

 4         Q    That's what Solomon said, right?

 5         A    No, Solomon said it, then Alaimo said it.

 6         Q    The exact same words, is that what you're

 7              telling us?

 8         A    No, it would be the same concept, but it's

 9              not every single word the exact same.

10                   MR. DiADAMO:  Could we go off the

11              record for a second.

12

13                   (OFF THE RECORD DISCUSSION)

14

15         Q    Sir, tell us exactly what your memory is of

16              what Joseph Alaimo said in the second floor

17              conference room after the recorders were

18              off specifically, please.

19         A    I can't give you a word for word exact one

20              hundred percent.  All I can tell you is

21              that he referenced the handcuffs, and that

22              I would be cuffed and taken out.  There's

23              frankly only one sentence that I

24              specifically remember the wording on
```

```
1                                                        172
2              exactly.
3        Q     You told us that?
4        A     No.
5        Q     What is it?
6        A     At that point in time, quite frankly,
7              having lost it, I said I can't believe my
8              friend did this to me, referencing Fulya,
9              and Alaimo's last words to me in this
10             entire world was he looked at me and said,
11             Moe, trust me on this one, she ain't no
12             friend of yours.  I remember that one
13             hundred percent.
14       Q     How many times was it that Solomon left the
15             room while you were there?
16       A     To my memory, three times.
17       Q     None of those times were before the
18             recorders were turned off, correct?
19       A     Correct.
20       Q     When he came back on each of the three
21             times, tell us what your memory is of what
22             he said to you.
23       A     It's listed in the Complaint.
24       Q     Could you refer us to where.
```

```
 1                                                    173

 2        A    Yes.

 3

 4                        BRIEF RECESS

 5

 6        Q    Before we took the break, I asked you, sir,

 7             to identify the specific statements that

 8             Chief Solomon made when he arrived back on

 9             the three trips from leaving the room.

10             Have you done that?

11        A    I did.  101, which is the other leave

12             return, 108 and 113.  Those are the times

13             that he was exiting and returning.

14        Q    Based on the Verified Complaint, you claim

15             that Chief Solomon said, "If you resign, I

16             know Metin will not press criminal charges

17             based upon my talking to her a little while

18             ago.  However, the mayor wants you fired

19             and prosecuted.  I can talk to her, as you

20             know, we have let people have leaves and

21             then they just go away.  I will talk to her

22             (the mayor) about this."  I read that

23             correctly?

24        A    Yes.
```

```
 1                                              174
 2      Q    At that time you knew that the mayor

 3           couldn't fire you.

 4      A    Yes.

 5      Q    You knew that?

 6      A    Could not fire me, yes.

 7      Q    The only authority to have you fired was

 8           the city council?

 9      A    The only final legal authority, yes.

10      Q    So that was a veiled threat?

11      A    No.  The mayor wants you fired and

12           prosecuted.

13      Q    You just told us that she had no authority

14           to fire you, right?

15      A    It doesn't say the mayor is going to fire

16           you, it says wants you fired.

17      Q    How is that a threat to you if the city

18           council was the only authority to terminate

19           you?

20                     MR. DiADAMO:  Objection.

21      A    You want my interpretation of what he was

22           saying?

23      Q    Do you not understand the question?

24      A    I understood what he was saying, yes.
```

```
 1                                                    175

 2        Q    My question is, how is it a threat that the

 3             mayor wants you fired when she has no

 4             authority to do it?

 5        A    She wanted me fired.  I would have been

 6             gone a long time ago if she had the legal

 7             authority to do it.

 8        Q    What legal authority did she have that

 9             morning as you sat in the conference room

10             on the second floor?

11        A    The threats were they were going to bring

12             that to the city council and have them fire

13             me.

14        Q    How was that a threat to you?

15                       MR. DiADAMO:   Objection.

16        A    To have my entire life blown up?

17        Q    You deny Metin's allegations, correct?

18        A    Yes.

19        Q    You deny her version of what happened in

20             large part in her statements, correct?

21        A    Yes.

22        Q    So how was it a threat to you for them to

23             go to the city council?

24        A    The mayor largely controlled the city
```

```
 1                                            176

 2            council, to begin with, number one.  Number

 3            two, I've got a female making allegations

 4            against me, and I have not had an arm's

 5            length relationship, so I couldn't sit back

 6            and say totally innocent, there had been

 7            some feelings, there had been some

 8            contact.  They just took it to this

 9            ultimate stage.

10       Q    What feelings were there?

11       A    We really liked each other, we were

12            friendly.

13       Q    What feelings were there on your part?

14       A    I felt like after many years of hating the

15            job with Pollard in office that here comes

16            somebody really nice.  We got along really

17            well, the office just became very pleasant.

18       Q    Did you have any feelings of sexual

19            intimacy towards Metin?

20       A    No.

21       Q    Did you ever desire to have sexual contact

22            with Ms. Metin?

23       A    She's very attractive, but I hadn't gone to

24            that level, no.
```

```
 1                                                      177
 2        Q    In your own mind, did you desire to have
 3             sexual relations with her at any time
 4             during her employment?
 5        A    No.
 6        Q    Prosecute.  The mayor couldn't prosecute
 7             you, right?
 8        A    Right.
 9        Q    Only the district attorney's office could
10             prosecute you, right?
11        A    The chief could bring the charges, yes.
12        Q    He can bring them, but with respect to
13             prosecution you knew as you sat in the
14             second floor conference room that the only
15             party that could prosecute you was the
16             district attorney, correct?
17        A    At that point in time with the threats, I
18             was not sitting there as a lawyer doing an
19             analysis.  I knew that if she wanted to
20             push something, if he wanted to push
21             something, I would be stuck with it.
22        Q    Even though you denied the allegations?
23        A    Yes.
24        Q    The mayor controlled the city council,
```

```
1                                              178
2           according to your testimony?
3    A      Yes.
4    Q      Who was the chairman?
5    A      As of January, Mike Hennessey.
6    Q      Who else did she control on the board?
7                   MR. DiADAMO:  Objection.
8    A      She had influence over approximately seven
9           of the nine.
10   Q      Who were the seven of the nine she had
11          influence over?
12   A      I would have to go down and remember every
13          one.  There's only two that I knew that
14          were opposing her.
15   Q      Who were they?
16   A      Kenneth Hendrick, and there had been a guy
17          named Woekel when he was on there.
18   Q      It's your testimony that current Mayor
19          Manzi was on the council at the time,
20          correct?
21   A      Yes.
22   Q      He was under the control of Mayor Pollard?
23   A      He followed her lead.  There's only a few
24          instances that he blocked her.  Her trying
```

```
 1                                                     179
 2              to get rid of me he blocked.
 3         Q    It's your belief that the city councilors
 4              would not be objective in their review of
 5              the allegations brought by Ms. Metin and
 6              your employment status?
 7                    MR. DiADAMO:  Objection.  What
 8              time period?  That time?  Now?
 9         Q    How about that time period.
10         A    At that point in time, the threat was the
11              hammer hitting me in the head.  Again, I'm
12              all of a sudden having two cops going after
13              me.  I wasn't sitting there like a legal
14              analysis.
15         Q    I understand that, but you were an attorney
16              at that time, right?
17         A    Yes.  Was I licensed, yes.
18         Q    You didn't practice criminal law, but you
19              knew that you had the right to an attorney?
20         A    Yes.
21         Q    You knew that you could end the interview
22              at any time and call an attorney, correct?
23         A    I was not allowed to leave the room.  I
24              couldn't even call my wife.
```

```
 1                                                      180

 2        Q    Did you ever ask to leave the room?

 3        A    Yes.

 4        Q    What was the response?

 5        A    No, and they blocked me.

 6        Q    Who blocked you?

 7        A    Solomon and then Alaimo.

 8        Q    How many times did you ask them to leave

 9             the room?

10        A    Twice.

11        Q    For what reason?

12        A    I wanted to go home.

13        Q    They told you you couldn't leave the room?

14        A    Correct.

15        Q    Did you ever ask to call anyone outside of

16             the room?

17        A    Yes, my wife.

18        Q    What was the response?

19        A    They wouldn't let me.

20        Q    You said earlier that Alaimo left the room

21             on one occasion, correct?

22        A    Yes, to my memory.

23        Q    That must be paragraph 108.

24        A    Yes.
```

```
 1                                              181

 2        Q    The occasion was that Solomon and Alaimo

 3             then said they were going back upstairs to

 4             talk to the mayor.  That's the one

 5             occasion, sir, that Alaimo left the room,

 6             according to you?

 7        A    To my memory.

 8        Q    Did either Alaimo or Solomon ever tell you

 9             that you were under arrest?

10        A    To my memory, no.  They threatened but I

11             don't believe they said you are under

12             arrest at this time.

13        Q    In what way did they threaten it?

14        A    It's listed in there that they would arrest

15             me, handcuff me, drag me out of the

16             building.

17        Q    Were you ever told that you cannot leave

18             the building or the second floor conference

19             room?

20        A    Yes, when I attempted to leave they blocked

21             me.

22        Q    Was that on tape or was that off tape?

23        A    To my memory, only the first five or ten

24             minutes was on tape.
```

1                                                            182

2     Q    So your attempts to leave the office were

3          after the tape recorders were turned off,

4          correct?

5     A    Yes.

6     Q    Was anyone else present on either of the

7          two occasions when you attempted to leave

8          the room besides Alaimo and Solomon?

9     A    To my memory, no.

10    Q    Besides asking to call your wife, did you

11         ask to call an attorney?

12    A    No.

13    Q    Did you ask them to stop the interview?

14    A    When I tried to leave, yeah.  I was turning

15         and saying I wanted to leave, and I was

16         blocked.

17    Q    Did you say you weren't going to return

18         after you left?

19    A    There was no conversation about that.  I

20         was just plain blocked.

21    Q    Was there any physical contact between you

22         and Chief Solomon in the conference room?

23    A    To my memory, no.

24    Q    Was there any physical contact between you

```
 1                                              183

 2                and Deputy Chief Alaimo in the conference

 3                room?

 4        A       One time when he pushed the chair back in

 5                when I wanted to get up.

 6        Q       Could you elaborate on that incident,

 7                please.

 8        A       I was sitting where the stenographer would

 9                be, basically in that type of table, and I

10                started to push back and was blocked.

11        Q       Is that incident referenced in the

12                Complaint?

13        A       I don't believe so, no.

14        Q       Did you talk about asking to leave anywhere

15                in the Complaint?

16        A       I don't remember.  I'm not sure.  I don't

17                know.

18        Q       You talked about going to the men's room on

19                one occasion in the Complaint, correct?

20        A       Yes.

21        Q       You did, in fact, go to the men's room with

22                Captain McCarthy, correct?

23        A       Yes, he would only let me go to the

24                bathroom if he was there.
```

```
1                                                    184

2      Q    Was that one of the occasions when you

3           asked to leave the room or was that another

4           one?

5      A    That was a different one.  The two were out

6           of the conference room at that point in

7           time.  It was just McCarthy.

8      Q    Was there anything unlawful about Chief

9           Solomon and Deputy Chief Alaimo putting

10          handcuffs on you?

11                    MR. DiADAMO:  Objection.

12     A    I'm not a criminal attorney.  Quite

13          obviously there weren't any criminal

14          charges they were pressing.  Now I find out

15          Fulya never wanted criminal charges.  So,

16          yes, if they were going to arrest me when

17          the person who is claiming according to

18          them for a crime, and she isn't, yeah, that

19          would be illegal.

20     Q    They never did put handcuffs on you,

21          correct?

22     A    No.

23     Q    Physically removing you from the conference

24          room and taking you to the police
```

```
1                                                    185

2               department for additional questioning, is

3               there anything unlawful about that?

4      A    I never went to the police department.

5      Q    You said you were threatened and

6               intimidated about leaving the conference

7               room and being dragged out of the building,

8               correct?

9      A    Correct.

10     Q    Was there anything unlawful about them

11              removing you from the conference room and

12              taking you down to the police station?

13                   MR. DiADAMO:  Objection.

14     A    Under the then circumstances, yes.

15     Q    What was unlawful about that?

16     A    They had ceased any investigation as soon

17              as that tape went off and pursued their

18              political agenda.  There was no more

19              investigation, there was no more

20              questioning about what occurred and how it

21              occurred and what my side of the story

22              was.  That stopped as soon as the tape

23              stopped.

24     Q    Did you deny any of the allegations in the
```

1                                              186

2              conference room that morning?

3       A     Yes.

4       Q     What specifically did you deny?

5       A     He brought up a comment that she said I was

6              following her, and I referenced that the

7              only one I knew was Depardo and I were at

8              Gold's Gym and going from the first floor

9              to the second floor when we saw Fulya and

10             the daughter coming down from the second

11             floor to the first.  I said I was not

12             pursuing her or following her.  We just

13             bumped into each other at that point in

14             time.  There was the conversation about the

15             phone call, you know you called Fulya.  He

16             had already told me he was there.  I said

17             Joe, you were there, you know that I wasn't

18             doing anything inappropriate, just

19             reporting a case.  Those were the sort of

20             things.

21      Q     Were you ever told that you could leave the

22             building in exchange for your resignation?

23      A     I was told if I resigned, sign the

24             resignation, I could leave.

```
1                                                    187

2        Q    You knew that you could leave without

3             signing the resignation at that time,

4             right?

5        A    No, they wouldn't let me out.  They were

6             physically blocking me from leaving.

7        Q    Administratively you knew you didn't have

8             to resign, though, correct?

9                      MR. DiADAMO:   Objection.

10       A    Administratively?

11       Q    You knew that in order to be discharged,

12            that you had to go through an

13            administrative process before the city

14            council, correct?

15       A    That thought process wasn't crossing my

16            mind at that point in time.

17       Q    You knew that going into the room, though,

18            right?

19       A    No, I knew that I was going to be

20            celebrated for a great victory, that's what

21            I was thinking about.

22       Q    Before you went into that room, before you

23            encountered Solomon and Alaimo that

24            morning, you knew that before you could be
```

```
 1                                                    188

 2              discharged you were entitled to a hearing

 3              before the city council.

 4      A       Was I aware, yes.

 5      Q       You knew that when you were in the

 6              conference room as well, correct?

 7      A       No.

 8      Q       It escaped your memory?

 9                    MR. DiADAMO:  Objection.

10      A       Some day, Gareth, if you have bad luck and

11              have two corrupt clowns doing that to you,

12              see if you sit there as an attorney.

13      Q       Did it escape your memory or not?

14                    MR. DiADAMO:  Objection.

15      A       I went totally fuzzy when I found out what

16              they were doing and how they were doing it

17              to me.  I didn't sit there and think, nor

18              did they intend for me to be to able think

19              through some of the issues.

20      Q       After you left the room, in hindsight, you

21              knew that you were entitled to an

22              administrative hearing before your

23              discharge, correct?

24      A       Not for a long time.
```

```
1                                                        189
2         Q    When did it occur to you?
3         A    That was brought up, and that's
4              attorney/client and I'm not going to be
5              discussing that, thank you.
6         Q    Did you deny having a dating relationship
7              with Ms. Metin?
8         A    I don't recall the term dating being used.
9         Q    Were you asked whether the relationship was
10             consensual?
11        A    I'm not sure if that wording was used or
12             not.
13        Q    In so many words, were you asked if it was
14             a consensual relationship by Solomon or
15             Alaimo?
16        A    I can't remember the exact words.  I would
17             say something to that effect.
18        Q    What was your response?
19        A    I don't recall specific wording.
20        Q    Your testimony today is that it was a
21             mutually affectionate relationship, right?
22        A    I never had the feeling it was an unwelcome
23             predatory relationship.  I was never shown
24             that.
```

```
 1                                                    190

 2        Q    You didn't have that thought as you sat in

 3             the conference room, correct?

 4        A    Which thought, sir?

 5        Q    That it was not an unwanted unwelcomed

 6             predatory relationship?

 7        A    Correct.

 8        Q    Why did you not tell that to the officers

 9             when you were asked about this issue?

10        A    I believe I did, but I don't remember the

11             words.  I think that section was on the

12             tape.

13        Q    Your answer was on the tape?

14        A    I believe that question to that effect, and

15             a response to that effect, was on the tape.

16        Q    You had not had sexual relations with Ms.

17             Metin up to that point, correct?

18        A    No.

19        Q    You had had mutually affectionate welcomed

20             contact with her, right?

21        A    Yes.

22        Q    What was there to be embarrassed about if

23             it was welcomed and mutually affectionate?

24        A    You have to put it where I was at that
```

1                                                          191

2                    point in time and how much it hit me.  I

3                    had gone through three and a half years of

4                    hell with Pollard, and all of a sudden

5                    somebody comes that's in nice and friendly

6                    to me, and I'm saying thank God, at least

7                    when I get out of the car in the morning my

8                    gut isn't turning because I have to walk

9                    into that freaking building, that somebody

10                   is friendly to me and we're getting along

11                   real great, and all of a sudden I find out

12                   she participated in a setup and I got two

13                   corrupt cops going after me.  It was like

14                   being hit by an atomic bomb.

15        Q     Did either Solomon or Alaimo ever come back

16                   into the conference room that morning

17                   before you left and tell you that they saw

18                   the tape themselves?

19        A     The only thing I recall about the

20                   conversation, they said there was a tape.

21                   I think they said they saw it, I'm not

22                   positive.  But the timeline, unless they

23                   were sitting there watching the events as

24                   they occurred, the timeline wouldn't work.

```
 1                                              192

 2        Q    In paragraph 113 of the Complaint you

 3             wrote, B, he simply wanted to avoid the

 4             publicity these charges would bring and the

 5             hurt to his family and name if he didn't

 6             comply with their threats.  Did I read that

 7             correctly?

 8        A    Yes.

 9        Q    My question is, if you challenged the

10             allegations and didn't resign, how would

11             the embarrassment be any less to you and

12             your family?

13        A    You're guilty no matter what once the

14             charge is made.

15        Q    You had no confidence in the city council

16             they would objectively review the

17             situation?

18        A    I have no confidence in politics.  I know

19             the way it works.

20        Q    You had no choice, no alternative to

21             resigning that morning, is that your

22             testimony?

23        A    Yeah.  I knew how ruthless they were.  I

24             just stupidly decided to trust them for one
```

```
1                                                        193
2              moment and I'm paying for that a thousand
3              times over.
4         Q    But you were the city solicitor for
5              twenty-five years, correct?
6         A    Yes.
7         Q    A dedicated employee, right?
8         A    The last mayor gave me the employee of the
9              year award because of my qualifications and
10             my work.
11        Q    Never any complaints about you regarding
12             sexual harassment?
13        A    No.  Quite frankly, they used to joke at
14             town hall that it was a city solicitor form
15             of government because so many people
16             listened to what I advised them and they
17             took the steps in that fashion.  I went
18             from being a very important employee to
19             some political person coming in and
20             Stalinizing the area.
21        Q    You denied that you sexually harassed Ms.
22             Metin?
23        A    Yes.
24        Q    In the face of denying Ms. Metin's charges,
```

```
 1                                                      194

 2              your dedicated professional service to the

 3              community, the lack of any complaints, and

 4              your administrative right to a hearing

 5              before the city council, you felt there was

 6              no alternative but for you to resign that

 7              morning, is that your testimony?

 8                      MR. DiADAMO:  Objection.

 9         A    My father said one thing to me that I run

10              through my mind every day.  He said the

11              Larivieres will never have much money, but

12              I gave you a good name and you'll pass it

13              to your kids.  Now this.  Do you think I

14              wanted this?  Those scum, if they kept

15              their mouth shut I would have honored mine,

16              gone out the door and never said another

17              word, because we can play all the games we

18              want, but when I signed that resignation

19              they let me go.  So stop playing the

20              criminal game, it didn't happen.

21         Q    Your answer is no, you felt you didn't have

22              an alternative?

23         A    No, I wanted my name.  I wanted the ability

24              to support my family.  If that's a crime,
```

```
 1                                                      195
 2              then I'm guilty.
 3      Q       If you wanted your name and you wanted to
 4              support your family, wouldn't the better
 5              alternative have been to stop the
 6              proceedings and ask for an attorney?
 7      A       No.
 8      Q       Would a better alternative have been to
 9              continue with the investigation and the
10              interrogation and then go through the
11              administrative process?
12      A       No.
13      Q       How about proceed with the criminal
14              investigation and defend yourself in a
15              court?
16      A       No.
17      Q       The only alternative was resignation.
18      A       Once the charges are made you're guilty.
19              The reality is all I ever did was work in
20              the public sector of law.  I can't get a
21              job in that sector now because of this
22              goddamned BS.
23      Q       You waived the right to a hearing, correct?
24      A       It's in that statement that Bain prepared.
```

```
1                                                    196
2        Q    Let's look at it.  Exhibit 13.  Do you
3             recognize Exhibit 13?
4        A    Yes, I do.
5        Q    Can you till us what it is?
6        A    It's the resignation.
7        Q    Your signature appears on the document,
8             correct?
9        A    That is correct.
10       Q    You signed it on August 16th, 2005?
11                  MR. DiADAMO:  Objection.
12       A    That is correct.
13       Q    I'm sorry, February 16th, 2005.
14       A    February, I'm sorry.
15       Q    David Bain was there when you signed this
16             document?
17       A    Bain brought this back in and threw it and
18             handed me a pen and said sign.
19       Q    When you signed it, had Bain already
20             signed?
21       A    To my knowledge, no.
22       Q    Did he sign it in your presence?
23       A    I don't recall.
24       Q    You knew that by signing this document you
```

```
1                                              197

2              were voluntarily resigning your position as

3              city solicitor?

4    A    No, I was not voluntarily resigning.

5    Q    You knew that you were resigning your

6              position, correct?

7    A    Yes.

8    Q    You also acknowledged the statement, I also

9              hereby waive my rights for an impartial

10             panel for an Article 9, Section 9-10

11             hearing under the Methuen Home Rule

12             Charter, correct?

13   A    Yes.

14   Q    By waiving that right with your signature,

15             you were giving up the right to a hearing

16             before the city council to challenge the

17             charges against you?

18   A    Under coercion, yes.

19   Q    You had inserted provisions waiving an

20             employee's right to an impartial panel and

21             Article 9 hearing in other instances,

22             correct?

23   A    No.  That is the very first time that that

24             language has ever appeared in any document,
```

1                                                                198

2              to my knowledge.

3        Q    But you have negotiated departures for

4              employees where they agreed not to go

5              before the city council for a hearing,

6              correct?

7        A    No.

8        Q    What type of hearing is an employee

9              entitled to?  A non-city council controlled

10             employee.

11       A    Those would be the civil service employees

12             are the one who have the hearing rights.

13       Q    Have you ever negotiated a waiver of a

14             civil service hearing for an employee of

15             the city of Methuen during your term as

16             city solicitor?

17       A    Only upon agreement of the union and

18             counsel.  I think you've seen the exhibits

19             in there that were countersigned by a

20             number of people.

21       Q    But you didn't ask for an attorney when you

22             signed this, right, because you were an

23             attorney?

24                      MR. DiADAMO:  Objection.

```
 1                                              199

 2      A    Not in that proceeding, no.

 3      Q    You weren't an attorney in that proceeding?

 4      A    No.  Lincoln was one hundred percent

 5           correct.

 6      Q    What did he say?

 7      A    You can't be your own attorney.  You don't

 8           have the ability to stand back and make a

 9           decision.

10      Q    You drafted your wills, right?

11      A    Yeah.

12      Q    You were your own attorney in that

13           proceeding?

14      A    Everything to the wife and kids.

15      Q    You negotiated your appointment to the city

16           solicitor's position.  You were your own

17           attorney in that proceeding.

18                      MR. DiADAMO:  Objection.

19      A    There isn't a proceeding that I'm involved

20           in.

21      Q    Did you hire an attorney to handle your

22           reappointment to the city solicitor's

23           position?

24      A    No, they put it on the agenda in accordance
```

```
1                                                    200

2                with the time standards of the charter, and

3                they vote it in.

4        Q       What if anything did David Bain say to you

5                that morning in the conference room?

6        A       Something like a greeting.  I don't

7                remember the exact words.  But there was no

8                discussion.

9        Q       Did he say whether he had prepared Exhibit

10               13?

11       A       I don't remember him using those words,

12               no.  He just walked in with the paper.

13       Q       Was anyone else in the room when you signed

14               Exhibit 13?

15       A       Solomon and Alaimo, to my memory.

16       Q       After you signed the document, what

17               happened next?

18       A       Solomon took me by the shoulder, took me

19               upstairs to the office, I went past a

20               couple of the cops, went into the office,

21               Solomon told me I would never be allowed to

22               come back into town hall.  At that point he

23               said I want the keys to the town hall, and

24               there's a security device, he said he
```

```
1                                                    201
2              wanted both of those.  I started looking
3              for it.  As a matter of fact, that
4              photograph that Bill Depardo gave me, it
5              was in that top-right hand drawer, and I
6              reached in not knowing whether the keys
7              were there.  At that point in time Solomon
8              grabbed my hand and took that away from
9              me.  He then saw my cellphone and handed me
10             the cellphone.  I told him I thought the
11             keys would be down in the car.  He sent
12             Chris McCarthy, the captain, down with me
13             to my car to get the keys.  One of the last
14             statements he was making while I was in the
15             office fulfilling on the promise that
16             nothing would be said or talked about, he
17             had said I'll make sure that your stuff is
18             taken out of the office and given to you.
19             We'll have it done at night so nobody will
20             know.
21     Q       Then you left the office?
22     A       Escorted, yes.
23     Q       Where did you go next?
24     A       I went down to the car, looked in my glove
```

```
 1                                                          202
 2              compartment, found the keys, handed them to
 3              McCarthy, and then drove home.
 4      Q      When you first left the building, what time
 5              was it the first time?
 6      A      It would be some time after noon.
 7      Q      Did you drive home after leaving City Hall?
 8      A      Yes.
 9      Q      Did you stop anywhere on the way home?
10      A      No.
11      Q      Did you drive your customary route on your
12              way home?
13      A      Yes.
14      Q      What time did you arrive home?
15      A      It's about a half hour, twenty minutes to a
16              half hour, so it would be whatever that
17              timeline is.
18      Q      Did you make any phone calls on your
19              cellular phone between the time you left
20              the building and you arrived home?
21      A      Before I arrived home?
22      Q      Yes.
23      A      No.
24      Q      Did you call anyone else after you arrived
```

```
 1                                                   203

 2             home that evening?

 3        A    Yes.

 4        Q    Who did you call?

 5        A    I called Solomon to confirm that he

 6             wouldn't be doing anything and that I could

 7             go on.

 8        Q    What was the response?

 9        A    Yes.

10        Q    When you say doing anything, you mean

11             criminally?

12        A    Yes, and that and publicity-wise.

13        Q    Do you distinguish between a criminal

14             investigation into what occurred on the

15             morning of the 16th and the civil sexual

16             harassment investigation?

17        A    They're totally different ballgames.

18        Q    But you agree that there are two different

19             components, correct?

20                  MR. DiADAMO:  Objection.

21        A    In the employee situation it's very rare

22             that there would be a criminal.  It's

23             always civil.

24        Q    If Chief Solomon and Deputy Chief Alaimo
```

```
1                                                   204
2              had probable cause to believe that an
3              indecent assault and battery had occurred
4              on the morning of the 16th in Fulya Metin's
5              office and your office, do you agree that
6              they had a right to ask you questions?
7      A       If there was a criminal allegation being
8              lodged, yes.
9      Q       Do you agree that they had a right to
10             detain you?
11     A       If it was purely related to the criminal,
12             yes.
13     Q       If Chief Solomon and Deputy Chief Alaimo
14             had probable cause to believe that an
15             indecent assault and battery had occurred
16             on the morning of February 16th, do you
17             agree that they had a right to arrest you?
18     A       Yes.
19     Q       Could you explain in what way you believe
20             your resignation was involuntary.
21     A       I've outlined it in there.  It was a
22             coercion and threats of applying the
23             criminal process, lies that Fulya wanted
24             the criminal process, so I was going to be
```

```
 1                                                      205

 2              handcuffed and dragged out of the building,

 3              was his exact words to me, and prosecuted.

 4              My career, everything would be in the

 5              toilet.

 6       Q      Do you agree that if an investigating

 7              officer investigating the sexual complaint

 8              is questioning a possible defendant, that

 9              they have the right to use coercive

10              methods?

11                      MR. DiADAMO:  Objection.

12       A      I believe there's due process in this

13              country.  One has a right to know what's

14              going on, be apprised of it.  If you look

15              at the policy, it's not a sneaky peeky,

16              it's an outlined process.

17       Q      But you had your due process rights,

18              correct, because you were given your

19              Miranda warning?

20       A      If it was purely criminal, if they stayed

21              purely criminal, yes.

22       Q      You waived that right to the criminal due

23              process, correct?

24                      MR. DiADAMO:  Objection.
```

```
1                                              206
2        A    No, I was deprived of the right to leave.
3             I was deprived of the right to communicate.
4        Q    You said that you didn't ask for an
5             attorney.
6        A    No.
7        Q    You didn't ask to call an attorney.
8        A    No.
9        Q    But you were given that right?
10       A    It was read under Miranda, yes.
11       Q    You knew going into the room that you were
12            entitled to an administrative hearing on
13            the civil side of the investigation, right?
14       A    If you're asking me as I walked to the door
15            if somebody stopped me and asked me that
16            question, I would say yeah.
17       Q    But when you got into the room, you no
18            longer felt you had that right to a civil
19            hearing before the city council, correct?
20       A    What happened is outlined in the Complaint
21            when the threats and the coercion started.
22            I did not, and I've repeatedly said, their
23            intent was to knock me off balance.  They
24            did.  I've never denied that.  I'm not
```

```
 1                                                      207

 2              going to deny it now.  I've never denied

 3              that they read Miranda and started out with

 4              a criminal process and wound up using it

 5              for a political purpose.

 6      Q      In paragraph 102 you said that, and I'm

 7              referring to Exhibit 1, the Verified

 8              Amended Complaint, you said that I need to

 9              go home and talk to my wife about this

10              whole issue.  I read that right, correct?

11      A      Yeah.

12      Q      Why did you need to go home to talk to your

13              wife about the whole issue?

14      A      I've been with her since 1973.  I don't

15              think I've made any solid decision ever

16              without communicating with her.

17      Q      Why did you decide not to communicate with

18              her about the resignation?

19      A      I wasn't allowed to.

20      Q      But you knew that you didn't have to sign

21              that paper that morning, correct?

22                     MR. DiADAMO:  Objection.

23      A      I knew, through their coercion, that I had

24              no choice, and I even uttered those words
```

```
1                                                          208

2                   to them, what choice do I have.

3          Q        Is there a provision in the city charter

4                   for criminal activities of an employee?

5          A        To my knowledge, no.

6          Q        If an employee commits a crime, does

7                   anything in city policy, whether it's in

8                   the charter or otherwise, speak to whether

9                   that employee can continue their

10                  employment?

11         A        Under Chapter 258, if somebody is indicted

12                  you can be suspended without pay pending

13                  the outcome of the trial.  If you're found

14                  not guilty, they have to repay you.  If

15                  you're found guilty, then you can be

16                  terminated and never recover the monies.

17         Q        Do you agree that former Mayor Pollard had

18                  no authority to revoke leave time, your

19                  leave time?

20         A        Direct authority?

21         Q        Yes.

22         A        No, direct legal authority, no.

23         Q        She had no authority to deny you leave time

24                  as well, correct?
```

```
 1                                                        209
 2        A    Legal authority, no.  Political authority,
 3             yes.
 4        Q    Wasn't one of your options that morning to
 5             take a paid administrative leave?
 6        A    Solomon said he broached that issue with
 7             Pollard.  I do remember one other thing
 8             that was in there that I had a conversation
 9             with him that he said Pollard was going to
10             fire me, and I said she doesn't have the
11             authority.  I know she can bring it to
12             council, but she doesn't directly have the
13             authority.  The leave, there was no
14             question in my mind if she said no the
15             political establishment would go with it.
16        Q    One of the allegations that you've made in
17             the Complaint is that you signed the
18             resignation letter under duress, correct?
19        A    Yes.
20        Q    Do you deny that you did not have a
21             reasonable alternative to the resignation?
22                      MR. DiADAMO:  Objection.
23        A    I'm not following you.
24        Q    Was there a reasonable alternative to your
```

```
1                                                    210
2              resignation?
3      A       No.
4      Q       Was there any alternative to your
5              resignation?
6      A       I was not allowed any alternative, no.
7      Q       If you had been afforded a paid
8              administrative leave and you were
9              ultimately terminated by the city council,
10             what impact would that have on your pension
11             and retirement?
12     A       There's no criminal action, so it shouldn't
13             affect it unless they proceeded against me
14             at the retirement level.
15     Q       If you're terminated by the city council,
16             there's no implications for your pension or
17             retirement?
18     A       There's a moral turpitude statute, it's not
19             applied that often to my knowledge, but it
20             could be applied, yes.  So if the
21             termination is made for moral turpitude,
22             yes.
23     Q       If you were convicted of a criminal offense
24             arising out of Ms. Metin's allegations,
```

```
1                                                       211
2              what would be the impact on your pension
3              and retirement benefits?
4        A     If it's related to the office, it would be
5              forfeited.
6        Q     Did that enter your mind as you sat in the
7              conference room on February 16th, 2006?
8        A     No.
9        Q     The consequences to your pension and
10             retirement never entered your mind when you
11             decided to resign?
12       A     From the moment they started at me,
13             everything was surrealistic.
14       Q     As you sit here today, do you wish you
15             didn't sign the resignation letter?
16       A     Of course.
17       Q     What would you have done differently?
18       A     If I knew that they were telling me lies
19             about Metin, if I knew that Metin in fact
20             wanted to come back to work with me, I
21             would have said the hell with this, you're
22             lying to me.  No, now I want my rights
23             because I know what the truth is.
24       Q     Based on your experience as city solicitor
```

```
 1                                              212
 2            and an employee of the city of Methuen, if
 3            the allegations of sexual harassment were
 4            deemed true, would you have been fired?
 5       A    I have no idea what the council would have
 6            done.  I'm assuming and hoping that no
 7            matter what, a twenty-five year employee
 8            would be given some credit.
 9
10            (OFF THE RECORD DISCUSSION)
11
12                 MR. NOTIS:  The parties have
13            agreed to suspend the deposition for the
14            day and reconvene the deposition hopefully
15            before the end of November 2006.  We've
16            also agreed to conduct it either in
17            Lawrence or Methuen on a date mutually
18            convenient for all parties.
19
20
21
22            (WHEREUPON THE DEPOSITION WAS SUSPENDED)
23
24
```

```
 1                                                    213
 2                    C E R T I F I C A T E
 3         COMMONWEALTH OF MASSACHUSETTS
 4         ESSEX, SS.
 5
 6              I, Joan R. Dunne, a Notary Public in
 7         and for the Commonwealth of Massachusetts,
 8         do hereby certify:
 9              That MAURICE LARIVIERE, the witness
10         whose testimony is hereinbefore set forth,
11         was duly sworn by me and that such
12         testimony is a true and accurate record of
13         my stenotype notes taken in the foregoing
14         matter, to the best of my knowledge, skill
15         and ability.
16              IN WITNESS WHEREOF, I have hereunto
17         set my hand and Notarial Seal this 20th day
18         of November, 2006.
19
20              Joan R. Dunne, Notary Public
           My Commission expires December 27, 2007
21
22              THE FOREGOING CERTIFICATION OF
           THIS TRANSCRIPT DOES NOT APPLY TO ANY
23         REPRODUCTION OF THE SAME BY ANY MEANS
           UNLESS UNDER THE DIRECT CONTROL AND/OR
24         DIRECTION OF THE CERTIFYING REPORTER.
```

1                                                    214

2

3
              I have read the foregoing
4     transcript of testimony and the same
      contains a true and accurate record of my
5     answers given to the questions therein set
      forth.

6

7
                        _____
8                       MAURICE LARIVIERRE

9

10

11

12

13

14

15

16          SIGNED UNDER THE PAINS AND PENALTIES
                        OF PERJURY
17

18

19

20

21

22

23

24

1                                    VOLUME II
                                     PAGES:  1-134
2                                    EXHIBITS:  16-18

3                    COMMONWEALTH OF MASSACHUSETTS

4         ESSEX, ss                SUPERIOR COURT DEPARTMENT
                                   C.A. NO. 05-1155C
5
    _____
6         MAURICE LARIVIERE,
                Plaintiff,
7
          vs.
8
          JOSEPH SOLOMON, Individually, and as
9         Chief of Police of the City of Methuen,
          and JOSEPH ALAIMO, Individually, and as
10        Deputy Chief of Police of the City of Methuen,
          and the CITY OF METHUEN,
11              Defendants,
    _____
12             CONTINUED DEPOSITION of MAURICE LARIVIERE, a

13        witness called on behalf of the Defendants in the

14        above-captioned matter, said deposition being taken

15        pursuant to Massachusetts Rules of Civil Procedure, by

16        and before Jean Wiseman, a Certified Shorthand Reporter,

17        and Notary Public in and for the Commonwealth of

18        Massachusetts, at the DiADAMO LAW OFFICE, LLP, 40

19        Appleton Way, Lawrence, Massachusetts, on Friday,

20        December 29, 2006, commencing at 10:00 o'clock in the

21        a.m.

22                            JOAN R. DUNNE
                         COURT REPORTING SERVICES
23                          28 Sonning Road
                       Beverly, Massachusetts 01915
24                            978-927-2678

```
1          A P P E A R A N C E S:

2          DiADAMO LAW OFFICE, LLP
           40 Appleton Way
3          Lawrence, MA  01840
           BY:  WILLIAM DiADAMO, ESQ.
4          Counsel for Plaintiff

5          MORRISON MAHONEY, LLP
           250 Summer Street
6          Boston, MA  02210
           BY:  GARETH W. NOTIS, ESQ.
7          Counsel for Defendant

8          REARDON, JOYCE & AKERSON, P.C.
           397 Grove Street
9          Worcester, MA  01605
           BY:  ANDREW J. GAMBACCINI, ESQ.
10         Counsel for Defendants, Joseph Solomon and Joseph Alaimo

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

```
 1                        I N D E X
_ _ _ _ _
 2         WITNESS_NAME                           Page_No.
_____ ____                        ____ ___
 3

 4         MAURICE LARIVIERE

 5

 6         CONTINUED DIRECT EXAMINATION BY MR. NOTIS      4

 7         CROSS EXAMINATION BY MR. GAMBACCINI          61

 8         REDIRECT EXAMINATION BY MR. NOTIS           111

 9         RECROSS EXAMINATION BY MR. GAMBACCINI       130

10

11

12

13                       E X H I B I T S
_ _ _ _ _ _ _ _
14

15         No._____Description_____Page_No.
____          _____           ____ ___
16

17         No. 16    City of Methuen Home Rule Charter      6

18

19         No. 17    Lt. Wnek's 3-pg. report             41

20

21         No. 18    E-mail communication between Manzi

22                        and Lariviere                  64
```

2 3

2 4

4

```
 1                    P R O C E E D I N G S

 2

 3

 4        M A U R I C E   L A R I V I E R E,

 5

 6              a witness having been duly identified and sworn

 7              under oath, testified as follows:

 8

 9                   CONTINUED DIRECT EXAMINATION

10   BY MR. NOTIS:

11        Q    Good morning, Mr. Lariviere.  Today is day 2 of

12   your deposition.  Day 1 took place on November 13th,

13   2006.  Is that your memory?

14        A    It was somewhere around there, around Veteran's

15   Day.

16        Q    Did you have an opportunity to review day 1 of

17   your transcript?

18        A    Did I read it?  Yes.

19        Q    Have you made any changes to your testimony from

20   November 13, 2006?

21        A    I ran through it briefly.  I don't recall

22   anything that jumped out at me.

23        Q    You didn't prepare an errata sheet with any

24   changes to the transcript?
```

1          A     No.

2          Q     I'm going to show you a bound document from the

3    City of Methuen Home Rule Charter and ask you to review

4    that document, please.

5                (Witness examines document.)

6          A     Do you want me to read the whole thing or --

7          Q     Why don't you review it and my question concerns

8    whether or not that was the charter that was in effect in

9    January of 2005 at the time of your resignation?

10         A     Are we at the end of the day going to be on

11   9-10?

12         Q     We might, but for now I would like you to just

13   take a look at the document and let me know whether it

14   was the document in effect in February of 2005 at the

15   time of your resignation?

16         A     Without sitting here for an hour and a half

17   reviewing this, it appears to be, yes.

18         Q     And are there dates on the document that would

19   let you know whether or not it was not the charter in

20   effect in February of 2005?

21         A     There are charter amendment chronologies.

22         Q     Could you review that and let me know whether or

23   not it looks like the version that was in effect in

24   February of 2005?

1          A     Again, without spending an hour and a half it

2     appears to be.

3          Q     Why don't we have that marked as the next

4     exhibit, which will be Exhibit 16.

5                           (Lariviere Exhibit 16 was marked

6                               for identification.)

7          Q     It looks like on page 34 of the charter that the

8     last amendment was in 1999; is that correct?

9          A     To my memory it seems to be accurate.

10         Q     And based on your tenure as city solicitor do

11    you have a memory of whether or not the Methuen City

12    Charter was amended at any time between 1999 and February

13    of 2005?

14         A     To the best of my memory, no.

15         Q     Do you know whether it's been amended since your

16    resignation in February of 2005?

17         A     I don't know.

18         Q     Okay.  Thanks.  Do you agree that you waived

19    your right to the remedies articulated in section 9-10 of

20    the Methuen City Charter?

21         A     Not without coercion and being forced, no, I did

22    not.

23         Q     The resignation letter that you signed on

24    February 16th, 2005 stated that you were waiving your

1    right to the remedies in section 9-10, correct?

2        A    The document that I was forced to sign said

3    that, yes.

4        Q    Okay.  And you knowingly signed that document,

5    correct?

6             MR. DiADAMO:  Objection.

7        A    By that point in time, no.  They had obtained

8    their mission to physically and emotionally intimidate

9    me.

10        Q    But at that point in time when you signed the

11    document in the presence of David Bain you were aware of

12    the remedies that you were waiving, weren't you?

13        A    No.

14        Q    Why were you not aware?

15        A    Because by that point in time they had been on

16    me for an hour and a half coercing and intimidating me.

17    I'm dealing with two known punks with a history of

18    violence that I knew that these sons of bitches had, in

19    fact, beaten up people and I thought that I was their

20    next candidate, especially after what they had been doing

21    to me.

22        Q    During the period of time in which you were in

23    the second floor conference room at the city hall tell us

24    all of the physical contact that was made between you and

1        Chief Solomon.

2            A    You know, Gareth, I would more than happy to

3        show you what was going on.  Would you like to be me as

4        an actor today?  I'll do it for you.

5            Q    The record can't reflect that, so what I would

6        like you do is please describe --

7            A    They were standing within inches of my face and

8        then --

9            Q    Let me finish my question.  I would like you to

10       the best of your memory describe the physical contact

11       between Chief Solomon and you that occurred in the second

12       floor conference room.

13           A    He's demonstrating how he's going to cuff me and

14       drag me out.  He's standing inches away from my face.

15       He's screaming at me demanding my resignation, demanding

16       that he's going to have me arrested.  At that point in

17       time, me not realizing it, lying that Fulya wanted

18       something done.

19           Q    Could you now describe all of the physical

20       contact between you and Deputy Chief Alaimo that took

21       place in the second floor conference room?

22           A    His distance from me was exactly the same as

23       Solomon's, right up to my face.  His physical contact

24       with me was when I tried to get up and there was that

1    time when I tried to push the chair back and he went

2    behind it and threw me back into the desk.

3         Q    Now, you've testified that you believe Fulya

4    Metin did not want to pursue criminal charges against

5    you; is that fair?

6         A    Based upon having read her deposition and based

7    upon having now read Wnek's deposition, yes.

8         Q    At the time that you were in the second floor

9    conference room did you know that Ms. Metin did or did

10   want to pursue criminal charges against you?

11        A    I was being told by Solomon and Alaimo also

12   saying it that she wanted me out and that she was going

13   to have me criminally prosecuted if I didn't resign.

14        Q    Do you have any personal knowledge that Fulya

15   Metin had made a decision at any time on February 16th,

16   2005 not to press criminal charges against you?

17             MR. DiADAMO:  Objection.

18        A    Based upon her deposition -- I don't know

19   personally because I tried to go talk to her and they

20   would not allow me to go talk to her.

21        Q    Now, a portion of your conversations with Chief

22   Solomon and Deputy Chief Alaimo were recorded; correct?

23        A    Yes.

24        Q    Do you agree that you asked Chief Solomon and

1      Deputy Chief Alaimo to turn off those recording devices

2      while you were in the conference room on February 16th?

3      A   I said to him:  "Can we talk?"  And he at that

4      point in time said something to the effect of:  "Upon

5      request of Lariviere I'm turning off these tapes."

6      Did I ask for them to be turned off?  No, I do

7      not recall that at all.

8      Q   Did you ever from that point forward ask Chief

9      Solomon or Deputy Chief Alaimo to turn the recording

10     devices back on?

11     A   No.  I don't even know if they were there any

12     more.

13     Q   Do you agree one alternative to resigning on

14     February 16th, 2005 was to take a leave of absence from

15     your position as the city solicitor?

16     A   Solomon said that and he said he was going to

17     look into that and he told me -- he turned around and

18     walked out the door and said:  "I'm going to go talk to

19     Pollard and then he was gone for several minutes and came

20     back and said:  "No, she doesn't want that.  She wants

21     you out of here.  She wants you arrested and prosecuted."

22     Q   Aside from what Chief Solomon told you Mayor

23     Pollard was saying about a leave of absence, as you sat

24     in that second floor conference room you knew that one of

```
1        the alternatives to a resignation was to take a leave of
2        absence, correct?
3            A    No.
4            Q    Why was that not an alternative to a
5        resignation?
6            A    That subject was brought up by Solomon and
7        immediately it was no, 'cause they were closing down
8        every other road.
9            Q    But you knew that ultimately the city council
10       was the authority that would make the decision as to
11       whether or not you would be granted administrative leave
12       or not, correct?
13           A    I was not given that mental thought.  We were
14       not sitting a room where there's peace.  I'm sitting in
15       the room with a guy that had been charged on numerous
16       occasions with beating the shit out of people that I
17       personally know beat the hell out of people and he's two
18       inches away from my face about to cream into me and I'm
19       going to sit there and think through the thought process?
20       Gareth, there was no God damn intent on their part ever
21       to allow me to think.  It was to intimidate me and push
22       me to the edge and that's exactly what they did.
23               And I would like to have you sit there two
24       inches away from the sons of bitches going at you and
```

1    say:  Oh, yeah, I got a thought process going on.  No.

2    And you want to know something?  The pattern of conduct

3    is well established and it's being repeated even to this

4    moment until these bastards are indicted by that federal

5    grand jury.

6        Q    So your testimony is that --

7        A    My testimony is they were out to screw me and

8    they were in my face.  They were after me.  They were

9    pushing me around and they were threatening me and they

10   broke me because I was a coward.

11       Q    Let me finish my question and we'll get out of

12   here a lot quicker.  Your testimony is that as you sat

13   there on the second floor conference room the thought

14   never occurred to you that you could go to the city

15   council and ask for a leave absence?  Is that your

16   testimony?

17       A    I was not allowed to talk to anybody, Gareth.  I

18   asked for permission to talk to two people and I was

19   denied that.  I was denied the ability to leave the area.

20   I was denied the ability to make any communication

21   whatsoever and yet I'm going to be talking to someone.

22       Q    You asked to talk to Fulya Metin, correct?

23       A    Yes

24       Q    And you also asked to talk to your wife,

1          correct?

2              A      Yes.

3              Q      But you never asked to talk to an attorney,

4          right?

5              A      No, I did not.

6              Q      You never asked to talk to anyone on the city

7          council, correct?

8              A      No, I did not.

9              Q      You never asked to speak with William Manzi, did

10         you?

11             A      No, I did not.

12             Q      Those thoughts never occurred to you.

13             A      No, sir.

14             Q      Even though you were given your Miranda rights

15         and you knew that you had those rights to talk to a

16         attorney, right?

17             A      Those Miranda rights disappeared the minute they

18         turned that tape off because any level of criminal

19         investigation ceased and that was my big screw up when

20         they turned that off because at that point that's when

21         the shit started and they went after me and that's when

22         they knew they could physically intimidate me because I

23         knew what the bastards were like and they knew it.  Don't

24         be telling me any God damn thing about I had some kind of

1    thought process 'cause they wanted to deprive me of it

2    and if someone is two inches away from your face

3    repeatedly screaming at you do you think that you would

4    just sit there?  No.

5        Q    You knew that there were consequences to your

6    pension as you sat there --

7        A    I told you that was BS the last time and I'm

8    telling you it's BS again.

9        Q    Why don't you tell me as you sit here today what

10   the consequences were to your pension for a resignation

11   versus a termination.

12       A    On what basis?

13       Q    On the basis of a termination of your position

14   as city solicitor versus a resignation of your position

15   as city solicitor.

16       A    On what basis is the termination?

17            MR. DiADAMO:  Well, objection.

18       Q    Well, you tell me what the different bases would

19   be for a termination.

20       A    Damned if I know given Fulya's testimony that

21   she had no intent whatsoever to hurt me, that she had no

22   intent for me to lose my job or for my family to be hurt

23   and she said we were good friends and she wanted to go

24   back to work for me.  Not my words.  You were there and

1      you know what she's testified to and Wnek's testified to

2      that.

3          Q     Sir, I'm asking you --

4          A     So there would be no termination.

5          Q     I'm asking you a hypothetical.  If the city

6      solicitor in February of 2005 was terminated from that

7      position what would be the consequences to the city

8      solicitor's pension benefits?

9              MR. DiADAMO:  Just so I understand, you're

10     asking him a question with a legal conclusion?  You're

11     asking him as a legal expert what his opinion would be.

12         Q     No, I'm asking based upon his personal knowledge

13     and his experience as the city solicitor what the

14     consequences of his pension benefits would be.

15         A     Sure.

16             MR. DiADAMO:  Hold on for a second.  I

17     understand that to be a legal question.

18         Q     You can characterize it any way you want and I

19     guess the judge will be the arbitrator of that, so, sir,

20     do you understand the question?

21         A     I understand what happens under the normal

22     course of termination.

23             MR. DiADAMO:  Let me object to the question.  Go

24     ahead and answer it.

```
1              A     It accelerates your pension benefits.

2              Q     If you're terminated.

3              A     If you have more than 20 years of service and

4       resulting in a termination of service, then there are

5       provisions in the retirement statute that give you an

6       acceleration of benefits.

7              Q     How would that differ from a voluntary

8       resignation?

9              A     Less money for a voluntary under those

10      circumstances.

11             Q     In what way would you receive less money for a

12      resignation versus a termination?

13             A     The calculation is different.

14             Q     Be more specific, please.

15             MR. DiADAMO:  Just note my objection to this

16      line of questioning.

17             MR. NOTIS:  Your objection is noted.

18             A     I have not looked at that statute in a couple of

19      years or probably five years.

20             Q     You knew as you sat in the room that if you were

21      terminated by the city council that your pension benefits

22      and your retirement benefits would be in jeopardy, didn't

23      you?

24             A     Absolutely did not.
```

1      Q     That never occurred to you?

2      A     I was not given that kind of opportunity.  At

3   this point in time I had to ask permission from someone

4   to go pee and they guarded while I went for a pee for

5   God's sake.

6      Q     The letter that you signed did not include a

7   waiver or a release from the City of Methuen, did it?

8      A     Not to my knowledge.

9      Q     You had negotiated resignations of employees

10  before that --

11     A     With full due process.

12     Q     I'm not finished with my question.

13     A     Good.  Have a good time.

14     Q     The letter that you signed on February 16th,

15  2005 did not include a waiver or release from the City of

16  Methuen, right?

17     A     No.

18     Q     And you had negotiated waivers and releases in

19  other resignations of Methuen employees in the past

20  before that date, right?

21     A     Yes.

22     Q     And you knew that that wasn't included in the

23  resignation letter that you signed?

24     A     No, I did not know that.  By that point in time

1      they had made me so fuzzy that there was no thought
2      process.  Take a look at my signature and tell me that
3      that is the signature of an absolutely normal person
4      executing a document.  It's a freaking zigzag that they
5      turned me mentally into and I just wanted to get the hell
6      out of there.  I couldn't take it anymore.
7          Q    The fact that there was no release or waiver in
8      the resignation letter you knew that because there was no
9      release or waiver that you would have an opportunity to
10     file a lawsuit against the city of Methuen, right?
11         A    No, I did not.  If you're asking me was that
12     incompetently drawn?  Yes.  I guess Solomon doesn't know
13     how to do a resignation letter very well.
14             MR. DiADAMO:  Wait for a question.
15         Q    As you sat in the second floor conference room
16     on February 16, 2005 did you know that your resignation
17     would be in the newspapers?
18         A    No.
19         Q    You were working under the belief that it
20     wouldn't be in the newspapers?
21         A    I was working under the promise.
22         Q    But you knew that because the city solicitor is
23     a very public position that regardless of whether or not
24     you resigned this was going to have media scrutiny,

1          correct?

2                  A     No.  I did not.

3                  Q     So you believed that whether or not you resigned

4          this was not going to get any attention to the papers?

5          Is that what you are telling us?

6                  A     I believed that those bastards were either going

7          to beat me up or make me sign that and leave.

8                  Q     So you have no opinion, sir, as to whether or

9          not a resignation versus you walking out of that room

10         without resigning would have received media attention?

11         Is that what you are telling us?

12                 A     At this point I was told that there would be

13         none and all I really gave a shit about was getting the

14         hell out of there.  I didn't want to go through this.  Do

15         you think that I want this?  Do you think I want my

16         family put through this shit because of those clowns?

17         They are going to jail you know.  Those sons of bitches

18         will get indicted and they're going to jail.

19                 MR. DiADAMO:  Why don't we take a break and go

20         off the record.

21                         (A brief recess was taken.)

22         BY MR. NOTIS:

23                 Q     Okay.  Back on the record.  After you left city

24         hall on February 16th, 2005 you went home, right?

1          A    Yes.

2          Q    You didn't return to Methuen for the remainder

3     of that day, correct?

4          A    That's correct.

5          Q    You returned the next day though, didn't you?

6          A    To Methuen?

7          Q    Uh-huh, yes.

8          A    No.

9          Q    When was the next time that you returned to

10    Massachusetts after February 16th?

11         A    The next day.

12         Q    For what reason was that?

13         A    Bill Manzi had called me and he said that he

14    wanted to meet with me.  He specifically said not in

15    Methuen though.  He told me let's meet at the One Mill

16    Street Restaurant area in the parking lot.

17         Q    And that's what you did, right?

18         A    Yes.

19         Q    What time did you get to the Mill Street parking

20    lot?

21         A    It was early morning.  I would say without

22    complete accuracy 9 o'clock or 9:30.

23         Q    What time did you talk to William Manzi prior to

24    coming to Lawrence that day?

1          A     What time?

2          Q     Yes, sir.

3          A     It would have been very early in the morning.

4          Q     Do you have a memory of what else was discussed

5     during that first telephone conversation besides let's

6     meet at the Mill Street parking lot in Lawrence?

7          A     To my memory there was no in-depth discussion on

8     the telephone.

9          Q     Can you tell us anything else about what was

10    said during that telephone conversation?

11         A     It was to the effect of, you know:  "I know what

12    happened with you with the resignation.  I need to talk

13    with you.  I want to meet with you.  I can't meet with

14    you in Methuen."  And then he suggested One Mill Street.

15         Q     And have you now exhausted your memory

16    concerning this telephone conversation?

17         A     Yes.

18         Q     When you arrived at the Mill Street parking lot

19    was Mayor Manzi already there?

20         A     He was a councilor at the time, but no, I

21    arrived first and he arrived subsequent.

22         Q     What happened next?

23         A     I got out of my car and I went over and sat in

24    his passenger seat.

1      Q     How long were you in the car at the parking lot

2   that day?

3      A     I would say approximately 20 to 25 minutes.

4      Q     And once you left the parking lot where did you

5   go?

6      A     I came here.

7      Q     To the DiAdamo law office?

8      A     Yes.

9      Q     Did you have any further conversations with

10   William Manzi on that day after you left the parking lot?

11      A     That day, no.

12      Q     When was the next time you spoke with him?

13      A     We spoke daily thereafter for I would say about

14   ten days.

15      Q     What was the discussion in Mayor or Councilor

16   Manzi's vehicle on the 17th of February?

17      A     I told him about what occurred.

18      Q     And what did you tell him exactly?

19      A     I told him that I was down in the second floor

20   conference room and apparently they had done the sting

21   trap or whatever you want to call it and Pollard was the

22   commander of the ship of this incident and Solomon and

23   Alaimo did their thing and manipulated me to the point of

24   signing.

1        Q      What did Councilor Manzi say to you in the
2    vehicle that day?
3        A      About Solomon he said words to the effect of:
4    "You know that's what he's like."
5        Q      What else did Councilor Manzi say?
6        A      He told me that the resignation would not be
7    accepted by the city council and his plan at that point
8    in time was to have a transition and have me come back.
9        Q      And was the resignation ultimately received by
10    the city council?
11        A      To my knowledge they never accepted it.  He told
12    me in a subsequent telephone conversation that he kind of
13    diverted the issue to make sure they would not accept it.
14        Q      Have you exhausted your memory about the
15    conversation between you and Councilor Manzi in the
16    vehicle on February 16th, 2005?
17        A      We discussed the incident and what occurred and
18    then he was discussing with me my return and he said
19    quite frankly I was his right hand.
20        Q      Would you consider Councilor Manzi to have been
21    a political ally of yours?
22        A      No, a friend, not a political ally.
23        Q      Did you consider him to be a political ally of
24    Sharon Pollard?

```
1              A     Yes, for the purposes of getting elected mayor.

2              Q     Did you ever ask the city council to reinstate

3        you as city solicitor?

4              A     Yes.

5              Q     When did you do that?

6              A     I talked to Mike Hennessey who is the chairman a

7        few days after that and we had a very brief conversation

8        in that area and he drifted immediately away from it and

9        I talked to Bill Manzi several times thereafter about

10       that.

11             Q     Did you ask anyone else on the city council to

12       reinstate you as city solicitor?

13             A     To my memory, no.

14             Q     Did you ever formally ask the city council as a

15       body to reinstate you as city solicitor?

16             A     As a body?  No.

17             Q     Did you ever submit anything in writing to the

18       city council asking them to reinstate you as city

19       solicitor?

20             A     I believe you have letters from Carmine DiAdamo

21       addressing that issue.

22             Q     And that letter was sent in June of 2005, right?

23             A     I'm not sure when it was sent.  At that point in

24       time I was in my alcoholic phase and everything was
```

1           pretty fuzzy.

2           Q    In any event between the date of your

3      resignation and when Attorney DiAdamo sent that letter to

4      the city council regarding your reinstatement did you or

5      anyone else on your behalf ask the city council formally

6      to reinstate you as city solicitor?

7           A    The full body?

8           Q    Yes.

9           A    No, I was dealing with the chairman and then

10     Manzi who was the real power behind the system.

11          Q    And all of that was done informally during

12     conversations that you had with those individuals, right?

13          A    Yes.

14          Q    And no one else was present during those

15     conversations?

16          A    I don't believe anyone else was present, no,

17     with the exception of one person one time.

18          Q    Was that an attorney or was it -- who was

19     present during that one occasion when someone else was

20     present?

21          A    Emma Donnelly.

22          Q    Who is Emma Donnelly?

23          A    She was an activist in Methuen years ago and --

24     a political activist and she got to know me in one of the

1    disputes she had with Methuen, so she contacted me and
2    tried to help me.
3        Q    Who else was present during that conversation?
4        A    It was just her and I.
5        Q    And was a member of the city council present?
6        A    No.  There was a message passed by her to
7    another person who was a friend of Manzi.
8        Q    So Councilor Manzi told you the day after your
9    resignation that the resignation would not be received by
10   the city council?
11       A    Yes.
12       Q    Did you have any reason to dispute that
13   information?
14       A    No, I did not and he confirmed it to me at the
15   next meeting when he said that he deliberately diverted
16   the subject so it wasn't received.
17       Q    And Mayor Manzi also told you that he would
18   accept a reinstatement on your behalf if you petitioned
19   the city council, didn't he?
20       A    He told me depending on the political
21   circumstance because initially he told in a conversation
22   me two or three articles and this will be all over and it
23   wasn't.  It got hotter and hotter and he walked away from
24   the issue and would not return calls to me and would not

1        provide any aide or assistance.

2            Q    Peter McQuillan was appointed as the interim

3        city solicitor from February 17th, 2005 up until around

4        June 15th, 2005.  Is that your memory?

5            A    To my memory he was appointed the following

6        Monday.

7            Q    So, in any event, it was sometime in February of

8        2005 until June 15th, 2005 that Peter McQuillan served as

9        interim city solicitor.

10           A    I'm not sure when he got the permanent

11       appointment, but your date line seems correct.

12           Q    Do you agree that at no time during Peter

13       McQuillan's tenure as interim city solicitor did you ask

14       to be reinstated?

15               MR. DiADAMO:  Objection.

16           A    No, I said I talked to Bill Manzi about that and

17       I kept calling and leaving massages quite frankly.

18           Q    Bill Manzi invited you to ask the city council

19       to ask to be reinstated, right?

20           A    He told me to stand down until he felt

21       politically able to handle the situation and it steamed

22       up and he walked away and he would not return my phone

23       calls and he would not provide me assistance at that

24       point.  At that point that's when I asked for a 2-11.

1          Q     Fair to say that up until the time that Peter

2     McQuillan was appointed permanent city solicitor that one

3     of your alternatives was to ask for a reinstatement by

4     the city council?

5          A     Not when Manzi opposed it, no.  Manzi was the

6     leader of that council and when the leader will not take

7     on the shoulder of responsibility to get the mission

8     accomplished it ain't going to happen.

9          Q     Mike Hennessey was the chairman of the council?

10         A     Yes.  So that Bill could run for mayor he put

11    Hennessey in.

12         Q     Hennessey was an ally of yours, right?

13         A     An ally?  We knew each other.

14         Q     He was an opponent of Sharon Pollard?

15         A     Yes.

16         Q     Didn't like Sharon Pollard?

17         A     That's the assumption that I had.

18         Q     He also invited you to petition the council for

19    reinstatement.

20         A     No, he did not.  I asked him about that.

21         Q     Aside from what Councilor Manzi was telling you

22    about reinstatement you knew that one of the alternatives

23    to your resignation was to ask for it to be revoked and

24    for you to be reinstated, correct?

1          A     At that point in time it was very clear to me,

2     especially since Fulya had been used to being out on a

3     free ride paycheck and then filing with the MCAD, that

4     that was not going to happen, and I was told very clearly

5     by the political allies of Manzi that that was not going

6     to happen.  The message had been passed to me that way.

7          Q     But you never asked, did you?

8          A     It was a waste of time.  I knew it was a waste

9     of time when Manzi walked away and refused to answer and

10     refused to commit and refused to even return a phone call

11     that it was over.  And certainly Dave never initiated

12     anything though Dave had the responsibility as the

13     supervisor.  They refused to do an investigation that I

14     asked them to do.

15          Q     When did you ask them to do an investigation?

16          A     Manzi was asked twice.

17          Q     In writing?

18          A     No.

19          Q     Who asked him?

20          A     Well, first time was me directly to him.  Second

21     time it was Emma Donnelly through another source.

22          Q     Do you know when she asked him?

23          A     I would say within a week of the initial

24     incident.

```
1              Q     And what was his response?

2              A     Let me think about it.

3              Q     And after that time you never followed up to see

4        if an investigation would take place?

5              A     After that point in time he wouldn't return my

6        calls.

7              Q     And at that point you had resigned your

8        position.

9              A     I did not resign the position.  I was forced out

10       against my will.

11             Q     If an employee resigned their position from

12       their employ with the city of Methuen are you aware of

13       any obligation under the sexual harassment policy for the

14       city to conduct an investigation?

15                   MR. DiADAMO:  Objection.

16             A     Under that policy I'm not positive, but in the

17       real word the MCAD absolutely.

18             Q     Well, if you were you were no longer employed by

19       the city what would be the remedy of an investigation?

20                   MR. DiADAMO:  Objection.

21             A     The principal purpose for the entire MCAD policy

22       is to protect the individual claiming to have been

23       harassed and to find an adequate remedy to address the

24       situation and to return him or her to a normal work
```

1    environment.

2         Q    And you were no longer in your position as the

3    supervisor for Fulya Metin after you signed that

4    resignation letter, right?

5         A    That's correct.

6         Q    So what would be the remedy that the

7    investigation would implement?

8              MR. DiADAMO:  Objection.

9         A    As you are well aware that's what accelerated

10   Fulya's issue, no. 1, and then, no. 2, then she got

11   concerned about -- allegedly about the phone being there.

12        Q    If you did not resign and did got sign the

13   letter would what have prevented you from returning to

14   work?

15             MR. DiADAMO:  Objection.

16        A    If I did not resign and I did not what?  I'm

17   sorry.

18        Q    If you didn't sign the resignation letter in the

19   second floor conference room on the 16th what would have

20   prevented you returning to work as the city solicitor for

21   Methuen?

22             MR. DiADAMO:  Objection.

23        A    Nothing.

24        Q    Was there an intolerable work condition that you

1       experienced as city solicitor from Methuen?

2               MR. DiADAMO:  Objection.

3       A       Yes.

4       Q       What was that intolerable work condition, sir?

5       A       Sharon Pollard was a miserable bitch.  She went

6       out of her way to make my life miserable every day of the

7       week literally.

8       Q       At any point after you signed the resignation

9       letter on February 16th, 2005 was there an intolerable

10      work condition that prevented you from returning to work?

11      A       Yes.

12      Q       When was that?

13      A        In accordance with their lie they immediately

14      went public with this whole thing to beat the shit of me

15      and to discourage any attempt whatsoever to allow my

16      reinstatement and they went running to the district

17      attorney with these bullshit statements.  That was their

18      way of making sure that the door was locked.

19      Q       Do you have any personal knowledge that your

20      employer deliberately acted to create an intolerable work

21      condition for you?

22      A       By my employer who do you mean?

23      Q       The city of Methuen.

24      A       Any officer of the city or --

```
 1              Q     Just the city of Methuen.

 2                    MR. DiADAMO:  Objection.

 3              A     The city of Methuen is 44,000 people.

 4              Q     You have sued the city of Methuen in this case,

 5      right?

 6              A     Being left no choice, yes.

 7              Q     And what do you allege that the city of Methuen

 8      did to deliberately create an intolerable work condition

 9      for you?

10              A     The reasons for the lawsuit is outlined in this.

11              Q     Can you show me where?

12              A     Page 1 to the end.

13              Q     So it's only contained in your complaint, right?

14              A     No, there's more information.

15              Q     I want you to tell me what information you have

16      that the city of Methuen acted deliberately to create an

17      intolerable work condition for you in your employment as

18      city solicitor.

19                    MR. DiADAMO:  Objection.

20              A     I think it's an obtuse question and at best I

21      don't understand it.

22              Q     You allege that an intolerable work condition

23      was created, right?

24              A     Yes.
```

1      Q     And you allege that that was deliberately done,
2      right?
3      A     Yes.
4      Q     What facts do you have that there was a
5      deliberate intent to create an intolerable work
6      environment for you?
7      A     Pollard regularly calling me and yelling at me,
8      threatening me.  Manzi coming down to the office and
9      telling me that she's berating the hell out of me to
10     everybody and that she wants me out.  Her denying me the
11     most basic things such as membership in lawyer
12     associations as far as being picked up by the town, which
13     it had been for twenty years.  Her refusing to hire
14     people that I asked be hired, her refusing to allow me to
15     buy or fix equipment such as my photocopy machine, fax,
16     any office materials.  It goes on and on.
17     Q     Did any of the things that you just stated play
18     a role in your decision to sign that resignation letter
19     on the 16th of February?
20     A     No.  Regrettably, it didn't.
21     Q     Did any of those things that you just stated
22     prevent you from asking the city council to reinstate you
23     to your position as city solicitor?
24     A     Yes.

1        Q    Which ones?

2        A    It was very clear with her attitude towards me

3    and how she had screwed other department heads and put

4    them in a psychological condition and forced them out of

5    their employment, that she controlled and owned that

6    entity and that she had a cop that she owned and was

7    corrupt and was doing this stuff with the district

8    attorney as a blocking maneuver.  There was no intent

9    whatsoever to allow me to ever have any rights.

10       Q    Are you aware of a specific policy of the city

11    of Methuen that coerced you into signing that resignation

12    letter?

13           MR. DiADAMO:  Objection.

14       A    No.

15           MR. DiADAMO:  You are talking about a written

16    policy, correct?

17       Q    Well, let's ask about a written policy first.

18    Are you aware of a written policy that the city of

19    Methuen had in place to coerce you to resign?

20           MR. DiADAMO:  Objection.

21       A    No.

22       Q    Are you aware of anything unwritten concerning a

23    policy that the city had to coerce you to resign?

24       A    Yes.

```
1          Q    What was that?
2          A    Pollard and Solomon and Alaimo detailed
3     repeatedly that she wanted me out, detailed that she
4     wanted me either arrested or resigning and they were
5     telling me repeatedly they were marching on her orders in
6     addition to these allegations about Fulya's statements.
7          Q    Are you aware of a custom that the city of
8     Methuen had to intimidate you to resign your position?
9               MR. DiADAMO:   Objection.
10         A    I'm aware that it had been done in the past,
11    yes.
12         Q    And what do you base that testimony on?
13         A    The way they got rid of Bruce McDougall.
14         Q    What was intimidating about the way that Mr.
15    McDougall's employment ended with the city of Methuen?
16         A    He could detail it.  They made his life an
17    absolute misery.  Anything he wanted, no.  She constantly
18    went behind his back to Solomon and had Solomon
19    effectively -- made him de facto running the police
20    department.  Insulting and demeaning him and she
21    supported Solomon in the midst of all of this.
22         Q    Are you aware of any regulation that was
23    implemented by your employer that contributed to your
24    resignation?
```

```
1                    MR. DiADAMO:  Objection.

2           A     Are we talking written?

3           Q     Written or otherwise, sir.

4                    MR. DiADAMO:  Objection.

5           A     To the extent that you consider their actions to

6     be a regulation, yes.

7           Q     Was there any ordinance that was implemented

8     that contributed to your resignation?

9                    MR. DIADAMO:  Objection.

10          A     No.

11          Q     Was there any ordinance that prevented you from

12    asking the city council to reinstate your position as

13    city solicitor?

14          A     A written ordinance?  No.

15          Q     Was there any unwritten ordinance that prevented

16    you from asking the city council to reinstate you as city

17    solicitor?

18                   MR. DIADAMO:  Objection.

19          A     By definition it wouldn't be an ordinance, so

20    no.

21          Q     Any regulation?

22          A     No.

23          Q     Any custom?

24          A     Yes.
```

1          Q     What custom?

2          A     It was very clear that the city council would

3     not do anything to help an employee.  They did not do

4     anything for a number of people that got screwed by her

5     and forced out the door.

6          Q     Any specific policy that you are aware of that

7     the city of Methuen had that prevented you from

8     petitioning the city council to reinstate your position?

9               MR. DiADAMO:  Objection.

10         A     Again, as I told you, I went to the right

11    sources in the political regime and how it works and I

12    was denied that ability.

13         Q     But you don't know of any policy that was in

14    place that prevented you from doing that, correct?

15              MR. DiADAMO:  Objection.

16         A     I don't understand what that means.

17         Q     Do you know what a policy is?

18         A     I know what a policy is.

19         Q     What's your definition of a policy?

20              MR. DiADAMO:  Objection.

21         A     A procedure that's enacted in a rule that does

22    not carry the force of a law, but it's established as a

23    protocol or a carry-on.

24         Q     Using that definition of a policy, tell me what

1         policy was in place that prevented you from petitioning

2         the city council to reinstate you to your position as

3         city solicitor?

4                   MR. DiADAMO:  Objection.

5         A    If we are going to go in with the context of

6         that with some kind of legal definition -- is that what

7         you're looking for?

8         Q    Do you understand the question?

9         A    I very well understand the question and I very

10        well understand the custom and routine that was being

11        carried on in Methuen at that point in time.

12        Q    That's what I'm asking you to describe.

13        A    Sure.  When Pollard decided she wanted to knock

14        you out she made your life an absolute misery.  She did

15        one after another in a Stalinist fashion.  She just made

16        your life miserable.  She denied you rights.  She

17        insulted you.  She demeaned you to your face.  She

18        demeaned you behind your back so people would come to

19        you.  She deprived you of any ability to effectively

20        operate your office.

21        Q    But you knew that in signing the resignation

22        letter you waived any contract rights you had to your

23        employment with the city of Methuen?

24                  MR. DIADAMO:  Objection.

1          A     Absolutely not.

2          Q     Do you have any knowledge of any documentary

3     evidence to show that there was a conspiracy between

4     Pollard and anyone else to coerce you into resigning your

5     position as city solicitor?

6          A     Only the names that are in the depositions.

7          Q     No documents to support that conclusion?

8          A     One other would be the Wnek report and the

9     newspaper articles.

10         Q     Which Wnek report are you referring to?

11         A     I believe it was done in April.

12         Q     Exhibit 12?

13         A     I would have to look.  I'm not positive.

14               (Witness examines document.)

15         A     No, this is not the one.  It would be related to

16    the incident.  This was a subsequent review of other

17    employees.

18         Q     I'm showing you a three-page document.  Is this

19    the report that you are referring to?

20         A     Give me one second.

21         Q     Sure.

22               (Pause)

23         A     The third page, first paragraph.

24         Q     You're referring to the paragraph that reads:

1           "I directly responded" --

2           A     No, not that part of the paragraph.

3           Q     Could you show me which sentence you are

4     referring to?

5           A     It would be those references that demonstrate

6     that Chief Solomon had been in Pollard's office, that he

7     came out to meet Fulya and to bring her back into

8     Pollard's office and that's where the staging area had

9     been.

10          Q     Just so the record is clear, why don't we mark

11    this as the next exhibit.

12                          (Lariviere Exhibit 17 was marked

13                              for identification.)

14          Q     Exhibit 17 is Lieutenant Wnek's three page

15    report, correct, sir?

16          A     That is what has been represented to me.

17          Q     And this is the report that you say supports --

18          A     You asked me if there was anything in writing, I

19    believe your phraseology was.

20          Q     I asked you whether or not there was any

21    documentary evidence to support a conspiracy between

22    Mayor Pollard and anyone else to coerce you to resign

23    your employment and you said --

24          A     Written documents, yes.

1          Q     Let me finish my question.  I asked you whether

2     or not there was any documentary evidence to support your

3     theory that there was a conspiracy between Sharon Pollard

4     and anyone else to coerce you into resigning your

5     employment.  Do you understand that question?

6          A     Written documents, yes.

7          Q     And your testimony was that there was a

8     newspaper article; there was deposition testimony given

9     in this case and there was a report prepared by

10     Lieutenant Wnek, correct?

11          A     That's correct.

12          Q     And you have in front of you the report that you

13     claim was prepared by Lieutenant Wnek.

14          A     I believe it's what I've been told.

15          Q     And you have referred to page 3 of the report to

16     support the conspiracy theory?

17          A     Yes.

18          Q     Where specifically -- please read into the

19     record where in the report is the evidence to support the

20     conspiracy theory?

21          A     The Chief was in Mayor Pollard's -- which would

22     be the office -- and he immediately responded to the

23     hallway to meet Fulya and he promptly took her to Mayor

24     Pollard's office.  He then indicates -- and this is

1      allegedly Wnek -- that he responded to the Mayor's office

2      where he spoke to Fulya.

3           Q    Is that it, sir?

4           A    Yes.

5           Q    Thanks.  Do you have any knowledge that Chief

6      Solomon knew about Fulya Metin's allegation against you

7      before she made her complaints to Lieutenant Wnek?

8           A    No.

9           Q    Do you have any knowledge that Deputy Chief

10     Alaimo knew anything about Fulya Metin's allegation

11     against you before she went to Lieutenant Wnek?

12          A    No.

13          Q    Do you have any knowledge that Sharon Pollard

14     had any awareness of Fulya Metin's allegations against

15     you before she went to Lieutenant Wnek?

16          A    No.

17          Q    Have you ever overheard any statement made by

18     Sharon Pollard that she directed Chief Solomon or Deputy

19     Chief Alaimo to coerce you into resigning your position

20     as city solicitor?

21          A    No.

22          Q    Is there anything besides your personal opinion

23     to support the conclusion that Sharon Pollard directed

24     Deputy Chief Alaimo and Chief Solomon to coerce you into

1       resigning your position?

2                   MR. DiADAMO:  Objection.

3           A     There's the statements of Solomon and Alaimo and

4       the fact that she was definitely involved in this because

5       the staging area was right there in her office and

6       there's the obvious inconsistency that not one piece of

7       this was done in accordance with standard police

8       procedure or the sexual harassment policy, not one ounce.

9           Q     Anything else, sir?

10          A     No.

11          Q     Have you completed your answer?

12          A     Yes.

13          Q     Up.  Up until the morning of February 16th, 2005

14      you had a good working relationship with Chief Solomon.

15      Fair statement?

16          A     I dealt with him when I had to and I stayed away

17      from him otherwise.

18          Q     You held him in high regard up until that date,

19      right?

20                  MR. DiADAMO:  Objection.

21          A     I don't understand your question.  What do you

22      mean?

23          Q     You thought up until the morning of February

24      16th, 2005 that Chief Solomon was an excellent police

1        chief, correct?

2            A     I don't believe I ever said that.

3            Q     You felt that he was very professional in the

4        way that he conducted himself up until that date?

5            A     No.

6            Q     Did you ever write anything concerning your

7        opinions about Chief Solomon's performance and his role

8        as chief of police?

9            A     To my memory, no.

10                 MR. DiADAMO:  Off the record for a second.

11                     (A brief recess was taken.)

12       BY MR. NOTIS:

13           Q     Have you ever seen any surveillance videotapes

14       of any individuals with personal knowledge of the

15       allegations in this case?

16           A     I'm sorry.  You're talking about the video that

17       they did?

18           Q     No, I'm just talking in general.  Have you seen

19       any surveillance tapes of any witnesses that have

20       personal knowledge of the allegations in your complaint?

21           A     No.

22           Q     Did you retain any investigator to perform any

23       investigation into the allegations in your complaint?

24                 MR. DiADAMO:  Objection.

```
1              A     I decline to answer.

2              Q     On what grounds?

3                    MR. DiADAMO:  Well, are you asking him if he

4       retained anyone or if I retained anyone?

5              Q     I'm not asking you whether you did.  I'm asking

6       whether he retained anyone to conduct an investigation.

7                    MR. DiADAMO:  Let's just be clear.

8              Q     If he knows, he knows.

9                    MR. DiADAMO:  Just, again, I'm entitled to do my

10      investigation and attorney-client and blah, blah, blah.

11      So anything that you have learned from me or anything

12      that you knew from me -- I guess the question is whether

13      or not you ever went out and hired a PI independently to

14      go out and do something.

15             A     No.

16             Q     Have you ever met with an investigator outside

17      of the presence of your attorneys in this case concerning

18      the allegations in your complaint?

19             A     No.

20             Q     Have you ever read any transcribed statements

21      taken from witnesses in this case other than the

22      deposition testimony?

23                   MR. DiADAMO:  Objection.

24             A     Yes.
```

1         Q     What statements have you read?

2         A     MCAD.

3         Q     Outside of the MCAD proceedings and depositions

4     taken in this case have you read any transcribed

5     statements from any witnesses with personal knowledge of

6     the allegations in your complaint?

7         A     No.

8         Q     Since February 16th, 2005 have you had any

9     conversations with Sharon Pollard about anything

10    contained in the allegations in your verified complaint?

11        A     No.

12        Q     Have you spoken to her at all since February

13    16th, 2005?

14        A     No.  Nor did I speak to her on that day.

15        Q     You had a conversation with Chief Solomon after

16    you left city hall on February 16, 2005, correct?

17        A     Yes.

18        Q     And that was on your cell phone?

19        A     Yes.

20        Q     Can you tell us what you discussed during that

21    telephone conversation?

22        A     When I got home my thought was just to move on,

23    that I would find another job.  I wanted to confirm that

24    they had given me their word and they would live with it

1   and so I called them.  He told me that he was on the road

2   driving at that point in time and he confirmed yes.

3        Q    What did he confirm?

4        A    He had during the course of that incident down

5   on the second floor said if I didn't resign he was going

6   public and destroy me.  If I did, he would keep it quiet.

7   After the resignation when he took me upstairs he was

8   instructing his men not to say anything and that, in

9   fact, he would clear out my office without anyone knowing

10  about it and do it at night.

11       Q    And do you have any information to suggest that

12  Chief Solomon discussed this incident with any members of

13  the media?

14       A    Yes, he was in the paper a number of times.

15       Q    Do you have any information to suggest that

16  Chief Solomon was the first person to go to the media to

17  discuss your resignation?

18       A    No.

19       Q    Have you had any conversations since that

20  February 16th, 2005 conversation with Chief Solomon?

21  Have you talked to Solomon since then?

22       A    No.

23       Q    Have you spoken to Alaimo since you left city

24  hall on February 16, 2005?

1          A    No.

2          Q    Have you spoken to Peter McQuillan about the

3    allegations in your complaint since February 16, 2005?

4          A    The day after in the afternoon.  I believe the

5    day after or the following day he called.

6          Q    And since that time have you had discussions

7    with him about the allegations in your complaint?

8          A    Maybe one or two times around that time frame,

9    but not since then.

10          Q    So those conversations would have been during

11    February 2005.  Is that a fair statement?

12          A    Yes.

13          Q    And your testimony is that there were anywhere

14    between two and three conversations with Mr. McQuillan?

15          A    About that issue, yes.

16          Q    Tell me what you discussed with Mr. McQuillan

17    the day after February 16th, 2005?

18          A    He called up.  He was livid.  He was screaming.

19    Do I say the exact words or --

20          Q    Yeah.

21          A    He said that fat fucking bitch screwed you and

22    that stinking fucking Leb did, too -- words to that

23    effect.

24          Q    What was the last word?

1      A    Leb.  Which surprised me because his wife is

2      Lebanese also.

3      Q    What else was discussed during that conversation

4      with Mr. McQuillan?

5      A    During the course of the conversation we

6      discussed what occurred and I gave him a detail.  He

7      asked what had occurred between Fulya and I, and I told

8      him and he said there was nothing wrong there.

9      Q    Did he say whether he had seen the videotape

10     yet?

11     A    No.  As a matter of fact, in that conversation

12     he had asked the question about:  "Is there anything that

13     shows that you didn't do anything serious?"  And I said:

14     "They videotaped it and that will show it."

15     Q    Have you had any conversation with Mr. McQuillan

16     about his viewing of the videotape?

17     A    To the best of my memory the last time I talked

18     to him regarding this incident would have been the day of

19     the videotape and there was nothing substantive.  He

20     happened to be in the parking lot with Carmine when I

21     arrived and he went wherever he went and Carmine and I

22     went in.

23     Q    And at that point do you know whether Mr.

24     McQuillan had seen the videotape yet?

1      A     I believe at that point he indicated that he

2   had.

3      Q     And did he tell you what his thoughts were about

4   the videotape?

5      A     Not to my memory.

6      Q     Has he ever expressed to you what his thoughts

7   were after seeing the videotape?

8      A     No, because we've had conversations since then

9   unrelated.

10      Q     Okay.  So the answer is no, he's never expressed

11   any thoughts to you about his viewing of the videotape

12   and what was contained on the videotape?

13      A     To the best of my memory, no.

14      Q     Did you have any conversations with Mr.

15   McQuillan about your reinstatement to the position as

16   city solicitor?

17      A     Yes.

18      Q     What did you discuss in that regard?

19      A     When he was getting appointed interim he said

20   that he was only there until I got back and that's all he

21   wanted at that point in time.

22      Q     Did he ever counsel you on how to petition the

23   city council to reinstate you to the city solicitor's

24   position?

1        A    No.

2        Q    Did you ever make any statements to him about

3    your intent to petition the city council for

4    reinstatement?

5        A    I advised him that Billy had been talking to me,

6    that there would not be an acceptance of the resignation.

7    Billy wanted things to calm down and then he would patch

8    it up.

9        Q    And what was Mr. McQuillan's response, if any?

10       A    I don't recall any response.

11       Q    Let me show you your Answers to Interrogatories

12   which we have marked as Exhibit 15, correct?

13       A    Yes.  Yes, it appears to be.

14       Q    Okay.  I'll turn your attention to Interrogatory

15   No. 3 and your answer to No. 3.

16       A    Yes.

17       Q    And you were asked to provide the name,

18   residential address, business address, telephone number

19   of any persons that possess information concerning your

20   complaint, the factual assertions and allegations

21   advanced in that complaint or any damages that you allege

22   have been suffered as a result of the matters advanced in

23   that complaint, correct?

24       A    Yes.

```
1              Q    And you have listed eleven individuals, correct?

2              A    Yes.

3              Q    And you signed the Answers on the 19th of July

4         2006?

5              A    Yes.

6              Q    Is there anyone else that you would like to add

7         to Answer No. 3?

8              A    I have not made a final decision on that.

9              Q    When do you anticipate a final decision?

10             A    When the discovery period is closed as is

11        standard.

12             Q    Well, it is closed, so --

13             A    It is?  See you later.  I thought this was

14        discovery.

15             Q    I will represent to you, sir, that discovery is

16        closed in this case.  Do you have any intent to further

17        supplement Answer No. 3 to your Interrogatories?

18             A    That would be something that I would be

19        discussing with my attorney and not discussing at this

20        time.

21             Q    But you know of no one else based on your

22        personal knowledge that would be responsive to

23        Interrogatory No. 3.

24                  MR. DiADAMO:  Let's take a break for a minute.
```

1                    (A brief recess was taken.)

2        BY MR. NOTIS:

3            Q    Would you read the last question back?

4                        (The last question referred to

5                            was read back.)

6            A    There might, in fact, be a number of more

7        people.

8            Q    Who are those people?

9            A    I don't know.  At this time I'm going through

10       the discovery that's existing.  We're also examining the

11       pattern of conduct that Solomon and Alaimo have

12       demonstrated of intimidation to people.  And we're

13       examining what information we can develop on the federal

14       criminal investigation against them.  And we're examining

15       two more cases that have been filed as well as the union

16       grievances filed about him intimidating cops.

17           Q    But as you sit here today you can't provide any

18       additional witnesses that are responsive to No. 3?

19           A    At this time I have not made a final decision

20       and I don't know.

21           Q    Okay.  One of the individuals you listed was

22       Christopher McCarthy, correct?

23           A    Yes.

24           Q    What information does Mr. McCarthy have

1           pertaining to the allegations in your complaint?

2           A    He was present that day.

3           Q    And is there anything aside from what's

4    contained in the verified complaint and discovery that's

5    been exchanged in this case that would indicate what

6    information Mr. McCarthy has?

7           A    We have not finalized, no.

8           Q    Same question as to Michael Hennessey.

9           A    In terms of --

10          Q    What information does Mr. Hennessey have that's

11   responsive to Interrogatory No. 3?

12          A    He was aware of Pollard and her methodology.  He

13   was aware of Solomon and Alaimo and their method of

14   conduct and their pattern of conduct.

15          Q    Same question as to Randy Haggar.  What

16   information does Mr. Haggar have that's responsive to No.

17   3?

18          A    He was there and participated in this operation.

19          Q    He was there on the 16th?

20          A    Yes, he was.

21          Q    What role did he have in the events of that day?

22          A    The first time that I became aware that he was

23   there and had been called in was when I arrived back at

24   the office and he was there in front of the office door.

1          Q     Did you have any conversations with him on

2     February 16th, 2005?

3          A     No, I did not.

4          Q     Have you had any conversation with him since

5     that date?

6          A     No, I have not.

7          Q     Thomas Kelly, what knowledge does he have that's

8     responsive to Interrogatory No. 3?

9          A     Kelly on a number of occasions told me how much

10     Pollard disliked me and had disdain for me and was pissed

11     off at a lot of the opinions I made when I had indicated

12     to him she was wondering out of the financial boundaries

13     out of the town and what the state law allowed.  And he

14     also was aware that she was the one that gave me the

15     marching orders to send the buy-back checks to me and he

16     was aware that that was done and it drained out the

17     financial budget.

18          One other thing since you asked about Kelly.

19     He's the chairman of the Methuen Retirement Board or was

20     the last time I knew, so he would know the figures and

21     calculations.

22          Q     Since February 16th, 2005 have you had

23     conversations with Linda Gagnon?

24          A     Yes, I have.

1          Q     How many?

2          A     Quite a few.  She used to call me when this

3     incident occurred.  She wanted me back as solicitor and

4     we had a very good relationship.  We talked on numerous

5     occasions up until the marching order was issued to her

6     not to talk to me.

7          Q     Has Linda Gagnon discussed with you the content

8     of Lieutenant Wnek's April 2005 report?

9          A     Yes.

10         Q     What has she discussed with you in that regard?

11         A     Do you want the context it was in or --

12         Q     Well, do you understand the question?

13         A     Yes.

14         Q     Can you answer it?

15         A     I saw the report early on and, quite frankly, at

16    that point in time I did not know that it had been

17    falsified.  I assumed that she had said that, so I just

18    kept silent on it.  I was called in for an MCAD

19    deposition and it was brought out that I had sexually

20    assaulted her and in the deposition, quite frankly, I

21    took the bullet.  I said:  "I do not recall that.  But

22    she's a friend.  If she said it happened, it happened."

23              Thereafter, I called her and quite frankly I

24    called to apologize to her that if this had been this way

1    for this many years that it bothered her that it bothered
2    me.
3           She immediately said:  "Maurice, that never ever
4    happened.  You never did that."  And then she went on to
5    indicate that she had talked to Fulya.  She had worked at
6    another business or company years before and someone had
7    done that and, apparently, it had been transposed by
8    Fulya to Wnek, which she denied in her depo, and she
9    transposed that information and Wnek then put it in the
10   report as if she had said it.
11          She has categorically denied repeatedly that
12   those statements were true.  She categorically denied
13   that I ever said anything that insulted her or touched
14   her or made her feel uncomfortable.  But I have not
15   talked to her since she was issued the marching orders.
16   Q    One of the statements in Lieutenant Wnek's
17   report at the end of the third paragraph is that she
18   indicated that she observed Maurice's behavior changed
19   when Fulya became employed with the city.  Did Ms. Gagnon
20   discuss that sentence with you?
21   A    I sent her that portion of the report, so that
22   she could look at what was being said about her.
23   She read the report.  She called in an emotional state
24   and actually used a couple of swear words and said:

1          "Maurice, not one word of that is true."

2          Q    And you understood her to mean the Wnek report?

3          A    Yes.  She went piece by piece on that.

4          Q    My question is concerning the last sentence.

5     What specifically did she tell you about the last

6     sentence, if anything?

7          A    She said she never said that.

8          Q    And was it just on one occasion that you

9     discussed Lieutenant Wnek's April 2005 report with Linda

10    Gagnon?

11         A    I would say approximately three times.

12         Q    And did you discuss the content on all three

13    occasions?

14         A    The first time was a summary because I didn't

15    have the document in my hand.  And then I told her that I

16    would send it to her for her to look at and she then --

17    we then talked.  She then told me there were two

18    occasions on which she spoke to Wnek.  One was that day

19    and one was a couple of days later they talked.  She told

20    me that at that stage Wnek had not made any notes or

21    brought any recorder or anything and apparently

22    thereafter no report existed until one was done in April

23    which was a couple of months later.

24              The last conversation we had substantively about

```
 1          that was just before the deposition with you.  And she

 2          said to me at that point in time that -- no, I'm sorry,

 3          this was Wnek because she said to me at that point in

 4          time:  "I told Wnek when I met him in the corridor I said

 5          words to the effect that nothing had ever occurred

 6          between him and I."

 7               Q    Have you talked to Connie Souci?

 8               A    No, I have not.

 9               Q    Have you talked to Diane Machiarello?

10               A    No, I have not.

11               Q    Have you spoken to her since the incident?

12               A    No, I have not.

13               Q    Have you spoken to Michelle Dragett since that

14          time?

15               A    I haven't spoken to her since about 2001.

16               Q    Have you spoken to John Mallory since February

17          16, 2005?

18               A    Yes.  Very briefly.

19               Q    What did you discuss with Mr. Mallory?

20               A    I saw him on two occasions.  He's the president

21          of the MCTV and the former president, Dave Scully, had

22          died, so I went to Dave's wake and funeral and I saw him

23          there.  And then I saw him -- they had a presentation

24          award at MCTV for Dave Scully.  They named a room after
```

1      him and I went to the presenting ceremony and saw him

2      there.

3          Q    Did you have any conversations with Mr. Mallory

4      about what's contained in your verified complaint?

5          A    No.

6          Q    Did Mr. Mallory convey to you any information

7      that he discussed with Fulya Metin about the allegations

8      in the verified complaint?

9          A    No.

10         Q    Or the MCAD complaint?

11         A    No.

12             MR. NOTIS:  At this point I'm going to pass the

13     questioning on to Attorney Gambaccini.  I might have some

14     additional questions later.  Thanks.

15

16                         CROSS EXAMINATION

17     BY MR. GAMBACCINI:

18         Q    During the first day your deposition testimony

19     do you recall giving some information about conversations

20     you had in the then previous 30 days with city employees;

21     namely, Gagnon, Kelly and Manzi?

22         A    I'd have to look at the deposition.

23         Q    You don't recall that testimony as you sit here

24     today?

1          A     Not offhand.  I'm sure it was brought up.

2     I do know that he asked some questions about the last 30

3     days.

4          Q     Turning to your earlier testimony regarding

5     Mayor Manzi do you recall giving some testimony about

6     e-mails that you had exchanged with him?

7          A     Yes.

8          Q     Were you able to locate those e-mails since the

9     first day of your deposition?

10         A     Yes, you called and were looking for them.

11         Q     I called you?

12              MR. DiADAMO:  No, me.

13         Q     So then you have been able to locate them?

14         A     I forwarded them to my attorney and my

15    understanding is he forwarded them to you.

16              MR. DiADAMO:  Let's go off the record for a

17    second.  Give me two minutes.  I might be able to get my

18    hands on them.

19                   (A brief recess was taken and Atty.

20                   DiAdamo has brought back into the room the

21                   e-mails that he found.)

22    BY MR. GAMBACCINI:

23         Q     Earlier in your testimony you had indicated that

24    some of your communications with Mayor Manzi were

1    directed towards the end of having Chief Solomon tell the

2    truth; is that right?

3          A    Right.

4          Q    What did you feel that Chief Solomon was saying

5    that was untruthful at the time that you had these

6    conversations with the mayor?

7          A    Every time he opened his lips.

8          Q    What had he said to that point?

9          A    He's lying about what went on in totality.

10          Q    What statements are you referring to by Chief

11    Solomon?

12          A    The easiest ones are just look at his

13    deposition.  He's denying that there was ever any

14    coercion or any intimidation or any threats.  He's

15    denying that he participated in anything having to do

16    with the civil side of the resignation.

17          Q    Okay.  So his deposition testimony is the

18    statement or the statements by Chief Solomon that you're

19    referring to, correct?

20          A    Yeah, by and large and there's newspapers

21    articles, too, about what he was saying.

22          Q    And I'm going to place in front of you a

23    document that I just received which purports to be an

24    e-mail communication between you and Mayor Manzi.

1          A     Yes.

2          Q     Is part of the subject matter of that e-mail

3     your communication with Mayor Manzi that you wished that

4     Chief Solomon would tell the truth?

5          A     Yes.

6          Q     Could we just mark that as the next exhibit,

7     please.

8                         (Lariviere Exhibit 18 was marked

9                              for identification.)

10         Q     Taking a look at what has been marked as Exhibit

11    18, based on the text of the e-mail, do you have an

12    understanding as to when you sent that e-mail to Mayor

13    Manzi?

14         A     It indicates October 31st.

15         Q     In the body of the e-mail itself is there a

16    reference to where this e-mail was sent with relation to

17    the deposition of Chief Solomon?

18         A     Yes.

19         Q     And when was that?

20         A     It says October 31st.  I think -- I'm trying to

21    think if where it's a forwarding if the date would

22    change.

23         Q     The first sentence of the e-mail reads, does it

24    not, "Today is Solomon's depo."?

1          A     Yes.  That would be the tag line.  I'm not sure

2     if October 31st would be something else, but the tag line

3     would definitely be the depo date.

4          Q     As of the time that you were writing that e-mail

5     communication to the mayor, Chief Solomon's deposition

6     had not yet been taken, correct?

7          A     To my understanding, yes.

8          Q     What statements are you referring to in that

9     e-mail communication to Mayor Manzi that you believe

10    Chief Solomon had made at that point that were

11    untruthful?

12         A     He has repeated them in the newspaper again and

13    again and again.  He has denied repeatedly that there was

14    any action that was political.  He said that it has been

15    a by-the-book investigation.  He repeatedly has said I

16    was guilty.  He repeatedly said no participation in the

17    resignation.

18         Q     He repeatedly has said that he had no

19    participation in the resignation?

20         A     Yes.  He said that he was purely on the criminal

21    investigation side.

22         Q     While we were on that subject can you articulate

23    for us what you contend to be Chief Solomon's

24    participating in your resignation -- in the actual

1      paperwork?

2            MR. DiADAMO:  Objection.

3      A     In the complaint it's covered in detail and I

4      have offered you now a day and a half of testimony on

5      what has been said by him.

6      Q     Other than that which is in the complaint and

7      that which has been testified to by you previously, any

8      other information that you have about Chief Solomon's

9      involvement in the events leading up to your resignation?

10           MR. DiADAMO:  Objection.

11     A     Short of we are now in the final stages of

12     assembling the evidence in the case.

13     Q     Shifting gears you recall that earlier in your

14     deposition you gave some testimony about a summer cottage

15     that you owned in Meredith, New Hampshire.  Do you recall

16     that testimony?

17     A     Yes.

18     Q     Have you ever derived any income from that

19     property?

20     A     No.

21     Q     Now, you also testified earlier in your

22     deposition about a mortgaging of your Windham, New

23     Hampshire property in January or February of 2005.  Do

24     you recall that?

1     A     Yes.  It would have been late January, early

2     February.

3          Q     Do you recall the amount of that mortgage?

4          A     $34,000, I believe.

5          Q     At the time that you took out that mortgage was

6     the Windham, New Hampshire property otherwise encumbered?

7          A     Yes.

8          Q     And what was the encumbrance on the property

9     prior to taking out the $34,000 mortgage, if you recall?

10         A     $60,000.

11         Q     What was your purpose in taking out a mortgage

12    in January or February of 2005?

13         A     My wife had finally gotten back to a full-time

14    job in Deerfield and she wanted to buy into the Deerfield

15    teacher retirement system and they told her that to

16    include her Massachusetts teachers service she would have

17    to pay them the current rate at which she was making

18    which came out to $34,000.  So our plan was that we'd

19    take out the loan.  She'd pay out over the teacher

20    retirement system the 34,000, so that she would be able

21    to buy her time and when she retired be able to have a

22    retirement income.

23         Q     Do you know from what entity that mortgage was

24    taken?

1           A     Methuen Municipal Employees Credit Union.

2           Q     Was this sequence of events taking place all

3    prior to your resignation on February 16, 2005?

4           A     Yes.

5           Q     Do you have any understanding as to what your

6    status with the city of Methuen has to be in order to

7    have a mortgage with the Methuen Credit Union?

8           A     I'm still a member of the credit union.

9           Q     Is membership in the union initially limited to

10   those who are employees of the city?

11          A     No.  I think it's if it's a family member I

12   think you qualify.

13          Q     There has to be some connection to the city of

14   Methuen?

15          A     To the best of my knowledge, but that is purely

16   speculation.

17          Q     In connection with the paperwork that you had to

18   fill out for that mortgage in February of 2005 do you

19   recall who notarized the document for you?

20          A     I know who the closing attorney was.

21          Q     Who was the closing attorney?

22          A     Peter McQuillan.  He was the attorney for the

23   credit union.

24          Q     Now, currently you have an arrangement of sorts

1    with Attorney Anthony Copani.  You have space in his

2    offices, correct?

3         A    Yes.

4         Q    Can you describe to us how you came to that

5    arrangement with Attorney Copani?

6         A    He called me.  He obviously knew that I was

7    undergoing a severe psychological condition.  He came to

8    realize that I had been offsetting this with alcohol

9    usage and he felt that I had better get the hell out of

10    the house and get somewhere and he said:  "Come on down

11    here and I'll give you a space and we'll see what we can

12    do if we can help you."

13         Q    Do you recall when you began sharing space with

14    Attorney Copani?

15         A    The first time would have been March or April of

16    '05.

17         Q    And what was the frequency with which you went

18    to Attorney Copani's offices during that time period in

19    March or April of 2005?

20         A    Two, maybe three days a week.

21         Q    Do you have any written agreement with Attorney

22    Copani about sharing space with his firm?

23         A    No.  He refuses to take any money.

24         Q    Have you shared in any profits or fees with

1     attorney Copani?

2          A     Yes.

3          Q     And what have those profits or fee sharing

4     events been?

5          A     Maybe $1800.

6          Q     And what was the nature of that money?

7          A     There was a woman that got a variance and her

8     neighborhood challenged her and Tony took the case over

9     and handed it to me to represent her.

10         Q     So did you receive all of the fees from that

11    particular matter?

12         A     No.

13         Q     So there's been some splitting of fees with

14    Attorney Copani?

15         A     Yes, the check was written out to Tony.  There

16    was a retainer of, I believe, $5000.  The check was

17    written out to him and he ultimately -- the case was

18    closed before the 5000 was used and I believe he gave me

19    one-third of whatever the balance was.

20         Q     Any other fee or profit splitting that you can

21    recall other than that $1800 matter?

22         A     There was been a couple of cases that we've

23    talked to people about, but no, not to my knowledge.

24         Q     Now, I understand your testimony earlier was

1          that you don't advertise or have a website for your law

2          office located in Attorney Copani's building.

3             A    Well, quite frankly, afterwards when I became

4          aware of MySpace I posted myself there now.

5             Q    And that's on MySpace.com?

6             A    Yes.  And I have had business cards made and

7          handed those out.

8             Q    Where have you handed out business cards?

9             A    Anybody that came within a few feet of me,

10         if they ever asked me questions about law and potential

11         representation.

12            Q    Now, a few seconds ago you indicated that when

13         you became aware of MySpace.com you posted your law

14         office on there; is that correct?

15            A    Yes.

16            Q    When did you become aware of the website

17         MySpace.com?

18            A    Quite frankly, I was unaware that Fulya had been

19         on MySpace and I used the term MySpace and I had said no,

20         it was Match.com and then I looked up MySpace and posted

21         myself up there.

22            Q    Is the site that you have on MySpace.com a

23         professional site or a personal site that references your

24         professional endeavors?

```
 1            A      It lists my professional endeavors.

 2            Q      Is it limited to your professional endeavors?

 3            A      Mine?

 4            Q      Yes.

 5            A      I have put on there an outline.  I had put on --

 6       they asked you questions and I put on there what my

 7       interests are and what my practice of law is and, quite

 8       frankly, some pictures.

 9            Q      Did you make any attempts to visit Fulya Metin's

10       MySpace.com page?

11            A      Yes.  I went there to verify whether or not she

12       had a MySpace.

13            Q      How many times have you visited her page?

14            A      Twice probably.  First time to look at it and

15       the second time to collect some evidence.

16            Q      What evidence did you collect from her MySpace

17       page?

18            A      Her friends' statements and comments to her.

19            Q      Do you have any understanding as to whether

20       you're listed on any advertisements for Mr. Copani's

21       firm?

22            A      I don't believe so.

23            Q      Do you know whether you are listed in the Yellow

24       Pages?
```

```
 1          A     No.

 2          Q     Any other similar business directory?

 3          A     Well, I'm in the Mass Journal, obviously.  Other

 4     than that I don't think so.

 5          Q     Earlier you also gave some testimony about a

 6     contract that you have with the Andover Housing Authority

 7     that you provide legal services for.  How did you come

 8     into that contract with the Andover Housing Authority?

 9          A     Peter McQuillan when he got the job with the

10     city of Methuen had left working there and they had

11     sought proposals -- RFPs -- and I filed with them and

12     went for an interview and got it.

13          Q     Do you have any understanding as to whether

14     anyone recommended you for that position?

15          A     I believe the executive director and I believe

16     one of the members were strong advocates.

17          Q     How about anyone outside the Andover Housing

18     Authority?  Do you have an understanding whether someone

19     outside the Andover Housing Authority recommended you for

20     the position?

21          A     Oh, yes.

22          Q     And who were these persons?

23          A     Lee Palmimer, Dennis DeSaglio and then the

24     former Police Chief, Bruce McDougall.
```

1      Q    Anyone else that you were aware of?

2      A    I have used other folks as references on other

3    applications.  I think it was those two on the Andover

4    application.

5      Q    For what reason did your wife move to full-time

6    employment in September of 2004 to the Deerfield School

7    System.

8      A    In '82 we had our first child and she left

9    employment as a full-time teacher in Wakefield, Mass and

10    we ultimately had three children and she wanted them to

11    get to a proper age and then she started looking for a

12    job and got a part-time job in Derry in 1995 with the

13    intent of trying to finding a full-time job and

14    ultimately she had a shot at Deerfield and got the job in

15    September of 2004 I believe is when she started.

16      Q    Do you recall what her salary was for the year

17    2005 approximately?

18      A    I would have to take a guess.  Are we including

19    all the pre-tax numbers?

20      Q    If I represent to you that on your tax returns

21    for the year 2005 the W-2 total was $100,000 how much of

22    that was your wife's salary?

23      A    I would say 46,000 -- somewhere around there.

24    Though obviously at the house I would have the exact

1    numbers.

2    Q    Is there any reason why you have elected not to

3    begin drawing from your municipal pension?

4    A    Yes.  I have this court case and I have an

5    equitable provisions clause as well as a damages clause.

6    Frankly, I would like to go back to work.

7    Q    Is it your understanding that once you begin

8    drawing from your municipal pension that that would

9    prevent your return at some point in the future with

10   Methuen?

11   A    Yes.

12   Q    Now, during the first day of your deposition

13   testimony you also indicated that prior to the events of

14   February 2005 you had not consulted with a psychiatrist

15   or a psychologist.  Do you recall that testimony?

16   A    I believe so.

17   Q    I'll represent to you that in some of the

18   medical records that have been provided in discovery

19   there was a reference about 20 years or so ago to a

20   referral to a mental health professional.  Do you recall

21   anything about that referral?

22   A    It might be in '81 when I went on a cruise with

23   my wife and we went through a storm.  I didn't have a

24   problem whatsoever, but she got sick.  A lot of people on

1        the ship were sick and when we got back all of a sudden I

2        got on the shore and I was dizzy as hell and she's goes

3        back to her normal condition and the doctor that was

4        treating me I believe said let's see if there's any

5        psychological component and I think I went once to see

6        somebody about my balance.  I think it was the balancing

7        system of the ears that got fouled up.  That would be the

8        only one that I'm aware of.

9            Q    Some documents produced by your attorney earlier

10       in discovery also reference your job search since

11       February of 2005 and included among those documents was a

12       spreadsheet of sorts with a listing of contacts.  Do you

13       recall that document?

14           A    Yes.

15           Q    Do you recall when you prepared that

16       spreadsheet?

17           A    Upon starting looking.

18           Q    And this is a spreadsheet that you've inputted

19       data into over time?

20           A    Yes.

21           Q    Are you still inputting contacts that you have

22       made for employment into a spreadsheet?

23           A    Yes.

24           Q    Do you know whether the document that was

1      produced through discovery in about July of 2006 was the

2      spreadsheet as existing at that time?

3          A    It should be, I believe.

4          Q    And your attorney also provided some

5      documents -- correspondence for the most part -- either

6      from you or to you related to employment prospects.  Have

7      you had seen those documents?

8          A    I would have provided them to him, I believe.

9          Q    In the documents that were provided there is one

10     correspondence from March of 2005 involving the town of

11     Brookine.  Do you recall that inquiry to Brookline?

12         A    The application seems familiar; the details I'm

13     not sure.  Towns for the most part would be in writing

14     rather than electronically like a lot of firms do now.

15         Q    Do you recall what attempts you made to secure

16     employment in February of 2005?

17         A    I'm not sure.

18         Q    And let me be clear you have given some

19     testimony earlier today about conversations that you had

20     with then Councilor Manzi about returning to work.  I'm

21     looking for inquiries that you made outside of the city

22     of Methuen.

23         A    The inquiries I believe would be logged in that

24     document that you have.

1        Q    If I were to represent to you that other than

2        that one document reflecting an inquiry made to the town

3        of Brookline in March of 2005 all of the other materials

4        reference inquiries made between August 2005 and February

5        of 2006 or thereafter.  Does that refresh your

6        recollection for employment outside of Methuen?

7        A    I believe that would be accurate because at that

8        point I was the daily article in the newspaper and there

9        was no way in hell that I could even be considered.  I

10       was hoping that time would be the great curer and

11       unfortunately it did not produce that.

12       Q    Other than the inquiry made to Brookline,

13       conversations that you had with then Councilor Manzi and

14       other individuals about returning to work and

15       conversations with Attorney Copani about sharing space

16       there, it's fair to say that you ever conducted no other

17       job search from February 2005 through August of 2005?

18       A    At that point I'm a total freaking train wreck.

19       I'm being promised that something would be worked out and

20       I was quite frankly drunk a lot.

21       Q    Now, you referenced earlier e-mailed

22       applications to potential employers.  When you e-mailed

23       applications to potential employers were those e-mails

24       requested by the employer, meaning the advertisement that

1          the employer had posted said please send e-mail

2          inquiries?

3               A    A lot of them had just that.  Some of them

4          were -- quite frankly, you could e-mail or hard mail and

5          the e-mailing is no charge, so in most circumstances when

6          it was e-mail I would choose that because of the cost.

7               Q    In the one year prior to February 16, 2005 -- so

8          from February '04 to February '05 -- did you make any

9          inquiries -- and by inquiries I'm talking about formal

10         letters, seeking employment, looking at job postings,

11         anything of the sort -- looking for a job outside of

12         Methuen?

13              A    I monitored it a couple of times because I was

14         getting tired of the shit I was going through, but I was

15         looking for municipal and looking for equivalent or

16         better salary and looking for a public system to continue

17         my retirement.

18              Q    So prior to the events of February of 2005 you

19         were looking for employment elsewhere?

20              A    I was monitoring.

21              Q    What do you mean by monitoring, just looking at

22         job postings?  Did you take any actions beyond that?

23              A    I don't believe so to my memory.

24              Q    For how long had that process of monitoring been

1      occurring moving back from February 16, 2005?

2          A    Shortly after Pollard started making my life an

3      absolute misery I started thinking about it.

4          Q    When was that approximately?

5          A    When she first started or when it went hard?

6          Q    When in your words your life became hell and you

7      began looking for employment elsewhere, when was that?

8          A    Late 2003 probably I would start monitoring,

9      where I had not looked before that.

10         Q    So it's fair to say that by February 2005 you

11     had been monitoring other employment for about a year and

12     a half?

13         A    On and off, yes.

14         Q    Referring to your employment as solicitor, they

15     were two-year appointments, correct?

16         A    That's correct.

17         Q    Did you have any right to contest a decision by

18     the council not to reappoint you?

19         A    No.  It would have to be some sort of situation,

20     but in the normal course of events, no.  If it was

21     something that might tag line a 1983 type of thing

22     potentially, yes.

23         Q    Excluding instances of discrimination based on

24     race or gender or religion or something like that, there

1      would be no recourse to a decision by the council not to

2      reappoint?

3           A    To the best of my knowledge, yes.

4           Q    If a decision was made by the city council not

5      to reappoint a solicitor, did that individual have any

6      right to a reason for the decision?

7           A    No.

8           Q    Within the window of a two-year appointment

9      we've talked about some of the procedural safeguards that

10     were in place -- the right to a hearing before the

11     council should the individual decide to have one, to have

12     an attorney present to cross examine witnesses -- things

13     like that.  Putting aside the procedural were there any

14     substantive job protections for the solicitor in or about

15     2005?

16               MR. DiADAMO:  Objection.

17          A    I'm not understanding your question.

18          Q    Let me be transparent with my question.  You're

19     aware of civil service law, correct?

20          A    Yes.

21          Q    And a just cause standard before you can be

22     disciplined or terminated, correct?

23          A    Yes.

24          Q    Was there any similar sort of substantive

1       protection for the position of city solicitor in Methuen

2       in 2005?

3            A    No.

4            Q    There would be a 9-10 procedure.  The sole

5       source of any substantive rights enjoyed by the solicitor

6       would be the charter that has been entered into evidence

7       earlier this morning?

8            A    The main frame, yes.

9            Q    Now, you were reappointed as solicitor in

10      January of 2005, correct?

11           A    Yes, that's correct.

12           Q    Was there a city council meeting to formally

13      appoint you or reappoint you as solicitor?

14           A    Yes, first meeting in January in odd number

15      years they would reappoint the city council employees.

16           Q    Was there a vote to reappoint you in January of

17      2005?

18           A    Yes, there was.

19           Q    Do you recall what the vote was -- what the

20      breakdown was?

21           A    Unanimous.

22           Q    Between the time period of the unanimous vote to

23      reappoint you as solicitor in 2005 and February 16, 2005

24      and the week thereafter was there a change in the

1      membership of the city council?

2          A      No.

3          Q      Do you believe that you would have received a

4      fair hearing before the city council in February 2005 or

5      soon thereafter?

6              MR. DiADAMO:   Objection.

7          A      Based upon what I know today, yes.

8          Q      And what do you know today that would lead you

9      to believe that you would have had a fair hearing before

10     the city council?

11         A      That Solomon and Alaimo were complete liars to

12     me that day.

13         Q      What information did you have in February of

14     2005 about the type of hearing that you would receive

15     before the city counsel?

16         A      I documented what they were saying in the

17     complaint.  I was being told that Fulya Metin was making

18     criminal charges against me, that she wanted me out, that

19     she was going to criminally prosecute me and it's

20     detailed in there what was being said to me.

21     Subsequently, I have obviously read Wnek's statement and

22     I have Fulya Metin's statement and I was just plain lied

23     to.

24         Q      Putting aside what might be termed the merits of

1          your testifying at a hearing before the city council,

2          what information did you have about the city council

3          itself in February of 2005 with respect to the type of

4          hearing that you believe that you would have received?

5                    MR. DiADAMO:   Objection.

6          A    I had a discussion with Bill Manzi at that

7          point.

8          Q    Is that one of the conversations that you

9          referred to earlier with Mayor Manzi?

10         A    Yes.

11         Q    And what did he tell you about the type of

12         hearing that you would receive?

13         A    He told me that I should not have been forced to

14         resign.  He told me that my relationship with Fulya was a

15         little too close based upon what he had seen in the

16         video, and at that point he was telling me he's seen the

17         full video, so he got a new version of life.

18         Q    Did he indicate to you that if you petitioned

19         the city council at that time that they would take an

20         objective view of the evidence and that you might be

21         returned to work in Methuen?

22         A    He told me at that point -- and, again, I think

23         I said it before, knowing he had the political parameters

24         of the entire system, he told me that he wanted it to

1     calm down and when things calmed down he would take care

2     of it.  He was making sure that there was an absorption

3     of my resignation and he told me that I should rely on

4     him.

5          Q     Now, during the first day of your deposition

6     testimony you described what you characterized as a

7     mutual affectionate relationship with Fulya Metin over

8     the course of time and you also testified about some of

9     the physical contact between the two of you in connection

10    with that relationship.  Was there any physical contact

11    between the two of you that you can recall today that you

12    haven't testified to previously?

13         A     Not to my knowledge.

14         Q     Any sexual conduct or banter that you can recall

15    sitting here today that you haven't testified to

16    previously in this deposition?

17         A     Quite frankly, yes.

18         Q     What are those?

19         A     When I appeared for the 56 in the federal case I

20    came back elated and I thought that I had done a really

21    good job before the judge and --

22         Q     You are talking about the summary judgment?

23         A     Yes.  And I said to Fulya:  "Quite frankly, if I

24    had a choice between going away for a weekend with you or

```
1       going to court, I would choose court."  I said that in a
2       joking fashion.
3           Q    What was her response?
4           A    She laughed.
5           Q    Do you recall when the summary judgment argument
6       was?
7           A    End of January.
8           Q    Anything else other than that comment?
9           A    In a sexual connotation?
10          Q    Correct.
11          A    No.
12          Q    When were you married?
13          A    February 14, 1976.
14          Q    Understanding that we've seen the videotape, are
15      there any persons other than Fulya Metin that you have
16      engaged in the conduct that's on that tape as well as
17      what you have testified to previously since your marriage
18      in February of 1976?
19               MR. DiADAMO:  Objection.
20          A    No.
21          Q    How often did you hug Fulya Metin?
22          A    Periodically we exchanged a hug when something
23      went on that was happy or gleeful.
24          Q    When you say periodically, looking at the time
```

1          frame from September of 2004 to February of 2005 --

2          A     It would be October 2004.

3          Q     Did you hug her more than once a week generally?

4          A     No.

5          Q     Every two weeks?

6          A     I would have to speculate.  If she was happy

7     about something or I was happy about something -- she had

8     a very disturbed home life, so I might give her a hug as

9     a source of support.

10          Q     On February 14th, 2005 do you recall what time

11     you left work?

12          A     It should have been about 5:30.

13          Q     Do you recall what you did after you left work

14     at about 5:30 on February 14th?

15          A     I believe at that point I was going to the gym.

16     I would have gone home, had supper and then gone out to

17     the gym until about 8 o'clock or so.  I think that I had

18     gone that Monday night.

19          Q     Did you go to the gym that night with Fulya

20     Metin?

21          A     No.

22          Q     Was she there at the gym that night?

23          A     There was one night and this might be that or

24     maybe not when we were heading up the stairs and she was

1      coming down with her daughter.  It might have been the

2      14th.  I'm not positive.  I believe that's the only time

3      I ever saw her there at night.

4          Q    Did you have any understanding during the day of

5      February 14th, 2005 whether she would be there that

6      night?

7          A    If that is the event, no.  And if that is the

8      event to my understanding she had not planned on that

9      until the mother and the boyfriend had such a violent

10     argument that she left the house with the daughter.

11         Q    Why did you frequent the Methuen Gold's Gym as

12     compared to any other gym closer to home?

13         A    The initial part was Fulya had talked about

14     going to the gym there and, thereafter, Bill DePardo and

15     I were friends and we started going nights over there on

16     and off.

17         Q    Earlier in your testimony you also referenced

18     e-mail correspondence that contained pornographic images

19     that you received in or about February of 2005 and that

20     you opened on your work computer.  Do you recall that

21     testimony?

22         A    I received these e-mails and I saw that they had

23     come from a Brian Leif -- I'm not positive how it's

24     spelled, but he was working in CD at that point in time.

1       Q      What's CD?

2       A      Community Development.

3       Q      And do you recall how many e-mails there were?

4       A      Maybe four or five -- maybe.  I'm not positive.

5   I just recall them and going downstairs and asking --

6   he'd been sending them to multiple people and I had asked

7   him to take me off the list.

8       Q      What was his response?

9       A      He did.

10      Q      Do you recall any of the other recipients of the

11  e-mails?

12      A      I believe Bill DePardo got some.  I think Gerry

13  DuShane (phonetic) and there as another fellow who works

14  in engineering.  He's an Italian gentleman and I forget

15  his name, but I believe he was getting them also.

16      Q      In connection with the MCAD proceedings do you

17  recall at some point in time participating in the

18  submission of a position statement?

19      A      Yes.

20      Q      In connection with that position statement do

21  you recall having any e-mail communications between you

22  and Fulya Metin appended to that position statement?

23      A      Yes.

24      Q      In one of those e-mail communications between

1    you and Fulya Metin that took place there was at the end

2    of an e-mail from you to her your initials, MJL, and then

3    FFL.  What does that mean?

4         A    Friends for life.  Short life.

5         Q    What was your purpose in adding that to the end

6    of that communication with Fulya Metin?

7         A    Any time she ever described a situation that was

8    going on in her life I always told her:  "I'm there for

9    you.  I'll help you.  I'll do whatever I can."  And I

10   started saying:  "You are my friend for life."

11        Q    Earlier in your testimony you also described Ms.

12   Metin's behavior on February 15th, 2005 as among the

13   friendliest times that you ever spent with her.  Is that

14   accurate?

15        A    Yes.

16        Q    Can you elaborate as to what led you to that

17   opinion of her behavior on February 15th, 2005?

18        A    Yes.  Quite frankly, at that point in time for

19   some time she had been talking about a friend of hers --

20   I don't know who it was -- her lover -- who was in

21   federal prison, but quite frankly I'm not interested in

22   criminal law, and she would be going on and on into a

23   diatribe about how this guy got fouled up with the system

24   and the jury came back guilty and she talked about an

appeals court and, quite frankly, if you want to talk about municipal law I'm with you, but criminal law didn't interest me that much and that day I was going to Essex County over to Salem Superior Court and her car had broken down and I go and head over and frankly for the first time I didn't mind her talking about that federal thing, I guess, because she was receptive about talking about other things as well and she really got ultra friendly.

Q How would you compare that behavior to her behavior on February 16th?

A Well, we were in the -- we were at Wendy's at the Methuen Loop and that was on the 15th that her car broke down and then I got her a coffee in the afternoon when I got back from court and we had that discussion and she left and it was as friendly as it gets.

Q How would you compare that behavior on the 15th to her actions and behavior on February 16th, 2005?

A I would say on the 15th it was ultra friendly and the 16th it was okay.

Q Do you know whether you still have your personal cell phone records from February 2005?

A Yes, I do. Let me put it this way. I'm a Verizon customer and back in that time line they did not

1          give you those.  They do now, but I asked Verizon to send
2          me those.
3              Q    Have you received them from Verizon yet?
4              A    Yes, I have.
5              Q    Moving ahead to February 16th, 2000 during the
6          period of time in which you were in the second floor
7          conference room with Chief Solomon and Deputy Chief
8          Alaimo during your conversation with them that morning
9          was there a period of time that the chief and deputy
10         chief were seated?
11             A    No.
12             Q    They were standing the entire time?
13             A    Yes.
14             Q    And you were seated the entire time?
15             A    Yes.  With the exception of when I went to the
16         restroom.
17             Q    Okay.  Do you recall anyone telling you that
18         morning what actions of yours were visible on the
19         videotape?
20             A    I believe Solomon said words to the effect of
21         that he saw me touch her butt.
22             Q    What was your response to that by Chief Solomon?
23             A    I said yes.  I believed him.
24             Q    Now, once David Bain entered the conference room

1          how long was he present for?

2          A     I would say less than 30 seconds.

3          Q     Did you have any conversation with him?

4          A     No.  He said:  "Here's this.  Sign it."

5          Q     Did you read the document before you signed it?

6          A     No.

7          Q     Who was in the room when you signed the

8     resignation document?

9          A     I know Solomon was there and I'm not positive,

10    but I think Alaimo was and then Dave Bain.

11         Q     Do you recall where the individuals were

12    situated at that time that you signed the document?

13         A     Bain was next to me and they were at the door,

14    which would be the exit.

15         Q     Was David Bain seated next to you?

16         A     No.  Like I said the entire thing was less than

17    30 seconds.  That's all it took to sign the thing.

18         Q     How far was Chief Colomon from you when you

19    signed the document?

20         A     Rough estimation, ten or twelve feet.

21         Q     And Deputy Chief Alaimo?

22         A     I believe he was right next to him.

23         Q     Now, earlier in your testimony you indicated

24    that it was your recollection that Chief Solomon left the

1       conference room three times; is that correct?

2       A    That's correct.

3       Q    How long was he gone each time?

4       A    I would say that the first time about four or

5       five minutes as best I can guesstimate.  The second time

6       when he went with Alaimo would have been ten minutes and

7       then the last time was just go up, grab it and come back.

8       Q    What's the --

9       A    The resignation letter.  He came back down with

10      Bain.

11      Q    And on the occasion that you just referred to

12      where Chief Solomon left the room with Deputy Chief

13      Alaimo that's the only time that you recall Deputy Chief

14      Alaimo leaving the room?

15      A    To my memory, yes.

16      Q    Do you recall either Chief Solomon or Deputy

17      Chief Alaimo indicating to you during your conversation

18      in the conference room:  "We don't want to arrest you,

19      Moe", or words to that effect?

20      A    No.

21      Q    Do you recall Chief Solomon saying that he had

22      lost sleep and that this incident was causing him pain?

23      A    That was his original statement and that was

24      part of the good cop/bad cop stuff.  I think that I put

1          that in the complaint, in fact.

2          Q    Do you recall either the chief or the deputy

3     chief indicating that if you need any help we can help

4     you get it or words to that effect?

5          A    No.

6          Q    Subsequently, you testified that you had a

7     telephone conversation with Chief Solomon on the 15th of

8     February, correct?

9          A    Yes.

10         Q    How long was that telephone conversation?

11         A    Not overly long, but the records I obtained from

12    Verizon I believe detail it.

13         Q    Do you have any present recollection based on

14    reviewing those records about how long the phone

15    conversation was?

16         A    It was short in nature.  I'm going to say three

17    to five minutes, but the record is very clear.

18         Q    Did you make any attempt to tape that telephone

19    conversation?

20         A    No, it's illegal.

21         Q    Earlier you gave some testimony about an Emma

22    Donnelly.

23         A    Yes.

24         Q    And you indicated that she had passed a note

1          from another person to Mayor Manzi?

2              A     A phone call.

3              Q     Who was the middle person in that scenario?

4              A     Dorothy Kalil, K-a-l-i-l.

5              Q     You also gave some testimony earlier with

6          respect to a request for an investigation also with a

7          third person being involved.  Who was that third person?

8              A     Emma Donnelly.

9              Q     On that issue of a request for an administrative

10         or internal investigation, based on your experience as

11         the city solicitor in Methuen, was there any practice in

12         the city about putting an administrative investigation on

13         hold while a criminal matter was pending?

14             A     It would depend upon the nature of it.

15             Q     Was there any practice in the city of Methuen

16         regarding internal investigations once the subject matter

17         of the investigation had proceeded into litigation,

18         whether at the MCAD, the Superior Court or federal court?

19             A      If it was MCAD we would make an investigation.

20         It was initiated right up front.  There's two steps.  The

21         city wants you to first look at the thing and then they

22         want you to do an investigation into it.  If you look at

23         their model you can see --

24             Q     On the issue of the conspiracy that you believe

1      existed in Methuen do you think that Fulya Metin was

2      involved in the conspiracy?

3          A    To the best of my knowledge at this point she

4      was rendered a sucker by Solomon and Pollard.

5          Q    Do you contend that either Chief Solomon, Deputy

6      Chief Alaimo or anyone else associated with the city of

7      Methuen coerced or tricked you or did anything that led

8      to your actions on the morning of February 16th, 2005?

9               MR. DiADAMO:  Objection.

10         A    I don't know.

11         Q    When do you contend that the conspiracy was

12     formed?

13         A    That's something we are in the process of

14     finalizing now once we go through all of the records.

15         Q    You currently have two children in college,

16     correct?

17         A    Three.

18         Q    How many of those children are dependent upon

19     you and your wife for tuition, food or otherwise living

20     expenses?

21         A    My middle child Catherine has a Presidential

22     Scholarship with a college and we had put away college

23     money for years and she's using that for the room and

24     board and books and other items.

1           My son Tom, again, is using the college funds

2     and my daughter, who is the oldest one is in Yale, and

3     she's on a part scholarship and she's going -- she's also

4     using the funds that we gave her.

5        Q    The Presidential Scholarship for your daughter

6     Catherine what percentage is that scholarship of her

7     total tuition expenses?

8        A    100 percent of the tuition.

9        Q    And the part scholarship for your child at Yale

10    what percentage of that scholarship --

11       A    Part of that is work study, part is money that

12    we give her and part of that is scholarship and I'm not

13    sure what the numbers are.

14       Q    Are your children's college expenses paid for

15    totally by a combination of scholarship or the college

16    funds that you had set up for them?

17       A    I'm sorry, I missed the question.

18       Q    Your children's college expenses, are those

19    totally taken care of by a combination of their

20    scholarships and work study and the college funds that

21    you had set up for them?

22       A    Yes.  For the last two and the first one -- the

23    work study would be purely for the oldest one.

24       Q    Now, during the first day of your deposition

1    testimony you indicated that this incident has come up in

2    three interviews that you had for subsequent employment.

3    When that issue had arisen during the course of those

4    interviews what has your response been?

5        A    The one that I remember most vividly is I

6    applied to the AG's office for a position and Tom Reilly

7    had already formed -- he was running for governor at that

8    point and Reilly had a form that you had to fill out and

9    one of the questions was about any litigation in your

10   life as either a plaintiff or defendant and the question

11   that was nuclear with respect to me was:  Is there

12   anything in your past that might show up as an

13   embarassment to the Attorney General?  And I didn't have

14   any choice but to truthfully answer and I had the

15   interview with the team that was heading up that

16   particular division and they asked the question and I

17   told them truthfully.

18       Q    Do you recall what you indicated on that

19   application form?

20       A    The MCAD action and the federal complaint.

21       Q    And can you describe what was said during the

22   interview on that subject?

23       A    They asked me to explain what the MCAD action

24   was and I did.

1        Q    Do you recall what you said?

2        A    I said it's a sexual harassment case brought

3    against me in Methuen because I was the supervisor.

4        Q    And was there any response from the team once

5    you explained what the MCAD action was?

6        A    I could tell in their faces that I was dead.

7    Reilly was going through a lot of garbage.  The last

8    thing he wanted to do was add another problem to his

9    cart.

10        Q    What about the other two interviews?  How did

11    you respond to this issue during those interviews?

12        A    Frankly in Newton I lied, but he found out

13    later.

14        Q    How did you lie in the Newton interview?

15        A    I did not go into the MCAD action.  The thing is

16    that among the cities there's frequent networking, so

17    everyone ends up knowing everything about everyone

18    anyway.  Everyone also fantasizes as I'm sure you know

19    and I had talked to a couple of people by that point in

20    time and the paperwork had gone to the head of the city

21    solicitor's association and word got back and so on and

22    so on.

23        Q    And was there a subsequent conversation with

24    that individual about his learning about the MCAD matter

1     despite the fact that you had not disclosed it

2     previously?

3          A    No.  I tried to recontact him.  I sent him an

4     e-mail and I tried to contact him, but I was not getting

5     any calls back at that point in time.  No letters or

6     anything else.

7          Q    What about the third interview?

8          A    On that one it was just a very quick in and out

9     sort of scenario.  I discussed it, but in wasn't intense.

10         Q    Do you remember what you said about the MCAD

11     matter during that third interview?

12         A    Very basically there was an allegation in which

13     I will have to go to a hearing and I'll be all set once

14     the hearing is finished.

15         Q    Now, at one point earlier this morning you

16     referred to a certain period of time as your alcohol

17     phase after the incident of February of 2005; is that

18     correct?

19         A    Yes.

20         Q    Can you describe what you meant by that phrase?

21         A    I was drunk all of the time.

22         Q    Prior to February of 2005 did you have any

23     problems with alcohol abuse?

24         A    At New Year's parties and Christmas parties I

1     might have had an excess on occasion.

2         Q     Had any individuals prior to February 2005 ever

3     suggested or recommended to you that you seek treatment

4     for alcohol abuse?

5         A     No.

6         Q     Have you ever sought treatment for alcohol

7     abuse?

8         A     No.  Once I went on Zoloft you're not allowed to

9     have that because that's an anti-depressant and if you

10    were to drink while on anti-depressants you would be

11    offsetting one to the other and I had to stop and

12    fortunately I was just able to do that and it was gone.

13        Q     Has any individual suggested or recommended to

14    you at any time that you seek treatment for a narcotic or

15    prescription medication abuse?

16        A     No.

17        Q     Are there any physical ailments that you now

18    suffer or have suffered from that you attribute to the

19    incident of February 2005 and your resignation from

20    Methuen?

21        A     The only physical ailment that I know of -- and

22    I'm not sure if it's related or just something that

23    occurs due to my age -- is blood pressure and I was put

24    on blood pressure medication, but I have never asked for

 1    a specific diagnosis.

 2        Q    Did you have any issues with your blood pressure

 3    prior to February of 2005?

 4        A    I remember my doctor saying at one point in time

 5    that a couple of times when they took the blood pressure

 6    it was higher than it had been and I remember asking her

 7    that question at that point in time.

 8            Are headaches considered -- would you consider

 9    that a physical ailment, too?

10        Q    Anything of that sort, yes.

11        A    I had more recently -- it's been more rare, but

12    I did have a lot of headaches.  And I have them if I

13    don't take my sertraline, which is the generic of Zoloft,

14    and if I miss that frankly I'm screwed.  I got a quick

15    education from doing that and I went into a depression,

16    so I learned pretty quickly not to do that again.

17            MR. DIADAMO:  Let me just grab some water.

18                    (Pause)

19            MR. DIADAMO:  Sorry, about that.  Go ahead.

20    BY MR. GAMBACCINI:

21        Q    Prior to February 2005 had you experienced any

22    problems with headaches.

23        A    Once in a while I would have a headache if I had

24    like the flu or something I would get a wicked headache

1          in the area above the eyes.

2              Q     Prior to 2005 any problems with headaches that

3          were similar in severity or frequency to what you claim

4          after February 2005?

5              A     Yes.

6              Q     Any other physical ailments that you attribute

7          to your resignation from Methuen in February of 2005?

8              A     No.

9              Q     Has your marriage changed at all since February

10         of 2005?

11             A     Give me a minute, please.

12             Q     Sure.   Take your time.

13                   MR. DiADAMO:   Let's go outside for a minute.

14                        (A brief recess was taken.)

15         BY MR. GAMBACCINI:

16             Q     Do you recall the question before we took a

17         break?

18             A     Yes.

19             Q     Can you describe how your marriage has changed

20         since February of 2005, please?

21             A     My wife is the most loving mother that ever

22         walked this planet and it's hurt her what all of those

23         newspapers articles with Solomon enjoying shitting all

24         over me did to my kids and it hurt them a lot and we were

1    a strong family and they hold it in, but sometimes it

2    just blows over.

3         And she was at the point -- we're at the point

4    now where I'm down to the last few years.  I wish the

5    fuck they hadn't been there.  I would have just gone

6    through and left.

7         All of a sudden we were going to have -- you

8    know, the last few years before I retired we'd enjoy it.

9    We had two incomes and we would have a little extra

10    rather than where we put the money for the kids and all

11    of a sudden it's gone and we were sitting there losing

12    all of the money and selling property and we have to sit

13    and see all the newspaper articles of those bastards

14    repeating themselves over and over again.  It's just

15    added like ten years to her life.  She looks physically

16    like she gained ten years in two.  It's just destroyed

17    her totally as far as this.

18    Q    To your understanding has any of that that had

19    an adverse impact on your wife been related to your

20    relationship with Fulya Metin?

21    A    The main stay of it is the newspaper articles

22    and the continuous beating that Pollard and Solomon made

23    again and again and again and it was just the impact it

24    had.  Obviously, I can't talk about direct conversations.

1    Q    Since February 16th, 2005 have you received any

2    funds from the city of Methuen?

3    A    Pollard drained out that buy-back account in

4    order to prevent the appointment of somebody and she sent

5    it to me a few days after she claimed there was no money

6    left in the budget and that was it.

7    Q    Was that one payment?

8    A    I believe there were two checks if I remember

9    correctly.

10    Q    Do you recall the total amount of those two

11    checks?

12    A    No.

13    Q    Do you have an approximation as to how much?

14    A    It would be the balance basically of what my

15    wife earned to what my earnings were for that year.

16    Since then nothing.

17    Q    The numbers that I referenced before for 2005 of

18    $100,000 of W-2 income and I believe your approximation

19    of your wife's salary in 2005 was 40,000, so does that

20    refresh your recollection as to how much money you

21    received after February 16th, 2005?

22    A    On the salary end you would have three

23    components.  It would be salary that I earned as city

24    solicitor between January and February and they had

1     ranked it as a cost of living adjustment, so because it
2     was from a prior year I got that amount, so it would be
3     the regular earnings until I left, the COLA amounts that
4     were paid, my wife's amount and then the buy-back amount.
5          Q    Have you had any out-of-pocket expenses that you
6     attribute to your separation from employment with Methuen
7     in February of 2005?
8          A    There's a tally running right now for the cost
9     of the litigation.  The municipality used to pay for my
10    BBO and for my MBA and now I'm paying that.  And we pay
11    the medical costs and the psychological counseling.
12         Q    Do you have a current understanding as to even
13    by way of approximation how much the out-of-pocket
14    expenses are at this time?
15         A    I would have to sit down and add it up.  It
16    would be two years of MBA and two years of BBO.  It would
17    be the medical expenses and I haven't added it all
18    together.
19         Q    You have no approximation as to how much it
20    would be?
21         A    It would be under $10,000 to my knowledge.
22         Q    How has the separation from employment with
23    Methuen in February of 2005 affected you emotionally?
24         A    I'm gone.  I'm destroyed.

```
1          Q    Can you elaborate how it's affected you since

2     February of 2005?

3          A    No family name no longer exists.  My ability to

4     have a career no longer exists.  I have to look my

5     children in the face and know that, in part, I'm

6     responsible.  The harm that's been done to my wife.

7     Friendships that I had for years; people that I trusted,

8     people that I counted on betrayed me out of convenience.

9               Outside of a few people like these guys and Tony

10    Copani everybody just said tough shit, bye, bye.  People

11    I did a lot of favors for and helped.  But honest to God

12    as bad as Pollard, Solomon and Alaimo were, your real

13    harm and your hurt is when your friends don't step

14    forward.

15              There's nothing left.  I went from everything --

16    being very happy, everything going along to Pollard

17    busting my balls at every turn to them doing this shit.

18              There isn't a day that goes by that this isn't

19    on my mind.  There isn't a minute that goes by that this

20    isn't occupying my thoughts.  I walked in today and you

21    said something as simple as:  "How's things?"  That's

22    like a baseball bat hit me on the side of the head.  I

23    can't even watch TV without somehow drawing a connection

24    between statements from people that are suffering or
```

1      whatever.  Every facet of my life has been destroyed.

2          Q    I don't want to interrupt you, so just let me

3      know when you have completed your answer.

4          A    It won't be complete until this shit is over.

5      I don't know what else to say.  I went from everything to

6      nothing.

7          Q    Has the severity or the nature of that distress

8      changed over time since February of 2005?

9          A    Yes.

10         Q    Have things gotten better or worse?

11         A    It's worse because I was listening to Manzi and

12     him saying:  "Don't worry about it.  This will all take

13     care of itself over time.  Things will be okay."  Where

14     am I today?  I loved municipal law.  I lived municipal

15     law.  What is the last thing that I can get?  Municipal.

16         Q    Has the emotional distress that you have

17     described had any impact on your usual daily activities?

18         A    Well, given the medicine and all of the rest my

19     ability to have a physical relationship with my wife is

20     gone.  My ability just to sit and watch TV or to go out

21     for a walk or to talk to my kids or to see somebody, it's

22     gone, everything is gone.

23              Like I said the simplest thing such as "How's

24     things going?", that which you never paid attention to,

1      now it's like a slam to me.  I don't know what to say to

2      people.  What am I going to say?  Don't ask me such a

3      freaking stupid question?

4          Q    Has the mental health counseling and the

5      associated medication assisted you at all in the distress

6      that you have suffered?

7          A    I gave up on psychology.  It wasn't helping me

8      and I just gave up.  It was -- I was spending money for

9      that and I just don't have the financial wherewithal and

10     it wasn't doing any good.  To me psychology is maybe if

11     there's something that isn't real that you perceive it,

12     then maybe somebody can talk you out of the problem, but

13     if the problem is everything there's nothing that they

14     can do.

15              And I went to two groups and they tried their

16     best.  They were good, but it just didn't work, the

17     medicine, yeah, I went from thinking about suicide a lot

18     to not thinking about it.

19              MR. DiADAMO:  Let's take a break.

20              (A brief recess was taken.)

21     BY MR. GAMBACCINI:

22         Q    Excluding matters relating to your separation

23     from employment with Methuen, have there been any other

24     stressors in you life since February of 2005?

1          A     Unrelated?

2          Q     Unrelated.

3          A     No.

4          Q     Are there any other damages or any other harms

5     that you attribute to your separation from employment

6     with Methuen that we haven't talked about today?

7          A     Not that I can think of.

8          MR. GAMBACCINI:  Okay.  I have no further

9     questions.

10          MR. DiADAMO:  I have no questions.

11

12                    REDIRECT EXAMINATION

13     BY MR. NOTIS:

14          Q     I have a couple of follow-up questions, Mr.

15     Lariviere, and I'll stay on the more emotional topics and

16     try to get rid of those right now.

17          You discussed your marital problems that you

18     experienced since February 16, 2005.  Do you attribute

19     any of those marital problems to your own actions?

20          A     Yes.

21          Q     In what way?

22          A     Very simply stated, I'm not going to claim that

23     I'm a 100 percent decent guy.  You and your clients can

24     claim perfection on their jobs and duties and functions.

112

1          I made a mistake.  Someone swung their fanny at me and I

2     sniffed and then these corrupt clowns used that as a

3     hammer to destroy me.  There's no freaking magic here.  I

4     exposed my leg and two snakes came out of the ground and

5     bit me and put poison into me.

6          Q    Specifically, what mistakes did you make that

7     contributed to your predicament?

8          A    After the way I have been treated by Pollard,

9     life was a freaking misery coming into work.  My gut

10     turned as I stepped out of the car every day.  I went

11     from loving a job to loving the idea she was finally

12     going to be freaking gone and all of a sudden out of the

13     darkness comes this very bright light that blinded me in

14     Fulya.  And she was so nice to me, always treating me

15     nice.  You saw the e-mails.  That's what I saw on a daily

16     basis from her.  And I latched on to that bright light

17     and was rendered blind.

18          Q    With respect to the physical contact that you

19     had with Ms. Metin what portion of the physical contact

20     that you had with her contributed to your current

21     predicament?

22          MR. DiADAMO:  Objection.

23          A    I'm not following you.  The reality is you guys

24     have seen the deposition.  She was played as a sucker,

1    too.  She never was told that there was criminal charges.

2    She never said that she wanted to do criminal.  She said

3    she was my friend.  She wanted to go back to work for me

4    and yet these clowns lied and said she was going to

5    prosecute me and I'm scared shitless that my name is

6    going to be destroyed and my career is going to be

7    destroyed unless I did exactly what those bastards

8    ordered me to when they trapped me the room.

9         Q    Are you done?

10        A    Yes.  I'm not done until those bastards are

11   brought to justice.

12        Q    What portion of the physical contact that you

13   described in your testimony today and during day one

14   contributed to your marital problems?

15             MR. DiADAMO:  Objection.

16        A    Day 1?  Which is day 1?

17        Q    Day 1 of your deposition in November?  Do you

18   understand that you gave testimony that day concerning

19   the physical contact that you had with Ms. Metin?

20        A    Help me out here.  Everything is starting to go.

21        Q    Let's take our time here.

22        A    I'm not a freaking computer.

23        Q    Do you understand that you gave testimony in

24   this case -- the federal case in November, correct?

114

1          A    Yes.

2          Q    That was at my office.  Attorney Gambaccini and

3     Attorney DiAdamo were there.  Do you recall that?

4          A    Yes.

5          Q    And you gave some testimony about the physical

6     contact that you had with Ms. Metin?

7          A    Yes.

8          Q    Did that physical contact that you had with Ms.

9     Metin contribute to the marital problems that you

10    described earlier today?

11              MR. DIADAMO:  Objection.

12         A    This became the catalyst that those clowns could

13    use to kill me.

14         Q    You said earlier today that, in part, you were

15    responsible for the marital problems that you're having.

16    What do you mean by, in part, you were responsible?

17         A    Had I not taken on Fulya's friendship and tried

18    to help her.  Had I done a pure analysis of work I would

19    have hired Gail Picclameni, which I was not allowed to

20    do, but I started putting her friendship at a very high

21    ranking and I shouldn't have.  I started enjoying her

22    companionship and that's when I stepped out of the

23    professional realm into more of an associate.  I

24    shouldn't have.  I'm not going to sit here -- let your

```
1      people tell you they're 100 percent innocent.  I'm not

2      going to.  When I screwed up, I screwed up.  I exposed my

3      leg to the snakes.

4           Q    You said during day 1 of your deposition that

5      you had not had an arm's-length relationship with Ms.

6      Metin.  What did you mean by that?

7           A    A hug is the elimination of arm's length and we

8      exchanged hugs.

9           Q    Anything else that you would consider to take it

10     out of the realm of an arm's-length relationship?

11          A    The touching of the butt.

12          Q    Anything else?

13          A    Well, the hug and the kiss, never like a long

14     one.  It would be like a peck, but yeah.

15          Q    Anything else?

16          A    On reflection we shouldn't have been so social

17     that we went out to lunch every day.  On reflection I

18     should not have been doing the things to help her that I

19     was.  It should have been just a plain cold office

20     relationship -- hello, goodbye.  I should not have let

21     friendship get that many points.

22          Q    You mentioned during your examination from

23     Attorney Gambaccini that when you returned from the

24     appeal summary judgment argument you made the remark that
```

```
1              if you had the choice between going away for a weekend
2              with Ms. Metin or arguing the summary judgment motion,
3              that you would choose the summary judgment motion,
4              correct?
5          A    Yes.  I remember jokingly saying that.  I loved
6              being in the courtroom.
7          Q    Did you desire to go away for a weekend with Ms.
8              Metin?
9          A    No, it was just a joke.
10         Q    When was the last time that you received any
11             sort of mental health or psychiatric counseling?
12         A    July or August of --
13         Q    Of 2006?
14         A    Yes.  I went to a fellow named Brian McCarthy
15             over in Derry and I went there three times and, quite
16             frankly, he recognized that there was that which you
17             perceive as a problem, which they can cure, and there's
18             that which is a fatal problem and there's nothing they
19             can do for that and he asked me:  "Is there anything I
20             can do to help you?  What do you think?"  And I said
21             until this is resolved -- this scat is resolved,
22             everything is destroyed.
23         Q    Do you have any plans to go back for additional
24             psychiatric counseling or mental health counseling?
```

```
1              A     It doesn't do any good.  I tried.  I went to the

2       psychologist.  I went back to another one and it just

3       doesn't do any good.

4              Q     So the answer is no?

5              A     No.  People are better for me psychologically

6       than anything else on the planet.

7              Q     One of the reasons that you told Attorney

8       Gambaccini that you have not returned for counseling is

9       that you couldn't afford it.  Is that true?

10             A     One of the reasons was I was spending money and

11      it wasn't -- I was spending money that I don't have and

12      it wasn't doing any good.

13             Q     Did you ever submit any of the bills for your

14      mental health counseling or psychiatric counseling or

15      psychological counseling to your health insurer?

16             A     Yes.

17             Q     What was the response that you received when you

18      submitted those bills?

19             A     They covered most of it outside of the -- what's

20      the phrase?  -- the co-pay.

21             Q     So some were covered and some weren't?

22             A     They cover up to I think it's 20 sessions in any

23      given fiscal year from July 1st to June 30th and then

24      you'd have to pay the full boat.  So I went to that guy
```

1    until I reached 20 and I said I can't be paying full

2    boat, so I'll wait until July and then I made a decision

3    that although he was doing the best damn job he could

4    that maybe I should try somebody else and I wanted to go

5    see a psychiatrist to see if that could be helpful.

6        Q    And who was the first gentleman that you

7    received therapy from?

8        A    It's in the notes.  I gave the medical notes to

9    you.  I'm starting to get scrambled here.

10       Q    So to the best of your memory there were just

11   two mental health therapists:  Mr. McCarthy and then the

12   first individual who you can't recall.

13       A    Dr. -- I can look it up right now -- Swinburne,

14   S-w-i-n-b-u-r-n-e.

15       Q    Who is your current health insurer?

16       A    My wife has insurance through CIGNA.

17       Q    Have you had any conversations with William

18   Manzi about him viewing the videotape of the events of

19   the morning of February 16th, 2005?

20       A    Yes.

21       Q    On how many occasions have you discussed this

22   with him?

23       A    The first time was a few days afterwards he

24   called me and advised me that he had seen the tape.

119

1      Q     And then how many conversations after that first

2      occasion?

3      A     I'm not sure.  It would be two or three.

4      Q     And tell us what Mr. Manzi told you about his

5      observations of the videotape?

6      A     I read the MCAD complaint and then by that point

7      in time the brain was really in mush and there were

8      statements in there about me touching her breasts and a

9      statement in there about me grabbing and pulling her and

10     committing other activities and I called him and I said:

11     "Look, Billy, you saw that tape.  I don't recall every

12     doing that.  Did you see that?"  And he said:  "No, I did

13     not see that on the tape."  And he told me he had seen

14     the entire tape.

15     Q     Did he say whether he was able to actually see

16     the events that were taking place on the tape?

17     A     Yes, he did.

18     Q     Did he say whether the imagine was distorted in

19     any respect?

20     A     No, he did not.  He said he could clearly see

21     it.

22     Q     Have you told us everything that William Manzi

23     told you about his viewing of the videotape?

24     A     He said some of your actions were inappropriate

1      and would merit some level of discipline.

2          Q    Which -- did he specify which type of conduct

3      was inappropriate?

4          A    I'm not positive at this time.  I just remember

5      him saying that there would be a like a suspension, but

6      no, this would never merit me for termination.

7          Q    Did any of your conduct merit discipline that's

8      present on the videotape?

9          A    Yes.

10         Q    Which aspects of it?

11         A    Not being arm's length.

12         Q    Anything specific about the interaction between

13     you and Ms. Metin?

14         A    Well, there was never an unwellcomeness shown.

15     There was never unwellcomeness conveyed to me.  It would

16     be not appropriate to touch a butt.

17         Q    One of the aspects of the relief you are seeking

18     in this case is a reinstatement, correct?

19         A    Yes.

20         Q    And you filed two complaints in this case:  The

21     original verified complaint and then the amended verified

22     complaint, correct?

23         A    Yes, which cataloged to one, yes.

24         Q    And when did you first file the first complaint?

1          What month and what year?

2          A    My attorney would know that.  I think it was

3     June, but I'm not positive.

4          Q    In any event in that first complaint you sought

5     equitable relief to return to your employment, correct?

6          A    Yes.

7          Q    So it's a fair statement that at that point in

8     time you desired to be reinstated to your position as

9     city solicitor?

10         A    Yes.

11         Q    Even though Mayor Pollard was still in office.

12         A    I believed at that point in time the political

13    system had failed totally and only the judicial system

14    would work, yes.

15         Q    But at that time when you filed the complaint

16    you desired to be reinstated to your position with Mayor

17    Pollard in the mayor's office, right?

18         A    At this point all I wanted to do was work a job.

19    That's all.

20         Q    Well, we are not talking about at this point.

21    We're talking about when you filed that complaint in

22    2005.

23         A    Yeah.  I knew that the system had walked on me.

24    I knew that the politics of the dynamic was what it was

```
1        and only a judge would make things right.

2             Q    When you filed the complaint were the conditions

3        of the position of city solicitor acceptable for you to

4        return?

5             A    I'm sorry, could you explain that, please?

6             Q    Were the work conditions -- the environment at

7        the city solicitor's office at city hall acceptable for

8        you to return to the position when you filed the

9        complaint in this action?

10                 MR. DiADAMO:  Objection.

11            A    Yes.  Go walk in city hall and see how many

12       people miss me and think I did a hell of a nice job.  Go

13       ask them.

14            Q    When did you reach the decision that you wanted

15       to return to the city solicitor's office?

16            A    The very same day.

17            Q    That you resigned?

18            A    That's when I came in to see the DiAdamos.

19            Q    You accepted the reappointment in January of

20       2005 to the city solicitor's position?

21            A    Yes.

22            Q    If the conditions created by Mayor Pollard were

23       so intolerable why did you accept that appointment?

24            A    She was in her last year and I was ready to hang
```

1    up on the wall:  "ISSP" - "I survived Sharon Pollard."

2    And I was going to sit there at that door as she dragged

3    that fat ass out of city hall for the last time and have

4    the biggest smirk in history.

5        Q    So you were willing to stay in the city

6    solicitor's office for half of your term with Sharon

7    Pollard as mayor, correct?

8        A    I had no choice.

9        Q    Did you ever request a 9-10 hearing following

10    the events of February 16th, 2005?

11        A    I requested an investigation of the matter for

12    purposes of reinstatement, yes.

13        Q    Not in writing?

14        A    No.

15        Q    And all those were behind closed doors with city

16    council members.

17        A    They're not behind closed doors.  They were

18    phone conversations.

19        Q    Were you ever denied specifically a 9-10 hearing

20    by the city council?

21        A    By Manzi, yes.

22        Q    How were you denied a 9-10 hearing by Manzi?

23        A    The first one he blew me off on.  The second one

24    him and Emma Donnelly came up with the most ridiculous

1      condition I ever heard of in my life.

2          Q    What was that?

3          A    I had to indemnify the city to not be able to

4      have my rights at hearing and Emma Donnelly can tell you

5      that story if you like.

6          Q    Are you still consuming alcohol?

7          A    No.  You can't drink when you're on sertraline.

8          Q    When's the last time that you had a drink?

9          A    In the communion line.

10         Q    Aside from the communion line?

11         A    December 15th, 2005.

12         Q    When did you first learn that Fulya Metin would

13     not be pursuing criminal charges against you?

14         A    She never intended to pursue anything against

15     me.

16         Q    When did you reach that conclusion?

17         A    When was it in the paper.

18         Q    What date?

19         A    I don't remember.

20         Q    You can't remember --

21         A    Sometime in 2005, I think, but I'm not positive.

22         Q    Was it before or after you filed the complaint?

23         A    I'm not positive.  I'm not establishing a time

24     line one to the other.

1        Q    So you can't tell us what month in relation to

2        the February 16th, 2005 events you first learned that Ms.

3        Metin was not pursuing criminal charges against you?

4        A    She never intended to, so the question is not

5        properly phrased.

6        Q    Well, sir, you told us earlier that you were

7        working under the impression that she was pursuing

8        charges against you.

9        A    I was told that by Solomon and Alaimo.

10       Q    Whether it was true or not you were working

11       under that assumption, correct?

12       A    Yes.

13       Q    My question is --

14       A    Pardon me, if I may answer the question.  I was

15       told that if I did not resign she was going to go out for

16       criminal charges against me.  That's what I was told.

17       Q    Again, from that day after you signed the

18       resignation forward to some point in time you were

19       working under the assumption that she was pursuing

20       criminal charges against you?

21       A    No.  I was made aware very quickly afterwards

22       that Solomon in order to cover his activity had brought

23       this crap down to the district attorney's office and I

24       didn't know what was going on then because there was all

1          of these articles flying around about the district

2          attorney and criminal charges and all of the rest.  And

3          at a later date I found out through sources that that was

4          just all crap.

5          Q    That's my question.  When was that time that you

6          learned that there was no criminal charges?

7                MR. DiADAMO:  Objection.

8          A    I'm not positive.

9          Q    What was your source of the information?

10         A    I can't disclose that.

11         Q    Why not?

12         A    Attorney-client.

13         Q    Did you ever inquire into the status of the

14         criminal charges through the district attorney's office?

15         A    Did I go directly to the DA?  No.

16         Q    Did you make any phone calls or send any e-mails

17         to the district attorney's office?

18         A    No, because that's not the way I think it should

19         be handled.

20         Q    Do you have an understanding of who at the

21         district attorney's office was in charge of criminal

22         investigations?

23         A    Yes.  And she was appointed as a judge a few

24         months ago.

1     Q     Does the name Kathleen Tutman refresh your

2     memory?

3     A     Yes.

4     Q     Did you have any conversations with then

5     District Attorney Tutman about the status of the criminal

6     charges against you?

7     A     No.

8     Q     Once you learned that there were no criminal

9     charges that were going to be brought against you, why

10    did you not petition the city to be reinstated?

11         MR. DiADAMO:  Objection.

12    A     I'm not sure about all of the time lines that we

13    were talking about, so I can't tell you.  All I know is I

14    had asked for an investigation and for reinstatement.  I

15    had been told when the water has calmed down that would

16    happen and then all of a sudden the political system

17    walked away on me and left me and my family dead in the

18    road.

19    Q     Do you agree that you could practice municipal

20    law in the private sector?

21    A     Yes, I have attempted to do that as late as --

22    with Brackett & Lucas I contacted them and I got a call

23    from Gary and he said:  "Give me a call.  I know you are

24    a good attorney.  I'll take you on."  And it must have

1   been thereafter that he found out about this because no

2   matter how many calls I made I got no return calls.  And

3   Kopelman & Paige I went to and sent applications and

4   resumes and a cover letter to every law firm that handles

5   municipal law short of those involved in this litigation.

6        Q    In your private practice that you are operating

7   out of Attorney Copani's office have you made any efforts

8   to practice municipal law?

9        A    Yes.

10       Q    What were those efforts?

11       A    In dealing with some of the local lawyers there

12  have been discussions about either through a direct

13  source or secondary source that they would funnel over

14  some municipal stuff to me.  The problems is right now if

15  it involves the city of Methuen nobody wants to go near

16  it.

17       Q    Well, you could represent clients in matters

18  involving other municipalities, couldn't you?

19       A    Yes.

20       Q    You could represent not just municipalities, but

21  individuals who had legal matters with municipalities.

22       A    Yes.  Obviously, I can't disclose the nature of

23  that, but yes, I have dealt with some people and

24  sometimes you tell them the reality of the politics and

```
1    sometimes you tell them it's the law that controls and
2    most of the time you tell them you have to maneuver this
3    for a political solution.
4         Q    So there's nothing that's precluding you
5    cultivating a successful law practice in the field of
6    municipal law, is there?
7              MR. DIADAMO:  Objection.
8         A    Outside of the fact that my career is destroyed,
9    no.
10        Q    Well, you can represent clients against various
11   municipalities or towns other than Methuen, right?
12        A    If they were to take me on, yes.
13        Q    And it's just your reputation that's holding you
14   back from that, right?
15        A    Yes.
16        Q    Nothing else?
17        A    Walk into city hall and talk to any freaking
18   lawyer that I dealt with and find someone that said I
19   sucked as an attorney.  Talk to any mayor short of that
20   fatso and they will all come back and tell you that I did
21   a good job.
22        Q    Well, sir, if you're such a successful attorney
23   what's preventing you from cultivating a successful law
24   practice?
```

1              MR. DiADAMO:  Objection.

2         A    This situation.  For god's sake, don't pretend

3    you don't know that.

4         Q    Do you have a copy of the application that you

5    filed with any of the three entities in which you had an

6    interview?

7         A    I should, yes.

8         Q    Could you provide them to your attorney, please?

9         A    Yes.

10        Q    Would you mind?

11        A    Uh-huh.

12             MR. NOTIS:  Okay.  That's all I have.  Thanks

13   again.

14

15                     RECROSS EXAMINATION

16   BY MR. GAMBACCINI:

17        Q    I have just one brief question.  Brian McCarthy

18   is in Derry, New Hampshire; is that correct?

19        A    Yes.   Center for Health Management, I think

20   it's called.  It's right across from the Parkland

21   Hospital.

22        Q    And he's a psychiatrist?

23        A    No.  They gave me a lower level referral.  I

24   think it's licensed social worker.

1               MR. GAMBACCINI:  That's it for me.  No further

2         questions.

3               MR. DiADAMO:  All right.  We'll read.

4         (Whereupon, the deposition was concluded at 1:50 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1

 2                    ERRATA SHEET DISTRIBUTION INFORMATION

 3            DEPONENT'S ERRATA SHEET AND SIGNATURE INSTRUCTIONS

 4

 5                    ERRATA SHEET DISTRIBUTION INFORMATION

 6

 7

 8            When the errata sheet has been completed by the

 9       deponent and signed, a copy thereof should be delivered

10       to each party of record and the ORIGINAL forwarded to

11       Gareth W. Notis, Esq. to whom the original deposition

12       transcript was delivered.

13

14                      INSTRUCTIONS TO DEPONENT

15

16            After reading this volume of your deposition,

17       please indicate any corrections or changes to your

18       testimony and the reasons therefore on the Errata Sheet

19       supplied to you and sign it.  DO NOT make marks or

20       notations on the transcript volume itself.  Add

21       additional sheets if necessary.  Please refer to the

22       above instructions for errata sheet distribution

23       information.

24
```

```
 1        PLEASE ATTACH TO THE DEPOSITION OF MAURICE LARIVIERE

 2        CASE:  LARIVIERE VS. CITY OF METHUEN, ET AL

 3        DATE TAKEN:  12-29-06

 4                              ERRATA SHEET

 5        Please refer to page 132 for errata sheet

 6        instructions and distribution instructions.

 7        Page   Line    Change                    Reason

 8        _____

 9        _____

10        _____

11        _____

12        _____

13        _____

14        _____

15        _____

16        _____

17                    I have read the foregoing transcript

18        of my deposition and except for any corrections or

19        changes noted above, I hereby subscribe to the

20        transcript as an accurate record of the statements

21        made by me.

22              Executed this _____day of_____, 2007

23                    _____
                          (Witness Name)
24
```

```
 1    COMMONWEALTH OF MASSACHUSETTS

 2    COUNTY OF SUFFOLK

 3                 I, JEAN WISEMAN, Shorthand Reporter and

 4    Notary Public duly commissioned and qualified in

 5    and for the Commonwealth of Massachusetts, do

 6    hereby certify that the foregoing deposition of MAURICE

 7    LARIVIERE was taken before me at the time and place

 8    therein designated; that the proceedings of said

 9    deposition were stenographically reported by me, and that

10    the foregoing pages, numbered 1 through 131, constitutes

11    a true and correct transcription of said proceedings as

12    had.

13                 I FURTHER CERTIFY that I am not a relative

14    or employee or attorney or counsel of any of the parties,

15    nor a relative or employee of such attorney or

16    counsel, or financially interested in the foregoing

17    action.

18                 WITNESS MY HAND AND SEAL THIS, THE _____ DAY

19    OF JANUARY, 2007, BOSTON, SUFFOLK COUNTY, COMMONWEALTH OF

20    MASSACHUSETTS.

21                            _____
                              JEAN WISEMAN
22                            Court Reporter, Notary Public,
                              My commission expires:
23                            May 19, 2009

24
```

**JOSEPH SOLOMON**
**October 31, 2006**

Page 1

1                 UNITED STATES DISTRICT COURT

2                 DISTRICT OF MASSACHUSETTS

3                         C.A. NO.: 05-11579EFH

4     ********************************************

5     MAURICE LARIVIERE,

6                  PLAINTIFF

7     VS.

8     JOSEPH SOLOMON, individually and

9     as Chief of Police for the

10    City of Methuen, JOSEPH ALAIMO,

11    individually and as Deputy Chief

12    of Police for the City of Methuen

13    and THE CITY OF METHURN,

14                  DEFENDANTS

15    ********************************************

16

17              DEPOSITION OF JOSEPH SOLOMON

18                DiADAMO LAW OFFICE, LLP.

19                   40 Appleton Way

20               Lawrence, Massachusetts

21                  October 31, 2006

22

23                  Annmarie Pereira

24                   Court Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 2

1 APPEARANCES:
2
3 Representing the Plaintiff:
4     DiADAMO LAW OFFICE, LLP
5     40 Appleton Way
6     Lawrence, MA  01840
7     BY:  CARMEN DiADAMO, ESQUIRE
8     (978) 685-4271     Fax (978) 794-4743
9
10 Representing the Defendant, Joseph Solomon:
11     REARDON, JOYCE & AKERSON
12     397 Grove Street
13     Worcester, MA  01605
14     BY:  ANDREW J. GAMBACCINI, ESQUIRE
15     (508) 754-7285     Fax (508) 754-7220
16
17 Representing the Defendant, Joseph Alaimo
18     MORRISON MAHONEY, LLP
19     250 Boston Street
20     Boston, MA  02110-1181
21     BY:  GARETH W. NOTIS, ESQUIRE
22     (617) 737-8857     Fax (617) 342-4281
23
24

Page 3

1                I N D E X
2 WITNESS:   JOSEPH SOLOMON
3
4 EXAMINATION             PAGE
5 BY MR. DiADAMO:       4
6
7              E X H I B I T S
8
9          (none offered)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              P R O C E E D I N G S
2
3     MR. NOTIS:  Usual stipulations alright?
4     MR. DiADAMO:  Perfect.
5     MR. GAMBACCINI:  Okay.
6
7       JOSEPH SOLOMON, DEPONENT, having first been
8 duly sworn by me testified as follows:
9
10 EXAMINATION BY MR. DiADAMO:
11
12   Q.  Tell us your full name.
13   A.  Joseph E. Solomon, S-O-L-O-M-O-N.
14   Q.  Excuse me.  Off the record.
15
16     (Off the record.)
17
18     MR. DiADAMO:  Let's put on the record, A:
19 He's going to read and sign it; thirty days before
20 any notary.  And, what, do you want to volunteer?
21 I'm not going to ask him his home address.  If
22 something needs to be sent of or served, I'll send it
23 to?
24     MR. GAMBACCINI:  I'll volunteer to accept

Page 5

1 service.
2     MR. DiADAMO:  Okay.
3
4   Q.  Now, you are personally the Chief of Police
5 in the Town of Methuen?
6   A.  Yes.
7   Q.  And how long have you enjoyed that
8 position?
9   A.  Just over four years.
10   Q.  And when did you begin it, if you know?
11   A.  September 1st of 2002.
12   Q.  And prior to that time, what was your
13 position in the Methuen Police Department?
14   A.  I was a Captain.
15   Q.  And how long had you been a Captain?
16   A.  August 2002 -- no.  August 2000 to
17 September of 2002.
18   Q.  And prior to 2000, what was your position
19 in the Methuen Police?
20   A.  Lieutenant, 1995, I was a Lieutenant.
21   Q.  '95?
22   A.  Yes, sometime in '95.
23   Q.  Okay.  When did you start with the Methuen
24 Police Department?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

3 (Pages 6 to 9)

Page 6

1    A.  April, April 1986 as a patrolman.
2    Q.  As a patrolman, okay.  Then you progressed
3  to Sargent?
4    A.  Yes.
5    Q.  Then Lieutenant?
6    A.  Correct.
7    Q.  Now, who is the Deputy Chief of Methuen?
8    A.  Joseph Alaimo.
9    Q.  And when was he appointed Deputy Chief?
10    A.  Sometime in 2002. I don't know the date.
11    Q.  Was it approximately at the same time as
12  you was?
13    A.  It was after me.  It was a few months or so
14  afterwards.
15    Q.  Okay.  And by whom were you appointed and
16  by whom was he appointed?
17    A.  I was appointed by Sharon Pollard who was
18  the Mayor, and he was appointed by Sharon Pollard who
19  was the Mayor.
20    Q.  How did the job become open?  Your job; not
21  his.
22    A.  The former Chief took an early retirement,
23  five-year program and retired.
24    Q.  Was there a reason for him taking an early

Page 7

1  retirement other than his desire to do so?
2    A.  Not that I'm aware of.
3    Q.  Now, the Chief of Detectives presently is
4  Michael Wnek?
5    A.  Yes.
6    Q.  And how long has he been Chief of
7  Detectives?
8    A.  July or August of 2002, within a few months
9  before I became Chief.
10    Q.  And there is Christopher McCarthy.  Is he
11  Captain?
12    A.  Captain, yes.
13    Q.  How long has Christopher been Captain?
14    A.  I do not know that.
15    Q.  Before your time?
16    A.  No, it was after I became Chief, but I
17  don't know at what point.
18    Q.  Okay.  And I take it that he took a
19  Captain's exam and it was part of a list?
20    A.  Yes.
21    Q.  Okay.  Now, in the time you became a
22  patrolman in Methuen, who was the Town Solicitor?
23    A.  I have no idea.
24    Q.  That was what year?

Page 8

1    A.  1986.
2    Q.  Okay.  Well, when did you become aware that
3  Maurice Lariviere was the Town Solicitor?
4    A.  I don't remember when.  Sometime during my
5  career.
6    Q.  I'm sorry.  Would you repeat the answer?
7    A.  Sometime during my career.  I don't know
8  exactly when.
9    Q.  Do you recall any other City Solicitor in
10  Methuen other than Maurice Lariviere?
11    A.  Not that I dealt with until Peter McQuillan
12  came in.
13    Q.  Okay.  So, he is the first one you've ever
14  dealt with in any capacity before Peter McQuillan?
15    A.  Me personally?
16    Q.  Yes.
17    A.  Yes.
18    Q.  Now, from the time you became Chief of
19  Police, had you ever been made aware of any formal
20  complaints made against Maurice Lariviere in the
21  Town?
22    A.  I'm sorry?
23    Q.  Had you become aware while you were Chief
24  of Police of any formal complaints that are beared

Page 9

1  against Maurice Lariviere?
2    A.  There is just the current one.
3    Q.  Besides the current one?
4    A.  No.
5    Q.  Okay.  Had anyone filed any protests or
6  complaints for any conduct that he had performed
7  during your time as Chief?
8    A.  Not to me, no.
9    Q.  Were you aware of anything that he had done
10  prior to the time you were Chief that was the subject
11  of any investigation?
12    A.  Not prior to this incident.
13    Q.  Okay.  Now, had you become aware during
14  your tenure in the Methuen Police Department of any
15  informal complaints that were made against Maurice
16  Lariviere?
17    A.  No.
18    Q.  And in your capacity as Chief of Police, I
19  take it that you would have had fairly frequent
20  interactions with Maurice Lariviere?
21    A.  Yes.
22    Q.  And interactions with his staff?  You would
23  have gone to his office?
24    A.  Yes.

**JOSEPH SOLOMON**
**October 31, 2006**

Page 10

1    Q.  Now, when did you become aware that Fulya
2  Metan was working for the Town?
3    A.  Sometime during her term that she was
4  there.  I don't know exactly when.
5    Q.  So, you would not know her beginning date
6  for instance?
7    A.  No, I do not.
8    Q.  Or her approximate time?
9    A.  I know approximately because of this
10  investigation, but I don't know exactly when she
11  started.
12    Q.  As a result of the investigation that's
13  gone on, do you know now when she started working at
14  the Town of Methuen?
15    A.  Sometime in November of 2004.
16    Q.  Okay.  And do you know if she had been
17  working as a temporary prior to that?
18    A.  Yes.
19    Q.  Now, as a result of this case, I take it
20  you've seen the Verified Complaint that's filed in
21  the Federal Court?
22    A.  By who?
23    Q.  By Maurice Lariviere?
24    A.  Yes, absolutely.

Page 11

1    Q.  Okay.  And I take it you've also seen his
2  response, the Mayor's Commission Against
3  Discrimination?
4    A.  I have not read that, no.
5    Q.  No one has given that to you?
6    A.  I haven't read it.  I have it.
7    Q.  You just didn't read it?
8    A.  No, I did not.
9    Q.  Who gave it to you?
10    A.  It came in the mail.  I'm not sure.
11    Q.  Let's stick with the Verified Complaint.
12  When you were reviewing the assertions, and that's
13  all they were in the Verified Complaint, did you note
14  anything that in your judgement was untrue?
15    A.  Yes.
16    Q.  What?
17    A.  I don't know that off the top of my head.
18  I made a list of some information and forwarded it to
19  my attorney.
20    Q.  Okay.  So, you made a list of things that
21  you considered to be untrue --
22    A.  Yes.
23    Q.  -- in the Verified Complaint?
24    A.  Yes.

Page 12

1    Q.  Okay.  And so that we know what we're
2  talking about, is this the Verified Complaint to
3  which I've been referring?
4
5    MR. NOTIS:  Is this the amended complaint
6  or this is the original?
7    MR. DiADAMO:  Let's make sure it's the
8  amended.  Hang on.  This is the Verified Complaint
9  that you're in jury demand.
10    MR. NOTIS:  Okay.
11    MR. DiADAMO:  Okay.  And I'd the amendment
12  right under it, and I lost it.  I don't want to put
13  this before you until I have the amended complaint.
14    MR. GAMBACCINI:  I have my copy.
15    MR. DiADAMO:  Okay, good.
16    MR. GAMBACCINI:  Are you going to mark it
17  as an exhibit?
18    MR. DiADAMO:  Yes, and I'll copy it and
19  make sure everybody gets them.
20
21    Q.  Two documents have been put in front of you
22  to your left, and to my right is the Verified
23  Complaint and to my left and your right is the
24  Amended Verified Complaint.  On which document did

Page 13

1  you use to make comments?
2    A.  That, I have no idea.
3    Q.  If you looked at them, would it refresh
4  your memory?
5    A.  I would have to read them all and look at
6  the answers that I gave.
7    Q.  Go ahead, look at them.  Do you have the
8  answer you gave with you?
9    A.  No, I don't have those.
10    Q.  So, since there's a chance that's going to
11  be time consuming and I'm going to want you to
12  explain all of the answers that I'm asking you that
13  full question and I'm going to ask you some other
14  questions.
15    But be sure you've not been given the
16  opportunity to go through that.
17    A.  Okay.
18    Q.  Now, instead, let us go directly to
19  February of 2005.
20    A.  Yes.
21    Q.  And in February of 2005 at some point
22  during the day did you become aware of a complaint by
23  a woman by the name of Fulya Metan?
24    A.  Yes.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 14

1    Q.  And who made you aware of that complaint?
2    A.  Lieutenant Mike Wnek.
3    Q.  And can you tell me what time of day he
4  made you aware of that complaint?
5    A.  It was somewhere around six o'clock, six
6  p.m., in that area.
7    Q.  Okay.  So, that's prior to six p.m. or
8  approximately, you had not heard anything about this
9  incident?
10    A.  Correct.
11    Q.  Okay.  And at that time is this the time
12  you were regularly scheduled to come in the police
13  department or were you in the police department?
14    A.  I was already at work.
15    Q.  Okay.  So, he came back from something to
16  discuss something with you?
17    A.  Correct.
18    Q.  Came to your office?
19    A.  Yes.
20    Q.  Was anybody else in your office?
21    A.  Yes.
22    Q.  Who?
23    A.  Lieutenant Mike Wnek came to my office with
24  Fulya Metan.

Page 15

1    Q.  Anyone else?
2    A.  No.
3    Q.  Okay.  And did you have a discussion at
4  that time?
5    A.  Not exactly at that time, but I had a
6  discussion with him.
7    Q.  Okay.  When they walked in the office, what
8  did they say to you?
9    A.  Lieutenant Wnek wanted to inform me of an
10  incident that had occurred and that, that Fulya had
11  contacted him, too.
12       I told him that I would like to speak with
13  him alone and asked him to remove Fulya from my
14  office.
15    Q.  So, Fulya said nothing; at that time you
16  spoke with Wnek?
17    A.  Correct.
18    Q.  Okay.  And when you spoke with Wnek, what
19  did Wnek say to you and what --
20    A.  Well, he left with her and then came back
21  and then he gave me --
22    Q.  How much time elapsed?
23    A.  A minute, just walked down to his office.
24    Q.  Okay.  So, she's still around?

Page 16

1    A.  She's still there.  Just went to his office
2  to wait.
3    Q.  Okay.  Go ahead, and?
4    A.  Then he told me that he had been contacted
5  by Fulya Metan today.  She said that there was
6  something major going on in her office and she needed
7  to talk to someone.
8       He then talked to her, and then he repeated
9  what she had said to him in a synopsis version.
10    Q.  Did he show you an e-mail at that time?
11    A.  No.
12    Q.  So, he just told you what she had related
13  to him?
14    A.  Correct.
15    Q.  Correct.  And after he told you what she
16  related to him, what did you do?
17    A.  I told him that he should have her write a
18  statement out, and that we'd be more than happy to
19  use one of our computers or give a notepad like we
20  would normally take a statement; and he then left my
21  office.
22    Q.  And at some point did he come back?
23    A.  Yes.
24    Q.  And did he ever have a statement by Fulya

Page 17

1  Metan with him at that time?
2    A.  Yes, he did.
3    Q.  And when he came back with the statement,
4  did you read the statement?
5    A.  Yes, I did.
6    Q.  Was Fulya there when you read the
7  statement?
8    A.  No.
9    Q.  You read it alone?
10    A.  No.
11    Q.  Michael was there?
12    A.  Mike was there and Deputy Alaimo was there.
13    Q.  Deputy Alaimo was there too.  When you
14  completed the statement, what did you do?
15    A.  I told him I would like to speak with her
16  personally.
17    Q.  And did she come back into your office?
18    A.  Yes, she did.
19    Q.  And what was the conversation between you
20  at that time?
21    A.  I told her I had read her statement, and I
22  asked her if she could tell me what had happened.
23  Eventhough I had read it, I'd like to hear it
24  directly from her.

**JOSEPH SOLOMON**
**October 31, 2006**

6 (Pages 18 to 21)

Page 18

1    Q.  And did she relate to you orally what she
2    had put down in the statement?
3        A.  Yes, she did.
4    Q.  Did she miss anything or did she relate the
5    entire statement to you?
6        A.  She related the entire statement to me.
7    Q.  And while she was relating the entire
8    statement to you, were you in the office alone or was
9    Lieutenant Alaimo there?
10       A.  Deputy Alaimo was there.
11   Q.  I beg your pardon?  Deputy Alaimo?
12       A.  Yes.
13   Q.  And what about Mr. Wnek?
14       A.  I believe Lieutenant Wnek was there.
15   Q.  Okay.
16       A.  So, she related again to all three of us.
17   Yes.
18   Q.  Now, it's after six o'clock; correct?
19       A.  Yes.
20   Q.  I assume after six o'clock there's nobody
21   at Town Hall?
22       A.  That's correct.
23   Q.  Okay.  Now, after she related it to you,
24   did you give any direct orders to the people who were

Page 19

1    in the room with you?
2        A.  You'd -- you'll have to -- I don't
3    understand exactly what you mean.
4    Q.  Well, you had a complaint in writing.  What
5    did you do about it?
6        A.  At that time Lieutenant Wnek and Fulya left
7    to go to his office so I could speak with the Deputy,
8    and I then talked with the Deputy for a short period
9    of time to decide exactly what I should do.
10   Q.  So, what did he say; what did you say?
11       A.  Well, yes, we just -- I don't remember
12   exact words.  We discussed the situation and at that
13   point I thought that it was important that I got into
14   City Hall.
15   Q.  It was important that you brought it to
16   City Hall?
17       A.  That I got into City Hall.  Had access to
18   City Hall.
19   Q.  Had access to City Hall and for what
20   purpose did you want that access?
21       A.  Well, I had discussed the situation and
22   felt that I wanted to put a camera into -- based on
23   the conversation that I had with Fulya, I wanted to
24   put a camera, a video camera, in Fulya's office.

Page 20

1    Q.  And who did you call to get the access?
2        A.  Mayor Sharon Pollard.
3    Q.  Did you call her at home?
4        A.  Either at home or on her cell.  I don't
5    remember.
6    Q.  And what did you say and what did she say?
7        A.  I told her that I needed access to City
8    Hall.  That I was working on a criminal
9    investigation.  I didn't want to discuss anything on
10   the phone, so could she meet me at City Hall to let
11   me in.
12   Q.  Okay.  Now, did she meet you at City Hall?
13       A.  Yes, she did.
14   Q.  Alone?
15       A.  I believe so, yes.
16   Q.  Nobody else with her?
17       A.  Well, the Deputy and me.
18   Q.  Deputy.  So, it's just you Pollard and the
19   Deputy?
20       A.  Correct.  To the best of my recollection.
21   Q.  And David Bain isn't there?
22       A.  No.
23   Q.  No other member of the Mayor's staff is
24   there?

Page 21

1        A.  No.
2    Q.  No other police officers are there?
3        A.  At that time, no.
4    Q.  Okay.  And when you got to the City Hall,
5    can you tell us what you discussed?
6        A.  I told the Mayor that there had been an
7    accusation by the Solicitor's secretary that's of a
8    criminal nature and I didn't want to discuss the
9    criminal nature stuff with her but I needed access to
10   the secretary's office.  And I also told her that
11   this criminal allegation may also have a civil aspect
12   to it.
13   Q.  And then I take it that you told her that
14   you wanted to record the goings on in the office the
15   next day?
16       A.  I did not tell her I was putting a camera
17   in the office.
18   Q.  You didn't tell her you were going to put a
19   camera in.  You just wanted access to the office?
20       A.  Yes, I needed access to the office.
21   Q.  Okay.  Now, at the point that you wanted
22   access to the office, I take it you wanted access to
23   the office so that you could install the camera?
24       A.  That's correct.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

7 (Pages 22 to 25)

Page 22

1     Q.  Now, up until that point, you had seen her
2  allegations in writing.  Okay.  You had heard the
3  allegations orally.  Which one, which one of the
4  allegations had you corroborated?
5     A.  I don't understand that.
6     Q.  Well, she told you something happened?
7     A.  Correct.
8     Q.  You're a police officer in charge of
9  investigations.  You do seek out corroboration of
10  allegations?
11     A.  Well, it would depend on the type of a
12  case.  Under sexual assault investigations, which I
13  am a Sexual Assault Investigator, the victims who are
14  named have inherit liability.
15          And in my cases, it's impossible to go get
16  some physical evidence on a sexual assault.  You have
17  to relay basically what she says to you, and it's
18  based on whether or not you believe.
19     Q.  So, you started off with a thought that
20  based on your experience there's inherit credibility
21  in anyone making an accusation of sexual assault?
22     A.  That's the way sexual assault
23  investigations work.  The named victims have inherit
24  reliability.  You also have to look at what they're

Page 23

1  saying and their mannerisms and how they react, what
2  they're telling you their version, I guess, of the
3  stories.
4     Q.  And you're also listening carefully to what
5  their wishes and desires are at that time; correct?
6     A.  Correct.
7     Q.  And one of the things that you noted when
8  you looked at the report was for Fulya Metan's desire
9  was to quote: "Please, keep it confident."  Did you
10  notice that?
11     A.  Not to the police.  She didn't tell me to
12  keep it confident.
13     Q.  So, that at that time when you were noting
14  her inherit credibility, you were not mindful of the
15  fact that she had said: "Please, keep it
16  confidential."?
17     A.  You have to look at what you're taking out
18  of her statement.  When you look at the manner of the
19  way she spoke, and I believe it was Linda Gagnon,
20  that she asked them to, "Please, keep it
21  confidential."
22     Q.  What about the Chief of Detectives?
23     A.  I'm sorry.
24     Q.  What about the Chief of Detectives, Michael

Page 24

1  Wnek?
2     A.  I don't remember her telling him saying
3  that he had to keep anything confident.
4     Q.  Do you recall in her written e-mail to him?
5     A.  I just said to you I didn't seen those
6  e-mails.
7     Q.  Please, keep it confidential.
8     A.  I didn't see those e-mails at that point.
9  But if you go back and read that e-mails, she was
10  asking to, please, keep it confidential that they
11  were meeting.
12          Other than that, it was a major problem.
13  So, I guess you have to be careful to read things in
14  context; otherwise, you can misconstrue what they
15  actually say.
16     Q.  In the conversation with Fulya, reading the
17  reports and speaking with Wnek, did you determine
18  that there was something that changed this from
19  sexual harassment to a sexual assault?
20     A.  I was never investigating sexual
21  harassment.  The whole case I was investigating was a
22  criminal charge of sexual assault.
23          So, I'm not the one who placed that title
24  on changing something from one thing to another.

Page 25

1     Q.  I'm not talking about changing.  Your job
2  as Chief of Police, do you understand any distinction
3  between those terms?
4     A.  Yes, I do.
5     Q.  What is the distinguishment?
6     A.  Well, sexual harassment would be unwanted
7  comments, statements that are generally feeling of
8  making someone uncomfortable by walking close by
9  them.
10          Under the law when you touch someone
11  against there will in a sexual nature then or in an
12  inappropriate place, that's a criminal offense.  So,
13  it's not sexual harassment.  It's sexual assault.
14     Q.  So, that if somebody were engaged in a
15  friendship one-on-one conversation and the other
16  reached over and kissed him or her, you would always
17  see that as an assault?
18     A.  No.  You'd have to know the factors as to
19  whether it was warranted or unwarranted, and you
20  would have to ask that person.
21     Q.  You would have to know pretty much the
22  conduct and the dealings between the parties up to
23  that time; wouldn't you?
24     A.  Well, I guess you would have to know some

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 26

1    background information.
2        Q.   Right.  Now, when I look at the report and
3    the statement, I didn't see much background
4    information.  Did you see some?
5        A.   Of course we're not talking about someone
6    kissing someone.  We're talking about someone
7    touching someone's breast and buttocks which is a
8    sexual assault.
9        If someone walked in here now and grabbed
10   one of your secretary's breasts, if it's unwarranted,
11   it's unwarranted.  The kissing is different than a
12   touching of the private parts.
13       Q.   Most basic kind of police work, if somebody
14   said that it would be desirable to try to corroborate
15   that in some way?
16       A.   You have to explain what you mean by
17   corroborate.
18       Q.   Well, you're in the business where you're
19   trying to prove things beyond the reasonable doubt?
20       A.   Probably cause.  Excuse me.  Don't put
21   words in my mouth.
22
23       MR. NOTIS:  Carmen, he's not finished his
24   answer.

Page 27

1        A.   Police officers are required before they
2    charge someone to raise the level of probable cause.
3        When it gets to the trial, that's where
4    beyond a reasonable doubt.  The law for charging
5    someone is probable cause not reasonable doubt.  Is
6    it more probable than not that this occurred?
7        Q.   And if somebody said that, just said that
8    that happened and in your mind that would be probable
9    cause?
10       A.   Well, many times people walk in the station
11   and say:  I was at a date with such and such, he
12   grabbed my breast, stuck his hands down my pants.  We
13   interview her.  We then ask to speak with the
14   gentleman and occasionally arrests are made right
15   there as we speak to the people regardless of what's
16   said.  So, that's part of the nature of the sexual
17   assault investigation.
18       Q.   So, I get this straight and I'm not saying
19   that this happened or is going to happen or anything
20   else.
21       If you received a call from a female
22   employee in the Mayor's office today telling you that
23   the Mayor reached down the back of her pants and
24   touch her buttocks, that in and of itself would be

Page 28

1    enough; correct?
2        A.   Under the law, it would.  We would
3    obviously want to speak with her and then go speak
4    with the Mayor and get his version.
5        Q.   The Mayor denies it and she says he reached
6    down the back of my pants and touched my buttocks.
7    Criminal?
8        A.   It's criminal.
9        Q.   So, with respect to employment in the Town
10   of Methuen, all allegations of unwanted touching are
11   subject of criminal investigation?
12       A.   Nothing to do with employment in the Town
13   of Methuen.  It has to do with a victim coming to you
14   and saying they were inappropriately touched.  And if
15   it fits within the statute, than it's a criminal
16   offense.
17       And then a lot of times we make calls to
18   the District Attorney's Office and we seek warrants
19   or he makes arrests.  We have many different ways of
20   doing those.
21       Q.   Having in mind now when we're dealing with
22   an uncorroborated version, are you attempting to go
23   out and find some more evidence to corroborate what's
24   happening?

Page 29

1        A.   That's correct.  That's exactly what was
2    done in this case.  Wasn't it?
3        Q.   We'll get to that.
4        A.   You brought it up.  You asked the question.
5        Q.   You're going to be there.  Believe me.
6    Relax, you've got plenty of time.
7        A.   I'm perfectly relaxed.
8
9        MR. NOTIS:  Wait for his question.
10
11       Q.   The question before you was, is that you go
12   out and you seek some corroboration?
13       A.   In some instances you do and some instances
14   you don't.  It all depends on the facts of the
15   individual case.
16       Q.   If there's a chance of corroboration.  You
17   never just go to trial with somebody saying to the
18   Mayor, I'm suing.  That individual put his hand down
19   the pants of an employee; would you try to find
20   something that either supported it or disproved it?
21       A.   There's a lot of differences between
22   charging somebody and being prepared for trial
23   because they're ongoing investigations.
24       Q.   But you're telling me that he would be

**JOSEPH SOLOMON**
**October 31, 2006**

Page 30

1  charged and then --
2      A.  Very likely he could be.  It would all
3  depend specifically on how the person related,
4  whether they appear to be credible, did they display
5  the proper demeanor, are they what we would expect a
6  sexual assault victim to display?  We would review it
7  with the District Attorney's Office and then we would
8  make a decision.
9      Q.  One of the first things you would do as a
10  matter of common sense would be to attempt to explore
11  the relationship between the parties; correct?
12      A.  Well, I mean, you say that as part of
13  common sense.  I don't know if I refer to it as part
14  of common sense, but that is part of a question that
15  we would ask somebody.
16      Q.  Yes.  That's not common sense?
17      A.  Common sense, police sense.  I don't know
18  what you call it.
19      Q.  Police sense is try as best you can to get
20  as much information as possible as to the
21  relationship between the parties?
22      A.  Yes, easy enough to do.
23      Q.  Now, did anybody ask Fulya Metan about the
24  relationship between the parties in the months before

Page 31

1  that?
2      A.  She related that it was a work/boss
3  relationship and that there was no outside dating
4  relationship.
5      Q.  There was not even an attempt for an
6  outside dating relationship; correct?
7      A.  I don't know what you mean, an attempt.
8      Q.  Well, I noted no statement that Maurice
9  Lariviere wanted to meet her on a back road or a
10  diner or nightclub or any other place?
11      A.  I don't understand what that is.
12      Q.  Yes.
13      A.  I don't under understand the question.  I'm
14  sorry.
15      Q.  Okay.  Let's try it a different way.  I
16  asked you whether or not you attempted to solicit how
17  these two related to each other prior to November
18  14.
19      A.  Um-hmm.
20      Q.  Did you?
21      A.  Yes.
22      Q.  And what was the response?
23      A.  We asked the question of Maurice Lariviere,
24  and he said we -- I specifically asked him if there

Page 32

1  was any mitigating factors that maybe there was a
2  dating relationship or was there any other
3  information that could mediate the allegations that
4  he inappropriately touched someone, and he said, No.
5      He had a perfect opportunity to say, yes,
6  there was a prior relationship.
7      Q.  At that time haven't you already told me
8  that if someone has told you about an unwanted
9  touching that's probable cause and there is a crime
10  that is going to be pursued?
11      A.  Well, the investigation is pursued,
12  absolutely.  I never said to you that just that
13  there's an arrest we do.  And I also said to you we
14  interview both parties.
15      We at least give them the opportunity, and
16  Maurice had the opportunity to tell us that.  And
17  that question was asked more than once to him.
18      Q.  After these initial interviews up until
19  this time, you found out considerably more about the
20  relationship between the parties; have you not?
21      A.  I don't understand.  Could you rephrase
22  that?
23      Q.  Well, during the first interview with Fulya
24  Metan, you were not told about e-mails sent to

Page 33

1  Maurice Lariviere's house on the weekends; were you?
2      A.  No.
3      Q.  You were not told that her daughter was
4  brought to the office to work and both of them used
5  to walk in and out of the office while the other
6  worked there?
7      A.  I was aware that the daughter came to work.
8      Q.  That Fulya Metan brought her daughter to
9  work in that office?
10      A.  She said that on some occasions when she
11  couldn't get a baby-sitter, Maurice said have her
12  come in.  Let her sit in my office while you work.
13  Yes, I knew that.
14      Q.  Was that in the first meeting when the
15  things were reduced to reports?
16      A.  I don't remember when I knew that.
17      Q.  Okay.  Well, how about the lunch
18  engagements?  Most every day in the week in the
19  proceeding months, had you been told about that
20  before those statements were written?
21
22      MR. NOTIS:  Objection.  You can answer.
23      THE WITNESS:  I'm sorry?
24      MR. NOTIS:  I'm just objecting for the

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 34

1    record.
2
3        A.  I don't remember when I found out about
4    that but at some point during this.  I do not know
5    that.
6        Q.  As a police officer investigating the
7    relationship between the party if's somebody out to
8    lunch with them eighty percent of the work days,
9    that's something you would have noted as Chief of
10    Police; correct?
11        A.  Well, there is statements in there about
12    them, about him joining the gym and drinking water
13    and things like and the same things.  I don't
14    remember how many times, but it is in her statement.
15        Q.  Were you mindful of that before you turn,
16    before somebody turned the videotape on the 15th?
17        A.  Mindful of that.  What do you mean mindful
18    of that?
19        Q.  Were you mindful of the fact that both of
20    them had been going to lunch and shopping, etcetera,
21    etcetera?
22        A.  Well, the information in the statement I
23    was mindful of, yes.
24        Q.  Were you mindful of that?  Let's forget the

Page 35

1    statement.
2        A.  I was mindful of the things of the
3    statement that she said that he joined the gym after
4    she joined the gym and they had lunch.  I did not
5    know that he -- that -- I don't know how many times
6    they did, but I did know that.
7        Q.  You knew nothing about the e-mails?
8        A.  No, I didn't know about the e-mails.
9        Q.  If you had known about the e-mails, would
10    you have taken the same action?
11        A.  Yes.
12        Q.  Same thing if you saw an e-mail signed,
13    kiss; you would have?  It wouldn't made any
14    difference to you?
15        A.  The videotape had a dual purpose on both
16    sides.  It could corroborate what exactly Miss Metan
17    was saying or it, it could vindicate Mr. Lariviere
18    saying nothing did occur.
19        He had just as much of an opportunity to
20    behave in an appropriate manner and not sexually
21    assault her on video which would then be mitigating
22    factors.
23        Q.  Are those the only two alternatives that
24    you're aware of?

Page 36

1        A.  I don't know.  Alternative to what?
2        Q.  You said it could have vindicated him or it
3    could have been showing somebody was harmed?
4        A.  It gave us both purposes one she said
5    occurs on a routine day or that none of it did occur
6    and Maurice Lariviere wasn't doing anything.
7        Q.  She knows that she's being videotaped;
8    correct?
9        A.  Yes.
10        Q.  He doesn't know he's being videotaped?
11        A.  Correct.
12        Q.  What does that videotape tell you about the
13    last time they're in the office alone without people
14    videotaping them?
15        A.  Nothing.
16        Q.  And it doesn't tell you about the time
17    before that when they were in the office alone?
18        A.  No.  We're talking about at that time.
19        Q.  So, if there were willing kisses or willing
20    hugs in the times before that video that you took, it
21    would have been valueless?
22        A.  Say that again.
23        Q.  I said:  If they were willing kisses and
24    hugs in the office prior to November 14th, prior to

Page 37

1    her making a complaint, your videotape would be
2    valueless?
3
4        MR. NOTIS:  Objection.  You can answer.
5
6        A.  I don't -- valueless or not valuable?
7        Q.  It means that on November 14th, if you
8    assume that as true and I'm not telling you if you
9    would have seen the same thing on the 14th as would
10    have occurred the last time they were in the office
11    together?
12
13        MR. NOTIS:  Objection.
14
15        A.  I don't know if that's true or not.
16        Q.  You didn't know at the time you saw the
17    videotape?
18        A.  Didn't know.
19        Q.  You didn't know if it had happened twelve
20    times before?
21        A.  Just based on what she told us.
22        Q.  Yes.  And the corroboration for what she
23    told you was your experience that people who
24    complained are generally truthful; that's the only

**JOSEPH SOLOMON**
**October 31, 2006**

Page 38

1  one?
2      A.  No.  I said they were, they have inherit
3  liability, and you have to evaluate them as a person,
4  the way they act and what they tell you.
5          Just as the husband of twenty-five years.
6  The wife says:  No, I don't want to have sex
7  tonight.  Don't touch my breasts.  If he does, it's
8  wrong.  Arrests are made all of the time for sexual
9  assault.
10     Q.  The woman has inherit credibility and
11 reliability?
12     A.  A victim has inherit reliability in sexual
13 assaults, yes.
14     Q.  Now, you're talking about where you're
15 trained in investigating.  Let's just say sexual
16 matters, potential sexual crimes, who else in the
17 department is trained to do that?
18     A.  Lieutenant Wnek.  Seven, eight people.  I
19 don't know the number of them.  Several different
20 people.
21     Q.  And all of them were trained by whom?
22     A.  Either the Mass State Police or the -- I'm
23 trying to think of the name of the training
24 committee.  The Massachusetts Police Training Council

Page 39

1  but I don't know.  We send them to a forty-hour
2  school.
3      Q.  And they all have inherited credibility?
4      A.  The officers?
5
6          MR. NOTIS:  Objection.
7
8      Q.  Strike that question.  They were all taught
9  that there was a victim's inherit credibility that
10 they should be mindful of?
11     A.  Reliability.
12     Q.  Reliability.
13     A.  That's what they should have been taught
14 that.
15     Q.  And this should be taken as a form of
16 corroboration?
17     A.  I never said it's a form of corroboration.
18 It's -- you have to take the whole persona, again,
19 together as to what the person is telling you, how
20 they were acting, do they fit in the typical profile
21 that you would expected of a victim of a sexual
22 assault.
23     Q.  Okay.  Now, if I'm right and correct me if
24 I'm wrong, the video was setup somewhere around five

Page 40

1  a.m. in the morning?
2      A.  The camera was set up at night.  The video
3  was turned on around five in the morning.
4      Q.  Oh, okay.  So, it was setup at night by
5  Captain McCarthy?
6      A.  Captain McCarthy.
7      Q.  He was there at five a.m.?
8      A.  Him and Lieutenant Wnek.
9      Q.  Okay.  And then the video was just turned
10 on at that time?
11     A.  The recorder was turned on at that time,
12 yes.
13     Q.  And I take it that nothing happened until
14 after eight o'clock?
15     A.  Yes.
16     Q.  And eight-twenty, Maurice Lariviere enters
17 the office?
18     A.  Somewhere around that time frame.
19     Q.  Okay.  And sometime after that, Fulya Metan
20 entered the office?
21     A.  Yes.
22     Q.  And at that time where are you?
23     A.  I am at City Hall.
24     Q.  And in the Mayor's office?

Page 41

1      A.  Correct.
2      Q.  She knows it's going on?
3      A.  She does not know what's going on.  I did
4  not tell the Mayor I had a camera setup.
5      Q.  It was separate business that you were
6  doing in the Mayor's office?
7      A.  No.  I was waiting outside her office,
8  three offices.  I was waiting there because it's a
9  close place that I could be without being visible
10 during the day.
11     Q.  I don't understand that.  Let's try it
12 again.  Was the closest place that you could be
13 visible all day?
14     A.  I wouldn't be sitting out in the corridor
15 at City Hall and someone would say --
16     Q.  But your purpose of being there was the
17 investigation that was going on?
18     A.  Correct.
19     Q.  Okay.  And by prior arrangement with the
20 Mayor, were you there to inform her if something came
21 about?
22     A.  No, I hadn't told the Mayor that I was
23 physically going to be there.  I appeared there in
24 the morning.  I didn't say to the Mayor; oh, I'll

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 42

1    meet you in the office in the morning.
2        Q.  So, you're in the office, she has no idea
3    why you're there?
4        A.  I said hi to her, and I don't know what she
5    thought.  I'm assuming she figures it has something
6    to do with the investigation, but I'm not talking to
7    her about it.
8        Q.  The video ran for about two hours; right?
9        A.  Right.
10       Q.  And you're there in the Mayor's office for
11   two hours?
12       A.  I'm sorry?
13       Q.  You didn't leave?
14       A.  I don't know.  Maybe go to the bathroom,
15   get a drink.  I'm not really sure.
16       Q.  Or are you in communication with Captain
17   McCarthy and Lieutenant Wnek?
18       A.  Yes.
19       Q.  And they're telling you what's going on in
20   the video?
21       A.  Yes.
22       Q.  And when I say approximately two hours,
23   that's the length of the video; is that right?
24       A.  Yes.  It runs until somewhere around

Page 43

1    ten-thirty.
2        Q.  Okay.  So, that, is it fair to state that
3    from the time one of the participants in the video
4    arrived in the office until ten-thirty, two superior
5    officers in the Methuen Police Department saw no
6    behavior that they wanted to go in and stop --
7        A.  No.
8        Q.  -- they wanted to go in and stop it?
9        A.  Well, they saw behavior that was wrong, but
10   they didn't go in.  They were in contact with Fulya,
11   and she felt that, that she was willing to stick it
12   out a little bit longer.
13       Q.  They were watching her being, in your
14   words, sexually assaulted?
15       A.  Correct.
16       Q.  Okay.  And it was the kind of an assault
17   that the police officers didn't unilaterally enter
18   the room about?
19       A.  Correct.  The beginning stuff that they all
20   saw was the kissing and the rubbing of the shoulder
21   and the touching of her hands.  When it got to the
22   point where he --
23
24       MR. NOTIS:  Hold on.  He's not done with

Page 44

1    his answer.
2
3        Q.  I want you to finish your answer.
4        A.  When they got to the point where he
5    sexually assaulted her by touching her
6    inappropriately and pulling her into himself, at that
7    point they called me and said that there's, this has
8    got to be stopped right now.
9        Q.  If he they walked in during the first
10   incident, would they have arrested him?
11       A.  They, wouldn't have been anyone.  I was
12   running the investigation.
13       Q.  If they called you and said:  He kissed
14   her.  Would you tell them to arrest him?
15       A.  For his kissing her, no.
16       Q.  Touching her shoulder?
17       A.  No.
18       Q.  Okay.  And once again, you had absolutely
19   no evidence that the first part of the conduct hadn't
20   happened several times in the office before that
21   without any objection?
22       A.  Yes.  She said that it happened, and that
23   it was unwanted.  She told him to stop it.
24       Q.  That's what you had.  You had her

Page 45

1    statement; period?
2        A.  Correct.
3        Q.  Okay.  Now, even at the end of this video
4    that I saw, no police officer came into the room or
5    made a move into the room; correct?
6        A.  Correct.
7        Q.  And nobody, nobody prevented Fulya Metan,
8    according to what I saw, from leaving the room?
9        A.  That's not correct.
10       Q.  You saw somebody preventing her from
11   leaving the room in the video I saw?
12       A.  Yes.
13       Q.  How were they preventing her?
14       A.  Maurice was holding her and pulling her
15   tighter and tighter to him, and she was trying to get
16   away from him.  She eventually was able to get away
17   from him and ran out of the room.
18       Q.  That's what you saw in the video?
19       A.  That's what I saw in the video.
20       Q.  Now, the two police officers according to
21   them hadn't budged, so did they see that, too?
22       A.  They saw in the video, and they called me
23   and said what was occurring and should they go in or
24   not.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 46

1    And, yes, they when he opened the door to
2    come out, she was running out of the office. So, she
3    had managed to get out of, out by herself.
4    Q.  Is it true that Captain McCarthy and Wnek
5    had not left the room they were in when Fulya was
6    totally out of the office?
7    A.  No. My understanding is they were leaving
8    that office. They were going to go in there as she
9    came running out.
10   Q.  Who told you that?
11   A.  One of them. I don't know which one.
12   Q.  No recollection which one?
13   A.  No. I had a communication with them by
14   phone. I don't know with which one of them.
15   Q.  A communication?
16   A.  We were talking on the telephone. No. I'm
17   sorry?
18   Q.  Now that she's out, I take it, you're
19   coming back from the Town Hall?
20   A.  I was walking down the corridor.
21   Q.  Okay. Did you stop in to see the Mayor?
22   A.  Who, me?
23   Q.  Yes.
24   A.  No. I was coming down the corridor towards

Page 47

1    Maurice's office and I passed Fulya.
2    Q.  Now, when they had called you, okay, they
3    called you; are they watching or are they seeing her
4    leave the office?
5    A.  When they first called me, they were
6    watching the videotape.
7    Q.  Okay. Who told you to come down?
8    A.  They told me what was going on, and I said
9    it was okay to go in there and stop it. By the time
10   they were coming out to go in there, she came running
11   out of the office and went down the corridor and
12   passed me in the great hall.
13   Q.  Past who?
14   A.  She went by me in the great hall.
15   Q.  Okay. So, you were in the Mayor's office
16   and she passed you going where?
17   A.  Going across to great hall.
18   Q.  To the Mayor's office?
19   A.  Very likely. I don't know. I didn't send
20   her there.
21   Q.  She would have gone out of the City
22   Solicitor's Office. She would have past the great
23   hall?
24   A.  There's where the woman's bathroom is. I

Page 48

1    don't know. You have to ask her where she was going.
2    Q.  She was going by David Bain's office?
3    A.  No, his office is to the right.
4    Q.  Okay. There was nowhere else to go by?
5    The counselor's office?
6    A.  There's a counselor office, the great hall,
7    the Solicitor, the Mayor's office, the accounting's
8    office, the bathroom.
9    Q.  Okay. So, she was going to the general
10   area of the bathroom and the Mayor's office. You
11   don't know which one she got into?
12   A.  No, because I continued by her.
13   Q.  Okay. And up to this time, she's had no
14   conversations whatsoever with the Mayor Sharon
15   Pollard?
16   A.  Correct.
17   Q.  Nor have you that day?
18   A.  I had a conversation with her, but not
19   about this conversation.
20   Q.  Okay. So, she still has had no
21   conversation about the videotape? She doesn't know
22   about it?
23   A.  Correct.
24   Q.  Now, she's out of the office and where does

Page 49

1    Lieutenant Wnek go?
2    A.  That, I don't know.
3    Q.  Well, you and your Deputy got together;
4    correct?
5    A.  Correct.
6    Q.  And where did you get together?
7    A.  What do you mean: Where did we get
8    together?
9    Q.  Where are you?
10   A.  We were both going down the corridor to
11   talk to Maurice.
12   Q.  You were going to go down to talk to or
13   confront Maurice?
14   A.  Correct.
15   Q.  And did you go into his office?
16   A.  Yes.
17   Q.  Was anything said as you, as you got into
18   the office?
19   A.  Yes.
20   Q.  What?
21   A.  I said: Hi, Maurice, I need to talk to you
22   about something.
23   Q.  And did you ask him to come with you?
24   A.  Yes, I did.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 50

1    Q.  Okay.  Where did you go?
2    A.  Downstairs to the second floor conference
3  room.
4    Q.  Now, before this time, had you discussed
5  that Civil Rights case that he had just received a
6  decision on?
7    A.  No.  He had left a message for me on my
8  cell phone.
9    Q.  Okay.  And as a matter of fact at some
10  point was there some discussion about the message
11  that he left with you and a telephone call?  Another
12  cell phone call with Fulya Metan?
13    A.  Discuss, discussion with you?
14    Q.  Discussion with Maurice.  Yes?
15    A.  Yes.
16    Q.  By you?
17    A.  Correct, I brought it up.
18    Q.  You brought up that he had talked to Fulya
19  Metan?
20    A.  During our interview that was on tape, yes.
21    Q.  And he said he talked to you about the same
22  thing?
23    A.  I would remember if he said that, but I
24  hadn't spoken to him.  I hadn't spoken to him.  He

Page 51

1  left me the message.
2    Q.  Well, in any event, you and the Deputy are
3  going to now meet with Maurice somewhere?
4    A.  Um-hmm.
5    Q.  In the room in City Hall?
6    A.  Correct.
7    Q.  Okay.  Is there reason why both of you are
8  meeting as opposed to just you?
9    A.  Yes, so that there was a witness to the
10  interview.
11    Q.  Let's see.  You need a witness to the
12  interview, you got two tapes.  Who's in charge of the
13  tapes?
14    A.  What do you mean who's in charge of the
15  tapes?
16    Q.  In charge of using the tapes?
17    A.  Me.  I had the machines.
18    Q.  You used them before?
19    A.  Have I used them before, I've never done an
20  interview recorded but I've used the machines before.
21    Q.  You've never done an interview before this?
22    A.  I have never interviewed before and
23  recorded them on two tapes myself.  That was a
24  procedure that was set by the District Attorney's

Page 52

1  Office shortly before this whole incident.
2    Q.  Where did the two tapes come from?
3  Belonged to somebody?
4    A.  I got one tape recorder from the
5  detective.  One tape recorder from my office and two
6  tapes from his draw.
7    Q.  Okay.  And I take it that there was
8  something that made you confident that these tapes
9  were going to work?
10    A.  Well, I tape recorded that.  The one in my
11  office I know works because I've used, and the ones
12  from the detectives are the ones that they use when
13  he interview people.
14    Q.  The one that you used that was used which
15  one is that the one I can't hear or the one with
16  nothing on it?
17    A.  I don't know what you're talking about.
18    Q.  Well, there are two tapes in this case.
19  One I can't hear and one there is nothing on it.
20
21    MR. NOTIS:  Objection.  Go ahead.
22
23    A.  So, what's the question?
24    Q.  I'm saying:  Which one of them is yours?

Page 53

1    A.  The black one is mine which is the one that
2  recorded; silver was the one from the detective that
3  didn't record.
4    Q.  The one that we can hear words on?
5    A.  Not me personally but mines as the Police
6  Chief.  It was my in my office.
7    Q.  It was purchased?  That was police issued?
8    A.  Right.  It was there when I took over.
9    Q.  Okay.  And the other one?
10    A.  Came from the Detective division.
11    Q.  Came from Lieutenant Wnek?
12    A.  Yes, it did.
13    Q.  Okay.  And knowing you were going to tape,
14  somebody turned them on to find out if they were
15  recording anything before you taped?
16    A.  I turned them on to make sure that the
17  wheel spun and they had batteries.
18    Q.  Did you check to see if there was going to
19  be anything on them?
20    A.  No.  I didn't test record, no.
21    Q.  Now, the interview with Maurice Lariviere
22  was approximately two hours long?
23    A.  No.
24    Q.  How long?

**JOSEPH SOLOMON**
**October 31, 2006**

Page 54

1    A.  I don't know the amount of time.  You would
2  have to play the tape and count how many minutes it
3  takes.
4    Q.  Okay.  Well over an hour?
5    A.  I don't know.
6    Q.  So, there's no recording or you've never
7  recorded anywhere that we interviewed a suspect for
8  ten minutes, thirty minutes, eighty minutes; you
9  never did that?
10    A.  No.  No.
11    Q.  And you have no memory of any approximation
12  of time both of you spent in the room with Maurice
13  Lariviere?
14    A.  I don't know how long.  That's not what you
15  said.  You asked how long the interview was.
16    Q.  How long did you spend in the room with
17  him?
18    A.  Probably about an hour but the interview
19  wasn't an hour long.
20    Q.  Okay.  Now, before you were in the room
21  with him, had you seen the tape or had listened?  Had
22  you seen the video or you had just heard a
23  description of it?
24    A.  I just heard a description of it.

Page 55

1    Q.  Okay.  And have you heard the tape as it
2  exists?  You now, the one that has words on it?
3    A.  Yes.
4    Q.  Can you understand it all?
5    A.  Not all of it but the majority of it.
6    Q.  Okay.  Now, on that tape though, correct me
7  if I'm wrong because I don't know how much I have
8  absorbed from it, okay.
9       Did you tell them that you clearly had
10  evidence to the assault of somebody?
11    A.  Yes.
12    Q.  Now, having in mind you had a so-called
13  victim and you had a videotape, okay.  Did you know
14  at that time were you going to arrest him?
15    A.  No, it was not my plan.
16    Q.  Your plan was?
17    A.  To interview him, see what information I
18  could obtain from him and make a phone call to the
19  District Attorney's Office.
20    Q.  You were going to make a call to the
21  District Attorney's Office?
22    A.  Yes.
23    Q.  And you told him about that?
24    A.  They had already been aware of it.  I had

Page 56

1  spoken with somebody that morning.
2    Q.  Okay.  On the tape, was there a discussion
3  about a resignation?
4    A.  No.
5    Q.  I do.  It did get prepared by David Bain
6  later on?
7    A.  I'm sorry?
8    Q.  How did one get prepared by David Bain
9  later on?
10    A.  Because Maurice asked to go off the record,
11  and then Maurice said I just want to resign.  I told
12  him that that had nothing to do with me.  If that's
13  what he wanted, I would go relay the message.
14    Q.  So, at no time did you tell him that he was
15  under arrest?
16    A.  No, I did not tell him that he was under
17  arrest.
18    Q.  Do you recall at some point going back to
19  the Mayor's office during that interview?
20    A.  Yes.
21    Q.  Do you recall assigning somebody to be with
22  Maurice while you left?
23    A.  Yes.
24    Q.  Who was that?

Page 57

1    A.  Captain McCarthy.
2    Q.  Captain McCarthy's instructions were to
3  stay with him?
4    A.  Correct.
5    Q.  If he stood up and said:  I'm going home.
6  What was Captain McCarthy supposed to do?
7    A.  He was to keep him there.
8    Q.  To keep him there?
9    A.  Absolutely.
10    Q.  What authority do have you to keep anybody
11  there?
12    A.  We have authority to detain somebody
13  without placing them under arrest.  I mean, you're an
14  attorney; you should know that.
15    Q.  I'm asking you what authority you used to
16  keep him there, you?
17    A.  We have the authority to retain somebody
18  during an investigation.
19
20       MR. NOTIS:  Hold on.
21
22    Q.  Under the facts of this case, let me get my
23  question out.  He stopped me before I stopped him.
24

**JOSEPH SOLOMON**
**October 31, 2006**

Page 58

1      MR. NOTIS:  Let's just so we have a clear
2  record.
3      MR. DiADAMO:  Strike it.  We'll start
4  again.
5      MR. NOTIS:  Okay.  But I'd run into the
6  problem again.  Chief, I'll just remind you to let
7  him finish his question.  And I'd ask counsel to let
8  the witness complete his answer before you start the
9  next question.  Thank you.
10      THE WITNESS:  Yes.
11
12     Q.  The question to you was:  In the facts of
13  this case where you were with respect to the
14  interview at the time you left, you still felt that
15  you had authority to detain him in the police
16  station?
17     A.  We weren't in the police station.
18     Q.  In that room?
19     A.  Yes.
20     Q.  Okay.  And had he said:  I'm going home;
21  Captain McCarthy would have detained him?
22     A.  Correct.
23     Q.  By arresting him?
24     A.  No.

Page 59

1      Q.  By physically holding him there?
2      A.  If required to be.
3      Q.  So, he would have used physical force to
4  keep him there?
5      A.  If, it was required.
6      Q.  Okay.  Now, how many times did Maurice ask
7  to speak to somebody outside that room?
8      A.  Once.
9      Q.  Who did he want to speak to?
10     A.  Fulya Metan.
11     Q.  Did he also want to speak to his wife?
12     A.  No.
13     Q.  Okay.  Had he asked you to speak to his
14  wife, would you have let him gone out to call his
15  wife?
16     A.  No.
17     Q.  Had he asked to talk to a lawyer, would you
18  have let him call a lawyer?
19     A.  Absolutely.
20     Q.  Now, you on that day were in the Mayor's
21  office.  We talked about the resignation.  You said
22  David Baine prepared it; correct?
23     A.  I never said David Baine prepared it.
24  Either he prepared it or someone else prepared it.

Page 60

1      Q.  He came in with it?
2      A.  He's the one that came in with the piece of
3  paper.
4      Q.  He's the Human Resource Officer?
5      A.  Director.
6      Q.  He's the sexual harassment officer, if you
7  will, in the Town of Methuen?
8      A.  Correct.
9      Q.  As a matter of fact, after you walked
10  outside his office at the place before you and Fulya
11  Metan was walking down the corridor, you'll see the
12  sexual harassment policy in the Town of Methuen?
13     A.  I have no knowledge of that.
14     Q.  You don't know that that's posted right
15  there?
16     A.  No, I don't.
17     Q.  Okay.  Did you and Baine have any
18  discussions with respect to sexual harassment?
19     A.  No, I did not.
20     Q.  Did you and Alaimo and Baine have those
21  discussions?
22     A.  Not to my knowledge.
23     Q.  Did Wnek and Baine have those discussions?
24     A.  Not to my knowledge.

Page 61

1      Q.  Okay.  When the resignation was secured,
2  who was it given to?
3      A.  That, I would have no knowledge of.  I -- I
4  didn't secure it.
5      Q.  Who secured it?
6      A.  Maurice and Dave Baine.
7      Q.  And that room that you were discussing that
8  you are in --
9      A.  Correct.
10     Q.  -- you weren't in there anymore?
11     A.  No.  Myself and the deputy did.  I left the
12  room and Dave Baine and Maurice Lariviere were in
13  there talking.
14     Q.  Now, you had gone back to the Mayor's
15  office?
16     A.  I'm sorry.  Who had?
17     Q.  You had during that period?
18     A.  Yes.
19     Q.  And you went back to her to discuss the
20  status of the case with her; correct?
21     A.  I went back.  You're confusing me as to
22  what you're talking about.  I went back to the
23  Mayor's office.  When I went to the Mayor's office
24  when Maurice said he wanted to resign to relay that

**JOSEPH SOLOMON**
**October 31, 2006**

Page 62

1  message, and then I had a conversation with Fulya to
2  ask if she had decided what she wanted to do with
3  charges.
4      Q. And what did Fulya say to you?
5      A. She said she still wasn't sure. She wanted
6  time to think about it.
7      Q. She wasn't sure?
8      A. She wanted to think about what she wanted
9  to do.
10     Q. She didn't tell you directly that she did
11 not want to press charges?
12     A. Not at that point, no.
13     Q. Who was Maurice Lariviere's employer?
14     A. The City of Methuen.
15     Q. Who hired him and fired him?
16     A. I don't know who hired him, but.
17     Q. It's a counsel position; correct?
18     A. But I don't know who hired him, and to my
19 knowledge he wasn't fired, so.
20     Q. Well, I just said who could hire him and
21 fire him?
22     A. Who could, the City Counselor.
23     Q. City Counselor, period; Mayor's got nothing
24 to do with it?

Page 63

1      A. Correct.
2      Q. You knew that the relations between the
3  Mayor and Maurice Lariviere were not good?
4      A. I knew that there was some estrangement
5  between the two of them, yes.
6      Q. And it was an estrangement that had lasted
7  for some time?
8      A. I don't know how long it lasted.
9      Q. I mean, you knew that when you were sitting
10 in the office, as in the Mayor's office, and the
11 videotape was running?
12     A. I knew there had been issues between the
13 two. It was mutual.
14     Q. In your entire police career, have you ever
15 heard of another videotaped alleged sexual crime?
16     A. Of it actually occurring?
17     Q. Yes, like --
18     A. Videotaped by the police?
19     Q. Yes.
20     A. Not in the Methuen Police, no.
21     Q. By anybody?
22     A. I don't know by anybody.
23     Q. You've never heard of one; have you?
24     A. I can't say that I never heard of any one.

Page 64

1      Q. Well, let's begin at the beginning. You
2  know in your common knowledge as the Chief of Police
3  that law enforcement officials have taped bribery
4  confrontations?
5      A. Um-hmm.
6      Q. You know that they have videotaped drug
7  arrests?
8      A. Um-hmm.
9      Q. You know that they have taped extortion
10 attempts?
11     A. Correct.
12     Q. I want to know if you've ever even heard of
13 anybody taping a sexual event with police officers
14 watching?
15     A. Not to my knowledge at this point that I
16 remember.
17     Q. Are you a member of the Police Chief
18 Association of Massachusetts?
19     A. Yes.
20     Q. Never ever heard of it; have you?
21     A. I don't know at this point I have ever
22 heard of it.
23     Q. Okay. In your judgement, having in mind
24 you're trained to investigate sex crimes, in your

Page 65

1  judgement do you have a judgement about whether or
2  not it's ever happened in Massachusetts?
3      A. I don't know.
4      Q. Certainly not one of the vices you were
5  taught about; is it?
6      A. Well, wireless cameras were not around when
7  I was trained. I was trained in the 1980s.
8      Q. Well, you've had officers trained since
9  that time; correct?
10     A. Correct.
11     Q. You haven't heard one of them talk about
12 videotapes; have you?
13     A. We talk about videotapes in law instances.
14 We've used them in many cases, and I think the
15 Methuen Police is a very ahead of the game police
16 department. So, I thought it was a very good
17 investigative technique.
18     Q. By ahead of the game on videotaping a
19 sexual event, you're not ahead of the game; are you?
20 You're first in the game; aren't you?
21     A. I can't answer that. I have no knowledge
22 if someone, anyone else has videotaped.
23     Q. And as your officers come back from
24 training in the investigation of sexual events, not

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

18 (Pages 66 to 69)

Page 66

1    one of them has given you an example of videotaping
2    possible confrontations that involve a sexual
3    component?
4        A.  No.  No one has come to me with that.
5        Q.  Okay.  And no one has told you that they've
6    been given any manual telling them that that is a
7    strategy or a good idea; correct?
8        A.  No, no one has told me that.  No one has
9    told me that at any time it isn't either.
10       Q.  And this one is done to an employee who has
11   bad relations with the Mayor; correct?
12       A.  Correct.
13       Q.  The Mayor you have good relations with?
14       A.  Correct.  And the man who I had good
15   relations with.  Me and Maurice had an excellent
16   working relationship.
17       Q.  It was no secret in the Town Hall among
18   everyone who was working there that Sharon Pollard
19   wanted Maurice Lariviere removed and David Baine made
20   City Solicitor?
21
22       MR. NOTIS:  Objection.
23
24       A.  That was never said to me.  Oh, I'm sorry.

Page 67

1        MR. NOTIS:  You can answer.  I just
2    objected.
3
4        A.  That was never said to me, and I had no
5    actual knowledge of that.
6        Q.  You never heard that?
7        A.  No, I never heard that.
8        Q.  This is the first time?
9        A.  That Maurice Lariviere was going to be
10   removed and Dave Baine was going to be replacing him,
11   absolutely never heard that.
12       Q.  I never ask questions twice, but I'm just
13   going to ask you to think for a moment about somebody
14   who may have been present when you would have heard
15   that directly.  I'm just giving you a chance to
16   think, and you can restate your answer after you --
17       A.  I never heard that directly said to me or
18   indirectly said to me.
19       Q.  Okay.  So, now, after you spent time with
20   Maurice Lariviere that day?
21       A.  Um-hmm.
22       Q.  You know there was a resignation executed?
23       A.  Correct.
24       Q.  And that a resignation meant to you that

Page 68

1    all the rights that he had under the Charter a
2    Solicitor who had been receiving approximately
3    twenty-five years were over, he didn't have those
4    rights anymore?
5        A.  Correct.
6        Q.  You also know that after that resignation
7    was signed, that any rights he had under the Methuen
8    Sexual Harassment Policy would never be exercised by
9    him again?
10       A.  I didn't even give that a thought.  I don't
11   know what rights he had under the policy.
12       Q.  When you first heard of the Fulya Metan
13   incident, it must have at least occurred to you that
14   she had some rights under the Methuen Sexual
15   Harassment Policy?
16       A.  Oh, I thought of it, but that wasn't what I
17   was there to investigate.
18       Q.  What rights that she has of the policy
19   applies to you too; right?
20       A.  The other.  If I become aware of it, I'm
21   required to report it up the chain of command to my
22   bosses.  So, if somebody tells me about something,
23   I'm supposed to report it.
24       Q.  And you know there's a procedure to resolve

Page 69

1    those things?
2        A.  I'm sure there is.
3        Q.  How long have you known Maurice Lariviere?
4        A.  Probably twenty years or eighteen.  From
5    whatever time I became aware that he was the
6    Solicitor.  I mean, the majority of my career.
7        Q.  Fulya Metan went to Mike Wnek to stop some
8    behavior according to the police; correct?
9        A.  Correct.
10       Q.  Having in mind how long you've known
11   Maurice Lariviere, if you, Joseph Solomon, had simply
12   said:  We heard something.  True or false.  Stop it.
13   Would you expect it to occur again the next day?
14       A.  That's not what a police officer does.  I
15   have an oath to investigate crimes, and this is a
16   report of a crime.
17
18       MR. NOTIS:  Let him answer the question.
19
20       A.  That is my answer.  That is a crime.  I'm
21   not going to go to somebody tomorrow that says my
22   husband smacked me and say:  Don't smack your wife.
23   My oath is to abide the law and to uphold it, and
24   that's what I was doing.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 70

1    Q.  Now, with respect to upholding the law in
2  sexual encounters, would you agree with me that the
3  wise police officer looks at the aggradation of
4  sexual conduct?
5    A.  I don't know what aggradation means.
6    Q.  Well, let's deal with the fact that:  If I
7  walked up to the Methuen Town Hall and saw somebody
8  who I had known in the old days and held their hand
9  and she said:  I'm very offended by you holding my
10 hand.  I shouldn't expect to be a criminal defendant?
11    A.  No.  Because that's not a sexual assault.
12    Q.  You have in your mind an idea of what a
13 sexual assault is, and that isn't sexual assault?
14    A.  Correct.
15    Q.  Correct.  Touching of the shoulder, you
16 didn't think of as sexual assault?
17    A.  No.
18    Q.  The kissing was not a sexual assault?
19    A.  Kissing on the lips, no.
20    Q.  Touching the buttocks was a sexual assault?
21    A.  Yes.
22    Q.  What other sexual assaults have you seen?
23    A.  What do you mean, have you seen?
24    Q.  When you saw the video, you heard about

Page 71

1  touching buttocks, touched.  That's the crime.  What
2  else?
3    A.  The thrusting of his hips into her crotch
4  area allowing his erect penis to touch her vagina.
5    Q.  Okay.  Are you telling me what she's
6  related to you?
7    A.  I see that on the video of him, pumping his
8  hips into her, and then her relation was that while
9  that was occurring he was erect and was touching her
10 private with his private.
11    Q.  That's what you saw in the video?
12    A.  I saw him thrusting the hips, and then I
13 listened to her explanation as to what occurred.
14    Q.  Now, the incident is over and Lariviere is
15 gone and Peter Biginley (phonetic) is at some point
16 in the City Solicitor's Office appointed or not.  I
17 don't know.  And what happens to Fulya Metan?
18    A.  I had nothing to do with Fulya Metan.  I
19 don't know.
20    Q.  Well, you work in the Town, and you know
21 that she is not an employee of the Town?
22    A.  Just as recent; correct.
23    Q.  Pardon me?
24    A.  Recently she's not an employee of the Town.

Page 72

1    Q.  Recently?
2    A.  Correct.  That's my understanding.
3    Q.  How about one day after the incident?
4    A.  That's not my understanding.
5    Q.  Two days after the incident?
6    A.  My understanding was she was a City
7  employee up until very recently when I heard from an
8  attorney that she was no longer an employee of the
9  City.
10    Q.  Excuse me.  Let me phrase that a lot better
11 than I phrased it.  You knew as an employee of the
12 City of Methuen that at some point she stopped
13 appearing in the Town of Methuen?
14    A.  Yes, I'm aware of that.
15    Q.  Okay.  Now, do you know approximately when
16 she stopped appearing?
17    A.  No, I do not.
18    Q.  Is it fair to state that you knew within a
19 week that she had stopped appearing as an employee?
20    A.  No, it's not because I don't know when she
21 stopped appearing as an employee.
22    Q.  When did you know that she had stopped
23 appearing as an employee?
24    A.  At some point I was told by Peter McQuillan

Page 73

1  that an attorney was hired to represent the City, and
2  in some worker comp case against Fulya; and that's
3  when I was aware that she wasn't reporting to work.
4    Q.  From the time of this February 14, 15th,
5  until the time you folks spoke to McQuillan, you were
6  in the presence of Sharon Pollard many, many times?
7    A.  Yes.
8    Q.  And are you telling me in those many, many
9  times, you weren't told that Fulya Metan was a no
10 show?
11    A.  No.  I never discussed Fulya Metan with
12 her.
13    Q.  And nobody in the presence of both of you
14 discussed that she was a no show?
15    A.  Not to my knowledge.
16    Q.  Okay?
17    A.  Or my remembrances.
18    Q.  As Chief of Police, you go to the City
19 Solicitor's Office?
20    A.  Correct.
21    Q.  Correct.  Did you see her there?
22    A.  I hadn't been to the City Solicitor's
23 office during all of this.  That's the first few
24 months for quite some time.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH SOLOMON**
**October 31, 2006**

Page 74

1      Q.  So, you had no idea that she's not
2  appearing for work?
3      A.  No.  It wasn't something that was of my
4  concern.
5      Q.  Oh, I take it at some point you read about
6  it in the newspaper?
7      A.  Oh, yes.
8      Q.  And then when you read about it in the
9  newspaper, you --
10      A.  I would have read it in the paper.
11      Q.  You've read that he was afraid of Peter
12  McQuillan; correct?
13      A.  Correct.
14      Q.  When the person you relied on when you felt
15  that had inherit credibility said she wasn't coming
16  back to work because she was afraid of Peter
17  McQuillan, did you do any further investigation?
18
19         MR. NOTIS:  Objection.  You can answer.
20
21      A.  There was further investigation going on as
22  of the one or two days right after this incident
23  occurred.
24      Q.  Who was doing the further investigation?

Page 75

1      A.  We arranged for the District Attorney's
2  Office to interview Fulya Metan and Assistant
3  District Attorney, Kathy Tutman, came into my office
4  and had a conversation with me.
5         She then had an interview of Fulya Metan.
6  She then came back and had another conversation with
7  me.  And during that second conversation after she
8  had interviewed Fulya and reviewed our reports, she
9  said to me that was a textbook investigation and we
10  did a very good job.  And from that point forward,
11  the District Attorney's Office was involved.
12         The District Attorney handles all of that.
13  And my understanding the District Attorney or
14  Assistant District Attorney, whose Kathy Tutman,
15  whose the Chief of the Sex Crime Unit at the time was
16  working directly with Fulya Metan and Lieutenant Wnek
17  in reviewing cases and making decisions.
18         At that point I wasn't directly involved
19  but the investigation was ongoing.
20      Q.  And at the time that Kathy Tutman, now
21  Judge Tutman, came to your office?
22      A.  Yes.
23      Q.  Both neither you nor she knew about the
24  e-mails that were going to Maurice Lariviere's house;

Page 76

1  correct?
2      A.  I didn't.  I don't know if she did.
3      Q.  If you didn't know it, there would be no
4  way of her knowing it; correct?
5      A.  I can't say what she knew.  I'm not one to
6  speak to her.
7      Q.  She knew nothing about the personal
8  relationship about the parties other than what Fulya
9  told her and Fulya told her what she told you;
10  correct?
11      A.  I don't know, so you'd have to ask her.
12      Q.  So, when you're talking about textbook
13  investigation, you don't know whether or not she knew
14  about the e-mails?
15      A.  No.
16      Q.  You didn't know about the shopping
17  excursions that were happening on a weekly basis?
18      A.  No.
19      Q.  You didn't know about the daily luncheons
20  that were going on?
21      A.  I didn't know what she knew.  I can't speak
22  for her.
23      Q.  So, if she did know about it, all of that
24  would be missing from the textbook investigation?

Page 77

1      A.  Well, you've got to understand as I said
2  before as a husband or the wife.  So, you're
3  independent actual contact before or after has no, no
4  major bearing on whether somebody is assaulted
5  against their will.
6      Q.  You're also very interested in credibility;
7  correct?
8      A.  Sure, absolutely.
9      Q.  And when you hear in Iraq, okay?
10      A.  Um-hmm.
11      Q.  And somebody talked about letters and you
12  find out the guy is doing time for a Federal thing
13  which is a major thing, that's something that tells
14  you something about the person whose credibility
15  you're relying on; doesn't it?
16
17         MR. NOTIS:  Objection.
18
19      A.  That may or may not.
20      Q.  It would be something of interest to you;
21  would it not?
22      A.  Well, if I see you have information you
23  would like to provide, I would be more than happy to
24  take a look at it.

**JOSEPH SOLOMON**
**October 31, 2006**

Page 78

1    Q.  You've never seen it?
2    A.  No, I haven't.
3    Q.  You hadn't been told about it?
4    A.  I heard just recently about that, but I
5  haven't seen anything that says that's accurate.
6    Q.  At the time had you seen letters going out
7  to Federal judges about boyfriends who are supposed
8  to be in Iraq and are really being held in Federal
9  penitentiaries, would it have made a difference with
10  respect to your idea of her inherit credibility?
11    A.  It would probably have warranted a little
12  bit more investigation.
13    Q.  And if you saw that in your other hand you
14  had a group of e-mails, one of which was signed kiss
15  and a second one was a description of the birthday
16  presents being bought for the so-called assailant;
17  would that have required a little more investigation?
18
19        MR. NOTIS:  Objection.
20
21    A.  No, e-mails back and forth.  The dating
22  relationship back and forth still don't erase whether
23  somebody was assaulted against their will.
24        As I've said before, husband and wives;

Page 79

1  girlfriends and boyfriends.  It occurs.  And again
2  that question was asked of Mr. Lariviere, and he
3  didn't say that there was any dating relationship.
4    Q.  Fulya Metan was the first one interviewed.
5  Did she tell you anything about the relationship
6  period, like, gifts going back and forth?
7    A.  No, she didn't mention there was gifts
8  going back and forth.
9    Q.  She didn't mention there were e-mails going
10  back and forth?
11    A.  No, she didn't.
12    Q.  She didn't mention shopping excursions with
13  both of them going?
14    A.  No.
15    Q.  Or lunches?
16    A.  No.
17    Q.  Okay.  Now, had you had that information,
18  would you at least have questioned her about the
19  relationship?
20    A.  We may have asked her more questions.
21    Q.  Yes.  And would you have asked her more
22  questions about the relationship between the two
23  parties in the office with the door closed without
24  other people looking at them?  Having in mind --

Page 80

1    A.  Yes, we could have.
2    Q.  -- having in mind, you know, that there's a
3  person with them at that time; correct?
4    A.  Correct.
5    Q.  And in your investigating of a so-called
6  sex, sex crimes, it would be of interest to you to
7  know that cordial and friendly e-mails were being
8  sent from the so-called victim to the so-called
9  assailant in his house where his wife and children
10  live.  That would have been of interest to you;
11  correct?
12    A.  That's kind of a weird question.  So, you
13  don't really send e-mails to a house.  You send them
14  to an address.  I could send to ABC.com, and you
15  could be in Hensing to get that e-mail.
16        So, it doesn't necessarily go to your
17  house.  It goes to your address.  That's kind of a
18  question that can't answer.  So, but.
19    Q.  Let's get a way that it can be answered.
20    A.  Electric.
21    Q.  If it's sent on a Saturday evening, pretty
22  good inference it ain't going to work; correct?  I'm
23  talking about whether that day going to the person at
24  work.

Page 81

1    A.  If I could answer this to you, it doesn't
2  go to a person or place.  My e-mail goes here.  So,
3  if I'm in Florida, my e-mail is in Florida.  It's not
4  in a house.  An e-mail you can retrieve that mail
5  from your house, from you cell phone, from the
6  library if you chose to, from you car if you had a
7  labtop in it.  So, it's kind of a hard question to
8  answer.
9    Q.  When you're looking at an e-mail that's
10  describing the weather on a Saturday and you look at
11  the time of e-mail and it's 7:15 p.m.?
12    A.  Um-hmm.
13    Q.  And you know that Maurice Lariviere is the
14  City Solicitor in the Town of Methuen?
15    A.  Correct.
16    Q.  It's a pretty good bet that that e-mail is
17  going to him someplace other than his work?
18    A.  It's definitely not going to -- wherever
19  the server is located, so you're asking a question
20  that's impossible to answer because e-mail doesn't go
21  to the person.  It goes to the location of that
22  server, and the server for his e-mail could be
23  outside the country.
24    Q.  So, we know how e-mails go.

# JOSEPH SOLOMON
# October 31, 2006

Page 82

1     A.  I'm, I'm, I'm trying to answer the
2  question.
3     Q.  If you saw at 7:15 saying the weather is
4  snowy outside and what are you doing tonight?  You
5  know that that e-mail was not intended to reach
6  somebody at City Hall on a Saturday night?
7     A.  Correct.  Not at their office, correct.
8     Q.  You would make a probable inference that it
9  was going to him personally at his home?
10     A.  Well, I can't say where it was going to
11  him.
12     Q.  Well, having in mind that if you knew that
13  they existed before you took any action, would you've
14  wanted to investigate those other facts?
15     A.  I don't understand what you're saying.
16     Q.  If you know that you have tangible evidence
17  of a warm ongoing relationship between the parties
18  and you've been told by somebody that there's a
19  constant series of assaults going on, based on your
20  experience as a police officer particularly as the
21  Chief of Police, you would not know that that wasn't
22  atypical to be buying presents and communicating with
23  people on the weekend who were assaulting you;
24  correct?

Page 83

1     MR. NOTIS:  Objection.
2
3     A.  No.  Actually, in a lot of instances when a
4  person, depends on the type of person, they befriend
5  another person, they would buy them stuff.  They may
6  take them on trips.
7     They may do one on, one guilted to be a
8  servant; and it's uncomfortable for accepting things
9  and allows them to have a little bit more of, you
10  know, their ability to touch them and go a little bit
11  further thinking that they're using some type of a
12  control technique.
13     And it always depends on the individual
14  situation.  There's some situations where people buy
15  things for people and buy them presents and try to
16  use that psychologically to gain an advantage over
17  the person and eventually assault them.
18     Q.  What about buying him a Bombay clock for
19  his birthday?
20     A.  I don't know.  Maybe she's saying thank you
21  for him giving her a $41,000.00 a year job.  I don't
22  know.  You'd have to ask her what her advantage was.
23     Q.  Did you think about the fact that the
24  complaints were lodged by her after her job became

Page 84

1  full time?
2     A.  What do you mean by that?
3     Q.  I want you to assume it's true that Fulya
4  is a temporary employee by Moore Services up until
5  December 26, 27 or 28.
6     A.  Okay.
7     Q.  The preceding year.  Did you know that
8  before I just said it?
9     A.  I knew she was a temp, but I didn't know
10  for how long.
11
12     MR. NOTIS:  I'm not sure if that date is
13  correct.
14     MR. DiADAMO:  I'm just telling him to
15  assume if it's not true.  The question is going out
16  the window.
17     THE WITNESS:  Just so we're all on the same
18  page.  That's all.
19     MR. DiADAMO:  Okay.
20
21     Q.  When you're dealing with the human
22  experience people you're interviewing, you're trying
23  to find out whether or not there's some secondary
24  gain of telling a story or doing something like that

Page 85

1  so you can judge or ask the story; correct?
2     A.  Um-hmm.
3     Q.  Now, when the complaint was made a month
4  after full-time employment was granted and not before
5  full-time employment was granted, would that have
6  made any difference to you?
7     A.  No.
8     Q.  If you had known that at the time, would
9  you at least have asked whether or not she was
10  requesting full-time employment before any physical
11  contact, before she was a full-time employee?
12     A.  If I know she was still temporary?
13     Q.  Yes, and claiming that she was being
14  touched later on?
15     A.  No, that doesn't have any bearing on my
16  investigation.  Whether she's a woman delivering a
17  UPS package or an employee, what does that have to do
18  with my investigation?
19     Q.  I'm asking you.  At some point do you
20  investigate the alleged assailant's status as well as
21  the victim's status?
22     A.  I don't know.  What do you mean by status?
23  Whether they're full-time or not?
24     Q.  Okay.  No, the mere fact is that Fulya

**JOSEPH SOLOMON**
**October 31, 2006**

23 (Pages 86 to 89)

Page 86

1    Metan could have been telling a story about Maurice
2    Lariviere that wasn't entirely true; correct?
3        A.  She could have been.  But in my opinion
4    from years and years of experience of interviewing
5    sexual assault victims, she was telling the truth.
6        Q.  But you know she didn't tell you the whole
7    truth; correct?
8
9        MR. NOTIS:  Objection.
10
11       A.  We never asked those questions about any of
12   those inside facts.  At the time the questions and
13   the conversation was about what is occurring to her
14   that is of a sexual assault nature.
15       Q.  But how about Fulya, is there any personal
16   relationship between you two.  Did you ask that?  Did
17   you ask that?
18       A.  No, I did not.
19       Q.  As a sexual investigator, wouldn't that be
20   the first thing you would ask?
21       A.  It would all depend on the type of
22   situation.  She was asked if there was a dating
23   relationship, and she said: "No."  There's a
24   difference than a personal relationship.

Page 87

1        Everyone who works has personal
2    relationships.  But, no, I didn't specifically ask if
3    she had those words personal relationship.
4        Q.  So, in this context, you would not have
5    probed what the actual relationship between the two
6    parties was?
7        A.  You know what, I didn't ask that question.
8    And, again as I've said I don't know how many times
9    today even, if they had a dating relationship today
10   and she said stop touching my ass and he kept doing
11   it; it's breaking the law.
12       Q.  And if she said stop touching my ass and I
13   stopped, I stopped breaking the law?
14       A.  If they weren't unwarranted before and she
15   didn't mind it, no, it wouldn't be breaking the law.
16       Q.  As a matter of fact, we can carve into
17   stone with respect to the law if the person doesn't
18   know the touching is unwarranted, the touching is not
19   criminal?
20       A.  No.  No.  That's not true.  If you walk
21   down the street and grabbed some girl's ass right
22   here, you would be locked up for an assault and
23   battery.  I don't have to.
24       Q.  I'm eighteen years old and in the back of a

Page 88

1    car and me and a girl are kissing her; and she says,
2    I don't want to be kissed in the first place.  Why
3    are you kissing me?  Did I commit a crime?
4        A.  Well, you have to -- kissing is not --
5    kissing someone on the lips is not a sexual assault.
6        Q.  Let me just get this perfectly clear.  The
7    person who is being charged of committing a crime,
8    that you've described it, has to know the conduct is
9    unwanted or nobody would make an approach to anybody;
10   correct?
11       A.  There's a difference between conduct of
12   touching somebody in an inappropriate place.  You as
13   an attorney know you can't walk out and touch your
14   secretary's ass unless you know it's warranted.
15       It's different than an eighteen-year-old
16   girl or boy and they pick each other up and going out
17   on dates, and then the guy reaches over and touches
18   her.  Well, no, knock it off.  Knock it off.
19       We have had dating relationships with
20   teenagers.  One child has been charged, charged with
21   sexual assault.  I didn't want him to do it, and he
22   did it and I'm offended by it.  It's a case by case
23   scenario.
24       Q.  As adults males we know that sexual

Page 89

1    interactions is a progression; correct?
2        A.  Um-hmm.
3        Q.  And at some point the progression, somebody
4    has a right to say no or indicate no?
5        A.  Correct.
6        Q.  We agree.  No question about it.  What
7    about if they don't say no and they don't indicate
8    no.  Just afterwards they say:  I didn't want that.
9    The guy shouldn't have touched me.
10       A.  Well, if it was an one-time situation, then
11   we would have to evaluate.  At that point there was
12   an one-time situation, there was the only time it
13   occurred and what do you think.  And we would get
14   advice as to which way to go.
15       Q.  So, when you videotaped that day in
16   February if there were touchings that had gone on at
17   other times where there was no indication they were
18   unwanted, would that have changed in your mind with
19   respect to what you saw in the videotape?
20       Let me, so that we make no mistake.  I'm
21   not saying that occurred.  I just asked you a
22   question.
23       A.  So, you're saying if --
24       Q.  If there were --

**JOSEPH SOLOMON**
**October 31, 2006**

Page 90

1    A. If she wanted to be touched all of those
2  other times?
3    Q. If there was no way, you know, to
4  understand the question. And so that you don't get a
5  -- strike that. Okay, and put on the record that
6  you're not answering that question because I stopped
7  you. Okay?
8    A. Okay.
9    Q. So, I want to get this perfectly clear.
10  Fulya Metan had been approached in that office on
11  occasions with a kiss or a touch in the buttocks and
12  she made no indication whatsoever it was unwanted,
13  would that have changed your mind with respect to
14  February 14th and 15th?
15    A. Changed my mind as to what?
16    Q. Whether or not there was any unwanted
17  sexual activities? If she had never, ever indicated
18  it was unwanted?
19    A. If she had never ever indicated? I have to
20  make sure I have it clear in my mind.
21      Indicating that him touching her in those
22  places was unwarranted, and then it was just that one
23  day that they saw it on video and now she's saying
24  it's unwarranted but never told him to stop that day

Page 91

1  or before then, I would say that that would not be --
2  it would be a question for a District Attorney, but I
3  don't believe this to be a qualifier for sexual
4  assault.
5    Q. If you had that, the undisputed facts, if
6  you have those undisputed facts, you wouldn't even
7  think about calling a District Attorney; would you?
8    A. Absolutely we would.
9    Q. You would call in the District Attorney?
10    A. We call the District Attorney all of the
11  time and run situations similar to this by him.
12    Q. So, if somebody came in and said: I've
13  been horsing around the office kissing me, hugging
14  me, reaching down my dress, etcetera, etcetera and I
15  sort of like it. And then one day he just reached
16  down my dress, and I didn't want that.
17      And you said: Well, did he know before he
18  did it, and you said, No, but he did. He had no
19  idea. That would be to the District Attorney?
20    A. Absolutely.
21    Q. Okay. While you were interviewing her,
22  there was never even a hint that she was threatened
23  with job loss or her occupation being compromised if
24  she didn't deliver so-called sexual favors; correct?

Page 92

1    A. No. She said she was afraid if she had
2  come forward that she would lose her job, but she
3  never said somebody told her that.
4    Q. Okay. There was no indication that Maurice
5  ever did anything or said anything to come across
6  that you're out of here?
7    A. Not that I'm aware of.
8    Q. As a matter of fact based on everything
9  that you've looked at in further investigation of the
10  interaction was just kindness, paying her medication
11  and doing her tax returns and etcetera. They're just
12  kind acts; correct?
13    A. I don't know if they were kind acts. You
14  would have to ask him if that's what he was doing.
15    Q. Did she tell you she didn't appreciate it,
16  having her meds paid for?
17    A. No. But I look at it as a well calculated
18  act to actions based on the whole totality of the
19  situation.
20    Q. So, that would've been in your mind too
21  when you made final judgements in the case that that
22  would be, would have been calculating?
23    A. Yes.
24    Q. Let me see if I've got this without

Page 93

1  spending a lot of time on it. When he started this
2  all and asked you a question about the complaint, a
3  verified complaint?
4    A. Um-hmm.
5    Q. And you've answered questions about your
6  interviews with Lariviere and the videotape. When I
7  asked you about the assertions in the complaint, can
8  I now direct your attention specifically to
9  Lariviere's assertions about his interactions with
10  Fulya Metan. Not with you. And ask you if there's
11  anything that you found untrue?
12    A. If you have a specific one, I will look at
13  it. But I don't remember them off the top of my
14  head.
15    Q. Okay.
16
17      MR. DiADAMO: Off the record.
18
19      (Off the record.)
20
21      MR. DiADAMO: Back on the record. So we
22  don't have to do it. Chief, I'm putting the amended
23  complaint in front of you.
24      It was provided kindly by your counselor,

**JOSEPH SOLOMON**
**October 31, 2006**

25 (Pages 94 to 97)

Page 94

1   and I ask you to review page two beginning with
2   background to the middle of page fourteen bearing the
3   date February 15th, '05 which is up to paragraph
4   eighty; and I'll be asking you questions about that
5   after the break.
6       THE WITNESS:  Okay.
7       MR. DiADAMO:  Eight to eighty; okay.
8
9       (Off the record.)
10
11      MR. DiADAMO:  Back on the record.
12
13      Q.  Prior to the break, Chief Solomon, I asked
14  you to review paragraphs eight through eighty of the
15  verified complaints and that eliminates the
16  assertions that relate to February 14th and the 15th
17  and thereafter.  And now that you have now reviewed
18  them; correct?
19      A.  Yes.
20      Q.  Okay.  Now, in your review of them, did you
21  see any assertion that you have evidence or that is
22  incorrect?
23      A.  I have to look at them.  Incorrect or that
24  I have no knowledge of?  Because a lot of them I have

Page 95

1   no knowledge of.  It's true.
2       Q.  I'm not asking you is it's the truth of
3   false of any of them.  All I am asking if you are
4   seeing something that is untrue; and if you are not,
5   your view even for the truth of anything.  Do you
6   understand that?
7       A.  I think so.
8       Q.  Alright.  So, your lawyers can advise you
9   if they want you, but I'm not asking you to vouch for
10  the truth of any of them.  I'm asking you if you have
11  personal knowledge that any of them are false?
12      A.  Number eleven, the last sentence is not
13  true, and I have actual knowledge of.
14      Q.  Okay.  For the record, the witness has
15  testified to the sentence that is, and look at it too
16  quote Lariviere, a then wrote "report concluding that
17  the Mayor's opponent was not properly ticketed, and
18  that, in fact, the accident was the fault of the
19  other driver.  Are you saying that is untrue, true?
20      A.  Partially untrue, yes.
21      Q.  What part is untrue?
22      A.  He did not say in the, in the report that
23  the opponent was not properly ticketed.  What he said
24  was:  The other driver should have received a ticket

Page 96

1   also so they both were ticketed.
2       Q.  Okay.  Go on.  And number, it's towards the
3   middle.
4       A.  Do you want me to read it?
5       Q.  Where are you starting?  The next night?
6       A.  Yes.
7       Q.  You can read it.  First of all, are you
8   saying it's untrue?
9       A.  Yes.
10      Q.  Okay.  It's false?
11      A.  It's false.
12      Q.  Okay.  Please, read.
13      A.  This is untrue:  "The next day Lariviere
14  went to the police station and advised that the
15  ticketing was illegal."  Solomon relayed this to the
16  Mayor, and according to Solomon was outraged that
17  Lariviere had interfered with the ticket issuance.
18  The tickets were later withdrawn.
19      Q.  That's all untrue?
20      A.  Except for the tickets were later
21  withdrawn.
22      Q.  Okay.  Go on.
23
24      (Witness complies.)

Page 97

1       A.  And number sixteen, second sentence:  I say
2   this is untrue.  This was well known to Solomon,
3   Alaimo, who also had known that the Mayor wanted the
4   solicitor's position vacated because she had
5   sufficient votes in the Town Counselor to select her
6   own date.
7       Q.  Are you saying that's false or you don't
8   know?
9       A.  I'm saying that's false as it relates to
10  me.
11      Q.  Okay.  The part -- without putting words in
12  your mouth.  The part that says:  This was well known
13  to Solomon is false?
14      A.  Correct.
15      Q.  Okay.  And Alaimo, too?
16      A.  I can't answer for him.
17      Q.  Just for you for now.
18      A.  I would prefer to answer that.
19      Q.  Okay.  It's well known to Solomon, okay.
20      A.  And number twenty-four:  I would, I'm
21  saying this is untrue because this is not what was
22  told to me.  Fulya Metan it states in January, the
23  two joined Golds Gym in Methuen and thereafter they
24  went to the gym and out to lunch up to and including

**JOSEPH SOLOMON**
**October 31, 2006**

26 (Pages 98 to 101)

Page 98

1    February 15th, 2005.
2        Q.  You say that was not told to you by Fulya
3    Metan?
4        A.  That's not what Fulya Metan told me.
5        Q.  What did she tell you?
6        A.  That she joined the gym and then shortly
7    after, thereafter, Maurice joined the gym and then
8    would appear there while she was working out.
9            Number forty-nine.  At no time, however,
10   did she ever tell the counsel staff about Lariviere
11   causing any illness or distress nor did she reference
12   Lariviere as approaching her, approaching her
13   sexually or in an unwanted manner.  I'm saying that
14   that's untrue.
15       Q.  And what is the truth?
16       A.  She had said that she had spoken to Linda
17   Gagnon, who was the City Counselor Clerk, and told
18   her that this, what was going on.  And Linda Gagnon
19   in an interview, and I believe there's a statement
20   somewhere from her said that, something similar to
21   that where Maurice was touching her in an inappropriate
22   way that happened twenty years ago.
23           Number fifty-one the last sentence:  Metan
24   never reported to that person that Lariviere had done

Page 99

1    anything inappropriate.
2            It is to the best of my recollection that
3    Metan had said she had told this woman, whose name is
4    Connie I can't think of her last name, about what was
5    going on.
6            I also believed there's a statement from
7    Connie, and I don't believe Connie -- I can't
8    remember if Connie confirmed that or not.
9
10           THE WITNESS:  Could we have a minute?
11   Could I have a minute with just my lawyers?
12           MR. DiADAMO:  Sure.  Go ahead off.
13
14           (Off the record.)
15
16           MR. DiADAMO:  Back on.
17
18       A.  Number seventy-two.  I would say this is
19   untrue.  I'm saying this is untrue:  At the request
20   of Metan, Lariviere in late-January joined the gym
21   when they had a special rate of joining.  After this,
22   Lariviere and Metan went together to the gym during
23   lunch.
24           And number eighty.  I'm saying that this

Page 100

1    part is untrue:  But mutual affectionate, which is on
2    much of the. . . . . by Metan, light hugs and kisses
3    were commonplace and Fulya benefited.
4            Fulya has informed me that nothing was
5    initiated by her and it was all unwanted.  I think
6    that was where I'm supposed to end.
7        Q.  You were supposed to end on eighty.
8        A.  Correct.
9        Q.  And so that we're perfectly clear, I want
10   the record to show that you have not been asked to
11   attest to the truth of any allegation?
12       A.  Okay.
13       Q.  You're comments of whether or not you had
14   evidence of the contrary?  Okay?
15       A.  Yes, sir.
16       Q.  Now respect to that verified complaint, I
17   did not ask you about February 14 or 15th.  I want to
18   just ask you in general terms now that you
19   categorically did not ask for Mr. Maurice Lariviere
20   resignation?
21       A.  Absolutely not.
22       Q.  And your Deputy Alaimo did not ask for his
23   resignation?
24       A.  Absolutely not.

Page 101

1        Q.  And you know that had you, had you asked
2    for a resignation, that would be inappropriate?
3        A.  Correct.
4        Q.  Would have been unconstitutional?
5
6            MR. NOTIS:  Objection.
7
8        A.  I don't know if it was unconstitutional.  I
9    just know it was not my place.
10       Q.  It was not your place.  Certainly not the
11   place of the two chief law enforcement officers for
12   the police; no one at the Town of Methuen?
13       A.  Correct.
14       Q.  Okay.  Now, when did you talk to any of
15   Maurice Lariviere's employers?  The people who
16   actually employed him?
17       A.  It would probably be on the 16th.  Because
18   you're saying 14th and 15th was -- actually the 15th
19   was the incident, so I believe it was the 16th.
20       Q.  Okay.  And who did you speak with?
21       A.  Counselor Chairman Michael Henneson.
22       Q.  And what did you say and what did he say?
23       A.  I don't remember all the specifics.  I told
24   him that there had been allegations of a sexual

**JOSEPH SOLOMON**
**October 31, 2006**

27 (Pages 102 to 105)

| Page 102 | Page 104 |
|---|---|

Page 102

1  assault nature made, that we had conducted an
2  investigation, but that I didn't believe I should be
3  releasing the specifics of it.
4      And that if he needed those, he can get
5  them from the District Attorney's office and that
6  Maurice had tendered a resignation to the city.
7      Q.  And that made it unnecessary for you to
8  talk to the employer; correct?
9      A.  No.  It was because of the sexual nature of
10  it.  I wouldn't tell the employer the details of what
11  occurred.
12      Q.  Well, had he not resigned, his rights under
13  the charter to a hearing would have had to speak to
14  his employer?
15      A.  I don't know how that works.  That would be
16  up to the District Attorney to decide what's said and
17  what isn't said.
18      Q.  We've already -- we're not going to go over
19  the same territory about what his rights were from
20  the Town.  You already testified to that.
21      What I do want to know is that at some
22  point you showed the videotape to some other people;
23  correct?
24      A.  Yes.

Page 104

1      Q.  So, to your recollection, in February and
2  March of that year, Mansey did not see the tape?
3      A.  Not to my recollection, no.  I would have
4  to go look at the log of everybody that saw the tape.
5      Q.  And you did not discuss the contents of the
6  tape with him?
7      A.  No, I did not.
8      Q.  Are you telling me you don't recall it or
9  you didn't do it?
10      A.  I'm saying I don't recall having any
11  conversation with Counselor Mansey or any elected
12  officials about specifics of the tape.
13      Q.  Let me ask that question again.
14      A.  To my belief, it didn't happen.
15      Q.  Okay.  Because if it didn't happened or you
16  didn't recall it; so, it wouldn't have happened with
17  any other elected official other then Counselor to
18  Mayor Mansey?
19      A.  Correct.  Correct.
20      Q.  Okay.  Did you have any direct discussions
21  with Counselor Mansey?
22      A.  No.
23      Q.  You never spoke to him then?
24      A.  I've spoken to him hundreds of times.

Page 103

1      Q.  To whom did you show it?
2      A.  To the District Attorney's representative
3  which was Kathy Tutman.
4      Q.  Yes?
5      A.  We have signed things by the people that
6  saw it.  You saw it, I believe.  I wasn't there.
7  Billy DiAdamo.
8      Q.  Let me make it more specific so that you
9  don't have to stretch your memory.
10      A.  I'm just trying to remember who saw it.
11      Q.  Other than counselor and first of all let's
12  start with elected officials in the Town of Methuen,
13  of the February incident, who saw it?
14      A.  As elected officials?
15      Q.  Yes.
16      A.  My understanding that nobody saw that and
17  the elected official, I would have to go back and
18  look at the sign-in logs at everybody that viewed it.
19      As of right now, my recollection is that no
20  elected officials have seen that videotape.
21      Q.  Let's me see if I can refresh your memory.
22  How about councilman now Mayor William Mansey?
23      A.  No, not to my recollection did the
24  councilman saw that videotape.

Page 105

1      Q.  Well, specifically on this issue, and I'm
2  dealing with February, March, let's say April, too.
3      A.  I don't remember any specific conversations
4  that I had with Counselor Mansey as to any specifics
5  of this case overall.
6      Q.  Or his resignation?
7      A.  I had nothing to do with his resignation.
8      Q.  Or the criminal complaint?
9      A.  No.
10      Q.  Or the contents of what was on the
11  videotape?
12      A.  Not to my recollection.
13      Q.  Or the contents of what was on the
14  audiotapes?
15      A.  No, not to my recollection.
16      Q.  Okay.  The Town of Methuen has an evidence
17  room; correct?
18      A.  Yes.  We have several different locations,
19  but we have an evidence place.
20      Q.  Is there a general custodian of the
21  evidence room?
22      A.  Yes.
23      Q.  Somebody whose responsible for it?
24      A.  Yes.

**JOSEPH SOLOMON**
**October 31, 2006**

|  |  |
|---|---|
| **Page 106** | **Page 108** |

**Page 106**

1  Q.  Okay.  Did the audiotapes ever get into the
2  evidence room?
3     A.  No.
4     Q.  What happened to them?
5     A.  They were locked into a safe.
6     Q.  And they weren't evidence of anything?
7     A.  They were evidence, absolutely.
8     Q.  But they're not in the evidence room?
9     A.  Correct.
10    Q.  The videotape, did that ever get into an
11 evidence room?
12    A.  Into the actual evidence room, no.
13    Q.  Okay.  But the harddrive from Lariviere's
14 computer did get in there?
15    A.  The harddrive from the computer was turned
16 over, too.  Was actually seized as a search warrant
17 by our computer forensics people who have their own
18 separate handle of evidence.
19       As to when they finished that did it go to
20 evidence, I don't know.
21    Q.  Do you recall taking it out of the evidence
22 room?  You?
23    A.  Me, the harddrive?
24    Q.  Yes.

**Page 107**

1     A.  No.
2     Q.  You don't recall you and Alaimo taking out
3  the harddrive out of the evidence room?
4     A.  No.
5     Q.  Alright.  Did you ever see a letter from
6  Peter McQuillan demanding a computer be returned by
7  Maurice Lariviere?
8     A.  I don't remember seeing a letter demanding
9  it.  I believe there was an e-mail asking for his
10 computer to be returned.
11    Q.  Did you request that that letter be sent?
12    A.  I don't remember.
13    Q.  But you do recall that there was a request
14 for a computer?
15    A.  Yes.  And I had a conversation with Peter
16 about it.
17    Q.  And you do know that after the video was
18 taken, Maurice Lariviere was in the constant custody
19 or at least the presence of the police; correct?
20    A.  I'm sorry.  The video and Maurice in the
21 presence of us, correct.
22    Q.  The entire time after?
23    A.  Until he left City Hall.
24    Q.  He was escorted out of City Hall?

**Page 108**

1     A.  Yes.
2     Q.  And to your knowledge, never to return?
3     A.  I don't know if he ever returned.
4     Q.  Not withstanding that you're aware of the
5  demand that he returned a computer that's the
6  property of the Town of Methuen?
7     A.  I'm sorry.  That who?
8     Q.  I'm sorry.  You recall that there has been
9  a demand made on him to return a computer?
10    A.  I thought you -- I thought you asked me
11 too.  Peter McQuillan ask us to give Peter a
12 computer.  I'm sorry.  I misunderstood your
13 question.
14       Peter McQuillan I believe he had an e-mail
15 conversation that he wanted us to give him back
16 Maurice's hard stationary computer.
17    Q.  And did you give it to him?
18    A.  To my knowledge, it was never returned; and
19 the D.A. still has it keeping it secured at the
20 police department.  I don't believe that was ever
21 returned.
22    Q.  Did you recall a letter going directly to
23 Lariviere demanding that he return it?
24    A.  There's two different kinds.  It's

**Page 109**

1  confusing, but it's two separate computers.
2     Q.  Well, let's deal with the two separate
3  ones.
4     A.  Okay.
5     Q.  Peter McQuillan was demanding a computer be
6  returned?
7     A.  From whom?
8     Q.  From Maurice Lariviere?
9     A.  I never seen it.  I understand from Peter
10 that he was demanding Maurice Lariviere return a
11 laptop computer that was City property.  That, I have
12 never seen or no knowledge of it other than Peter
13 telling me about it.
14    Q.  Okay.  But you do know that when he left,
15 he left empty handed?
16    A.  He left with some small personal
17 belongings.
18    Q.  Okay.  But not a computer?
19    A.  He didn't leave there with a computer in my
20 presence, no.
21    Q.  You're aware that Fulya Metan was
22 processing a worker's compensation claim; correct?
23    A.  That she had one, yes.
24    Q.  She was processing.  Did anybody discuss

**JOSEPH SOLOMON**
**October 31, 2006**

| Page 110 |
|---|
| 1   with you being a witness in this case? |
| 2        A.  Not me being a witness, no. |
| 3        Q.  Did anybody discuss with you any facts that |
| 4   related to the case?  Again, just yes or no. |
| 5        A.  No. |
| 6        Q.  And I'm not interested in what any lawyer |
| 7   told you. |
| 8        A.  That's who I'm talking about, no. |
| 9        Q.  Did a lawyer speak with you? |
| 10       A.  Yes. |
| 11       Q.  About the case? |
| 12       A.  Yes. |
| 13       Q.  Who? |
| 14       A.  Attorney Ted Fayburn (phonetic). |
| 15       Q.  Okay.  He represented the Town of Methuen? |
| 16       A.  Yes. |
| 17       Q.  Okay.  And engaged by? |
| 18       A.  Peter McQuillan. |
| 19       Q.  And? |
| 20       A.  To my understanding, engaged by Peter |
| 21   McQuillan. |
| 22       Q.  Well, prior to this thing? |
| 23       A.  He was my personal attorney years ago. |
| 24       Q.  So, your personal attorney was the one who |

| Page 112 |
|---|
| 1   from Malden Mills, he's a security guard.  I've known |
| 2   him for twenty years. |
| 3        Q.  You've known Fosset for twenty years? |
| 4        A.  Yes.  He was a con and he was ECE. |
| 5        Q.  Do you know he was engaged by the Town to |
| 6   do security checks on Fulya Metan? |
| 7        A.  No, I did not know that. |
| 8        Q.  Did you know that he was engaged by Murray |
| 9   Miller a month before by the Town? |
| 10       A.  No, I did not no that. |
| 11 |
| 12       MR. DiADAMO:  I have nothing further. |
| 13       MR. GAMBACCINI:  I have no questions. |
| 14       MR. NOTIS:  No questions. |
| 15       MR. DiADAMO:  Okay. |
| 16 |
| 17       (Deposition concluded at 12:30 p.m.) |
| 18 |
| 19 |
| 20 |
| 21 |
| 22 |
| 23 |
| 24 |

| Page 111 |
|---|
| 1   was defending the Fulya Metan worker's compensation |
| 2   case? |
| 3        A.  Yes. |
| 4        Q.  Now, have you seen any investigative |
| 5   reports? |
| 6        A.  You've been my personal attorney, too. |
| 7        Q.  I have been? |
| 8 |
| 9        MR. DiADAMO:  Off the record. |
| 10 |
| 11       (Off the record.) |
| 12 |
| 13       Q.  Are you aware of any investigative reports, |
| 14   activity checks on Fulya Metan? |
| 15       A.  I don't know what you mean. |
| 16       Q.  Are you aware of any generated reports by |
| 17   private investigators with respect to Fulya Metan? |
| 18       A.  I was told that there's one that exists. |
| 19       Q.  Had you spoken to the investigators? |
| 20       A.  No. |
| 21       Q.  Do you know Robert Fosset? |
| 22       A.  Oh, yes. |
| 23       Q.  And his son? |
| 24       A.  I don't know his son.  If it's Bob Fosset |

| Page 113 |
|---|
| 1        I, ANNMARIE PEREIRA, a Notary Public in and |
| 2   for the Commonwealth of Massachusetts, do hereby |
| 3   certify that JOSEPH SOLOMON appeared before me and |
| 4   satisfactorily identified themself, on the 31st day |
| 5   of October, 2006 at Lawrence, Massachusetts, and was |
| 6   by me duly sworn to testify to the truth and nothing |
| 7   but the truth as to his knowledge touching and |
| 8   concerning the matters in controversy in this cause; |
| 9   that he was thereupon examined upon his oath and said |
| 10   examination reduced to writing by me; and that the |
| 11   statement is a true record of the testimony given by |
| 12   the witness, to the best of my knowledge and ability. |
| 13       I further certify that I am not a relative |
| 14   or employee of counsel/attorney for any of the |
| 15   parties, nor a relative or employee of such parties, |
| 16   nor am I financially interested in the outcome of the |
| 17   action. |
| 18       WITNESS MY HAND this _____ day of |
| 19   _____, 2006. |
| 20 |
| 21   Annmarie Pereira   My Commission expires: |
| 22   Notary Public      August 7, 2009 |
| 23 |
| 24 |

**JOSEPH SOLOMON**
**October 31, 2006**

30 (Pages 114 to 116)

Page 114

```
 1   Today's date:  November 13, 2006
 2   To:        Carmen DiAdamo, Esquire
 3   Copied to:  Andrew Gambaccini, Esquire
 4            Gareth Notis, Esquire
 5   From:      Annmarie Pereira
 6   Deposition of:  JOSEPH SOLOMON
 7   Taken:     October 31, 2006
 8   Action:    U.S. DIST. CT., DIST. OF MA.
 9            C.A. NO.: 05-11579EFH
10         Enclosed is a copy of the deposition of
11   JOSEPH SOLOMON.  Pursuant to the Rules of Civil
12   Procedure, MR. SOLOMON has thirty days to sign the
13   deposition from today's date.
14         Please have him sign the enclosed signature
15   page.  If there are any errors, please have him mark
16   the page, line and error on the enclosed correction
17   sheet.  He should not mark the transcript itself.
18   This addendum should be forwarded to all interested
19   parties.
20         Thank you for your cooperation in this
21   matter.
22
23
24
```

Page 116

```
 1          CORRECTION SHEET
 2   DEPONENT:     JOSEPH SOLOMON
 3   CASE:      U.S. DIST. CT. DIST. OF MA.
 4          C.A. NO.: 05-11579EFH
 5   DATE TAKEN:   October 31, 2006
 6   *****************************************
 7   PAGE / LINE / CHANGE OR CORRECTION AND REASON
 8   *****************************************
 9   _____/_____/_____
10   _____/_____/_____
11   _____/_____/_____
12   _____/_____/_____
13   _____/_____/_____
14   _____/_____/_____
15   _____/_____/_____
16   _____/_____/_____
17   _____/_____/_____
18   _____/_____/_____
19   _____/_____/_____
20   _____/_____/_____
21   _____/_____/_____
22   _____/_____/_____
23   _____/_____/_____
24   _____/_____/_____
```

Page 115

```
 1          UNITED STATES DISTRICT COURT
 2           DISTRICT OF MASSACHUSETTS
 3             C.A. NO.: 05-11579EFH
 4   *****************************************
 5   MAURICE LARIVIERE,
 6           PLAINTIFF
 7   VS.
 8   JOSEPH SOLOMON, individually and
 9   as Chief of Police for the City of
10   Methuen, JOSEPH ALAIMO, individually
11   and as Deputy Chief of Police
12   for the City of Methuen and
13   THE CITY OF METHUEN,
14           DEFENDANTS
15   *****************************************
16       I, JOSEPH SOLOMON, do hereby certify, under
17   the pains and penalties of perjury, that the
18   foregoing testimony is true and accurate, to the best
19   of my knowledge and belief.
20       WITNESS MY HAND, this _____ day of
21   _____, 2006.
22        _____
23           JOSEPH SOLOMON
24   AP
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-11579EFH

* * * * * * * * * * * * * * * * * * * * *

MAURICE LARIVIERE,                          *

            Plaintiff                       *

vs.                                         *

JOSEPH SOLOMON, Individually and as         *

Chief of Police for the City of Methuen,    *

JOSEPH ALAIMO, Individually and as          *

Deputy Chief of Police for the City of      *

Methuen and THE CITY OF METHUEN,            *

            Defendants                      *

* * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:   JOSEPH ALAIMO

DiAdamo Law Offices

40 Appleton Way

Lawrence, Massachusetts

November 7, 2006    11:20 a.m.

Linda Anne Rebello

Registered Professional Reporter

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 2

1  APPEARANCES:
2
3  Representing the Plaintiff:
4     DiAdamo Law Offices
5     40 Appleton Way
6     Lawrence, Massachusetts   01840
7     (978) 685-4371
8     BY:  CARMINE W. DIADAMO,ESQ.
9
10  Representing the Defendants:
11     Morrison & Mahoney
12     250 Summer Street
13     Boston, Massachusetts   02210
14     (617) 737-8857
15     BY:  GARETH W. NOTIS, ESQ.
16
17  Representing Joseph Solomon, Joseph Alaimo,
18        and Michael Wnek
19     Reardon, Joyce & Akerson
20     397 Grove Street
21     Worcester, Massachusetts   01605
22     (508) 754-7220
23     BY:  ANDREW J. GAMBACCINI
24

Page 3

1              I N D E X
2
3  WITNESS:      JOSEPH ALAIMO
4
5  EXAMINATION BY:           PAGE
6  Mr. DiAdamo              4
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1              STIPULATIONS
2       It is hereby stipulated by and
3  between counsel for the respective parties that
4  the reading and signing of the deposition may be
5  under the pains and penalties of perjury.
6          It is further stipulated that all
7  objections, except as to the form of the
8  question, and all motions to strike are
9  reserved until the time of trial.
10             - - - -
11       JOSEPH ALAIMO, Deponent, having first
12  been duly sworn, deposes and states as follows:
13
14     EXAMINATION BY MR. DIADAMO:
15
16     Q.    Tell us your name, please.
17     A.    Joseph Alaimo.
18     Q.    And what is your occupation?
19     A.    Deputy Chief of Police, Methuen,
20  Massachusetts Police Department.
21         MR. DIADAMO: And with respect to
22  residential address why don't you say
23  something on the record.
24         MR. GAMBACCINI: In lieu of you

Page 5

1  asking questions regarding the deputy
2  chief's residential address I will accept
3  service on his behalf.
4     Q.    You heard that?
5     A.    Yes.
6     Q.    How long have you been deputy
7  chief?
8     A.    Four years.
9     Q.    Michael Wnek told us you were
10  appointed shortly after Chief Solomon.
11         What was the time difference?
12     A.    I think the chief was appointed in
13  September and I was appointed in November.
14  Actually I think it was December.
15     Q.    Was there a reason why your sworn
16  position was not under civil service?
17     A.    I'm not sure I understand the
18  question.
19     Q.    You are aware of the fact you have
20  the only sworn position in the town not under
21  civil service?
22     A.    Yes, I am aware of that.
23     Q.    How did that occur?
24     A.    What do you mean?  The legalities

**JOSEPH ALAIMO**
**November 7, 2006**

Page 6

1   of it?
2       Q.    Just tell us the reason why this
3   position is unique in that sense.
4       A.    You would have to ask the people
5   who appointed me.
6       Q.    Sharon Pollard?
7       A.    Sharon Pollard was the appointing
8   authority at the time, right.
9       Q.    So you have no idea how it
10  happened just that they did it?
11      A.    I know how it happened.
12      Q.    How did it happen?
13      A.    I cannot tell you the legalities
14  of it.
15      Q.    How did it happen?
16      A.    Sharon Pollard went to the city
17  council.  They appointed me deputy chief of
18  police.
19      Q.    At that time where was your wife
20  employed?
21      A.    For the City of Methuen.
22      Q.    In what capacity?
23      A.    She was the secretary for the
24  mayor.

Page 7

1       Q.    Now, in Methuen you know there is
2   a chief of police and a deputy chief.
3             Is there just one deputy chief in
4   the Town of Methuen?
5       A.    Yes.
6       Q.    Now, I want to direct your
7   attention to what we are here talking about
8   today so we can get through this.  We are
9   talking about February of 2004 and the so called
10  Metin investigation.
11            When did you first become aware
12  that there was a possible complaint against
13  Maurice Lariviere?
14      A.    On Tuesday, February 15, 2005.
15      Q.    How did you become aware of it?
16      A.    I got a call from the chief.
17      Q.    And he called you from where?
18      A.    I have no idea.
19      Q.    As a result of the call what did
20  you do?
21      A.    I responded to the police
22  department.
23      Q.    When you got to the police
24  department whose office did you go to?

Page 8

1       A.    The chief's.
2       Q.    Who was the in the chief's office
3   at that time?
4       A.    Chief Solomon.
5       Q.    Just Chief Solomon?
6       A.    At that time, yes.
7       Q.    Did you have a discussion with
8   him?
9       A.    Yes.
10      Q.    What was that discussion?
11      A.    I don't recall exactly what the
12  discussion was.
13      Q.    The substance, what was the
14  discussion?
15      A.    He told me that a complaint had
16  been made by the solicitor's -- I believe she
17  was the secretary at the time.  I don't know
18  exactly what her title was.  And that was the
19  substance of the conversation.
20      Q.    Now, at that time all of the
21  members of the police department knew what the
22  relationship was between Sharon Pollard and
23  Maurice Lariviere, is that correct?
24      A.    I don't know exactly what you mean

Page 9

1   by that.
2       Q.    You knew Sharon Pollard did not
3   like Maurice Lariviere?
4       A.    No.  I couldn't get in Sharon
5   Polard's mind. I don't know if she liked him or
6   didn't like him.
7       Q.    You were told that by your wife,
8   weren't you?
9       A.    No.
10            MR. NOTIS: Hold on.  It's
11  privileged.
12            MR. DIADAMO: Strike that.  I
13  should not have asked that at all.  And
14  excuse me it's not privilege.  It's
15  disqualification.
16            MR. NOTIS: Whatever.  Same thing.
17            MR. DIADAMO: No.  Not at all.  You
18  can waive privilege you cannot waive
19  disqualification.
20      Q.    So you had no awareness that there
21  was some tension between Sharon Pollard and
22  Maurice Lariviere at the time?
23      A.    Could you ask the question again.
24      Q.    You had no awareness there was

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 10

1  tension between Maurice Lariviere and Sharon
2  Pollard in February of 2004?
3     A.   No.
4     Q.   None at all?
5         MR. NOTIS: '04 or '05 you are
6  asking about?
7         MR. DIADAMO: I am saying '04,
8  aren't I?
9         MR. NOTIS: I think it's '05.
10       MR. DIADAMO: It's 2005. We all
11  know what we are talking about. Let the
12  record show we are talking 2005.
13     Q.   You went to the chief's office.
14  Did anybody join you in the chief's office?
15     A.   No. When I went to the chief's
16  office no, nobody joined me.
17     Q.   You became aware there was going
18  to be a complaint against Maurice?
19     A.   Yes, I became aware of that.
20     Q.   Are you aware of what he told you?
21     A.   Who?
22     Q.   The chief.
23     A.   Yeah.
24     Q.   What did he say?

Page 11

1     A.   He told me that Lieutenant Wnek
2  spoke with this young woman who was Maurice's
3  secretary. I never met her. I was not sure of
4  her name to be honest with you at the time. And
5  that she had made a complaint against him. He
6  didn't specifically tell me what the complaint
7  was at that time. Just said there was a
8  complaint at that time and the complaint was
9  sexual in nature.
10     Q.   Did somebody else join the both of
11  you in the chief's office?
12     A.   At that time?
13     Q.   After that time.
14     A.   You mean that night?
15     Q.   Yes.
16     A.   Yes.
17     Q.   Who?
18     A.   Lieutenant Wnek and Fulya Metin.
19     Q.   Would you describe the
20  conversation among that group as they arrived.
21     A.   I don't recall all the
22  conversation that went on by that group.
23     Q.   In substance what did you discuss?
24     A.   The substance, to be honest with

Page 12

1  you, I just sort of listened what was going on.
2  The substance went on between the chief, and
3  Lieutenant Wnek, and Fulya Metin. I didn't
4  participate in the conversation that much.
5     Q.   You participated in the extent you
6  were listening to the conversation, correct?
7     A.   Right.
8     Q.   I am asking you in substance what
9  were they discussing.
10     A.   In substance they were -- I don't
11  recall what they were discussing at this moment
12  in time.
13     Q.   After they had the discussion was
14  there a plan of action agreed to the next day?
15     A.   Yes.
16     Q.   What was that?
17     A.   To put a camera into Fulya Metin's
18  office in city hall.
19     Q.   Who was going to do that?
20     A.   I don't recall exactly who was
21  going to do it at that point. I don't recall.
22     Q.   Do you recall the chief calling
23  the mayor to get access to the hall that evening
24  or to the town hall that evening?

Page 13

1     A.   I don't recall him calling the
2  mayor, no.
3     Q.   How were you going to get access
4  to the town hall before the town hall opened?
5     A.   What do you mean? I am not
6  exactly sure what you are asking.
7     Q.   You agreed to put a video camera
8  in the town hall, correct?
9     A.   Right.
10     Q.   It was going to happen before the
11  work day started the following day, correct?
12     A.   Right.
13     Q.   Somebody needed to gain access to
14  the town hall to place the video camera,
15  correct?
16     A.   That is correct.
17     Q.   Who was called to open the town
18  hall to allow somebody to go in and place a
19  video in there?
20     A.   As I told you before as I sit here
21  today I don't recall who was called. I didn't
22  call anybody.
23     Q.   You don't recall anybody else
24  calling anybody?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA  Worcester, MA  Boston, MA  Lawrence, MA  Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

5 (Pages 14 to 17)

Page 14

1    A.    I don't recall this conversation.
2    Q.    Who was going to do it?
3    A.    Who was going to do what?
4    Q.    Set up the camera and videotape?
5    A.    I don't recall which officer was
6 going to set it up as I sit here today.
7    Q.    The next day when did you become
8 aware the camera was set up in city hall?
9    A.    Sometime during the morning of the
10 next day.
11    Q.    Were you alone or were you with
12 somebody when you found that out?
13    A.    I don't recall exactly when I
14 found that out or who I was with.
15    Q.    We heard that Chief Solomon was in
16 the mayor's office at the time. Where were you?
17        MR. NOTIS: At what time?
18        MR. DIADAMO: As the video was
19    proceeding.
20    A.    I'm not sure I understand the
21 question. You are asking me as the video was
22 proceeding?
23    Q.    The video of what was happening in
24 Maurice's office. The chief is sitting in the

Page 15

1 mayor's office. Where are you?
2    A.    I don't recall that the chief was
3 sitting in the mayor's office. I am not exactly
4 sure where we were to be honest with you. You
5 are talking a couple of years ago, Carmine.
6    Q.    Let's get it clear on the record.
7 While this video was running you have no idea
8 where you were?
9    A.    As I recall right now I don't
10 recall which room we were in. Whether it was
11 the mayor's office or anywhere else.
12    Q.    Were you in the police station?
13    A.    No. We were in city hall.
14    Q.    You were in city hall?
15    A.    Yes.
16    Q.    Were you with the chief?
17    A.    Yes.
18    Q.    So if the chief were in the
19 mayor's office that is where you were.
20    A.    If the chief were in the mayor's
21 office and I was with him it's probable that I
22 would have been there.
23    Q.    But at any point both of you were
24 together during the taping, the entire taping

Page 16

1 session?
2        By both of you I mean you and
3 Chief Solomon.
4    A.    Yes, I recall that is correct.
5    Q.    But you don't have any specific
6 knowledge of whether or not you were sitting
7 directly in the mayor's office or in the waiting
8 room, or do you remember that?
9    A.    I don't have a specific
10 recollection as I sit here today about where I
11 was.
12    Q.    Let me see if I can try to refresh
13 your recollection a little bit.
14        Do you recall during that time
15 where you were in relation to your wife who was
16 working in that office?
17    A.    I don't recall my wife was working
18 in that office. The mayor's office?
19    Q.    Yes.
20    A.    That day?
21    Q.    Yeah.
22    A.    I don't recall that she was
23 working that day.
24    Q.    What was her schedule? Did she

Page 17

1 work every day in the mayor's office?
2    A.    I was on vacation time.
3    Q.    You were on vacation?
4    A.    Correct.
5    Q.    Was she on vacation?
6    A.    I don't recall, to be honest with
7 you.
8    Q.    Okay.
9    A.    I don't recall.
10    Q.    But you don't have any memory --
11 you remember being with the chief?
12    A.    Yes.
13    Q.    You don't have any memory of where
14 you were and you have no memory of whether or
15 not you saw your wife that morning?
16    A.    I am saying I don't recall where I
17 was. Whether I was in the mayor's office or
18 whether my wife was working that day. I was in
19 city hall however.
20    Q.    Now, while this tape was playing
21 what were you doing?
22    A.    I don't recall. What tape was
23 playing?
24    Q.    Pardon me?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 18

1     A.     What tape was playing, Carmine?
2     Q.     You know that there is two
3 Methuen Police Department employees videotaping
4 Maurice Lariviere's suite whether it's Fulya's
5 office or his office?
6     A.     Yes.
7     Q.     You know that. And you are with
8 the chief?
9     A.     Correct.
10     Q.     I am asking you what both of you
11 were doing.
12     A.     I don't recall as I sit here what
13 we were both doing.
14     Q.     At some point you knew that the
15 taping session was over, correct?
16     A.     I wouldn't refer to it as a taping
17 session. That makes it sound like we do it on a
18 regular basis.
19     Q.     Characterize it any way you want.
20     A.     Did I come to the awareness that
21 it was over?
22     Q.     Yes.
23     A.     That it had ended, yes.
24     Q.     How did you know it was ended?

Page 19

1     A.     As I recall Chief Solomon ended
2 it.
3     Q.     He ended it how?
4     A.     He Nexteled one of the officers, I
5 don't know which one, and told them to stop it.
6 That is how it ended.
7     Q.     Do you have a specific memory of
8 both of you talking to David Bain before that
9 happened?
10     A.     I don't have a specific instance
11 of me ever talking to David Bain before.
12     Q.     Now, when the videotaping stopped
13 you and the chief went somewhere, did you not?
14     A.     Yes.
15     Q.     Where did you go?
16     A.     We went to Maurice's office.
17     Q.     And did both of you go in some
18 other place?
19     A.     Yes.
20     Q.     Where did you go?
21     A.     To the meeting hall. I believe it
22 was the second floor.
23     Q.     There is a meeting hall in the
24 town hall on a different floor than Maurice?

Page 20

1     A.     Right.
2     Q.     And in that room there was just
3 you, the chief, and Maurice, correct?
4     A.     Yes.
5     Q.     And there were two tape recorders
6 there, correct?
7     A.     Correct.
8     Q.     Whose tape recorders were they?
9     A.     I didn't put them there. I don't
10 recall. I am not sure whose tape recorders they
11 were.
12     Q.     Both of you are the highest
13 ranking law enforcement officials in the Town of
14 Methuen, is that correct?
15     A.     That is right.
16     Q.     Did either, what is called taping
17 machines, did either one of them belong to
18 either of you?
19     A.     They didn't belong to me.
20     Q.     You don't know whether or not they
21 belong to the chief?
22     A.     As I stated before I don't know
23 who they belong to.
24     Q.     You do know that somebody turned

Page 21

1 both of them on at the beginning, correct?
2     A.     Yes, I do.
3     Q.     Who turned them on?
4     A.     Chief Solomon.
5     Q.     As the two chief law enforcement
6 officials in the city did either of you check to
7 see whether or not they were actually working?
8     A.     I can't speak for Chief Solomon
9 but I did not check.
10     Q.     You were just sitting there. Did
11 you see somebody say at least something like
12 testing 1, 2, 3 and play it back to see if they
13 were getting something?
14     A.     Did I see that? No.
15     Q.     So is it your memory they were
16 just turned on and that was it?
17     A.     I don't have a distinct
18 recollection of how they got turned on. I don't
19 have that recollection as I am sitting here
20 today.
21     Q.     You don't have a recollection of
22 when they were tunrned off?
23     A.     I didn't say off. I said on.
24     Q.     If you don't have a recollection

**JOSEPH ALAIMO**
**November 7, 2006**

---

Page 22

1  of when they were turned on I take it you don't
2  have a recollection of when they were turned off
3  either, correct?
4      A.    Incorrect.
5      Q.    You don't know when they were
6  turned on but you do know when they were turned
7  off?
8      A.    Correct.
9      Q.    When were one or both of them
10 turned off?
11     A.    To my knowledge they were turned
12 off when I got up to go look at a tape and then
13 they were turned off again when Maurice
14 Lariviere requested they be turned off.
15     Q.    How long had you spoken to him
16 before they were turned off the first time?
17     A.    I don't recall.
18     Q.    Do you recall what you spoke to
19 him about?
20     A.    Ask me a question I will try to
21 answer it.
22     Q.    One of you advised him of his
23 rights, is that correct?
24     A.    Correct.

---

Page 23

1      Q.    Who did that?
2      A.    I did.
3      Q.    After he was advised of his rights
4  then some questions were asked of him, correct?
5      A.    Correct.
6      Q.    Question No. 1 was what?
7      A.    I don't recall what question No. 1
8  was, Carmine.
9      Q.    Do you recall any question asked
10 by you or the chief?
11     A.    Yes.
12     Q.    What?
13     A.    I recall questions being asked
14 verbatim what had happened.
15     Q.    You asked him what had happened. I
16 take it he knew that something happened or that
17 you were aware something happened at the time,
18 correct?
19     A.    I am not.
20     Q.    Did somebody just say Maurice,
21 what happened?
22     A.    Ask that question again.
23     Q.    I am trying to find out the
24 context.

---

Page 24

1      A.    I am too.
2      Q.    You said you asked him what
3  happened.  I am asking you simply what preceded
4  that.
5            Is there some discussion before
6  that question came up?
7      A.    I believe your question was did
8  one of us ask a question, myself or Chief
9  Solomon.  You asked me the question and I recall
10 I asked Maurice what had happened.
11     Q.    I said before do you recall before
12 that what any discussion was?
13     A.    With whom?
14     Q.    With Maurice, or the chief, or
15 anybody else while you were in that room.
16     A.    I don't recall specifically as I
17 am sitting here what we talked about.
18     Q.    So the first thing you remember is
19 the question of what happened?
20     A.    How about if we, if you like we
21 can look at it.  We don't have the tape here.  I
22 don't recall exactly.  You know, you are talking
23 going by memory here.  You are going to have to
24 be more specific with your questions.  I will

---

Page 25

1  try to help you out.
2      Q.    Have you listened to the tape?
3      A.    Yes.
4      Q.    You understood it and it refreshed
5  your memory when you listened?
6      A.    Yes, it did when I listened to it.
7      Q.    You heard it and it refreshed your
8  memory as to the entire conversation from the
9  time it was turned on to the time it was turned
10 off, correct?
11     A.    Yes, it did.
12     Q.    Before we talk about everything
13 that was said tell me what you heard on the
14 tape.
15     A.    I heard a conversation between
16 Maurice Lariviere, myself, and Chief Solomon.
17     Q.    What was said by Maurice?
18     A.    Which time?
19     Q.    You tell me in any order you want.
20     A.    Yes, no, maybe.  I recall that.
21     Q.    What was said by you?
22     A.    I read him his rights. You know, I
23 am not going to sit here and go by my memory.
24 It's too shallow. I don't recall exactly what I

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

8 (Pages 26 to 29)

Page 26

1  said. You know, again, if you ask me a specific
2  question I will try to answer.
3      Q.    You do have a distinct memory that
4  when you listened to the tape it refreshed your
5  memory, right?
6      A.    I listened to the tape to refresh
7  my memory. As of right now my memory isn't that
8  refreshed.
9      Q.    Immediately after you listened to
10 that tape your memory was refreshed at that
11 time?
12     A.    Yes.
13     Q.    You have forgotten it again?
14     A.    I don't recall forgetting it the
15 first time. I just don't recall right now.
16     Q.    I am asking you, I asked you, you
17 told me Maurice said yes, no, maybe.
18     A.    I remember that.
19     Q.    I asked you what you said. You
20 said you don't remember.
21     A.    No, I told you.
22     Q.    You advised him of his rights?
23     A.    Yes.
24     Q.    Tell me what you said.

Page 27

1      A.    Again, for the third or fourth
2  time I don't recall specifically what I said.
3  Ask me the question. I will be glad to answer
4  it.
5      Q.    Do you recall what Chief Solomon
6  said?
7      A.    I recall bits and pieces what
8  Chief Solomon said.
9      Q.    Do you recall Chief Solomon
10 telling Maurice Lariviere that the videotape
11 clearly showed evidence of a crime?
12     A.    I don't recall that specific
13 language.
14     Q.    Do you recall general language to
15 that effect?
16     A.    Yes.
17     Q.    In general terms what was said?
18         By general I mean in substance
19 even though you might not remember the exact
20 statement.
21     A.    The chief had told Maurice, and
22 again I am not exactly sure what was said,
23 generally speaking he told him that Fulya Metin
24 had accused him of illegally touching her and

Page 28

1  that was the substance of what I recall.
2      Q.    Did you ask any questions during
3  this session?
4      A.    As I am sitting here right now I'm
5  not sure I asked questions.
6      Q.    Other than what you told us Chief
7  Solomon said in the last question I asked you do
8  you recall anything else that he said during the
9  time that you were interviewing Maurice
10 Lariviere?
11     A.    That Chief Solomon said?
12     Q.    Yes.
13     A.    Yes, I do.
14     Q.    What did he say?
15     A.    He told him that Fulya Metin had
16 made a complaint against him and went through
17 the police department and we were there
18 investigating it.
19     Q.    What else did he say?
20     A.    You are asking me to be way too
21 vague here. I am not exactly sure. I am not
22 going to give you information out of context.
23 You need to ask me something specific.
24         There is so many things going

Page 29

1  through my mind I don't recall exactly what was
2  the case.
3      Q.    You have been asked what Chief
4  Solomon said to Maurice Lariviere, period.
5      A.    That is right. And I gave you my
6  answer to the best of my recollection right now.
7  And I am trying to help you.
8      Q.    You were asked after that, after
9  what you just told me, did he say anything else
10 to Maurice Lariviere.
11     A.    Right. And I said he had.
12     Q.    And I said what was that.
13     A.    And I said I don't recall exactly
14 what he said as I am sitting here right now. I
15 don't recall it.
16     Q.    The only thing that would refresh
17 your memory as to what was said would be you
18 re-listening to one or both of those tapes?
19     A.    Well, certainly that would.
20     Q.    You know one of the tapes is
21 totally blank, right?
22     A.    I know that one of the tapes we
23 thought was totally blank. I'm not sure if it's
24 totally blank.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 30

1      Q.      That is not the one you listened
2  to, is it?
3      A.      No.
4      Q.      You listened to the other one?
5      A.      Correct.
6      Q.      That you clearly heard when you
7  listened to it from beginning to end?
8      A.      I heard the tape, yes. But I
9  didn't clearly hear it because, you know . . .
10     Q.      Did you hear most of what was
11 going on at the meeting?
12     A.      Yes.
13     Q.      So at some point on that tape you
14 must have heard the word resignation, did you?
15     A.      You know, I don't recall if I
16 heard that as I am sitting here right now on the
17 tape.
18     Q.      One of the points of that meeting
19 was to get Maurice's resignation, correct?
20     A.      Incorrect.
21     Q.      Incorrect?
22     A.      Totally incorrect.
23     Q.      Resignation came as a surprise to
24 you at that time?

Page 31

1      A.      Absolutely. Nothing to do with
2  me. I was there investigating or I was there
3  present during an interview for a criminal
4  offense. Why would I care?
5      Q.      While you were there thinking
6  about a criminal offense did the person you were
7  interviewing just spontaneously resign for no
8  reason?
9      A.      How do I know what his reasons
10 were for resigning.
11     Q.      You don't remember any questions
12 or answers. You remember him just saying I
13 resign. Is that what happened?
14     A.      No, that is not what happened.
15     Q.      What happened?
16     A.      About what?
17     Q.      About a resignation.
18     A.      You have to ask Moe what happened.
19     Q.      We will ask Moe what he said about
20 it. I am asking you what you heard about it at
21 that meeting.
22     Q.      About resignation?
23     Q.      Yes.
24     A.      I don't know where you are going

Page 32

1  with this. I just don't recall exactly what was
2  said about resignation.
3      Q.      Do you recall both you and Chief
4  Solomon leaving the interview room leaving
5  McCarthy in to stay with Maurice while you went
6  to see the mayor?
7      A.      Ask that question again.
8      Q.      Do you recall you and Solomon
9  leaving that interview room and having Captain
10 McCarthy stay with Maurice while you went to see
11 the mayor?
12     A.      Correct, yes, I do recall that.
13     Q.      You remember that?
14     A.      Yes.
15     Q.      You both walked out, you and Chief
16 Solomon, correct?
17     A.      Correct.
18     Q.      And McCarthy was given orders not
19 to let him leave, correct?
20     A.      I didn't talk to McCarthy. I
21 don't recall what was told to him specifically.
22     Q.      As you walked out of the room as
23 the second in command at the entire police
24 department can you tell me that Maurice at that

Page 33

1  point had the right to get up, walk out, and go
2  home?
3      A.      No, he did not have the right to
4  go.
5      Q.      You must have heard something
6  which stopped him from going home.
7              What did you hear?
8      A.      No, that is not why I came to that
9  conclusion.
10     Q.      How did you come to that
11 conclusion?
12     A.      We were conducting a legitimate
13 criminal investigation and he was not allowed to
14 go home until we were done with it. That has
15 nothing to do with what I heard or didn't hear.
16     Q.      That is something that Maurice
17 would have known that whole interview he was not
18 allowed to go home?
19     A.      I can't tell you what Maurice
20 would have known. You have to ask Maurice.
21     Q.      You told me that you were having
22 the criminal investigation and he could not go
23 home.
24     A.      You asked me did I hear somebody

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 34

1  tell him that. I said I don't know. I know I
2  didn't tell him.
3      Q.    Let's leave it at this, Maurice
4  could not go home according to the Methuen
5  police until you decided he could go home?
6      A.    Maurice could not leave the
7  interview room until we were done with our
8  investigation according to the law not the
9  Methuen police.
10      Q.    Okay. Now, let's go to the fact
11  you and Solomon are now walking to the mayor's
12  office. I take it you talked to the mayor,
13  correct?
14      A.    I didn't speak to the mayor, no.
15      Q.    Did you wait outside the mayor's
16  office while Solomon went in?
17      A.    No.
18      Q.    Did you go into the mayor's office
19  with Solomon?
20      A.    Yes.
21      Q.    What did they talk about?
22      A.    I don't recall.
23      Q.    Okay. You don't even recall the
24  substance?

Page 35

1      A.    In substance what I recall is that
2  the chief went in to speak with the mayor
3  relative to what Maurice Lariviere had
4  requested.
5      Q.    What was the request, first of
6  all, that he went in with?
7      A.    Who? The chief?
8      Q.    You said to talk to the mayor
9  about a request by Maurice. I am asking you what
10  the request was.
11      A.    The request by Maurice. You know,
12  I can't really answer that because I don't
13  recall exactly what was said and you are asking
14  me a question.
15      Q.    Tell me in substance what was
16  said.
17      A.    To the best of my recollection the
18  substance was that Lariviere had related to the
19  chief at some point, whether it's on the tape or
20  not I don't recall, that he was interested in
21  leaving his position with the City of Methuen.
22      Q.    What did he want for that?
23      A.    I don't know.
24      Q.    Are you telling us that he just

Page 36

1  wanted to resign for nothing? He just wanted to
2  resign?
3      A.    I don't know why he wanted to
4  resign. I can't answer that question.
5      Q.    He didn't say to you I want to
6  resign if you do X?
7      A.    No, he didn't say anything like
8  that to me.
9      Q.    Just he wanted to resign?
10      A.    I don't recall why he wanted to
11  resign.
12      Q.    Do you recall that when you went
13  to the mayor's office that Solomon related to
14  the mayor exactly what Maurice Lariviere
15  requested that he relate?
16      A.    I do not recall that specific
17  conversation, no.
18      Q.    Do you recall it was about a
19  resignation?
20      A.    My recollection is that Maurice
21  wanted to leave his position, yes. I don't
22  recall what the conversation was with the mayor.
23      Q.    Do you recall David Bain being in
24  the room while you are talking with the mayor?

Page 37

1      A.    No, I don't recall.
2      Q.    At some point magically both of
3  you showed up with a typed resignation in your
4  hands to go back to see Maurice?
5      A.    That is not true.
6      Q.    Was there a typed resignation in
7  front of Maurice Lariviere?
8      A.    I don't know.
9      Q.    You don't remember ever seeing
10  one?
11      A.    I have never seen any typed
12  resignation from anybody.
13      Q.    When you left that interview room
14  had Maurice resigned?
15      A.    Had Maurice resigned?
16      Q.    Yes.
17      A.    To who?
18      Q.    You tell me.
19      A.    As far as I know he had not
20  resigned when I left the interview room.
21      Q.    Now, you both went back to the
22  room, correct?
23      A.    Yes.
24      Q.    After you met with the mayor?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 38

1      A.    Yes.
2      Q.    When you went back to him did you
3  go back with a piece of paper?  Either one of
4  you?
5      A.    I didn't go back with a piece of
6  paper and I don't recall if Joe Solomon did.
7      Q.    Maurice was in the room with
8  McCarthy when you went back, right?
9      A.    Right.
10     Q.    There was some more conversation,
11 correct?
12     A.    Not to my recollection.
13     Q.    You went back into the room and
14 you said the interview is over?
15     A.    When I went back to the room I
16 didn't say anything.
17     Q.    What did Somomon say?
18     A.    I don't recall what he said.
19     Q.    Did he have a resignation with
20 him?
21     A.    Again, I have answered two or
22 three times I don't recall him having a
23 resignation and I know I didn't have a
24 resignation.

Page 39

1      Q.    Did he have a piece of paper?
2      A.    Not to my recollection he didn't.
3      Q.    Did he tell Maurice to go home?
4      A.    Not that I recall.
5      Q.    Did he tell him he could go home?
6      A.    Not that I recall.
7      Q.    At some point the both of you
8  left, correct?  You left the room.  You are
9  still not there.
10     A.    Who is still not there?
11     Q.    Do you remember leaving the room?
12     A.    Which time?
13     Q.    The second time when you got back
14 there.
15     A.    Yes.  I remember returning back to
16 the room, yes.
17     Q.    You returned back to the room then
18 after you returned back to the room you left the
19 room at some point, right?
20     A.    Obviously, yes.
21     Q.    When you left the room Maurice
22 Lariviere, I take it, was already gone.
23     A.    When I left?
24     Q.    The room the last time Maurice

Page 40

1  Lariviere was gone.
2      A.    I don't recall.
3      Q.    He was not under arrest, was he?
4      A.    No.
5      Q.    When you left the room the second
6  time as a matter of common sense he was not
7  under arrest and you left the room?
8      A.    Not the second time.  I don't know
9  when he left the room.  The second time I left
10 the room I went up with Joe Solomon to the
11 mayor's office.
12     Q.    Then you came back from the
13 mayor's office to the room, right?
14     A.    Right.
15     Q.    When you came back to the room
16 that time did you have a discussion with Maurice
17 Lariviere?
18     A.    No.
19     Q.    Did Joe Solomon have a
20 conversation with Maurice Lariviere?
21     A.    Not that I can recall.
22     Q.    After you both got back to the
23 room I take it at some point you and Joe Solomon
24 left the room.

Page 41

1      A.    Yes, of course.
2      Q.    When you left the room where was
3  Maurice?
4      A.    When I left the room Maurice was
5  still in the room.
6      Q.    With Joe Solomon?
7      A.    No.  Joe Solomon left with me.
8      Q.    Captain McCarthy?
9      A.    What about Catpatin McCarthy?
10     Q.    Was he in the room?
11     A.    When I left?
12     Q.    Yeah.  You left with Solomon I
13 thought you just told me.
14     A.    I did.
15     Q.    Okay.  You are gone.  Maurice is
16 still there.
17     A.    So what is your question?
18     Q.    What other law enforcement was in
19 the room at that point as you were leaving?
20     A.    As I am leaving?
21     Q.    Yes.
22     A.    I don't recall who was still
23 there, who was left.
24     Q.    You don't recall?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 42

1      A.      No.
2      Q.      Okay. You don't recall him being
3  escorted out of town hall, correct?
4      A.      I don't.
5      Q.      You don't recall it. You don't
6  recall anything else.
7          Do you recall him being escorted
8  out?
9      A.      There is no need to be fresh,
10  Carmine. I am trying to do the best I can.
11          I do not recall.
12      Q.      You just don't recall him being
13  escorted out?
14      A.      You have to ask the question more
15  specifically. Are you asking me a question or
16  giving me a statement?
17      Q.      You don't recall him being escorted
18  out, correct?
19          Does that help you?
20      A.      Correct.
21      Q.      Okay. Do you recall his office
22  being secured?
23      A.      Yes.
24      Q.      Was he gone at that time or did

Page 43

1  you secure him in the office?
2      A.      Two different things.
3      Q.      Yeah. Which one was it?
4      A.      What is your question? Did I
5  secure him in the office? No.
6      Q.      So you secured the office?
7      A.      No.
8      Q.      Who did?
9      A.      I don't recall.
10      Q.      Were you there as it was being
11  done?
12      A.      Why don't you elaborate and
13  explain to me what you mean by secure. I am not
14  exactly sure what you mean by that.
15      Q.      Secure means with a lock or key
16  closing that office down so nobody could get
17  into it except law enforcement officials to
18  secure the scene of the crime.
19      A.      So your question is without the
20  sarcasm, I presume, was I there when that room
21  was locked down?
22      Q.      Yes.
23      A.      No.
24      Q.      Had you already left the city

Page 44

1  hall?
2      A.      I don't recall if I had or not.
3      Q.      Do you recall that before it was
4  locked down Maurice had already left?
5      A.      Carmine, I don't recall when
6  Maurice left.
7      Q.      Do you recall that after your
8  interview that you both walked back to the
9  mayor's office and Fulya Metin was there?
10      A.      Ask the question again.
11      Q.      Do you recall that after you
12  finished interviewing Maurice Lariviere you
13  walked back with Solomon to the mayor's office
14  and Fulya Metin was there?
15      A.      I don't recall specifically as I
16  am sitting here today.
17      Q.      Okay. Now, after all that is over
18  and Maurice Lariviere resigned -- you do
19  remember he did indeed resign, correct?
20      A.      I am aware that he resigned.
21      Q.      After that happened who had
22  possession of the videotape? You or Solomon?
23      A.      After he resigned who had
24  possession? Can you be more specific?

Page 45

1      Q.      How can you be more specific than
2  that?
3      A.      Well, I am asking a specific time.
4      Q.      I will start one hour after he
5  resigned and I will go with you one hour until
6  kingdom come.
7      A.      I don't believe one hour after he
8  resigned I had possession of the tape myself
9  personally, no.
10      Q.      Sometime after that one hour did
11  you come into possession of the tape?
12      A.      Yes, I did.
13      Q.      When?
14      A.      Sometime after the incident I came
15  in possession. I don't know specifically when.
16      Q.      Were you in possession of it two
17  hours later?
18      A.      I don't recall specifically when.
19      Q.      Were you in possession of it the
20  same day?
21      A.      Yes.
22      Q.      When you say you were in
23  possession of it what did you do with it? Where
24  did you bring it?

**JOSEPH ALAIMO**
**November 7, 2006**

Page 46

1      A.     I bought it and put it in my safe.
2      Q.     In your office?
3      A.     Yes.
4      Q.     Now, in the first week that that
5  tape was in your safe who took it out and viewed
6  it?
7      A.     In the first week I don't recall.
8      Q.     Did someone view it?
9      A.     You know, I don't recall if it was
10 the first week. Yeah, people have reviewed it.
11     Q.     Let's start with William Manzi.
12 He reviewed it, correct?
13     A.     I don't have any knowledge that he
14 reviewed it.
15     Q.     You don't recall William Manzi
16 seeing the tape within one week of this incident
17 even though you are the one who's got it in your
18 safe?
19     A.     I don't recall William Manzi
20 seeing the tape any time never mind within one
21 week.
22     Q.     Did you open the safe to get the
23 tape out during the first week?
24     A.     Again, I don't recall when I took

Page 47

1  the tape out again.
2      Q.     Did Joseph Solomon have access to
3  your safe to get a tape?
4      A.     Joseph Solomon does have access to
5  my safe.
6      Q.     It's a combination? He can go in
7  any time he wants?
8      A.     Yes, he can.
9      Q.     This tape never got to the
10 evidence room, right?
11     A.     No.
12     Q.     Was there a reason for that?
13     A.     Yes.
14     Q.     What was the reason?
15     A.     Because it was the solicitor and
16 we wanted to make sure it stayed secure at all
17 times within the higher ranks, myself and the
18 chief.
19     Q.     How about when you took the hard
20 drive out of his computer, you put that in the
21 evidence room. What was the difference?
22     A.     I didn't take the hard drive out
23 of the computer. That was one of the other
24 officers.

Page 48

1      Q.     Who?
2      A.     I'm not sure.
3      Q.     As one of the two chief law
4  enforcement officers in Methuen did you give
5  specific orders of what to do with evidence in
6  the Maurice Lariviere case?
7      A.     No.
8      Q.     Is this the first time you heard
9  that the hard drive was in the evidence room but
10 the tapes were not?
11     A.     Is this the first time I heard
12 that?
13     Q.     Yes.
14     A.     Yeah.
15     Q.     Okay. So this is the first time
16 you heard that the videotape never made it to
17 the evidence room, right?
18            MR. NOTIS: Objection. Go ahead.
19     A.     What was the question?
20     Q.     This is the first time you have
21 heard that the videotape never ever made it to
22 the evidence room, correct?
23            MR. NOTIS: Objection. Go ahead.
24     A.     No. I already answered I had the

Page 49

1  videotape.
2      Q.     So you know it never made it to
3  the evidence room, correct?
4      A.     I had the videotape. I mean that
5  is pretty simple. I had the videotape in my
6  safe.
7      Q.     The audio tapes never made it to
8  the evidence room, correct?
9      A.     That is correct.
10     Q.     Where did they go?
11     A.     My safe.
12     Q.     Where?
13     A.     My safe.
14     Q.     Both of them?
15     A.     Correct.
16     Q.     The hard drive in the computer
17 that you took out of Maurice's office, did that
18 get to the evidence room?
19     A.     I didn't take out the hard drive
20 from the computer in Maurice's office.
21     Q.     It never got to your safe?
22     A.     No, it did not.
23     Q.     Whoever took it you don't know
24 whether or not they put it in the evidence room?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

Page 50

1    A.    I am not aware of where the hard
2 drive went.  I believe that is the third time I
3 am saying that.
4    Q.    Did you personally discuss Maurice
5 Lariviere with Sharon Pollard?
6    A.    Yes, I have discussed Maurice
7 Lariviere with Sharon Pollard.
8    Q.    After February 14, 2005?
9    A.    Yes.
10    Q.    When?
11    A.    I don't recall exactly when.
12    Q.    What was the discussion about?
13    A.    The discussion was about Maurice
14 Lariviere resigning and the fact that Sharon
15 Pollard felt very bad about it and his family.
16    Q.    Let's hear the whole thing.
17    A.    She told me she felt bad for him
18 and his family.  It's too bad this had to
19 happen.
20    Q.    When did she tell you that?
21    A.    Again, Carmine, I don't remember
22 when she told me that.  You asked me if I had a
23 discussion.  Yes.  I know it was after the
24 incident obviously.

Page 51

1    Q.    Was it within a month or two
2 months?
3    A.    It was within a month, yes.
4    Q.    So at the time she had the
5 discussion both of you knew that Fulya Metin was
6 no longer coming to work in Methuen, correct?
7    A.    Both of who?
8    Q.    You and Sharon Pollard.
9    A.    Again, I can't speak for Sharon
10 Pollard.  I don't recall when she left Methuen
11 or didn't show to work.  I have no idea.
12    Q.    The only discussion that you
13 remember with Sharon Pollard is how badly she
14 felt about what happened to Maurice?
15         MR. NOTIS: Can we take a quick
16    break?
17         MR. DIADAMO: Sure.
18         (Recess.)
19         (Question read back.)
20    A.    I wouldn't say it's the only
21 discussion I remember.
22    Q.    What other discussion do you
23 remember?
24    A.    At some point after the event

Page 52

1 general conversation came up about Maurice.  I
2 don't recall specifically what it was.  But I
3 remember that specific thing about her feeling
4 bad for Maurice.  There was other conversations
5 but I don't recall specifically what they were.
6    Q.    So you don't recall any other
7 conversation except the one you have related on
8 the record?
9    A.    No.  There was other conversation
10 but I don't recall specifically what it was.  It
11 was about Maurice and different things.
12    Q.    Let me make it clear.  You had
13 other conversations with her but you don't
14 remember what those conversations were about?
15    A.    Yeah, I would say that is a fair
16 statement.
17    Q.    Okay.
18         MR. DIADAMO: Nothing further.
19         MR. GAMBACCINI: No questions.
20         MR. NOTIS: I have nothing for the
21    witness.
22
23         (Deposition concluded at 12:20 p.m.)
24

Page 53

1
2         C E R T I F I C A T E
3
4         I, Linda Anne Rebello,
5 Registered Professional Reporter and Notary
6 Public, within and for the Commonwealth of
7 Massachusetts do hereby certify that
8 JOSEPH ALAIMO, the witness whose deposition
9 is hereinbefore set forth, satisfactorily
10 identified himself, was duly sworn by
11 me, and that such deposition is a true
12 record of the testimony given by the
13 witness.
14    I further certify that I am neither
15 related to or employed by any of the parties
16 to this action, nor am I financially
17 interested in this action.
18
19    WITNESS MY HAND this 16th day of
20 November, 2006.
21
22
23 LINDA ANNE REBELLO   My commission expires:
24 Notary Public        June 28, 2007

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**JOSEPH ALAIMO**
**November 7, 2006**

15 (Pages 54 to 56)

Page 54

```
 1      Today's date:      November 16, 2006
 2      To:        Carmine DiAdamo
 3      Copied to:   Gareth Notis, Andrew Gambaccini
 4      From:        Linda Anne Rebello
 5      Deposition of:   Joseph Alaimo
 6      Taken:        November 7, 2006
 7      Action:        Maurice Lariviere vs.
 8              Joseph Solomon, et al
 9
10      Enclosed is a copy of the deposition of
11   JOSEPH ALAIMO.    Pursuant to the Rules of
12   Civil Procedure, Mr. Alaimo has 30 days
13   to sign the deposition from today's date.
14      Please have Mr. Alaimo sign the
15   enclosed signature page.  If there are any
16   errors, please have Mr. Alaimo mark the
17   page, line and error on the enclosed
18   correction sheet.
19      He should not mark the transcript itself.
20   This addendum should be forwarded to all
21   interested parties.
22      Thank you for your cooperation in this
23   matter.
24
```

Page 55

```
 1      * * * * * * * * * * * * * *
 2      Maurice Lariviere        *
 3      vs.              *
 4      Joseph Solomon, et al       *
 5      * * * * * * * * * * * * * *
 6
 7
 8      I, JOSEPH ALAIMO, do hereby certify,
 9   under the pains and penalties of perjury,
10   that the foregoing testimony is true and
11   accurate, to the best of my knowledge and
12   belief.
13
14      WITNESS MY HAND, this _____ day of
15   _____, 2006
16
17
18
19
20
21      JOSEPH ALAIMO
22
23
24
```

Page 56

```
 1          CORRECTION SHEET
 2   DEPONENT:  Joseph Alaimo
 3   CASE:      Lariviere vs. Solomon, et al
 4   DATE TAKEN: November 7, 2006
 5   *********************************************
 6   PAGE/ LINE/  CHANGE OR CORRECTION AND REASON
 7   *********************************************
 8   ___/ ___/_____
 9   ___/ ___/_____
10   ___/ ___/_____
11   ___/ ___/_____
12   ___/ ___/_____
13   ___/ ___/_____
14   ___/ ___/_____
15   ___/ ___/_____
16   ___/ ___/_____
17   ___/ ___/_____
18   ___/ ___/_____
19   ___/ ___/_____
20   ___/ ___/_____
21   ___/ ___/_____
22   ___/ ___/_____
23   ___/ ___/_____
24   ___/ ___/_____
```

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

00001

 1                                    Volume: I

 2                                    Pages:  1-214

 3                                    Exhibits: 1-13

 4

 5    MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

 6                           No. 05BEM00777

 7

 8    ----------------------------------

 9    FULYA METIN,

10                     Complainant,

11       v.

12    CITY OF METHUEN and MAURICE LARIVIERE,

13                     Respondents.

14    ----------------------------------

15

16

17              DEPOSITION of FULYA METIN

18    Thursday, October 12, 2006, 10:30 a.m. to 4:06 p.m.

19              DAVIS, MALM & D'AGOSTINE

20                   One Boston Place

21                 Boston, Massachusetts

22

23        Court Reporter:  Paulette Cook, RPR/RMR

24

00002

```
 1   A P P E A R A N C E S:

 2       DAVIS, MALM & D'AGOSTINE

 3       By David Rapaport, Esq.

 4       One Boston Place

 5       Boston, Massachusetts 02108

 6       617-367-2500

 7       drapaport@davismalm.com

 8       Counsel for the Plaintiff

 9

10       KAZAROSIAN LAW OFFICES

11       By Marsha V. Kazarosian, Esq.

12       546 Main Street

13       Haverhill, Massachusetts 01830

14       978-372-7758

15       marsha@kazarosian.com

16       Counsel for the Fulya Metin

17

18       DiADAMO LAW OFFICE, LLP

19       By Carmine W. DiAdamo, Esq.

20       40 Appleton Way

21       Lawrence, Massachusetts 01840

22       978-685-4271

23       carmine@diadamo.com

24       Counsel for Maurice Lariviere
```

```
00003
 1    A P P E A R A N C E S (cont.):

 2

 3        MORRISON MAHONEY, LLP

 4        Gareth W. Notis, Esq.

 5        250 Summer Street

 6        Boston, Massachusetts 02210-1181

 7        617-737-8857

 8        gnotis@morrisonmahoney.com

 9        Counsel for the City of Methuen,

10        Joseph Solomon and Joseph Alaimo

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

00004

1                    I N D E X

2    Examination of:                        Page

3    FULYA METIN

4     By Mr. Rapaport                        6, 199

5     By Mr. DiAdamo                         113

6     By Ms. Kazarosian                      190

7

8                    E X H I B I T S

9    No.                                     Page

10   1         Resume                        9

11   2         Charge of Discrimination

12             dated 3/8/05                  75

13   3         E-Mail dated 11/29/04         99

14   4         E-Mail dated 12/5/04          101

15   5         E-Mail dated 1/8/05           102

16   6         E-Mail dated 2/2/05           105

17   7         E-Mail dated 1/8/05           189

18   8         E-Mail dated 1/22/05          189

19   9         E-Mail dated 2/1/05           189

20   10        E-Mail dated 1/28/05          189

21   11        Letter dated 11/23/04         190

22   12        Haight Letter                 190

23   13        Letter dated 5/16/05

24       ** Exhibits retained by Mr. Rapaport **

00005

```
 1              P R O C E E D I N G S

 2                  FULYA METIN,

 3

 4   a witness called for examination by counsel for the

 5   Defendants, being first duly sworn, was examined and

 6   testified as follows:

 7

 8                  DIRECT EXAMINATION

 9   BY MR. RAPAPORT:

10      Q.  Please state your full name and address.

11      A.  Sure.  It's Fulya Metin.  I'm at 26 Arista

12   Drive.  I'm in Huntington, New York now.  It's

13   11746.

14      Q.  How long have you been at that address?

15      A.  About two months.

16      Q.  Before that where did you live?

17      A.  I was in Haverhill, Massachusetts.  It was

18   200 Morgan Drive, Haverhill, Mass. 01832.

19      Q.  Let me give you a few preliminary

20   instructions before I get into the questions about

21   the facts of this case.  Have you ever been deposed

22   before?

23      A.  No.

24      Q.  I'm sure your lawyer has explained the
```

00006

1    general practice to you, but let me just go over it

2    briefly 'cause it's not an everyday occurrence for

3    people.  I'm going to be asking you questions and

4    you're sworn to give truthful answers.  Do you

5    understand that?

6        A.  Yes.

7        Q.  And you nodded which leads me to give you

8    another instruction, which we always give, which is

9    that you do need to respond verbally by saying yes,

10   no, or, you know, using whatever words you want.  In

11   everyday conversation we tend to shake our head, but

12   we don't want the reporter to guess whether it's a

13   yes or a no, so do always try to respond verbally.

14            And try to let me finish the question

15   before you answer.  Even if you think you know what

16   I'm going to ask you, you may not really know, and

17   I'll try not to interrupt your answer so that when

18   somebody reads this transcript one day it will be

19   easier to follow it.

20            If you don't understand a question that

21   I ask, just let me know, and I'll try to explain it

22   or rephrase it.  If you need to take a break at any

23   time, let me know, we'll take a break.  We're going

24   to take a lunch break.  We'll take other breaks from

00007

1    time to time, if other people need to use the

2    restroom.  The one time I would ask you not to take

3    a break, although, obviously, if it's subject of

4    consultation with your counsel, is in between one of

5    my questions and your answers, unless it involves a

6    question of privilege.  A privilege would be, for

7    example, if I said what did you and your lawyer

8    discuss.  I'm not allowed to inquire into that.  Or

9    it would be proper for your lawyer to tell you not

10   to answer that question.  And I do want you to keep

11   in mind that I don't want to know about any

12   conversations you had with your legal counsel in

13   this case.  Okay?

14        A.   (Nods head.)

15        Q.   You need to say yes rather than just nod

16   your head.

17        A.   Yes.

18        Q.   Easy to forget.  Is there any reason you

19   can't give accurate testimony here today such as any

20   physical issues or emotional issues or medications

21   you could be on?

22        A.   No.

23        Q.   Let me start by asking you whether or not

24   you're working at the present time?

00008

1      A.   I am not working.

2      Q.   Have you been working either full or part

3   time since you moved to Long Island?

4      A.   No.

5      Q.   Have you worked in between the time when you

6   left the city solicitor or the City of Methuen

7   position and the time you recently moved to New

8   York?

9      A.   No.

10      Q.   Have you been in on any job interviews

11   during that time?

12      A.   No.

13      Q.   Do you have any job interviews planned for

14   the near future?

15      A.   Not yet.

16      Q.   Are you currently receiving any counseling

17   for whatever emotional distress issues you have?

18      A.   I was until I moved to New York and I'd like

19   to go back again, but I'm just trying to look for

20   somebody else to talk to.

21      Q.   You're looking for someone in the New York

22   area?

23      A.   Yes.

24      Q.   Who was the person or persons that you were

00009

 1    treating with here in Massachusetts?

 2        A.   Here, her name was Goni -- G O N I --

 3    Helavi.

 4        Q.   Where was she located?

 5        A.   She was located in Woburn.

 6        Q.   Is she the only person?

 7        A.   Yes.

 8        Q.   I'm going to spend a considerable time on

 9    your background, your work experience before we get

10    to the incident that's brought us all here today.

11        A.   Hm Hm.

12        Q.   In order to move that process along, I'm

13    going to mark as Exhibit 1 a resume.  I'll represent

14    to you that this came from your personnel file in

15    the City of Methuen.  It's got your name and address

16    up top, and it's -- it consists of two pages.  We'll

17    mark this as Exhibit 1.  I have copies for everyone.

18             (Exhibit No. 1 marked

19             for identification.)

20        Q.   Would you please look over Exhibit 1 and

21    tell me if that is the resume that you were using at

22    the time you got the job in the city solicitor's

23    office?

24        A.   I believe so, yes.

00010

1    Q.  And was that resume accurate at the time you

2  prepared it?

3    A.  Yes.

4    Q.  Starting on the back, I see it says that

5  you're fluent in Turkish.  Do you have any facility

6  in any languages other than Turkish and English?

7    A.  A little bit Albanian but not as fluent as

8  Turkish.

9    Q.  I see that you list on the second page that

10  you're a notary public in the State of New York --

11    A.  Yes.

12    Q.  -- is your notary license still valid?

13    A.  Yes, it is.

14    Q.  Are the other I'll call them

15  computer-related type skills that I see in that

16  little part of the resume about the 75 words per

17  minute and Excel and all that, does that -- does

18  that all represent skills that you had at the time

19  you prepared this resume?

20    A.  Yes.

21    Q.  I didn't see -- I see you listed Johnson and

22  Wales and Long Island Business Institute, but I

23  didn't see high school.  Could you tell me where you

24  went to high school?

00011

 1     A.  I went to Chelmsford -- in Chelmsford,

 2  Massachusetts, Chelmsford High School, and I

 3  graduated in 1988.

 4     Q.  Let me go back a little bit to find out why

 5  you were at Chelmsford High School.  Were you born

 6  in this country, or did you come here from somewhere

 7  else?

 8     A.  I was not born in this country.

 9     Q.  When did you come to this country?

10     A.  I was about three years old.

11     Q.  Did you come with your parents?

12     A.  Yes.

13     Q.  Were either of your parents American

14  citizens?

15     A.  No, they weren't.

16     Q.  Are you an American citizen?

17     A.  Yes.

18     Q.  And how did you become one?

19     A.  My mother and my father got divorced.  At

20  the time I automatically became a citizen.  I was

21  naturalized.

22     Q.  Do you remember what year that is or was?

23     A.  I think it was like maybe '79, around there.

24     Q.  Did you grow up by which I mean spend your

00012

1     say elementary schools in addition to high school in

2     Massachusetts?

3          A.   Yes.

4          Q.   In which part?

5          A.   Elementary school was in Lexington.   And

6     then the junior high school and high school was in

7     Chelmsford.

8          Q.   Okay.   You spent one year at Johnson and

9     Wales studying business and advertising; is that

10    correct?

11         A.   Yes.

12         Q.   What year was it that you spent there?

13         A.   Eighty-eight to '89.

14         Q.   Right after high school?

15         A.   Yes.

16         Q.   When was the five-week title closing class

17    at Long Island Institute?

18         A.   I believe that was about three years ago.   I

19    have a certificate for that.

20         Q.   Was your first full-time job after you

21    finished your schooling at Fidelity?

22         A.   Yes.

23         Q.   Okay.   And that was here in Boston?

24         A.   Yes.

00013

1      Q.   Which location here in Boston?

2      A.   At the World Trade Center.

3      Q.   Okay.  And how did you come to end up

4   working at Fidelity?

5      A.   I was temping for them at first.  Then I got

6   offered a full-time job.

7      Q.   Now I see your first position at Fidelity

8   was as a full service trader.  You've described that

9   position on the second page of Exhibit 1.

10     A.   Hm Hm.

11     Q.   Actively trading investment portfolios,

12  etc., and that lasted I suppose for about a little

13  more than a year.  Did you receive training at

14  Fidelity for that particular job?

15     A.   Yes.

16     Q.   Okay.  And then your next job was a national

17  account trader for several months.  Do you see that

18  at the bottom of the first page?

19     A.   Yes.

20     Q.   Okay.  And then you went on to become a data

21  control fund accountant?

22     A.   Hm Hm.

23     Q.   Did you have any -- well, did Fidelity give

24  you any training that qualified you for the national

00014

1    account trader position?

2        A.  Yes, they did.

3        Q.  What about for the data control fund

4    accountant position?

5        A.  Yes, they did.  They had a lot of training

6    there.

7        Q.  When you left Fidelity, how much were you

8    earning approximately?

9        A.  It was about 20,000.

10       Q.  Were there benefits?

11       A.  Yes, really good benefits.

12       Q.  When you were at Fidelity, did you receive

13   any instruction in what to do if any kind of sexual

14   harassment occurred on the job?

15       A.  Fidelity?  No.  I don't actually recall

16   anything like that.

17       Q.  Were you aware of a human resources

18   department at Fidelity --

19       A.  Yes, they had a human resources department.

20       Q.  Again, you got to remember to let me finish

21   the questions before you answer, even if you know

22   where I'm going.  I'll ask it again.

23           Were you aware when you were at Fidelity

24   that they had a human resources department?

00015

1       A.  Yes.

2       Q.  And what was your understanding, if you had

3   any, of what this human resources department did?

4       A.  If you had any problems with like insurance

5   or questions about your paychecks, you would contact

6   them.

7       Q.  Let me take the Long Island Business

8   Institute a little out of order here because I

9   believe that occurred after Fidelity.

10          What exactly was it that you learned or

11  studied at the Long Island Business Institute in

12  Commack?

13      A.  How to become a title closer.

14      Q.  Did you learn that skill?

15      A.  Yes.

16      Q.  Now while you were at Fidelity from January

17  of 1990 to June of 1993, did you yourself ever

18  experience anything you ever considered to be sexual

19  harassment?

20      A.  No.

21      Q.  Were you aware of any other person at

22  Fidelity experiencing that?

23      A.  No.

24      Q.  Were you aware of any discussion about

00016

1  sexual harassment at Fidelity while you were there?

2      A.  No.

3      Q.  You list your next job as -- in Lake

4  Success, New York at Citrus & Allied, Inc., as a

5  customer service representative, and there's a

6  little bit of a gap from June 1993 to October 1993.

7          What were you doing during that -- those

8  months?

9      A.  I actually had -- I had gotten married

10  between there to my ex-husband.  Then I just --

11  moving and everything I was looking for a job, and I

12  found Citrus & Allied.

13     Q.  Well, in connection with getting married,

14  did you move from Massachusetts to New York?

15     A.  Yes.

16     Q.  When you left Citrus & Allied, how much were

17  you earning approximately?

18     A.  About 32,000.

19     Q.  Were there benefits connected with that job?

20     A.  Yes.

21     Q.  Can you give me any idea of how large a

22  company that was?

23     A.  Citrus & Allied, it wasn't a very large

24  company.  They're like -- they did perfumes and oils

00017

1    -- essential oils.  It was like a family-run

2    business.

3        Q.  And where -- was it just one location?

4        A.  There was another location I believe -- if I

5    can remember correctly, in North Carolina, I think.

6        Q.  Were you given any training in the issue of

7    sexual harassment at Citrus & Allied?

8        A.  Not that I remember.

9        Q.  Did you experience anything you considered

10   to be sexual harassment at Citrus?

11       A.  No.

12       Q.  Were you aware of anybody else being

13   harassed there?

14       A.  No, not that I know of.

15       Q.  Did Citrus & Allied have a human resources

16   department?

17       A.  Not really, no.  It was like a family run --

18       Q.  Okay.  The next job that you list on Exhibit

19   1 starts in January of 1997.  So my question is what

20   did you do during that calendar year 1996?

21       A.  I had my daughter was born in '95, and on

22   September of '95.  So I stayed home with her a

23   little bit.

24       Q.  And your next job was with Reckson

00018

1    Associates Realty Corp. in Melville?

2        A.   Yes.

3        Q.   And you've described what you did there.

4    What size company was Reckson Associates?

5        A.   About two hundred people.

6        Q.   Did they have a human resources function?

7        A.   Not that I -- they must have.  I don't

8    remember ever talking to anybody in human resources

9    though.

10       Q.   Did you get any training there in dealing

11   with sexual harassment?

12       A.   No.

13       Q.   Did -- did you experience anything that you

14   felt was sexual harassment at Reckson?

15       A.   No.

16       Q.   Were you aware of anybody else

17   experiencing --

18       A.   No.

19       Q.   Okay.  Your next position was in Westbury at

20   JG Fogg & Co.-Westbury Capital Partners.  You were

21   the executive secretary to the president.  What kind

22   of a company was this?

23       A.   That was very small.  It was a venture

24   capital company.

00019

     1      Q.  Oh, I forgot to ask you when you left

     2   Reckson how much were you earning?

     3      A.  Reckson was only about 35,000.

     4      Q.  Were there benefits?

     5      A.  Yes.

     6      Q.  At Fogg you were the executive secretary to

     7   the president.  Did you receive any training in

     8   sexual harassment at Fogg?

     9      A.  No.  It was like a very small company.  They

    10   didn't have that.

    11      Q.  Did you experience any sexual harassment

    12   there?

    13      A.  No.

    14      Q.  Were you aware of anyone else experiencing

    15   it?

    16      A.  No.

    17      Q.  Do you recall -- and I don't remember

    18   exactly when it was -- maybe the other lawyers

    19   around the table have a better memory than I do, but

    20   do you remember there was a time when a woman named

    21   Anita Hill charged Clarence Thomas who's now on the

    22   U.S. Supreme Court with sexual harassment?

    23      A.  I don't remember that.

    24      Q.  So you didn't watch those hearings on TV?

00020

1      A.  No.

2      Q.  When you left Westbury Capital Partners in

3   August 2001, approximately how much were you

4   earning?

5      A.  I was making about 50,000.

6      Q.  Five oh?

7      A.  Yes.

8      Q.  And were there benefits?

9      A.  Yes.

10     Q.  All right.  Then it looks as if you moved

11   into a job in a law firm.  Law offices of Mario

12   DeMarco right after you left Fogg.

13            How is it that you ended up moving from

14   this --

15     A.  I got --

16     Q.  You've got to let me finish.  -- moving from

17   this venture capital firm into a law firm?

18     A.  I got laid off from the venture capital

19   firm.  Then I found a job here at the immigration

20   office.

21     Q.  In Farmingville?

22     A.  Yes.

23     Q.  Was that on Long Island?

24     A.  Yes.

00021

    1       Q.   Had you had any previous experience working

    2    in a law firm?

    3       A.   Before that?   No.

    4       Q.   Now you list your position here on Exhibit 1

    5    as legal assistant.

    6       A.   Hm Hm.

    7       Q.   Can you describe what you meant by that

    8    term?

    9       A.   Well, I would help the lawyer with

   10    immigration -- immigration matters as far as doing

   11    the filing for, you know, like on petitions for

   12    relative petitions, I would help with that.   I'd

   13    also help with like motions and translating for

   14    Turkish clients.

   15       Q.   Would you call it kind of a paralegal

   16    position?

   17       A.   It was like that, but I did not have my

   18    paralegal certification or anything.   It was just

   19    like a legal secretary position.

   20       Q.   Well, would you say that it was -- that it

   21    required you to do anything more than what you

   22    thought a legal secretary would do?

   23       A.   No.

   24       Q.   Did this -- how many people were in this law

00022

1   firm?

2       A.  It was very small.  Maybe about five, six.

3       Q.  And beyond immigration work, did the firm

4   handle anything else other than naturalization and

5   immigration?

6       A.  Sometimes they did some like deportation,

7   political asylum cases.  I also notarized a lot of

8   documents there, too.

9           MS. KAZAROSIAN:  Can I stop for a

10  question and ask a question?

11          MR. RAPAPORT:  Sure.

12          MS. KAZAROSIAN:  I just realized how --

13  that we didn't have any discussion about how we're

14  going to handle objections.

15          MR. RAPAPORT:  Let's go off the record

16  for a minute.  We were all so anxious to get started

17  here.

18          (Off the record.)

19          MR. RAPAPORT:  Off the record we've all

20  very rapidly agreed that the usual stipulations will

21  -- and this time everyone didn't have a different

22  version of the usual stipulations.  All objections

23  except to form of the question will be reserved till

24  the time of trial.  Motions to strike will be

00023

1   similarly reserved.

2           The witness will read and sign her

3   deposition, make whatever corrections she feels is

4   necessary.  It will be signed under oath; it need

5   not be signed before a notary.  Is that agreeable?

6           MR. OTIS:  One further suggestion, that

7   an objection for one is an objection for all.  But I

8   think our case we can discuss what stipulations we

9   want.

10          MR. RAPAPORT:  You're talking about the

11  federal case?

12          MR. DiADAMO:  We'll try to keep as much

13  of this into the federal case and not go over the

14  whole thing again.  So. ..

15          MR. RAPAPORT:  If there's any practical

16  matter -- I mean I don't have a problem, except I'm

17  not part of the federal case, and Garth is not part

18  of the MCAD.  Marsha's not part of the federal case,

19  at least as a party.  All right.  Why don't we go

20  ahead?

21          MR. NOTIS:  I don't have I have any

22  standing to object during this deposition; likewise,

23  I don't think you have any standing to object at our

24  deposition.

00024

1                    MR. RAPAPORT:  I agree.  I will not horn

2       in on your objections.

3                    MS. KAZAROSIAN:  I want to make sure

4       it's from the beginning of the depo.

5                    MR. RAPAPORT:  Absolutely.

6       BY MR. RAPAPORT:

7          Q.  You worked for nearly two years for the

8       DeMarco offices?

9          A.  (Nods head.)

10         Q.  You have to respond verbally, please.

11         A.  Yes.

12         Q.  Did you enjoy that work?

13         A.  Yes.

14         Q.  How much were you earning when you left?

15         A.  About 35,000.

16         Q.  And were there benefits?

17         A.  No.

18         Q.  Okay.  You moved from that apparently right

19      into another what looks like legal job working for a

20      firm called Adler, Calonita & Associates, LLP.

21         A.  Hm Hm.

22         Q.  Was that a law firm?

23         A.  Yes, it was.

24         Q.  Where were they located?  'Cause you didn't

00025

1    list it here.

2        A.   Oh, it was Garden City, New York.

3        Q.   You worked for almost exactly a year there,

4    correct?

5        A.   Hm Hm.

6        Q.   They did real estate law?

7        A.   Yes.

8        Q.   And also criminal work?

9        A.   Yes.

10        Q.   Did they do any employment work?

11        A.   What do you mean by employment --

12        Q.   Any employment law where people get fired

13    from jobs and --

14        A.   Oh.  No, no.

15        Q.   Did their criminal work involve sexual

16    harassment, as far as you know?

17        A.   As far as I know, no.

18        Q.   Did you get any training there in dealing

19    with sexual harassment?

20        A.   No.

21        Q.   Did you experience it there?

22        A.   No.

23        Q.   Or at the DeMarco offices?

24        A.   No.

00026

```
 1      Q.  Did you -- were you aware of anyone else at

 2   the Adler firm experiencing sexual harassment?

 3      A.  No.

 4      Q.  You were the legal assistant for the

 5   president I see?

 6      A.  Yes.

 7      Q.  Now by that time you had your title closing

 8   training at Long Island Business Institute, correct?

 9      A.  Yes.

10      Q.  Did you use that training from Long Island

11   Business Institute at all in the DeMarco law office?

12      A.  I was trying to.  I was trying to become a

13   title closer.  I had some training there as well.

14      Q.  When you got to the Adler firm, did you use

15   your title skills?

16      A.  I just trained a little bit, but I wasn't

17   actually able to close a loan myself or anything

18   yet.  But I attended a few closings.

19      Q.  When you left the Adler Calonita firm, how

20   much were you earning?

21      A.  It was about almost 40,000.

22      Q.  Were there benefits?

23      A.  There was benefits, yes.

24      Q.  And that was in New York.  After that did
```

00027

```
 1   you move to Massachusetts?

 2       A.  Yes.

 3       Q.  Why did you move to Massachusetts?

 4       A.  I moved to Massachusetts.  I wanted to live

 5   with my mother for a little bit to save some money

 6   instead of paying rent.

 7       Q.  And was the -- withdrawn.

 8           Did your mother live at 200 Morgan Drive

 9   in Haverhill?

10       A.  Yes.

11       Q.  Was the arrangement in part at least so that

12   you could save some money?

13       A.  Yes.

14       Q.  And can I assume from that that you did not

15   pay rent to your mother?

16       A.  I did not pay rent.

17       Q.  Okay.  Did you contribute at all to the food

18   expenses for you and your daughter?

19       A.  Yes.

20       Q.  What was the arrangement there?

21       A.  What was the arrangement?

22       Q.  Yeah.  In other words, was there some set

23   amount you would pay --

24       A.  No.  I would just buy my own food for my
```

00028

1    daughter and I.

2        Q.   Okay.  Would it be fair to say that other

3    than paying for your food and your daughter's, you

4    did not have living expenses connected with being at

5    200 Morgan Drive?

6        A.   Yes.

7        Q.   Did you have a car once you moved to

8    Haverhill?

9        A.   Yes.

10       Q.   What kind of car did you have?

11       A.   A Nissan Altima.

12       Q.   Did you own that car?

13       A.   Yes.  Actually, my mother owned it.  I'm

14   sorry.  My mother owned it.  I drove it.  It's under

15   my mother's name.

16       Q.   You had the use of it?

17       A.   Yes.

18       Q.   In terms of looking for jobs, would it be

19   fair to say that you could take any job that would

20   be within an auto commute of Haverhill?

21       A.   Yes.

22       Q.   All right.  What did you do to find work

23   once you moved to Haverhill?

24       A.   I went to a temporary agency.

00029

1      Q.  Moore?

2      A.  Moore staffing.  Then I also at the same

3   time before I took the job I was offered a job at

4   Fidelity Investments again in Marlborough, but I

5   turned it down to go to -- to go to work for City of

6   Methuen.

7      Q.  Got to slow down a little 'cause --

8      A.  Sure.

9      Q.   -- I'm missing something here.

10     A.  Yep.

11     Q.  Did you learn about the position with

12  Fidelity in Marlborough before or after you were in

13  touch with Moore?

14     A.  Before I got the job with the City of

15  Methuen?

16     Q.  No.  Let me distinguish --

17     A.  Oh, with Moore, at the same time.

18     Q.  Did the Fidelity job come through Moore?

19     A.  No.

20     Q.  How did Fidelity learn that you were in the

21  market again?

22     A.  I had a friend that worked there.  I went

23  there to apply for a job.

24     Q.  They offered you one?

00030

1    A.  Yes, they did.  At the same time I got

2    offered the same job at Methuen by Moore.  I got

3    offered two jobs at the same time.

4    Q.  Okay.  Let's look at the Fidelity job for a

5    minute.

6    A.  Hm Hm.

7    Q.  Did you regard Marlborough as within a

8    reasonable commute of Haverhill?

9    A.  I thought it wasn't a reasonable commute.  I

10   thought it was kind of a far commute.

11   Q.  How long would it take you to drive from

12   Haverhill to Marlborough?

13   A.  About 45 minutes.

14   Q.  How much would the Fidelity job have paid if

15   you know?

16   A.  The Fidelity job was about 35,000 to start.

17   Q.  What was the job?

18   A.  It was working for insurance benefits

19   companies.

20   Q.  Did it have --

21   A.  That was like a temporary job as well.  Then

22   it was going to go to full time after a certain

23   amount of time.

24   Q.  Did that work have anything to do with what

00031

1    you had done with Fidelity back in the early

2    nineties?

3        A.  It was going to be different.  Different

4    work.

5        Q.  Would you agree with me that Fidelity has

6    good benefits?

7        A.  Yes, they do.

8        Q.  When you signed up with Moore, did you

9    understand they placed people in jobs temporarily?

10       A.  Yes.  Yes, I did.

11       Q.  Did you have to fill out some forms with

12   Moore?

13       A.  Yes.

14       Q.  How did you hear about Moore?

15       A.  Through the phone book.

16       Q.  And before you ended up at -- with a job for

17   the City of Methuen, did Moore place you in any

18   other positions?

19       A.  No.  That was the first position they placed

20   me in.

21       Q.  Were you aware that they were in the

22   business of placing people in a variety of different

23   positions on a temporary basis?

24       A.  Yes.

00032

1    Q.  That was -- what was what they did?

2    A.  Right.

3    Q.  Okay.  When you talked to Moore, was there a

4    particular person you dealt with?

5    A.  Oh, I can't remember her name.

6    Q.  Did you and Moore have any discussion about

7    what kind of jobs you might be qualified to do?

8    A.  I remember taking a test like typing,

9    computer test.

10   Q.  All right.  At that time did you regard

11   yourself as somebody who was qualified to work as a

12   legal assistant or secretary in law firms of the

13   sort you had done in New York?

14   A.  Yes.

15   Q.  And also for a financial firm like Fidelity

16   and the positions you had done?

17   A.  Yes.

18   Q.  And also for companies engaged in the kind

19   of real estate work that your prior employers had

20   engaged in?

21   A.  Yes.

22   Q.  And as a customer service representative?

23   A.  Yes.

24   Q.  At that time did you have any particular

00033

1    interest in working for a law firm or in a legal job

2    as opposed to other types of work?

3        A.  At that time it really didn't matter to me.

4    I could have went either, legal or like a venture

5    capital firm or, you know, Fidelity or a stock firm.

6    It didn't matter.  Anything I was used to doing that

7    I had experience with I would go to.

8        Q.  Now when you -- when you were talking to

9    Moore just before they placed you with the City of

10   Methuen, did they give you any instructions about

11   what to do if you had any problems on your job

12   assignment?

13       A.  Not that I -- I don't remember.

14       Q.  By the time you signed up with Moore, were

15   you aware of the existence of sexual harassment in

16   the workplace in this country?

17            MS. KAZAROSIAN:  I'm going to object,

18   but you can answer.

19       A.  Was I aware that there was?

20       Q.  That sexual harassment occurs in the

21   workplace.

22       A.  Yes.

23       Q.  But you say you had never experienced it in

24   the workplace up until that point?

00034

1     A.   Yes.

2     Q.   Did you know anybody who had experienced --

3   personally known anybody who had experienced sexual

4   harassment in the workplace up to the point when you

5   signed up with Moore?

6     A.   No.

7     Q.   When you moved in with your mother at 200

8   Morgan Drive, was there anybody living there besides

9   you and your daughter and your mother?

10    A.   My mother's boyfriend.

11    Q.   What's his name?

12    A.   Glen.

13    Q.   Were there any pets in the house?

14    A.   Yes.

15    Q.   What kind of pets?

16    A.   My two cats and two -- one ferret.

17    Q.   Your two cats and one ferret?

18    A.   Yes.

19    Q.   Okay.  No dogs though?

20    A.   A dog came on later on as a Christmas

21  present from my mother to my daughter.

22    Q.   Okay.  Now the position that Moore sent you

23  to for the City of Methuen was what as you

24  understood it?

00035

1      A.  A legal secretary, but if I was to be hired

2   they told me that I would need to get my paralegal

3   certificate which I was going to try to do.

4      Q.  Did you understand that the placement was a

5   temporary one at least to start?

6      A.  Yes.

7      Q.  Were you interviewed for the job?

8      A.  Yes.

9      Q.  Who interviewed you?

10     A.  Okay, if I can remember correctly, I think

11  it was David Bain.

12     Q.  What was his job?

13     A.  David Bain is in the human resource

14  department there at the City of Methuen, but I can't

15  definitely remember.  I think it was David Bain.

16  I'm not a hundred percent sure though.

17     Q.  What about Mr. Lariviere?

18     A.  Did I interview -- I think I met him after

19  in the solicitor's office.  'Cause I met David Bain

20  first.  Then I met Mr. Lariviere.

21     Q.  Were you interviewed by anyone else?

22     A.  No.  For the temporary, that was it -- for

23  the temporary job.

24     Q.  Were you aware at that time that the mayor

00036

 1    of Methuen was Sharon Pollard, a woman?

 2        A.   No, I wasn't aware at that time.

 3        Q.   There came a point when you were working on

 4    a temporary basis in the city solicitor's office

 5    when you say some sexual harassment type conduct

 6    occurred?

 7        A.   Yes.

 8        Q.   How soon after you started working there did

 9    that --

10        A.   It was by the fourth or fifth day after I

11    started temping.

12        Q.   Where did it occur?

13        A.   Right by the file cabinets in the office.  I

14    was filing something and Maurice had approached me,

15    and he started kissing me.  I pushed him away, and I

16    said please don't do this.

17             I'd been through some things a long time

18    ago -- you know, don't do this to me.  He said to me

19    he couldn't help himself.  That's what he said to

20    me.

21        Q.   Where did he kiss you?

22        A.   On the lips.

23        Q.   Once or more than once?

24        A.   Like once -- once.

00037

1      Q.  So he said he couldn't help himself.  What

2   happened after that?

3      A.  I just pushed myself away, and he

4   apologized.  He said it wouldn't happen again.

5      Q.  What happened after that?

6      A.  I left work, and I was like really upset.  I

7   was very --

8      Q.  What time -- I don't mean to pin you down to

9   minutes exactly, but was this morning, noon --

10     A.  No.  It was late afternoon.  It was almost

11  before I had to leave.

12     Q.  Ah, okay.  By that time you'd been working

13  there for about four or five days?

14     A.  Yes.

15     Q.  All right.  And where in city hall in

16  Methuen is the city solicitor's office located?

17     A.  It's on the third floor -- it's on the third

18  floor, and it's right by the human resource office

19  and right by the city council office.

20     Q.  The human resources office is where

21  Mr. David Bain worked?

22     A.  Yes.  The city council office is next door

23  to the left sometimes city councilmen are there and

24  then the two that worked the front, and then the

00038

```
 1   mayor's office is all the way down the end on the

 2   third floor.

 3       Q.   The mayor's office is on the third floor?

 4       A.   Yes.

 5       Q.   By that time did you know the mayor of

 6   Methuen was a woman named Sharon Pollard?

 7       A.   Yes, I did.

 8       Q.   Did she have a chief of staff?

 9       A.   Yes.

10       Q.   Her name?

11       A.   I remember her as Tootie.

12       Q.   That was her nickname?

13       A.   Yes.  I don't remember the last name.

14       Q.   You met her?

15       A.   Not personally really just briefly I knew

16   her name was at another time tea.

17       Q.   Were you aware of who the city clerk was?

18       A.   The city clerk?

19       Q.   Yes.

20       A.   I don't think I did.

21       Q.   Did you ever learn that the city clerk was

22   Christine Touma-Conway?

23       A.   Not until later on I learned that.

24       Q.   When did you learn that?
```

00039

1      A.   I think a couple weeks into the job.

2      Q.   Were there other people in the human

3   resources office besides David Bain?

4      A.   Yes.  There was Connie and Jill.  And there

5   was another -- I forgot his name now.  He was head

6   of the vet -- veterans.

7      Q.   That office you said was right next door to

8   the city solicitor's office?

9      A.   Yes.

10      Q.   You mentioned I think that there were two

11   women who worked in the city council office?

12      A.   Yes.

13      Q.   Who were they?

14      A.   Diane -- Diane and Kathy, I believe, if I

15   remember the names correctly.

16      Q.   What about Miss Gagnon; where did she work?

17      A.   City council office.

18      Q.   Were there three women who worked in --

19      A.   There was two.  I met Diane.  Diane and

20   Kathy were the two that were in the city council

21   office.

22      Q.   What about Linda Gagnon?

23      A.   I keep thinking her name was Linda, but I

24   think it was Diane.

00040

1      Q.   Diane?

2      A.   Yes.  I had a friend named Linda a long time

3   ago, and I got mixed up.

4      Q.   Okay.  Now after -- well, when you went home

5   that day after the first conduct that you're

6   complaining about by Mr. Lariviere, did you tell

7   anyone about it?

8      A.   I told my best friend.  I called her.

9      Q.   Who's that?

10      A.   Her name was Linea Aspesi.

11      Q.   Can you spell it for the reporter?

12      A.   Linea, L I N E A.  Last name is Aspesi, A S

13   P E S I.

14      Q.   Where was she located?

15      A.   She was working at Brigham and Women's

16   Hospital.

17      Q.   In what part of the hospital?

18      A.   Human resources.

19      Q.   How long had you known her?

20      A.   Since tenth grade of high school.  Since

21   '86.

22      Q.   Before you called her back in late 1994 -- I

23   mean 2004, had you had any discussion with your

24   friend in human resources at the Brigham about

00041

1    sexual harassment?

2        A.   No.

3        Q.   Had she ever talked to you about any work

4    she was doing in the sexual harassment --

5        A.   No.

6        Q.   What was the conversation -- the substance

7    of what you said to your friend and what she said to

8    you that day when you called her?

9        A.   I just told her I was really upset about

10   what happened.  I wasn't sure I wanted to leave -- I

11   wanted to quit.  She was just talking to me telling

12   me how she felt about what happened.  She was upset

13   about it.

14       Q.   What did she tell you?

15       A.   She had told me that I should tell somebody.

16       Q.   Did she tell you why she thought you should

17   tell someone?

18       A.   So that the behavior would stop.

19       Q.   And you decided not to tell anyone, correct?

20       A.   Yes.

21       Q.   Okay.  Why didn't you take your friend's

22   advice?

23       A.   I was really afraid.  I really didn't want

24   to lose the job either because it was a really good

00042

1    job.  It was good money, and it was -- you know, the

2    hours were good.  It right donw -- not that far from

3    my house.  Fridays you got out of work early, and I

4    could be with my daughter.  I thought I could handle

5    it on my own.  He said he wouldn't do it again.  So

6    I wanted to -- you know, I thought that I could go

7    back there and be safe, and it wouldn't happen

8    again.

9         Q.  Did it happen again?

10        A.  Yes.

11        Q.  How quickly after that first occasion?

12        A.  I would say about two weeks later.

13        Q.  What happened two weeks later?

14        A.  You know, he just started making comments or

15   staring at me funny, you know, staring at parts of

16   my body, try to massage my shoulders, touch my hair.

17        Q.  What did you do?

18        A.  I would always tell me it makes me

19   uncomfortable, you know, stop, but he continued to

20   do it.

21        Q.  When you told him to stop, did he say

22   anything?

23        A.  He's like why, you don't like when I do

24   that, does it bother.  You don't like if I touch

00043

1    you, so if I touch you like that -- always

2    questions.

3        Q.  What did you say, if anything?

4        A.  I was like, no, I don't like that.  I was

5    like, you know, it makes me uncomfortable.

6        Q.  When he did this two weeks later?  Was that

7    early in the day, midday, late day?

8        A.  There were so many -- there were so many

9    things to remember, I just remember one time going

10   to court with him where I was in the car with him,

11   and he was trying to touch my legs and put his hand

12   up my skirt, and I told him to stop it and pushed

13   him away.

14       Q.  Well, let's stick with this time two weeks

15   you said after the first time.

16       A.  Hm Hm.

17       Q.  Did you go home as soon as that conduct

18   happened on that day?

19       A.  The first time?

20       Q.  No, not the first time.  The two weeks later

21   time.

22       A.  Hm Hm.

23       Q.  Let me make sure that you understand my

24   question.  You said the first time it happened about

00044

1   four or five days into your employment.

2       A.  Yes.

3       Q.  It was late in the afternoon, and you

4   immediately left?

5       A.  Hm Hm.

6       Q.  All right.  Two weeks later he started doing

7   other things to you?

8       A.  Yes.

9       Q.  All right.  On that occasion two weeks later

10  did you go home when he ceased doing what he was

11  doing?

12      A.  At the end of the day I went home.

13      Q.  But not before the end of the day?

14      A.  Not that I recall, no.

15      Q.  Okay.  So here he was doing it again.

16      A.  (Nods head.)

17      Q.  Respond verbally, please.

18      A.  Yes.

19      Q.  Okay.  And on the second occasion did you

20  call your friend at Brigham and Women's again?

21      A.  No, I didn't.

22      Q.  And at that time did you consider going to

23  David Bain in human resources and telling him what

24  had happened?

00045

1     A.  I just didn't know who to tell.  I didn't

2  know what to do.

3     Q.  You say you didn't know who to tell.  You

4  did know David Bain was next door in the human

5  resources office?

6     A.  I did know that, yes.

7     Q.  And I think you said there were a couple of

8  other women in the human resources office?

9     A.  Hm Hm.

10    Q.  All right.  Didn't you consider David Bain

11 in human resources might be an appropriate person to

12 complain to?

13    A.  It didn't even come to my mind to tell you

14 the truth.  I didn't think of David Bain to tell

15 him.

16    Q.  You didn't think of the other two women --

17    A.  I didn't even think.  I just was thinking I

18 could just deal with it myself and handle it.

19    Q.  Did it occur to you at that time to go to

20 Mayor Pollard about the problem?

21    A.  Not at that time, no.

22    Q.  Or to her chief of staff?

23    A.  Not at that time.

24    Q.  By that time do you think you knew that the

00046

1    city clerk was a woman Christine?

2        A.  I probably did -- I don't remember.

3        Q.  Okay.  All right.  So you went home.

4              Did you tell anybody that now two weeks

5    later it was starting up again?

6        A.  Yeah, I always told my -- the woman that

7    watches my daughter for me, who babysits her, she

8    knew what was going on.  I was always distraught.

9        Q.  What's her name?

10       A.  Meagen.

11       Q.  Meagen what?

12       A.  Schutte.

13       Q.  Could you spell that?

14       A.  M E A G E N.  The last name is S C H U T T

15   E.

16       Q.  Where does she live?

17       A.  Down the street from where I lived on Morgan

18   Drive.

19       Q.  Do you know if she still lives in Haverhill?

20       A.  Yep, she does.

21       Q.  Did you tell anyone other than Meagen?

22       A.  I told John Molori in the mayor's office.

23       Q.  Now when you say you told John Molori --

24              MR. RAPAPORT:  I believe that's

00047

1    M-O-L-O-R-I.

2        Q.   -- was that after you say Mr. Lariviere

3    started to bother you again two weeks after he had

4    first done it, or was that some later time?

5        A.   I think it was a later time.  I don't

6    remember the exact date.

7        Q.   If you can stick with when Mr. Lariviere you

8    say started doing things you didn't want again two

9    weeks after the first time.

10       A.   Hm Hm.

11       Q.   You told Meagen about it.  Do you remember

12   telling anybody else about it?

13       A.   At that time?  Not until a bit later.  No,

14   no, I don't remember telling anybody else.

15       Q.   The next day when you went in after he had

16   engaged in this conduct, did you have any

17   conversation with him about what he was doing?

18       A.   No.  He just -- you know, then he was acting

19   like his normal self like he wasn't going to do it

20   again.  Then the behavior just started up again.

21       Q.   When would it start up again?

22       A.   Almost every day it would happen.  Some kind

23   of comment or touching -- just trying to dodge him

24   all the time.

00048

1    Q.  Did it become clear to you that he was not

2  going to stop?

3    A.  Yeah, it did.

4    Q.  When it became clear to you that he wasn't

5  going to stop, did you consider looking for another

6  position?

7    A.  I thought about it every day.  I was

8  thinking of what I should do, if I should leave,

9  should I say something.

10    Q.  You had a lot of skills, didn't you?

11    A.  Yes.

12    Q.  Worked for Fidelity, for law firms, for

13  venture capital outfits?

14    A.  Hm Hm.  Yes.

15    Q.  And you knew that the Moore temporary agency

16  existed in -- were they in Haverhill?

17    A.  They were in Methuen.

18    Q.  Methuen.  Okay.  Why didn't you at that

19  point when you realized he wasn't going to stop --

20  why didn't you look around for another position?

21    A.  I was really scared.  I didn't know what to

22  do.  I was really confused about what to do.

23    Q.  Scared?  Mr. Lariviere never threatened you,

24  did he?

00049

```
 1        A.   No, he never threatened me.   No.

 2        Q.   He never told you not to report his conduct

 3   to anyone, did he?

 4        A.   No.

 5        Q.   So when you say you were scared, what were

 6   -- was there some person who was scaring you?

 7        A.   No.   I was afraid to say something because I

 8   was afraid to cause any trouble there like, you

 9   know, I wanted to keep that job.   It was good pay.

10   It was good pay.   I needed the money.   I was afraid

11   I'd have to look for another job.   So. ..

12        Q.   You said you didn't want to look for another

13   job or --

14        A.   Yeah.

15        Q.   Well, you had looked for a whole lot of jobs

16   in your career, hadn't you?

17        A.   Yes.

18        Q.   Successfully?

19        A.   Hm Hm.

20        Q.   According to Exhibit 1, you had, you know,

21   very little time between positions here.   Did you

22   think that you wouldn't find another comparable job

23   in the Lawrence Methuen area?

24        A.   I'm not sure.
```

00050

1      Q.  You never tried, did you?

2      A.  I didn't try to look after that.  I just was

3  there, and I wanted to stay there so I could work

4  and get my check every week.

5      Q.  But you could have gotten a check every week

6  working for another employer in that part of

7  Massachusetts, couldn't you have?

8      A.  I could have.

9      Q.  But you decided you wanted to stay working

10  for the city solicitor?

11      A.  (Nods head.)

12      Q.  You have to respond verbally.

13      A.  Yes.  Yes.

14      Q.  Even though you say he was touching you in

15  unwanted ways?

16      A.  Yes.

17      Q.  And you say you had concluded that he wasn't

18  going to change?

19      A.  I don't think -- I thought maybe -- I'm not

20  sure I could say that.  I'm saying that I thought

21  maybe he would change.  I thought I could deal with

22  it.  I thought I could handle him.  Like I could

23  dodge him or whatever and continue working there.

24      Q.  You say it was happening after this initial

00051

1  period on an almost daily basis?

2      A.  Yes.

3      Q.  You say you continued to tell him to stop?

4      A.  Yes.

5      Q.  And he wasn't stopping?

6      A.  No.

7      Q.  Well, then help me understand what grounds

8  you had for thinking that as the weeks and months

9  went on there was any reason to believe he was going

10  to change?

11      A.  I was hoping things would get better.  I was

12  hoping that he would come to his senses and stop

13  doing what he was doing.

14      Q.  Even though he kept doing it every day?

15      A.  Yes.

16      Q.  And you kept protesting every day?

17      A.  Yes.  I was hoping that he would stop.

18      Q.  Now you said at a certain point that John

19  Molori who worked in the mayor's office and you had

20  a discussion about what Mr. Lariviere was doing?

21      A.  (Nods head.)

22      Q.  Respond verbally, please.

23      A.  Yes.

24      Q.  Had you developed some kind of a friendship

00052

1    or --

2        A.   Yes.

3        Q.    -- with Mr. Molori?

4        A.   Yes, he was my friend.

5        Q.   Did you ever have lunch with him?

6        A.   Yes.

7        Q.   Did you have coffee or tea with him

8    sometimes?

9        A.   Sometimes, yes, coffee.

10        Q.   And when was it if you can recall when you

11    first told John Molori about what Mr. Lariviere was

12    doing?

13        A.   I would say maybe after two months.  After I

14    became a full-time employee there in December.

15        Q.   You're saying two months -- when you became

16    a full-time employee?

17        A.   Yes, around then.

18        Q.   Before we get to Mr. Molori, let me ask you

19    about this transition from temporary to full time.

20    You started the job as a temporary?

21        A.   Hm Hm.

22        Q.   And there came a time when you realized it

23    was possible to become permanent, correct?

24        A.   Yes.

00053

1      Q.   Okay.  Was that an opportunity for you to

2    leave the position no questions asked 'cause it was

3    a temporary position --

4      A.   Hm Hm.

5      Q.   -- and have Moore help you find another job

6    in the greater Haverhill or other area?

7      A.   I guess it was an opportunity, but I was

8    told like from the beginning that I was probably

9    going to be hired as a full time by them.

10            So I wanted to be able to get -- to make

11   41,000 a year because the temping you only made like

12   $330 a week.  So that was my goal was to stay to

13   make more money every week.

14     Q.   Did you ever look into whether it would be

15   possible to make $40,000 in the same area working

16   for a different employer --

17     A.   No, I didn't.

18     Q.   -- where you wouldn't be sexually harassed?

19     A.   No, I didn't.  I thought about it, but I

20   didn't pursue it.

21     Q.   Was there anything stopping you from

22   pursuing it?

23     A.   No.

24     Q.   So let's get back to Mr. Molori.  It was at

00054

1    about the time you became permanent that you and he

2    had a discussion about Mr. Lariviere?

3        A.  I think it was about that time or maybe a

4    little bit before.  I don't recall the exact date.

5        Q.  What was it that you and Mr. Molori

6    discussed?

7        A.  I told him what was going on and how it was

8    bothering me and I wasn't sure what to do, should I

9    say something.  That's what we discussed.

10       Q.  What did he say?

11       A.  He said I should tell the mayor or tell

12   Tootie.  I said, no, I really need this job; I don't

13   want to say anything right now, let me see if I can

14   handle this.  He promised not to say anything, and

15   he didn't say anything.

16       Q.  Did you think if you spoke to the mayor and

17   told her that you were being sexually harassed that

18   you would lose your job?

19       A.  Yeah, I felt that at the time.

20       Q.  Why?

21       A.  Why?  'Cause I felt -- at that time I felt

22   -- I didn't know -- I was confused.  I was scared.

23   If I said something, I didn't want to cause a huge

24   problem.  I just didn't want to be looked at

00055

1    someplace where I liked to work and where I liked

2    the people there to say that this is happening to

3    me.

4        Q.  Did you think that Mayor Pollard would

5    ignore your complaints if you went to her?

6        A.  I don't remember thinking that, no.  I was

7    just scared to say something.

8        Q.  But not as a result of any threats by

9    Mr. Lariviere?

10       A.  No.

11       Q.  You didn't want to take a chance on losing

12   the job?

13       A.  At that time, yes, I was afraid to lose a

14   job.  I needed the income.  I was a single mother.

15   I needed to make my check every week.  I was making

16   more money being a full-time employee.

17            I liked the job.  I liked the people

18   around me.  I just didn't like what was happening in

19   that office.  His actions were inappropriate.

20       Q.  But you never explored whether you could get

21   other full-time work in the same area at the same

22   compensation where you --

23       A.  I thought about it, but I didn't take

24   action.  No, I didn't.

00056

```
 1      Q.  All right.  Did you ever discuss the issue
 2   again with Mr. Molori after that time?
 3      A.  A couple of times after things were
 4   happening, I told him this happened today; this is
 5   ridiculous, you know.  I did, yes.
 6      Q.  Did he again advise you to let Mayor Pollard
 7   know?
 8      A.  Yes, he did.
 9      Q.  And you decided not to?
10      A.  Yes.
11      Q.  Did he ever offer to go with you to the
12   mayor?
13      A.  I don't recall.  I don't remember.
14      Q.  Did you ever discuss what you objected to
15   that Mr. Lariviere was doing with any other employee
16   of the City of Methuen?
17      A.  Yes, I did.
18      Q.  Who?
19      A.  I was saying Linda but Diane Gagnon.
20      Q.  All right.  Was she connected with the city
21   council?
22      A.  Yes, she was.
23      Q.  What was her job?
24      A.  She was at the front.  I guess she was like
```

00057

1    a secretary of the city council.

2        Q.  Was she who like Mr. Molori you became

3    friendly with?

4        A.  Yes.

5        Q.  Ever have lunch with her?

6        A.  No, I never had lunch with her.

7        Q.  You talked to her from time to time?

8        A.  Yeah I talked to her all the time when I

9    went next door to make copies and stuff.

10       Q.  When you spoke to Miss Gagnon about

11   Mr. Lariviere --

12       A.  It was after I talked to Mr. Molori.

13       Q.  What did you and Mrs. Gagnon discuss or Miss

14   Gagnon?

15       A.  I told her what was happening and that I was

16   really afraid to say something, but it's getting out

17   of control, and I need to say something 'cause I

18   can't take it anymore.

19           She had told me that previously when she

20   first started there something happened to her with

21   Maurice; that Maurice was behind her massaging her

22   shoulders and humping the chair, and she said she

23   was bothered by that and told him to stop, and he

24   never bothered her after that.

00058

1    Q.  Your experience with him was different,

2  wasn't it, that you had told him to stop --

3    A.  I would tell him I was uncomfortable, please

4  stop, and he kept doing it to me, yes.

5    Q.  All right.  What did Miss Gagnon advise you

6  to do, if anything?

7    A.  I don't know.  She seemed really concerned

8  about me.  She seemed like she was worried about

9  what to do.  She told me maybe I should tell Peter

10  McQuillan what was going on.

11    Q.  Who was Peter McQuillan?

12    A.  He was Maurice's -- I guess he used to be

13  the solicitor there.  On one occasion I had had

14  Peter McQuillan and Maurice.  So I knew him that

15  way.  I knew they were friends.

16    Q.  Did she tell you why she thought you might

17  perhaps tell Peter McQuillan?

18    A.  I can't remember actually.  I can guess to

19  why she told me that.

20    Q.  No, that's okay.  Did you as a result of

21  what Miss Gagnon said did you tell Peter McQuillan?

22    A.  No, I did not.

23    Q.  Why not?

24    A.  I just didn't know -- I didn't know if I

00059

 1    should tell Peter McQuillan.  I just didn't know

 2    what to do at that time.  I wanted to tell somebody.

 3    I didn't know who to tell.

 4         Q.  Let me ask you again how about Mr. Bain, the

 5    head of human resources for the City of Methuen?

 6         A.  Just did not come to my head.  I didn't

 7    think of David Bain at the time.  I -- maybe I

 8    should have.  I just didn't.

 9         Q.  Did you ever pass him in the course of a

10    day, you know, in city hall?

11         A.  Yes.

12         Q.  After that discussion with Miss Gagnon, did

13    you ever talk with her again about Mr. Lariviere?

14         A.  No, because at that day I wrote an e-mail.

15         Q.  You did what?

16         A.  That day after I told her --

17         Q.  Yes?

18         A.   -- I think if I remember correctly, it was

19    the day I sent an e-mail to Officer Wnek.

20         Q.  A member of the Methuen Police Department?

21         A.  Yes.

22         Q.  The Methuen Police Department you understand

23    investigates criminal matters?

24         A.  Yes.

00060

```
1      Q.  So you ultimately decide -- you decided to

2    tell somebody in the police department about

3    Mr. Lariviere?

4      A.  Hm Hm.  Yes.

5      Q.  Did you think at the time that it was a --

6    possibly a police matter?

7      A.  At the time?  Not that I recall.  I wasn't

8    thinking anything like that.  I couldn't take it

9    anymore.  I had to say something, and he came to my

10   mind.

11     Q.  Well, tell me if you can why you decided to

12   make your complaint to a police officer who worked

13   at the City of Methuen rather than the human

14   resources department or the mayor's office?

15     A.  I guess because he came into our office all

16   the time, Officer Wnek and him and Maurice would

17   discuss sometimes about harassment issues and things

18   like that.  So in my mind -- I don't know why he

19   just came to my mind that day.

20          I got an e-mail from the police

21   department that day at my desk about some kind of

22   fundraising thing, and I saw his name.  Then just in

23   my head I said maybe I should tell him what was

24   going on.  And I did.
```

00061

1          I didn't tell him in the e-mail.  I just
2     wrote in the e-mail that I -- something was going on
3     that I just needed help with; I couldn't handle it
4     on my own anymore.  Maybe someone should talk to
5     him.
6     Q.  Did you think when you spoke to the police,
7     Officer Wnek, that your complaint might result in
8     possible criminal charges against Mr. Lariviere?
9     A.  At the time I wasn't thinking anything.  I
10    just wanted to say something.  Even though I felt
11    what was happening was criminal, I felt that it was
12    wrong what he was doing to me.  When someone says
13    stop, they should stop touching you --
14    Q.  Did you want to see Mr. Lariviere criminally
15    prosecuted at that time?
16    A.  At that time I didn't know how I felt.  I
17    was very confused 'cause it happened so fast,
18    everything.  I just wanted to go back to work and
19    not be harassed.  That's all.  That was how I felt.
20    Q.  From the time you had the first conversation
21    with your friend at Brigham and Women's in the HR
22    department to the time you went to the police, did
23    you ever speak to your friend again about
24    Mr. Lariviere?

00062

1      A.   In between, no, I didn't.

2      Q.   Did you ever see the City of Methuen's

3   sexual harassment policy?

4      A.   Not that I remember, no.

5      Q.   Do you remember whether it was posted

6   anywhere at city hall?

7      A.   No, I don't.

8      Q.   Did you ever have lunch with Mr. Lariviere?

9      A.   Yes.

10     Q.   With approximately what frequency over the

11   course of your employment?

12     A.   A lot because he always followed me around

13   like -- if I ever wanted to go to lunch by myself,

14   he was right behind me, can I come with you.  I told

15   him I had all these errands to do, but yet he always

16   insisted on coming.  I have to talk to you about

17   something or something about work, or I need to talk

18   to you.

19     Q.   Did you ever ask Mr. Lariviere to go to

20   lunch?

21     A.   No.

22     Q.   Do you say that every time you and he ended

23   up having lunch together it was as a result of his

24   suggesting it?

00063

 1    A.  Yes.  Just, you know, following me around

 2   saying can I come with you.  I'd be like no, I have

 3   something to do.  And then he just would come with

 4   me.

 5    Q.  When you say follow you around --

 6    A.  I would try to go to lunch by myself, and

 7   he'd be like, oh, can I come and do errands --

 8           THE REPORTER:  Wait, wait.  Sorry you

 9   have to --

10    Q.  Yes, slow down.  All right, let me ask you a

11   new question.  What do you mean when you say he

12   would follow you around?

13    A.  I would try to get up to go to lunch by

14   myself, and then he would get his jacket on and say

15   to me I want to come with you.  I'd be like, no, I

16   have things to do today; I have errands to do.

17   Well, please let me drive you to your errands.  No,

18   I said I'm going to lunch, and then he would just

19   follow me almost to my car, and then he would just

20   get in the car with me, or sometimes other days he'd

21   be like -- I would drive, and he'd be like can I

22   come with you.  Like he'd always beg to come with me

23   to lunch.

24    Q.  Did you ever turn him down?

00064

1    A.  I always tried to, but he was always so

2    persistent.  He just wouldn't leave me alone.

3    Q.  So you never refused to have lunch with him?

4    A.  No, I would tell him I don't want you to

5    come, but he would follow me out the door literally

6    behind me to the car.

7    Q.  All right.  When you got to the car, was

8    there ever a time when you said to him I don't want

9    to have lunch with you today?

10   A.  Yes, there was.

11   Q.  And did you then get in the car and drive

12   somewhere?

13   A.  I tried to, but he would just sit there and

14   wait.  He'd be like right by the car, and I was like

15   -- he always wanted to come with me to lunch.

16   Q.  Were you parked in that parking area on the

17   lower level --

18   A.  Yes.

19   Q.   -- behind city hall?

20   A.  Yes.

21   Q.  All right.  Help me understand what happened

22   when you would leave wanting to be by yourself and

23   he would follow you to your car.

24   A.  He would just come with me.  He would just

00065

1    follow me.

2        Q.  All right.  Slow down for a second.

3            Didn't you ever just get in your car and

4    drive off to D'Angelo's or somewhere and have lunch?

5        A.  I did sometimes by myself, yes.   I had

6    lunch by myself sometimes.  A lot of times he would

7    follow me and come with me.

8        Q.  Would he follow you in his car?

9        A.  No.  He would come in the car with me.  On

10   some occasion I had did go in his car and have

11   lunch, yes.

12       Q.  But when you got in into your car, you're

13   saying he went to the passenger' side and got into

14   your car?

15       A.  Yes.

16       Q.  Did you ever tell him to leave?

17       A.  No, I would tell him I don't want you to

18   come today.  And he's like but, no, I want to come,

19   and then he would just persistently say he wanted to

20   come to lunch.  It was hard like to get him not to

21   go.

22       Q.  How often would you end up having lunch with

23   him?

24       A.  Maybe a couple times every week.  Like two

00066

1    times a week maybe.  If I had errands to do, he'd

2    just come on my errands with me and follow me

3    around.

4        Q.  Follow you in his car, or he'd be in your

5    car?

6        A.  He'd be in my car; I'd be in his car.  I'd

7    be doing my errands, and he would just follow me

8    around on my errands.

9        Q.  Did you ever tell him lunch aside, I don't

10   want you to follow me around on my errands?

11       A.  No, I never said that.  I would tell him I

12   don't want you to come with me today, but he would

13   persist that he wanted to come.

14       Q.  Did you ever consider complaining about this

15   behavior to Mr. Bain or anyone --

16       A.  I thought about it, but I didn't say

17   anything.

18       Q.  Did you consider complaining to the mayor or

19   her chief of staff about this as you describe it

20   forcing himself -- forcing you to have lunch with

21   him?

22       A.  I thought about it.

23       Q.  Did you enjoy having lunch with

24   Mr. Lariviere?

00067

```
 1        A.  On some days he was very friendly and nice,

 2   and he -- you could have a conversation with him.

 3   He never did anything to me during lunch.  He was

 4   very normal.

 5        Q.  So there were sometimes -- correct me if I'm

 6   wrong -- when you enjoyed having lunch with him?

 7        A.  Not enjoyed it, but he was civil.  Like he

 8   was normal.  He wasn't like he was in the office.

 9   He was like a -- my boss.  He wasn't like that.

10        Q.  Was there somewhere to have lunch in city

11   hall?

12        A.  No --

13        Q.  Did you --

14        A.  -- unless you sit at your desk and have

15   lunch.

16        Q.  Did you ever consider bringing lunch?

17        A.  Sometimes I would go get lunch and bring it

18   right back.

19        Q.  Did you ever go home for lunch?

20        A.  No, not often.  No.

21        Q.  Were there any places where you and

22   Mr. Lariviere tended to go more than others for

23   lunch?

24        A.  A place like D'Angelo's maybe.
```

00068

1      Q.  Did you ever refer to anybody -- well,

2    withdrawn.

3            Did you ever refer to any of the places

4    where you would have lunch with Mr. Lariviere as

5    "our" -- O-U-R -- "place"?

6      A.  No.  I didn't.  He did.

7      Q.  You never did?

8      A.  No.

9      Q.  Did you ever buy Mr. Lariviere a birthday

10   present?

11     A.  Yes.

12     Q.  Was it a Bombay clock?

13     A.  Yes, it was.

14     Q.  When was his birthday, if you remember?

15     A.  I think it was in November, if I remember.

16     Q.  This was well after he started what you

17   describe as sexual harassment?

18     A.  Yes.

19     Q.  If he was sexually harassing you, why did

20   you buy him a birthday present?

21     A.  At the same time I worked for him; he was my

22   boss.  So I felt like I should buy him a birthday

23   present.

24     Q.  Did he ask you for one?

00069

1    A.  No, he didn't.

2    Q.  Did you think that by giving him a birthday

3  present after the sexual harassment had begun you

4  were sending him any kind of a message?

5    A.  No.

6    Q.  Did you ever during the course of your

7  employment in the city solicitor's office get a

8  tattoo?

9    A.  Yes.

10   Q.  When in the range of October to the middle

11  of February did that happen?

12   A.  I think it was around December, if I

13  remember correctly.

14   Q.  Had you discussed the possibility of getting

15  a tattoo with Mr. Lariviere before --

16   A.  I didn't discuss --

17   Q.  You have to let me finish the whole

18  question.  It just makes our job harder.

19   A.  Hm Hm.

20   Q.  Did you ever discuss the possibility of

21  getting a tattoo with Mr. Lariviere?

22   A.  No.

23   Q.  Did you ever suggest the two of you get one?

24   A.  No.

00070

1     Q.  Are you saying that so far as you know he

2    didn't know you were going to get the tattoo until

3    you actually did it?

4     A.  I was talking on the phone about getting a

5    tattoo with somebody, and he overheard me, and

6    that's when the whole tattoo -- he knew I was

7    getting a tattoo.

8              When I came to work with the tattoo, he

9    said to me did you get your tattoo.  I was like yes.

10    Q.  All right.  Did you then show him your

11   tattoo?

12    A.  I didn't show him voluntarily.  It was all

13   patched up.  He was like let me see your tattoo, and

14   I said to him no 'cause it's all -- it's hurting,

15   and it's all patched up.  And then he said -- so he

16   was trying to like take the tape down a little bit

17   and look at it, and he looked at it.  I was telling

18   him to stop and --

19    Q.  Slow down a little 'cause I want to go over

20   this in more detail.

21              You're saying that you came in one day,

22   and did you indicate to him that you had one or he

23   asked you?

24    A.  He approached me.  He asked me did you get

00071

1    your tattoo that you talked about.

2        Q.   What did you say?

3        A.   I said, yes, I did.

4        Q.   Where were you?

5        A.   I was at my desk.

6        Q.   Where was he?

7        A.   Right in front of the desk.

8        Q.   What were you wearing?

9        A.   I was wearing black pants -- stretchy black

10   pants and a sweater, if I recall correctly.

11       Q.   And did you -- so in what area --

12       A.   It's right here (indicating).  So if you're

13   wearing pants, you can see it.  It's like right

14   here, the tattoo.

15       Q.   There was a gap between the pants and the

16   sweater?

17       A.   Yeah, but the pants were kind of loose so

18   you could see the bandage coming out of the pants.

19       Q.   So there was a bandage?

20       A.   Yes.

21       Q.   Okay.  And what happened next?

22       A.   He was like can I see your tattoo.  And I

23   said to him, no, it hurts, and it's bandaged.  And

24   he kept begging to see the tattoo.

00072

1      Q.  All right, let me stop you right there.

2              Did you want to show him your tattoo?

3      A.  No, I did not want to show him my tattoo.

4      Q.  But you ended up showing it to him?

5      A.  He was coming closer and closer to me trying

6   to take the tape off.  At that point I was very

7   uncomfortable, and I took the tape down a little bit

8   and said here's my tattoo so that he would stop it

9   and leave me alone.

10     Q.  Did he stop and leave you alone?

11     A.  No.  He kept, you know, talking about the

12  tattoo, trying to kiss my tattoo, all that stuff.

13  He didn't leave me alone.

14     Q.  All right.  At that point when according to

15  you he was forcing you to show him your partially

16  bandaged tattoo and was trying to kiss it -- was it

17  sore and tender?

18     A.  Yes, it was.

19     Q.  At that point did it occur to you to walk

20  down the hall to Mayor Pollard and tell her what

21  this man was doing?

22     A.  Of course it did.  Of course, I wanted to

23  say something every single day it was happening.

24  Every day I wanted to.  I was just scared to say

00073

1   something.  I was afraid.

2        Q.  Afraid of what?

3        A.  I was afraid of what was going to happen if

4   I said something.  Afraid of what would happen to

5   him if I said anything something.  Afraid I might

6   lose my job.  So there was a lot of fear in me.  I

7   was scared of a lot of different factors.

8        Q.  Had John Molori ever told you that nothing

9   would happen to you if you went to the mayor and

10  told her?

11       A.  Not that I remember, no.

12       Q.  All right.  What happened -- well,

13  withdrawn.

14            Did he actually kiss the tattoo?

15       A.  I can't remember if that day he actually

16  did.  But in future events he tried to kiss the

17  tattoo a lot.

18            Like he'd always say come here or put me

19  on his lap and try to kiss my tattoo or push me on

20  his lap when I'd walk by or just come after me.

21       Q.  This day -- the first day when he saw that

22  tattoo, what happened after he tried to kiss it?

23       A.  I pulled away, and I usually after I pulled

24  away and got really upset, I would go to the ladies

00074

1    room, or I would just walk away from him to get away

2    from him or go do something else.  Or try to, you

3    know, get my composure back.

4        Q.  Had you met Officer Wnek by the time that

5    Mr. Lariviere first saw your tattoo?

6        A.  It was much later -- it was much later.

7        Q.  That you met Wnek?

8        A.  Yeah.

9        Q.  Okay.  All right.  Did you tell anyone else

10   after this first time when he tried to kiss your

11   tattoo?  Did you tell anyone?

12       A.  Not that I recall, no.

13       Q.  And when was the next time he did anything

14   with regard to your tattoo?

15       A.  I can't remember the dates.  There were so

16   many things that happened every day with him.

17       Q.  I don't need the exact date.  I just mean

18   in --

19       A.  Every --

20       Q.  Wait, hang on.  In relation to this first

21   time when he saw the tattoo was it days, weeks, or

22   whatever later --

23       A.  It was days later he would say could I kiss

24   your tattoo, let me see your tattoo.  He'd call it

00075

1    his tattoo friend.

2        Q.  What would you say?

3        A.  I'd say leave me alone, stop it.  Let me see

4    tattoo today.  And that's the kind of voice he would

5    do -- let me see your tattoo.  I'd be like, no,

6    leave my tattoo alone, leave me alone.

7            MS. KAZAROSIAN:  Could I ask that we

8    have a break?

9            MR. RAPAPORT:  Sure.  Let's take five or

10   ten minutes.

11           (A recess was taken.)

12           MR. RAPAPORT:  We're going to mark as

13   Exhibit 2 the charge of discrimination dated March

14   8, 2005.

15           (Exhibit No. 2 marked

16           for identification.)

17   BY MR. RAPAPORT:

18       Q.  I'd like you to tell me whether this is your

19   signature on page -- the first page of Exhibit 2?

20           (Pause.)

21       Q.  Is this your signature on the first page?

22       A.  Yes.

23       Q.  Is this document, Exhibit 2, the charge of

24   discrimination that you filed with the MCAD?

00076

 1    A.  Yes.

 2    Q.  Now if you go down in the charge itself, the

 3  description to about the third paragraph that starts

 4  "in December of 2004."

 5    A.  Hm Hm.

 6    Q.  I'll read a couple of sentences and then ask

 7  you a question about them.

 8         "In December 2004 I was offered the job

 9  of -- the job full time as secretary to

10  Mr. Lariviere by and through the City of Methuen and

11  accepted the job.  I was convinced that he would

12  stop what he was doing."

13         Why were you convinced that he would

14  stop when you accepted the full-time position?

15    A.  I thought by saying no all the time and

16  telling him to stop and by maybe he would see me as

17  like a co-worker and not, you know, -- consider me

18  to do this all the time to me that he would stop.

19    Q.  Even though it hadn't worked up to that

20  point?

21    A.  I just kept thinking that maybe there was

22  hope that he would stop.

23    Q.  You say in the next sentence towards the --

24  well, a couple sentences down towards the end "again

00077

1    he said that he could not help himself...." --

2    A.  Yes, he said --

3    Q.  -- and I -- hang on.  "And I felt terrible,

4    but I also felt that I did not have a safe place to

5    go."

6           What did you mean by saying you didn't

7    have a safe place to go?

8    A.  Well, I wasn't sure -- like I didn't have a

9    safe place to go, who do I tell, what do I say.

10   There was nothing there at the City of Methuen that

11   told me to go to human resources or anything like

12   that.  So I wasn't sure where to -- I didn't have a

13   safe place to go, like who to go to.

14   Q.  But isn't it true that by this time your

15   friend in human resources at Brigham and Women's

16   Hospital had suggested to you that you tell human

17   resources?

18   A.  She did.  That was -- that was what she had

19   told me, yes.

20   Q.  So you did know that going to human

21   resources was an option?

22   A.  It was an option, yes.

23   Q.  I'm going to jump ahead a little bit on the

24   second page of the particulars.  You indicate -- and

00078

```
 1    I'll just paraphrase the next to last paragraph --

 2    that you're still employed by the city as secretary

 3    to the solicitor.  The interim solicitor appointed

 4    was Peter McQuillan, etc.

 5            My question is after Mr. Lariviere was

 6    no longer the city solicitor and was replaced by

 7    Mr. McQuillan, did you have any reason to believe

 8    that Mr. McQuillan would sexually harass you in the

 9    position?

10    A.  Oh.  No.

11    Q.  And by this time the police had come to your

12    assistance, correct?

13    A.  Yes.

14    Q.  And the mayor was aware of what had

15    happened?

16    A.  Yes.

17    Q.  And you were getting full support of the

18    city government?

19    A.  Yes.

20    Q.  Okay.  So I guess my question is why were

21    you not returning to your position as the secretary

22    to the new city solicitor, Peter McQuillan?

23    A.  I felt very uncomfortable to go back there,

24    just what had happened and what -- everybody knew
```

00079

1    had happened.  So many people knew so much about me

2    at that time, and I was really scared.

3              Plus Peter McQuillan I felt was a really

4    good friend of Maurice's, and I felt uncomfortable

5    being there.  Plus being in that office completely

6    freaked me out, being in that same office of what

7    had happened.

8       Q.  Okay.  Well, then why didn't you seek

9    positions at other offices that wouldn't have that

10   kind of an association for you?

11      A.  I just completely got so -- I wasn't well

12   enough to do that.  I felt really -- about what had

13   happened made me really depressed.  I was going

14   through anxiety.

15             I was really, really saddened by what

16   had happened.  I had a hard time with what had

17   happened.  I wasn't physically able to go back

18   there.

19      Q.  Have those feelings persisted from then

20   until today?

21      A.  Yes.

22      Q.  You still don't feel you're able to work in

23   any kind of an office?

24      A.  I still have a fear of like being panicky if

00080

1    I have to work in an office.  Like my future, I

2    don't know what I'm going to do now.

3              What I was doing in offices working, I'm

4    just afraid it would happen or one more bad thing

5    would happen, and it would make me go back to how

6    I'm feeling again.

7         Q.  Even though in all the jobs that we reviewed

8    in detail this morning on Exhibit 1 it had never

9    ever happened to you, had it?

10        A.  No.

11        Q.  You I think testified this morning that you

12   never even heard of it happening to anybody else in

13   these firms --

14        A.  Yes.

15        Q.   -- listed on Exhibit 1, correct?

16        A.  Yes.

17        Q.  Do you think you could work in a position

18   now that does not involve being in an office

19   environment?

20        A.  Right now I'm not really sure what I want to

21   do.  Right now I'm trying to see what I'd be

22   comfortable doing.  I don't know the answer to that.

23        Q.  Have you experimented with doing any

24   particular type of work --

00081

1    A.  I haven't yet, no.

2    Q.  You have to let me finish the question.

3        Have you experimented with doing any

4    particular kind of work recently where you think you

5    might be comfortable?

6    A.  No, I haven't.

7    Q.  Within the first few days of your employment

8    at Methuen, do you remember ever telling

9    Mr. Lariviere that you didn't know anybody in the

10   area and for that reason went to Burger King in

11   Methuen and sat in your car and ate your lunch by

12   yourself?

13   A.  Not to that extent, but we did have a

14   conversation about that, yes.

15   Q.  By having that conversation with him, were

16   you hoping that you might be able to have some

17   lunches with him?

18   A.  No.

19   Q.  Why did you then tell him that?

20   A.  He had asked me what I did for lunch.  I

21   said to him I went to Burger King.  He said to me by

22   yourself?  I was like yes.

23       He said why'd you go by yourself.  I

24   said because I don't know anybody around here right

00082

1    now because I'm just new to the area and everything.

2    And then that's how that conversation came about.

3        Q.  In one of your early lunches with

4    Mr. Lariviere did you speak to him about your

5    marital situation?

6        A.  Yes, I did.

7        Q.  You discussed some of your problems with

8    him?

9        A.  But there was a reason why I did though.

10       Q.  Tell me the reason.

11       A.  Do you want to hear?  Okay.

12           Maurice was talking to me about his old

13   secretary that he had had who passed away.  He was

14   very upset.  He was crying and everything about it.

15   You could tell he was hurt.  He mentioned to me

16   about her possibly being in a physically abusive

17   relationship and everything.

18           So at that time I felt safe to say that,

19   you know, I was kind of, you know, in a similar

20   situation like that.  I felt bad about what had

21   happened to her, too -- bad nobody knew about it.

22   That's why he knew about that.  I felt comfortable

23   saying that because he had just spoke about his old

24   secretary.

00083

1       Q.  Was that before or after that first occasion

2   when he started touching you?

3       A.  It was before.

4       Q.  After that first occasion in which you told

5   us was about four or five days into your employment

6   where he touched you and did the things you told

7   us --

8       A.  Hm Hm.

9       Q.   -- after that did you feel comfortable

10  talking to him about your personal problems?

11      A.  No, I didn't.

12      Q.  Did there come a time when you joined Gold's

13  Gym in Methuen?

14      A.  Yes.

15      Q.  Why did you do that?

16      A.  To get away from him during lunch.  I

17  figured it was a good excuse to go to the gym and

18  work out so he wouldn't come with me to lunch

19  anymore.

20      Q.  Did it work?

21      A.  No.

22      Q.  Why not?

23      A.  Because he also joined the gym.

24      Q.  Did you speak to him about that?

00084

```
 1        A.  Well, when I said I was going to join the

 2   gym, he was saying to me that he also wanted to join

 3   the gym.  I didn't take him seriously at the time.

 4   I didn't think he really was going to join the gym,

 5   too.  So --

 6        Q.  But he did?

 7        A.  Yes.  He had a conversation with me.  Yes.

 8        Q.  When he joined the gym and your plan to get

 9   away from him during lunch, did you quit the gym?

10        A.  No, I still went.

11        Q.  Did you work out with him at the gym?

12        A.  I would go myself, and then he would come in

13   his car later on and be at the gym as well.

14        Q.  Would you socialize with him during your

15   workout?

16        A.  No, not really.  I would work out, do

17   whatever I would have to do, and he would work out

18   in his area.

19        Q.  Did you eat lunch on these days when you

20   went to the gym?

21        A.  No.  I would usually pick something up and

22   bring it back to my office.

23        Q.  Did you ever choose the places where you and

24   Mr. Lariviere ended up having lunch over the course
```

00085

1   of your employment?

2       A.   Not that I remember.   I'm not sure about

3   that.

4       Q.   And who ended up paying for these lunches?

5       A.   We would take turns paying.   Like one day he

6   would pay; the next day I would pay.

7       Q.   During these lunches or at any other time

8   during your employment with Methuen, did you talk

9   with Mr. Lariviere about any financial problems you

10  were having?

11      A.   I didn't mean to talk to him about it, but I

12  was sometimes at work like calling credit places up,

13  and he would overhear me talking to them about my

14  credit cards.   They would call me all the time on my

15  cell phone.

16           So he kind of knew it was going on.   He

17  would ask me what's the matter, are you having

18  problems.   I told him, yeah, I'm having problems

19  with the credit cards, you know, I can't pay all

20  these bills and that kind of stuff.

21           Not voluntarily telling him, but at work

22  when it was really quiet I'd try to make a phone

23  call to one of those debt companies -- debt

24  consolidation companies, and he overheard.   And

00086

1    sometimes if I was next door talking to the girls,

2    he would come in, and I'd be talking to them about

3    it, and he would hear.  And then he'd ask me

4    questions about it, and then I gave him some

5    information about that.  That's how he knew.

6        Q.  Why did you take these calls from creditors

7    on your cell phone at work?

8        A.  I tried not to, but sometimes by mistake it

9    would come unknown number, I would answer it not

10   knowing it was a credit card company, and then it

11   was a credit card company.

12       Q.  Did you ever talk to Mr. Lariviere about any

13   financial issues you had or problems you had when

14   you were living on Long Island?

15       A.  He had asked me one time like why I came

16   back to Boston.  I told him I was having problems

17   making ends meet and everything.

18       Q.  Did you ever look to him for any financial

19   assistance?

20       A.  No.  I didn't look to him for financial

21   assistance, but one time when I had the ulcer

22   because of everything that was happening, I had to

23   get my medication, but the insurance wouldn't cover

24   it, and he heard me talking to CVS.

00087

```
 1              He offered to me let me give you $80 to
 2    pay for your prescription, and he said -- I told him
 3    I'll pay him back the next day when I get my check,
 4    and he helped me.  So he went to CVS with me and got
 5    my medication and gave me the money, and the next
 6    day I paid him back.  I wrote him a check.
 7        Q.  Did you ever use the term "archangel" in
 8    connection with Mr. Lariviere?
 9        A.  Yeah, 'cause he would always ask me like,
10    you know, how do you think of me, how do you view me
11    like, you know, do you view me as somebody -- how do
12    you see me like as somebody -- 'cause, see, a long
13    time ago he would write things like, you know, I
14    want to run away with you to Turkey and things like
15    that and, you know, have children -- all these weird
16    things all the time.
17              So I would say to him, you know, I look
18    to you as like a father, Maurice, or like an
19    archangel kind of person, to keep telling him that I
20    looked to him as a, you know, like -- not as the way
21    he sees me, but I see him as somebody who's helpful
22    and as -- you know, like that kind of a person.
23        Q.  Did you refer to him as archangel --
24        A.  I did at times.
```

00088

1        Q.  Please, you got to let me finish, count to

2    two, and then you can answer.

3             Did you refer to him from time to time

4    as archangel?

5        A.  Yes.  I think just one time I did when he

6    was asking me those questions about how I view him.

7        Q.  Just once?

8        A.  Yes.  And then -- I'm sorry.  Never mind.

9        Q.  If you want to add something, go ahead.

10       A.  Then at one time in the e-mail he wrote that

11   he was archangel.  He was telling me back that

12   that's what he was.  He referred to himself as that.

13       Q.  When you learned that you were going to get

14   the permanent position, do you remember ever jumping

15   into Mr. Lariviere's arms and expressing your

16   gratitude?

17       A.  No.

18       Q.  Did you ever hug him and kiss him --

19       A.  I think I gave him a hug and kiss on the

20   cheek saying thank you.

21       Q.  For the job?

22       A.  Yes.

23       Q.  Did you ever tell him that he was the best

24   boss you'd ever had?

00089

1      A.   No.

2      Q.   By the way, in any of these prior

3  employments that we went over this morning listed on

4  Exhibit 1 did you ever get your boss a birthday

5  present?

6      A.   Yes.

7      Q.   Which ones?  Which jobs?

8      A.   The JG Fogg & Company, my boss.  He would

9  buy me birthday presents and Christmas presents,

10  too.  I bought him birthday presents.  Most of my

11  bosses we'd usually exchange gifts.

12      Q.   I want to be very specific here.

13      A.   Yep.  JG Fogg, Citrus & Allied, and Fidelity

14  I remember.

15      Q.   In each of those instances you would get

16  your bosses presents on their birthday?

17      A.   Yes.

18      Q.   In each of those cases did they give you

19  presents, too?

20      A.   Yes.

21      Q.   And in each of those cases did you get them

22  presents after they had given you presents?

23      A.   Yes.

24      Q.   Had Mr. Lariviere given you a birthday

00090

1    present?

2        A.  Yes, he did.

3        Q.  When is your birthday?

4        A.  Stop, hold on a second.  Birthday present?

5    No.  Christmas present he gave me and my daughter.

6        Q.  What did he give you?

7        A.  If I remember correctly -- oh, I can't

8    remember what it was.  I remember Melisa's Christmas

9    present was a little stuffed animal.

10       Q.  Yours?

11       A.  My daughter's.

12       Q.  No, I know.

13       A.  Mine I can't remember.  I'm --

14       Q.  Okay.

15       A.  -- drawing a blank.  On occasion he would

16   buy presents for me like flowers or candy.  He was

17   very generous that way.  He'd always buy things.

18       Q.  Did you ever tell him you really didn't want

19   presents?

20       A.  I was like you don't even have to, Maurice.

21   You know, I don't really want anything.  I did, yes.

22       Q.  Did you ever tell him not to get you anymore

23   presents?

24       A.  No, I never said don't ever get me anything

00091

    1   ever again.  I said, you know, -- usually you didn't

    2   have to.  That was my way of saying.

    3       Q.  Did you ever mention to Mr. Lariviere that

    4   you had a fiance named Anthony who was in Iraq?

    5       A.  It didn't come up like talking about him.

    6   He asked me who my fiance was.  I said he was away.

    7   And Maurice was like away where.  I'm like away.

    8   Maurice said to me is he away in the army.  I was

    9   like, yes, he's away in the army.

   10       Q.  Was that true?

   11       A.  No, it wasn't.

   12       Q.  Where was he?

   13       A.  He was actually in federal prison.

   14       Q.  In where?

   15       A.  In Fort Dix.

   16       Q.  Was he in fact your fiance?

   17       A.  Yes.

   18       Q.  And once the dog appeared in the household

   19   where your mother and you and the others lived, did

   20   that affect the quality of your living situation?

   21       A.  Sometimes, 'cause it was a puppy, and it

   22   would bark at night or wanted to go for a walk, and

   23   I had some problems sometimes, yes.

   24       Q.  Problems sleeping?

00092

1     A.   Sometimes, yes.

2     Q.   Did the dog remain there throughout your

3  employment at Methuen?

4     A.   Yes.

5     Q.   And until you left to go to New York

6  recently?

7     A.   Yes.

8     Q.   Did you ever tell Mr. Lariviere that your

9  living situation at home made you tired and sick?

10    A.   Sometimes, 'cause I would come to work, he'd

11 ask me -- I was I little tired.  He's like what's

12 wrong.  I would say I'm a little tired, a little

13 stressed out over stuff at home.

14    Q.   Were you feeling bad at that time about the

15 fact that your fiance was in prison?

16    A.   Yeah, that was pretty bad.

17    Q.   Did that feeling amount to depression in

18 your view?

19    A.   No.

20    Q.   Okay.  Were you ever depressed over the fact

21 that your fiance was in jail?

22    A.   I wasn't depressed.  I was sad about it.

23    Q.   And did that last during the time that he

24 has been in jail?

00093

```
 1      A.  I pretty much got over it at the time I was

 2  in Boston.

 3      Q.  Who were the people other than Mr. Bain in

 4  the human resources office?

 5      A.  There was a Connie and a Jill.

 6      Q.  Did you become particularly friendly with

 7  one or the other of them?

 8      A.  They were both very nice.  Connie was very

 9  nice.  Connie and I tried to get together sometimes

10  to go out, but we never did.

11      Q.  Did you ever tell Connie about your

12  complaints concerning Mr. Lariviere?

13      A.  I never told her, no.

14      Q.  After Mr. Lariviere first saw your tattoo,

15  did you ever say to him now it's your turn to get a

16  tattoo?

17      A.  No.

18      Q.  Did you ever show Mr. -- well, withdrawn.

19          Did you have a dating website through

20  match.com?

21      A.  I was on match.com, yes.

22      Q.  Did you ever show that to Mr. Lariviere?

23      A.  Not voluntarily.  I was on it one day and he

24  saw me.  He's like what's that, is that you on the
```

00094

1    picture.  I said, yeah, that's me.  I said I was on

2    this dating site.

3        Q.  What else did you and he discuss, if

4    anything?

5        A.  Not anything else about that.  That was it.

6        Q.  Did you show him the picture of you on

7    match.com?

8        A.  Well, he was behind me.  He saw me on there.

9    He was like what is that.  I said it was the dating

10   site.  I went on to go see what it was all about,

11   and he saw it.  He was looking.  He was like is your

12   picture on there --

13       Q.  Did you ever tell him that you had met a man

14   who was a police officer from Rhode Island on

15   match.com?

16       A.  I didn't tell him, but I told the girls next

17   door.

18       Q.  Did you ever discuss that with

19   Mr. Lariviere?

20       A.  No, I didn't.

21       Q.  Now do you remember at about the time the

22   job became permanent that there was some sort of

23   "welcome aboard party" with cake?

24       A.  Yes.

00095

1      Q.  Okay.  And do you remember giving him a hug

2   and a kiss at that time at the party or after the

3   party?

4      A.  I think I said thank you.  I don't remember

5   giving him a hug and kiss though.  I think I said

6   thank you for the party 'cause he had gotten a cake

7   and a card, and there were some people from next

8   door, and it was very nice what they had done.

9      Q.  Do you remember ever an occasion when you

10  were wearing a sweater with a collar around your

11  neck and where you told Mr. Lariviere that the

12  sweater was designed to hang off your shoulders?

13     A.  No.  I'll tell you what really happened

14  actually.

15     Q.  Okay.

16     A.  I came into work with a sweater that -- you

17  couldn't see through it or anything like that.  It

18  was like off the shoulders.  I wasn't wearing it off

19  the shoulders.  You could though if you wanted to.

20          And when he saw me in that sweater, he

21  was just looking at me.  He's like, wow, I love that

22  sweater, put it off your shoulders.  He was behind

23  me and kept trying to put the sweater down my

24  shoulders.  I said, no, stop it.  He was trying to

00096

1   massage me and touch me in certain areas.

2       Q.  So you're saying the -- that you didn't take

3   any action to yourself pulling the sweater down?

4       A.  No.  The sweater for some reason made him do

5   all that stuff by -- just by wearing the sweater, he

6   started reacting that way.

7       Q.  Did you ever discuss with Mr. Lariviere the

8   possibility of his getting a job for your mother at

9   the city?

10      A.  Yes, we did.  That came about.  I was

11  talking to my mother on the phone about jobs.  Then

12  Maurice said to me is your mother looking for a job.

13  I'm like yes.  He's like, well, maybe we can help

14  her get a job here.  I was like that would be great

15  if you could try.  He tried.

16          He got her resume, and he tried to send

17  it over to the police department to help her get a

18  job.

19      Q.  Here again the initiative came, according to

20  you, from Mr. Lariviere?

21      A.  Yes.

22      Q.  Okay.

23      A.  I didn't personally ask him to help her.  He

24  offered.

00097

 1      Q.  Did you ever talk to him about possibly

 2   taking your daughter Melisa skiing?

 3      A.  No.  I was -- I was making plans to take my

 4   daughter skiing myself, but I had to go get some ski

 5   equipment, and one day during lunch Maurice came

 6   with me, and I went to go get some ski stuff, and I

 7   tried on this black men's ski jumpsuit, and then he

 8   -- that's all.  I bought that like $40 at the ski

 9   place.

10           I know he said it was like some sexy ski

11   outfit, but, in fact, it was just a stupid little

12   men's ski jumpsuit like black.

13      Q.  Did you ask him to drive you to the Ski

14   House in Salem, New Hampshire?

15      A.  I didn't ask him, no.

16      Q.  He -- he --

17      A.  He offered.

18      Q.  He made it happen?

19      A.  Yeah.

20      Q.  All right.  Did you try ski -- try on ski

21   outfits with him there at the ski house?

22      A.  I didn't try it on with him.  I went in

23   myself and tried it on and bought one.

24      Q.  Did you come out and show him how they

00098

1   looked?

2       A.  No, I didn't.

3       Q.  Did you ever tell him that you were worried

4   about never being able to afford a home given the

5   cost of homes these days?

6       A.  Yes, I remember we had a discussion about

7   that one day about homes.

8       Q.  Did you ever tell him in late January, early

9   February that you were upset because of the

10  relationship between your mother and Glen?

11      A.  No.

12      Q.  Did you ever tell him that fighting and

13  swearing between your mother and Glen was bothering

14  Melisa?

15      A.  No.

16      Q.  Did you ever meet Mr. Lariviere and a friend

17  of his, William Departo, at Gold's Gym and tell them

18  about any fighting or swearing?

19      A.  I saw them there.  I didn't meet them

20  intentionally.  I went to the gym.  Melisa was with

21  me.  They said why are you here.  Then I said

22  something about my mother and Glen fighting.  I said

23  -- mentioned something about to get out of the house

24  I came to the gym.

00099

1      Q.  What was your e-mail address when you were

2   working at the city, your own personal e-mail?

3      A.  It was melisaful@aol.com.

4      Q.  Did you ever send e-mails to Mr. -- personal

5   e-mails -- e-mails in the nature of personal e-mails

6   to Mr. Lariviere?

7      A.  I never really initiated it.  Whenever I was

8   on the computer, he would usually IM me or send me

9   an e-mail.  If I didn't respond, he kept IM'ing me,

10  IM'ing me, and sometimes I would just respond to one

11  of his e-mails.

12     Q.  And did you ever sign or end one of your

13  e-mails with the phrase LOL?

14     A.  Yes.  Which means laugh out loud.

15     Q.  Have you ever heard it used to mean lots of

16  love?

17     A.  No, I never heard it that way.

18          MR. RAPAPORT:  We'll mark as Exhibit 3

19  an e-mail message from melisaful@aol.com dated

20  November 29, 2004.

21          (Exhibit No. 3 marked

22          for identification.)

23     Q.  Is this an e-mail you sent to Mr. Lariviere?

24     A.  Yes.

00100

1    Q.  Now when you say in here thanks for thinking

2    of me, what were you referring to?

3    A.  I really can't remember.  It might have been

4    either when he was trying to help me -- giving me

5    some tax advice or -- I can't remember exactly when.

6    I was telling him thank you for something.  Then he

7    told me he sent an e-card and kept asking me did I

8    get it.  Then I wrote are you sure you aren't

9    dreaming that you sent it.  I wrote LOL, laugh out

10   loud.

11   Q.  Why would you say laugh out loud after --

12   A.  Because I was saying are you sure you sent

13   it and wasn't dreaming.  That was funny to me.  So I

14   put LOL.  That means laugh out loud.

15   Q.  That was funny to you?

16   A.  Yes.

17   Q.  I notice the subject line says re: Yedi --

18   Y-E-D-I -- mission accomplished?

19   A.  Maurice would call me Yedi sometimes which

20   in Turkish means 7.

21   Q.  Did he have any facility in Turkish, so far

22   as you know, before he met you?

23   A.  No.

24   Q.  Did you tell him what that word meant?

00101

1    A.   Yes.  He would ask me what does seven mean

2   in Turkish.  I said Yedi in Turkish is number seven.

3   He would say he rolled a seven when I was hired;

4   like he was happy that I was there.  That's why he

5   called me Yedi.

6    Q.   Were you comfortable with him calling you by

7   a Turkish word?

8    A.   Yeah, it didn't bother me.

9        MR. RAPAPORT:  Exhibit 4 is going to be

10   another e-mail from melisaful@aol dated December 5,

11   2004.

12        (Exhibit No. 4 marked

13        for identification.)

14    Q.   Is Exhibit 4 an e-mail you sent to

15   Mr. Lariviere?  Do you have that in front of you?

16    A.   Yes, I do.

17    Q.   Is that an e-mail you sent to Mr. Lariviere?

18    A.   Yes.

19    Q.   Why did you ask him how his weekend was

20   going?

21    A.   I -- if I remember correctly, I think it was

22   an e-mail that he had written me first and he wanted

23   me to respond to.  And I sent him an e-mail back.

24    Q.   Well, but my question is why on a Sunday

00102

1    were you e-mailing your boss asking him how his

2    weekend was going?

3        A.   I was responding to an e-mail he sent me.

4        Q.   What did that say?

5        A.   I can't remember.  I remember he sent me an

6    e-mail.  So I was responding back to his e-mail that

7    he sent me because on the subject it says regarding

8    Yedi.  It was an old e-mail that he had sent me.  I

9    was responding to that.

10       Q.   Is there anything in Exhibit 4 that you

11   think suggests that this e-mail was written in

12   response to some e-mail from Mr. Lariviere?

13       A.   It doesn't look that way.  I was just

14   responding.  I can't remember.  I wished I saved all

15   the e-mails that he sent me, but I didn't, so you

16   could see the track of what he was saying.

17            MR. RAPAPORT:  Exhibit 5 is going to be

18   another e-mail from melisaful to apparently

19   Mr. Lariviere's e-mail address.  This one's dated

20   January 8, 2005.

21            (Exhibit No. 5 marked

22             for identification.)

23       Q.   This e-mail, Exhibit 5, is that one you sent

24   to Mr. Lariviere on Saturday, January 8, 2005?

00103

1      A.  Again, I was responding --

2      Q.  Excuse me.  The question is is this an

3  e-mail you sent him?

4      A.  Yes, it is.

5      Q.  Next question, why are you e-mailing your

6  boss on a Saturday?

7      A.  See, you don't have the other part of this

8  e-mail.  I was responding to his e-mail.  He was

9  asked me how I was doing with my stomach, and  I

10  sent it back to him.  I wrote, hi, how are you,

11  how's your weekend going.  I told him about the

12  doctor and what the doctor said, and that's all.

13      Q.  Now at this point, January 8th, you were

14  several months into being sexually harassed,

15  correct?

16      A.  Right.

17      Q.  Why are you then asking him, quote, how are

18  you; how is your weekend going?

19      A.  Because I thought by being friends with

20  Maurice maybe he would stop and see me differently.

21  That's how I felt I could handle the situation.

22      Q.  You thought by being more friendly with

23  Maurice that it would discourage him from harassing

24  you?

00104

1      A.  Yes.

2      Q.  Did it work?

3      A.  It didn't work, no.  I thought it would at

4   the time; that if maybe I was friendly with him,

5   maybe he would stop it and maybe see me as a friend

6   and not as what he was looking at me as.

7      Q.  Had you been friendly to him before January

8   8th?

9      A.  I mean as friendly as a boss/co-worker

10  relationship, yes.  That's how friendly I was to him

11  as boss.

12     Q.  Had it worked before January 8th?

13     A.  It didn't work.  I thought it might work.  I

14  kept trying that avenue.

15     Q.  And when you -- you said goodbye, you wrote

16  B Y, and then there are a whole bunch of Es.  Is

17  there any reason why you wrote it that way?

18     A.  That's just the way I write bye.

19     Q.  That's what?

20     A.  That's just the way I write bye.

21     Q.  Always?

22     A.  Yeah, always.

23          MR. RAPAPORT:  The next is Exhibit 6.

24  This is an e-mail from melisaful dated February 2,

00105

1    2005.

2                    (Exhibit No. 6 marked

3                    for identification.)

4        Q.  Is this Exhibit 6 an e-mail you sent to

5    Mr. Lariviere on February 2, 2005?

6        A.  Yes.

7        Q.  Okay.  And you signed it kiss, didn't you?

8        A.  I kind of have a habit sometimes.  All my

9    friends I send e-mails to I always write kiss a lot

10   at the end.  Without thinking, I was so used to

11   writing it, I just wrote kiss without thinking what

12   a kiss meant, you know what I mean?

13                    That's how I am.  That's how I walls

14   write my e-mails.  I can show you twenty thousand

15   other e-mails that I wrote -- have kiss at the end.

16       Q.  But you knew this e-mail was going to your

17   boss though, right?

18       A.  (Nods head.)

19       Q.  You have to respond verbally.

20       A.  Yes.

21       Q.  And you knew by February 2, 2005 your boss

22   had been sexually harassing you for months?

23       A.  Yes.

24       Q.  And you still said to him, hi, hi, hi and

00106

1    then signed it kiss?

2        A.  Yes.

3        Q.  Do you remember ever being interviewed by a

4    doctor named Clive Dalby -- D-A-L-B-Y -- in Methuen

5    I think in connection with your worker's comp case?

6        A.  Dalby?  Yes, I do.  I think it was City of

7    Methuen asked me to go see that doctor.

8        Q.  Yes.

9        A.  Yes, I remember.

10        Q.  Okay.  Do you remember ever telling

11    Mr. Dalby that when you worked for Mr. Lariviere

12    that he daily attempted to touch and kiss you?

13        A.  Yes.

14        Q.  And was that true?

15        A.  Yes.

16        Q.  Do you remember that when you were

17    interviewed by Mr. Dalby it looks like sometime

18    September in 2005 -- at least that's the date of the

19    report I have -- telling him that you had lost

20    interest in your usual activities like skiing,

21    rollerblading and going to the gym?

22        A.  Yes.

23        Q.  Had you engaged in those activities before

24    you started working for the city?

00107

1    A.  Yes.

2    Q.  Did you engage in them while you were

3  working at the city?

4    A.  While I was working at the city?

5    Q.  Yes.

6    A.  Yes.

7    Q.  And at some point did you stop engaging in

8  those activities?

9    A.  Yes.  I didn't find -- I had a hard time

10  doing things.  Yes.

11    Q.  Well, after you stopped working for the

12  city, did you do any skiing?

13    A.  No.

14    Q.  Any rollerblading?

15    A.  No.

16    Q.  Any going to the gym?

17    A.  Sometimes but not as much as I used to.

18    Q.  How often did you go to the gym after you

19  were no longer working for the city?

20    A.  Maybe like twice a week maybe.

21    Q.  For how long approximately?

22    A.  For like another year maybe.

23    Q.  Going back for a minute to these

24  conversations with Mr. Molori, do you remember his

00108

1   ever telling you that if the mayor -- Mayor

2   Pollard -- had heard of any sexual harassment going

3   on that she would absolutely not stand for it?

4        A.   No.

5        Q.   Have you discussed your case, by which I

6   mean the MCAD case, with anybody other than your

7   attorney?

8        A.   The MCAD case?

9        Q.   Yeah, the discrimination case for sexual

10  harassment against the City and Mr. Lariviere.

11       A.   No.  No.

12       Q.   Not with your mother?

13       A.   Not really.

14       Q.   Not with your fiance?

15       A.   No.

16       Q.   Not with your friend at Brigham and Women's

17  other than what you've already told us?

18       A.   I haven't really been discussing it with

19  anybody.

20       Q.   Okay.  Have you been involved in any

21  litigation other than this case and the ones arising

22  out of the Methuen --

23       A.   No.

24       Q.    -- employment?

00109

1      A.   No.

2      Q.   Never been a plaintiff or a defendant in a

3  lawsuit?

4      A.   No.   The only thing that's going on is my

5  daughter got bit by a dog and had thirty stitches.

6  That's one case.

7      Q.   Other than that, you haven't made any legal

8  claims against anyone?

9      A.   No.

10     Q.   Now I think you told me a while ago you were

11  still experiencing symptoms that you attribute to

12  the -- to what happened during your employment at

13  Methuen.

14          I don't mean at this moment, but are you

15  at the present time continuing to experience

16  symptoms?

17     A.   Yes.

18     Q.   What symptoms?

19     A.   I still have a lot of anxiety and

20  depression.

21     Q.   But you were able to move to New York a

22  couple months ago?

23     A.   Yes.

24     Q.   All right.  Now in New York -- tell me again

00110

1    -- I may have asked you this this morning -- why you

2    left Methuen and moved to New York?

3         A.   I just wanted to go back to New York.

4         Q.   Do you have any kind of support system in

5    New York?

6         A.   I have my friends.

7         Q.   What sort of daily routine have you had in

8    the last couple of weeks in New York?

9         A.   Just taking my daughter to school, and

10   that's about it.

11        Q.   You say you're looking for a therapist

12   there?

13        A.   I'm going to try, yes.

14             MS. KAZAROSIAN:  Sorry, I didn't hear

15   that question.  Are you looking for?

16             MR. RAPAPORT:  -- a therapist there, and

17   I think she said yes.

18             MS. KAZAROSIAN:  A therapist, okay.

19        Q.   Do you have a car in New York?

20        A.   Yes.

21        Q.   What sort of a place are you living in?

22        A.   I'm living with a friend right now.

23        Q.   So this is temporary?

24        A.   Yes.

00111

1    Q.  Who is the friend?

2    A.  Her name is Susan.

3    Q.  Susan what?

4    A.  Capanelli.

5    Q.  Is the address the one you gave us at the

6    beginning?

7    A.  Yes.  Hm Hm.

8    Q.  How do you know Susan?

9    A.  She's my friend.

10   Q.  For how long has she been a friend?

11   A.  For about seven years.

12   Q.  Is she related to your fiance at all?

13   A.  Yes.

14   Q.  How is she related?

15   A.  She's her sister-in-law -- his

16   sister-in-law.

17   Q.  His sister-in-law?

18   A.  Hm Hm.

19   Q.  Okay.  You say you're still engaged?  Are

20   you still engaged to your fiance?

21   A.  I just got married actually.

22   Q.  When was that?

23   A.  A couple weeks ago.

24   Q.  This was to your fiance?

00112

1     A.  Yep.

2              MR. RAPAPORT:  We can be off the record.

3              (Off the record.)

4              (A lunch recess was taken.)

5     BY MR. RAPAPORT:

6     Q.  Ms. Kazarosian has indicated that Miss Metin

7     wants to clarify or supplement her answer to some

8     question I asked.  By all means.

9     A.  It was a question about my prior working

10    history, if anything ever happened to me.  When I

11    was about 19 or 20, I was working at this place

12    called Gentle Movers in South Boston.

13             MR. DiADAMO:  Which one?

14    A.  When I was like 19 or 20 years old.

15             MR. DiADAMO:  What was the name of the

16    company?

17             THE WITNESS:  Gentle Movers.

18    A.  It's called Gentle Movers.

19    Q.  Not Gentle Giant?

20    A.  No.  It was Gentle Movers in South Boston,

21    and my boss at the time had come after me, and the

22    next day I had quit, but I had pursued something for

23    unemployment because you can't get money from

24    unemployment unless you willfully -- since I quit on

00113

1    my own, I had to prove that -- that was the reason

2    why I left.

3              So I won that part of my unemployment.

4    I got unemployment for a month, and then I got

5    another job.

6        Q.  Okay.

7        A.  I just wanted to tell you.

8        Q.  And what did he do that you felt was

9    improper?

10       A.  I was in his office, and he just came after

11   me and started to attack me and kiss me and stuff

12   like that.  And I just quit the next day.  The

13   unemployment thing I pursued, and that was it.

14             MR. RAPAPORT:  Okay, thank you.

15             THE WITNESS:  I forgot about that.

16             MR. DiADAMO:  I announced during the

17   break I'm losing my voice.  So if you don't hear me,

18   please let me know.

19   CROSS-EXAMINATION BY MR. DiADAMO:

20       Q.  I'm Carmine DiAdamo.  I represent Maurice

21   Lariviere.  We've been referring to you as

22   Ms. Metin.  Are you still Ms. Metin?

23       A.  I haven't legally changed my name yet.  So

24   I'm still Metin for now, yes.

00114

1      Q.  Okay.  Thank you.  Ms. Metin, when you made

2    the move from New York to Massachusetts, were you

3    still married?

4      A.  No.

5      Q.  How long had it been since you were

6    divorced?

7      A.  About four years, I believe.

8      Q.  And when you left New York, there were

9    significant financial issues that still involved

10   you, correct?

11     A.  There were just problems being a single

12   mother with no child support trying to make ends

13   meet.  That was my basic problem.

14     Q.  Were there any liabilities of people who

15   wanted money back from either you or your

16   ex-husband?

17     A.  No, there were not.

18     Q.  None whatsoever?

19     A.  None whatsoever.

20     Q.  Therefore, there was no talk whatsoever of

21   bankruptcy or anything like that?

22     A.  Oh, I did have bankruptcy like about eight

23   years ago, yes, that's correct.

24     Q.  So that eight years before I assume there

00115

1   was a bankruptcy and that involved your first

2   husband, if you will?

3       A.  Yes.  Yes.

4       Q.  And for the record his full name was?

5       A.  Erhan, E-R-H-A-N.  Last name was Metin,

6   M-E-T-I-N.

7       Q.  And as you were leaving New York, where was

8   he?

9       A.  I don't know where he was.  He went to

10  Turkey, and I hadn't heard from him.

11      Q.  Since that time have you heard from him?

12      A.  He saw his daughter about a year ago, yes.

13      Q.  When he saw his daughter, did he make any

14  arrangements with respect to support?

15      A.  No.  I have to go to court and file that.

16  But since he is overseas, they have a hard time

17  catching him.

18      Q.  He went back overseas and?

19      A.  There's no address for him.  That's a

20  problem.

21      Q.  As far as you know, he's still overseas?

22      A.  He's still in Turkey, yes.

23      Q.  After that bankruptcy -- incidentally, did

24  that involve just him or --

00116

1       A.  It involved both of us.  The reason being he

2   had opened a restaurant and took out credit out of

3   my credit cards, and his credit card's like about

4   $80,000.  We couldn't pay it back because the

5   restaurant went under.  That's why we declared

6   bankruptcy.

7       Q.  Could you hold for one minute?

8           (Telephone interruption.)

9   BY MR. DiADAMO:

10      Q.  Now the reason I asked you that question is

11  on your direct examination you were talking about

12  discussions that you had with respect to credit card

13  bills.

14          Did they relate in any way to those

15  transactions that eventually got into the

16  bankruptcy?

17      A.  No.  Because the bankruptcy's all clear.

18  That was eight years ago.

19      Q.  So the credit cards that were overdrawn or

20  overdue, what have you, were charges that had been

21  incurred by you from the time of the bankruptcy till

22  the time you left New York?

23      A.  Probably within the past couple years they

24  were incurred, yes.

00117

```
 1      Q.  As you left New York, did you have a number
 2   that you knew you owed credit card companies?
 3      A.  It wasn't much.  It was like -- I owed like
 4   $5,000 I think.
 5      Q.  And those were the ones that you were
 6   receiving the calls at --
 7      A.  Yes.
 8      Q.   -- when you were in Methuen?
 9      A.  Yes.  The reason being I didn't have a job
10   for a couple months, two months so I had no income
11   coming in.  I was late paying them.  That's why I
12   got behind.
13      Q.  Now you when you came back here eventually
14   registered with Moore Temporary Services, correct?
15      A.  Yes.
16      Q.  Had you looked for anything else besides
17   that job?
18      A.  Yes.  I went to Fidelity and I applied
19   there.
20      Q.  Yes.
21      A.  And that was about it.  The first two jobs I
22   applied for.
23      Q.  You decided you would take that job with
24   Moore Services?
```

00118

    1    A.  Yes.  Thinking about it --, yes I did.

    2    Q.  When you signed up with Moore Services, you

    3  did not sign up for a specific job, did you?

    4    A.  No.

    5    Q.  You signed up just to work for them?

    6    A.  Yes.

    7    Q.  You knew that they were going to assign you

    8  wherever they wanted to assign you and they were

    9  going to pay you a week or daily pay?

   10    A.  You have to go on an interview with whatever

   11  job that they hired you.  You got that assignment.

   12    Q.  Yes.

   13    A.  Yes.

   14    Q.  They paid Moore Services?

   15    A.  Yes.  They paid Moore Services got a

   16  percentage, if I remember correctly, of what you

   17  made and also you got your percentage.

   18    Q.  The check then -- and Moore Services then

   19  wrote a check to you?

   20    A.  Yes.

   21    Q.  Okay.  So that when you went to work for the

   22  Town of Methuen, you knew that that was going to be

   23  the arrangement that Moore Services had an agreement

   24  with Methuen --

00119

 1    A.  Yes.

 2    Q.  -- and you were going to be the employee?

 3    A.  Yes.

 4    Q.  And you knew from the day you walked in how

 5  much you were going to make because --

 6    A.  A week, yes.

 7    Q.  -- because Moore Services told you?

 8    A.  Yes.

 9    Q.  Now as you went to work for the Town of

10  Methuen, who was in charge of orienting you as to

11  what you were doing?

12    A.  Maurice.

13    Q.  And your first contact had been David Bain?

14    A.  Yes.

15    Q.  Had you spent any time at all before he

16  turned you over to Maurice?

17    A.  No, not that I remember.

18    Q.  So when you got into the thing -- into

19  Maurice' office, you did not know anything at all

20  with respect to the running of the office?

21    A.  Yes.

22    Q.  It's fair to say for at least the first

23  several days it was a matter of instruction and

24  orientation --

00120

1    A.   Yes.

2    Q.    -- as to what was going on?

3    A.   Yes.

4    Q.   You told us from the beginning that right

5    away in the fourth or fifth day --

6    A.   Yes.

7    Q.    -- he had made a move toward you?

8    A.   Yes.

9    Q.   But you also told us that the job was very

10   attractive to you?

11   A.   It was because of the hours and the pay and

12   if it was full time it was going to be a great job.

13   I liked it there as far as the people went.

14   Q.   You also knew the job could be over in one

15   day?

16   A.   That's true, too, yes.

17   Q.   Because Moore Services was going to direct

18   your employment?

19   A.   Yes.

20   Q.   Okay.  So that there was no chance of you

21   having any import into continued employment by the

22   Town of Methuen?

23   A.   The Moore Services had told me that this

24   could possibly lead to a full-time assignment.  That

00121

1    it could possibly.  That was one of the reasons why

2    I took that job too compared to Fidelity because

3    otherwise I would have went to Fidelity.

4        Q.  It was a possibility?

5        A.  Yes, it was a possibility --

6            MS. KAZAROSIAN:  Could we ask you to

7    finish before you ask the next question?

8            MR. DiADAMO:  Absolutely.

9        Q.  Did you want to add something?

10       A.  It was closer to home, to me to be closer to

11   my daughter, that's the reason why I took the City

12   of Methuen job.

13       Q.  My question to you was notwithstanding

14   anything Moore said to you, you perfectly understood

15   that it was in the Methuen's control, not Moore

16   Services' control, as to who would be hired?

17       A.  Yes.

18       Q.  Okay.  And as a matter of common sense in a

19   matter of several days, like four days, you had not

20   demonstrated any real abilities with respect to that

21   specific job?

22           MS. KAZAROSIAN:  Objection.

23       Q.  You can answer.

24           MS. KAZAROSIAN:  You can answer.

00122

1     A.  Oh what do you mean?  I don't understand the

2  question.

3     Q.  Nobody would have known your real

4  capabilities in four days, correct?

5     A.  Probably not.

6          MS. KAZAROSIAN:  Objection.  You can

7  answer.

8     Q.  Your answer was probably not.

9     A.  (Nods head.)

10    Q.  At the end of that four- or five-day period

11  when you told us that Maurice came onto you, you did

12  not quit?

13    A.  I thought about it.  But I did not quit,

14  yes.

15    Q.  And you knew that your eventual employer if

16  you stayed in Methuen would be someone you had

17  already rebuffed?

18         MS. KAZAROSIAN:  I object but go ahead.

19    A.  I don't understand what you're trying to

20  say.

21    Q.  Pushed him away; you weren't interested in

22  his advances?

23    A.  Exactly, yes.

24    Q.  Okay.  But, I take it, you were hopeful that

00123

```
 1    he would still be attempting to hire you anyway?

 2        A.  Well, I was trying to do my job to my best

 3    ability to be hired, yes.  And hoping that he

 4    wouldn't do that anymore.  That was my -- that's why

 5    I wanted to stay there.

 6        Q.  So that you had made a judgment during the

 7    orientation the job was attractive enough so that

 8    you would take it, even though he had made an

 9    advance to you?

10        A.  Well, I'm not sure how to --

11        Q.  How old were you at the time?

12        A.  How old was I?

13        Q.  Yes.

14        A.  I was 36 -- 35.  Thirty-five.

15        Q.  Thirty-five years old?

16        A.  (Nods head.)

17        Q.  And a fifty something person had come onto

18    you?

19        A.  Yes.

20        Q.  And you were of the assumption that was

21    going to stop?

22        A.  I was hoping it would stop.  It was a lot

23    harder for me to be in that situation because of my

24    past.  You have to understand that, too.
```

00124

1            You know, as a kid I had a lot of bad

2    things happen to me, and it was harder for me to say

3    something because I felt like frozen there.  I felt

4    -- I had a hard time trying to say something.  It

5    was hard for me.

6            It took everything I had to say

7    something because in the past when you say things

8    people don't believe you, number one, or, number,

9    two, nothing's done.  And I felt -- that's why I

10   stayed there for so long trying to make it better so

11   I could --

12       Q.  Was it your mind at the time that if you

13   said no to the advance he would not be recommending

14   you for full-time employment?

15       A.  No, I did not think that at all.

16       Q.  Didn't cross your mind at all?

17       A.  No, that was not even crossing my mind.  I

18   just wanted to do my job, have that stop and

19   hopefully have it turn into a full-time so I can

20   make more money to support my daughter.  That was my

21   intentions.

22       Q.  Now every time you walked out of that office

23   and made a left, you saw a bulletin board, correct?

24       A.  There was a bulletin board there, yes.

00125

1    Q.  What was the most prominent document on the

2  bulletin board?

3    A.  I never looked at the bulletin board.  I

4  don't remember.

5    Q.  So that you did not see a sexual harassment

6  policy --

7    A.  No, I didn't --

8    Q.  -- that was a prominent document set out

9  fully and completely on the bulletin board to the

10  left of your office?

11    A.  I had never noticed it.

12          MS. KAZAROSIAN:  Objection.  You can

13  answer.

14    A.  I never noticed it.

15    Q.  If you continued walking by that bulletin

16  board to the next office, what would the next office

17  be?

18    A.  It would be the city council office which I

19  was there a lot.

20    Q.  So it's a place where you would go to

21  interact --

22    A.  Yes --

23    Q.  -- with other people --

24    A.  -- and also to get away from Maurice --

00126

1      Q.   -- all the time?

2      A.   Yes.  Yes.

3      Q.   When you went there to get away from

4   Maurice, you also knew that the women in the office

5   had had years and years of experience with Maurice?

6      A.   Yes.

7      Q.   Now if you walked by that office, where

8   would you be?

9      A.   You'd be at the mayor's office.

10     Q.   Where was David Bain's office?

11     A.   Next to the other -- other side of the

12   office to the right of our office.

13     Q.   Directly to the right of your office?

14     A.   Yes.

15     Q.   So that you had a bulletin board on one

16   side.  You had the human resources officer on the

17   other side.  And if you walked past the bulletin

18   board, you had some women who had known Maurice for

19   years?

20     A.   Yes.

21     Q.   Now after being there for two months, you

22   were still a temporary employee?

23     A.   It was in December I became a full-time

24   employee.

00127

1    Q.  Let's say -- is it fair to say you started

2  October 1st or October 4th as a temp?

3    A.  Yes.

4    Q.  October to November to December 4th you're

5  still a temporary employee, correct?

6    A.  I think it was the end of December I became

7  a full time.

8    Q.  You're getting a check from Moore Services

9  December 4?

10   A.  Yes.

11   Q.  And I think you told Mr. Rapaport that the

12 touching and everything else was going on every

13 single day.

14   A.  Yes, if was.  If he wasn't there, it wasn't.

15 But if he was there it was.

16   Q.  Every day --

17   A.  Yes.

18   Q.  -- that he was present --

19   A.  Yes, hm hm.

20   Q.   -- he was touching you, and you did not

21 want him to touch you?

22   A.  Yes.

23   Q.  And you were rebuffing these touches?

24   A.  Yes.

00128

1      Q.  And you were telling him you did not want to

2   be touched?

3      A.  Yes.  I told him I was uncomfortable --

4              MS. KAZAROSIAN:  Excuse me, could you

5   let her finish her answer?

6      Q.  I thought I heard -- did you not finish that

7   answer?

8              MS. KAZAROSIAN:  Before you ask the next

9   question, let her finish her answer.

10     A.  I told him I was uncomfortable.  I told him

11  -- I would push him away.  I said please stop, it's

12  uncomfortable.  That's what I would always say.

13             And I would try to do something else in

14  the office, or I would try to get away from him.

15  That was like every day.

16     Q.  So at least during the workdays during that

17  sixty-day period every day that he was there and you

18  were there you told him to leave you alone?

19     A.  Yes.

20     Q.  And you also had an expectation that he

21  would be recommending you for full-time employment?

22     A.  Well, I wasn't sure that was going to

23  happen.  I was hoping that would happen.  But I

24  wasn't a hundred percent sure that it was going to

00129

1   happen.  He had mentioned it to me that if he wanted

2   to hire me as full time -- and in my mind I was

3   looking forward to having a better paycheck for

4   better support of my daughter.  That's all I was

5   thinking in my head.

6       Q.  So as a 35-year-old young woman you knew

7   that Maurice really liked you?

8       A.  I mean he was very nice to me, but it was

9   kind of a weird relationship with Maurice because he

10  would cry all the time at my desk.  He would act so

11  strange.

12          You didn't know how to deal with him.

13  You didn't know whether to take it as -- how to deal

14  with him.  You felt bad for him.  You felt sorry for

15  him, at the same time why was he doing that to me.

16  That's what I couldn't understand.  How

17  uncomfortable and frightened I was when that was

18  happening.

19      Q.  You also felt other things, too, correct?

20      A.  Well, I was confused.  What do you mean

21  by -- felt like how?

22      Q.  Well, you gave me a list of things that you

23  felt, and I just wanted to know if you felt other

24  things, too?

00130

    1       A.  What do you mean by other things?

    2       Q.  Well, for instance, he was sort of coming

    3   onto you like a 14- or 15-year-old boy, not a

    4   55-year-old man, correct?

    5               MS. KAZAROSIAN:  Objection.  You can

    6   answer.

    7       A.  He was very -- he was very odd in his

    8   behavior.  I mean if someone's -- if your boss is

    9   crying at your desk telling you all these personal

   10   things about his life, how was I supposed to react?

   11   He would tell me about his wife, how he hasn't been

   12   able to sleep with his wife and he thinks about me;

   13   that he loves me and he would cry.

   14               I didn't know how to deal with him.  I

   15   felt sorry for him.  At the same time I was upset

   16   about what was going on.  I didn't want to say

   17   anything; that I was afraid to.  There were so many

   18   things I felt.  It was very hard for me to say

   19   something.

   20               He was very hard to figure out how to

   21   feel about Maurice because of the way he was acting

   22   so weird and irrational.  That was my boss.  That's

   23   the person I'm supposed to be -- that's supposed to

   24   be my boss, not acting like that.

00131

1      Q.  You would not have stayed if in your

2    judgment the sexual encounters were going to

3    accelerate in the sense of even more sexual

4    activity, correct?

5      A.  I mean to my toleration point how much I

6    could take, that's why at that point where it was

7    getting to be escalated so much I said something

8    finally.  I felt enough strength to say something.

9      Q.  Okay.  So at the level that it was going on

10   while you were a temporary employee --

11     A.  It got worse as -- sorry.

12     Q.  -- you --

13     A.  Go ahead.

14     Q.  -- you made a judgment that you could

15   tolerate it, and you could handle it?

16     A.  Yes, I did.

17     Q.  And there was an expectation that you had a

18   chance of getting a pretty good full-time job,

19   correct?

20     A.  I was hoping that it would turn into a

21   full-time job, yes.

22     Q.  And that's really what motivated the

23   interaction between you?

24            MS. KAZAROSIAN:  Objection.

00132

1    A.  No, that's not -- I don't think so.  That's

2    not true.  I guess I was trying to do my job every

3    day so I can get a paycheck, support my daughter and

4    to be able to work and not be harassed like that.

5              I was hoping by being friends with him,

6    by trying to understand him more, trying to

7    understand what he was thinking, maybe he would

8    appreciate me as a co-worker and not think of me as

9    another way.  As much as I tried to act that way, he

10   did not listen to me.

11             I told him about the sexual abuse I had

12   as a kid.  He didn't care.  He did it more and more.

13   That was my way of saying to him stop it, don't do

14   this to me because I won't be able to handle it.

15   Whatever warnings I gave him, he did not listen.  He

16   should have stopped.  He should have stopped doing

17   what he was doing.  I gave him enough reasons to

18   stop.

19   Q.  I'm again dealing with the period while

20   you're a temporary employee, and the question simply

21   to you was you knew that you could stop the behavior

22   if it got to a level that you found it was totally

23   unacceptable?

24             MS. KAZAROSIAN:  Objection.  You can

00133

1    answer.

2        Q.  You knew you could stop it if you wanted to?

3            MS. KAZAROSIAN:  Let her answer the

4    question one at a time.  Can she just take an answer

5    -- a question and an answer before the next question

6    comes?

7        A.  No, I know I could have stopped it, but I

8    had hard time saying something.  I did not want to

9    cause any problems.  That's my -- that was my whole

10   motivation for staying there and trying to see if I

11   could deal with it.  Trying to make it stop.

12       Q.  And you didn't want to cause any problems --

13       A.  In my life with all the commotion of --

14           THE WITNESS:  Sorry.

15       Q.  You saw full-time employment on the horizon?

16       A.  No, I wasn't thinking that way.  I don't

17   agree.  I wasn't thinking that way.  Of course, I

18   was hoping that would happen, but I wasn't thinking

19   the reason why I'm staying is only 'cause of

20   full-time employment.

21       Q.  There was no other reason to stay there.

22   You were being paid by Moore the same amount every

23   week, correct?

24       A.  Right.  But, of course, I was hoping, but I

00134

1   wasn't sure that was going to -- right, I guess --

2       Q.  Now this may be stating the obvious, but the

3   number one person you needed to support you for

4   full-time employment was Maurice Lariviere?

5           MS. KAZAROSIAN:  Objection.  You can

6   answer.

7       A.  Well, he was my boss.

8       Q.  Right.

9       A.  Right.  So -- okay, go ahead.

10      Q.  He was the number one person who needed to

11  support you to get that job?

12          MS. KAZAROSIAN:  Objection.

13      A.  I don't understand.  Like I said, he was my

14  boss.  So I was hoping I would get my full-time

15  employment there so I can get more money.

16          MS. KAZAROSIAN:  You keep saying you

17  don't understand.  Excuse me.  I don't know if it's

18  getting taken down, but if you don't understand, say

19  it so that he hears you, so he understands that you

20  don't understand, and maybe he can rephrase it.

21          THE WITNESS:  Okay.

22      Q.  Well, let's get to a question you do

23  understand.

24          I asked you if you were well aware that

00135

1   you needed the recommendation of Maurice Lariviere

2   to obtain the full-time job you wanted?

3       A.  Yes.

4           MS. KAZAROSIAN:  Objection.  You can

5   answer.  Answer.

6       A.  Yes.

7       Q.  And as a matter of common sense, if he said

8   I don't want Fulya Metin working in the office, you

9   would not have got the job?

10          MS. KAZAROSIAN:  Objection.  You can

11  answer.

12      A.  Yes.

13      Q.  So that when we look at the personal

14  interactions between you that Mr. Rapaport asked you

15  about, this obviously was in your mind?

16          MS. KAZAROSIAN:  Objection.  You can

17  answer.

18      A.  What do you mean?

19      Q.  While you were a temporary, while the

20  conduct that's going on that you claim was going on,

21  you were mindful of the fact that you wanted Maurice

22  Lariviere on your side when it came for a

23  recommendation for full-time employment?

24      A.  I mean I guess I would hope that he would

00136

1    say he'd want me as a full-time employee, yes.

2        Q.  So that having in mind you wanted him on

3    your side, you conveyed to him, did you not,

4    friendly comments?

5            MS. KAZAROSIAN:  Objection.  You can

6    answer.

7        A.  What friendly comments?  Like the e-mails?

8        Q.  Should we go back through the e-mails or --

9        A.  These e-mails were also --

10       Q.  In general terms -- excuse me.  In general

11   terms I'm talking about you just making friendly

12   comments about Maurice in city hall to other people.

13           MS. KAZAROSIAN:  Objection.  You can

14   answer.

15       A.  I don't remember making any friendly

16   comments about Maurice at city hall.

17       Q.  Are you saying you didn't do it?

18       A.  I don't understand what you're asking me.

19   Like what questions are you talking about?  What did

20   I say to the city hall people?

21       Q.  If someone asked you how you were getting

22   along with Maurice during that sixty-day period that

23   I've outlined October to December --

24       A.  Right.

00137

1      Q.   -- did you not tell people that he was a

2   terrific boss; that you loved your job and you loved

3   coming to work?

4      A.   No, that's not true.

5      Q.   That never happened?

6      A.   Never happened.

7      Q.   Okay.  Now during this sixty-day period is

8   this the time that you got acquainted with John

9   Molori?

10     A.   Yes.

11     Q.   Now we heard about a friendship.  Was there

12  a dating friendship?

13     A.   No, there was not a dating friendship.

14     Q.   So that if John Molori said it was a dating

15  friendship, he's in error?

16     A.   He's in error, yes.

17     Q.   Okay.  And he was someone you knew in the

18  town hall?

19     A.   Yes.

20     Q.   And he was somebody that you knew at Gold's

21  Gym?

22     A.   Yes.

23     Q.   As a matter of fact, there's a charge for

24  Gold's Gym, correct?

00138

1            MS. KAZAROSIAN:  Objection.  You can

2    answer.

3        A.  Yes.

4        Q.  Who paid your charge for Gold's Gym?

5        A.  John Molori got me the pass.

6        Q.  John Molori?

7        A.  Hm Hm.

8        Q.  When was that?

9        A.  That was when I first started going the gym.

10       Q.  I'm sorry, what?

11       A.  When I first started going to the gym, John

12   Molori said I could use the gym because he works for

13   a contractor and then when the membership runs out I

14   can start paying for it every month as a favor for

15   him for doing construction, and I said are you sure

16   that's okay.  He said, yes, that's fine.  As a

17   friend he gave me that for a gift.

18       Q.  How long did you get rights for free Gold's

19   Gym because of John Molori?

20       A.  About a year.

21       Q.  Just excuse me.  I'm losing my voice.  I'm

22   sorry, how long?

23       A.  About a year or so.

24       Q.  During that first sixty days did Maurice

00139

1    speak to you about your well-being and your

2    problems?

3        A.  You know, he'd always ask me personal

4    questions, yes, but he also told me a lot of

5    personal things about himself, too.  Okay?

6        Q.  Was there ever a time you expressed you had

7    a personal problem -- a personal issue where he

8    really didn't actively try to help you?

9            MS. KAZAROSIAN:  Objection.  You can

10   answer.

11       A.  No.

12           MS. KAZAROSIAN:  Objection.  Then you

13   can answer.  Wait until I finish what I'm saying.

14       Q.  The answer to that was he did, he helped you

15   every time you asked him, right?

16           MS. KAZAROSIAN:  Objection.

17       A.  There's one problem there.  I never asked

18   him for help.  He always voluntarily said to me do

19   you need help with this, I can help you with this.

20   I never said, Maurice, I need your help.  He came to

21   me and said I can help you with that, I can help you

22   with this.  He came across as the most nicest

23   person, nice guy in the world, but I never

24   voluntarily went to him to ask him for help.

00140

1      Q.  He came across as a nice guy who really

2   liked you?

3      A.  That's his prerogative.  I don't know.  I

4   guess he liked me, yes.  He had -- he had problems.

5      Q.  It was obvious that he liked you, correct?

6      A.  It's obvious he had problems.

7      Q.  Was one of the problems that he liked you?

8      A.  That's his -- I don't know.  Maybe he liked

9   me.  He said he liked me all the time.  He said he

10  loved me all the time.  I -- Yes.

11     Q.  You knew that there was a problem of you

12  obtaining full-time employment in the Town of

13  Methuen, correct?

14          MS. KAZAROSIAN:  Objection.  You can

15  answer.

16     A.  There was a problem?

17     Q.  Sure.

18     A.  I don't remember a problem.

19     Q.  With Moore Business Services --

20     A.  Well, they had to have a certain amount of

21  time before they could hire you -- yeah, that's

22  right 'cause they were going to hire me full time

23  sooner, but they couldn't because they had to stop

24  paying Moore services for a certain amount of time.

00141

1    Yes, that's correct.

2        Q.   When were they going to hire you?

3        A.   Right away after -- pretty much -- oh, I

4    forgot about that.  They could have hired me right

5    away, but when they found out Moore -- when we

6    called up Moore and told them that Moore said they

7    can't have that, I still have to work a certain

8    amount of time.

9        Q.   Excuse me?  You don't mean right away the

10   first two or three days you were working at Methuen?

11       A.   No.  A couple weeks later.

12       Q.   So just two weeks later there's a suggestion

13   that you be hired full time?

14       A.   He had mentioned it right away to me in the

15   beginning that he wanted to hire me full time when I

16   first started and he was acting like that.

17       Q.   You're talking about Maurice now?

18       A.   Yes.

19       Q.   You were interviewed by David Bain?

20       A.   Yes.

21       Q.   Right away Maurice wants to hire you?

22       A.   Yes.  He did.  Right away he was telling me

23   how happy he was that I was there; how it made him

24   so happy to go to work every day.  He always said

00142

```
 1    really nice things like that.  He did all the time.

 2        Q.  Was this within the first four or five days?

 3        A.  Yes, it was.

 4        Q.  He wanted you full time?

 5        A.  Yes.

 6        Q.  From that point -- when were you actually

 7    hired full time?

 8        A.  I think -- they wanted to do it earlier, but

 9    then they ended up doing it later because of a

10    payment -- payment issues.  You have to have like

11    thirteen weeks or something like that, if I can

12    remember correctly.

13            It ended up like in December -- sometime

14    the end of December when I was hired full time.

15        Q.  The end of December?

16        A.  Yes.  If I can remember correctly.

17        Q.  So that were you on the full-time payroll of

18    the Town of Methuen after January --

19        A.  December --

20        Q.  -- '05?

21        A.  Yes.

22        Q.  You were on the payroll then?

23        A.  Yes.

24        Q.  Now did you need to be interviewed by any
```

00143

1   other people in the city hall like the mayor or her

2   assistant or somebody like that?

3       A.  The mayor interviewed me, yes.

4       Q.  When did she interview you?

5       A.  I think a couple weeks before that -- I

6   can't remember exactly what the dates were but she

7   did.

8           MS. KAZAROSIAN:  Just a minute

9   please --

10          MR. DiADAMO:  Her voice went down like

11  it was over.  Relax.

12          MS. KAZAROSIAN:  Mr. DiAdamo, let her

13  finish the answer.  You can see her mouth moving.

14  She's still answering.  Just let her finish before

15  you go to the next question.

16      Q.  Answer.

17      A.  I can't remember exactly what time frame,

18  but it was in between a couple weeks before I was

19  getting my full-time check I was interviewed by the

20  mayor, yes.

21      Q.  Now let's try to orient it to Christmas.

22  Having in mind you're a full-time employee January

23  1.

24      A.  I think it was maybe in December sometime,

00144

1    if I remember correctly.  I can't remember exact

2    dates.  It was either end of November, beginning of

3    December.  Around that time.

4        Q.  Did you have a one-on-one interview with

5    Mayor Pollard?

6        A.  No.  If I remember correctly, Maurice was in

7    there with me.  So Maurice, myself and the mayor.

8        Q.  That was it?  Nobody else?

9        A.  I can't remember.  I can't really remember.

10   I think so.

11       Q.  Okay.

12       A.  I know -- it wasn't just the mayor and I

13   alone.  It was somebody else in there.  I think it

14   was Maurice.  It might have been David Bain.  I

15   can't remember.  Either David Bain or Maurice and

16   the mayor and myself.  Somebody else was in there

17   with me.

18       Q.  Well, did you leave the meeting with

19   Maurice?

20       A.  I can't remember.  I don't remember.  I just

21   don't have -- I don't remember who was with me.  I

22   could swear it was David Bain or -- could have been

23   Maurice, but it was -- I don't remember.

24       Q.  Why don't we start off in substance of what

00145

1   was discussed at that meeting by the various

2   parties?

3       A.  Discussed at that meeting?  I really can't

4   -- I can't remember.  It was so long ago.  I think

5   she looked at my resume and then just asked a few

6   questions about that, about my background and that

7   was about it.  I can't remember exactly for word

8   what was said or what questions were asked.

9       Q.  Did you know that prior to that time she had

10  declined to hire you?

11      A.  I have -- no, I had no idea about that.

12      Q.  Nobody said that to you at all?

13      A.  No one said that to me at all.

14      Q.  When she said she was going to hire you --

15      A.  I can't remember if she told me she was

16  going to hire me at that moment or I found out

17  later.  I don't remember.

18      Q.  Okay.  When you finished the interview, did

19  you know the status of Moore's staffing?

20          MS. KAZAROSIAN:  Objection.  You can

21  answer.

22      A.  I don't remember.  I think -- I can't

23  remember.  I'm not sure if after the -- if I

24  remember correctly, I think after the interview --

00146

 1    I'm not sure if I found out right away or a couple

 2    days later after I found out I was hired full-time,

 3    then there was a problem with the Moore staffing I

 4    believe.  And then they had to keep me on for

 5    another couple of weeks before they had to have that

 6    thirteen weeks.  And I believe I had to work for

 7    Moore for a certain amount of weeks.  And there was

 8    a problem with that.  I remember I think Maurice had

 9    to talk to the mayor about that, is it okay if they

10    keep me on there until then.

11        Q.  So that after the interview with the mayor

12    and discussions about Moore staffing, you were still

13    not a full-time employee at the Town of Methuen?

14        A.  Right, until the end of December when I

15    first -- end of December is when I first started

16    becoming a full time.

17        Q.  There's no question about that?

18        A.  Yeah, it was the end of December.

19        Q.  So that the discussions with the mayor --

20        A.  In between that time --

21        Q.  -- and the Moore staffing --

22            THE WITNESS:  Sorry.

23        Q.   -- would have occurred sometime earlier in

24    December?

00147

1      A.  Yes, I believe.  End of November, beginning

2  of December.

3      Q.  Now excuse me one minute.

4          MR. RAPAPORT:  Your call.  We have to

5  take a short break.  She has that conference call.

6          (A recess was taken.)

7  BY MR. DiADAMO:

8      Q.  Before I forget, you knew John Molori worked

9  at the mayor's office?

10     A.  Yes.

11     Q.  Did you know a Mrs. Alaimo who worked in the

12 office also?

13     A.  Oh, yes.

14     Q.  Okay.

15     A.  Not very well, but I had said hi to her and

16 stuff like that.

17     Q.  Had you had any social contact with her

18 other than just being at town hall?

19     A.  No.

20     Q.  You knew she was the deputy chief's wife,

21 correct?

22     A.  Not until a lot later on I figured it out.

23 I didn't know it at the time.

24     Q.  When did you figure it out?

00148

1        A.    Probably the day I was at the police station

2    I figured that out.

3        Q.    Okay.

4        A.    The name's familiar.

5        Q.    I'm putting Exhibit 6 in front of you.

6    Exhibit 6 for the record is an e-mail dated February

7    2, 2005, and it's from you, correct?

8        A.    Yes.

9        Q.    And it's to whom?

10       A.    To brookhurst98 at myway.com.

11       Q.    Who is that?

12       A.    Maurice.

13       Q.    And the subject is hi grammy?

14       A.    Yes.

15       Q.    What -- who -- why is that the subject?

16       A.    He wrote me an e-mail regarding my mother,

17   if I remember correctly, getting her a job, and I

18   said to him -- I think I wrote thanks for all your

19   help trying to get her a job and stuff like that.

20   That's what the subject was.  I don't remember

21   exactly what the other e-mail said, but it was in

22   response to one of his e-mails.

23       Q.    As of February 2nd, was he still trying to

24   get your mother a job in Methuen?

00149

```
 1      A.  Yes, he was trying to.  He was thinking of
 2   trying to get her a job there.
 3      Q.  And your reference to "thanks for all your
 4   help" --
 5      A.  I meant my mother.
 6      Q.   -- relates to that?
 7      A.  Yes.
 8      Q.  Had there been any inappropriate touchings
 9   in the office the week before February 2nd?
10      A.  Yes.
11      Q.  Every day?
12      A.  Yep, pretty much every day.
13      Q.  And after it occurred every day, you signed
14   off on this e-mail "kiss."
15      A.   Like I said before, I'm so used to writing
16   it all the time so I didn't think of what I was
17   writing.  I just wrote it.  I always tell my friends
18   that.  I write kiss all the time.  It didn't mean
19   anything.
20      Q.  Finished?
21      A.  Yes.
22      Q.  You gave us that explanation before?
23      A.  Yes.
24      Q.  All right.  Before Maurice Lariviere's
```

00150

1    response was filed at the MCAD, who do you know saw

2    these e-mails other than you and Maurice Lariviere?

3        A.   Nobody.

4        Q.   And then after you saw the e-mails --

5        A.   Hm Hm?

6        Q.    -- don't go into any conversation -- did

7    somebody ask you to prepare explanations for them?

8        A.   No.

9        Q.   But you do have an explanation for each one

10   of them, correct?

11       A.   Yes.

12       Q.   And the explanations are all that they are

13   responses from other e-mails?

14       A.   Yes.

15       Q.   And the other e-mails, do you know whether

16   or not they were generated by computers in the law

17   office?

18       A.   No, they're at my home computer.

19       Q.   I'm talking about Maurice Lariviere's

20   e-mails to you.

21            MS. KAZAROSIAN:  Objection.  You can

22   answer.

23       A.   I believe they were from his house because

24   Brookhurst was his personal e-mail address that he

00151

 1    used.  Like I said before, he would IM me all the

 2    time when I was home on the weekends.  If I didn't

 3    respond to him, he kept IM'ing me, IM'ing me, IM'ing

 4    me, and sometimes just to get him off my back I

 5    would send him an e-mail back.

 6        Q.  Let me ask you a question.  Do you know

 7    enough about computers to know that those e-mails

 8    would still be in existence?

 9        A.  I'm -- yeah, sure.

10        Q.  They're in existence?

11        A.  Yes.

12        Q.  And if you know that much about computers,

13    how would you get them?

14            MS. KAZAROSIAN:  Objection.  You can

15    answer.

16            MR. DiADAMO:  She said she knew.

17        A.  I don't know like how to get them if they're

18    like -- already deleted from the computer if you

19    have to go into the hard drive somehow.  I wish I

20    did 'cause I had all the e-mails that he sent me.  I

21    have so much more stuff to show you guys, but I

22    never -- I can't figure out how to go into my

23    computer into the hard drive.  I wish I could.

24        Q.  Go into your computer in the hard drive?

00152

```
 1     A.  Yes, and get all the e-mails he sent me.

 2     Q.  Where's your computer?

 3     A.  At home.

 4     Q.  You still have it?

 5     A.  Yes.

 6     Q.  It's in existence?

 7     A.  Yes.

 8     Q.  How long have you had these e-mails?

 9          MS. KAZAROSIAN:  Objection.  You can

10  answer.

11     A.  How long have I had them?

12     Q.  Yeah.

13     A.  I -- I've known about them before with the

14  complaint, the MCAD complaint.

15     Q.  From the time of filing the MCAD

16  complaint --

17     A.  Right.

18     Q.   -- you had them?

19     A.  Right.

20     Q.  And you also had the knowledge that e-mails

21  to you would be in your hard drive on your computer,

22  correct?

23     A.  Yes.

24     Q.  Okay.  After Exhibit 6 -- may I have that
```

00153

1    back to give it to Mr. Rapaport?

2        A.  Yep.

3        Q.  It was less than two weeks later that you

4    attempted to communicate with Mr. -- Officer Wnek?

5        A.  Yes.

6        Q.  You knew him because he came to the legal

7    office, correct?

8        A.  Yes.

9        Q.  Did you know what his position was?

10       A.  Yes, I knew he worked at the police

11   department.  He was a detective.  Yes, I knew that.

12       Q.  Had something different that happened in the

13   relationship between you and Maurice Lariviere from

14   February 2nd until you met with Mr. Wnek?

15           MS. KAZAROSIAN:  Objection.  You can

16   answer.

17       A.  Nothing.  The same -- same things happened

18   all the time.

19       Q.  I'd like you just to think a moment about

20   that because I'm going to ask you was it the same

21   kind of conduct that occurred during the first four

22   or five days of your employment?

23       A.  No.  It got -- escalated more and more each

24   day.  And when I -- before I said something, it got

00154

1  worse and worse and worse and worse to the point

2  that I couldn't do it anymore.

3      Q.  You had never asked to meet him somewhere

4  outside the office alone, did you?

5              MS. KAZAROSIAN:  Objection.  Who are you

6  -- who are you saying who asked her?  Just anybody

7  in the world?

8              MR. DiADAMO:  No, no.  I said you were

9  never asked outside the office.  She knows it means

10  Mr. Lariviere.

11              MS. KAZAROSIAN:  Objection.  But you can

12  answer if you understand it.

13      Q.  Let's make it so that you perfectly

14  understand it.

15              Mr. Lariviere -- Mr. Lariviere never

16  asked you to meet him anywhere outside the office?

17      A.  He did.

18      Q.  Where?

19      A.  For drinks.

20      Q.  A drink where?

21      A.  He didn't tell me where.  He always asked me

22  would you like to go out for a drink after work.

23      Q.  The answer was always no?

24      A.  No.

00155

1        Q.  You were never asked to go to a hotel room

2    or any other place where you could be intimate,

3    correct?

4        A.  The only weird thing he asked me one day was

5    -- I said I had to go home during lunch.  He said

6    can I come to your house.  I said no.  He kept

7    asking me that for a couple of days.  He said to me

8    can I go to your house and see where you live and

9    see the dog, and he talked about my dog Roxie, and I

10   said no.

11       Q.  Would you see anybody else like your mother,

12   her boyfried or your daughter --

13       A.  Probably not 'cause my daughter was at

14   school, my mother was working, and her boyfriend was

15   working.

16       Q.  When you say probably not, was that

17   definitely not?

18            MS. KAZAROSIAN:  Objection.  You can

19   answer.

20       A.  If they were home sick or something like

21   that, pretty much.  Nobody would be home.

22       Q.  But when you said no, the issue was not

23   pursued?

24       A.  No.  When I said no, he did pursue it for a

00156

1    couple more days after that.  He'd ask me that

2    almost everyday.  If I made something for dinner, he

3    would say can I -- I'm going to have to try that

4    chicken soup you made or what'd you make for dinner

5    last night, can I come over and have some soup.  And

6    I'd be like no, that kind -- those kind of

7    questions.

8        Q.  With respect to the advances and with

9    respect to the suggestions that you go somewhere,

10   you always said no?

11       A.  Yes.

12       Q.  And there were no repercussions in the sense

13   of punishment to you because you said no, correct?

14       A.  No.

15       Q.  The time you said stop, he stopped?  Then --

16            MS. KAZAROSIAN:  Objection.  You can

17   answer.

18       A.  No, he did not stop.  I had to physically

19   push myself away from him for him to stop.  I'd have

20   to physically run away from him and go to the

21   bathroom, pull myself away from his grasp and from

22   his kissing me for it to stop.  I had to tell him to

23   stop many times.

24       Q.  You said that you would push him away?

00157

1    A.  (Nods head.)

2    Q.  The cause of discrimination -- charge of

3    discrimination is already in evidence as Exhibit 2.

4    I'll underline it to make it easy.  I've underlined

5    something in the third to last paragraph you can

6    just take a look at --

7              MS. KAZAROSIAN:  You're referring to

8    Officer --

9              MR. DiADAMO:  Exhibit 2 is the charge of

10   discrimination.

11             MS. KAZAROSIAN:  Okay.

12             MR. DiADAMO:  Okay?

13             MS. KAZAROSIAN:  Yep.

14   A.  That's the MCAD complaint.

15   Q.  Does that accurately describe how you would

16   push him away?

17             MS. KAZAROSIAN:  Are you talking about

18   in the incident she's describing here or all the

19   time?

20             MR. DiADAMO:  First of all, let's deal

21   with the incident.

22   A.  On the videotape with the camera recording?

23   Q.  Yeah, you have a camera running.

24   A.  Okay, hm hm.

00158

1    Q.   I'm trying to compare the method of -- in

2    relation to your statement that you always pushed

3    him away.  Did you always push him away the same

4    way?

5    A.   This time at the video when he was

6    approaching to kiss me, I didn't -- 'cause I knew

7    there was a video behind me.  So I just went like

8    that (indicating).  I didn't get up and push him

9    like that (indicating).

10            Towards the end of the video when he was

11   kissing me and making out with me and I was being

12   close -- pushed closer and closer to him, I was

13   trying to pull away, and he was pulling me closer, I

14   pushed him away and got free.

15   Q.   That was the kind of push I'm talking about.

16   Is that the way you would push him away --

17   A.   Yes, all the time.

18   Q.   All the time.  So now we have the videotape

19   that shows us how -- that fairly represents how you

20   would push him away, correct?

21   A.   Till the end of when I was pushing him away

22   'cause he wouldn't let me go, I would push him away.

23   Q.   Okay.  Can I have that back, please.  Thank

24   you.  One other thing about this document, the

00159

1   underlined part of that reads --

2           MS. KAZAROSIAN:  Can we actually read

3   what you underlined so the record --

4           MR. DiADAMO:  Sure, for the record, I

5   have underlined the third to last paragraph.  "The

6   camera recorded Mr. Lariviere coming into the office

7   and immediately coming to my desk, kissing me,

8   trying to kiss me, reaching over the desk, kneeling

9   down at my desk, touching my face and hair, trying

10  to touch my breast, etc., as I attempted to push him

11  away."

12          MS. KAZAROSIAN:  Okay.

13          MR. DiADAMO:  Was that a fine reading?

14          MS. KAZAROSIAN:  Yes.  And that's the

15  sentence you were asking about?

16          MR. DiADAMO:  Yes.  And that's the only

17  sentence I've referred to in this whole report.

18  BY MR. DiADAMO:

19      Q.  Now you know that all of us have seen this

20  video, correct?

21      A.  Yes.

22      Q.  Does the camera record Mr. Lariviere coming

23  into the office and immediately coming to you and

24  doing this?

00160

1        A.  As soon as I got in, yes.

2        Q.  As soon as you're in the office?

3        A.  As soon as I walked into the office and sat

4    down, he immediately came to greet me and came over

5    and kissed me.  It does show that.  That's what I

6    remember.

7        Q.  Do you know how long the videotape is?

8        A.  I know it's very long, but as soon as I

9    walked into the office -- the video camera was there

10   before I even got there -- before he was there.  It

11   was recording him when he came in.

12            But when I first came into the office

13   and sat down, as soon as I sat down, he came over to

14   greet me and he kissed me.

15       Q.  So the first time that we see you on the

16   videotape --

17       A.  Hm Hm.

18       Q.   -- he makes an advance towards you,

19   correct?

20       A.  Yes.

21       Q.  And you're sure of that?

22       A.  I'm pretty sure of that, yes.

23       Q.  And what we would have seen is the first

24   time we see both of you together, he comes to your

00161

1   desk, he's kissing you and trying to kiss you -- I

2   haven't finished though the entire statement.

3           MS. KAZAROSIAN:  You said what we would

4   have seen?

5           MR. DiADAMO:  Yeah, what we did see.

6           MS. KAZAROSIAN:  Objection.  If you have

7   an answer.

8       Q.  From what you recall.

9       A.  That's what I remember, yes, as soon as I

10  came into the office and sat down at my desk, he

11  came to greet me, and he came over my desk and

12  kissed me on the lips.  And I pulled back.

13          Then we started to talk about

14  work-related stuff.  And I remember the rest of the

15  video.  I remember what happened.

16      Q.  Do you recall how many times you came and

17  went -- left the office and came into the office on

18  that video?

19      A.  I don't remember.  I do not remember.

20      Q.  More than three times?

21          MS. KAZAROSIAN:  You know what?  She

22  says she doesn't remember.  I think the video speaks

23  for itself, Carmine.  I don't want to keep going on

24  this.

00162

1              MR. DiADAMO:  Let me ask the questions.

2              MS. KAZAROSIAN:  The video speaks for

3    itself.  If she says she doesn't remember, she

4    doesn't remember.

5         Q.  Forgetting the video, as far as you know,

6    this is what occurred -- what I have underlined

7    right here?

8         A.  Yes.

9         Q.  Now, first of all, you knew that everything

10   was being videotaped; Maurice Lariviere didn't know

11   it was being videotaped, correct?

12        A.  Yes.

13             MS. KAZAROSIAN:  Objection.  You can

14   answer.

15        A.  Yes.

16        Q.  And prior to the videotape you -- how many

17   times had you met with Michael Wnek?

18        A.  One time.

19        Q.  After you met with him the one time, did you

20   meet with any other police officers?

21        A.  No.

22        Q.  When the videotape was set up, did you know

23   it was being set up at a specific time?

24        A.  I didn't know what time.  I just knew they

00163

1    told me there was going to be a video.  That's all I

2    knew.

3        Q.  Okay.  Was your assumption that it was there

4    when you arrived in the morning?

5        A.  Yes.

6        Q.  And when you arrived in the morning, was

7    Maurice Lariviere already in the office?

8        A.  Yes.

9        Q.  And is that the time that this occurred --

10   that the sentence I underlined and read to you?

11       A.  Yes.

12       Q.  Do you recall there was a time when the

13   videotape was turned off?

14       A.  I do not recall.

15       Q.  Nor at the end --

16       A.  I left the office.  I don't know what

17   happened after that.

18       Q.  Well, let's start with -- you've told us

19   that this behavior that's contained in the sentence

20   that was underlined in Exhibit 2 occurred

21   immediately when both of you were in the office

22   early in the morning?

23       A.  As soon as I arrived into the office, it

24   started, yes.

00164

1      Q.  Do you recall immediately leaving the office

2   then?

3      A.  I don't recall like how many times I went in

4   -- I was doing a lot of things.  I was trying to get

5   some papers copied from next door.  I don't

6   remember.  I think I was still sitting there after

7   that incident happened.  I don't actually remember

8   how many times I left or came back --

9      Q.  Well, when you saw the videotape, did you

10  see both of you in the office for a period after

11  that?

12     A.  Yes.  It was more things that happened on

13  the video I remember.

14     Q.  After the kiss?

15     A.  Uh-huh.

16     Q.  After you you're pushing him away --

17     A.  Yeah, he was coming next to me.  I was on

18  the phone.  The video camera didn't get that.  He

19  uses my phone by my desk.  He was touching my hair,

20  trying to touch my face.  He sat on my desk.

21          He was swinging his knees telling me

22  something.  He was trying to massage my shoulder --

23  touching my hand.  He knelt -- knelt down next to me

24  was still trying to touch me.  I was like do you

00165

1    want to get this done, do you want to sign these.  I

2    remember all that very clearly.

3        Q.  From the time of the kiss how long was it

4    before you finally left the office in time?

5            MS. KAZAROSIAN:  Objection.

6        A.  I don't understand what you mean.  When

7    everything was finally over?

8        Q.  Finally over, you left the office for the

9    end of the day.

10       A.  I think it was like two hours later.

11       Q.  So the kiss happened in the first few

12   minutes?

13       A.  Yes.

14       Q.  And two hours later --

15       A.  No.  There was other things that happened in

16   between.

17       Q.  Yes.  You've told us other things happened.

18       A.  Right.  Then at the end when he was -- when

19   I went to get up, he grabbed me, and that's when

20   everything -- I left the office, and they came in

21   and everything happened, and I was -- I went out of

22   the office.

23       Q.  When he grabbed you?

24       A.  When he grabbed me and I was pushing him

00166

1   away, he was pulling me closer, and he was kissing

2   me, and then he touched my butt.  So. ..

3       Q.  So that you recall --

4       A.  I recall all that.

5       Q.   -- a kiss -- I guess a kiss at the end,

6   too?

7       A.  Yes.

8       Q.  Two hours in between?

9       A.  And other little things in between as well

10  like I mentioned to you the touching of the hair --

11      Q.  Right.

12      A.   -- all that.

13      Q.  Two hours in between.  How many times did

14  you leave the office?

15      A.  I don't remember.

16      Q.  Okay.  Were you ever stopped or prevented

17  from leaving the office?

18      A.  Was I ever stopped?  No.

19      Q.  No.  Now after you left the office finally,

20  where did you go?

21      A.  I was taken down to the mayor's office.

22      Q.  And what time of day was this?

23      A.  It was like around 10:30, I believe --

24  10:30, 11 o'clock.

00167

1    Q.  You were taken into the mayor's office or

2    the outside waiting room?

3    A.  Into the mayor's office.

4    Q.  Who was there?

5    A.  I remember David Bain was there.  There was

6    another lawyer there -- the one that works

7    downstairs with the dark hair.  I can't recall her

8    name.  And Michael Wnek was there.  And I was there.

9    And that's all I remember who was there.

10   Q.  Another lawyer.  Is this the Christine

11   Touma?

12   A.  Yes, that was Christine Touma.  I just

13   couldn't remember the name.

14   Q.  The four of you were in the office that day?

15   A.  I can't remember anybody else.  I'm not a

16   hundred percent sure.

17   Q.  Approximately how long were you there?

18   A.  I can't really remember.  Maybe 45 minutes

19   or so.

20   Q.  Did anybody come in or out during that time?

21   A.  I cannot remember.

22   Q.  Did you see Chief Solomon during that time?

23   A.  I cannot recall if I saw Chief Solomon.  I

24   saw him when he came into the office and I left.

00168

1    And that was it.

2        Q.  That's what I'm getting at.  Did you -- at

3    the time the four of you were in the office, Chief

4    Solomon came into the office, did he not?

5        A.  I don't remember.  I don't remember seeing

6    -- I can't recall.  I was really upset when I was in

7    there.  I was really shaken up by the whole thing.

8    I can't remember who was in there.

9             I just remember that -- that lawyer,

10   David Bain, the mayor and myself and Michael Wnek

11   came in there, too.  And that's all I remember.  I

12   don't remember who came in or out.

13       Q.  Okay. Maybe I misunderstood.  I thought you

14   said that Chief Solomon came in at that time, and

15   don't let me put words in your mouth.

16       A.  Not at the -- at Maurice's office.  At the

17   solicitor's office Chief Solomon came in, yeah.

18       Q.  Okay, we'll get to that.  That's afterwards,

19   correct?

20       A.  That's before I went to the mayor's office.

21   I mean that's after -- that's before.

22       Q.  Okay.  Before you went to the mayor's

23   office, you saw Chief Solomon go into Maurice

24   Lariviere's office?

00169

1    A.  Yes, and that's when I left.  That's when I

2  went out.

3    Q.  He came in before you went out?

4    A.  I was not -- no, 'cause I can't remember.  I

5  was trying to get out of the office I think to get

6  away from him because of that assault thing that was

7  going on with him grabbing me and me trying to pull

8  away and trying to get away from him, and they came

9  in -- I don't remember if it was Michael Wnek or the

10  other guy that was in there or if it was chief -- I

11  saw Chief Solomon and the deputy in that office.

12  They went to go get Maurice and talk to him.

13              Then I -- as I was leaving, they came

14  in.  So I did not see Maurice's reaction or Maurice

15  at all.  I went outside, and then I was taken to the

16  mayor's office.

17    Q.  Perhaps I misunderstood, but what happened

18  that day was what happened most every day in the

19  office from the day you were hired, correct?

20    A.  Yeah, but sometimes it was worse than that.

21  Sometimes it was worse.  Sometimes there were

22  variations of different things that happened.  A lot

23  of things happened in that office.  A lot to

24  mention.

00170

1     Q.  Okay.  When you walked out of the office and

2  you saw Chief Solomon and you were upset, did you

3  walk out alone to the mayor's office?

4     A.  I cannot remember.  I don't remember who --

5  if they escorted me.  I think someone told me to go

6  there.  I can't remember who did.  I can't remember.

7  I don't remember.

8     Q.  You sat in the mayor's office.  Did you talk

9  to the mayor?

10    A.  Not really.  I was so shaken up.  I was so

11 upset.  I didn't talk at all.  I was just shocked.

12 I was just really upset.  It was just a blur to me.

13    Q.  Did you talk to Michael Wnek?

14    A.  Not really.  I was just very upset.  Like I

15 didn't talk much.  I just sat there.

16    Q.  In any event, at some point that day you

17 went home, correct?

18    A.  After that I had to go to the police station

19 and stay there and answer some questions and

20 everything.  They did more of an investigation.

21 Then I went home.

22    Q.  And the next day did you go back to work?

23    A.  Nope.  I had a couple days -- they gave me a

24 couple days.  Then I went back I think that Monday

00171

1    -- the following Monday.  I went back and I went --

2    I was working in the human resources office.  I had

3    nothing to do.  I just sat there.  I had taken my

4    computer in there.  And then --

5        Q.  Can I stop you there for a minute?

6        A.  Sure.

7        Q.  I'll let you explain that fully, but I would

8    like to know during the time you were out of the

9    city hall before that Monday, did you speak to law

10   enforcement officials?

11       A.  Not that I recall, no.  No, I didn't.  I

12   mean I don't think so.

13       Q.  Did you speak to any town employees?

14       A.  David Bain I think I did.  I think I called

15   David Bain to tell him that I was nervous about

16   going back on Monday.  I wasn't sure if I could do

17   it or not.

18       Q.  You initiated the call to David Bain?

19       A.  Yes.

20       Q.  What was the substance of your conversation?

21       A.  I just said to him that I'm afraid to go

22   back on Monday, I'm really nervous.  I don't think

23   I'm ready to go back.  He said don't worry, come

24   back, you'll be fine, come back on Monday and I did.

00172

1     Q.   Did you tell him who you were afraid of?

2     A.   No, I didn't tell him who I was afraid of.

3   I told him I was uncomfortable going back there.  I

4   was still nervous about it.  I didn't say I was

5   afraid of anybody.

6     Q.   Let's get back to that Monday you were

7   talking about.

8     A.   Hm Hm.

9     Q.   You came back to work?

10    A.   Right.

11    Q.   Did you speak to any law enforcement

12  officials that day?

13    A.   Not that I remember.  I don't remember.

14    Q.   From that point how long did you remain at

15  the job before you left it finally?

16    A.   I think it was Tuesday.  I went back and I

17  think Tuesday I left.

18    Q.   After Tuesday when was the next time you

19  talked with Methuen law enforcement officials?

20    A.   I think Michael Wnek a couple times he had

21  called me to see if I was okay.  The papers were

22  making a really big deal, if I was all right about

23  that.  That was about it.  A couple times we spoke,

24  and that was about it.  A couple of phone calls.

00173

1       Q.   Did you and he discuss why there was a

2   criminal investigation going on?

3       A.   Yeah, in between that -- I forgot about

4   that -- I went to the police station, and I had to

5   meet with the attorney general, and they wanted to

6   know if I wanted to press criminal charges against

7   Maurice.

8       Q.   And your answer was?

9       A.   I said I didn't want to do that.

10      Q.   When Michael Wnek was setting up the

11  videotape, did you have any discussions about

12  criminal cases?

13      A.   No.  No.

14      Q.   Did he mention the word "crime" to you?

15      A.   No, he didn't.  He did not.

16      Q.   When you called Michael Wnek, what did you

17  want to accomplish?

18      A.   When I called in --

19      Q.   The first time.

20      A.   I didn't call him the first time.

21      Q.   I'm sorry, when you e-mailed him.  You're

22  right.

23      A.   I e-mailed him.  I wanted him to listen to

24  me.  Maybe he could talk to Maurice or something and

00174

1    tell him not to do this anymore.  That's what I

2    wanted to accomplish.

3        Q.  That was your goal?

4        A.  That was my goal.  I wanted the whole thing

5    to stop.

6        Q.  Your goal was not criminal prosecution or

7    lawsuits or anything?

8        A.  No.  My goal was just to go back to work and

9    have him stop and to be normal like have a normal

10   office where nobody was touching you or harassing

11   you be able to go to work and not be sick to your

12   stomach and be upset all the time.  That's what I

13   wanted to do.  I just wanted to go back to work.

14       Q.  You finished?

15       A.  (Nods head.)

16       Q.  So your goal was go back to work for Maurice

17   Lariviere in that office for the foreseeable future?

18       A.  Yes.

19       Q.  And that's the only thing you wanted to

20   accomplish?

21       A.  Yes.

22       Q.  And then after the taping the only thing

23   that was missing was Maurice Lariviere, right,

24   because you knew he was gone and fired or resigned?

00175

1          MS. KAZAROSIAN:  Objection.  You can

2    answer.

3      A.  Yes.

4      Q.  Yep.  Was it still your goal?

5          MS. KAZAROSIAN:  Objection.  You can

6    answer.

7      A.  To make him resign?

8      Q.  No, no.  Was it your goal to just go back

9    into an office with Maurice Lariviere?

10     A.  I didn't know what was going to happen.

11   Like I said to you, my goal was just to go back to

12   work by me telling Michael Wnek I just couldn't take

13   it anymore.  I went to him because I felt like maybe

14   he could help me maybe talk to him.

15          What I felt was what was happening was

16   wrong at this point after four and a half months of

17   this happening I felt so -- I couldn't take it

18   anymore.  That's why I said something.  I went to

19   them because I felt they were the safest place to

20   go.

21     Q.  Well, they certainly got rid of the person

22   who was harassing you, didn't they?

23          MS. KAZAROSIAN:  Objection.

24     A.  He -- he resigned.  I'm not saying they got

00176

1    rid of him.  He resigned himself.  I'm not saying

2    they forced him -- I have no idea.

3        Q.  You have no idea what happened, do you?

4        A.  I don't see that they did that.  I just see

5    that he resigned.  That's what I see.

6        Q.  You knew that if you went back to city hall

7    in any capacity the one person who wouldn't be there

8    would be Maurice Lariviere, correct?

9            MS. KAZAROSIAN:  Objection.  You can

10   answer.

11       A.  After the fact, yes.  Not before that I

12   didn't know that.  After I knew that.

13       Q.  You knew that within a day from the

14   videotape?

15       A.  (Nods head.)

16           MS. KAZAROSIAN:  Objection.

17       Q.  You have to answer.

18       A.  Yes.  You mean the day after the videotape?

19   After the videotape?

20       Q.  You knew --

21       A.  The day after everything happened, yes.

22   Yes.

23       Q.  You knew he would not be in the city hall if

24   you went back?

00177

1      A.  Yes, because he resigned.  Yes.

2      Q.  Now when did Methuen know that you would not

3   come back to work?

4              MS. KAZAROSIAN:  Objection.  You can

5   answer.

6      A.  When did they know?  That Tuesday I went in

7   to go to work, and I had a really hard time.  I felt

8   really uncomfortable.  When I saw Peter McQuillan, I

9   really freaked out for some reason.  Seeing him just

10  freaked me out.

11             To go back in that office and work

12  there, I couldn't do it.  I wasn't sure what I

13  wanted to do.  Where were they going to put me to

14  work, I couldn't handle it -- handle all the -- I

15  just couldn't handle being there.  So I just left.

16  And I couldn't go back.

17     Q.  You left that Tuesday?

18     A.  (Nods head.)

19     Q.  Now from that Tuesday for let's say the next

20  month did you speak with Joseph Solomon?

21     A.  No, I did not.

22     Q.  Did you speak with Deputy Chief Alaimo?

23     A.  No.

24     Q.  Did you speak with Michael Wnek?

00178

1    A.  I think I spoke to Michael Wnek like once or

2    twice.  I can't remember what days.  But it was

3    discussing like the newspapers, the media and stuff

4    like that.

5    Q.  Did you discuss with him the fact that you

6    weren't going back to work?

7    A.  I cannot remember.

8    Q.  Didn't he ask you to go back to work?

9    A.  I don't remember if he asked me that.  I

10   don't remember that.  I can't recall that.  I

11   remember speaking to Michael Wnek about the

12   newspapers are really bad and how they were coming

13   to my house, and that was bothering me.  That's all

14   I remember talking to Michael Wnek about.

15   Q.  Did you have a conversation to the effect

16   that you asked me to help you and now, meaning

17   Michael Wnek -- you asked me to help you; I did it,

18   and now you won't go to work?

19   A.  No.

20       MS. KAZAROSIAN:  Objection.

21   Q.  You never had that conversation?

22   A.  Never.

23       MS. KAZAROSIAN:  Objection.

24   Q.  How many weeks did the town pay you that you

00179

1    were not at the job?  By pay I don't mean worker's

2    compensation.

3        A.  I cannot exactly remember, but it was a

4    couple months.

5        Q.  So for a couple months they just gave you

6    your full pay?

7        A.  Yes.

8        Q.  During that couple of months who

9    communicated with you on behalf of the town?

10       A.  I don't remember.  I think Marsha you

11   communicated with them with that, right?

12           MS. KAZAROSIAN:  If you can't remember,

13   you can't remember.

14       A.  I can't remember.

15       Q.  From the time you left that Tuesday until

16   today have you had any conversation with Joseph

17   Solomon?

18       A.  No, I have not.

19       Q.  With Deputy Chief Alaimo?

20       A.  No.

21       Q.  Sharon Pollard?

22       A.  No.

23       Q.  Any employee of the mayor's office?

24       A.  I spoke to John Molori probably a few times,

00180

1    and that's it.

2        Q.  You've spoken to John Molori?

3        A.  A couple times, yes.

4        Q.  Could you tell us when you spoke with him?

5        A.  I don't remember when I spoke to him.

6        Q.  Did you speak to him on the phone or in

7    person?

8        A.  On the phone.

9        Q.  Did he ask you to come back?

10       A.  No.

11       Q.  What did you speak about?

12       A.  About how things were going, how I was.

13   That was about it.

14       Q.  You were still going to the health club he

15   belonged to --

16       A.  I never saw him --

17       Q.  That he had taken care of the fee for?

18       A.  I never saw him at the health club.

19       Q.  You know the town Methuen, don't you?

20           MS. KAZAROSIAN:  I didn't hear the

21   question.  I didn't understand what you said.  I

22   have to hear the question so I can understand what

23   -- could you repeat it?

24           THE REPORTER:  I actually asked the same

00181

1    thing.

2                    (Reporter read back.)

3                    MR. DiADAMO:  That was the beginning of

4    a question, Marsha, I think.  Did you say you didn't

5    hear the question before that?

6                    MS. KAZAROSIAN:  I didn't hear that

7    question.

8                    MR. DiADAMO:  That wasn't a question.

9    That was the start of a question.  You want me to

10   start again on that question?

11                   MS. KAZAROSIAN:  Absolutely, please.

12   BY MR. DiADAMO:

13   Q.  You know, do you not, that the Town of

14   Methuen hired investigators to determine your

15   whereabouts and what you were doing after this

16   incident happened, correct?

17   A.  I have no idea.  I didn't know that.

18   Q.  This is the first time you've heard that?

19   A.  Yes, it is.

20   Q.  You know that every time you went to the

21   health club you signed in, correct?

22   A.  I do know -- yes, of course.  You show your

23   pass and you go in, yes.

24   Q.  You told Mr. Rapaport that while you were

00182

1   living up here you were at the health club

2   approximately two times a week?

3       A.  I can't remember.  Some weeks were

4   different.  Some weeks -- most of the weeks two

5   times a week.  I can't remember exactly how many

6   times I went.

7       Q.  If I suggest to you you were going to a

8   health club four times a week would that be too

9   much?

10      A.  Some weeks maybe I was.  Maybe I was.  I

11  can't remember exactly how many times I went.

12      Q.  In any event, you know they check you in and

13  they check you out?

14      A.  Yes.

15      Q.  Now in the times after that Tuesday that you

16  went to the health club did you see Michael Wnek?

17      A.  No, I never saw Michael Wnek at the health

18  club.

19      Q.  Did you see John Molori?

20      A.  Nope.

21      Q.  Did you see Departo?

22      A.  No, I did not.

23      Q.  Did you see any Methuen employees?

24      A.  I saw the fire chief one time.  I remember

00183

1    that.  And who else did I see there once?  Another

2    woman that worked -- I don't remember her name

3    though.  She worked in the building.  That's all I

4    recall seeing.  I want to say later on I switched

5    over to the Haverhill gym.

6        Q.  Your recent marriage took place where?

7        A.  In New York.

8        Q.  In New York City?

9        A.  Long Island.

10       Q.  Where?

11       A.  Homestead -- Hempstead, Long Island.

12       Q.  The City of Hempstead, Long Island?

13       A.  Yes.

14       Q.  What date did it occur on?

15       A.  It was on September 5th.

16       Q.  And at the time was your present husband

17   incarcerated or a halfway house?

18       A.  He's released in a halfway house.

19       Q.  Released?

20       A.  (Nods head.)

21       Q.  How long will he be attached to the halfway

22   house?

23       A.  He's almost finished with the halfway house.

24   He's finished with the halfway house in a couple

00184

1    weeks.

2        Q.   Couple weeks he'll be out?

3        A.   Hm Hm.

4        Q.   Just give me one second.

5             (Pause.)

6        Q.   When Mr. Rapaport was asking you questions,

7    he was talking about a dating website, and you said

8    -- correct me if I'm wrong -- Maurice only knew

9    about it because of looking over your shoulder.  You

10   read his statement, and you went by a number --

11   lucky and a number.

12       A.   Hm Hm.

13       Q.   Over your shoulder he was able to see the

14   code you were using on the website?

15            MS. KAZAROSIAN:  Objection.  You can

16   answer.

17       A.   I assume so.  I didn't tell him my code or

18   anything like that.

19       Q.   You didn't tell him that you used lucky

20   3396?

21       A.   I do not remember telling him that.  I don't

22   recall.

23       Q.   And when he's looking over your shoulder --

24       A.   It's in pretty big letters.

00185

1      Q.   When he's looking over your shoulder, he'd

2   be unable to determine any actual dates you were

3   making as a result of the website, correct?

4      A.   Yes.

5      Q.   Yes, he could have?

6      A.   No, no, he couldn't have.

7      Q.   So that when he put in his statement that

8   you had arranged a date with a state trooper, I take

9   it that you're the one who told him about that?

10      A.   I did not tell him about that.  I don't know

11   how he found out about that.  The girls next door

12   knew I went on a date with a Rhode Island police

13   officer for one night and got to ride in the police

14   car.  I was telling them about it.  I thought he was

15   a nice guy.  I was telling the girls. So either the

16   girls told him.  I didn't tell him directly.

17      Q.   The girls next door would have heard from

18   you that you had a boyfriend in Iraq who you would

19   marry, correct?

20      A.   I never told them that Anthony was in jail,

21   correct.

22      Q.   Is it a correct statement that you told them

23   that you had boyfriend in Iraq who you were going to

24   marry?

00186

```
 1      A.  That we had not stopped like the engagement

 2   or anything like that.  We were going to see what

 3   was going to happen, and when he came back we were

 4   going to see whether or not we got married or not.

 5   That's what I told them.

 6      Q.  Did you also tell the girls next door that

 7   you had some doubts about whether or not there would

 8   actually be a marriage?

 9      A.  I did because he was away.  So, yes, I did.

10      Q.  And at the same time were you telling them

11   about putting your site on match.com and arranging

12   dates for yourself?

13           MS. KAZAROSIAN:  Objection, but you can

14   answer.

15      A.  No.

16      Q.  This is a different time?

17           MS. KAZAROSIAN:  Objection, but you can

18   answer.

19      A.  They knew about match.com because of the

20   date that I went on with that police officer.  I

21   didn't openly discuss that all the time.  That was

22   just a one-time conversation with them.

23      Q.  But it wasn't the conversation when you were

24   expressing your doubts about marrying that person in
```

00187

1   Iraq?

2       A.  There was conversations about everything in

3   that office.  The girls talked about everything.  So

4   you know how girls talk?  We go if there and talk

5   about our lives and this -- it was just

6   conversation.

7       Q.  As a matter of fact, you told one of them

8   you were going out with John Molori, correct?

9       A.  I never said that.

10      Q.  You never said that?

11      A.  I never said that.  That's such a lie.

12      Q.  One other thing we need to handle.  Did

13  Maurice actually do your tax returns or --

14      A.  No, he did not.

15      Q.  Just made the offer?

16      A.  No, he never made an offer.  He just told me

17  that I have to -- I don't remember.  He was giving

18  me some advice about tax returns.  I never offered

19  to do them or did my tax returns, no.

20      Q.  The statements I see in the e-mails about

21  your tax returns --

22      A.  I cannot remember what were on those -- from

23  what I recall, he would just -- was just telling me

24  something about taxes.  Some information.  I don't

00188

1    recall him asking to do my taxes.

2        Q.  Weren't those occurring at the same time

3    that you were discussing loans to take care of your

4    credit card problems and what the interest rates

5    were and --

6            MS. KAZAROSIAN:  Objection.  You can

7    answer.

8        A.  There was one time when he knew I was having

9    problems with my credit cards because of the credit

10   card companies calling me all the the time, and

11   Maurice recommended I get a credit loan from the

12   credit union.  So he tried to help, and he ran

13   downstairs and he found out about 5 percent

14   interest, to try to do that.  That's what he tried

15   to help with.

16           He said there was a credit union that I

17   could use to get a loan to pay my credit cards off.

18       Q.  Just looking at this.

19           MR. DiADAMO:  Did you mark that?

20           MR. RAPAPORT:  This would be --

21           MS. KAZAROSIAN:  Is that a new one?  Can

22   I see it?

23           MR. DiADAMO:  Yes, sure.

24           MR. RAPAPORT:  This must be 7.

00189

```
1                    (Exhibit No. 7 marked

2                    for identification.)

3                    MR. RAPAPORT:  Let's do this off the

4     record.

5                    (Off the record.)

6                    MR. DiADAMO:  For the record Exhibit 8

7     is an e-mail dated January 22, 2005 from -- I don't

8     want to read the whole thing -- from Maurice to

9     melisaful.  Is that enough for everybody?

10                    MR. RAPAPORT:  Yep.

11                    (Exhibit No. 8 marked

12                    for identification.)

13                    MR. DiADAMO:  We've marked 8.  Nine is

14     an e-mail dated January 22, 2005 from Maurice to

15     melisaful.  Let's strike that and do it again.

16     Okay?

17                    MS. KAZAROSIAN:  Yep.

18                    MR. DiADAMO:  Nine is an e-mail dated

19     February 1, 2005 from Maurice to melisaful.

20                    (Exhibit No. 9 marked

21                    for identification.)

22                    MR. DiADAMO:  Ten.  E-mail January 28,

23     2005 from Metin to brookhurst98.

24                    (Exhibit No. 10 marked
```

00190

1                        for identification.)

2                        (Off the record.)

3                        (Exhibit Nos. 11 through 13 marked

4                     for identification.)

5              MR. DiADAMO:  For the record, Exhibit 11

6     is a letter dated November 23rd, 2004 beginning

7     dearest Anthony and ending Fulya.

8                 Exhibit 12 is a letter addressed to the

9     Honorable Charles Haight -- H-A-I-G-H-T, JR, Sr.

10    Judge.

11                Exhibit 13 is a letter dated May 16,

12    2005 to -- commencing Dear Judge Haight --

13    H-A-I-G-H-T.  With that, I have no further

14    questions.

15             MS. KAZAROSIAN:  Okay, good.  All right.

16    I have a few questions.  He's going to wait, and

17    we'll reconvene.  We're going to finish this one.

18             MR. RAPAPORT:  All right.  Go ahead.  Go

19    ahead.

20             MS. KAZAROSIAN:  'Cause I can't ask

21    questions in the next one.

22             MR. RAPAPORT:  Right.  Okay.

23    CROSS-EXAMINATION BY MS. KAZAROSIAN:

24       Q.  Fulya, can you describe how close in

00191

    1    proximity your work area was to Maurice Lariviere's

    2    office door -- his -- the entrance?

    3        A.  When you came into the file cabinets into

    4    one room was my desk, and his office was the next

    5    office over.

    6        Q.  So how many feet maybe from your desk to the

    7    door to go into his office?

    8        A.  I would like say maybe like 30 feet.

    9        Q.  Thirty feet?

   10        A.  Hm Hm.  I'm guessing on the official --

   11        Q.  Were you ever given a sexual harassment

   12    policy by the Town of Methuen?

   13        A.  No, I was not.

   14        Q.  Were you ever told that there was a sexual

   15    harassment policy by anyone in the town?

   16        A.  No.

   17        Q.  Did you ever see any sexual harassment

   18    policy posted anywhere in city hall?

   19        A.  No, I did not.

   20        Q.  Or in the law office?

   21        A.  I did not.

   22        Q.  You had stated that you had some history or

   23    experience as a young person with sexual harassment.

   24    Do you recall that?

00192

1        A.   Yes.   I was sexually abused by my stepfather

2    for about seventh grade -- seventh grade to tenth

3    grade.

4        Q.   And how old -- how much older was your

5    stepfather than you?

6        A.   My stepfather -- I'm not sure how old -- how

7    old was he?   Let me see.   Twenty -- twenty years or

8    so.

9        Q.   And did you complain or tell anyone at the

10   time your stepfather was sexually abusing you during

11   that period?

12       A.   I told my mother.

13       Q.   And what did your mother do?

14       A.   My mother asked me if I was wearing any

15   clothes that were inappropriate or -- and she didn't

16   do anything.

17       Q.   How did that make you feel?

18       A.   Very bad and that by telling somebody nobody

19   helps you, it made me feel very bad.

20       Q.   Did you feel some responsibility as a result

21   of that question from your mother?

22       A.   Yeah, I felt like it was my fault.

23       Q.   What did you -- were you then -- did

24   anything -- strike that.

00193

1              Did anything happen after you told your

2    mother to stop the sexual abuse by your stepfather?

3       A.  Nothing happened.  It just continued.

4       Q.  And did you ever complain again?

5       A.  I did.

6       Q.  To whom?

7       A.  To my best friend, and she told her mother.

8    And then the police came and then I -- I went to a

9    foster home.

10      Q.  Okay.  When the police came, did they take

11   you away?

12      A.  Yeah, they did.

13      Q.  How did you feel when the police took you

14   away?

15      A.  Very upset 'cause I was taken away from my

16   home, and I didn't know what to do.  And I was taken

17   to a foster home.

18      Q.  When the police took you, did you feel that

19   the harassment or the abuse was going to end?

20      A.  Yes.

21      Q.  So in that respect how did you feel about

22   the police at that time when they took you from

23   that?

24      A.  Well, I felt like that they had helped me

00194

1    and that, you know, the abuse stopped.

2        Q.   What kind of abuse -- could you describe in

3    some detail as to what you experienced with your

4    stepfather?

5        A.   It was a lot of grabbing and seeing him

6    naked all the time and making out, grabbing parts of

7    my body, rubbing, all kinds -- all kinds of stuff.

8        Q.   Is it safe to say that the sexual abuse that

9    you endured from your stepfather was similar to that

10   that you endured from Maurice Lariviere?

11       A.   Yes.

12            MR. RAPAPORT:  Objection.

13       Q.   Okay.  The answer's yes?

14       A.   Yes.

15       Q.   Did you ever have any conversations with

16   Maurice where you advised him of your -- the sexual

17   abuse you endured in the past?

18       A.   Yes, I did.

19       Q.   Did you describe any -- did you go into any

20   detail with him as to what had happened to you?

21       A.   I told him a little bit about the grabbing

22   and the kissing and the hugging and the grabbing of

23   like the breast and stuff like that.

24       Q.   Now how did you feel about Maurice Lariviere

00195

1   in general?

2       A.  I was very confused by him because he was my

3   boss, and I looked to him as a friend, and he was

4   very helpful sometimes.  Other times I was really

5   confused by the way he acted.  I just -- I felt bad

6   for him.  I didn't know how to feel.

7           I thought he had really bad problems and

8   issues that he had to deal with.  I just thought

9   that he was like really perverted, and he had

10  problems, but at the same time I felt bad for him

11  because he was so nice.

12      Q.  When you -- when your stepfather was abusing

13  you, how long a period of time was that?  How many

14  years?

15      A.  It was like three to four years.  Seventh

16  grade to like tenth grade.  Sixth to tenth grade.

17  Around that time.

18      Q.  When he would make advances toward you, what

19  would you do?

20      A.  I couldn't get away from him 'cause he was a

21  lot stronger than me.

22      Q.  Describe him.

23      A.  He was like -- he almost was like

24  Mr. Universe at one time.  So he was very big,

00196

1    muscular.  He looked like Maurice a lot with a

2    mustache.  His appearance looked like him and stuff,

3    not the physical body, but the face and everything

4    was the same.

5        Q.  Why did you wait -- why did you endure this

6    harassment for a period of two and a half months or

7    so or from the time you started there until you

8    finally went to -- e-mailed Officer Wnek?

9        A.  Because I was really like -- I was really

10   scared and I felt frozen like I couldn't defend

11   myself sometimes; that I felt like whenever he kept

12   doing it that I couldn't -- like I wasn't really

13   there.  Like I was minimizing what was happening.

14   Like it wasn't really happening; that I could deal

15   with it.  I was afraid to say something 'cause maybe

16   nobody would believe me or nobody would do anything.

17       Q.  Why?  What would lead you to believe that?

18       A.  Also all the problems it causes by saying

19   something, you know, --

20       Q.  What would lead you to believe that saying

21   something would cause problems?

22       A.  Because when I told my mother a long time

23   ago, she never did anything when I was a kid.  So I

24   had that in me that maybe it was my fault what was

00197

1  happening at the office.

2      Q.  And that when someone did do something, how

3  did you feel about the results?

4      A.  I just felt like it really wasn't happening.

5  Like I didn't know -- like I wasn't there.  Like I

6  was frozen kind of a feeling.

7      Q.  Well, when you finally told someone about

8  your stepfather, you were taken from the home you

9  had stated just a moment ago, and you were put in a

10  foster home?

11      A.  Yes.

12      Q.  Was that -- how did you feel about that?

13      A.  I was very scared to be in a foster home.

14  It was very -- there was like no place to sleep.  We

15  slept on the floor.  It was very uncomfortable.

16      Q.  How long were you there?

17      A.  About a year.

18      Q.  And that was as a result of you -- someone

19  taking action on your behalf?

20      A.  Yes.  Yep.

21      Q.  When your stepfather was abusing you for

22  that period of time, did you ever at any time ask

23  him to stop?

24      A.  I would cry all the time, but he would just

00198

1   laugh.  He was mostly drunk all the time.

2       Q.  After the videotaping episode and the two

3   days that you were out of work prior to returning,

4   did you have any idea what your reaction would be

5   when you returned to work?

6       A.  I didn't know how I was going to react.  I

7   just know when I went back I was very uncomfortable

8   and very scared to be there.

9       Q.  And did that surprise you that your reaction

10  was that -- to that extent?

11      A.  Yeah, it did.

12      Q.  How many times did you see that videotape

13  after it was taken?

14      A.  Once.

15      Q.  And when --

16      A.  Actually, two times.

17      Q.  Two times?

18      A.  Yeah.  At the police station the day that I

19  went after -- after they took the videotape and then

20  after with you when we went together.

21      Q.  When you saw it at the police station, did

22  you sit there for the two hours and see the entire

23  thing?

24      A.  No.  They -- they fast forwarded to the

00199

1    scenes.

2        Q.  And the second time do you recall when that

3    was?

4        A.  The second time?  I can't remember.  Maybe

5    last year sometime.  Last spring.

6        Q.  So it was over a year ago?

7        A.  I believe so, yes.

8        Q.  And at that time did you sit there for the

9    entire two hours it was on?

10       A.  No.  They just fast forwarded to the parts.

11       Q.  So you haven't seen that video in the last

12   year, year and a half, correct?

13       A.  I believe so, yes.

14             MS. KAZAROSIAN:  I don't have any other

15   questions.

16             MR. RAPAPORT:  I have some.

17   REDIRECT EXAMINATION BY MR. RAPAPORT:

18       Q.  Mr. DiAdamo marked some exhibits.  One of

19   them is Exhibit 11.  I think you have a copy of that

20   in front of you.  It's a letter from you to Anthony.

21   Do you see that?

22       A.  Yep.

23       Q.  Okay.  In that letter the expression LOL is

24   used at various points.  Did that expression mean

00200

1    lots of love?

2        A.  No.  Laugh out loud.

3        Q.  All right.  Let's take the first instance

4    when you use that expression in the second paragraph

5    there on the first page where you talk about an

6    awful eye twitch.  What was that eye twitch that you

7    were talking about?

8        A.  I was -- I'd been having an eye twitch every

9    single day.

10       Q.  Was it pleasant or unpleasant?

11       A.  Unpleasant like a nervous twitch.

12       Q.  You said then to him "have no idea why it

13   won't go away Ahhhh -- A H H H, right?

14       A.  Yep.

15       Q.  Maybe I am losing it.

16       A.  Laugh out loud.

17       Q.  Was there something funny about that, that

18   eye twitch?

19       A.  No.  You know, you just tell somebody like

20   you're losing it.  I just said LOL.  To me it was

21   funny the way I wrote it.  It was in the context of

22   how I wrote my letter to Anthony.

23       Q.  You thought your reference to the eye

24   twitch --

00201

1    A.  I was making light of the situation.

2    Q.  You've got to let me finish.  We'll get out

3  of here quicker if we don't interrupt each other.

4         You thought when you were talking about

5  this awful eye twitch to Anthony that there was

6  something laughable about that?

7    A.  Yes.

8    Q.  And then you say in the next sentence that

9  you had trouble sleeping, and your body's in shock,

10  and you were tired, and you had a cold, you couldn't

11  breathe and that your head hurt.  Do you see that?

12    A.  Yes.

13    Q.  Okay.  That's the next paragraph.  And that

14  you were one big giant mess, and then you end that

15  by saying LOL.

16         Was there anything funny about your head

17  hurting and not being able to breathe?

18    A.  I guess I meant to say here I go complaining

19  again, LOL.  Just something you -- I just use LOL a

20  lot.

21    Q.  Do you ever use it to mean lots of love?

22    A.  No, I never use it to mean lots of love.

23    Q.  Always means laugh out loud?

24    A.  Yes.

00202

1      Q.  All right.  At the top of the second page

2   you're talking about your tattoo and how it hurt.

3   And then you say so I guess you're with me forever,

4   LOL.

5           Was there anything funny about saying to

6   him that you guess he'd be with you forever?  Is

7   that funny?

8      A.  I just use LOL a lot.  I don't know if it

9   was funny or not.  When I was writing, to me I felt

10  it appropriate to put LOL after.

11     Q.  Were you just writing LOL and not knowing

12  why you wrote that --

13     A.  No.  I felt like I wanted to put LOL after

14  that sentence.

15     Q.  For any particular reason?

16     A.  I just use it a lot.  No reason.

17     Q.  You always mean laugh out loud?

18     A.  Yes.

19     Q.  If you look at Exhibit 13, your letter to

20  judge Haight dated May 16, 2005, on the -- let's see

21  -- I guess the third page the first full paragraph

22  that says without Anthony and since his

23  incarceration my life has been very difficult.  Was

24  that true?

00203

1       A.   Yes, it was difficult.

2       Q.   And the next sentence says "I have been

3    severely depressed because I am heartbroken.  I miss

4    him so much."  Was that true?

5       A.   I probably exaggerated more so because I was

6    writing this letter to help him get released.  So...

7       Q.   You're not telling me that you exaggerated

8    in a letter to a federal judge --

9       A.   Not really exaggerated that much.  I'm just

10    saying I probably wasn't as depressed -- I was

11    depressed but not like --

12       Q.   You weren't severely depressed?

13       A.   I was depressed I guess.

14       Q.   This letter says severely depressed, right?

15    Do you see that?

16       A.   Yep, I do.

17       Q.   Are you saying now that you were not

18    severely depressed, merely depressed?

19       A.   I was depressed.  I mean at the time maybe I

20    thought I was severely depressed.  I don't know how

21    depressed I was.  I was depressed.

22       Q.   You say you were heartbroken in the next

23    sentence?

24       A.   Yeah, 'cause he went to jail I was

00204

1    heartbroken over that.  Yes.

2        Q.  Would it be fair to say that you were

3    feeling bad, depressed while he was incarcerated

4    because of his incarceration and being separated

5    from him?

6        A.  Yes.

7        Q.  So that was one source of your feeling bad

8    and feeling depressed?

9        A.  Yep.  There was a lot of reasons why I was

10   depressed, yes.

11       Q.  One of them though was --

12       A.  One of them was that, too, yes.

13       Q.  Okay.  In response to some of your counsel's

14   questioning you told us a little bit about your

15   stepfather, and you said that he was almost like

16   Mr. Universe.  Do you mean he was a bodybuilder?

17       A.  He was a bodybuilder, yes.

18       Q.  You certainly aren't telling us that Mo

19   Lariviere was any kind of bodybuilder, were you?

20       A.  No.  I said his face looked like him.

21       Q.  Certainly his body, there was no way,

22   shape --

23       A.  No, there wasn't.

24       Q.   -- or form -- let me finish -- in which

00205

1    Mr. Lariviere's physique resembled that of your

2    stepfather, was there?

3        A.  No.

4        Q.  By the way, when you told me earlier today

5    about that incident you remembered after the lunch

6    break where you were sexually harassed at a job when

7    you were younger and you quit immediately,

8    approximately where would you place the age of the

9    man who did that?

10       A.  In his forties.

11       Q.  In response to your counsel's questioning

12   you said that you -- when you told your mother about

13   the abuse that you suffered from your stepfather

14   nothing had happened.  Remember that testimony?

15       A.  Yes.

16       Q.  And that was all when you were 12, 13, 14

17   years old?

18       A.  Yes, around that time.

19       Q.  Okay.  And you didn't think that if you took

20   the advice that you were getting from various people

21   in the City of Methuen to report the incident to HR

22   or the mayor, you didn't think that nothing would

23   happen as a result, did you?

24       A.  I really didn't know -- don't know what to

00206

1    think.  I didn't know what to think if they would

2    have stopped it right away if I told HR.  I don't

3    know.

4        Q.  Did you -- weren't you assured by Mr. Molori

5    that the mayor would take action if you were

6    being --

7        A.  I don't recall that.  I don't remember him

8    ever telling me that.

9        Q.  Did you have any reason to doubt that the

10   Pollard -- that Mayor Pollard would not take action

11   if you told her about this abuse by Mr. Lariviere?

12       A.  I had no reason to -- I don't know -- no one

13   told me that that she would take action right away.

14   I don't know.  I just didn't -- I chose not to tell

15   her.

16       Q.  Are you saying you didn't know whether she

17   would or wouldn't take action?

18       A.  I don't know.  I don't know what would have

19   happened until I did it.  I don't know what would

20   have happened.

21       Q.  All right.  Certainly nothing would happen

22   if you didn't do it?

23       A.  Exactly.

24       Q.  And you knew that your protest to

00207

1    Mr. Lariviere were not having the desired effect,

2    were they?

3        A.  No.

4        Q.  You told your counsel that you were worried

5    at the City of Methuen that nobody would believe you

6    if you told them that you were being sexually

7    harassed by Mr. Lariviere.  Do you remember that

8    testimony?

9        A.  Yes.

10       Q.  Well, when you told Mr. Molori, he certainly

11   believed you, didn't he?

12       A.  I believe he did, yes.

13       Q.  And your friend in HR at Brigham and Women's

14   Hospital, she believed you, didn't she?

15       A.  Yes.

16       Q.  And Linda -- Diane Gagnon -- Miss Gagnon,

17   she believed you, didn't she?

18       A.  I'm sure she believed me 'cause it kind of

19   happened to her a long time ago.

20       Q.  All right.  So if these people had -- you

21   had spoken to believed what you were telling them

22   about Mr. Lariviere, did you have any reason to

23   believe that David Bain wouldn't believe you?

24       A.  I had no reason to believe that, no.

00208

1      Q.  Your counsel started out by asking you

2   whether you were ever given a copy of the sexual

3   harassment policy at Methuen, and you said no,

4   correct?

5      A.  Yes.

6      Q.  You're not telling us, are you, that you

7   were unaware that it was illegal to sexually harass

8   people in the workplace?  You're not telling us

9   that, are you?

10     A.  I'm sure -- I know it's illegal, yes.

11     Q.  Okay.  And you weren't unaware while you

12  were working for the City of Methuen that if you're

13  being sexually harassed one of the things you're

14  supposed to do is tell somebody in authority at your

15  employer about it?

16     A.  But he's my boss.  I would go to him if I

17  was being sexually harassed.

18     Q.  Wait a minute.  Mr. Lariviere was not the

19  only person at the City of Methuen to whom you could

20  have complained, was he?

21     A.  No.

22     Q.  You had the mayor, correct?

23     A.  Yes.

24     Q.  You had David Bain, head of HR?

00209

    1       A.  Yes.

    2       Q.  You had Tina Touma-Conway, an attorney who

    3   was the clerk?

    4       A.  Yes.

    5       Q.  You had Tootie Hurley who was the chief of

    6   staff for the mayor?

    7       A.  Yes.

    8       Q.  Okay.  So you weren't telling me today that

    9   you didn't know that if you're being sexually

   10   harassed that you're supposed to tell somebody in

   11   authority?

   12       A.  Can I just make a comment?

   13       Q.  Yes.

   14       A.  I had a hard time trying to figure out who

   15   to tell when all this was happening.  I was afraid

   16   to tell anybody.  I was afraid I'd cause all kinds

   17   of problems.  Also I felt safe going to the police.

   18       Q.  Let's break that down.  You said that you

   19   were reluctant to tell anybody; that you also had

   20   trouble figuring out who to tell?

   21       A.  Exactly.

   22       Q.  You knew you weren't going to tell

   23   Mr. Lariviere 'cause he was the harasser, right?

   24       A.  Right.

00210

1      Q.  That left a choice of the mayor, the head of

2   HR, the clerk, etc., correct?

3      A.  I didn't know who to go to.  I wasn't sure

4   if I wanted to say anything.  It took me a long time

5   to be able to say something.

6      Q.  Once you decided you were ready to speak

7   out, did you make any effort to find out who you

8   should go to at the City of Methuen to complain of

9   sexual harassment?

10     A.  No, I did not.

11     Q.  You knew it was a function of the HR

12  department to help employees with that kind of a

13  problem, didn't you?

14     A.  I -- yes, I did.

15     Q.  You could have gone --

16     A.  I just didn't think of -- sorry.

17     Q.  You could have gone to David Bain and said,

18  Mr. Bain, who should I go to to make a complaint

19  about sexual harassment?  You could have done that?

20     A.  I could have done that, yes.

21     Q.  But you chose not to?

22     A.  Yes.

23     Q.  Now -- I'm almost done here.  You told us

24  why you felt that it was hard for you to complain

00211

1    about the sexual harassment, correct?

2        A.  Yes.

3        Q.  One way to end the sexual harassment would

4    have been to complain and hopefully get it to stop,

5    correct?

6        A.  Yes.

7        Q.  And you didn't take any action in that

8    regard until you ultimately went to

9    Officer/Detective Wnek, correct?

10       A.  Yes.

11       Q.  There was another way to get the sexual

12   harassment against you to stop; namely, going to a

13   different job, correct?

14       A.  Yes.

15       Q.  And you never took any steps during your

16   entire period of being sexually harassed by

17   Mr. Lariviere -- you never took any steps to find

18   another position, did you?

19       A.  I thought about it a lot, but I never took

20   the action.

21       Q.  All right, that's all I have.

22           MS. KAZAROSIAN:  I have no other

23   questions.

24           MR. RAPAPORT:  I guess we're concluded

00212

1   with the deposition of Miss Metin in the case of the

2   -- the MCAD case of Metin versus City of Methuen and

3   Maurice Lariviere.

4             I assume there will be some continuation

5   of her deposition as a witness in the federal case

6   with Mr. Notis and Mr. DiAdamo.  We're done.  We're

7   off the record.

8             (Whereupon the proceedings

9              adjourned at 4:06 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

00213

```
 1              C E R T I F I C A T E

 2      I, FULYA METIN, do hereby certify

 3   that I have read the foregoing transcript of my

 4   testimony, and further certify that it is a true and

 5   accurate record of my testimony (with the exception

 6   of the following corrections listed below):

 7

 8   Page  Line           Correction

 9   ____  ____     _____

10   ____  ____     _____

11   ____  ____     _____

12   ____  ____     _____

13   ____  ____     _____

14   ____  ____     _____

15   ____  ____     _____

16   ____  ____     _____

17

18

19      Signed under the pains and penalties of

20   perjury this ____ day of _____, 2006.

21

22          _____

23             FULYA METIN

24
```

00214

```
 1                    CERTIFICATE

 2    COMMONWEALTH OF MASSACHUSETTS)

 3    SUFFOLK, SS.                 )

 4

 5        I, Paulette M. Cook, Registered Merit Reporter

 6    and Notary Public in and for the Commonwealth of

 7    Massachusetts, do hereby certify that FULYA METIN,

 8    the witness whose deposition is hereinbefore set

 9    forth, was duly sworn by me and that such deposition

10    is a true record of the testimony given by the

11    witness.

12        I further certify that I am neither related to

13    or employed by any of the parties in or counsel to

14    this action, nor am I financially interested in the

15    outcome of this action.

16        In witness whereof, I have hereunto set my hand

17    and seal this 27th day of October, 2006.

18

19

20

21                    Notary Public

22

23    My commission expires:

24    March 8, 2007
```

Lariviere
vs.
Solomon/Alaimo/Methuen

Fulya Metin

Volume 1

October 12, 2006
pp. 1-39

**Jones Reporting**
*COMPANY*

Two Oliver Street, Suite 804
Boston, MA  02109
617-451-8900
info@jonesreporters.com
www.jonesreporters.com

Fulya Metin

1                              Volume: I

2                              Pages:  1-39

3                              Exhibits: 1-9

4        COMMONWEALTH OF MASSACHUSETTS

5                  C.A. No. 05-11579EFH

6

7    ----------------------------------------

8    MAURICE LARIVIERE,

9                    Plaintiff,

10      v.

11   JOSEPH SOLOMON, Individually, and as Chief

12   of Police of the City of Methuen, and JOSEPH

13   ALAIMO, Individually, and as Deputy Chief of

14   Police of the City of Methuen, and the

15   CITY OF METHUEN,

16                    Defendants.

17   ----------------------------------------

18

19            DEPOSITION of FULYA METIN

20   Thursday, October 12, 2006, 10:30 a.m. to 4:48 p.m.

21            DAVIS, MALM & D'AGOSTINE

22              One Boston Place

23            Boston, Massachusetts

24      Court Reporter:  Paulette Cook, RPR/RMR

Fulya Metin

Page 2

1  A P P E A R A N C E S:
2  DAVIS, MALM & D'AGOSTINE
3  By David Rapaport, Esq.
4  One Boston Place
5  Boston, Massachusetts 02108
6  617-367-2500
7  drapaport@davismalm.com
8  Counsel for the Plaintiff
9
10  KAZAROSIAN LAW OFFICES
11  By Marsha V. Kazarosian, Esq.
12  546 Main Street
13  Haverhill, Massachusetts 01830
14  978-372-7758
15  marsha@kazarosian.com
16  Counsel for the Fulya Metin
17
18  DiADAMO LAW OFFICE, LLP
19  By Carmine W. DiAdamo, Esq.
20  40 Appleton Way
21  Lawrence, Massachusetts 01840
22  978-685-4271
23  carmine@diadamo.com
24  Counsel for Maurice Lariviere

Page 4

1  I N D E X
2  Examination of:                    Page
3
4  FULYA METIN
5  By Mr. Notis                        6
6
7
8
9  E X H I B I T S
10  No.                               Page
11
12  1    E-Mail 2/14/05               8
13  2    Synopsis 2/15/05              8
14  3    Permission Note 2/16/05        8
15  4    Synopsis                     8
16  5    Synopsis 2/16/05              8
17  6    Poem                         8
18  7    Document                     8
19  8    Document                     8
20  9    Document                     8
21
22
23
24  ** Exhibits retained by Mr. Notis **

Page 3

1  A P P E A R A N C E S (cont.):
2
3  MORRISON MAHONEY, LLP
4  Gareth W. Notis, Esq.
5  250 Summer Street
6  Boston, Massachusetts 02210-1181
7  617-737-8857
8  gnotis@morrisonmahoney.com
9  Counsel for the City of Methuen,
10  Joseph Solomon and Joseph Alaimo
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 5

1  P R O C E E D I N G S
2       MR. DiADAMO: For the record I have
3  completed my examination of Fulya Metin during the
4  first deposition which we have just concluded.
5       MR. NOTIS: Okay.  The parties will
6  agree to the usual stipulations.  Reserve all
7  objections, except as to the form of the question,
8  including motions to strike until the time of trial.
9       We've also stipulated prior to beginning
10  this deposition that any questions and answers
11  provided in the MCAD deposition will have equal
12  effect to those questions asked and answered during
13  this deposition.  Is that correct, Attorney DiAdamo?
14       MR. DiADAMO: Yes.  And would you -- may
15  I offer an amendment that the exhibits entered in
16  the first one will also be part of the second
17  deposition?
18       MR. NOTIS: Great.  I agree.  Attorney
19  DiAdamo noticed the deposition.  However, I will
20  begin my questioning.  He's certainly not foreclosed
21  from asking questions when I'm completed.
22       Could you swear the witness, please?
23       FULYA  METIN,
24

2 (Pages 2 to 5)

Fulya Metin

Page 6

1  a witness called for examination by counsel for the
2  Plaintiff, being first duly sworn, was examined and
3  testified as follows:
4
5         DIRECT EXAMINATION
6  BY MR. NOTIS:
7      Q. Good afternoon. Could you state your name
8  for the record?
9      A. It's Fulya. Last name is Metin, M-E-T-I-N.
10     Q. My name is Gareth Notis. I represent the
11 City of Methuen, Joseph Alaimo and Joseph Solomon in
12 this case.
13        The same instructions that you got this
14 morning will apply to this deposition. You'll have
15 a right to read and sign your transcript from
16 the federal case. Would you like that opportunity?
17     A. Yes.
18     Q. We'll send it to you, and you'll have thirty
19 days from your attorney's receipt of the transcript
20 to make any corrections and return it to us.
21     A. (Nods head.)
22     Q. You married your husband on September 15th;
23 is that correct?
24     A. September 5th.

Page 7

1      Q. September 5th. His last name is what?
2      A. Capanelli.
3      Q. Do you intend to change your name from Metin
4  to Capanelli?
5      A. Yes. I haven't been able to do it yet.
6      Q. When he is released from the halfway house,
7  do you intend to move in with him?
8      A. Yes.
9      Q. Have you made any arrangements as to where
10 you're going to live?
11     A. Not at the moment.
12     Q. Do you plan to stay on Long Island down in
13 New York?
14     A. I'm not a hundred percent sure yet, but I --
15 I'm not sure. Maybe. Maybe not. I'm not sure
16 right at this time.
17     Q. Okay. Do you have any plans to leave the
18 United States?
19     A. No.
20     Q. And your daughter's enrolled in elementary
21 school down on Long Island?
22     A. She's in sixth grade, middle school.
23     Q. What school is she enrolled in?
24     A. She's in the Cormack Middle School.

Page 8

1      Q. Was your social security number?
2      A. 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.
3      Q. What is your mother's name?
4      A. Rana, R-A-N-A.
5      Q. Last name is Metin?
6      A. No. It's K-U-R-A-N.
7      Q. And if we need to get in touch with you to
8  testify at the trial in the federal case, how would
9  we do that?
10     A. The address that I gave -- you want me to
11 give the address again?
12     Q. Yes, please.
13     A. It's 26 Arista -- A-R-I-S-T-A -- Drive.
14 It's Huntington -- H-U-N-T-I-N-G-T-O-N -- New York
15 11746.
16     Q. Do you have a phone number where we can
17 reach you?
18     A. Yes. It's 631-332-0554.
19     Q. And that is your cell phone number?
20     A. Yes.
21        MR. NOTIS: Can we have these marked as
22 the exhibits?
23        (Exhibit Nos. 1 through 9 marked
24        for identification.)

Page 9

1      Q. Miss Metin, when did you first meet
2  Mr. Molori?
3      A. When did I first meet him? I can't remember
4  the day. When I started working at the City of
5  Methuen.
6      Q. Sometime after you began your assignment
7  through Moore Temp Agency --
8      A. Yes.
9      Q. -- is that correct?
10     A. Yes.
11     Q. You hadn't met him prior to beginning work
12 at the City of Methuen, correct?
13     A. No.
14     Q. And you periodically went to lunch with him?
15     A. Sometimes, yes.
16     Q. And he also partially paid for your
17 membership to the Gold's Gym, correct?
18     A. Yes.
19     Q. Would you describe --
20     A. Sorry, go ahead.
21     Q. Would you describe your relationship with
22 him as friendly?
23     A. Yeah, we were really good friends.
24     Q. It never reached the level of a sexual or

3 (Pages 6 to 9)

Page 10

1  intimate relationship?
2      A. No, it never did.
3      Q. And you told us this morning that you
4  eventually at some point during 2005 had a
5  discussion with Mr. Molori about Mr. Lariviere's
6  conduct; is that right?
7      A. Yes.
8      Q. And to the best of your memory, could you
9  tell us during that first conversation what you told
10  Mr. Molori?
11      A. To my best of my knowledge, I told him that
12  he was acting a little strange and he was trying to
13  touch me all the time, things like that. And there
14  was a letter that he had written to me talking about
15  going to Turkey; that I was some kind of goddess --
16  some strange letter that I was showing John.
17          I was like, you know, I can't believe he
18  wrote this weird letter, and I just threw the letter
19  away. That's one conversation I had with John
20  Molori.
21      Q. Mr. Molori encouraged you to report
22  Mr. Lariviere's conduct; is that correct?
23      A. Yes. He said I should tell the mayor or
24  Tootie.

Page 11

1      Q. In response, you made Mr. Molori promise
2  that he would not report your conversation; is that
3  right?
4      A. Yes.
5      Q. Why did you do that?
6      A. I just -- at that time I didn't know -- I
7  thought I could handle it. I didn't want to say
8  anything. You know, I was afraid to lose my job.
9  There was a lot of mixed feelings about that. I
10  just didn't want John to get involved either.
11      Q. And to your knowledge at any time between
12  that first conversation with Mr. Molori and the time
13  of the videotape on February 16, 2005 did Mr. Molori
14  report your conversation with him to anyone else?
15      A. Not that I know of. I -- I told him not to.
16  I was pretty sure he kept his word, but I don't know
17  if he behind my back or anything ever said anything.
18  I do not know.
19      Q. Do you have any personal knowledge of
20  Mr. Molori reporting the conversation that you had
21  with him about Mr. Lariviere's conduct with the
22  mayor?
23      A. Not that I know of.
24      Q. Do you have any personal knowledge about

Page 12

1  Mr. Molori having discussions with Joseph Solomon?
2      A. Not that I know of, no. I don't think he
3  ever did. I don't think he ever did 'cause he
4  promised me he would never say anything.
5      Q. How about Joseph Alaimo?
6      A. Not that I know of.
7      Q. Okay. You first notified lieutenant win I
8  can by e-mail; is that right?
9      A. Yes.
10      Q. Could you look at Exhibit 1 and tell us if
11  you recognize that document?
12      A. Yes. That was an e-mail that I wrote on
13  February 14th right before I left work.
14      Q. And you sent that from your --
15      A. -- computer.
16      Q. -- work e-mail or your home address?
17      A. My work e-mail.
18      Q. What is the time of that e-mail?
19      A. 5:18.
20      Q. You asked Lieutenant Wnek to either respond
21  to the e-mail or call you on your cell phone; is
22  that right?
23      A. Yes. Yes.
24      Q. And do you recall how Mr. Wnek responded to

Page 13

1  you?
2      A. The next day -- I can't remember if he sent
3  me -- I can't remember if he sent me an e-mail or
4  called me and told him that I could meet him at --
5  at the -- after work by the -- at the parking lot
6  near Starbucks to meet with him and talk to him
7  about what had happened -- about what was going on,
8  to tell him what was happening.
9          He met me in the parking lot. He came
10  into the car. I told him everything that was going
11  on in the office.
12      Q. And your memory is that that was on February
13  15th?
14      A. Fifteenth, yes.
15      Q. Incidentally, the 14th was Valentine's day?
16      A. It was the next day. It was the 15th.
17      Q. The day you sent your e-mail was Valentine's
18  Day, right?
19      A. Yes.
20      Q. Was Mr. Lariviere's harassment of you any
21  greater or less on Valentine's Day than any other
22  day?
23      A. I just remember towards a couple weeks
24  before I said something it was getting worse, it was

4 (Pages 10 to 13)

Fulya Metin

Page 14

1  more grabbing, more touching, more hand trying to go
2  down your pants kind of thing. It was getting
3  harder for me to push him away. It was much harder
4  for me to get away from him.
5      Q. The conversation with Lieutenant Wnek behind
6  city hall, was that after work?
7      A. It was after work. It was in the parking
8  lot of Starbucks. It wasn't near city hall.
9      Q. Do you recall how long the conversation was
10  approximately?
11     A. For like fifteen minutes or so.
12     Q. What happened next after the conversation
13  ended in the vehicle?
14     A. He told me to go down to the police station
15  with him, if I'd be willing to do that. I said
16  sure. So we went down to the police station. Yeah.
17     Q. Did Mr. Wnek express to you any concerns of
18  his that the contact from Mr. Lariviere might have
19  been of a criminal nature?
20     A. I cannot recall, but he seemed to be upset
21  by what was happening when I told him everything
22  that was happening, he seemed to be upset that that
23  was happening; that I should go to the police
24  station and file a report and tell them what was

Page 15

1  going on.
2      Q. So that's what you did, right?
3      A. Yes.
4      Q. You went down to the police station with
5  Lieutenant Wnek?
6      A. Yes.
7      Q. And when you got there, did you speak with
8  anyone else besides Lieutenant Wnek?
9      A. I went to -- he had me meet with the chief,
10  too. I had to meet with the chief and him -- after
11  I was in there for like an hour or so filing my
12  report of what happened, I met with the chief and
13  him.
14     Q. Could you look at --
15     A. Yeah, this is my report that I filed at
16  Michael Wnek's office.
17     Q. -- Exhibit 2?
18     A. Yep.
19     Q. And that's a copy of your report, correct?
20     A. Yes.
21     Q. Is that your initial on the bottom
22  right-hand corner of Exhibit 2?
23     A. Yes.
24         MR. NOTIS: Should I distribute these to

Page 16

1  everyone?
2      (Pause.)
3      Q. Could you look at Exhibit 4 as well? Do you
4  recognize Exhibit 4?
5      A. Yes.
6      Q. That's just a second copy of Exhibit 2 but
7  without the date on the first page, right?
8      A. Let me see. Yes. It's the same thing.
9      Q. And your memory is that you -- this was a
10  recording of the statement that you gave to
11  Lieutenant Wnek at the police station on the evening
12  of February 15, 2005?
13     A. Yes, it is.
14     Q. Have you seen either Exhibit 2 or Exhibit 4,
15  your statement, at any time since you gave it to
16  Lieutenant Wnek?
17     A. I -- let me think. I saw that date -- I saw
18  it that day after I typed it.
19     Q. You reviewed the statement in lieutenant --
20  in Lieutenant Wnek's office?
21     A. Yes.
22     Q. And everything in the statement is accurate,
23  correct?
24     A. Yes.

Page 17

1      Q. You wouldn't have put your initials on it if
2  it wasn't accurate, would you?
3      A. Of course.
4      Q. After you gave the statement to Lieutenant
5  Wnek, you went down to the chief's office?
6      A. Yes.
7      Q. And at the chief's office what was
8  discussed?
9      A. They were asking questions like what's going
10  on, what happens -- all kinds of questions.
11     Q. And was there a discussion about videotaping
12  what was going on in the city solicitor's office on
13  the evening of the 15th?
14     A. Yeah. Not until the end of all the
15  questioning and everything they said would you mind
16  if we put a videotape -- would it be okay with you
17  to see if he's doing all this stuff. I was like
18  sure. They made me -- I signed something. I said,
19  okay, I wouldn't mind.
20     Q. Was Joseph Alaimo present at any time on the
21  evening of the 15th when you were at the police
22  station?
23     A. I'm sorry?
24     Q. Was Joseph Alaimo present --

5 (Pages 14 to 17)

Fulya Metin

Page 18

1    A. Yes, he was. He was actually in the office
2  when they were asking me questions. So it was -- it
3  was a three -- it was Wnek, Solomon and Alaimo.
4    Q. Could I see the exhibits?
5    A. Sure.
6    Q. Exhibit 3, is that your signature?
7    A. Yes, it is.
8    Q. And that's on the 16th of February 2005,
9  correct?
10   A. Yes.
11   Q. And that would be the morning of the
12  videotaping, correct?
13   A. Yes.
14   Q. And you -- you authorized the police
15  department to video --
16   A. Yes.
17   Q. -- the conduct in the city solicitor's
18  office, correct?
19   A. Yes.
20   Q. Had you ever met Joseph Solomon before the
21  evening of the 15th?
22   A. I'm trying to think. He had come to the
23  office a couple times to meet with Maurice. That's
24  the only interaction I ever had.

Page 19

1    Q. Had you ever complained to Joseph Solomon
2  about Mr. Lariviere's harassment or conduct prior to
3  the evening of February 15?
4    A. No.
5    Q. When did you first meet Mayor Pollard?
6    A. I first met Mayor Pollard -- I'm trying to
7  think -- when I first started like in the elevator,
8  I met her. Like I saw her in the elevator.
9       Just hello, that was it. Then when I
10  had the interview is when I really formally met her.
11  During the interview that I had for the full-time
12  job.
13   Q. Your memory of the interview was that
14  someone else was present, correct?
15   A. Yes.
16   Q. You just don't remember exactly who it was?
17   A. I can't remember exactly who it was. I
18  can't remember.
19   Q. Did you make any complaints to the mayor
20  during that interview or at any time before the
21  interview about Mr. Lariviere's conduct?
22   A. No, I did not.
23   Q. How about subsequent to that interview
24  leading up to the date of the videotape on the

Page 20

1  morning of February 16th, did you complain to Mayor
2  Pollard about Mr. Lariviere's conduct?
3    A. I did not, no.
4    Q. Did you ever have any discussions with Mayor
5  Pollard about any of the harassment that was going
6  on from Mr. Lariviere of you?
7    A. No, I did not.
8    Q. Do you have any personal knowledge of
9  whether Mayor Pollard had any knowledge of
10  Mr. Lariviere's conduct any time prior to February
11  15, 2005?
12   A. I do not -- No, I don't think she knew
13  anything. I never told her anything.
14   Q. You told us earlier that you had no
15  knowledge that Mr. Molori even told Mayor Pollard --
16   A. I have no idea -- sorry.
17   Q. You told us earlier you have no knowledge of
18  Mr. Molori conveying that information to Mayor
19  Pollard?
20   A. Yes, I have no knowledge of that.
21   Q. Did you see Mayor Pollard on the morning of
22  the videotaping at any time?
23   A. No, I did not.
24   Q. It wasn't until afterwards that you saw her?

Page 21

1    A. Afterwards I saw her, yes.
2    Q. How about Joseph Solomon; did you see him on
3  the morning of the videotaping?
4    A. I did not see him on the morning of the
5  videotaping.
6    Q. Did you see Joseph Alaimo on the morning of
7  the videotaping?
8    A. I did not see Joseph Alaimo on the morning
9  of the taping.
10   Q. Was any promise ever made to you that if you
11  didn't press charges Mr. Lariviere would resign?
12   A. Nobody ever told me that, no.
13   Q. And what was the reason you decided not to
14  press charges against Mr. Lariviere?
15   A. I guess I felt bad for his family more than
16  anything 'cause I know criminal charges -- after
17  what Anthony went through and everything, I just
18  didn't feel that was needed. Even though what I
19  felt he had done to me was wrong and everything, I
20  just felt to put his family through that -- I just
21  felt bad. I just didn't want to do that.
22   Q. Did the media attention that the case was
23  gathering have any role in your decision not to
24  press charges?

6 (Pages 18 to 21)

Fulya Metin

Page 22

1    A. It could have. I was maybe afraid of the
2  videotape getting out maybe. That was another fear
3  of mine -- that was another reason, too. 'Cause the
4  videotape was kind of scaring of me, if that came
5  out and --
6    Q. What is your memory of the first time that
7  you discussed Mr. Lariviere's conduct with someone
8  from the district attorney's office?
9    A. Like how it went? Like how they were
10 towards me or --
11   Q. Just the timing of it. Do you have a memory
12 of when that first meeting took place?
13   A. I think it was like a week after.
14   Q. Who was present at the meeting?
15   A. Officer Wnek and -- I forgot her name, but
16 the -- I can't remember her name. I had her card.
17   Q. Kathy Tuttman?
18   A. Tuttman, I believe so, yes.
19   Q. Was anyone else present besides Lieutenant
20 Wnek and Kathy Tuttman?
21   A. I think there was another woman there from
22 -- there was another woman there as well. I can't
23 remember her name though. She had something to do
24 with -- I can't remember her. I think there was

Page 23

1  another woman there.
2    Q. Can you describe the substance of the
3  conversation with the meeting with District Attorney
4  Tuttman?
5    A. She was like very pleasant. She was very
6  pleasant. She asked me what I wanted to do -- to
7  think about it and to give an answer whenever I'm
8  ready. She gave me her card. And that's about it
9  -- is all I can recall.
10   Q. Did you give her an answer that day at the
11 first meeting?
12   A. No. I don't think so. I think I told them
13 later on I think.
14   Q. Did she tell you what type of criminal
15 charges she was considering filing against
16 Mr. Lariviere?
17   A. I can't recall. I don't remember.
18   Q. And subsequent to that meeting, how long was
19 it after that meeting that you decided not to press
20 charges?
21   A. I think it was like a couple days later, I
22 believe.
23   Q. If you could look at your statement, Exhibit
24 4, I'm going to ask you some questions about the

Page 24

1  document.
2    A. Sure.
3    Q. About halfway down the statement reads:
4  "The days at the office would be getting my work
5  done, but often almost on a daily basis he would
6  come over to my desk and make stupid comments about
7  me being in a bathing suit." Is that correct?
8    A. Yes, he would. Yes.
9    Q. How frequently were there remarks about you
10 being in a bathing suit?
11   A. There was a couple times maybe.
12   Q. And did you object to those remarks from
13 Mr. Lariviere?
14   A. I just tried to change the subject. I just
15 tried to change the subject. I didn't say anything.
16 I just changed the subject from what I remember.
17   Q. Later in the statement almost at the bottom
18 it reads: "He would tell me to hug him all the
19 time, and he would get so close to me that I could
20 feel his private part on my private area, and he
21 would sort of try to adjust himself so he got really
22 close to my private area." Did I read that
23 correctly?
24   A. Yes.

Page 25

1    Q. Could you describe when approximately that
2  instant occurred?
3    A. It happened a lot when he was trying to hug
4  me really close and kiss me. He was so -- he was
5  thrusting a little bit and adjusting himself a
6  little bit sort of, and I could feel that.
7    Q. During those occasions when Mr. Lariviere
8  would rub against you, did you direct him to stop?
9    A. I would try to get away from him. I was
10 like stop it. I would just try to push him away.
11 He kept pushing me closer; I kept pushing away.
12        It was like a struggle all the time push
13 away, get closer -- I would just get away from him
14 and would just leave.
15   Q. Did you ever invite Mr. Lariviere to gyrate
16 against you?
17   A. No.
18   Q. Those were unwanted advances, right?
19   A. Yes.
20   Q. You directed him to stop?
21   A. Yes.
22   Q. On the second page about halfway through it
23 talks about Mr. Lariviere touching your breast when
24 he tried to hug you. Do you have a memory of

7 (Pages 22 to 25)

Page 26

1  Mr. Lariviere trying to touch your breasts?
2      A. Yes.
3      Q. Could you describe to us how many times that
4  occurred?
5      A. A lot -- it happened a lot.
6      Q. When it happened, could you give us a
7  description of what occurred?
8      A. I'd be sitting at my desk, and he would try
9  to grab me from behind. He would grab right here
10  and would come move his hands up higher so he was
11  trying to grab that area.
12     Q. Did he ever try to stick his hands down your
13  shirt?
14     A. Not down my shirt, no. But everywhere -- if
15  I wore some loose pants, he'd try to stick his hand
16  down the back of my pants sometimes.
17     Q. Did you object to those advances?
18     A. Yes.
19     Q. Did Mr. Lariviere ever describe to you the
20  status of his sex life with his wife?
21     A. Yes, he did.
22     Q. Could you tell us what he described in that
23  regard?
24     A. Sure. One day he said he was crying -- came

Page 27

1  to my desk. He was crying. He said to me he's
2  really upset. I was like what's wrong. We went
3  into his office to sit down at his desk, this little
4  conference table that he has, and he said to me he's
5  having a really hard time, he's only been with one
6  woman in his life, never been with anybody else but
7  his wife and that he can't have sex with his wife
8  anymore; that he thinks of me and that -- that he
9  loves me, and he's crying like hysterically crying.
10  And I didn't know what to do. I didn't know what to
11  say.
12          I just said to him I don't think of you
13  that way. I work for you. I'm a friend like --
14  you're like a father to me. I said -- I said I love
15  somebody else, that kind of stuff. But he kept
16  crying and crying and crying.
17     Q. Could you like at Exhibit 5. It's a
18  document dated February 16, 2005?
19     A. Exhibit 5?
20     Q. Is it Exhibit 6?
21     A. This (indicating)?
22     Q. Yeah, Exhibit 5.
23     A. Okay.
24     Q. Do you recognize Exhibit 5?

Page 28

1      A. Yes.
2      Q. Is that your signature on the bottom?
3      A. Yes, it is.
4      Q. And you signed it on the 16th of February,
5  2005, right?
6      A. Yes.
7      Q. That was the day of the videotape?
8      A. Yes.
9      Q. And could you read the statement to
10  yourself, and let me know when you're done?
11     A. Okay.
12         (Pause.)
13     A. I read it.
14     Q. Does this statement that you signed
15  accurately reflect your memory of what occurred on
16  the morning of February 16, 2005 in the city
17  solicitor's office?
18     A. Yes, it does.
19     Q. And does it reflect your memory of what was
20  recorded on the videotape that you viewed on two
21  occasions?
22     A. Yes, it does.
23     Q. You wouldn't have signed it if it didn't,
24  right?

Page 29

1      A. Yes.
2      Q. It's fair to say your memory on the day of
3  was better than it is today?
4      A. I still remember that pretty clearly. I
5  remember what happened that day pretty clearly.
6      Q. Did Lieutenant Wnek type up Exhibit -- is it
7  5 for you?
8      A. I typed it up myself.
9      Q. Did Mr. Lariviere ever ask you to go on any
10  vacations with him?
11     A. He would talk about -- I would ask me
12  questions about Turkey a lot, where I'm from. And
13  on some occasions he went to the library and was
14  looking at books on Turkey, and there was one time
15  he kept asking me maybe we should go to Turkey one
16  day, how many children are we going to have, that
17  kind of stuff.
18         But that was only one time I remember.
19  But I don't know if he was serious. I think he was
20  just saying -- I don't know.
21     Q. You told us this morning about occasions
22  when you would hug Mr. Lariviere voluntarily,
23  correct?
24     A. Yes.

8 (Pages 26 to 29)

Fulya Metin

Page 30

1    Q. And from time to time you would give him a
2  kiss on the cheek, correct?
3    A. Yes. When -- sorry.
4    Q. None of the kisses to your lips though were
5  voluntary, were they?
6    A. No.
7    Q. You never initiated them, did you?
8    A. No, I did not.
9    Q. They were initiated by Mr. Lariviere?
10   A. Yes.
11   Q. Were they wanted by you?
12   A. No.
13   Q. Did you object to them?
14   A. Yes.
15   Q. Did you object to them orally to
16 Mr. Lariviere?
17   A. Yes.
18   Q. What did you say on those occasions?
19   A. I said don't do that, it's uncomfortable, I
20 don't like when you do that.
21   Q. Were his touchings of your buttocks area
22 welcomed or wanted?
23   A. No.
24   Q. Were his touchings of your breasts welcome

Page 31

1  or wanted?
2    A. No.
3    Q. Incidentally, did he ever feel your breasts
4  underneath your shirt, or was it always on top of
5  your shirt?
6    A. On top of my shirt.
7    Q. Did Mr. Lariviere ever make statements to
8  you asking you do you like me?
9    A. All the time.
10   Q. How frequently would that occur?
11   A. A lot. I can't remember but many, many
12 times he would ask me that.
13   Q. Did he ever present to you documents where
14 he made statements like that and asked you to sign
15 them?
16   A. Yes. He would come by with a little
17 post-it, and it would be like I like Maurice;
18 Maurice is a good guy, things like that. He'd sit
19 there and say sign it.
20   Q. Could you look through the exhibits before
21 you and tell me if you recognize any of those to be
22 Mr. Lariviere's post-it notes or statements that he
23 asked you to sign?
24   A. Yes, these are some of them.

Page 32

1    Q. Why don't you tell us which exhibit you're
2  looking at and describe what it says?
3    A. Sure. That's my -- that looks like my
4  signature on Exhibit 7. Yeah. That's one thing he
5  made me sign.
6    Q. Could you read what it says on the top of
7  Exhibit 7?
8    A. Sure. It says Maurice has always treated me
9  good and been very supportive of me.
10   Q. Where did he ask you to sign that document?
11 Physically where were you located?
12   A. At my desk. I was trying to do my work, and
13 he'd just come by with something, sign this. I'm
14 like --
15   Q. Why did you sign it?
16   A. 'Cause he wouldn't go away if I didn't sign
17 it. He sat there, and he's like sign it, sign it.
18 I just wanted him to go away so I would be just like
19 whatever (indicating).
20   Q. Why don't you look at the next exhibit and
21 tell us if you recognize that?
22   A. Exhibit 8, yes, I do.
23   Q. What is that document?
24   A. Another one that he made me sign Maurice

Page 33

1  means a lot to me. He typed it, and he made me sign
2  it.
3    Q. What does that document say?
4    A. Exhibit 8?
5    Q. Yes. Could you read it into the record?
6    A. Yep. Maurice means a lot to me. And he
7  would come by and say like sign it. To get rid of
8  him, I'd just sign it so he'd go away and leave me
9  alone.
10   Q. Could you look at Exhibit 9 and tell me if
11 you've have seen that before?
12   A. I've never seen that before. All I know
13 about this is that that day they came and everything
14 happened with the videotape I heard something about
15 this, but I never -- I didn't see this. I don't
16 know about this one.
17   Q. Were there ever occasions when you would go
18 into Mr. Lariviere's office, and there would be
19 pornographic material on his computer screen?
20   A. I never noticed anything like that.
21   Q. Was there an occasion when you went into --
22 when you went into Mr. Lariviere's office when he
23 had your photograph up on his video -- on his
24 computer screen?

9 (Pages 30 to 33)

Fulya Metin

Page 34

1    A. Yes, I saw my -- my photograph on his
2  computer screen.
3    Q. Was that the photograph from your
4  match.com --
5    A. Yes.
6    Q. -- entry?
7    A. Yes, it was.
8    Q. Did he ever present pornographic material to
9  you?
10   A. No, he did not.
11   Q. I'm going to show you the first amended
12  verified complaint and jury demand which
13  Mr. Lariviere has filed in this litigation.
14       Could you review paragraph 80 to
15  yourself?
16       (Pause.)
17   Q. Mr. Lariviere's claiming in the present
18  litigation that on a personal level the parties were
19  not intimate but mutually affectionate with much of
20  the affection initiated by Metin.
21       Is it true that on a personal level you
22  were not intimate with Mr. Lariviere?
23   A. Yes.
24   Q. Was the contact of a sexual nature mutually

Page 35

1  affectionate?
2    A. No.
3    Q. Was any of the sexual or physical contact
4  with Mr. Lariviere initiated by you?
5    A. No, it was not.
6    Q. Have you ever heard an audiotape of the
7  interrogation of Mr. Lariviere by the chief of
8  police and the deputy chief?
9    A. No, I have not.
10   Q. Were you aware on the morning of February
11  16, 2005 that Mr. Lariviere was being interrogated
12  in the building?
13   A. No, I had no idea where he was in the
14  building. I had no idea they audiotaped him or
15  anything.
16   Q. Approximately what time did you leave the
17  building that morning?
18   A. I was -- after everything that had happened
19  and like around 10:30, 11, I went to the mayor's
20  office. I was there for a good hour or so, hour and
21  a half I believe.
22       Then from there I left, but I didn't see
23  anybody else. I didn't see Maurice. I didn't see
24  the police or anything. I left and I followed

Page 36

1  Michael Wnek to the police station. I went to the
2  police station after that to file some more -- to do
3  some more paperwork.
4    Q. During that hour that you were in the
5  mayor's office did you see Joseph Solomon enter the
6  office at any time?
7    A. I can't remember if he did or not. I don't
8  recall.
9    Q. Did you see Joseph Alaimo come into the
10  mayor's office at any time?
11   A. I can't remember. I just remember Michael
12  Wnek being there and the mayor and that other woman
13  -- the lawyer. And David Bain. I can't remember if
14  they came in or not.
15   Q. After you left the mayor's office where did
16  you go next?
17   A. To my car and then to the police station.
18   Q. When you got to the police station, what did
19  you do?
20   A. I think I signed some more things, looked
21  over some -- I sat there -- I can't remember. I
22  think I signed something here on the 16th.
23   Q. Why don't you review the documents and let
24  me know if you signed any of those when you went to

Page 37

1  the police station after leaving city hall?
2    A. Oh, I watched a video when I went to the
3  police station. Now I remember. I watched the
4  video and then I signed this.
5    Q. Is that the statement?
6    A. Yeah, of what happened.
7    Q. What exhibit is that?
8    A. Exhibit 5.
9        MR. NOTIS: Nothing further. Thanks.
10       MR. DiADAMO: Are you all set? I want
11  to know what we're doing for time? I don't think
12  she's got a chance of making it --
13       MR. RAPAPORT: Sounds like everyone's
14  done.
15       MS. KAZAROSIAN: Are you done?
16       MR. DiADAMO: I think I'm done.
17       MS. KAZAROSIAN: I'm not a party to this
18  anyway.
19       MR. RAPAPORT: I'm not.
20       MS. KAZAROSIAN: So we're done.
21       MR. NOTIS: The deposition has ended.
22       MS. KAZAROSIAN: Concluded. Great.
23       (Whereupon the proceedings
24       adjourned at 4:48 p.m.)

10 (Pages 34 to 37)

Page 38

```
1              C E R T I F I C A T E
2      I, FULYA METIN, do hereby certify
3  that I have read the foregoing transcript of my
4  testimony, and further certify that it is a true and
5  accurate record of my testimony (with the exception
6  of the following corrections listed below):
7
8  Page  Line        Correction
9    ___  ___     _____
10   ___  ___     _____
11   ___  ___     _____
12   ___  ___     _____
13   ___  ___     _____
14   ___  ___     _____
15   ___  ___     _____
16   ___  ___     _____
17
18
19     Signed under the pains and penalties of
20  perjury this ____ day of _____, 2006.
21
22        _____
23        FULYA METIN
24
```

Page 39

```
1            CERTIFICATE
2  COMMONWEALTH OF MASSACHUSETTS)
3  SUFFOLK, SS.              )
4
5     I, Paulette M. Cook, Registered Merit Reporter
6  and Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that FULYA METIN,
8  the witness whose deposition is hereinbefore set
9  forth, was duly sworn by me and that such deposition
10  is a true record of the testimony given by the
11  witness.
12     I further certify that I am neither related to
13  or employed by or any of the parties in or counsel to
14  this action, nor am I financially interested in the
15  outcome of this action.
16     In witness whereof, I have hereunto set my hand
17  and seal this 28th day of October, 2006.
18
19
20
21        Notary Public
22
23  My commission expires:
24  March 8, 2007
```

11 (Pages 38 to 39)

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

C.A. No. 05-11579EFH

* * * * * * * * * * * * * * * * * * * * *

MAURICE LARIVIERE,                          *

        Plaintiff                       *

vs.                                         *

JOSEPH SOLOMON, Individually and as         *

Chief of Police for the City of Methuen,    *

JOSEPH ALAIMO, Individually and as          *

Deputy Chief of Police for the City of      *

Methuen and THE CITY OF METHUEN,            *

        Defendants                      *

* * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF:  MICHAEL WNEK

DiAdamo Law Offices

40 Appleton Way

Lawrence, Massachusetts

November 7, 2006      9:10 a.m.

Linda Anne Rebello

Registered Professional Reporter

**MICHAEL WNEK**
**November 7, 2006**

---

Page 2

1   APPEARANCES:
2
3   Representing the Plaintiff:
4       DiAdamo Law Offices
5       40 Appleton Way
6       Lawrence, Massachusetts   01840
7       (978) 685-4371
8       BY:  CARMINE W. DIADAMO,ESQ.
9
10  Representing the Defendants:
11      Morrison & Mahoney
12      250 Summer Street
13      Boston, Massachusetts   02210
14      (617) 737-8857
15      BY:  GARETH W. NOTIS, ESQ.
16
17  Representing Joseph Solomon, Joseph Alaimo,
18      and Michael Wnek
19      Reardon, Joyce & Akerson
20      397 Grove Street
21      Worcester, Massachusetts   01605
22      (508) 754-7220
23      BY:  ANDREW J. GAMBACCINI
24

---

Page 3

1               I N D E X
2
3   WITNESS:     MICHAEL WNEK
4
5   EXAMINATION BY:            PAGE
6   Mr. DiAdamo               5
7
8
9
10
11
12  EXHIBITS:            PAGE
13  1   Statement, 2-15-05       25
14  2   Permission to video     59
15  3   Statement, 2-16-05       60
16  4   Phone log               64
17  5   7 page document         68
18  6   Report, 4-5-05          78
19
20
21
22
23
24

---

Page 4

1           MR. GAMBACCINI: In lieu of you
2   asking questions regarding the
3   lieutenant's home address I will receive
4   service on his behalf.
5           MR. DIADAMO: In the event we
6   forget at some of the other depositions,
7   we are going to depose other police
8   officers, can we have the same stipulation
9   for other police officers like Deputy
10  Chief Alaimo?
11          MR. GAMBACCINI: I represent the
12  chief and the lieutenant. I don't
13  represent the other officers. For those
14  individuals I will accept service.
15          MR. DIADAMO: Thank you.
16          STIPULATIONS
17      It is hereby stipulated by and
18  between counsel for the respective parties that
19  the reading and signing of the deposition may be
20  under the pains and penalties of perjury.
21          It is further stipulated that all
22  objections, except as to the form of the
23  question, and all motions to strike are
24  reserved until the time of trial.

---

Page 5

1               - - - -
2           MICHAEL WNEK, Deponent, having first
3   been duly sworn, deposes and states as follows:
4
5       EXAMINATION BY MR. DIADAMO:
6
7       Q.    Tell us your name.
8       A.    It's Michael Wnek.  W-N-E-K.
9       Q.    Who is your employer?
10      A.    City of Methuen, Methuen Police
11  Department.
12      Q.    And what is your job title?
13      A.    I am lieutenant commander of
14  detectives.
15      Q.    How long have you been in this
16  position?
17      A.    Approximately four years.
18      Q.    Prior to that what position did
19  you have?
20      A.    I was a shift commander, platoon
21  patrol division.
22      Q.    What was your rank at that time?
23      A.    Lieutenant.
24      Q.    And what was your job before that?

**MICHAEL WNEK**
**November 7, 2006**

Page 6

1      A.      Sergeant patrol supervisor, patrol
2  division.
3      Q.      Prior to that?
4      A.      I was a patrol officer.
5      Q.      When did you begin your work in
6  the Methuen Police Department as a patrol
7  officer?
8      A.      July of 1987.
9      Q.      In July of 1987 who was the chief
10  of the police department?
11      A.      Donald DeSantis.
12      Q.      For how long from '87 on?
13      A.      From '87, I believe he retired in
14  April of 1995.
15      Q.      And who was the chief after Donald
16  DeSantis?
17      A.      Bruce MacDougall.
18      Q.      And after Bruce MacDougall the
19  chief was Joseph Solomon?
20      A.      Joseph Solomon.
21      Q.      Do you recall when Joseph Solomon
22  commenced being Chief of Police?
23      A.      I think it was August or September
24  of 2000. 2001 I think. I'm sorry.

Page 7

1      Q.      At some point you received, did
2  you not, an E-mail from a woman by the name of
3  Fulya Metin?
4      A.      That is correct.
5      Q.      And can you tell us the date the
6  E-mail was sent to you?
7      A.      She sent the E-mail on Valentine's
8  Day 2005 which was February 14th.
9      Q.      And did you receive it on February
10  14th?
11      A.      No, sir.
12      Q.      Were you working on that day or
13  were you off duty?
14      A.      I was working until 4:30 on
15  February 14th.
16      Q.      She sent it on that day and when
17  was the date and the approximate time that you
18  received it?
19      A.      I received the E-mail the next day
20  on the 15th approximately 9:00 a.m. in the
21  morning I opened it up.
22      Q.      Prior to receiving the E-mail you
23  knew who Fulya Metin was?
24      A.      Yes.

Page 8

1      Q.      Had you been in her presence
2  before February 14th?
3      A.      Yes.
4      Q.      Other than trips to the town
5  solicitor's office were you in her presence
6  physically prior to February 14th?
7      A.      I believe so.
8      Q.      At what locations?
9      A.      I saw her once at Starbucks at the
10  loop and a second time I was working a detail,
11  the Lowe's Cinema detail, and she was there with
12  her daughter at a movie.
13      Q.      Prior to February 14th had you
14  ever seen her at Gold's Gym?
15      A.      I think I did. I am not 100
16  percent sure.
17      Q.      Did you see her with anybody at
18  Gold's Gym?
19      A.      I don't remember.
20      Q.      Now, after you received the E-mail
21  at 9:00 on the 15th what did you do?
22      A.      I tried calling. There was a cell
23  phone number on the E-mail. I tried calling
24  that.

Page 9

1      Q.      What happened?
2      A.      I was not able to get through.
3      Q.      And when you say you were not able
4  to get through did you get a voice mail?
5      A.      I don't remember if I got a voice
6  mail or if it didn't dial through. It was not
7  ringing. But I can't remember. I couldn't get
8  through.
9      Q.      After that occurred at some point
10  did you subsequently make contact with Fulya
11  Metin?
12      A.      Yes.
13      Q.      When was that?
14      A.      It was on that day. I don't
15  remember what time. But it was on the 15th.
16      Q.      But you did make physical voice
17  contact so you could speak with her?
18      A.      Yes.
19      Q.      Did you have a conversation at
20  that time?
21      A.      Very brief conversation.
22      Q.      What was the conversation?
23      A.      That she couldn't talk right now
24  but she wanted to meet away from city hall.

**MICHAEL WNEK**
**November 7, 2006**

Page 10

1      Q.      Did she tell you when she was
2  speaking with you she was at work at the time?
3      A.      Yes, she did.
4      Q.      And she was at work in the city
5  solicitor's office?
6      A.      Yes.
7      Q.      Did you make arrangements to meet
8  at a later time?
9      A.      Yes.
10      Q.      Where did you make arrangements to
11  meet?
12      A.      I told her I would meet her in the
13  loop parking lot on Pleasant Valley Street in
14  Methuen after work.
15      Q.      Was there a reason for that
16  location or did you just pick it?
17      A.      I normally choose that when I meet
18  witnesses or people that want to report
19  something to me.
20      Q.      So this is a standard procedure of
21  yours that when a witness asks to speak with you
22  about something that has not commenced you would
23  meet them over at the loop?
24      A.      For me personally I like to make

Page 11

1  it a public place unless somebody requests
2  something a little more private.  But normally I
3  would meet over there.
4      Q.      Okay. And this public place, I
5  take it, was in a motor vehicle in February in a
6  car in the loop parking lot?
7      A.      Yes, sir.
8      Q.      With just the both of you present?
9      A.      Yes.
10      Q.      In the parking lot of the loop?
11      A.      Um-hum.  Yes.
12      Q.      Now, approximately what time did
13  she get there?
14      A.      It was a little after 5:00 p.m.
15  Maybe close to 5:15.
16      Q.      And when she got there did you get
17  in her car or did she get in your car?
18      A.      I got out of my car.  I sat in the
19  passenger's side of her vehicle.
20      Q.      Would you relate, as best you can,
21  who said what to whom once you got in the car.
22      A.      I think I initially asked her, I
23  said what is the matter.
24      Q.      What was her reply?

Page 12

1      A.      And she replied that she had been
2  having some trouble with Maurice.
3      Q.      Is that all she said at that time?
4      A.      She elaborated some more.  She
5  specifically told me some incidents that
6  happened over the last couple of months while
7  she was employed over there.
8      Q.      What did she relate?
9      A.      She related that about four days,
10  three or four days into her employment she was
11  standing by a file cabinet and Maurice walked up
12  to her and kissed her on the lips.
13      Q.      You knew immediately during the
14  conversation that there was a sexual component
15  to her complaint, correct?
16      A.      Immediately?
17      Q.      Yes.
18      A.      No.
19      Q.      When she said that did you know
20  her complaint was at least in part?
21      A.      At that point based on her
22  demeanor when she said he kissed her I felt it
23  was leading up to some type of sexual situation.
24      Q.      In the Methuen Police Department

Page 13

1  is there a procedure or protocol with respect to
2  the investigation of complaints that are sexual
3  in nature?
4      A.      Yes, there is.
5      Q.      Would you relate that.  Is it a
6  procedure or protocol?  Is there no difference
7  in your mind?
8      A.      In an incident where it might
9  involve sexual abuse with an initial encounter
10  with the police officer when there is enough
11  information that it would lead the officer to
12  believe that it might be sexual in nature the
13  officer will call for somebody who specializes
14  in sexual assault investigation.
15      Q.      And at that time in February what
16  would be the pool of the people who would have
17  been called?  Who are they?
18      A.      I mean I am in charge of all the
19  investigations that fall into that catagory.
20      Q.      So you are on top.  Are you the
21  investigator or assigner of investigators?
22      A.      I manage all sexual assault cases.
23      Q.      But I mean do you go out
24  physically and get statements?

**MICHAEL WNEK**
**November 7, 2006**

Page 14

1       A.      Not normally.
2       Q.      Not normally.  Somebody else does
3   that normally, right?
4       A.      I assign them.
5       Q.      And who are they assigned to?
6       A.      We have a list of officers that
7   would handle those type of assignments.
8       Q.      Do you recall in February who
9   those people would have been?
10      A.      I don't know.  Normally on call
11  officers.  There is a lot of factors that would
12  lead to me assigning a case to a specific
13  individual.
14      Q.      Okay. Had you chosen to assign
15  this case to a subordinator who was in that
16  group --
17      A.      At that point no.
18      Q.      I have not finished the question.
19          MR. NOTIS: Wait for the question.
20      Q.      The whole question is had you
21  decided to assign it at that time rather than
22  complete the statement is there somebody
23  specific you would have assigned it to?
24      A.      This particular, no.

Page 15

1       Q.      You would have assigned it to
2   yourself?
3       A.      In this situation considering it
4   was a department head that the allegation was
5   made I would have done it exactly the way I
6   handled it.  Was to report it to the Chief of
7   Police.
8       Q.      Now, when you are thinking of
9   assigning a subordinator do they receive more or
10  less training than you with respect to the
11  investigation of sexual complaints be it
12  harassment or crime?
13      A.      I would say equal.  Equal
14  training.
15      Q.      What was their training?
16      A.      Sexual assault investigation
17  classes.
18      Q.      So you would have taken as many
19  and got the same certifications as the people
20  you would assign?
21      A.      That is correct.
22      Q.      Now, back in the car she had told
23  you about some concerns about Maurice Lariviere.
24  She told you about a kiss in prior testimony.

Page 16

1           What else did she tell you in the
2   car?
3       A.      She said that after the kiss she
4   told him to stop, what did you do that for, and
5   Maurice apologized to her.  Said he was sorry.
6       Q.      Did she relate any other incident
7   to you in the car?
8       A.      Yes.
9       Q.      Please tell us what other
10  incidents she related.
11      A.      She said that after about two
12  weeks without any incident there was some more
13  inappropriate touching, hugging, kissing, sexual
14  comments.
15      Q.      Okay.  And anything after that?
16      A.      At that point I believe that she
17  said it was progressively getting worse and I
18  confirmed with her that in my opinion it was
19  sexual harassment and that it bordered on
20  criminal behavior.
21      Q.      In the car did she make any
22  comments to you about criminal behavior?
23      A.      No.
24      Q.      Did she make any comments with

Page 17

1   respect to what her wishes and desires were at
2   that time?
3       A.      Yes.
4       Q.      What did she say?
5       A.      She was confused and obviously
6   upset.  She was not sure what she wanted to do.
7   She indicated that she didn't want Maurice to
8   lose his job, she just wanted the touching to
9   stop.
10      Q.      In the car did she make it clear
11  to you that she didn't want him to lose his job
12  and she was having the conversation with you to
13  explore a way for the conduct to just stop?
14      A.      No.
15      Q.      Didn't you ask her if those were
16  her wishes and desires?
17      A.      I never asked her, no.  She told
18  me.
19          MR. DIADAMO: Will you excuse me,
20      please.
21          (Recess.)
22      Q.      Now, as you sat in the car are you
23  mindful of the fact that Methuen has a sexual
24  harassment officer and a sexual harassment

**MICHAEL WNEK**
**November 7, 2006**

6 (Pages 18 to 21)

Page 18

1  policy?
2      A.    Yes.
3      Q.    What you heard, at least in part,
4  clearly fell under that policy, correct?
5      A.    Yes.
6      Q.    Okay. Is it fair to state at least
7  most of the story involved conduct that would be
8  handled exclusively by the sexual harassment
9  officer under that policy?
10     A.    I believe it fell under two
11  categories.  It was my opinion that part of the
12  unwanted touching may have been criminal.
13     Q.    How it would ultimately be handled
14  was not your call, was it?
15     A.    No, sir.
16     Q.    After you completed your
17  conversation with Miss Metin in the car did you
18  take her back to the station?
19     A.    There was more conversation.
20     Q.    Go right ahead.  I thought you
21  completed. I'm sorry.  I got interrupted.
22          Can you relate, as best you can,
23  the conversation.
24          And I might want to tell you be

Page 19

1  mindful of the fact you have filed reports and
2  all counsel have read your reports.
3          Can you relate, the best to your
4  memory, what else was said in the car?
5      A.    To the best of my memory after I
6  had informed her that I thought his conduct,
7  Maurice's conduct, would be considered sexual
8  harassment and that may be criminal she
9  elaborated a little bit more about some of the
10  unwanted touching.  As it progressively got
11  worse he would hug her.  He would try to grab
12  her breasts.  He would grab her buttocks.  And
13  she opened up a little bit more as the
14  conversation went on.  Gave some more detail
15  about some of the incidents.
16     Q.    Now, apart from her description
17  of the conduct of the nature you have just
18  described did she also describe her personal
19  relationship with Maurice Lariviere?
20     A.    Yes.
21     Q.    What did she say at that time?
22     A.    She said that she enjoyed her job,
23  she liked Maurice as a boss. That was part of
24  the reason for the confusion.  That she knew he

Page 20

1  was a family man.  She didn't want to hurt his
2  family but that she just wanted his behavior to
3  stop.  She was very confused and upset.
4      Q.    In this whole incident she never,
5  ever described any other course of action for
6  the conduct to stop, she was desirous of your
7  opinion, correct?
8      A.    That is correct.
9      Q.    At that point how long had you
10  know Maurice?
11     A.    More than 20 years.
12     Q.    You knew him from the time you got
13  on the force, right?
14     A.    Before that.
15     Q.    He was someone that you had spoken
16  to for years, and years, and years?
17     A.    Right.
18     Q.    And your relationship with him has
19  always been amicable and cordial, correct?
20     A.    Correct.
21     Q.    You have dealt with him over
22  police work, right?
23     A.    Yes.
24     Q.    You also have dealt with him on a

Page 21

1  personal basis, small talk, and gatherings, and
2  things like that?
3      A.    Yes.
4      Q.    Had you ever had any problems with
5  him whatsoever?
6      A.    Never.
7      Q.    Did you relate all you want to
8  relate with respect to what she told you in the
9  car?
10          Be mindful of the fact that I have
11  read your statements and there are other things
12  you related in the statement you have not
13  related.
14     A.    As I sit here I know there might
15  have been some other things that she said or I
16  said to her and I don't remember them as I sit
17  here today.
18     Q.    Why don't we let the record show I
19  can put your statement in front of you and ask
20  you to refresh your recollection and I am
21  chosing not to do so.
22     A.    Yes, sir.
23     Q.    Now, at some point did you drive
24  the two cars back to the station or did you go

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 22

1  in one car?
2      A.    I don't remember.
3      Q.    But you both did go back to the
4  station?
5      A.    Yes.
6      Q.    And since the meeting at quarter
7  of five -- was it about quarter of five at the
8  loop? About what time did you get back to the
9  station?
10     A.    It was in the neighborhood of
11  6:00 p.m.
12     Q.    And when you arrived at 6:00 p.m.
13  did you go to your office?
14     A.    Well, prior to going back to the
15  station I remember specifically that I had
16  called the chief, Chief Solomon, on my Nextel
17  and asked him if I could meet him and informed
18  him that there was something very important I
19  needed to speak to him in private on.
20     Q.    You reached him and told him that?
21     A.    Yes. He told me he was still in
22  his office.
23     Q.    So you knew he was back at the
24  police station?

Page 23

1      A.    Yes, sir.
2      Q.    So at some point you arrived back
3  at the police station somewhere around sixish?
4      A.    Yes, sir.
5      Q.    And when you arrived back at the
6  station did you go to his office or did you go
7  to your office?
8      A.    Immediately went to his office.
9      Q.    When you went to the office did
10  you have Fulya with you at that time?
11     A.    Yes, sir.
12     Q.    Did you both go in the office at
13  the same time?
14     A.    Yes.
15     Q.    Was there anybody else in the
16  office other than the three of you?
17     A.    No.
18     Q.    Will you relate who spoke first?
19     A.    I did.
20     Q.    What did you say?
21     A.    I gave the chief a brief synopsis
22  of what Fulya had told me in the car at the
23  loop.
24     Q.    And when you finished your

Page 24

1  synopsis of what she told you what did he say?
2      A.    He indicated he wanted to speak
3  with me privately and instructed me to take
4  Fulya into my office where she could write a
5  statement about the allegations that she had.
6      Q.    Did you do so?
7      A.    Yes.
8      Q.    When she went to your office did
9  you provide her with a typewriter to make a
10  statement?
11     A.    I let her use my Word Perfect on
12  my computer.
13     Q.    So the statement that we have in
14  your package is a statement she typed on your
15  Word Perfect?
16     A.    Yes.
17     Q.    She did it?
18     A.    That is correct.
19         MR. NOTIS: There is a couple
20  different statements that she prepared.
21  You might want to specify which one we are
22  talking about.
23     Q.    For the purposes of simplicity I
24  am going to show you a statement, a copy of the

Page 25

1  statement, that is Fulya's synopsis on 2-15-05.
2         Is this the statement that we are
3  talking about?
4      A.    (Document examined.) These three
5  pages would be the initial one.
6         MR. DIADAMO: Off the record.
7         (Discussion off the record.)
8         MR. DIADAMO: I am offering as
9  Exhibit 1 to the deposition a three page
10  statement which the witness has described.
11         MR. NOTIS: Can we go off the
12  record?
13         MR. DIADAMO: Sure.
14         (Discussion off the record.)
15         MR. DIADAMO: That is Exhibit 1.
16         (Exhibit No. 1 marked;
17         statement, 2-15-05.)
18     Q.    During the entire time she was
19  working on your computer preparing that
20  statement were you in the presence of the chief
21  in his office?
22     A.    Not the entire time, no.
23     Q.    So when you eventually came back
24  in your office she was still typing her

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 26

1  statement?
2      A.    Yes.
3      Q.    How much time did you spend alone
4  with the chief?
5      A.    I don't remember exactly.
6      Q.    Was it more than half an hour?
7      A.    It could have been. I am really
8  not sure.
9      Q.    I want you to relate, the best you
10 can, what the conversation was between you.
11     A.    The conversation was that we both
12 thought that the behavior boardered on indecent
13 assault and battery.  A crime of indecent
14 assault and battery.  Obviously we knew a
15 situation like this was the word of one person
16 vs. the word of another person as are many
17 crimes of that particular statute.
18            We talked about Maurice's
19 longstanding service to the city and the fact
20 that she was a relatively new employee.  We
21 weighed that factor in. And, to the best of my
22 memory, that is when the subject of videotaping
23 came up.
24     Q.    Who brought it up?

Page 27

1      A.    I don't remember exactly who.  I
2  know it was not me though.
3      Q.    It was not you?
4      A.    No.
5      Q.    There are only two of you in the
6  office.
7      A.    At some point the deputy chief
8  arrived at the PD and I'm not sure at what point
9  in the conversation.
10     Q.    So while you are not sure one or
11 both of them brought the issue of taping up?
12     A.    That is correct.
13     Q.    Had they reached a concurrence
14 this would be a course of action while you were
15 still in the room?
16     A.    At that point no.
17     Q.    When you left you didn't know what
18 they were going to do when you left the room?
19     A.    No, that is not true.  It was just
20 at that point a decision was not made yet.
21     Q.    Was the decision made while you
22 were in the room?
23     A.    Later on it was.
24     Q.    Later on while you were in that

Page 28

1  same meeting?
2      A.    Yes.
3      Q.    Go on.
4      A.    Fulya had returned.  I had brought
5  Fulya back into the office again.
6      Q.    You had left the room to go to
7  where Fulya was typing the statement and did you
8  wait for her to complete her typing?
9      A.    Yes.
10     Q.    When she completed her typing did
11 you bring her back to the room with Solomon and
12 Alaimo?
13     A.    Yes.
14     Q.    I am using their last names for
15 the sake of clarity on the record.  I know what
16 their job titles are.
17            When she was brought back into the
18 room who initiated the discussion about a video?
19     A.    Well, the first that happened, I
20 had handed the chief the synopsis that Fulya had
21 typed.  I remember I had Fulya initial both the
22 beginning and end that she read her synopsis.
23            At one point Maurice actually
24 called Fulya while we were all in the office and

Page 29

1  she had a brief conversation on her cell phone
2  with Maurice.
3      Q.    Let me ask you something.  Did he
4  also speak with Somomon?
5      A.    Maurice?
6      Q.    Yes.
7      A.    I don't believe he did that
8  evening in my presence, no.
9      Q.    When that call was over, since
10 that is what you were really investigating, did
11 Fulya tell the three of you there he was calling
12 about a case that he had received notice of that
13 day?
14     A.    Yes.
15     Q.    So that conversation was about a
16 victory in a civil rights case?
17     A.    It was a victory and Maurice was
18 very happy about what happened. That is why he
19 called her.
20     Q.    And that is all she related about
21 the conversation?
22     A.    Yes.
23     Q.    The call is over.  Who initiated
24 the discussion about a videotape?

**MICHAEL WNEK**
**November 7, 2006**

Page 30

1    A.    I don't remember.  It was not me.
2    Q.    When you came back into the room
3  were you made aware of the fact that Solomon or
4  Alaimo had called any other town officials?
5    A.    No.
6    Q.    They didn't say that to you?
7    A.    No.
8    Q.    When you came back into the room
9  do you recall either one of them talking to
10  Fulya about a videotape?
11    A.    Yes.
12    Q.    Who did?
13    A.    I am not 100 percent sure.  I
14  think it was the chief.  Chief Joe Solomon.
15    Q.    What did he say to her?
16    A.    He said that we believe what you
17  are saying, Fulya.
18    Q.    He said we believe what you are
19  saying?
20    A.    We believe the allegations.  We
21  believe your complaint.  We would like to have a
22  little more.  If we were to set up a video
23  camera would we capture, you know, the
24  allegations that you are making.  Would we

Page 31

1  capture that on video.
2    Q.    Did any one of the three of you
3  discuss with Fulya what other personal contact
4  she and Maurice had from the beginning of her
5  employment until that date?
6    A.    In the room?
7    Q.    Yes.
8    A.    I don't remember.
9    Q.    Well, I don't want to put words in
10  your mouth but I think you told us prior in the
11  deposition that she liked her job, that she
12  liked Maurice, and they were on a friendly
13  basis.
14    A.    Yes.
15    Q.    Was that explored in the room at
16  all?
17    A.    Yes, it was.
18    Q.    By whom?
19    A.    Fulya had indicated that it was
20  more of the same.  Indicated similar to what she
21  indicated to me in the car at the loop.  There
22  was some confusion with her part, upset at the
23  whole situation, and pretty much the same in
24  which she explained to me at the loop.

Page 32

1    Q.    You were dealing with a complaint
2  of sexual conduct involving a town employee and
3  you heard from the person complaining that part
4  of her relationship was personal and friendly?
5    A.    Yes.
6    Q.    Did any one of the three of you
7  simply ask, you know, was there any other
8  interaction going on between you other than the
9  touching, the kissing, the feeling, or whatever
10  else she had described?
11    A.    Yeah.  We asked her.  And I mean
12  it was that part she was saying that there was
13  the unwanted touching, the unwanted kissing.  As
14  I remember now she forced him to write some
15  notes.
16    Q.    He forced her to write some notes
17  is what I think you are trying to say.
18    A.    Didn't I say that?
19    Q.    I heard you say she forced him.
20    A.    She said that he forced her to
21  write some notes.  As I remember now she also
22  indicated that she felt he was not giving her
23  any space.  That he would follow her to lunch.
24  That she joined the health club, Gold's Gym, and

Page 33

1  that the next thing she seemed bothered by the
2  fact Maurice also joined the gym.
3    Q.    Did she relate any of the good
4  things, if any, that happened between them from
5  October to February?
6    A.    Just that she thought he was a
7  nice guy, he was a good boss, she was happy that
8  she had the job, that she got the job.  And more
9  of the confusion that of her I don't know if I
10  am doing the right thing.  I just want this to
11  stop.
12    Q.    It was clear to you that her
13  position was she wanted the behavior to stop but
14  she wanted the job in his office to continue,
15  correct?
16    A.    Yes.  She liked her job.
17    Q.    She wanted to continue working for
18  him, she wanted the behavior to stop?
19    A.    Yes.
20    Q.    And that was loud and clear to all
21  three of you, right?
22    A.    Yes.
23    Q.    Okay. Now, you are unsure who
24  suggested the video?  It was suggested by

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 34

1  somebody and it was not you?
2      A.    It was kicked around in
3  conversation. I don't know who first brought it
4  up.
5      Q.    Now, before this incident can you
6  recall any sexual harassment or assault case,
7  verbal or non-verbal, that was investigated by
8  either Solomon or Alaimo?
9      A.    Well, the chief had investigated
10  many, many cases. Prior to him becoming chief
11  he held the position that I have as commander of
12  the sexual assault unit. And prior to that as a
13  patrol officer he was one of the sexual assault
14  investigators. So he had a tremendous amount of
15  police experience regarding these type of
16  investigations.
17      Q.    So that once you went into his
18  office with this as you are commanding officer
19  in your judgment he was taking over the course
20  of action on this case?
21      A.    In my judgment the chief clearly
22  had the most experience in the police department
23  in these type of matters.
24      Q.    And he was the one who was going

Page 35

1  to be calling the shots from that point on?
2      A.    Yes, sir. He is the boss.
3      Q.    Okay. Now, what time did Fulya
4  Metin leave city hall that night?
5      A.    I'm not sure of the exact time. I
6  know it was dark. Actually it was dark when we
7  arrived at the PD. I'm not sure of the exact
8  time we left.
9      Q.    She would have had to drive you
10  back to the loop to get your car?
11      A.    I remember she expressed some
12  concern over somebody seeing her arriving at the
13  PD. And I don't remember if we drove together to
14  the loop. I mean from the loop to the PD. But
15  the chief had told Fulya that I was to follow
16  her all the way back to her home to make sure
17  she got home safely.
18      Q.    And did you do that?
19      A.    And I did that.
20      Q.    Now, after that did you go back to
21  the station?
22      A.    Yes.
23      Q.    Was there further conversations
24  with the chief?

Page 36

1      A.    Yes.
2      Q.    Would you relate them to us,
3  please.
4      A.    There was a decision that was made
5  that we were going to video Fulya's office and I
6  was instructed to report approximately 5:00 in
7  the morning to the PD to meet Captain McCarthy.
8      Q.    There was a discussion at that
9  point, was there not, that the chief had spoken
10  to other town officials with respect to what was
11  going on and what was going to occur, correct?
12      A.    I was told that they would have
13  the building open, that actually we would get a
14  key and that we were going to go in the men's
15  room where there would be a moniter, a
16  television moniter, and wireless camera that was
17  being set up. As far as specific city officials
18  I was not given any information as to who was
19  contacted.
20      Q.    You were not given any indication
21  the mayor of the City of Methuen was contacted?
22      A.    I don't remember. I may have. I
23  don't want to guess. I am really not sure.
24      Q.    Do you have some thought in your

Page 37

1  mind that that is what you heard?
2      A.    Am I allowed to guess?
3      Q.    No, don't guess. But it sounded
4  like that might be something you heard.
5          MR. NOTIS: Objection. Go ahead.
6      A.    I really don't remember.
7      Q.    The Town of Methuen is an
8  interesting place. Let's just start with the
9  fact Mayor Pollard was mayor at that time.
10  Sharon Pollard.
11      A.    Yes, sir.
12      Q.    Sharon Pollard appointed Solomon
13  as chief, correct?
14      A.    Yes, sir.
15      Q.    When did that occur?
16      A.    As I earlier said it was August
17  either 2000 or 2001. I'm not sure of the year.
18  I know it was either August or September.
19      Q.    You knew that Alaimo was similarly
20  appointed by Sharon Pollard?
21      A.    Shortly after Chief Solomon Joe
22  Alaimo was appointed as deputy chief.
23      Q.    You also knew he was appointed
24  outside of civil service, is that correct?

**MICHAEL WNEK**
**November 7, 2006**

Page 38

1    A.    Yes, sir.
2    Q.    He is the only employee in the
3  police department who is outside of civil
4  service, correct?
5    A.    The only sworn employee, yes.
6    Q.    And you are also mindful of the
7  fact that Alaimo's wife Lisa was an employee of
8  Pollard's office at that time?
9    A.    Yes.
10    Q.    What was her position?
11    A.    I don't know her exact title.  She
12  might have been a receptionist.
13    Q.    And it was also specific knowledge
14  that you were aware of in the police department
15  that Sharon Pollard minimally clearly did not
16  get along with Maurice Lariviere, is that
17  correct?
18    A.    I did not know that.
19    Q.    You did not know that at all?
20    A.    No, sir.
21    Q.    Now, first of all, the next
22  morning who actually set up the video camera?
23    A.    I don't know.
24    Q.    Were you one of the ones that were

Page 39

1  there to observe what was occurring?
2    A.    I was at city hall observing, yes.
3    Q.    You were looking at the moniter?
4    A.    The moniter.
5    Q.    And as you are looking at the
6  moniter were you aware of the fact that Chief
7  Solomon was also in city hall in the mayor's
8  office?
9    A.    Through Captain McCarthy's
10  communication, yes.
11    Q.    Captain McCarthy was also with you
12  viewing the video?
13    A.    Yes, sir.
14    Q.    He knew that was where Solomon was
15  or would be?
16    A.    I don't know.  I mean obviously he
17  would know.  He was on his Nextel with him.
18    Q.    He told you where the chief was?
19    A.    I think he told me he was in the
20  mayor's office.
21    Q.    And at the time he told you that
22  had either Maurice or Fulya appeared on the
23  video yet?
24    A.    Maurice had first appeared.

Page 40

1    Q.    Before McCarthy told you?
2    A.    Before there was any conversation
3  with McCarthy and the chief.
4    Q.    So once Maurice appears was there
5  a call from McCarthy to Solomon?
6    A.    I don't remember.
7    Q.    You do remember a call from
8  McCarthy to Solomon after?
9    A.    At some point after Maurice shows
10  up, yes.
11    Q.    It was not the other way around?
12    A.    It could have been.
13    Q.    Do you recall the phone rang in
14  the room or somebody dialed the phone?
15    A.    I know we had our Nextels on
16  vibrate.  I don't know who called who.  But I
17  remember asking McCarthy who is that. And he
18  whispered to me the chief.
19    Q.    At that time did he have awareness
20  the chief was in the mayor's office?
21    A.    Yes.
22    Q.    And then at some later point Fulya
23  came into the room?
24    A.    Yes.

Page 41

1    Q.    Now, you watched the moniter for
2  the entire time these two were interacting with
3  each other, correct?
4    A.    Yes, sir.
5    Q.    And while you were watching the
6  moniter you were mindful of the fact she had
7  shared that office at least since October of the
8  preceding year?
9    A.    There were adjoining offices, yes.
10    Q.    There was a suite of a couple of
11  offices for the town solicitor?
12    A.    Yes, sir.
13    Q.    Was the camera focused in on one
14  of the offices or both of the offices?
15    A.    Just Fulya Metin's office.
16    Q.    And during the entire taping did
17  Fulya Metin go into Maurice Lariviere's office?
18    A.    I think she might have went in
19  once.
20    Q.    And you would have lost sight of
21  her at that time?
22    A.    Yes.
23    Q.    Did you know whether he was there
24  at that time or whether he had left the office?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 42

1      A.      Not 100 percent sure.
2      Q.      Now, we have all seen the video so
3  let me just simply ask you did you observe three
4  interactions which you noted in your report?
5      A.      Yes, sir.
6      Q.      Tell me about the first one.
7      A.      As I remember the first one, to
8  the best of my memory, it was Maurice leaning
9  over her desk and giving Fulya a kiss.
10     Q.      Let me stop you there for a
11  moment.  We will go on. Assuming that this video
12  started about 8:20, I should have asked you
13  first, approximately what time was the first
14  encounter? Approximately.
15     A.      I think it was sometime between
16  8:30 and 9:00 a.m., the first encounter.  I know
17  it was definitely after 8:30.
18     Q.      And you observed at that point, I
19  think you said, a brief kiss?
20     A.      It was a kiss.
21     Q.      Having in mind we have all seen
22  it, I noted that you described it as unwanted.
23  Is it because of what you observed or because of
24  what Fulya told you?

Page 43

1      A.      Both.
2      Q.      If she had not told you it was
3  unwanted and you just saw it on the tape would
4  you have described it as unwanted?
5      A.      To me it appeared that she kind of
6  tilted her head.  She tilted her head slightly.
7  I mean it didn't, in my opinion, look like an
8  embraceful kiss.
9      Q.      You didn't see her back away from
10  it at all, did you?
11     A.      Her body, no.  I detected a slight
12  tilt with her head as I remember it today.
13     Q.      Just a tilt, not a tilt away, just
14  a tilt?
15     A.      It was just a tilt.
16     Q.      Not a tilt away, just a tilt?
17     A.      It was just a tilt.
18     Q.      Other than what she had described
19  to you in the matter of common sense you had no
20  personal knowledge of what encounters had
21  occurred between them prior to the videotape
22  date?
23          MR. NOTIS: Objection.
24     Q.      Do you understand the question?

Page 44

1      A.      Repeat that for me.
2      Q.      Other than what she related to you
3  you had no personal knowledge of any prior
4  similar encounters between them before that
5  date?
6      A.      Other than what she related to me
7  in the car at the loop, and additionally at the
8  police station, and additionally in her
9  synopsis.
10     Q.      Other than what you related in
11  your report you had no other knowledge of any
12  other personal dealings between them, correct?
13     A.      I don't believe so, no.
14     Q.      Now, that was encounter 1. And
15  would you describe encounter 2.
16     A.      As I remember it today I think he
17  was sitting on her desk. Maurice was sitting on
18  Fulya's desk.  And I remember several times
19  Maurice had reached out and was either rubbing
20  or like tickling her left shoulder as she sat at
21  her desk. To the best of my memory I think he
22  might have reached around and grabbed her neck
23  and maybe gave her another kiss.
24     Q.      In that encounter there was

Page 45

1  nothing that suggested to you visually what you
2  are looking at to indicate that encounter was
3  unwanted, correct?
4      A.      She may have been tilting her head
5  as well in that kiss.  I am not 100 percent
6  sure.
7      Q.      Nothing stands out in your mind,
8  does it?
9      A.      I don't remember.  I mean I have
10  to revisit the video again.
11     Q.      As an experienced detective at
12  that point the one thing you know is that she
13  knows she is on camera and he doesn't, correct?
14     A.      That is correct.
15     Q.      And she has complained to you that
16  there was unwanted contact between them in the
17  past, correct?
18     A.      Yes, sir.
19     Q.      So that any contact at all between
20  them in your experience is going to be promoted
21  by her who knows she is on the video, correct?
22     A.      We thought about that.  We
23  considered that.
24     Q.      You did?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 46

1    A.    Yes.
2    Q.    Okay. Now, there is encounter 3,
3 correct?
4    A.    Yes.
5    Q.    Up until encounter 3 you had seen
6 nothing that would cause you to go in and stop
7 the interaction between them, correct?
8    A.    I did call her on the cell phone
9 somewhere between encounter 1 and encounter 3. I
10 asked her to leave her office and go to the
11 ladies room so I could talk to her.
12    Q.    And did she do so?
13    A.    She went to the ladies room. I
14 talked with her on the cell phone. And my
15 thought process was that even though she agreed
16 and she signed something agreeing to us
17 videotaping the situation I didn't want her to
18 feel like we were putting her in a position
19 where she was going to be subjected to any
20 unwanted behavior then subsequently, you know,
21 blame the police department or anything like
22 that. So I specifically remember saying to her
23 are you okay with this up to this point. She
24 indicated some distress over what happened and

Page 47

1 she said yes, she wanted us to see more. That
2 typically he becomes more aggressive. And I
3 assured her that I was close by in the building
4 and that at any point that she wanted to end
5 this she was to just exit the office and call me
6 on the cell phone and I would assure her that
7 either myself or I would have someone there to
8 come to her aid.
9    Q.    If you terminated the video after
10 encounter 2 it would not even be in the mind to
11 explore any criminal action, correct?
12    A.    That is correct.
13    Q.    With that in mind after encounter
14 2 you met with Miss Metin and she agreed to go
15 back in, correct?
16    A.    Cell phone.
17    Q.    You called and you met, didn't
18 you?
19    A.    I never met.
20    Q.    I beg your pardon. You were just
21 talking on the phone?
22    A.    Yes, sir.
23    Q.    Did you relate to her that you had
24 not seen anything criminal yet on the tape?

Page 48

1    A.    I didn't discuss that criminal
2 aspect of it with her.
3    Q.    And then how long do you have to
4 wait for encounter 3?
5    A.    I don't know exactly in time.
6    Q.    In time was it well over an hour?
7    A.    I don't think it was, no.
8    Q.    What is your judgment today? We
9 have a video.
10    A.    I was sitting in a room, in a
11 small room since 5:00 a.m. and it was maybe 20
12 minutes, 30 minutes to the third encounter.
13    Q.    When you were talking on the cell
14 phone with Fulya was she relating to you what
15 work was going on in the office that day and
16 what their respective moods were?
17    A.    We didn't get into the business
18 end of what they were doing, no.
19    Q.    And now, encounter 3 occurred
20 whatever time it happened. Describe that,
21 please.
22    A.    As I remember it Maurice begins by
23 squatting to her left side while she was seated
24 at her desk. At some point she stands up. I

Page 49

1 think she is shuffling or moving papers around
2 in different locations. Maurice grabs her
3 around the waist and he starts to kiss her. I
4 could see she either raises her hands up or in
5 my opinion looks like she is trying to push him
6 away. He continues to kiss her. I think it was
7 his right hand moves down like to the top part
8 of her buttocks around the waist area and the
9 top of her buttocks. You see his hand kind of
10 moving up the side of her body. More kissing.
11 The encounter goes from where it's behind her
12 desk and it moves over to like the left side of
13 her desk and kind of spins around in a half
14 circle.
15    Q.    That hand on the top of her
16 buttocks would you in your judgment deem that to
17 be a sexual touching?
18    A.    I would consider it border line.
19    Q.    Border line. Maybe I missed
20 something. Was there something else in that
21 third encounter?
22    A.    In my opinion it looked like
23 Maurice was acting more aggressively.
24    Q.    But aggressively in the sense of

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 50

1  touching shoulders and kissing, correct?
2      A.    But he was, I mean, he was really
3  getting into it.  I mean it was not in relation
4  to the first two enouncters, you know, brief.
5  It was more intense.
6      Q.    Forget the fact that there are two
7  police officers watching a videotape of it
8  happening, you as chief of detectives would not
9  prosecute any case of sexual assault against
10  somebody who was kissing another person?
11          MR. NOTIS: Objection.
12      Q.    Correct?
13          MR. NOTIS: You can answer.
14      A.    No.
15      Q.    And when you were talking about
16  the aggressive move in your judgement and common
17  experience it was no more than the move of a
18  person who is attempting to secure a kiss,
19  correct?
20      A.    Correct.
21      Q.    And the reality is that you didn't
22  see him exercise any full capabilities of
23  holding her in a location that she couldn't
24  easily have walked back from?

Page 51

1          I can phrase it another way it you
2  want.
3      A.    Would you.
4      Q.    Sure.
5      A.    Thank you.
6      Q.    He has his arms around her,
7  correct?
8      A.    Yes.
9      Q.    And that in your common experience
10  would be something that would preceed a kiss on
11  the lips, correct?
12      A.    Yes, sir.
13      Q.    And you didn't note that she was
14  in kind of a strangle hold she could not just
15  walk away?  In other words, you didn't see her
16  squirming and trying to back away from him on
17  the videotape, correct?
18      A.    To me it looked like she resistd a
19  little but she was not forcefully like this.
20  There appeared to be some slight resistance.
21      Q.    There was slight resistance.  And
22  you know as you are watching the slight
23  resistance she was mindful there was two police
24  officers looking at the conduct as it was

Page 52

1  happening?
2      A.    Yes, sir.
3      Q.    And she didn't appear to you after
4  that incident was over to push him away and go
5  running screeching out of that office, correct?
6      A.    It did look like she exited
7  quickly.
8      Q.    She didn't walk out on the tape,
9  did she?
10      A.    I have to see the video again.  As
11  I remember it today it looked like she exited
12  fairly quickly.
13      Q.    Let me ask you another way. We can
14  see Maurice Lariviere as she is walking out.  He
15  does not appear to look particularly surprised
16  that she was leaving, correct?
17      A.    That is correct.
18      Q.    He does not look to be confounded
19  she is running away from him, correct?
20      A.    Correct.
21      Q.    He looks awfully casual, doesn't
22  he?
23      A.    Yes.
24      Q.    When she gets out of the office

Page 53

1  what do you do?
2      A.    Well, I remember Captain McCarthy
3  calling the chief and saying she is coming out
4  of the office.
5      Q.    At that time you know the chief is
6  in the town hall in the mayor's office, correct?
7      A.    Yes.
8      Q.    And do you know at that time,
9  because you have been trapped in the room since
10  5:15, who else is in the mayor's office?
11      A.    I assume that Deputy Chief Alaimo
12  was with him because I was still monitoring the
13  camera.  We can see the chief and deputy chief
14  walking past Fulya's desk and go into Maurice's
15  office where we don't see him on the camera.
16      Q.    So once that call was made they
17  come all the way to Maurice's office?
18      A.    Yes.  They are on the same floor.
19      Q.    What are you doing at that time?
20      A.    At that point the captain and I
21  secure the video moniter.  Captain McCarthy
22  calls for someone to come up and take possession
23  of the video moniter as well as to stand guard
24  in Maurice's office or in front of Maurice's

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 54

1  office.
2      Q.    Then where do you go?
3      A.    I go into the mayor's office.
4      Q.    When you go into the mayor's
5  office Fulya is present, correct?
6      A.    Yes, sir.
7      Q.    The mayor is present?
8      A.    Yes, sir.
9      Q.    John Molori is present?
10     A.    I don't remember Molori being
11  there at that time.
12     Q.    Lisa Alaimo is present?
13     A.    She may have been in the reception
14  area.  I don't remember her specifically in
15  Sharon Pollard's office.
16     Q.    David Bain is present?
17     A.    David Bain is in there.
18     Q.    And a woman by the name of Tooty
19  Healy. Do you remember her?
20     A.    At that time I remember seeing
21  her.  I don't remember if it was in the hallway
22  between the reception area and Mayor Sharon
23  Pollard's office or if she was in the mayor's
24  office but I do remember seeing her that day.

Page 55

1      Q.    When we are talking about the
2  mayor's office we are not talking about the
3  suite where people outside sit we are talking
4  about --
5      A.    Her private office.
6      Q.    -- her private office, correct?
7      A.    That is correct.  As I remember it
8  was David Bain, the mayor, and Fulya Metin.
9      Q.    And you went into that meeting?
10     A.    It was not really a meeting.
11     Q.    You went into that congregation of
12  people?
13     A.    Yes.
14           MR. NOTIS: You would like to think
15  it's a meeting.
16           MR. DIADAMO: It would be a lot
17  quicker.
18     Q.    When you went in there what was
19  being discussed by whom?
20     A.    I remember the mayor saying hi to
21  me and that I said to the mayor.  I said, you
22  know, mayor, I just want you to know that the
23  police department is going to offer Fulya all
24  the services she needs.  I mean Fulya was

Page 56

1  clearly upset and confused.  And I assured the
2  mayor we would provide her any service that she
3  needed.  The mayor thanked me.  She said,
4  Michael, you did a good job, thank you very
5  much.
6           I remember receiving some
7  instructions to bring Fulya to the police
8  department so that she could write a synopsis of
9  what encountered in her office that day.  And I
10  think those instructions came from the chief but
11  I am not 100 percent sure.
12     Q.    The chief was in that meeting in
13  Mayor Pollard's office?
14     A.    No, sir.  If I received the
15  instructions from him, or from anybody for that
16  matter, I am almost certain it was via by
17  Nextel.
18     Q.    Is it not your personal knowledge
19  but do you know that while this meeting, I am
20  not trying to make it something it isn't, was
21  going on you knew Alaimo and Solomon were with
22  Lariviere?
23     A.    I assumed that they were, yes.
24     Q.    When you said Fulya was confused

Page 57

1  at that meeting did she reiterate she just
2  wanted things to stop, she didn't want it to go
3  any further?
4      A.    After that meeting, I mean after
5  she left her office and while she was in Mayor
6  Pollard's office she didn't reiterate that fact.
7      Q.    You said she was confused and I
8  was trying to --
9      A.    Well, I would say more flustered
10  than confused.
11     Q.    Okay.  Somomon and Alaimo were
12  with Lariviere.  Were you in that room for the
13  entire time Solomon and ALaimo were interviewing
14  Maurice Lariviere?
15     A.    I was not present at all, no.
16     Q.    I know you were not present at the
17  interview.  I am saying were you in the mayor's
18  office the whole time?
19     A.    No, sir.
20     Q.    Where did you go?
21     A.    The meeting in Sharon Pollard's
22  office lasted, it was extremely brief, I don't
23  think it was more than five minutes during my
24  time there.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 58

1    Q.    Did you go somewhere with Fulya
2    after that?
3    A.    We went to the police station to
4    my office.
5    Q.    That is when she dictated her
6    brief notes on what occurred during the
7    videotape?
8    A.    Synopsis of what happened that
9    morning, yes.
10   Q.    When did she execute the
11   permission to do the video?
12   A.    That was done the evening of the
13   15th prior to her leaving the police department.
14   Q.    Okay.
15   A.    And that was at the suggestion of
16   the chief.
17   Q.    I want to get it squared away that
18   I am putting in front of you a document which I
19   think is that permission slip dated February
20   16th. I am trying to determine what had
21   occurred. Let me say to you directly that
22   whatever the answer is I find it totally
23   irrelevant in this case. I am just curious
24   about whether or not there is a mistake in the

Page 59

1    date she gave permission. I want to know when
2    this was done and how.
3    A.    I really thought we did it that
4    night but it's quite possible that we did this
5    the next day.
6    Q.    Nobody is alleging that there is
7    some consequence to when she did it. We agree
8    she agreed to a videotape.
9    A.    I am trying to remember. This may
10   have been done the next day so the date would
11   probably be accurate.
12   Q.    So it is possible that that
13   happened after the video?
14   A.    Yes, sir.
15   Q.    And was it done at your direction
16   or the direction of Solomon?
17   A.    I received orders to have this
18   documented.
19   Q.    Okay.
20        MR. DIADAMO: Let's mark this as
21   Exhibit 2.
22        (Exhibit No. 2 marked;
23        permission to video.)
24   Q.    While we are at it I am putting in

Page 60

1    front of you another document and it looks like
2    it's Fulya's synopsis of 2-16-05. And I am
3    going to ask you if that is the brief statement
4    that Fulya Metin made after the video was
5    completed?
6    A.    (Document examined.) Yes, sir.
7    Q.    Okay.
8        MR. DIADAMO: Mark that Exhibit 3.
9        (Exhibit No. 3 marked;
10        statement, 2-16-05.)
11   Q.    Now, after you went back to the
12   police department did you go back to the city
13   hall that day?
14   A.    Yes, I did.
15   Q.    When you went back to the city
16   hall was Solomon, Alaimo, and Lariviere still
17   meeting?
18   A.    No. I never saw Maurice that day
19   other than what was on the video.
20   Q.    When you went back did you see
21   Solomon?
22   A.    Yes.
23   Q.    Where did you see him?
24   A.    I'm trying to remember if he came

Page 61

1    to the PD at some point or I saw him at city
2    hall. I did see him at city hall later that day
3    though.
4    Q.    When you saw him were you mindful
5    of the fact that the interview with Maurice was
6    over?
7    A.    Yes, sir.
8    Q.    What did he say to you?
9    A.    He told me that Maurice resigned.
10   Q.    Did you say anything back to him?
11   A.    No.
12   Q.    Did he tell you that Maurice had
13   been escorted out of the building?
14   A.    No.
15   Q.    Did he tell you that he had signed
16   a resignation?
17   A.    I believe he did, yes.
18   Q.    Did he tell you that he had signed
19   a resignation prepared by David Bain?
20   A.    No, sir.
21   Q.    Did you have any discussion during
22   this entire day with David Bain?
23   A.    No, sir.
24   Q.    He was present in the mayor's

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 62

1  office. Did you hear him saying anything?
2      A.    I may have said good morning
3  David. Hi David. But there was nothing other
4  than a greeting. And I am not even sure that I
5  even said hi to him. Normally, you know, I
6  would say hi to a guy like that.
7      Q.    When Solomon told you that Maurice
8  Lariviere resigned did he say anything else?
9      A.    There was some conversation about
10 Chief Solomon wanted to get a search warrant for
11 Maurice's office as well as his computer.
12     Q.    Is that the full conversation?
13     A.    I believe it was, yes.
14     Q.    He didn't tell you why he
15 resigned, did he?
16     A.    No. And I didn't ask either.
17     Q.    You knew when you heard that that
18 that was something that Fulya Metin never asked
19 for, correct?
20     A.    That is correct.
21     Q.    When you were in Mayor Pollard's
22 office was there any discussion whatsoever about
23 Maurice Lariviere's job status?
24     A.    No, sir.

Page 63

1      Q.    Now, after the events of that day
2  you had further contact with Fulya Metin, did
3  you not?
4      A.    There may have been some more
5  conversation that day. And then subsequent to
6  that day there was maybe a half a dozen phone
7  calls and one other meeting, to the best of my
8  memory. One other meeting with Fulya.
9      Q.    One other meeting where?
10     A.    At the police department, Sanborn
11 Hall.
12     Q.    How long after?
13     A.    Maybe a week later. Could have
14 been a few days later.
15     Q.    Did you know what her job status
16 was at the time of that meeting?
17     A.    I don't remember.
18     Q.    Now, you have one report, I think
19 it was dated in April sometime. Do you recall
20 that report?
21     A.    No.
22     Q.    First of all, while I am thinking
23 about it, you did a log of your cell phone calls
24 to and from Fulya Metin prior to February 25th,

Page 64

1  is that correct?
2      A.    Yes, sir.
3      Q.    Is that the document?
4      A.    (Document examined.) Yeah. What
5  I did was I E-mailed it from either my home to
6  my office or from my office to my home so that I
7  would have a record of it. Like a time record
8  of it.
9      Q.    And that is the document?
10     A.    Yes.
11     Q.    Okay.
12         MR. DIADAMO: Would you mark that,
13 please.
14         (Exhibit No. 4 marked;
15         phone log.)
16     Q.    Now, were you aware of the fact
17 that Fulya Metin went back to work?
18     A.    I think she tried to go back to
19 work. I don't know how long.
20     Q.    When you say tried, nobody stopped
21 her from going back to work, did they?
22     A.    Nobody stopped her, no.
23     Q.    She stopped herself?
24     A.    Yes.

Page 65

1      Q.    Do you know how many days she was
2  back before she stopped?
3      A.    I'm not sure of the exact amount.
4  I don't even want to guess. I don't know.
5      Q.    Well, you do know at some point
6  she stopped?
7      A.    She stopped working, yes, I do
8  know that.
9      Q.    And did you become aware that she
10 made some allegations about Peter McQuillan?
11     A.    No, I don't remember that. No.
12     Q.    Do you recall it was even reported
13 in the paper she would not be back to work
14 because Peter McQuillan was in the office and he
15 was a friend of Maurice's?
16     A.    I don't remember.
17     Q.    In any event you do know the Town
18 of Methuen was paying an employee who was not
19 coming to work, right?
20     A.    I don't even know that. I don't
21 know that for sure.
22     Q.    You do know now.
23     A.    They were paying her when she was
24 not working?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**MICHAEL WNEK**
**November 7, 2006**

Page 66

1    Q.    Yeah, right.
2    A.    Yes, I know it now.  Yes.
3    Q.    And you know that she was paid and
4    you know that she collected workers comp,
5    correct?
6    A.    I know it now.
7    Q.    You know she brought a lawsuit.
8    A.    I know it now.
9    Q.    And now apart from knowing that
10   you also got more information concerning the
11   personal relationship between Fulya Metin and
12   Maurice Lariviere.
13   A.    Will you restate that again,
14   please.
15   Q.    Yes.  I said after that time,
16   after you videotaped it, you were generally
17   aware she was leaving and suing the town that
18   you got more information concerning the personal
19   relationship between Fulya Metin and Maurice
20   Lariviere?
21   A.    I don't think I got any additional
22   information after.
23   Q.    Were you physically shown E-mails
24   from Fulya to Maurice and Maurice to Fulya that

Page 67

1    occurred during her employment?
2    A.    Yes.
3    Q.    Can you describe those to us?
4    A.    I see one that was brought to my
5    attention in front of me but . . .
6    Q.    Let the record show what you are
7    looking at is upside down.  I will talk to you
8    about those.  That is the order in which you
9    presented them to me, sir.
10         I am asking you about different
11   communications other than the ones that you had
12   affixed to your report.
13   A.    I know a search warrant was done
14   for his computer.  Whatever was extracted from
15   his computer was not brought to my attention.
16   Q.    First of all, you know that the
17   town is represented by someone in the MCAD case,
18   correct?
19   A.    Yes.  I don't know who it was.
20   Q.    David Rappaport, he has
21   interviewed you, has he not?
22   A.    No, sir.
23   Q.    Has Peter McQuillan interviewed
24   you?

Page 68

1    A.    Officially on this, no.
2    Q.    I am going to put a package of
3    documents in front of you and ask you if you
4    have seen these before.
5    A.    (Documents examined.) I saw a
6    couple of these but not every single one of
7    them.
8    Q.    Okay. I can give you a couple of
9    minutes to read them.
10   A.    Give me a couple of minutes.
11         (Recess.)
12   Q.    Now, first of all, you reviewed
13   these now.  You have read them all?
14   A.    Yes.
15         MR. DIADAMO: Would you mark those
16   Exhibit 5.  A package of 7 pages.
17         (Exhibit No. 5 marked;
18         7 page document.)
19   Q.    As someone who is investigating
20   sexual complaints in the past do you have a
21   comment on the tenor or the mood of these
22   statements?
23   A.    My comment would be that it looks
24   like it appears to be a friendly dialogue.

Page 69

1    Q.    You sense a true friendship?
2    A.    Yes.
3    Q.    What I want to do is I want to ask
4    you in your job investigating these matters had
5    she presented you with these in the car in the
6    loop do you honestly really think that a
7    videotape would have occurred the next day?
8    A.    Well, I can say this, I mean no
9    crimes are similar.  I mean every crime has
10   different elements.  And having reviewed
11   hundreds of crimes specific to sexual assaults
12   the situations vary.  I mean there are many
13   instances where it's unfortunately the family
14   members of abusing or inappropriately touching
15   other family members, children, and often times
16   the relationships are good relationship despite
17   the fact that there is some type of unwanted
18   touching.
19   Q.    Did you note as you reviewed these
20   E-mails that most of them were sent to Maurice
21   on weekends?
22   A.    Yes.
23   Q.    And they are not family members,
24   correct?

**MICHAEL WNEK**
**November 7, 2006**

Page 70

1    A.    Maurice and Fulya, no.
2    Q.    And when we are talking about
3  family members we are talking about natural
4  coercion of people living in the same family or
5  under the same roof, correct?
6    A.    Once again, having reviewed
7  hundreds of cases the situation varies.
8    Q.    Let's stick with this case for a
9  little bit.
10         You have reported and you have
11  documents with respect to your assertion before
12  that she told you that Maurice would write kind
13  things and make her sign them.
14    A.    Yes.
15    Q.    When you reviewed the E-mails you
16  can see that on weekends she would send far
17  kinder messages by E-mail directly to Maurice,
18  correct?
19    A.    Yes.
20    Q.    And would send them to his home
21  with his wife and three children, correct?
22    A.    Yes.
23    Q.    Now, let me ask you again.  In
24  your role as a very experienced investigator had

Page 71

1  you seen these documents at the time you heard
2  about these complaints do you really think the
3  video would have occurred of Maurice's?
4         MR. NOTIS: Objection.  Go ahead.
5    A.    Yes.
6    Q.    You would have disregarded these?
7         MR. NOTIS: He didn't say that.
8         MR. DIADAMO: Let him answer the
9  question.
10         MR. NOTIS: Objection for the
11  record.
12    A.    I wouldn't have disregarded them.
13  I wouldn't have disregarded anything that was
14  presented.
15    Q.    You would have questioned her
16  carefully about them, correct?
17    A.    I would have questioned her on
18  them, yes.
19    Q.    You would have then known that the
20  person that she was complaining about she had
21  bought him a birthday present and had sent an
22  E-mail about it on December 5th, correct?
23    A.    Um-hum.  Yes.
24    Q.    You would have known that he was

Page 72

1  doing the tax returns for her, correct?
2    A.    If that was presented to me I
3  would have known, yes.
4    Q.    You would have known in that car
5  at the time that she had discussed a medical
6  condition with him?
7    A.    That is correct.
8    Q.    You also would have known that he
9  advanced her funds to pay for the medications?
10    A.    That is correct.
11    Q.    And you also would have known in
12  the car that at no time did Maurice, according
13  to Fulya, at no time did he ever threaten her
14  with job action, for instance, like you are
15  either going to perform sexual acts or you are
16  out of here?
17    A.    She never indicated that he put
18  any threat on her.
19    Q.    So if you had just these documents
20  without any other story you would have known you
21  were dealing with two people who had a personal
22  relationship, correct?
23    A.    Based on what she told me I
24  already knew that anyway.

Page 73

1    Q.    Did you know it was the kind of
2  relationship where people would be communicating
3  or writing on weekends that you see in these
4  E-mails?
5    A.    I didn't know that.  But she did
6  indicate she was friends and that she liked
7  Maurice.
8    Q.    If you knew that a male was
9  interested in a female you would know that these
10  E-mails did nothing to discourage that interest,
11  correct?
12    A.    The friendly interest?
13    Q.    Yes.  Just an interest.  These
14  E-mails do nothing to discourage any interest,
15  friendly, sexual, or any other way?
16    A.    That is correct.
17    Q.    Would you have been mindful of
18  that fact if you had seen these in the car?
19    A.    As I said, she already indicated
20  that she liked Maurice and that she thought he
21  was a nice guy.
22    Q.    But when you look at this one that
23  is signed kiss and she is accusing him of an
24  unwanted kiss would you have at least questioned

**MICHAEL WNEK**
**November 7, 2006**

Page 74

1  her about that?
2      A.      Absolutely.
3      Q.      And depending on the answer would
4  you have taken perhaps different action?
5      A.      I'm sure it would have weighed
6  into the decision making as to what course we
7  took.
8      Q.      Even in addition to these E-mails
9  you received even more information with respect
10 to the relationship after Fulya left her
11 employment, correct?
12     A.      Could you repeat that again.
13     Q.      Even in addition to these E-mails
14 you learned more personal information about
15 Fulya after she left the Town of Methuen, did
16 you not?
17     A.      More personal information about
18 Fulya, yes.
19     Q.      What kind of personal information
20 did you receive about her?
21     A.      I just heard some information
22 within the last day about her that I didn't
23 know.
24             MR. NOTIS: The conversations with

Page 75

1      your attorneys don't discuss.
2      Q.      You can answer.  I am not asking
3  you about conversations.  I am asking what you
4  know.
5      A.      That she got married.  She
6  recently got married.
7             MR. DIADAMO: Off the record.
8             (Discussion off the record.)
9      Q.      You know she is pursuing cases for
10 money, correct?
11     A.      Yes.
12     Q.      You know that you had done
13 everything in your power to clear the way for
14 her employment in the Town of Methuen, correct?
15     A.      Regarding her maintaining her
16 employment?
17     Q.      Yeah.
18     A.      I felt like as an investigator I
19 offered her all my services and support as a
20 professional, that the city would try to provide
21 her with what she needed, yes.
22     Q.      You also in the course of this
23 thing have seen documents that detail Maurice
24 Lariviere's assertions with respect to the

Page 76

1  relationship, true or false?
2      A.      False.
3      Q.      You have not seen his submission
4  at MCAD detailing their relationship?
5      A.      No, I haven't.
6      Q.      You have not seen the verified
7  complaint filed in the federal court?
8      A.      No, I have not.
9      Q.      Have you spoken to Solomon or
10 Alaimo about Maurice's allegations?
11     A.      No.
12     Q.      Now, you have known both Solomon
13 and Lariviere for years and years, correct?
14     A.      I have known Maurice longer.
15     Q.      Do you know of any reason why when
16 they were sitting in a room, Alaimo, Solomon,
17 and Maurice, that Maurice would not relate to
18 Solomon his relationship before you met?
19     A.      Repeat that again.
20     Q.      Knowing both of them for years do
21 you know of any reason why Maurice would not
22 relate to Solomon his relationship with Fulya
23 Metin?
24     A.      I don't understand the question.

Page 77

1  I'm sorry.
2      Q.      Very fair. If I suggest to you
3  that Maurice did not tell Solomon about the
4  E-mails, did not tell Solomon about the personal
5  contacts between them, for instance, going to
6  lunch almost every day, did not tell him about
7  her daughter working in the office with Maurice,
8  was there anything between them that would
9  explain why he would not say things like that to
10 Solomon and instead resign that you know of?
11     A.      I don't know.  I don't know.
12     Q.      You don't know?
13     A.      No.
14     Q.      Let me ask you a couple of more
15 things. I noted in your statement that you
16 interviewed some town employees.
17             First of all, did you interview
18 John Molori?
19     A.      Yes.
20     Q.      What did John Molori tell you?
21     A.      I don't remember exactly.
22     Q.      The report that I was talking to
23 you about is April 5, 2005.  That is this
24 report, is it not?

**MICHAEL WNEK**
**November 7, 2006**

21 (Pages 78 to 81)

Page 78

1      A.      Give me a second to look at it.
2      Q.      Sure.  If I have written anything
3  in the margin I am telling you I know you didn't
4  write it.
5      A.      (Document examined.) I remember
6  this conversation with John Molori.
7      Q.      First of all, this is a report you
8  presented on April 5, 2005?
9      A.      Yes.
10         MR. DIADAMO: Let's mark that
11  Exhibit 6.
12         (Exhibit No. 6 marked;
13         report, 4-5-05.)
14         MR. DIADAMO: Exhibit No. 6 is a
15  five page report dated April 5, 2005.
16      Q.      Now, Paragraph 2 of that report is
17  your synopsis of what John Molori said to you,
18  correct?
19      A.      Yes.
20      Q.      Did John Molori tell you that he
21  was seeing Fulya socially?
22      A.      He told me that he went out to
23  lunch with Fulya.  That they were friends.
24      Q.      That is it?

Page 79

1      A.      That maybe they joined the gym.
2  They might have went to the gym, Gold's Gym.
3      Q.      This is dated April 5th.  Did he
4  tell you he was responsible for her having a
5  free one year membership at the gym?
6      A.      He didn't indicate that, no.
7      Q.      Did he talk about being out with
8  her during the evening?
9      A.      Never.
10      Q.      Never?
11      A.      Never.
12      Q.      Did you ask him any questions to
13  that effect?
14      A.      I asked him the specific question.
15  I asked him, as I remember it, what did Fulya,
16  if at all, convey to you regarding what was
17  going on between Maurice and Fulya.
18      Q.      Now, the next question I want to
19  ask you about is Linda Gagnon. You have related
20  something she told you in the interview that I
21  am going to ask you directly.
22         Did Linda Gagnon tell you this or
23  did Fulya Metin tell you that she said this to
24  Linda Gagnon?

Page 80

1         Look at it.  I want to you to
2  answer that question carefully.
3      A.      (Document examined.) I remember
4  talking to Linda Gagnon.  I don't remember if
5  Linda Gagnon came forward to me. To the best of
6  my memory I don't think that Fulya told me. Let
7  me say I don't remember if Fulya told me or if
8  Linda came forward to me.  I don't remember.
9      Q.      Would it refresh your recollection
10  if I suggested to you Linda Gagnon has stated
11  that she categorically did not say what is in
12  that report?
13         MR. NOTIS: Objection.
14      Q.      You can answer that, if you can.
15      A.      That is not true.
16      Q.      I just want to say I just said to
17  you if I suggest to you that Linda Gagnon said
18  that she did not tell you what is in that report
19  would that refresh your memory as to whether or
20  not you were told it by Linda Gagnon before you
21  met?
22         MR. NOTIS: Objection.
23      A.      I remember Linda Gagnon being in
24  my office.

Page 81

1      Q.      But you don't remember her telling
2  that story, do you?
3      A.      And I remember Linda Gagnon
4  telling me that story.
5      Q.      You do?
6      A.      Yes.
7      Q.      Okay.
8         MR. DIADAMO: I have nothing
9  further.
10         MR. GAMBACCINI: No questions.
11         MR. NOTIS: No questions.
12
13      (Deposition concluded at 11:05 a.m.)
14
15         MR. DIADAMO: I would like the
16  original.
17         MR. NOTIS: I would like a mini and
18  a copy.
19         MR. GAMBACCINI: I will have a copy
20  and mini.
21
22
23
24

**MICHAEL WNEK**
**November 7, 2006**

Page 82

```
 1
 2          C E R T I F I C A T E
 3
 4       I, Linda Anne Rebello,
 5   Registered Professional Reporter and Notary
 6   Public, within and for the Commonwealth of
 7   Massachusetts do hereby certify that
 8   MICHAEL WNEK, the witness whose deposition
 9   is hereinbefore set forth, satisfactorily
10   identified himself, was duly sworn by
11   me, and that such deposition is a true
12   record of the testimony given by the
13   witness.
14       I further certify that I am neither
15   related to or employed by any of the parties
16   to this action, nor am I financially
17   interested in this action.
18
19       WITNESS MY HAND this 16th day of
20   November, 2006.
21
22
23   LINDA ANNE REBELLO  My commission expires:
24   Notary Public       June 28, 2007
```

Page 84

```
 1   * * * * * * * * * * * * * * *
 2   Maurice Lariviere        *
 3   vs.                 *
 4   Joseph Solomon, et al     *
 5   * * * * * * * * * * * * * * *
 6
 7
 8       I, MICHAEL WNEK, do hereby certify,
 9   under the pains and penalties of perjury,
10   that the foregoing testimony is true and
11   accurate, to the best of my knowledge and
12   belief.
13
14       WITNESS MY HAND, this _____ day of
15   _____, 2006
16
17
18
19
20
21          MICHAEL WNEK
22
23
24
```

Page 83

```
 1   Today's date:      November 16, 2006
 2   To:            Carmine DiAdamo
 3   Copied to:  Gareth Notis, Andrew Gambaccini
 4   From:       Linda Anne Rebello
 5   Deposition of:   Michael Wnek
 6   Taken:      November 7, 2006
 7   Action:     Maurice Lariviere vs.
 8               Joseph Solomon, et al
 9
10       Enclosed is a copy of the deposition of
11   MICHAEL WNEK.  Pursuant to the Rules of
12   Civil Procedure, Mr. Wnek has 30 days
13   to sign the deposition from today's date.
14       Please have Mr. Wnek sign the
15   enclosed signature page.  If there are any
16   errors, please have Mr. Wnek mark the page,
17   line and error on the enclosed correction
18   sheet.
19       He should not mark the transcript itself.
20   This addendum should be forwarded to all
21   interested parties.
22       Thank you for your cooperation in this
23   matter.
24
```

Page 85

```
 1         CORRECTION SHEET
 2   DEPONENT:  Michael Wnek
 3   CASE:     Lariviere vs. Solomon, et al
 4   DATE TAKEN:  November 7, 2006
 5   *******************************************
 6   PAGE/ LINE/  CHANGE OR CORRECTION AND REASON
 7   *******************************************
 8   ___/ ___ /_____
 9   ___/ ___ /_____
10   ___/ ___ /_____
11   ___/ ___ /_____
12   ___/ ___ /_____
13   ___/ ___ /_____
14   ___/ ___ /_____
15   ___/ ___ /_____
16   ___/ ___ /_____
17   ___/ ___ /_____
18   ___/ ___ /_____
19   ___/ ___/_____
20   ___/ ___/_____
21   ___/ ___/_____
22   ___/ ___/_____
23   ___/ ___/_____
24   ___/ ___/_____
```

**DAVID BAIN**
**November 21, 2006**

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MASSACHUSETTS

3                      C.A. No. 05-11579EFH

4    * * * * * * * * * * * * * * * * * * * * *

5    MAURICE LARIVIERE,                        *

6              Plaintiff                       *

7    vs.                                       *

8    JOSEPH SOLOMON, Individually and as       *

9    Chief of Police for the City of Methuen,  *

10   JOSEPH ALAIMO, Individually and as        *

11   Deputy Chief of Police for the City of    *

12   Methuen and THE CITY OF METHUEN,          *

13              Defendants                     *

14   * * * * * * * * * * * * * * * * * * * * *

15

16        DEPOSITION OF:   DAVID BAIN

17             DiAdamo Law Offices

18             40 Appleton Way

19          Lawrence, Massachusetts

20       November 21, 2006   12:30 p.m.

21

22

23          Linda Anne Rebello

24       Registered Professional Reporter

| Page 2 | | Page 4 | |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | STIPULATIONS |
| 2 | | 2 | It is hereby stipulated by and |
| 3 | Representing the Plaintiff: | 3 | between counsel for the respective parties that |
| 4 | DiAdamo Law Offices | 4 | the reading and signing of the deposition may be |
| 5 | 40 Appleton Way | 5 | under the pains and penalties of perjury. |
| 6 | Lawrence, Massachusetts 01840 | 6 | It is further stipulated that all |
| 7 | (978) 685-4371 | 7 | objections, except as to the form of the |
| 8 | BY: CARMINE W. DIADAMO,ESQ. | 8 | question, and all motions to strike are |
| 9 | | 9 | reserved until the time of trial. |
| 10 | Representing the Defendants: | 10 | - - - - |
| 11 | Morrison & Mahoney | 11 | DAVID BAIN, Deponent, having first |
| 12 | 250 Summer Street | 12 | been duly sworn, deposes and states as follows: |
| 13 | Boston, Massachusetts 02210 | 13 | |
| 14 | (617) 737-8857 | 14 | EXAMINATION BY MR. DIADAMO: |
| 15 | BY: GARETH W. NOTIS, ESQ. | 15 | |
| 16 | | 16 | Q. Tell us your name. |
| 17 | Representing Joseph Solomon, Joseph Alaimo, | 17 | A. David Bain. |
| 18 | and Michael Wnek | 18 | Q. Do you live in Methuen? |
| 19 | Reardon, Joyce & Akerson | 19 | A. No. |
| 20 | 397 Grove Street | 20 | Q. Where? |
| 21 | Worcester, Massachusetts 01605 | 21 | A. Lawrence. |
| 22 | (508) 754-7220 | 22 | Q. Where we made agreements for all |
| 23 | BY: ANDREW J. GAMBACCINI | 23 | employees we might as well include you. We |
| 24 | | 24 | don't ask residential addresses. Okay. But if |

| Page 3 | | Page 5 | |
|---|---|---|---|
| 1 | I N D E X | 1 | I need to communicate with you or subpoena you I |
| 2 | | 2 | am going to send it to Mr. Notis and it will be |
| 3 | WITNESS: DAVID BAIN | 3 | accepted if you concur. |
| 4 | | 4 | A. Okay. |
| 5 | EXAMINATION BY: PAGE | 5 | Q. You are employed by the Town of |
| 6 | Mr. DiAdamo 4 | 6 | Methuen? |
| 7 | Mr. Notis 37 | 7 | A. That is correct. |
| 8 | | 8 | Q. What is your present job? |
| 9 | | 9 | A. Human resource director. |
| 10 | | 10 | Q. When did you begin that job? |
| 11 | | 11 | A. I think it was December 5, 1999. |
| 12 | | 12 | Q. And part of the job of human |
| 13 | | 13 | resources is to handle the sexual harassment |
| 14 | | 14 | policy in the Town of Methuen? |
| 15 | | 15 | A. That is correct. |
| 16 | | 16 | Q. Was there one in existence in '99? |
| 17 | | 17 | A. Not to my knowledge. |
| 18 | | 18 | Q. When did it come into existence? |
| 19 | | 19 | Approximately. |
| 20 | | 20 | A. I don't know. |
| 21 | | 21 | Q. Do you recall just one policy |
| 22 | | 22 | coming into existence or have there been |
| 23 | | 23 | revisions? |
| 24 | | 24 | A. One policy. |

**DAVID BAIN**
**November 21, 2006**

Page 6

1    Q.    And that policy was in effect at
2    least in 2004 and 2005?
3    A.    That is correct.
4    Q.    With respect to this policy do you
5    know who drafted it?
6    A.    Yes, I do.
7    Q.    Who?
8    A.    Maurice Lariviere.
9    Q.    And you also know that this is the
10   model policy for MCAD?
11   A.    Correct.
12   Q.    With respect to employment by the
13   Town of Methuen is there anything that you do
14   with the policy when a new employee comes on
15   board?
16   A.    Yes.
17   Q.    What do you do?
18   A.    Make them aware of it.
19   Q.    Do you give them a copy or do you
20   tell them about it?
21   A.    We have been telling them about
22   it.
23   Q.    Specifically Fulya Metin, did you
24   have a conversation with her?

Page 7

1    A.    No.
2    Q.    Was there a reason why?
3    A.    She was a temporary employee
4    supplied by an agency and was to be there for a
5    theoretically short amount of time about a
6    month.
7    Q.    At some point she became a real
8    employee, if you will.
9    A.    That is correct.
10   Q.    Nobody talked to her at that time
11   either?
12   A.    No.
13   Q.    Was there a reason for that?
14   A.    No.
15   Q.    Just an oversight?
16   A.    That is correct.
17   Q.    Let me bring you back to the fall
18   of 2004. The city solicitor at that time was
19   without any support staff, correct?
20   A.    That is correct.
21   Q.    What happened to eliminate the
22   staff?
23   A.    There was a woman who worked for
24   him for many years whose name escapes me at the

Page 8

1    moment who became ill and then died. He had, I
2    believe, one temporary person in that period of
3    time to help him out and that was basically it.
4    Q.    Sharon Barrett?
5    A.    Barrett. Thank you.
6    Q.    So did he come to you with respect
7    to hiring somebody else or did he go to somebody
8    else?
9    A.    I believe he came to me and I
10   believe he also approached the mayor.
11   Q.    How long was he without support
12   staff in his office at that time?
13   A.    I don't remember.
14   Q.    Do you recall somebody that was
15   proposed for employment was rejected by the
16   mayor?
17   A.    Yes.
18   Q.    And approximately when did that
19   occur?
20   A.    I don't remember.
21   Q.    Can you tell us the reason why
22   that person was rejected?
23   A.    I don't remember.
24   Q.    Well, first of all who found her?

Page 9

1    A.    Well a search was instituted.  We
2    advertised and candidates applied.
3    Q.    When candidates replied Maurice
4    talked to them and you also talked to them,
5    correct?
6    A.    We interviewed them together.
7    Q.    Now, currently this woman was
8    acceptable to both you and Maurice?
9    A.    She was recommended.
10   Q.    You mean she was recommended by
11   you and Maurice for employment?
12   A.    Yes.
13   Q.    What happened?
14   A.    Well, the mayor wanted to
15   interview her. And she did. And she found her
16   not to be acceptable.
17   Q.    Did she give any specific reasons
18   why she was not acceptable?
19   A.    Not that I recall.
20   Q.    Now, sometime after that did you
21   interview other people or go to a service?
22   A.    I believe we did both.
23   Q.    And what happened after that?
24   A.    We ended up with the service.  I

**DAVID BAIN**
**November 21, 2006**

Page 10

1  think there was one other candidate. There his
2  was one other candidate and then that candidate
3  rejected us. She got another job. After that
4  we went to the service with the thought of going
5  out again in a month or so to see if we could
6  get someone full-time.
7      Q.    And from the service you got Fulya
8  Metin, correct?
9      A.    That is correct.
10     Q.    A short time after she came to be
11 employed did Maurice approach you with respect
12 to her full-time status, if you will?
13     A.    He did so at some point.
14     Q.    Do you recall when that point was?
15     A.    I don't.
16     Q.    When he came to you what did he
17 say?
18     A.    He said that she was great, she
19 did a great job, and wanted to see if we can
20 maybe put her on full-time.
21     Q.    After that conversation what did
22 you do?
23            Let me ask it another way. For her
24 to get on full-time the mayor had to put her on

Page 11

1  full-time, correct?
2      A.    That is correct.
3      Q.    So after it was suggested to you
4  by Maurice she come on full-time what did you
5  do?
6      A.    I approached the mayor, I believe.
7      Q.    What did the mayor do?
8      A.    The mayor interviewed her.
9      Q.    After the interview?
10     A.    After the interview she basically
11 said she would hire her subject to the fee being
12 paid. There was an agency fee, employment
13 ageency fee.
14     Q.    Was there any further conversation
15 with the mayor at that time about why to hire
16 her?
17     A.    Not that I recall.
18     Q.    Do you recall being told Fulya
19 Metin knew Mrs. Alaimo who worked in the mayor's
20 office well?
21     A.    No.
22     Q.    You don't recall that at all?
23     A.    No.
24     Q.    After she was hired we all know

Page 12

1  the story.
2            Very briefly tell us about what
3  happened with Moore Services.
4      A.    There was a fee that had to be
5  paid. I can't remember the amount or anything
6  like that. And she was hired subject to her
7  paying the fee. The fee went down every month
8  and when it got to be zero she was put on
9  full-time.
10     Q.    Okay. And do you recall when that
11 was?
12     A.    I don't know.
13     Q.    Now, were you the one who was
14 tracking the time it took to run down the
15 obligation to when the obligation from Moore
16 Services was reduced to zero?
17     A.    I don't believe so.
18     Q.    Who was doing that?
19     A.    I don't know to be honest with
20 you.
21     Q.    During that time did you have any
22 interaction at all with Fulya Metin?
23     A.    No.
24     Q.    No casual conversation?

Page 13

1      A.    Hi, how are you.
2      Q.    But you would at least see her
3  every day?
4      A.    I would see here in the hallway
5  and in the solicitor's office.
6            MR. DIADAMO: Off the record.
7            (Discussion off the record.)
8      Q.    And it's obvious she knew what her
9  job was.
10     A.    I believe that she did.
11     Q.    Okay. Now, from that time until
12 mid February did Fulya Metin make any complaints
13 to you --
14     A.    No.
15     Q.    -- about her work?
16     A.    No.
17     Q.    To your knowledge did she make any
18 complaints to anybody else?
19     A.    No.
20     Q.    And I used the date February 16th.
21 We will refer to that as the videotape date.
22 You are aware on some date in February there was
23 a videotape made of Fulya and Maurice Lariviere,
24 correct?

**DAVID BAIN**
**November 21, 2006**

Page 14

1      A.    I am aware of that.
2      Q.    Okay. So I am asking you to assume
3   that is true, that date is February 16th, if you
4   don't know that date.  Okay?
5      A.    Okay.
6      Q.    Before that date did you
7   personally know a videotape was going to be
8   made?
9      A.    Yes.
10     Q.    Who told you?
11     A.    Chief Solomon.
12     Q.    And he told you when?
13     A.    I believe he told me the night
14  before which would probably be the 15th.
15     Q.    February 15th you learned from
16  Chief Solomon there was going to be a videotape?
17     A.    Yes.
18     Q.    Where are you when he tells you
19  that?
20     A.    I am at home.
21     Q.    Did he call you?
22     A.    Yes.
23     Q.    What did he say to you?
24     A.    Basically I don't remember.

Page 15

1      Q.    Basically you don't remember?
2      A.    Right.
3      Q.    Do you remember in substance what
4   he told you?
5      A.    In substance I believe he told me
6   that a complaint had been made by Fulya against
7   Maurice for inappropriate conduct of a sexual
8   nature.  That that was being investigated.  That
9   the plan was to put a camera into Fulya's part
10  of the office, the receptionist part of the
11  office, and did the mayor have the authority to
12  give them that permission.
13     Q.    Did he describe the conduct?
14     A.    Inappropriate touching is my
15  memory.
16     Q.    In your position in human
17  resources as a sexual harassment officer what in
18  your mind at that time distinguished that from
19  the average sexual harassment complaint?
20     A.    In my mind the complaint was
21  received by the police as opposed to being
22  received by my office or me and I took it to be
23  of a criminal nature.
24     Q.    Did you take what you heard a

Page 16

1   description of a criminal nature or did you take
2   it that they assumed it was criminal?
3      A.    I took it they assumed it was
4   criminal.
5      Q.    But they never described it in any
6   detail to you?
7      A.    Not that I recall.
8      Q.    Did you ask them why it was
9   criminal and not standard sexual harassment and
10  it came under the policy?
11     A.    No.
12     Q.    Do you know the reason why they
13  called you and not the mayor or one of the
14  mayor's assistants directly?
15     A.    I don't know.
16     Q.    You don't know why they called you
17  as opposed somebody else?
18         MR. NOTIS: Do you mind if I take
19     a quick call.
20         (Recess.)
21     Q.    I think I was at the point where I
22  asked you about why they called you as opposed
23  to other people.  And you said you don't know.
24  I don't want to put words in your mouth.

Page 17

1      A.    I believe they called me because I
2   am a lawyer.
3      Q.    Did they call you to ask you if it
4   was legal taping in an office at City Hall?
5          MR. NOTIS: Objection.  Just one
6      clarification.  Are you saying that two
7      people called him or one when you say
8      they?  I thought Solomon called him.
9          MR. DIADAMO: If I said they have
10     mis-spoken.
11     A.    My memory is I was asked whether
12  or not the mayor had the authority to grant them
13  permission to tape at City Hall basically and I
14  said I believe that she did.
15     Q.    Okay. That was without any search
16  or anything?  Snap judgment?
17     A.    Snap judgment.
18     Q.    Was there any other conversation
19  during that telephone call?
20     A.    Not that I recall.
21     Q.    Were you assigned any specific
22  task for the next day?
23     A.    No.
24     Q.    Were you told to go anywhere

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DAVID BAIN**
**November 21, 2006**

6 (Pages 18 to 21)

Page 18

1  specifically the next day at that time?
2      A.    No.
3      Q.    Did you do anything at all with
4  respect to this matter from the time of the
5  telephone call until you arrived at work on
6  February 16th?
7      A.    No.
8      Q.    On February 16th you arrived at
9  work the regular time?
10     A.    No.
11     Q.    When did you come?
12     A.    I came after the regular time
13 because I believe I was at the Industrial
14 Accident Board the first thing in the morning.
15     Q.    Okay. Approximately when did you
16 get to City Hall?
17     A.    Approximately 10:30 would be my
18 best estimate.
19     Q.    When you got to City Hall, if you
20 know, had the taping session ended or was it
21 still going on?
22     A.    I believe it had ended.
23     Q.    What makes you think that it
24 ended?

Page 19

1      A.    I believe I was told that it
2  ended.
3      Q.    By whom?
4      A.    I don't recall.
5      Q.    Okay. Well, when you arrived and
6  you were told by somebody where did you go?
7      A.    I believe I went to the mayor's
8  office.
9      Q.    When you got to the mayor's
10 office, first of all, who was physically present
11 in her office as well as the outer area of her
12 office?
13     A.    The outer area I don't know. The
14 inner area when I went into the office Chief
15 Solomon was in the office, the mayor was in the
16 office. I don't know if anyone else was there or
17 not.
18     Q.    Toody was not there?
19     A.    Not to my memory.
20     Q.    Alaimo?
21     A.    I don't remember him being there.
22     Q.    Her Alaimo.
23     A.    I don't recall seeing her at all.
24     Q.    But in any event you have no

Page 20

1  memory of anybody else or any notion that
2  anybody else was in that room at that time?
3      A.    No. I have no memory of it, no.
4      Q.    Now, at that time would you relate
5  what Solomon said and what Sharon Pollard said.
6      A.    I really don't recall.
7      Q.    Start off this way. Were you
8  informed that Maurice Lariviere had been
9  interviewed by Solomon and Alaimo or was that
10 process going to start?
11     A.    I believe I was informed that they
12 had interviewed him.
13     Q.    Are you sure the time now is
14 10:30?
15     A.    I am not sure of the time at all.
16 It could be later.
17     Q.    It's your memory today that the
18 videotaping had stopped and the interviewing had
19 commenced?
20         MR. NOTIS: I don't think he said
21     that.
22     A.    My memory is that I really don't
23 recall where information came from. I know I
24 received information.

Page 21

1      Q.    What information did you receive?
2  Let's start with that.
3      A.    From a source I received
4  information that Maurice, that the city
5  solicitor, was in the second floor conference
6  room being interviewed by the police. And that
7  is about it.
8      Q.    That information that you
9  received, did you receive it in the room with
10 the mayor and the chief of police?
11     A.    I believe so.
12     Q.    So you just don't know which one?
13     A.    I don't know who told me what.
14     Q.    Okay. Now, what else were you
15 told?
16     A.    At some time after, I had been
17 there for ten minutes or so is my memory, I was
18 told that Maurice had decided he wanted to
19 resign his position.
20     Q.    Okay. Do you know who told you
21 that?
22     A.    I believe it was Chief Solomon.
23     Q.    Now, were you told that or were
24 you directed to draft the resignation?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DAVID BAIN**
**November 21, 2006**

Page 22

1      A.      I was told that.
2      Q.      Did they ask you to draft a
3  document in accordance with the charter they
4  were terminating the rights without him
5  exercising any other right?
6      A.      I consulted on the preparation of
7  a resignation document.
8      Q.      At that time?
9      A.      At that time.
10     Q.      What was the discussion?
11            MR. NOTIS: I am going to object
12  to that because I think it might be
13  privileged.  Do you mind if I talk to the
14  witness and clarify that?
15            MR. DIADAMO: Yes, you can.
16            MR. NOTIS: Let's step out.
17            (Recess.)
18            MR. NOTIS: Could you read the
19  question back.
20            (Question read back.)
21            MR. NOTIS: I have instructed the
22  witness not to answer the question to the
23  extent that he provided legal counsel but
24  as to any other discussions that were not

Page 23

1  of a legal nature he can answer the
2  question.
3            I will instruct the witness to
4  give his answer if he understands the
5  question.
6            MR. DIADAMO: I want it on the
7  record is he in for a penny or is he in
8  for a pound? You make your decision right
9  now.  He is either an attorney giving
10  legal advice or he is an employee who
11  runs the human resource office. You call
12  your own shot. I want it on the record.
13            MR. NOTIS: He is both.  That is
14  the fact of the matter.  You know as well
15  as I do that he has got dual roles there.
16  An attorney if he is asked legal advice by
17  an employee of the city that is
18  privileged.  If he is asked advice about a
19  human resource or employment issue that
20  does not have legal ramifications.  That
21  is not privileged.  I think that is pretty
22  clear.  He can answer accordingly.  It's
23  his privilege.
24     Q.      So we make it very clear.  You are

Page 24

1  present with Chief Solomon and Mayor Pollard.
2  At that point are you legally representing
3  either the chief or the mayor or the city?
4      A.      I don't believe so.
5            MR. DIADAMO: Let's go back to that
6  question. The one I asked before. Can you
7  go back to that question.
8            (Question read back.)
9      A.      The document was being prepared
10  and there is a provision in the Methuen charter
11  that allows people to have a hearing before the
12  council. And I suggested that that provision be
13  included in the resignation and that if he was
14  going to resign he should waive that right.
15     Q.      That was your suggestion?
16     A.      I believe it was.
17     Q.      Please don't accept this as true.
18  I want you to assume that I have some
19  information that as soon as Solomon got to the
20  office he was back with a resignation in under
21  five minutes.
22            Does that refresh your memory at
23  all as to whether or not you had prepared
24  something before Solomon got to that office?

Page 25

1            MR. NOTIS: Objection.  Go ahead.
2      A.      No.
3      Q.      It's your memory that the
4  preparation occurred after you met Solomon?
5      A.      That is my memory.
6      Q.      So your memory was that prior to
7  the meeting in the office you were not told to
8  prepare a resignation?
9      A.      That is correct.
10     Q.      Who was in the office?
11            Do you recall if Fulya Metin was
12  in the office?
13     A.      No.
14     Q.      You never saw her?
15     A.      This is the same time period you
16  are talking about?
17     Q.      Yes.
18     A.      No.
19     Q.      From the time you walked into what
20  is called the waiting area then there is the
21  mayor's office you never saw Fulya Metin?
22     A.      Not at that time, no.
23     Q.      And are you telling me you don't
24  recall it or she just was not there?

**DAVID BAIN**
**November 21, 2006**

Page 26

1      A.      I don't recall it. My memory is
2  she was not there.
3      Q.      Now, when you prepared the
4  resignation who did you give it to?
5      A.      I didn't prepare the resignation.
6      Q.      Who did?
7      A.      You mean actually typing?
8      Q.      Let's say you dictated it to
9  someone, I would think, and or wrote it out and
10 typed it -- I don't know why I am putting words
11 in your mouth. Simply tell us what happened.
12         MR. NOTIS: Is there a question?
13     A.      Ask me a question.
14     Q.      The question is a resignation was
15 formulated. What did you do with respect to the
16 formulation of the resignation?
17     A.      I suggested the second sentence.
18     Q.      Did you dictate the resignation to
19 anybody?
20     A.      No.
21     Q.      Who prepared it?
22     A.      My memory is Chief Solomon
23 prepared it. Actually prepared it.
24     Q.      He actually typed it?

Page 27

1      A.      That is my memory.
2      Q.      And the words he used were your
3  words?
4      A.      I don't recall. I don't believe
5  so.
6      Q.      Well, having in mind that you had
7  discussed charter language after he finished
8  preparing it did you read it?
9      A.      Yes, I did.
10     Q.      And did it comport with the
11 language that you suggested?
12     A.      I believe it did.
13     Q.      There was nothing in that document
14 that you had not proposed?
15     A.      I did not, to my memory, draft the
16 first sentence.
17     Q.      And the first sentence is what?
18     A.      I hereby resign or whatever it
19 said.
20     Q.      And the rest of the language
21 waiving rights in general terms was a language
22 that you had used?
23     A.      That I had suggested.
24     Q.      Did he leave with that document?

Page 28

1      A.      Who?
2      Q.      Chief Solomon.
3      A.      I don't remember.
4      Q.      Well, after he typed it what
5  happened?
6      A.      My memory is, I believe, that we
7  both left and took it downstairs and gave it to
8  Maurice to look at.
9      Q.      You were present when Maurice was
10 handed it?
11     A.      I handed it to Maurice.
12     Q.      What happened?
13     A.      Maurice looked at it, signed and
14 dated it, and I signed it.
15     Q.      Was there any conversation?
16     A.      Not that I recall.
17     Q.      After it was signed what happened?
18     A.      I left. I went back up to the
19 mayor's office.
20     Q.      When you left he was just in the
21 room? Just Solomon or other people?
22     A.      Chief Solomon and Alaimo.
23     Q.      After he left did Solomon and or
24 Alaimo come back to the mayor's office?

Page 29

1      A.      You have to clarify that. Who is
2  he.
3      Q.      After Maurice Lariviere left.
4      A.      I don't know.
5      Q.      Did Solomon and or Alaimo come
6  back to the mayor's office after you had left
7  that room?
8      A.      Yes.
9      Q.      How long a time was it before they
10 came back?
11     A.      I don't know.
12     Q.      When they came back do you
13 remember being in the mayor's office?
14     A.      I don't remember.
15     Q.      Were you there?
16     A.      Yes.
17     Q.      You were there, Solomon was there,
18 Alaimo was there, and Pollard was there,
19 correct?
20     A.      That is my memory.
21     Q.      Those four people in the office.
22 No one else?
23     A.      Not that I remember.
24     Q.      Okay. Now, can you tell me what

**DAVID BAIN**
**November 21, 2006**

Page 30

1   was discussed?
2       A.   I don't have a memory of the
3   discussion at that time.
4       Q.   Well, we have already heard from a
5   previous witness that you were proposed for the
6   next city solicitor.
7           Did that conversation commence at
8   that time?
9       A.   Not that I recall.
10      Q.   When did that conversation
11  commence?
12      A.   I don't know.
13      Q.   Somebody told you that they wanted
14  you to be city solicitor.
15          MR. NOTIS: Objection.
16      Q.   Correct?
17      A.   No.
18      Q.   Nobody asked you?
19      A.   To be city solicitor?
20      Q.   Let me stop and ask it another
21  way.
22          You had an awareness that the
23  mayor wanted you to be city solicitor, correct?
24          MR. NOTIS: Objection.

Page 31

1       A.   No.
2       Q.   You had no awareness of that?
3       A.   No.
4       Q.   Did she ever discuss with you who
5   was going to be the next city solicitor?
6       A.   No.
7       Q.   Did anyone else ever discuss with
8   you who was going to be the next city solicitor?
9       A.   Not that I recall.
10      Q.   Did anyone tell you that you were
11  going to be a candidate to be the next city
12  solicitor?
13      A.   No.
14      Q.   You recall a series of news
15  articles at that time about the position,
16  correct?
17      A.   Actually, no.
18      Q.   Do you recall statements in the
19  media that the mayor wanted either you or the
20  city clerk, I forget her name, to be the city
21  solicitor?
22      A.   No.
23      Q.   Were you reading the newspaper
24  around that time?

Page 32

1       A.   I don't remember.
2       Q.   So you don't remember any
3   discussions at all that occurred at that meeting
4   in the mayor's office about who was going to
5   fill that spot?
6           THE WITNESS: Can we go off the
7   record for a second?
8           MR. DIADAMO: Sure.
9           (Discussion off the record.)
10      Q.   So that we have it on the record,
11  you do not recall any conversations at that
12  point with respect to you becoming the city
13  solicitor?
14      A.   That is correct.
15      Q.   Were there discussions about you
16  or anyone else becoming the interim city
17  solicitor?
18      A.   Yes.
19      Q.   Did you have any discussions with
20  the mayor about that position?
21      A.   Yes.
22      Q.   What were those discussions?
23      A.   I believe I said that I would do
24  the job on an interim basis to cover the city

Page 33

1   until they found somebody to do it permanent.
2       Q.   Okay. Do you recall discussions
3   that were occurring with respect to the funding
4   of the city solicitor's position?
5       A.   No.
6       Q.   Do you recall any statements that
7   the city solicitor's budget had been entirely
8   utilized and a city solicitor could not be
9   pointed?
10      A.   No.
11      Q.   Do you recall any conversations
12  that funds had been sent it Maurice Lariviere
13  which exhausted the city solicitor's budget?
14      A.   No.
15      Q.   Did you ever see the videotape in
16  this case?
17      A.   No.
18      Q.   Have you seen the MCAD
19  submissions?
20      A.   No.
21      Q.   Have you seen the federal
22  complaint?
23      A.   No.
24      Q.   Have you seen anything that

**DAVID BAIN**
**November 21, 2006**

Page 34

1  clarifies in your mind whether or not there was
2  a possible crime committed or if it was a sexual
3  harassment incident that was solely under your
4  jurisdiction?
5      A.    No.
6      Q.    Has anybody discussed with you why
7  this was a crime as opposed to something that
8  would be handled under your policy and your
9  jurisdiction?
10     A.    No.
11     Q.    Have you ever asked?
12     A.    No.
13     Q.    Have you spoken to Solomon about
14  this from February 16th until today?
15     A.    I can't answer that question.
16     Q.    You can't answer it because you
17  don't know?
18     A.    It's not specific enough.
19     Q.    Okay. I think you talked to
20  Solomon about Fulya Metin and her claims.
21     I believe so.
22     Q.    You defended the workers
23  compensation case at the outset, correct?
24     A.    That is correct.

Page 35

1      Q.    As part of that defense, I take
2  it, you talked to Solomon and Alaimo.
3          MR. NOTIS: I am going to object on
4  attorney client privilege grounds.
5          MR. DIADAMO: Once again, he did
6  not get asked what the conversation was.
7  I asked whether or not he talked to them.
8          MR. NOTIS: I am just putting the
9  objection out there.
10         MR. DIADAMO: Okay. You are not
11  instructing him not to answer?
12         MR. NOTIS: No. I am just putting
13  the objection out there.
14     A.    I don't recall speaking to them
15  about her claim concerning the compensation
16  case.
17     Q.    Well, what steps did you go
18  through to assemble the defense for the town?
19         MR. NOTIS: That I am going to
20  instruct him not to answer.
21         MR. DIADAMO: You are instructing
22  him not to answer?
23         MR. NOTIS: He is the attorney for
24  the town for the workers comp case. You

Page 36

1  are going to ask him what he did to defend
2  the case? That is privileged.
3          MR. DIADAMO: I asked him what he
4  assembled.
5          MR. NOTIS: That is privileged.
6          MR. DIADAMO: You are holding his
7  privilege?
8          MR. NOTIS: He was the attorney for
9  the city and you are asking him what he
10  did to defend the city in the workers comp
11  case. That is privileged. I'm sorry. I
12  am instructing him not to answer.
13         MR. DIADAMO: You are instructing
14  him not to answer?
15         MR. NOTIS: He can do what he
16  wants.
17     A.    I am going to do what my lawyer
18  tells me.
19     Q.    Take his advice and not answer
20  that question?
21     A.    That is correct.
22         MR. DIADAMO: I have nothing
23  further.
24         MR. GAMBACCINI: No questions.

Page 37

1          EXAMINATION BY MR. NOTIS:
2
3      Q.    Did you have any desire, Mr. Bain,
4  to be interim city solicitor?
5      A.    No.
6      Q.    Did you have any desire to be the
7  city solicitor?
8      A.    No.
9      Q.    Why not?
10     A.    I have been there and done that.
11  I worked for nine years. I was assistant city
12  attorney in Lawrence. I was very happy being
13  the human resource director.
14         MR. NOTIS: Nothing further.
15
16     (Deposition concluded at 1:30 p.m.)
17
18
19
20
21
22
23
24

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**DAVID BAIN**
**November 21, 2006**

11 (Pages 38 to 41)

---

Page 38

```
 1
 2                C E R T I F I C A T E
 3
 4        I, Linda Anne Rebello,
 5   Registered Professional Reporter and Notary
 6   Public, within and for the Commonwealth of
 7   Massachusetts do hereby certify that
 8   DAVID BAIN, the witness whose deposition
 9   is hereinbefore set forth, satisfactorily
10   identified himself, was duly sworn by
11   me, and that such deposition is a true
12   record of the testimony given by the
13   witness.
14        I further certify that I am neither
15   related to or employed by any of the parties
16   to this action, nor am I financially
17   interested in this action.
18
19        WITNESS MY HAND this 16th day of
20   December, 2006.
21
22
23   LINDA ANNE REBELLO   My commission expires:
24   Notary Public        June 28, 2007
```

Page 40

```
 1   * * * * * * * * * * * * * * *
 2   Maurice Lariviere       *
 3   vs.                     *
 4   Joseph Solomon, et al   *
 5   * * * * * * * * * * * * * *
 6
 7
 8        I, DAVID BAIN, do hereby certify,
 9   under the pains and penalties of perjury,
10   that the foregoing testimony is true and
11   accurate, to the best of my knowledge and
12   belief.
13
14        WITNESS MY HAND, this _____ day of
15   _____, 2006
16
17
18
19
20
21             DAVID BAIN
22
23
24
```

---

Page 39

```
 1   Today's date:      December 16, 2006
 2   To:            Carmine DiAdamo
 3   Copied to:   Gareth Notis, Andrew Gambaccini
 4   From:          Linda Anne Rebello
 5   Deposition of:    David Bain
 6   Taken:         November 21, 2006
 7   Action:        Maurice Lariviere vs.
 8                  Joseph Solomon, et al
 9
10        Enclosed is a copy of the deposition of
11   DAVID BAIN.  Pursuant to the Rules of
12   Civil Procedure, Mr. Bain has 30 days
13   to sign the deposition from today's date.
14        Please have Mr. Bain sign the
15   enclosed signature page.  If there are any
16   errors, please have Mr. Bain  mark the page,
17   line and error on the enclosed correction
18   sheet.
19        He should not mark the transcript itself.
20   This addendum should be forwarded to all
21   interested parties.
22        Thank you for your cooperation in this
23   matter.
24
```

Page 41

```
 1        CORRECTION SHEET
 2   DEPONENT:   David Bain
 3   CASE:     Lariviere vs. Solomon, et al
 4   DATE TAKEN:  November 21, 2006
 5   *********************************************
 6   PAGE/ LINE/  CHANGE OR CORRECTION AND REASON
 7   *********************************************
 8   ___/ ___ /_____
 9   ___/ ___ /_____
10   ___/ ___ /_____
11   ___/ ___ /_____
12   ___/ ___ /_____
13   ___/ ___ /_____
14   ___/ ___ /_____
15   ___/ ___ /_____
16   ___/ ___ /_____
17   ___/ ___ /_____
18   ___/ ___ /_____
19   ___/ ___ /_____
20   ___/ ___ /_____
21   ___/ ___ /_____
22   ___/ ___ /_____
23   ___/ ___ /_____
24   ___/ ___ /_____
```

---

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

Page 1

1           UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3                     C.A. No. 05-11579EFH

4    * * * * * * * * * * * * * * * * * * * * *

5    MAURICE LARIVIERE,                          *

6                Plaintiff                        *

7    vs.                                          *

8    JOSEPH SOLOMON, Individually and as          *

9    Chief of Police for the City of Methuen,     *

10   JOSEPH ALAIMO, Individually and as           *

11   Deputy Chief of Police for the City of       *

12   Methuen and THE CITY OF METHUEN,             *

13               Defendants                       *

14   * * * * * * * * * * * * * * * * * * * * *

15

16        DEPOSITION OF:   WILLIAM MANZI

17            DiAdamo Law Offices

18             40 Appleton Way

19          Lawrence, Massachusetts

20        November 21, 2006      10:00 a.m.

21

22

23           Linda Anne Rebello

24        Registered Professional Reporter

**WILLIAM MANZI**
**November 21, 2006**

| Page 2 | | Page 4 | |
|---|---|---|---|
| 1 | APPEARANCES: | 1 | MR. DIADAMO: I will not be asking |
| 2 | Representing the Plaintiff: | 2 | Mayor Manzi a residential address and |
| 3 | DiAdamo Law Offices | 3 | Mayor Manzi as well as his counsel agree |
| 4 | 40 Appleton Way | 4 | that if I need to subpoena him or I need |
| 5 | Lawrence, Massachusetts 01840 | 5 | to communicate with him, and I don't know |
| 6 | (978) 685-4371 | 6 | any reason why I would have to communicate |
| 7 | BY: CARMINE W. DIADAMO,ESQ. | 7 | with him directly, the notice will be sent |
| 8 | | 8 | to Attorney Notis and that will serve as |
| 9 | Representing the Defendants: | 9 | direct notice to Mayor Manzi. |
| 10 | Morrison & Mahoney | 10 | MR. NOTIS:I will accept notice. |
| 11 | 250 Summer Street | 11 | MR. DIADAMO: Peter, do you |
| 12 | Boston, Massachusetts 02210 | 12 | understand why I am doing that? |
| 13 | (617) 737-8857 | 13 | MR. MCQUILLAN: Yes, I do. |
| 14 | BY: GARETH W. NOTIS, ESQ. | 14 | - - - - |
| 15 | | 15 | STIPULATIONS |
| 16 | Representing Joseph Solomon, Joseph Alaimo, | 16 | It is hereby stipulated by and |
| 17 | and Michael Wnek | 17 | between counsel for the respective parties that |
| 18 | Reardon, Joyce & Akerson | 18 | the reading and signing of the deposition may be |
| 19 | 397 Grove Street | 19 | under the pains and penalties of perjury. |
| 20 | Worcester, Massachusetts 01605 | 20 | It is further stipulated that all |
| 21 | (508) 754-7220 | 21 | objections, except as to the form of the |
| 22 | BY: ANDREW J. GAMBACCINI | 22 | question, and all motions to strike are |
| 23 | | 23 | reserved until the time of trial. |
| 24 | Also present: Peter McQuillan | 24 | |

| Page 3 | | Page 5 | |
|---|---|---|---|
| 1 | I N D E X | 1 | WILLIAM MANZI, Deponent, having first |
| 2 | | 2 | been duly sworn, deposes and states as follows: |
| 3 | WITNESS: WILLIAM MANZI | 3 | |
| 4 | | 4 | EXAMINATION BY MR. DIADAMO: |
| 5 | EXAMINATION BY: PAGE | 5 | |
| 6 | Mr. DiAdamo 5 | 6 | Q. Tell us your name. |
| 7 | | 7 | A. William M. Manzi, III. |
| 8 | | 8 | Q. And your present position is? |
| 9 | | 9 | A. Mayor of the City of Methuen. |
| 10 | | 10 | Q. And how long have you enjoyed that |
| 11 | | 11 | position? |
| 12 | | 12 | A. I took office January 1st of this |
| 13 | | 13 | year. |
| 14 | | 14 | Q. Prior to that time had you enjoyed |
| 15 | | 15 | a position in the Town of Methuen? |
| 16 | | 16 | A. Yes. |
| 17 | | 17 | Q. What was that position? |
| 18 | | 18 | A. City councilor. |
| 19 | | 19 | Q. And how long had you served on the |
| 20 | | 20 | council prior to your election as mayor? |
| 21 | | 21 | A. I don't remember. |
| 22 | | 22 | Q. Over ten years? |
| 23 | | 23 | A. Possibly. |
| 24 | | 24 | Q. And at least in the three years |

**WILLIAM MANZI**
**November 21, 2006**

Page 6

1    prior to you being elected mayor you were a
2    member of the council, correct?
3        A.    Yes.
4        Q.    And as you were a member of the
5    council did you enjoy any position of leadership
6    on the council?
7        A.    Yes.
8        Q.    What was that?
9        A.    City council chairman.
10       Q.    When were you city council
11   chairman?
12       A.    I was city council chairman for
13   five consecutive years.  Five of my last six
14   years.
15       Q.    Would you denote what years.
16       A.    I don't remember.
17       Q.    Well, if it were five years from
18   2005 I am assuming we are talking the year 1999
19   through all of 2004, correct?
20       A.    Yes.  That would be correct, I
21   guess.
22       Q.    And there was one year during that
23   time you were not chairman of the council?
24       A.    The last year as city councilor I

Page 7

1    was not the chairman.
2        Q.    So for the year 2004 and the year
3    preceding you taking office you were not
4    chairman?
5        A.    I was not chairman for one year
6    before I took office so that would be 2005.
7        Q.    I think I misunderstood. Did you
8    take office as mayor in January 2005?
9        A.    No.  I took office in January of
10   2006.
11       Q.    Okay. I misunderstood. Now, during
12   2005 there was another council chairman.
13   Who was that?
14       A.    Michael Hennessy.
15       Q.    Now, during your term on the
16   council, and we have already said you were there
17   at least ten years, who was the Methuen town
18   solicitor?
19       A.    Maurice Lariviere.
20       Q.    And Maurice Lariviere was an
21   employee of the Town of Methuen, correct?
22       A.    Yes.
23       Q.    Who or what was the appointing
24   authority of Maurice Lariviere?

Page 8

1        A.    City council.
2        Q.    And it was the city council upon
3    which you served?
4        A.    Yes.
5        Q.    What term during his tenure in
6    office was he appointed for each time he was
7    appointed?
8        A.    It changed.  He was appointed
9    initially for a two year term and then I don't
10   recollect exactly how it was changed.  But it
11   may have been to a three year term with the idea
12   of extending the solicitor's term beyond the
13   advent of a brand new city council.
14       Q.    Now, there was a vote for his
15   reappointment, was there not, in the year 2005?
16       A.    I don't recall the year but there
17   was a vote for his reappointment.
18       Q.    Did that vote occur while you were
19   on the council?
20       A.    Yes.
21       Q.    Or while you were mayor?
22       A.    No.  While I was on the city
23   council.
24       Q.    Would it refresh your memory if I

Page 9

1    suggested to you that it occurred the last year
2    you were a councilor just prior to the time you
3    were mayor?
4        A.    No, it wouldn't refresh my memory.
5        Q.    So you don't remember when there
6    was a vote on his three year appointment?
7        A.    That is correct.
8        Q.    But you do remember there was a
9    vote?
10       A.    Yes.
11       Q.    And at the time of that vote who
12   was the mayor of Methuen?
13       A.    Sharon Pollard.
14       Q.    Were there any other candidates
15   for the position at the time he was appointed?
16       A.    No.
17       Q.    Was his appointment unanimous?
18       A.    To the best of my recollection it
19   was.
20       Q.    Did you support his appointment?
21       A.    Yes.
22       Q.    And during the term, let's say
23   from 2001 to the time you took office as mayor,
24   how did you and Maurice Lariviere get along?

**WILLIAM MANZI**
**November 21, 2006**

Page 10

1    A.    Very well.
2    Q.    Did you have any dissatisfaction
3  with any facet of his employment?
4    A.    No.
5    Q.    Were you made aware of any
6  dissatisfaction with his job performance by any
7  other city councilor during that same time?
8    A.    No.
9    Q.    You were, however, made aware of
10  dissatisfaction of his job by Sharon Pollard,
11  were you not?
12    A.    Yes.
13    Q.    When was that?
14    A.    Almost immediately upon her taking
15  office.
16    Q.    And she told you about her
17  dissatisfaction, correct?
18    A.    Yes.
19    Q.    Would you tell us what she told
20  you.  Tell me what she told you.
21        MR. NOTIS: At what point?
22        MR. DIADAMO: I am going to ask him
23    that.
24        MR. NOTIS: Do you understand the

Page 11

1    question?
2        THE WITNESS: No.
3    Q.    When did she first discuss Maurice
4  Lariviere's employment with you?
5    A.    Upon the filing of legislation by
6  myself dealing with the Historic District
7  Commission.
8    Q.    Can you give us an approximate
9  year or date that occurred?
10    A.    Within the first 30 days of her
11  being in office.
12    Q.    Did she begin office in 2001?
13    A.    I don't recall.
14    Q.    How do we refresh your memory as
15  to when her term started?
16    A.    I can't answer that.
17    Q.    Let's do it this way.  Did she
18  serve two whole terms?
19    A.    Three full terms.
20    Q.    Three full terms?
21    A.    Yes.
22    Q.    How long is a term?
23    A.    Two years service.
24    Q.    So you took office in 2006,

Page 12

1  correct?
2    A.    Yes.
3    Q.    Having in mind her term was two
4  years she was the mayor in 2004 though 2005,
5  correct?
6    A.    Yes.
7    Q.    She was the mayor in 2002, 2003,
8  correct?
9    A.    Yes.
10    Q.    And she was the mayor in 2000,
11  2001, correct?
12    A.    It makes sense.
13        MR. DIADAMO: Off the record.
14        (Discussion off the record.)
15    Q.    I want the recod to show if you
16  are off a year that we all are.
17    A.    Okay.  That is fine.  I will
18  stipulate to that.
19    Q.    But, in any event, you do recall
20  that it was her first year as mayor?
21    A.    Yes.
22    Q.    And it had to do with legislation
23  you were involved in?
24    A.    Yes.

Page 13

1    Q.    You did have a conversation with
2  her during that year about that legislation?
3    A.    Yes.
4    Q.    And the conversation occurred.
5  Her thoughts were discussed with Maurice
6  Lariviere?
7    A.    Dispute relative to a legal
8  interpretation.
9    Q.    Would you relate the conversation
10  to us, please.
11    A.    Simply a dispute between the
12  mayor's office and the solicitor relative to
13  whether the Historic District Commission and the
14  restoration have the full authority needed to be
15  commenced from scratch, to use a layman's term,
16  or whether, in fact, it could simply be done
17  legislatively by Methuen city council.  There
18  was a difference of opinion between the
19  solicitor and the mayor's office over that.
20    Q.    Was there also a difference of
21  opinion between you and the mayor's office?
22    A.    On that issue there was.
23    Q.    Had you received legal advice,
24  formally or informally, from any lawyer --

**WILLIAM MANZI**
**November 21, 2006**

Page 14

1      A.     You are getting -- I don't think
2   you finished the question but you may be getting
3   into some privileged ground here so . . .
4      Q.     The privileged ground relates to
5   conversations. Okay. I am going to ask you
6   whether or not you received any legal advice
7   with respect to your opinion or your position.
8   And I am going to ask you to answer that
9   question yes or no.
10       MR. NOTIS: I am going to instruct
11   him not to answer because you asked him
12   what his position was now you are trying
13   to get him to state whether or not the
14   advice he got was agreeable with his
15   position and I think you are trying to
16   find out what the actual advice was.
17       MR. DIADAMO: I want you to
18   respectfully spend a minute rethinking
19   that. Whether or not somebody received
20   advice has probably been asked about
21   12,000 times in depositions in the last
22   three years.
23       MR. NOTIS: I don't have a problem
24   with you asking whether or not he got

Page 15

1   legal advice but on that particular issue
2   you are getting into specifically what the
3   advice was. I am going to instruct him
4   not to answer.
5       MR. DIADAMO: I am not asking him
6   what the advice was. The question
7   specific to him is --
8       MR. NOTIS: Rephrase the question
9   and I will rethink it.
10      Q.     I asked you whether or not you
11   received any legal advice with respect to your
12   position concerning this issue. I also
13   instructed you to please answer the question yes
14   or no.
15       MR. NOTIS: Can we go off the
16   record?
17       MR. DIADAMO: Sure.
18       MR. NOTIS: I want to have a
19   meeting outside.
20       (Recess.)
21       MR. DIADAMO: Repeat the question,
22   please.
23       (Question read back.)
24      A.     Yes.

Page 16

1      Q.     From whom did you receive the
2   advice?
3      A.     Maurice Lariviere.
4      Q.     Conversely do you know whether or
5   not Mayor Pollard received any legal advice with
6   respect to that issue?
7      A.     No, I don't know.
8      Q.     When the meeting was occurring
9   among you did she make any statements concerning
10   her legal position?
11      A.     Yes.
12      Q.     What did she say?
13      A.     She said that there was a point
14   from the secretary of state William Galvin that
15   supported her position.
16      Q.     Did she show you that position?
17      A.     I believe so but I don't really
18   recall seeing it.
19      Q.     Having that in mind what position
20   were you supporting with respect to the
21   council's position?
22      A.     I filed the legislation. I
23   supported the legislation that I filed.
24      Q.     What happened to the legislation?

Page 17

1      A.     It passed as I filed it.
2      Q.     Is it in existence in Methuen
3   today?
4      A.     Yes.
5      Q.     And the legislation that is in
6   existence in Methuen today was legislation Mayor
7   Pollard had opposed and did not want in effect
8   in Methuen?
9      A.     No.
10      Q.     Explain.
11      A.     She supported the legislation.
12      Q.     What did she not support at that
13   meeting?
14      A.     The mechanism used to achieve the
15   goal.
16      Q.     What was the mechanism?
17      A.     The mechanism was a full
18   redrafting of the regulations with the attendant
19   public hearing requirements and extended time
20   period for same.
21      Q.     Did she give you a reason why she
22   wanted a different procedure?
23      A.     Yes.
24      Q.     What was the reason?

**WILLIAM MANZI**
**November 21, 2006**

Page 18

1    A.    Shorter time period.
2    Q.    And was there a reason why you
3  wanted a longer time period?
4    A.    I did not desire a longer time
5  period.
6    Q.    For what reason?
7    A.    I didn't desire a longer time
8  period.  I filed the legislation and the
9  legislation followed the law.
10    Q.    While this issue was being
11  discussed did Sharon Pollard make any comments
12  about Maurice Lariviere?
13    A.    I don't understand the question.
14    Q.    Let me ask you one general
15  question. From the year 2001 to the year 2005
16  Sharon Pollard made it clear to you that it was
17  her desire that you not accept legal positions
18  from Maurice Lariviere.
19        MR. NOTIS: Objection.  You may
20    answer.
21    A.    No.
22    Q.    Did she discuss with you her
23  position concerning legal opinions of Maurice
24  Lariviere?

Page 19

1    A.    Yes.
2    Q.    What did she say?
3    A.    Depending on the opinion.  I don't
4  follow the question.
5    Q.    Okay.
6    A.    There are many opinions written by
7  a solicitor.
8    Q.    Do any of them stand out in your
9  mind?
10    A.    No.
11    Q.    Let me direct your attention to
12  specifically one.  And that is one that had to
13  do with an accident report concerning an
14  individual in the Town of Methuen.
15    A.    Yes.
16    Q.    You do recall that?
17    A.    I do.
18    Q.    I suggest to you this was about a
19  female by the name of Ellen Bain or Ellen Bahan.
20  I don't know how to pronounce it.
21    A.    I didn't hear the question.
22    Q.    I said one of those issues related
23  to an individual in the town by the name of
24  Ellen Bahan.

Page 20

1    A.    Yes.
2    Q.    Would you relate that incident to
3  us, please.
4    A.    An accident police report
5  allegation that the report was not correct
6  requested by the mayor to the city solicitor to
7  investigate the report.
8    Q.    Who made the allegation that the
9  report was not complete or accurate?
10    A.    Ellen Bahan.
11    Q.    Who had made the report?
12    A.    The police officer.
13    Q.    Which one?
14    A.    I don't recall.
15    Q.    What was Sharon Pollard's specific
16  directive?
17    A.    As I understood it it was a
18  directive to the city solicitor to conduct an
19  investigation of the report and the allegation.
20    Q.    And at that point what was he
21  supposed to do after his investigation was
22  completed?
23    A.    File a report with the mayor.
24    Q.    About the report or changing the

Page 21

1  report?
2    A.    The request was to investigate the
3  report and investigate additional allegations
4  made by Miss Bahan.
5    Q.    Again, during the same time
6  period, 2001 through 2005, were you told
7  specifically not to accept legal opinions of the
8  city solicitor Maurice Lariviere?
9    A.    No.
10    Q.    Was there any discussions about
11  the mayor's feelings with respect to legal
12  opinions from Maurice Lariviere?
13    A.    Yes.
14    Q.    What did she discuss?
15    A.    Simply reflections on individual
16  opinions that she considered to be incorrectly
17  drawn.
18    Q.    Based on your interactions at City
19  Hall there was no doubt within your mind that
20  Sharon Pollard wanted another city solicitor.
21    A.    I can't really answer for her.
22  I know that she disagreed with much of his work.
23    Q.    You were told directly she wanted
24  him out, correct?

**WILLIAM MANZI**
**November 21, 2006**

Page 22

1    MR. NOTIS: Objection.  Go ahead.
2    A.    No.
3    Q.    Let me say one thing here.
4 Whenever I ask you a question like that it is
5 always excluding conversations from lawyers.
6 Okay?
7    A.    Yes.
8    Q.    Did any individual approach you
9 and discuss with you their feelings about
10 Maurice Lariviere?
11    A.    Yes.
12    Q.    Who?
13    A.    Many people. I don't recall who
14 specifically.  It's a political issue so
15 politicians.
16    Q.    In general terms what did they
17 tell you?
18    A.    Clear understanding that they were
19 not political sole mates.
20    Q.    And when you say they were not
21 political sole mates that would be Sharon
22 Pollard and Maurice Lariviere were not political
23 sole mates?
24    A.    That is correct.

Page 23

1    Q.    And in your position it was pretty
2 clear to you that they were not, correct?
3    A.    Yes.
4    Q.    And did you have discussions with
5 any other members, either employees or
6 apppointed officials in the town, with respect
7 to Sharon Pollard's goal to replace Maurice
8 Lariviere?
9    Answer that yes or no.
10    A.    No.
11    Q.    None whatsoever?
12    A.    I don't accept the premise.
13    Q.    You don't accept what premise?
14    A.    That there was a goal to remove
15 Maurice Lariviere.
16    If you are asking me if I had
17 conversations about that I don't accept the
18 premise.
19    Q.    Do you accept the premise without
20 those conversations that one of the goals of
21 that administration was to get rid of Maurice
22 Lariviere?
23    A.    No.  I believe they disagreed with
24 the charter with regard to the solicitor and

Page 24

1 that was how they presented it.
2    Q.    By diagreeing with the charter,
3 without putting words in your mouth, was that
4 disagreement that Sharon Pollard wanted the
5 authority to hire city solicitors and take that
6 power away from the council?
7    A.    Yes.
8    Q.    And when did that become a topic
9 of discussion?
10    A.    Almost from day one.
11    Q.    And, first of all, did she discuss
12 it with you?
13    A.    Yes.
14    Q.    What did she say to you?
15    A.    That the solicitor for the City of
16 Methuen ought to report to the mayor by charter.
17    Q.    I take it that you had an opinion
18 on that, did you not?
19    A.    I did.
20    Q.    What was that opinion?
21    A.    That the existing charter system
22 served the city well and I would not be in favor
23 of such a change.
24    Q.    Did she respond to that?

Page 25

1    A.    No.
2    Q.    To your knowledge did her position
3 ever change from the time she was elected until
4 February of 2005?
5    A.    No.
6    Q.    Did she attempt to make any moves
7 to change the charter?
8    A.    No.
9    Q.    To your personal knowledge did she
10 discuss such a charter change with other members
11 of the council?
12    A.    Not to my knowledge.
13    Q.    You never heard that at all?
14    A.    No.
15    Q.    And you don't know that she
16 approached other council members specifically on
17 that issue?
18    A.    I am not directly aware of any
19 conversations of that sort.
20    Q.    But you are indirectly aware, are
21 you not?
22    A.    No.  Honestly, no.  I am not even
23 indirectly aware.
24    Q.    Weren't you indirectly aware some

**WILLIAM MANZI**
**November 21, 2006**

Page 26

1  councilors had been spoken to by the mayor
2  specifically with respect to trying to
3  accomplish that change?
4      A.    No.
5      Q.    This is the first you are hearing
6  of it?
7      A.    Absolutely.
8      Q.    Okay. Immediately after she
9  becomes mayor how do you and he get along?
10         By he I mean Maurice Lariviere.
11     A.    Very well.
12     Q.    Were you pleased by his work?
13     A.    Yes.
14     Q.    Were there any councilors, to your
15  knowledge, who were displeased with his work?
16     A.    Overall, no.
17     Q.    Did any of them express any
18  specific dissatisfaction to you?
19     A.    About Maurice, no.
20     Q.    I would take it some of them might
21  have not liked his opinion at some time.
22     A.    That would be the only caveat.
23     Q.    Okay. Now, during your entire time
24  as an elected official up until February 2005

Page 27

1  had you heard about any dissatisfaction about
2  Maurice as the lawyer or Maurice individually?
3      A.    No.
4      Q.    Now, were you aware of any move
5  inside the council to remove him, the city
6  solicitor, during that same time period?
7      A.    No.
8      Q.    Now, were you also aware right
9  after her election up to February of a
10  relationship with Chief Solomon and Deputy Chief
11  Alaimo?
12     A.    I don't understand the question.
13     Q.    First you know that she appointed
14  Joseph Solomon Chief of Police.
15     A.    Yes.
16     Q.    When did that occur?
17     A.    I don't recall.
18     Q.    In your position as an elected
19  official at that time what happened to Bruce
20  MacDougall?
21     A.    My recollection is that he took an
22  early retirement package that was offered and
23  took the early retirement that the state
24  offered.

Page 28

1      Q.    Do you know why he did that?
2      A.    No.
3      Q.    Now, as he was doing that Joseph
4  Solomon was promoted by Sharon Pollard, correct?
5      A.    Yes.
6      Q.    Now, is this an employment that
7  goes before the council?
8      A.    Yes.
9      Q.    Did she speak to you about it?
10     A.    Yes.
11     Q.    What did she say and what did you
12  say?
13     A.    I believe at some point she
14  informed me that she was going to send up the
15  name of Joseph Solomon for confirmation as chief
16  of police.
17     Q.    What did you say?
18     A.    Okay. Send it along.
19     Q.    Were you in favor of the
20  appointment?
21     A.    I voted in favor of the
22  appointment of Solomon.
23     Q.    Were there any other candidates at
24  that time?

Page 29

1      A.    Not to my recollection.
2      Q.    Now, after that occurred, there
3  was a request, the deputy chief became
4  appointed, correct?
5      A.    Yes.
6      Q.    Did that position exist at the
7  time?
8      A.    No. Not to my recollection.
9      Q.    The position as proposed was not
10  going to be a civil service position, correct?
11     A.    That is correct.
12     Q.    Were you aware of any other
13  position, any other civil service position, in
14  the Town of Methuen during your entire term any
15  office in the Town of Methuen that similarly was
16  made outside of civil service?
17     A.    Yes.
18         MR. NOTIS: Objection.
19     Q.    Which one?
20     A.    We have created assistant to the
21  fire chief. And I believe that may be outside
22  of civil service.
23     Q.    So do you recall the Alaimo
24  appointment being made outside of civil service

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

Page 30

1  and the appointment of the deputy fire chief
2  being outside of civil service?
3       A.     I am not 100 percent sure about
4  the deputy fire chief but I am certain with
5  Alaimo.
6       Q.     Do you know when that would have
7  occurred?
8       A.     No.  I don't recall.
9       Q.     Now, up to again February of --
10            MR. NOTIS: '05.
11      Q.     I was about to say '05.
12  -- had you formerly or informally received any
13  complaints about Maurice Lariviere?
14      A.     Not to the best of my
15  recollection.
16      Q.     Did you know from the year 2001 to
17  February '05 that the mayor wanted to deminish
18  the role of Maurice Lariviere or to terminate
19  his role period?
20            MR. NOTIS: Objection.
21      A.     No.
22      Q.     This is the first time you ever
23  heard that?
24            MR. NOTIS: Objection.

Page 31

1       A.     I mean maybe you want to rephrase
2  the question.
3       Q.     Did you hear from any councilor or
4  any member of the mayor's staff or the mayor
5  that the mayor wanted to diminish the role of
6  Maurice Lariviere?
7       A.     I don't know what that means,
8  diminish the role.  It's outlined by charter.
9       Q.     But to get opinions from other
10  people because she had some fundamental
11  disagreements with him.
12      A.     I would agree that she would often
13  times seek outside legal counsel for herself.
14  I agree to that, yes.
15      Q.     And on those issues did you feel
16  that Maurice Lariviere's opinion was going to be
17  sufficient as his employer?
18      A.     Yes.
19      Q.     Did you and she ever discuss that?
20      A.     Yes.
21      Q.     Did you discuss the fact that she
22  was spending town funds to get additional
23  opinions from Maurice Lariviere's opinion?
24      A.     Yes.

Page 32

1       Q.     What did she say to you?
2       A.     She felt that she needed her own
3  representation that was answerable to the
4  mayor's office.
5       Q.     When you heard that did you ever
6  have a candid discussion with her about what her
7  problem was with Maurice?
8       A.     On a case by case basis, yes.
9       Q.     That each one of these outside
10  counsel was costing the residents money and you
11  disagreed with it, correct?
12      A.     I disagreed with the idea of
13  hiring an outside counsel on a permanent basis
14  for the mayor's office.
15      Q.     Since your constituents were
16  paying for it did you have some frank
17  discussions with her about the procedure itself?
18      A.     Yes.  Simply that the charter as
19  it was written was satisfactory to me.
20      Q.     What was her response with respect
21  to how she treated opinions of Maurice
22  Lariviere?
23      A.     On a case by case basis she agreed
24  with some, she vehemently disagreed with some.

Page 33

1       Q.     Did she ever express to you the
2  reasons for her disagreement?
3       A.     Yes.
4       Q.     What were the reasons?
5       A.     Depending on the opinion.
6       Q.     Well, first of all let's do it
7  another way.
8              Did she ever tell you she had
9  consulted with other lawyers in the town with
10  respect to opinions?
11      A.     Yes.
12      Q.     In her office there was an
13  employee by the name of David Bain?
14      A.     Not in her office.
15      Q.     Well, working for her basically.
16      A.     Yes.
17      Q.     Who was an attorney.
18      A.     Yes.
19      Q.     There was a female working in the
20  town with the job of city clerk who was an
21  attorney.
22      A.     Yes.
23      Q.     Did she every state to you she had
24  asked them for opinions and they were

**WILLIAM MANZI**
**November 21, 2006**

10 (Pages 34 to 37)

Page 34

1    contradictory to what Maurice was telling her?
2         A.    Yes.
3         Q.    Can you think of one specific
4    issue that that occurred?
5         A.    No.  Multiple occasions.
6         Q.    Many occasions, isn't it?
7         A.    Multiple.
8         Q.    This was sort of an ongoing issue
9    in the Town of Methuen.
10              MR. NOTIS: Objection.
11         A.    Yes.
12         Q.    During the course of time from
13    2001 to 2005 this was happening with more
14    frequency as opposed to less frequency.
15         A.    I don't necessarily agree with
16    that.
17         Q.    Was there any issue that she was
18    willing to take Maurice Lariviere's position on
19    if she disagreed with the issue?
20         A.    Certainly not.
21         Q.    Okay.
22         A.    When she agreed with his opinion
23    she agreed.
24         Q.    But she did consider his opinion

Page 35

1    valueless unless it was exactly the same as her
2    opinion.
3         A.    I don't know that.  I can't say
4    yes or no to that.  You would have to ask her
5    that.
6         Q.    You knew that, didn't you?
7         A.    I can't characterize what her
8    thoughts were.
9         Q.    From a practical opinion you knew
10    that.  I will ask you one more time.  I want to
11    be sure we get an answer on the record.
12              Had you been told by the mayor not
13    to use Maurice Lariviere on some opinions?
14         A.    Not to my recollection, no.
15         Q.    Now, let's talk for a moment about
16    February of 2005. First of all, to orient you as
17    to dates and get some concurrence from
18    Mr. Notis, are you aware that the resignation of
19    Maurice Lariviere was signed on February 16th?
20         A.    What is the question?
21         Q.    I said are you aware that the
22    resignation of Maurice Lariviere was signed on
23    February 16th?
24         A.    No  I am aware there is a signed

Page 36

1    resignation.  I don't recall the date.
2         Q.    You know that there was a
3    videotape taken of Maurice Lariviere and another
4    Methuen employee sometime in February.
5         A.    Yes.
6         Q.    If I suggested to you that
7    occurred on February 16th would you agree with
8    that?
9         A.    No.  I don't have any recollection
10    of the date.
11         Q.    You just know it happened?
12         A.    Yes.
13         Q.    And you knew that it happened the
14    day it happened?
15         A.    Yes.
16         Q.    Okay. So let me take you prior to
17    that day and ask you if you were aware of any
18    issues relating to Maurice Lariviere and a town
19    employee on the day before that date.
20         A.    No.
21         Q.    None whatsoever?
22         A.    No.
23         Q.    Do you recall what you were doing
24    on that date?

Page 37

1         A.    Which date?
2         Q.    The day before the day of it.
3         A.    No, I don't.
4         Q.    Now, nobody called you at all,
5    correct?
6              MR. NOTIS: When?
7              MR. DIADAMO: I said the day
8    before.
9              MR. NOTIS: We are still talking
10    about that day.
11              MR. DIADAMO: He does not want to
12    say February 16th or 15th so I am dealing
13    with the day and day before.  Okay.
14              MR. NOTIS: As long as the witness
15    understands.
16         Q.    You understand what is what I am
17    talking about?
18         A.    Yes.  I understand the issue about
19    the date. I don't understand the last question.
20         Q.    Okay.
21              MR. DIADAMO: Off the record.
22              (Discussion off the record.)
23         Q.    The day before the video was taken
24    who was council chairman?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

Page 38

1      A.      Michael Hennessy.
2      Q.      You were simply a member of the
3  council.  Did you enjoy some position?
4      A.      No position.
5      Q.      It was the date you were still
6  getting along well with Maurice Lariviere?
7      A.      Yes.
8      Q.      And he was still in the position
9  where you were accepting his legal opinions with
10  some confidence?
11      A.      Yes.
12      Q.      And that you had a personal
13  relationship in the sense you were cordial with
14  each other?
15      A.      Yes.
16      Q.      Now, on that day he was employed
17  by the Town of Methuen, correct?
18      A.      Yes.
19      Q.      And his direct employer was the
20  Methuen city council, the charter, correct?
21      A.      Yes.
22      Q.      And the Methuen city council was
23  his superior and would direct his day-to-day
24  activities, correct?

Page 39

1      A.      Through the chairman.
2      Q.      So it was the chairman who would
3  direct him either unilaterally or advise from
4  the council, correct?
5      A.      Yes.
6      Q.      What role would the mayor have
7  with respect to what he did on a day-to-day
8  basis?
9      A.      It was a substantial role.
10      Q.      What was the substantial role?
11      A.      The mayor was the CEO of the
12  community and would be responsible for answering
13  legal complaints and collective bargaining
14  issues on a day-to-day basis.  The mayor
15  interactd with the city solicitor on a
16  continuing basis.
17      Q.      And she would ask him for his
18  legal opinion, I take it.
19      A.      Yes.
20      Q.      And that was the legal opinion
21  that at times she would prefer to get from
22  somebody else, correct?
23      A.      Yes.
24      Q.      She had no role whatsoever with

Page 40

1  respect to firing or hiring, correct?
2      A.      Yes.
3      Q.      Yes, she did or?
4      A.      Excuse me.  She did not have any
5  role in hiring or firing under the Methuen city
6  charter.
7      Q.      And Chief Solomon or Deputy Chief
8  Alaimo certainly had no role with respect to the
9  hiring or firing of Maurice Lariviere?
10      A.      They did not.
11      Q.      That role was restricted simply to
12  a vote of the council?
13      A.      Yes.
14      Q.      And there was a charter provision
15  that specifically related to his removal,
16  correct?
17      A.      Yes.  To the extent that it
18  outlined the procedures for the hiring of the
19  city solicitor.  I don't recollect anything in
20  the charter that deals with the removal of the
21  city solicitor.  But that is simply a lack of
22  recollection.
23      Q.      You know there is a charter
24  provision that relates to the removal of any

Page 41

1  city employee?
2      A.      I believe that is correct.
3      Q.      And do you know whether he could
4  be removed without cause, or cause, or both?
5      A.      During the course of his tenure it
6  would be my understanding that he would need to
7  be removed for cause.  But that has never been
8  explored and so I consider it to be a legal
9  question.
10      Q.      In general terms you know that
11  removal for cause gives the employees rights in
12  the Methuen town charter.
13      A.      Not all.
14      Q.      But him.
15      A.      Identify the right.  I don't agree
16  with that.
17      Q.      The right to a hearing.
18      A.      Under what provision of the
19  charter?
20      Q.      2.14.
21      A.      I am not familiar with 2.14.
22  Could you tell me what 2.14 says.
23      Q.      You don't know?
24      A.      I am not aware he has any charter

**WILLIAM MANZI**
**November 21, 2006**

12 (Pages 42 to 45)

## Page 42

1  right to a hearing.
2      Q.    So then if somebody said to him
3  you are fired, no reason, you are not aware of
4  any rights he would have under the charter?
5      A.    No, I am not aware of any rights
6  that he has under Section 2.14.
7      Q.    Or the charter itself.
8      A.    Or the charter itself.
9      Q.    Okay. Now, with respect to what
10 was characterized as the day of the video I want
11 you to assume as true that that date is February
12 16th. I am asking you to assume those are the
13 same dates.
14          When was the first time that you
15 knew that there was an employment or criminal
16 issue related to Maurice Lariviere?
17     A.    I don't recollect.
18     Q.    The morning or the afternoon of
19 February 16th?
20     A.    No, I don't believe. My
21 recollection is that I did not know that day.
22     Q.    You did not know that day?
23     A.    My recollection is I don't recall
24 that I knew that day.

## Page 43

1      Q.    What is your recollection that you
2  did know?
3      A.    At some point after.
4      Q.    How were you made aware of it?
5      A.    I don't recollect.
6      Q.    Somebody told you it happened?
7      A.    Absolutely.
8      Q.    The next day, the 17th, Methuen
9  had no solicitor.
10     A.    That is correct.
11     Q.    So you knew by that time.
12     A.    I believe that I did.
13     Q.    Did you know prior to the time
14 that Methuen had no solicitor that something had
15 happened with respect to Maurice Lariviere?
16     A.    I knew that at some point. I
17 realized that a letter of resignation had been
18 tendered.
19     Q.    And did you know that before
20 February 17th, the day Methuen had no city
21 solicitor?
22     A.    I don't recollect when I was made
23 aware of the fact that he had signed a letter of
24 resignation.

## Page 44

1      Q.    Were you told about it or were you
2  given a copy of it?
3      A.    I was never given a copy of it.
4  I was told of it.
5      Q.    When you were told about it where
6  were you?
7      A.    I don't recollect.
8      Q.    Were you on town property?
9      A.    I don't recollect.
10     Q.    When you heard about it what did
11 you do?
12     A.    I don't recollect.
13     Q.    Do you recall calling anyone?
14     A.    No, I did not.
15     Q.    Somebody you were cordial with had
16 just resigned. Did you at least know the
17 alleged reasons why he resigned?
18     A.    At some point I was made aware of
19 that, yes.
20          MR. NOTIS: Off the record.
21          (Discussion off the record.)
22     Q.    You hear about a resignation of
23 Maurice Lariviere, you don't know whether it is
24 in person or on the phone?

## Page 45

1          You have to answer. You are
2  nodding your head.
3      A.    I am waiting for you to complete
4  the question, counselor. When you complete the
5  question I will give you a verbal answer.
6      Q.    All right. When you heard about
7  the resignation of Maurice Lariviere you don't
8  know whether or not you heard about it, first of
9  all, in person or by telephone, correct?
10     A.    That is correct.
11     Q.    You don't know who you heard it
12 from?
13     A.    That is correct.
14     Q.    You don't know where you were?
15     A.    That is correct.
16     Q.    You don't know whether or not you
17 were with somebody?
18     A.    That is correct.
19     Q.    As a result of what happened do
20 you recall whether or not you went anywhere?
21     A.    No, I don't recall.
22     Q.    Do you recall whether or not you
23 spoke to anyone?
24     A.    I don't recall.

**WILLIAM MANZI**
**November 21, 2006**

Page 46

1    Q.    So there is a person out there who
2  had been working for 25 years and you have no
3  idea what you did when you heard that?
4        A.    I don't recall.
5        Q.    When do you start recalling you
6  were doing something?
7        A.    Doing what, counselor? Rephrase
8  the question.
9        Q.    Taking any action at all with
10 respect to Maurice Lariviere, be it learning
11 more information or meeting with people.
12       A.    At some point after he tendered a
13 resignation I had a meeting with the mayor.
14       Q.    Was the meeting during the daytime
15 hours?
16       A.    Yes.
17       Q.    Was it on the day of the video or
18 the day after the video?
19       A.    It was not on the day of the
20 video.
21       Q.    Okay. So that you are at least
22 clear you met with no one on the day of the
23 video.
24       A.    Yes.

Page 47

1        Q.    In your conversations with other
2  councilors do you know if any other councilor
3  had heard about this on the date of the video?
4        A.    Not that I am aware of.
5        Q.    Now, on the next day you said that
6  you talked with the mayor.
7        A.    I did not say that. I said I met
8  with the mayor at some point after the
9  resignation was tendered.
10       Q.    Okay. Then I think, correct me if
11 I am wrong, you told me that was the day after.
12       A.    No, I did not.
13       Q.    I said correct me if I am wrong.
14       A.    You stand corrected.
15       Q.    So that you don't remember?
16       A.    I don't remember whether it was
17 the day immediately after.
18       Q.    Before meeting with her had you
19 had any discussions with any other councilors?
20       A.    Not to my recollection.
21       Q.    Well, the moment you knew it you
22 knew that a council employee was no longer a
23 council employee, correct?
24       A.    Yes.

Page 48

1        Q.    Did you discuss that with anyone?
2        A.    At some point, yes.
3        Q.    But, to your knowledge, that did
4  not occur on February 16th?
5        A.    That is correct.
6        Q.    Did you discuss it with any law
7  enforcement officials?
8        A.    Not to my recollection.
9        Q.    Did you discuss it with any
10 friends or acquaintances?
11       A.    Not to my recollection.
12       Q.    Now, at some time after the 16th
13 you met with the mayor.
14       A.    That is correct.
15       Q.    Can you give me an approximate
16 time that you met with the mayor?
17       A.    I cannot. It was a daytime
18 meeting.
19       Q.    Was it at least the same week that
20 it occurred?
21       A.    I don't recollect.
22       Q.    You know there was an immediate
23 news article about this.
24       A.    I know this was a news article.

Page 49

1        Q.    Did you speak with Maurice
2  Lariviere before or after you spoke with the
3  mayor?
4        A.    Yes.
5        Q.    Was that a telephone conversation?
6        A.    Yes. There was a telephone
7  conversation and a personal meeting both.
8        Q.    Where were you during the
9  telephone conversation? Were you at home?
10       A.    I don't recollect.
11       Q.    Okay. Would you relate the
12 telephone conversation to me.
13       A.    Just that he needed to see me and
14 that there was a problem and that he needed to
15 talk to me.
16       Q.    During that conversation minimally
17 did you know he was no longer an employee of the
18 Town of Methuen?
19       A.    I honestly don't recollect that. I
20 just don't recall if he said what had happened
21 over the phone.
22       Q.    In any event without knowing at
23 this moment what was discussed something was
24 discussed that encouraged the meeting, correct?

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

14 (Pages 50 to 53)

Page 50

1    A.    He asked me to meet with him and I
2  did.
3    Q.    And you met him where?
4    A.    In the City of Lawrence.
5    Q.    Where?
6    A.    One Mill Street.
7    Q.    Do you recall when that meeting
8  occurred?
9    A.    I do not.  Daytime is my
10  recollection.
11    Q.    If I suggested to you that that
12  meeting occurred on February 17th, the day after
13  the video date, would it refresh your
14  recollection that it occurred on that date?
15    A.    No.
16    Q.    On the day of the meeting with
17  Maurice Lariviere can you tell us what else you
18  did on that day?
19    A.    No.
20    Q.    You have no memory of anything on
21  that day except meeting with Maurice Lariviere?
22    A.    I recall meeting Maurice
23  Lariviere.
24    Q.    That is it?

Page 51

1    A.    That is all I remember.
2    Q.    Okay.  Do you remember driving your
3  car down to meet with him?
4    A.    I recollect that I drove myself
5  down to meet him, yes.
6    Q.    And you recollect that the meeting
7  occurred in the parking lot of Mill Street?
8    A.    Yes.
9    Q.    And for the record I mean a
10  restaurant called One Mill Street.
11         In the parking lot across the
12  street?
13    A.    That is correct.
14    Q.    And the meeting occurred in the
15  parking lot, not the restaurant?
16    A.    Yes.
17    Q.    The meeting occurred morning,
18  noon, or night?
19    A.    Daytime.
20    Q.    So you have no recollection of
21  whether it occurred in the morning or afternoon?
22    A.    I don't recall whether it was
23  morning or afternoon.
24    Q.    You both arrived by car?

Page 52

1    A.    Yes.
2    Q.    Which one of you left their car to
3  get in the other one's?
4    A.    I don't recollect which car we sat
5  in.
6    Q.    You don't recollect whether you
7  were in Maurice's car in the passenger's seat or
8  whether you were in your car in the driver's
9  seat?
10    A.    That is correct.  I don't
11  recollect who got out of what car.
12    Q.    At this point you have had
13  conversation with Sharon Pollard.
14    A.    I don't recollect what date I met
15  with Sharon Pollard on this.
16    Q.    I am asking you now do you have
17  any memory before this meeting over here on Mill
18  Street?
19    A.    To the best of my recollection the
20  answer to that is no.
21    Q.    Did you have any conversations
22  with Chief Solomon?
23    A.    I don't recall.
24    Q.    You are not saying it didn't

Page 53

1  happen, you simply don't recall?
2    A.    I don't recall any.
3    Q.    Do you recall any conversations
4  with Deputy Chief Alaimo?
5    A.    I don't recall any conversation
6  with Deputy Chief Alaimo.
7    Q.    You know at that time Deputy Chief
8  Alaimo's wife was employed in the mayor's
9  office?
10    A.    Yes.
11    Q.    Now, we don't know what car the
12  conversation took place in but a conversation
13  did take place?
14    A.    Yes.
15    Q.    Would you relate that conversation
16  to me.
17    A.    It was an emotional conversation
18  in which Maurice related to me what he felt had
19  happened. And really the specifics of which
20  evade me.  I mean we talked about what happened.
21  He informed me what happened.
22    Q.    I don't expect an exact
23  conversation.  I am going to ask you the
24  substance.  What did you talk about?

**WILLIAM MANZI**
**November 21, 2006**

15 (Pages 54 to 57)

Page 54

1    A.    We talked about the incident. We
2  talked about the resignation.
3    Q.    I am going to give you plenty of
4  time to talk about everything. I would like, if
5  you permit me to, to take one at a time.
6          You said you talked about the
7  substance of the incident. I was going to ask
8  you the substance of that conversation and go on
9  to your next one.
10          And I will tell you right now I am
11  going to give you all the chance you want to
12  discuss all the issues.
13    A.    Just that Maurice related to me
14  the incident as he saw it. Maurice related to
15  me things about his relationship with Fulya
16  Metin and the incident itself.
17    Q.    What in substance did he say?
18    A.    He said that he felt that he had a
19  situation arise that was a disaster for him
20  personally and that he felt that he had been
21  mistreated by the police and by the mayor.
22    Q.    During that conversation, again in
23  substance, not exactly, he told you how he had
24  proceeded his relationship with Fulya Metin

Page 55

1  prior to the videotape?
2    A.    To some degree, as far as I
3  recollect it.
4    Q.    As far as you recollect it relate
5  that to us now.
6    A.    He said that he had some sort of
7  relationship with Fulya Metin. Again, an
8  emotional conversation by him that did not
9  follow from point A to point B. He sort of
10  covered a lot of ground. But essentially he
11  felt that Fulya Metin had done him wrong. And
12  that, again, his conversation to me centered
13  primarily on the personal disaster that this
14  situation was for him and his family,
15  particularly his wife, and that the Fulya Metin
16  issue was not as it appeared and that I ought
17  not to believe everything that I was likely to
18  hear in the future.
19    Q.    He also told you in substance that
20  in his judgment he and Fulya enjoyed a warm,
21  personal, and mutual relationship prior to
22  February 16th?
23    A.    Yes.
24    Q.    His feelings were that they were

Page 56

1  both friendly?
2    A.    I believe he conveyed that to me.
3    Q.    He also conveyed to you that he
4  had some genuine affection to her?
5    A.    Yes.
6    Q.    And in his judgement she had felt
7  some genuine affection to him?
8    A.    Yes.
9    Q.    Did he relate specifically any of
10  the interactions between them prior to the
11  videotape?
12    A.    He may have during that
13  conversation though I don't recollect whether
14  that came during that conversation or later on.
15    Q.    During that conversation did he
16  relate to you they went out to lunch with some
17  frequency?
18    A.    I believe that he did during that
19  specific conversation.
20    Q.    And during that conversation he
21  also related to you, did he not, that she had
22  even bought him presents?
23    A.    I don't recollect him telling me
24  that during that conversation.

Page 57

1    Q.    Did he relate during that
2  conversation that they had been communicating
3  over the internet by E-mail?
4    A.    I believe that he did during that
5  conversation. But, again, I have no direct
6  recollection of that level of specificity.
7    Q.    Did he relate to you that she had
8  shared a wealth of personal information about
9  herself?
10    A.    During that conversation he did.
11    Q.    And did he relate to you, again in
12  substance, that he was totally shocked that she
13  had made any accusations whatsoever concerning
14  his behavior towards her?
15    A.    Yes.
16    Q.    Do you recall what he said?
17    A.    He was shocked that she had made
18  accusations against him.
19    Q.    And in that context did he tell
20  you in substance that he felt that everything
21  they had done was consensual on both their
22  parts?
23    A.    He did.
24    Q.    Incidentally, do you remember

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

Page 58

1  anything else that occurred in that
2  conversation?
3      A.    No.  It was personal at some level
4  and emotional.  But that is my best
5  recollection.
6      Q.    So there is no misunderstanding
7  you both liked each other?
8      A.    Yes.
9      Q.    I don't mean that in the past
10  tense. I mean you liked each other.
11      A.    Yes.
12      Q.    Now, do you recall anything else
13  that occurred during that conversation?
14      A.    I mean, you would have to ask me a
15  specific.
16      Q.    I am asking you specifically if
17  you recall something that stands out in your
18  mind.
19      A.    The only other thing, that he was
20  going to retain counsel.
21      Q.    Now, after that conversation
22  occurred did you tell him that you were going to
23  do anything?
24      A.    No.

Page 59

1          MR. DIADAMO: Want to take a five
2  minute break?
3          MR. NOTIS: Sure.
4          (Recess.)
5      Q.    We were discussing before the
6  short break the meeting in the One Mill Street
7  parking lot.
8          Do you recall anything else that
9  was discussed?
10      A.    Not beyond what I have related to
11  you.
12      Q.    And I take it you both left in
13  your separate cars.
14      A.    Yes.
15      Q.    And when you left where did you
16  go?
17      A.    I don't recall where I went.
18      Q.    At some point after that you did
19  have a meeting with Methuen officials, correct?
20      A.    Yes.
21      Q.    You met with the mayor?
22      A.    I did.
23      Q.    You met with the Chief of Police
24  at some point?

Page 60

1      A.    I don't recollect ever having a
2  meeting on this issue with the Chief of Police.
3      Q.    Do you recall any conversation?
4      A.    At some point I may have discussed
5  the matter with him but I don't recollect.
6      Q.    Let's start with the mayor. You
7  have left One Mill Street.  Lariviere has
8  resigned. Did you meet her on that day?
9      A.    I don't recall what day I met with
10  her.
11      Q.    Okay. When you did meet with her
12  where did you meet with her?
13      A.    In the mayor's office.
14      Q.    Who else was present other than
15  you and she?
16      A.    Chief of staff, Toody Healy.
17  Mr. Bain. I believe there were others in the
18  meeting and I don't recollect beyond Bain and
19  Healy who they were.  Those two I recall.
20      Q.    When you had that meeting did you
21  know anymore about the case than you knew when
22  you were in the parking lot at One Mill Street?
23      A.    Could you rephrase the question,
24  counselor.

Page 61

1      Q.    First of all, did anybody give you
2  anymore information with respect to the case
3  between the meeting in the parking lot?
4      A.    Not to my recollection.
5      Q.    Between the parking lot and the
6  mayor's meeting had you seen the so called video
7  of the incident?
8      A.    No.
9      Q.    When you were in the mayor's
10  office what did you discuss?
11      A.    The mayor informed me that Maurice
12  Lariviere tendered his resignation and that the
13  resignation was the result of an on going
14  investigation and that she couldn't say a whole
15  lot more about it beyond that.
16      Q.    She couldn't say a whole lot about
17  investigation that was going on relating to a
18  council employee?
19      A.    Yes.
20      Q.    That was her position?
21      A.    Yes.
22      Q.    So her position was that she was
23  going to provide you and the council with no
24  information?

**WILLIAM MANZI**
**November 21, 2006**

Page 62

1    A.    At that point she informed me that
2  he had resigned and that anything beyond that
3  she was not able to talk about at that time.
4    Q.    If I characterize, this was a very
5  short meeting.
6    A.    It was.
7    Q.    How long?
8    A.    Five, ten minutes.
9    Q.    When was the next time that you
10  met with anybody with respect to this issue?
11    A.    I don't recollect.
12    Q.    If I recollect the newspapers were
13  popping all over the place. I am assuming you
14  are hearing from some of the councilors, are
15  you?
16    A.    Yes.
17    Q.    Who are you hearing from?
18    A.    Different councilors. City
19  council chairman, other councilors.
20    Q.    Do any of them have an interest in
21  what actually happened?
22    A.    They have an interest in what
23  happened, yes.
24    Q.    And what were you as a councilor

Page 63

1  doing about it?
2    A.    There was nothing at that point
3  that we could do about it.
4    Q.    Why not?
5    A.    He had tendered a resignation.
6    Q.    So the resignation was the vehicle
7  on which you people would do nothing about it?
8    A.    I don't know that I agree with
9  that characterization.
10    Q.    What characterization would you
11  agree with?
12    A.    You put one out there and I will
13  tell you whether I agree with it or not,
14  counselor.
15    Q.    Was it the judgment of yours, as
16  far as other members of the council, that you
17  could not do anything about it because of the
18  resignation?
19    A.    No, I don't agree with that
20  either.
21    Q.    You had heard a more complete
22  version than all the councilors in the parking
23  lot of One Mill Street, correct?
24    A.    Yes.

Page 64

1    Q.    In fact, you had heard the story
2  you were sympathetic to not that you believed
3  the whole thing.
4    A.    I had heard the representation by
5  Maurice as to what he felt had happened in the
6  parking lot at One Mill Street.
7    Q.    Now, at some point this is all
8  swirling fairly quickly. Within several days
9  you saw the video?
10    A.    At some point I saw the video or
11  attempted to see the video.
12    Q.    Within a couple of days?
13    A.    I don't know that I can agree with
14  that characterization. I don't recall.
15    Q.    How did you arrange your viewing?
16    A.    To the best of my recollection I
17  was somewhere in the City of Methuen. I
18  happened upon a police officer and said that I
19  wanted to see the video. And I went into the
20  police station to attempt to look at the video.
21    Q.    Who was the officer?
22    A.    I don't recall.
23    Q.    When you went into the police
24  station who did you see?

Page 65

1    A.    I don't recall. I went in with
2  the officer that brought me in.
3    Q.    You talked to a guy, got in the
4  car, drove to the station?
5    A.    Yes.
6    Q.    Today you don't know who that
7  person is?
8    A.    I don't recollect which one of the
9  officers it was.
10    Q.    Do you know who you went up to to
11  see the video?
12    A.    I'm sorry. Repeat.
13    Q.    Who did you go up to to see the
14  video?
15    A.    I went in with the officer and
16  attempted to look at the video. The look was
17  unsuccessful.
18    Q.    What did you do to look at the
19  video?
20    A.    I went in. The video was placed
21  in a VCR. I attempted a look at it. Because of
22  a malfunction I could not completely view the
23  video. And I left after ten minutes or so of
24  attempting to view it.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

Page 66

1       Q.     There was a video operator,
2   correct? Someone running the video?
3       A.     The officer that brought me in, I
4   believe, ran the video.
5       Q.     You don't remember who that is?
6       A.     No.
7       Q.     You do know that that video had to
8   be evidence in the custody of a specific person,
9   correct?
10          MR. NOTIS: Objection.
11      A.     No. I don't recall that.
12      Q.     At some point you did see the
13  video?
14      A.     At some point I attempted to see
15  the video.
16      Q.     At some point you saw it, is that
17  correct?
18      A.     At some point I attempted to see
19  it. I never viewed a completed video,
20  counselor.
21      Q.     Which part of the video did you
22  view?
23      A.     I attempted to view the entire
24  video. There was a problem with the machinery.

Page 67

1   I was able to see some small portions of the
2   video and then after several times of attempting
3   to correct the problem I left.
4       Q.     This was all in the same day?
5       A.     Yes.
6       Q.     After that you saw the video?
7       A.     Never.
8       Q.     So that is the only time you saw
9   the video?
10      A.     That is the only time I saw the
11  video.
12      Q.     You do know that it has been
13  reported in the paper you saw the video?
14      A.     I don't recall that it was
15  reported in the paper that I saw the video.
16      Q.     What part of the video did you
17  see?
18      A.     The part that I recollect was of
19  Maurice Lariviere coming into the outer office.
20      Q.     What did you see occur?
21      A.     I saw what I would consider to be
22  an obstructed view of physical contact between
23  Mr. Lariviere and Fulya Metin.
24      Q.     An obstructed view?

Page 68

1       A.     There was a problem with the
2   video. And as best I recollect there were
3   running through the TV screen vertical jiggly
4   lines that made it difficult for me to get a
5   clear view of the video though I was able to
6   identify both parties.
7       Q.     As mayor of the City of Methuen
8   you now know that this is a significant problem
9   with an audio tape in Methuen, a blank audio
10  tape of Methuen, and now a problem with the
11  videotape in Methuen, correct?
12      A.     I don't know of any problem with
13  the videotape.
14      Q.     The one you couldn't see.
15      A.     Yes.
16      Q.     Was the problem rectified so you
17  could see it better than you saw it?
18      A.     Well, my best understanding of it
19  was that at that point that it was not a problem
20  with the tape but rather a problem with the
21  machine. And it was described to me as a
22  different type of videotape that might not
23  operate properly on a standard video play back
24  device. So at least as it was explained to me

Page 69

1   in my attempt to view it there was not so much a
2   problem with the videotape potentially with the
3   machinery we were attempting to view it with.
4       Q.     Who explained that to you?
5       A.     The person that brought me in.
6       Q.     You still don't know who that is?
7       A.     I don't recollect who that is.
8       Q.     You know every police officer in
9   Methuen by name, don't you?
10      A.     No, I do not.
11      Q.     Everyone at the rank who showed
12  you a videotape you would know them by name.
13          MR. NOTIS: Objection. Go ahead.
14      A.     It's possible. But there are
15  names that I don't know. If you are asking me
16  if I knew every one of rank counselor, the
17  answer is no. I don't fully understand your
18  question.
19      Q.     Did you ever tell anyone that you
20  saw the videotape?
21      A.     I believe, counselor, that I told
22  you that I had seen some portions of it and it
23  was obstructed in a telephone conversation I had
24  with you sometime after the viewing of the

Page 70

1  videotape.
2      Q.    Did you characterize the conduct
3  on the tape with respect to severity?
4      A.    With the caveat that I could not
5  fully view it to you directly I characterized it
6  as inappropriate contact.
7      Q.    Did you further characterize what
8  should occur as a result of the inappropriate
9  contact?
10     A.    No. Not to my recollection.
11     Q.    You viewed it once. Was there a
12  reason why you didn't view it again when you
13  could actually see it?
14     A.    No. Not that I can recollect.
15     Q.    Immediately after that the
16  political issues relating to this incident and
17  the continuation of that legal office began
18  immediately, correct?
19     A.    Yes.
20     Q.    Issue No. 1 was a dispute between
21  the mayor and the council as to who a city
22  solicitor would be, correct?
23     A.    Yes.
24     Q.    The mayor took a series of actions

Page 71

1  in an attempt to prevent the council from naming
2  a city solicitor, did she not?
3      A.    I don't agree with that
4  characterization.
5      Q.    What characterization would you
6  agree with?
7      A.    Put one forward and I will tell
8  you whether I agree with it or not.
9      Q.    First of all, she suggested a
10  person or persons for the job.
11     A.    Yes.
12     Q.    And those persons or persons were
13  not the ultimate person who was selected.
14     A.    Yes.
15     Q.    She also, maybe I am using the
16  wrong words, drained the city solicitor's budget
17  in an attempt to prevent an appointment by the
18  council.
19     A.    I don't agree with that
20  characterization because it's not possible to do
21  that.
22     Q.    Was money expended from budget
23  funds allocated to the city solicitor's office?
24     A.    I don't remember whether there

Page 72

1  were expenditures out of the funds controlled by
2  that office. In any case it would be
3  non-germane to the ultimate issue.
4      Q.    You knew it was being done germane
5  or not germane, correct?
6      A.    No. Again, I don't recollect that
7  there was were political issues. But that I
8  don't recall being one of them.
9      Q.    With respect to that specific
10  issue you had, did you not, another conversation
11  with Maurice Lariviere, correct?
12     A.    I had mulitple conversations with
13  Mr. Lariviere.
14     Q.    Well, in one conversation with
15  Mr. Lariviere you asked him why he had withdrawn
16  funds that were owed to him by the City of
17  Methuen, correct?
18     A.    I am aware that he did. I don't
19  recall asking him why, counselor.
20     Q.    You recall, to refresh your
21  memory, he told you, did he not, these were
22  direct deposits and moneies had been paid into
23  his account without his request.
24          You do recall that conversation?

Page 73

1      A.    I recall that there was an issue
2  relative to his retirement and accrued monies
3  that were there. And I recognize that there was
4  a dispute about the same. I don't agree with the
5  characterization that you just gave me.
6      Q.    What characterization would you
7  give?
8      A.    You put one forward and I will
9  tell you whether I agree with it or recollect
10  it.
11     Q.    With respect to the employment of
12  the city solicitor after that resignation there
13  was an issue as to how that person would be
14  paid. It was at least publicly referenced in
15  the newspapers, correct?
16     A.    I don't recollect an issue about
17  the payment to the city solicitor so my answer
18  is I don't recollect that as being a primary
19  issue or even a side issue.
20     Q.    You don't recollect reading
21  several articles?
22     A.    That it was a financial issue
23  relative to the naming of solicitors, no, I do
24  not.

**WILLIAM MANZI**
**November 21, 2006**

Page 74

1    Q.    About funds expended by the mayor
2  to prevent the council appointment.
3    A.    Absolutely not. You would have to
4  produce that article. I don't recall that.
5    Q.    You don't recall those articles?
6    A.    I don't.
7    Q.    Okay. Do you recall specific
8  council meetings in which the issue was
9  discussed with respect to financing the new
10 position?
11   A.    No. My recollection is that it
12 was non-germane to the issue of hiring an
13 interim solicitor which was the immediate issue
14 at hand.
15   Q.    There was discussion?
16   A.    Non-germane, counselor.
17   Q.    That was your position?
18   A.    Yes.
19   Q.    And I am asking you simply whether
20 or not there was action taken in the town that
21 made that an issue.
22   A.    Not to my recollection.
23   Q.    Who is Tom Kelly?
24   A.    City auditor.

Page 75

1    Q.    Do you remember him making
2  payments to Maurice Lariviere?
3    A.    I recall that somebody brought to
4  my attention that there were payments being made
5  to Maurice Lariviere. Whether it was Mr. Kelly
6  or not I don't recall.
7    Q.    What did you do when you heard the
8  payments were made?
9    A.    Nothing.
10   Q.    Do you recall calling Maurice
11 Lariviere or Maurice Lariviere calling you about
12 that exact issue?
13   A.    I remember having a discussion
14 with Mr. Lariviere. Again, I had multiple
15 discussions with Mr. Lariviere. At some point
16 we discussed those issues during the course of
17 one of those conversations.
18   Q.    Relate the substance of that
19 conversation, please.
20   A.    Simply that payments had been made
21 to Mr. Lariviere. And I believe that the
22 substance of the conversation was that the
23 payments by Mr. Lariviere's calculation were
24 insufficient based on his personal calculation

Page 76

1  of what they should be.
2    Q.    Was there also conversation that
3  he had not requested the payment?
4    A.    I believe so, yes.
5    Q.    Was there also conversation as to
6  why the payments were made?
7    A.    I don't recollect that, no.
8    Q.    You don't recall if there was a
9  direct order to Tom Kelly to make these
10 payments?
11   A.    If there was a direct order to Tom
12 Kelly to make those payments I would not be
13 aware of that.
14   Q.    To this day you are not aware of
15 that?
16   A.    I am not aware that there was a
17 direct order given to Tom Kelly to make those
18 payments.
19   Q.    Do you recall that there was an
20 order to Tom Kelly to make those payments?
21   A.    No, I do not.
22   Q.    This is the first time you ever
23 heard of that?
24   A.    That there was an order given to

Page 77

1  Mr. Kelly to make those payments this would be
2  the first time I heard of that.
3    Q.    Is this the first time you heard
4  that there was an attempt to take financial
5  steps on the mayor's part to prevent the
6  appointment of a city solicitor that she
7  disagreed with?
8    A.    Please rephrase that question for
9  me.
10   Q.    Do you recall that there were
11 financial steps taken by the executive branch of
12 the Town of Methuen to prevent the appointment
13 of any specific solicitor?
14   A.    The answer is no.
15   Q.    You are not aware of that?
16   A.    I am not aware of that.
17   Q.    Okay. Do you recall issues that
18 related to temporary appointments as opposed to
19 permanent?
20   A.    I remember the process that led to
21 the selection of the interim solicitor.
22   Q.    Interim?
23   A.    Yes.
24   Q.    Describe that process.

**WILLIAM MANZI**
**November 21, 2006**

21 (Pages 78 to 81)

Page 78

1      A.      The city council upon the signed
2   resignation of Mr. Lariviere moved at some point
3   after that at a meeting, regular or special, to
4   appoint Peter McQuillan as interim city
5   solicitor.
6      Q.      Was there a reason for an interim
7   as opposed to permanent?
8      A.      The interim solution was based on
9   the fact that we needed immediate help. That
10  the city council desired to exercise its
11  prerogative under the charter and that we would
12  make a full appointment after a full review of
13  any potential applicant. But in the short term
14  the city was in need of legal counsel and that
15  because of the short term needs and ability to
16  do a full blown search without the benefit of an
17  interim would not be prudent for the city.
18     Q.      You were aware, were you not, that
19  the mayor had two specific candidates that she
20  wanted placed in that position?
21     A.      On an interim basis, that is
22  correct.
23     Q.      Who were those people?
24     A.      David Bain and Tina Touma Conway.

Page 79

1      Q.      The council as a whole would not
2   support those positions, correct?
3      A.      Yes.
4      Q.      Yes, they weren't?
5      A.      I'm sorry. Yes, they would not be
6   supportive of the appointments that I just
7   referenced.
8      Q.      You have told me about about a ten
9   minute meeting in the mayor's office
10  approximately. Can you tell me whether or not
11  there was any subsequent meetings with the mayor
12  concerning the employment status of Maurice
13  Lariviere?
14     A.      I believe that that meeting was
15  the only meeting that I had specifically over
16  that subject matter with Mayor Pollard.
17     Q.      Are you aware of anybody else on
18  the council who had a meeting?
19     A.      Yes.
20     Q.      Who?
21     A.      Chairman Hennessy.
22     Q.      Do you recall approximately when
23  those meetings took place?
24     A.      I do not.

Page 80

1      Q.      Now, you have told us that you saw
2   a version of the tape that had some mechanical
3   difficulties. You have also told us you made no
4   attempt after that to see it again.
5      A.      Yes.
6      Q.      You do recall that at some point
7   all of the councilors received more information
8   with respect to what had occurred during this
9   incident?
10     A.      Yes.
11     Q.      Did the council itself ever
12  attempt to investigate what happened to its
13  employee?
14     A.      Council did not.
15     Q.      Now, I take you back to that day
16  of the video. You are not involved in it. Did
17  anybody tell you how long that videotape took
18  place?
19     A.      I don't recollect anybody talking
20  to me about the duration of the tape.
21     Q.      Somebody did talk to you, did they
22  not, about the duration of the time that Maurice
23  Lariviere was in a room talking to police
24  officials, correct?

Page 81

1      A.      I don't recollect anybody telling
2   me how long except potentially from Maurice
3   himself.
4      Q.      What did he tell you?
5      A.      I don't recollect how long Maurice
6   represented that he was in the room with the
7   police officers. But I do believe during the
8   course of the first conversation I had with him
9   that he represented a time. I just don't
10  recollect how long he told me he was in that
11  room for. But during the meeting at One Mill
12  Street I believe he told me that there was a
13  duration of time. I just don't recollect what
14  that duration was.
15     Q.      Okay. And during that time he told
16  you he was not treated very well?
17     A.      He represented that to me.
18     Q.      Did he represent to you that
19  virtually all of the time he was in that room
20  there was an effort to secure his resignation?
21     A.      He represented that to me.
22     Q.      Did anybody else give you any
23  other reason why he spent that much time in a
24  room?

**WILLIAM MANZI**
**November 21, 2006**

22 (Pages 82 to 85)

Page 82

1    A.    No, sir.
2    Q.    That is the only version you have?
3    A.    Relative to the duration of time
4  in the room that to my recollection is the only
5  explaination that I have.
6    Q.    Okay. When you spoke to him did he
7  tell you he was being offered something for a
8  resignation?
9    A.    No. Well, actually I believe that
10  he did represent that he was offered something.
11  I take that back.
12    Q.    What?
13    A.    That he would agree to resign in
14  return for the non-publicity attended with the
15  matter. That is what he represented to me.
16    Q.    Did you ever discuss that with
17  Chief Solomon ever from then until now?
18    A.    Relative to?
19    Q.    What he had told you in the
20  parking lot, true or false, the facts that you
21  said, did you ever discuss that?
22    A.    I don't recollect discussing that
23  representation by Mr. Lariviere with Chief
24  Solomon.

Page 83

1    Q.    No one ever gave you a reason of
2  why that conversation was discussed at the time,
3  whatever that time was, except a demand for
4  resignation, correct?
5    A.    Mr. Lariviere's representation to
6  me is the only one I am relying on.
7    Q.    Using the caveat of true or false?
8    A.    Yes.
9    Q.    Now, the next week did you have
10  any contact with Fulya Metin?
11    A.    No.
12    Q.    Have you ever had any contact with
13  her?
14    A.    No.
15    Q.    You know that she came back for a
16  brief period, say a day, and never came back
17  again, right?
18    A.    I am aware of that, yes.
19    Q.    Now, did you discuss that with
20  Chief Solomon?
21    A.    Fulya Metin's employment status
22  was never discussed with Chief Solomon to my
23  recollection.
24    Q.    Did you ever discuss it with

Page 84

1  anybody? Except lawyers, of course.
2    A.    Yes.
3    Q.    Who?
4    A.    City councilors.
5    Q.    What did you discuss and with
6  whom?
7    A.    I don't recall the specific city
8  couuncilors but we discussed the employment
9  status of Fulya Metin.
10    Q.    What did you discuss?
11    A.    Her status as being paid but not
12  working.
13    Q.    Did you do anything about it?
14    A.    No.
15    Q.    Based on everything you heard and
16  the statement you saw it was your judgment she
17  should be back in Methuen working, correct?
18    A.    Yes. I was not in favor of
19  payments for Fulya Metin without working.
20    Q.    At the end, the last month, you
21  were in favor of some payments, correct?
22    A.    Repeat the question.
23    Q.    She was paid a sum of money?
24    A.    At the time that you asked the

Page 85

1  question, counselor, there was no workers comp
2  claim.
3    Q.    I said in the last month.
4    A.    It's not a contradiction to the
5  first answer which your implication is. You
6  don't try to connect the two, counselor.
7    Q.    Let me put on the record there is
8  no attempt to connect the two. The next
9  question.
10         In the last month you were in
11  favor of some payments to Fulya Metin, correct?
12    A.    No. I have never been in favor of
13  payments to Fulya Metin, counselor.
14    Q.    Why were you not in favor of
15  payments to Fulya Metin?
16    A.    I was not in favor of payments to
17  Fulya Metin because I was not convinced that the
18  claim that was filed was a claim that I
19  understood to be correct.
20    Q.    So if it was up to you solely you
21  would have not paid a dime.
22    A.    Right.
23    Q.    Based on the interaction you saw
24  on that tape, and you have described the

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

**WILLIAM MANZI**
**November 21, 2006**

23 (Pages 86 to 89)

Page 86

1  condition of the tape, you would not have made
2  any payments to Fulya Metin?
3      A.    Not relevant to my decision.
4      Q.    Because based upon what you saw on
5  that tape, whatever that was, as Maurice
6  Lariviere's employer you would not have
7  discharged him, would you?
8      A.    I can't characterize that.
9      Q.    I said based upon what you saw on
10  the tape on that day, whatever condition it was
11  in, that you described on the record you would
12  not have discharged Maurice Lariviere.
13      A.    I just can't characterize that
14  because I would be advised by people that would
15  be surrounding me which would be lawyers and
16  investigators.  So we would just discuss it and
17  I would make a determination after that.  I was
18  not part of that decision so to characterize
19  that is an unfair question to me.
20      Q.    I am not characterizing.  I am
21  saying based solely on the tape that you saw you
22  would not have voted to discharge Maurice
23  Lariviere.  The question is not everything.
24          MR. NOTIS: Objection.

Page 87

1      Q.    Solely on that tape.
2          MR. NOTIS: Objection.  Asked and
3  answered.
4      Q.    Try again.  Go ahead.
5      A.    Repeat the question.
6      Q.    I said based solely on what you
7  saw on that tape, having in mind the condition
8  you have described the tape in, you would not
9  have voted to discharge Maurice Lariviere.
10      A.    Based on a faulty tape that was
11  not clear and if that was the only determinant
12  the answer is no.
13      Q.    You saw nothing on the tape based
14  on its condition that would have caused you to
15  discharge him.
16      A.    If the tape was the sole cause of
17  action based on the condition it was in I would
18  not.
19      Q.    Have you heard or seen anything
20  else from that time to today that would cause
21  you to vote for his discharge?
22      A.    No.
23          MR. DIADAMO: I have nothing
24  further.

Page 88

1          MR. GAMBACCINI: No questions.
2          MR. NOTIS: No questions.
3
4      (Deposition concluded at 12:00 p.m.)

Page 89

1
2          C E R T I F I C A T E
3
4          I, Linda Anne Rebello,
5  Registered Professional Reporter and Notary
6  Public, within and for the Commonwealth of
7  Massachusetts do hereby certify that
8  WILLIAM MANZI, the witness whose deposition
9  is hereinbefore set forth, satisfactorily
10  identified himself, was duly sworn by
11  me, and that such deposition is a true
12  record of the testimony given by the
13  witness.
14      I further certify that I am neither
15  related to or employed by any of the parties
16  to this action, nor am I financially
17  interested in this action.
18
19      WITNESS MY HAND this 16th day of
20  December, 2006.
21
22
23  LINDA ANNE REBELLO   My commission expires:
24  Notary Public        June 28, 2007

**WILLIAM MANZI**
**November 21, 2006**

Page 90

1      Today's date:      December 16, 2006
2      To:          Carmine DiAdamo
3      Copied to:    Gareh Notis, Andrew Gambaccini
4      From:        Linda Anne Rebello
5      Deposition of:    William Manzi
6      Taken:        November 21, 2006
7      Action:        Maurice Lariviere vs.
8                Joseph Solomon, et al
9
10        Enclosed is a copy of the deposition of
11    WILLIAM MANZI.  Pursuant to the Rules of
12    Civil Procedure, Mr. Manzi has 30 days
13    to sign the deposition from today's date.
14        Please have Mr. Manzi sign the
15    enclosed signature page.  If there are any
16    errors, please have Mr. Manzi mark the page,
17    line and error on the enclosed correction
18    sheet.
19        He should not mark the transcript itself.
20    This addendum should be forwarded to all
21    interested parties.
22        Thank you for your cooperation in this
23    matter.
24

Page 91

1      * * * * * * * * * * * * * *
2      Maurice Lariviere          *
3      vs.              *
4      Joseph Solomon, et al      *
5      * * * * * * * * * * * * * *
6
7
8        I, WILLIAM MANZI, do hereby certify,
9      under the pains and penalties of perjury,
10    that the foregoing testimony is true and
11    accurate,
12    to the best of my knowledge and belief.
13
14        WITNESS MY HAND, this _____ day of
15    _____, 2006
16
17
18
19
20
21        WILLIAM MANZI
22
23
24

Page 92

1          CORRECTION SHEET
2      DEPONENT:  William Manzi
3      CASE:     Lariviere vs. Solomon, et al
4      DATE TAKEN: November 21, 2006
5      *********************************************
6      PAGE/ LINE/  CHANGE OR CORRECTION AND REASON
7      *********************************************
8      ___/ ___ /_____
9      ___/ ___ /_____
10    ___/ ___ /_____
11    ___/ ___ /_____
12    ___/ ___ /_____
13    ___/ ___ /_____
14    ___/ ___ /_____
15    ___/ ___ /_____
16    ___/ ___ /_____
17    ___/ ___ /_____
18    ___/ ___ /_____
19    ___/ ___ /_____
20    ___/ ___ /_____
21    ___/ ___ /_____
22    ___/ ___ /_____
23    ___/ ___ /_____
24    ___/ ___ /_____

EXHIBIT
_8_

## EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

C- City of Methuen
Attn: Director of Human Resources
41 Pleasant Street
Methuen, MA 01844

Maurice Lariviere
c/o City of Methuen
41 Pleasant Street
Methuen, MA 01844

Person Filing Charge:      Fulya Metin
This Person (Check One):   ( ) Claims to be aggrieved
                           ( ) Is filing on behalf of
Date of Alleged Violation:   02/16/05
Place of Alleged Violation:
EEOC Charge Number:        16CA501238
MCAD Docket Number:        05BEM00777

NOTICE OF CHARGE OF DISCRIMINATION WHERE AN FEP AGENCY WILL INITIALLY
PROCESS (See Attached Information Sheet For Additional Information)

You are hereby notified that a charge of employment discrimination under
        [ ] Title VII of the Civil Rights Act of 1964
        [ ] The Age Discrimination in Employment Act of 1967 (ADEA)
        [ ] The Americans Disabilities Act (ADA)
Has been received by
[ ]   The EEOC and sent for initial processing to     MCAD
                                                      (FEP Agency)

[ ]   The Mass. Commission Against Discrimination
      (FEP) Agency and sent to the EEOC for dual filing purposes.

While the EEOC has jurisdiction (upon the expiration of any deferral requirements if this is a Title VII
or ADA Charge) to investigate this charge, EEOC may refrain from beginning an investigation and
await the issuance of the Agency's final findings and orders. These final findings and orders will be given
weight by EEOC in making its own determination as to whether or not reasonable cause exists to believe
that the allegations made in the charge are true.

You are therefore encouraged to cooperate fully with the Agency. All facts and evidence provided by
you to the Agency in the course of its proceedings will be considered by the Commission when it
reviews the Agency's final findings and orders. In many instances the Commission will take no further
action, thereby avoiding the necessity of an investigation by both the Agency and the Commission. This
likelihood is increased by your active cooperation with the Agency.

[X]   As a party to the charge, you may request that EEOC review the final decision and order of the above
      named Agency. For such a request to be honored, you must notify the Commission in writing within
      15 days of your receipt of the Agency's issuing a final finding and order. If the agency terminates
      its proceedings without issuing a final finding and order, you will be contacted further by the
      Commission. Regardless of whether the Agency or the Commission processes the charge, the
      Recordkeeping and Non-Retaliation provisions of Title VII and the ADEA as explained on the
      second page of this form apply.

For further correspondence on this matter, please use the charge number(s) shown.

[ ]   An Equal Pay Act Investigation (29 U.S.C 206(d) will be conducted by the Commission concurrently
      with the Agency's investigation of the charge.
[X]   Enclosure: Copy of the Charge

Basis of Discrimination
( ) Race        ( ) Color        ( ) Sex        ( ) Religion        ( ) National Origin

EEOC Charge Number 16CA501238, EEOC Transmittal Letter to Respondent

03/08/2005 00:46 FAX  6179946624                                                002

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | 05130077 |
| ☐ EEOC | 16CA501238 |

and EEOC

State or local Agency, if any

| NAME(Indicate Mr., Ms., Mrs.) | HOME TELEPHONE (Include Area Code) |
|---|---|
| Ms. Fulya Metin | (978) 469-5893 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 200 Morgan Drive, | Haverhill, MA 01832 | 09/26/69 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (if more than one list below.)

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE (Include Area Code) |
|---|---|---|
| City of Methuen | City of Methuen and City Solicitor | (978) 794-3234 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 41 Pleasant Street | Methuen, MA 01844 | Essex |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| Maurice Lariviere | (978) 794-3234 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 41 Pleasant Street | Methuen, MA 01844 | Essex |

CAUSE OF DISCRIMINATION BASED ON (check appropriate box(es))

☐ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ AGE
☐ RETALIATION  ☐ NATIONAL ORIGIN  ☐ DISABILITY  [XXX] OTHER (Specify) Sexual Harassment in the workplace.

| DATE DISCRIMINATION TOOK PLACE |
|---|
| EARLIEST (ADEA/EPA)  Oct. 2004    LATEST (ALL)  Feb. 2005 |
| ☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

Please see attached.

RECEIVED MAR 1 8 2005

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I declare under penalty of perjury that the foregoing is true and correct.

NOTARY - (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

3/8/05  *Fulya metin*
Date  Charging Party (Signature)

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Day, month, and year)
3/8/05  *[signature]*  my commission expires 2-25-11

EEOC FORM 5 (Test 10/94)

( ) Age             ( ) Disability        ( ) Retaliation       ( ) Other

Circumstances of alleged violation:
SEE ENCLOSED COPY OF THE CHARGE OF DISCRIMINATION (or EEOC FORM 5)

| Date | Type Name/Title of Authorized EEOC Official | Signature |
|------|---------------------------------------------|-----------|
| 3/24/2005 | Robert L. Sanders, Director | |

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FULYA METIN,                          )
                                      )
      Complainant,                )
                                      )
v.                                    )        No. 051300777
                                      )
CITY OF METHUEN and                   )
MAURICE LARIVIERE,                    )
                                      )
      Respondents.               )

## JOINT CERTIFICATION MEMORANDUM

Pursuant to 804 CMR 1.20, the parties in this case present the following joint

certification memorandum.

    1.     NAMES, ADDRESSES, TELEPHONE AND FAX NUMBERS

**A.**    **Parties**

1.    Fulya Metin
      558 New Highway
      Apt. 1A
      Hauppauge, NY  11788
      613-979-0381
      fmsailingawat@aol.com

2.    City of Methuen
      The Searles Building
      41 Pleasant St.
      Methuen, MA 01844
      (978) 983-8575
      Fax: 978-983-8981

3.    Maurice Lariviere
      16 Sunridge Rd.
      Windham, NH 03087
      613-881-5485
      Mlarlaw@gmail.com

**B.     Trial Counsel**

<u>Complainant</u>

Marsha Kazarosian
Janet Dutcher
Kazarosian Law Offices
546 Main Street
Haverhill MA 01830
(978) 372-7758
Fax: (978) 372-9299

<u>Respondent: City of Methuen</u>

David Rapaport
Laurie Alexander-Krom
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
(617) 367-2500
Fax: 617-523-6215

<u>Respondent: Maurice Lariviere</u>

Carmine W. DiAdamo
William H. DiAdamo
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271

## 2.     DEFINITION OF CLASSES

Sexual harassment/Hostile Work Environment

## 3.     STIPULATED OR AGREED-TO FACTS

1.     On October 4, 2004, Fulya Metin began working as a temporary employee with the City of Methuen (the "City").   Ms. Metin worked as an assistant to the City Solicitor, Maurice Lariviere.

2

2.    On the day she stopped working for the City, Ms. Metin was receiving a salary equivalent to approximately $41,888.08 a year, with benefits including health care, sick time and vacation pay.

3.    In December 2004, Ms. Metin was offered and accepted a full time position with the City.

4.    Mr. Lariviere's last day of employment with the City was February 16, 2005.

5.    Ms. Metin was out on paid leave on February 16th, 17th and 18th of 2005.

6.    After Mr. Lariviere resigned from his employment on February 16, 2005, Ms. Metin worked for the City on February 22nd and the morning of February 23rd in the City's Human Resources Department. Ms. Metin left work on the morning of February 23, 2005 and never returned. Although Ms. Metin was no longer actively working for the City, the City voluntarily held open her job and continued to pay Ms. Metin her salary until June 4, 2005.

7.    On May 26, 2005, Counsel for the City sent Ms. Metin's counsel a letter, requesting that Ms. Metin indicate whether she would be returning to her position as the Assistant to the City Solicitor by June 3, 2005 or to indicate if she required an accommodation due to an alleged disability or handicap.   On June 6, 2005, Counsel for the City sent Ms. Metin's counsel a second letter indicating that he had not heard back from counsel regarding Ms. Metin's return to work and that Ms. Metin's leave had expired on June 3, 2005.

8.    In June of 2005, Ms. Metin began receiving workers' compensation benefits and subsequently entered into a lump sum settlement in the total amount, less attorneys' fees, of $33,900.00.

3

9.    Maurice Lariviere authored the City's sexual harassment policy.

10.   Ms. Metin and Mr. Lariviere exchanged non-work related and work related emails with each other.

### 4.    ISSUES AND FACTS IN DISPUTE

1.    Was Ms. Metin sexually harassed by Lariviere.

2.    Was a hostile work environment created.

3.    Whether the physical contact with Mr. Lariviere was unwelcome.

   a.    The amount of lunches initiated by Ms. Metin.

   b.    The amount of lunches where Ms. Metin paid the bill.

   c.    Whether Ms. Metin voluntarily showed her tattoo to Mr. Lariviere.

   d.    Whether Ms. Metin asked Mr. Lariviere to join her gym and whether she offered to provide him with a seven day guest pass.

4.    The frequency and severity of the allegedly unwelcome conduct.

5.    Whether all of the alleged incidents were sexual in nature.

6.    Whether Ms. Metin communicated to Mr. Lariviere that the conduct was unwelcome.

7.    Whether the City offered Ms. Metin an administrative position at any other department at City Hall or at a satellite office.

8.    Whether Ms. Metin worked on Mr. Lariviere's files when she worked for the City on February 22nd and the morning of February 23rd.

9.    Whether Ms. Metin communicated to third parties that the conduct had occurred and was unwelcome.

10.   The type of investigation the City conducted.

11.   The date on which Mr. Lariviere authored the City's sexual harassment policy.

12.    Whether Mr. Lariviere's actions violated the City's sexual harassment policy.

13.    Whether the City knew or should have known that Mr. Lariviere's alleged conduct violated the City's sexual harassment policy or the laws established by the Commonwealth.

14.    Whether in the past Mr. Lariviere had engaged in sexually inappropriate conduct while employed with the City and while at work.

15.    The nature and extent of Ms. Metin's emotional distress.

16.    What other factors in Ms. Metin's life caused her emotional distress.

17.    Whether Ms. Metin was constructively terminated from her position with the City.

18.    The length of time Ms. Metin would have stayed employed with the City, if the alleged harassment by Mr. Lariviere had not occurred.

## 5.    MOTIONS

### A.    Contemplated Motions of the Complainant

1.    Motion to allow into evidence the Massachusetts Department of Workforce Development's medical records, including the IME and other doctor's reports, as well as the Department of Workforce Development's decision.

### B.    Contemplated Motions of the Respondent City of Methuen

1.    Motion in limine to exclude the Massachusetts Department of Workforce Development's Decision regarding Ms. Metin's claim for unemployment compensation and to exclude any references to the decision and or to the unemployment compensation proceedings.

2.     Motion in limine to exclude any expert opinions given by Goni Halevi and to limit her testimony to the facts regarding Ms. Metin's therapy sessions.

3.     Motion in limine to exclude the medical reports of Dr. Marcus and Dr. Braverman and the records of the Pentucket Medical Associates.

## 6.     LEGAL ARGUMENTS

**A.     Legal Arguments of the Complainant are attached hereto as <u>Exhibit A</u>.**

**B.     Legal Arguments of the Respondents are attached as <u>Exhibit B</u>.**

Because the City of Methuen did not receive the Complainant's legal arguments until the afternoon of June 13, 2007 (the day the certification memorandum was due), for purposes of responding to the Complainant's legal arguments, the City of Methuen reserves its right to submit an amendment to its legal arguments.

## 7.     PARTIES' RESPECTIVE SETTLEMENT POSITIONS

On June 8, 2007, the Complainant made a demand for $375,000.

## 8.     LIST OF WITNESSES

**A.     Joint List of Witnesses**

1.     John Molori
City of Methuen
The Searles Building
41 Pleasant St.
Methuen, MA 01844
(978) 983-8575

2.     Linda Gagnon
City of Methuen
The Searles Building
41 Pleasant St.

Methuen, MA 01844
(978) 983-8575

3.    Fulya Metin
558 New Highway
Apt. 1A
Hauppauge, NY 11788

4.    Maurice Lariviere
16 Sunridge Rd.
Windham, NH 03087

5.    David Bain
City of Methuen
The Searles Building
41 Pleasant St.
Methuen, MA 01844
(978) 983-8575

6.    Lieutenant Wnek
City of Methuen
The Searles Building
41 Pleasant St.
Methuen, MA 01844
(978) 983-8575

7.    Sharon Pollard

## B.    Complainant's List of Additional Witnesses

1.    Chief Solomon

Chief Solomon is expected to testify to the information he received regarding the harassment, the videotaping, his observations of what was taped, Mr. Lariviere's resignation and the investigation.

2.    Megan Schutte

3.    Linea Aspesi

Both Ms. Schutte and Ms. Aspesi will testify regarding the conversations they had with Ms. Metin pursuant to her complaints of sexual harassment by Mr. Lariviere and how it was affecting her.

4.   Michael Braverman, M.D.
     339 Broadway, Suite 1
     Cambridge, MA 02139

5.   Goni Halevi
     269 South Street
     Chestnut Hill, MA 02467

6.   Michael W. Marcus, M.D.
     Marcus Mental Health Associates
     82 Marlborough Street
     Boston, MA 02116

Ms. Halevi and the doctors will all testify regarding Ms. Metin's symptoms, complaints, their diagnosis and treatment as set forth in the medical records and reports previously produced.

7.   The other police officer who viewed the tape on February 16, 2005.

Is expected to testify regarding the taping and what he observed on the tape.

Complainant reserves the right to call rebuttal witnesses and to supplement her list of witnesses within 10 days of the hearing.

## C.   City of Methuen's List of Additional Witnesses

1.   Peter McQuillan
     City of Methuen
     The Searles Building
     41 Pleasant St.
     Methuen, MA 01844
     (978) 983-8575

     Will testify regarding the remedial actions taken by the City after Ms. Metin complained about Mr. Lariviere's conduct to the police. Will also testify regarding the City's workplace environment after Mr. Lariviere was forced to resign from his position.

8

2.    Kathleen Healey
      City of Methuen
      The Searles Building
      41 Pleasant St.
      Methuen, MA 01844
      (978) 983-8575

      Will testify as to the female friendly atmosphere at the City of Methuen
      and her availability to discuss with Ms. Metin any concerns she might have
      had regarding sexual harassment or Mr. Lariviere's alleged conduct.

3.    Christine Touma-Conway
      City of Methuen
      The Searles Building
      41 Pleasant St.
      Methuen, MA 01844
      (978) 983-8575

      Will testify as to the female friendly atmosphere at the City of Methuen
      and her availability to discuss with Ms. Metin any concerns she might have
      had regarding sexual harassment or Mr. Lariviere's alleged conduct.

The City of Methuen specifically reserves the right to call any witness listed by
any other party, any rebuttal witnesses and to supplement its list of witnesses
within 10 days prior to the hearing.

**D.    Maurice Lariviere's List of Additional Witnesses**

1.    Steve Coburn
      Sunridge Road
      Windham NH.

Mr. Lariviere specifically reserves the right to call any witness listed by any other
party and rebuttal witness.

## 9.    LIST OF EXHIBITS

**A.    Complainant's List of Exhibits**

1.    Deposition transcripts of all witnesses

2.    All emails between parties

3.    Tape of, on or about, 2/16/05

4.    Goni Halevi's records and bills

5.    Pentucket Medical Associates bills and records

6.    Complainant's wage and benefit history from the City

7.    Plaintiff's pay and benefit records from Geico Insurance Company

8.    Dr. Braverman's reports, records, notes and bills

9.    Department of Industrial Accident's medical records, reports filings and decision

10.   Dr. Michael W. Marcus' reports, records, and bills

11.   Department of Industrial Accidents File

12.   Gym memberships of Complainant and Respondent, Maurice Lariviere.

13.   Complainant's attorney's fees and costs.

14.   Pleadings from the United States District Court case, Lariviere v. City of Methuen, Civil Action #05-11579EFH.

Complainant reserves the right to use any of the Respondents' exhibits, rebuttal exhibits, or supplement her exhibit list within ten days of the hearing.

## B.   City of Methuen's List of Exhibits

1.    Metin's resume

2.    Ms. Metin's email to Mr. Lariviere dated 11-29-04 ("lol")

3.    Ms. Metin's email to Mr. Lariviere dated 12-05-04  ("how is your weekend going?")

4.    Ms. Metin's email to Mr. Lariviere dated 01-08-05  ("Hiiiiiiii")

5.    Ms. Metin's email to Mr. Lariviere dated 02-02-05  ("Hi Hi Hi ...Kiss")

6.    Mr. Lariviere's email to Ms. Metin dated 01-08-05  (tax returns)

7.    Mr. Lariviere's email to Ms. Metin dated 01-22-05 (offering help)

8.    Mr. Lariviere's email to Ms. Metin dated 02-01-05 (signed ArchAngel)

9.    Email exchange 01-28-05 (re Ms. Metin's mother)

10.   Ms. Metin's letter to Anthony Capanelli dated 11-23-04

11.   Anthony Capanelli's letter to Judge Haight

12.   Ms. Metin's letter to Judge Haight dated 05-16-05

13.  May 26, 2005 letter from the City's counsel to Fulya Metin's counsel regarding Ms. Metin's anticipated return to work with the City.

14.  June 6, 2005 letter from the City's counsel to Ms. Metin's counsel regarding Ms. Metin's anticipated return to work with the City.

The City reserves the right to use any of the Exhibits listed by the Complainant, rebuttal witnesses and to supplement its list of witnesses within 10 days of the hearing.

## C.    Maurice Lariviere's List of Exhibits

1.  Ms. Metin's letter to Judge Haight dated 05-16-05

2.  May 26, 2005 letter from the City's counsel to Fulya Metin's counsel regarding Ms. Metin's anticipated return to work with the City.

3.  June 6, 2005 letter from the City's counsel to Ms. Metin's counsel regarding Ms. Metin's anticipated return to work with the City.

Mr. Lariviere specifically reserves the right to offer any exhibits listed by any other party.

## 10.    PROBABLE LENGTH OF HEARING/DATES

Depending upon whether the MCAD holds half days or full day hearings, we anticipate that we will need 3-4 full days.

## 11.    LIST OF PROPOSED ISSUES TO BE CERTIFIED

1.    Was Ms. Metin subjected to unwelcome and unsolicited conduct of a sexual nature, that was severe and pervasive, and that interfered with her ability to perform her job and which constituted sexual harassment within the meaning of Mass. Gen. L. ch. 151B?

2.    Was the work environment a hostile work environment as defined under Massachusetts case law?

3.     Did Ms. Metin voluntarily resign and, if so, was it constructive discharge?

4.     The nature and extent of Ms. Metin's emotional distress damages and what portion of her emotional distress was caused by the alleged workplace harassment and/or hostile work environment?

5.     Is Ms. Metin entitled to emotional distress damages, and if so, in what amount?

6.     Is Ms. Metin entitled to damages for lost wages and benefits, and if so, in what amount?

7.     The length of time Ms. Metin would have stayed employed with the City, if the alleged harassment by Mr. Lariviere had not occurred.

8.     Did Ms. Metin properly mitigate her damages?

9.     If the Commission finds that Ms. Metin is entitled to lost wages and benefits, should the City be credited for the amount of compensation that Ms. Metin received as unemployment and/or workers' compensation?

10.     Is Ms. Metin entitled to her attorneys' fees and costs, and if so, in what amount?

Respectfully submitted by:

David Rapaport BBO# 411920
Laurie Alexander-Krom BBO # 637385
Davis, Malm & D'Agostine, P.C.
One Boston Place
Boston, MA 02108
Tel. 617 367-2500
Fax 617 305-3104
Attorneys for Respondent City of Methuen

Marsha Kazarosian
Janet Dutcher
Kazarosian Law Offices
546 Main Street
Haverhill MA 01830
(978) 372-7758
Fax: (978) 372-9299
Attorneys for Fulya Metin

Carmine W. DiAdamo
William H. DiAdamo
DiAdamo Law Office LLP
40 Appleton Way
Lawrence, MA 01840
(978) 685-4271
Attorneys for Maurice Lariviere

13

444060v.1

MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

MCAD Docket No.: 05BEM00777

|  |  |
|---|---|
| FULYA METIN,<br>   Complainant<br><br>    v.<br><br>MAURICE LARIVIERE,<br>   and<br>CITY OF METHUEN,<br>   Respondents | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINANT'S MEMORANDUM OF LAW IN SUPPORT OF HER COMPLAINT FOR DISCRIMINATION PURSUANT TO M.G.L. C. 151B

NOW COMES Fulya Metin, Complainant in the above-entitled matter, by and through her attorney, Marsha V. Kazarosian, and hereby states the following in support of her Complaint for Discrimination pursuant to M.G.L. c. 151B s. 4(16A):

### *FACTS*

Fulya Metin (hereinafter "Metin"), was 35 years old in October 2004 when she began working as a legal secretary for the City of Methuen's (hereinafter referred to as "City") City Solicitor Maurice Lariviere (hereinafter "Lariviere"). Lariviere began sexually harassing her on her fourth day of work. Metin repeatedly pleaded with him to stop his advances and even explained to him that she was very sensitive to his advances because she had been abused as a child by an older man much like Lariviere. He was not deterred and continued to sexually harass her on a daily basis, professing his love and inability to control himself around her.

KAZAROSIAN<br>LAW OFFICES<br>546 MAIN STREET<br>HAVERHILL. MA 01830<br><br>(978) 372-7758<br>FAX:<br>(978) 372-9299

1

Metin became more and more agitated and distressed, developing and experiencing physical and emotional symptoms, including but not limited to stress, depression, vulnerability, self degradation, loss of self esteem and humiliation.

Metin desperately needed her job to support her family and was not in a financial position to leave, therefore, she continued at the job, hoping that she would be able convince Lariviere to stop his advances, or that he would see that what he was doing was devastating to her. As such, she tried for as long as she could to work under these circumstances. However, in early 2005, the constant and unrelenting harassment became unbearable and she realized that she could not continue this way, but was confused and fearful about what options she had to end the abuse short of leaving her job.

Lariviere admits to authoring the City's sexual harassment policy. However, the City is not clear as to whether or not the policy had been adopted at all times relevant to this matter. In any event, it undisputed that no sexual harassment policy was ever posted, nor was it ever made available or given to Metin. Nevertheless, Metin memorialized her distress and repulsion at Lariviere's actions early on by reporting them to John Molori (hereinafter "Molori"), who worked directly with the Mayor. However, at the time that she reported the incidents to Molori, she asked him not to report the incidents because she feared losing her job.

Molori, after learning the details of the sexual harassment, chose not to report Lariviere's conduct to the Mayor or to any other person, despite his knowledge that Lariviere's conduct was a violation of the City's sexual harassment and other policies, that sexual harassment in the workplace was a violation of the law, and that Lariviere's actions put the City and Metin at risk.

KAZAROSIAN
LAW OFFICES
548 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-0299

In February 2005, Metin reported the behavior to Linda Gagnon (hereinafter "Gagnon"), who also, despite her knowledge of the fact that Lariviere's conduct was a clear violation of policy, chose not to report it to anyone in authority. However, Gagnon advised Metin that Lariviere had also sexually harassed her in the past.

On or about February 15, 2005, the situation was intolerable and Metin was no longer able to weather the continued egregious assaults and reported the conduct to the police. On February 16, 2005, as a result thereof, the police obtained the Mayor's permission to video tape Lariviere's conduct in the office. The surveillance camera was set up and that morning Lariviere's conduct around Metin was taped. However, the tape did not capture audio.

The video clearly shows many repeated, distinct and obviously unwanted incidents of sexual advances, touching, and harassment by Lariviere toward Metin for a period of approximately one and a half to two hours. After the tape was made, Lariviere resigned. Metin attempted to work for City until the end of the week. However, she was working on Lariviere's files in the office next door to where all the sexual harassment occurred. City offered her no other position. As a result, Metin left her job. City paid her until June 4, 2005, at which point City advised her that if she did not return to work as legal secretary to the City Solicitor, her pay and benefits would be terminated. At no time did City speak to Metin regarding her medical condition or about a position at City Hall.

### MCAD Jurisdiction

Pursuant to M.G.L. c. 151B s. 5, the MCAD has proper jurisdiction over this matter, as the Verified Complaint was filed pursuant to Chapter 151B.

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

3

### STATEMENT OF APPLICABLE LAW

The law in Massachusetts is well-settled pursuant to claims of sexual harassment encompassed by M.G.L. c. 151B s. 4(16A), which makes it unlawful "[f]or any employer, personally or through its agents, to sexually harass any employee."

Sexual harassment is defined as

sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature when (a) submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or a basis for employment decisions; (b) such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individuals work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment. M.G.L. c.151B s. 1(18); See *Muzzy v. Cahillane Motors, Inc.*, 434 Mass. 409, 411 (2001).

Neither the City nor Lariviere deny that the incidents occurred, but merely state that Metin  has failed to prove that the "advances, request, conduct have the purpose or effect of unreasonably interfering with performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.." GL c151B §4 (16A) because it was consensual, or "...at the very least, Metin did nothing to discourage it..." This is akin to a Not Guilty By Reason of Insanity Defense. Lariviere admits he did it, but says it wasn't his fault.

Lariviere and the City point to lunches attended by Metin, gifts given by Lariviere, e-mails, a shopping trip for ski pants, compliments given by Lariviere, etc., in an attempt to substantiate their position that the sexual groping, assaults, touches, stalking, comments and harassment were consensual and did not constitute sexual harassment. Lariviere knew or should have known that what he was doing was a violation of the law, and a fortiori, was a violation of

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

4

Metin. Lariviere knew or should have known that any sexual relationship such as the one he claims to have had with Metin, was a violation of the very City Policy authored by him.

The City is liable for a supervisor's harassment whether they had notice or not. *College-Town v. MCAD*, 400 Mass 156 (1987) citing *Zirelli v. Director of the Division of Employment Sec.* 394 Mass 229 (1985). The standard is similar to a strict liability.

The Court has repeatedly dealt with this type of argument set forth by City. In *College-Town*, the Court acknowledged that "harassment by a supervisor carries an implied threat that the supervisor will punish resistance through exercising supervisory powers......" The Court further established that "employers are liable for those on whom it confers authority." It is that very authority which was granted to the supervisor which makes him particularly able to force subordinates to submit to sexual harassment. See *College-Town* citing *Sexual Harassment Claims of Abusive Work Environment under Title VII*, 97 Harv. L. Rev. 1449 (1984) further citations omitted.

Whether or not the parties went to lunch, or whether gifts were purchased and exchanged for a holiday or event, or whether they continued to communicate with each other, is not evidence of a consensual sexual relationship. It is irrelevant as to whether or not Metin suffered unwanted touching or advances or sexual innuendo or direct assault.

Metin testified that she repeatedly asked Lariviere to stop harassing her and advised him that his continued harassment was injuring her emotionally and physically. City and Lariviere admit that in January and February of 2005, Metin complained to her co-workers about Lariviere's behavior and that on or about February 15, 2005, she reported it to the police. Her

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-0299

5

conduct is consistent with that of a person who is being sexually harassed in the workplace. It is inconsistent with the actions of a person who is engaging in a consensual sexual relationship.

It is clear that Metin desperately needed her job, was in an unfamiliar state with limited familial support, and was attempting to placate Lariviere by answering his e-mails in a friendly manner and she would appear with him in an very public location for lunch, generally in the presence of third parties. Again, these actions do not suggest to any reasonable person that Lariviere's sexual harassment was condoned or consensual.

City also admits that on February 16, 2005, it knew and witnessed Lariviere's behavior. Despite this, City never took adequate or appropriate steps to remedy the situation. City never questioned co-workers, nor ever spoke to Metin. City did not conduct an appropriate investigation. City's only response, without even speaking to Metin to determine her state of mind or whether or not she was amenable to the offer, was to place Metin in the Human Resources office (next door to Lariviere's office), and assigning her to work on Lariviere's cases. Shortly thereafter, City offered her a position as the legal secretary for the new City Solicitor, a friend of Lariviere's (again without discussing anything with Metin), and assigning her to work in the office where she had endured the horrific sexual harassment by Lariviere. They offered her not protections or explanations.

At no time did City speak with Metin to determine what job, if any, she could perform for the City in any other location other than that of the City Solicitor's office of Human Resources. City failed to take steps to properly remedy the situation.

In establishing a claim based on hostile work environment, the complaining party must show that she "worked in a sexually hostile work environment that unreasonably interfered with

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

6

her work performance." *Muzzy*, 434 Mass. at 411. It is the complainant's burden to establish that the conduct complained of was "sufficiently severe and pervasive to interfere with a reasonable person's work performance." *Id.* "A hostile work environment is defined as one 'pervaded by harassment or abuse, with resulting intimidation, humiliation, and stigmatization [that] posses a formidable barrier to the full participation of an individual in the workplace.'" *Liu v. Whitehead Institute*, 2007 WL 809798 (Mass.Super., 2007) (citing *Cuddyer v. Stop & Shop Supermarket Co.*, 343 Mass. 521, 532 (2001)). This is an all facts and circumstances test; however, the court must pay particular attention to the following factors: "(1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating rather than a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance." *Liu, supra.* (citing *Brown v. Hot, Sexy and Safer Products*, 68 F.3d. 525, 540 (1ˢᵗ Cir.1995)).

A determination of a hostile work environment is viewed according to an objective standard, meaning that the evidence of harassment is to be considered from the "view of a reasonable person in the plaintiff's position." *Muzzy*, 434 Mass at 411 (citing *Ramsdell v. Western Mass. Bus Lines, Inc.*, 415 Mass. 673, 677-78 (1993). The hostile work environment must be both objectively and subjectively offensive. *Id.* at n.2.

Clearly, based upon the above facts, a hostile work environment was created by Lariviere's sexual harassment of Metin. He subjected her repeatedly to discriminatory conduct that was humiliating and extremely offensive. The effect of this conduct was severe and made it impossible to work in the same area. Metin will testify that the emotional impact of his repeated

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

7

and constant harassment was that even after he left as City Solicitor, she could not work on his files or in his office without becoming nauseous, very nervous and suffering headaches, etc.

Once liability has been established, the MCAD has broad discretion to award remedies in order to "best effectuate the goals of G.L. c. 151B." *Conway v. Electro Switch Corp.*, 402 Mass. 385, 387 (1988). Pursuant to G.L. c.151B s. 5, the commission may "...take such affirmative action, including but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership in any respondent labor organization, as, in the judgment of the commission, will effectuate the purposes of this chapter ... In addition to any such relief, the commission shall award reasonable attorney's fees and costs to any prevailing complainant."

Compensation to the prevailing complainant for damages resulting as a natural and probable consequence of an unlawful act of discrimination may include back pay, as the statute does not expressly limit relief. See G.L. c. 151B s. 5; *Bournewood Hosp., Inc. v. MCAD,* 371 Mass. 303, 315 (1976). Pursuant to G.L. c.151B s. 5, the commission may "...take such affirmative action, including but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay ... as, in the judgment of the commission, will effectuate the purposes of this chapter."

City argues that Metin should not be awarded back pay as she voluntarily left her job or in the alternative, to recover her lost back wages, Metin must demonstrate a constructive discharge.

The Massachusetts Courts have consistently held that "A constructive discharge occurs when the employer's conduct effectively forces an employee to resign.'" *GTE Prods. Corp. v. Stewart,* 421 Mass. 22, 33-34 (1995), quoting from *Turner v. Anheuser-Busch, Inc.,* 7 Cal. 4th

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

8

1238, 1244-1245 (1994).  See *Rubin* v. *Household Commercial Financial Servs., Inc.*, 51 Mass.

App. Ct. 432, 439 (2001).  This requires "...an objective assessment..." of the conditions at work,

and a determination that "...they were so difficult as to be intolerable."  *GTE Prods. Corp.* v.

*Stewart, supra* at 34.

It is well settled law that although the employee may finally say, *"I quit,"* the employment

relationship is actually severed involuntarily by the employer's acts, against the employee's will.

As a result, a constructive discharge is legally regarded as a **firing** rather than a **resignation.**"

(Emphasis added).  *Turner* v. *Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1244--1245 (1994).

In *Salvi v. Suffolk County Sheriff's Department,* 67 Mass.App.Ct., 596 (2006), the Court

reviewed a similar case, concluding that there was sufficient evidence to establish a constructive

discharge.  The Court held that

> Although the slurs and statements made directly to the plaintiff had discontinued after the
> Chamoun incident, the cumulative impact of the persistent rumors regarding the plaintiff's
> sexual orientation, the lingering effects of the slurs and the shunning and the snickering,
> the undesirable assignments, the plaintiff's unsuccessful pursuit of administrative
> remedies, the exoneration of O'Brien and Powers, the special concerns of being isolated
> in an environment where the support of one's coworkers is critical to one's own safety,
> and the deterioration of the plaintiff's mental health attributable, at least in part, to the
> plaintiff's problems at work, *provided the jury with the necessary evidence of intolerable
> working conditions.* (Emphasis added).

The Court went on to hold that it was significant that the plaintiff's treating psychologist

advised the plaintiff not to return to work because the environment there was unduly stressful.

Metin's therapist, Dr. Halevi, testified that it was not unreasonable that Metin could not

return to City Hall to work because of the stress that she was suffering as a result of Lariviere's

sexual harassment.  Furthermore, the cumulative impact of the numerous months of sexual

harassment by Lariviere, along with the fact that City failed to ever meaningfully engage Metin

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7750
FAX:
(978) 372-9299

9

in an investigation of the incidents and failed to take appropriate action, caused the deterioration of her mental health and clearly created a constructive discharge by City.

City also argues that the back pay should be subject to mitigation or offset by the plaintiff's receipt of outside benefits.

"As a general rule, a tortfeasor's liability to an injured person shall not be reduced by the amount of compensation received by the injured. . . ." *Buckley Nursing Home, Inc. v. MCAD*, 20 Mass. App. Ct. 172 (1985). Citing *Shea v. Rattie*, 287 Mass. 454 (1934). This is referred to as the Collateral Source Rule. The Collateral Source Rule applies to insurance as well as the manner of payments such as disability and welfare. *Buckley Id.*

An exception to the Collateral Source Rule is when the injury was caused by a third party for which Defendant is not responsible. *Jones v. Wayland*, 374 Mass. 249 (1978). City alleges that the Collateral Source Rule should not apply since it did not cause the harm for which Metin received worker's compensation because they forced Lariviere to resign after they saw the tape.

There is no argument that Metin received the benefits as a result of an injury or an intervening factor. It is agreed that the benefits she received were as a result of being sexually harassed by Lariviere at work.

In its argument, City fails to take into consideration that it is responsible for the acts of Lariviere. Furthermore, as Metin sets forth, the effects of Lariviere's sexual harassment is long term. It did not disappear with the simple resignation of Lariviere. Furthermore, it was exacerbated by City's failure to properly investigate and resolve the issue.

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

10

This is not a case where a third party, independent of the City, was responsible for Metin's damages. Therefore, the Collateral Source Rule must be applied and City should not receive any credit for monies paid to Metin, including worker's compensation..

Back pay is also subject to prejudgment interest of twelve percent. The award of back pay is to be determined from the termination of employment to the hearing date. *Buckley*, Id.

An award of lost benefits may include compensation for lost pension benefits or compensation for lost medical insurance premiums. See *Ventresco v. Liberty Mut. Ins. Co.*, 55 Mass.App.Ct. 201 (2002) (lost pension); *Franklin Publishing Co. v. Massachusetts Comm'n Against Discrim.*, 25 Mass.App.Ct. 974 (1988) (lost medical insurance premiums).

When the defendant is a government entity, the prevailing plaintiff may be entitled to prejudgment interest accrued on the back pay award when it is necessary in order to fulfill the overriding purpose of G.L. c. 151B and make the plaintiff whole. *DeRoche v. Massachusetts Comm'n Against Discrimination*, 447 Mass. 1, 24-5 (2006); See also G.L. c. 151B s. 5. Public employers are not immune from this determination. *Id*. The appropriate rate of interest is twelve percent to be calculated "from the date of commencement of the action." G.L. c. 231 s.6B.

An award for front pay, for lost earnings capacity after the time of judgment is also allowable pursuant to G.L. c.151B s. 5, when necessary to make the injured party whole. *Conway v. Electro Switch Corp.*, 402 Mass. 385, 388 (1988). Similarly to back pay, this award is also subject to a duty of mitigation on the part of the plaintiff. *Id*. at 389.

The fact that the front pay award cannot be proved with absolute certainty will not bar recovery for the plaintiff, especially in those instances "where the critical focus is on the

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

11

wrongfulness of the defendant's conduct." *Conway*, 402 Mass. at 388 (citing *Datacomm Interfact, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 777 (1986)).

The complaining party has a duty to mitigate damages (*Conway v. Electro Switch Corp.*, 402 Mass. 385, 389 (1988)); however, the burden of proof to show a failure to mitigate is on the defendant-employer. In order to meet its burden, the employer must prove that... "(a) one or more discoverable opportunities for comparable employment were available in a location as convenient as, or more convenient than, the place of former employment, (b) the improperly discharged employee unreasonably made no attempt to apply for any such job, and (c) it was reasonably likely that the former employee would obtain one of those comparable jobs." Buckley, *Id.* at 185 (citing *Ryan v. Superintendent of Schs. of Quincy*, 374 Mass. 670, 673 (1978)).

In the case at bar it is agreed that Metin was earning $41,888.08/yr as a City employee with full benefits, including health care, sick time, vacation pay, etc. Her last pay check was through June 4, 2005. Metin then became employed at Geico Insurance Company on January 8, 2007, earning $31,000.00/yr. Therefore, Ms. Metin has incurred a minimum of *$62,832.12* in lost wages through January 8, 2007, and continues to incur *$10,888.00* in lost wages from that date forward.

Defendants' have failed to establish that Metin failed to mitigate her damages. As stated above, Ms Halevi testified that Metin was unable to return to work as a result of the harassment that she suffered. City points to Ms. Halevi's records that indicate that Metin was ready to return to work towards the end of their therapy sessions which ended in September 2006. Metin

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL. MA 01830

(978) 372-7758
FAX:
(978) 372-0299

became re-employed in January 2007. Clearly she did so, after becoming capable of searching for a new job and returning to work.

The MCAD also has authority to award emotional distress damages. See *College-Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrim.*, 400 Mass. 156, 169 (1987). Proof of emotional distress may be established merely through the plaintiff's testimony, so long as there is a causal relationship between the plaintiff's testimony and the employer's unlawful act. See *Boston Public Health Commission v. Massachusetts Comm'n Against Discrimination*, 67 Mass.App.Ct. 404, 413 (2006); *DeRoche*, 447 Mass. at 9-10. Other lay persons may also testify, as expert testimony is not required in order to make this showing. *Id.*

While the finding of discrimination alone no longer gives rise to the inference that the plaintiff has suffered emotional distress, the following four factors are to be considered: "(1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the complainant has suffered and reasonably expects to suffer; and (4) whether the complainant has attempted to mitigate the harm (e.g., by counseling or taking medication)." *Stonehill College v. Mass Comm'n Against Discrimination*, 441 Mass. 549 (2004); *DeRoche, id* 447 Mass. at 7.

In the case at bar it is clear that Metin suffered and continues to suffer emotional distress as a result of this matter. The independent psychiatric evaluation by Dr. Braverman confirmed Dr. Halevi's diagnosis that Metin suffered from an acute stress disorder and major depression with anxiety precipitated by the sexual harassment at work. Metin continues to suffer symptoms, including but not limited to severe depression, anxiety, insomnia, loss of appetite and stomach pain.

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

13

This is merely the medical diagnosis which attempts to describe the feelings of fear, humiliation, degradation and loss of humanity and self esteem that Metin felt each and every time an incident occurred, each and every time she would hear Lariviere coming near her, each and every time the subject of this case arose, each and every time her thoughts threw her back to the sexual harassment that she endured as a child, which exacerbated her current anxiety, depression, and emotional distress.  It is almost impossible to put into words the utter feeling of loss and self hatred suffered by Metin, which continues today as a result of Lariviere's sexual harassment and the City's inappropriate handling of same.

The MCAD "...shall award reasonable attorney's fees and costs to any prevailing complainant." G.L. c. 151B s. 5.  Unlike the judiciary, the MCAD does not have the discretion to decline an award of attorney's fees.  See G.L. c.151B s. 9.

In determining reasonable attorney's fees, both Massachusetts Courts and the MCAD apply the "lodestar" approach.  See *Baker v. Winchester Sch. Comm.*, 14 Mass. Discrim.L. Rep. 1097, 1098 (1991).  Reasonable attorney's fees are calculated by "...multiplying the number of hours reasonably spent on the case by a reasonable hourly rate."  *Fontaine v. Ebtec Corp.*, 415 Mass. 309, 324-5 (1993); *School Comm. of Norton v. Massachusetts Comm'n Against Discrim.*, 63 Mass.App.Ct. 839, 851 (2005).  The average rate in an attorney's community for similar work done by similarly experienced attorneys is the proper starting point in ultimately determining what the services are objectively worth.  *School Comm. of Norton, supra.* at 852.  The rates determined may "...differ according to the type of service performed - courtroom work, research, travel or other tasks."  *School Comm. of Norton*, 63 Mass.App.Ct. at 852 (citing *Stratos v. Department of Public Welfare*, 387 Mass. 312, 323 (1982)).  However, other factors may be

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299

14

considered such as length of trial, difficulty of issues involved, and degree of competence demonstrated by the attorney. *Fontaine,* 415 Mass. 324-5.

As a result of the egregious sexual harassment suffered by my client, and the City's failure to act appropriately and timely in this action, my client has incurred in excess of *$64,000.00* in fees and *$2,448.00* in costs through April 30, 2007.  I have attached a rough draft of the hourly billing.

<div style="margin-left:40%">

Respectfully submitted,
Fulya Metin,
By her attorney,

</div>

Date:   June 13, 2007

<div style="margin-left:40%">

Marsha V. Kazarosian, Esquire
BBO #262670
KAZAROSIAN LAW OFFICES
546 Main Street
Haverhill, MA  01830
Tel. (978) 372-775

</div>

<div align="center">

CERTIFICATE OF SERVICE

</div>

I hereby certify that a true copy of the above document was served upon David Rapaport, Esquire, attorney for City of Methuen, at Davis, Malm and D'Agostine, PC, One Boston Place, Boston, MA 02108 and Carmine DiAdamo, Esquire, attorney for Maurice Lariviere, at 40 Appleton Way, Lawrence, MA 01840 by mail on June 13, 2007.

<div style="margin-left:40%">

Marsha V. Kazarosian, Esquire

</div>

KAZAROSIAN
LAW OFFICES
546 MAIN STREET
HAVERHILL, MA 01830

(978) 372-7758
FAX:
(978) 372-9299



MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

FULYA METIN,                          )
                                      )
        Complainant,                  )
                                      )
v.                                    )        No. 051300777
                                      )
CITY OF METHUEN and                   )
MAURICE LARIVIERE,                    )
                                      )
        Respondents.                  )

## RESPONDENT'S LEGAL ARGUMENTS FOR PURPOSES OF THE CERTIFICATION MEMORANDUM

The following is the legal memorandum in support of the positions of the

Respondents, the City of Methuen and Maurice Lariviere.

### CITY OF METHUEN'S LEGAL ARGUMENTS

**I.    Ms. Metin was not constructively discharged from her employment with the City of Methuen**

Because Ms. Metin quit her job with the City, she will have to show that she was

constructively discharged from her position in order to collect any back pay award.  To

prove a constructive discharge, an employee must show that the working conditions

imposed by the employer had become so onerous, abusive, or unpleasant that a

reasonable person in the employee's position would have felt compelled to resign.

Mercado-Alicea v. P.R. Tourism Co., 396 F.3d 46, 52 (1st Cir. 2005); Luciano v. Coca-

Cola Enterprises Inc., 2004 WL 1922137 at * 2 (D. Mass. 2004) *citing* Penn. State Police

v. Suders, 542 U.S. 129 (2004) (plaintiff must show that she was exposed to an abusive

work environment so intolerable that her resignation qualified as a fitting response).

For Ms. Metin to prove that she was exposed to such an abusive work environment requires something more than the quantum of proof necessary to sustain a claim of sexual harassment or hostile work environment. Luciano at *2; see also Contardo v. Merrill Lynch, Pierce, Fenner & Smith Inc., 753 F. Supp. 406 (D. Mass. 1990) (the mere fact of discrimination, without more, is insufficient to make out a claim of constructive discharge). Whether Ms. Metin was constructively discharged is an evaluative determination made by applying an objective standard, not a state-of-mind standard. Tavares De Almeida v. The Children's Museum, 28 F. Supp. 2d 682, 686 (D. Mass. 1998). Therefore, Ms. Metin's subjective view of her work environment is irrelevant.

Ms. Metin cannot show that at the time of her resignation the working conditions were so objectively intolerable that a reasonable person would have felt compelled to resign. At the time of Ms. Metin's resignation, Mr. Lariviere was no longer working for the City and therefore Ms. Metin was no longer being subjected to his alleged workplace harassment. A reasonable person under these circumstances would have viewed Mr. Lariviere's resignation as a positive change for Ms. Metin in terms of her working environment. Objectively, her working environment became significantly better and not so abusive and intolerable so as to compel a reasonable person's resignation. See Tavares De Almeida, 28 F. Supp. 2d at 686 (no constructive discharge found in part because the plaintiff could not dispute the defendant's contention that there was no contact between the plaintiff and the alleged harasser for 19 months).

Ms. Metin's argument that she resigned because she was worried about working with Mr. Lariviere's friend, Peter McQuillan, who had become the new City Solicitor, and that she was concerned because "everyone knew so much about her" is not enough

2

to make a case of constructive discharge. There was no reason or basis for Ms. Metin to think that Mr. McQuillan would subject her to a hostile work environment. On the contrary, the City took immediate action upon receiving her complaint and was extremely supportive of her. Among other things, the City forced Mr. Lariviere's resignation, voluntarily provided her with a fourteen week paid leave of absence and gave her to the option to return to work at a different site. Compare with Salvi v. Suffolk County Sheriff's Dept., 67 Mass. App. Ct. 596, 607 (2006) (sufficient evidence of constructive discharge where there were still persistent rumors regarding the plaintiff's sexual orientation, undesirable assignments given to the plaintiff, the plaintiff's unsuccessful pursuit of administrative remedies, the plaintiff is forced to continue working with co-workers who made the slurs and shunned him because of his homosexuality, and the plaintiff had special concerns of working in a prison environment where the support of one's coworkers is critical to one's own safety).

If Ms. Metin cannot prove constructive discharge, her claim for lost wages fails. Similarly, her claim for emotional distress damages should cut off from the date she voluntarily quit her job. For example, the complainant in the case <u>Hall v. Commonwealth of Mass. Dept. of Mental Retardation</u>, 2005 WL 2994158 (2005, MCAD), was unable to show that she was constructively discharge from her employment. Accordingly, the MCAD cut off her emotional distress damages from the date she voluntarily left her employment and as a result, the complainant was not entitled to emotional distress damages related to her leaving her job in May 2000 or to the circumstances surrounding her status with the respondent after May 2000. Similarly, Ms. Metin's emotional distress damages should also be cut off beginning on

3

February 23, 2005 and the City should not be liable for any emotional distress that
Metin suffered due to the loss of her job.

## II.    Mr. Lariviere's conduct is not unwelcome by Ms. Metin

In order to establish a prima facie case of sexual harassment in the workplace,
Ms. Metin must show that she was subjected to unwelcome and unsolicited sexual
advances, resulting in an intimidating and humiliating atmosphere which interfered
with her ability to perform her job. Slomkowski v. The Donut Shop, 2002 WL 32002541
at * 3 (MCAD, November 25, 2002) citing College-Town div. of Interco, Inc. v. MCAD,
400 Mass. 156, 162 (1987).  The conduct must be sufficiently severe and pervasive and
must be objectively and subjectively offensive. Coppenrath v. Casey, 2006 WL 2139997
at *6 (MCAD, July 13, 2006) citing Ramsdell v. Western Bus Lines, Inc., 415 Mass. 673,
678 (1993).

There is clear evidence that Ms. Metin welcomed and even encouraged Mr.
Lariviere's alleged conduct towards her or, at the very least, Ms. Metin did nothing to
discourage it and did not find it offensive or unwelcome.    Ms. Metin admits that she
viewed Mr. Lariviere as a friend.  Ms. Metin and Mr. Lariviere would go out to lunch
together and, according to Ms. Metin, they would take turns buying lunch.  On one
occasion, Mr. Lariviere accompanied Ms. Metin up to New Hampshire to shop for new
ski pants.  While on this shopping trip together, Ms. Metin tried on black ski pants and
displayed them to Mr. Lariviere for his opinion.

Ms. Metin also accepted and reciprocated in an exchange of gifts with Mr.
Lariviere.  Ms. Metin testified at her deposition that Mr. Lariviere was very generous
and would often buy her flowers and candy.  Ms. Metin admitted that she never told him
to stop buying her things.  Ms. Metin also testified that Mr. Lariviere constantly told her

4

how much he liked her and how happy he was that she was there. According to Ms. Metin, "Mr. Lariviere always said nice things to me."

Ms. Metin and Mr. Lariviere would also exchange friendly emails to each other on the weekends. Ms. Metin would personalize these emails by signing them "kiss" and writing "Hi Hi Hi." In addition, Mr. Lariviere in his emails would call Ms. Metin "Yedi" and would sign his emails "Archangel." Mr. Lariviere's nickname "Archangel" originated from Ms. Metin telling him that she viewed him as a father figure and as her "archangel." The archangel reference came from the fact that Ms. Metin solicited and accepted Mr. Lariviere's help on a number of occasions. For example, Ms. Metin accepted money from Mr. Lariviere in order to purchase a medical prescription and, less than two weeks before reporting him to the police, Ms. Metin accepted help from him with regard to her mother's job search. In addition, Ms. Metin and Mr. Lariviere engaged in very personal conversations, including conversations regarding their own individual medical problems.

Finally, even though she had plenty of opportunities, Ms. Metin never reported the alleged sexual harassment to anyone until the middle of February, 2005. This was despite the fact that her office was located next door to the Human Resources Offices and a short distance from the Mayor, Sharon Pollard. The Mayor's Chief of Staff and the Town Clerk were female. Various people also advised Ms. Metin to report any problems she was having with Mr. Lariviere. In addition, the alleged harassment wasn't so severe and pervasive as to prevent Ms. Metin in December 2004 from accepting a full time position working with Mr. Lariviere, even though she allegedly was being sexually harassed, every single day, by him during the previous two months. In addition, Ms. Metin's co-workers, Linda Gagnon and John Molori, testified at their depositions that

they never witnessed the alleged harassment. They also never witnessed Ms. Metin being upset at work, even when they observed Ms. Metin interacting with Mr. Lariviere.

In conclusion, the evidence in this case portrays a mutual friendship as opposed to a subordinate, who was allegedly enduring unwelcome, offensive, sexual harassment from a superior. See Slomkowski, 2002 WL 32002541 (no hostile work environment even though the shop owner followed the complainant to her car, told her that he loved and wanted to marry her, and the complainant never complained but rather participated in the exchange of cards, letters and gifts); see also Kalil v. Philips, 2002 WL 31318593 (MCAD, September 6, 2002) (no hostile work environment where the employer continued to romantically pursue the complainant, attempted to touch her, sent her cards and notes, and became hostile towards her when she refused to accompany him to social events, but the complainant continued to call him and give him personal gifts).

### III.    Other factors in Ms. Metin's life caused her emotional distress

In the Stonehill College case, the Massachusetts Supreme Judicial Court ("SJC") clarified the considerations that the Commission should apply when making emotional distress awards. See Stonehill College v. MCAD, 441 Mass. 549 (2004). First, the SJC stressed that emotional distress damages should not be improperly considered or awarded as a substitute for punitive damages. Emotional distress damage awards, when made, should be fair and reasonable, and proportionate to the distress suffered. See Id. at 566. Each award should be case specific and should not be determined by a formula or precise reference points. Some factors that should be considered include: (1) the nature and character of the alleged harm; (2) the severity of the harm; (3) the length of time the complainant has suffered and reasonably expects to suffer; and (4) whether the complainant has attempted to mitigate the harm.  Id. Most importantly, the SJC held

6

that complainants must show a sufficient causal connection between the respondent's

unlawful act and the complainant's emotional distress. According to the SJC, emotional

distress existing from circumstances other than the actions of the respondent, or from a

condition existing prior to the unlawful act, is not compensable. Id.

With regard to Ms. Metin, there are several other factors that contribute to her

alleged emotional distress. These factors include the following:

- Ms. Metin's absent biological father and issues related to his estate;
- The sexual abuse Ms. Metin endured from her alcoholic step-father for three years;
- The abusive relationship she endured with her previous husband;
- The ongoing tumultuous relationship she had with her mother - her mother had not protected her from the abusive stepfather, and her mother was a gambler and drinker;
- Ms. Metin's living arrangements at the time – Ms. Metin called her room a "cell," had arguments with mother, and had to deal with her mother and her boyfriend's fighting and their gambling and drinking, and issues with his relationship with Ms. Metin's daughter;
- Fiancé's imprisonment;
- Single parent stresses;
- After leaving the work environment, there was unstructured time which exacerbated her depression.

Ms. Metin discussed all of these issues with Ms. Halevi during their therapy

sessions and Ms. Halevi testified that these issues predisposed Ms. Metin to the Post

Traumatic Stress Disorder from which she allegedly suffered. In addition, Ms. Metin

was able to function on a daily basis. She rose out of bed most mornings to take her

daughter to school, ice skating lessons and to gymnastics. Ms. Metin also regularly

worked out at Gold's Gym. The sum of this evidence contradicts the allegation that Ms.

Metin suffered from severe emotional distress and from PTSD allegedly caused by the

workplace harassment. <u>See</u> <u>MCAD & McGrath v. Local Union No. 12004, United</u> <u>Steelworkers of America, et. al.</u>, 2004 WL 1852966 (MCAD, 2004) (low emotional distress damages where the employee was harassed on job because of sexual orientation but had a history of his father abandoning him, an alcoholic mother, and a brother who sexually abused him).

### IV.     <u>Ms. Metin has failed to mitigate her damages</u>

In connection with her claim for lost wages, Ms. Metin has a duty to mitigate her damages.   Ms. Halevi's testified that she saw improvements in Ms. Metin's emotional state during the last three months of treatment and that Ms. Metin was ready to go back to work some time towards the end of their sessions (their therapy sessions ended September 2006).   Similarly, Ms. Halevi's therapy notes for July 2006 indicated that Ms. Metin wanted to move on and get these things over with.   Ms. Halevi also testified that Ms. Metin was putting her job search on hold until after her lawsuit had ended. Based upon this evidence, it appears that Ms. Metin should have been able to return to work at least by July 2006.

In addition, there were many opportunities for Ms. Metin to find employment. Ms. Metin had extensive skills and experience as a trader, secretary, and a legal assistant.   Accordingly, any award of lost wages should be cut off beginning in July 2006 for her failure to mitigate her damages.

**V.    Any damages accessed against the City should be offset by the amounts Ms. Metin received in worker's compensation and unemployment payments.**

The collateral source rule has been applied in the employment discrimination context under certain circumstances, but not always. For example, one exception to the collateral source rule is when the employer is not responsible for the actual injury. In Johansson v. Commonwealth Dept. of Correction, 1999 WL 33453105 (MCAD, July 19, 1999), the MCAD had found that the employer acted unlawfully and accordingly the employee was entitled to back pay, **less any** compensation she received in workers' compensation and/or other benefits during this time. See Johansson, at * 10. In Johansson, the employee, a corrections officer, had been harassed on the job by an inmate and had requested to be transferred from the site. Because her employer did not grant this transfer, the employee never returned to work and instead went on disability retirement and entered into a lump sum worker's comp settlement with the employer. The MCAD's damages formula included the deduction from back pay of any workers' comp and/or other benefits received during the lost pay time period. See also Johansson v. MCAD, 68 Mass. App. Ct. 1113 (2007) (the appeals court remanded the issues of damages back to the MCAD and cited the Commissioner's formula, which allowed for the offset in back pay with any compensation received in workers' compensation and/or other benefits received during this time).

Similarly, the City did not cause the harm for which Ms. Metin received workers' compensation. Once the City was put on notice of Mr. Lariviere's actions, the City forced him to resign. Accordingly the amounts that Ms. Metin received in workers compensation and in unemployment compensation, should be deducted from any back pay award.

9

## MAURICE LARIVIERE'S LEGAL ARGUMENTS

Mr. Lariviere similarly contests the liability and the nature and extent of Ms. Metin's injuries and accordingly, adopts the City's legal arguments as his own.  Mr. Lariviere, however, denies any liability to the City.

10

# Commonwealth of Massachusetts
## ESSEX SUPERIOR COURT
## Case Summary
## Civil Docket

## Eagle Tribune Publishing Company v Solomon

Details for Docket: ESCV2005-00523

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | ESCV2005-00523 | **Caption:** | Eagle Tribune Publishing Company v Solomon |
| **Filing Date:** | 04/01/2005 | **Case Status:** | Disposed: Appeal assembled |
| **Status Date:** | 09/28/2006 | **Session:** | Civil-CtRm 1 (Lawrence) |
| **Lead Case:** | NA | **Case Type:** | Complex |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 01/26/2006 |
| **Service Date:** | 06/30/2005 | **Disposition:** | 05/26/2006 |
| **Rule 15:** | 08/29/2005 | **Rule 12/19/20:** | 08/29/2005 |
| **Final PTC:** | 03/27/2006 | **Rule 56:** | 02/25/2006 |
| **Answer Date:** | 08/29/2005 | **Jury Trial:** | NO |

### Case Information

| | | | |
|---|---|---|---|
| **Docket Number:** | ESCV2005-00523 | **Caption:** | Eagle Tribune Publishing Company v Solomon |
| **Filing Date:** | 04/01/2005 | **Case Status:** | Disposed: Appeal assembled |
| **Status Date:** | 09/28/2006 | **Session:** | Civil-CtRm 1 (Lawrence) |
| **Lead Case:** | NA | **Case Type:** | Misc equitable remedy |

### Tracking Deadlines

| | | | |
|---|---|---|---|
| **TRK:** | F | **Discovery:** | 01/26/2006 |
| **Service Date:** | 06/30/2005 | **Disposition:** | 05/26/2006 |
| **Rule 15:** | 08/29/2005 | **Rule 12/19/20:** | 08/29/2005 |
| **Final PTC:** | 03/27/2006 | **Rule 56:** | 02/25/2006 |
| **Answer Date:** | 08/29/2005 | **Jury Trial:** | NO |

## Parties Involved

4 Parties Involved in Docket: ESCV2005-00523

| | | | |
|---|---|---|---|
| **Party Involved:** | | **Role:** | Defendant |
| **Last Name:** | Solomon | **First Name:** | Joseph E |

| | | | |
|---|---|---|---|
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |
| | | | |
| **Party Involved:** | | **Role:** | Defendant/intervenor |
| **Last Name:** | Metin | **First Name:** | Fulya |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |
| | | | |
| **Party Involved:** | | **Role:** | Other interested party |
| **Last Name:** | DiAdamo, Esq. | **First Name:** | Carmine W. |
| **Address:** | DiAdamo Law Office LLP | **Address:** | 40 Appleton Way |
| **City:** | Lawrence | **State:** | MA |
| **Zip Code:** | 01840 | **Zip Ext:** | |
| **Telephone:** | | | |
| | | | |
| **Party Involved:** | | **Role:** | Plaintiff |
| **Last Name:** | Eagle Tribune Publishing Company | **First Name:** | |
| **Address:** | | **Address:** | |
| **City:** | | **State:** | |
| **Zip Code:** | | **Zip Ext:** | |
| **Telephone:** | | | |

## Attorneys Involved

4 Attorneys Involved for Docket: ESCV2005-00523

| | | | |
|---|---|---|---|
| **Attorney Involved:** | | **Firm Name:** | CARU01 |
| **Last Name:** | Caruso | **First Name:** | Peter J |
| **Address:** | 1 Elm Square | **Address:** | |
| **City:** | Andover | **State:** | MA |
| **Zip Code:** | 01810 | **Zip Ext:** | |
| **Telephone:** | 978-475-2200 | **Tel Ext:** | |
| **Fascimile:** | 978-475-1001 | **Representing:** | Eagle Tribune Publishing Company, (Plaintiff) |
| | | | |
| **Attorney Involved:** | | **Firm Name:** | DAVI01 |

| Last Name: | Mickiewicz | First Name: | Kenneth J |
|---|---|---|---|
| Address: | 1 Boston Place | Address: | |
| City: | Boston | State: | MA |
| Zip Code: | 02108 | Zip Ext: | |
| Telephone: | 617-367-2500 | Tel Ext: | |
| Fascimile: | 617-523-6215 | Representing: | Solomon, Joseph E (Defendant) |

| Attorney Involved: | | Firm Name: | KAZA01 |
|---|---|---|---|
| Last Name: | Kazarosian | First Name: | Marsha V |
| Address: | 546 Main Street | Address: | |
| City: | Haverhill | State: | MA |
| Zip Code: | 01830 | Zip Ext: | |
| Telephone: | 978-372-7758 | Tel Ext: | |
| Fascimile: | 978-372-9299 | Representing: | Metin, Fulya (Defendant/intervenor) |

| Attorney Involved: | | Firm Name: | |
|---|---|---|---|
| Last Name: | McQuillan | First Name: | Peter J |
| Address: | Searles Building, Room 311 | Address: | 41 Pleasant Street |
| City: | Methuen | State: | MA |
| Zip Code: | 01844 | Zip Ext: | |
| Telephone: | 978-983-8575 | Tel Ext: | |
| Fascimile: | 978-983-8991 | Representing: | Solomon, Joseph E (Defendant) |

## Calendar Events

10 Calendar Events for Docket: ESCV2005-00523

| No. | Event Date: | Event Time: | Calendar Event: | SES: | Event Status: |
|---|---|---|---|---|---|
| 1 | 04/14/2005 | 14:00 | Motion/Hearing: prel inj | C | Event rescheduled by court prior to date |
| 2 | 04/21/2005 | 14:00 | Motion/Hearing: prel inj | C | Event held as scheduled |
| 3 | 04/21/2005 | 14:00 | Motion/Hearing: miscellaneous | C | Event held as scheduled |
| 4 | 02/14/2006 | 14:00 | Motion/Hearing: Rule12 to Dismiss | C | Event held as scheduled |
| 5 | 04/11/2006 | 14:00 | Conf: final pre-trial | C | Event continues over Multiple Days |
| 6 | 04/13/2006 | 14:00 | Conf: final pre-trial | C | Event held as scheduled |
| 7 | 05/11/2006 | 14:00 | Motion/Hearing: miscellaneous | C | Event held as scheduled |
| 8 | 06/01/2006 | 14:00 | Conf: litigation contrl | C | Event canceled not re-scheduled |
| 9 | 06/08/2006 | 09:00 | TRIAL: by jury | C | Event canceled not re-scheduled |

| 10 | 06/29/2006 | 14:00 | Motion/Hearing: Rule56 | C | Event held as scheduled |

## Full Docket Entries

107 Docket Entries for Docket: ESCV2005-00523

| Entry Date: | Paper No: | Docket Entry: |
|---|---|---|
| 04/01/2005 | 1 | Complaint & civil action cover sheet filed |
| 04/01/2005 | | Origin 1, Type D99, Track F. |
| 04/01/2005 | 2 | Plaintiff Eagle Tribune Publishing Company's MOTION for Preliminary |
| 04/01/2005 | 2 | Injunction w/Supporting Memorandum |
| 04/01/2005 | | Notice sent to appear on April 14, 2005 for a hearing on Preliminary |
| 04/01/2005 | | Injunction |
| 04/01/2005 | 3 | Plaintiff Eagle Tribune Publishing Company's MOTION to consolidate of |
| 04/01/2005 | 3 | hearing with trial merits. |
| 04/01/2005 | 4 | Plff's motion to request hearing date |
| 04/11/2005 | | Notice sent to appear on April 21, 2005 for a hearing on Preliminary |
| 04/11/2005 | | Injunction |
| 04/14/2005 | 5 | SERVICE RETURNED: Joseph E Solomon(Defendant) |
| 04/14/2005 | 6 | SERVICE RETURNED (order of notice): Joseph E Solomon |
| 04/14/2005 | 7 | Assented to MOTION to continue hearing date to 4/21/05 at 2 pm |
| 04/14/2005 | | MOTION (P#7) ALLOWED scheduled to 4/21/05 at 2 pm (Thomas P. |
| 04/14/2005 | | Billings, Justice) Notices mailed April 14, 2005 |
| 04/14/2005 | 8 | District Attorney's MOTION to Intervene and Motion For Leave To |
| 04/14/2005 | 8 | File Answer Separately |
| 04/20/2005 | 9 | Memorandum: Of Law In Support Of Plaintiff's Opposition To District |
| 04/20/2005 | 9 | Attorney's Motion To Intervene And Motion To File Answer Separately |
| 04/20/2005 | 9 | filed by Eagle Tribune Publishing Company ; Affidavit Of Carmine |
| 04/20/2005 | 9 | DiAdamo |
| 04/20/2005 | 10 | Affidavit of compliance with Superior Court Rule 9A.filed by |
| 04/20/2005 | 10 | Plaintiff, Eagle Tribune Publishing Company |
| 04/21/2005 | 11 | Affidavit of Peter J Caruso in support of motion for Injunctive Relief |
| 04/21/2005 | 12 | Affidavit of Jason Tait |
| 04/21/2005 | 13 | Opposition to Plaintiff's Motion For Preliminary Injunction And A |
| 04/21/2005 | 13 | Certificate Of Service filed by District Attorney. |
| 04/21/2005 | 14 | Defendant's Metin MOTION to Intervene, certificate of service. filed |
| 04/21/2005 | 14 | 4/19/04 |
| 04/21/2005 | 15 | ORDER on Motions to intervene, and on Plff's Motion for Preliminary |
| 04/21/2005 | 15 | Injunction-Denied. (Thomas P. Billings, Justice) |
| 04/21/2005 | 16 | Defendant Joseph E Solomon's MOTION to strike Plaintiff's Motion For |
| 04/21/2005 | 16 | Preliminary Injunction; Defendant's Opposition To Plt's Motion For |

| 04/21/2005 | 16 | Preliminary Injunction |
| 04/21/2005 | 17 | Opposition to Plaintiff's Motion For A Consolidation of Hearing With |
| 04/21/2005 | 17 | Trial on Merits filed by Joseph E Solomon |
| 04/22/2005 | 18 | Atty Kenneth J Mickiewicz's notice of appearance for Joseph E |
| 04/22/2005 | 18 | Solomon, Chief of Police of City of Methuen, as custodian of records |
| 04/22/2005 | 18 | of the Methuen Police Department. filed 4/14/05 |
| 04/25/2005 | 19 | ANSWER: Joseph E Solomon(Defendant) |
| 01/04/2006 |  | Notice sent to appear for pre-trial conference on April 11, 2006 |
| 01/13/2006 | 20 | Defendant Joseph E Solomon's MOTION to Dismiss (MRCP 12b) Complaint |
| 01/13/2006 | 20 | of Eagle Tribune Publishing Company; Memorandum in support of Motion |
| 01/13/2006 | 20 | to Dismiss |
| 01/13/2006 | 21 | Opposition to Defendant's Motion to Dismiss filed by Eagle Tribune |
| 01/13/2006 | 21 | Publishing Company |
| 01/13/2006 | 22 | Request for hearing and Affidavit of Kenneth J Mickiewicz under |
| 01/13/2006 | 22 | Superior Court Rule 9A |
| 02/14/2006 |  | MOTION (P#20) Count II is dismissed as premature. Denied with |
| 02/14/2006 |  | respect to Count I; it is not moot & matter is scheduled for trial |
| 02/14/2006 |  | (Frances McIntyre, Justice). Notices mailed February 15, 2006 |
| 02/15/2006 |  | Notice sent to appear for trial by jury on June 08, 2006 |
| 04/14/2006 | 23 | Court received Joint Pre-Trial Memorandum |
| 04/27/2006 | 24 | Plaintiff Eagle Tribune Publishing Company's MOTION for in camera |
| 04/27/2006 | 24 | review of videotape by plaintiff's Counsel and defendant's Counsel; |
| 04/27/2006 | 24 | Memorandum in support of motion |
| 04/27/2006 | 25 | Opposition to #24 filed by Joseph E Solomon, Fulya Metin |
| 04/27/2006 | 26 | Request for hearing and Affidavit of Kenneth J. Mickiewicz under |
| 04/27/2006 | 26 | Superior Court Rule 9A |
| 05/02/2006 |  | Notice sent to appear on May 11, 2006 for a hearing on Motion for in |
| 05/02/2006 |  | camera review of videotape by plaintiff's counsel and defendant's |
| 05/02/2006 |  | counsel |
| 05/15/2006 | 27 | MEMORANDUM OF DECISION AND ORDER ON MOTION FOR IN CAMERA REVIEW OF |
| 05/15/2006 | 27 | VIDEOTAPE ( Motion #24) - ORDER- (Thomas P. Billings, Justice). |
| 05/15/2006 | 27 | Copies mailed May 15, 2006 |
| 05/22/2006 | 28 | Court received Letter from Attorney's regarding a copy of the MCAD |
| 05/22/2006 | 28 | charge of Discrimination by the defendants attorneys |
| 05/23/2006 | 29 | Affidavit of Capt. Kristopher McCarthy. 3 Tapes Recieved 5/23/06 at |
| 05/23/2006 | 29 | 11:00 am. |
| 05/23/2006 | 30 | Atty Peter J McQuillan's notice of appearance for Joseph E Solomon as |
| 05/23/2006 | 30 | co-counsel. |
| 05/23/2006 | 31 | Maurice Lariviere's Emergency MOTION to Intervene as plaintiff |
| 05/23/2006 |  | MOTION (P#31) DENIED without prejudice to re-filing pursuant to |
| 05/23/2006 |  | superior court rule 9A. I take judicial notice of the fact that |
| 05/23/2006 |  | Lariviere has been award of this action and the parties positions |

7/17/07 6:05 PM

| 05/23/2006 | | since at least the 04/21/05 hearing on the plaintiff's motion for |
| 05/23/2006 | | preliminary injunction; any "emergency" is self-created (Thomas P. |
| 05/23/2006 | | Billings, Justice). Notices mailed May 23, 2006 |
| 05/24/2006 | 32 | FURTHER ORDER ON MOTION FOR IN CAMERA REVIEW OF VIDEOTAPE (Thomas P. |
| 05/24/2006 | 32 | Billings, Justice) |
| 05/31/2006 | | Notice sent to appear on June 29, 2006 for a hearing on Motion for |
| 05/31/2006 | | Summary Judgment |
| 06/22/2006 | 33 | Plaintiff Eagle Tribune Publishing Company's MOTION for Summary |
| 06/22/2006 | 33 | Judgment, pursuant to Mass.R.Civ.P. 56, as to Joseph E Solomon, Fulya |
| 06/22/2006 | 33 | Metin; Memorandum in support of Motion for SJ with supporting |
| 06/22/2006 | 33 | statement of facts and legal elements |
| 06/22/2006 | 34 | Opposition to #33 filed by Joseph E Solomon, Fulya Metin |
| 06/22/2006 | 35 | Request for hearing and Affidavit of counsel pursuant to Superior |
| 06/22/2006 | 35 | Court Rule 9A filed by Eagle Tribune Publishing Company |
| 06/22/2006 | | Certificate of service of Peter J Caruso |
| 06/26/2006 | | Notice sent to appear on 7/25/2006 for a hearing on Plaintiff's |
| 06/26/2006 | | Motion for Summary Judgment |
| 06/28/2006 | | Notice sent to appear on 6/28/2006 for a hearing on S.J. |
| 06/30/2006 | 37 | SUMMARY JUDGMENT for Defendant Joseph E Solomon, Fulya Metin without |
| 06/30/2006 | 37 | costs (Thomas P. Billings, Justice). Copies mailed 6/30/2006 |
| 06/30/2006 | 36 | MEMORANDUM OF DECISION AND ORDER plaintiff's motion for summary |
| 06/30/2006 | 36 | judgment is DENIED, and the motion for summary judgment if defendant |
| 06/30/2006 | 36 | Solomon and Intervenors District Attorney for the Eastern District |
| 06/30/2006 | 36 | and Fulya Metin is ALLOWED. Jusgment to enter, dismissing the |
| 06/30/2006 | 36 | complaint (Thomas P. Billings, Justice). Copies mailed June 30, 2006 |
| 06/30/2006 | | Finished file held @LSC |
| 07/31/2006 | 38 | Plaintiff Eagle Tribune Publishing Company's notice of appeal, with |
| 07/31/2006 | 38 | rule 9 (C) statement . (filed 7/26/2006) |
| 09/28/2006 | 39 | Record assembled; notice (9d) to clerk of Appeals Court with 2 |
| 09/28/2006 | 39 | certified copies of docket entries; notice mailed |
| 10/17/2006 | 40 | Notice of docket entry received from Appeals Court. |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11579EFH

| | |
|---|---|
| MAURICE LARIVIERE, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| JOSEPH SOLOMON, individually, and as | ) |
| Chief of Police of the City of Methuen, and | ) |
| JOSEPH ALAIMO, individually, and as | ) |
| Deputy of Police of the City of Methuen, and | ) |
| THE CITY OF METHUEN | ) |
| | ) |
| Defendants. | ) |
| | ) |

**AFFIDAVIT OF MAURICE LARIVIERE IN SUPPORT OF HIS OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

I, Maurice Lariere, under pains and penalties of perjury, state the following is true and accurate:

1.    The statements I made in the Second Amended Verified Complaint are true and accurate.

2.    The following Exhibits attached to the Plaintiff's Opposition to the Defendants' Motion for Summary Judgment are true and accurate:

| | |
|---|---|
| Ex. A | Plaintiff's Second Amended Complaint |
| Ex. B | Lariviere Deposition Volume I, November 1, 2006. |
| Ex. C | Lariviere Deposition Volume II, November 13, 2006. |
| Ex. D | Lariviere Deposition Volume III, December 29, 2006. |
| Ex. E | Joseph Solomon Deposition |
| Ex. F | Joseph Alaimo Deposition |
| Ex. G | Fulya Metin Deposition |
| Ex. G2 | Fulya Metin Deposition Volume II |
| Ex. H | Michael Wnek Deposition |
| Ex. I | David Bain Deposition |
| Ex. J | William Manzi Deposition |
| Ex. K | Metin MCAD Complaint |
| Ex. L | MCAD Joint Certification Memorandum |
| Ex. M | Eagle Tribune v. Solomon Docket |
| Ex. N | Lariviere Affidavit |

1

| Ex. O | Capanelli Documents |
| Ex. P | Emails |
| Ex. Q | Hatem Affidavit |
| Ex. R | Methuen Charter |
| Ex. S | Resignation |
| Ex. T | Sexual Harassment Policy |

3.   I did not realize that they had falsely stated Metin wanted me to resign immediately or have charges brought until she testified at her deposition on October 12, 2006 and I received and read it in November 2006.

4.   It was not until the Metin deposition that I discovered that she told them she still liked me as a boss and considered me a friend she wanted to continue to work with me.

5.   I obtained from the defendants during discovery the audiotapes of my interview by Solomon and Alaimo. The first audiotape is fundamentally inaudible and I can barely hear myself talking while minimally hearing Solomon and Alaimo. The second audiotape is totally defective and nothing is on it.

6.   A review of the audiotape time format indicates it was on for thirteen minutes approximately. I was held from 10:30 until approximately noon in the second floor conference room. Most of the time I was in the room and over one hour and fifteen minutes there was no recording being used to my knowledge.

7.   I had no part and was allowed no input in the drafting of the resignation letter or any language in it.

8.   The defendants destroyed my life, career, reputation and ability to support my family.

9.   Since this incident in February 2005, well over two years ago, I have submitted over 450 job applications to obtain employment. I have been able to secure very few interviews, and am always asked why I left Methuen after so many years. I have not received one substantial job offer.

10.  The only recurring work I have been able to find is counsel to the Andover Housing Authority. That contract is limited to $2,000.00. I estimate that I made about $3,800.00 last year.

11.  As Methuen City Solicitor, I had just been given a cost of living increase when my appointment was renewed in January 2005 and I was to earn $96,000.00 per year, plus another "career incentive of $8,000.00. In addition, I received health benefits, vacation, sick and personal leave/buyback, and accrual of substantial pension benefits.

12. My plan was to retire at age 62 when I would have attained maximum retirement percentage. (I am now 57, and was 55 at the time of the involuntary resignation.)

13. My wife's teacher's salary (she returned to full time work in September 2004) is not enough to cover our expenses, and we are on the verge of losing our home as almost all of our monies have been drained.

14. I have read the many articles published about this incident in the Lawrence Eagle Tribune and Boston Globe. Without specifically counting all the articles, I estimate that there have been around 90.

15. More important is the suffering my three children (currently enrolled Yale, Emanuel and Massachusetts Maritime Academy) and wife have had to endure with the publicity and stories in addition to the substantial financial hardship.

16. Due the allegations and publicity, I have lost many friends and contacts. Many of my City employee friends have stated that they are afraid to talk to me.

17. After the incident, I was so emotionally distraught that eventually I sought treatment and counseling for my emotional suffering. I have now be on anti-depressants for two years.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY ON THIS THE 20TH DAY OF JULY, 2007.

MAURICE J. LARIVIERE

United States District Court,
S.D. New York.
UNITED STATES OF AMERICA Plaintiff,
v.
Anthony CAPANELLI, Defendant.
No. 01 CR. 1121(CSH).
July 9, 2004.

MEMORANDUM AND ORDER


HAIGHT, Senior J.
*1 Defendant has moved under 18 U.S.C. § 3143(b) or, in the alternative, 18 U.S.C. § 3145(c), for release from detention pending appeal. For reasons set forth below, this request is denied.

I. BACKGROUND

On April 22, 2003, at the end of a jury trial conducted in this Court, defendant was convicted of conspiracy to commit robbery in violation of 18 U.S.C. § 2113(a). The victim by design of the conspiracy was the Federal Credit Union located at the New York Times printing plant in College Point, Queens. Capanelli was acquitted on three other counts, including another count of conspiracy, this one to commit robbery in violation of 18 U.S.C. § 1951(b)(1).FN1

FN1. As is discussed infra, these two counts addressed the same acts. That this was so has become the core of Capanelli's appeal to the Second Circuit.

After the jury returned its verdict, the government made a motion for detention pending sentence pursuant to 18 U.S.C. § 3143(a). An extended colloquy ensued, at the end of which I determined that the count upon which defendant was convicted constituted a crime of violence, as that phrase is used in 18 U.S.C. § 3142(f)(1)(A). On this basis, I granted the government's motion.

On April 24, 2003 I filed a Memorandum, reported at United States v. Capanelli, No. 01 CR. 1121, 2003 WL 1955833 (S.D.N.Y., April 24, 2003), (the "April 24 Memorandum") raising, mea sponte, the possible application to Capanelli's case of 18 U.S.C. § 3145(c), which provides for appeal of an order of detention made pursuant to 18 U.S.C. § 3143(a)(2) or 18 U.S.C. § 3143(b)(2). In that Memorandum I cited United States v. DiSomma, 951 F.2d 494 (2d Cir.1991), in which the court of appeals upheld Judge Cederbaum's decision to release a defendant convicted of conspiracy to commit robbery based on her determination that there were substantial issues of fact or law that might result in a reversal of the conviction, providing "exceptional reasons" under 18 U.S.C. § 3145(c).

The parties submitted briefs in response to the April 24 Memorandum and I conducted oral arguments on May 7, 2003. On May 12, 2003 I issued an Opinion, reported at United States v. Capanelli 263 F.Supp.2d 677 (S.D.N.Y., May 12, 2003) (the "May 12

Opinion"). In that Opinion I applied a four part test for 18 U.S.C. § 3145(c) appeals drawn from DiSomma. Under this test, defendant needed to show that he 1) posed no risk of flight, 2) posed no danger to the community, 3) that his appeal raised substantial questions of law or fact that were likely to result in reversal, a new trial, or a reduced sentence, and 4) that there were exceptional reasons why detention would not be appropriate.

Without making determinations on the first two questions, I addressed the third and fourth questions. In his submission to the Court in response to the April 24 Memorandum, Capanelli informed the Court that he would pursue an appeal based on his assertions that, first, he was not informed by his fellow conspirators that the crime contemplated was an armed robbery rather than a simple burglary, and, second, the conspirators were impelled to "upgrade" to armed robbery from burglary and larceny by government agents. Capanelli expressed confidence that these facts would lead to a reversal of his conviction. Further, he asserted that they undercut the Court's finding that his crimes were crimes of violence.

*2 In the May 12 Opinion I rejected these arguments, drawing significant points of distinction between Capanelli's case and that which faced Judge Cederbaum in DiSomma. Specifically, I held that the jury could rightly find Capanelli guilty of conspiracy to commit armed robbery based on his participation in planning of the crime, which included drawing a map of the New York Times facility to be robbed, complete with the positions of security guards, and his knowledge that security guards were not duty on a 24 hour-a-day, 7 day-a-week basis.FN2 Finding neither a likelihood of success on appeal nor exceptional reasons, I denied Capanelli's appeal of the April 22, 2004 detention order.

FN2. In DiSomma the facility to be robbed was a jewelry store that was locked and abandoned during non-business hours when the burglary was to take place.

In a Memorandum Opinion filed on July 14, 2003 and reported at United States v. Capanelli, 270 F.Supp.2d 467 (S.D.N.Y., 2003) (the "July 14 Opinion"), I declined to grant the government's motion to raise Capanelli's offense level based on an asserted amount of loss exceeding $1,500,000. The principal basis for this decision was that the government did not produce any direct evidence at trial regarding the amount of money or other valuables that were housed in the Credit Union. The government did produce recorded conversations in which the conspirators discussed their belief that the "big score" was worth between $2 million and $6 million. While this was evidence that the conspirators intended to steal more that $1.5 million, I determined that the evidence produced at trial did not support a finding that this intention was anything more than folly akin to a similar hope to steal $1.5 million from a child's lemonade stand. I held that the "hopes and uninformed beliefs" proved by the conversations of the conspirators were "insufficient in law to carry [the government's] burden of proof up to a reasonable certainty." Capanelli, 270 F.Supp. at 475. Since the government failed in fulfilling its burden, I declined to grant the motion for enhancement of sentence.

On June 16, 2003 I sentenced Capanelli to a term of 51 months in prison to be followed by 2 years of supervised release. At the end of that hearing, without prompting from the

government or protest from Capanelli or his counsel, I stated that "[t]he defendant is remanded into custody." June 16, 2003 Trans. at 59.

On June 1, 2004 Scott Leemon, appellate counsel for Capanelli, wrote to chambers requesting a status conference to address the possibility of filing a motion for Capanelli's release from detention pursuant to 18 U.S.C. § 3145(c). I granted the application. Prior to the hearing, and in response to a request from Chambers, both Mr. Leemon and the government submitted letter briefs outlining the issues as they saw them.

On June 17, 2004 I conducted a hearing on Mr. Leemon's proposed motion. During the hearing it was established that Capanelli did want to bring a motion for release pending appeal. Mr. Leemon advised the Court that his letter of June 15, 2004 would serve as that motion, brought under 18 U.S.C. § 3143(b) or, in the alternative, under 18 U.S.C. § 3145(c). June 17 Trans. at 9. The government advised the Court that its letter of June 11, 2004 would, while submitted prior to Capanelli's motion, serve as the government's response. FN3 June 17 Trans. at 10. Mr. Leemon has subsequently submitted a reply in the form of a letter dated June 24, 2004.

FN3. The government's June 11, 2004 letter dealt exclusively with the issue of jurisdiction. At the June 17, 2004 hearing I invited the government to submit additional papers to argue, in the alternative, the substantive issues presented by Capanelli's motion. The government declined. June 17 Trans. at 10-11.

## II. DISCUSSION

### A. Jurisdiction

*3 As in all matters brought before this Court, jurisdiction is the issue of first priority. In a letter dated June 11, 2004, the government takes the position that "this Court is fully divested of jurisdiction in this matter, and that any request for review of the Court's decision on bail pending appeal must be made in the Court of Appeals." June 11 Letter at 1. The government rests its entire opposition to the pending motion on this conclusion. June 17 Trans. at 10-11. The government's argument in support of this conclusion is premised on the factual assertion that this Court's May 12, 2003 Opinion "rejected Capanelli's application for bail pending appeal." June 11 Letter at 2 (footnote omitted). This premise is flawed.

On April 22, 2003, after the jury returned its verdict, the government moved under 18 U.S.C. § 3143(a) for an order of detention pending sentencing. That motion was granted on April 22, 2003. On May 7, 2003 I conducted a hearing to consider Capanelli's appeal of the April 22, 2003 decision. That appeal was brought under 18 U.S.C. § 3145(c), and was denied in the May 12, 2003 Opinion. Capanelli next appeared before the Court on June 16, 2003 for sentencing. During that hearing, neither Capanelli nor the government made any motions regarding Capanelli's continued detention pursuant to the April 22, 2003 order of detention. Nonetheless, at the end of the hearing I declared, ex cathedra, that "[t]he defendant is remanded into custody;" and it was so.

This second recitation of those events is necessary to make the point that Capanelli has never made, and this Court has never considered, a motion for release pending appeal. Given this, the government's characterization of the May 12, 2003 is inaccurate in one significant aspect: that Opinion did not consider any motion made pursuant to 18 U.S.C. § 3143(b). It follows that Capanelli's present motion for release pending appeal is not a motion for appeal of a previous 18 U.S.C. § 3143(b) order. Rather, it is a 18 U.S.C. § 3143(b) motion.

The government has suggested that, even if this is a motion for release pending appeal, 18 U.S.C. § 3145(c) is still the applicable statutory provision. This argument is based on the assertion that the Court's statement on June 16, 2003, remanding Capanelli to custody after sentence was handed down, reflected consideration of a decision sub silentio on an implied 18 U.S.C. § 3143(b) motion. June 17, 2004 Trans. at 14-15. There are three critical problems with this position.

First, the Court's statement was a pro forma order of remand. A motion for detention or release pending appeal was not made on June 16, 2003. 18 U.S.C. § 3143(b) was not within the Court's horizon of consideration on June 16, 2003. By remanding Capanelli to custody after sentencing, the Court did not intend to deny or foreclose a motion for release pending appeal.

Second, a motion or ruling on release pending appeal would not have been timely on June 16, 2003. 18 U.S.C. § 3143(b) is captioned "Release or detention pending appeal by the defendant." It provides, in pertinent part, that "the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds-(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in-(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process."

*4 From the text of the statute it is clear that, in order to move for release pending appeal, three conditions must obtain: first, the defendant must have been convicted; second, the defendant must have been sentenced; and, third, the defendant must have filed an appeal. On April 22, 2003 the first of these preconditions was set in place. On June 16, 2003, but not before, the second was laid next to the first. Importantly, however, the masonry work was not completed until, at the earliest, July 16, 2003, when Capanelli filed his notice of appeal from final judgment. An 18 U.S.C. § 3143(b) motion could not have been brought or considered before that date.FN4

FN4. An 18 U.S.C. § 3143(b) motion may require filing of actual appeal papers in the form of a brief. The Court is informed by the government and by counsel for Capanelli that Capanelli has recently filed his appellate brief, a copy of which has been provided to this Court as part of the present motion. Therefore, whether the third element requires

filing notice of appeal or filing an actual appellate brief, the 18 U.S.C. § 3143(b) trinity is complete in this case.

Third, 18 U.S.C. § 3143(b), as quoted supra, sets forth a number of factors that require separate consideration. There is no record in this case that those factors were ever considered on June 16, 2003. Similar, but not identical, factors are germane to a 18 U.S.C. § 3143(a) motion. The Court has heard and decided a motion under this section of the statute. Prior to rendering that decision, an extensive record was made of the Court's reasons. The same was true of the 18 U.S.C. § 3143(c) motion that was made on appeal of the 18 U.S.C. § 3143(a) decision. That no such record was made on June 16, 2003, provides ample evidence to readers of that cold record that no 18 U.S.C. § 3143(b) motion was before the Court on June 16, 2003.

The motion presently before the Court is a novel motion for release pending appeal pursuant to 18 U.S.C. § 3143(b). 18 U.S.C. § 3143(c) has no application in these circumstances. The government cannot be heard to argue that this Court does not have jurisdiction over Capanelli's present 18 U.S.C. § 3143(b) motion. The Second Circuit made this clear in United States v. Hochevar, 214 F.3d 342 (2nd Cir.2000), where the court of appeals declined to entertain the appellant's motion for release pending appeal. There, the court of appeals held that, under the Federal Rules of Appellate Procedure, an appellant must bring a motion for release pending appeal in the district court first, and may only bring the matter to the court of appeals once the district court has created a sufficient record of its decision in reference to 18 U.S.C. § 3143(b). Hochevar, 214 F.3d at 343-344.

While the Second Circuit in Hochevar retained the discretion to exercise original jurisdiction over 18 U.S.C. § 3143(b) motions, it is clear that this discretion does not exclude the jurisdiction of a district court to hear a 18 U.S.C. § 3143(b) motion, particularly where, as here, the appeal is at an early stage. Id. at 344. ("When release is sought before the appeal has been briefed and argued, the district court, having greater familiarity with the record, is normally in a far better position than the court of appeals to make such determinations in the first instance.")

The government does not, at least theoretically, disagree. In its June 11, 2004 letter, the government acknowledges that "the appropriate procedure for motions of bail pending appeal is for the district court to review the application first, and then to allow a defendant to seek review in the court of appeals." June 11 2004 Letter at 3. The point here is, of course, that the condition precedent has not been achieved. Presently before the Court is Capanelli's first timely motion for release pending appeal. Given this posture, it is this Court's responsibility to hear the present motion under 18 U.S.C. § 3143(b). It is this Court's further burden to make an appropriately detailed record that can inform the court of appeals should either Capanelli or the government be displeased with this Court's ruling.

B. Capanelli's 18 U.S.C. § 3143(b) Motion for Release Pending Appeal

*5 To prevail on his motion, Capanelli must show, by clear and convincing evidence, that

he is not likely to flee and that he does not pose a danger to the safety of another person or to the community. Capanelli has not offered any evidence in his favor on these issues. He has, rather, relied upon the Court's familiarity with Capanelli and this case. While the Court may have been in a position to evaluate danger of flight and risk to the community posed by Capanelli in spring 2003, more than one year has passed since that time. The Court declines to make these critical evaluations based on a cold record and in the absence of any information regarding recent events and conditions. In keeping with its duty to provide a complete record on the present motion, see Hochevar, 214 F.3d at 344, the Court will withhold its opinion on these matters pending the provision of further evidence.

In addition, Capanelli must show that his appeal "is not for the purpose of delay and raises a substantial question of law or fact likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b). By contrast to the fact-intensive determination of risk of flight and danger of violence, these are issues of law and logic about which the Court need not delay its predictions.FN5

FN5. This choice of vocabulary indicates that the analysis and conclusions to follow are predictive rather than proscriptive. It is the duty of the court of appeals to evaluate the merits of Capanelli's appeal. As I read 18 U.S.C. § 3143(b), I am not invited to usurp this role. My function is simply to evaluate the likelihood that Capanelli's appeal will result in reversal, a new trial, a sentence that does not include imprisonment, or a much reduced sentence. While this requires discussion of the legal issues presented on appeal, the discussion does not reach the normative questions presented by the appeal itself. Analysis of the law and facts in the present context simply provides evidence for what this Court concludes is likely to happen on appeal.

Capanelli, according to the draft of his brief to the Second Circuit provided to this Court, brings four principal claims on appeal. First, Capanelli argues that the government violated his Fifth Amendment rights by prosecuting a multiplicitous indictment. Second, Capanelli contends that the Court erred in its analysis and application of the sentencing guidelines. Third, Capanelli claims that his Sixth Amendment right to trial by jury was violated because the government failed to put before the jury any evidence that the New York Times Credit Union, which was the object of the conspiracy, contained anything of value. Finally, Capanelli seeks reversal of an evidentiary ruling at trial allowing admission of digital recordings of destroyed audio tapes.

The second and fourth grounds for appeal were issues before this court during the trial and sentencing in April, May, and June of 2003. The first and third claims present new issues. None of these claims were considered by this Court in the context of its prior 18 U.S.C. § 3143(a) and 18 U.S.C. § 3145(c) decisions.FN6 On the whole, the appeal that contains them appears to have been brought in good faith, and not to cause delay. These are substantial questions of law that are certainly worthy of the Second Circuit's attention. While the ultimate merits of the appeal will be decided there, this Court must, in carrying out its duty on the present motion, determine whether or not these arguments are likely to

result in reversal, an order for new trial, or a significant reduction in sentence.FN7 In this Court's opinion, they are not.

FN6. On his earlier 18 U.S.C. § 3145(c) appeal of the Court's 18 U.S.C. § 3143(a) decision, Capanelli focused on his subjective knowledge about the scheme and the role of the government in "provoking" the conspirators. The Court found these arguments unpersuasive. See Capanelli, 263 F.Supp.2d at 682-683. Because Capanelli raises new issues for appeal on the present motion, the Court's May 12, 2003 Opinion has no res judicata effect in the present context.

FN7. The Court embarks on this analysis without any substantive contribution from the government. At the June 17, 2004 hearing the Court invited the government to comment on the legal issues presented on Capanelli's appeal so that it could be heard if the jurisdictional issue was resolved in Capanelli's favor. The government declined, electing to rely exclusively on its jurisdictional argument. See June 17, 2004 Trans. at 10-11

1. Capanelli's Fifth Amendment Claim

*6 Capanelli was convicted of conspiracy to commit bank robbery by force or violence in violation of the Federal Bank Robbery Act, 18 U.S.C. § 2113(a) (the "FBRA"). He was acquitted on all other counts presented by the indictment: one for conspiracy to commit robbery in violation of the Hobbs Act, 18 U.S.C. § 1951(b)(1), and two counts of attempt, one attached to each of the conspiracy counts. The pith of Capanelli's Fifth Amendment claim is that any violation of the Hobbs Act is a lesser and included crime under the FBRA. Capanelli claims that, by submitting these two counts to the jury, he was put in jeopardy of life and limb twice for the same offense.

It is worthy of note in the context of the current predictive analysis that Capanelli did not raise this Fifth Amendment concern at trial. In his brief to the Second Circuit he "concedes that his trial counsel did not move for a dismissal of the charges prior to trial ... or after trial, but now raises this issue for the first time on appeal." Appellants brief at 42. In this circumstance, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affects substantial rights.' If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error "seriously affects the fairness, integrity, or public reputation of judicial proceedings." " Johnson v. United States, 520 U.S. 461, 466-467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)). This is a hurdle whose height alone makes Capanelli less likely to succeed on appeal. It is not an insurmountable obstacle, however. A discussion of the legal issues is, therefore, necessary.

The critical question to answer in determining whether a multiple count indictment violates the Double Jeopardy Clause is "whether Congress intended to authorize multiple punishments for conduct that violates two statutory provisions." United States v. Marrale, 695 F.2d 658, 662 (2d Cir.1982). In the Second Circuit, this question is to be determined by a three-step inquiry. Id. (citing Albernaz v. United States, 450 U.S. 333, 336-342 (1981)). The first step is to look at the statute or statutes in question. "If the offenses charged are set forth in different statutes or in distinct sections of a statute, and each

section unambiguously authorizes punishment for a violation of its terms, it is ordinarily to be inferred that Congress intended to authorize punishment under each provision." Id. Here, the two counts in question address separate sections of United States Code, Title 18. Each of the sections authorizes punishment. On this basis, inference of congressional authority for multiple punishments seems warranted.

The second step in the inquiry is "to determine whether the two offenses are sufficiently distinguishable from one another that the inference that Congress intended to authorize multiple punishments is a reasonable one." Marrale, 695 F.2d at 662. For this part of the analysis, the test established by the Supreme Court in Blockburger v. United States, 284 U.S. 299 (1932), is still applicable. That test requires a court to determine "whether each provision [of a multiple count indictment] requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. In this case, the Hobbs Act requires proof that a defendant obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce. 18 U.S.C. § 1951(a). The FBRA does not. The FBRA does, however, require proof that the property to be taken by force was "in the care, custody, control, management, or possession of, any bank, credit union, or any savings and loan association." 18 U.S.C. § 2113(a). The Hobbs Act does not.

*7 The third step in the procedure set forth in Albernaz asks a court to compare the results obtained from the first two steps to the "legislative history of the provisions to discover whether a contrary congressional intention is disclosed. If the legislative history either reveals an intent to authorize cumulation of punishments or is silent on the subject, the court should conclude that Congress intended to authorize multiple punishments." Marrale, 695 F.2d at 662. The gravamen of Capanelli's Fifth Amendment claim is that 18 U.S.C. § 2113 is "the exclusive provision for the prosecution of bank robbery" in the federal criminal scheme. Appellant's brief at 27. This contention is unlikely to be accepted by the Second Circuit.

The Second Circuit has previously ruled that 18 U.S.C. § 2113 is not "a comprehensive scheme that provides the exclusive remedy for conduct falling fully within its coverage." Marrale, 695 F.2d at 661-662. In that case, the appellant was tried and convicted on a multiple count indictment that included one count of robbery in violation of 18 U.S.C. § 2113 and one count of stealing money from a foreign shipment in violation of 18 U.S.C. § 659 for robbing an armored car. Applying the three-part test established in Albernaz, the Second Circuit held that cumulative punishments based on these counts was authorized by Congress and did not violate Marrale's Fifth Amendment rights. The present case is closely analogous to Marrale. While it is possible to distinguish between the two, the core holding, that 18 U.S.C. § 2113 does not exclude additional robbery charges, indicates to this Court that the Second Circuit is unlikely to overturn Capanelli's conviction on Fifth Amendment grounds.FN8

FN8. In his appellate brief, Capanelli relies heavily on United States v. Holloway, 309 F.3d 649 (9th Cir.2002). There, the Ninth Circuit held that all violations of the FBRA necessarily include an interference with commerce. Second Circuit precedent does not appear to accord with Holloway. While the Second Circuit may decide to adopt a position similar to that established in Holloway, speculation about this possibility cannot provide

the predictive certainty necessary at this stage to grant Capanelli's motion for release pending appeal.

Even if the Second Circuit were to rule in Capanelli's favor on the issue of multiplicity, Capanelli does not appear to have suffered any constitutional harm. The Fifth Amendment protection against double jeopardy "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717 (1969). Assuming that Capanelli is right in asserting that he was wrongly subjected to a multiplicitous indictment, he has, as a matter of fact, only been convicted and sentenced on one of the counts. Capanelli appreciates the fact that "the normal remedy for a multiplicity after trial and conviction is the striking of one of the counts of the conviction." Appellant's brief at 33. Given this, it would seem that any error that occurred in this case was harmless. In effect, the jury has given Capanelli all the relief that he would receive from the court of appeals if he had been convicted of both conspiracy counts and it was found that the two counts were multiplicitous.

Capanelli, citing an excerpt from Justice Stevens's concurring opinion in Ball v. United States, 470 U.S. 856, 868 (1985), contends that by subjecting him to a multiplicitous indictment, the government compromised the jury's deliberations to such a degree that a constitutional harm exists. To the Court's knowledge, this is an issue of first impression in this Circuit. Existing Second Circuit precedent focuses on multiplicity of punishment as the Fifth Amendment trigger. See e.g. Marrale 695 F.2d at 661. While the court of appeals may see wisdom in adopting the position advanced by Capanelli and Justice Stevens, that possibility is too speculative to warrant a finding at this stage that Capanelli is likely to succeed in his pursuit of a reversal or an order for a new trial.

2. Capanelli's Claim Based on an Alleged Sentencing Error

*8 On June 16, 2003 the Court ruled that "a five level enhancement with respect to the brandishing or possession of a firearm during the course of the intended robbery is correct" in this case. June 16, 2003 Trans. at 24. The Court's reasons for reaching this conclusion are part of the record. See id. at 22-24. Those reasons and the justice of the five level enhancement need not be considered in the present context, however. Even if Capanelli were to succeed on this claim, the reduction in sentence that would accompany that success would still result in, at minimum, a sentence of thirty months. See id. at 7. Capanelli has, to date, been incarcerated for approximately one year. It is unlikely that resolution of his pending appeal will require more than eighteen months. Therefore, thirty months is not "a term of imprisonment less than the total of the time [Capanelli] has already served plus the expected duration of the appeal process." 18 U.S.C. § 3143(b)(1)(B)(iv). For this reason, Capanelli's second claim on appeal is not sufficient to support a motion for release at this juncture.

3. Capanelli's Sixth Amendment Claim

Capanelli makes two arguments under his third claim on appeal. The first is that the jury

could not, on the basis of evidence produced at trial, have determined that Capanelli was a participant in the conspiracy. Because the Court does not think it likely that the court of appeals will determine that the jury's finding of guilt was contrary to the weight of evidence produced at trial, the Court does not think it likely that Capanelli will be granted a new trial based on this claim.

Capanelli's second Fifth Amendment Claim is of greater bulk even if it carries no more weight. In its July 14 Memorandum Opinion this Court, in evaluating the government's request for a sentence enhancement, pointed out that during Capanelli's trial "[t]he government did not call any witness to testify about the functions of the credit union, the services it rendered to members, its physical location and dimension, and most significantly, the credit union's practice with respected to the amount of cash it kept on hand at the College Point facility." Capanelli, 270 F.Supp. at 472. Nonetheless, Capanelli was convicted of conspiracy to commit robbery in violation of 18 U.S.C. § 2113.

On appeal, Capanelli argues that, in order to sustain its prima facie burden on the robbery count, the government needed to produce evidence that there was "property, money or any other thing of value belonging to, or in the care of [the New York Times Credit Union]." 18 U.S.C. § 2113(a). That the government, according to Capanelli, provided no such evidence means that this essential element of the charge against him was not put before the jury, denying him of his Sixth Amendment right to trial by jury. While this argument has some surface appeal, particularly in the wake of the Supreme Court's recent decision in Blakely v. Washington, No. 02-1632, 2004 U.S. LEXIS 4573 (June 24, 2004), it is unlikely that this claim will result in a reversal or an order for a new trial.

*9 First, it is important to understand that, in the text of its July 14, 2003 Memorandum quoted above, this Court went no farther than to find that there was not sufficient evidence produced at trial to warrant an upward departure under the sentencing guidelines. The Court did not rule that the jury could not, as a matter of law, find that there was something of value in the Credit Union. The holding was limited to insufficiency of proof as to any particular dollar amount.

Second, there is no minimum value requirement for robbery under 18 U.S.C. § 2113. There is mention, in the first paragraph of 18 U.S .C. § 2113(a), of taking or attempted taking of "any property or money or any other thing of value." There was evidence presented at trial that would allow the jury to find that there was something of value in the Credit Union.

Third, assuming, arguendo, that there was nothing of value in the Credit Union, the jury was still entitled to find Capanelli guilty of violating 18 U.S.C. § 2113. There was ample evidence produced at trial to prove that the defendants believed, reasonably, that the Credit Union contained money, probably in significant sums, given that the specific object of the robbery was the New York Times's payroll. Actual, as opposed to legal, impossibility does not negate crimes of attempt and conspiracy. See United States v. Jimenez Recio, 537 U.S. 270, 275-276 (2003) (reversing the Ninth Circuit to hold that impossibility by frustration of purpose does not provide an excuse against a charge of

conspiracy as a "distinct evil"); United States v. Wallace, 85 F.3d 1063, 1068 (2d Cir.1996) ("That the conspiracy cannot actually be realized because of facts unknown to the conspirators is irrelevant"). That their conspiracy to rob the Credit Union of money or other items of value was, by assumption here, impossible to carry out due to facts unknown to the conspirators would not provide them with an excuse against a charge of attempt or conspiracy to violate 18 U.S.C. § 2113. On this basis, the beliefs of the defendants in this case and the actions taken in pursuit of a criminal purpose seem sufficient to sustain the conspiracy conviction even if the cupboard at the Credit Union was, in fact, bare.

Even if the law were not thus, Capanelli could have been found guilty under the statute itself without proof that the Credit Union contained anything of value. 18 U.S.C. § 2113(a) provides that "[w]hoever enters or attempts to enter any bank [or] credit union ... with intent to commit in such bank [or] credit union, any felony affecting such bank [or] credit union ... in violation of any statute of the United States, or any larceny-Shall be fined under this title or imprisoned not more than twenty years, or both." There is, in this section of the statute, no mention of value, and, thus, no requirement that value be proved. All that is necessary is an intention to enter a federally insured credit union with the purpose of committing a felony or a larceny. There was ample evidence produced at trial to sustain a determination of guilt under this independent section of 18 U.S.C. § 2113. For all of the foregoing reasons, it is unlikely that Capanelli's third claim on appeal will result in a reversal or a new trial.

4. Capanelli's Evidentiary Claim

*10 In his fourth stated claim for appeal, Capanelli contends that the Court erred in allowing the government to introduce into evidence digital copies of recordings when the storage chips upon which those recordings were originally lodged had been destroyed by the government. At trial, the Court ruled that the copy was admissible as a duplicate pursuant to Federal Rules of Evidence 1001(4) and 1003. Because the Court thinks it unlikely that this ruling will be overruled on appeal, the Court finds it unlikely that this claim will result in a reversal or an order for a new trial.

IV. CONCLUSION

For all of the foregoing reasons, Capanelli's motion for release pending appeal is denied. Having ruled thus, the Court acknowledges that it has failed to make a complete record on the motion because it has not taken and reviewed evidence relevant to flight risk and danger to the community posed by Capanelli if he were to be released. While making a record on these issues is not required as a matter of logic at this stage, it will be necessary if Capanelli should decide to appeal this decision. Therefore, the Court makes the following order:

1) Capanelli's motion for release pending appeal brought under 18 U.S.C. 3143(b) is denied.

2) By no later than July 16, 2004, counsel for Capanelli and counsel for the government are ordered to submit to the Court a joint proposal for procedures by which evidence relevant to a determination of Capanelli's risk of flight and danger to the community can be submitted to the Court for review. This proposal should detail what evidence should be considered, how it can be presented to the Court, and a proposed time-line for submission of the evidence.

S.D.N.Y.,2004.
U.S. v. Capanelli
Not Reported in F.Supp.2d, 2004 WL 1542247 (S.D.N.Y.)

Case 1:05-cv-11579-EFH    Document 40-19    Filed 07/20/2007    Page 1 of 8    Page 1 of 1

X   Message is not flagged. [ Flag for Follow Up ]
⟲   Message has been replied to in the past.

   **Date:**  Mon, 29 Nov 2004 14:15:03 -0500
  **From:**  <Melisaful@aol.com>
         [                 |              |              ]
     **To:**  <brookhurst98@myway.com>
**Subject:**  Re: Yedi, Mission accomplished

Thank you Maurice... :o)


Thanks for thinking of me!!!!!

I didn't get the E-Card though.. hmmmm are you sure you sent it and wasn't dreaming? lol

✗   Message is not flagged. [ Flag for Follow Up ]

   **Date:**   Sun, 5 Dec 2004 20:03:01 EST
   **From:**   <Melisaful@aol.com>
        [                    ]                 ]                 ]
     **To:**   <brookhurst98@myway.com>
**Subject:**   Re: Yedi

Hi

How is your weekend going?

Melisa and I bought you a birthday present today..  Hope you like it.

See you tomorrow..

X̄   Message is not flagged. [ <u>Flag for Follow Up</u> ]

**Date:**   Sat, 8 Jan 2005 13:58:35 -0500

**From:**   Maurice <brookhurst98@myway.com>

       [                |             |            }

**To:**   <fgmetin@ci.methuen.ma.us>, <melisaful@aol.com>

**Subject:**   New York Tax Return

Yedi,

The W-2's for the tax returns go out by law by the end of January. Have you contacted the NY business's you worked for in 2004 to tell them where to mail your W-2 info for your tax returns? ( your new address in Haverhill) VERY Important

**No banners. No pop-ups. No kidding.**

Make My Way your home on the Web –

X   Message is not flagged. [ Flag for Follow Up ]

Message has been replied to in the past.

**Date:** Sat, 8 Jan 2005 16:25:47 EST
**From:** <Melisaful@aol.com>
   [         |         |         ]
**To:** <brookhurst98@myway.com>
**Subject:** Re: New York Tax Return

Hiiiiiiiiiiiiii

How are you?  How is your weekend going?

The doctor told m et hat I might have more than one ulcer and that i have to go for a test when they put you to sleep and then do a test to see what is going on with your stomach.  They're supposed to call me with an appointment.  I didn't feel too good lastnight, but feel a little better today....    I can't believe all this snow again.. ahhhhhhhhhhhh!   Don't shovel too much.

Take care and hope everyone is doing well..

byeeeeeeeee

Fulya

X̶   Message is not flagged. [ Flag for Follow Up ]

  Date:  Sat, 22 Jan 2005 07:55:30 -0500

 From:  Maurice <brookhurst98@myway.com>

    To:  <melisaful@aol.com>

Subject:  Yedi

Yedi,

I hope the test results came out ok. Let me know what happened and what the doctor recommended. If you need any help let me know.

Friday night we went to the Mall at Rockingham. It was cold as hell out. Right now it is saturday morning and still cold. I am staying inside today. Looks like some real big time snow coming in this afternoon and into sunday. Well it will be snow blower time again.

Tom wants to go to the Lowell Lochmonsters hockey game tomorrow regardless. I tend to agree but will have to wait and see.

Remember if you want me to do your tax returns to save you some $ feel free to ask me. I have the turbo tax program and it is easy to do. Would also be willing to work on a household budget for you. Then no more check bounce problems. ;-)

Hope all is well and hope I hear from you soon about the doctors report.

MJL FFL

**No banners. No pop-ups. No kidding.**
Make My Way your home on the Web –

X  Message is not flagged. [ Flag for Follow Up ]

Date:    Fri, 28 Jan 2005 11:04:59 -0500
From:    Metin, Fulya <FGMetin@ci.methuen.ma.us>
         [              |              |              ]
To:      <brookhurst98@myway.com>
Subject: RE: go home you're fired

**ha ha ha ha..**
**i'm leaving now, i'll tell her to start on Monday s he'll be very very happy**

-----Original Message-----
**From:** Maurice [mailto:brookhurst98@myway.com]
**Sent:** Friday, January 28, 2005 11:06 AM
**To:** Metin, Fulya
**Subject:** go home you're fired

Where is my Rana

**No banners. No pop-ups. No kidding.**
Make My Way your home on the Web -

X   Message is not flagged. [ Flag for Follow Up ]

**Date:**   Tue, 1 Feb 2005 17:31:29 -0500
**From:**   Maurice <brookhurst98@myway.com>
  [              ]              ]              ]              ]
**To:**   <melisaful@aol.com>
**Subject:**   Hi Grammy


Relax Yedi,
All things will work themselves out. You will be healthy, out of debt and buff.
ArchAngel



**No banners. No pop-ups. No kidding.**
Make My Way your home on the Web -

X   Message is not flagged. [ Flag for Follow Up ]

**Date:**  Wed, 02 Feb 2005 08:50:02 -0500
**From:**  <Melisaful@aol.com>
**To:**  <brookhurst98@myway.com>
**Subject:**  Re: Hi Grammy

Hi Hi Hi

Thanks for all your help...

Kiss

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MAURICE LARIVIERE,<br>    Plaintiff,<br><br>v.<br><br>JOSEPH SOLOMON, individually and<br>as Chief of Police for the City of<br>Methuen, JOSEPH ALAIMO,<br>individually and as Deputy Chief of<br>Police for the City of Methuen and<br>THE CITY OF METHUEN,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

C.A. No.: 05-11579EFH

## AFFIDAVIT OF MICHAEL E. HATEM

I, Michael E. Hatem, being duly sworn depose and say as follows:

1.  I am a former employee of the Methuen Police Department. I left the department in   January of 2005 as a Lieutenant.

2.  This Affidavit is being given after I initiated a contact with Maurice Lariviere in December, 2006. I did not come forward sooner for personal reasons which I shall explain in the future at an appropriate time.

3.  With respect to the Maurice Lariviere affair, so-called, I was in the police department the day that the first newspaper article dealing with this matter was published. I believe it was the day after Chief Solomon and Deputy Chief Alaimo confronted Maurice Lariviere.

4.  After the newspaper was delivered to the police station, Deputy Chief Alaimo walked in to my office during the afternoon.

5.  I had a news article on my desk and stated "Oh my God, when did this happen?" Deputy Chief Alaimo responded, "Yesterday."

6.    I stated, "Yesterday, I was working yesterday" and Alaimo stated, "yeah, we kept it between a few of us. We didn't want anybody else involved."

7.    I stated, "geez, I'm glad I didn't get involved in this thing."

8.    At the time I was standing at my desk looking at the paper.

9.    Deputy Chief Alaimo stated, "sit down, I'm going to tell you what happened."

10.    I stated, "Deputy, you don't have to tell me anything." He re-stated, "sit down, I'm going to tell you what happened."

11.    He related that the girl who works for Maurice Lariviere was complaining about inappropriate touching. I asked him how this came about. Alaimo stated that Lieutenant Wnek who would go to Maurice Lariviere's office to get advice on internal affairs matters got to know the girl involved. At some point she contacted Wnek and asked to meet with him. He did so (in a parking lot) and she told him what she claimed was happening.

12.    Alaimo then stated that based on the complaint they set up some cameras in her office.

13.    He had stated where the officers were who were involved in the investigation, but I do not remember where he said they were stationed.

14.    I do remember that Alaimo stated during our conversation at this point "I told the girl she'd be recorded. There would be cameras in the office and she should "be careful, don't overact."

15.    He then stated the tape went on for a long while and further stated that he and Solomon showed Maurice the tape.

16.    Alaimo told me he stated during that meeting "Maurice, you've known me for 25 years. If you do not resign right now, I am going to put handcuffs on you and march you out of the office right now in front of everybody."

17.    There was further small talk that I do not recall. He then got up and left my office.

18.    While I was an employee of the Methuen Police Department I read that Chief Solomon denied that any statements were made about a resignation. I knew that his statement was completely false but I did not come forward. As I stated previously, there were personal reasons why I did not act which I know I will be asked about in the future.

SIGNED, under the pains and penalties of perjury, this 26th day of December, 2006.

Michael E. Hatem

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, SS                                                      December 26, 2006

On this 26th day of December, 2006, before me, the undersigned notary public, personally appeared Michael E. Hatem and proved to me through satisfactory evidence of identification which was a Massachusetts driver's license, to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge or belief.

Simone T. Marchand
Notary Public
My commission expires 9/15/11

3

# HOME RULE CHARTER OF THE CITY OF METHUEN

**Published by Order #3718 of the Methuen City Council in Accordance with Chapter 43B, Section 12, Massachusetts General Laws**

## SUMMARY OF CONTENTS

Summary of Charters in Methuen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 1, Incorporation; Short Title; Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 2, Legislative Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 3, Executive Branch . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 4, School Committee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 5, Financial Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 6, Administrative Departments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 7, Nominations and Elections . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 8, Free Petition; Initiative; Referendum; Recall . . . . . . . . . . . . . . . . . . . . . . .

Article 9, General Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Article 10, Transitional Provisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Chronology of Charter Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## SUMMARY OF CHARTERS

## IN THE CITY OF METHUEN

The Town of Methuen was originally organized as a Town by Chapter 12 of the Acts and Resolves of 1725, "Being an act for dividing the City of Haverhill and erecting a new Town there and in parts adjacent by the name of Methuen"; the name of the Town being given by Governor Dummer after Lord Methuen.

? The Town functioned under a Selectmen/Open Town form from 1726 until 1917. The General Court, by Chapter 116 of the Acts and Resolves of 1916, established a Selectmen/Representative Town Meeting form of government. The General Court,

thereafter, by Chapter 289 of 1917, allowed the Town to organize as a City. On January 7th, 1921, the Supreme Judicial Court, in the case of Attorney General ex rel. Mann vs. City of Methuen; 236 Mass. 564, found that the City Charter had not been appropriately adopted under the Constitution of the Commonwealth. Though the Court did not strike down the Charter, it left open the legality of all City action thereafter.

The General Court enacted thereafter, Chapter 241 of 1921, providing for the establishment of a Selectmen/Representative Town form of government. This Charter existed from 1921 to 1973.

On January 1st, 1973, Methuen's first Home Rule Charter became effective. Said Charter established a strong Town Manager with a twenty?one member Town Council. Said government was written by the first Home Rule Charter Commission. This "Town Form" was declared to be, in law, a _City_ by the Appeals Court on December 12th, 1978 in the case of Chadwick vs. Scarth, 6 Mass. App. 725.

On January 1st, 1978, Methuen's second Home Rule Charter became effective. Said Charter, while keeping the Town Manager/Town Council form of government, reduced the Town Manager's power by requiring Council approval of such matters as contracts and appointments. On May 4th, 1993, at a Special Town Election, the citizens accepted Chapter 332 of the Acts and resolves of 1993 providing for a mayor and term limitations.

# ARTICLE 1

## Incorporation; Short Title; Power

### Section 1?1 Incorporation.

The inhabitants of the municipality of Methuen, within the corporate limits established by law, shall continue to be a body corporate and politic under the name "Town of Methuen"

.

### Section 1?2 Short Title.

This instrument shall be known, and may be cited as the Methuen Home Rule Charter.

### Section 1?3 Form of Government.

The administration of the fiscal, prudential, and municipal affairs of the Town, with the government thereof, shall be vested in an executive branch, to consist of the Town Manager, and a legislative branch, to consist of the Town Council. The executive branch shall never exercise any legislative power, and the legislative branch shall never exercise any executive powers. Except as may otherwise be specifically authorized by the Charter, no member of the Town Council, nor any committee thereof, shall take any part in the conduct of the administrative business of the Town.

## Section 1?4 Powers of the Municipality

Subject only to express limitations on the exercise of any power or function by a municipality in the Constitution or the statutes of the Commonwealth, it is the intent and the purpose of the voters in Methuen, through the adoption of the Charter, to secure for the Town all powers it is possible to secure under the Constitution and statutes of the Commonwealth, as fully and as completely as though each such power was specifically and individually enumerated herein.

Methuen will constitutionally have a city form of government and the General Laws that apply only to cities, or treat cities differently than towns, will automatically apply to Methuen. For example, Methuen will conform to the debt limit, bond and notes issuance's, etc. of Chapter 44, the Municipal Finance Act' as it applies to cities.

### Section 1?5 Construction.

The powers of the municipality under the Charter are to be construed liberally in favor of the Town, and the specific mention of particular powers is not intended to limit, in any way, the general powers of the municipality as stated in Section 1-4.

### Section 1?6 Intergovernmental Relations.

Subject only to express limitations in the construction or statutes of the Commonwealth, the Town may exercise any of its powers or perform any of its functions/ and may participate in the financing thereof, jointly or in cooperation, by contract or otherwise, with the Commonwealth, or any political subdivision or agency thereof, or the United States government or any agency thereof.

## ARTICLE 2

## Legislative Branch

### Section 2?1 Composition; Eligibility; Election and Term.

(a) Composition ? There shall be a Town Council consisting of nine members which shall exercise the legislative powers of the Town. Six Councillors shall be nominated and elected from the voters by districts, two Councillors to be elected from each of the three districts of the Town. Three Councillors shall be nominated and elected at large. Precincts 1, 2, 6 and 10, to be known as the Central District; Precincts 3, 7, 9 and 12, to be known as the East District; and Precincts 4, 5, 8 and 11, to be known as the West

District. (Approved by Legislature, June 10th, 1986, Chapter 88 of the Acts and Resolves of 1986). The Town Council shall be the judge of the election and qualification of its members.

(b) Eligibility ? Only voters who at all times during their term of office shall be and remain residents of the Town shall be eligible to hold the office of Councillor. A member of the Town Council shall, notwithstanding his removal from one district to another, continue to serve and to perform his official duties during his term of office.

(c) Election and Term ? The term of office of all members of the Town Council shall be for two years, beginning on the first secular day in January after their election and until their successors are qualified. No person shall hold the office of Town Councillor for more than three consecutive or nonconsecutive terms.

### Section 2?2 Organization.

After the Councillors elect have been sworn, the Town Council shall be called together by the oldest member elected who shall preside. The Town Council shall then elect, from among its members, a Chairman and Vice Chairman to serve at the pleasure of the Town Council. The Chairman shall preside at all meetings of the Town Council and perform such other functions as may be assigned by the Charter, by ordinance, or by vote of the Town Council. The Vice Chairman shall act as Chairman of the Council during the absence or disability of the Chairman. (Approved by voters November 3rd, 1981; see Resolution #758).

### Section 2?3 Compensation; Expenses.

The Town Council shall, by ordinance, establish an annual salary and expense allowance for its members. No ordinance increasing such salary or expense allowance shall be effective, however, unless it shall have been adopted by a two?thirds vote of the full Council during the first eighteen months of the term for which Councillors are elected and the new salary and expense schedule is to be effective upon the commencement of the terms of office of the next Town Council to be elected.

### Section 2?4 General Powers and Duties.

Except as otherwise provided by law or by the Charter, all powers of the Town shall be vested ~n the Town Council which shall provide for their exercise and for the performance of all duties and obligations imposed on the Town by law.

### Section 2?5 Prohibitions.

No Councillor shall, while a member of the Town Council, hold any other office or position the salary or compensation for which is payable out of the town treasury. No former Councillor shall hold any compensated appointive town office or town employment until one year after the expiration of his service on the Town Council. This provision shall not prevent a town officer or employee who has taken a leave of absence from such duties in order to serve as a member of the Town Council from returning to such office or employment following service as a member of the Town Council.

## Section 2?6 Filling of vacancies.

If a vacancy occurs in the office of Councillor?at?Large or in the office of District Councillor, whether by failure to elect or otherwise, the remaining Councillors shall, within twenty?one days following the date such vacancy is declared to exist, act to fill the said vacancy. The Council shall elect as acting Councillor whichever of the defeated candidates for the seat in which the vacancy is declared to exist. That person who received the highest number of votes at the last regular town election immediately preceding the date the vacancy is declared to exist, and who received at least twenty (20) percent of the total votes cast for the office at such election, and who remains eligible and willing to serve. There being no such person, the Council shall choose from among the voters, entitled to vote for such Councillor, an acting Councillor to serve for the balance of the unexpired term. If such choice is not made as hereinbefore provided within the said twenty?one days, the choice shall be made by the Councillor senior in length of service, or if there be more than one such, by the Councillor senior both in age and in terms of service. Any person so chosen shall be sworn and commence to serve forthwith. No vacancy shall be filled, in the manner hereinbefore provided, if a regular town election is to be held within one hundred twenty days following the date the vacancy is declared to exist.

## Section 2?7 Exercise of Powers; Quorum; Rules of Procedure.

(a) Exercise of Powers ? Except as otherwise prohibited by law or the Charter, the legislative powers of the Town Council may be exercised in a manner determined by it.

(b) Quorum ? A majority of the full Town Council shall constitute a quorum. The affirmative vote of a majority of the full Town Council shall be necessary to adopt any appropriation order. Except as otherwise provided by law or the Charter, any other motion or measure may be adopted by a majority vote of those present.

(c) Rules of Procedure ? The Town Council shall, from time to time, establish rules for its proceedings. Regular meetings of the Town Council shall be held at a time and place fixed by ordinance but which shall be not less frequent than once monthly. Special meetings of the Town Council may be held on the call of the Chairman of the Town Council, or on the call of any three or more members, by written notice delivered to the place of residence or business of each member at least forty?eight hours in advance of the time set. Except as otherwise authorized by General Laws, all sessions of the Town Council shall be open to the public and press. Every matter coming before the Town Council for action shall be put to a vote/ the result of which shall be duly recorded. A full, accurate, and up?to?date record of the proceedings of the Town Council shall be kept and shall be open to inspection by the public.

## Section 2?8 Council Staff.

(a) City Accountant ? The City Council shall, on or before January 15th in odd numbered years, elect, by ballot or otherwise, a City Accountant to hold office for a term of two years and until his /her successor is qualified. The City Accountant shall keep and have charge of the accounts of the Town. He shall regularly audit the books and accounts of

all town agencies, and he shall have such powers and perform such other duties as the Town Council may prescribe in addition to such duties as may be prescribed by law.

(b) Clerk of the Council ? The City Council shall on or before January 15th in odd numbered years elect, by ballot or otherwise, a Clerk of the Council to hold office for a term of two years or until his/her successor is qualified. The Clerk of the Council shall give notice of all meetings of the Town Council to its members and to the public, keep a record of its proceedings and perform such duties as may be assigned by the Charter, by ordinance, or by other vote of the Town Council.

(c) City Solicitor ? The City Council shall, on or before January 15th in odd numbered years shall elect, by ballot or otherwise, a City Solicitor to hold office for a term of two years and until his/her successor is qualified.The City Solicitor shall represent the municipality in all court matters, advise the Town Council and municipal boards and officers upon all legal questions and perform such other duties as the Town Council may prescribe in addition to such duties as may be prescribed by law. (Approved by voters November 5th, 1985; see Resolution #1380 and Chapter 182 of the Acts and Resolves of 19S5).

(d) Salaries ? The Town Council shall set the salaries of the Town Accountant, Clerk of the Council, Town Manager and Town Solicitor. (Approved by voters November 5th, 1985; see Resolution #1380 and Chapter 182 of the Acts and Resolves of 1985).

## Section 2?9 Measures; Emergency Measures; Charter Objection

(a) In General ? No measure shall be passed finally on the date on which it is introduced, except in cases of special emergency involving the health or safety of the people or their property. Except as otherwise provided by the Charter, every adopted measure shall become effective at the expiration of thirty days after adoption or at any later date specified therein. Measures not subject to referendum shall become effective upon adoption. No ordinance shall be amended or repealed except by another ordinance adopted in accordance with the Charter, or as provided in the initiative and referendum procedures.

(b) Emergency measures ? An emergency measure shall be introduced in the form and manner prescribed for measures generally except that it shall be plainly designated as an emergency measure and shall contain statements after the enacting clause declaring that an emergency exists and describing its scope and nature in clear and specific terms. A preamble which declares and defines the emergency shall be separately voted on and shall require the affirmative vote of two?thirds of the Town Council. An emergency measure may be passed with or without amendment or rejected at the meeting at which it is introduced. No measure making a grant, renewal or extension, whatever its kind or nature, of any franchise or special privilege shall be passed as an emergency measure' and except as provided in General Laws/ Chapter 166, Sections 70 and 71 (relating to utility lines), no such grant, renewal or extension shall be made otherwise than by ordinance. After its adoption, an emergency measure shall be published as prescribed for other adopted measures. It shall become effective upon adoption or at such later time as it may specify.

(c) Charter Objection ? On the first occasion that the question on adoption of a measure is put to the Town Council, if a single member objects to the taking of the vote, the vote shall be postponed until the next meeting of the Town Council, whether regular or special. If two or more other members shall join the member in objection' such postponement

shall be until the next regular meeting; but for an emergency measure, at least four members in all must object. This procedure shall not be used more than once for any matter bearing a single docket number notwithstanding any amendment to the original matter.

### Section 2?10 Delegation of Powers.

The Town Council may delegate to one or more town agencies, the powers vested in the Town Council by the laws of the Commonwealth to grant and issue licenses and permits, and may regulate the granting and issuing of licenses and permits by any such town agency, and may, in its discretion, rescind any such delegation without prejudice to any prior action which has been taken.

### Section 2?11 Inquiries and Investigations.

The Town Council may require any town officer or member of a board or commission to appear before it, and give such information as it may require in relation to his office, its function, and performance. The Town Council shall give at least forty?eight hours written notice of the general scope of the inquiry which is to be made to any person it shall require to appear before it under this section. The Town Council may make investigations into the affairs of the Town and into the conduct of any town agency, and for this purpose may subpoena witnesses, administer oaths and require the production of evidence.

## ARTICLE 3

## EXECUTIVE BRANCH

### Section 3?1. Mayor ? Qualifications; Term of Office; Compensation.

(a) Mayor; Qualifications ? The Chief Executive Officer of the Town shall be a Mayor, elected by and from the qualified voters of the Town. Any voter domiciled in the Town shall be eligible to hold the office of mayor. He shall devote his full time to the office and shall not hold any other public office, elective or appointive, nor engage in any other business activity whether or not such business activity is pursued for gain, profit or other pecuniary advantage, during his term.

(b) Term of Office ? The term of the office of Mayor shall be two years/ beginning on the first Monday of January following his election and until his successor is qualified. No person shall hold the office of Mayor for more than three consecutive or non?consecutive terms.

(c) Compensation ? The Town Council shall, by ordinance, establish an annual salary for the Mayor.

### Section 3?2. Executive Authority and Duties.

The executive powers of the Town shall be vested solely in the Mayor, and may be exercised by him either personally or through the several Town agencies under his general supervision and control. The Mayor shall see that all of the provisions of the

http://www.cityofmethuen.net/Mayor/charter.htm

General Laws, of this Charter, of votes of the Town Council which require enforcement by him or officers subject to his direction and supervision are faithfully carried out and shall cause a record of all his official duties to be kept. He shall have the following authority and duties:

(a) He shall supervise and direct the administration of all departments, commission, boards and offices, except the Town Council, the School Committee, the Town Accountant, the Town Solicitor, and Clerk of the Council.

(b) He shall fix the compensation of all Town officers and employees appointed by him within the limits established by Town ordinances and existing appropriations.

(c) He shall attend all regular meetings of the Town Council, unless excused at his own request, and shall have a voice but no vote in all of its deliberations.

(d) He shall keep full and complete records of his office, and shall render as often as may be required by the Town Council, but not less than once a year, a full report of all operations during the period reported on, which report shall be made available to the public.

(e) He shall keep the Town Council fully advised as to the needs of the Town and shall recommend to the Town Council for adoption such measures requiring action by them as he may deem necessary or expedient.

(f) He shall have full jurisdiction over the rental and use of all Town facilities under his control. He shall be responsible for the maintenance and repair of all Town property under his control.

(g) He shall be responsible for the appointment, subject to the approval of the Town Council, of any necessary building and facilities committees having to do with the preparation of plans and supervision of work on all construction, reconstruction, alterations, improvements and other undertakings authorized by the Town Council, provided, however, that the approval of the School Committee shall be obtained for school construction or improvement plans.

(h) He shall keep a full and complete inventory of all property of the Town, both real and personal.

(i) He shall negotiate and may execute contracts involving any subject within his jurisdiction. All contracts shall be awarded by the Mayor, however, all contracts, prior to said award, shall meet with approval, by vote, of the majority of the Town Council.

(j) He shall be responsible for the purchasing of all supplies, materials and equipment for all departments and activities of the Town, but not including food for schools, school books and other instructional materials, supplies and equipment; library books and related printed and audio?visual subject material, unless otherwise requested by the School committee or the Library Trustees.

(k) The City of Methuen shall have a board of no less than three (3) Assessors appointed by the Mayor and he shall designate one of his appointees as Chairman thereof.

(l) He shall perform any other duties required by the ordinances or other votes of the Town Council.

(m) He shall exercise general supervision and direction over all Town agencies unless otherwise provided by law. Each Town agency shall furnish to him, forthwith upon his request, any information, materials or otherwise as he may request and as needs of his office and the interests of the Town require.

Section 3?3. Appointments by the Mayor.

Except as otherwise provided by this Charter, the Mayor shall appoint, upon merit and fitness alone, and may remove subject to the provisions of the civil service laws, the provisions of this Charter, or other pertinent statutes where applicable, all officers and employees of the Town, except employees of the School Department. All appointments of Department Heads, Assistant Department Heads, Division Heads, Police Superior Officers of the rank of Sergeant and above, Fire Department Superior Officers of the rank of Lieutenant and above, the Conservation Commission Agent, and all Boards and Commissions shall be subject to confirmation by a majority vote of the full City Council. The Mayor shall submit, in writing, to the Town council, at least ten days prior to the next regular meeting when the appointment is to be made, the name of any person he desires to appoint to a City position.

Section 3?4. Temporary Appointments to Town Offices.
Whenever a vacancy, either temporary or permanent, occurs in a Town office and the needs of the Town require that such office be filled, the Mayor may designate the head of another Town agency or a Town officer or employee, or some other person, especially fitted by merit and fitness, to perform the duties of the office on a temporary basis until such time as the position can be filled as otherwise provided by law, Charter or ordinance. The Mayor shall file a certificate, in substantially the following form, with the Town Clerk whenever he makes a designation under this section:
I designate (name of person) to perform the duties of the office of (designate office in which vacancy exists) on a temporary basis until the office can be filled by (here set out the regular procedure for filling the vacancy, or when the regular officer shall return). I certify that said person is qualified to perform the duties which will be required and that I make this designation solely in the interests of the City of Methuen.

Section 3?5. Communications; Special Meetings.
(a) Communications to the City Council ? Within six weeks following the start of each fiscal year, the Mayor shall submit the City Council, and make available for public distribution, a complete report on the financial and administrative activities and status of the City for the preceding fiscal year. He shall from time to time, and, whenever requested by the City Council, by written communication, keep the City Council fully informed of the financial condition and administrative issues of the City and shall recommend to them such measures for their consideration as, in his judgment, the needs of the City require.

(b) Special Meetings of the City Council ? The Mayor may at any time call a special meeting of the City Council for any purpose by causing a notice thereof to be delivered in hand or residence of each member of the City Council. Such notice shall, except in an emergency as determined by the Mayor, be delivered at least forty?eight (48) hours in advance of the time set and shall specify the purpose of purposes for which this meeting is to be held.

Section 3?6. Approval of Mayor; Exception (Veto).
Every order, ordinance, resolution or vote adopted or passed by the City Council relative to the affairs of the City shall be presented to the Mayor for his approval. If approved, he must sign it. If not, he shall return it, with his written objections, to the City Council who

shall, again, consider it. To override the Mayor's objections, a two?thirds vote is required. Further, the failure of the Mayor to submit his disapproval of the measure with written objections within ten (10) days after it is presented to him shall be deemed valid and in full force and effect. This section shall not apply to emergency measures as provided in Sections 2?9(a) and 2?9(b) of this Charter.

### Section 3?7. Temporary Absence of Mayor.

(a) Acting Mayor ? Whenever/ by reason of sickness/ absence from City or other unexpected cause, the Mayor shall be unable to perform the duties of his office for a period of three (3) successive working days or more, the City Council shall appoint from among its members an Acting Mayor to serve in the Mayor's absence.

(b) Powers of an Acting Mayor ? The Acting Mayor shall have all the powers of the Mayor except that he shall not make any permanent appointment or removal to or from any office unless the disability of the Mayor shall have continued for sixty (60) days or more without having resigned, nor shall he approve or disapprove of any measure passed by the City Council unless the time within the Mayor must act would expire before the return of the Mayor.

### Section 3?8. Vacancy in Office of Mayor.

(a) Special Election ? If a vacancy in the office of Mayor occurs in the first year of the term for which the Mayor is elected, whether by reason of death, resignation, removal from office, incapacity, or otherwise, the City Council shall forthwith order a special election to be held within thirty (30) days following the date the vacancy is created to fill such vacancy for the balance of the then unexpired term.

(b) Council Election ? If a vacancy in the office occurs in the second year of the term for which the Mayor was elected, whether by reason of death, resignation, removal from office, of otherwise, a meeting of the City council shall be called forthwith and they shall elect, by a majority vote, one of its members as Mayor for the unexpired term. Falling to so elect at said meeting, or, thirty (30) days thereafter, the Chairman of the City Council shall become Acting Mayor for the unexpired term. Upon the qualification of the City Council member or Chairman of the City Council as the Mayor under this section, a vacancy shall exist in his seat on the City Council which shall be filled in the manner provided in Section 2?6.

(c) Powers; Term of Office ? The Mayor elected under Section 3?8(a) of 3?8(b) shall have all the powers of the Mayor. He shall serve for the balance of the term unexpired at the time of his election to the office.

## SECTION 3-9 TERMS OF OFFICE - DEPARTMENT HEADS

The terms of office of Department Heads of the City of Methuen shall be three years. The term "Department Heads" as used herein, shall mean the Fire Chief, Director of Public Works, Veterans Service Agent, City Clerk, Treasurer/Tax Collector, and the Executive Director of the Council on Aging and such other officers who may be designated as Department Heads under City Ordinances. ( Approved by the voters November 5th 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996).

# ARTICLE 4

## School Committee

### Section 4?1 Composition; Eligibility; Election; Term.

(a) Composition ? There shall be a School Committee consisting of seven members, six of whom shall be nominated and elected at large, and the Mayor who shall serve as the seventh member of the School Committee. The Mayor shall also serve as the Chairman therof with full power to vote. The School Committee shall exercise control and management of the public schools of the city. (Approved by the voters November 5th 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996).

(b) Eligibility ? Only voters shall be eligible to hold office of School Committeeman.

(c) Election and Term ? The terms of School Committeemen shall be two years, beginning the first secular day in January after election and until their successors are qualified.

### Section 4?2 Organization.

The School Committee shall annually organize by the election from among its members a Chairman/ a Vice Chairman and a Secretary. The Vice Chairman shall preside at all meetings of the committee in the event of the absence or the disability of the Chairman.

### Section 4?3 General Powers and Duties.

The School Committee shall have the powers and duties which School Committees have under the General Laws and may have such additional powers and duties as the City Council may, by ordinance, from time to time assign. The powers of the School Committee shall include, but not be limited to, the power to: (1) appoint a Superintendent; (2) appoint all other officers and employees connected with the schools, except as otherwise provided by this Charter, fix their compensation and define their duties make rules concerning their tenure of office and discharge them (3) furnish all school buildings with proper fixtures, furnishings and equipment; and (4) make all reasonable rules and regulations consistent with law, for the management of the public schools of the City and for conducting the business of the Committee.

### Section 4?4 Location and Erection of Schools; Approvals Required.

No site for a school building shall be acquired by the City unless the approval of the site by the School Committee is first obtained. No plans for the construction of or alterations on a school building shall be accepted, and no work shall be begun on the construction or alteration of a school building, unless with the approval of the School Committee and the Mayor. The Mayor shall notify the School Committee in writing prior to or at the time of

each change in plans after work is begun. This section shall not require such approval for the making of ordinary repairs.

### Section 4?5 Prohibitions.

No member of the School Committee shall, during the term for which he was elected, hold any other compensated City office or City employment under the jurisdiction of the School Committee nor shall be eligible for appointment to any compensated City office or City employment under the jurisdiction of the School Committee, until one year after the term for which he was elected has expired. This provision shall not prevent a City officer or employee, under the jurisdiction of the School Committee, who has taken a leave of absence from such duties in order to serve as a member of the School Committee from returning to such office or employment following such services as a member of the School Committee.

### Section 4?6 Filling of Vacancies.

If a vacancy occurs in the office of School Committeeman whether by failure to elect or otherwise, the remaining School Committeemen shall, within twenty?one days following the date such vacancy is declared to exist, act to fill the said vacancy. The School Committee shall elect as acting School Committeeman whichever of the defeated candidates for election to the School Committee who received the highest number of votes at the last regular city election immediately preceding the date the vacancy is declared to exist and who received at least twenty (20) percent of the total votes cast for the office at such election, and who remains eligible and willing to serve. There being no such person, the School Committee shall choose from among the voters an acting School Committeeman to serve the balance of the unexpired term. If such choice is not made as hereinbefore provided within the said twenty?one days, the choice shall be made by the School Committeeman senior in length of service, or if there be more than one such, by the School Committeeman senior both in age and in terms of service. Any person so chosen shall be sworn and commence to serve forthwith. No vacancy shall be filled, in the manner hereinbefore provided, if a regular City election is to be held within one hundred twenty days following the date the vacancy is declared to exist.

### Section 4?7 Budget Hearing.

(a) At least thirty (30) days before the meeting at Which the School Committee is to vote on the budget request which it will submit to the Mayor for inclusion in the budget he is required to submit to the City Council, the School Committee shall cause to be published in a local newspaper a general summary of their proposed budget. The summary shall indicate specifically areas of increase from the present budget, if any, and the reasons for such changes and a notice stating (1) the times and places where complete copies of their proposed budget will be available for public examination, and (2) the date, not less than seven nor more than fourteen days following such publication, and the place at which a public hearing will be held by the School Committee on their proposed budget.

(b) The School Committee shall submit its annual budget to the City Council for approval in the following format: Expenditures for each individual school building in the City, including administration, if any, shall be broken down categorically by line item. Example: Teacher salaries, custodial salaries, teacher aide salaries, teacher supplies,

maintenance supplies, etc.

# ARTICLE 5

## Financial Procedures

### Section 5?1 Submission of Budget; Budget Message.

Within the period prescribed by state statute, the Mayor shall submit to the City Council a proposed budget for the ensuing fiscal year which shall provide a complete financial plan of all City funds and activities for the ensuing fiscal year, and accompanying budget message, and supporting documents, including the estimated effect of the proposed budget on the tax rate. The proposed budget, including departmental requests, shall be in the same format as prescribed by the Mayor.

The message of the Mayor shall explain the budget for all City agencies both in fiscal terms and in terms of work programs. It shall outline the proposed financial policies of the City for the ensuing fiscal year, describe the important features of the budget, indicate any major changes from the current fiscal year in financial policies, expenditures and revenues, together with the reasons for such changes; summarize the City's debt position and include such other material as the Mayor deems desirable or the City Council may reasonably require.

### Section 5?2 Action on the Budget.

(a) Public Hearing ? The City Council shall publish in one or more newspapers of general circulation in the City the general summary of the proposed budget as submitted by the Mayor by a notice stating: (1) the times and places where copies of the proposed budget are available for inspection by the public, and (2) the date, time and place, not less than two weeks after such publication, when a public hearing on said proposed budget will be held by the City Council.

(b) Adoption of the Budget ? The City Council shall adopt the budget, with or without amendments, within forty?five days following the date the budget is filed with the Clerk of the Council. In amending the budget, it may delete or decrease any programs or amounts except expenditures required by law or for debt service, but except on the recommendation of the Mayor, it shall not increase any item in or the total of the proposed budget.

If the City Council fails to take action With respect to any item in the budget within forty?five days after receipt of the budget, such amount shall, without any action by the City Council, become a part of the appropriations for the year, and be available for the purposes specified.

### Section 5?3 Capital Improvement Program.

(a) Submission ? The Mayor shall prepare and submit annually to the City Council a five?year capital improvement program at least thirty days prior to the final date for

submission of the operating budget.

(b) Contents - The capital improvement program shall include: (l) a clear summary of its contents; (2) a list of all capital improvements proposed to be undertaken during the next five fiscal years with supporting data; (3) cost estimates, method of financing, and recommended time schedules; and (4) the estimated annual cost of operating and maintaining the facilities included. The above information shall be revised and extended each year.

(c) Public Hearing ? The City Council shall publish in one or more newspapers of general circulation in the City the general summary of the capital improvement program and a notice stating: (1) the times and places where copies of the capital improvement program are available for inspection by the public; and, (2) the date, time and place not less than two weeks after such publication, when a public hearing on said program will be held by the City Council

(d) Adoption ? After the public hearing and on or before the twentieth day of the last month of the current fiscal year, the City Council shall, by resolution, adopt the capital improvement program, with or without amendment, provided that each amendment must be voted separately and that any increase in the capital improvement program as submitted must clearly identify the method of financing proposed to accomplish this increase.

## Section 5?4 Provision for Outside Audit.

At least once in every three years an outside audit of the books and accounts shall be made. In the event that the Commonwealth shall fail in any such period to provide for an audit to be conducted, within ninety days following the date a written request for them to do so is made by the City Council, the City Council shall provide for such an audit to be made by a certified public accountant, or firm of such accountants, who have no personal interests, direct or indirect, in the fiscal affairs of the City government or of any of its affairs or employees.

## Section 5?5 Annual Audit of Department Heads.

There will be a financial audit done by a private public accountant or firm of all department heads who are responsible for any negotiating or any individual who awards any contracts or investments in the interest of the city. This audit shall be done annually and if this audit finds that there is no wrongdoing as far as the residents of the City are concerned, a report stating such shall be placed on file with the City Clerk. If any wrongdoing is found, then the private accountant shall forward to the District Attorney's office of Essex County, any such evidence of wrongdoing for his necessary action.

## Section 5?6 Chief Financial Officer Obtaining Five (5) Quotes from Banks

The Treasurer shall obtain not less than five (5) quotes on interest rates from separate corporate financial institutions when borrowing or investing City funds and shall file such records of transaction with the City Council. This section does not pertain to bond issues.

# ARTICLE 6

## Administrative Departments

### Section 6?1 Reorganization Plans by City Council.

Except as otherwise prohibited by law or the Charter, the city Council may, by ordinance, reorganize, consolidate or abolish any existing City agency, in whole or in part; establish new City agencies and prescribe the functions of any City agencies. All City agencies under the direction and supervision of the Mayor shall be headed and administered by officers appointed by him.

### Section 6?2 Reorganization Plans by Mayor.

(a) The Mayor may, from time to time, prepare and submit to the City Council, reorganization plans which may, subject to applicable law and the Charter, reorganize, consolidate or abolish any City agency, in whole or in part, or establish new City agencies, as he deems necessary or expedient. Such reorganization plan shall be accompanied by an explanatory message when submitted.

(b) Every such reorganization plan shall, upon receipt by the Clerk of the Council, be referred to an appropriate committee of the City Council which shall, not more than thirty days later, hold a public hearing on the matter and shall, within ten days following such hearing, report either that it approves or that it disapproves of the plan. A reorganization plan shall become effective ninety days after the date it is received by the City Council, unless the City Council has, prior to that date, voted to disapprove the reorganization plan, or, unless a later effective date is specified in the plan. A reorganization plan presented by the Mayor to the City Council under this section may not be amended by it, but shall either be approved or rejected as submitted and shall not be subject to the objection as provided in Section 2?9(c).

### Section 6?3 Publication Of Reorganization Plan.

An up?to?date record of any reorganization plan under this article shall be kept on file in the office of the City Clerk and copies of all such plans shall be included as an appendix in any publication of the ordinances of the City.

# ARTICLE 7

## Nominations and Elections

### Section 7?1 City Elections; General and Preliminary.

The regular City election shall be held on the first Tuesday following the first Monday in November of each odd numbered year.

On the fourth Tuesday preceding every regular City election, there shall be held a preliminary election for the purpose of nominating candidates.

### Section 7?2 Preliminary Elections.

(a) Signature Requirements ? The number of signatures of voters required to place the

name of a candidate on the official ballot to be used at a preliminary election shall be as follows: For an office which is to be filled by vote of the whole City, not less than one hundred and fifty signatures, not less than fifty from each of the three districts. For an office which is elected by the voters in a district, not less than fifty signatures from said district.

(b) Ballot Position ? The order in which names of candidates appear on the ballot for each office shall be determined by a drawing by lot conducted by the City Clerk in the presence of such candidates or their representatives as may choose to attend such drawings.

(C) Determination Of Candidates for Election ? The two persons receiving at a preliminary election the highest number of votes for nomination for an office shall be the sole candidates for that office whose names may be printed on the official ballot to be used at the regular election at which such office is to be filled, and no acceptance of a nomination at a preliminary election shall be necessary to its validity.

If two or more persons are to be elected to the same office at such regular election, the several persons in number equal to twice the number so to be elected receiving at such preliminary election the highest number of votes for nomination for that office shall be the sole candidates for that office whose names may be printed on the official ballot.

If the preliminary election results in a tie vote among candidates for nomination receiving the lowest number of votes, which but for said tie vote would entitle a person receiving the same to have his name printed upon the official ballot for the election, all candidates participating in said tie vote shall have their names printed upon the official ballot, although in consequence, there be printed thereon candidates to a number exceeding twice the number to be elected.

(d) Nominations of Candidates; Conditions Making Preliminary Election Unnecessary ? If, at the expiration of the time for filing petitions of candidates to be voted for at any preliminary election, not more than twice as many such petitions have been filed with the City Clerk for an office as are to be elected to such office, the candidates whose petitions have thus been filed shall be deemed to have been nominated to said office and their names shall be voted on for such office at the succeeding regular election, and the City Clerk shall not print said names upon the ballot to be used at said preliminary election and no other nomination to said office shall be made. If, in consequence, it shall appear that no names are to be printed upon the official ballot to be used at any preliminary election on any district or districts of the City, no preliminary election shall be held in any such district or districts.

Section 7?3 Regular Election.

(a) Information to Voters ? If the candidate in a regular City election is an incumbent of the office to which he seeks election, against his name shall appear the phrase "candidate for re?election".

(b) Ballot Position ? The order in which names of candidates appear on the ballot for each

office in a regular City election shall be determined by a drawing by lot conducted by the City Clerk in the presence of such candidates or their representatives as may choose to attend.

### Section 7?4 Precincts and Districts.

The territory of Methuen shall be divided into twelve precincts, so established as to consist of as nearly equal a number of inhabitants as it is possible in compact and contiguous territory; bounded insofar as possible by the center line of known streets or ways or by other well defined limits. The twelve precincts shall be separated into three districts. The Central District shall include Precincts 1, 2, 6 and 10; the East District shall include Precincts 3, 7, 9 and 12; and the West District shall include Precincts 4, 5, 8 and 11. (Approved by the Legislature June 10th, 1986 ? Chapter 88 of the Acts and Resolves of 1986; see Resolution #1473).

### Section 7?5 Application of State Laws.

Except as expressly provided in the Charter and authorized by statute, all city elections shall be governed by the laws of the Commonwealth relating to the right to vote, the registration of voters, the nomination of candidates, the conduct of preliminary and regular elections, the submission of Charter amendments and other propositions, the counting of votes and the declaration of results.

## ARTICLE 8

### Free petition; Initiative; Referendum; Recall

### Section 8?1 Free Petition.

(a) Individual Petitions, Action Discretionary ? The city Council and the School committee shall receive all petitions which are addressed to them and signed by a voter and may, in their discretion, take such action in regard to such petitions as they deem necessary and appropriate.

(b) Group Petitions; Action Required ? The city Council(or the School Committee), as the case may be, shall hold a public hearing and act by taking a vote on the merits of every petition which is addressed to it and which is signed by at least one hundred fifty voters. The hearing shall be held by the City Council or the School Committee, or, in either case, by a committee or sub?committee thereof and the action by the City Council or School Committee shall be taken not later than three months after the petition is filed with the city Clerk. Hearings on two or more petitions filed under this section may be held at the same time and place. The City Clerk shall mail notice of the hearing to the ten petitioners whose names first appear on each petition at least seven days before the hearing. Notice by publication at least seven days prior to all such hearings shall also be made, and shall be at public expense. No hearing shall be heard upon any one subject matter more than once in any given twelve month period.

### Section 8?2 Citizen Initiative Measures.

(a) Commencement of Proceedings ? Initiative procedures shall be started by the filing of an initiative petition with the City Clerk. The petition shall be addressed to the City

Council or the School Committee, shall contain a request for passage of a particular measure set forth in the petition and shall be signed by not less than ten per cent of the total number of voters.

Signatures to initiative petitions need not be all on one paper. All such papers pertaining to any one measure shall be fastened together and shall be filed in the office of the City Clerk as one instrument, with the endorsement thereon of the names and addresses of the persons designated as filing the same. With each signature to the petitions, shall be stated the place of residence of the signer, giving the street and number, if any.

When such certificate has been so transmitted, said petition shall be deemed to be valid unless written objections are made with regard to the signatures thereon by a voter within forty?eight hours after such certification by filing such objections with the City Council or the School Committee, and a copy thereof with the registrars of voters. Any such objection shall be determined forthwith.

(b) Referral to City Solicitor ? If the city Clerk determines that a sufficient number of signers are voters, he shall transmit a copy of the petition to the city Solicitor. Within fifteen days after his receipt of the petition the City Solicitor shall advise the City Clerk in writing whether the measure may be proposed by initiative procedures and whether it may lawfully be passed by the City Council or the School Committee. If the opinion of the Solicitor is that the measure may not lawfully be passed, he shall state his reason or reasons therefor in his reply. The City Clerk shall forthwith furnish a copy of the City Solicitor's opinion to the person designated on the petition as filing the same.

(c) Initiative Petition; Requirements for Passage and Submission to Electorate ? If any initiative petition is signed by voters equal in number to at least ten per cent of the total number of voters, and, in the opinion of the City Solicitor, such measure may lawfully be passed by the City Council or the School committee the City Council or the School Committee within twenty days after the date of the certificate of the registrars to that effect: (1) shall pass said measure without alteration, subject to the referendum vote provided by this Charter; or (2) the City Council shall call a special election to be held on a date fixed by it not less than thirty nor more than forty?five days after the date of the certificate hereinbefore mentioned, and shall submit the proposed measure without alteration to a vote of the voters at that election; provided, that if any City election is otherwise to occur within one hundred and twenty days after the date of said certificate, the city Council may, at its discretion, omit the calling of a special election and submit the proposed measure to the voters at such approaching election. The ballots used when voting upon a proposed measure under this section shall state the nature of the measure in terms sufficient to show the substance thereof.

## Section 8?3 Citizen Referendum Procedures

. Referendum Petition; Effect on Final Passage ? If within twenty days after the final passage of any measure, except a revenue loan order, by the City Council or by the School Committee, a petition signed by voters equal in number to at least ten per cent of the total number of voters, and addressed to the City Council or to the School

Committee, as the case may be, protesting against such measure or any part thereof taking effect, is filed with the City Clerk, the same shall thereupon and thereby be suspended from taking effect; and the City Council or the School Committee, as the case may be, shall immediately reconsider such measure or part thereof; and if such measure or part thereof is not entirely rescinded, the city Council shall submit the same, by the method herein provided, to a vote of the voters either at the next regular City election, or at a special election which may, in its discretion, be called for the purpose and such measure or part thereof shall forthwith become null and void unless a majority of the voters voting on the Same at such election vote in favor thereof. The petition described in this section shall be termed a referendum petition and section 8?2 (a) shall apply to the procedure in respect thereto, except that the words "measure or part thereof protested against" shall for this purpose be understood to replace "measure" in said section whenever it may occur, and "referendum" shall be understood to replace the word "initiative" in said section. In addition to the requirements for filing as mentioned above, the following shall apply: referendum petitions shall be on a form as prepared by the City Clerk and such petition forms may not be issued on any referendum matter until the same has been finally passed in accordance with Article 2, Section 2?9(a) of the Methuen Home Rule Charter. Failure to comply with the above procedure shall invalidate any petition otherwise proper in form and substance. (Approved by voters November 5, 1985; see resolution #1359).

### Section 8?4 Submission of Proposed Measure to Voters.

The City Council may, of its own motion, and shall upon request of the School Committee if a measure originates with that committee and pertains to the affairs under its administration, submit to a vote of the voters for adoption or rejection at a general or special City election any proposed measure, or a proposition for the repeal or amendment of any measure, in the same manner and with the same force and effect as are hereby provided for submission on petition.

### Section 8?5 Measures with Conflicting Provisions.

If two or more proposed measures passed at the same election contain conflicting provisions, only the one receiving the greater number of affirmative votes shall take effect.

### Section 8?6 Recall Petitions.

(a) Who Can be Recalled ? The holder of any elective City office may be recalled therefrom by the voters as herein provided.

(b) Recall Petition ? Any one hundred fifty voters may file with the City Clerk an affidavit containing the name of the officer sought to be recalled and a statement of the grounds for the recall. The City Clerk shall thereupon deliver to said voters making the affidavit copies of petition blanks demanding such recall printed forms of which he shall keep available. The blanks shall be issued by the City Clerk with his signature and the official seal attached hereto. They shall be dated, shall be addressed to the City Council and shall contain the names of all persons to whom they are issued, the name of the person whose recall is sought, the grounds of recall as stated in the affidavit and shall demand the election of a successor in the said office. A copy of the petition shall be entered in a

record book to be kept in the office of the City Clerk. The recall petition shall be returned and filed with the City Clerk within sixty days after the filing of the affidavit, and shall have been signed by at least fifty per cent of the number of voters of the City who have voted in the last preceding local election, or in the case of a district councilman, of the district, who shall add to their signatures the street and number, if any, of their residences. The City Clerk shall within twenty?four hours of receipt submit the petition to the registrars of voters and the registrars shall forthwith certify thereon the number of signatures which are names of voters.

(c) City Council's Action on Receiving Petition - If the petition shall be found and certified by the City Clerk to be sufficient, he shall submit the same with his certificate to the City Council without delay, and the City Council shall forthwith give written notice of the receipt of the certificate to the officer sought to be recalled and shall, if the officer does not resign within five days thereafter, order an election to be held on a date fixed by them not less than forty?five nor more than sixty days after the date of the City Clerk's certificate that a sufficient petition is filed; provided, however, that if any other City election is to occur within sixty days after the date of the certificate, the city council shall postpone the holding of the recall election to the date of such other election. If a vacancy occurs in said office after a recall election has been ordered, the election shall nevertheless proceed as provided in this section.

(d) Nomination of Candidates ? Any officer sought to be removed may be a candidate to succeed himself, and unless he requests otherwise in writing, the City Clerk shall place his name on the ballot without nomination. The nomination of other candidates, the publication of the warrant for the removal election and the conduct of the same, shall all be in accordance with the provisions of law relating to elections, unless otherwise provided in this section.

(e) Incumbent Holds Office Until Election ? The incumbent shall continue to perform the duties of his office until the recall election. If then re?elected/ he shall continue in office for the remainder of his unexpired term, subject to recall as before, except as provided in this section. If not re?elected in the recall election, he shall be deemed removed upon the qualification of his successor, who shall hold office during the unexpired term. If the successor fails to qualify within five days after receiving notification of his election, the incumbent shall thereupon be deemed removed and the office vacant.

(f) Propositions on Ballot ? Ballots used in a recall election shall submit the following propositions in the order indicated:

For the recall of (name of officer)

Against the recall of (name of officer)

Immediately at the right of each proposition there shall be a square in which the voter, by making a cross mark (X), may vote for either of the said propositions.

Under the proposition shall appear the word "Candidates", the directions to voters required by Section 42 of Chapter 54 of the General Laws, and beneath this, names of

candidates nominated as hereinbefore provided. If a majority of the votes cast upon the question of recall is in the affirmative, the candidate receiving the highest number of votes shall be declared elected. If a majority of votes on the question is in the negative, the ballots for candidates need not be counted.

(g) Reappointment of Person Recalled ? No person who has been recalled from an office, or who has resigned from office while recall proceedings were pending against him, shall be appointed to any city office within two years after such recall or such resignation.


## ARTICLE 9

## GENERAL PROVISION


### Section 9?1 Certificate of Election and Appointment.
Every person who is elected or appointed shall receive a certificate of such election or appointment from the City Clerk which shall bear the date of its expiration. Except as otherwise provided by law, before performing any act under his election or appointment, he shall take and subscribe to an oath to qualify him to enter upon the duties of office. A record of the taking of such oath shall be made by the City Clerk. Any oath required by this section may be administered by any officer authorized by law to administer oaths. Records of transaction of all officers and boards shall be open to the inspection of the public.

### Section 9?2 Rules and Regulations.
A copy of all rules and regulations adopted by any City agency shall be filed in the office of the City Clerk and made available for review by any person who requests such information.

### Section 9?3 Re?enactment and Publication of Ordinances.
The City Council shall, at five year intervals, cause to be prepared by a special committee of the city Council appointed for that purpose proposed revisions or recodifications of all ordinances of the City which shall be presented to the City Council for re?enactment. Such revision or recodification shall be prepared under the supervision of the City Solicitor, or, if the City Council so directs, by special counsel retained for that purpose. Copies of the revised ordinances shall be made available for distribution, provided, however, that a charge not to exceed the actual cost per copy of reproduction may be charged.

### Section 9?4 Liability of City Offices and Agencies.

A11 City officers and members of City agencies shall be deemed to be public or municipal officers or officials. Subject to appropriation, the City may indemnify any such officer or member for expenses or damages incurred in the defense or settlement of a claim against him which arose while acting within the scope of his official duties or employment, but only to the extent and subject to the limitations imposed by the General Laws.

## Section 9?5 Prohibition.

No member of the executive or legislative branch or of the School committee shall appear as counsel before any City office or agency.

### Section 9?6 Meetings of Qualified Voters.

General meetings of the voters may be held from time to time, according to the right secured to the people by the Constitution Of the Commonwealth; and all such meetings may, and upon the request in writing of one hundred voters setting forth the purpose thereof, shall be duly called by the City Council .

### Section 9?7 Severability.

If any provision of the Charter is held invalid, the other provisions of the Charter shall not be affected thereby. If the application of the Charter or any of its provisions to any person or circumstance is held invalid, the application of the Charter and its provisions to other persons and circumstances shall not be affected thereby.

### Section 9?8 Specific Provisions Shall Prevail.

To the extent that any specific provision of the Charter will conflict with any provisions expressed in the Charter in general terms, the specific provisions shall prevail.

### Section 9?9 References to General Laws.

All references to the General Laws contained in the Charter refer to the General Laws of the Commonwealth of Massachusetts and are intended to include any amendments or revisions to such chapters and sections or to the corresponding chapters and sections of any re?arrangement of the General Laws enacted subsequent to the adoption of the Charter.

### Section 9?10 Removals and Suspensions.

(a) In General ? Any appointed officer or full-time salaried employee of the City, not subject to the provisions of the state civil service law, whether appointed for a fixed or an indefinite term, may be suspended or removed from office by the appointing authority for good cause. The term cause shall include, but not be limited to the following: incapacity other than temporary illness, inefficiency, insubordination and conduct unbecoming the office.

(b) Suspension ? Any appointed officer or full-time salaried employee of the City may be suspended from the office by the appointing authority if such action is deemed by them to be necessary to protect the interest of the City. However, no suspension shall be for more than fifteen days. Suspension may be coterminous with removal and shall not interfere with the rights of the officer or employee under the removal procedure given below.

(c) Removal ? The appointing authority when removing any such officer or employee shall act in accordance with the following procedure:
1. A written notice of intent to remove and a statement of the cause or causes therefor shall be delivered by registered mail to the last known address of the person sought to

be removed.

**2. Within five days of delivery of such notice the officer or employee may request a public or closed hearing to be held by the City Council at which he may be represented by counsel, who shall be entitled to present evidence, call witnesses and to question any witness appearing at the hearing. Such hearing shall be conducted under the rules of evidence.**

**3. Between one and ten days after the public or closed hearing is adjourned, the City Council shall direct the appointing authority to take final action by either removing the officer or employee or notifying him that the notice has been rescinded.**

**4. After delivery of this notice of intent to remove, if the officer or employee fails to request a hearing, the appointing authority shall take final action either by removing the officer or employee or notifying him that the notice has been rescinded.**

**Nothing in this section shall be construed as granting a right to such a hearing to a person who holds a position for a fixed term, when his term expires.**

**Section 9?11 Procedures.**
**(a) Meetings ? All multiple member bodies of the City whether elected or appointed or otherwise constituted, shall meet regularly at such times and places within the City as they may prescribe. Except in emergencies, special meetings of any multiple member body shall be held on the call of the respective chairman or by one?third of the members thereof by written notice delivered to the residence or place of business of each member at least forty?eight hours in advance of the time set. A copy of the said notice shall also be posted on the City bulletin board(s). Special meetings of any multiple member body shall also be called within one week after the date of the filing with the City Clerk of a petition signed by at least one hundred voters and which states the purpose or purposes for which the meeting is to be called. Except in cases of special emergency as otherwise authorized by the General Laws, all meetings of all multiple member bodies shall be open and public; however, the multiple member body may recess for the purpose of discussing in a closed or executive session limited to its own membership, any matter which would tend to defame or prejudice the character or reputation of any person, which would affect the public security, or which might have a direct fiscal effect on the city, provided that the general subject matter for consideration is expressed in the motion calling for such session.**

**(b) Agendas ? Except in cases of special emergency, at least forty?eight hours before any meeting of a multiple member body is to be held, an agenda containing all items which are scheduled to come before it at the meeting shall be posted. No action taken on a matter not included in the posted agenda shall be effective unless the body first adopts by special vote a resolution declaring that an emergency exists and that the particular matter must be acted upon at that meeting for the immediate preservation of the peace, health, safety or convenience of the City.**

**(C) Rules and Journal ? Each multiple member body shall determine its own rules and**

order of business unless otherwise provided by the Charter or by law and shall provide for keeping a journal of its proceedings. These rules and journals shall be a public record kept available in a place convenient to the public at all times and certified copies shall be kept available in the City Clerk's office.

(d) Voting ? Except on procedural matters all votes of all multiple member bodies shall be taken by a call of the roll and the ayes and nays shall be recorded in the journal, provided, however, that if the vote is unanimous only that fact need be recorded.

(e) Quorum ? A majority of the members of a multiple member body shall constitute a quorum, but a smaller number may adjourn from time to time and compel the attendance of absent members in the manner and subject to the penalties prescribed by the rules of the body. No other action shall be valid or binding unless ratified by the affirmative vote of the majority of the full body.

### Section 9?12 Definitions.

Unless another meaning is clearly apparent from the manner in which the word is used, the following words as used in the Charter shall have the following meanings:

(a) Charter ? The word "Charter" shall mean this Charter and any amendments to it made through any of the methods provided under Article LXXXIX of the amendments to the State Constitution.

(b) Days ? The word "days" shall refer to business days, not including Saturdays, Sundays, and Legal Holidays, when the time set is seven days or less; when more than seven days, every day shall be included when counting days.

(c) Emergency ? The word "emergency" shall mean a sudden, unexpected, unforeseen happening, occurrence or condition which necessitates immediate action.

(d) Full Council ? The words "full Council" shall mean the entire authorized complement of the City Council notwithstanding any vacancies which might exist.

(e) Initiative Measure ? The words "initiative measure" shall mean a measure proposed by initiative procedures under the Charter, including a specific item in a City budget or School Committee budget but excluding:

1. Proceedings relating to the organization or operation of the City Council or School Committee;

2. An emergency measure passed in conformity with the Charter;

3. The City budget as a whole or the School Committee budget as a whole;

4. A revenue loan order;

5. An appropriation for the payment of the City debts or obligations;

**6. Any appropriation of funds necessary to implement a written agreement executed under General Laws, Chapter 149, Section 1781 (relating to collective bargaining);**

**7. Any proceeding or part thereof/ relating to the election, employment, appointment, suspension, transfer, demotion, removal or discharge of any City officer or employee;**

**8. Any proceeding repealing or rescinding a measure, or a part thereof, which is protested by referendum procedures.**

**(f) Majority Vote ? The words "majority vote" shall mean a majority of those present and voting, provided, that a quorum of the body is present.**

**(g) Measure ? The word "measure" shall mean an ordinance passed or which could be passed by the City Council or an order, resolution, vote or other proceeding passed or which could be passed by the City Council or School Committee.**

**(h) Multiple Member Body ? The words "multiple member body" shall mean any body consisting of two or more persons, whether elected, appointed or otherwise constituted.**

**(i) Municipality ? Methuen shall have a municipal form of government.**

**(j) Number and Gender ? The singular number may be extended and applied to several persons or things; words imparting the plural number may include the singular; and words imparting the masculine gender shall include the feminine gender.**

**(k) Referendum Measure ? The words "referendum measure" shall mean a measure protested by referendum procedures under the Charter, including a specific item in the City budget or School Committee budget, but excluding items #1 through 7 mentioned under the definition of (e) Initiative Measures, and (8) any proceeding providing for the submission or referral of a matter to the voters at an election.**

**(l) City ? The word "City" shall mean the name "City of Methuen".**

**(m) City Agency ? The words 'city agency shall mean any board, commission, committee, department, or office of the City government.**

**(n) Voters ? The word "voters" shall mean registered voters of the City of Methuen.**

**ARTICLE 10**

**Transitional Provision**

**Section 10?1 Continuation.**
**All by?laws, ordinances, resolutions, of the previous City Council votes, and rules and regulations of the City which are in force at the time the Charter is adopted, not inconsistent with the provisions of the Charter, shall continue in force until amended or**

repealed.

## Section 10?2 Continuation of Government.

**All City agencies shall continue to perform their duties until reappointed, re?elected, or until successors to their respective positions are duly appointed or elected or their duties have been transferred.**

## Section 10?3 Continuation of Administrative Personnel.

**Any person holding an office or position in the administrative service of the City, or any person serving in the employment of the City shall retain such office or position and shall continue to perform his duties until provisions shall have been made in accordance with the Charter for the performance of the said duties by another person or agency; provided, however, that no person in the permanent full time service of employment of the City shall forfeit his pay grade or time in service. All such persons shall be retained in a capacity as similar to their former capacity as it is practical so to do.**

## Section 10?4 Transfer of Records and Property.

**All records, property, and equipment whatsoever of any Town agency or part thereof, the powers and duties of which are assigned on whole or part to another Town agency shall be transferred forthwith to the Town agency to which such powers and duties are assigned.**

## Section 10?5 Effect on Obligations, Taxes and other Legal Acts.

**All official bonds, recognizances, obligations, contracts and other instruments entered into or executed by or to the Town before its adoption of the Charter, and all taxes, special assessments, fines, penalties, forfeitures incurred or imposed, due or owing to the Town, shall be enforced and collected, and all writs, prosecutions, actions and causes of action, except as herein otherwise provided, shall continue without abatement and remain unaffected by the Charter; and no legal act done by or in favor of the Town shall be rendered invalid by its adoption of the Charter.**

## Section 10?6 Council Salary.

**The salary to be paid to each member of the Town Council elected at the first election shall be determined by the Town Council but under no circumstances shall exceed $1.000.00 per annum. This salary if any shall continue until changed by ordinance under the provisions of Section 2?3 of the Charter.**

## Section 10?7 Time of Taking Effect.

**This Charter shall become fully effective on January 1, 1978 but it shall take partial effect in accordance with the following schedule:**

**(a) The first regular election shall be held in accordance with Article 7?1 of this proposed Charter on the first Tuesday following the first Monday in November, 1977. All of the provisions of the Charter which relate to the conduct of regular Town elections including a preliminary election with regard to the Town Council shall take effect as stated in the Charter.**

(b) The school committee shall only elect three members at large in November of 1977 for a term of two years. The three school committeemen elected at the regular Town election of April, 1977 shall continue to serve until the election of November, 1979. At that time six school committeemen will be elected every two years in accordance with the Charter proposed.

(c) The powers and duties of the Town Council shall not become fully effective until the first secular day of January, 1978, but in the meantime, the Town Council shall prepare for the transition to the new form of government as follows:

1. They shall establish qualifications and procedures to follow in the selection of a Town Manager to serve under the Charter. The appointment of a Town Manager shall be effective on the second Monday of January following their election.

2. They shall cause to be prepared rules and regulations governing the conduct of Council business. They shall study the requirements of the new Council and may prepare all necessary ordinances to be effective, for the orderly and convenient exercise of the administrative affairs of the Town. They shall consider and prepare such agency reorganizations as they deem advisable, such as a Community Development Authority and a Human service board, for their consideration at the first session of the Council after January 1, 1978 but shall take no such action until they have taken the oath of office on the first secular day of 1978.

(d) Representatives to Greater Lawrence Regional Vocational Technical High School. The committee members elected by the Town of Methuen to the Greater Lawrence Regional Vocational Technical High School district shall be elected in the following manner:

1. The committee member to be elected at the April, 1977 election shall serve until the end of 1979 and his replacement shall be elected at the November, 1979 election.

2. The committee member whose term would have expired after the April, 1979 election shall serve until the end of 1979 and his replacement shall also be elected in the November, 1979 election.

Thereafter, both representatives that Methuen is entitled to will be elected at the regular election held every two years in accordance with this Charter.

(e) Representatives to Nevins Library.

The representatives elected by the Town of Methuen to the Nevins Memorial Library will be elected in the following manner:

1. The delegate who will be elected in April, 1977 will serve until the end of 1979 and his replacement will be elected in the November, 1979 election.

2. The delegate who would have been elected in the April, 1978 election Will continue

serving as a holdover and he will serve until the end of 1979 and his replacement will be elected at the November, 1979 election.

Thereafter, both representatives will be elected in the regular manner.

(f) Any officials elected under the previous Charter shall remain in office until January 1, 1978 unless specific provisions for their continuance is provided for in this Charter.

(g) Community Development Department.

The Town Council, within sixty (60) days after taking office, shall file a special act with the Great and General Court of the Commonwealth of Massachusetts to create a Community Development Department which will combine the Methuen Housing Authority, Methuen Redevelopment Authority, Methuen Planning Board and any other boards and commissions that the Town Council feels is necessary to coordinate the present responsibilities of these boards and commissions.

(h) Elimination of fiscal autonomy for the Methuen School Department.

The Town Council shall, within thirty (30) days after taking office in January 1978, submit home rule legislation which shall eliminate fiscal autonomy for the Methuen School Department. Such legislation shall allow the Town Council, by a 4/5 vote, to reduce the budget as submitted by the Methuen School Department.

(i) The Town Manager appointed in January following the election at which the Charter is adopted shall assist the Town Council in the establishment of the new Charter as they may request him to do.

(j) The councillors in office at the time of the first November election shall continue to serve in that office until December 31st of that year. They shall be responsible for general operation of the government and shall continue to perform all of the powers, duties and functions of their office as though, this, the Charter, had not been adopted except that they shall coordinate all of their long-range plans with the new members of the new Town Council.

Section 10?8 Disposition of Special Acts.

(a) Partial Repeal of Certain Special Acts ? The following special acts, insofar as they confer power upon the Town of Methuen which the Town would not otherwise hold under the Charter, General Laws or the Constitution, are retained; otherwise, they are hereby repealed, it being the explicit intention of this paragraph that portions of any special acts retained which limit or restrict a power conferred or the manner in which it is to be exercised be repealed and that powers so conferred are to he exercised in accordance with the Charter.

Chapter 310 of the acts of 1892; Chapter 176 of the acts of 1909; Chapter 57 of the acts of 1968.

**(b) Special Act Specifically Retained ?** The following act is hereby recognized, confirmed and retained: Chapter 12 of the acts of 1725.

**Section 10?9 Town Solicitor Appointment/Time of Taking Effect.**
The provisions of Section 2?8(c) relative to the appointment of the Town Solicitor shall take effect on July 1st, 1986, provided, however, that the Town Council shall, upon the effective date of the act, assume supervision and direction of the Town Solicitor and he/she shall become directly responsible and accountable to the Town Council. (Approved by voters November 5,1985, see Resolution #1380 Chapter 182 of the Acts and Resolves 1985.)

## CHRONOLOGY OF CHARTER AMENDMENTS

1. <u>Home Rule Charter adopted April 23rd, 1977, effective January 1st, 1978,</u>

2. <u>Article 2, Town Council, Section 2?2, Organization.</u> Amendment approved by the voters November 3rd, 1981. Amendment submitted to voters by the Town Council, Resolution #758, approved March 16th, 1981.

This section originally read as follows:

### Section 2?2 Organization

After the Councillors Elect have been sworn, the Town Council shall be called together by the oldest member elected who shall preside. The Town Council shall then elect, from among its members, a chairman and vice chairman to serve at the pleasure of the Town Council. The chairman shall preside at all meetings of the Town Council, and perform such other functions as may be assigned by the Charter, by ordinance or by vote of the Town Council. The vice chairman shall act as chairman of the Council during the absence or disability of the chairman. The Town Council shall elect from among its members one Councillor to sit as a voting member of the School Committee. This member shall serve at the pleasure of the Town Council.

3. <u>Article 4, School Committee, Section 4?1, subsection (a), Composition.</u> Amendment approved by the voters November 3rd, 1981. Amendment submitted to voters by the Town Council, Resolution #758, approved March 16th, 1981.

This section originally read as follows:

(a) Composition ? There shall be a School Committee of seven members. six of these members to be nominated and elected at?large. The seventh member shall be a member of the Town Council elected by the Town Council. The School Committee shall exercise control and management of the public schools of the Town. All school committeemen shall be nominated and elected by the voters at large.

4. <u>Article 8, Referendum Petitions, Section 8?3.</u> Amendment approved by the voters November 5th, 1985. Amendment submitted to voters by the Town Council, Resolution #1359, approved February 25th, 1985. Said amendment added the last two sentences at the end of the second paragraph.

5. <u>Appointment of Town Solicitor.</u> Amendments approved by the voters November 5th, 1985. Amendments submitted to the voters by the Town Council, Resolution #1380, approved August 5th, 1985 and enacted by the General Court as Chapter 182 of the Acts and Resolves of 1985.

Said act:

(a) Struck sub?section (c) of Article 2, Section 2?8, and replaced the same with the present section;

(b) Moved former sub?section (c) to new subsection (d);

(c) Added new Article 10, Section 10?9.

6. <u>Number of Precincts Increased.</u> Amendment approved by the legislature June 10th, 1986 as Chapter 88 of the Acts and Resolves of 1986. Amendment submitted by the Town Council, Resolution #1473, approved April 16th, 1986.

Amendment changed:

(a) Article 2, Section 2?1, sub?section (a), which originally read:

"Precincts 1, 2 and 6 to be known as the central district; precincts 3, 7 and 9 to be known as the east district; and precincts 4, 5 and 8 to be known as the west district".
To:

(b) Article 7, Section 7?4, which reads:

Section 7?4 Precincts and Districts.

The territory of the Town shall be divided into nine precincts so established as to consist of as nearly equal a number of inhabitants as it is possible in compact and contiguous territory; bounded insofar as possible by the center line of known streets or ways or by other well defined limits.

The nine precincts shall be separated into three districts. The central district shall include precincts 1, 2 and 6; the east district shall include precincts 3, 7 and 9; and the west district shall include precincts 4, 5 and 8.

7. <u>Election of a Mayor and Establishment of Limitation of Terms of City Councillors.</u> Chapter 332 of the Acts and Resolves of 1993 accepted by the voters on May 4th, 1993 replaced the Town Manager with a Mayor and placed term limits on the Mayor and City Councillors.

**8. Section 9-10 of Article 9, Removals and Suspensions.**

**The following was added: "Nothing in this section shall be construed as granting a right to such a hearing to a person who is a member of Local 3699, American Federation of State, County and Municipal Employees, AFL-CIO, Methuen Support Staff Employees unit. Said member shall be governed by the discplinary procedure of said units collective bargaining agreement with the Town.Chapter 76 of the Acts and Resolves of 1996.**

**9. Article 2, Sections 2-8(a), (b) and (c) Appointment of City Accountant , Clerk of the Council and City Solicitor.**

**Amendment approved by the Legislature June 28th 1996 as Chapter 145 of the Acts and Resolves of 1996. Amendment submitted by the City Council, Order # 3738, approved February 5th 1996.**

**10. Article3, Section 3-3 Appointments by the Mayor**

**Amendment approved by the voters November 5th 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.**

**11. Article 3 Section 3-9 Terms of Office Department Heads**

**New section added to Charter. Amendment approved by the voters November 5th 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.**

**12. Article 4, School Committee, Section 4-1 Subsection (a) Composition.**

**Amendment approved by the voters November 5th 1996; see Resolution #3745 and Chapter 148 of the Acts and Resolves of 1996.**

[Return to top of page](#)

*Copyright ? 1997 City of Methuen.Com*
*For questions or comments on this page contact* billmanzi@cityofmethuen.com

I, Maurice Lariviere, do hereby tender my resignation to the City of Methuen, effective immediately, this 16th Day of February 2005.

I also hereby waive my rights for an impartial panel or an ARTICLE 9 Section 9-10 hearing under the Methuen Home Rule Charter.

_____
Maurice J. Lariviere

_____
Date  8/16/05

Witnessed:

_____
David J. Bain JR.

_____
Date  Feb/16/2005

# SEXUAL HARASSMENT POLICY OF THE CITY OF METHUEN

## I. Introduction

It is the goal of the City of Methuen to promote a workplace that is free of sexual harassment. Sexual harassment of employees occurring in the workplace or in other settings in which employees may find themselves in connection with their employment is unlawful and will not be tolerated by this organization. Further, any retaliation against an individual who has complained about sexual harassment or retaliation against individuals for cooperating with an investigation of a sexual harassment complaint is similarly unlawful and will not be tolerated. To achieve our goal of providing a workplace free from sexual harassment, the conduct that is described in this policy will not be tolerated and we have provided a procedure by which inappropriate conduct will be dealt with, if encountered by employees.

Because Methuen takes allegations of sexual harassment seriously, we will respond promptly to complaints of sexual harassment and where it is determined that such inappropriate conduct has occurred, we will act promptly to eliminate the conduct and impose such corrective action as is necessary, including disciplinary action where appropriate.

Please note that while this policy sets forth our goals of promoting a workplace that is free of sexual harassment, the policy is not designed or intended to limit our authority to discipline or take remedial action for workplace conduct which we deem unacceptable, regardless of whether that conduct satisfies the definition of sexual harassment.

## II. Definition Of Sexual Harassment

In Massachusetts, the legal definition for sexual harassment is this: "sexual harassment" means sexual advances, requests for sexual favors, and verbal or physical conduct of a sexual nature when:

(a) Submission to or rejection of such advances, requests or conduct is made either explicitly or implicitly a term or condition of employment or as a basis for employment decisions; or,

(b) Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment.

Under these definitions, direct or implied requests by a supervisor for sexual favors in exchange for actual or promised job benefits such as favorable reviews, salary increases, promotions, increased benefits, or continued employment constitutes sexual harassment.

The legal definition of sexual harassment is broad and in addition to the above examples, other sexually oriented conduct, whether it is intended or not, that is unwelcome and has the effect of creating a work place environment that is hostile, offensive, intimidating, or humiliating to male or female workers may also constitute sexual harassment.

While it is not possible to list all those additional circumstances that may constitute sexual harassment, the following are some examples of conduct, which if unwelcome, may constitute sexual harassment depending upon the totality of the circumstances including the severity of the conduct and its pervasiveness:

*Unwelcome sexual advances -- whether they involve physical touching or not;

*Sexual epithets, jokes, written or oral references to sexual conduct, gossip regarding one's sex life; comment on an individual's body, comment about an individual's sexual activity, deficiencies, or prowess;

*Displaying sexually suggestive objects, pictures and/or cartoons;

*Unwelcome leering, whistling, brushing against the body, sexual gestures, suggestive or insulting comments;

*Inquiries into one's sexual experiences; and,

*Discussion of one's sexual activities.

All employees should take special note that, as stated above, retaliation against an individual who has complained about sexual harassment, and retaliation against individuals for cooperating with an investigation of a sexual harassment complaint is unlawful and will not be tolerated by this organization.

## III. Complaints of Sexual Harassment

If any of our employees believes that he or she has been subjected to sexual harassment, the employee has the right to file a complaint with our organization. This may be done in writing or orally.

If you would like to file a complaint you may do so by contacting the Director of Human Resources at 978-794-3237. The Human Resources office is located in Room 313, Searles Building 41 Pleasant Street, Methuen. The director is also available to discuss any concerns you may have and to provide information to you about our policy on sexual harassment and our complaint process.

## IV. Sexual Harassment Investigation

When we receive the complaint we will promptly investigate the allegation in a fair and expeditious manner. The investigation will be conducted in such a way as to maintain confidentiality to the extent practicable under the circumstances. Our investigation will include a private interview with the person filing the complaint and with witnesses. We will also interview the person alleged to have committed sexual harassment. When we have completed our investigation, we will, to the extent appropriate inform the person filing the complaint and the person alleged to have committed the conduct of the results of that investigation.

If it is determined that inappropriate conduct has occurred, we will act promptly to eliminate the offending conduct, and where it is appropriate we will also impose disciplinary action.

## V. Disciplinary Action

If it is determined that inappropriate conduct has been committed by one of our employees, we will take such action as is appropriate under the circumstances. Such action may range from counseling to termination from employment, and may include such other forms of disciplinary action, as we deem appropriate under the circumstances.

## VI. State and Federal Remedies

In addition to the above, if you believe you have been subjected to sexual harassment, you may file a formal complaint with either or both of the government agencies set forth below. Using our complaint process does not prohibit you from filing a complaint with these agencies. Each of the agencies has a short time period for filing a claim (EEOC - 300 days; MCAD – 300 days).

    1. The United States Equal Employment Opportunity Commission ("EEOC") One Congress Street, 10th Floor Boston, MA 02114, (617) 565-3200.