UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CIVIL ACTION No. 05-11579EFH

| | |
|---|---|
| MAURICE LARIVIERE, | ) |
| | ) |
| Plaintiff | ) |
| v. | ) |
| | ) |
| JOSEPH SOLOMON, individually, and as | ) |
|    Chief of Police of the City of Methuen, and | ) |
| JOSEPH ALAIMO, individually, and as | ) |
|    Deputy of Police of the City of Methuen, and | ) |
| THE CITY OF METHUEN | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S CONCISE STATEMENT OF ADDITIONAL MATERIAL FACTS**

Plaintiff acknowledges that this Statement is longer and more comprehensive than "concise" implies, but submits that it is necessary because the defendants' Statement deliberately omits the context which elucidates the conduct and the missteps of all the parties. Therefore, facts stated by the defendants are at times vague and misleading because they represent only parts of the critical events. The jury will consider the totality of the circumstances and will not be limited to hearing partial versions or cherry-picked facts. Simply put, it is in the defendants' best interests that the whole story be withheld, but a proper consideration of the plaintiff's case demands that the whole story be revealed.

Finally, plaintiff has condensed the most relevant facts from the numerous exhibits into this admittedly lengthy document for the convenience of the Court.

1.    Plaintiff Maurice Lariviere ("Lariviere") is a resident of Windham, New Hampshire. Until February 16, 2005, he was the city solicitor for the City of Methuen. Ex. A, ¶ 1.

2.     Defendant Joseph Solomon ("Solomon") is an individual who resides at Methuen, Massachusetts.  At all times relevant hereto, he was the chief of police of the City of Methuen. Ex. A, ¶ 2. Ex. E, p. 5. He was appointed by then Mayor Sharon Pollard.  Ex. E, p. 5.

3.     Defendant Joseph Alaimo ("Alaimo") is an individual who resides at Methuen, Massachusetts.  At all times relevant hereto, he was the deputy chief of police of the City of Methuen. Ex. A, ¶ 3. He was also appointed by Pollard, and is the only sworn officer who was not appointed under civil service. Ex. F, p. 5, Ex. H, p. 37. His wife was Secretary to Pollard. Ex. F, p. 6, Ex. H, p. 38.

4.     The City of Methuen is a duly chartered city located in Massachusetts with a principal place of business at 41 Pleasant Street, Methuen, Massachusetts. Ex. A, ¶ 4.

5.     The City Solicitor's position is a two-year appointment made by the City Council pursuant to the Home Rule Charter of the City of Methuen.  Lariviere had been reappointed by the City Council ("the Council") in January of 2005. Ex. A, ¶ 5.

6.     Prior to that, Lariviere had served as City Solicitor for approximately 25 years, and has continuously been reappointed by numerous administrations. No complaints whatsoever have been lodged against him concerning inappropriate conduct with employees or staff. Ex. A, ¶ 6.

7.     The Mayor appoints employees of the City Solicitor's office. At all times relevant hereto, the Mayor of Methuen was Sharon Pollard ("the Mayor"). Ex. A, ¶ 7.

8.     Since mid-2001, relations between the Mayor and Lariviere have been acrimonious, upon information and belief because Lariviere was not appointed by, under the control of, beholden to, or subservient to the Mayor. Ex. A, ¶ 8.  Even the present Mayor, William Manzi,

then a City Councilor, was aware that Pollard was dissatisfied with Lariviere and wanted to replace him with a solicitor beholden to her. Ex. J, p. 10-38.

9.    For example, the Mayor repeatedly became angry when Lariviere refused to disclose to the Mayor confidential communications with city councilors. Lariviere's policy, as the City Solicitor, was to keep his conversations with both councilors and the Mayor confidential. Accordingly, any documents such as ordinances or resolutions prepared for any councilor and/or the Mayor were kept confidential until the client went public with them. Lariviere would not convey any information on the existence of the documents until the councilor or the Mayor placed them on the agenda. The Mayor would often express disgust that she was not immediately told when a councilor talked to Lariviere about any matters including resolutions or ordinances. Ex. A, ¶ 9.

10.    In one instance, a council dispute erupted regarding raises being granted to department heads. A councilor had Lariviere draft a salary increase ordinance, but only for the department heads of elder affairs and veterans, and not other department heads. In accordance with his practice, Lariviere did not report this draft ordinance to anyone, including the Mayor. After reviewing the draft agenda, the Mayor screamed at Lariviere for not disclosing this to her. Lariviere responded that it had always been his policy to not breach attorney-client confidentiality, including not telling councilors when he did work for her. The Mayor then screamed over the phone "You scare me," and hung up. Ex. A, ¶ 10.

11.    The Mayor also resented Lariviere because he wrote a report defending a political opponent and enemy of hers. In early 2004, her opponent had been in an accident while exiting her driveway and received a citation relating to the accident. After filing a complaint with the police claiming the citation was based on political retribution, the Mayor directed that Lariviere

conduct a thorough investigation, which he did.  Lariviere then wrote a report concluding that the

Mayor's opponent was not properly ticketed, and that in fact the accident was the fault of the

other driver. Ex. A, ¶ 11.

12.    The next day, Lariviere went on vacation. Shortly thereafter, he received a call from a

city councilor on behalf of the mayor, telling him that the Mayor wanted Lariviere to toss the

report and re-write it, deleting all reference to her opponent not being at fault. The Mayor then

ordered Lariviere and the city councilor to appear for a meeting at which the Mayor tried to force

Lariviere to change the report.  Lariviere steadfastly refused, and the Mayor left the meeting

angry and disgusted. Ex. A, ¶ 12.

13.    On another occasion, Solomon ordered a police officer to appear at city hall on the

night of a city Council meeting and issue tickets to persons parking in areas with signage limiting

the time for parking. Two tickets were given out, one to a political opponent of the Mayor and

the other to a city councilor opponent of the Mayor. The next day, Lariviere went to the police

station and advised that the ticketing was illegal.  Solomon relayed this to the Mayor who,

according to Solomon, was outraged that Lariviere had interfered with this ticket issue. The

tickets were later withdrawn. Ex. A, ¶ 13.

14.    In the eight years prior to the Mayor's election, insurance had been handled by the

purchasing agent.  Upon information and belief, the Mayor disliked the purchasing agent and

forced her out of office, whereupon Lariviere took over the duties. Ex. A, ¶ 14.

15.    Thereafter, Lariviere sought information updates on the property insurance from

various city departments and determined that there were numerous errors in the property

schedule, including coverage for properties the city did not own, non-coverage for properties it

did own and incorrect coverage for yet other properties. He then attempted to have the agency

correct these errors. Despite numerous requests by Lariviere, the agency failed to correct the errors. Lariviere informed the Mayor by letters and e-mails of the agency's failures, yet the Mayor failed to take any action to change agents. Lariviere then learned that the agency misrepresented the rating of the insurance company covering the city. When Lariviere wrote a letter detailing the agency's failings and requested that the city change agents, the Mayor reacted by taking the insurance duties from Lariviere and transferring them to another city employee. Lariviere later was informed that the agent was a campaign contributor of the Mayor. Ex. A, ¶ 15.

*16.* In sum, even though Lariviere was hired by the Methuen Town Council, the Mayor, as she had done in virtually all other departments, wanted to eliminate Lariviere and hire a solicitor who would be primarily loyal to her. This was well known to Solomon and Alaimo who also knew that the Mayor wanted the City Solicitor's position vacated because she had sufficient votes in the Methuen Town Counsel to select her own candidate. Ex. A, ¶ 16.

17. In May 2004, Lariviere's legal secretary advised him that she was retiring as of August 25, 2004. Ex. A, ¶ 17.

18. Lariviere, through the Human Resources Director, sought to change the job title to litigation paralegal. Following an interview process, a candidate was chosen for the position, however the Mayor without explanation (but obviously because of her acrimonious relationship with Lariviere) refused to hire her and delayed the process. This prospective employee was highly qualified, supported and recommended by Lariviere and the Human Resources Director. Ex. A, ¶ 18.

19. The position then went unfilled for six weeks. In late September 2004, the Human Resources Director advised Lariviere that he would use a temp service to fill the position

pending a second round of an interview process. This would leave the solicitor's office inadequately staffed by inexperienced employees with major litigation facing the City. Ex. A, ¶ 19.

20.     On September 29, 2004, the temp agency sent Metin for an interview, and Lariviere agreed to accept Metin for the temporary secretary position. In accordance with temporary service contracts, the City contracted with the temp agency and not Metin directly.  Metin started work as a temporary secretary on October 4, 2004. Ex. A, ¶ 20.

21.     A few days after Metin started, Lariviere went out to lunch; upon his return Metin advised him that she didn't know anyone in the area and thus she went to the Burger King in Methuen and sat in the car and ate her food by herself. Ex. A, ¶ 21.

22.     The next day, Lariviere invited Metin to go to lunch at Bugaboo Creek at the Loop in Methuen. The conversation was very pleasant, and Metin openly talked about her failed marriage and life problems. Ex. A, ¶ 22.

23.     During this meal Metin began divulging personal, intimate details of her life. She was divorced from her husband, Erhan. He had beaten her on numerous occasions and once hit her and threw her out of his vehicle as they were driving through a parking lot. Ex. A, ¶ 23.

24.     After this time, Metin suggested that they should go again to lunch. Starting after this point and into late January 2005, Lariviere and Metin regularly went to lunch Monday through Thursday of each week unless Lariviere had a meeting or court appearance. In January, the two joined Gold's gym in Methuen and thereafter they went to the gym or out to lunch, up to and including February 15, 2005. Ex. A, ¶ 24.

25.     Metin chose the places they went out to eat, including Wendy's, Starbucks, Barnes and Noble, and D'Angelo's.  Except for Starbucks, Lariviere had prior to this never been to these places. Lariviere and Metin took turns purchasing the food. Ex. A, ¶ 25.

26.     In addition to going to lunch, they would go shopping at various stores including pet stores and toy stores. As an example, they went to Toys/R/Us when she wanted to buy her daughter Christmas presents. All shopping expeditions, with one exception, were to purchase items Metin wanted to obtain. Ex. A, ¶ 26.

27.     Metin advised Lariviere that as her marriage deteriorated and the violence got worse, she experienced psychological problems and began counseling. During this period she admitted having an adulterous affair with another man. Ex. A, ¶ 27.

28.     Metin advised Lariviere that her husband didn't seem angry about the affair but thereafter they divorced. Ex. A, ¶ 28.

29.     The husband had also taken their monies amounting to eighty thousand dollars and invested it in a restaurant. Ex. A, ¶ 29.  Ex. G, p. 116.

30.     Upon the business failing, Metin and her husband, Erhan, filed for Bankruptcy. This occurred in approximately 1999. Ex. A, ¶  30. Ex. G, p. 114-8.

31.     The husband after the divorce moved to Turkey where he is to this date. Since separation he has never provided her with any monies nor supported their child. Ex. A, ¶ 31. Ex. G, p. 115.

32.     At the time of the break-up of the marriage Metin was living on Long Island in New York. She had advised Lariviere she had problems keeping jobs and at her last employment she was paid approximately thirty-five thousand dollars for an annual salary, which, according to her, on Long Island constituted poverty. Ex. A, ¶ 32.

33.    She admitted to Lariviere that while on Long Island things had gotten so bad that she willfully borrowed money from people knowing she had no intent of repaying them and in fact had already decided to flee New York. Ex. A, ¶ 33.

34.    Facing no chance at being able to survive on Long Island she moved to Haverhill, Massachusetts and began living with her mother and her mother's boyfriend Glenn. Ex. A, ¶ 34.

35.    Shortly after Metin started, Lariviere contacted the Human Resources Director and asked him to put on hold the job search for the litigation paralegal position to see if Metin would work out. Metin had indicated that she would like the position. Ex. A, ¶ 35.

36.    She indicated she very much liked working for Lariviere. She admitted to calling him "Archangel" (Ex. G, p. 87), saying he was helping to save her from her many problems. Their personal relationship, formed primarily by her, was deepening. Anything that broadened the relationship or personalized it was initiated by her. Ex. A, ¶ 36.

37.    In late October, Lariviere agreed to recommend Metin for the secretary's position upon her promising him to obtain a paralegal certificate and agreeing to his training her in a paralegal role. Ex. A, ¶ 37.

38.    Lariviere recognized that she was not qualified for the litigation paralegal position nor for that of legal secretary, However, the pleasant relationship convinced him to offer her the position on the hope of her being trained for it. Ex. A, ¶ 38.

39.    Lariviere recommended hiring Metin full time to the Human Resources Director.  The Human Resources Director arranged for her to meet with the Mayor, and the Mayor agreed to hire her. Ex. A, ¶ 39.

40.    A very happy and excited Metin returned to the office and jumped into Lariviere's arms with such force as to almost knock him over. She repeatedly hugged and kissed Lariviere while thanking him for the job (Ex. A, ¶ 40), which Metin admits. Ex. G2, pp. 29-30.

41.    Later that day it was discovered that since she was an employee of the temp agency, the City could not hire her permanently for twelve weeks from the start date unless they bought out her time from the agency. Ex. A, ¶ 41.

42.    The Mayor declined to buy out the time, so Metin had to wait two additional months until December 27, 2004 to be made full time. When she found out she would have to wait, she hugged Lariviere and lightly cried but said she understood. Ex. A, ¶ 42.

43.    Metin would often thank Lariviere for the job and how it was going to help her financially. She would say repeatedly he was the best boss she ever had and was training her nicely. She in fact in January of 2005 told Lariviere she did not want to leave the job and him as her boss, and would talk her fiancé Anthony into moving to Massachusetts when he returned home from Iraq. He was over there serving as a Seabee. Ex. A, ¶ 43. (The truth, that he was in prison, is further explained in ¶ 56-7 below.)

44.    Metin often complained and looked sad about her life situation including how credit card bill collectors constantly chased her on her unpaid credit card debt by calling her on her cell phone and how she hated having to live with her mother and the mother's boyfriend Glenn, with whom she had numerous issues. Ex. A, ¶ 44.

45.    During conversations initiated by her, Metin explained in detail her family's unstable history, short duration marriages and illicit romances. The mother has been married 4 or 5 times and has had boyfriends for financial convenience such as Glenn. Metin indicated the mother

periodically would return to her second husband, live with him for a while then take his property and leave. The aunt's marriages have not lasted long either. Ex. A, ¶ 45.

46.    Metin complained often about how in the mother's home she was sharing a bed with her daughter and a cat. In December they purchased a dog, which also slept in the bed. She would quite often come into work tired and depressed saying she did not get much sleep because of the sleeping accommodations. Ex. A, ¶ 46.

47.    Next door to the solicitor's office was the City Council office. Metin would make document photocopies and take breaks over there and have coffee, water or tea. She would spend at least an hour per day in the council office. She would tell the council staff the stories about her troubled past, present predicament living with her mother, and current financial woes. She told them in detail about her husband's violence and Glenn's actions as to her daughter. Ex. A, ¶ 47.

48.    She also testified that she was sexually abused by her stepfather from seventh to tenth grade. Ex. G, p. 192-4.

49.    She often complained that these circumstances made her tired and sick. She complained often about her back area and her stomach and how her debt, her current living and her failed marriage were related to these problems. She repeated these statements to the council staff. Ex. A, ¶ 48.

50.    At no time, however, did she ever tell the council staff about Lariviere causing any illness or distress, nor did she reference Lariviere as approaching her sexually or in an unwanted manner. Ex. A, ¶ 49.

51.    The Office of Human Resources Director (the individual who handles sexual harassment complaints) is next door to the solicitor's office. Metin never went over there to report any misconduct by Lariviere. Ex. A, ¶ 50.

52.    Metin additionally became friends with an employee in the Human Resources Office. They would quite often talk about life in general. Their friendship developed to the point where they discussed going to dating service type parties or going out for the evening. Metin never reported to that person that Lariviere had done anything inappropriate. Ex. A, ¶ 51.

53.    Metin shortly after starting work with Lariviere began using the term "we" in referencing Lariviere and her. In early November she stated, "we should get tattoos" and "we should join a gym." Ex. A, ¶ 52.

54.    In mid to late November, she arrived at work and stated to Lariviere when he asked how her weekend went, "I got it." She then proceeded to reach underneath her elastic waste band on her pants and her underwear and pulled them both down to expose a tattoo. The tattoo was a red rose. The top of the rose was at the height of the waste band with the stem extending diagonally on the left side of her torso down her body several inches. She invited Lariviere to come over and look at it and touch the area around it but not the tattoo itself because it still stung from the needles used. She advised Lariviere she would have to leave her pants down because of the stinging and she then used the blouse to cover the tattoo. She then stated, "Now it is your turn to get a tattoo." Lariviere again declined. Ex. A, ¶ 53.

55.    In late October early November she showed Lariviere her dating web site. She signed onto the Internet at *Match.com*. (Metin acknowledges that she had an account. Ex G. p. 93.) When she went on the Internet she showed Lariviere that it contained pictures of her. She later told Lariviere that she had met a police officer from Rhode Island on Match.com and had gone down there one weekend and in fact signed a liability waiver and rode around in his police car with him during his shift. She told council staff about this Rhode Island date and the Match.Com site. Ex. A, ¶ 54.

56.    She revealed that she was engaged to a person named Anthony but said she was not sure if she wanted to marry him. Ex. A, ¶ 55. Notwithstanding the engagement she confided with city employees that she searched for other dates through the Internet and local dating programs. Ex. A, ¶ 55.

57.    It turns out that Anthony was in fact an Anthony Capanelli, who was convicted on or about April 22, 2003 of conspiracy to commit robbery of Federal Credit Union located at the New York Times Printing Plant in College Point, Queens, and sentenced to 51 months in prison, to be followed by two years of supervised release. Ex. O.

58.    At her deposition, Metin finally admitted that she in fact had a fiancé in Federal Prison in Fort Dix. Ex G. p. 91. She married him on September 5, 2006 in a halfway house in New York. Ex. G, p. 111-112, 183.

59.    After several weeks of medical complaints, in late November or early December 2004 she called a doctor to arrange for a medical review of her pain, which she thought was kidney stones or ulcers. Ex. A, ¶ 56.

60.    In early January the doctor advised her that she most likely had numerous ulcers and would need more testing. He wrote a prescription to ease the pain. Metin advised Lariviere upon returning from the doctor that her state health insurance plan did not cover this prescription and that she did not have the money to buy the pain relief medicine. Ex. A, ¶ 57.

61.    Lariviere loaned her the 90 dollars in cash so that she could get the medicine, and even drove her to the pharmacy in Haverhill to get it. She repaid him by check made out to cash approximately one week later. Ex. A, ¶ 58.

62.    She went for further testing and the doctor confirmed that she had numerous ulcers. Ex. A, ¶ 59.

63.    Lariviere and Metin occasionally exchanged emails on weekends. Ex. P.  One email in early December told Lariviere she and her daughter had bought him a birthday present that she hoped he would like. The present was a Bombay clock. Ex. G, p. 68. On his birthday she gave him the present and they exchanged a hug and kiss. Ex. A, ¶ 60.

64.    On December 27, 2004, Metin received the permanent position of legal secretary. Excited by the appointment she again hugged and kissed Lariviere. Ex. A, ¶ 61.

65.    Lariviere around this time arranged for a "welcome on board" cake party with the staff in the area next to his office. After the party an excited Metin hugged and kissed Lariviere and thanked him. Ex. A, ¶ 62.

66.    On one occasion, Metin was wearing a sweater with the collar around her neck. She told Lariviere this sweater was designed to actually hang off her shoulders. Metin then proceeded to pull the right side of the sweater off her shoulder and onto her arm; she then moved the exposed bra strap off her shoulder and onto her arm. She repeated this on her left side. The sweater as then sitting exposed her breasts and her bra cups. Ex. A, ¶ 63.

67.    On another occasion while Lariviere was sitting in a chair at the side of her desk, she took his left hand, held it and began to smooth file his left thumbnail. Ex. A, ¶ 64.

68.    In early January, Metin advised Lariviere that she was going to get a free membership to Gold's Gym in Methuen through a "friend of a friend." As she had previously asked she again stated to Lariviere that he should join the gym with her. In mid January she got the membership and asked Lariviere if he wanted a one-week pass. Lariviere declined at that time. Ex. A, ¶ 65.

69.    She would go to the gym two days a week and out to lunch with Lariviere two days per week. Ex. A, ¶ 66.

70.    In late December and early January, Metin was still pondering how to resolve her debt problems. She was in default of approximately 11 credit cards. The credit card companies called her continuously on her cell phone. Lariviere recommended she consolidate the credit card debt with a Methuen Credit Union Loan. Ex. A, ¶ 67.

71.    Lariviere called the credit union and talked to Laurie and discovered there was going to be a special rate on January 27th of 5.5 percent. Lariviere advised Metin to join the credit union and then apply for the loan. She checked out payment companies but eventually took out the loan. She hinted to Lariviere he should co-sign with her but he declined. She had her mother join the credit union and co-sign. The mother originally opposed co-signing because Metin had failed to make payments to her on the loan the mother took out on her car. Ex. A, ¶ 68.

72.    The emails between each other continued. In an email dated February 2, 2005, she stated "Hi Hi Hi  thanks for all your help" and she then proceeded to sign it "Kiss". Ex. A, ¶ 69. See emails, attached hereto as Ex. P.

73.    In late January, she told Lariviere she was so happy with working here she wanted her mother to get a job in Methuen. Jokingly Lariviere sent her an email entitled "go home you're fired" and saying "Where is my Rana." (Rana is Metin's mother) Metin responded "ha ha ha.. I'm leaving now, I'll tell her to start on Monday she'll be very very happy." Ex. A, ¶ 70.

74.    Metin had during this period asked Lariviere to help her mother find a job in Methuen. Metin called the mother at her job and had her email her resume to her. Metin gave the resume to Lariviere who made inquiries about getting Rana a job either in Methuen or locally. Ex. A, ¶ 71.

75.     At the request of Metin, Lariviere in late January joined the gym when they had a special rate for joining. After this, Lariviere and Metin went to the gym together during lunch. Ex. A, ¶ 72.

76.     Lariviere and Metin continued going out to lunch on a regular basis, and even referred to one place they frequented often, D'Angelo's as "their regular place." Ex. A, ¶ 73.

77.     In January, she talked often about taking her daughter Melisa skiing that winter for the first time and how though Metin loved skiing she had not been for several years. Metin indicated she did not have any ski apparel and asked after lunch one day for Lariviere to drive her to Ski-Haus in Salem, N.H. They went to Ski Haus and she tried on skiing outfits and asked Lariviere to tell her how they looked on her and shaped to her body. Ex. A, ¶ 74.

78.     Metin became increasingly frustrated over her mother's gambling and trips to Foxwoods. Sometimes she just disappeared for days. The mother, while only earning money in the low thirties, often lost thousands of dollars each time. Ex. A, ¶ 75.

79.     Metin began talking on a regular basis about how one person can no longer support the family and how you need to get married. She expressed a sort of frustration and stated that a marriage to Anthony had become a financial necessity. Ex. A, ¶ 76.

80.     She expressed frustration over how she probably would never be able to afford a home given prices today and how she needed to find a way to have money and how tired she was of near poverty and endlessly having to go home to the situation with her mother and her boyfriend. Ex. A, ¶ 77.

81.     By late January/early February, the mother/boyfriend relationship had so degraded that the fighting and swearing between Rana and Glenn deeply bothered her child Melisa. On a number of occasions Metin would in the midst of the fight take her daughter out of the home.

One night she in fact met Lariviere and his friend William Depardo at Gold's Gym and told them about the fighting and swearing leading to her fleeing the house that night. Ex. A, ¶ 78.

82.    In early February the distraught Metin began showing signs of erratic behavior. For example, she would denounce her mother to Lariviere, but when Rana would call her on the cell phone, she would become a pleasant and loving daughter during the call and then immediately denounce her after the call terminated. Ex. A, ¶ 79.

83.    On a personal level, the parties were not intimate, but mutually affectionate with much of the affection initiated by Metin. Light hugs and kisses were commonplace and Fulya benefited greatly from the assistance she was getting in turning around her life problems. Ex. A, ¶ 80.

84.    On behalf of the City, Lariviere was defending *Beal v. Blanche and The City of Methuen,* in the Massachusetts Federal District Court, involving a claim that a Methuen police officer while on duty had taken a woman into custody and then raped her. He was later convicted of the crime and sentenced to prison. The woman, Tori Beal, then brought a suit against the City of Methuen claiming that the hiring, retaining and failing to supervise the officer, David Blache, was "deliberately indifferent" to the constitutional rights of citizens especially given the fact the there had been a prior charge of rape made against Blache. Ex. A, ¶ 81.

85.    As Metin knew, Lariviere worried about and lived this case day in and day out, knowing it to be the biggest case Methuen had ever faced and there was a very real chance of a verdict against Methuen costing the taxpayers millions of dollars. Ex. A, ¶ 82.

86.    This was one of the largest, most serious and most difficult cases Lariviere had ever handled. If lost, the effects on the Mayor, City Council, and police department could have been devastating. Ex. A, ¶ 83.

87.    On January 27th, 2005 Lariviere appeared before Federal District Court Judge Stearns and argued his motion for summary judgment in favor of the City.  On the afternoon of Feb. 15th, Lariviere learned that the judge had ruled in favor of the City and dismissed the case. An ecstatic Lariviere called the former Police Chief, Bruce McDougal who was in charge of the department when the rape occurred. Lariviere and McDougal knew each other for fifteen years but Lariviere's voice was so high and excited in the message left that McDougal could not even recognize Lariviere's voice. Ecstatic, Lariviere then went down and advised the Mayor's chief of staff of the victory. He then called and left cell phone messages for Solomon, and then for Metin, with whom he had discussed the subject many times. After going to the gym that night, Lariviere again called Metin to talk about the case. Ex. A, ¶ 84.

88.    Unknown to Lariviere, during that time, Metin was apparently meeting with police Lieutenant Michael Wnek and Solomon and Alaimo. Ex. A, ¶ 85.

89.    On February 15, Metin emailed Wnek. She testified that she wanted Wnek to "talk to Maurice or something and tell him not to do this anymore. That's what I wanted to accomplish." Ex. G, pp. 173-4.

90.    Her goal was that she "wanted the whole thing to stop." Her "goal was not criminal prosecution or lawsuits or anything," but "just to go back to work and have him stop and to be normal like have a normal office where nobody was touching you or harassing you be able to go to work and not be sick to your stomach and be upset all the time." Ex. G, p. 174.

91.    She further testified that her "goal was to go back to work for Maurice Lariviere in that office in the foreseeable future," and that was all. Ex. G, p. 174. Wnek confirms that Lariviere never threatened Metin. Ex. H, P. 72.

92.     She also testified that she went to Wnek "because I felt like maybe he could help me maybe talk to him. … I went to them because I felt they were the safest place to go." Ex. G, p. 175. She did not think it was a police matter, but went to Wnek because "he came into our office all the time" and he and Lariviere "would discuss sometimes about harassment issues and things like that." She thought of him particularly because she got an email that day from the police department about a fundraising and she saw his name.  Ex G. p. 60.

93.     Wnek corroborates that Metin never mentioned any criminal behavior, and that she did not want Lariviere to lose his job. Ex. H, p. 17. She admitted that she liked Lariviere as a boss. Ex. H, 19.

94.     Unknown to Wnek, Solomon and Alaimo was the foregoing history of the interaction between Metin and Lariviere. While Wnek immediately went to his superiors Solomon and Alaimo (Ex. H, p. 15.), they, recognizing the potential political prize, investigated no further. (Solomon felt no need to, because, "a victim has inherent credibility in sexual assaults." Ex. E, p. 22, 38.

95.      Instead, without thought they devised a plan to put a video camera in Lariviere's office, Ex E p. 21-22, even though he had no experience in taping sexual crimes and in fact had never heard of anybody taping a sexual event with police officers watching. Ex. E, pp. 64-66. Had they known of the parties' history, they would have known the interaction between them was inevitable, and Metin, knowing that she was being taped, would give them what they wanted.

96.     Metin certainly knew about and even authorized the video. Ex. G2, p. 18.  Ex. E, p. 36. Lariviere did not. Ex. E, p. 36.

97.    Lariviere arrived the morning of February 16 and began working on a letter to send to the City Council outlining the victory in the Federal Court. He had never in his 25 years sent out a similar letter, but in his mind this extremely important victory had to be reported. He again called Solomon to talk to him about the court victory. Ex. A, ¶ 86.

98.    Metin later appeared at work. He then talked to her about the case and the letter he was doing describing the victory. After discussing the matter with her, he told Metin to go to the Mayor's staff meeting that morning as the representative of the solicitor's office. She seemed unusually confused and distracted, but agreed to go. Ex. A, ¶ 87.

99.    A short time later Metin returned to the office to advise Lariviere that the staff meeting was not then but rather the following day. Lariviere checked his calendar and agreed. Metin returned to her office. Ex. A, ¶ 88.

100.    Lariviere called Metin into his office and gave her a copy of the addresses of the councilors so that she could prepare mailing envelopes for them while he finalized the letter. She later asked him to email her the letter so she could reformat it. Metin asked about reformatting the letter and Lariviere said no he just wanted it on one page. Ex. A, ¶ 89.

101.    She printed out one original copy and then left the solicitor's office and went to the council office to copy the letter. Ex. A, ¶ 90.

102.    Metin returned and began the envelope process. Lariviere printed a copy of the Judge's decision and then went into her office to get it. Lariviere and Metin talked for a while about the case and then he picked up the decision and began to leave. Ex. A, ¶ 91.

103.    As Lariviere went back to his office Metin called out, "You are a good attorney." Lariviere came back out and went around to the inside of her L-shaped desk. They talked about the case and his victory for a while. Ex. A, ¶ 92.

104.    As she had done to him, he leaned over and kissed her on the cheek and then a peck type kiss on her lips.  At this time she looked slightly downwards. He asked, "Are you ok?" She answered, "Yes, I am just tired." (This is something she often told him given the troubles at home and her lack of sleep.) Ex. A, ¶ 93.

105.    Lariviere leaned over and with his right arm placed it on her left shoulder as a sign of support. He often told her, "I am there for you to help you, my friend."  She talked to him for a bit and then stood up. They briefly kissed. She began to leave and he stood up and again asked, "Are you ok?" She again said yes and then started to walk past him a short distance. He pointed to and made contact with her stomach on the right front area and asked, "Is it (her ulcer) ok?" She said, "Yes." He said, "You are getting skinny; the gym exercises are working." Ex. A, ¶ 94.

106.    After a few moments she left and went outside. Ex. A, ¶ 95.

107.    She never at any point in time gave any indication that the contact was unwanted or inappropriate; nor was the contact any different than similar displays initiated by her in the past. Ex. A, ¶ 96.

108.    During this entire time, Metin was aware that everything in the office was being videotaped. Ex. G, pp. 162-3.  She remained in the office for about 2 hours. Ex. G, p. 165.

109.    During the videotaping, Solomon was in City Hall, in the Mayor's office. Ex. E, p. 40-1.

110.    Officers Wnek and McCarthy were viewing the video as the event occurred, and did not see anything that caused them to go in and stop the behavior. Ex. H, pp. 42-52, Ex. E, p. 42-3. Solomon and Alaimo did not view the video prior to meeting with Lariviere.  Ex. E, p. 46-52, 54.

111.    Sometime prior to going to see and detain Lariviere, Solomon had already made a call to the District Attorney sometime that morning. Ex. E, p. 55-6.

112.    Shortly after Metin left the solicitor's office, Solomon and Alaimo arrived. Lariviere assumed that the two had arrived to talk about the court triumph. However, the two were stern faced and told him they wanted to talk to him in the second floor conference room. Lariviere assumed they were going to throw him a surprise party to celebrate his victory. He followed them into the conference room and when he saw it was empty he assumed the people would arrive shortly. Ex. A, ¶ 97.

113.    Alaimo then took out a piece of paper and began to read the Miranda rights to Lariviere. Only then did he realize something bad was happening. Alaimo and Solomon then told him Metin had made a complaint against him for sexual assault. These sexual assaults included fondling her breasts. Lariviere was stunned and overwhelmed to find out a person he trusted had done this to him. Ex. A, ¶ 98.

114.    Despite reading him his rights, Solomon testified that Lariviere was not allowed to leave the room and would have been physically detained if necessary. Ex. E, pp. 56-9. Alaimo admits that Lariviere was not permitted to leave the conference room until the police were done with their investigation. Ex. F, p. 34.

115.    Solomon and Alaimo had at the beginning put on two small tape recorders. Lariviere asked to talk to them and assumed they were turned off. Ex. A, ¶ 99. Neither Solomon nor Alaimo tested the recorders and claim they had little experience in using such tapes. Ex. E, pp. 51-3, Ex. F, p. 21.

116.    The audiotapes were found to be flawed when the plaintiff sought to review them in discovery. One tape had no recording at all, and the other tape is basically inaudible. Ex. N. ¶ 6.

A review of the audiotape ran for 13 minutes even though Solomon admitted having him in custody for at least one hour (Ex. G, p. 54) and Plaintiff has established that he was held by the defendants against his will for approximately 1 and ½ hours. Ex. N. ¶ 6.

117.    The officers began berating him: "Metin wants you out of here; you cannot work here anymore, you are finished." Solomon told him how much it hurt him to have to do this, and how he could not sleep the previous night because of this. Ex. A, ¶ 100.

118.    Knowing that Methuen has a sexual harassment policy dealing with this type of employee-employer dispute, including a complete review process, they nevertheless demanded that he resign and waive his right to a hearing in order to avoid criminal prosecution. (Solomon denies knowing Lariviere's rights under the Methuen sexual harassment policy. Ex. E, p. 68.) Solomon said, "If you resign, I know Metin will not press criminal charges based upon my talking to her just a little while ago. However, the Mayor wants you fired and prosecuted. I can talk to her; as you know, we have let people have leaves and then they just go away. I will talk to her (the Mayor) about this." Ex. A, ¶ 101. Metin denies she said this. Ex. G2, p. 21.

119.    Lariviere told him, "I need to go home and talk to my wife about this whole issue." Solomon said, "You will not leave: resign or I arrest you right now." Solomon then left to talk to the Mayor. Alaimo remained in the room. Solomon then returned and said, "There will be no leave time - she wants you out now or you are under arrest. Metin will want you arrested if you do not resign." Ex. A, ¶ 102.

120.    Lariviere was absolutely confused and devastated; he thought he was going to a victory party and was now in criminal custody, being told he had to resign immediately or be arrested. Ex. A, ¶ 103.

121.    Solomon and Alaimo, the two chief law enforcement officials in Methuen and the mayor's strongest supporters, hadn't even asked him to describe what had been going on for approximately 5 months. They knew he had due process rights with respect to his job and was a council employee with 25 years of service, but his version was of no interest to them. All his rights had to be waived and he had to resign. Ex. A, ¶ 104.

122.    Lariviere asked if he could talk to Metin, and was told no. Ex. A, ¶ 105.

123.    They repeated again statements Metin made to them, that Lariviere had molested her and fondled her breasts and that he stalked her. Lariviere denied the charges made. Lariviere asked about the stalking, and they pointed to his call to her the night before.  Lariviere told Solomon that he called her about the court case, and he admitted, "I was there for the second call and heard it." Lariviere said, "Joe if you did then you know all I talked about was the court case and then hung up." Ex. A, ¶ 106.

124.    Solomon referenced Lariviere's stalking her at the gym. Lariviere referred to Depardo and the night Metin and her daughter met even though Lariviere and Depardo had planned on being there and Metin had not. Ex. A, ¶ 107.

125.    Solomon and Alaimo then said they were going back up stairs to talk to the Mayor. They brought Captain McCarthy in to keep watch on him. Lariviere had to plead for permission to go to the bathroom and when McCarthy agreed to allow him to go to the bathroom he further indicated that he must accompany him there. They walked down the corridor and upon arrival at the toilet Lariviere begged that McCarthy stay outside and allow him to go to the toilet by myself. After he finished he stepped outside and the police captain was there waiting for him and escorted him back to the conference room. Ex. A, ¶ 108.

126.    Solomon and Alaimo returned and demanded an immediate resignation or he would be arrested, cuffed and taken out of the building. Again and again Solomon repeated, "Metin said you either quit or she will prosecute you. If you quit no guarantees, but after having talked to her I know she will not seek criminal charges." Ex. A, ¶ 109.

127.    As Alaimo stood over Lariviere who was seated, Solomon repeatedly stated, "Sign the resignation or I will arrest you, handcuff you and drag you out of this building in front of people you know." He then added, "When we arrest you it will be all over the papers. We will then ask the council to terminate you. If you quit now it will be kept quiet and no one will know. I will instruct my people not to talk about this. Your choice - make it now." Ex. A, ¶ 110. Ex. C, p. 36.

128.    Solomon specifically promised that the matter would be kept out of the newspapers, and subsequently did not keep his promise. Ex. C, p 38.

129.    Finally, Solomon looked at his watch and said, "I have a meeting in twelve minutes. This is your last chance resign or you are arrested, handcuffed and taken out of this building." Ex. A, ¶ 111.

130.    After one and one-half to two hours of this vitriolic attack, Lariviere snapped. He knew any clarification or explanation would be fruitless. The lies, threats, intimidation and coercion by the police were calculated to secure a waiver of his rights and his quick exit. Lariviere could only see the harm that would befall him and more significantly, his family. Ex. A, ¶ 112.

131.    He said, "OK, what choice do I have?" Beaten, he simply wanted to avoid the publicity these charges would bring and the hurt to his family and name if he didn't comply with

their threats. Solomon returned with the Human Resources Director, and put the resignation letter and a pen in front of Lariviere to sign. Ex. A, ¶ 113.

132.    Significantly, there is even a discrepancy as to who prepared the resignation; David Bain the human resources director, an attorney and the Methuen sexual harassment officer, claims under oath it was Solomon. Ex. I, pp. 26-7, while Solomon claims it was Bain or someone else, Ex. E, pp. 59-60, no doubt because Solomon knows it was not appropriate or him to do so. Ex. E, pp. 100-101.

133.    Ironically, the Human Resources Department was located next to the City Solicitor's office (Ex. G, p. 37) and the Director was another unquestioning supporter of the Mayor and was fully aware of how allegations of sexual harassment should be handled. He hadn't even given Metin a copy of the policy as mandated upon her employment and acquiesced as the police turned this incident into a criminal investigation to deliberately deny Lariviere of his rights. Ex. A, ¶ 114. Ex I. pp. 6-7.

134.    Under duress, Lariviere involuntarily and under coercion resigned.  Lariviere was not given a reasonable time within which to choose between resignation and the termination proceedings to which he had a right. Ex. A, ¶ 117.

135.    Within a few days of the incident, Metin went to the police station and met with the "attorney general." They asked if she wanted to press charges, and she said she did not. Ex. G, p. 173.

136.    Despite police procedure to the contrary, neither the audio nor video went into the evidence room, but were maintained in Alaimo's safe, where he and Solomon had access. Ex. E, p. 106. Ex. F, pp. 48-9.

137.    Alaimo, significantly, claims that he was not aware of the relationship between Lariviere and Pollard, does not recall Metin's complaints as they were made to he and Solomon, Ex. F, p. 24-9, does not recall why Lariviere wanted to resign, Ex. F, p. 36, what the conversation was in the Mayor's office, Ex. F, p. 36, and does not even recall seeing the resignation Ex. F, p. 37-8, among many other lapses of memory about any fact or detail of possible importance to this case, despite the fact it involved one of Methuen's longest standing and most respected employees and an alleged sex crime.

138.    Michael Hatem, a former Methuen Police Officer has stated that he was in the police department the day that the first newspaper article dealing with this matter was published. At that time, he had a conversation with Alaimo, who told Hatem that the girl who works for Lariviere was complaining about inappropriate touching. Hatem asked him how this came about. Alaimo stated that Lieutenant Wnek, who would go to Lariviere's office to get advice on internal affairs matters, got to know the girl involved. At some point she contacted Wnek and asked to meet with him. He did so (in a parking lot) and she told him what she claimed was happening.  Alaimo then stated that based on the complaint they set up some cameras in her office.  Hatem remembers that Alaimo stated, "I told the girl she'd be recorded. There would be cameras in the office and she should be careful, don't overact."  Ex. Q.

139.    Alaimo also told Hatem he stated during that meeting "Maurice, you've known me for 25 years. If you do not resign right now, I am going to put handcuffs on you and march you out of the office right now in front of everybody."  While Hatem was an employee of the Methuen Police Department he read that Chief Solomon denied that any statements were made about a resignation. Hatem knew that the statement was completely false.  Ex. Q.

140.    Shortly after the incident, Lariviere spoke to William Manzi, then a City Counselor and now Mayor of Methuen (Ex. J, p. 50), and Manzi stated that he would "make things right." Manzi also stated that he had put Peter McQuillan in as interim city solicitor and would reinstate Lariviere "when things calmed down but he needed time." Ex. A, ¶ 118.

141.    Manzi further stated numerous times that Lariviere coming forward early would result in nothing occurring especially since Solomon and Pollard had sent this case to the DA to block his return. Ex. A, ¶ 119.

142.    Manzi further promised that he would make sure the council did not act to accept Lariviere's resignation and in fact proudly told Lariviere that he diverted the council's attention from such action at the meeting where McQuillan was made interim solicitor. (Upon information and belief, the Council has never accepted Lariviere's resignation.) Ex. A, ¶ 120.

143.    McQuillan also called Lariviere several times during the early period and told Lariviere that he (McQuillan) was there only until Lariviere could return. Ex. A, ¶ 121.

144.    Lariviere relied on their statements based on his belief that Manzi was the de facto leader of the political system in Methuen.  Although another was the chairman of the City Council, Manzi was clearly the leader, and at the time was running for Mayor (Pollard was prevented from running by term limits) and was expected to win handily, which he did.  Manzi's power grew even further after Pollard was alleged and later found to have diverted public funds to a non-profit with which she was involved. Ex. A, ¶ 122.

145.    Lariviere was justified in taking no formal action with respect to his resignation based on the representations of Manzi, who asked for Lariviere's patience and stated he needed time to correct the situation and did not want to have his chances of becoming Mayor hurt in this controversy. Ex. A, ¶ 123.

146.    On several occasions, Lariviere began asking Manzi for a Methuen Home Rule Charter 2-11 council investigation of the event and was told to wait until things calmed down a bit more. Ex. A, ¶ 124.

147.    In early to mid June, 2005, Emma Donnelly, a politically active former resident, contacted Lariviere and asked if she could help.  At Lariviere's request, Donnelly asked Dorothy Kalil, one of Manzi's primary political supporters, to ask Manzi for the 2-11 investigation. Manzi never acted. Ex. A, ¶ 125.

148.    Nevertheless, after this Manzi kept promising to make things right and that he would get Lariviere a different job. Again, nothing happened. Ex. A, ¶ 126.

149.    Significantly, Solomon claims that Manzi never saw the video (Ex E. pp. 103) while Manzi claims that he saw the video at some point, but there was some malfunction that prevented him from seeing it completely. Ex. J, pp. 64-5.

150.    The defendants deliberately and intentionally disregarded and circumvented Methuen's sexual harassment policy and chose instead to utilize lies, coercion, threats and intimidation to seize control of the Solicitor's office and eliminate an unwanted employee.  The defendants did not investigate the relationship; rather, they brought the full force of law enforcement down on Lariviere to force a politically desirable conclusion. Ex. A, ¶ 128.

151.    Wnek characterized the emails, which he saw after the resignation, as "friendly dialogue" and "true friendship." Ex. H, p. 72-4. Ex. P.

152.    Shortly after the events described above, Metin filed two claims of her own. First, she filed a Workers' Compensation claim alleging, *inter alia*, that she was unable to work due to stress. Ex. L.  Despite Methuen's repeated declarations that they would defend the matter to the end, Ms. Metin was paid weekly benefits from the date of the alleged incident to June, 2006,

when Methuen settled for an additional lump sum in the amount of $33,900.00. Ex. L. Methuen was represented by Frederick Fairburn, who had previously been Solomon's personal attorney. Ex. E, pp. 110-1.

153.    Metin also filed a Complaint with the Massachusetts Commission Against Discrimination against Lariviere and Methuen. Ex. K.

154.    Methuen has defended against Metin on the grounds, *inter alia*, that Metin was not constructively discharged *and that Lariviere's conduct was not unwelcome by Ms. Metin*. Ex. L, Part B.

155.    Further, Methuen admits: "the City forced Mr. Lariviere's resignation…." Ex. L, Part B. p. 4.  Methuen further admits that, "There is clear evidence that Ms. Metin welcomed and even encouraged Mr. Lariviere's alleged conduct toward her, or at the very least, Ms. Metin did nothing to discourage it and did not find it offensive or unwelcome." Ex. L, Part B. p. 4-8.

156.    Bain testified that Solomon was the individual who typed the resignation letter for LaRiviere to sign and Bain had him add the provision regarding waiving the right to a hearing under the charter. Ex. I, p. 26-7. To the contrary, Solomon testified that either Bain or someone else prepared it. Ex. E, p. 59. Solomon claims he had nothing to do with the  resignation. Ex. E, p 105.

157.    Solomon testified that he did not ask for Lariviere's resignation, and that his or any law enforcement officers asking for Lariviere's resignation would be inappropriate. Ex. E, p. 100-101.  Ex. F, p. 30.

**158.**    The defendants have continually sought to keep the tape private.  On or about April 1, 2005, the Eagle Tribune Publishing Company filed a lawsuit against Solomon and others in the Essex Superior Court seeking release of the videotape to the public. The Essex County District

Attorney and Metin were permitted to intervene, and after hearing, the Court granted the

defendant's Motion for Summary Judgment, prohibiting the tape from being released. Ex. M.


                                        Plaintiff,
                                        Maurice Lariviere
                                        By his attorneys,

                                                /s/
                                        _____
                                        Carmine W. DiAdamo
                                         BBO#122960
                                        William H. DiAdamo
                                         BBO#558883
                                        DiAdamo Law Office LLP
                                        40 Appleton Way
                                        Lawrence, MA 01840
                                        (978) 685-4271



                        <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that a true copy of the above document was served upon the attorney of
record for each other party by electronic filing and/or first class mail on July 20, 2007.

                                /s/
                        _____
                        William H. DiAdamo