UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO: 05-11579EFH

| | |
|---|---|
| MAURICE LARIVIERE, )<br>  Plaintiff, )<br>v. )<br> )<br>JOSEPH SOLOMON, Individually, and as Chief )<br>of Police of the city of Methuen, JOSEPH )<br>ALAIMO, Individually and as Deputy Chief of )<br>Police of the City of Methuen, and THE CITY OF )<br>METHUEN, )<br>  Defendants ) | |

### DEFENDANTS' MOTION IN LIMINE TO LIMIT EVIDENCE AND ARGUMENT AS TO CLAIMED DAMAGES

The defendants, Joseph Solomon and Joseph Alaimo, hereby move this Honorable Court in Limine for an Order limiting the plaintiff's anticipated presentation of evidence and argument concerning: (1) any claimed property interest in employment as City Solicitor for the City of Methuen beyond January, 2007, as well as any asserted damages arising out of such a claim, including salary, pension contributions or other benefits; (2) and, (2) any claimed physical, mental or emotional harm or injury, beyond that which might be proper for the lay testimonial presentation of the plaintiff himself. In support of this motion, the defendants state the following:

### FACTS

As is made clear from a review of the operative Second Amended Verified Complaint, at the heart of the plaintiff's claims in this litigation is his assertion that he was forced, by the defendants, to resign his position as City Solicitor for the City of Methuen, and that such purported conduct by the defendants operated so as to deprive him of "clearly established protected property interest, namely[,] his employment as

1103794v1

[C]ity [S]olicitor." *See* Second Amend. Compl., p. 24, ¶ 145. Indeed, this claimed property interest in his employment as City Solicitor in large part forms the basis for the overwhelming majority of the plaintiff's sundry constitutional, statutory and common law claims against these defendants. *See* Second Amend. Compl., p. 22 (claiming, in connection with the first cause of action, alleging constructive discharge and unlawful termination, that the defendants secured the plaintiff's resignation against his will and "forced him to relinquish his right to a hearing. . . ."); p. 23 (claiming, in connection with the second cause of action, alleging the intentional infliction of emotional distress, that the conduct of the defendants was designed to strip the plaintiff of his rights and ensure "that he would not have the forum guaranteed to him to address these allegations. . . ."); p. 24 (claiming, in connection with the third cause of action, alleging a violation of the Massachusetts Civil Rights Act, that the plaintiff was deprived of a property interest in his employment as City Solicitor); pp. 25-26 (claiming, in connection with the fourth cause of action, alleging a violation of the plaintiff's constitutional rights as enforceable by means of 42 U.S.C. § 1983, that the plaintiff was deprived of a property right to his position as City Solicitor); pp. 26-27 (claiming the same deprivation in connection with the fifth cause of action, a § 1983 claim against these defendants in their official capacities); p. 29 (claiming, in connection with the seventh cause of action, alleging interference with advantageous or contractual relations, an adverse impact upon his continued employment; also claiming, in connection with the eighth cause of action, alleging conspiracy, that the plaintiff was forced to resign his position); p. 30 (claiming, in connection with the ninth cause of action, alleging deceit, that the defendants had misrepresented material facts to "compel and/or induce the plaintiff to resign. . . .").

As it relates to this claimed property interest in the position of City Solicitor for the City of Methuen, it is alleged in the Second Amended Verified Complaint that "The City Solicitor's position is a two-year appointment made by the City Council pursuant to the Home Rule Charter of the City of Methuen. . . ."; Second Amend. Compl., p. 2, ¶ 5; and that the plaintiff had been reappointed by the City Council in January, 2005, meaning that his then existing appointment was to expire in January, 2007.

During the second day of his deposition, the plaintiff testified as to the nature of this claimed property interest, explaining that, excluding an instance of employment discrimination that might invoke various statutory protections, the plaintiff had no right to contest a decision by the Methuen City Council not to reappoint him. Mr. Lariviere testified:

> Q: Referring to your employment as Solicitor, they were two year appointments?
>
> A: That's correct.
>
> Q: Did you have a right to contest a decision by the council not to reappoint you?
>
> A: No. It would have to be some sort of situation, but in the normal course of events, no. It was something that might be a tag line a 1983 type of thing, potentially, yes.[1]

The plaintiff further testified that, as to reappointment, he would not even have been entitled to an articulation as to the reason or reasons for which reappointment was not granted by the City Council.[2]

---

[1] See page 84 of the plaintiff's deposition transcript, day two, copies of which are appended hereto and designated as Exhibit "A".

[2] See id. at pages 84-85. The Plaintiff also testified that, within the period of a two year appointment to the position of City Solicitor, he had no substantive employment protections, such as just cause, beyond that which was set forth within the Methuen City Charter. See id.

> Q: Excluding instances of discrimination based upon race or gender or religion or something like that, there would be no recourse to a decision by the council not to reappoint?
>
> A: To the best of my knowledge, yes.
>
> Q: If a decision was made by the city council not to reappoint a solicitor, did that individual have any right to a reason for the decision.?
>
> A: No.[3]

Turning then to the issue of claims of physical, mental or emotional damage, the Second Amended Verified Complaint has alleged that, as a result of the conduct of the defendants, the plaintiff has suffered harm, including "severe mental anguish, …physical injury and other harm." Second Amend. Compl., p. 23, ¶ 34. The plaintiff, however, has not designated an expert witness, nor does the plaintiff's exhibit list contain any written material, properly authenticated, that concern or that tend to support an assertion of physical, mental or emotional injury.

## ARGUMENT

A.   **The Plaintiff's Claimed Property Interest in Continued Employment**

Assuming for present purposes only that the plaintiff is able to sustain a claim as to any constitutionally protected property interest in the position of City Solicitor for the City of Methuen commencing in January, 2005 and continuing for a two year period thereafter,[4] the plaintiff's own testimony indicates very clearly that any such interest did not extend, in any form or fashion, beyond January, 2007, when the then existing appointment was set to expire. Put differently, the plaintiff himself, a licensed attorney, has claimed no property interest in the position of City Solicitor extending beyond

---

[3] *See id.* at pages 84-85.
[4] Of course, such a claim could be subject to challenge within a motion for judgment as a matter of law at the close of the plaintiff's case-in-chief.

January, 2007. Consequently, this Court should bar the plaintiff from introducing any evidence, making reference to any evidence or presenting any argument claiming any damages related to continued employment for the City of Methuen as City Solicitor beyond January, 2007, or any benefits associated with such a tenure, including pension, longevity or other like incentives.

B.   The Plaintiff's Claims of Physical, Mental or Emotional Damage

As discussed, the Plaintiff has advanced, in his operative Second Amended Verified Complaint, claimed injuries that include physical, mental and emotional damage, allegedly as a result of the conduct of the defendants. The plaintiff, however, has not designated an expert witness to testify as to any such injuries, diagnoses or matters of causation. See Fed.R.Evid. 702 (indicating circumstances in which a duly qualified expert witness will be permitted to provide testimony in areas of scientific, technical or other specialized knowledge).

The plaintiff must present evidence of both an injury and its causation. Caputo v. Boston Edison Co., 924 F.2d 11, 13 (1st Cir. 1991) citing Lynch v. Merrell-Nat'l. Laboratories, 830 F.2d 1190, 1197 (1st Cir. 1987). More than conclusory allegations of emotional distress caused by the defendants' conduct must be shown. See Caputo v. Boston Edison Co., 924 F.2d 11 (1st Cir. 1991). The plaintiff is "required to produce direct or circumstantial evidence to show that there was a 'causal relationship'" between the facts as described in the Second Amended Verified Complaint and his emotional distress. See Siguel v. Allstate Life Insurance Co., 1996 U.S. App. LEXIS 4666, *10 (1st Cir. 1995).

In the case at bar, Mr. Lariviere has not presented any evidence causally relating his alleged emotional distress to the alleged violations of his civil rights or any of his other causes of action. Instead, he has merely made conclusory allegations of emotional distress. These allegations are unsupported by medical records or other evidence linking the emotional distress to any of the defendants conduct. A causal relationship must be established by expert medical testimony if such a causal relationship is not within the knowledge or experience of a layman. Oberlander's Case, 348 Mass. 1, 5 (1964). Stated differently, if "the harm is not obvious to the layman, its existence may not be demonstrated solely by the complaints of the alleged victim; it must also be 'substantiated by expert medical testimony.'" Anderson v. W.R. Grace & Co., 628 F. Supp. 1219, 1227 (D. Mass., 1986). Emotional distress claims typically require expert testimony. See Anderson v. W.R. Grace & Co., 628 F. Supp. 1219 (D. Mass., 1986).

Moreover, the plaintiff has not sought, through his exhibit list, the introduction of any authenticated medical records detailing treatment or diagnoses for any injury claimed to be connected to this litigation or to these defendants.

Accordingly, this Court should enter an order directing that the plaintiff is not to present evidence or argument on any matter that properly may not be provided within the course of the plaintiff's own testimony as a lay witness.

## CONCLUSION

For the reasons stated herein, the defendants, Joseph Solomon and Joseph Alaimo, hereby move this Honorable Court for an order limiting evidence and argument as to claimed damages as set forth above.

Respectfully Submitted,

| | |
|---|---|
| The Defendants,<br>**Joseph Solomon and Joseph Alaimo**<br>By their Attorneys, | The Defendants,<br>**Joseph Solomon and Joseph Alaimo**<br>By their Attorneys, |
| */s/ Gareth W. Notis*<br>Gareth W. Notis - BBO #637814<br>Morrison Mahoney LLP<br>250 Summer Street<br>Boston, MA 02210<br>617-737-8857 | */s/ Andrew J. Gambaccini*<br>Andrew J. Gambaccini, BBO #: 654690<br>Reardon, Joyce & Akerson, P.C.<br>397 Grove Street<br>Worcester, MA<br>508-754-7285 |

## CERTIFICATE OF SERVICE

  I hereby certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants this 11th day of January 2008.


*/s/ Gareth W. Notis*

1103794v1                8

### Page 77

1 produced through discovery in about July of 2006 was the
2 spreadsheet as existing at that time?
3   A  It should be, I believe.
4   Q  And your attorney also provided some
5 documents -- correspondence for the most part -- either
6 from you or to you related to employment prospects. Have
7 you had seen those documents?
8   A  I would have provided them to him, I believe.
9   Q  In the documents that were provided there is one
10 correspondence from March of 2005 involving the town of
11 Brookline. Do you recall that inquiry to Brookline?
12   A  The application seems familiar; the details I'm
13 not sure. Towns for the most part would be in writing
14 rather than electronically like a lot of firms do now.
15   Q  Do you recall what attempts you made to secure
16 employment in February of 2005?
17   A  I'm not sure.
18   Q  And let me be clear you have given some
19 testimony earlier today about conversations that you had
20 with then Councilor Manzi about returning to work. I'm
21 looking for inquiries that you made outside of the city
22 of Methuen.
23   A  The inquiries I believe would be logged in that
24 document that you have.

### Page 78

1   Q  If I were to represent to you that other than
2 that one document reflecting an inquiry made to the town
3 of Brookline in March of 2005 all of the other materials
4 reference inquiries made between August 2005 and February
5 of 2006 or thereafter. Does that refresh your
6 recollection for employment outside of Methuen?
7   A  I believe that would be accurate because at that
8 point I was the daily article in the newspaper and there
9 was no way in hell that I could even be considered. I
10 was hoping that time would be the great curer and
11 unfortunately it did not produce that.
12   Q  Other than the inquiry made to Brookline,
13 conversations that you had with then Councilor Manzi and
14 other individuals about returning to work and
15 conversations with Attorney Copani about sharing space
16 there, it's fair to say that you ever conducted no other
17 job search from February 2005 through August of 2005?
18   A  At that point I'm a total freaking train wreck.
19 I'm being promised that something would be worked out and
20 I was quite frankly drunk a lot.
21   Q  Now, you referenced earlier e-mailed
22 applications to potential employers. When you e-mailed
23 applications to potential employers were those e-mails
24 requested by the employer, meaning the advertisement that

### Page 79

1 the employer had posted said please send e-mail
2 inquiries?
3   A  A lot of them had just that. Some of them
4 were -- quite frankly, you could e-mail or hard mail and
5 the e-mailing is no charge, so in most circumstances when
6 it was e-mail I would choose that because of the cost.
7   Q  In the one year prior to February 16, 2005 -- so
8 from February '04 to February '05 -- did you make any
9 inquiries -- and by inquiries I'm talking about formal
10 letters, seeking employment, looking at job postings,
11 anything of the sort -- looking for a job outside of
12 Methuen?
13   A  I monitored it a couple of times because I was
14 getting tired of the shit I was going through, but I was
15 looking for municipal and looking for equivalent or
16 better salary and looking for a public system to continue
17 my retirement.
18   Q  So prior to the events of February of 2005 you
19 were looking for employment elsewhere?
20   A  I was monitoring.
21   Q  What do you mean by monitoring, just looking at
22 job postings? Did you take any actions beyond that?
23   A  I don't believe so to my memory.
24   Q  For how long had that process of monitoring been

### Page 80

1 occurring moving back from February 16, 2005?
2   A  Shortly after Pollard started making my life an
3 absolute misery I started thinking about it.
4   Q  When was that approximately?
5   A  When she first started or when it went hard?
6   Q  When in your words your life became hell and you
7 began looking for employment elsewhere, when was that?
8   A  Late 2003 probably I would start monitoring,
9 where I had not looked before that.
10   Q  So it's fair to say that by February 2005 you
11 had been monitoring other employment for about a year and
12 a half?
13   A  On and off, yes.
14   Q  Referring to your employment as solicitor, they
15 were two-year appointments, correct?
16   A  That's correct.
17   Q  Did you have any right to contest a decision by
18 the council not to reappoint you?
19   A  No. It would have to be some sort of situation,
20 but in the normal course of events, no. If it was
21 something that might tag line a 1983 type of thing
22 potentially, yes.
23   Q  Excluding instances of discrimination based on
24 race or gender or religion or something like that, there

### Page 85

1 calm down and when things calmed down he would take care
2 of it. He was making sure that there was an absorption
3 of my resignation and he told me that I should rely on
4 him.
5   Q  Now, during the first day of your deposition
6 testimony you described what you characterized as a
7 mutual affectionate relationship with Fulya Metin over
8 the course of time and you also testified about some of
9 the physical contact between the two of you in connection
10 with that relationship. Was there any physical contact
11 between the two of you that you can recall today that you
12 haven't testified to previously?
13   A  Not to my knowledge.
14   Q  Any sexual conduct or banter that you can recall
15 sitting here today that you haven't testified to
16 previously in this deposition?
17   A  Quite frankly, yes.
18   Q  What are those?
19   A  When I appeared for the 56 in the federal case I
20 came back elated and I thought that I had done a really
21 good job before the judge and --
22   Q  You are talking about the summary judgment?
23   A  Yes. And I said to Fulya: "Quite frankly, if I
24 had a choice between going away for a weekend with you or

### Page 86

1 going to court, I would choose court." I said that in a
2 joking fashion.
3   Q  What was her response?
4   A  She laughed.
5   Q  Do you recall when the summary judgment argument
6 was?
7   A  End of January.
8   Q  Anything else other than that comment?
9   A  In a sexual connotation?
10   Q  Correct.
11   A  No.
12   Q  When were you married?
13   A  February 14, 1976.
14   Q  Understanding that we've seen the videotape, are
15 there any persons other than Fulya Metin that you have
16 engaged in the conduct that's on that tape as well as
17 what you have testified to previously since your marriage
18 in February of 1976?
19       MR. DiADAMO: Objection.
20   A  No.
21   Q  How often did you hug Fulya Metin?
22   A  Periodically we exchanged a hug when something
23 went on that was happy or gleeful.
24   Q  When you say periodically, looking at the time

### Page 87

1 frame from September of 2004 to February of 2005 --
2   A  It would be October 2004.
3   Q  Did you hug her more than once a week generally?
4   A  No.
5   Q  Every two weeks?
6   A  I would have to speculate. If she was happy
7 about something or I was happy about something -- she had
8 a very disturbed home life, so I might give her a hug as
9 a source of support.
10   Q  On February 14th, 2005 do you recall what time
11 you left work?
12   A  It should have been about 5:30.
13   Q  Do you recall what you did after you left work
14 at about 5:30 on February 14th?
15   A  I believe at that point I was going to the gym.
16 I would have gone home, had supper and then gone out to
17 the gym until about 8 o'clock or so. I think that I had
18 gone that Monday night.
19   Q  Did you go to the gym that night with Fulya
20 Metin?
21   A  No.
22   Q  Was she there at the gym that night?
23   A  There was one night and this might be that or
24 maybe not when we were heading up the stairs and she was

### Page 88

1 coming down with her daughter. It might have been the
2 14th. I'm not positive. I believe that's the only time
3 I ever saw her there at night.
4   Q  Did you have any understanding during the day of
5 February 14th, 2005 whether she would be there that
6 night?
7   A  If that is the event, no. And if that is the
8 event to my understanding she had not planned on that
9 until the mother and the boyfriend had such a violent
10 argument that she left the house with the daughter.
11   Q  Why did you frequent the Methuen Gold's Gym as
12 compared to any other gym closer to home?
13   A  The initial part was Fulya had talked about
14 going to the gym there and, thereafter, Bill DePardo and
15 I were friends and we started going nights over there on
16 and off.
17   Q  Earlier in your testimony you also referenced
18 e-mail correspondence that contained pornographic images
19 that you received in or about February of 2005 and that
20 you opened on your work computer. Do you recall that
21 testimony?
22   A  I received these e-mails and I saw that they had
23 come from a Brian Leif -- I'm not positive how it's
24 spelled, but he was working in CD at that point in time.