IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MAURICE LARIVIERE,             ) C.A. No. 05-11579-EFH

        PLAINTIFF         ) Courtroom No. 2

VS.                     )

JOSEPH SOLOMON, ET AL,     ) 1 Courthouse Way

        DEFENDANTS       ) Boston, MA  02210

JURY TRIAL DAY 1

TESTIMONY OF MAURICE LARIVIERE ONLY

JANUARY 15, 2008

BEFORE THE HONORABLE EDWARD F. HARRINGTON

UNITED STATES DISTRICT COURT JUDGE

VALERIE A. O'HARA

OFFICIAL COURT REPORTER

2

1    A P P E A R A N C E S:

2        DiAdamo Law Office, LLP, by CARMINE W. DiADAMO, ESQ.
     and WILLIAM H. DiADAMO, ESQ.,  40 Appleton Way, Lawrence,
3    Massachusetts  01840; for the Plaintiff;

4        Reardon, Joyce & Akerson, P.C., by ANDREW J.
     GAMBACCINI, ESQ., 397 Grove Street, Worcester, Massachusetts
5    01605; for the Defendants.

6        Morrison, Mahoney & Miller, by GARETH W. NOTIS, ESQ.,
     250 Summer Street, Boston, Massachusetts  02210-1181; for
7    the Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TESTIMONY OF MAURICE LARIVIERE ONLY</u>

1       THE COURT:  That concludes your opening

2   statements.  Again, opening statements are not evidence.

3   Call your first witness.

4       MR. CARMINE DiADAMO:  Thank you, your Honor.

5   Maurice Lariviere, please.

6       MAURICE JOSEPH LARIVIERE, JR., having been duly

7   sworn by the Clerk, testified as follows:

8                   DIRECT EXAMINATION

9   BY MR. WILLIAM DiADAMO:

10       THE COURT:  Keep your voice up so the jury can

11   hear you, sir.

12       THE WITNESS:  I apologize, your Honor.

13   Q.  Mr. Lariviere, I'm going to stand back here so the jury

14   can hear my questions and your answers from far away.  Make

15   sure you keep your voice up.  Can you state your name full

16   name for the jury, please.

17   A.  My full name is Maurice Joseph Lariviere, Jr.

18   Q.  Where do you live, Mr. Lariviere?

19   A.  Windham, New Hampshire.

20   Q.  How long have you lived there?

21   A.  Since 1986.

22   Q.  Do you live with anyone?

23   A.  Yes, over time I had my wife and my three children.  My

24   three children are currently in college.  My wife is there

1    with me all the time.

2    Q.  And do your children live with you when they're not in

3    school?

4    A.  My two youngest, Katherine and Thomas are, yes.  My

5    oldest one is 25, and she's living in Connecticut.

6    Q.  How old are your other two children?

7    A.  One's about to be 21 and one's about to be 19 shortly.

8         THE COURT:  Can you hear the witness?

9         THE JUROR:  Yes.

10   Q.  Are you currently taking any medications?

11   A.  Yes.  My doctor told me to go on an anti-depressant

12   known as Sertraline.

13   Q.  How long have you been on Sertraline?

14   A.  Since September of 2005.

15   Q.  And does the Sertraline affect your memory or your

16   ability to answer questions?

17   A.  It affects my ability to translate information, yes.

18   Q.  Okay.  In what way do you understand the Sertraline to

19   affect you?

20   A.  This whole situation is a destruction of my life.

21        MR. NOTIS:  Objection, your Honor.

22        THE COURT:  I'm going to overrule the objection,

23   but let's proceed.

24        MR. WILLIAM DiADAMO:  Let me ask the question

25   again, if I might, your Honor.

1          THE COURT:  No, let's not.  He says he's somewhat

2     impaired and the reason is because of this situation.  Let's

3     proceed.

4          MR. WILLIAM DiADAMO:  Thank you, your Honor.

5     Q.  Mr. Lariviere, are you currently employed?

6     A.  I have a couple of contracts, very small contract jobs,

7     but, otherwise, no.

8     Q.  When was the last time you were employed full time?

9     A.  With the system until February of 2005.

10    Q.  How long had you been employed by the system?

11    A.  Just shy of 25 years.

12    Q.  Okay.  Can you first describe your -- briefly describe

13    your educational background to this jury.

14    A.  Yes, I went to high school, Tenney High in Methuen, then

15    I was at Northeastern and I got a bachelor's degree in

16    political science, then I went to Suffolk Law School nights

17    and got my juris doctorate.

18    Q.  When did you graduate from law school?

19    A.  1977.

20    Q.  Would you bring the microphone closer to you, sir.

21    After you graduated from law school in 1977, what did you do

22    for employment?

23    A.  I had gone into private practice with a fellow named

24    Smith Williams.

25    Q.  How long were you in private practice?

1  A.  1977 until 1980.

2  Q.  Okay.  What did you do in 1980?

3  A.  In 1980, I was appointed the town attorney for

4  Methuen.

5  Q.  Okay.  Would you describe the procedure by which you

6  became appointed town attorney?

7  A.  Yes, at that point in time, the town manager was in

8  charge of making the appointments and the town manager at

9  that point in time appointed me.  Thereafter in 1985, the

10  charter was changed to have the town council appoint the

11  town attorney.

12  Q.  Were you appointed for a specific period in 1980?

13  A.  I was given a temporary appointment initially and then

14  thereafter appointed for two years.

15  Q.  Prior to being appointed in Methuen, did you or your

16  family have any connection with Methuen?

17  A.  My father was a Methuen police officer and a member of

18  the Board of Assessors until approximately 1972.  I had been

19  Home World Charter Commissioner which brought in the town

20  management form of government.  I also had been a town

21  counselor briefly from 1972 to 1974.

22  Q.  For how long was your father a police officer?

23  A.  From 1941 until the mid-1960s.

24       THE COURT:  Let me ask you this, the word

25  "council" is used in two different connotations.  One is the

1    political body called, what do they call the town?

2              MR. WILLIAM DiADAMO:  Correct, your Honor.

3              THE COURT:  What is his official name?

4              MR. WILLIAM DiADAMO:  Thank you, your Honor.  Let

5    me clarify that.

6              THE COURT:  You should.

7    Q.  You mentioned Mr. Lariviere that there was a town

8    council.  Can you describe what the town council is and its

9    function?

10   A.  Yes, the town council is the equivalent of a city

11   council.  They're the legislative body, and I served on that

12   from 1972 to 1974.

13   Q.  That's c-o-u-n-c-i-l?

14   A.  Yes.

15             THE COURT:  What is your -- what was your official

16   title that you served for approximately 25 years?

17             THE WITNESS:  I was the town attorney.

18             THE COURT:  The town attorney?

19             THE WITNESS:  Yes.

20             THE COURT:  Is Methuen a town or a city?

21             THE WITNESS:  That's been a question forever, your

22   Honor.  It has been ruled by the Supreme Judicial Court to

23   be considered a city.

24             THE COURT:  Although they use the word "town;" is

25   that right?

1              THE WITNESS:  Yes, your Honor.

2              MR. CARMINE DiADAMO:  Your Honor, I want to

3    volunteer the official designation, the City known as the

4    Town of Methuen, believe it or not.

5              THE COURT:  I'm elucidated.  Did you get that,

6    members of the jury?

7    Q.  Mr. Lariviere, would it be appropriate to say that your

8    position, so that we differentiate and not have any

9    difficulties with homonyms, is town solicitor?  Is that a

10   designation that you have had?

11   A.  Yes, town solicitor.

12   Q.  Solicitor is another word for attorney, another word for

13   lawyer; is that right?

14   A.  Yes.

15   Q.  Okay.  And so just to clarify in case we've already lost

16   people on this, at one point you were actually a member of

17   the town council; is that right?

18   A.  Yes.

19   Q.  Okay.  That was before you became a solicitor?

20   A.  Yes.

21   Q.  Okay.

22             THE COURT:  That's an elected position; is that

23   right?

24             THE WITNESS:  Yes, your Honor.

25             THE COURT:  But so-called town solicitor is

1    appointed by the town; right?

2                THE WITNESS:  Yes, your Honor.

3                THE COURT: Okay.

4    Q.  So at some point in 1980, you're appointed by a town

5    manager, then subsequent to that starting in 1985, with the

6    charter change, you're appointed by the city council?

7    A.  Yes.

8    Q.  Okay.  And can you describe the term of your employment

9    by the city council starting in 1985?

10   A.  It's a two-year appointment that's made subject every

11   two years that I have to go back for reappointment by the

12   city council.

13   Q.  Okay.  How frequently is the city council elected?

14   A.  Every two years.

15   Q.  Okay.  So was there a corroboration between those two

16   things?

17   A.  There would be an odd year, every other year as far as

18   election of the solicitor, the appointment of the solicitor

19   and the election of the council.

20   Q.  From 1985 through 2005, how many different times were

21   you appointed?

22   A.  Well, counting 1980 on forward, which they had to

23   confirm the appointment, approximately 13 times.

24   Q.  During that time, do you know how many votes against

25   your appointment were issued?

1    A.  Out of a council of 9, there would have been

2    approximately 120 some odd votes, and there was only two

3    no.

4    Q.  Now, at some point the Methuen system of government

5    changed again, is that correct, in the '90s?

6    A.  It changed so it became effective in the year 2000.

7    Q.  And how did it change?

8    A.  There was entertained a change put on the ballot to go

9    to a mayor form of government and to eliminate the town

10   manager form of government.

11   Q.  When did that occur?

12   A.  1999.

13   Q.  Subsequently I assume a mayor was elected?

14   A.  Yes.

15   Q.  Who was the mayor elected?

16   A.  The first mayor was Dennis DiZoglio.

17   Q.  I'm going to focus just prior to when the mayor was

18   elected, pre-'99 backwards, can you describe what your

19   general job responsibilities were for the Town of Methuen?

20   A.  The general job duties and responsibilities were to

21   ensure we stayed within all legal requirements that existed.

22   It would include employment law, labor negotiations, land

23   use, drafting contracts, drafting requests for proposals,

24   drafting bid documents, ordinance, resolutions, drafting

25   documents we submitted to the Federal Government, state

1    government.

2    Q.  Did your job duties and responsibilities change when the

3    initially when the mayor form of government came into

4    being?

5    A.  No.

6    Q.  Were you doing substantially the same things?

7    A.  Yes.

8    Q.  What was your involvement first with the town managers?

9    How would you work with the town managers, if at all?

10   A.  My relationship with each and every one of the town

11   managers and then with Dennis DiZoglio was, quite frankly,

12   excellent.  They relied on me very closely literally

13   day-to-day.

14   Q.  How frequently would you interact with the town managers

15   and then with Mayor DiZoglio?

16   A.  I would say once or twice a day they'd have me down

17   there to go through various items.

18   Q.  Okay.  And because this will also become important

19   later, can you describe to this jury the physical setup of

20   the layout of the city hall?

21   A.  The city hall is known as the Searles Building.  You go

22   up on one end of the Searles Building is where the mayor's

23   office is, and at the other end is where the solicitor's

24   office is, next door to it is the human resources

25   department, and just up the corridor a bit is city council,

1    which is the legislative body office.

2    Q.  Now, the city hall in Methuen has several floors; is

3    that right?

4    A.  Yes, three.

5    Q.  And on which one is the city solicitor's office

6    located?

7    A.  Third floor.

8    Q.  Which is the mayor's office located?

9    A.  Third floor.

10   Q.  Approximately how far away from each other are they?

11   A.  I'd say about 100, 125 feet.

12   Q.  Now, can you describe physically the layout of the

13   solicitor's office?

14   A.  As you walk through the door, there's a corridor area.

15   That's where all my file systems used to be, cases and

16   documents that I had.  You'd take a slight left.  There

17   would be the secretarial office, and then through that door

18   you would go into my office.

19   Q.  With the secretarial area and your office separated?

20   A.  There was a doorway.

21   Q.  Was there any other way in and out of your particular

22   office?

23   A.  No.

24   Q.  Now, the -- after Mr. DiZaglio was mayor, was somebody

25   elected subsequent to that?

1   A.  Yes.

2   Q.  Who's that?

3   A.  Sharon Pollard.

4   Q.  Okay.  Were you familiar with Ms. Pollard, Mayor Pollard

5   before she was elected?

6   A.  Oddly enough back in the early 1990s, she wanted to

7   change to the mayor form of government, and she come in and

8   asked me on how it would be done, and then she had her

9   friend, Peter McQuillan, write something which I had to toss

10  out and redraft to the mayor form of government.

11  Q.  How was Ms. Pollard involved with the City of Methuen at

12  that time?

13  A.  She had been the executive director of the Housing

14  Authority, which is a separate entity, but otherwise she was

15  not involved in the actual system.

16  Q.  With respect to the rewriting that you just mentioned,

17  what was the purpose of that?

18  A.  She wanted to have a ballot question to go from the

19  manager form of government to the mayor form of

20  government.

21  Q.  And was she involved in that eventually happening?

22  A.  Yes.

23  Q.  Now, you indicated at some point she became elected.  Do

24  you recall when?

25  A.  Yes, it was the year 1999.

1    Q.  And when Mayor Pollard became elected, can you describe

2    to me your initial interactions with her?

3    A.  From the year 2000, January, 2000 'till early to

4    mid-2001, the relationship, working relationship was fine.

5    All of a sudden, it began to change dramatically.

6    Q.  When did it begin to change?  More importantly, why did

7    it begin to change?

8    A.  Time line-wise her husband, Thomas Lucier, had been

9    caught taking money illegally from the teaching retirement

10   fund.

11           MR. NOTIS:  Objection, your Honor.

12           THE COURT:  Pardon me?

13           MR. NOTIS:  Objection.  Can we be heard at

14   sidebar?

15               (The following occurred at sidebar)

16           MR. NOTIS:  The objection is primarily relevance

17   and highly prejudicial to be introducing criminal activities

18   of someone who's not even going to be a witness.  Throughout

19   the trial they're going to try to destroy the reputation of

20   Mayor Pollard.  At one point after this incident she was

21   investigated for misuse of funds for a charity organization

22   that she was on.  There's going to be an attempt to get that

23   stuff into evidence.  All of this information is trying to

24   destroy her family, cast them in a bad light is highly

25   irrelevant and highly prejudicial.  It doesn't have anything

1    to do --

2            THE COURT:  What happened to the husband?  Was he

3    prosecuted?

4            MR. NOTIS:  I frankly don't know, but if he was,

5    we don't have certified records of what the conviction was

6    and was it a felony?

7            THE COURT:  How is this relevant?

8            MR. WILLIAM DiADAMO:  Well, the relevance is

9    easier, your Honor.  A large part of our case is that

10   Officers Solomon and Alaimo forced his resignation in order

11   to appease their primary political support for Sharon

12   Pollard.

13           THE COURT:  Let's assume that these defendants did

14   force his resignation.  First of all, what evidence do you

15   have that they were doing it for and on behalf of the mayor;

16   and, secondly, what difference does it make?  The mayor is

17   not a defendant.

18           MR. WILLIAM DiADAMO:  It's all about motive, your

19   Honor.  It's all the reason they did it.

20           THE COURT:  What's your evidence?

21           MR. WILLIAM DiADAMO:  Our evidence is going to be

22   what Mr. Lariviere testifies to and the fact Sharon Pollard

23   hated him, wanted him out, he works for the town, not for

24   the mayor.

25           THE COURT:  Let's assume Pollard hated him.  I

1    accept that.  What's the evidence that these two individuals

2    did what they did, whatever it is, on her behalf?

3             MR. WILLIAM DiADAMO:  Well, I think that's for the

4    jury to find, your Honor.  We're going to find that there's

5    a motive.  Let me expand it a little bit without taking too

6    much of your patience.  I'm going to provide evidence that

7    Mayor Pollard hates him.  I'm also going to provide reasons

8    that Mr. Alaimo --

9             THE COURT:  You haven't answered my real question

10   though.  What's the evidence that these guys did it on

11   behalf of Pollard if they did it on behalf of themselves?

12   It's irrelevant.

13            MR. WILLIAM DiADAMO:  No, you're also going to

14   hear from two other police officers, Officer Wornack, who

15   you've already heard about, another officer, Officer

16   Phillips and Hatem.

17            THE COURT:  Just talk.

18            MR. CARMINE DiADAMO:  I beg your pardon.

19            MR. WILLIAM DiADAMO:  After all this stuff

20   happened, Officers Alaimo and Solomon and Pollard are all in

21   Lariviere's office after the resignation, their term is

22   smoking and joking and saying, We got the bastard.

23            THE COURT:  All right.  Objection overruled.

24   Proceed.

25            (The sidebar was concluded.)

1        MR. WILLIAM DiADAMO:  Thank you, your Honor.

2  Q.  Mr. Lariviere, when we stopped, you were explaining the

3  deterioration of your relationship with Mayor Pollard.

4  Could you please finish your answer.

5  A.  It was right around the point in time Tom Lucier was the

6  executive director of the teacher retirement system for the

7  state, and he had been using the state credit card, I think

8  it was about $6,000 illegally, and as a result, the State

9  Ethics Commission had negotiated with him, and he resigned

10  from the position.  He had also been appointed by his wife

11  to the town retirement system, and that caused a swirl of a

12  controversy, and he had to resign from that.

13        She had talked to me about that because at that

14  point in time she was advised that she read a letter that

15  the State Ethics Commission was looking into her having

16  appointed her husband to the town retirement board, and

17  right around that point in time was the first time she was

18  screaming and hollering at me and laying the blame on me.

19  Q.  Okay.  How did that -- how did you affect that

20  situation?  What was your involvement in that situation?

21  A.  I was not involved in appointments, but I was suggesting

22  to her that the position she should take is as the mayor and

23  the only authority she has is the ability to appoint.  She

24  can get exclusion from the state ethics law on that,

25  especially given the fact it was just this part-time type of

1    position with minimal, if any, payment.

2    Q.  Did you have any other issues or problems with Mayor

3    Pollard, during this, you know, after, shortly after the

4    beginning of 2001?

5    A.  After 2001, the relationship deteriorated and she

6    started cutting more out more and more out of the policy

7    provisions and policy actions of the town, and there were

8    several instances where she wound up actually screaming at

9    me about issues.

10   Q.  Okay.  Can you describe the issues, some of the issues

11   about which she was screaming at you?

12   A.  One of the issues involved a woman known as Ellen

13   Bahard. (sic)

14          THE COURT:  I don't think we have to go into that.

15   Basically the rapport of your testimony is you had a

16   deteriorating relationship with Mayor Pollard; is that

17   correct?

18          THE WITNESS:  Yes.

19          THE COURT:  All right.

20          THE COURT:  Counsel for the defendant can inquire

21   into it, if they desire, but it gets too far afield going

22   into other matters.

23          MR. WILLIAM DiADAMO:  Very good, thank you, your

24   Honor.

25   Q.  Now, were you familiar with now Chief Solomon during

1    this time period, the late '90s and early 2000s?

2    A.  Yes.  Bruce McDougall, who was the chief when Pollard

3    came in, had left and she had appointed Solomon.

4    Q.  Okay.  Are you familiar with the circumstances under

5    which she appointed Chief Solomon?

6    A.  Quite frankly, I'm sure Bruce would come in and testify

7    she made his life miserable so he left.

8    Q.  Mr. Lariviere, what I'm asking you, as the town

9    solicitor, were you familiar with the appointment of Chief

10   Solomon and any conditions that go along with the position

11   of Chief Solomon?

12   A.  He was appointed under the civil service provisions.

13   Q.  Is that usual or customary or was it in Methuen?

14   A.  Yes.

15   Q.  And what was your relationship with Chief Solomon during

16   this time period after he's appointed as chief of police?

17   A.  We did not have a bad relationship but we didn't have a

18   friendship, no.

19   Q.  You had interaction with Chief Solomon?

20   A.  On a business level, yes.

21   Q.  Where some of the things you were handling were

22   involving the police department?

23   A.  Yes.

24   Q.  Were you familiar with Deputy Chief Alaimo?

25   A.  Yes, I was.

1    Q.  How were you familiar with Deputy Chief Alaimo?

2    A.  I believe the first time I was dealing with him, he was

3    the union president of the patrolmen's union.

4    Q.  Can you give us a time frame?

5    A.  Back into the '80s, '85, '86, I would think.

6    Q.  What was your interaction with him as the union and you

7    as the solicitor?

8    A.  I was in charge of the negotiating contracts between the

9    town and the police union.

10   Q.  Okay.  What was your relationship with Officer Alaimo at

11   that time?

12   A.  Because of some situations between the town and his

13   family members, it was not that good.

14   Q.  Okay.  Can you discuss what the issue was with

15   Mr. Alaimo's, or, excuse me, Deputy Chief Alaimo's family

16   members?

17          MR. NOTIS:  Objection.

18          THE COURT:  I'm going to sustain that.  Basically

19   your testimony is that there was some adverse relationship

20   between the town and members of his family that caused you

21   to have not a close relationship with him; is that correct?

22          THE WITNESS:  Yes, your Honor.

23          THE COURT:  All right.

24   Q.  Now, after the deterioration of the relationship with

25   Mayor Pollard, how did that affect your day-to-day job?

1   A.  As far as dealing with the mayor, I was pretty much cut

2   out of the most of the business that was going on in the

3   mayor's office.  I was still dealing with some of the

4   department heads, but I do know an exact example talking

5   with just -- he told me straight out the mayor disliked

6   me.

7           MR. NOTIS:  Objection.

8           THE COURT:  Overruled.

9   Q.  Can you describe what your job duties and

10  responsibilities had been reduced to?

11  A.  Where I had been one of the chief advisories to the

12  executives, including Mayor DiZoglio, we had a small

13  committee that did the work, I was cut out of all of that,

14  and most of the functions dealing with the mayor were

15  gone.

16  Q.  How were you treated by the individuals in city hall?

17  A.  Most of the individuals in city hall I got along with

18  very well.

19          THE COURT:  We're going to suspend at this time

20  for a quick break.  Usually we break at 11:00 so you can

21  have coffee and donuts, and I've just been advised because

22  we selected the jury a little late the coffee and donuts are

23  in there now, so I don't want to see them go to waste, so

24  we'll break for about 10 minutes, you'll have a quick cup of

25  coffee, and then we'll get back here.

1           THE CLERK:  All rise for the jury.

2           (A recess was taken)

3           THE CLERK:  All rise for the jury.

4           THE CLERK:  Court is in session.  You may be

5   seated.

6           MR. WILLIAM DiADAMO:  Thank you, your Honor.

7           THE COURT:  Let's proceed.  Pick up the pace.

8           MR. WILLIAM DiADAMO:  Yes, sir.

9   Q.  Mr. Lariviere, I think where we ended was your situation

10  in city hall in, you know, 2001 and going forward to 2005,

11  and I'm sorry if I asked you this, but how were your job

12  duties and responsibilities affected by having Mayor Pollard

13  in office?

14  A.  My duties as relayed to the upper level of the conduct

15  were all but obliterated.  I was doing remainder jobs.  She

16  had brought in David Bain, who was made human resources

17  director.  He was an attorney.  And Tina Touma-Conway was

18  brought in as the city clerk.  She started dealings

19  excluding me and cutting me out.

20  Q.  What was Attorney --

21          THE COURT:  Please keep your voice up.  Talk to

22  the jury.

23          THE WITNESS:  Sorry, your Honor.

24  Q.  What was Tina Touma-Conway's background?

25  A.  She had been an attorney but no municipal experience to

1   my knowledge.

2   Q.  And when those individuals came in, Mr. Bain and

3   Ms. Tina Touma-Conway, how if at all did that affect your

4   relationship with Mayor Pollard?

5   A.  I was progressively cut further and further out of

6   dealings.

7   Q.  Now, as the city solicitor under the charter, to whom do

8   you report?

9   A.  Under the charter, I would be the employee of the city

10  council but on a day-to-day basis in fact working for what

11  had been the town manager and the mayor.

12  Q.  Were there any other employees in city hall who work for

13  the city council?

14  A.  There was only out of 1,000 employees total for the

15  municipality, there's only three, the city auditor, the

16  council clerk and myself.

17  Q.  And how did your reporting to the city council interfere

18  or affect your relationship with Mayor Pollard?

19  A.  The mayor wanted me to act like a spy and report to her

20  my dealings with city councilors.  I absolutely refused.

21  Q.  And how did Mayor Pollard respond to that?

22  A.  She began to get extremely caustic, screaming at me.

23  Q.  Okay.  Now, in -- did you have any assistance in your

24  office prior to 2004?

25  A.  I had a secretary.  When I walked in the office, she was

1   there, Sharon Barrett.  She was my secretary for 21 years.

2   Q.  Okay.  She was there when you started in 1980?

3   A.  Yeah.

4   Q.  And how long was she your secretary?

5   A.  2000.

6   Q.  Take a moment.  Would you like something to drink?

7        MR. WILLIAM DiADAMO:  May I approach, your Honor?

8   A.  In 2001, she went on a vacation with her husband and

9   basically had an accident, she paralyzed herself, and she

10  couldn't work thereafter, and in 2002, she died.

11  Q.  What was your relationship with Ms. Barrett?

12  A.  I had two women in my life that kept me together was my

13  wife and Sharon Barrett.  She seemed to know every aspect of

14  what I needed, and she was there every moment of every day

15  in the workplace.  She was great.

16  Q.  How did it affect you personally working when

17  Ms. Barrett was no longer there?

18  A.  The irony of the situation, I knew Sharon Barrett had

19  the accident the same time Sharon Pollard goes against me.

20  It was like a bomb dropping on me.

21  Q.  When Ms. Barrett was no longer available, did anybody

22  else come in to assist you in the office?

23  A.  Yes.

24  Q.  Who's that?

25  A.  I had a secretary that came in.  She had been working

1    with the town.

2    Q.  Mr. Lariviere, I'm going to ask you just to take a deep

3    breath so you know I'm having a little difficulty hearing

4    you.

5           THE COURT:  Keep your voice up.  You got to

6    project your voice.  What was the question?

7    Q.  The question, I believe, was did you have anybody else

8    to assist you after Ms. Barrett left?

9           THE COURT:  After she left, who was your

10   secretary?

11          THE WITNESS:  Diane Maciariello.

12          THE COURT:  How long did she last?

13          THE WITNESS:  She was there from 2001, when my

14   secretary was out sick and disabled, 'till August, 2004,

15   your Honor.

16          THE COURT:  And then after she left, what

17   happened?

18          MR. WILLIAM DiADAMO:  Thank you, your Honor.

19          THE COURT:  Let's get over the secretaries.  Let's

20   get to the secretary in this case.

21          MR. WILLIAM DiADAMO:  Understood, that's where we

22   are, your Honor.

23   A.  Diane in May, 2004 came in and told me she was going to

24   be retiring.  She gave me several months' advance notice so

25   I'd have a chance to go out and recruit somebody.  I told

1    the human resources director, and he started a job search

2    for me.

3    Q.  Is this Mr. Bain?

4    A.  Yes.

5    Q.  And can you describe what happened over the next period

6    of time?

7    A.  There were quite a few candidates that applied.  The

8    timeline was perfect so I'd have somebody in there in time,

9    and we met, David Bain and myself met with several

10   candidates, and we chose one candidate as the top person to

11   take the job.

12   Q.  And was that person approved?

13   A.  No.

14   Q.  What happened?

15   A.  Quite frankly I asked -- I had Dave go down and make the

16   recommendation to the mayor because I knew if I did, I

17   didn't think she'd have a chance, and Gail happened to be an

18   attorney, and I thought this is fantastic, when I retire,

19   she can take over as solicitor, she'll have the training,

20   but the mayor would not provide a reason, would not hire

21   her.

22   Q.  And this is Gail?

23   A.  Piccolomini.

24   Q.  So, she ended up working with you, for you?

25   A.  No.

1    Q.   Was anybody else looked at?

2    A.   There were several other candidates that I thought would

3    do the job well, but at that point in time Pollard took the

4    review process away from me, I wasn't even allowed to talk

5    to anybody about the job.  Then in August, 2004, Diane went

6    out and Pollard left me alone in the office without any help

7    for six weeks.

8    Q.   After those six weeks, what happened?

9    A.   September 29th, 2004, David Bain told me that they were

10   bringing in a temporary to fill in the position pending a

11   full search and then finding somebody.

12   Q.   Okay.  And did you meet the temporary employee?

13   A.   Yes, he brought over a woman, Fulya Metin.

14           THE COURT:  What's her name?

15           THE WITNESS:  Fulya Metin.

16           THE COURT:  How do you spell her last name?

17           THE WITNESS:  M-e-t-i-n.

18   Q.   Do you recall when you first met Ms. Metin?

19   A.   September 29th.

20   Q.   Under what conditions did you meet her?

21   A.   David brought her over, asked her, excuse me, asked me

22   if I wanted to have her start working, and she and I talked

23   for a brief period and then I had told David yes.

24   Q.   What did you discuss with her at that time?

25   A.   Talked very briefly about her career, and she started

1    discussing, she was home from New York, she was back living

2    with her mother over in Haverhill, Massachusetts, and it was

3    a short conversation but very pleasant.

4    Q.  Okay.  Did you have any initial reaction to Ms. Metin

5    when you met her?

6    A.  I liked her very much.

7    Q.  When did Ms. Metin start?

8    A.  I asked her if she could start the next day, which would

9    have been a Thursday, and she said she couldn't, it was

10   Thursday or Friday.  She started the following Monday, I

11   believe it was October 2d.

12              THE COURT:  That's 2004?

13              THE WITNESS:  Yes, your Honor.

14              MR. WILLIAM DiADAMO:  Thank you.

15   Q.  Now, after Ms. Metin started, can you describe,

16   initially during this first period of time in October, how

17   your relationship was with Metin?

18   A.  A couple days after she started, I had gone out to lunch

19   with a friend and came back and she told me that she didn't

20   know anybody in the area, and she had gone to Burger King

21   and sat in the car and ate, and I said to her why don't we

22   go out tomorrow.  We went out to Bugaboo Creek, which is at

23   the Methuen Mall.

24   Q.  Did you have any conversation with her at that time?

25   A.  Yes.  It was extremely pleasant and nice, and she was

1   very open and provided all kinds of personal information.

2   Q.   Okay.  What sort of things did you discuss with

3   Ms. Metin right off the bat?

4            MR. NOTIS:  Objection.

5            THE COURT:  At least at this stage I'm going to

6   sustain it.

7   Q.   Okay.  Now --

8            THE COURT:  In other words, you had a good

9   relationship with her as a result of this conversation?

10           THE WITNESS:  Yes, your Honor.

11  Q.   Now, after this initial conversation, can you describe

12  the evolution of your relationship with Ms. Metin over the

13  next several weeks?

14  A.   Yes.  After that luncheon she had suggested that we

15  start, go to lunch together, and Methuen has a work day

16  that's 8:30 to 5:30 Monday through Thursday and then closes

17  at noon on Friday.  So every day, unless I was tied up with

18  the court or some other detail, every day we went out to

19  lunch together.

20  Q.   Okay.  Did you do anything else with Ms. Metin?

21  A.   Quite often we were out there, she wanted to go

22  shopping, so we'd stop off and go shopping in various

23  places.

24  Q.   How frequently would you go shopping?

25  A.   I'd say a couple times a week.

1    Q.   What sorts of things would you go shopping for?

2    A.   One of the times I do remember going to Toys-R-Us.  It

3    was around Christmas, and she was picking out presents for

4    her kid Melissa.  Another time we'd be going to there was a

5    Sea World, I believe it's referred to.  It's the animal

6    store, and we'd go there, and she'd be buying various items

7    for her cat and her dog.

8    Q.   You mentioned Ms. Metin's daughter Melissa.  When did

9    you first learn about Melissa?

10   A.   Fulya talked a lot about her daughter, and actually the

11   term it's Turkish, I believe it's Melissa, one L, and she

12   talked about her quite often, and then ultimately her

13   baby-sitter had gone away for a week, so Melissa came in and

14   was in the office with us for a week.

15   Q.   Okay.  Did you learn anything else about Ms. Metin's

16   family?

17   A.   Yes.  She told me about the relationship.

18             MR. NOTIS:  Objection, your Honor.

19             THE COURT:  Well, basically she discussed her

20   relationship with other people; is that correct?  We can't

21   be going off on a tangent here as to what the conversation

22   is between this person and the witness outside the presence

23   of the defendant.

24             MR. WILLIAM DiADAMO:  Your Honor, may we approach

25   for a moment?

1              ( THE FOLLOWING OCCURRED AT SIDEBAR:)

2              MR. WILLIAM DiADAMO:  Well, the answer would be

3    that he had very detailed knowledge of her family, a lot of

4    personal things with respect to Ms. Metin, this is all

5    absolutely --

6              THE COURT:  Why don't you ask her about it?

7              MR. WILLIAM DiADAMO:  I'm going to.

8              THE COURT:  I don't want to go into the details of

9    everything.  Did she discuss intimate details with her

10   family?  I'll allow that.

11             MR. WILLIAM DiADAMO:  The reason, your Honor, I

12   believe this is crucial to our case is we're going to

13   establish, we will establish that there is a mutual

14   affectionate detailed relationship here that the police know

15   nothing about, make no inquiry into.

16             THE COURT:  That may be so, but I don't want

17   conversations in.

18             MR. WILLIAM DiADAMO:  I understand that, but what

19   he knows is admissible.

20             THE COURT:  It may or may not be what he knows,

21   but the ultimate thing is you can ask because of these

22   conversations and going out every day and you're buying

23   things that they had an intimate relationship through this

24   conversation.  I just don't want to go into the details of

25   this.

1          MR. WILLIAM DiADAMO:  Your Honor, in fairness I

2     would like not every miniscule detail but those details are

3     for me to prove to a jury that these people had a real

4     relationship.

5          THE COURT:  It may be a real relationship or not,

6     but the real issue here is, as I see the case, is the sexual

7     aspect is minimal.  The real point of this whole case to me,

8     from analyzing it, is whether these guys threatened him,

9     threatened him.  That's the thing, the threat.  That's what

10    you should keep your eye on.

11         MR. WILLIAM DiADAMO:  Absolutely, your Honor.

12    Again, I'm just -- I'm trying not to test your patience but

13    I want to go over these details.

14         THE COURT:  You try your case, you won't test my

15    patience.  The point is the jury doesn't want to hear this.

16    They want you to convey that they had a close, close

17    relationship.  I don't want to go into the details of the

18    conversations.

19         MR. WILLIAM DiADAMO:  I understand, your Honor.

20         ( THE SIDEBAR CONFERENCE WAS CONCLUDED.)

21    Q.  Mr. Lariviere, again, you went out to lunch with

22    Ms. Metin, went out shopping, I want to get back on track

23    here.  You had, just generally you had many conversations

24    with Ms. Metin; is that correct?

25    A.  Yes.

1   Q.   Okay.  Can you describe for this Court the things that

2   you learned about Ms. Metin as a result of the

3   conversations?

4                MR. NOTIS:  Objection, your Honor.

5                THE COURT:  Well, he could just give, without

6   going into the conversations just advise what you had as a

7   result of the conversations, what subject matters, mainly to

8   show the extent of the relationship without going into

9   conversations; namely, she told me about her husband, she

10  told me about her boyfriend, she told me about her daughter,

11  or the relationship, whatever it is, but just the subject

12  matter.  I don't want the conversation, per se.  What

13  subjects did she discuss with you?

14               THE WITNESS:  We talked about her relationship

15  that she had with her husband and how there had been a

16  divorce, talked about how her husband had taken 80,000 of

17  theirs and put into a restaurant business and then gone

18  bankrupt, how after he divorced her, he refused to provide

19  any assistance to her and her child and he had moved to

20  Turkey, talked a lot about her mother and her dire situation

21  and how she had been married and divorced four or five

22  times, she was currently living with this gentleman named

23  Glen, and, quite frankly, she talked about some of the

24  incidents where --

25               THE COURT:  We don't want to go into that.  And

1    did she talk about her child?

2              THE WITNESS:  Yes, she quite frankly loved her

3    child.

4              THE COURT:  So, in other words, as a result of

5    your relationship with her, you knew intimate details about

6    her family and personal life; is that correct?

7              THE WITNESS:  Yes, your Honor.

8              THE COURT:  All right.  Proceed.

9              MR. WILLIAM DiADAMO:  Thank you.

10   Q.  Did you ever provide any assistance of any kind to

11   Ms. Metin?

12   A.  Yes.  She had a medical issue.  It was I believe an

13   ulcer and she was on the state health plan, and, as a

14   result, she didn't have money to pay for a medical job that

15   she needed, so I loaned her $90, and we went over and picked

16   up the medicine.

17   Q.  What was Ms. Metin's status at this point in terms of

18   her employment?

19   A.  A few days after she started, I had asked the human

20   resources director to put the job search on hold, and I

21   wanted to see how Fulya would work out.  And subsequent to

22   that in late October, Fulya I had been talking and I asked

23   her if she wanted the job, and she indicated yes, so I had

24   asked the human resources director to arrange for her to be

25   appointed.

1          THE COURT:  What's her first name?

2          THE WITNESS:  Fulya.

3          THE COURT:  Spell that.

4          THE WITNESS:  F-u-l-y-a.

5          THE COURT:  And the last name is?

6          THE WITNESS:  Metin, that was her maiden name,

7   excuse me, her marital name, your Honor.

8   Q.  When you had the conversation with Ms. Metin about

9   becoming a full-time employee, what was her reaction?

10  A.  She was very happy and said yes, then subsequently she

11  had gone down for an interview with the mayor and the mayor

12  had approved it, and, quite frankly, she came back and

13  jumped into my arms and gave me a hug and a kiss.

14  Q.  Had you had any physical contact of any sort with

15  Ms. Metin prior to this time?

16  A.  Yes.

17  Q.  What was that contact?

18  A.  Periodically we'd have something to celebrate or enjoy

19  and we'd exchange a hug and a kiss.

20  Q.  Can you describe the types of things that would

21  precipitate that kind of action or reaction?

22  A.  On my part, whenever, if I was in court and I had won a

23  case, I'd be very happy.  For her part, a lot had to do with

24  her having this job which she loved and things related to

25  her daughter.

1    Q.   On the first occasion when there was physical contact

2    between you and Ms. Metin, can you describe the

3    circumstances?

4    A.   I believe at that point in time we had been talking to

5    places we had gone out to eat and were going to go out to

6    eat, and she had chosen most of them and just was kind of a

7    hug and a kiss on the cheek.

8    Q.   Who initiated the contact?

9    A.   I believe I did.

10   Q.   What was the reaction of Ms. Metin?

11   A.   Perfectly happy.

12   Q.   Did she do or say anything to you that indicated

13   displeasure or that she didn't want it in any way?

14   A.   No.

15   Q.   Can you recall the next time that there was any contact

16   between you and Ms. Metin?

17   A.   When she was hired.

18            THE COURT:  Try to get at least not the exact day

19   in relationship to October whenever, October 2d, 2004, when

20   any of these events occurred.

21            MR. WILLIAM DiADAMO:  Okay.  Thank you.

22   Q.   Let's start with it, I'm not sure if we established,

23   Mr. Lariviere, when the first contact took place.  Do you

24   have, do you recall the date, or do you have an estimate as

25   to when it occurred?

1    A.   Probably in the first week or two of her being there.

2    Q.   Okay.  When was the next time that there was any

3    physical interaction between you and Ms. Metin?

4    A.   We were coming back from lunch, and at that point in

5    time I hadn't offered her the position, we were coming back

6    from lunch, and she kind of looked at me and said let me

7    know when I'm not going to be here any more, when somebody

8    else is coming in, and it bothered me, and I at that point

9    in time said, I'd like to have you stay, and she gave me a

10   hug and kiss at that point in time.

11   Q.   Can you describe, as best you can for the jury, the

12   extent of the hug and kiss that she gave you?

13   A.   On both parts none of them were lengthy or detailed, the

14   kiss would be like a quick one.

15   Q.   Okay.  What was the points of contact between you and

16   Ms. Metin?

17   A.   Lip or cheeks.

18   Q.   Okay.  On this occasion, did Ms. Metin initiate it or

19   did you?

20   A.   She did.

21   Q.   Okay.  Approximately how long after this first incident

22   did it occur?  How far, if you can give me a date or an

23   approximate time frame?

24   A.   I'd say mid-October to the latter part of October.

25   Q.   Were there any other incidents of physical contact

1    between you and Ms. Metin over the next several weeks?

2    A.  When she came in one day, we had gone out shopping and

3    she wanted to take her kid skiing but she didn't have the

4    money to pay for it because she was short on money she had

5    given her mother, and I loaned her that.  She happily gave

6    me a hug and a kiss.  I loaned her I think $120.

7    Q.  Without going into exhaustive detail, can you generally

8    describe when subsequent physical contact took place and the

9    circumstances?

10   A.  If there was a happy occasion or --

11   Q.  Can you give an example, you've already on your part.

12   Can you be more specific with respect to Ms. Metin?

13   A.  The example of that is that time when I drove her over

14   and gave her the money so she could buy medicine.  She gave

15   me a hug on that one.  When I went shopping with her to a

16   ski store, at that point in time she had given me a hug and

17   kiss.

18   Q.  Did the extent of the physical contact change at all

19   during this time?  I'm going to limit you to about December,

20   2004, October, November, December of 2004, did the extent of

21   the contact, the degree or the condition of the contact

22   change at all?

23   A.  No.

24   Q.  Okay.  Did the frequency change at all?

25   A.  I don't think so, no.

1    Q.   Okay.  Can you estimate for this Court and for the jury

2    approximately how frequently these interactions were taking

3    place?

4    A.   Once or twice a week, I'd say anyways.

5    Q.   At this point how much time per day were you spending

6    with Ms. Metin?

7    A.   Well, she was in the office, so unless I was out at a

8    meeting or in court, she'd be there and I'd be working with

9    her and giving her information and details to do.

10   Q.   Okay.  So basically with some exceptions a full

11   workweek?

12   A.   Yes.

13   Q.   And what about outside the office, what time were you

14   spending with Ms. Metin?

15   A.   The only time we were outside the office together is if

16   we went to lunch.

17   Q.   Okay.

18   A.   And later on when we went to the gym together.

19   Q.   Okay.  When did you start going to the gym with

20   Ms. Metin?

21   A.   Late June, excuse me, yeah, late January, 2005.

22   Q.   Okay.  What were the conditions by which you ended up

23   going to the gym with Ms. Metin?

24   A.   When she first started, she had used the term "we," and

25   I remember in two circumstances, one of them was about

1    joining the gym and the other about getting a tattoo.

2    Q.  And as a result of the conversation about the gym, did

3    you do anything?

4    A.  Initially, no, not until late January.  She joined I

5    believe in the mid-part of January, 2005 and then I joined

6    after she had asked me, I joined in late January, 2005.

7    Q.  Now, you mentioned tattoo?

8    A.  Yes.

9    Q.  Can you describe what you were referring to?

10   A.  There had been an indication about her getting a tattoo,

11   and then one day she came in and displayed it to me.

12   Q.  Okay.  Where was the tattoo located?

13   A.  The tattoo would be in the area of around the belly

14   button, and it was a flower, a rose.  I believe the head of

15   the rose was towards the belly button, and the remainder

16   went off to the side.

17   Q.  What were the circumstances under which Ms. Metin showed

18   you the tattoo?

19   A.  She indicated she had got it and was showing it to me.

20   Q.  And where did this occur?

21   A.  In the office.

22   Q.  And again was it during the workweek?

23   A.  Yes.

24   Q.  Okay.  And --

25            THE COURT:  Was it an old tattoo or did she just

1   get it?

2           THE WITNESS:  She had just got it, your Honor.

3   Q.  And can you describe to the jury, I mean, you sort of

4   indicated where it pointed to the belly button or so, if you

5   could just stand up and show the jury where to your

6   knowledge the tattoo was located.

7   A.  The head of the tattoo would be approximately here and

8   then the stem went off this way.

9   Q.  Okay.  Did Ms. Metin have to arrange her clothing in any

10  way in order for you to see it?

11  A.  She pulled her pants down.

12  Q.  Now, you indicated that you had spoken to human

13  resources about making Ms. Metin a full-time employee; is

14  that correct?

15  A.  Yes.

16  Q.  When did she become a full-time employee?

17  A.  Because of the temporary agencies have a contract, if

18  she was going to go permanent, if it's within the 12-week

19  period, the town would have had to pay off 12 weeks worth of

20  what they would have had for a profit, so she was not

21  allowed to start until late December, approximately

22  December 27th, 2004.

23  Q.  And did she in fact become a full-time employee at some

24  point?

25  A.  Yes, December 27th, 2004.

1    Q.  You talked a little bit about some of the details of

2    Ms. Metin shared with you regarding her life.  Do you know

3    where she was living?

4    A.  She was living with her mother and her boyfriend in

5    Haverhill.

6    Q.  What were the circumstances, what was the arrangement,

7    the living arrangement?

8    A.  They had a bedroom area, which was, the daughter Melissa

9    and Fulya used to be in one bedroom, and there was a common

10   bathroom, and then the mother and boyfriend were over on the

11   other side.

12   Q.  Were you ever -- did you ever go to the house?

13   A.  The closest I ever got there to my memory is the day

14   that I drove her over to Haverhill to get the medicine, she

15   wanted to go see if the baby-sitter was back, and we drove

16   over which was approximately near where she lived.

17   Q.  Okay.  Did you ever go inside her house?

18   A.  No.

19   Q.  Did you ever ask to go inside her house?

20   A.  No.

21   Q.  Did she ever ask you inside the house?

22   A.  I want to strike that for a second, if I may.  I just

23   remembered one thing, at one point her mother was going to

24   be signing a document for her regarding the loan, and she

25   wanted me to notarize it, and I told her I can't notarize it

1    unless in the presence of the witness or the person that's

2    signing.  That was the only time I recall.

3    Q.  Okay.  Now, we've discussed some of the details, but can

4    you characterize the affect Ms. Metin's presence in your

5    office had on you?

6    A.  From mid-2001, when I lost Sharon Barrett and had to be

7    dealing with Sharon Pollard, I honest to God, I hated the

8    job that I loved for 21 years, used to turn my stomach just

9    driving into the town hall parking lot, but I'm saying what

10   choice do I have?  I'm just, there's a term limit, I'll

11   hopefully survive long enough for her to go and normalcy

12   will return, and it was just terrible and all that, and

13   then, all of a sudden, Fulya showed up, and it was like a

14   bright light.  I loved going to work, loved her being there.

15   It was great.  I told her repeatedly that I loved her

16   working there.

17   Q.  How did Ms. Metin respond?

18   A.  She told me --

19              MR. NOTIS:  Objection, your Honor.

20   A.  At that point --

21              THE COURT:  Sustained.  Without going into the

22   conversation, what was her attitude towards your profession

23   of in a sense liking her being there?  What was her

24   attitude?

25              THE WITNESS:  Her attitude was exactly the same,

1   your Honor, including not only wordy conversations but

2   e-mails she used to send me.

3        THE COURT:  In other words, she was happy working

4   for you?

5        THE WITNESS:  Yes, your Honor.

6        THE COURT:  All right.  Let's go.

7   Q.  Now, at any point from the time she shows up in

8   September of 2004 until February, 2005, does Ms. Metin

9   indicate any displeasure with you, your actions, your

10  attitude, anything?

11  A.  No.  As a matter of fact, she used to bring in notes

12  periodically to me and expressing that she liked me.

13       THE COURT:  So are we getting to February 16th?

14       MR. WILLIAM DiADAMO:  We're getting there, your

15  Honor.

16       THE COURT:  All right.  You have the jury.  They

17  have other things to do besides hanging around this

18  establishment, so let's move it.

19       MR. WILLIAM DiADAMO:  Yes, your Honor.  May I

20  approach, your Honor?

21       THE COURT:  Yes.  You don't have to ask.

22       MR. WILLIAM DiADAMO:  Thank you.

23  Q.  Mr. Lariviere, I'm going to ask you to look at three

24  documents and ask if you can identify those for the Court,

25  please.

1    A.  Yes, I recognize them.

2    Q.  Okay.  Can you describe what they are?

3    A.  She wrote a note to me once.  Should I read it?

4    Q.  Yes, please.

5    A.  "Maurice's treated me real good and been very supportive

6    of me."  There was another time after she had had a

7    discussion, a more pleasant discussion with her father who

8    had married and became a widow, new wife within three months

9    and as far as the estate money, they didn't have a good

10   relationship and after she was yelling, let's say I

11   indicated, I hope it's not like to me, and she wrote a note

12   to me saying, "I'm not putting Maurice down."  Then she

13   wrote another note to me, "Maurice means a lot to me.  I

14   like Maurice".

15   Q.  Let me stop you, Mr. Lariviere.  The one that you just

16   read, the first one you read there, okay, what were the

17   circumstances by which that note came into your

18   possession?

19   A.  The first she just came in and put it on my desk.

20   Q.  Do you remember when that occurred?

21   A.  I'm going to say approximately mid-November, 2004.

22   Q.  Okay.  And was there any, that you're aware of, was

23   there any precipitating event that caused her to do that,

24   anything in particular?

25            MR. NOTIS:  Objection, your Honor.

1          THE COURT:  Objection as to the particular event?

2          MR. NOTIS:  As to the witness, the out-of-court

3     witness' state of mind, what her state of mind was.

4          THE COURT:  What occurred?  Did a certain event

5     occurred that precipitated that note?

6          THE WITNESS:  She was always very nice to me, and

7     we got along well, and I tried to support her as much as

8     possible, and she would bring that in as a way of conveying

9     the message.

10    Q.  With respect to the documents you have in front of you,

11    to summarize, was there any precipitating event or events,

12    you've already described one that had to do with the estate

13    money.  Were there any other events that precipitated notes

14    that Ms. Metin provided to you?

15    A.  There was a point in time when I was trying to help her

16    get a loan to pay off her debts through the Methuen Credit

17    Union, and I believe that "Maurice means a lot to me" was in

18    relation to that when I was trying to help her.

19    Q.  What did you do to help her?

20    A.  I went downstairs and talked to the director of the

21    banking unit down there, it's the credit union.

22          MR. NOTIS:  Can I?

23          MR. WILLIAM DiADAMO:  Can I ask those be marked?

24          MR. NOTIS:  No objection.

25          THE COURT:  In evidence marked as one exhibit.

1          MR. WILLIAM DiADAMO:  One exhibit, Exhibit 1.

2          ( Handwritten notes were marked Exhibit No. 1 and

3     admitted into evidence.)

4     Q.  Now, Mr. Lariviere, on February 15th, 2005, do you

5     recall anything significant happening at work?

6          THE COURT:  This is February 15th?

7          MR. WILLIAM DiADAMO:  15th, 2005.

8          THE COURT:  2005.

9          MR. WILLIAM DiADAMO:  Correct, your Honor.

10          THE COURT: This is day before?

11          MR. WILLIAM DiADAMO:  Previous to the gravamen of

12     this case.  We're getting there, yes.

13          THE COURT:  All right.

14     A.  February 15th, 2005, for any attorney it would have been

15     a hell of a day.  I had gone to the Supreme Court and had

16     filed a motion for a summary judgment and had been, with all

17     due respect, the summary judgment in the case.  I came back,

18     had been --

19          THE COURT:  You filed it on behalf of the City of

20     Methuen?

21          THE WITNESS:  We were a defendant, your Honor, in

22     a case.

23          THE COURT:  And the judge ruled in your favor?

24          THE WITNESS:  Yes, your Honor.

25          THE COURT:  Summary judgment basically is a ruling

1    as a matter of law based on uncontested facts.  So he won a

2    case, he filed a motion for summary judgment on behalf of

3    the city.  The Judge reviewed the papers and granted

4    judgment on behalf your client, the system; is that correct?

5              THE WITNESS:  Yes, your Honor.

6              THE COURT:  You felt pretty happy about that?

7              THE WITNESS:  That made me happy, but when I found

8    out that I received the ruling from the United States

9    District Court, I almost jumped through the roof.

10   Q.  So there were two separate things; is that correct?

11   A.  Yes.

12             THE COURT:  On one day you won two cases?

13             THE WITNESS:  Yes, your Honor.

14   Q.  So, I'm sorry, just so we're clear, with respect to the

15   second one you just alluded to in the Federal District

16   Court, can you describe to the jury who doesn't have the --

17             THE COURT:  What kind of a motion did you win on

18   that?

19             THE WITNESS:  That was a summary judgment motion,

20   your Honor.

21             THE COURT:  So you got two summary judgments in

22   your favor on one day?

23             THE WITNESS:  Yes, your Honor.  I had argued the

24   case before Judge Stearns earlier in late January, and very

25   basically what happened was there had been a police officer

1    who had taken a female into custody and while he had her in

2    custody, she claimed that he raped her, and the district

3    attorney, after a year of investigation and relying on DNA

4    evidence, indicted him.  There was then a trial.  He was

5    convicted and sent to prison.

6           She immediately then filed an action in the United

7    States District Court against the system and against the

8    police officer.  Their claim was, as to Methuen was what's

9    known as without going into a legal deliberate indifference.

10   In other words, we knew this guy was no good, and we didn't

11   do anything because he had a prior claim of a rape, and they

12   were claiming we should have done something civil

13   administration wise, and we went into court that day, and my

14   feeling was, what I found out --

15          THE COURT:  You're only representing the city; you

16   weren't representing the personal defendant?

17          THE WITNESS:  No, your Honor.  What had happened

18   was the insurance company, which the mayor had retained, had

19   gone bankrupt so it was going to be directly out of the

20   taxpayers' pocket, and it was in relation to then Chief

21   Bruce McDougall, who's a very good friend of mine, and it

22   bothered me ominously.  I was at a loss of that.  I'm

23   assuming the value of a case raping a woman in custody, I'm

24   assuming taxpayers could be hit by $5 million, so we'd get

25   hit with a big money case, one of my best friends would be

1    disgraced, he's the police chief, for the decision he made,

2    and then the city and police department would look terrible.

3    And it was law that had not yet developed in Massachusetts.

4           I found cases across the country that I was trying

5    to rely on, and, quite frankly, I was living that case day

6    after day, went in for the judgment hearing, argued the case

7    before the Judge against an attorney, very good, and waited

8    and waited, and the United States District Court, you can

9    access this site and find out the Court's ruling.  Late in

10   the afternoon after Fulya left, I went to what's known as

11   the Pacer site, and I found that the Judge had ruled in our

12   favor and tossed the case out.

13   Q.  What was your emotional reaction to learning that?

14   A.  It was the biggest case I ever won.  Here we are with a

15   situation that all I could thing of, oh, my God, because I

16   was involved in the earlier stages of the thing, and to me

17   it was $5 million easy, a jury's going to come back, if

18   Methuen stayed, and we're going to get kicked, and a friend

19   of mine, the police chief, Bruce McDougall, he'd look

20   terrible.  I knew what the papers would do, they'd have a

21   blast destroying us, and, all of a sudden, here I am, the

22   biggest case of my life, and I was thrilled.

23           THE COURT:  So you're feeling pretty good?

24           THE WITNESS:  It was fantastic.

25           THE COURT:  All right.  We'll suspend here.

1    Members of the jury, don't let anyone talk to you about the

2    case.  Don't you talk about the case to anyone else and

3    refrain from making any definitive judgment about this case

4    until all the evidence is in.  I'll see you tomorrow at

5    9:00.

6            THE CLERK:  All rise for the jury.

7            (Whereupon, the hearing was suspended at

8    1:00 p.m.)

9            C E R T I F I C A T E

10    UNITED STATES DISTRICT COURT )

11    DISTRICT OF MASSACHUSETTS    )

12    CITY OF BOSTON               )

13            I, Valerie A. O'Hara, Registered Professional

14    Reporter, do hereby certify that the foregoing excerpt of

15    transcript was recorded by me stenographically at the time

16    and place aforesaid in No. 05-11579-EFH, Maurice Lariviere

17    vs. Town of Methuen and thereafter by me reduced to

18    typewriting and is a true and accurate record of the

19    proceedings.

20                        /S/ VALERIE A. O'HARA

21                        _____
                          VALERIE A. O'HARA

22                        REGISTERED PROFESSIONAL REPORTER

23

24

25