```
 1                IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MASSACHUSETTS

 3

 4

 5

 6     MAURICE LARIVIERE,              ) C.A. No. 05-11579-EFH

 7              PLAINTIFF              ) Courtroom No. 2

 8     VS.                            )

 9     JOSEPH SOLOMON, ET AL,         ) 1 Courthouse Way

10              DEFENDANTS            ) Boston, MA  02210

11

12

13                      JURY TRIAL DAY 2

14              TESTIMONY OF MAURICE LARIVIERE ONLY

15                      JANUARY 16, 2008

16

17

18          BEFORE THE HONORABLE EDWARD F. HARRINGTON

19              UNITED STATES DISTRICT COURT JUDGE

20

21

22

23

24                   VALERIE A. O'HARA

25                 OFFICIAL COURT REPORTER
```

1  A P P E A R A N C E S:

2      DiAdamo Law Office, LLP, by CARMINE W. DiADAMO, ESQ.
   and WILLIAM H. DiADAMO, ESQ.,  40 Appleton Way, Lawrence,
3  Massachusetts  01840; for the Plaintiff;

4      Reardon, Joyce & Akerson, P.C., by ANDREW J.
   GAMBACCINI, ESQ., 397 Grove Street, Worcester, Massachusetts
5  01605; for the Defendants.

6      Morrison, Mahoney & Miller, by GARETH W. NOTIS, ESQ.,
   250 Summer Street, Boston, Massachusetts  02210-1181; for
7  the Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TESTIMONY OF MAURICE LARIVIERE ONLY</u>

1
2        THE CLERK:  All rise.

3        THE COURT:  I'll see counsel.

4        (The following occurred at sidebar).

5        MR. NOTIS:  Good morning, your Honor.  After trial

6   yesterday, we were told by a number of people in the back of

7   the courtroom that they could hear word for word what was

8   being said.

9        THE COURT:  I heard that.  Your voice is too

10  loud.

11       MR. NOTIS:  Is there a way we could turn on

12  classical music during the sidebars?

13       THE COURT:  Just keep your mouth shout.  That's

14  the first time in 20 years that I've heard complaints about

15  people at the sidebar, but I heard it from quite a few

16  people so the fault may be in yourselves.

17       MR. WILLIAM DiADAMO:  Fair enough.

18       MR. NOTIS:  A couple more issues, sorry to bother

19  you.

20       THE COURT:  I usually don't have issues.  Since

21  we're here, what is it?

22       MR. NOTIS:  Counsel has agreed to play the video

23  when Mr. Woodruf is testifying.  We wanted to alert the

24  Court of that.  We plan to do that.  The video is about a

25  half hour long.

```
 1          THE COURT:  Sure.  When are you going to get to
 2    the meat?  Is it bad?
 3          MR. CARMINE DiADAMO:  Judge for yourself.  You
 4    wouldn't pay a lot of money if you were interested in bad
 5    stuff.
 6          THE COURT:  Is it nothing?
 7          MR. CARMINE DiADAMO:  You'll see it in five
 8    minutes.
 9          THE COURT:  I don't want to be shocked.
10          MR. CARMINE DiADAMO:  I assure you there's no
11    person that's going to be shocked when you see this.  In my
12    opinion, it's PG, maybe PG-13 if you really stretch it.
13          THE COURT:  I didn't understand the connotation.
14    In other words, I don't have to bring my glasses.
15          MR. CARMINE DiADAMO:  No.
16          MR. NOTIS:  You're not going to have to work too
17    hard.  Last issue, we wanted to bring a witness who's coming
18    up from Long Island.  Counsel has agreed to call her out of
19    order.  I'll be starting my direct and they will cross her.
20    Is that acceptable to the Court?
21          MR. CARMINE DiADAMO:  We have no objection.
22          THE COURT:  The only thing on Friday my wife has
23    what they call, you know, like a toe that's like that.
24    She's being operated on in the morning.  I'm coming to
25    court, but I may have to cut it short by about 12:00 to pick
```

1    her up.  They throw you out of the hospital fast.  So how

2    long is she going to be on the stand?

3            MR. NOTIS:  Two hours.

4            MR. CARMINE DiADAMO:  If he does his direct and I

5    cross, we know it's going to go faster than if I have to

6    play with it for a while.

7            THE COURT:  Out of order is all right with me.

8            MR. CARMINE DiADAMO:  One more thing that really

9    is not all that important.  You may or may not have already

10   got the notion that Solomon is no longer chief of police in

11   Methuen, I'm having really problems with chief.

12           THE COURT:  How about the Deputy Chief?

13           MR. CARMINE DiADAMO:  He's been demoted.  What is

14   he, lieutenant, and Solomon has been suspended.  They're

15   going to be discharging him within the minute.

16           THE COURT:  We're not going to go into that

17   stuff.

18           MR. NOTIS:  We have a motion in limine.

19           THE COURT:  I won't rule.

20           MR. CARMINE DiADAMO:  Gareth, I will not jump in.

21   I told him I would not do that, silly.  My problem is, I

22   don't want to be to calling the guy chief when he's not the

23   chief.

24           MR. NOTIS:  He may be the chief.

25           THE COURT:  The only problem, he's called the

1    chief, the case describes him as a chief.  You can call him

2    whatever you want.  I don't care.

3            MR. CARMINE DiADAMO:  If I call him Mr. Solomon

4    and Chief Solomon, I'm not really slipping.

5            THE COURT:  You can call him anything.  You can

6    swear at him.

7            (The sidebar was concluded.)

8            THE CLERK:  All rise for the jury.  Court is in

9    session.  You may be seated.

10            (Jurors entered the courtroom.)

11            THE COURT:  Good morning.  I'm glad to see

12    everybody here.  Put your witness on the stand.

13            MR. WILLIAM DiADAMO:  Thank you, your Honor.

14    Mr. Lariviere.

15            THE COURT:  We're going to start moving this case,

16    are we?  We all know the background and everything.

17                MR. WILLIAM DiADAMO: Yes.  Okay.

18                MAURICE JOSEPH LARIVIERE, JR., RESUMED

19                    DIRECT EXAMINATION, CONTINUED

20    BY MR. WILLIAM DiADAMO:

21    Q.  Mr. Lariviere, when we broke yesterday, just to get back

22    into context, you had discussed that on February 15th, 2005,

23    you had won two big cases, is that correct, two significant

24    cases?

25    A.  Yes.

1    Q.  After learning about the second big win of the day, what

2    did you do?

3    A.  I checked on the district court site, found out the

4    ruling of the Judge.  At that point in time I called and

5    left a message with Bruce McDougall, the retired police

6    chief, and then called and left a message with Joseph

7    Solomon, and Fulya had left at five o'clock, I called and

8    left a message with her.

9    Q.  Did you do anything else that evening?

10   A.  After that, town hall closed at 5:30.  At 5:30, I went

11   back home and talked to the family and told them all about

12   the win.  After that, I went to the gym with my friend, Bill

13   Depardo, and as we were coming out, I talked with Fulya

14   again and talked with her about the case.

15   Q.  Now, had you ever corresponded with Ms. Metin in any

16   way?

17   A.  Yes, we exchanged phone calls and we exchanged e-mails.

18          MR. WILLIAM DiADAMO:  May I approach, your Honor?

19   Q.  I'd like to show you some documents, ask if you

20   recognize those.

21   A.  Yes, I do.

22   Q.  Okay.  What are they?

23   A.  These are e-mails that we had exchanged.

24   Q.  Okay.  Can you give the jury a time frame those e-mails

25   were exchanged?

1    A.   The e-mails are in November, December, January and

2    February.

3    Q.   Okay.

4    A.   That would be November, December, 2004, January,

5    February, 2005.

6    Q.   Thank you.

7         MR. WILLIAM DiADAMO:  I'd ask them to be marked,

8    your Honor.

9         MR. NOTIS:  Objection, your Honor.

10        THE COURT:  Who are these e-mails between?

11        MR. WILLIAM DiADAMO: These are e-mails from

12   Ms. Metin, your Honor, to Mr. Lariviere.

13        THE COURT:  Who are they from?

14        MR. WILLIAM DiADAMO:  The secretary, your Honor,

15   Fulya Metin, to Mr. Lariviere.

16        THE COURT:  From her to him?

17        MR. WILLIAM DiADAMO:  Correct.

18        THE COURT:  Sustained.  Marked for identification

19   only at this time.  Mark it 2 for identification only.

20        MR. WILLIAM DiADAMO:  Thank you.

21        (E-mails were marked Exhibit No. 2 for

22   identification.)

23   Q.   Mr. Lariviere, when you got up the next morning, what

24   did you do?

25   A.   I got up the next morning, I went in to work, I got

1    there approximately twenty past eight, and I started working

2    on a letter to send out to the city council to tell them

3    about the victory in court.

4            MR. WILLIAM DiADAMO:  Your Honor, at this time we

5    would like to show the videotape to the jury and to the

6    Court.

7            THE COURT:  Is that the next, what occurred next?

8            MR. WILLIAM DiADAMO: Yes.

9            THE COURT:  Surely.  Any objection to it being

10   shown at this time?

11           MR. NOTIS:  No objection, your Honor.

12           Your Honor, counsel's agreed that I will give a

13   brief explanation to the jury about the videotape.

14           THE COURT:  At this time?

15           MR. NOTIS:  Ladies and gentlemen, what you're

16   going to see is an excerpted or a highlighted version of

17   what happened that morning.  There are parts that are sped

18   up so we get to the parts that are important.  You'll see

19   different varying speeds on this video.  Also, what's going

20   to be marked into evidence is the complete time lapse

21   version of this video.  Bear in mind this was recorded with

22   a time lapsed video camera.  It's going to be a little fuzzy

23   as you see it.  It's a highlight version.  It's a little

24   slow in starting, but you're going to see the events

25   unfolding.

1          MR. WILLIAM DiADAMO: If I might, I believe this

2    video is approximately 45 minutes.  I don't know the exact

3    length of this videotape, but it's two hours, somewhere in

4    that neighborhood, so we condensed it to a shorter version?

5          MR. NOTIS:  Correct.

6          THE WITNESS:  Your Honor, may I have permission to

7    step down?

8          THE COURT:  Surely.  Can the jury see?

9          (Videotape was played.)

10          THE COURT:  Mark as it as an exhibit.

11          MR. WILLIAM DiADAMO:  Yes, please, your Honor.

12    There are actually two tapes, there's a shorter excerpt in

13    one, and there's also a full version of one so we'd like, we

14    can mark them together as Exhibit 3.

15          MR. NOTIS:  We would mark them separately.

16          THE COURT:  Why don't you have Exhibit 3A for the

17    shortened version and Exhibit 3B for the longer version.

18          MR. WILLIAM DiADAMO: That would be a shorter

19    version.

20          MR. NOTIS:  That's the highlight VHS tape.  This

21    is the DVD highlights tape, 3B.  This is the DVD adjusted

22    speed.

23          THE COURT:  That's A?

24          MR. NOTIS:  C.  Your Honor, 3D is the DVD

25    highlights.  Thank you.

1          MR. CARMINE DiADAMO:  What was that?

2          MR. NOTIS:  DVD highlights.

3          ( DVD tapes were marked Exhibit No. 3-A through

4     3-D and admitted into evidence.)

5          MR. WILLIAM DiADAMO:  May I proceed, your Honor?

6          THE COURT:  Surely.

7          MR. WILLIAM DiADAMO:  Thank you.

8     Q.  Mr. Lariviere, you've had an opportunity to see the

9     videotape.  Just to give the jury some context, can you tell

10    me what the possibility of view, that is, the tape history

11    they were looking at physically?

12    A.  That would be the angle they were looking at, if you

13    look to the right, you'd see me walking into another room.

14    That was my room.  The area we were talking about was the

15    secretary's office, and to the left would be going out into

16    the corridor area where my file system was and out into the

17    main building.

18    Q.  So the camera is behind Ms. Metin's desk?

19    A.  Yes.  In that area is our storage area where my fax

20    machine is, excuse me, my photocopy machine and a

21    telephone.

22          THE COURT:  Can you hear the witness?

23          THE JUROR:  Yes.

24          THE COURT:  Speak into the microphone.

25          THE WITNESS:  Yes, your Honor.

1    Q.  Mr. Lariviere, at one point you were seen standing

2    behind Ms. Metin over to her side sort of a portion of you.

3    Do you recall what you were doing at that time or what you

4    were working on?

5    A.  Is that the tape at the very end you're referring to?

6    Q.  At the very beginning, early on when we first see you,

7    you're standing behind, beside Ms. Metin?

8    A.  At that point in time I had come in, and I had been

9    typing that letter to send out to the council to tell them

10   about the court case, and I had also printed out

11   Judge Stearns' ruling, and you can see me on the tape I had

12   been reviewing it in front of Fulya and telling her about

13   the case, and, quite frankly, what you were seeing was the

14   teenage boy.

15   Q.  At one point you were sitting on the corner of

16   Ms. Metin's desk and talking to her.  Do you recall what you

17   were doing at that time?

18   A.  Yes.  It was quite common that she would come in in the

19   morning and talk to me about her family conditions and how

20   it was bothering her and bothering her daughter.  I would

21   often go over, talk to her and show her support and tell her

22   I was there, and I used to call myself FFL, friend for life,

23   and we were talking about that, and I was telling her I'll

24   always be there for you, I can assure you of that.

25   Q.  And do you recall anything else specifically you

1   discussed with Ms. Metin that morning?

2         MR. NOTIS:  Objection, your Honor.

3         THE COURT:  What's that?

4         MR. NOTIS:  Objection.

5         THE COURT:  Overruled.

6   A.  I remember talking to her I think it was in the other

7   room.  There was going to be a staff meeting downstairs, and

8   I had told her to go to it, and she had left.  I was off by

9   a day.  It was the following day, and we talked a little bit

10   about that.

11   Q.  Were you aware that there was a videotape in the

12   office?

13   A.  No.

14   Q.  When -- what was your emotional condition that morning?

15   A.  At that point in time I was still dancing over the win

16   of the case, and you can see my hands flapping, and that's

17   exactly what I was doing, and then I'm reading the decision

18   and I'm flapping my hands like a child.  I was so happy.

19   Q.  Now, at some point that morning -- well, at the end of

20   the videotape you see two gentlemen very briefly, very

21   quickly walk across the screen.  Did you see that?

22   A.  Yes.

23   Q.  Do you know who those gentlemen were?

24   A.  Solomon and Alaimo.

25   Q.  Okay.  Can you describe what happened when Mr. Solomon

1    and Mr. Alaimo entered your office?

2    A.   Fulya had left.  I had gone back in and was sitting

3    down, and they had come in looking very stern-faced, and at

4    that point in time they told me they wanted me to go down to

5    the second floor conference room.  Quite frankly, I had the

6    interpretation that we were going to go down and have a

7    party celebrating my victory in court.

8    Q.   With respect to the victory you were sending to the city

9    council, just to get us back on track here, how did that

10   case affect the police department?

11           MR. NOTIS:  Objection, your Honor.

12           THE COURT:  Overruled.

13   A.   The police department, my impression as a municipal

14   attorney has always been if you start losing case, it's like

15   a row of dominos.  I was afraid of losing any and all cases.

16   This one where it involved a lawsuit where a police officer

17   had been convicted and sent to prison for rape, I felt that

18   it would disgrace the department if the city and the police

19   department were found to be liable in that situation.

20   Q.   Did you have any reaction when Mr. Solomon and

21   Mr. Alaimo came into your office stern-faced?

22   A.   My impression, that was the sort of situation where

23   they'd bring me down the stairs and surprise me, and I'd

24   have a nice party with the cops.

25   Q.   Did you have any other conversation in your office?

1    A.  No, that was it.

2    Q.  Did you go with them to the second floor conference

3    room?

4    A.  Yes.

5    Q.  Can you describe to me where people were as you walked

6    down to the conference room?

7    A.  The second and the third floor are, involves the town

8    engineer, DPW, community development, and then there's the

9    solicitor's office and the town council office.  There's

10   very rarely the average citizens are up there.  Quite

11   frankly, when we walked down, there was no one in the

12   corridor.

13   Q.  Where was Mr. Solomon in relation to you?  Where was

14   Mr. Alaimo as you walked downstairs?

15   A.  Solomon went ahead of him, and I walked immediately

16   behind him, and immediately behind me was Alaimo.

17   Q.  Do you recall how Officers Solomon and Alaimo were

18   dressed?

19   A.  Offhand, no.

20   Q.  Do you recall that they were armed?

21   A.  I believe so, yes.

22   Q.  And once you got to the second floor conference room

23   downstairs -- strike that.  Did you have any further

24   conversation with Mr. Solomon and Mr. Alaimo as you walked

25   to the second floor conference room?

1    A.   None whatsoever.

2    Q.   When you got to the second floor conference room, what

3    happened?

4    A.   I went walking in, and, quite frankly, when the door was

5    opened, I expected to see a whole bunch of cops there, and

6    they weren't there, and my initial impression, okay, they'll

7    have me sit in there, then in come the cops, and we have the

8    party.  I sat down, and at that point in time Alaimo

9    approached me, and I'm going to say he's maybe 10, 12 inches

10   away from me, and he reached in his pocket, pulled out a

11   piece of paper and at that moment read me Miranda.

12   Q.   Describe the conference room, please.

13   A.   The conference room would be -- there is a doorway in,

14   the depth I'm going to say is approximately 14 feet; the

15   width is approximately 30.  That's just an approximation.

16   There's a big table in the center.

17   Q.   Chairs around the table?

18   A.   Yes.

19   Q.   And when you got in, you sat down?

20   A.   When I got in, I sat down at the front of the table.

21   There's -- obviously that's where the person that's going to

22   celebrate sits.

23   Q.   Where were Solomon and Alaimo?

24   A.   Alaimo was here, Solomon would be to the other side.

25   Q.   Where are they in relation to the doorway?

1    A.  Alaimo would be directly blocking the doorway.

2    Q.  Now, Officer Alaimo read you your Miranda right; is that

3    right?

4    A.  Yes.

5    Q.  Do you recall him saying anything else?

6         THE COURT:  I think everybody knows the Miranda

7    rights in substance, but what did he say to you?

8         THE WITNESS:  He read the dry version of the

9    Miranda rights just as it exists on the law.

10        THE COURT:  Namely that you have a right to remain

11   silent, that you have a right to have an attorney?

12        THE WITNESS: Yes, your Honor.  It was read

13   exactly as the courts have said to do it.

14        THE COURT:  And he read it off --

15        THE WITNESS:  A slip of paper.

16        THE COURT:  -- a piece of paper?

17        THE WITNESS:  Yes, your Honor.

18   Q.  What was your reaction when he read you your Miranda

19   rights?

20   A.  My first reaction was it a joke, and then I started

21   seeing the stern face, nobody's there, and all of a sudden,

22   I was just in shock.  I didn't know what was going on.

23   Q.  Did you respond at all when they read you your Miranda

24   rights?

25   A.  Just prior to reading the Miranda rights, Solomon had

1    pulled out two tape recorders and put them on the table and

2    started them.  It was right at that point in time they said

3    that Fulya was making -- I believe at that point in time

4    Fulya was making criminal accusations against me and I was

5    being held in custody.

6    Q.  Okay.  Let's be specific.  Mr. Alaimo read you your

7    rights?

8    A.  Yes.

9    Q.  Officer Solomon takes out two audiotape recordings?

10   A.  I believe the tape started at the reading of the

11   Miranda.

12   Q.  Did you have any reaction when you saw the audiotape

13   recordings?

14   A.  No.  Again, up until that point in time I was waiting

15   for a party.

16   Q.  After the tape recorders went on and Officer Alaimo read

17   you your rights, what happened?

18   A.  The accusations were made at that point in time, and

19   then during the tape, and I hope the tape is played here

20   today, they were being very friendly and very nice.  They

21   wanted -- almost acting like they were trying to be helpful,

22   and they wanted me to make information to them about the

23   relationship with myself and Fulya, and as that was going

24   on, the confusion started.

25           THE COURT:  You say an accusation was made.  What

1  accusation?

2      THE WITNESS:  I believe it was referenced in

3  sexual assault, your Honor.

4  Q.  Can you recall what it was that either Officer Solomon

5  or Officer Alaimo said to you about what you were being

6  accused of?

7  A.  The exact wording at that point in time, I don't recall,

8  I just remember there was something about an assault.

9  Q.  Did they say by whom the accusation was being made?

10  A.  Fulya.

11  Q.  What happened when you heard that?

12  A.  I went downstairs to celebrate a party, and the next

13  thing you know, Miranda was being read to me.  It was like a

14  nuclear weapon, especially an accusation with somebody I was

15  very friendly with, and we had a very good relationship,

16  including the exchange of e-mails and notes and everything.

17  It was like being hit by a nuclear bomb.

18  Q.  How did you respond to Officers Alaimo and Solomon after

19  they made the accusation?

20  A.  They'd ask me to talk to them about if there was any

21  item that I should tell them about in relationship with

22  Fulya.  Quite frankly, at that point in time I wanted to

23  turn the tape off because I wanted to tell them things about

24  the relationship, and I didn't want it to be on tape.

25  Q.  Why not?

1    A.  I'm a guy married 29 years who has had a shitty job, and

2    all of a sudden a great person coming along and we're having

3    far too close a relationship for what should be allowed, and

4    I had to explain it to them because they wanted but, I just

5    didn't want to be on tape.  I was worried about the thing

6    going public and that sort of deal.  I got scared, and I

7    didn't know what the hell to do.  I got confused.

8    Q.  What happened after you asked the tape to be turned

9    off?

10   A.  That was the biggest mistake I ever made in my entire

11   life is the minute I had turned it off, the politics started

12   and the shit started and the forcing me to resign started

13   and the threats.

14   Q.  After the tapes went off, what specifically did Officers

15   Alaimo and Solomon say?

16   A.  "Fulya wants you out of here."

17            MR. NOTIS:  Objection.

18            THE COURT:  Overruled.

19   A.  "You will resign, you will leave," and then they started

20   their gig about Pollard wanting me out and wanted me

21   arrested no matter what.

22   Q.  Where were they when they were speaking to you?

23   A.  Solomon was right here, right up against me, and Alaimo

24   was on this side, and each one would take their turn

25   screaming at me, yelling at me, and I was trying, I was

1    trying to tell them, yes, I screwed up, yes, I had a

2    friendship too close with her, and I was trying to explain

3    things.

4         They made charges against me about stalking, and I

5    said no way.  The only time I've ever seen her on the

6    outside was when I was at the gym with my friend, Bill

7    Depardo, and in fact the daughter of Bill talked to her.  I

8    didn't stalk her.  I bumped into her one night, didn't care.

9    They come out with this accusation, he goes, and we're

10   investigating a 20-year-old assault that you made.  I didn't

11   know what they were talking about.  It was like God damn, I

12   wished if that tape was on, we wouldn't be sitting here

13   today, I can assure you of that.  The threats started again

14   and again and again, then Alaimo says the threat and Solomon

15   for the first time left to go see Pollard.

16   Q.  Let's stop there for a moment, okay.  Describe a little

17   bit the threats that were made against you.

18        THE COURT:  Keep your voice up.

19        MR. WILLIAM DiADAMO:  I'm sorry, thank you, your

20   Honor.

21        MR. NOTIS:  Same objection.

22        THE COURT:  Overruled.

23   Q.  Can you be more specific about any other different

24   threats that were made against you or what they were saying

25   to you?

22

1          THE COURT:  What was the question?  What was that

2     last question?

3          MR. WILLIAM DiADAMO: I was asking specifically

4     what Officers Solomon and Alaimo were saying to him prior to

5     the time that Mr. Solomon first left the room.

6          THE COURT:  What's the objection?

7          MR. NOTIS:  Would you like me to state the

8     objection on the record, your Honor?

9          THE COURT:  I'd like to hear it.

10         MR. NOTIS:  Hearsay.  It's also the heart of the

11    case.

12         THE COURT:  Hearsay?

13         MR. NOTIS:  Yes.

14         THE COURT:  First of all, it's the res judicata;

15    secondly, it's an admission.

16         MR. NOTIS:  Fine, I'm just preserving my record on

17    the record, your Honor, I have to my represent my client.

18         THE COURT:  Let me ask you this, is that an

19    admission?

20         MR. NOTIS:  I don't know what the response is

21    going to be.

22         THE COURT:  He's talking about what the defendants

23    say in exception to the hearsay rule.

24         MR. NOTIS:  I accept the Court's ruling.

25         THE COURT:  Proceed.

1    A.  They said, "You'll resign now or I'm going to put cuffs

2    on you and drag you out of this building."  One would start,

3    then the other would start, and it was back and forth.

4    Every time I tried to explain, Carmine said I'm a

5    knucklehead.  What can I say, a friend correctly identified

6    I was a knucklehead and got too friendly.  I didn't want to

7    be on tape.  Do you think I wanted to be sitting there with

8    the Tribune sitting there waiting?  I was afraid.

9    Q.  Mr. Lariviere, take a moment, okay.

10            THE COURT:  What's the question?

11            MR. WILLIAM DiADAMO:  Thank you, your Honor.

12   Q.  Mr. Lariviere, again I'm going to lead you up to the

13   time Officer Solomon first left the room.  Can you recall

14   anything else specifically that Officers Solomon or Alaimo

15   said to you?

16   A.  What I remember is the physical gestures.

17   Q.  What sort of physical gestures were made towards you?

18   A.  He come up to me, pointing in my eyes.

19            THE COURT:  When you say he, whom?

20            THE WITNESS:  Solomon.  It was like one and one

21   team, Solomon would start, Alaimo would follow in on the

22   game, and at that point in time, at that point I asked if I

23   could go and talk to my wife.

24   Q.  What happened when you asked to talk to your wife?

25   A.  The threat again about being cuffed and dragged out of

1    the building, and Alaimo's making these threats about the

2    press and all the rest of that.

3    Q.  Can you be specific about what threats Mr. Alaimo was

4    making regarding the threats?

5    A.  I think he said something to the effect of the press is

6    outside, they'll see you as you're being dragged out, words

7    to that effect.

8    Q.  After you asked to speak to your wife, what happened?

9    A.  When they wouldn't let me call her or leave to see her,

10   I tried to get up, and Alaimo immediately came behind the

11   chair and blocked me in and pushed the chair back in.

12   Q.  Were you allowed to speak to your wife?

13   A.  No.

14   Q.  Were you allowed to -- did you ask to speak to anyone

15   else?

16   A.  I couldn't understand why Fulya, given the friendship we

17   had, would have made these charges and, quite frankly, until

18   I saw her deposition and that next deposition, I thought she

19   had, and I said I need to talk to Fulya, I don't know what's

20   going on, and they wouldn't let me talk to her.

21   Q.  Did you ask to speak to anyone else?

22   A.  No.

23   Q.  Were you able to speak to anyone else?

24   A.  I wasn't allowed to leave the room.

25   Q.  At some point you've indicated that Officer Solomon left

1    the room?

2    A.  Yes.

3    Q.  Did he say anything before he left the room?

4    A.  He told me he was going to go talk to Pollard.  He told

5    me something to the effect, as I knew, where the policy to

6    have people go out on sick leave for a while, then they'd

7    leave and he'd go check with her and get her approval to

8    allow that, and if I resigned, they'd let me go out the door

9    that way.

10   Q.  What happened when Officer Solomon left?

11   A.  Alaimo just stood over me.  He stood to block me from

12   being able to leave the room, and he just -- at that point

13   in time I was so confused and scared I can't give you

14   gesture by gesture at this point.

15   Q.  At some point did Officer Solomon return?

16   A.  He returned, said, "Pollard wants you to resign

17   immediately, you will resign or you're going to be arrested

18   and dragged out of here."  Then they went on and on about

19   that again and again.  They're very good dealing with

20   somebody in custody.  They know how to put him into scared

21   status, and then ultimately Solomon and Alaimo said they

22   were going back up to check with Pollard and see about

23   a resignation and put on sick leave.

24          They brought Captain Chris McCarthy into the room.

25   As they were leaving, Solomon said to him, "Use whatever

1  force is necessary to keep him here."  While they were gone,

2  I asked McCarthy for permission to go to the toilet, and he

3  escorted me down.  I asked for permission to go into the

4  bathroom by myself, and he allowed me, he stood at the door,

5  and he brought me back to the second floor conference

6  room.

7  Q.  Can you estimate approximately how much time you had

8  been in the conference room by this point?

9  A.  I'd say, I don't know, three-quarters of an hour to an

10  hour.

11  Q.  Did you have any conversation with Officer McCarthy?

12  A.  I remember looking at Chris and saying, "One day I'm at

13  the top of the scale and then in the same moment I'm gone,

14  my life is gone, my career is gone, my name is gone, I'm

15  destroyed."

16  Q.  At any point did Officers Solomon and Alaimo return?

17  A.  Yes.  They returned to say they talked to Pollard.

18  Pollard would not allow me to go on sick leave, I would

19  resign immediately, then they started mentioning again about

20  Fulya wanted me prosecuted unless I quit and left

21  immediately, and Solomon saying something to the effect of

22  I've talked to Fulya, I know if you resign right now, that

23  she won't prosecute you, I feel confident with that, words

24  to that effect.  Then they started again hooting, screaming,

25  threatening to arrest me, and then after a while, oddly

1    enough, Solomon just looked at his watch and said, I got a

2    meeting in 12 minutes, resign now or I'm going to handcuff

3    you and drag you out of the building in front of your

4    friends, your choice."  I didn't know what to say.  At that

5    point --

6    Q.  Did either Solomon or Alaimo make any mention of the

7    press?

8    A.  Both of them had mentioned the press by that point in

9    time.

10   Q.  In what context did they mention the press?

11   A.  That they'd have me in the paper having committed the

12   sexual assault and being prosecuted for it if I didn't

13   resign immediately.

14   Q.  After Officer Solomon looked at you, pointed to his

15   watch, what happened?

16   A.  I collapsed and gave in.

17   Q.  Can you describe what happened from there?

18   A.  By that point in time there was absolutely nothing left

19   of Maurice Lariviere.  They went out to destroy me; they

20   did.  I just knew with the threats, knowing they'd beat the

21   hell out of me if I tried to leave, the fear they'd put me

22   in, the fear of my family being put to disgrace, I gave in

23   to the bastards.  I wish I hadn't.

24   Q.  Mr. Lariviere, what happened?

25   A.  Please.

1          THE COURT:  Try to compose yourself, sir.  What's
2    the question?
3    Q.  The question is what happened next after Mr. Solomon
4    looked at his watch, told you you had 12 minutes?
5    A.  I said to him, "What choice do I have?"  He went up to
6    type the resignation letter.
7    Q.  Did he return to the room at any point?
8    A.  A little while later, him and David Bain walked into the
9    room, David took the paper and put in front of me, said,
10   "Sign it."  I signed it, I believe at that point he signed
11   it, and then he left.  He was maybe in the room, I don't
12   know --
13          THE COURT:  When you say he, who is he?
14          THE WITNESS:  David Bain, your Honor.
15          THE COURT:  What was his capacity?
16          THE WITNESS:  HR Director, your Honor.
17          THE COURT:  What is it?
18          THE WITNESS:  Human Resources Director, your
19   Honor.
20   Q.  When Mr. Bain came into the room, was there anybody else
21   in the room?
22   A.  There was Solomon, Alaimo and Bain.
23   Q.  And in addition to being the HR Director, you also knew
24   Mr. Bain to be an attorney; is that correct?
25          THE COURT:  Keep your voice up.

1    MR. WILLIAM DiADAMO:  I'm sorry.

2  Q.  You knew Mr. Bain to be an attorney; is that correct?

3  A.  Yes.

4  Q.  Mr. Lariviere, I'd like to show you a document, ask you

5  if you recognize it.

6  A.  Yes.

7  Q.  What is it?

8  A.  It's the resignation letter that Bain told me to sign.

9  Q.  Is that the letter or the document that you signed on

10  February 16th?

11  A.  Yes.

12    MR. WILLIAM DiADAMO: I ask that it be marked, your

13  Honor?

14    MR. NOTIS:  No objection, your Honor.

15    THE COURT:  Received in evidence, marked as an

16  exhibit.

17    ( Letter of resignation was marked as Exhibit

18  No. 4 and admitted into evidence.)

19    MR. WILLIAM DiADAMO:  Thank you.

20  Q.  Do you recall reading the resignation before you signed

21  it?

22  A.  No.

23  Q.  Did you have any conversation with Mr. Bain before he

24  left?

25  A.  No.  He just came in, handed it to me, told me to sign

1  it, and then he left.

2  Q.  After Mr. Bain, Attorney Bain left, what did you do?

3  A.  Solomon took me over to the side of the room, and I

4  basically told him, I said, "Pollard got what she wanted, I

5  hope they'll be no press on this.  Let me go on with my

6  life."  At that point in time after he said yes, he and

7  Alaimo took me back upstairs to my office.

8  Q.  What happened when you got to your office?

9  A.  We went in, he said words to the effect that he'd be

10  having his men at the end of the day, after the close of

11  city hall moving my stuff out, and he said, "You can have

12  your jacket," and then he saw my cell phone, it was on the

13  desk, he picked it up, he handed it to me, he said, "Take

14  that, you're not taking anything else."

15       Then he said, "All the department heads have keys

16  and security locks to the building," and he said, "I want

17  those right now," and I reached into my desk thinking that

18  it was in there, and I saw a photo, something my friend,

19  Bill Depardo, had given me as a joke.  At that point in time

20  Solomon grabbed my hand, took that away and put it down and

21  said, told me to leave, "Where's the keys," and I told him,

22  "I think they're in the car," and McCarthy was ordered to

23  take me down to my car.  As we were leaving, Solomon said to

24  me, "You will never, ever enter this point again."  I went

25  downstairs, went into my car, I found the keys, gave it to

1   him, and then I drove home.

2   Q.  What did you do when you got home?

3   A.  I was trying to recapture myself, then I called Solomon

4   on his cell phone, and I wanted to get assurance again that

5   because I had complied with his demands that this would not

6   go public, and I told him, "Look, just let me go on with my

7   life, let my family go on," and he assured me again.

8   Q.  What did you do when you got home?

9   A.  After a while, the remedy I started using was alcohol.

10  Q.  Can you describe to the jury what your condition, your

11  mental and emotional condition was when you got to your

12  house?

13  A.  There's nothing left of me, I was just in -- I was just

14  in shock.  My entire life had just gone.  I went in to

15  celebrate the biggest court victory in my life, and I walked

16  out with nothing, my career gone, my support, my family

17  gone.  It's impossible to sit here and categorize that you

18  go from 100 percent to zero in a matter of minutes.  I just

19  sat there, and the only remedy I had was alcohol.

20  Q.  At what point, if any, did you tell your family?

21  A.  My children come in, my two youngest, Katherine and Tom,

22  and they were shocked because dad always had a long work

23  day, and they didn't know what the hell was going on, why is

24  dad home early?  I couldn't talk to them.  I went in our

25  house, the garage is on the bottom floor, I went down to the

1    garage and just sat there waiting for my wife Christine to

2    come home.  She was a teacher, and she was out teaching.  I

3    waited for her to come home.

4    Q.  Did you see your wife when she got home?

5    A.  Down in the garage.

6    Q.  Okay.  Did you have a conversation with her at that

7    time?

8    A.  Yes.

9    Q.  Okay.  Did you do anything the following day with

10   respect to Methuen?

11   A.  Quite frankly, yeah.  The entire time I had been in the

12   practice, there's only been one person that's been important

13   to me, and that's in law Carmine DiAdamo.  I told my family

14   so many times if anything ever goes wrong in my life, for

15   example, an automobile accident when I'm in work, I want you

16   on the phone to Carmine in ten seconds, and that's who I

17   called, and I talked to you and met with you in the

18   building.

19   Q.  When was the next time you had any interaction with

20   anybody associated with Methuen?

21   A.  I called Bill Manzi, who was on the city council at that

22   point in time and is now currently the mayor of Methuen and

23   has been for the last two years.

24   Q.  When did you first contact Mr. Manzi?

25   A.  I believe it was the following day, if I remember

1    correctly.

2    Q.  Okay.  What was your intent with contacting Mr. Manzi?

3         MR. NOTIS:  Objection, your Honor.  Could we be

4    heard at sidebar?

5         (The following occurred at sidebar)

6         THE COURT:  Keep your voice down.  What's the

7    question?

8         MR. WILLIAM DiADAMO:  The question was, I asked

9    him if he contacted Mr. Manzi and why was he contacting

10   Mr. Manzi?

11        MR. NOTIS:  The objection, all this point is

12   post-stressing, post-coercion and has no relevancy.  There's

13   no allegation Mr. Manzi was involved in the conspiracy.  The

14   only allegation was that Pollard was involved in the

15   conspiracy.  We're getting afoul.

16        THE COURT:  What's the intent?

17        MR. WILLIAM DiADAMO:  If they're going to waive --

18        THE COURT:  I just want to find out, I'm not

19   interested in the entire case at this possibility.  I'm

20   ruling on a question.  What will the answer be, what was his

21   intention?

22        MR. WILLIAM DiADAMO:  The intent is going to be he

23   contacted Manzi on this point and subsequent occasions to

24   discuss getting his job back or figuring out what it is he

25   was going to do.  They're going to argue that he made no

1    attempt to get his job back, he didn't exercise his rights

2    all under the charter.

3                  THE COURT:  Is that true?

4                  MR. NOTIS:  That is true.

5                  THE COURT:  Objection overruled.

6                  MR. NOTIS:  Thank you.

7                  (Sidebar conference was concluded)

8    Q.  All right, I'm sorry, Mr. Lariviere, I don't recall the

9    specific question I had for you, but I think it was what was

10   your intent in contacting then councillor, now Mayor Manzi?

11                 THE COURT:  The question, what was the intent?

12   A.  I wanted to be reinstated to the position, and I wanted

13   to talk to him about the way to handle it, and I called him

14   and we arranged for a meeting.  That would have been on the

15   18th.  By the 16th is when the resignation occurred, the

16   17th it was already in the paper, and I was notwithstanding

17   promises, and when I called Bill, I was told we couldn't

18   meet in Methuen, we'd meet privately in Lawrence.

19   Q.  Let me back you up for a moment.  You indicated that you

20   read something in the paper the following day; is that

21   correct?

22   A.  Yes.

23   Q.  Okay.  What do you recall seeing in the paper?

24   A.  Very basically that --

25                 MR. NOTIS:  Objection, your Honor.

```
1              THE COURT:  Overruled.
2   A.  Very basically that I had committed a sexual criminal
3   act, if I recall correctly, and that as a result I resigned.
4   Q.  Had you had any conversation with anybody from the
5   newspaper?
6   A.  No.
7   Q.  Had you had any conversation with anybody on the 16th,
8   other than the people you've told us about, Officers
9   Solomon, Alaimo, David Bain, Christopher McCarthy and your
10  family?
11  A.  No.
12  Q.  What was the effect on you when you read it in the
13  paper, when you read what you read in the paper?
14  A.  I remember obviously our conversation is private, I
15  remember you saying to me let me go out and look at the
16  paper just to see, and you went out, brought it back and
17  threw it in front of me, and I thought the nuclear bomb had
18  already gone off, but that was even worse.  Now it looks
19  like I'm guilty because I resigned.
20  Q.  How did the publicity at that time affect you?
21  A.  The press started chasing me, and I didn't mind that so
22  much.
23              THE COURT:  Who was chasing you?
24              THE WITNESS:  The press, your Honor.
25  A.  But I remember my daughter Katherine coming home the
```

1   night of the 17th, she was at Salem High, and they have the

2   newspaper stand out there, and she walked through the door.

3   My wife tried the best she could to get her to stop crying,

4   but the press had been apparently at my door, and they left

5   a thing on the door saying call.  My daughter had brought it

6   up.  You know, it's one thing if they want to destroy me,

7   it's just a game, but my kids.  God, I wish I was dead at

8   that point.  I really wished I just died.

9   Q.  How old were your children at that point?

10  A.  My middle child, Katherine, was a senior in high school.

11  My youngest one was a junior in high school.

12  Q.  You started off about talking to Mr. Manzi.  Now, what

13  was your relationship with Mr. Manzi prior to all this point

14  beginning?

15  A.  We were good friends.

16  Q.  What was your professional relationship with

17  Mr. Manzi?

18  A.  Manzi was the -- I met Manzi, he was a councilor, and we

19  developed a friendship with my working for him and serving

20  him.

21  Q.  And what was your relationship, professional

22  relationship, your professional relationship with the city

23  council?

24  A.  They were my employer.

25  Q.  Okay.  You indicated that a day later, two days after

1   this incident you met with Mr. Manzi; is that correct?

2   A.  Yes.

3   Q.  Where did you meet him?

4   A.  The meeting he wanted me to do was in the City of

5   Lawrence in a parking lot in a restaurant in downtown, what

6   they call the mill area of Lawrence, and I drove in there,

7   waited for him, and then he drove in, and I got out of my

8   car and went into his.

9   Q.  Did you have a conversation with him at that time?

10  A.  Yes, I told him about the incident, what had gone on.

11  Q.  What was the substance of the conversation you had with

12  him?  What was the topic?

13  A.  That Pollard had used Solomon and Alaimo to force me to

14  resign and they were making false accusations.

15  Q.  How did Mr. Manzi respond, Mayor Manzi respond?

16          MR. NOTIS:  Objection.

17          THE COURT:  Sustained.

18  Q.  After you had the conversation with Mayor Manzi, was

19  there any other topic that was discussed during that meeting

20  with now Mayor Manzi, Councilor Manzi at that point?

21  A.  I was seeking his guidance on how to proceed to be

22  reinstated.

23  Q.  After you spoke to Mr. Manzi that day, what was your

24  intent about how to proceed to get reinstated?

25  A.  To follow the guidelines and talk to Bill, since he was

1    very much in the call in the political system, and he did

2    became mayor ultimately.

3    Q.   What did you intend to do?

4    A.   Whatever he told me as far as how to proceed.

5    Q.   How did you proceed?

6    A.   The object at that point in time was to let the waters

7    slow down a bit, and in a series of phone calls that was

8    conveyed to me that Peter McQuillan would come in as the

9    interim.  When the waters calmed down, I'd be brought

10   back.

11   Q.  At some point -- well, you mentioned Mr. McQuillan.

12   Who's Mr. McQuillan?

13   A.  Peter McQuillan is a long-term friend of mine, and, as a

14   matter of fact, we'd gone out to lunch together and Fulya

15   had joined us, and there was Peter and Fulya and myself had

16   gone out to lunch, and Peter had called, and, quite frankly,

17   he was furious with what had been done to me, angry as

18   hell.

19   Q.  Is Mr. McQuillan here today?

20   A.  I believe he's sitting in the back.

21   Q.  At some point what happened with respect to

22   Mr. McQuillan and the City of Lawrence?

23            THE COURT:  What was that?

24            MR. WILLIAM DiADAMO: I'm sorry, I'll keep my voice

25   up, your Honor.

1    Q.  What happened with Mr. McQuillan and the City of

2    Lawrence?

3           THE COURT:  Who's McQuillan?  He was the interim

4    appointment?

5           MR. WILLIAM DiADAMO:  That's what I was going to

6    get to.

7    Q.  He was made interim appointment.  Do you recall when, if

8    you recall?

9    A.  I believe the following Monday he was appointed

10   interim.

11   Q.  Okay.  Now, do you recall anything else that you did

12   with respect to attempting to get your, to get reinstated to

13   your job?

14   A.  I had called and talked to the chairman, Michael

15   Hennessey.

16          THE COURT:  Chairman of the what?

17          THE WITNESS:  Chairman of the city council, your

18   Honor, and we had a meeting there.  We met over in

19   New Hampshire.  We wanted -- that given the situation of now

20   the daily news on this, he wanted to meet privately out of

21   the Methuen area.

22   Q.  What did you do as a result of that meeting?

23   A.  I had talked to him about --

24          THE COURT:  He asked you what you did.

25          THE WITNESS:  Okay.

1    A.   After that, I also began contacting some other people to

2    act as agents for me to contact councilors.

3    Q.   Were you familiar with the Methuen city charter?

4    A.   Yes, yes.

5    Q.   And how are you familiar with the charter?

6    A.   The original charter, there was the city or town

7    administrator form of government.  I was on the charter

8    commission that wrote it, and then that basically stayed the

9    same, and it was amended to the mayor form ultimately.

10   Q.   Did you explain to the jury yesterday that the solicitor

11   appointment was a two-year appointment; is that correct?

12   A.   Yes.

13   Q.   Okay.  When had you most recently been reappointed?

14   A.   January of 2005, just a little over a month before this

15   point.

16   Q.   And were you familiar with any protections that were

17   afforded you under the city charter as the city solicitor?

18   A.   Yes, there's a due process which must be observed that

19   they would have to provide me with the opportunity to deal

20   with the issue, to present my case, so to speak, before they

21   could take any action, disciplinary action against me.

22   Q.   Were you ever given that opportunity?

23   A.   No.  When Bain walked down, they had added that clause

24   in 9-10.

25   Q.   What is 9-10?

1    A.  9-10 is the due process right that before an employee

2    could be, city council employee would be terminated, they'd

3    have the right to a hearing.

4    Q.  Just so that we're clear, what is 9-10?  What is the

5    reference?

6    A.  It's a process by which the discipline is going to be

7    administered against a city solicitor, city order that they

8    have a right to a hearing, to prior notice, the right to

9    defend.

10   Q.  Is it your understanding that you would waive that right

11   by signing the resignation?

12   A.  At that point when they threw that paper in front of me,

13   no.  That entire time between hitting the table and my

14   signature on it, five seconds, at best.

15   Q.  At some point did you become aware that -- according to

16   this point that you had waived your rights to an impartial

17   panel or an Article 9, Section 9-10 under the Methuen home

18   rule charter?

19   A.  Not for some time because I was not given a copy of

20   that.

21   Q.  Now, you've indicated that you spoke to Mayor Manzi now,

22   I'm sorry, now Mayor Manzi, at the time Councilor Manzi, a

23   day or two after the incident.  Did you have any further

24   conversations with Attorney Manzi, excuse me, Mayor Manzi,

25   Councilor Manzi?

1    A.  Yes.

2            THE COURT:  The answer is yes.  What's the next

3    question?

4    Q.  How many conversations did you have with him over the

5    next several months?

6    A.  A lot.

7    Q.  Okay.  What was the topic of those conversations?

8    A.  The main stay, which was in essence the strategy, was to

9    let the waters calm and then I'd be returned.

10   Q.  What was your understanding of why Councilor Manzi said

11   let the waters to remain calm at this point?

12   A.  To return to calm, they were anything but calm at that

13   point in time.  Every day there was another Tribune, like, I

14   was the top on the front page, "No politician has the

15   courage to come forward and do the right thing."

16   Q.  Were you aware at this time, when you were having these

17   conversations with Councilor Manzi, what his aspirations

18   are?

19           THE COURT:  I mean -- no objection, but if there

20   were one, sustained.

21           MR. NOTIS:  Then there is one, your Honor.

22   Objection.

23   Q.  Let me see if I ask it this point, which is, were you

24   aware at this point of any political aspirations that

25   Mayor Manzi had?

1          THE COURT:  If he's a town councilor at one time

2    and now he's the mayor and he wants things to be quiet, let

3    the jury draw their inference.  Proceed.

4          MR. WILLIAM DiADAMO:  Very good, thank you, your

5    Honor.

6    Q.  Did anything come of any of these discussions with

7    Mayor Manzi?

8          THE COURT:  Did you do anything?

9          THE WITNESS:  I obeyed his suggestions.

10          THE COURT:  In other words, you made no move until

11    the water is calm; is that so?

12          THE WITNESS:  Yes, your Honor.

13    Q.  At any point did you take any action with respect to

14    being reinstated?

15    A.  Ultimately, I had no choice but to file this Court

16    action.

17    Q.  Okay.  Now, with respect to Mayor Manzi, now

18    Mayor Manzi, do you have a relationship with him

19    currently?

20    A.  He's made me a million promises about taking care of me,

21    and given the fact he hasn't honored one of them, it's

22    affected our relationship immensely.

23    Q.  At some point did you start looking for other work?

24    A.  Yes.

25    Q.  When was that?

1   A.  Shortly thereafter and --

2          THE COURT:  Shortly thereafter when?  When did you

3   start looking for other work?

4          THE WITNESS:  I would say some time in March, your

5   Honor.

6   A.  And I had started about a month or so thereafter, I had

7   started maintaining a list of positions I applied for.

8   Quite frankly, I was getting confused.  I didn't want to be

9   sending in second applications again.

10  Q.  Can you specifically tell the jury what you did to try

11  to find alternative employment?

12  A.  There's what's known as Lawyers' Weekly, which is it's

13  the newspaper for lawyers, and it's online, and they have a

14  listing of all the jobs that you can apply for.  There is

15  also obviously the Boston Globe which has a listing of jobs,

16  the Mass. Municipal Association, which is also online and

17  has jobs, the Mass. Bar Association, which is online, and

18  I'd go online and be looking up the various jobs in the

19  legal or related fields.

20  Q.  And what were you doing after you looked up potential

21  employment?

22  A.  I got a couple of interviews, and one of them was in

23  fact with the AG's office, your Honor.

24  Q.  Did you send out any inquiries for jobs?

25  A.  Yes.  Obviously my specialty 25 years was just municipal

1    law, so I sent out letters to all the surrounding

2    communities to see if there would be any counsel services,

3    whether it be by contract or employment.

4    Q.  And about how many resumes or inquiries did you send

5    out?

6    A.  As of now, about 550.

7    Q.  Of those 550, how many responses have you gotten?

8    A.  I kept a list of it.  Most of it was no response, then

9    there was some simply you got a tag letter that said, you

10   know, we've chosen somebody else.

11   Q.  Did you go on any interviews at all?

12   A.  Yes.

13   Q.  Approximately, how many interviews approximately did you

14   go on?

15   A.  I'd say four or five.

16   Q.  And what happened at those interviews?

17   A.  I don't know if the AG's office had the forms that they

18   have now, but I went in, they gave me an interview form.  I

19   was looking for the municipal law unit, and I had to go down

20   with the form, fill out information.  One of the

21   questionnaires was are you involved as a plaintiff or a

22   defendant in any litigation?  Then there was a question, it

23   said, is there anything in your background which would prove

24   as an embarrassment to the attorney general if you were

25   hired?  And I had to write down the situation, I had no

1    choice.  I went in for the interview, and they looked at

2    that, and I was pretty much dead on the spot.

3    Q.  Did you describe this incident to any other prospective

4    employers?

5    A.  Yes.  Obviously if you're asked a question, you have no

6    choice but to be honest because they have more than adequate

7    right to fire you if you're not truthful.

8    Q.  Have you received any job offers?

9    A.  The Andover Housing Authority has hired me as their

10   counsel, but the contract's limited to $2,000 a year.  The

11   former mayor, Dennis DiZoglio, is the executive director for

12   the Merrimack Valley Planning Commission, and he's in the

13   process of having me brought in to do training for land use

14   and zoning of the board, local boards and commissions, but

15   that would be $250 per training session, so I assume about

16   $1,000 a year at best, and then the last one, there's a

17   contractor authority.

18            THE COURT:  A what?

19            THE WITNESS:  The health contractor authority,

20   your Honor.  I'm serving as the hearing officer, and you get

21   $50 per hour for that, and on a hearing, you average about

22   $200, so far I've made $250.

23   Q.  At the time of your resignation in February of 2006,

24   what was your salary?

25   A.  They just changed it and increased it to $96,000.

1    Q.  Okay.  And what was the method of the increase or the
2    way it was calculated?
3    A.  3 percent increases, I recall.
4    Q.  Had that happened previously ever?
5    A.  Yes.
6    Q.  Okay.  What was the usual and customary practice?
7    A.  Usual and customary practice over time had been in the
8    last decade or so been about three percent per year.
9    Q.  In addition to the approximately $96,000 a year in
10   salary, what other benefits did you receive from Methuen?
11   A.  We're allowed to accumulate up to 240 sick days, and I
12   never used sick days, so when I reached 240, I would get I
13   think it was $50 per day that I went over and didn't use the
14   days, so I got that, then they have a longevity system that
15   they pay you based upon the amount of years.  They'll give
16   you a little extra money based on your years of working for
17   the city.
18   Q.  And how was that computed?
19   A.  That's based upon your income and your years of
20   service.
21   Q.  And in 2005, immediately prior to you leaving, what was
22   your longevity pay?
23   A.  It was going to be $8,000.
24   Q.  That would be in addition to the 96,000?
25   A.  Yes.

48

1    Q.  And --

2              THE COURT:  Is that yearly or just a one-shot

3    deal?

4              THE WITNESS:  Yearly, your Honor, with an increase

5    because each year would be added on.

6    Q.  So it would be an additional multiplier, so you'd get a

7    little bit more each year?

8    A.  Yes.

9    Q.  Okay.  With respect to your other benefits for working

10   at Methuen, can you describe those, please?

11   A.  I had the health insurance through, they used Tufts, and

12   I had that.

13   Q.  Any other benefits that you can recall at this time?

14   A.  The biggest one is being a municipal employee, I have

15   the retirement benefit under the state law.

16   Q.  Okay.  How does that work?

17             MR. NOTIS:  Objection, your Honor.

18             THE COURT:  Overruled.  Do you know?

19             THE WITNESS:  Yes, I do, your Honor.  Quite

20   frankly, I was legal counsel to the Methuen Retirement Board

21   when I was city solicitor, so I was very familiar with it.

22   It's based upon the highest three-year average and then a

23   multiplier based upon your age at time of retirement, and

24   your years of service and the maximum is 80 percent.

25   Q.  In 2005, you had been working for the city for 25

1  years?

2  A.  Yes.

3  Q.  Okay.  Had you vested in the retirement system at that

4  point?

5  A.  Excuse me?

6  Q.  Had you vested in the retirement system at that point?

7  A.  Yes, plus because I had been a councilor back when I was

8  in my 20's, I got three years of service for that, so as of

9  2005, I was credited with 28 years of service.

10  Q.  Prior to this point in 2005, did you have in mind a plan

11  for your retirement?

12          THE COURT:  Well, what's unclear at least to me,

13  maybe not to the jury, does he receive any money for

14  retirement or no?

15          MR. WILLIAM DiADAMO: I was just about to get it

16  there.  Let me ask it that way.  We'll start there.

17  Q.  Are you currently receiving any retirement benefits?

18  A.  No.

19  Q.  What's the reason?

20  A.  I'm hoping that this Court will reinstate me so I can

21  take the retirement.

22          MR. NOTIS:  Objection.  Move to strike.

23          THE COURT:  The answer is no, he's not receiving

24  any retirement.  Anything else is excluded.

25  Q.  Okay.  Are you eligible to receive retirement benefits

1    right now?

2    A.   Yes, but due to my age, the point system is very low.

3    Q.   Can you describe to the jury the point system?

4    A.   When --

5              THE COURT:  How old are you?

6              THE WITNESS:  I'm now 58, your Honor.  The point

7    system starts at age 55, and you are 1.5, then you go up at

8    65, you arrive at 2.5.  So it's a 10th of a point each year

9    being added on.  So, for example at 58, the multiplier would

10   be 1.8 percent, 1.8, excuse me.

11   Q.   Okay.  If you were to take your retirement right now, do

12   you know what amount you would be receiving on an annual

13   basis?

14   A.   The retirement that I would take, now I would have to

15   take what's known as an Option A.  I had planned what's

16   known as an Option C.  Option A you collect your retirement

17   if I die, it's dead, the coverage is dead.  I planned on an

18   Option C that when I died, my wife would still be collecting

19   the retirement, but given it's only about 44,000, I think,

20   or less, if it's an Option A, if I took an Option C, it

21   would be so low that I wouldn't be able to do anything

22   bill-wise.

23   Q.   Just to clarify, if you were to take your Option A

24   retirement right now, do you know what you would be

25   receiving from the Commonwealth?

1    A.  Approximately, using what's known as the public employee

2    retirement administrative commission multiplier system,

3    approximately forty-three, forty-four thousand dollars.

4    Q.  A year?

5    A.  Yes.

6            THE COURT:  What I'm unclear on, in signing that

7    resignation letter and waiving all rights under due process,

8    did you give up your retirement permanently, or do you still

9    have an opportunity at some stage to exercise some option

10   and receive at least some retirement?

11           THE WITNESS:  I would have that option, your

12   Honor.

13           THE COURT:  You still have the option?

14           THE WITNESS:  Yes, your Honor.

15   Q.  So that today, as we sit here, that's available to you;

16   is that correct?

17   A.  Yes.

18   Q.  Okay.  Did you have --

19           THE COURT:  So, in other words, you have not been

20   deprived of your retirement benefits entirely?  That's not

21   the plan?

22           THE WITNESS:  No, your Honor.

23   Q.  Did you have a plan prior to February of 2005 as to when

24   you intended to retire?

25   A.  Ultimately, I'd go to age 65, and then at that point I

1    could take an option C so that when I died, my wife would

2    still be able to have retirement monies.

3    Q.   Okay.  Were you able to calculate what your retirement

4    would be at the age of 65 if you had continued to work as

5    the Methuen City Solicitor until that time?

6              MR. NOTIS:  Objection, your Honor.

7              THE COURT:  Overruled.

8    A.   Actually each year the system itself, as required by

9    law, provides that information to you, and it would be

10   $99,000 a year.

11   Q.   So if you had been able to work until the age of 65 in

12   your position as Methuen City Solicitor, that was your

13   expectation as to your retirement, $99,000 a year?

14   A.   Yes, yes.

15   Q.   Mr. Lariviere  --

16             THE COURT:  Much more on this point?

17             MR. WILLIAM DiADAMO:  No, your Honor.

18   Q.   Aside from financial aid, how else has this point

19   affected you in the last three years?

20   A.   Without breaching attorney-client privilege, Carmine

21   asked me how it affected my life, and I looked at him, said,

22   "Carmine, I don't have one any more, it's gone.  I have no

23   ability to support my family."  I put college money away for

24   my kids, they're in college, and the way that our assets

25   have been drained to pay off debt, I'm assuming I might have

1    to tag into that.  It's affected my friendships totally,

2    people that I trusted and had a lot of faith in, and your

3    part is that Solomon and Alaimo, they did what they did, but

4    I never trusted them anyways.  It's not your enemies did

5    that hurt you, it's what your friends fail to do, and I

6    relied on people like Bill Manzi to help, all the promises I

7    got and where I'm sitting.

8    Q.  In February of 2005, was your wife working?

9    A.  Yes.  When we had our children, she had stepped down

10   working, she had been a teacher, and she wanted to take care

11   of the kids.  So until 1995, she had not worked, and then

12   she got a part-time job, and then finally in September of

13   2004, she started a full-time job as a teacher.

14   Q.  And is she currently employed?

15   A.  She's the only means of staying alive that we have.

16   Q.  Where is she?

17   A.  Yes.

18   Q.  Where is she today?

19   A.  She's working.

20   Q.  Where are your children today?

21   A.  My oldest one is in a master's program at Yale, my

22   daughter Katherine is at Emmanuel College, and she's a

23   junior, and my son is a sophomore at Mass. Maritime

24   Academy.

25   Q.  Is there any other way in which -- strike that.  Have

1  you had to sell anything because of your financial

2  constraints?

3  A.  Yes.

4  Q.  What?

5  A.  I had a boat that I used, as a matter of fact, I took a

6  loan out for, and I had to sell that in order to start

7  paying off some debts, and they've eaten my savings

8  account.

9  Q.  How has this point affected your relationship with your

10  wife?

11  A.  I, frankly, she's one of the most best mothers I've ever

12  seen my entire life.  I remember one time I got mad at her

13  because she was a better mother than my mother was, but I've

14  had to be on the anti-depressant, and that eliminates my

15  ability to be a husband, and we've had to live with what

16  we've been through with the press and day after day after

17  day after day, everyone at this point, they're publishing,

18  they write a damn article about, "Snowstorm cancels trial."

19  She's doing the best she can to make it through this

20  situation.

21  Q.  Are you still married to your wife?

22  A.  Yes.

23  Q.  Do the children still come home when they're off

24  school?

25  A.  If it wasn't for, quite frankly, you and Carmine and my

1    family, if I could have had a handgun, I wouldn't be

2    involved in this today.  They've kept me going.

3    Q.  Finally, Mr. Lariviere, how do you feel that these

4    events have affected your name?

5    A.  I live every day with one thought my father gave me.  He

6    said Larivieres never have much money, but I gave you a good

7    name, and you will give that to your kids.  Somewhere along

8    the line, I'll see him again, and the name is gone.  I

9    destroyed my father's name by giving it to these clowns.

10              THE COURT:  Anything further?

11              MR. WILLIAM DiADAMO:   That's all I have, your

12    Honor.

13              THE COURT:  We'll suspend.  20-minute morning

14    break.

15              THE CLERK:  All rise for the jury.

16              (A recess was taken).

17              THE CLERK:  All rise for the jury.

18              Court is in session.  You may be seated.  The

19    direct examination has been concluded.  Now we're starting

20    with cross-examination.

21              MR. COURT:  They've agreed upon them.  Read them

22    into the record, just their number.

23              MR. NOTIS:  Exhibit 5 is a letter to Best-Buy

24    applying for a job.  Exhibit 6 is the statement from Fulya

25    Metin on February 15th, 2005.  Exhibit 7 is a letter

1     applying for a job to the Town of Brookline dated March 8th,

2     2005.  Exhibit 8 a certified copy of the sexual harassment

3     policy from the City of Methuen.  Exhibit 9 is a document

4     entitled Bahan, B-a-h-a-n, investigation report dated

5     June 9, 2004.  Exhibit 10 is an agreement between the

6     Methuen Police Department and Terrence Neel, N-e-e-l.

7     Exhibit 11 is a request for leave of absence and notice of

8     resignation for employee Shaun, S-h-a-u-n, Cronin,

9     C-r-o-n-i-n.  Exhibit 12 are the cellular phone records of

10    Maurice Lariviere for February and January of 2005.

11    Exhibit 13 is a statement by Fulya Metin dated

12    February 16th, 2005, and Exhibit 16 is the Methuen Home Rule

13    Charter.

14              ( Letter to Best-Buy was marked Exhibit No. 5 and

15    admitted into evidence.)

16              ( Statement from Fulya Metin on February 15th,

17    2005 was marked Exhibit No. 6 and admitted into evidence.)

18              ( Letter applying for a job to the Town of

19    Brookline dated March 8th, 2005 was marked Exhibit No. 7 and

20    admitted into evidence.)

21              ( Certified copy of the sexual harassment policy

22    from the City of Methuen was marked Exhibit No. 8 and

23    admitted into evidence.)

24              ( Document entitled Bahan Investigation Report

25    dated June 9, 2004 was marked Exhibit No. 9 and

1      admitted into evidence.)

2              ( Agreement between the Methuen Police Department

3      and Terrence Neel was marked Exhibit No. 10 and

4      admitted into evidence.)

5              ( Request for leave of absence and notice of

6      resignation for employee Shaun Cronin was marked Exhibit

7      No. 11 and admitted into evidence.)

8              ( Cellular phone records of Maurice Lariviere for

9      February and January of 2005 was marked Exhibit No. 12 and

10     admitted into evidence.)

11             ( Statement by Fulya Metin dated February 16th,

12     2005 was marked Exhibit No. 13 and admitted into evidence.)

13             ( Methuen Home Rule Charter was marked Exhibit

14     No. 16 and admitted into evidence.)

15                         CROSS-EXAMINATION

16     BY MR. NOTIS:

17     Q.  Good afternoon.  Can you hear me?

18     A.  Yes.

19     Q.  The Beal case you discussed on the direct examination,

20     the events that were the subject matter of that case took

21     place during Bruce McDougall's administration; do you

22     agree?

23     A.  Yes.

24             THE COURT:  Is that the federal case?

25             MR. NOTIS:  That's correct.

1    Q.  That case involved allegations of civil rights

2    violations against the city, right?

3    A.  Yes.

4    Q.  Is that similar to the claims that you filed in this

5    case, correct?

6    A.  No.

7    Q.  They were 1983 claims?

8    A.  1983 but totally different claims.

9    Q.  How about the Frachelli case that you were counsel of

10   record for in 1987?

11   A.  I'm sorry, you'd have to help me with that.  I had a

12   number of cases.

13   Q.  I show you a copy.

14          THE COURT:  When you say he was involved, he was

15   involved as an attorney?

16          MR. NOTIS:  That's correct, your Honor.

17          THE COURT:  Who was he representing?

18   Q.  You were representing the city, correct, sir?

19   A.  If you give me a moment, please, it's too many years

20   ago.  The case was actually handled by the insurance company

21   attorney.

22   Q.  Well, you're the first counsel of record there, right,

23   sir?

24   A.  Yes.  I always put myself, my name on record so that I

25   would be receiving all the documents and could monitor what

1  the insurance company attorney was doing.

2  Q.  Well, there was an insurance attorney J. Beehan, too?

3  A.  That started out that way.  What happened was the

4  insurance company went bankrupt, was taken over by I believe

5  the State of Connecticut, and at that point in time they

6  pulled out and I had to step in because they'd be no

7  insurance coverage.  It would be pure taxpayer.

8  Q.  This case, the Frachelli case, that was about a

9  deprivation, about a procedural due process case?

10  A.  I believe the name is Fisichelli, and I'd have to read

11  it, but I don't recall.

12  Q.  Why don't you take a moment and read it, sir.

13        THE COURT:  Wait a minute.  What's the point?

14  This is cross-examination.  Ask him the question.

15  Q.  Sir, isn't this point that this case involved actually

16  the same allegations you're filing in this case?

17  A.  I don't know.  I'd have to look at this.  We're talking

18  a case that I didn't directly handle.

19        THE COURT:  Let's assume --

20  A.  It's 20 years ago.

21        THE COURT:  What's the relevance?  Assume for the

22  sake of this point that it's somewhat factually the same.

23  Ask the question.

24  Q.  Sir, when you filed this lawsuit and when you were

25  sitting in that conference room with these two gentlemen,

1    you knew exactly what your procedural due process rights

2    were, didn't you?

3    A.   No.

4    Q.   You forgot them?

5    A.   They had successfully destroyed my thought process.

6    Q.   Now, the layout of your office, sir, you had a large

7    office off to the right of the video, correct?

8    A.   With the camera angle, yes.

9    Q.   And there's a lobby area as you come in?

10   A.   The corridor area, yes, where my file cabinets were.

11   Q.   And there's a door to that lobby area, isn't there?

12   A.   Yes.

13   Q.   It was your custom and practice to keep that closed,

14   wasn't it?

15   A.   You're talking about the entrance into the office

16   itself?

17   Q.   Yes.

18   A.   Yes.

19   Q.   You know it's now kept open, right?

20   A.   No.

21   Q.   Now, when it was closed, isn't it true that you kept it

22   closed so you could engage in the conduct that you did with

23   Ms. Metin when she was at her secretary's desk without

24   warning?

25   A.   That door had been closed the entire time that I was

1   there.  It was just custom that it's an office door.

2   Q.  In any event, you would have a warning when someone was

3   entering the office, if you were engaged in the type of

4   conduct we saw in the video with Ms. Metin; you agree with

5   that?

6   A.  I guess.  I've never thought about that.

7   Q.  Okay.  Now, the mayor's office is also on the third

8   floor, right?

9   A.  Yes.

10  Q.  Down the hall on the opposite side of the building?

11  A.  Yes.

12  Q.  Is city council the great hall in the middle?

13  A.  In the middle the great hall, yes, the meeting area.

14  Q.  Okay.  Where is the men's room in relation to that door

15  that you kept closed?

16  A.  Directly across.

17  Q.  Is it your understanding that that's the room the two

18  detectives were in that day?

19  A.  That's what I've been led to believe.

20  Q.  And there was a sign on that door that said out of order

21  the day that the video took place, correct?

22  A.  Yes.

23  Q.  And you approached that door, didn't you, during the

24  course of that day and tried to get into the men's room?

25  A.  Yes, for obvious reasons.

1    Q.   Now, you talked about some of the things that were on

2    the second floor of the city hall.  Wasn't the credit union

3    there at that time as well?

4    A.   They would be on the other side.

5    Q.   On the second floor though, exactly?

6    A.   Correct.

7    Q.   And that's open to the general public?

8    A.   No.

9    Q.   Who's it open to?

10   A.   That's the municipal employee's credit union.

11   Q.   Essentially it's a bank, right?

12   A.   Say it again, please.

13   Q.   Essentially it's a bank, right?

14   A.   Yeah.

15   Q.   Employees can come and go as they want during the course

16   of the day, right?

17   A.   Yes.

18   Q.   Now, the conference room that you were interviewed, sir,

19   that had two doors, didn't it?

20   A.   Yes.

21   Q.   One on one end and one on the other, correct?

22   A.   Correct.

23   Q.   Now, you told us yesterday during direct that you had --

24   that Mayor Pollard came to you and had a conversation with

25   you about making the change to the mayor system of

1    government, right?

2    A.  Yes, and if I had the opportunity I'd like to correct

3    some of the times.

4    Q.  What was the timing?

5    A.  The 1993 is when we went to the mayor form of government

6    and Dennis DiZoglio took over as mayor '94, '96, '98, and he

7    left office in 2000, and that's when Pollard came in.

8    Q.  So your testimony yesterday that that conversation took

9    place with Pollard in '99 was incorrect?

10   A.  About changing, yes, it would have been -- I think I

11   said yesterday it might be incorrect.  I think I said the

12   early '90s.

13   Q.  That conversation never took place, did it, please?

14   A.  That she came in yes, very much so.

15   Q.  Do you know what she was doing back in 1993?

16   A.  I think she was in a clothing-type sale business.  I'm

17   not positive, but I think it was.

18   Q.  Taking you to the January, 2005 time frame, you had just

19   signed up for a new two-year term; do you agree?

20   A.  I had been reappointed.

21   Q.  Okay.  You knew that Pollard was going to be there for

22   the next year?

23   A.  By that point in time it was down to 11 months, yes.

24   Q.  And you had no expectation that in 2007, when your term

25   was up, that you would be renewed as the city solicitor, did

1    you?

2    A.  Based upon 13 reappointments and being there 25 years,

3    yes, I had a reasonable belief, especially given who was

4    going to be mayor.

5    Q.  What if there was a full-blown sexual harassment hearing

6    before the city council pursuant to the city charter, would

7    your expectation have changed then?

8              MR. CARMINE DiADAMO:  Objection.

9              THE COURT:  Overruled.

10   A.  I don't know.  I know that under the facts currently

11   that wouldn't have occurred.

12   Q.  Well, based on your experience with the city council,

13   sir, if someone came before them with allegations of the

14   conduct that was on that video, do you think they would

15   reappoint someone like you to the city solicitor's office?

16   A.  Mr. Notis, they were deprived of the right to supervise

17   their employee because they were not told, the chairman

18   under that sexual harassment policy should have been

19   contacted and should have been the one to get involved, so

20   what would they do?  I don't know because they, your

21   clients, violated the policy.

22   Q.  Sir, you never went to that city council and asked for a

23   hearing, did you?

24   A.  Once the resignation was signed and was taken control of

25   by HR, under the law I no longer had any legal rights on

1    that.  They were gone.

2    Q.  You could always go to the city council, couldn't you,

3    and request to have that resignation revoked?

4    A.  I did go to the person in power and ask.

5    Q.  You never did it in a public forum before the council,

6    did you?

7    A.  No.

8    Q.  And you never did it in writing, did you?

9    A.  My counsel had been communicating with the city, yes.

10   Q.  And what is your testimony about what your counsel

11   requested?

12   A.  He was putting them on notice that they had better not

13   go to a permanent appointment, as I recall, that they would

14   be triggering a lawsuit, as I recall, but I don't have the

15   document in front of me.

16   Q.  Well, we'll come back to that document, sir.  You know

17   under the city charter, Mayor Pollard had no right to

18   investigate into your conduct?

19   A.  That would be correct.

20   Q.  That was the city council's decision?

21   A.  If they had been informed, which they were deprived of

22   that right.

23   Q.  Now, once you waived your right, sir, in writing, there

24   was no need to initiate a hearing, was there?

25   A.  Sir, the entire reason that they went after me was to

1    deprive me of my due process rights, which is pretty dammed

2    important at this point.

3    Q.  The city council never invited you to come in and

4    explain your actions, right?

5    A.  Not once it hit the papers.  They knew how to close and

6    lock the door, these guys.

7    Q.  Now, let's just make it clear that Mayor Pollard had no

8    authority to suspend or discipline you either?

9    A.  No, just the Gestapo.

10   Q.  And you knew that when you were in the room with Deputy

11   Chief Alaimo and Solomon?

12   A.  Did I know she wouldn't have termination authority,

13   yes.

14   Q.  And you knew she couldn't initiate the investigation

15   before the city council, right?

16   A.  I'm sorry, could you repeat that, please.

17   Q.  You knew that she had no authority to initiate the

18   investigation before the council?

19   A.  No, that would be not true.  She could.

20   Q.  Well, let's look at the charter, sir.  Section 2-11 is

21   inquiries and investigation, correct?

22   A.  Yes.

23          THE COURT:  Keep your voices up for the jury now,

24   both of you.

25          THE WITNESS:  Sorry, your Honor.

1    Q.  Does it say anything in Section 2-11 about the mayor

2    initiating an investigation?

3    A.  No, but the mayor could request a council quite

4    obviously.

5    Q.  It says to the contrary, doesn't it, that the city

6    council may make investigations into the affairs of the city

7    and the conduct of the city agencies.  Did I read that

8    right?

9    A.  Yes, it's a standard provision for legislatures.

10   Q.  And you, if you were going for a sexual harassment

11   hearing before the council, that's the provision that they'd

12   use to bring you in, right?

13   A.  They could use that or what's known as 9-10, yes.

14   Q.  You attended Christmas parties at Mayor Pollard's house

15   through the years?

16   A.  I did not go to the first two.  I went, my wife and I

17   went I think to the third or fourth, try to come forward and

18   see if I could mend some fences, see if she'd start being

19   nice to me.

20   Q.  When you say third or fourth, you mean third or fourth

21   of her term?

22   A.  Yes.

23   Q.  What year would that be?

24   A.  I'm going to say 2003 she would invite all the

25   department heads and some of the assistant department heads,

1    and I went there hoping that that would get her into a

2    better mood.

3    Q.  Sir, you gave sworn testimony under oath in this case,

4    didn't you, that Mayor Manzi was actually the leader of the

5    political system, right?

6    A.  Yes.

7    Q.  Not Pollard?

8    A.  The way the system works, quite frankly, from my

9    experience is when a person goes in and there's a three-term

10   limitation on elections of mayors and when they're in that

11   last term, the people are starting to look for the next guy

12   coming in who's going to be running the show so, yes, he was

13   very much in control.

14   Q.  All right.  Not part of this point though to make you

15   resign, right?

16   A.  No.

17   Q.  So, why were you fearful of the political weight of

18   Mayor Pollard coming down on you if Manzi was the political

19   heavy weight in the city?

20          THE COURT:  What time are we talking about?

21   Q.  At the time of your resignation.

22   A.  At the time of the resignation, when I communicated with

23   him, I knew that he had the power to make decisions that

24   could get me reinstated because I had no rights.  I had to

25   get those rights back by him, and knowing he was in control,

1    I know that he's the boss, he's the general, he has to make

2    the call, not me, not the guy in the paper every day of the

3    week.

4    Q.  And the city council had the right to fire you, right,

5    not the mayor?

6    A.  They had the right to fire me after a hearing, yes.

7    Q.  But you didn't answer the second part, the mayor had no

8    right to fire you, did she?

9    A.  That's correct.

10   Q.  Now, she also had administrative duties, and one of

11   those was personnel, would you agree?

12   A.  Yes.

13   Q.  And one of her personnel rulings was that people who

14   were department heads shouldn't go to lunch with their

15   employees, right?

16   A.  Not that I'm aware of.

17   Q.  You shouldn't leave your department unmanned during

18   lunch.  That was her order, wasn't it?

19   A.  I remember she sent something out I'm going to say the

20   beginning of February, 2005, probably a week or two, I think

21   I remember a week or two beforehand there was something to

22   that reference.

23   Q.  And you breached that when you went out to lunch with

24   Ms. Metin, right?

25   A.  She had no authority to issue an order to me.  The

1    council had the authority to issue an order to me.

2    Q.  Isn't it true when you did go to lunch, wasn't it in

3    effect you begging to go with her?

4    A.  No, that's false, and, quite frankly, Mr. Notis, the

5    current city solicitor is right there, he went to lunch, you

6    want to call him, call him.  You'll see there was very, very

7    nice, very pleasant luncheons.

8    Q.  Now, you took criminal law in law school?

9    A.  I would assume so.

10   Q.  You took criminal procedure in law school?

11   A.  I'm not sure.  We're talking 1973.

12   Q.  In any event, you understood what your Miranda rights

13   were when they were read to you, correct?

14   A.  Yes.

15   Q.  You knew when Deputy Chief Alaimo told you you could

16   stay silent, that you could do that?

17   A.  Yes.

18   Q.  And you knew that if you requested an attorney at any

19   time, that one would be given to you, right?

20   A.  I don't know about one being given to me.  My

21   understanding is that I could communicate with an attorney.

22   My understanding under state law, once I'm under arrest,

23   held for an hour, I'd have that definitive right under state

24   law.

25   Q.  And wasn't your deposition testimony, sir, that you

1    never did ask for an attorney that day?

2    A.  No, I asked for my wife.

3    Q.  You could have stopped the interview at any time while

4    the audiotape was running and after and ask for an attorney,

5    but you declined to do so; that's your sworn testimony

6    today?

7    A.  Mr. Notis, the minute that that tape was turned off,

8    any, any extent of the criminal ended, and it went

9    immediately into forcing my resignation, immediately.

10   Q.  That summary judgment, that big victory you had that

11   morning in the state court case, that was an unopposed

12   motion, wasn't it?

13   A.  No.

14   Q.  It was opposed by the other side?

15   A.  Excuse me, I'm sorry?

16   Q.  It was an unopposed motion?

17   A.  I had showed up for the motion, and the other side had

18   not appeared, and, as a result, the Judge awarded me that,

19   yes.

20   Q.  Now, you also counseled police officers from time to

21   time when they were the subject of investigations, fair?

22   A.  I would assume so.

23   Q.  And from time to time those involved situations when

24   they were interrogating witnesses or when they were

25   arresting witnesses, correct?

1    A.   No, I don't believe so.

2    Q.   How about the Cronin case, sir?

3    A.   The Cronin case, and I forget the exact terminology that

4    was used, but he was I think the term is keying, the charge

5    he had been keying his microphone that would be contacting

6    with the police officers in the station, I think clicking

7    it, I think they use the term keying.

8    Q.   You were familiar with the workings of criminal law,

9    arrest procedures and interrogations when you entered that

10   room on the 16th of February, correct?

11   A.   No.

12   Q.   You're an attorney for 25 years, you don't know the

13   inner workings of the criminal law system; is that your

14   testimony?

15   A.   That's correct.   In this point and age the law is so

16   complicated that you get to be a specialist in one area does

17   not mean you know the other areas of law.

18   Q.   Now, you saw people bring claims in the past, much like

19   that Fisichelli case in front of you, and the reason they

20   did was to financially rehabilitate themselves, right?

21   A.   Again, I'm not familiar with the Fisichelli case because

22   it was handled by an insurance company, and we're talking

23   about over 20 years ago.

24   Q.   In any event, when you went into that room and you saw

25   the letter presented to you by David Bain, there was no

1    release or waiver, correct?

2         THE COURT:  There was no what?

3         MR. NOTIS:  Release or waiver.

4    A.  I'm sorry, release or waiver of what?

5    Q.  Your right to bring a lawsuit?

6    A.  In that document they wrote, no.

7    Q.  And you had in fact negotiated hundred of documents for

8    other city employees where you insisted that that provision

9    was in there?  Do you agree?

10   A.  To be honest with you, I have to look at them.  You have

11   the exhibits.  I wouldn't doubt that I would have something

12   like that in there to protect Methuen.

13   Q.  So when you went into that room, you also knew that you

14   had not given up that right, fair?

15   A.  That was not even remotely in my memory or knowledge or

16   thought pattern, not even remote.

17   Q.  You had drafted the city sexual harassment policy?

18   A.  The sexual harassment policy is a type done by MCAD, and

19   we simply use that format and entered the system data.

20   Q.  You wouldn't have entered it as a city policy unless you

21   understood the contents, would you?

22   A.  No, it was obvious.

23   Q.  You knew what it said?

24   A.  Yes.

25   Q.  You knew the rules that you as a supervisor had to

1    follow?

2    A.  I knew what they establish as the element of sexual

3    harassment, yes.

4    Q.  And you had in fact taken continuing legal education

5    courses in sexual discrimination and sexual harassment

6    claims, fair?

7    A.  I assume.  I don't recall offhand immediately, no.

8    Q.  If you said that at your deposition, you'd have no

9    reason to dispute that, would you?

10   A.  No.

11   Q.  You managed the city's litigation, what it involved in

12   those areas, correct?

13   A.  Yes.

14   Q.  The resignations that you negotiated for the city, you

15   were advocating for the city during those times, correct?

16   A.  Yes.

17   Q.  And you were advocating against an employee who you were

18   attempting to get to resign or leave the city, correct?

19   A.  Advocating, no.

20   Q.  You were trying to get the best deal possible for the

21   city and protect its rights, true?

22   A.  The department head or the mayor would tell me what they

23   wanted.  We would then provide the person with physical due

24   process and negotiate, if they so chose, a resignation under

25   certain conditions as they might want or their attorney.

1    Q.  I'll show you Exhibit 11, Mr. Lariviere.  That's the

2    Cronin resignation letter, correct?

3    A.  Yes.

4    Q.  And that contained a waiver of his rights to appeal the

5    decision, right?

6    A.  Yes.

7    Q.  And so you knew about that when you went into the room

8    on the 16th, correct?

9    A.  Yes.

10   Q.  Because you had been on the other side, you had been

11   Mr. Bain, hadn't you?

12   A.  No.

13   Q.  And now you're claiming that you were ignorant of what

14   was on that letter; is that your testimony?

15   A.  What I'm claiming is that not one instance that I was

16   involved in did anybody ever been deprived of due process,

17   and if you want to read this point, may I read the first

18   sentence of this point?

19   Q.  On redirect, sir.  Now, let's talk about interview

20   techniques.  You've written about those in the past, haven't

21   you?

22   A.  Probably.

23   Q.  Because you in fact have conducted interviews of city

24   employees?

25   A.  Yes.

1    Q.  And in the past, sir, isn't it true that you've used

2    fictitious stories and deceptive methods when interviewing

3    witnesses?

4    A.  No.

5    Q.  You didn't write about that?

6    A.  Write about it?

7    Q.  Do you have a memory of writing about using those

8    techniques?

9    A.  If you have a document, I would like to see it.

10   Q.  Do you recognize the document, sir?

11   A.  Yes, I recognize that.

12   Q.  Did you draft it?

13   A.  Yes.

14   Q.  That's Exhibit 9, that's the Bahan report, right?

15   A.  Bahan report, yes.

16   Q.  And you talked about the techniques you've used when you

17   were interviewing the witness, fair?

18   A.  Yes.

19   Q.  Could you read the sentence starting with two tests and

20   the following sentence, and the third after that, for that

21   matter, to the jury?

22   A.  Sure.  Do you want me to outline the background of this

23   point or just read it?

24   Q.  I'd like you to read those three sentences, please.

25   A.  Okay.  "To test memory, and as is sometimes necessary in

1    interrogations, I employed erroneous and fictitious facts.

2    Deception is a recognized method to developing details of

3    incidents.  In this point I pretended to have an additional

4    written document signed by Moore, totally implicating

5    Mahoney of the delivery in order to punish."

6    Q.  Thank you.  You advised employees on the retirement and

7    pension system as well?

8    A.  Yes.

9    Q.  And you gave some pretty explicit testimony about the

10   workings of a system when Mr. DiAdamo was asking you

11   questions?

12   A.  I'm sorry, could you repeat that, please?

13   Q.  You gave some pretty clear analysis about the workings

14   of the system during direct, right?

15   A.  I'm aware of the system, yes.

16   Q.  And you knew when you went into that room that if you

17   had been convicted of a crime that you could potentially

18   forfeit your retirement benefits?

19   A.  That was not anywhere near my thought process.

20   Q.  But you knew that, didn't you?

21   A.   Mr. Notis, if I knew that and was thinking about that,

22   and you've seen I've written very detailed lengthy legal

23   documents, if I was in charge and had the right to protect

24   myself in an agreement, if I was allowed to leave the room

25   and to prepare it, yeah, I would have written all kinds of

1    documents to protect myself.  I was not the one that typed

2    it, not the one that thought up the language.

3    Q.  Now, isn't it true that in order to forfeit your

4    retirement benefits, it would have to be something relating

5    to your conduct in office?

6    A.  Typically, yes.

7    Q.  That's what you said at your deposition?

8    A.  Yes.

9    Q.  And there's another way that your retirement benefits

10   would have been revoked, and that's the moral turpitude

11   provision, right?

12   A.  My understanding, I have not really seen that being

13   used, but my understanding, there is a statute on it.

14   Q.  Well, you weren't confused on the day of your

15   deposition, so let's read your testimony.  On page 210,

16   Day 1.

17           THE COURT:  Is this a deposition?

18           MR. NOTIS:  Yes, your Honor, of the witness.

19           THE COURT:  Deposition, as you know, testimony

20   given under oath during the pretrial discovery period.

21   Q.  You gave this point under oath, sir?

22   A.  Yes, as a matter of fact I testified to that just the

23   way I did now.

24   Q.  But when you were -- when you testified, just to be

25   clear, you were sworn in by the court reporter, right?

1    A.  Yes, I was.

2    Q.  Under the pains and penalties of perjury?

3    A.  Yes, I was.

4    Q.  And you had an opportunity to review this point and make

5    corrections after your deposition, right?

6    A.  Yes.

7    Q.  I'll read the question, you read the answer.  "If you're

8    terminated by the city council, there's no implications for

9    your pension or retirement", and your answer?

10   A.  "There's a moral turpitude statute.  It's not applied

11   that often to my knowledge, but could it be applied, yes, so

12   moral turpitude is made, moral turpitude."

13   Q.  "If termination is made to moral turpitude, yes?"

14   A.  Yes, sorry.

15           MR. WILLIAM DiADAMO:  May I have a page and

16   line?

17           MR. NOTIS:  Page -- November 13th, 2006.

18           MR. CARMINE DiADAMO:  2006?

19           MR. NOTIS:  Yes.  Two years later.

20   Q.  If the council determined that you had harassed this

21   woman and sexually assaulted her criminally, your pension

22   benefits were at issue, weren't they?

23   A.  They could be.

24   Q.  And you knew that that day when you went into the

25   room?

1    A.  No, I did not.

2    Q.  And you knew that as you were sitting there?

3    A.  No, I was not thinking about that.

4    Q.  Sir, that had escaped your memory also, I guess,

5    right?

6    A.  Sir, I was given less than five seconds to sign a

7    document thrown in front of me.  My thought process was not

8    exactly the speed of a computer.

9    Q.  Now, in addition to all your legal responsibilities, you

10   were also a supervisor, correct?

11   A.  Yes.

12   Q.  And you had a very small department and you had only one

13   person to supervise, who was that?

14   A.  That would be the secretary.

15   Q.  And back in 2004, 2005, that was Ms. Metin, do you

16   agree?

17   A.  From October 2d, 2004 to February, 2005, yes.

18   Q.  You were in charge of directing her day-to-day work?

19   A.  I was the supervisor, yes.

20   Q.  You reviewed her performance?

21   A.  I don't know that I wrote anything.  I just, you know,

22   she'd be coming in.

23   Q.  That was your job as to evaluating her performance, and

24   if she was inadequate, you could request that she could be

25   fired?

1    A.  Request, yes.

2    Q.  And you recommended raises, if necessary?

3    A.  Yes.

4    Q.  And you could discipline her or recommend discipline,

5    correct?

6    A.  Recommend.

7    Q.  Now, going back to the sexual harassment policy, you

8    were her supervisor.  You were one of the people that she

9    was supposed to report harassment to, correct?

10   A.  In that particular instance, she would be reporting it

11   to the person next door, who would be the human resources

12   director, or in the alternative, she could report it to the

13   mayor, or in the further alternative, the city council.

14   Q.  Now, yesterday you said that Mayor Pollard controlled

15   the hirings of the secretary's office; was that your

16   testimony yesterday?

17   A.  Under the charter, yes.

18   Q.  Okay.  But you had no say and she apparently had

19   objected to your hiring that first person, right?

20   A.  Correct.

21   Q.  Yet when you were in the car with her and there was that

22   hug and kiss exchanged, you're the one who told her I'm

23   going to hire you, right?

24   A.  The only -- what did occur was we were driving back from

25   lunch, and she had asked me something to the effect of would

1    you let me know before, give me a couple weeks notice before

2    you hire somebody new, and after we got back that's when I

3    said to her, I said would you like to stay.

4    Q.  You felt she wasn't qualified at that point though,

5    right?

6    A.  No.

7    Q.  And you felt that when she initially came in for the

8    interview, correct?

9    A.  To be quite honest with you, at that point in time she

10   has a great personality and her job qualifications were -- I

11   seemed to like her right away.  She seemed like a really

12   decent person to be with.

13   Q.  But you gave sworn testimony in this case that both when

14   you hire on a temporary basis and when she was hired on a

15   permanent basis, she wasn't qualified for the position,

16   correct?

17   A.  I had asked her to commit to me that she would become a

18   paralegal, and she had promised that she would be.

19   Q.  Wasn't the real reason that you wanted her hired was

20   because you were sexually attracted to her?

21   A.  I found her attractive, yes.

22   Q.  And wasn't another reason that you saw her as

23   vulnerable?

24   A.  No.

25   Q.  And wasn't another reason that you felt that you could

1    prey on her or victimize her?

2    A.  No.

3    Q.  Now, sir, I want you to take a look at an exhibit that

4    we have in evidence.  It's up on the chalk here.  I believe

5    you've seen it before.  That's the statement that Ms. Metin

6    provided.  That's Exhibit 6.  Is that correct?

7    A.  Would you give me a moment, please?

8    Q.  Sure.

9         MR. NOTIS:  Your Honor, I'd like to publish copies

10   to the jury.

11        THE COURT:  Surely.

12        THE COURT:  It's in evidence, isn't it?

13        MR. NOTIS:  Yes, it is.

14   A.  I went over it quickly, the specific sections that I

15   appreciate your directing me.

16        MR. NOTIS:  Your Honor, could I have the witness

17   approach the chalk for this point of questioning?

18        THE COURT:  Sure.  What is the reason?

19        MR. NOTIS:  I'd like to address certain passages

20   and highlight them.

21        THE COURT:  All right.

22   Q.  On the first page, Ms. Metin wrote about the fourth or

23   fifth day into the assignment --

24        THE COURT:  What is the date of this?

25        MR. NOTIS:  This is February 15th, 2005, the date

1    before the videotaping.

2    Q.  "About the fourth or fifth day into the assignment,

3    Maurice was acting a little too nice to me, and I thought it

4    was strange, but I brushed the thoughts aside.  On that day

5    near the doorway into the office, he came up into nowhere,

6    he just grabbed me and kissed me.  I was very upset and

7    horrified by it and I pulled away."  Do you see that

8    reference?

9    A.  Yes, I do.

10   Q.  Do you deny that she pulled away from you?

11   A.  Yes.

12   Q.  Could you please highlight, "I pulled away from you,"

13   please.

14   A.  "I pulled away."

15   Q.  A little bit further down, sir, "The days in the office

16   were getting -- would be getting my work done but almost day

17   on a daily basis he would come over to my desk and make

18   stupid comments about me being in a bathing suit or stare at

19   my chest or stare at me all the time or make me feel

20   uncomfortable."  Do you see that passage?

21   A.  Unfortunately, I didn't bring my glasses.  This is not

22   easy.

23          THE COURT:  Why don't you mark it for him.  He's

24   having trouble seeing it.

25   Q.  The question is, Do you deny that that occurred, sir?

1    A.  Yes.

2    Q.  Can I highlight it then for you?

3    A.  Sure.

4    Q.  A little bit further down it says, "He would tell me to

5    hug him all the time, and he would get close to me that I

6    could feel his private part right on my private area, and he

7    would sort of try to adjust himself so he got really close

8    to my private area.  I would push him away and get all

9    upset, and then he would still try to kiss me, and the more

10   I tried to push him away, the more he would try to kiss me

11   almost to the point of trying to make out with me."  Did I

12   read that correctly?

13   A.  I believe so, yes.

14   Q.  Did you deny that she tried to push you away during

15   those occasions, sir?

16   A.  Yes, categorically.

17   Q.  Can I please highlight that for you.

18   A.  If I may, does this justify misuse of the police force?

19   Q.  Sure, the questions are for you.  Turning to the second

20   page about halfway down, it says, "He would on a few

21   occasions and more often lately touch my breasts when he

22   tried to hug me, and I pull his hands down, and he'd be like

23   'ouch, you hurt my hand, say you're sorry'."  Did I read

24   that right, Mr. Lariviere?

25   A.  I'm doing the best I can here to read but I

1    understand.

2    Q.  Did you hear me read it?

3    A.  Yes.

4    Q.  Do you deny that statement?

5    A.  Yes, I do.

6    Q.  Could I please highlight that for you then?

7    A.  Yes.

8         THE WITNESS:  If I may, your Honor, I hope the

9    exhibits we wanted to put on will be admitted.

10        THE COURT:  There's no need to talk.  Just answer

11   questions.

12        THE WITNESS:  My apologies, your Honor.

13        MR. NOTIS:  Your Honor, if I could have the chalk

14   marked as an exhibit.

15        THE COURT:  What's that?

16        MR. NOTIS:  Could I have the chalk marked as the

17   next exhibit?

18        THE COURT:  It's already in evidence, but you can

19   use it for closing argument, but there's no need to mark it.

20        MR. NOTIS:  Fair enough, thanks.

21   Q.  Sir, at one point did you ask Ms. Metin to go to the

22   Mediterranean and her children with you?

23   A.  Children?  No.  I'm a little bit over the hill on that

24   one.

25   Q.  You did ask her to go to the Mediterranean, didn't

1  you?

2  A.  She talked to me a lot about Turkey and how nice and

3  beautiful it was and how she liked being over there, and we

4  talked about it would be nice in the Mediterranean, that

5  sort of thing.

6  Q.  The statements that we looked at yesterday, the ones

7  that she signed that said, "Maurice means a lot to me,"

8  Exhibit 1, there were three pages, isn't it true that you

9  made Ms. Metin sign those?

10 A.  No.  The only one that I had suggested was, I think I

11 said yesterday she had been yelling at her stepmother of her

12 second or third marriage to the father who died, about the

13 estate, and I jokingly said why don't you write a note

14 telling me that you're not going to put me down because the

15 way she was treating the other one, and she wrote that note

16 at that point.

17 Q.  In fact, you prepared those, didn't you?

18 A.  No.

19 Q.  You kept them in your desk drawer in your office?

20 A.  I assume so.  I just throw that stuff into a drawer.

21 Q.  Now, isn't it true that your conduct on the videotape

22 was in violation of the sexual harassment policy?

23 A.  No.

24 Q.  There's two levels of sexual harassment under the

25 provisions.  One is quid pro quo, and one is unwelcome

1    conduct.  You have in front of you Exhibit 8, right?

2    A.  Yes.

3    Q.  And Section 2 is definition of sexual harassment?

4    A.  That's correct.

5    Q.  And in Section B these are things that are not

6    permitted; do you agree?

7          THE COURT:  What are you referring to?

8          MR. NOTIS:  I'm referring to the sexual harassment

9    policy, Exhibit 8.

10          THE COURT:  The policy of what?

11          MR. NOTIS:  Of sexual harassment.

12          THE COURT:  I understand.  What's the authority?

13   Is it the town?  What policy?

14          MR. NOTIS:  It is.  It's the system policy.

15   Q.  Sir, you wrote, this is a policy that you created from

16   the MCAD, right?

17   A.  That's the policy that MCAD under law has to provide a

18   forum which we have the right to use and we, quite frankly,

19   had used it rather than writing our own.

20          THE COURT:  Let me ask you that, is this policy,

21   is that a sexual harassment?

22          THE WITNESS:  Yes.

23          THE COURT:  Is that a crime or civil liability or

24   what?

25          THE WITNESS:  It's a civil issue, your Honor,

1    absolutely nothing to do with the criminal provisions.

2    That's totally separate, your Honor.  It's civil purely.

3    Q.  Mr. Lariviere, this was in effect on the day of the

4    videotaping; do you agree?

5    A.  Yes.  We were mandated to keep the -- to put these in

6    effect under state law, and, quite frankly, to distribute to

7    all our employees.

8    Q.  And this would be the policy that the city council would

9    examine in the context of your behavior if they were going

10   to initiate one of those 211 hearings that we talked about

11   earlier, right?

12   A.  Quite frankly, it would be up to the --

13            MR. CARMINE DiADAMO:  Your Honor.

14            THE COURT:  Overruled.  It's cross-examination.

15            MR. CARMINE DiADAMO:  Okay, very well.

16   A.  It would be up to the city council to choose whatever

17   they chose to do their review.

18   Q.  And that was a possibility you knew about when you were

19   in that room with the defendants?

20   A.  That was not remotely close to what was going on, nor my

21   thought pattern.  Bear in mind again, they started out with

22   a claim she wanted criminal action, though it was a lie.

23   Q.  Sir, you knew about this point when you were in there,

24   right?

25   A.  Did I know there was a provision in existence?  Yes.

1   Did I think about it?  No.

2   Q.  You knew how it functioned, and you knew there was the

3   possibility that you could have a full-blown hearing before

4   the council addressing this, correct?

5   A.  That was not even remotely in my thought process.

6   Q.  That's the hearing that you so desperately wanted that

7   you claim was taken away from you, right?

8   A.  You're talking 211.  Are you talking the 211

9   investigation or a 9-10 disciplinary hearing?

10  Q.  Well, sir, either one.  You knew that that was a

11  possibility that you could be brought in front of the city

12  council for a hearing about your sexual harassment, again,

13  the civil side, about your conduct on the videotape,

14  correct?

15  A.  If somebody had asked me, I would assume, yes, but was I

16  thinking about that, no.

17  Q.  And isn't it true that that's one of the reasons you

18  resigned was to avoid that process?

19  A.  Gareth, this point will not get past the jury.

20  Q.  Sir, that's for them, the jury.  Could you please

21  read --

22          THE COURT:  Here's the thing though, you're

23  cross-examining him with respect to a civil procedure, it

24  appears that the purport of his testimony is that he was

25  accused of a criminal offense called indecent assault.  Was

1    that your testimony?

2          THE WITNESS:  Yes, your Honor.

3          MR. NOTIS:  Your Honor, could we have a sidebar

4    about this point?

5          THE COURT:  No, you can proceed, but there seems

6    to be some disconnect between his understanding and your

7    question but proceed.

8          MR. NOTIS:  Okay.

9          MR. CARMINE DiADAMO:  I'd like to say

10   respectively, your Honor, we would be delighted to come to

11   the sidebar.

12         THE COURT:  Overruled.  No further argument.

13   Proceed.  This is cross-examination, and he has a right to

14   do it.

15   Q.  Could you read the first paragraph of the sexual

16   harassment definitions to the jury, please?

17   A.  Are we in the introduction section?

18   Q.  Section 2, definitions, please.

19   A.  Do you want the first paragraph?

20         MR. CARMINE DiADAMO:  Your Honor, excuse me, I'm

21   not sure what he's being asked to read.

22         THE COURT:  Let me tell you, he's the plaintiff.

23   He's been put on the stand.  He's testified in direct.  He's

24   made the accusations, and he made it with some force.

25   Counsel for the defendants have a right to cross-examine

1    him.  If the complainant doesn't understand what he's being

2    shown, then he should answer, not you.  Whether you know

3    what he's referring to is relevantly insignificant.  Do you

4    know what he's pointing out to you?

5              THE WITNESS:  I was just asking him that, your

6    Honor.

7    A.  Is it the first paragraph?

8    Q.  Yes, please.

9    A.  "In Massachusetts, the legal definition of sexual

10   harassment is this:  Sexual harassment means sexual

11   advances, request for sexual favors and verbal or physical

12   conduct of a sexual nature when" and then there's a series

13   of qualifications.

14   Q.  Sir, isn't that what your conduct was on the video?

15   A.  No.

16   Q.  And isn't the conduct of Ms. Metin described in her

17   statement exactly that?

18   A.  In that statement that she wrote, I would consider it,

19   yes.

20   Q.  Okay.  Now, turning to page 2, "One of the other

21   violations of the sexual harassment policy would be

22   inquiries into one sexual's experiences"?

23   A.  I'm sorry, where are you?

24   Q.  Page 2, sir, three-quarters of the way down.

25   A.  Is that where the wording starts at?  That's page 3.

1    Q.  So we agree that discussing one's sexual experiences or

2    one's sexual activities, that's also a violation of the

3    policy?

4    A.  If it's offensive.

5    Q.  And you did that with Ms. Metin, didn't you?

6    A.  Ms. Metin talked to me about it, too.

7    Q.  And if she mentioned that in her statement that you had

8    asked about her sexual life, and you had told her about your

9    sexual experiences, that would be a violation of the policy,

10   wouldn't it?

11   A.  No, it would not.

12   Q.  And when you went into that conference room for the last

13   time, sir, you knew about this, didn't you?

14   A.  Did I know that there was this point?  Yes.  Did I know

15   anything about what was about to occur?  Absolutely not.

16   Q.  Sir, it's true or at least you told us at your

17   deposition that you never desired to have sexual contact

18   with Ms. Metin?

19   A.  You mean the ultimate, no.  That would scare the hell

20   out of me, to be honest with you.

21   Q.  Now, you called Ms. Metin frequently on her cell phone,

22   didn't you?

23   A.  We exchanged phone calls back and forth, yes.

24   Q.  Also you called Chief Alaimo, I'm sorry, Chief

25   Solomon?

1    A.  On the cell phone, yes.

2    Q.  You had his cell phone number?

3    A.  Yes, he wanted the ability, all the department heads

4    wanted the ability to access the city attorney, if

5    necessary, and I was, as far as I was concerned, I was a

6    24-7 employee.

7    Q.  Sir, you have in front of you Exhibit 12.  Do you

8    recognize those as your cellular phone records?

9    A.  I assume so.  It looks like it.

10   Q.  Okay.  Is it your understanding that in the line that

11   says destination where it says incoming, that that would be

12   a call that you received on your phone?

13   A.  I believe so.

14   Q.  And the calls going out, that would be calls that you

15   sent or you made from your phone?

16   A.  I believe so.

17   Q.  Sir --

18   A.  I don't know Verizon's system, but I'm assuming.

19   Q.  All right.  Brentwood, New York, 631-3679, do you

20   recognize that as Ms. Metin's number?

21   A.  Where are you, please?

22   Q.  First page.

23   A.  First page, what number, please?

24   Q.  Well, you made three calls to her on January 7th, calls

25   2, 3 and 5; do you see those?

1    A.   Brentwood, Brentwood, Brentwood.   That's the one you're

2    referring to?

3    Q.   Yes, sir.

4    A.   I believe so.   I'm assuming that's her number.

5    Q.   Sir, do you see any incoming calls from her in this list

6    of calls?

7    A.   I don't know.   I'd have to -- I'd be here for the next

8    two hours looking through all this.

9    Q.   If I represent to you that there are no incoming calls,

10   do you have any reason to dispute that?

11   A.   No.

12   Q.   Now, you made some calls to her the night before the

13   videotaping, correct?

14   A.   Yes.

15   Q.   First one was around what time?

16   A.   I would say somewhere between 5 and 5:30 she left, and I

17   was calling her to tell her about the case.

18   Q.   Okay.   And what was the purpose of that call?

19   A.   To tell her about the case.   She had seen me working on

20   that for the longest time.

21   Q.   And it's your testimony that you went home, correct?

22   A.   After I made a couple other calls, yes.

23   Q.   And then you went back to the gym?

24   A.   I went over to the gym, yes.

25   Q.   Where was the gym located?

1    A.   It's in Methuen.

2    Q.   So you drove to Windham, 20 minutes or 30 minutes after

3    you made that phone call, correct?

4    A.   No.  Which phone call are you referring to, please?

5    Q.   The first one.

6    A.   No, I had gone home.

7    Q.   So where did you make the call from?

8    A.   If you could, please.

9    Q.   The first call, Mr. Lariviere.

10   A.   Yes, if you could, please, point to the one that

11   says --

12   Q.   It's 7:09.  Where did you make that call from?

13   A.   I see one that says 8:45 a.m.  Are you referring to the

14   7th here, are we?

15   Q.   Page 6 is the calls from February 11th through 16th.

16   A.   Okay.

17   Q.   Where did you make the 7:09 call from?  Where were you

18   at that time?

19   A.   There's a number system on there, Mr. Notis.

20   Q.   No. 91.

21   A.   91.  7:09 p.m., I'm assuming that would be when I was

22   arriving at the gym or was on my way over to the gym.

23   Q.   Okay.  And then the second one is at 9:15, that's when

24   you were leaving the gym?

25   A.   That's correct.

1    Q.  Now, at your deposition you described the touchings that
2    you made on Ms. Metin as mutual, mutually affectionate; do
3    you recall that?
4    A.  Yes.
5    Q.  And is it your testimony that if she was resisting your
6    advances, that would be considered mutually affectionate?
7    A.  If she was openly resisting, she would not be.
8    Q.  Did you see the video when it was played?
9    A.  To be honest with you, I almost went blind it was so
10   poorly done.
11   Q.  Did you see the video, sir?
12   A.  Yes.
13   Q.  Did you see any instances in that video when she shied
14   away from you or moved away from you?
15   A.  Mr. Notis, that by any reasonable standard is an
16   unreliable document because it speeds, it slows, it's taken
17   at a different angle.  I looked at it.  I was confused.
18   About the only thing I saw was my fanny most of the time.
19   Q.  Sir, did you see on that video any occasions when
20   Ms. Metin appeared to shy away from you or move away from
21   you?
22           MR. WILLIAM DiADAMO:  Objection.
23           THE COURT:  Overruled.
24   A.  No, I did not, and, quite frankly, given the way that
25   was playing, it was impossible to really make a good

1    analysis.

2    Q.  We have several other videos in evidence, and we can

3    look at those later.  Did you ever see an occasion on the

4    video where you blocked her path around that desk?

5    A.  Blocked, no.  She was on one side, I was one side around

6    the desk area where I was talking to her.

7         THE COURT:  Anything further?

8         MR. NOTIS:  Yes, your Honor.

9    Q.  Sir, do you recognize Exhibit 13?

10   A.  I've seen it in exhibits.  I have not seen the original,

11   nor was I aware of the circumstances outlining it.  I assume

12   Lieutenant Wnek will testify to it.

13   Q.  Well, it's signed by Ms. Metin on the 16th, correct?

14   A.  It appears to be, but I was again not present for the

15   signing.

16   Q.  And it's signed by Lieutenant Wnek on the same day?

17   A.  It appears to be, again, not present.

18        THE COURT:  What day is this?

19        MR. NOTIS:  The 16th.

20   Q.  I'm going to read a passage and let me know,

21   Mr. Lariviere, if you disagree with this point.

22   A.  Please give me the line, sir.

23   Q.  It's about three-quarters of the way down starting with

24   "He was."  Let me know when you see it.

25   A.  "He was at my desk"?

1    Q.  Yes, sir.  I'll read it.  "He was at my desk for a while

2    talking.  When I tried to get up, he grabbed me to him

3    really close and started to kiss me and if I tried to get

4    away, he kept trying to pull me closer to him, and he kept

5    kissing me and moving me closer to him.  The more I tried to

6    get away, the more aggressive he seemed to become."  Do you

7    deny that interpretation, sir?

8    A.  Yes.  I'd have to agree with my counsel, at best, PG.

9           THE COURT:  No talking, the answer is yes.  It's

10   always best when you're a witness is just answer the

11   question.  Go ahead.

12   Q.  Sir, how did you -- had you visited websites that

13   described hidden video cameras?

14   A.  That described hidden cameras?

15   Q.  In your office, sir, hadn't you visited Internet sites

16   that described hidden video cameras?  Yes or no.

17   A.  The question would have to be more specific.  I'm not

18   sure what you're talking about.

19          MR. NOTIS:  Your Honor, could I have a moment with

20   counsel?

21          THE COURT:  Sure.

22   Q.  Sir, did you visit sites from your office computer?

23          MR. WILLIAM DiADAMO:  Objection, your Honor.

24   A.  Visit certain sites.

25          MR. CARMINE DiADAMO:  This, your Honor, we would

1    respectively like to approach on.

2            THE COURT:  All right.  What's the question?

3            (The following occurred at sidebar)

4            MR. NOTIS:  Your Honor, he visited some websites,

5    and one of them was a hidden sex cam site, and it talks

6    about people looking at people through hidden cameras.  I am

7    willing to hold off on this point until tomorrow based on an

8    agreement I had with counsel, but if my cross ends, I don't

9    want to preclude myself from using this.

10           THE COURT:  What is it?

11           MR. CARMINE DiADAMO:  He wants to use porn sites,

12   that's what he's trying to show.

13           MR. NOTIS:  Porn shots.  The reason this point in

14   particular is very relevant is because it's hidden sex cams.

15   He's objecting to the use of the video cam, the surveillance

16   hidden cam.  He's going to the sites.

17           THE COURT:  He's never objected to the use of it.

18   Here's the thing, he hasn't objected.  It was agreed by the

19   parties it be shown.  He merely said that he thought that

20   was --

21           MR. NOTIS:  Poorly done.

22           THE COURT:  -- poorly done.

23           MR. NOTIS:  Your Honor.

24           THE COURT:  It may be I'll permit since you're not

25   going to ask it today, but I'll tell you --

1          MR. NOTIS:  I know you want me to speed up.

2          THE COURT:  It's an act of desperation on this.

3   It may be highly prejudicial.

4          MR. NOTIS:  Okay.

5          THE COURT:  And I don't know how I'm going to

6   rule, but it hasn't been asked yet, but I'll tell you if you

7   win this point, this is a tough question.  This is a tough

8   question.  You got to have some real basis.  In other words,

9   you're trying to -- what's the basis for it?

10         MR. NOTIS:  The basis, this point he is objecting

11  to hidden cameras.

12         THE COURT:  He's not.  I've heard no objection to

13  a hidden camera.

14         MR. NOTIS:  Okay.  I'll ask him that.  I'll ask

15  him right now.  If he says yes --

16         THE COURT:  But let me tell you this, most people

17  would be.

18         (The sidebar was concluded)

19  Q.  Mr. Lariviere, do you have a problem with the technique

20  of using the surveillance camera on the 16th by the police?

21  A.  If it was used for a proper purpose, no.  Though I've

22  never heard of it being used before, but it was used for an

23  improper purpose, so, yes, very much of an objection.

24  Q.  So you objected to the use of the surveillance camera on

25  that day?

1    A.  No.  On that day, I didn't even know about it.

2    Q.  Sir, do you have an opinion as to whether your conduct

3    on the video camera was indecent assault?

4            MR. CARMINE DiADAMO:  Objection.  Doesn't it speak

5    for itself?  There are eight people here who can make a

6    decision about what that movie showed.  His really means

7    nothing.

8            THE COURT:  In other words --

9            MR. CARMINE DiADAMO:  How about mine?

10           THE COURT:  -- you don't want his answer on this?

11           MR. CARMINE DiADAMO:  I'm just saying why are we

12   in an area that is for the jury?

13           THE COURT:  He's asking to give an opinion as to

14   what his opinion is.

15           MR. NOTIS:  Yes, sir.  Yes, your Honor.

16           THE COURT:  Are you an expert as to what

17   constitutes indecent assault?

18           MR. NOTIS:  Yes, your Honor.  He's given a number

19   of legal opinions about the case.  I'm asking his opinion on

20   the legal issue.

21           THE COURT:  The criminal offense of indecent

22   assault?

23           MR. NOTIS:  Yes.

24           THE COURT:  He's a lawyer.  I'll let him answer

25   it.  Objection overruled.

1          MR. CARMINE DiADAMO:  Specifically he's asking him

2     about on that tape.

3          THE COURT:  On that tape.

4          MR. CARMINE DiADAMO:  On what we all just saw.

5          THE COURT:  Right.  If he wants to ask someone his

6     opinion as to what we all saw, I mean, what's your opinion?

7     Was that indecent assault?

8          THE WITNESS:  To my understanding, your Honor, and

9     I'm not a criminal attorney --

10          THE COURT:  No, but he's asking for your opinion.

11     Tell the jury what your opinion is.

12     A.  No, because it was not unwelcome.

13     Q.  So, in other words, if --

14          THE COURT:  What was your answer?

15          THE WITNESS:  No, because it was not unwelcome,

16     your Honor.

17     Q.  If the conduct was unwelcome, you agree then that it

18     would have been indecent assault and battery?

19          MR. CARMINE DiADAMO:  Objection.

20          THE COURT:  Overruled.

21     A.  That I am not, you're talking on the criminal component

22     or the civil component?

23     Q.  Sir, do you understand the question?

24     A.  I understand the question, but, again, I am not a

25     criminal attorney.

1    Q.  You just told us that if the way you qualified it was

2    that if the conduct was welcome, it wouldn't be indecent

3    assault and battery, right?

4    A.  To my understanding, yes.

5    Q.  So, do you believe the converse, that if the conduct was

6    not welcome and it was unwanted, that it would constitute an

7    indecent assault and battery?

8         MR. WILLIAM DiADAMO:  Objection, your Honor.

9         THE COURT:  Overruled.

10   A.  To my understanding, if there had been a clearly

11   demonstrated objection so that the message is certain, yes,

12   it would be unwelcome.

13   Q.  Now, you were given an opportunity when the interview

14   started to have an attorney present?

15   A.  When they were doing the tape and they were allegedly

16   doing criminal investigation, yes.

17   Q.  And you never asked for one the rest of the day even

18   when the audiotape went off?

19   A.  No, I repeatedly say I only asked for two people, my

20   wife and Fulya.

21   Q.  Now, at some point isn't it fair to say that Deputy

22   Chief Alaimo left the room while the tapes were still

23   running?

24   A.  I had listened to the audiotape, and I would say based

25   on that, that would be correct.

1  Q.  And he went upstairs it's your understanding to look at

2  the videotape and then came back down?

3  A.  I know that allegedly he left the room for a short

4  period and then returned.

5  Q.  And didn't he tell you what he saw on the videotape when

6  he came back down?

7  A.  I don't recall specifics, but the audiotape would speak

8  for itself.

9  Q.  And how long was he gone when he went up to the room,

10  sir?

11  A.  It would be a very short period of time.

12  Q.  And you agree that the audiotapes were turned off at

13  that point?

14  A.  To my understanding, yes.

15  Q.  Okay.  Now, you said earlier that Solomon and Alaimo

16  were in uniform that day?

17       THE COURT:  I think he testified he didn't know

18  how they were dressed.

19       THE WITNESS:  Correct.

20  Q.  Do you have a memory?

21  A.  No, your Honor is correct, I said I didn't know.

22  Q.  Were you watching the video when they went through on

23  the top of the screen, did you see them in uniform?

24  A.  To be honest with you, by that point in time the thing

25  had zigzagged, I had a headache and stopped looking.

1  Q.  So the answer is no?

2  A.  Right.

3  Q.  Did Chief Solomon or Deputy Chief Alaimo have a weapon,

4  specifically a handgun, with them on the day of the

5  interview?

6  A.  I believe that Solomon did based upon what I saw.

7  Q.  Did he have handcuffs with him?

8  A.  Yes, he did.

9  Q.  Did Deputy Chief Alaimo have handcuffs with him?

10  A.  That I don't know.

11  Q.  So, your testimony is that when you were in that

12  conference room being interviewed, Chief Solomon had a gun

13  and handcuffs?

14  A.  At the very end he pulled out the handcuffs and threw

15  them in my face, when he was doing the threat about the

16  handcuffing, yes.  It's a little hard to miss it when you're

17  about four inches away from your eyeball.

18  Q.  Sir, when you left the room and you went upstairs, who

19  else was with you besides the defendants?

20  A.  Chris McCarthy might have been behind them.  I'm not

21  positive.

22  Q.  Did you see anyone else as you got up to the solicitor's

23  office?

24  A.  When I got back upstairs, I believe Randy Haggar, who

25  was a police officer, was at my doorway area.

1  Q.  Were you crying at that point when you got up there?

2  A.  At that point in time, no.

3  Q.  Had you cried at any point during the interview process

4  or any time during the conference room interaction?

5  A.  No.

6  Q.  Had you hyperventilated at all during that time?

7  A.  Yes.

8  Q.  When did that occur?

9  A.  At the beginning and a good portion through it.

10  Q.  Sir, you agree that no threats were made or promises

11  were made to you during the taped audiotape portion of the

12  interview?

13  A.  No, they were, quite frankly, very friendly and they

14  were going on with their routine about this bothered or

15  something to this point.  They were -- they created a nice

16  environment for their audio portion of the game.

17  Q.  You agree that there was never any physical contact

18  between you and Chief Solomon when you were in the

19  conference room?

20  A.  The only contact would be when they were directly up

21  against my face and when Alaimo held the chair and pushed it

22  back in on me.

23  Q.  Were they any closer than you were to Ms. Metin on the

24  video when you watched it at this point?

25  A.  Yes.

1    Q.  Was she closer to your face than you were to theirs?

2    A.  I don't believe they kissed me.

3    Q.  I believe you categorized it as an atomic bomb or

4    nuclear weapon this morning?

5    A.  Yes.

6    Q.  That was your interpretation of what was going on?

7    A.  Yes.

8    Q.  Did you ever ask Ms. Metin how she felt that day when

9    you sexually assaulted her?

10   A.  I did not restrain her or detain her, as they did, nor

11   did I make any threats to her whatsoever.

12   Q.  There was no physical contact between you and Deputy

13   Chief Alaimo in that room; you agree with that?

14   A.  Just the contact regarding when I tried to push the

15   chair out and get away.

16   Q.  Now, during occasions when Chief Solomon and Deputy

17   Chief Alaimo left the room, was there a phone in the room?

18   A.  To my knowledge, no.

19   Q.  No phone in the conference room?

20   A.  No.

21   Q.  Okay.  When Captain McCarthy came in during that one

22   occasion, did you ask him if you could call your wife?

23   A.  No, because he'd be operating under the directive of

24   Solomon.

25   Q.  So he's involved in the conspiracy too; is that your

1    theory?

2    A.  He's obeying the orders of his chief.

3    Q.  So let's talk about who's in the conspiracy now.

4    Mayor Pollard, right?

5    A.  Absolutely.

6    Q.  David Bain?

7    A.  David Bain, if you're asking what I feel or what I

8    believe, please help me.

9    Q.  Was David Bain, sir, involved in the conspiracy to get

10   you to resign?

11   A.  My understanding is he just accidentally walked into the

12   room while Solomon was typing that resignation.

13   Q.  Captain McCarthy, you just told us you think he was

14   involved in the conspiracy?

15   A.  Yes, in more than one, yes.

16   Q.  How about Haggar when you went upstairs, him, too?

17   A.  I don't have the slightest idea what he knew.

18   Q.  Mayor Pollard, she's involved in the conspiracy?

19   A.  Given what Solomon told me, yes, and given what we were

20   going to have for testimony, yes.

21   Q.  And she's not a defendant in this case and neither is

22   Captain McCarthy, right?

23   A.  No.

24   Q.  You never asked Captain McCarthy to intervene on your

25   behalf and stop the interview, right?

1    A.  To stop the interview?  He was ordered, the only orders

2    he got was to come in, and he was ordered to use whatever

3    force is necessary to keep me there.

4    Q.  How long had you known him?  I'm sorry, did you complete

5    your answer?

6    A.  Yes.

7    Q.  How long had you known Captain McCarthy before the 16th

8    of February?

9    A.  I believe I met him when he got in an automobile

10   accident and I had to handle the case when he hit a car.

11   Q.  So about ten years?

12   A.  Maybe.

13   Q.  You felt comfortable with him, you worked with him on

14   matters for the police department?

15   A.  Not that often, no.  Very rare.

16   Q.  How about Randy Haggar, did you feel comfortable with

17   him?

18   A.  I didn't really have that much contact with him.

19   Q.  How about David Bain, sir, did you feel comfortable with

20   him?

21   A.  Comfortable?

22   Q.  Yes.

23   A.  I knew that he was a Pollard dike, and I stayed away

24   from him as best as possible.

25   Q.  He's in the conspiracy, he's in the Pollard dike; is

1  that what you said?

2  A.  I never said he was in the conspiracy.

3  Q.  Now, David Bain was an attorney.  He was the human

4  resources director, and he worked in the office next to

5  yours for how long?

6  A.  Pollard brought him in I would say 2001, somewhere

7  around there to the best of my knowledge.

8  Q.  So you had a working relationship with him for about

9  four years?

10 A.  To be honest with you, he fouled up so much that even

11 Solomon used to say he was a foul ball.

12 Q.  Do you agree, sir, that you never told David Bain about

13 this alleged intimidation or coercion that had just taken

14 place before you signed the resignation letter?

15 A.  He walked in, gave me the document to sign, told me to

16 sign it, I signed it, he signed it, he marched out.  That's

17 the totality of my experience with them and the signature.

18 Q.  Now, I'm going to put the resignation letter up.  I'll

19 put it in front of you as well, sir.  What was your

20 understanding of, and this is the time when you're signing

21 the document, what was your understanding of what you were

22 giving up with that first sentence of the letter?

23 A.  As I've indicated before, by that point in time they had

24 put me into such a frenzy I didn't even read it.  They threw

25 it in front of me and said sign.  Check that signature.

1    Does that look like the signature of somebody writing out

2    correctly?  Please.

3    Q.  Sir, you signed the answers to interrogatories in this

4    case, didn't you?

5    A.  Yes.

6    Q.  Is that your signature?

7    A.  Yes.

8    Q.  Do you recognize that?  You signed this on June 6th,

9    correct?

10   A.  Yes.

11   Q.  Does it appear similar to your signature on the

12   resignation letter?

13   A.  No.

14   Q.  Were you under duress when you signed the answers to

15   interrogatories?

16   A.  Well, the signature is not the same, but the question,

17   was I under duress?  No.

18        MR. NOTIS:  Your Honor, could I publish it to the

19   jury?  It's not an exhibit.

20        THE COURT:  Then you can't publish it unless it's

21   in evidence.  If you wish it to be put in evidence.

22        MR. CARMINE DiADAMO:  Not at this point.

23        MR. NOTIS:  Not at this time, your Honor.

24        THE COURT:  But you don't publish something that's

25   not in evidence.

1   Q.  Now, you knew that once you signed this resignation

2   letter, there would be no sexual harassment investigation,

3   correct?

4   A.  I never even thought about that.  The whole thing was

5   they were threatening to cuff me and drag me out of the

6   building on these alleged false criminal charges.

7   Q.  And you knew that you could request paid administrative

8   leave from the city council and take a leave of absence

9   while the investigation was pending?  That was also an

10  alternative for you.

11  A.  As I previously testified, Solomon went up twice, and he

12  talked about leave, and he came back twice and said no, she

13  won't allow it.

14  Q.  You knew even after the audiotape went off that you

15  could refuse to talk to Solomon and Alaimo, correct?

16  A.  As I've testified, the reason I wanted that private was

17  so I could talk to him about the whole situation.  I didn't

18  want to be on tape.  Do you think I want to be sitting here

19  with eight people and saying I'm a knucklehead?  I wanted to

20  talk to them privately.  They were pretending that they were

21  trying to be decent guys.

22  Q.  But you knew that you could refuse to talk to them,

23  right?

24  A.  Yes, but I also knew that on these allegations I had no

25  choice but to give them some information.

1    Q.  And you knew that you could stop the interview

2    immediately and ask for an attorney, but you didn't do

3    that?

4    A.  I've told you that repeatedly, the only people I wanted

5    to talk to was my wife and Fulya.

6    Q.  Now, you told us at your deposition that if Solomon and

7    Alaimo had probable cause to believe that the crime of

8    indecent assault and battery had occurred, they had a right

9    to question you, correct?

10   A.  To my understanding, they would have that right.  They

11   would not have a right to force resignation, but the

12   question on criminal component, yes.

13   Q.  And you also agreed at your deposition that they had a

14   right to detain you, correct?

15   A.  That's my understanding.

16   Q.  And you also told us at your deposition that if they had

17   probable cause to think that a crime of indecent assault and

18   battery had occurred, they could arrest you?

19   A.  I'd have to see, you know, a lot of this point asking me

20   to remember a several hundred word document.

21   Q.  Page 204, day 1, November 14th, 2006.  I'll read the

22   question and you read the answer.  This is on page 203, line

23   24.  "If Chief Solomon and Deputy Chief Alaimo had probable

24   cause to believe that an indecent assault and battery had

25   occurred on the morning of the 16th in Fulya Metin's office

1    and your office, do you agree that they had a right to ask

2    you questions," and your answer was?

3    A.   "If there was a criminal allegation being lodged, yes."

4    Q.   Do you agree that they had a right to detain you?

5    A.   If it was purely related to criminal, yes.

6    Q.   The next question, "If Chief Solomon and Deputy Chief

7    Alaimo had probable cause to believe that an indecent

8    assault and battery had occurred on the morning of

9    February 16th, do you agree that they had a right to arrest

10   you," and your answer?

11   A.   "Yes."

12   Q.   Now, your understanding is that there had been a

13   criminal allegation lodged, correct?

14   A.   Until I saw the depositions of Wnek and Fulya Metin,

15   yes, I thought they had been.  They had been telling me that

16   Metin had sought it.

17   Q.   Now, you knew that Fulya Metin didn't make up her mind

18   to press charges until about two weeks after the incident,

19   correct?

20          MR. WILLIAM DiADAMO:  Objection, your Honor.

21          THE COURT:  If he knows.

22   A.   I know that she talked to Michael Wnek, and she and Wnek

23   both in their depositions said she liked me, she considered

24   me a friend, she wanted to continue working with me, and she

25   went to Wnek purely to have Wnek come to me and say Maurice,

1    back off.  Never, never did she mention, and Wnek says right

2    up front, he'll be here to testify, never did she talk about

3    criminal.

4    Q.  So, Fulya Metin -- and we'll hear her testimony about

5    what she was thinking about that morning.  Do you have any

6    personal knowledge about she made a decision to press

7    charges criminally against you that day, the 16th?

8    A.  The only knowledge is what she said in the deposition,

9    the reason she talked to Wnek.

10   Q.  You still haven't answered the question.  Yes or no?

11   A.  I have enough problem trying to think my own thoughts,

12   let alone another human being's.

13   Q.  Isn't it true you were very concerned about that issue,

14   and you followed up with a number of people to try to find

15   that out?

16   A.  I'm sorry, you're going to have --

17          THE COURT:  Find what out?

18          MR. NOTIS:  Whether or not Metin wanted to press

19   charges against him criminally.

20   A.  I had talked to a couple of friends who called me and

21   who were friends with Fulya.  They were shocked about this

22   point going around, and my friend wanted to talk to her and

23   find out what was going on, and, quite frankly, try to mend

24   fences.

25   Q.  Who was the friend, sir?

1    A.   Linda Gagnon.

2    Q.   Did you also call Peter McQuillan and ask him to call

3    the D.A.'s office and find out the status of the

4    investigation was?

5    A.   I believe so.

6    Q.   And isn't it true that you did that because you were

7    concerned about your pension benefits getting yanked away

8    from you?

9    A.   No.  To begin with, that is much further down the line

10   in time.  I think you got your timeline wrong.

11   Q.   What's wrong about the timeline, sir?

12   A.   That would not occur for another few weeks, to my

13   memory.

14   Q.   What?

15   A.   That Peter, Peter and I were exchanging conversations.

16   He obviously wanted me to help him being interim, and I

17   believe during one point in time he talked about he had a

18   friend that knew people in the D.A.'s office, and he said go

19   talk to him and see if you can find out what's going on to

20   my memory, and then I went over.  I was in the same office

21   Peter had been in, and I went upstairs and talked to this

22   person.

23   Q.   Isn't it true that you called Peter every day up until

24   the time you learned that the charges were not going to be

25   pressed against you?

118

1    A.  I can't say every day, but he's been a friend of mine

2    for decades, and, yeah, I know that we talked quite

3    frequently back and forth.

4    Q.  And isn't it true that he's the one you learned from

5    that Fulya Metin had decided not to press charges against

6    you?

7    A.  What he told me, you wanted me to tell you?

8    Q.  Isn't it true that you learned that she was not going to

9    press charges from Peter McQuillan?

10   A.  Peter conveyed to me that the district attorney was

11   pissed off that Solomon was playing this point.  That's what

12   he told me, and then I found out that a lot of the people in

13   the district attorney's office weren't too thrilled with

14   Solomon.

15          MR. NOTIS:  Your Honor, I move to strike that

16   answer.

17          THE COURT:  Overruled.

18   Q.  Sir, you told -- isn't it true that you found out from

19   Mr. McQuillan, yes or no, that Fulya Metin did not want to

20   press criminal charges against you?

21   A.  To my memory, the first time I found out about it was

22   reading in the paper.  I do know that Peter and I had talked

23   about it a lot, but to the best of my memory the first time

24   was in the paper.

25   Q.  And isn't it one of your allegations in this case that

1    Chief Solomon misrepresented to you that Ms. Metin had

2    decided to press criminal charges?

3    A.  Her statement, as he related it to me, she wants you to

4    resign, she wants you out right now, or she'll criminally

5    prosecute you, and then he went on to say I know, I've been

6    talking to her, she'll be okay if you resign.

7    Q.  But you know, don't you, she had actually had not made

8    that decision?

9    A.  I know that now that was never her intent.

10   Q.  Now, you told us at your deposition that the incident in

11   the conference room lasted an hour and a half to an hour and

12   45 minutes; is that your testimony today?

13   A.  To my understanding, being brought down to the

14   conference room started around 10:30, and then when I got

15   home about 10 minutes later, I called Solomon, and I believe

16   that phone call is like 12:42, so I would say approximately

17   that time line, hour and a half, I guess.

18   Q.  And you told us that it began at 10:30?

19   A.  To the best of my memory, yes, around then.

20   Q.  And how long does it take you, sir, to get from Methuen

21   to your house in Windham?

22   A.  Approximately 30 to 35 minutes depending upon traffic.

23   Sometimes much longer.

24          THE COURT:  Anything further?

25          MR. NOTIS:  Yes, your Honor.

1    Q.  Now, when you went back up to the conference room with

2    Chief Solomon and Deputy Chief Alaimo and Captain McCarthy,

3    you found something in your desk?

4    A.  You mean, not the conference room, you mean back to my

5    office?

6    Q.  Back to your office?

7    A.  Yes.

8    Q.  What was that you found in your desk, sir?

9    A.  Bill Depardo had brought in a joking picture and told me

10   at that point in time he had handed it out to a bunch of

11   people.  They change the name, and it would be mine is

12   Maurice, and there were other guys that they put his name

13   in, and I had thrown it in the desk.

14   Q.  And you kept it there for how long?

15   A.  And he gave it to me.  I'd be taking a pure guess, I'd

16   say two to three weeks before the incident.

17   Q.  Isn't it true that when you went into that drawer, you

18   tried to crumble out that picture and put it in the

19   garbage?

20   A.  No.  I took it out when I saw it, and before I had a

21   chance to do anything, Solomon grabbed my hand, pulled it

22   out of my hand.  I didn't have a chance to do anything.

23   Q.  Could you just describe to the jury what was in that

24   photograph, please.

25   A.  I believe it was the picture of a female exposed on the

1    top.  I believe he was doing these pictures.  I think the

2    one he gave me, he said, "I love Maurice," something like

3    that, and he told me he was giving it to some other people

4    except changing the name.

5    Q.  Now, you gave some testimony earlier today that

6    Councilor Manzi at the time was going to help you get back

7    your job?

8    A.  Yes.

9    Q.  You know now that he in fact nominated Peter McQuillan

10   to be the interim solicitor very quickly?

11   A.  Yes, he went quickly so Pollard wouldn't take it over.

12   Q.  And you know, sir, that Pollard had no right to appoint

13   the city solicitor, correct?

14   A.  That's correct.

15   Q.  And you know that Mayor Manzi was on the subcommittee,

16   in fact, he was the chair to appoint the permanent

17   solicitor, right?

18   A.  I don't know who was on what committee.

19   Q.  And you know that he was interviewing candidates for the

20   permanent city solicitor's position throughout the spring of

21   2005 leading up to June, right?

22   A.  I don't know who was on that committee or what their

23   rules were or how they handled it.

24   Q.  You know that interviews were taking place though,

25   correct?

1    A.  Yes.

2    Q.  Okay.  For the permanent spot, not the interim spot?

3    A.  To my knowledge.

4    Q.  So those wouldn't be the actions of someone that

5    intended to put you back in the solicitor's office, would

6    they?

7    A.  At that point in time was when, as I told you,

8    Mr. DiAdamo, Attorney DiAdamo, had without violating the

9    attorney-client privilege said, listen you freak'n dummy, I

10   told you all along, I don't want to use the next word, but

11   at that point in time it became obvious he was going forward

12   with Peter, notwithstanding promises.

13   Q.  Manzi was part of the conspiracy, too?

14   A.  No.

15   Q.  You go to lunch with him how often, sir?

16   A.  There's a group of us that will go out to breakfast

17   periodically.

18   Q.  Who's in that group?

19   A.  There's the former mayor, Dennis DiZoglio, former fire

20   chief, Ken LaRazzo, there's Joe Salvo, the HR director,

21   excuse me, business administrator for the school system,

22   there's Steve Defayo, who's the chairman of the

23   community development board, there's Jim O'Neill who had

24   been the community director in Methuen back during the

25   Dennis DeZoglio administration.

1    Q.  Sir, you don't know of anyone including yourself who

2    petitioned the board to reinstate you?

3    A.  In direct writing, no, I do not.

4    Q.  And you know that Manzi voted for Mr. McQuillan to be

5    the full-time counselor and that took place mid-June, 2005,

6    solicitor, rather?

7    A.  I don't know, but I would assume from now.

8    Q.  During this point, February, March, 2005, didn't you

9    also seek to recover your sick time, vacation time and

10   longevity pay from the city?

11   A.  No.  As a matter of fact, I'm very clear on that one.

12   The check was sent to me, and, quite frankly, Pollard had

13   sent it to run out the money in the account claiming they

14   couldn't bring in an interim.  Manzi, as I was driving over

15   to meet with my attorneys, Manzi called me screaming at me,

16   why the hell did you ask for that money?  And I said what

17   are you talking about?  I didn't.  And you will see there's

18   no reference ever that I asked for that money, and, in fact,

19   if you see it being cashed through, it wouldn't be for

20   several months thereafter.

21   Q.  Isn't it true, sir, is Tom Kelly a friend of yours?

22   A.  Yes.

23   Q.  How long have you known him?

24   A.  Let's put it this way, I hadn't seen him for a long

25   time.  I had a lot of respect for him.  I knew him from

1    work, and I thought he was a nice guy.

2    Q.  What is his position with the city?

3    A.  City auditor.

4    Q.  Describe for the jury what the auditor does.

5    A.  He'd be in charge of controlling the money expenditure

6    for the city.

7    Q.  So he would be the one to cut you those checks for your

8    longevity pay, vacation time or sick time, right?

9    A.  Yes.

10   Q.  And how much were those checks, sir?

11   A.  I had 240 sick days and with the buy-out, you'd have the

12   actual numbers, I don't have them in front of me, about

13   32.

14   Q.  Does the number $45,000 refresh your memory?

15   A.  I'd have to see it, to be honest with you.  I don't know

16   it was that high, but you might be right.

17   Q.  Your testimony is that Mayor Pollard, in an attempt to

18   control who the city solicitor was going to be, drained the

19   vacation and longevity pay to get it out of the budget; is

20   that your testimony?

21   A.  Yes, that was actually in the paper.

22   Q.  And that's what she did, she directed Mr. Kelly to do

23   that; is that your testimony?

24   A.  Do you have the letter that was sent to me with the

25   check?

1    Q.  Sir, I don't.  But do you have any personal knowledge

2    that Mayor Pollard directed Tom Kelly to drain that fund and

3    pay you your $45,000?

4    A.  I don't know it's that amount.  Take a look at Kelly's

5    letter.  He directly references Pollard.

6    Q.  So your opinion then is that Pollard instructed Kelly,

7    gave him a directive to send that money to you, right?

8    A.  Yes.

9    Q.  And she did that because she wanted to control the

10   solicitor's office; is that your testimony?

11   A.  Yes.

12   Q.  Okay.  Now, very shortly after the resignation, you

13   applied for a job with the Town of Brookline, fair?

14   A.  I'd have to look at the --

15   Q.  Does that sound correct to you?

16   A.  I believe that is correct.

17           THE COURT:  How much longer on cross?

18           MR. NOTIS:  Another 15, 20 minutes.

19           THE COURT:  All right.  We'll suspend at this

20   time.  As I told you yesterday, don't talk about this case

21   with anyone, don't let anyone talk to you about it and

22   refrain from any definitive judgment until all the evidence

23   is in.  See you tomorrow at 9:00.

24           THE CLERK:  All rise for the jury.

25           THE COURT:  I'll see counsel to see how the case

1    is moving.

2              (Discussion held off the record.)

3              (Whereupon, the hearing was suspended at

4    1:05 p.m.)

5                    C E R T I F I C A T E

6    UNITED STATES DISTRICT COURT )

7    DISTRICT OF MASSACHUSETTS     )

8    CITY OF BOSTON                )

9              I, Valerie A. O'Hara, Registered Professional

10   Reporter, do hereby certify that the foregoing excerpt of

11   transcript was recorded by me stenographically at the time

12   and place aforesaid in No. 05-11579-EFH, Maurice Lariviere

13   vs. Town of Methuen and thereafter by me reduced to

14   typewriting and is a true and accurate record of the

15   proceedings.

16                        /S/ VALERIE A. O'HARA
                          _____
17                        VALERIE A. O'HARA

18                        REGISTERED PROFESSIONAL REPORTER

19

20

21

22

23

24

25