IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

MAURICE LARIVIERE,                ) C.A. No. 05-11579-EFH

            PLAINTIFF            ) Courtroom No. 2

VS.                             )

JOSEPH SOLOMON, ET AL,          ) 1 Courthouse Way

            DEFENDANTS          ) Boston, MA  02210

JURY TRIAL DAY 3

TESTIMONY OF MAURICE LARIVIERE ONLY

JANUARY 17, 2008

BEFORE THE HONORABLE EDWARD F. HARRINGTON

UNITED STATES DISTRICT COURT JUDGE

VALERIE A. O'HARA

OFFICIAL COURT REPORTER

1    A P P E A R A N C E S:

2        DiAdamo Law Office, LLP, by CARMINE W. DiADAMO, ESQ.
and WILLIAM H. DiADAMO, ESQ.,  40 Appleton Way, Lawrence,
3    Massachusetts  01840; for the Plaintiff;

4        Reardon, Joyce & Akerson, P.C., by ANDREW J.
GAMBACCINI, ESQ., 397 Grove Street, Worcester, Massachusetts
5    01605; for the Defendants.

6        Morrison, Mahoney & Miller, by GARETH W. NOTIS, ESQ.,
250 Summer Street, Boston, Massachusetts  02210-1181; for
7    the Defendants.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>TESTIMONY OF MAURICE LARIVIERE ONLY</u>

1

2          THE CLERK:  All rise for the jury.  Court is in

3     session.  You can be seated.

4          THE COURT:  It's come to my attention that some

5     papers, or at least one paper in Essex County, has reported

6     this matter.  I instruct the jury you are not to read

7     anything in the newspaper, or if you by inadvertence have

8     already done so, please disregard it because your

9     determination will be made on the basis of the evidence

10    admitted in this court, and tomorrow we're going to go from

11    9 to 11 so you'll have a short day.  Put the witness on the

12    stand.

13         MR. NOTIS:  Your Honor, we've agreed to put two

14    additional exhibits into evidence.  I'd like to read them

15    into the record.  Defendant's Exhibit 15 is an enhanced

16    audiotape version of the interview of Maurice Lariviere on

17    February 16th, 2005, and Defendant's Exhibit 16 is a letter

18    from Mr. Lariviere to Todd Wolf dated April 17th, 2007.

19         ( Audiotape version of the interview of Maurice

20    Lariviere on February 16th, 2005 was marked Exhibit No. 15

21    and admitted into evidence.)

22         ( Letter from Mr. Lariviere to Todd Wolf dated

23    April 17th, 2007 was marked Exhibit No. 16 and admitted into

24    evidence.)

25         I'd also like to address the jury briefly, with

1    the agreement of counsel, about the audiotape, your Honor.

2            THE COURT:  All right.

3            MR. NOTIS:  This morning we're going to hear a CD

4    version of the interview that took place on the morning of

5    the 16th.  This was a CD where somebody digitally took what

6    was on two microdiscs and put it onto the CD to enhance the

7    volume so it could be heard clearly.  The two microdiscs

8    that were used during the interview of Mr. Lariviere were

9    used on a Dictaphone.  Over the course of time those

10   microdiscs degraded, so it was necessary for the jurors to

11   hear this so we put it on a CD, so this is what we'll be

12   hearing this morning, not the original microdiscs.

13           THE COURT:  How long is this transcription?

14           MR. NOTIS:  Twelve minutes, your Honor.

15               MAURICE JOSEPH LARIVIERE, JR., RESUMED

16               CONTINUED CROSS EXAMINATION

17   BY MR. NOTIS:

18   Q.  Good morning, Mr. Lariviere.

19   A.  Good morning.

20   Q.  Yesterday when we finished, we were talking about your

21   letter to the Town of Brookline.  Do you recall that

22   testimony?

23   A.  Yes, I do.

24   Q.  And you have that in front of you.  Which exhibit is

25   that, sir?

1    A.  It's marked Defendant's Exhibit 7.

2    Q.  Is that the letter that you received from the Town of

3    Brookline in response to your inquiry about a position with

4    them?

5    A.  Yes.

6    Q.  Now, I also have Defendant's Exhibit 16.  Yesterday you

7    told us that you hastily signed the resignation letter and

8    your signature was scribbly, correct?

9    A.  Yes.

10   Q.  That's the letter you signed in April of 2007?

11   A.  Yes.

12   Q.  Does that signature look similar to the one in the

13   resignation letter to you, sir?

14   A.  May I see that again, please?

15   Q.  Yes, you may.

16   A.  No.

17          MR. NOTIS:  Your Honor, could I publish this to

18   the jury, please?

19          THE COURT:  Surely.

20   Q.  Mr. Lariviere, yesterday you gave some opinions about

21   indecent assault and battery.  You know that's a felony,

22   correct?

23   A.  No.  I'm not sure what it is.

24   Q.  You know that if you were convicted of that felony, that

25   you would be registered as a sex offender in Massachusetts;

1    you know that, right?

2            MR. CARMINE DiADAMO:  Objection.

3            THE COURT:  Overruled.

4    A.  No, I do not.

5    Q.  You were told that on the audiotape by Chief Solomon,

6    weren't you?

7    A.  I might have been.  I don't recall.

8    Q.  And you knew that the possible penalty for conviction

9    was up to five years in prison?

10   A.  No.

11   Q.  And, sir, do you know what the elements of indecent

12   assault and battery are?

13   A.  On the criminal side, no.

14   Q.  If I told you that it was an intentional and unjustified

15   use of force, that is a touching upon the person of another,

16   would that refresh your memory?

17   A.  I don't know that I've ever seen that statute, to be

18   honest with you.

19   Q.  Does that sound correct to you?

20   A.  Having never seen the statute, I don't know.

21   Q.  Do you know what the aggravating factors of indecent

22   assault and battery are?

23   A.  Mr. Notis, again, I'm not a criminal attorney.  I know

24   civil side and what sexual harassment would constitute.  On

25   the criminal side, that's a very specialized field, and I

1    don't know it.

2    Q.  Well, if I told you that an indecent assault and battery

3    becomes indecent if it involves the touching of the anatomy

4    commonly through breasts, buttock; would that refresh your

5    memory?

6            MR. WILLIAM DiADAMO:  Objection, your Honor.

7            THE COURT:  Overruled.

8    A.  Once again, I'm not familiar with the statute.  You're

9    asking me questions on the statute I don't know.

10   Q.  Now, you asked Chief Solomon if you could talk to Fulya

11   that morning, correct?

12   A.  Yes, I did.

13   Q.  And you did that on the audiotaped interview, right?

14   A.  I know I did it off the audio.  I'm not sure if I did it

15   on the audio.

16   Q.  And isn't it the true that the reason you wanted to do

17   that, to find out if she was going to press charges against

18   you?

19   A.  At that point in time when I was really asking, they

20   were telling me she wanted my resignation, they were telling

21   me she was making accusations against me, and I was

22   confused.  The person I really had a good relationship with

23   and a friend with was making these charges, or at least I

24   believed at that time based upon what they told me, so I

25   didn't know what to do.  I wanted to talk to a friend.

1    Q.  If you learned before you signed that resignation letter

2    that Fulya was not going to press charges, you would not

3    have signed that letter?  Yes or no.

4    A.  If I had learned that --

5    Q.  Yes or no, Mr. Lariviere.

6            THE COURT:  Wait a minute.  Wait a minute.  Be

7    courteous to witnesses.

8    Q.  Do you understand the question?

9    A.  If I had learned --

10           THE COURT:  Just ask the question, you answer it.

11   No theatrics in this court.

12           MR. CARMINE DiADAMO:  Thank you, your Honor.

13   A.  If I had learned and I was aware that they were lying to

14   me and that she was demanding my resignation, yes, I would

15   have said forget about it.

16   Q.  You knew that Solomon and Alaimo had no authority to

17   prosecute you because you knew that the district attorney

18   had that discretion and authority; right?

19   A.  I knew that the police department is the arresting

20   authority that takes you into custody, provides the evidence

21   to the D.A.

22   Q.  So you know Solomon and Alaimo don't prosecute you, the

23   Essex County District Attorney's Office does, and you knew

24   that back then, right?

25   A.  Was I aware of the fact that the D.A. prosecutes?  Yeah,

1    I think everybody who reads the paper is aware of that.

2    Q.    The question is you knew they couldn't, right?

3    A.    I knew they could make an arrest and put charges to the

4    D.A.'s office against me, yes.

5    Q.    Now, yesterday you said that your actions on the tape

6    were those of a teenage boy; do you recall that testimony?

7    A.    Yes.

8    Q.    And do you agree that the actions on the tape weren't

9    appropriate for a teenage boy?

10   A.    Do I agree that I should have not allowed that to be

11   occurring in the office, yeah.  I think my attorney right

12   from the beginning has described what I was.  I'm not going

13   to deny it.

14   Q.    I'm sorry, did you complete your answer?

15   A.    I'm not going to deny that I let the relationship get

16   too close.  I'm not going to deny it.  There's no sense.

17   Q.    Now, at some point Captain McCarthy came down to the

18   second floor conference room, correct?  How long was he

19   there?

20   A.    If I took a guess, it would be somewhere between five

21   and ten minutes when Solomon and Alaimo left.

22   Q.    And you don't have a firm memory, but that's your best

23   estimate?

24   A.    Based upon the timeline of being there, having briefly

25   talked to him and having begged his permission to go to the

1    bathroom, I would say, yeah, five to ten minutes.

2    Q.  And how long were you at the bathroom, sir?

3    A.  Long enough to conduct my business.

4    Q.  And how long was the audiotape version of that morning

5    when you were in the room?

6    A.  I believe it's 12 minutes.

7           MR. NOTIS:  Your Honor, I'd like to play the

8    audiotape.  Thank you.

9           (Audiotape was played)

10          MR. NOTIS:  Your Honor, could I start it over?  It

11   seemed to be very loud from the beginning.

12          THE COURT:  Yes.  You're going start from the

13   beginning?

14          MR. NOTIS:  Yes, I am, your Honor.

15          THE COURT:  All right.

16          (Audiotape was played)

17   Q.  At the very end, Mr. Lariviere, did you hear yourself

18   say can we go off the record?

19   A.  Yes, that's what I've already testified to.

20   Q.  You were also asked if you had a dating relationship.

21   Do you agree that you did say you had a dating relationship

22   with Ms. Metin?

23   A.  Gareth, at that point in time they were asking those

24   questions, and, as I said before, I wanted to go off the

25   tape because the last thing I wanted in the world was to be

1    on the tape and having to reveal the relationship.

2    Q.  And you never asked to go back on the tape, correct?

3    A.  The tape as soon as Solomon made his announcement, he

4    put the tapes off, and to my knowledge he took them away.

5    Q.  You never asked for those, right?

6    A.  No, but, as they said, they're required under law to

7    make those tapes.

8    Q.  Sir, you were also told that it was the victim's choice

9    to go forward with this prosecution, with this

10   investigation, and you heard that on the tape, did you

11   not?

12   A.  Yes.

13   Q.  And you were in fact asked a question in response to

14   that about whether she wanted to go forward with the

15   investigation and the prosecution, didn't you?

16   A.  Could you repeat that, I'm sorry?

17   Q.  You also asked a question back to Chief Solomon about

18   whether Fulya wanted to go forward with the investigation.

19   Did you hear that on the tape?

20   A.  I don't recall hearing that clearly, but if it's on

21   there, it's on there.

22   Q.  And then you heard Chief Solomon say, I don't know, I'll

23   have to go upstairs and talk to her, right?

24   A.  I believe I heard his voice is much clearer than mine.

25   I believe I heard that.

1    Q.  Now, yesterday there was some testimony about what you

2    would do when you went to interviews and what you would

3    disclose to employers.  Do you recall that testimony?

4    A.  You mean investigations?

5    Q.  Well, you told the jury, correct me if I'm wrong --

6    A.  Sure.

7    Q.  -- that when you went on interviews and you filled out

8    applications, you would disclose that you were a party in

9    litigation; do you recall that?

10   A.  When I went to the A.G.'s office, their initial

11   interview form mandated those responses.

12   Q.  Isn't it true that one of your concerns before you

13   signed the resignation letter was that when you went for

14   future employment, you would have to say terminated vs.

15   resigned?

16   A.  No.

17   Q.  When you go for an interview or you fill out an

18   application and you summarize your employment history, one

19   of the things you fill out is the reason why you left; do

20   you agree with that?

21   A.  I'm sorry, could you repeat that, please?

22   Q.  Do you agree when you fill out an employment application

23   or apply for a job, you summarize your employment history?

24   A.  Yes.

25   Q.  And when you summarize your employment history,

1    oftentimes you're asked what was the reason for leaving?

2    A.   Sometimes.  I can't say all the time, but it would be to

3    my memory a fairly standard question.

4    Q.   Now, do you agree that you had a business card with the

5    law office of Maurice Lariviere on it prepared after your

6    resignation?

7    A.   When I went with Tony Copani, yes.

8    Q.   You also had letters with the law office of Maurice

9    Lariviere on the top of them?

10   A.   Yes.

11   Q.   And you were working at Attorney Copani's office in

12   Methuen after your resignation?

13   A.   I was trying to get some work, but Tony's business has

14   been slow.

15   Q.   Now, isn't it true that you told us at your deposition

16   you would work about five hours a week at Attorney Copani's

17   office, right?

18   A.   I don't recall that at the deposition.  If it's there,

19   it's there.  I do know that I've turned over all my 1040

20   information and my tax returns to you.

21   Q.   Well, sir, if you're only working five hours a week, how

22   are you going to generate income?

23   A.   Most of the time I was sitting there doing job

24   searches.

25   Q.   I see.  But you had that contract for the Andover

1    Housing Authority, right?

2    A.  The latter part of that year, I believe.

3    Q.  You didn't make any seminars to promote yourself and

4    your skills as an attorney?

5    A.  I went, I became listed in the Cambridge Who's Who and I

6    also had done some ads on the local radio.

7    Q.  And one of the positions you applied for was with

8    Best-Buy as the human resources manager.  Do you recall

9    that?

10   A.  I've applied for 550.  I'd have to look.

11   Q.  You went on an interview with the Town of Newton.  Do

12   you recall that?

13   A.  Yes.

14   Q.  And it's true that you lied to them when you went there

15   about your employment history, correct?

16   A.  I lied about the reason, yes.  At that point in time I

17   was desperate to get a job, and they had a part-time

18   position and they asked for the reason for leaving, and I

19   told them part of the truth but not all, no.  I did, I would

20   have to say that I lied by not providing them full

21   information.

22   Q.  You were fully vested in the municipal retirement system

23   at the time this incident occurred in February, 2005?

24   A.  Yes.

25   Q.  So whether you stopped your employment then or not, you

1   still had access to those benefits when you turned 65 or

2   whenever you choose to take those benefits, correct?

3   A.  As I've explained to you, Gareth, if I took that, then

4   my ability to continue accumulating retirement ends, and I

5   had been told I was going to be going back into Methuen, I

6   received that promise a million times, and it just never was

7   owned up to, so I did not want to eliminate my ability to

8   continue accruing the time and the ability to earn.

9   Q.  Sir, you have your cell phone records in front of you?

10  A.  Yes.

11  Q.  Could you look at February 14th of 2005, which is on

12  page 6.  February 14th, excuse me.

13          THE COURT:  I'm not going to shut off

14  cross-examination, but you indicated yesterday that you

15  would have 20 minutes.  We're close to at least 30 minutes.

16          MR. NOTIS:  Thank you, your Honor.

17  A.  Yes, I have the February 14th.

18  Q.  That's your anniversary, correct?

19  A.  Yes.

20  Q.  And you called Ms. Metin on her cell phone that day,

21  right?

22  A.  1-25 p.m., yes.

23  Q.  Do you agree, sir, that if you had never had physical

24  contact with Ms. Metin on the 16th on that videotape, that

25  you wouldn't be in this position today?

1   A.  If I hadn't put myself into the hands of two crooked

2   cops, yeah.

3           MR. NOTIS:  Thank you.  Nothing else.

4           THE COURT:  Any redirect?

5           MR. WILLIAM DiADAMO:  Very briefly, your Honor?

6           THE COURT:  Very briefly.

7                     REDIRECT EXAMINATION

8   BY MR. WILLIAM DiADAMO:

9   Q.  Mr. Lariviere, I just want to clarify a couple things so

10  there's hopefully no confusion.  One is you were asked by

11  Mr. Notis regarding an unopposed motion that you had won,

12  okay.  Can you describe to the jury what that was, the

13  unopposed motion?

14  A.  Yes.  That was in the stated Supreme Court, and the

15  person that brought the action was involved in an automobile

16  accident, had initially sued the Commonwealth, the Town of

17  Pelham, New Hampshire, where the operator was from, and then

18  Methuen, and on that one, I waited till they targeted the

19  Commonwealth more than town and then moved for summary

20  judgment and when I went in there, he didn't show up, so I

21  was granted it.

22  Q.  Is that the motion that you were so happy about that

23  there was the biggest win of your career?

24  A.  No.

25  Q.  This was the other case involving the police; is that

1    right?

2    A.   That was the type of motion I won hundreds of time.  It

3    was irrelevant frankly overall.

4    Q.   You were asked by Mr. Notis about a resignation that had

5    been prepared by you; is that correct?

6    A.   Prepared by me?

7    Q.   Let me be more specific, not a very artful question.

8    You were asked something about the Shaun Cronin resignation;

9    is that correct?

10   A.   Yes.

11   Q.   Do you recall that?  I don't know if you have that

12   document in front of you.

13   A.   I do not.  Yes.

14   Q.   Can you briefly tell the jury the circumstances of the

15   Cronin case?

16   A.   Yes.  Without sounding too legalistic, in this country

17   there's especially for government employee there's what's

18   known as due process, you can't just summarily execute

19   someone, you have to provide them prior notice that there

20   would be a hearing.  You have to provide what the hearing

21   will be about and apprise of their right to counsel or

22   representative.

23          With Mr. Cronin, the chief had decided that he

24   wanted to move towards a resignation or going to the mayor

25   for termination, so he was provided notice of his right to

1  come to the hearing, his right to have counsel and his right

2  to have a union representative.  As a matter of fact, the

3  thing that Mr. Notis, I told Mr. Notis I wanted to read at

4  the very beginning it said, I submit this letter to you

5  after consultation with my union representative and counsel.

6          Very basically he came in with his

7  representatives.  He knew what the charges were before he

8  arrived.  He was told he had the right to leave any time he

9  wanted.  He in fact stood out several times with his

10  representatives to discuss and negotiate this agreement, and

11  at the end he was told if you want to leave, you leave.  We

12  have to have a formal hearing later, but it's your choice,

13  talk to your representatives, make a decision, and at that

14  point in time he agreed to it.

15          This is something quite frankly, as you see on the

16  tape, Solomon talks about relying on my decisions.  I taught

17  him due process of law as far as employment cases very

18  carefully and outlined to him very carefully people's

19  rights, and you can't step on them.  Those fundamental

20  rights to get up and leave, to cancel.

21          THE COURT:  That's enough.

22          MR. NOTIS:  Thank you.

23                  REDIRECT EXAMINATION

24  BY MR. NOTIS:

25  Q.  Mr. Lariviere, just to clarify in case it wasn't clear,

1  Mr. Cronin, what sort of employee was he of Methuen?

2  A.  He was a police officer.

3  Q.  And with respect to some questions Mr. Notis asked you

4  about your meetings with now Mayor Manzi, can you estimate

5  for the Court how many times you met with Mr. Manzi over the

6  last year or so?

7  A.  Bill would be in contact --

8        THE COURT:  The question is how many times.

9  A.  I would say a minimum of two times a week there'd be a

10  phone call or an e-mail exchanged.

11  Q.  What was the purpose of the communication with

12  Mayor Manzi?

13  A.  Most of them related to being re-employed with the city,

14  and there was a lot of discussion about being returned as

15  the attorney for what's known as the Joint Human Resources

16  Department.

17  Q.  What does that mean?

18        THE COURT:  He knows what that means.  Let's move.

19  Q.  Okay.  With respect to some questions that Mr. Notis

20  just asked you about damages, again just to clarify, you

21  have -- can you estimate for the jury approximately how much

22  money you've earned per year since this incident occurred

23  starting this 2005?

24  A.  Approximately $3,000.

25  Q.  Per year?

1    A.   Approximately.

2    Q.   Okay.  Finally, Mr. Lariviere, you've had an opportunity

3    to see a videotape here yesterday, and you were able to

4    observe the conduct between or the contact between you and

5    Ms. Metin; is that correct?

6    A.   Yes.

7    Q.   Okay.  Can you characterize how that contact or conduct

8    was different than any other time that you had any contact

9    or conduct with Ms. Metin?

10   A.   When we were celebrating something good, pretty much

11   similar.  What I did see is I went over and went into a

12   crouching position with her and quite often she'd be telling

13   me about how she had problems, and I'd be there telling her

14   I wanted to help her and do whatever is necessary, then I

15   might give her, touch her on the shoulder and say, I'm there

16   for you, I'm there for you.

17           MR. WILLIAM DiADAMO:  That's all I have, thank

18   you.

19           MR. NOTIS:  One question, your Honor.

20                   RECROSS-EXAMINATION

21   BY MR. NOTIS:

22   Q.   You have a cottage on Winnepauskee, correct?

23   A.   It's in an association.

24   Q.   And you haven't sold that?  You had that before the

25   resignation, and you haven't sold it, have you, sir?

1    A.    I wish you hadn't asked about that.  My mother and

2    father-in-law died and the money they gave to my wife,

3    between the mortgage and that was to get that, and yes, I

4    might have to sell it.

5    Q.    Second home, correct?

6    A.    It's not even mine.  It's my wife's.

7    Q.    Second home, correct, Mr. Lariviere?

8    A.    Yes.

9            MR. NOTIS:  Thank you, nothing else.

10           THE COURT:  You may step down.  Call your next

11   witness.

12                      - - - -

13           (Whereupon, the hearing was suspended at

14   1:00 p.m.)

C E R T I F I C A T E

UNITED STATES DISTRICT COURT )

DISTRICT OF MASSACHUSETTS      )

CITY OF BOSTON                 )

           I, Valerie A. O'Hara, Registered Professional

Reporter, do hereby certify that the foregoing excerpt of

transcript was recorded by me stenographically at the time

and place aforesaid in No. 05-11579-EFH, Maurice Lariviere

vs. Town of Methuen and thereafter by me reduced to

typewriting and is a true and accurate record of the

proceedings.

                         /S/ VALERIE A. O'HARA
                         _____
                         VALERIE A. O'HARA

                         REGISTERED PROFESSIONAL REPORTER